IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MATTHEW RILEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 1:05cv994-MHT |
| | ) | |
| UNITED RENTALS (NORTH | ) | |
| AMERCIA), INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT UNITED RENTALS' MEMORANDUM BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant United Rentals (North America), Inc. (hereinafter referred to as "United Rentals") and in support of its Motion for Summary Judgment respectfully submits this Memorandum Brief.

**INTRODUCTION**

This is a products liability case where Plaintiff seeks to hold United Rentals liable for injuries he suffered while using a core drill machine rented by his employer from United Rentals' Dothan, Alabama location.

NARRATIVE STATEMENT OF FACTS

1.      On August 28, 2003, Flavor House Products ("Flavor House") rented a Norton Model DM500 core drill machine from the Defendant, United Rentals Dothan Branch.

2.      The subject core drill machine was purchased new by United Rentals in March of 2003. (Report of Paul Guthorn, p. 2). According to the rental history, the core drill machine was first rented out on April 10, 2003. (Report of Paul Guthorn, p. 2). The rental to Flavor House on August 28 was the 14th rental of the equipment. (Report of Paul Guthorn, p. 2). At the time of the

accident, the equipment was approximately 4-1/2 to 5 months old. (Report of Paul Guthorn, p. 2). Including this occasion, it had been rented out only 14 times. (Report of Paul Guthorn, p. 2).

3.    The machine was delivered with the READY TO RENT tag attached to it and accompanied by the United Rentals General Safety document, Form 1524-000. (Affidavit of Chris Waymire, Exhibit "B").

4.    Flavor House had rented core drill machines from the Dothan facility on five prior occasions between April 17, 2000 and June 30, 2003.  (Report of Paul Guthorn, p. 3)

5.    Plaintiff Riley testified that Mike Walters was the head shift mechanic and Riley's supervisor. (Depo of Matthew Riley, p. 23, l. 15-17).  Since Mr. Riley had never used a core drill before, he took care to make sure he knew how to use it by observing Walters, familiarizing himself with the machine, looking at all the different parts and looking at the various information on the drill. (Depo of Matthew Riley, p. 36, l. 21-p. 37, l. 11). Mr. Riley believes he read the READY TO RENT tag that was attached to the machine. (Depo of Matthew Riley, p. 87, ll. 4-20; p. 90, ll. 1-23). Mr. Riley was not sure if he read the warning labels on the machine. (Depo of Matthew Riley, p. 40, l. 8-p. 41, l. 1).  Mr. Riley did not read the operator's manual and did not ask anyone to see the operator's manual before using the machine. (Depo of Matthew Riley, p. 90, l. 18-p. 91, l. 15).  Obviously, Mr. Riley felt that he had sufficient training from Walters to operate the machine.  (Depo of Matthew Riley, p. 40, l. 8-p. 41, l. 1).

6.    Mr. Riley checked the leveling screws, apparently believing they were anchor bolts, before leaving the maintenance shop to make sure they were screwed up enough to not hold the base off the floor. (Depo of Matthew Riley, p. 70, l. 19-p. 73, l. 21).

7.    Regarding the machine description, Mr. Riley said it was in used condition but everything seemed to work properly on it. (Depo of Matthew Riley, p. 49, ll. 9-19).  It appeared

to be maintained. (Depo of Matthew Riley, p. 52, ll. 1-5). Mr. Riley observed that the vacuum pump was operating, the motor came on, it didn't make any funny noises, and the lever seemed to go up and down properly. (Depo of Matthew Riley, p. 52, ll.1-10). Mr. Riley checked the gasket and it seemed to be in good shape. (Depo of Matthew Riley, p. 50, ll. 13-15).

8.     Mike Walters drilled the first hole. (Depo of Matthew Riley, p. 70, ll. 10-13). Mr. Riley stated that he helped set up the machine for the first hole. (Depo of Matthew Riley, p. 70, ll. 10-13). They did not use the leveling screws on the base. (Depo of Matthew Riley, p. 70, l. 19- p. 73, l. 21). Mr. Riley did not have any discussions with Walters about the proper use of the four leveling screws prior to operation of the core drill. (Depo of Michael Walters, p. 76, ll. 8-16). Obviously, Mr. Riley felt that he had sufficient training from Walters to operate the machine. (Depo of Michael Walters, p. 40, l. 8-p. 41, l. 1). Mr. Riley understood that the machine could go out of control and cause injury if the vacuum system didn't keep the base secure to the ground. (Depo of Matthew Riley, p. 137, l. 5-p. 138, l. 18).

9.     While Walters was drilling the first hole, the base became dislodged and started spinning until Mr. Riley turned the switch off. (Depo of Mike Walters, p. 110, l. 3-p. 111, l. 2). They then checked the gasket, set the machine back up and Walters finished drilling the hole without incident while standing on the machine base. (Depo of Mike Walters, p. 111, ll. 7-23).

10.     Mr. Riley positioned the core drill machine for the second hole under Walters' instruction. (Depo of Matthew Riley, p. 75, ll. 4-6). Mr. Riley checked the gasket before drilling the second hole and did not see any cracks or tears. (Depo of Matthew Riley, p. 74, l. 2- p. 75, l. 19). Walters left while he was drilling the second hole. (Depo of Matthew Riley, p. 40, ll. 6-9). The vacuum pump was being used at the time of the accident. (Depo of Matthew Riley, pp. 77, ll. 8-20). Mr. Riley knows the leveling screws were not touching the floor and that the machine was

sitting on the gasket while he was drilling the second hole because there was a cushion-like play to it rather than something hard hitting the floor. (Depo of Matthew Riley, p. 73, ll. 4-21).

11.     While drilling the second hole, Mr. Riley heard the drill motor running and the vacuum pump running. (Depo of Matthew Riley, pp. 77, ll. 8-20). It did not make any strange noise. (Depo of Matthew Riley, pp. 77, ll. 8-20). Mr. Riley was applying pressure to the handle, lowering the drill and standing with one foot on the base when the bit lodged inside the hole, the base broke loose, and the whole unit began to spin around. (Depo of Matthew Riley, p. 66, l. 4- p.67, l. 23; p. 77, l. 21-p. 78, l. 11).

12.     Mr. Walters was the third shift lead mechanic. (Depo of Make Walters, p. 9, ll. 10-11).   He inspected the core drill before using it to make sure it was in proper operating condition. (Depo of Mike Walters, p. 17, ll. 2-14). As best he could remember, Walters checked the gasket and the warning labels. (Depo of Mike Walters, p. 17, ll. 2-6). Matthew Riley was with him in the maintenance shop when he inspected the core drill. (Depo of Mike Walters, p. 17, ll. 7-14). Mr. Riley stated that he had never used a core drill before. (Depo of Mike Walters, p. 25, ll. 11-13). Walters said that he took care and precautions to make sure that Mr. Riley understood how to properly use the core drill.

13.     Walters stated that he had used core drills probably a dozen times before. (Depo of Mike Walters, p. 20, l. 20- p. 21, l. 1). He felt that he knew how to use core drills sufficiently to instruct Mr. Riley. (Depo of Mike Walters, p. 26, ll. 7-9). He told Riley that he would show him how to operate the core drill and drill the first hole. (Depo of Mike Walters, p. 26, ll. 7-9). He did not consult the operator's manual before operating. (Depo of Mike Walters, p. 26, ll. 13-15).   Walters felt he had the knowledge that he could operate the core drill without the operator's manual because he had run it before. (Depo of Mike Walters, p. 26, l. 13-23-p. 27, l. 8).   Walters

did not look for an operator's manual because he didn't feel they needed it. (Depo of Mike Walters, p. 26, l. 13-p. 27, l. 8). Walters thought he had sufficient knowledge to operate it safely and efficiently based on previous usage. (Depo of Mike Walters, p. 26, l. 13-p. 27, l. 8).

14.     Regarding the core bit he used, Walters stated that he inspected it before using it to make sure that it had all of its teeth. (Depo of Mike Walters, p. 60, l. 4-p. 61, l. 13). He also inspected the bit while in use and saw that all of the teeth were intact. (Depo of Mike Walters, p. 60, ll. 4-17).

15.     Kenneth Tew was the production superintendent and acting safety director for Flavor House Products at the time of the accident. (Depo of Ken Tew, p. 9, l. 20-p. 10, l. 2). He took photographs of the machine before it was disassembled in the maintenance shop. (Depo of Ken Tew, p. 16, l. 8-p. 17, l. 10 and p. 26, l. 1- p. 27, l. 13). It was his understanding that the machine was picked up from the accident location and carried to the maintenance shop after the accident and that it was unaltered from the accident configuration when photographed. (Depo of Ken Tew, p. 31, l. 15- p. 32, l. 16).

16.     Mr. Tew looked at the core bit that was installed on the machine and could tell that it matched the hole that was drilled. (Depo of Ken Tew, p. 36, l. 7-p. 38, l. 12). He was also told, probably by Donald Cody, that the core bit on the machine, as depicted in his photographs, was the one used to drill the holes. (Depo of Ken Tew, p. 38, l. 1- p. 39, l. 4).

17.     Walters set the machine up at the job site and used the leveling screws at the base to level the machine.

18.     Walters drilled the first of two holes which he estimated to be 2 to 2-1/2 inches deep. During the drilling of that hole, the vacuum came loose and the base spun around. (Depo of Mike Walters, p. 69, ll. 10-23). Mr. Riley unplugged the machine from the wall to stop the

machine from spinning. (Depo of Mike Walters, p. 69, ll. 10-23). Walters then cleaned off and inspected the gasket, checked the core bit, set the machine back over the hole, re-leveled with leveling screws and continued to use the machine. (Depo of Mike Walters, p. 70, l. 15-p. 75, l. 15). The vacuum sealed back to the floor and, with Walters standing on the base, finished drilling the hole. (Depo of Mike Walters, p. 112, l. 13-p. 113, l. 23).

19.    Mr. Tew asked what kind of training Mr. Riley had and was informed that Mr. Riley had watched Walters use the machine and then Walters let Mr. Riley use it. (Depo of Ken Tew, p. 41, l. 12- p. 42, l. 8). Mr. Tew didn't think it was proper for Walters to leave Mr. Riley operating the core drill machine. (Depo of Ken Tew, p. 42, l. 15- p. 43, l. 6). He believed that Mr. Riley did not operate the machine properly. (Depo of Ken Tew, p. 44, ll. 15-19).  Mr. Riley did not have the machine properly anchored and Mr. Riley was standing on the base. (Depo of Ken Tew, pp. 44-45).

20.    According to both Mr. Riley and Walters, the vacuum pump was operational during their use of the core drilling machine. (Depo of Mike Walters, p. 116, ll. 13-19, and p. 118, ll. 10-21; depo of Matthew Riley, p. 77, ll. 8-23).

21.    Walters stated that he reviewed the READY-TO-RENT tag before using the equipment. (Depo of Mike Walters, p. 63, ll. 3-21). The READY-TO-RENT tag includes the following information:

> "…I understand the correct operation and function of the controls and confirm that I have received adequate instruction, and acknowledge the safety sheet, to enable myself and/or my crew to use the equipment in a safe and proper manner without risk to injury."

22.     Walters stated that he had seen the United Rentals General Safety Sheet (Form 1524-000) which provides that the operator must carefully read and follow any warnings, safety signs and instructions provided with, or located on, the equipment. (Depo of Michael Walters, p. 82, l. 17-p. 85, l. 1). The Safety Sheet provides:

(1) Only operate if you have been authorized and are trained in equipment's safe operation.

(2) Check with Rental Yard on correct operating procedures. Call if you have any questions!

…

(6) Always maintain total control of the equipment you are operating.

…

(9) DO NOT OPERATE DAMAGED OR FAULTY EQUIPMENT! CALL RENTAL LOCATION IMMEDIATLEY FOR REPLACEMENT. STOP USING UNTIL REPLACEMENT ARRIVES.

…

If the person receiving this handout will not be the user of the equipment, forward these instructions to the operator. If there is any doubt as to the operation or safety of the equipment, DO NOT USE!!!
CALL US IMMEDIATELY!!!

FAILURE TO FOLLOW THESE INSTRUCTIONS COULD RESULT IN INJURY OR DEATH.

23.     Flavor House Products received a Rental Contract from United Rentals. (Affidavit of Chris Waymire, Exhibit B). The terms and conditions page of the contract contained the following language:

**DISCLAIMER OF WARRANTIES**: UNITED MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO THE MERCHANT ABILITY OF THE EQUIPMENT OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. THERE IS NO WARRANTY THAT THE EQUIPMENT IS SUITED FOR CUSTOMERS INTENDED USE, OR THAT IT IS FREE FROM DEFECTS. EXCEPT AS MAYBE SPECIFICALLY SET FORTH IN THIS RENTAL AGREEMENT, UNITED DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, MADE IN CONNECTION WITH THIS RENTAL TRANSACTION.

(Terms and Conditions, ¶ 3, a true and correct copy of which is attached as Exhibit A to Chris Waymire's Affidavit).

24.     The first occasion of an unanticipated response from the equipment was as Mr. Walters was nearing completion of the first hole. At that time, the core bit reportedly jammed causing the machine to spin. (Depo of Mike Walters, p. 109, l. 19-p. 110, l. 23). Mr. Riley was present when this occurred and unplugged the power cord from the wall to stop the machine. (Depo of Mike Walters, p. 111, l. 1-6). Both Mr. Riley and Walters acknowledged that they knew the machine was not supposed to operate like this and that it could create a danger if the base came loose. (Depo of Michael Walters, p. 117, ll. 6-8; depo of Matthew Riley, p. 137, ll. 1-5; p. 138, ll. 1-18). Mr. Riley said he understood before the accident that there was the potential for injury if the base came loose.  Both acknowledged that the equipment, including the vacuum, appeared to be working normally.  (Depo of Michael Walters, p. 118, ll. 10-23; p. 124, ll. 10-23). After the first spinning event, the machine was inspected, tested, and re-used. (Depo of Michael Walter, p. 111, l. 7-p. 113, l. 13).

25.     Riley is not sure if he saw the warning label on the machine that included the following information: (Depo of Riley, p. 126. ll. 4-20, p. 242, l. 21-p. 243, l. 10).

"For your own safety, read and understand the operator's manual"

"Failure to properly secure unit before drilling may cause serious injury."

26.    Although this information was on the machine, Mr. Riley did not read or request an operator's manual. (Depo of Matthew Riley, p. 90, l. 18-p. 91, l. 13).

STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying the portions of 'the pleadings. depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)).

**ARGUMENT**

The Plaintiff filed a six count complaint: (1) Alabama Extended Manufacturer's Liability Doctrine (AMELD); (2) Negligence/Wantonness; (3) Negligent/Wanton Failure to Maintain; (4) Failure to Warn; (5 and 6) Breach of Implied Warranties of Fitness and Merchantability.

As discussed more fully below, Plaintiff has not and cannot state a viable cause of action against United Rentals under Alabama law. Briefly stated, summary judgment is due to be granted on all of the Plaintiff's counts because: (A) Plaintiff has failed to present expert

testimony; (B) Plaintiff cannot prove proximate cause; (C) Plaintiff cannot establish a breach of any duty allegedly owed to him by United Rentals; (D) Plaintiff's warranty claims are barred because United Rentals disclaimed any express or implied warranties; and (E) Plaintiff's wantonness claim is barred for lack of evidence.

1.    AMELD

Proof of an accident and injury alone is insufficient to establish fault under the AEMLD. Under the AEMLD, the plaintiff must affirmatively show a defect in the product. Customarily, this can only be done with expert testimony. Expert testimony is required when the nature of the product is of such a complex and technical nature that a lay jury, acting without such assisting testimony, could not reasonably infer from the facts that the product was defective and that the defect caused the product's failure and resulting injury to the plaintiff. Only if the lay juror could reasonably be expected to understand the product's defectiveness, is expert testimony not essential.

A product "defect" under AEMLD is something that renders a product unreasonably dangerous and does not meet with reasonable expectations of the ultimate consumer. *Flemister v. General Motors Corp.*, 723 So.2d 25, 27 (Ala. 1998). Put differently, even a "flawed" product is not defective when it is in a condition expected by the consumer. *Hawkins v. Montgomery Industries International, Inc.*, 536 So.2d 922, 925-26 (Ala. 1988).

At the time of this accident, the core drill machine was less than 5 months old. It had been rented out only 14 times. There were no reported malfunctions with the machine up to and including this rental. As stated earlier, the first occasion of an unanticipated response from the equipment was as Mr. Walters was nearing the completion of the first hole. At that time, the core bit reportedly jammed causing the machine to spin around. Mr. Riley was present when this

occurred and unplugged the power cord from the wall to stop the machine. Both Riley and Walters acknowledge that they knew the machine was not suppose to operate in this manner and it could create a danger if the base came loose. Mr. Riley said that he knew before the accident that there was potential for injury if the base came loose.

Both acknowledge the equipment, including the vacuum, appeared to be working normally. It appears that the leveling screws were not being used at the time of the accident. Mr. Riley testified in his deposition that he could tell the base was sitting on the gasket because there was a cushion play to the feel of the drill when he was drilling the second hole. As a result, this product is not defective as considered by the Alabama Extended Manufactures Liability Doctrine. If the Plaintiff had been using the drill in an appropriate manner, then the accident would not have occurred. As a result, Defendant United Rentals is entitled to summary judgment as a matter of law.

2.    Negligence/Wantonness

In order to prove his claim of negligence or wantonness, the Plaintiff must establish that the Defendant breached a duty owed to the Plaintiff.

The core drill machine was first rented out on April 10, 2003. The rental to Flavor House Products on August 28th was the fourteenth rental of the equipment. At the time of the accident, the equipment was approximately 4 ½ to 5 months old. The Ready to Rent tag, signed by the customer, indicates that all functions were operating, the unit was clean and safety decals were in place. (Report of Paul Guthorn, ¶ 2).

The core drill machine and a four inch diamond cut core bit were reserved by a Flavor House Products employee. The Rental Out Contract gives a date and time out of August 28, 2003 at 12:25 p.m. The contract has signatures for both the customer and the deliverer. The customer's

signature is from Adam Hall, a Flavor House mechanic. The machine was delivered with a Ready to Rent tag attached to it and accompanied by the United Rentals' General Safety Document, Form 1524-000. There were no reported malfunctions with the machine up to and including this rental.

Considering the above, United Rentals made reasonable inspections to determine the condition of the core drill machine. In addition, United Rentals had no notice, either actual or implied, that there was a problem with the subject machine. Further there is no evidence that United Rentals failed to maintain, repair or service the core drill machine.  As such, United Rentals discharged its duty of care to Plaintiff Matthew Riley and is entitled to summary judgment as a matter of law.

a.     Contributory Negligence

The Alabama Supreme Court has set forth the elements of contributory negligence many times.  The three elements essential to contributory negligence are that the party charged with contributory negligence (1) had knowledge of the condition or failure, (2) appreciated the danger and (3) failed to exercise reasonable care in the premises, but with such knowledge and appreciation, put himself into the way of danger. *Sutton v. Mitchell Co.*, 534 So.2d 289, 290 (Ala. 1988).  A plaintiff may be contributorily negligent as a matter of law, *Sutton, supra* and the Alabama Supreme Court has imposed the defense as a complete bar under widely varying circumstances. For example, in *Waters v. Bucyrus-Erie Co.*, 537 So.2d 24 (Ala. 1989), plaintiff operated a crane near a power line knowing that the power line was energized and was barred from recovery. In *Wallace v. Doege*, 484 So.2d 404, 406 (Ala. 1986), plaintiff's negligence in attempting to clean a saw without turning off the power likewise barred recovery. Moreover, contributory negligence clearly is established as a matter of law when a plaintiff *knew of and*

*consciously appreciated* a danger but nevertheless put himself in harm's way. *Sears v. Waste Processing Equipment, Inc.*, 695 So.2d 51 (Ala. Civ. App. 1997); *Ronden v. Tomlinson*, 538 So.2d 15 (Ala. 1988) (emphasis added).

The testimony of Matthew Riley clearly establishes he was contributorily negligent as a matter of law because he knew of and consciously appreciated the danger associated with this drill. Nevertheless, Mr. Riley put himself in harms way by standing on the machine. Plaintiff testified that Mike Walters was the Head Shift Mechanic and his Supervisor. Mr. Riley had never used a core drill before, he took care to make sure he knew how to use the subject machine by observing Walters. This included familiarizing himself with the machine, looking at all the different parts and looking at the various information on the drill. Mr. Riley believes the Ready to Rent tag was attached to the machine. He is unsure if he read the warning labels on the machine. He did not read the Operators Manual and did not ask anyone to see the Operator's Manual before using the machine.

Mike Walters drilled the first hole. Mr. Riley stated that he helped set up the machine for the first hole. Mr. Riley did not have any discussion with Walters about the proper use of the four leveling screws prior to the operation of the core drill. He felt he had sufficient training from Walters to operate the machine. Mr. Riley understood that the machine could become uncontrollable and cause injury if the vacuum system did not keep the base secured to the ground.

While Walters was drilling the first hole, the base became dislodged and started spinning until Mr. Riley turned the switch off. Then both parties checked the gasket, set the machine back up, and Walters finished drilling the first hole without incident while standing on the machine's base. Mr. Riley positioned the core drill for the second hole under Walter's instruction. He

13

checked the gasket before drilling the second hole and did not see any cracks or tears. Walters left while he was drilling the second hole. The vacuum pump was being used at the time of the accident. Mr. Riley noticed the leveling screws were not touching the floor and that the machine was sitting on the gasket while he was drilling the second hole because there was a cushion-like play to it, rather than something hard hitting the floor.

While drilling the second hole, Mr. Riley heard the drill motor running and the vacuum pump running. It did not make any strange noise. He applied pressure to the handle lowering the drill and was standing with one foot on the base when the bit lodged inside the hole and the base broke loose. The whole unit began to spin around causing injury to Riley.

As the evidence shows, the first occasion of an unanticipated response from the equipment was as Walters was nearing completion of the first hole. At that time, the core bit jammed causing the machine to spin. Mr. Riley was present when this occurred and unplugged the power cord from the wall to stop the machine. Both Mr. Riley and Walters acknowledged that they knew the machine was not suppose to operate like this and it could create a danger if the base became loose. Mr. Riley said he understood before the accident that there was potential for injury if the base came loose. Even after the first spinning event, the machine was tested, inspected and reused. Even after witnessing all of the above, Plaintiff continued to use the machine without the leveling screws and even stood on the base of the machine, which he previously witnessed spin. As a result, Plaintiff knew of and consciously appreciated the danger created when the machine base came dislodged from the floor and was caused to spin. Nevertheless, the Plaintiff put himself in harms way by standing on the base of the machine and continuing to drill the second hole. The actions of the Plaintiff constituted contributory negligence as a matter of law.

b.    Product Misuse

The product misuse defense is different from the defense of contributory negligence, and is an available defense regardless of whether the misuse was by the plaintiff or some other user of the product. Misuse is use of the product in a manner unintended and not reasonably foreseeable by the manufacturer.

As a matter of law, it was not reasonably foreseeable that United Rentals would know that the Plaintiff would either stand on the machine during use, or fail to use the leveling screws. It is undisputed that Mr. Riley did not read the Operator's Manual and did not ask anyone to see an Operator's Manual before using the machine. Mr. Riley felt that he had sufficient training from Walters to operate the machine.

Once again, the first occasion of an unanticipated response from the core drill was as Mr. Walters was nearing completion of the first hole. At that time the core bit reportedly jammed and caused the machine to spin. Mr. Riley unplugged the machine from the wall to stop the machine from spinning. Walters then cleaned off and inspected the gasket, checked the core bit, and set the machine back over the hole, re-leveled with the leveling screws and continued to use the machine to finish the hole.

3.    Negligent/Wanton Failure to Maintain

See discussion under paragraphs A, B, and C below.

4.    Failure to Warn

A manufacturer or seller has no duty to warn an employee of a danger of which *his employer* is already aware or had reason to be aware. *Ex parte Chevron Chemical Co.*, supra. In essence, notice of the hazard to the employer was imputed to its employees and they, therefore, had a "reason to know " of the hazard. Related to the foregoing principle is the concept that a

manufacturer or supplier "is not required to provide a redundant warning." *Ex parte Chevron Chemical Co.*, 720 So.2d 925. Where an employer receives a product warning from a third party, the manufacturer or supplier of the product has no duty to provide a separate, additional warning. *Cook v. Branick Mfg.., Inc.*, 736 F.2d 1442, 1448 (11th Cir. 1984)(applying Alabama law)(where franchisor provided a warning to its franchisee regarding the hazards associated with using a curing rim without a safety pin, the manufacturer of the rim had not duty to give an additional warning to the franchisee's employees).

       a.       No Duty to Warn of Known or Obvious Danger.

A fundamental concept underlying Alabama product liability law is that a product is not defective unless it is dangerous beyond the expectation of the ordinary consumer. *Beech v. Outboard Marine Corp*., 584 So.2d 447 (Ala. 1991). Consistent with this basic principle, the law is settled that a manufacturer or seller has a duty to warn "only when [it] has <u>no</u> reason to believe that the user will realize the 'dangerous condition' of the product…" *Ex parte Chevron Chemical Co.*, 720 So.2d 922, 925 (Ala. 1998). Thus, a manufacturer or seller has no duty to warn an ultimate user or consumer of a danger of which he is already aware or had reason to be aware. *Ex parte Chevron, Chemical Co.*, 720 So.2d 922, 926 (Ala. 1998). In addition, there is no duty to warn of known or obvious harzards. *Ford Motor Co. v. Rodgers*, 337 So.2d 736, 739 (Ala. 1976)("therefore, there is no duty to warn when the danger is obvious."); *Entrekin v. Atlantic Richfield Co.*, 519 So.2d 447, 450 (Ala. 1987)(exposed moving gears).

Both Mr. Riley and Walters acknowledge that they knew the machine was not suppose to spin and that it could create a danger if the base came loose. Mr. Riley stated that he understood before the accident that there was potential for injury if the base came loose. However, even after witnessing the first spinning event, Riley attempted to stand upon the base of the machine to drill

the second hole. This use of the product is completely unintended by the manufacturer and not reasonably foreseeable by United Rentals. As a result, United Rentals is entitled to summary judgment as a matter of law.

In the instant case, Flavor House had every reason to know the hazards associated with the use of this drill. Whenever a third party has a duty to warn of a dangerous condition in the workplace, that duty is discharged by informing the employer of the dangerous condition. The court in <u>Cook v. Branick MFG</u>, 736 F.2d 1442 (11th Cir. 1984), held that:

> "Any duty on the part of the manufacturer to warn of the dangerous working condition would ordinarily be discharged when the manufacturer notified all supervisory personnel of the injured worker. They knew what employees of theirs had assumed such relationships to them that they would be put to work on this job. To require the manufacturer to attempt to learn the identity of each and every employee of the employer, who was and would be involved on this job, would not only be wholly unreasonable, but it would in all probability prove both futile and impossible."

Walters, the Plaintiff's Supervisor, was aware of the United Rentals Safety Sheet. The Safety Sheet provides, among other things, that you should not operate damaged or faulty equipment, and if you have any questions about the operation of the equipment to call the rental yard. Applying Alabama law, the defendant had discharged any duty it may have had to warn of the unsafe condition of the drill since it adequately notified plaintiff's supervisory personnel of the danger.

    b.    Sophisticated User.

The manufacturer who sells an industrial product to a sophisticated user has no duty to provide warnings to the employee of that purchaser where the purchaser has an obligation to inform its employees. See *Vines v. Bloit Corporation*, 631 So.2d 1003 (Ala. 1994) *Cook v.*

*Branick Manufacturing, Inc.*, 736 F.2d 1442 (11th Cir. 1984), see also *Davis v. Avendale Ind., Inc.*, 975 F.2d 169 (5th Cir. 1992).

According to the rental documents, Flavor House Products had rented core drill machines from the Dothan facility of United Rentals on five prior occasions between April 17, 2000 and June 30, 2003. In addition, Walters, the Plaintiff's immediate Supervisor, testified that he had used core drill probably a dozen times before the date of the accident. Walters felt that he knew how to use the core drill sufficiently to instruct Mr. Riley. Walters told Mr. Riley that he would show him how to operate the core drill and drill the first hole. Walters did not consult an Operator's Manual before operating the drill and Walters felt that he had the knowledge that he could operate the core drill without the Operator's Manual because he had operated one before. Walter's did not look for an Operator's Manual because he felt he did not need one. Walters felt he had sufficient knowledge to operate the core drill machine safety and efficiently based on previous usage. As a result, United Rentals is entitled to summary judgment as a matter of law.

    A.     <u>PLAINTIFF'S FAILURE TO PRESENT EXPERT TESTIMONY PRECLUDES HIM FROM ESTABLISHING A DEFECT UNDER THE AEMLD.</u>

Proof of an accident and injury alone is insufficient to establish fault under the AEMLD. *Brooks v. Colonial Chevrolet-Buick, Inc. and General Motors Corp.*, 579 So.2d 1328, 1332 (Ala. 1991). Under the AEMLD, the plaintiff must affirmatively show a defect in the product. *Id.* at 1332. Customarily, this can only be done with expert testimony. *See* C. Gamble, 2 *McElroy's Alabama Evidence*, § 305.02 (5th Ed. 1996). Expert testimony is required when the nature of the product is of such a complex and technical nature that a lay jury, acting without such assisting testimony, could not reasonably infer from the facts that the product was defective and that the defect caused the product's failure and resulting injury to the plaintiff. *Brooks*, 579 So.2d at

1332. <u>Only</u> if the lay juror could reasonably be expected to understand the product's defectiveness, is expert testimony not essential. *Interstate Engineering, Inc. v. Burnette*, 474 So.2d 624 (Ala. 1985).

For example, in *Brooks*, the Alabama Supreme Court held that an automobile brake system, composed of calibers, rotors, discs, rear wheel cylinders, brake shoes, an master cylinders, was a system composed of parts that would not be familiar to the lay juror; the lay juror could not be expected to understand the system and determine if it was defective without the assistance of expert testimony. *Brooks*, 579 So.2d at 1333. *See also Donnelly v. Clue Car, Inc.,* 724 So.2d 25 (Ala. Civ. App. 1998) (expert required to prove defect in case involving broken golf cart windshield, as lay juror could not be expected to understand windshield's composition); *Britt v. Chrysler Corp.*, 699 So.2d 179 (Ala. Civ. App. 1997) (expert required to prove defect in case involving airbag); *Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.*, 395 So.2d 991 (Ala. 1981) (expert required to prove defect in case involving blown out tire).

Similarly, a core drill machine, which is composed of separate complex and technical mechanical components is not the type of system that would be familiar to the lay juror. Rather, like a brake system, windshield, airbag or tire, expert testimony is required to assist the fact finder in determining whether the drill at issue here was defective and whether the defect caused the products failure and resulting injury to the Plaintiff. Accordingly, Plaintiff's failure to proffer expert testimony precludes him from proving defect and establishing liability under the AEMLD.

This is especially true where, as here, United Rentals has proffered the expert testimony of Paul Guthorn, an Alabama licensed professional engineer. The Plaintiff's expert witnesses suggest that the core drill machine should have been equipped with a cut off mechanism in the event of loss of vacuum and that the vacuum system was insufficient. The Plaintiff's expert

witnesses do not establish that the core drill machine was defective under the AEMLD, nor that any defect is traceable to United Rentals nor that the defective condition caused the Plaintiff's injuries.

B.    PLAINTIFF'S CLAIMS ARE BARRED BECAUSE HE CANNOT PROVE PROXIMATE CUASE.

To prevail on their negligence/wantonness and unreasonably dangerous product (AEMLD) claims, a plaintiff must demonstrate that the defendant's acts or omissions proximately caused plaintiff's harm. Plaintiff's vague assertion that United Rentals' alleged negligence/wantonness, and rental of an unreasonably dangerous product proximately caused Plaintiff's personal injury, are based on nothing more than speculation and conjecture. In Alabama, proximate cause is defined as "an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces the injury and without which the injury would not have occurred." *Crowne Invs. v. Bryant*, 638 So.2d 873, 877-78 (Ala. 1994); *see also Ex parte Diversey Corp.*, 742 So.2d 1250, 1254 (Ala. 1999) (summary judgment for defendant in products liability case affirmed where plaintiff failed to show that chemicals manufactured by the defendant caused his injuries); *Locke v. City of Mobile*, 2002 WL 31630708 *3-5 (Ala. Nov. 22, 2000) (summary judgment for defendant affirmed where Plaintiff failed to present "substantial evidence" linking the flooding of property to negligence of the defendant).

The Plaintiff's two (2) expert witnesses, Donald Shaffer and John C. Frost, do not set forth any opinions that establish causation as against United Rentals.

C.    UNITED RENTALS DID NOT BREACH ANY DUTY ALLEGEDLY OWED TO PLAINTIFF

It is well-established that in order to prove a claim of negligence or wantonness a plaintiff

must establish that the defendant breached a duty owed by the defendant to the plaintiff. *Kmart v. Bassett,* 769 So.2d 282, 284. In *Bassett,* the Plaintiff sued Kmart for allegedly failing to use reasonable care in maintaining its automatic doors in a reasonably safe condition. *Id.* at 285. In reversing the judgment in favor of the Plaintiff, the Court determined that Plaintiff's evidence was not sufficient to prove a breach of duty. *Id.* In particular, Plaintiff "did not produce substantial evidence indicating that Kmart failed to maintain the automatic doors in a reasonably safe condition or that the maintenance Kmart provided was unreasonable." *Id.*

According to the Complaint, United Rentals allegedly owed Mr. Riley a duty to use reasonable care in maintaining, servicing and/or repairing the core drill machine at issue. Like in *Bassett,* there is no evidence which even tends to indicate that United Rentals somehow failed to maintain, repair or service the core drill machine rented to Riley. In fact, Plaintiff has no evidence, expert or otherwise, to show any breach of a duty owed to Plaintiff. Rather, the evidence in the record, including the expert opinion of Paul Guthorn, shows that United Rentals did, in fact, use reasonable care with respect to the core drill machine at issue. Accordingly, there is simply no evidence that any duty owed to the Plaintiff was breached by United Rentals.

       D.     <u>PLAINTIFF'S IMPLIED BREACH OF WARRANTY CLAIMS ARE BARRED BECAUSE UNITED RENTALS DISCLAIMED ANY IMPLIED WARRANTY.</u>

It is well established that Alabama law permits disclaimers of warranties in a commercial leasing setting such as this, and a warranty will not be implied where the contract expressly and "conspicuously" provides against it. *See* §7-2A-214, Ala.Code 1975. A clause is conspicuous when the print is larger or is in a contrasting type or color than that contained in the rest of the

document. *See generally* §7-1-201(10), Ala.Code 1975.[1]; *See also Fincher v. Robinson Bros.*

*Lincoln-Mercury, Inc.,* 583 So. 2d 256 (Ala. 1991) (affirmed summary judgment on implied

warranty claim where the contract at issue contained a warranty disclaimer provision printed in a

different type and color than rest of document); *Money v. Willings Detroit Diesel, Inc.,* 551 So.2d

926 (Ala. 1989) (affirmed summary judgment in case where warranty-disclaimer provision was

printed in all capital letters); *Feil v. The Wittem Group, Inc.,* 784 So.2d 302 (Ala. Civ. App.

2000) (implied warranties of merchantability and fitness for a particular purpose were

successfully disclaimed in installment sales contract where disclaimer was in all capital letters);

*Morgan Building and Spas, Inc., v. Gillett,* 762 So.2d 366, 372 (Ala. Civ. App. 2000) (warranty

disclaimer in all capital letters was conspicuous and effectively disclaimed the implied

warranties).

Here, the Agreement between United Rentals and Flavor House clearly and conspicuously

provides:

> **DISCLAIMER OF WARRANTIES**: UNITED MAKES NO
> WARRANTIES, EXPRESS OR IMPLIED, AS TO THE
> MERCHANTABILITY OF THE EQUIPMENT OR ITS FITNESS
> FOR ANY PARTICULAR PURPOSE. THERE IS NO
> WARRANTY THAT THE EQUIPMENT IS SUITED FOR
> CUSTOMERS INTENDED USE, OR THAT IT IS FREE FROM
> DEFECTS. EXCEPT AS MA Y BE SPECIFIC ALL Y SET
> FORTH IN THIS RENTAL AGREEMENT, UNITED DISCLAIMS
> ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED,
> MADE IN CONNECTION WITH THIS RENTAL
> TRANSACTION.

(Terms and Conditions, ¶ 3, a true and correct copy of which is attached as Exhibit to Chris

Waymire's Affidavit).

The above paragraph clearly disclaims the warranties by United Rentals that could have

---

[1] Whether a clause or provision of a contract is conspicuous is a question for the court. Sec. 7 -1-

arisen from its rental of the core drill machine. The disclaimer, which, in contrast to the rest of the page, is in all capital letters, satisfies the requirements of "conspicuous" under Alabama law. Accordingly, United Rentals is entitled to summary judgment on Plaintiff's breach of warranty claims.

> E.    PLAINTIFF'S WANTONNESS CLAIMS ARE BARRED FOR LACK OF FACTUAL SUPPORT.

Along with his negligence claims, Plaintiff alleges that United Rentals wantonly serviced, repaired and/or maintained the core drill machine at issue. Plaintiff, however, provides absolutely no support for such allegations, and said claims are due to be dismissed. To prevail on a wantonness claim under Alabama law, a plaintiff must prove by clear and convincing evidence that the defendant was consciously aware that doing or omitting a particular act would likely or probably result in injury. *Stone v. Southland Nat'l Ins. Corp., 589* So. 2d 1289, 1292 (Ala. 1991). The statutory definition of wantonness under Alabama law is "conduct that is carried on with reckless or conscious disregard of the rights or safety of others." §6-ll-20(b)(3) Ala. Code (1975). If the plaintiff cannot prove that the defendant knew that injury was a likely or probable result of the defendant's actions, then the defendant is entitled to summary judgment on the wantonness claim. *See Mead Coated Bd. v. Dempsey,* 644 So. 2d 872, 875 (Ala. 1994); *Coca-Cola Bottling Co. United v. Stripling,* 622 So. 2d 882, 884 (Ala. 1993). The Eleventh Circuit Court of Appeals, applying Alabama law, explained the distinction between wantonness and negligence. Quoting the court, "wantonness means knowledge that an act or failure to act does not merely increase risk of injury, but that the act make the injury likely or probable." *Toole* v. *McClintock,* 999 F.2d 1430 (11th Cir. 1993).

---

201(10), Ala.Code 1975.

In this case, Plaintiff has failed to come forth with any evidence to raise a bona fide triable issue of fact as to his claims of wantonness. For Plaintiff to maintain his claim that United Rentals wantonly failed to service or maintain the core drill machine at issue, he must be able to demonstrate that, although the unit worked before it left the store, before the alleged accident, United Rentals nevertheless acted "with reckless or conscious disregard of the rights or safety" of the Plaintiff, and was "consciously aware" that the way in which it serviced, and maintained the unit "would likely or probably result in injury." *See Stone* v. *Southland National Ins. Corp.,* supra; §6-11-20(b)(3) Ala. Code (1975). Plaintiff simply can provide no such evidence. Rather, the evidence shows that the core drill machine appeared to be maintained and worked before becoming dislodged during the drilling of the first hole by Mike Waters. While United Rentals disputes that the core drill machine was negligently serviced, or maintained, Plaintiff has provided no factual basis, much less evidence, which even tends to suggest the "recklessness," "conscious disregard of the rights or safety of others," or the "knowledge that injury is likely or probable" necessary to establish claims based on wantonness. Accordingly, United Rentals' motion for summary judgment regarding Plaintiff's wantonness claims is due to be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, United Rentals respectfully requests that its Motion for Summary Judgment be granted and that Plaintiff's claims be dismissed with prejudice.

/s/ C. Winston Sheehan, Jr.
C. WINSTON SHEEHAN, JR.   (SHE013)
Attorney for United Rentals (North America), Inc.

OF COUNSEL:
BALL, BALL, MATTHEWS & NOVAK, P.A.
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama  36102-2148
Phone:  (334) 387-7680
Fax:      (334) 387-3222

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2006, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:

Joseph T. Brasher
Hamilton Westby Antonowich
  & Anderson LL
600 W Peachtree Street, NW
Suite 2400
Atlanta, GA 30308

Joseph David Lane
Cochran Cherry Givens & Smith, PC
PO Box 927
Dothan, AL 36302-0927

W. Scott McGarrah, III
McGarrah & Davenport, P.C.
PO Box 43548
Birmingham, AL 35243

Robert H. Sprain, Jr.
Sprain & Associates PC
1707 29th Court, South
Birmingham, AL 35209

Eugene P. Stutts
Spain & Gillon, L.L.C.
2117 Second Avenue, North
The Zinszer Building
Birmingham, AL 35203

/s/ C. Winston Sheehan, Jr.
OF COUNSEL