IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

      Plaintiff,

Vs.                          CIVIL ACTION NO.

                          1:05 CV-994-W

MILWAUKEE ELECTRIC TOOL

CORPORATION, et al.,

      Defendants.


DEPOSITION OF KENNETH TEW, taken pursuant to notice and stipulation on behalf of the Defendants, in the conference room of Cochran, Cherry, Givens, Smith, Lane & Taylor, 163 West Main Street, Dothan, Alabama, before Ricky L. Tyler, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, on Monday, July 17th, 2006, commencing at 1:05 P.M.

Page 9

1          credit hours or would it be --

2      A.   Basically just general education, I guess, no

3          kind of creditation for it.

4      Q.   What did you do for Sony, sir?

5      A.   I started out in the warehouse driving a

6          forklift, worked my way up through as a

7          injection molding technician, and then into

8          management.  And I was a supervisor and a

9          process specialist for injection molding.

10     Q.   And can you help me with that?  What does that

11         mean?

12     A.   What that is, at that time Sony molded the

13         plastic parts for VHS cassettes.  And they --

14         all of the plastic parts for the VHS cassette

15         was injection molded.  And, you know, if the

16         technicians or the supervisors couldn't get the

17         defects out of it, then they called me to come

18         in and take care of it to see if I could work

19         out the defects.

20     Q.   And what position did you hold at Flavor House,

21         sir?

22     A.   I started out as a supervisor.  I worked a year

23         as a floor supervisor.  And then about the

Page 10

1      second year I was there I got promoted to

2      Production Superintendent.

3   Q.  And how long were you Production

4      Superintendent?

5   A.  Until I left in -- it must have been about

6      August of '04.

7   Q.  So about a year after this accident when you

8      received -- is when you left?

9   A.  Uh-huh.  (Positive response.)

10  Q.  And how long had you been a Production

11     Superintendent?

12  A.  For about three years.

13  Q.  So you had been a Production Superintendent at

14     Flavor House since 2001?

15  A.  Yes.

16  Q.  Did you hold any position or did you perform

17     the functions of a Safety Director for Flavor

18     House at the time of this accident?

19  A.  I can't remember if -- at the time.  I know our

20     Safety Director, Levin Hamm, had left and there

21     was a female, I can't remember her name, she

22     stayed for about three months.  And I can't

23     remember if she was still there or not.  It

| | | |
|---|---|---|
| 1 | | prepared of the accident that we're here about |
| 2 | | today, Mr. Riley's accident? |
| 3 | A. | Uh-huh.  (Positive response.) |
| 4 | Q. | And did you bring those with you? |
| 5 | A. | No, I did not.  They're still with Flavor |
| 6 | | House. |
| 7 | Q. | Okay.  And what records does Flavor House have? |
| 8 | A. | What I know is they have a copy of the accident |
| 9 | | report and just general notes that I made at |
| 10 | | the time of the accident of who I talked to at |
| 11 | | the time of the accident. |
| 12 | Q. | Anything else, sir? |
| 13 | A. | Not that I can recall.  There were some photos |
| 14 | | that were made.  The Plant Manager at the time, |
| 15 | | Dan Rewis, and I made photos of the equipment |
| 16 | | and the area and I know that's in the file. |
| 17 | Q. | Okay. |
| 18 | | MR. LANE:  What was that last name |
| 19 | | again? |
| 20 | A. | Rewis, R-E-W-I-S.  It's like Lewis with an R. |
| 21 | | MR. LANE:  Okay.  Thank you. |
| 22 | Q. | Where is Mr. Rewis now? |
| 23 | A. | The last I heard he was with Tom's Foods in |

1          Columbus, Georgia.

2     Q.   And what does he do for them?

3     A.   I think he was over quality.

4     Q.   When did he leave the employ of Flavor House?

5     A.   It was probably around May of '04.

6     Q.   And approximately how many photographs were

7          made by you and Mr. Rewis?

8     A.   I don't know.

9     Q.   Just your best judgment as you sit here today?

10    A.   Best judgment, there was probably eight or ten.

11         There was a printout of the photos and there

12         was also a photo card that we made and we also

13         put the card in the file also.

14    Q.   And when is the last time you reviewed those

15         photographs on the photo card?

16    A.   I stopped by out there on -- this past Friday,

17         which was the 14th.  I stopped by Flavor House

18         just for a minute to look over the file to kind

19         of refresh my memory on some of the things that

20         happened.

21    Q.   And who did you meet with on Friday the 14th?

22    A.   The Safety Director out there now.  I don't

23         know his last name, his first name is --

Page 26

1   A.   I remember taking a photo of the wall where it
2        happened at.  I remember taking a photo -- I
3        would think I took a photo of the drill before
4        we took it apart.  I remember taking a photo
5        of, I think, the tags on the drill, because the
6        rental company was wanting to come pick it up.
7        So we took photos of the tags.  I can't
8        remember if we took photos after we took it
9        apart.  I feel sure that we probably did, but I
10       don't remember.
11  Q.   And who took the photographs of the drill
12       before it was taken apart?
13  A.   It would have been probably me.  It was either
14       -- I was trying to think the other day, it was
15       either me or Dan Rewis, but I think it was -- I
16       think I did.
17  Q.   All right.  And what sort of camera did you
18       use, sir?
19  A.   It was a digital camera that belonged to the
20       Marketing Department.
21  Q.   And who was over the Marketing Department from
22       whom you got the camera?
23  A.   I borrowed it from Josh Sowell.

Page 27

1   Q.   Is he still there?

2   A.   Yes.

3   Q.   And would he have that card?

4   A.   The card should be in the file in an envelope.

5        I put the card in an envelope and stapled it to

6        the folder.

7   Q.   Do you know if any other type camera was used

8        other than the digital camera from Marketing?

9   A.   Not that I'm aware of.

10  Q.   The photographs that you took of the drill

11       before it was taken apart, where were these

12       photographs actually taken?

13  A.   At the maintenance shop.

14  Q.   And the photographs of the tag on the drill,

15       where was that taken, sir?

16  A.   It was also the maintenance shop.

17  Q.   And the photographs of the wall where it

18       happened, who took those photographs?

19  A.   I believe I did.

20  Q.   And about what time was it you took the

21       photographs of the wall where it happened?

22  A.   Probably -- we didn't have a camera available

23       right off, probably shortly after 8:00 when

Page 31

1   A.    Yes.

2   Q.    And that was before it was taken -- the drill

3         was taken apart?

4               MR. LANE:  Object to the form.

5   A.    I believe it was.

6   Q.    The drill, had it been modified in any way

7         before you took photographs of it?

8   A.    Not that I'm aware of.  I understand it was

9         just brought to the maintenance shop to get out

10        of the way and then they left it.

11  Q.    As I understand it, it was brought to the

12        maintenance shop in order to sanitize the area

13        where the accident happened?

14  A.    Yes.

15  Q.    And the purpose of you taking those photographs

16        before it was disassembled was to ensure that

17        it stayed in the same condition as it was at

18        the time of the accident with Mr. Riley?

19  A.    Yes.

20  Q.    And do those two photographs fairly and

21        accurately depict the condition of the core

22        drill machine at the time of Mr. Riley's

23        accident?

7-17-2006                                      Kenneth Tew

1           MR. LANE:  Object to the form.

2    A.    Yes.

3    Q.    Since there's been an objection.  Did you

4          verify that that was the condition of the core

5          drill machine as part of your investigation?

6    A.    Yes.  When I was -- when I took the photos, I

7          took the photos as it was when I came in.  And

8          my understanding was that it was picked up from

9          the location where the accident happened,

10         carried to the maintenance shop, and then I

11         took the photos just as it sat there.  As far

12         as I know it hadn't been touched since the

13         accident.

14   Q.    And that was important for you as the Safety

15         Director?

16   A.    Yeah.

17           MR. LANE:  Just so you understand my

18               objection, it's to -- your

19               question didn't specify before the

20               accident versus after the

21               accident.

22           MR. SHEEHAN:  Okay.

23           MR. LANE:  That's the purpose for my

Ricky L. Tyler                Montgomery Reporting Service
(334) 262-3331                          (877) 834-6048

7-17-2006                                              Kenneth Tew

Page 37

1    A.    Yes.

2    Q.    Okay.  And why did you take a picture of that
3          core drill bit?

4    A.    So basically we would have a record of
5          everything, you know, all of the pieces of the
6          drill.

7    Q.    And did you determine the size of the drill bit
8          that was being used by Mr. Riley at the time of
9          the accident?

10   A.    What do you mean?

11   Q.    The diameter of the drill bit?

12   A.    No.

13   Q.    Did you ask anybody about the size of the drill
14         bit being used by Mr. Riley?

15   A.    No.

16   Q.    Did you -- I'm sorry, sir.

17   A.    Go ahead.

18   Q.    Did you check as to the condition of the drill
19         bit being used by Mr. Riley?

20   A.    Other than just looking at this bit, you know,
21         I could tell the bit matched the hole, because
22         I went out and looked at the hole that they had
23         attempted to drill.  You know, I looked at the

Page 38

```
 1          bit, but I'm not familiar enough, you know,
 2          with drill bits to know -- especially this type
 3          of drill bit, to know if anything was wrong
 4          with the bit or not.
 5     Q.   All right, sir.  Did you -- you say you
 6          compared that drill bit on the machine with the
 7          hole at the location of the accident?
 8     A.   I didn't take it out and match it, but just
 9          physically looked, you know, where the hole
10          would have been drilled.  And, you know, it
11          just visually appeared to match the size of
12          this drill bit.
13     Q.   All right.  So in your opinion the drill bit
14          depicted in Exhibit Number 5 was the drill bit
15          that was being used by Mr. Riley at the time of
16          the accident?
17     A.   Yes.  And that's what I was told also, that it
18          was the same bit.
19     Q.   And who were you told that by, sir?
20     A.   By the Maintenance Department.
21     Q.   And who with maintenance?
22     A.   Because that's the only bit that they had for
23          that hole.
```

1    Q.    And who were you told that by?

2    A.    It was probably Donald.  I'm not sure.

3    Q.    Donald Cody?

4    A.    Donald Cody.

5    Q.    Sir, let me show you a series of three

6          photographs, Exhibits 6, 7 and 8, attached to

7          Mr. Walters' deposition and ask you what those

8          are, sir?

9    A.    Number 6 looks like a tag, but I'm not sure

10         exactly what it's supposed to be showing in

11         that photo.  7, the Ready to Rent tag, the

12         equipment number and basically a safety or an

13         inspection check showing it's ready to be

14         rented.  It looks like it was checked on August

15         the 25th.

16   Q.    Before we move on, in Exhibit Number 6, whose

17         hand is that in that photograph, sir?

18   A.    I don't know.

19   Q.    Did you take that photograph or these series of

20         three photographs depicting the Ready to Rent

21         tag?

22   A.    I think I did.

23   Q.    And, again, would that have been in the

1    A.    It looks like a front and a back in that photo.

2    Q.    Sir, if I could look at this, let me see if I

3          can read this Exhibit 9.  It states "I

4          understand the correct operation and function

5          of the controls and confirm that I have

6          received adequate instruction, and acknowledge

7          the safety sheet, to enable myself and/or my

8          crew to use the equipment in a safe and proper

9          manner without risk to injury."  Did I read

10         that correctly?

11   A.    You did.

12   Q.    What steps were taken to ensure that Mr. Riley

13         knew how to properly operate this core drill

14         machine, sir?

15              MR. LANE:  Object to the form.

16   A.    I'm not -- I don't know of anything.  The

17         Maintenance Department kind of handled that.  I

18         don't know of any.  I don't know what kind of

19         instructions were given to him, if any.

20   Q.    As part of your investigation, did you try to

21         determine if he was given any instruction?

22   A.    I asked and I think Mike -- I think it was Mike

23         Walters that was working with him at the time,

1         I believe, I think he had already gone when I

2         got there that morning.  And I understand

3         through the Maintenance Department, I asked

4         what kind of training he had, and basically,

5         the way I understand, they -- he was watching,

6         I think, Mike do it and then he said he wanted

7         to do it.  So Mike just stepped back and let

8         him start operating the equipment.

9    Q.   Was Mike Walters present while Mr. Riley was

10        operating the core drill machine?

11             MR. LANE:  Object to the form.

12   A.   I don't know, I wasn't there.

13   Q.   I mean, what did --

14   A.   Now, what --

15   Q.   What did you learn in your investigation?

16   A.   The way I understand, the best I can remember,

17        was that I think Mike had left, I think, if I

18        remember right.  I think Matthew started the

19        drilling machine and Mike had stepped away from

20        the actual accident site.

21   Q.   For what reason, sir?

22   A.   I don't know.

23   Q.   Would that have been proper for the lead

Page 43

1      mechanic, who knew how to operate the core

2      drill machine, to have left the inexperienced

3      mechanic there to operate the core drill

4      machine?

5            MR. LANE:  Object to the form.

6   A.   I wouldn't think so.

7   Q.   Would that have been in violation of Flavor

8      House policy?

9            MR. LANE:  Object to the form.

10  A.   As far as I know, there is no policy on that.

11  Q.   There's no policy with respect to the employee

12      who is operating the machinery to know how to

13      properly operate the machinery?

14            MR. LANE:  That's a different -- I

15               object to the form.

16  A.   I'm not sure what --

17  Q.   I guess I would -- if I'm not mistaken, does

18      not Flavor House have a policy that if you're

19      going to operate a piece of equipment, you

20      should know how to properly operate it?

21  A.   Yes.

22  Q.   And that is the policy of Flavor House, is it

23      not?

7-17-2006                                              Kenneth Tew

Page 44

1    A.    Yes.  You should know how to operate it, yes.

2    Q.    And be familiar with it?

3    A.    Yes.

4    Q.    And know what dangers do exist if not properly

5          operated?

6    A.    Yes.

7    Q.    Well, did Matthew Riley properly operate this

8          core drill machine?

9                    MR. LANE:  I'm going to object to the

10                        form.

11   A.    As far as I know he did not properly operate

12         it.

13   Q.    Okay.  Well, how did he not properly operate

14         it?

15   A.    There's a couple of things that seemed to

16         happen.  One, of course, the drill was not

17         anchored.  And then we understand Matthew was

18         also standing on the drill base to weight it

19         down.

20   Q.    What else did Mr. --

21                    MR. LANE:  Let me object generally to

22                        his testimony about this.  I

23                        haven't seen any foundation for

Ricky L. Tyler                      Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

f60fb274-36d8-4b62-9e7a-603e3bc3a337