

August 31, 2006

Laboratory Number 050356

Reference:          Riley vs. United Rentals

Date of Incident:   August 29, 2003

## ENGINEERING ANALYSIS

### INTRODUCTION

An evaluation of a core drill machine has been performed. It was reported that Matthew Riley was injured when the base of a core drill machine broke free from the concrete floor while he was drilling a hole. The machine reportedly spun and struck Mr. Riley. The purpose of the evaluation was to determine the cause(s) of the accident. This evaluation is based on the information provided to date. As additional information becomes available, this evaluation will be supplemented to incorporate that information.

### DOCUMENTS REVIEWED

Complaint, Circuit Court of Houston County Alabama, Case No. CV05-534-A
DM450&DM500 Core Drills Owners Manual, Clipper Form 7125 dated 8/00
Deposition of Kenneth Tew, dated July 17, 2006 (including exhibits).
Deposition of Michael Walters, dated July 17, 2006(including exhibits).
Deposition of Matthew Riley, dated June 21, 2006 (including exhibits and videotape).
Deposition of Michael Waters, dated July 18, 2006(including exhibits).
Plaintiff's Disclosure of Expert Witnesses
Response to Notice of Deposition
Applied Technical Services Chemical Report dated July 13, 2005.



## BACKGROUND

### Equipment Description

The subject core drill machine was identified as a Norton Model DM500. The machine is intended to drill cores (holes) into concrete. It uses an electric drill to power a core bit. The core bit creates the core in the concrete. The drill is attached to a carriage on a vertical column and is moved up and down the column by the operator using a handle.

The column is attached to a base. The base sits on the work surface and supports the column and drill. A vacuum pump, mounted on the base creates a vacuum between the bottom of the base and the work surface resulting in a holding force. A flexible gasket helps to maintain a seal between the base and the work surface. Leveling screws at each corner of the base are adjusted to ensure that the core drill is level and the base is snug against the work surface.

### Equipment History

Based upon review of documents, the core drill was purchased new by United Rentals in March of 2003. According to the rental history, the core drill assembly was first rented out on April 10, 2003. The rental to Flavor House on August 28 was the 14th rental of the equipment. At the time of the accident, the equipment was approximately 4-1/2 to 5 months old.

According to the rental documents, the rental prior to Flavor House was to Atkinson Industrial Electric for two days starting on August 20. The Ready To Rent tag, signed by the customer, indicates that all functions were operating, the unit was clean and safety decals were in place. There was no reported indication of any problems with the unit during this rental.



The core drill machine and a 4 inch diamond core bit were reserved by Donna of Flavor House. A rental out contract gives a date and time out of 8/28/03 at 12:25 p.m. The contract has signatures for the customer and the deliverer. It has been reported that the customer signature is for Adam Hall, a Flavor House mechanic. The machine was reportedly delivered with the READY TO RENT tag attached to it and accompanied by the United Rentals General Safety document, Form 1524-000. The pickup ticket associated with the rental contract shows the pickup date and time as 8/29/03 at 4:48 p.m.

The Flavor House core drill machine rental history with the United Rentals facility in Dothan was reviewed. According to provided documents, Flavor House had rented core drill machines from the Dothan facility on five prior occasions between April 17, 2000 and June 30, 2003. Included with the machines, core bit sizes of 3, 3-1/2, 4, and 4-1/4 are listed in the paperwork.

### Accident Information

Background information regarding the events surrounding the accident were provided in deposition testimony of Matthew Riley, Michael Walters and Kenneth Tew. As additional information becomes available, it will be reviewed for incorporation in to the accident information.

### Matthew Riley Deposition Testimony

Riley indicated that Mike Walters was the head shift mechanic and Riley's supervisor. Since he had never used a core drill before, he took care to make sure he knew how to use it by observing Walters, familiarizing himself with the machine, looking at all the different parts and looking at the various information on the drill. He believes he read the READY TO



RENT tag that was attached to the machine, but was not provided with the United Rentals General Safety sheet. He was not sure if he read the warning labels on the machine. He did not read the operator's manual and did not ask anyone to see the operator's manual before using the machine. He felt that he had sufficient training from Walters to operate the machine.

He checked the leveling screws, apparently believing they were anchor bolts, before leaving the maintenance shop to make sure they were screwed up enough to not hold the base off the floor.

Regarding the machine description, he said it was in used condition but everything seemed to work properly on it. It appeared to be maintained. The vacuum pump was on, the motor came on, it didn't make any funny noises, and the lever seemed to go up and down properly. He checked the gasket and it seemed to be in good shape.

Mike Walters drilled the first hole. Riley stated that he helped set up the machine for the first hole. They did not use the leveling screws on the base. He did not have any discussions with Walters about the proper use of the four leveling screws prior to operation of the core drill. He felt that he had sufficient training from Walters to operate the machine. He understood that the machine could go out of control and cause injury if the vacuum system didn't keep the base secure to the ground.

While Walters was drilling the first hole, the base became dislodged and started spinning until Riley turned the switch off. They then checked the gasket, set the machine back up and Walters finished drilling the hole without incident while standing on the machine base.

Riley positioned the core drill machine for the second hole under Walters' instruction. He checked the gasket before drilling the second hole and did not see any cracks or


tears. Walters left while he was drilling the second hole. The vacuum pump was being used at the time of the accident. He knows that the leveling screws were not touching the floor and that the machine was sitting on the gasket while he was drilling the second hole because there was a cushion-like play to it rather than something hard hitting the floor.

While drilling the second hole, he heard the drill motor running and the vacuum pump running. It did not make any strange noise. He was applying pressure to the handle, lowering the drill and standing with one foot on the base when the bit lodged inside the hole, the base broke loose, and the whole unit began to spin around.

According to Mr. Riley, they were using the core bit with a missing tooth at the time of the accident. He stated that the core bit shown in photographs attached to the machine was not the one he used and that only one core bit was being used that night.

**Michael Walters Deposition Testimony**

Mr. Walters was the third shift lead mechanic. He inspected the core drill before using it to make sure it was in proper operating condition. As best he could remember, he checked the gasket and the warning labels. Matthew Riley was with him in the maintenance shop when he inspected the core drill. Riley stated that he had never used a core drill before. Mr. Walters said that he took care and precautions to make sure that Mr. Riley understood how to properly use the core drill.

Mr. Walters stated that he had used core drills probably a dozen times before. He felt that he knew how to use core drills sufficiently to instruct Mr. Riley. He told Riley that he would show him how to operate the core drill and drill the first hole. He did not consult the operator's manual before operating. Mr. Walters felt he had the knowledge that he could operate


the core drill without the operator's manual because he had run it before. He did not look for an operator's manual because he didn't feel they needed it. Mr. Walters thought he had sufficient knowledge to operate it safely and efficiently based on previous usage.

Regarding the core bit he used, Mr. Walters stated that he inspected it before using it to make sure that it had all of its teeth. He also inspected the bit while in use and saw that all of the teeth were intact.

Mr. Walters stated that he did not have any problems with the core drill machine. He set the machine up at the job site and used the leveling screws at the base to level the machine.

He drilled the first of two holes which he estimated to be 2 to 2-1/2 inches deep. During the drilling of that hole, the vacuum came loose and the base spun around. Mr. Riley unplugged the machine from the wall to stop the machine from spinning. Mr. Walters then cleaned off and inspected the gasket, checked the core bit, set the machine back over the hole, re-leveled with leveling screws and continued to use the machine. The vacuum sealed back to the floor and, with Walters standing on the base, finished drilling the hole.

### Kenneth Tew Deposition Testimony

Mr. Tew was the production superintendent and acting safety director for Flavor House at the time of the accident.

He took photographs of the machine before it was disassembled in the maintenance shop. It was his understanding that the machine was picked up from the accident location and carried to the maintenance shop after the accident and that it was unaltered from the



accident configuration when photographed. As far as he knew it hadn't been touched since the accident.

He looked at the core bit that was installed on the machine and could tell that it matched the hole that was drilled. He was also told, probably by Donald Cody, that the core bit on the machine, as depicted in his photographs, was the one used to drill the holes.

The machine was partially disassembled at the maintenance shop. The core bit and the water swivel were removed to look for a shear pin. These parts were then re-attached.

Mr. Tew asked what kind of training Mr. Riley had and was informed that Riley had watched Mr. Walters use the machine and then Walters let Riley use it. Tew didn't think it was proper for Walters to leave Riley operating the core drill machine. He believed that Riley did not operate the machine properly. Riley did not have the machine properly anchored and Riley was standing on the base.

Attached to the Tew deposition was a statement by Flavor House Sanitation Manager James Mason, dated August 29, 2003. Mr. Mason stated that he observed Riley drilling a hole in the concrete floor and Sanitation Attendant Aaron Myers assisting him. The statement says that Mr. Riley was standing on the "drills flat sides" to give extra downward pressure. The drill snagged and spun with Mr. Riley holding on to it.

**INSPECTION**

The core drill machine was inspected on May 12, 2005 and February 23, 2006 in Marietta, GA. The machine was identified by United Rentals equipment number 502881, Norton Model Number DM500, and Serial Number 02 G 016. Included with the machine were a



Milwaukee Heavy Duty Dymo drill, Serial Number 798C602220020 and a Gast vacuum pump Model DOA-V185A-AA, Serial Number 0112114701.

A 4-inch core bit was on the machine. A 3-1/2 inch core bit, uninstalled, accompanied the machine. The installed 4-inch bit had all of its teeth intact. The 3-1/2 inch bit had two remaining teeth. A drill base vacuum gasket and the separated power cord from the vacuum pump were also submitted for inspection. The gasket had a partial edge separation. Visual examination did not reveal separation through the thickness of the gasket.

At the time of the inspection, the distal ends of the four leveling screws on the base were flush with the base. The gasket was placed back into the groove on the underside of the base.

Electrical power was supplied to the vacuum pump; however, the pump did not run. The pump cover, head gasket, and head were removed. A white powdery substance was observed on the top and bottom surfaces of the head. Samples of the substance were removed and submitted for chemical analysis. Fourier transmission-infrared (FT-IR) and energy dispersive x-ray (EDX) analyses of the substance revealed it to be predominantly aluminum oxide.

The Milwaukee drill was operated and then disassembled. Torque values of 198.6, 231.2, and 217.2 foot-pounds for the start of clutch slip were recorded.

**DISCUSSION**

At the time of inspection, the vacuum pump was not functional and the vacuum capability was not evaluated. According to both Mr. Riley and Mr. Walters, the vacuum pump was operational during their use of the core drilling machine. Therefore, the operating condition



of the pump changed during the 20+ months from the date of the accident to the date of the inspection. The presence of aluminum oxide within the pump housing would indicate that during that period of inactivity, moisture was present in the pump resulting in the observed oxidation.

Given the statements of both Mr. Riley and Mr. Walters that the pump was functioning, the READY TO RENT tag (Walters exhibits 7 and 8) dated August 25, 2003 indicating that the equipment performs and operates as intended by the manufacturer and that the "All Functions" and "Operational Check" boxes are marked, and the absence of any prior complaints during the rental history of the machine, it is highly probable that the vacuum pump was functional at the time of the accident.

The vacuum system was intact at the time of the inspections. However, no functional testing of the system was performed to determine the efficacy of the system. Given the amount of time since the accident occurred, any attempt to do so would need to address any affects associated with the time interval.

At the time of the inspection, the vacuum gasket was observed to have a partial edge separation. Based upon visual examination, the separation was not through the gasket thickness. Both Mr. Riley and Mr. Walters stated that they inspected the gasket before and during use. Mr. Riley stated that there were no cracks or tears in the gasket. There was no mention by Mr. Tew of any gasket damage during his post-accident investigation. Given the time span from accident to inspection, it is not known at what point in time the observed partial edge separation was created.



It is probable that the 4-inch core bit was being used by Mr. Riley at the time of his accident. Mr. Tew was informed that, other than the machine being picked up and moved from the accident site to the maintenance shop after the accident, that it was in its post-accident configuration. The photographs taken by Mr. Tew, reportedly depicting the machine in its accident configuration, show the 4-inch rather than the 3-1/2 inch bit on the machine. At the subsequent inspections, the 4-inch core bit was on the machine. All of the teeth for the 4-inch bit were intact. Mr. Walters testified that he inspected the bit before and during use of the machine and that the bit had all of its teeth. He also stated that, if it didn't have all of its teeth, he would not use that core bit. Mr. Riley stated in his deposition that the bit used during the core drilling was missing one tooth and was, he believed, 3 inches although it could have been 3-1/2 inches.

Mr. Walters stated that he reviewed the READY-TO-RENT tag before using the equipment. The READY-TO-RENT tag includes the following information:

> "...I understand the correct operation and function of the controls and confirm that I have received adequate instruction, and acknowledge the safety sheet, to enable myself and/or my crew to use the equipment in a safe and proper manner without risk to injury."

Further, Mr. Walters stated that he had used core drill machines before. Mr. Walters felt he had the knowledge that he could operate the core drill without the operators manual because he had run it before. He did not look for an operator's manual because he didn't feel that he and Mr. Riley needed it. Mr. Walters thought he had sufficient knowledge to operate it safely and efficiently based on previous usage.



Laboratory No. 05050
Page 11

Flavor House had rented core drill machines from the Dothan United Rentals facility on five prior occasions between April, 2000 and June 2003. Given the level of usage by Flavor House and the statement from Mr. Walters that he had used core drill machines many times before, it would be expected that Flavor House, in general, and Mr. Walters, in particular should have had sufficient knowledge to use the equipment in a safe and proper manner. Mr. Walters acknowledged that he did not believe that he needed the operator's manual to operate it safely and efficiently based on previous usage. Based in part on the aforementioned, it is probable that the absence of an operator's manual did not contribute to this accident.

At the time of the accident, the core drill machine was approximately 4-1/2 to 5 months old. Including this occasion, it had been rented out 14 times. There were no reported malfunctions with the machine up to and including this rental. The first occasion of an unanticipated response from the equipment was as Mr. Walters was nearing completion of the first hole. At that time, the core bit reportedly jammed causing the machine to spin. Mr. Riley was present when this occurred and unplugged the power cord from the wall to stop the machine. Both Riley and Walters acknowledged that they knew the machine was not supposed to operate like this and that it could create a danger if the base came loose. Mr. Riley said he understood before the accident that there was the potential for injury if the base came loose. Both acknowledged that the equipment, including the vacuum, appeared to be working normally. After the first spinning event, the machine was inspected, tested, and re-used. Procedurally, the significant difference after the first spinning event was that the operator (Walters on the first hole, Riley on the second) stood, partially or completely, on the base while drilling.



Laboratory No. 05050
Page 12

Based upon the available information, the spinning event experienced by Mr. Walters and observed by Mr. Riley during drilling of the first hole was the first time that anyone associated with this machine had notice of this type of event occurring with this machine. Subsequent to this event, they continued to operate the equipment.

Riley is not sure if he saw the warning label on the machine that included the following information:

"For your own safety, read and understand the operator's manual"

"Failure to properly secure unit before drilling may cause serious injury."

Although this information was on the machine, Mr. Riley did not read or request an operator's manual. Instead, it appears that Mr. Riley was relying on Mr. Walters to train/instruct on the proper operation of the equipment.

Mr. Walters stated that he used the leveling screws and inferred that he knew their use was required to properly secure the unit before drilling. He also said that he did not instruct Riley about the importance of the leveling screws. He said that he just overlooked it. Although he says that he set up the core drill machine for the second hole and used the leveling screws, the collective physical evidence and descriptions of events would indicate that Mr. Walters had failed to engage the leveling screws. Mr. Riley stated that he did not have any discussions with Walters about the proper use of the four leveling screws prior to operation of the core drill. Had Mr. Walters instructed Mr. Riley on the importance of the leveling screws and/or ensured that they were properly used, it is less likely that the core bit would have jammed and the resultant breaking of the vacuum at the base would have been avoided.



Given the deposition testimony of Riley, Walters, and Tew, the photographic documentation by Tew and the equipment configuration at the inspections, it appears that the leveling screws were not being used at the time of the accident. Photographs taken by Mr. Tew of the machine in its accident configuration show the leveling screws flush with the base. With the leveling screws in the observed positions, the base and column could potentially tilt slightly due to gasket compliance. Mr. Riley mentions in his deposition that he could tell the base was sitting on the gasket because there was a "cushion play" to the feel of the drill while he was drilling the second hole. Such movement during drilling could cause the core bit to bind and also adversely affect the base retention capability; therefore, allowing the unit to rotate about the core bit.

## CONCLUSIONS

The following conclusions are based upon evaluation of the aforementioned items:

1. At the time of the accident, the core drill machine was approximately 4-1/2 to 5 months old. There were no reported malfunctions with the machine up to and including this rental. The first occasion of an unanticipated response from the equipment was as Mr. Walters was nearing completion of the first hole.

2. At the time of the accident the vacuum pump was functional and the vacuum system was holding the base in place until the core bit jammed.

3. During drilling of both the first and the second hole, the core drill machine spun when the core bit jammed during use.



4. The leveling screws were not being used creating the potential for jamming of the core bit and increasing the likelihood of the machine spinning.

5. Mr. Riley understood before the accident that there was the potential for injury if the base came loose.

6. Mr. Riley did not appear to recognize the necessity of using the leveling screws.

7. Mr. Walters provided training/instruction for Mr. Riley. He failed to instruct Riley about the importance of the leveling screws.

The aforementioned conclusions are subject to change or modification subject to availability of additional information. A copy of my Curriculum Vitae has been attached to this report.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 31, 2006.

Respectfully submitted,

Paul S. Guthorn, MSME
Professional Engineer
Alabama Number 27133-E



# PAUL S. GUTHORN

## *TECHNICAL AREAS OF SPECIALIZATION:*

- Mechanical Failure Analysis
- Metallurgical Failure Analysis
- Vehicle Systems Analysis
- Accident Reconstruction
- Fire Analysis

## *EDUCATION:*

Master of Science in Mechanical Engineering
California State University, Long Beach (1983)

Bachelor of Science in Materials Science Engineering
Brown University (1979)

Post Graduate Courses and Research
UCLA (1987-1993)

Performance of Vehicles
UCLA (1991)

Fire Analysis and Behavior
UCLA Extension (1991)

### *Additional Training:*

Engineering Dynamics Corporation HVE Forum (2003)
Crash Data Retrieval System Training Course (2001)
Society of Automotive Engineers International Congress: Accident Reconstruction (1998)
Photogrammetry in Accident Reconstruction (1997)
Investigation of Motor Vehicle Fires (1996)
Motorcycle Accident Reconstruction (1996)
Introduction to PC-Crash and PC-Rect (1995)
Heavy Vehicle Rollovers: A Safety Issue Toptec
    Society of Automotive Engineers (1993)
Advanced Traffic Accident Reconstruction with the Use of Microcomputers
    University of North Florida (1992)

## *REGISTRATION:*

Professional Engineer, California Number MT1845
Professional Engineer, California Number M28649
Professional Engineer, Alabama Number 27133-E

## CERTIFICATION:

Mobile Equipment Trainer
Forklift Operator
Boom Lift Operator
Rough Terrain Lift Truck Operator
Aerial Work Platform Operator

## PROFESSIONAL EXPERIENCE:

**Vice-President,** Vollmer-Gray Engineering Laboratories, Inc. (January 2000 to present); Staff Engineer, Vollmer-Gray Engineering Laboratories (May 1989 to December 1999). Metallurgical and mechanical failure analysis, vehicular systems analysis, accident reconstruction, fire analysis.

**Engineer,** Fowler, Inc. (November 1986 to May 1989). Failure and fracture analyses of metallic structures, metallographic and fractographic studies, static and fatigue testing on full-scale structural components.

**Section Manager,** Douglas Aircraft Company (April 1985 to October 1986). Managed failure analysis activities for Materials and Process Engineering Department. Immediate supervisor of nine engineers and three laboratory technicians. Provided overall technical cognizance of all in-service and test failure analysis.

**Senior Engineer,** Douglas Aircraft Company (September 1979 to March 1985). Failure analyses of DC-8, DC-9 and DC-10 aircraft. Research and development of high strength aluminum alloys and SPF/DB Ti-6A1-4V. Design allowables testing for new aluminum alloys. Fracture toughness and crack growth rate testing of aerospace materials. Processing of aluminum alloys, stainless steel alloys, castings, forgings, shot peening, peen forming. Member of AMEC sub-committee on shot peening. On-site surveys of primary and secondary metal producers.

## PRESENTATIONS:

*Aerial Equipment Accident Investigation,* Specialty Risk Services, July 2005

*Documentation, Preservation and Interpretation of Physical Evidence in an Accident Investigation,* Aerial Platform Safety Conference, Dallas, TX, November 4, 2004

*Automotive Systems and Accident Reconstruction,* Automobile Club of Southern California, November 16, 2003

*Automotive Systems and Accident Reconstruction,* 21st Century Insurance, November 24, 2003

*Crash Data Retrieval in Accident Reconstruction,* Farmers Insurance, February 20, 2002

*Masters in Trial,* The Foundation of the American Board of Trial Advocates, Riverside, CA, November 1, 2002

*Investigation of Vehicle Defects,* Law Offices of Gilbert, Kelly, Crowley and Jennett, Los Angeles, CA April 21, 2001

## COMMITTEES:

ANSI/SIA A92 Aerial Platforms
ANSI/SIA A92.5 Boom-Supported Elevating Work Platforms
ANSI/SIA A92.6 Self-Propelled Elevating Work Platforms

## PROFESSIONAL AFFILIATIONS:

ASM International
Society of Automotive Engineers
American Society of Mechanical Engineers
Southwest Association of Technical Accident Investigators

# VOLLMER-GRAY
ENGINEERING LABORATORIES, INC.

## FEE SCHEDULE

|  | CONSULTING (per hour) | TESTIMONY (2-hour minimum) |
|---|---|---|
| Carrie Henger | $100.00 | $150.00 |
| Isaac Ikram | $150.00 | $200.00 |
| Christopher Brignola | $150.00 | $200.00 |
| Anthony LaPalio | $150.00 | $250.00 |
| Michael Stapleford | $200.00 | $250.00 |
| Philippe Van Herle | $210.00 | $260.00 |
| Bruce J. Agle | $210.00 | $260.00 |
| Ian Morrison | $225.00 | $275.00 |
| Paul Guthorn | $250.00 | $300.00 |
| Gerald Zamiski | $250.00 | $300.00 |
| Ned Wolfe | $275.00 | $325.00 |
| Cory Gray | $275.00 | $325.00 |
| Reuben Vollmer | $275.00 | $325.00 |

* * * * * * * *

| | |
|---|---|
| Technician | $50.00 per hour |
| Delivery | $25.00 per hour |
| Mileage | $.60 per mile |
| Photos, mounted | $2.00 each |
| Digital prints | $2.00 each / $20.00 per CD |
| Color copies | $1.00 per page |
| Photographic expense | $1.00 each |
| Read and correct depo transcript | One minute per page |

NOTE: All time is charged portal-to-portal from Long Beach. There is a 2-hour minimum for deposition, arbitration and trial testimony. Compensation for services performed will not be contingent upon the necessity of client to receive payment from other parties. All items stored on our premises are subject to a storage fee.

Effective 1/1/06

2421 Palm Drive, Signal Hill, CA 90755   Tel: 562-427-VGEL (8435)   Fax: 562-427-8434
www.vglabs.com



**VOLLMER-GRAY**
ENGINEERING LABORATORIES, INC.

**Deposition Testimony**
**Paul S. Guthorn, P.E.**

| Lab No. | Depo Date | Client Attorney | Reference |
|---|---|---|---|
| 010934 | 8/13/02 | Ernie Algorri | Briggs vs. Krause, Inc; Home Depot |
| 020622 | 8/17/02 | Todd Theodora | Gamez vs. Goodyear Dunlop |
| 980653 | 12/19/02 | Rob Johnson | Walden vs. United Rentals |
| 020247 | 2/4/03 | Michael Weinstock | Kirkwood vs. Stevens |
| 000621 | 6/16/03 | Richard Falk | Rakotomahanina vs. Metro Car Co. |
| 030554 | 7/10/03 | Jeff Anielski | Travelers vs. I.A.S., et al. |
| 030828 | 10/29/03 | Phillip E. Black | De La Torre vs. Ordonez |
| 020130 | 1/5/04 | Steven Joffe | Griggs vs. Caterpillar |
| 030200 | 2/10/04 | Shelly Zeise | Hall vs. Bissonnette |
| 030031 | 4/21/04 | Eric Beatty | Mejia vs. Stewart & Stevenson |
| 030345 | 5/11/04 | Anthony Deichler | Patchett vs. Todd Textor |
| 040619 | 9/27/04 | Shelly Zeise | Vasquez vs. Loskill |
| 030496 | 11/9/04 | | Green/Stonell/Davis vs. United Rentals |
| 040503 | 11/30/04 | Steve Joffe | Rios, et al. vs. Martinez, et al. |
| 040864 | 12/17/04 | Garrard & Davis | Krant vs. Hopper |
| 030496 | 11/9/04 | Ed Spivey | Green/Stonel/Davis vs. United Rentals |
| 040503 | 11/30/04 | Bonne, Bridges, et al. | Rios, et al., vs. Martinez, et al. |
| 030685 | 5/4/05 | Page, Mrachek, et al. | Lopez vs. Genie Industries |
| 050351 | 6/6/05 | David M. Shaby II | Rodriguez vs. Faeber |
| 050380 | 7/12/05 | Roger Koll & Assoc. | Coyle vs. North American Van Lines |
| 040897 | 7/20/05 | Bradley & Gmelich | Han vs. City of Long Beach, et al. |
| 050276 | 11/9/05 | Tropio & Morlan | Alcala vs. Lobel, et al. |
| 040879 | 11/1/05 | Charmasson, Buchaca, etc | Nemeth vs. D.P. James Paving |
| 060029 | 2/8/06 | Wilson, Elser, et al. | Levine vs. Arnett |
| 050442 | 5/4/06 | Gordon & Rees | Gordon vs. Funco Motor Products |

2421 Palm Drive, Signal Hill, CA 90755   Tel: 562-427-VGEL (8435)   Fax: 562-427-8434
www.vglabs.com



## TRIAL TESTIMONY
## PAUL S. GUTHORN

| | | |
|---|---|---|
| 11/14/02 | Douglas W. Otto | Igor Hayduk |
| 8/26/03 | Cooper & Phillips | Gnanakone vs. City of Hawthorne |
| 3/4/04 | Wilson, Elser, et al. | Griggs vs. Caterpillar |
| 8/19/04 | Engle & Bride | Goudy vs. Del Rio |
| 6/16/05 | Qualls & Workman | Snow vs. United Rentals |
| 3/10/06 | Tropio & Morlan | Alcala vs. Lobel |

2421 Palm Drive, Signal Hill, CA 90755   Tel: 562-427-VGEL (8435)   Fax: 562-427-8434
www.vglabs.com