**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MATTHEW RILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:  1:05cv994-T** |
| **vs.** | ) | |
| | ) | |
| **UNITED RENTALS (NORTH** | ) | |
| **AMERICA), Inc. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT UNITED RENTALS'**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff in the above-styled matter and, submits his Brief in Support of his

Response in Opposition to Defendant United Rentals' Motion for Summary Judgment.

**INTRODUCTION**

Defendant Untied Rentals "rented" the Norton DM 500 Core Drill (the product) in question

to Flavor House Products, Inc. (Flavor House) on August 28th, 2003.  Just past midnight, on August

29th, 2003, Matthew Riley was seriously injured while operating the product.  This is a products

liability action involving claims brought pursuant to the Alabama Extended Manufacturers Liability

Doctrine, as well as negligence and warranty theories against United Rentals.  United Rentals now

seeks Summary Judgment on all claims.  However, as the Statement of Facts and Argument, and

evidentiary submissions that follow indicate, United Rentals is not entitled to summary judgment

and its request is due to be denied.

**NARATIVE STATEMENT OF FACTS IN SUPPLEMENTATION AND OPPOSITION TO DEFENDANT'S NARRATIVE STATEMENT OF FACTS**

1.      On August 29th, 2003, just past midnight, Matthew Riley was injured when the Norton DM 500 Core Drill he was operating malfunctioned.  Mr. Riley and his superior, Mike Walters were assigned the job of installing stanchions or steel posts into the concrete floor to serve as barriers to protect a wall sink from fork lift traffic in the plant.  (Exhibit 1, Walters depo p. 25).  The day before (August 28th) the core drill had been rented from United Rentals so that it would be available for use by the third shift mechanics to install the barriers.

2.      The Investigation of the incident revealed that during the course of drilling one of the holes, the vacuum system that is intended to secure the base of the drill to the floor during operation failed.  Consequently, the drill assembly violently shifted and rotated, causing Mr. Riley to fall to the ground.  As he attempted to get out of the way, the drill assembly hit him in the head and face, causing severe head and facial injuries.  (Exhibit 2, John Frost Report; Exhibit 3, Don Shaver Report).  Exhibit 11 to Mr. Walters' deposition shows the completed first hole and the partially completed second hole that resulted from the use of the core drill on August 29, 2003.  (Exhibit1, Walters depo pp. 44-45, depo Exhibit 11).

3.      The particular core drill in question was about five months old at the time of the rental to Flavor House.  On 3/14/2003, Saint-Gobain Abrasives, Inc., d/b/a Norton, sold two Norton DM 500 Core Drills to United Rentals at their Dothan, Alabama location.  The core drills are received in three separate containers with the component parts of the drill, the drill base, the drill motor assembly and the vacuum hold down assembly.  United Rentals is responsible for the final assembly of the product.  A Norton DM 500 Core Drill (Exhibit 4, Riley depo Exhibit 31) is a device designed to "drill" core holes into such things as concrete floors.  The device is similar to a bench

drill press in that it contains a base and post that serves as the platform that the drill motor is attached to. It also has a drill motor and bit lowering and raising mechanism that allows the operator to raise and lower the diamond edged drill bit to the surface to be drilled, and apply pressure to allow the core drill bit to move through the surface to be drilled. In order to function, the drill base must be secured.

4.      Norton, in its Operator's Manual describes three potential means of securing the base of the unit to the surface, only one of which must be used. (Exhibit 4, Riley depo Exhibit 32, Operator's Manual p. 7). Of these three methods, one is the vacuum system that was provided with this DM 500 core drill. This particular DM 500 model did not have an anchor bolt system for anchoring the drill stand base. The vacuum pump is installed on the base of the unit and runs continuously while the core drill is plugged in. (Exhibit 4, Riley depo Exhibit 32).

5.      Before beginning the job, Mr. Riley advised Mr. Walters that he did not have any experience operating a core drill (Exhibit 1, Walters depo p. 25). Mr. Walters received on the job training in the use of the core drills, (Exhibit 1; Walters depo p. 102) and had considerable experience using core drills before the date of this incident, having operated a number of different core drills approximately a dozen times before, and felt that he had sufficient knowledge to instruct Mr. Riley and ultimately did instruct in the drill's use. (Exhibit 1, Walters depo pp. 12, 20-21, 26, 27, 99-100). Additionally, Mr. Walters had seen a number of other mechanics using core drills at Flavor House in the past. (Exhibit 1, Walters depo. p. 28).

6.      The core drill was delivered to Flavor House with what United Rentals calls a "Ready to Rent" tag. Interestingly, the "Ready to Rent" tag was not signed by anyone at Flavor House. (Exhibit 5, Exhibit 1 to Mr. Mixon's deposition; Exhibit 1, Walters depo Exhibits 6 and 7). In any event, as instructed on the Ready to Rent tag, Mr. Walters ensured, to the best of his knowledge,

3

that he and his crew (Mr. Riley) knew how to operate the equipment in a safe and proper manner. (Exhibit 4, Riley depo p. 38).

7.      Although he did not see one on this occasion, Mr. Walters was familiar with the United Rentals General Safety sheet (Exhibit 1, Walters depo p. 14, Exhibit 4).  None of the instructions listed on the General Safety sheet were violated.

8.      It is important to note that when the unit was rented to United Rentals (for the first time) on August 28th, 2003, no operator's manual was provided with the product and the "Ready to Rent" tag indicated that no manual was provided.  (Exhibit 5, Exhibit 1 & 2 to Mixon Deposition, Ready to Rent Tag; Exhibit 6, Kennedy depo pp 60-64; Exhibit 1, Walters depo p. 26, 30).  Even though no manual was provided with the product, Mr. Walters did not think a manual was necessary due to his previous experience using the drill.  (Exhibit 1, Walters depo p. 30).

9.       Mr. Riley and Mr. Walters donned eye protection and ear protection.  (Exhibit 1, Walters depo pp. 18-19), and prepared to begin the job.  First various inspections were performed on the drill assembly and the work area.  Mike Walters inspected the core drill to the best of his knowledge, along with Mr. Riley before going out to the job site and setting it up for drilling.  He checked and installed the rubber gasket, the electrical plugs and made sure the moving parts of the press were working properly.  He found no problems with the drill at that time.  If he had notice any problems with the core drill he would not have used it.  (Exhibit 1, Walters depo pp. 13, 17, 34, 35). Additionally, the work area was inspected.  The floor was in good condition and free from any obstructions, and was swept clean in preparation for setting up the drill.  (Exhibit 1, Walters depo pp. 66-67).

10.     Mr. Walters set the drill up for the first hole (as well as the second hole that Mr. Riley was drilling at the time of the incident).  (Exhibit 1, Walters depo pp. 32-33).

11.    It is undisputed that the vacuum system was being used to secure the base to the floor surface and that the base was leveled and rigid with the floor.  (Exhibit 1; Walters depo at p. 112).  Mr. Walters explained the manner in which the drill was set up and how the drill initially held firm using the vacuum system.  However, during the course of drilling the first hole, the base released from the floor causing the drill base to rotate.  Mr. Walters explained that "it appeared that the vacuum came loose from the floor" causing the base to spin around.  His hands were on the drill press handle and on the top of the drill support post at the time.  The drill did not hit him or injure him in any way.  According to Mr. Walters, Mr. Riley cut the power to the drill almost immediately. (Exhibit 1. Walters depo pp. 69, 78, 79, 110, 111, 112).

12.    Mr. Walters explained that after the base disengaged during the first hole, he cleaned the gasket and checked it for breaks, made sure the drill was in good working order, and swept the floor area again.  He checked the drill bit and confirmed that none of the teeth were missing.  After performing the checks and setting the drill back up plugging it in and testing the vacuum strength by attempting to shift it back and forth, he felt the vacuum system was working properly and that the vacuum was forming a good seal.  He explained that he would not have used if he didn't think the base would hold securely.  (Exhibit 1, Walters depo pp. 70, 71, 72, 73, 77, 78, 79, 80, 102-114, 116).

13.    Mr. Walters did not really know why the drill base vacuum failed, but said that he checked the first hole after the base shifted to see if anything was in the hole that the bit might have hung on and found nothing.  When he set it back up and plugged the unit back in, the vacuum sealed the base to the floor and appeared to be holding.   The base held while Mr. Walters finished the first hole. (Exhibit 1, Walters depo pp. 119, 126, 127).   He did not recognize to any extent that as a result of

the vacuum coming loose that it would create a danger of injury to either himself or someone standing nearby. (Exhibit 1, Walters depo p. 71).

14.     After the first hole was completed, Mr. Walters set the drill up for Mr. Riley to use. (Exhibit 1, Walters depo p. 76). He positioned the drill and adjusted the leveling bolts (consistent with the instructions in the owner's manual). (Exhibit 1, Walters depo pp. 32-33, 76).

15.     Leveling bolts: Mr. Walters explained that on this machine there are leveling bolts on the four corners of the base. Mr. Walters explained the set up and use of the leveling bolts: "You seal the vacuum to the floor and then run your bolts down until they touch the floor so it (the base) don't move." Even thou Mr. Walters did not have the operator's manual to refer to, this procedure is virtually identical to the instructions provided on p. 8 of the manual. (Exhibit 4, Riley depo Exhibit 32, Operator's Manual p.8). He explained that this was the procedure he used in setting the drill up for the first and second hole. He affirmed that when he stood on the base there was no movement in the base. He confirms that he set the drill up for the second hole and adjusted the leveling bolts before Mr. Riley began drilling. (Exhibit 1, Walters depo pp. 74, 75, 76). He observed Mr. Riley operating the drill before he left on a call, and he did not observe any problems either with the drill or with Mr. Riley's use of the drill. (Exhibit 1, Walters depo p. 33).

16.     Mr. Walters explained that he would not have instructed Mr. Riley to use a core drill bit that had teeth missing. (Exhibit 1, Walters depo p. 61) He inspected the drill bit prior to beginning the job and it had no teeth missing. (Exhibit 1, Walters depo p. 62).

17.     Significance of the Manual: The manual (that was not provided with the core drill) does provide information concerning the operation of the core drill. On page four of the manual, the Safety Precautions are listed. (Exhibit 4, Riley depo Exhibit 32, Operator's Manual p. 4). Of the sixteen items listed, only three are even related to the issues raised here by United Rentals. Item 1:

"Know your core drilling machine!  Read the Operator's Manual carefully."  Although this is the first instruction in the Preparation section of the Manual, as previously indicated, no such manual was provided to allow the operator to read the manual carefully.

18.     Item 13 from the Manual provides that the base of the drill stand should be secured to the work surface by one of three means: anchor bolts, ceiling jack <u>or</u> vacuum attachment.  (Exhibit 4, riley depo Exhibit 32, Operator Manual p. 4).  Except for the unreliable hearsay testimony of Mr. Tew (Flavor House employee) it is undisputed that the vacuum system was installed on this drill and was being used at the time of the incident to secure the drill stand to the work surface.

19.     Item 14 provides that the operator should "never stand on the drill stand base <u>as a method of securing the drill stand</u>."  (Exhibit 4, Riley depo Exhibit 32, Operator's Manual p. 4).

20.     While it is true that Mr. Riley and Mr. Walters both stood on the base of the core drill during its use that morning, the purpose of standing on the core drill was not to secure the base.   Mr. Walters explained that although he did stand on the base while drilling about ¾ of the first hole, he did so (not to secure the base) but because it was easer to reach the drill press lever; standing on the base had nothing to do with securing the base.  (Exhibit 1, Walters' depo pp. 48, 49, 113-114).

21.     Exhibit 13 to Mr. Walters' deposition shows Mr. Riley's exemplar position and Mr. Walters' position during part of the operation of the core drill.  (Exhibit 1, Walters depo pp. 46, 50, depo Exhibit 13).

22.     Mr. Walters does not recall instructing Mr. Riley on whether or not to stand on the drill base, but he states that Mr. Riley did see him (Walters) standing on the base while he drilled the first hole.  (Exhibit 1, Walters depo p. 47).

23.     Mr. Walters explained that it was not unusual to stand on the drill base while drilling into the floor, that he had done it before and he had seen others doing it.  In fact, he testified that almost

everyone he had ever seen using one had stood on the base from time to time.  Exhibit 1, Walters depo pp. 114-115).  Mr. Walters' testimony is consistent with Mr. Cody's testimony on the subject.  Mr. Cody, also a mechanic at Flavor House, testified that he had used systems with vacuum pumps similar to the Norton Core Drill, and indicated that he had stood on the base of such machines himself during its operation to make it easier to reach the press handle.  (Exhibit 8, Cody depo pp. 81, 82).  Mr. Cody indicated that he wasn't that concerned about standing on the base because "the ones with the vacuum, they're pretty secure, they're not like the older ones."  He was not aware of any problems with the vacuum pump.  (Exhibit 8, Cody depo pp. 88-89).

24.     Although Defendant United Rentals places great emphasis on the inappropriateness of standing on the drill base, no warning against this practice is on the product.  And as previously discussed, standing on the base is not specifically prohibited even in the manual.  The only prohibition is against standing on the base <u>as a means to secure the base</u>.  Exhibit 4, Riley depo Exhibit 32, p. 4).

25.     The procedure for using the Vacuum Hold Down system is explained on page 8 of the Operator's Manual.  The manual explains that the vacuum pump comes on automatically when the unit is plugged in so that "turning the (drill) motor off does not turn off the vacuum pump and release the drill from the work surface."  (Exhibit 4, Riley depo Exhibit 32, p. 8).

26.     Contrary to United Rentals assertion (paragraph 8 of Defendant United Rentals Narrative Statement of Facts), the leveling bolts were properly used in the set up for both holes.  The manual explains that the leveling screws are to be adjusted "so that the base is snug against the work surface."  (Exhibit 4, Riley depo Exhibit 32, Operator's Manual p. 8).  This is precisely the way Mr. Walters adjusted the leveling screws when he set up the drill for the first hole he drilled as well as the set up for the second hole Mr. Riley began drilling.   (Exhibit 1, Walters depo pp. 74, 75, 76).

8

The fact that Mr. Riley was unaware of the purpose of the corner bolts is inconsequential and irrelevant, since Mr. Walters (not Mr. Riley) is the one who set the drill up for drilling both holes, utilizing the leveling bolts in the proper manner.

27.     Contrary to Tew's and Mr. Riley's misconception, there are no "anchor bolts" on the subject model of the core drill.  However, the bolts shown in the attached photos show the leveling screws that were the subject of Mr. Walter's drill setup testimony.  (Exhibit 1, Walters depo Exhibits 1 & 2).

28.     Contrary to United Rentals' representation (paragraph 16 of Narrative Statement of Facts, citing Ken Tew's testimony) the drill bit that was used to drill the holes was the broken bit depicted in Exhibit 1 of Donald Cody's deposition, not the undamaged drill bit Mr. Tew photographed back at the mechanic's shop.  (Exhibit 8, Cody depo 101-102, Cody Exhibit 1, pictures).  Donald Cody saw the bit first hand at the scene of the incident.  Mr. Tew, who is currently working as an insurance claims adjuster, received his information second hand from others, primarily, Mr. Cody, whose testimony is contrary to Mr. Tew's.  Mr. Tew never talked with Mr. Riley about the event. (Exhibit 7, Tew depo pp. 83-84, 86).

29.     Although Mr. Tew opined that Mr. Riley didn't use the drill properly, he provided no foundation or basis to support that opinion, other than incorrect assumptions.  Mr. Tew believed (incorrectly) that the base was supposed to be anchored with anchor bolts, a position unsupported in the manual and other testimony, and didn't even realize that the unit in question had a vacuum hold down system.  And finally, he couldn't even identify the vacuum pump component on the drill assembly.  He didn't know where the power switches were located on the unit, nor had he ever seen or heard the unit in operation.  He could not identify components in the pictures he took of the unit. And finally, he never asked to see nor ever reviewed the operator's manual as a part of his

investigation (admitting that the unit did not come with a manual).  As a result of his investigation, he made no changes to Flavor House's procedures related to the use of core drills.  (Exhibit 7, Tew depo pp. 89-95).  His testimony on the subject is contrary to all others and totally lacks credibility.

30.    Mr. Cody testified that he had used vacuum systems before and that the base had never broken loose, although sheer pins had broken on the drill motor shaft.  (Exhibit 8, Cody depo pp. 92-93).  And finally, Mr. Cody indicated that the diamond core drill bits are designed to drill through rebar and that you can't predict where the rebar is going to be located in the concrete floor. He had drilled through rebar himself before.  (Exhibit 8, Cody depo pp. 97-98).

31.    Although Tew went on to opine Mr. Riley may have been impaired (based upon a positive qualitative drug screen), he admitted that he has no training in interpreting drug screening results to make a judgment of impairment, nor has he consulted with anyone qualified to provide such an analysis.  And finally, neither Mr. Mason (an employee who witnessed the incident), nor Mr. Walters indicated that Mr. Walters showed signs of any impairment at all prior to the incident. (Exhibit 7, Tew depo pp. 95-97).  Again, Tew's testimony on the subject is contrary to all others and lacks any basis or credibility.

32.    An inspection of the product tool place near Atlanta, GA, and revealed that the vacuum pump was not functional.  The power cord had been detached during the incident, however, even after rewiring the unit, the vacuum pump was found to be non-functional.  By agreement, the parties agreed to partially disassemble the vacuum pump to investigate the reason for the pump's failure. Inspection revealed a large amount of corrosion in the pump itself (as depicted in Exhibit 2 to Mr. Kennedy's deposition).  Mr. Kennedy, the United Rentals Service Manager, admitted that United Rentals does not service or maintain the area of the vacuum pump depicted.  (Exhibit 6, Kennedy depo p. 90, Kennedy depo Exhibit 2).

10

33.     The inspection also revealed that the Milwaukee drill motor was operating according to the manufacturers specifications.  Rather than having a sheer pin (as searched for and expected by Donald Cody), the unit was equipped with a "clutch" mechanism that served as a safety feature and to prevent damage to the drill motor should the drill bit jam.  The inspection also indicated that the rubber seal that is installed on the bottom of the base to form a seal between the metallic base and the floor, was slightly torn at its end joint.  (Exhibit 3, Shaver Expert Report; Exhibit 2, Frost Expert Report).

34.     Both Don Shaver and John Frost found that the product was defectively designed and unreasonably dangerous, and negligently designed, and that the defective condition of the product and the negligent design proximately caused Mr. Riley's injuries.   Each opined that Mr. Riley's use of the machine was reasonably foreseeable by United Rentals.  Each found that the core drill vacuum pump was not properly maintained and that the resulting corrosion found in the pump contributed to cause the loss of vacuum.  Each concluded that warnings were non-existent that would have had any impact on the outcome of this incident.  Each opined that alternative feasible designs, such as a vacuum switch interlock, dynamic warnings, etc. were available that would have eliminated or minimized the hazard.  The complete sworn report of each expert shows the analysis and basis for these conclusions.  (Exhibit 2, John Frost Sworn Report; and, Exhibit 3, Don Shaver Sworn Report).

## STANDARD OF REVIEW

In review of a Motion for Summary Judgment, the court must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).   Summary judgment is proper only if it is

shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. *See id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the non-moving party to provide evidence establishing a genuine issue of material fact. An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## ARGUMENT

Defendant United Rentals asserts that it is entitled Summary Judgment on all counts, claiming that Plaintiff has (A) failed to present expert testimony; (B) Plaintiff cannot prove proximate cause; (C) Plaintiff cannot establish a breach of any duty allegedly owed to him by United Rentals; (D) Disclaimer of Warranties; (E) Lack of evidence for wantonness claim. As discussed below, defendant's Motion is due to be denied.

**Alabama Extended Manufacturer's Liability Doctrine (AEMLD):**

In order to establish liability under the AEMLD, a plaintiff must show:

(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Halsey v. A.B. Chance Company,* 695 So.2d 607, 608 (Ala.1997)(quotations and citations omitted).

It is undisputed that Defendant is engaged in the business of "selling" goods such as the Norton Core Drill, and that United Rentals did supply the core drill in this case. It is uncontroverted that the product did reach the consumer without substantial change in the condition in which it was "sold." It is also undisputed that Mr. Riley was injured while using the core drill. The pertinent analysis here concerns whether there are disputed facts concerning the defective nature of the product and whether that defect was the proximate cause of Mr. Riley's injures. The answer is yes to both issues.

"[A] defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the parties." *Beam v. Tramco, Inc.,* 655 So.2d 979, 981 (Ala.1995). Moreover, "it makes no difference whether it is dangerous by design or defect. The important factor is whether it is safe or dangerous when the product is used as it was intended to be used." *Casrell v. Altec Indus., Inc.,* 335 So.2d 128, 133 (Ala.1976). Finally, "[w]hether a product is 'unreasonably dangerous' is for the trier of fact, just as negligence, vel non, is in a traditional negligence case." *Id.*

In the present case, Walters and Cody, the two experienced core drill operators, consistently stated that they had never seen a vacuum hold down system fail before. When this happened to Mr. Walters while drilling the first hole, he checked the machine out before reusing it and convinced himself that the malfunction was an anomaly, caused by dirt or debris.

13

It is important to note that contrary to United Rentals assertions, the testimony of Mr. Walters indicates that the core drill was set up and operated properly, and the manner in which the drill was being used was as it was intended (consistent with the instructions provided in the unavailable operator's manual). The machine was properly and securely set up, using the leveling bolts, and appeared to be functioning properly, with the exception of the isolated malfunction while drilling the first hole.

Likewise, the operator's manual provides that using the vacuum securing method was intended and it was intended to hold the base securely to the floor surface. But as the irrefutable failure indicates, the product did fail to meet the expectations of the users, in that the force of the vacuum was less than the force required to engage the clutch on the drill motor, causing the base to break free from the vacuum seal and rotate in the opposite direction of the drill motor.

John Frost and Don Shaver, Plaintiffs engineering experts, filed reports in this case setting out the defective condition of the product as well as the alternative feasible designs. John Frost is a safety engineer with extensive experience in his field. He received his Bachelor of Science in Electrical Engineering from the University Of Virginia in 1972, where he was a Dupont Scholar, and a Master of Science in Industrial Engineering specializing in Safety Engineering from Texas A&M University in 1974. He has served as a practicing Safety Engineer for the United States Department Of Defense for 33 years as a civilian. He recently retired as the Chief of the Safety Office at the U.S. Army's Aviation and Missile Command in 2005. In that capacity he was responsible for safety engineering guidance for the design and support for the Army's aircraft and missiles, as well as safety support to the approximately 8,000 employees of the command.

He conducted an investigation of this incident, reconstructed the accident, reviewed discovery materials, and concluded "the design of the DM 500 Core Drill is inherently hazardous,

14

unreasonably dangerous and defective," and that "the hazardous design and condition of the DM 500 Core Drill was the root cause of Mr. Riley's injuries." Mr. Frost's sworn expert report setting out his qualifications and basis of his opinions is attached hereto as Exhibit 2. (Exhibit 2, Frost Expert Affidavit and attached Frost Expert Report, p. 9).

Mr. Don Shaver is a licensed professional engineer who investigated this incident as well. Following his inspections and analysis, Mr. Shaver concluded that "the Core Drill as designed has a hazard defined as the potential for serious injury as a result of loss of vacuum in the hold down system (Vacuum Loss Hazard), resulting in release of the base during operation, with resulting loss of control of the entire drill apparatus while the drill motor is still under power." He further opined that "[t]he Vacuum Loss Hazard, as described above would be reasonably foreseeable to a designer or manufacturer of the product if proper hazard analysis were performed." Mr. Shaver also itemized the following areas of his opinions:

- The product is defective and unreasonably dangerous as a result of the designer or manufacturer's failure to address the Vacuum Loss Hazard by design or guarding.

- The Vacuum Loss Hazard should have been reasonably foreseen by a reasonably prudent designer or manufacturer.

- The designer or manufacturer unreasonably failed to address the Vacuum Loss Hazard by design or guarding.

- The Drill Core Cutting Rig offers no built in redundancy or back-up in the event of failure of the vacuum pump/seal.

- Whereas the Milwaukee built drill motor is equipped with a slip clutch, this is inadequate to address the Vacuum Loss Hazard. The sudden failure of the "hold down" method (the Vacuum System in Mr. Riley's case), caused the injury when all of the kinetic energy

15

exerted in rotation was suddenly released in an uncontrolled manner. This allowed the heavy base, stand, vacuum pump and drill motor to be uncontrolled and rotate about the core bit axis. This mass became a rotary hammer that could violently strike anything in its path, in this case the operator, Matthew Riley. The unit then came to an uncontrolled stop after it tore the power cord loose.

Mr. Shaver clearly establishes that the product was defective and that the defective condition of the product was the proximate cause of Mr. Riley's injury.

Based upon the testimony of Mr. Shaver and Mr. Frost alone, combined with the facts of the incident as set out in Plaintiff's narrative facts, it is clear that Plaintiff has met his burden to establish the defective and unreasonably dangerous condition of the product as required to establish AEMLD action. As previously stated, United Rentals does the final assembly of the component core drill parts received from Norton. The base is assembled, installing the upright drill motor post and motor mount; the vacuum pump with plumbing and wiring is installed; and, the drill motor is installed on the motor mount and wired. As such, United Rentals plays a significant role in the manufacture of the final product and has superior knowledge concerning its components and the hazards associated with its use. In the very least, a material issue of fact exist precluding summary judgment.

**Negligent Failure to Maintain:**

United Rentals maintains that it did not breach any duty to maintain the product, because it contends, the product was working fine and had a Ready to Rent tag on it when it was delivered. Although Flavor House was responsible for superficial inspections and maintenance of the Core Drill while in their custody and use, it is clear that such "maintenance" is limited. United Rentals owes a duty to the consumer to perform more extensive maintenance of the product. In this case, it

is clear that the maintenance of the vacuum pump is beyond the capabilities of the consumer and should be performed by United Rentals.

Mr. Shaver was present and participated in a joint inspection of the subject core drill in Atlanta, GA. He saw first hand, the condition of the core drill after the incident. In particular he confirmed that the vacuum pump was not functioning at the time of the inspection and that it was found to have a substantial amount of corrosion inside the workings of the vacuum pump. He found that the subject DM500 core drill was not properly maintained by United Rentals prior to transfer of the product to Flavor House and use by Mr. Riley. Failure to properly maintain the product by United Rentals caused or contributed to cause the vacuum failure and catastrophic results of the failure. Based upon Mr. Shaver's analysis, in the very least a genuine issue of material fact exists precluding summary judgment on this issue.

**Contributory Negligence as a Matter of Law:**

To prove contributory negligence, the defendant bears the burden of proof to show that the plaintiff: "(1) had knowledge of the condition; (2) had an appreciation of the danger under the surrounding circumstances; and (3) failed to exercise reasonable care, by placing himself in the way of danger." *Wallace v. Doege,* 484 So.2d 404, 406 (Ala.1986). In order to find that a Plaintiff has been contributory negligent, there must be a finding that the Plaintiff put himself in danger's way ... and a finding that the Plaintiff appreciated the danger confronted .... Moreover, it must be demonstrated that the Plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred.... Mere 'heedlessness' is insufficient to warrant a finding of contributory negligence as a matter of law. *Central Alabama Electric Co-op. v. Tapley,* 546 So.2d 371, 381 (Ala.1989)(internal quotations and citations omitted)).

The question of contributory negligence is generally one of fact for the jury. Only when "the conduct of the plaintiff in certain cases may be so lacking in reasonable care for his own safety that reasonable minds may not differ on the issue of the plaintiff's own negligence; in such a case the question becomes one of law." *Johnson v. Niagara Mach. & Tool Works,* 555 So.2d 88, 93 (Ala.1989). Of course, Defendant also has the burden of establishing that the alleged contributory negligence proximately caused the injury.

In the present case, defendants cannot meet their burden to establish that Mr. Riley was contributory negligent as a matter of law. First, United Rentals cannot establish that Mr. Riley's conduct was negligent as a matter of law, and second, United Rentals cannot establish that any alleged negligence was, as a matter of law, the proximate cause of Mr. Riley's injuries. The testimony presented herein sets out that none of the operators appreciated the risk associated with using the product. But in any event, United Rentals cannot establish as a matter law that any of the alleged conduct was negligent at all.

United Rentals assertion of negligence on Matthew Riley's part is apparently based upon the fact that he stood on the base of the drill during its operation, and that as a matter of law this constitutes negligent conduct. However, the Operator's Manual itself belies this claim. The manual does not forbid "standing" on the base of the core drill. The manual merely indicates that the operator should not use "standing on the base" as a method of securing the base. It is clearly a factual issue as to whether this conduct constitutes negligence, especially in light of the fact that numerous other Flavor House operators (including Mr. Walters and Mr. Cody) of similar, if not the same core drills, had operated core drills in the same fashion without incident.

Even more difficult is United Rentals burden to establish that Mr. Riley's conduct in standing on the base during his operation of the drill somehow caused the vacuum to fail. Mr.

18

Walters' testimony would suggest otherwise, where he definitively stated that he set the drill up for the second hole, and that he adjusted the leveling bolts appropriately and that the base was stable when Mr. Riley began using it.  Standing on the base under those circumstances would not cause the vacuum seal to fail since the base by action of the leveling bolts was resting flat and secure on the floor and could not move in a way to cause the seal to break.  Again, in the very least, a genuine issue of material fact exists on this issue.

Mr. Walter's experience drilling the first hole belies any causal connection between the failure of the vacuum system and standing on the unit.  Mr. Walters testified that he does not believe he stood on the base of the drill prior to the initial failure he experienced while drilling the first hole. (Exhibit 1, Walters depo p. 109).  This fact alone calls into question United Rentals' claim that Mr. Riley's standing on the drill stand base caused the loss of vacuum and the ultimate failure.  If the unit failed the first time without anyone standing on the base, how can United Rentals say as a matter of law that standing on the base was the proximate cause of the failure.  Simply put, United Rentals cannot meet its burden to establish that, as a matter of law, standing on the base was the proximate cause of the failure.  In the very least it creates genuine issue of material fact for the jury to decide.

Finally, United Rentals claims that standing on the base of the drill base constitutes negligence, yet United Rentals did nothing to warn Mr. Riley or Flavor House that such conduct, according to United Rentals was dangerous and could lead to serious injury.  As previously reported, United Rentals did not supply the manual that contains the language United Rentals claims warns against such conduct.[1]  It is undisputed that no warnings were on the product that would have

---

[1] Again, Plaintiff contends that such conduct is not warned against or prohibited, even in the non-produced manual.

alerted Mr. Riley or anyone else of any purported hazard associated with standing on the base of the unit during operation.

Furthermore, as stated by Plaintiffs experts, the manner in which the product was being used was reasonably foreseeable and should have been anticipated by United Rentals.

**Product Misuse:**

As Defendant United Rentals admits, the "product misuse" defense is only available where the Defendant can show that the use of the product was in a manner unintended by the seller or not reasonably foreseeable. Defendant's claim that Mr. Riley is guilty of product misuse as a matter of law is simply untenable. As discussed above, a genuine issue of material fact exists as to whether Mr. Riley did anything that was inappropriate in the operation of the unit, much less that as a matter of law. Plaintiff's experts, both Frost and Shaver, have opined that Mr. Riley's manner of use of the product was clearly reasonably foreseeable by the seller. In this case, a genuine issue of material fact exists as to whether Mr. Riley's or Mr. Walter's use of the product was even in contravention of the instructions. Certainly, it is undisputed that the core drill was being used for one of the purposes for which it was designed, i.e., drilling concrete holes. There is no evidence that Mr. Riley's failure to read the manual constituted misuse of the product. Certainly, it is difficult to conceive that United Rentals could claim that failure to read the manual in not reasonably foreseeable on United Rentals' part, especially when it was United Rentals policy not to provide the manuals with the equipment. As previously discussed, a genuine issue of material fact on this issue precludes summary judgment.

**Negligent Failure to Warn:**

To maintain an action for failure to warn based upon a negligence theory or under the AEMLD, the plaintiff must prove: (1) that the defendant had a duty to warn him or her of the

product's danger when used in its customary manner;  (2) the defendant's warning breached that

duty because it was inadequate;  and (3) the breach proximately caused the plaintiff's injuries.

*Strickland v. Royal Lubricant Company,* 911 F.Supp. 1460, 1468 (M.D.Ala.1995).   A warning is

"adequate" if it is "one that is reasonable under the circumstances, and it need not be the best

possible warning."   *Strickland,* 911 F.Supp. at 1468 (quoting *Gurley v. American Honda Motor*

*Co.,* 505 So.2d 358, 361 (Ala.1987)).  Plaintiff's experts clearly establish that the vacuum loss

hazard was reasonably foreseeable by manufacturers, including United Rentals as the final

assembler of the product.  Therefore, United Rentals owed a duty to warn of those hazards.

Adequacy of warnings is not really an issue in this case, since no warnings of the hazards

were presented at all by United Rentals.  As previously discussed, no warning of the hazard

associated with loss of vacuum was provided on the product.  No warnings were present on the

vacuum gauge indicating dangerous loss of vacuum negative pressure.  No warnings were on the

product to warn against standing on the base of the core drill.  And the one accessible warning on

the product that cautioned that the user should read the manual was defaced.

In this case, United Rentals contends that Plaintiff was negligent because he did not read the

operators manual that contained, what United Rentals contends is warnings against standing on the

base of the core drill, and consequently that he stood on the core drill base.  United Rentals cannot

have it both ways.  United Rentals provided no warning at all of this case, and did not as a matter of

policy (according to United Rentals Service Manager, Kennedy) provide manuals for products like

the core drill.  If United Rentals can maintain that Mr. Riley should have read the manual with the

"warning," then United Rentals cannot contend that it had no duty to warn, nor that it breached that

duty by not supplying the manual with the product.

The hazard associated with the loss of vacuum pressure was not known or open and obvious as contended by United Rentals. In fact, even after the product malfunctioned when Mr. Walters was drilling the first hole, no one was hurt and no one really knew why the product had failed. The warnings, including dynamic warnings that would alert the user to loss of vacuum negative pressure as suggested by Plaintiff's experts, were non-existent, preventing the users to comprehend why the product failed. And certainly, with this experience, no one realized the extent of potential injury.

**Sophisticated User Defense:**

United Rentals claims that Flavor House, as a sophisticated user, had a duty to warn Mr. Riley of the hazards of the product and that United Rentals had no duty to provide warnings. Certainly, if anything, the testimony in this case indicates that a genuine issue of material fact exists on the issue of whether Mr. Riley was properly instructed in the use of the product. Defendant United Rentals cited *Vines v. Beloit Corp*., 631 So. 2d 1003 (Ala. 1994) for the proposition that it owed no duty to warn in this case. However, *Beloit* is distinguishable in a significant manner. The *Beloit* Court looked to *Cook v. Branick*, 736 F. 2d 1442 (11th Cir. 1984):

> In *Cook v. Branick Mfg., Inc.,* 736 F.2d 1442 (11th Cir.1984), the court considered a manufacturer's duty under Alabama law to protect a purchaser's employees from potential hazards in its product. The product was machinery used in the process of recapping tires. The manufacturer had made the employer aware of the hazard that subsequently resulted in the plaintiff's injury. The manufacturer had recommended warnings and operating procedures to reduce the risk. However, the plaintiff's employer did not adopt these recommendations. The Eleventh Circuit affirmed a judgment based on a directed verdict in favor of the manufacturer. The court stated:

22

*1006* "[A]ny duty on the part of the [the manufacturer] to warn of the [dangerous working condition] would ordinarily be discharged when [the manufacturer] **notified all supervisory personnel** of the [injured worker]. *Cook,* at 1446, quoting *Crawford Johnson & Co. v. Duffner,* 279 Ala. 678, 189 So.2d 474, 477 (1966). See also *Davis v. Avondale Industries, Inc.,* 975 F.2d 169 (5th Cir.1992).

As in *Beloit*, United Rentals would, in the least, have to meet its duty to provide Flavor House with the warnings it contends were contained in the manual. Yet the evidence clearly suggests that United never provided the Norton DM 500 Core Drill Operators Manual to anyone with Flavor House, much less to the operators of the core drill. *Beloit*, 631 So. 2d 1003, 1006.

In the present case, there is no indication that United Rentals met its obligation to provide warnings to Flavor House. These cases do not establish that United Rentals' duty to Flavor House is obviated. Consequently, United Rentals does owe a duty to Flavor House to provide warnings, so that those warnings can be forwarded on to its employees, and United Rentals has failed to establish that it met that duty as a matter of law so as to invoke the sophisticated user defense to obviate its duty to warn.

Plaintiff's experts each indicated that although warnings are way down on the list of possible remedies to address the loss of vacuum hazard, United Rentals woefully failed to even provide a modicum of warnings. Clearly, United Rentals has a duty to warn of known hazards associated with the use of the product, at least to Flavor House. By providing no warnings, dynamic or otherwise, United Rentals breached its duty to warn to Flavor House and consequently to the operators. In the very least, a genuine issue of material fact exists concerning this issue.

**Breach of Implied Warranties of Fitness and Merchantability:**

Plaintiff concedes that under current Alabama law summary judgment is due to be granted with regard to his claims of breach of implied warranties of fitness and merchantability and voluntarily concedes those claims, as to this defendant.

**Wanton Conduct Claims:**

Plaintiff will voluntarily dismiss his claims of wanton conduct with regards to this Defendant.

<u>CONCLUSION</u>

Plaintiff has provided evidence on the issues raised by Defendant United Rentals and established that a genuine issue of material fact exists for each issue addressed (with the exception of the Wantonness claim and the Implied Warranty claims, as addressed above).  All other issues raised by United Rentals contain genuine issues of material fact and United Rentals Motion is due to be denied.

WHEREFORE, Plaintiff requests this Honorable Court to deny Defendant United Rentals Motion for Summary Judgment.

**COCHRAN, CHERRY, GIVENS,
SMITH, LANE & TAYLOR, P.C.**

/s/ Joseph D. Lane
**JOSEPH D. LANE**
Alabama Bar No. 118498
163 W. Main Street
Post Office Box 927
Dothan, Alabama  36302
(334) 793-1555
(334) 793-8280 (facsimile)
Attorneys for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

24

I hereby certify that I have this date served a copy of the foregoing upon all counsel of record in this cause by placing a copy of the same via E-mail, addressed as follows, on this the 25th day of September, 2006:

C. Winston Sheehan, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, Alabama  36102-2148

Robert H. Sprain, Jr., Esq.
Sprain & Shires, P.C.
1707 29th Court South
Homewood, Alabama 35209

Eugene P. Stutts, Esq.
Spain & Gillon, L.L.C.
The Zinszer Building
2117 Second Avenue North
Birmingham, Alabama 35203

W. Scott McGarrah, III, Esq.
McGarrah & Davenport, P.C.
Post Office Box 43548
Birmingham, Alabama 35243

Joseph T. Brasher, Esq.
Hamilton, Westby, Antonowich & Anderson
One Georgia Center
17th Floor
600 W. Peachtree Street, N.W.
Atlanta, Georgia 30308

/s/ Joseph D. Lane
**OF COUNSEL**