[1]

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

          Plaintiff,

Vs.                              CIVIL ACTION NO.

                                 1:05 CV-994-W

MILWAUKEE ELECTRIC TOOL

CORPORATION, et al.,

          Defendants.



          DEPOSITION OF MICHAEL JAMES WALTERS, taken

pursuant to notice and stipulation on behalf of the

Defendants, in the conference room of Cochran,

Cherry, Givens, Smith, Lane & Taylor, 163 West Main

Street, Dothan, Alabama, before Ricky L. Tyler,

Certified Court Reporter and Notary Public in and for

the State of Alabama at Large, on Monday, July 17th,

2006, commencing at 9:05 A.M.

## [2]

1             APPEARANCES
2 FOR THE PLAINTIFF:
3      JOSEPH D. LANE, ESQ.
4      Cochran, Cherry, Givens, Smith,
5      Lane & Taylor
6      P. O. Box 927
7      Dothan, AL 36302
8
9 FOR THE INTERVENOR, RALCORP:
10     JOSEPH T. BRASHER, ESQ.
11     Hamilton, Westby, Antonowich & Anderson
12     One Georgia Center
13     17th Floor
14     600 West Peachtree Street, N.W.
15     Atlanta, Georgia 30308
16
17 FOR THE DEFENDANT, MILWAUKEE ELECTRIC TOOL
18 CORPORATION:
19     W. SCOTT McGARRAH, III, ESQ.
20     McGarrah & Davenport, P.C.
21     P. O. Box 43548
22     Birmingham, AL 35243
23

## [3]

1 FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
2     KEVIN T. SHIRES, ESQ.
3     Sprain & Shires, PC
4     1707 29th Court Street
5     Birmingham, AL 35209
6
7 FOR THE DEFENDANT, GAST:
8     EUGENE P. STUTTS, ESQ.
9     Spain & Gillon, LLC
10     The Zinszer Building
11     2117 Second Avenue North
12     Birmingham, AL 35203
13
14 FOR THE DEFENDANT, UNITED RENTALS:
15     C. WINSTON SHEEHAN, JR., ESQ.
16     Ball, Ball, Matthews & Novak
17     2000 Interstate Park Drive
18     Suite 204
19     Montgomery, AL 36109-5413
20
21 ALSO PRESENT:
22     VERNON JAMES, Safety Manager, Flavor House
23

## [4]

1           INDEX
2            Page
3
  Direct Examination by MR. SHEEHAN:   8
4 Cross-Examination by MR. McGARRAH:  96
  Cross-Examination by MR. STUTTS:  120
5 Cross-Examination by MR. BRASHER:  137
  Cross-Examination by BY MR. LANE:  139
6 Redirect Examination by MR. SHEEHAN:  144
  Cross-Examination by MR. SHIRES:  148
7 Recross-Examination by MR. McGARRAH:  150
  Further Redirect Exam by MR. SHEEHAN:  155
8
9         EXHIBITS
10 For Defendant:
11 001  Photograph
  For Identification   10
12 002  Photograph
  For Identification   11
13
14 003  Rental Out Contract
  For Identification   13
15 004  General Safety Document
  For Identification   14
16
17 005  Photograph
  For Identification   24
18 6  Photograph
  For Identification   36
19
20 7  Photograph
  For Identification   36
21 8  Photograph
  For Identification   37
22
23 9  Checklist Tag
  For Identification   38

## [5]

1 10  Photograph
  For Identification   38
2
3 11  Photograph
  For Identification   38
4 12  Photograph
  For Identification   39
5
6 13  Photograph
  For Identification   46
7 14  Riley Time Sheet
  For Identification   52
8
9 15  Photograph
  For Identification   55
10 16  Photograph
  For Identification   57
11
12 17  Photograph
  For Identification   58
13 18  Photograph
  For Identification   58
14
15 19  Photograph
  For Identification   58
16 20  Photograph
  For Identification   59
17
18 21  Photograph
  For Identification   63
19 22  Photograph
  For Identification   63
20
21 23  Photograph
  For Identification   64
22 24  Photograph
  For Identification   65
23

[6]

1  25    Photograph
      For Identification            65
2
      26    Photograph
3     For Identification            65
4     27    Photograph
      For Identification            90
5
      28    Photograph
6     For Identification            91
7

8

9            STIPULATIONS

10

11        It is stipulated and agreed by and between

12   counsel representing the parties that the deposition

13   of MICHAEL JAMES WALTERS may be taken before Ricky L.

14   Tyler, Certified Court Reporter and Notary Public in

15   and for the State of Alabama at Large, without the

16   formality of a commission; and all formality with

17   respect to other procedural requirements is waived;

18   that objections to questions, other than objections

19   as to the form of the questions, need not be made at

20   this time, but may be reserved for a ruling at such

21   time as the deposition may be offered in evidence or

22   used for any other purpose by either party as

23   provided by the Federal Rules of Civil Procedure.

[7]

1        It is further stipulated and agreed by and

2   between counsel representing the parties in this case

3   that the filing of the deposition of MICHAEL JAMES

4   WALTERS is hereby waived and that said deposition may

5   be introduced at the trial of this case or used in

6   any other manner by either party hereto provided for

7   by the Statute, regardless of the waiving of the

8   filing of same.

9        It is further stipulated and agreed by and

10  between the parties hereto and the witness, that the

11  signature of the witness to this deposition is hereby

12  waived.

13

14

15               * * * * *

16

17

18          P R O C E E D I N G S

19

20       MICHAEL JAMES WALTERS, of lawful age, having

21  first been duly sworn to tell the truth, testified as

22  follows:

23

[8]

1            DIRECT EXAMINATION

2   BY MR. SHEEHAN:

3   Q.   Mr. Walters, my name is Winston Sheehan.  If I

4        ask you a question in this deposition that you

5        do not understand or if you can't hear it, if

6        you will, let me know and I will be glad to

7        repeat it, otherwise I will assume that you are

8        answering the question honestly and completely;

9        is that fair?

10  A.   Yes, sir.

11  Q.   Your name, sir?

12  A.   Michael James Walters.

13  Q.   And where do you live, sir?

14  A.   What's that, sir?

15  Q.   Where do you live?

16  A.   302 Bowden Street.

17  Q.   Is that here in Dothan?

18  A.   Newville.

19  Q.   And how long have you resided there?

20  A.   Almost five years.

21  Q.   Mr. Walters, you have been identified as the

22       lead mechanic who was present during an

23       accident involving a core drill machine and a

[9]

1        Mr. Matthew Riley; do you recall that day?

2   A.   Vaguely, but I do recall it.

3   Q.   Okay.  And I probably misspoke when I said day.

4        As I understand it, it was the third shift --

5   A.   Yes.

6   Q.   -- there at Flavor House?

7   A.   Yes.

8   Q.   And when did you come on duty that evening?

9   A.   11:00 that night.

10  Q.   And what was your position with Flavor House?

11  A.   I was lead mechanic on the third shift.

12  Q.   And your supervisor?

13  A.   It would be Ricky Smothers.

14  Q.   And what was his position, sir?

15  A.   Maintenance Manager.

16  Q.   And who would have been over Mr. Smothers?

17  A.   I don't recall who was there.

18  Q.   Okay.  What position would there have been

19       over, I guess, the title Maintenance Manager?

20  A.   I'm going to assume it's the Plant Manager.

21  Q.   Okay.  And that's the name you don't recall at

22       this time?

23  A.   What's that, sir?

Michael Walters

[10]

1   Q.   The Plant Manager's name at the time of the
2        accident? That's fair.
3   A.   I don't recall because we've done switched.
4   Q.   No problem.  As far as supervisors, was --
5        Mr. Ricky Smothers, was he there that evening?
6   A.   No, sir.
7   Q.   Okay.  And what about James Mason?
8   A.   Yes, sir.
9   Q.   And what was his position, sir?
10  A.   He was Sanitation Manager, I guess, or
11       supervisor.
12  Q.   Would he have been over Mr. Smothers?
13  A.   I don't believe so.
14  Q.   All right, sir.  What about Mr. Ken Tew, what
15       was his position?
16  A.   I'm going to think he was Safety Director at
17       the time.
18       (Exhibit 001 marked for identification.)
19  Q.   Let me show you what's been provided to us as
20       photographs of the subject core drill machine.
21       I'll go on and mark this as Exhibit 001 to your
22       deposition and ask if you can identify that for
23       us, please, sir?

[11]

1   A.   It appears to be the one we rented.
2   Q.   All right, sir.  And is that -- where was that
3        photograph taken, sir?
4   A.   It looks like the maintenance shop.
5   Q.   Okay.  And when was that photograph taken?
6        MR. BRASHER:  If you know.
7   A.   I could not tell you that, sir.
8   Q.   Okay.  Do you know -- or have you ever seen
9        that photograph before today?
10  A.   No, sir.
11  Q.   Have you ever seen any photographs of the
12       accident site or of the core drill machine
13       involved in the accident?
14  A.   No, sir.
15  Q.   So that I'm clear, this Exhibit Number 001,
16       does that fairly and accurately depict the
17       subject core drill machine?
18  A.   Yes, sir.
19       (Exhibit 002 marked for identification.)
20  Q.   I'm going to show you another photograph that's
21       been provided to us by Flavor House.  I'll mark
22       it as Exhibit Number 002 to your deposition and
23       ask you if that is also a photograph of the

[12]

1        base of that subject core drill machine that
2        was involved in the accident?
3   A.   It appears to be that.
4   Q.   And does that Exhibit Number 2 fairly and
5        accurately depict the condition of the core
6        drill machine involved in the accident?
7   A.   Yes, sir.
8   Q.   As I understand it, Mr. Matthew Riley had never
9        used a core drill machine before that evening?
10  A.   No, sir, not that I was aware of.
11  Q.   Okay.  I'm sorry.  Can you help me understand
12       that?
13  A.   He had stated he had never used one before.
14  Q.   Okay.  So he did notify you that he had never
15       used --
16  A.   Yes, sir.
17  Q.   Okay.  And as a result, did you take care and
18       precautions to make sure that he understood how
19       to properly use the core drill machine?
20  A.   Yes, sir.
21  Q.   Did you yourself examine the core drill machine
22       before using it?
23  A.   Yes, sir.

[13]

1   Q.   Did you inspect the machine to make sure that
2        it was in proper working condition?
3   A.   To the best of my knowledge.
4   Q.   And did you check the gaskets before operating
5        the core drill machine?
6   A.   Yes, sir.
7   Q.   Did you check the warning labels on the core
8        drill machine before operating it?
9   A.   The best that I can remember.
10  Q.   Okay.  Were you -- let me show you what I'll
11       mark as 003 to your deposition, the Rental Out
12       contract.
13       (Exhibit 003 marked for identification.)
14  Q.   Did you happen to see that?
15  A.   No, sir.
16  Q.   All right.  And whose signature appears down
17       here in the left-hand corner?
18  A.   That I can't tell you.
19  Q.   Okay.  It's been represented to us that that's
20       the signature for Adam Hall.
21  A.   Yes, sir.
22  Q.   Who is Adam Hall?
23  A.   He is another mechanic.

**[14]**

1    Q.   Okay.  And was he working that evening?
2    A.   No, sir.
3    Q.   What was his position or shift that he worked?
4    A.   He worked first shift.
5    Q.   First shift.  And those hours would be what,
6         sir?
7    A.   It's 6:00 to 3:00 now.  I don't know if they
8         was coming in at 6:00 then or not.
9         (Exhibit 004 marked for identification.)
10   Q.   Let me show you Exhibit Number 004 to your
11        deposition and ask you if you can identify this
12        document that's titled "General Safety"?
13   A.   No, sir.  I don't believe there was one with it
14        when we got it.
15   Q.   Okay.  Have you ever seen that document?
16   A.   Yes, sir.
17   Q.   And where did you last see that document?
18   A.   From when we had rented one before from there.
19   Q.   Rented one from whom, sir?
20   A.   United Rentals.
21   Q.   All right.  And when had you last rented one
22        from United Rentals where you had seen that
23        safety sheet?

**[15]**

1    A.   That I couldn't give you a definite answer on.
2    Q.   Can you help us maybe with an approximate;
3         days, months, years?
4    A.   It was probably a year or two before.
5    Q.   Okay.  And how did you happen to see that
6         General Safety document a year before the
7         accident?
8    A.   It was laying with the drill whenever they went
9         to turn it back in.
10   Q.   All right, sir.  And if you would, sir -- was
11        it in connection with a core drill machine
12        rental?
13   A.   Yes, sir.
14   Q.   Let me ask you if you would help me with
15        paragraph one there.
16             MR. LANE:  Have you got an extra copy
17             of that?
18             MR. SHEEHAN:  I don't, but it was in
19             the last deposition.  I'm sorry.
20   Q.   Paragraph one reads "Only operate if you have
21        been authorized and are trained in equipment's
22        safe operation."  Did I read that correctly,
23        sir?

**[16]**

1    A.   Yes, sir.
2    Q.   And then down at the bottom there, the last
3         paragraph under paragraph 11, "If the person
4         receiving this handout will not be the user of
5         the equipment, forward these instructions to
6         the operator."  Did I read that correctly, sir?
7    A.   Yes, sir.
8    Q.   "If there is any doubt as to the operation or
9         safety of the equipment, do not use," with
10        three exclamation points?
11   A.   Yes, sir.
12   Q.   "Call us immediately," with three exclamation
13        points?
14   A.   Yes, sir.
15   Q.   Did you ever call United Rental?
16   A.   No, sir.
17   Q.   And finally, I guess, that last sentence,
18        "Failure to follow these instructions could
19        result in injury or death."  Did I read that
20        correctly?
21   A.   Yes, sir.
22   Q.   Now, what precautions did you take to ensure
23        that this core drill machine was in good

**[17]**

1         condition, sir?
2    A.   I inspected it, to the best of my knowledge.
3    Q.   Okay.  And how did you inspect it, sir?
4    A.   Checked the gaskets, checked the plugs, made
5         sure it was freely moving and all before we set
6         it up to drill the first hole.
7    Q.   All right, sir.  And where was this inspection
8         conducted?
9    A.   In the maintenance shop.
10   Q.   And who was present during this inspection?
11   A.   Me and Mr. Riley.
12   Q.   Was anyone else in the maintenance shop at the
13        time?
14   A.   No, sir.
15   Q.   Were you and Mr. Riley the only maintenance
16        people on that third shift that evening?
17   A.   As far as I can remember.
18   Q.   All right, sir.  How was it that James Mason
19        happened to be at the plant that evening?
20   A.   He's Sanitation Supervisor.  He was there with
21        sanitation.  That's when they come in and clean
22        the plant.
23   Q.   Third shift, that's makes sense.  Was the mill

[18]

1    -- or, excuse me, was the facility in operation
2        at the time?
3    A.   I can't say that for sure. I don't know if
4        there was anything left running or not.
5    Q.   All right. What about personal protective
6        devices, did you have any assigned to you at
7        the time?
8    A.   As far as what, sir?
9    Q.   Eye protection?
10   A.   Yes, sir. I had -- we had gloves and safety
11       glasses and earplugs.
12   Q.   Okay. And was Mr. Riley using safety glasses
13       at the time of the accident?
14   A.   As far as I know, sir. I wasn't there present
15       at the time of the accident.
16   Q.   Okay. What about while you were operating the
17       machine for drilling the first hole?
18   A.   Yes, sir.
19   Q.   That was a poor question. Was Mr. Riley using
20       eye protection when you were drilling the first
21       hole?
22   A.   Yes, sir.
23   Q.   Okay. Was he also using earplugs?

[19]

1    A.   Yes, sir.
2    Q.   Were you also using eye protection and
3        earplugs --
4    A.   Yes, sir.
5    Q.   -- drilling the first hole?
6    A.   Yes, sir.
7    Q.   What other safety equipment was provided to you
8        at that time?
9    A.   There wouldn't be none, sir.
10   Q.   So the only personal safety protections were
11       the eyewear and earplugs?
12   A.   Yes, sir.
13   Q.   And can you describe the eyewear that was
14       assigned to y'all?
15   A.   Just a pair of safety glasses.
16   Q.   And is this something that you have assigned to
17       you when you first go to work there?
18   A.   Yes, sir. We usually give everybody a pair.
19   Q.   Okay.
20   A.   If you don't already have your own.
21   Q.   Okay. And how long had Mr. Riley been working
22       at the plant?
23   A.   I want to think two or three days, if I recall

[20]

1    it right.
2    Q.   And were you involved in the employment of
3        Mr. Riley, either by recommending him --
4    A.   No, sir.
5    Q.   -- or telling him about the job?
6    A.   No, sir.
7    Q.   How did Mr. Riley happen to obtain the
8        position?
9    A.   I have no idea, sir.
10   Q.   Did you know Mr. Riley before the accident?
11   A.   No, sir.
12   Q.   Before the day of the accident or that evening,
13       had you worked with Mr. Riley?
14   A.   No, sir.
15   Q.   What, if anything, had Mr. Riley been doing for
16       the two or three days he was working there?
17   A.   I don't remember exactly, sir.
18   Q.   Had you seen him around?
19   A.   Yes, sir.
20   Q.   And had you used a core drill machine before
21       that evening?
22   A.   Yes, sir.
23   Q.   Approximately how many times, sir?

[21]

1    A.   Probably a dozen.
2    Q.   Okay. And what projects had you used a core
3        drill machine on?
4    A.   I had put pylons in at work and I had used it
5        from previous jobs.
6    Q.   All right. And what sort of previous jobs had
7        you -- let me see if I can get you to help me.
8        Can you kind of give us just a brief work
9        history? Before going to work at Flavor House,
10       where had you worked, sir?
11   A.   I worked for Baxley Blow Pipe Company.
12   Q.   And when was that, sir?
13   A.   Where was it?
14   Q.   When?
15   A.   I left there in 2000 and I think I went to work
16       there in '93 or '94.
17   Q.   All right, sir.
18       MR. STUTTS: What was the name of it?
19   A.   Baxley Blow Pipe Company.
20   Q.   And what did you do at Baxley Blow Pipe?
21   A.   I was the road foreman.
22   Q.   And what would -- what were your duties and
23       responsibilities during those seven years as

[22]

1    road foreman?
2    A.   To install air collection systems.
3    Q.   And in that position had you used a core drill
4        machine before?
5    A.   Yes, sir.
6    Q.   And about how many times had you used a core
7        drill machine while working for Baxley Blow
8        Pipe?
9    A.   It would be part of that dozen.
10   Q.   Okay.  And what did you do before working at
11       Baxley Blow Pipe?
12   A.   I was in the military.
13   Q.   And how long were you in the military, sir?
14   A.   Still am.
15   Q.   Okay.  On active duty how long?
16   A.   Active duty I had ten years in.
17   Q.   And what position or MOS did you have?
18   A.   I was an E-6 EOD diver.
19   Q.   And in the military had you used a core drill
20       machine?
21   A.   Yes, sir.
22   Q.   And approximately --
23   A.   I couldn't even guesstimate how many times we

[23]

1        had used it there.  It wasn't very many.
2    Q.   Okay.  What would you have used a core drill
3        machine for as a diver?
4    A.   For doing maintenance and all around the dive
5        shop.
6    Q.   And before the military what had you done for a
7        living?
8    A.   I was in high school.
9    Q.   Okay.  And where did you graduate?
10   A.   Dale County High School.
11   Q.   And is your family from Dale County?
12   A.   No, sir.
13   Q.   Where is your family?
14   A.   My father was from Pennsylvania.  My mother was
15       from New Brocton, I believe.
16   Q.   Okay.  Were you born and reared in Dale County?
17   A.   No, sir.
18   Q.   Okay.  So, in other words, you just -- where
19       had you lived, I guess, before going to school
20       at Dale County?
21   A.   In Virginia Beach.
22   Q.   Was your father military?
23   A.   Yes, sir.

[24]

1        (Exhibit 005 marked for identification.)
2    Q.   Let me show you what I'll mark as 005 to your
3        deposition and ask you what that is a
4        photograph of?
5    A.   It appears to be a core drill laying on its
6        side.
7    Q.   And the bit that's on that core drill machine,
8        what size core drill bit is that, sir?
9    A.   I could not tell you, sir.
10   Q.   What size core drill bit were you using at the
11       time of the accident?
12   A.   To give you a truthful answer, I couldn't.
13       MR. BRASHER:  You don't recall?
14   A.   No.
15   Q.   Was there a written work order for the project
16       that you were involved in?
17   A.   No, sir, not that I was aware of.
18   Q.   How was it that you were given this assignment?
19   A.   It was passed down from shift to shift.
20   Q.   And how would it have been passed, sir?
21   A.   From one lead person to the next.
22   Q.   So who would have given you the project?
23   A.   I don't recall who was the lead mechanic at

[25]

1        that time on second shift.
2    Q.   And, again, the purpose of the project was
3        what, sir?
4    A.   To put some stanchions up to protect the sink.
5    Q.   And you say that you had inspected the core
6        drill machine before you went to the site?
7    A.   Yes, sir.
8    Q.   About when did y'all head out to the site?
9    A.   I don't even recall, sir.  It wasn't long after
10       we come to work.
11   Q.   Had Mr. Riley already told you that he didn't
12       know how to operate a core drill machine?
13   A.   Once we got to the job site.
14   Q.   Was that the first time you realized that he
15       didn't know what he was --
16   A.   Yes, sir.
17   Q.   -- what he was doing?
18       MR. LANE:  I object to the form.
19   Q.   Let me see if I can rephrase it.  Is that the
20       first time you realized that he did not know
21       how to operate a core drill machine?
22   A.   Yes, sir.
23   Q.   When he told you that he didn't know how to

**[26]**

1    operate a core drill machine, what did you say
2    to him?
3  A.  That I would show him how and I would drill the
4    first hole.
5  Q.  How many holes were to be drilled?
6  A.  I don't recall.
7  Q.  And did you feel like you knew how to use a
8    core drill sufficient to instruct Mr. Riley?
9  A.  Yes, sir.
10  Q.  Because you had used it at least a dozen times
11    before?
12  A.  Yes, sir.
13  Q.  Okay.  Did you consult an owner's manual before
14    operating the core drill machine?
15  A.  No, sir.
16  Q.  And why not?
17  A.  There was not one furnished with it.
18  Q.  Okay.  Did you ask anyone at the plant to
19    review a core drill machine manual before going
20    to the site to make these holes?
21  A.  No, sir.
22  Q.  Did you seek counsel from anyone as to how to
23    properly operate a core drill machine before

**[27]**

1    going to the site --
2  A.  No, sir.
3  Q.  -- to make the first hole?  I'm sorry?
4  A.  No, sir.
5  Q.  And why not?
6  A.  I felt that I had the knowledge and that I
7    could do it without it because I had ran it
8    before.
9  Q.  Did you tell Mr. Riley that you would be glad
10    to get help from someone else there at the
11    plant who might have also used a core drill
12    machine before?
13        MR. BRASHER:  Object to the form.
14        MR. LANE:  Object to the form.
15        MR. BRASHER:  You may answer, if you
16        can.
17  A.  Can you ask that again?
18  Q.  Sure.
19        MR. BRASHER:  The same objection.
20        Well, you can ask the question
21        first.
22        MR. SHEEHAN:  Thank you, sir.
23  Q.  Did you tell Mr. Riley that you would check

**[28]**

1    with someone else at the plant before showing
2    him how to operate the core drill machine?
3        MR. BRASHER:  Object to the form.
4        MR. LANE:  Object to the form.
5  A.  No, sir.
6  Q.  Did you tell Mr. Riley that you would like to
7    check on how to properly operate the core drill
8    machine before you drilled the first hole?
9  A.  No, sir.
10        MR. LANE:  Object to the form.
11  Q.  Had a core drill machine been used there at
12    Flavor House before the date of this accident
13    involving Mr. Riley?
14  A.  Yes, sir.
15  Q.  Had you seen core drill machines being operated
16    there at Flavor House before the accident?
17  A.  Yes, sir.
18  Q.  And by whom, sir?
19  A.  By different mechanics on different shifts.
20  Q.  Could you help us maybe with names of some of
21    the mechanics who had used core drill machines
22    at Flavor House in the past?
23  A.  Adam Hall, Donald Cody, Larry Glime.

**[29]**

1  Q.  I'm sorry, you said that last name was?
2  A.  Larry Glime.
3  Q.  Can you help me with that name?
4  A.  Larry.
5  Q.  And the spelling --
6  A.  G-L-I-M-E.
7  Q.  All right, sir.  Anyone else at Flavor House
8    that used a core drill machine before the
9    accident involving Mr. Riley?
10  A.  Not to my knowledge.
11  Q.  And what would, say, Adam Hall have been using
12    a core drill machine for at Flavor House
13    before?
14  A.  To put stanchions up.
15  Q.  And Mr. Cody?
16  A.  The same thing.
17  Q.  And Larry?
18  A.  The same.
19  Q.  And what position did Adam Hall hold at Flavor
20    House?
21  A.  He's a mechanic.
22  Q.  Was he also a lead mechanic?
23  A.  No, sir.

7-17-2006                                                          Michael Walters

[30]

1   Q.   And Mr. Cody?
2   A.   He's the lead mechanic on the day shift.
3   Q.   And Larry?
4   A.   I believe he was lead mechanic on second shift;
5      I'm not for sure of that.
6   Q.   All right, sir.  And are they still with Flavor
7      House?
8   A.   Yes, sir.
9   Q.   Before leaving the maintenance shop, did you
10      look to see if there was an owner's manual for
11      the core drill machine?
12   A.   No, sir.
13   Q.   And why not?
14   A.   Because I didn't see it laying there with it.
15   Q.   Okay.  Did you look for an owner's manual?
16   A.   No, sir.
17   Q.   And why not?
18   A.   Because I didn't feel we needed it.
19   Q.   And why is that, sir?
20   A.   Because I thought I had knowledge enough to
21      operate it safely and efficiently.
22   Q.   And that was based on what, sir?
23   A.   On previous usage of a core drill.

[31]

1   Q.   Did you see anyone else, say, look for an
2      owner's manual?
3   A.   No, sir.
4   Q.   What about Mr. Hall or Mr. Cody, did you ever
5      hear them asking for an owner's manual?
6   A.   No, sir.  Which I wasn't there at the time of
7      the rental.
8   Q.   Okay.  Who was there at the time of the rental?
9          MR. BRASHER:  If you know.
10   A.   That I can't tell you, sir.
11   Q.   Okay.  Where were you at the time of the
12      accident?
13   A.   Exactly I couldn't tell you.  I was either in
14      the maintenance shop or headed on my way back
15      out.
16   Q.   And why were you in the maintenance shop at the
17      time of the accident?
18   A.   Because I had another call that I was going to
19      see what the problem was.
20   Q.   And who was that from, sir?
21   A.   Sanitation.
22   Q.   And would that have been Mr. Mason?
23   A.   Either that or one of his workers.

[32]

1   Q.   Did you have a cell phone?
2   A.   No, sir.
3   Q.   Or any kind of communication device --
4   A.   No, sir.
5   Q.   -- at the scene?
6   A.   No, sir.
7   Q.   Would that have assisted so you wouldn't have
8      had to go back to the maintenance shop?
9   A.   Maybe, but I would have still had to have left
10      and went and seen what the problem was.
11   Q.   Okay.  Before leaving, did you give Mr. Riley
12      instructions as to -- that it was okay for him
13      to operate the core drill machine?
14   A.   Yes, sir.  He was operating it at the time I
15      had left.
16   Q.   Okay.  What was he actually doing at the time
17      you left, sir?
18   A.   Starting to drill the next hole.
19   Q.   Did you help him set up the drill for the
20      second hole?
21   A.   Yes, sir.
22   Q.   And how long were you there while Mr. Riley was
23      operating the drill?

[33]

1   A.   I don't recall.
2   Q.   How deep had Mr. Riley drilled into the slab at
3      that time when you left?
4   A.   I don't recall that neither, sir.
5   Q.   Did you observe any problems with the core
6      drill machine while Mr. Riley was operating it
7      in drilling the second hole?
8   A.   No, sir.
9   Q.   Did you hear any problems with the core drill
10      machine or the vacuum motor while Mr. Riley was
11      operating the machine?
12   A.   Not while I was there.
13   Q.   If you had, what would you have done, sir?
14          MR. BRASHER:  Object to the form.
15   A.   Stopped him.
16   Q.   And how would you have stopped him?
17   A.   I would have probably reached over there and
18      tapped him on the shoulder or something.
19   Q.   And at the time Mr. Riley had his personal
20      protective eyeglasses and earplugs?
21   A.   Yes.
22   Q.   Were you still able to hear the motor with the
23      earplugs on?

7-17-2006                                                          Michael Walters

---

[34]

1        MR. LANE:  Object to the form.
2   A.   I don't recall, sir.
3   Q.   Did the -- was there anything about the core
4        drill machine that gave you some concerns
5        before you walked off and left Mr. Riley there
6        with -- drilling the second hole?
7   A.   No, sir.
8   Q.   Had you previously inspected the core drill
9        machine to make sure that it was properly
10       maintained?
11  A.   Prior to going to the work site, yes, sir.
12       MR. BRASHER:  Object to the form.
13  Q.   And how did you check the core drill machine to
14       make sure it was properly maintained before
15       operating it?
16       MR. LANE:  Object to the form.
17  A.   Inspected the gasket and made sure it was free
18       moving, the cords, plug and ground, prior to
19       going to the job site.
20  Q.   Did you see anything wrong with the core drill
21       machine before operating it yourself or while
22       Mr. Riley was operating it?
23  A.   No, sir.

[35]

1   Q.   If you had noticed any improper maintenance of
2        the core drill machine before leaving the
3        maintenance shop, what would you have done,
4        sir?
5        MR. BRASHER:  Object to the form.  Go
6        ahead.
7   A.   It wouldn't have been used.
8   Q.   Okay.  And what would you have done if you had
9        seen that the core drill machine had been
10       improperly maintained?
11       MR. BRASHER:  Object to the form.
12  A.   I would have notified the day shift lead
13       mechanic so he could have called United Rentals
14       the next morning.
15  Q.   Had you ever had any problems with a core drill
16       machine before?
17  A.   No, sir.
18  Q.   Had you ever had any problems with a piece of
19       equipment rented from United Rentals?
20  A.   Can you ask that one more time, sir?
21  Q.   Yes, sir.  Had you ever had any problems with a
22       piece of equipment rented from United Rentals?
23  A.   No, sir.

[36]

1   Q.   Had you ever spoken to anyone at United
2        Rentals?
3   A.   No, sir.
4   Q.   Have you, since the accident involving
5        Mr. Riley, spoken with anyone at United Rentals
6        or connected in any way with them?
7   A.   No, sir.
8   Q.   Can you help me with this?  I don't know where
9        to put the label.  Can you show me what would
10       be up and down on that photograph?  And if I
11       can get you to maybe put that label down in the
12       bottom left-hand corner of where it would be up
13       or down?
14  A.   I don't know.
15  Q.   All right.  Let's see.  I'll put the label
16       here, Exhibit Number 006 to your deposition,
17       and let me show you Exhibit Number 007.
18       (Exhibits 6 and 7 marked for
19       identification.)
20  Q.   These are photographs that have been provided
21       to us by Flavor House.  The Exhibit marked 006,
22       is that -- can you identify what that is first?
23  A.   No, sir, not from that picture I can't, sir.

[37]

1   Q.   Okay.  And what about Exhibit Number 007, can
2        you identify what that is, sir?
3   A.   It appears to be a tag.
4   Q.   Okay.  And this tag -- what would you call that
5        tag?
6   A.   It appears to be a checklist.
7   Q.   Okay.  And so, in other words, you would refer
8        to it as a checklist tag just for purposes of
9        the deposition, whatever you feel comfortable
10       with identifying it?
11  A.   Yes, sir.
12  Q.   Okay.  Does -- Exhibit Number 006, does that
13       appear to be the checklist tag that's
14       identified in 007?
15  A.   Yes, sir.
16       (Exhibit 8 marked for identification.)
17  Q.   Okay.  Let me show you the other photograph
18       that's been provided to us by Flavor House of
19       that checklist tag, and I've marked that as
20       008, these three photographs taken at Flavor
21       House of this checklist tag.  Did you review
22       that tag while at the maintenance shop?
23  A.   No, sir.

---

**[38]**

1          (Exhibit 9 marked for identification.)
2  **Q.**  Let me show you what I will mark as Exhibit 009
3       to your deposition and ask you, if you would,
4       help me with the sentence there on that
5       checklist tag, "The safety and performance of
6       this equipment has been verified.  I am
7       responsible for routine service and cleaning."
8       Did I read that correctly, sir?
9  A.   Yes, sir.
10  **Q.**  "As user of this equipment, I understand the
11       correct operation and function of the controls
12       and confirm that I have received adequate
13       instruction, and acknowledge the safety sheet,
14       to enable myself and/or my crew to use the
15       equipment in a safe and proper manner without
16       risk to injury."  Did I read that correctly,
17       sir?
18  A.   Yes, sir.
19  **Q.**  And did you ensure that you and your crew knew
20       how to use the equipment in a safe and proper
21       manner without risk to injury?
22  A.   To the best of my knowledge.
23          (Exhibits 10 and 11 marked for

**[39]**

1          identification.)
2  **Q.**  I will show you what I'll mark as Exhibit
3       Number 010 and 011 to your deposition and ask
4       you what these are, sir?
5  A.   It appears to be the job site.
6  **Q.**  Okay.
7          MR. STUTTS:  It appears to be what,
8             sir?
9  A.   The job site, sir.
10          MR. STUTTS:  Job site?
11  A.   Yes.
12          MR. STUTTS:  All three pictures?
13  A.   The two pictures he's provided.
14          MR. STUTTS:  10 and 11?
15  A.   Yes.
16          (Exhibit 12 marked for identification.)
17  **Q.**  And let me show you Exhibit Number 12, it's
18       another photograph that's been provided to us
19       by Flavor House.  Do these three photographs
20       fairly and accurately depict the condition of
21       the area where the accident took place?
22  A.   Yes, sir.
23  **Q.**  Do these photographs, Exhibit Number 009, 010

**[40]**

1       and -- excuse me, I'm sorry, I misspoke.  Does
2       Exhibit Number 10, 11 and 12 to your
3       deposition, do those three photographs fairly
4       and accurately depict the condition of the
5       accident site after apparently the core drill
6       machine had been moved?
7  A.   Yes, sir.
8  **Q.**  And where would the sink have been positioned?
9  A.   Yes, sir, it's on the wall.
10  **Q.**  Okay.  And you've pointed to Exhibit Number 10?
11  A.   10.
12  **Q.**  And you pointed to the right-hand side of that
13       photograph?
14  A.   Yes, sir.
15  **Q.**  Was the sink ever installed?
16  A.   The sink was already installed, sir.
17  **Q.**  Oh, it was.  Okay.  I'm sorry, I just didn't
18       see it in that photograph.
19  A.   I believe it's covered up with plastic right
20       there, sir.
21  **Q.**  Okay.  So in the upper right-hand corner
22       there's an object that's covered up -- appears
23       to be covered up with plastic, would that be

**[41]**

1       fair?
2  A.   Yes, sir.
3          MR. BRASHER:  Do you want him to mark
4             it?
5          MR. SHEEHAN:  No, that's all right.
6             Thank you though.
7  **Q.**  Before beginning the operation, did you ask for
8       anyone to come over and assist Mr. Riley with
9       the drilling of the second hole?
10  A.   No, sir.
11  **Q.**  Do you know if anyone was assisting Mr. Riley
12       while he was drilling the second hole?
13  A.   No, sir.
14  **Q.**  Did you prepare a written statement of the
15       events of that evening?
16  A.   I don't recall, sir.
17  **Q.**  Would it have been customary for you to have
18       prepared a written report of the accident?
19  A.   To the best of my knowledge you should have.
20  **Q.**  Okay.  Is that standard procedure at Flavor
21       House, for a written report to be prepared?
22  A.   Yes, sir.
23  **Q.**  Were witness statements written as to what

7-17-2006

Michael Walters

[42]

1      actually took place during the accident?
2   A.   Yes, sir.
3   Q.   And that would be in the ordinary course of
4      business at Flavor House?
5   A.   Yes, sir.
6          MR. BRASHER:  Let me object to the
7              form, to the extent that this
8              isn't the witness to testify
9              regarding policy and procedure.
10  Q.   Well, you had been working there at Flavor
11     House for how long before this accident?
12  A.   I'm going to say two and a half or three years.
13  Q.   Okay.  And you were familiar with the operating
14     procedures and SOP there at Flavor House with
15     respect to reporting accidents?
16  A.   Yes, sir.
17  Q.   And you were aware that when an accident
18     occurred at Flavor House that there would be a
19     report prepared, even of a minor accident?
20  A.   Yes, sir.
21  Q.   And in a situation like this where there was a
22     serious injury to the fellow employee, you were
23     aware that written statements would be taken

[43]

1      from all witnesses to the accident, were you
2      not, sir?
3   A.   Yes, sir.
4   Q.   And would you have written out a handwritten
5      report of the accident?
6   A.   I don't recall if I did or not, sir.
7   Q.   Okay.  Were you tape-recorded --
8   A.   No, sir.
9   Q.   -- as to what had taken place?
10  A.   No, sir.
11  Q.   Exhibit Number 10, to the left here, what is
12     this, sir?
13  A.   It appears to be a stack of pallets.
14  Q.   Okay.  And why were these stack of pallets
15     there at the time of the accident?
16          MR. LANE:  I object to the form.  I
17              don't believe there's been
18              testimony that they were there at
19              the time of the accident.
20  Q.   And that's a good follow-up.  Were these
21     pallets present at the scene of the accident
22     before you and Mr. Riley began operating the
23     core drill machine?

[44]

1   A.   No, sir.
2   Q.   Where were these pallets before you and
3      Mr. Riley began operating the core drill
4      machine?
5   A.   I couldn't tell you that, sir.
6   Q.   What would these pallets have been used for or
7      what were their purpose?
8   A.   I don't know, sir.
9   Q.   Were pallets customary there at Flavor House?
10  A.   Yes.
11  Q.   Would that be for product coming in and out?
12  A.   Yes.
13  Q.   And for use of a forklift operation?
14  A.   Yes, sir.
15  Q.   Did Mr. Riley hit his head on these pallets
16     that are identified here in photograph Number
17     10?
18          MR. LANE:  I object to the form.
19          MR. BRASHER:  Object to the form.
20  A.   No, sir.
21  Q.   Photograph Number 11, sir, has two holes, which
22     hole is the first hole, sir?
23  A.   It would be the one right there, sir.

[45]

1   Q.   And that would be the hole that's, shall we
2      say, perfectly circle, round?
3   A.   Yes, sir.
4   Q.   And that's the hole you drilled, sir?
5   A.   Yes, sir.
6   Q.   Okay.  And how deep was that hole that you
7      drilled?
8   A.   I don't recall, sir.
9   Q.   Can you give us just a best judgment as you sit
10     here today?
11  A.   To the best of my knowledge, probably two, two
12     and a half inches deep.
13  Q.   Okay.  And was that the depth of the slab there
14     at Flavor House?
15  A.   No, sir.
16  Q.   Did that go all the way through the slab?
17  A.   No, sir.
18  Q.   How deep did you need to drill the hole for
19     these pilings?
20  A.   About as deep as what it was.
21  Q.   Okay.  And how deep would be necessary for --
22     and you say it was a piling?
23  A.   It would be a stanchion there.

7-17-2006

Michael Walters

[13]  (Pages 46 to 49)

[46]

1   **Q.**   Okay.  And how deep would that stanchion need
2        to be?  How deep would the hole need to be?
3   **A.**   Two, two and a half inches.
4   **Q.**   All right, sir.  Now, the second hole that was
5        drilled by Mr. Riley, is that the hole that's
6        depicted on Exhibit Number 11 as being on the
7        left-hand side of that photograph?
8   **A.**   Yes, sir.
9   **Q.**   And you say you were there when Mr. Riley began
10       drilling the second hole?
11  **A.**   Yes, sir.
12           (Exhibit 13 marked for identification.)
13  **Q.**   Let me show you what I'll mark as Exhibit
14       Number 13 to your deposition.  Do you recognize
15       the individual in that photograph?
16  **A.**   Yes, sir.
17  **Q.**   And who is that, sir?
18  **A.**   Mr. Riley.
19  **Q.**   And is that the position that Mr. Riley was
20       standing in at the time that he began drilling
21       the second hole?
22  **A.**   To the best of my knowledge, sir.
23  **Q.**   Okay.  Did Mr. Riley place his feet on the base

[47]

1        of that core drill machine while he was
2        drilling that second hole?
3   **A.**   I don't recall, sir.
4   **Q.**   Did you instruct Mr. Riley as to where -- or
5        whether or not he should be standing on the
6        base of the core drill machine while operating
7        it?
8   **A.**   No, sir.
9   **Q.**   You just left it up to Mr. Riley to decide
10       whether or not he should stand on the core
11       drill machine?
12           MR. LANE:  Object to the form.
13  **A.**   I know he had seen me do it prior.
14  **Q.**   I'm sorry, sir.  Seen you doing what, sir?
15  **A.**   Standing on the base of the drill.
16  **Q.**   And how would you have been standing on the
17       base of the drill before the accident?
18  **A.**   In drilling the first hole.
19  **Q.**   Okay.  With both your feet on the base of the
20       core drill machine?
21  **A.**   Yes, sir.
22  **Q.**   Okay.
23           MR. STUTTS:  Both feet?

[48]

1   **Q.**   Did you say both feet, sir?
2   **A.**   Yes, sir.
3   **Q.**   Okay.  With your full weight on the core drill
4        machine?
5   **A.**   Yes, sir.
6   **Q.**   And would that have been to hold the core drill
7        machine in place?
8           MR. LANE:  Object to the form.
9   **A.**   No, sir.
10  **Q.**   And why were you standing on the core drill
11       machine with both your feet with all of your
12       weight on it?
13  **A.**   Just an easier position to be in.
14  **Q.**   And were you leaning on anything else or were
15       you just --
16  **A.**   No, sir.
17  **Q.**   Was all of your weight on the base of the core
18       drill machine?
19  **A.**   Yes, sir.
20  **Q.**   Both your right and your left foot?
21  **A.**   Yes, sir.
22  **Q.**   And how much do you weigh, sir?
23  **A.**   I weigh 220.

[49]

1   **Q.**   And at the time of the accident how much did
2        you weigh, sir?
3   **A.**   Around the same weight.
4   **Q.**   220 pounds?
5   **A.**   Yes, sir.
6   **Q.**   Okay.  And did you have any trouble holding the
7        core drill machine down with your 220 pounds of
8        weight?
9           MR. LANE:  Object to the form.
10  **A.**   No, sir.
11  **Q.**   While you were drilling the first hole with
12       your 220 pounds on the base of the core drill
13       machine, did you have any difficulties drilling
14       that first hole?
15  **A.**   No, sir.  Not while I was standing on it, sir.
16  **Q.**   And how long did you stand on the base of the
17       core drill machine while drilling the first
18       hole?
19  **A.**   I don't recall.
20  **Q.**   Can you just give us your best judgment as
21       you're here today?
22  **A.**   Probably three-quarters of the way of the hole.
23  **Q.**   All right, sir.  Had you begun drilling the

[50]

1      first hole by standing on the core drill
2      machine with both your feet?
3   A.   No, sir.
4   Q.   How had you begun drilling the hole?
5   A.   In the position Mr. Riley is.
6   Q.   As represented on Exhibit Number 13?
7   A.   Yes, sir.
8   Q.   Okay.  And you say this is -- about what time
9      was it that you began drilling the first hole?
10  A.   I couldn't give you an answer on that, sir.
11  Q.   All right.  Was the first project you had begun
12     that day, was it going to be the drilling of
13     the hole -- two holes for the protection of the
14     sink?
15  A.   Yes, sir.
16  Q.   Okay.  Were there any other projects that you
17     had assigned to you that evening?
18  A.   Yes, sir.
19  Q.   And what were the other projects, sir?
20  A.   Anything that arose with sanitation.
21  Q.   But were there any other prearranged?  I mean,
22     had the lead mechanic from the prior shift told
23     you of any other jobs?

[51]

1   A.   I couldn't tell you that, sir.  I don't recall.
2   Q.   Fair enough.  At Flavor House do y'all use work
3      orders?
4   A.   No, sir.
5   Q.   It's just all verbal?
6   A.   Yes, sir.
7   Q.   So it's just passed down from lead mechanic to
8      the next lead mechanic?
9   A.   Yes, sir.  That's how it was at that time.
10  Q.   All right, sir.  That has now changed?
11  A.   Yes, sir.
12  Q.   And you now have work orders?
13  A.   I don't really know how they do it now, sir.  I
14     know there's a written list.
15  Q.   Okay.  And who prepares the written list now,
16     sir?
17  A.   Donald Cody.
18       MR. LANE:  Winston, can we take a
19          bathroom break?
20       MR. SHEEHAN:  Sure.
21       MR. LANE:  Either now or just whenever
22          you're at a stopping point.  Are
23          you at a stopping point?

[52]

1        MR. SHEEHAN:  That will be fine.
2        (Recess.)
3        (Exhibit 14 marked for identification.)
4   BY MR. SHEEHAN:
5   Q.   Mr. Walters, we've taken a break, and if at any
6      time you need to take a break, you just let us
7      know.  Could I show you Exhibit Number 14 to
8      your deposition and ask you if you could
9      identify that for me, please, sir?
10  A.   It appears to be Matthew Riley's time sheet.
11  Q.   All right, sir.  And can you explain to us what
12     is represented there on his time sheet?
13  A.   It appears to be date and time and day of the
14     week and date and time that he went to break
15     and the time that he clocked out.
16  Q.   Okay.  So a total of how many hours had
17     Mr. Riley worked at Flavor House before this
18     accident?
19  A.   It appears to be about 23.9 hours.
20  Q.   So he was on his third day?
21       MR. LANE:  Object to the form.  I
22          haven't looked at the document,
23          but --

[53]

1        MR. SHEEHAN:  I shouldn't say third
2          day, that's incorrect.  These were
3          documents provided to us by
4          Ralcorp in response to a request
5          for production last week as a
6          supplemental response.
7        MR. LANE:  The only thing -- if you
8          don't mind me just asking you
9          something, because I'm just trying
10         to understand it myself, I don't
11         know if that -- does it have any
12         indication on here about when the
13         accident happened?
14       MR. SHEEHAN:  That's good a follow-up
15         question.
16  Q.   Sir, if you could, we're trying to interpret
17     this time sheet that's been marked as Exhibit
18     14; can you tell whether or not it reflects the
19     time of the accident on this time sheet?
20  A.   No, sir, it doesn't.
21  Q.   Okay.  In your judgment, as you sit here today,
22     about what time did the accident with Mr. Riley
23     occur?

7-17-2006                                                    Michael Walters

[15]  (Pages 54 to 57)

**[54]**

1   A.   I don't recall.
2   Q.   But this was the first project of that shift?
3   A.   Yes, sir.
4   Q.   That third shift that evening?
5   A.   Yes, sir, as far as I recall.
6   Q.   And you had come in at 11:00 P.M. on August the
7        28th, which was a Thursday?
8   A.   The best I recall.
9   Q.   All right, sir.  And is it reflected on the
10       time sheet that Mr. Riley had also come in at
11       about -- what time did he come in on Thursday,
12       the 28th of August?
13  A.   It appears to be 10:55 he clocked in.
14  Q.   All right, sir.
15           MR. STUTTS:  Would that have been the
16              27th or the 28th?
17  Q.   And what day of the week -- I mean, excuse me.
18       What date would that have been that he clocked
19       in at 10:55?
20  A.   It appears to be the 28th.
21           MR. STUTTS:  And at midnight it would
22              have been the 29th?
23  A.   Yes, sir.

**[55]**

1           MR. BRASHER:  Let the record reflect
2              that you're referring to that
3              exhibit for that information.
4   A.   Yes.
5           MR. BRASHER:  You don't have any
6              personal recollection of that, do
7              you?
8   A.   No, sir.
9   Q.   Sir, we've gone over several photographs and
10       you've helped us with those.  Let me show you
11       11 photographs that have been provided to us by
12       Ralcorp Corporation as photographs that were
13       taken at Flavor House.  I will mark them as a
14       composite exhibit if that's agreeable with
15       everyone, composite Exhibit 15 to your
16       deposition.
17          (Exhibit 15 marked for identification.)
18  Q.   If you would, look through those, sir, and tell
19       us if those photographs fairly and accurately
20       depict the items represented in the
21       photographs; and if not, which photographs do
22       not fairly and accurately --
23           MR. LANE:  And I'm just going to

**[56]**

1              generally object just because
2              there may be other things in the
3              photograph which aren't the
4              subject of the photograph.
5   Q.   I tell you what, why don't you -- because of
6        the objection, as you go through, can you
7        identify each one of them and tell us if it
8        fairly and accurately depicts the area and what
9        is depicted in the photograph?  The first one
10       has an exhibit label of what, sir?
11  A.   15.
12  Q.   All right, sir.  And what is that, sir?
13  A.   It appears to be the job site.
14           MR. LANE:  And I object to the form of
15              the question with regards to that
16              one, because we've got that issue
17              with the pallets that we've talked
18              about previously.  I don't know if
19              you're talking about at the time
20              of the accident or at the time the
21              photograph is taken, they're not
22              necessarily the same thing.
23           MR. STUTTS:  Winston, if you are going

**[57]**

1        to go though them individually,
2        don't you think we ought to give
3        each one of them a number?
4           MR. SHEEHAN:  I think that's probably
5              better.
6           MR. STUTTS:  Because we want to be able
7              to refer back to them.
8   Q.   If you would, sir, Exhibit Number 15, what is
9        that?  And, if you would, tell us what you
10       believe would not have been present at the
11       scene of the accident at the time of
12       Mr. Riley's injury?
13  A.   It appears to be the job site.  And the pallets
14       wouldn't have been there; the bag of peanuts
15       wouldn't have been there; the pallet lift
16       wouldn't have been there ; the cardboard
17       wouldn't have been there; other than that,
18       that's about it.
19          (Exhibit 16 marked for identification.)
20  Q.   All right, sir.  And photograph Number 16, what
21       is that, sir?
22  A.   It appears to be a picture of the core drill,
23       the base of it.

[58]

Q. Anything that appears to be -- does that reasonably and fairly depict the condition of the core drill machine at the time of the accident involving Mr. Riley?
A. Yes, sir.
(Exhibit 17 marked for identification.)
Q. Let me show you Exhibit Number 17 and ask you if that fairly and accurately depicts the condition of the core drill machine at the time of Mr. Riley's accident?
A. Yes, sir.
(Exhibit 18 marked for identification.)
Q. Let me show you Exhibit Number 18 and ask you what that is, sir?
A. It appears to be a picture of the core drill.
Q. Does that fairly and accurately depict the condition of the core drill --
A. Yes, sir.
Q. -- at the time of Mr. Riley's accident?
A. Yes, sir.
(Exhibit 19 marked for identification.)
Q. Let me show you Exhibit Number 19 and ask you what that is, sir?

[59]

A. It appears to be a picture of the bit from the core drill.
Q. And does that fairly and accurately depict the bit that was being used at the time of Mr. Riley's accident?
A. To the best of my knowledge.
(Exhibit 20 marked for identification.)
Q. Let me show you Exhibit Number 20 and ask you what that is, sir?
A. It appears to be another picture of the bit.
Q. Okay. And is that the condition of the bit at the time that Mr. Riley was using it?
MR. BRASHER: Which one? Let me interject there are two bits depicted in there.
Q. Okay. If you could, there's one photograph of a bit which appears to be missing some teeth and then at the bottom there appears to be a drill bit with what appears to be all of the teeth present.
MR. BRASHER: All that are depicted in that photo. I mean, it doesn't show the entire bit.

[60]

MR. SHEEHAN: Okay. I think that's well put. Could I see those?
MR. SHIRES: Sure.
Q. Let me show you Exhibit Number 19 to your deposition. That appears to be a drill bit with all of the teeth present?
A. Yes, sir.
Q. And was that the drill bit that Mr. Riley was using at the time of his accident?
MR. BRASHER: If you know.
A. I don't know.
Q. Does that appear to be the bit that you were using when you drilled the first hole?
MR. LANE: Again, object to the form.
A. Again, I don't know. I don't know if they've changed the bit after the accident or what.
MR. BRASHER: You didn't take these photographs, did you?
A. No, sir.
Q. Did you --
A. I wasn't present at the time these were taken.
Q. Okay. Well, would you have used a drill bit without all of the teeth present?

[61]

A. No, sir.
Q. And why not?
A. Because it could have hung up and it wouldn't have drilled right.
Q. Okay. When you went to the accident -- or excuse me. When you left the maintenance shop after inspecting the drill, did you make sure the drill bit had all of its teeth present before you went to the site?
A. Yes, sir.
Q. Did you use or instruct Mr. Riley to use a drill bit with any of the teeth missing?
A. No, sir.
Q. Would you have instructed Mr. Riley to use a drill bit that had missing teeth?
A. No, sir.
Q. And why not?
MR. LANE: Asked and answered. Object to the form.
A. Because it just wouldn't work.
Q. Okay. Now, I notice Exhibit Number 20 does have a drill bit with teeth missing, as well as, on the bottom of that photograph, what

[62]

1    appears to be the same drill bit as depicted in
2    Exhibit Number 19; is that correct, sir?
3  A.   Yes, sir.
4  Q.   Okay.  So that I'm clear then, the drill bit
5    reflected in photograph Number 20, which
6    appears to have missing teeth, was this the
7    drill bit that you had on the drill when you
8    first began the operation there at Flavor
9    House?
10 A.   I couldn't tell you.
11 Q.   Okay.  Did you check the drill bit to make sure
12   it had all of the teeth present?
13        MR. LANE:  Object to the form.
14 A.   Yes, sir, prior to beginning.
15 Q.   And how many teeth were missing on the drill
16   bit when you began the operation?
17 A.   None.
18        (Off-the-record discussion.)
19 Q.   All right, sir.  We were going through the
20   photographs that had been produced by Flavor
21   House.  Let me show you Exhibit Number 20 and
22   ask you, this is the photograph you identified
23   as what appears to be two drill bits?

[63]

1  A.   Yes, sir.
2        (Exhibit 21 marked for identification.)
3  Q.   Okay.  Photograph Number 21, what is that, sir?
4  A.   It appears to be a tag of some sort.
5  Q.   Okay.  Is that the checklist tag that you were
6    referring to before?
7  A.   I assume so.
8        (Exhibit 22 marked for identification.)
9  Q.   And let me show you Exhibit Number 22 and ask
10   you what that is, sir?
11 A.   That appears to be the checklist tag.
12 Q.   And did you review this checklist tag before
13   taking the core drill machine to the site of
14   the sink placement?
15 A.   Yes, sir.
16 Q.   Okay.  And did you inspect the back of that
17   checklist tag as well?
18 A.   No, sir.
19 Q.   And why not?
20 A.   I didn't see a reason to because it said Ready
21   to Rent.
22 Q.   Okay.  And do you know where this tag is
23   currently?

[64]

1  A.   No, sir.
2  Q.   Was it on the machine at the time of the
3    accident?
4  A.   I couldn't tell you that, sir.
5  Q.   Did you ever see this tag on the machine?
6  A.   I don't recall.
7        (Exhibit 23 marked for identification.)
8  Q.   Let me show you Exhibit Number 23 and ask you
9    what that is?
10 A.   It appears to be a picture of the same tag.
11        MR. BRASHER:  Let me ask, aren't these
12        Exhibits 6, 7 and 8 also?  Aren't
13        these the same thing?
14        MR. SHEEHAN:  They are.  This was the
15        composite of 11 photographs that
16        had been provided by Ralcorp as
17        being the only photographs
18        available and we were trying -- or
19        I'm trying to identify those with
20        Mr. Walters.
21 Q.   Sir, if I could, we're on Exhibit Number 23 and
22   that is what, sir?
23 A.   It appears to be a picture of the same tag,

[65]

1    checklist tag.
2        (Exhibit 24 marked for identification.)
3  Q.   Exhibit Number 24 is what, sir?
4  A.   It appears to be a picture of the job site
5    after the accident.
6        (Exhibit 25 marked for identification.)
7  Q.   And Exhibit Number 25?
8  A.   It appears to be the same.
9        MR. SHEEHAN:  Joe, are there any other
10       photographs?
11       MR. BRASHER:  I think you've got
12       everything.
13 A.   That should be it.
14       MR. BRASHER:  What I emailed you is
15       everything we have.
16       (Exhibit 26 marked for identification.)
17 Q.   Let me show you Exhibit Number 26 and ask you
18   -- I will represent to you that in June of 2006
19   we were allowed to inspect what was purported
20   to be the site of the accident and at that time
21   a photograph was made of the site.  Can you
22   identify Exhibit Number 26 for us, sir?
23 A.   It appears to be the job site.

7-17-2006                                                    Michael Walters

[18]  (Pages 66 to 69)

[66]

1   Q.   Okay.  And you're currently working at Flavor
2        House?
3   A.   Yes, sir.
4   Q.   And do you see any changes in the condition of
5        the job site where this accident took place?
6   A.   Yes, sir.
7   Q.   What changes, if any, have there been?
8   A.   The floor has been redone and the sink has been
9        removed.
10  Q.   And when was the floor redone, sir?
11  A.   I couldn't tell you, sir.
12  Q.   Can you, as you sit here today, just
13       approximately; a month ago, two days?
14  A.   Probably a year ago.
15  Q.   And what was the purpose of redoing the floor?
16  A.   Because the other one was peeling up and
17       cracking, just deteriorated.
18  Q.   So that I'm clear, the floor where the accident
19       occurred was --
20  A.   No, I can't say it was deteriorated.
21  Q.   Okay.  What condition was it in before it was
22       resurfaced?
23  A.   It appeared to be good and stable.

[67]

1   Q.   The floor where the accident --
2   A.   It was in good condition.
3   Q.   -- where the accident occurred was in good
4        condition?
5   A.   Yes, sir.
6   Q.   Is that your testimony?
7   A.   Yes, sir.
8   Q.   Okay.  What did you do before drilling the
9        first hole in the way of preparation?
10  A.   We swept the floor.
11  Q.   Okay.  Anything else?
12  A.   No, sir.
13  Q.   Did you move any pallets?
14  A.   No, sir, there was nothing in the way.
15  Q.   What did you do to ensure that the condition of
16       the floor was even and level before you began
17       the operation of the core drill machine?
18       MR. LANE:  Object to the form.
19  A.   Just visually looked at it.
20  Q.   And who is Aaron Myers?
21  A.   I could not tell you.
22  Q.   Do you understand that James Mason observed
23       this accident?

[68]

1   A.   I don't know if he observed it or not.
2   Q.   Have you spoken to anyone at Flavor House about
3        what happened that evening involving the
4        drilling of the first hole as well as the
5        drilling of the second hole by Mr. Riley?
6   A.   Since when?
7   Q.   Since the accident occurred?
8   A.   None other than my immediate supervisor.
9   Q.   And that would have been who, sir?
10  A.   Ricky Smothers.
11  Q.   And what has Ricky Smothers told you?
12  A.   Has told me?
13  Q.   Please, sir.
14  A.   He hasn't told me nothing.
15  Q.   Okay.  What was y'all's discussion in reference
16       to the accident?
17  A.   It was just about what had happened.
18  Q.   And what did he say had happened?
19  A.   He didn't tell me what happened; I was telling
20       him what happened.
21  Q.   All right.  And what did you tell him had
22       happened?
23  A.   That Matthew was over there drilling a hole and

[69]

1        it appeared that the core drill had hung up and
2        he had fell on the floor and it went airborne
3        and hit him.
4   Q.   What else did you tell Mr. Smothers?
5   A.   I don't recall.
6   Q.   Have you spoken to anyone else at Flavor House
7        other than their --
8   A.   I don't recall who all I had spoke to or if I
9        did or I didn't.
10  Q.   While you were drilling the first hole, did you
11       have any problems with the core drill machine?
12  A.   Yes, sir.
13  Q.   And what problems, if any, did you have, sir?
14  A.   It appeared that the vacuum come loose from the
15       floor and spun around.
16  Q.   And at what point in time did the vacuum come
17       loose?
18  A.   While I was drilling the first hole.
19  Q.   And why did it come loose?
20  A.   I could not tell you that, sir.
21  Q.   After the vacuum came loose, what, if anything,
22       did you do?
23  A.   Mr. Riley pulled the plug.

7-17-2006                                                     Michael Walters

[19]  (Pages 70 to 73)

---

**[70]**

1  **Q.**  And where was the plug, sir?
2  **A.**  It's right around the corner on the other side
3        of the wall.
4  **Q.**  From the sink?
5  **A.**  Yes, sir.
6  **Q.**  And what sort of plug was that?
7  **A.**  It's a 110 regular outlet.
8  **Q.**  Did you have an extension cord?
9  **A.**  I don't recall.
10 **Q.**  Did Mr. Riley get tangled up in the cord,
11       either an extension cord or any of the cords on
12       the core drill machine, at the time of the
13       accident?
14 **A.**  I couldn't tell you that.
15 **Q.**  You say that the vacuum came loose during the
16       drilling of the first hole.  Did you check the
17       gasket on the core drill machine after it came
18       loose?
19 **A.**  Yes, sir.
20 **Q.**  And what was the condition of the gasket?
21 **A.**  It appeared to be in good condition.
22 **Q.**  Did you inspect the core drill machine to see
23       if there were any problems with the core drill

---

**[72]**

1  **Q.**  Can you explain that to me?
2  **A.**  Taking the base of it and shifting it back and
3        forth to ensure it was holding.
4  **Q.**  Okay.  What do you mean when you say shifting
5        it back and forth?
6  **A.**  From side to side, trying to break the vacuum
7        loose from the floor.
8  **Q.**  And did you check the gauge on the vacuum?
9  **A.**  No, sir.
10 **Q.**  And why not?
11 **A.**  It didn't even appear to me to do it.
12 **Q.**  Sir?
13 **A.**  It didn't appear to me to do it.
14 **Q.**  Do what, sir?
15 **A.**  It was holding to the floor, so I didn't see
16       the reason to check the gauge.
17 **Q.**  But, again, I guess what I'm trying to figure
18       out is, what did you do once you realized that
19       there was a problem that could create an injury
20       to you and others?
21       MR. LANE:  Object to the form.
22 **Q.**  If you could, maybe just tell me the procedures
23       that you followed as a lead mechanic after the

---

**[71]**

1        machine which had caused the vacuum to come
2        loose?
3  **A.**  No, sir.
4  **Q.**  Did you recognize that as a result of the
5        vacuum coming loose that it would create a
6        danger of injury to either you or someone
7        standing nearby?
8        MR. LANE:  Object to the form.
9  **A.**  Not to any extent.
10 **Q.**  Okay.  But to some extent you recognized that
11       it could create a danger --
12 **A.**  Yes, sir.
13 **Q.**  -- if the vacuum did come loose?
14 **A.**  Yes, sir.
15 **Q.**  So what precautions did you take once the
16       vacuum did come loose to ensure it did not
17       injure others?
18       MR. LANE:  Object to the form.
19 **A.**  Repositioned the drill and started over and
20       ensured the vacuum was holding.
21 **Q.**  And how did you ensure that the vacuum was
22       holding?
23 **A.**  Tried to shift it back and forth.

---

**[73]**

1        problems with the core drill machine during the
2        drilling of the first hole?
3        MR. LANE:  Object to the form.
4  **A.**  I repositioned it and verified that the vacuum
5        was holding.
6  **Q.**  Anything else?
7  **A.**  And continued to drill.
8  **Q.**  And how did you reposition it?
9  **A.**  We just swept the floor out and cleaned the
10       gasket and all off from any of the dust and
11       debris and then repositioned it back to where
12       we could drill the hole.
13 **Q.**  And did you inspect the -- I will show you
14       Exhibit Number 2.  Did you inspect this water
15       filter?
16 **A.**  No, sir.
17 **Q.**  And why not?
18 **A.**  I just didn't do it.
19 **Q.**  Okay.
20       MR. LANE:  By the way, I object to the
21       form, classifying that as a water
22       filter.  I don't know what it's
23       called, but I don't think the

---

7-17-2006                                                Michael Walters

[20]  (Pages 74 to 77)

[74]

1         record has established what it is.
2   Q.   Okay.  If you could, sir, can you, just in your
3         own words, describe what the item is there on
4         Exhibit Number 2 that is in the middle of the
5         photograph that appears to be a plastic
6         container of some sort?  Just in your own
7         words?
8   A.   It appears to be a filter of some sort.
9   Q.   Okay.
10  A.   Whether it being an air filter or a water
11        filter, I couldn't tell you.
12  Q.   Okay.  Did you check with anyone before taking
13        it to the site to see what that was?
14  A.   No, sir.
15  Q.   Let me ask you, what are these bolts here at
16        the corners of the base of the drill machine?
17  A.   Leveling bolts.
18  Q.   And what are they used for, sir?
19  A.   To ensure you have a good seal.
20  Q.   And how do you use those leveling bolts to
21        ensure you have a good seal?
22  A.   You seal the vacuum to the floor and then run
23        your bolts down until they touch the floor so

[75]

1         it don't move.
2   Q.   And did you perform that operation before you
3         began the first and second drilling of the
4         hole?
5   A.   Yes, sir.
6   Q.   And did Mr. Matthew Riley observe you using the
7         leveling bolts to ensure that there was proper
8         suction to the floor?
9   A.   Yes, sir.
10  Q.   And so that I'm clear then, you actually
11        screwed the leveling bolts down so that the
12        base of the core drill machine was level or
13        would be level on that concrete slab?
14        MR. LANE:  Object to the form.
15  A.   Yes, sir.
16  Q.   Okay.  As I understand it, initially you
17        started out the drilling of the first hole with
18        your feet to the side of the base of the core
19        drill machine?
20  A.   Yes, sir.
21  Q.   And then for some reason you placed both feet
22        on the core drill base; was that after you had
23        already leveled it?

[76]

1   A.   Yes, sir.
2   Q.   Okay.  Was there any movement of the base as
3         you stood on it?
4   A.   No, sir.
5   Q.   And that's because you used the leveling
6         screws?
7   A.   Yes, sir.
8   Q.   And did you instruct Mr. Riley about the
9         importance of those leveling screws?
10  A.   No, sir.
11  Q.   And why not?
12  A.   I just overlooked it.
13  Q.   Did Mr. Riley -- before he began drilling the
14        second hole, did he use the leveling bolts?
15        MR. LANE:  Object to the form.
16  A.   No, sir.
17  Q.   Did you instruct Mr. Riley that he needed to
18        use those leveling bolts before beginning
19        drilling the second hole?
20  A.   No, sir, because I set the drill up.
21  Q.   Okay.  Well, did you use the leveling bolts to
22        level the core drill machine before Mr. Riley
23        began drilling the second hole?

[77]

1   A.   Yes, sir.
2   Q.   And did you anchor the core drill machine?
3   A.   No, sir.
4   Q.   And why not?
5   A.   I had never seen one that needed to be
6         anchored.
7         MR. BRASHER:  Do you mean with the
8         vacuum?
9         MR. LANE:  Object to the form, because
10        there's different ways of
11        anchoring it; vacuum is one method
12        and I think you're referring to
13        another if I hear your question
14        right.
15  Q.   You indicated that after you had the problem
16        with the vacuum on drilling the first hole that
17        you then repositioned it; and how did you
18        reposition it, sir?
19        MR. BRASHER:  Object to the form.  It's
20        been asked and answered twice.
21        Tell him again.
22  A.   I turned it over and cleaned the gasket off and
23        swept the floor and repositioned it over the

7-17-2006                                                    Michael Walters

[21]  (Pages 78 to 81)

[78]

1      hole.
2    Q.   Did you turn it over on its side, its back or
3         what?
4    A.   I don't recall which way I turned it.
5    Q.   And you say you were about three-quarters
6         through the first hole at the time that you had
7         the difficulty with the vacuum?
8    A.   Yes, sir.
9    Q.   Did the base rotate when it hung up --
10   A.   With me?
11   Q.   -- during the first hole?  Yes, sir.
12   A.   Yes, sir.
13        MR. LANE:  Did you say when it hung up?
14        MR. SHEEHAN:  Yes, sir.
15        MR. LANE:  I don't -- that may be what
16             happened, but I don't remember him
17             testifying that the drill hung up.
18        MR. SHEEHAN:  Thank you.  No, that's a
19             good point.
20   Q.   During the operation of the core drill machine
21        for the drilling of the first hole, did the
22        drill bit hang up in the concrete slab?
23   A.   That I can't tell you.  I just know the vacuum

[79]

1      broke loose.
2    Q.   Okay.  Did it continue to drill while the
3         vacuum came loose?
4    A.   No, sir.
5    Q.   So that I'm clear then, before Mr. Riley turned
6         the machine off, did the drill continue to
7         operate drilling through the concrete as the
8         vacuum came loose?
9    A.   No, sir.  The base of it was going round and
10        round.
11   Q.   Okay.  So it was going around 360 degrees?
12   A.   Yes, sir.
13   Q.   How many times did the base go around?
14   A.   I don't recall that.
15   Q.   And what caused the drill bit to hang up in the
16        concrete three-quarters of the way through the
17        first hole?
18        MR. LANE:  Again, I object to the form.
19        MR. BRASHER:  Object to the form.
20   A.   I have no idea.
21   Q.   Okay.  Did you check the drill bit after the
22        base spun around during this first hole?
23   A.   Yes, sir.

[80]

1    Q.   Were any of the teeth on the drill bit missing?
2    A.   No, sir.
3    Q.   All of the teeth of the drill bit you were
4         using were present?
5    A.   Yes, sir.
6    Q.   When you set the drill up for the second drill
7         operation by Mr. Matthew Riley, did you check
8         the drill bit?
9    A.   Yes, sir.
10   Q.   And were all of the teeth present on the drill
11        bit when Mr. Riley was operating the drill bit?
12   A.   Yes, sir.
13   Q.   Did you ever see more than one drill bit?
14   A.   No, sir.
15   Q.   So the only drill bit you ever saw was the
16        drill bit that had all of the teeth present?
17   A.   Yes, sir.
18        MR. LANE:  Well, again, object to the
19             form.  If you're referring to the
20             drill bit in the picture, then I
21             object to the form as to whether
22             or not that's the bit he saw
23             previously or not, just for

[81]

1      clarification.
2    Q.   So that we're clear then, sir, did you use or
3         did you help or assist Mr. Riley in using a
4         drill bit that had any missing teeth to it?
5    A.   No, sir.
6    Q.   And what size drill bit were you using?
7    A.   I don't recall.
8    Q.   So that I'm clear, while you were drilling the
9         first hole when the base of the drill went
10        around 360 degrees -- did you tell me how many
11        times it went around?
12   A.   No, sir, I don't recall.
13   Q.   But it went around at least once?
14   A.   Yes, sir.
15   Q.   Okay.  While it was going around, that's when
16        Mr. Riley cut the switch off?
17        MR. LANE:  Well, object to the form.
18   A.   I believe he pulled the plug.
19   Q.   Pulled the plug.  So he went around the
20        corner --
21   A.   Yes, sir.
22   Q.   -- and pulled the plug?  I'm sorry you need
23        to --

7-17-2006                                                                  Michael Walters

[22]  (Pages 82 to 85)

[82]

1    A.  Yes, sir.
2    Q.  Thank you.  And you didn't get hung up in the
3        extension cord or any of the wires?
4    A.  No, sir.
5    Q.  Were you standing on the drill base at the time
6        that the base started to rotate 360 degrees?
7    A.  No, sir.
8    Q.  Is that why you positioned yourself with your
9        entire 220 pounds on the base?
10   A.  No, sir.  It's just an easier place to be to
11       drill the hole.
12   Q.  So that I'm clear then, you didn't stand on the
13       core drill machine base in order to prevent it
14       from spinning around?
15   A.  No, sir.
16          MR. BRASHER:  That's been asked and
17             answered.
18   Q.  As you were drilling, did you observe anyone
19       else in the area?
20   A.  I don't recall.
21   Q.  You completed the first hole and then actually
22       moved the core drill machine over and
23       positioned it and set it up for Mr. Riley to

[83]

1        use?
2    A.  Yes, sir.
3    Q.  After the accident did you inspect the core
4        drill machine?
5    A.  No, sir.
6    Q.  Did you note whether there had been any damage
7        or have you been told that there was damage to
8        the core drill machine after the accident
9        involving Mr. Riley?
10   A.  The only thing I noticed was the plug was
11       pulled off the end of it.
12   Q.  And which plug was that, sir?
13   A.  The 110 plug to the actual drill.
14   Q.  And did you make any repairs or modifications
15       to the core drill machine after the accident?
16   A.  No, sir.
17   Q.  What about before the accident?
18   A.  No, sir.
19   Q.  Did Mr. Riley make any changes to the core
20       drill machine before the accident or after the
21       accident?
22   A.  No, sir.
23   Q.  Did anyone at Flavor House make any

[84]

1        modifications or changes?
2    A.  That I can't tell you.
3    Q.  Who all in Flavor House was involved in
4        investigating this accident?
5           MR. BRASHER:  If you know.
6    A.  That I don't know.
7    Q.  Donald Coty or Cody?
8    A.  Cody.
9    Q.  Ricky Smothers?
10   A.  Yes, sir.
11   Q.  Adam Hall?
12          MR. BRASHER:  Are these questions?
13          MR. SHEEHAN:  Yeah, I'm just asking if
14             he knows these people.
15          MR. BRASHER:  Okay.
16   A.  Yes, sir.
17          MR. BRASHER:  Not if they were --
18          MR. LANE:  If he knows these people?
19          MR. BRASHER:  If he knows them or if
20             they were involved in the accident
21             investigation?
22          MR. SHEEHAN:  That's a good question.
23   Q.  Do you know whether or not these individuals

[85]

1        were involved in an investigation of the
2        accident?
3    A.  No, sir.
4    Q.  Harold Mixon, I don't believe we've discussed
5        him, who is that?
6    A.  He is now third shift supervisor.
7    Q.  And at the time of the accident he was?
8    A.  A maintenance mechanic on first shift.
9    Q.  Roy Donley?
10   A.  He was a mechanic.
11   Q.  On what shift, sir?
12   A.  I don't remember what shift he worked in.
13   Q.  And then Ken Tew was the Safety Director?
14   A.  As far as I can remember.
15   Q.  How long was he the Safety Director after this
16       accident?
17   A.  I don't know.
18   Q.  And why did he leave Flavor House?
19   A.  I couldn't tell you.
20   Q.  Did you have any theory or opinion as to what
21       caused this accident?
22   A.  No, sir.
23   Q.  After the accident did you have any opinion as

7-17-2006                                                     Michael Walters

[86]

1    to what caused the accident?
2  A.   I had an opinion.
3  Q.   And what was that, sir?
4  A.   That it appeared the drill bit had hung up in
5       the concrete and the vacuum had come loose.
6  Q.   Was there any rebar in that slab?
7  A.   I don't recall.
8  Q.   Did you find any rebar as you drilled the first
9       hole?
10 A.   No, sir.
11 Q.   Did you check the hole to see if there was
12      rebar?
13 A.   No, sir.
14 Q.   Did the drill bit get hung up in the second
15      hole due to rebar?
16      MR. LANE:  Object to the form.
17 A.   I couldn't tell you.
18 Q.   Did you see any rebar in that second hole?
19 A.   No, sir.
20 Q.   Did you tell anyone that the drill bit hung up
21      as a result of striking rebar in that second
22      hole?
23 A.   No, sir.

[87]

1  Q.   About how long had you been gone from the site
2       before you learned that Mr. Riley had been
3       involved in an accident?
4  A.   Two to three minutes.
5  Q.   Where were you when you learned of the
6       accident?
7  A.   Halfway between the job site and the
8       maintenance shop.
9  Q.   Had you already made it to the maintenance
10      shop?
11 A.   Yes, sir.  I was returning on my way back.
12 Q.   And what had you done at the maintenance shop?
13 A.   I had been paged up there by one of the
14      sanitation workers.
15 Q.   And did you meet anyone at the maintenance
16      shop?
17 A.   I don't recall who it was.
18 Q.   And did you assist this person at the
19      maintenance shop?
20 A.   Yes.
21 Q.   What did you do for them?
22 A.   I don't recall.
23 Q.   But whatever it was, you solved the problem

[88]

1    there at the maintenance shop?
2  A.   Yes, sir.
3  Q.   And then what did you do, sir?
4  A.   Was returning to the job site.
5  Q.   You were just walking, there wasn't any cart or
6       anything?
7  A.   Yes, sir.
8  Q.   Okay.  And what happened as you walked towards
9       the site?
10 A.   Mr. Riley was already on the floor and being
11      attended to.
12 Q.   By whom, sir?
13 A.   I don't recall who was there.
14 Q.   And what did you do?
15 A.   I went to see what the accident -- what the
16      problem was.
17 Q.   Okay.  And what did you observe?
18 A.   Mr. Riley had lacerations to his face.
19 Q.   What else did you observe, sir?
20 A.   I really don't recall.
21 Q.   What did you do?
22 A.   I don't recall exactly what I done.
23 Q.   How long did you stay there?

[89]

1  A.   Until the paramedics come and got him.
2  Q.   Okay.  During that time did you talk to anyone
3       about what had happened or what instructions
4       you had given Mr. Riley?
5  A.   I don't recall.
6  Q.   And what happened after the paramedics arrived?
7  A.   I don't recall what we done then.
8  Q.   How long were the paramedics there?
9  A.   I don't recall.
10 Q.   Can you help us just as you sit here today; was
11      it an hour or two hours?
12 A.   I couldn't even recall that.
13 Q.   Okay.  Did you see anyone take any photographs?
14 A.   No, sir.
15 Q.   What happened after the paramedics left?
16 A.   I don't recall.
17 Q.   Did you complete any other projects that
18      evening or start any other projects?
19 A.   I don't recall, other than handling sanitation.
20 Q.   What would that be, sir?
21 A.   Whatever they needed.
22 Q.   Did you clean up the accident site?
23 A.   No, sir.

7-17-2006                                                    Michael Walters

[90]

1  Q.  Did anyone clean up the accident site?
2  A.  Yes, sir.
3  Q.  And who was that?
4  A.  I believe James Mason instructed people to do
5      so.
6  Q.  And why was that?
7  A.  Because of the blood that was on the floor.
8  Q.  And why is that?
9         MR. LANE:  Why was there blood on the
10        floor, is that the question?
11 Q.  Why was it necessary to clean up blood on the
12     floor?
13 A.  Because it's a contaminant and we deal with
14     food product.
15 Q.  Okay.  And about what time was the blood
16     cleaned up from the floor?
17 A.  I couldn't tell you that, sir.
18 Q.  Did you do anything else that evening?
19 A.  I don't recall.
20        (Exhibit 27 marked for identification.)
21 Q.  Let me show you Exhibit Number 27 to your
22     deposition and ask you what that is, sir?
23 A.  It appears to be a picture of the core drill.

[91]

1         (Exhibit 28 marked for identification.)
2  Q.  Okay.  And let me show you Exhibit Number 28
3      and ask you what that is?
4  A.  It appears to be a picture of a tag.
5  Q.  Okay.  And is that tag --
6  A.  Sticker.
7  Q.  -- located on the base of the core drill
8      machine?
9  A.  It appears to be so.
10 Q.  Okay.  If I can, let me come over.  Looking at
11     Exhibit Number 28, it appears to say "Read
12     operations manual before using."  Did I read
13     that correctly?
14 A.  The best that I can tell.
15 Q.  Does it also say "Failure to secure rig
16     properly may" and then "in serious"?
17 A.  That appears to be what it says.
18 Q.  Okay.  And did you -- did you read that
19     warning?
20        MR. BRASHER:  Let me object to the form
21        to the extent that the exhibit
22        depicts that that has been
23        defaced.  The warning sticker that

[92]

1         you're referring to has been
2         defaced such that portions of the
3         text and, in fact, the caption at
4         the top of it are illegible.
5  Q.  You may answer the question, sir.
6  A.  Can you repeat the question, please?
7  Q.  Sure.  Did you review that warning label?
8         MR. BRASHER:  The same objection.
9  A.  No, sir.
10 Q.  Did you call to anyone's attention the fact
11     that there was that warning label on the base
12     of the machine?
13 A.  No, sir.
14 Q.  Let me show you Exhibit Number 4, if I could.
15     The third sentence there under General Safety,
16     does it read "If any safety devices or warnings
17     have been removed, defeated, defaced or
18     rendered inoperable, do not use the equipment,"
19     and then there are four exclamation points?
20        MR. BRASHER:  Let me object to the
21        form.
22 Q.  Did I read that properly?
23 A.  Where are you reading?

[93]

1  Q.  The third sentence on this General Safety
2      instruction.
3  A.  Yes, sir.
4         MR. BRASHER:  Let me object to the
5         extent your question infers that
6         Exhibit 4 was --
7         MR. STUTTS:  Joe, that's not an
8         objection to the form and that's
9         what we have an agreement here on.
10        MR. BRASHER:  It is an objection to the
11        form.
12        MR. STUTTS:  No, it's not.  The form
13        would be whether it's leading.
14        MR. BRASHER:  Well, no.  There's no --
15        it assumes facts not in evidence.
16        There's no testimony that this --
17        MR. STUTTS:  That's not a form
18        objection.
19        MR. LANE:  I think it is a form.
20        MR. BRASHER:  Of course it is.
21        MR. STUTTS:  Both of y'all have been
22        making speeches.
23        MR. BRASHER:  I'm allowed to make a

[94]

1    reference for later use for the
2    basis of my objection on the
3    record. I am permitted to do
4    that.
5        MR. STUTTS: Well, we've agreed to
6        waive all of those except as to
7        the form.
8        MR. BRASHER: His question infers --
9        there's testimony that this was
10       not -- this witness did not see
11       this exhibit with the drill.
12       MR. STUTTS: Well, you can bring that
13       out in further questioning if you
14       want to, but that hasn't got
15       anything to do with the form of
16       the question. It may have
17       something to do with the substance
18       of the question, but it doesn't
19       have anything to do with the form.
20       MR. BRASHER: Well, I object to the
21       form.
22       MR. STUTTS: And we have an agreement
23       that you won't object except as to

[95]

1        the form.
2        MR. BRASHER: I am objecting to the
3        form of the question.
4        MR. STUTTS: All right.
5        MR. BRASHER: It assumes facts not in
6        evidence. If that's not a form
7        objection, I don't know what is.
8    BY MR. SHEEHAN:
9    Q.   Let me see if I can read here under paragraph
10       12. "If the person receiving this handout will
11       not be the user of the equipment, forward these
12       instructions to the operator." Did I read that
13       correctly, sir?
14   A.   Yes.
15       MR. BRASHER: Same objection.
16   Q.   So that I'm clear, sir, after this accident you
17       took no steps to assist in the investigation of
18       the cause of the injury to Mr. Riley?
19   A.   No, sir.
20   Q.   I'm sorry, that was a poor question. Did you
21       do anything to determine the cause of the
22       accident?
23   A.   No, sir.

[96]

1        MR. SHEEHAN: I appreciate your time.
2        Thank you.
3
4        CROSS-EXAMINATION
5    BY MR. MCGARRAH:
6    Q.   Mr. Walters, my name is Scott McGarrah. I
7        represent a company called Milwaukee Electric
8        Tool, and they made the drill motor on this
9        core drill, and I've got a few questions. I'll
10       try not to be repetitive, but sometimes it just
11       kind of becomes necessary.
12           When you got there -- what time did you
13       get there the day of the accident or that
14       evening?
15   A.   About 11:00 P.M.
16   Q.   Okay. And had you worked the day before?
17   A.   Yes, sir.
18   Q.   Was the core drill present the previous day
19       that you were at work?
20   A.   Not to my knowledge it wasn't.
21   Q.   All right. Do you know why the core drill was
22       obtained for this particular -- on this
23       particular occasion? In other words, did you

[97]

1        request it, or did somebody tell you to get
2        one, or did you tell someone to get one, or how
3        did it end up being there?
4    A.   It was there for me to use that night.
5    Q.   All right. When you got there that night, did
6        you already know ahead of time that you were
7        going to be cutting these holes?
8    A.   No, sir.
9    Q.   And you just received a verbal or written work
10       order?
11   A.   Yes, sir.
12   Q.   And who gave you that order?
13   A.   It was whoever was the lead mechanic on the
14       second shift.
15   Q.   All right. So you were basically told to go
16       drill these holes there at this location and
17       the core drill was there for y'all's use?
18   A.   Yes, sir.
19   Q.   Have you ever rented one yourself to be used
20       there at Flavor House?
21   A.   No, sir.
22   Q.   When you -- you've used them there before; is
23       that correct?