IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MATTHEW RILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 1:05cv994-T |
| vs. | ) | |
| | ) | |
| UNITED RENTALS (NORTH | ) | |
| AMERICA), Inc. et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF JOHN C. FROST**

Comes the affiant, John Frost who being sworn, deposes and says upon personal knowledge the facts and opinions as detailed in the following report:

# REPORT OF FINDINGS

## INVESTIGATION OF TRAUMATIC INJURIES TO MR. MATTHEW RILEY

JOHN C. FROST
Safety Engineer

JUNE 28, 2006

Safety Engineering Services
2627 Trailway Road, SE
Huntsville, Alabama 35801
(256) 650-0335

1

## BACKGROUND

On August 29th, 2003, Mr. Matthew Riley, a Maintenance Mechanic for Flavor House Products was seriously injured while drilling a hole in a concrete floor. As an experienced Safety Engineer, I was asked to evaluate the accident and determine the root cause(s) of Mr. Riley's injuries.

My education includes a Bachelor of Science in Electrical Engineering from the University Of Virginia in 1972, where I was a Dupont Scholar, and a Master of Science in Industrial Engineering specializing in Safety Engineering from Texas A&M University in 1974. I served as a practicing Safety Engineer for the United States Department Of Defense for 33 years as a civilian. I retired as the Chief of the Safety Office at the U.S. Army's Aviation and Missile Command in 2005. In that capacity I was responsible for safety engineering guidance for the design and support for the Army's aircraft and missiles, as well as safety support to the approximately 8,000 employees of the command. A copy of my Curriculum Vitae is attached.

## DATA EVALUATED

I have reviewed the following materials specific to this incident in my ongoing analysis of this matter:

1. Photographs by United Rentals of the equipment being utilized at the time of the injury.
2. Photographs of the accident scene near the time of the accident
3. Video of a teardown inspection of the same equipment.
4. Chemical analysis by Applied Technical Services of material found in the equipment in question.
5. Deposition testimony of Mr. Matthew Riley.
6. Owners Manual for Model DM500 Core Drill.
7. The Complaint in the matter.
8. United Rental's Initial Disclosures and a Supplement thereto.

## RECONSTRUCTED ACCIDENT SEQUENCE

Based upon my review of the materials available at this time, it is my opinion that the sequence of events preceding Mr. Riley's injury was fundamentally as follows:

On the evening of August 28th, 2003, Mr. Riley began his shift as a Flavor House Products Maintenance Mechanic at approximately 11 PM. This was his fourth day on the job. He was directed by his supervisor, Mr. Mike Walters, to assist in drilling two holes in a concrete floor for eventual protective pylon installation. He was told they were to use a DM500 Core Drill rented from United Rentals. This unit is shown below.



Mr. Riley informed his supervisor that he had never used such a machine. No Operator's Manual was available for Mr. Riley to review.

After a general inspection of the drill and clearing up the work area, Mr. Riley installed the vacuum gasket on the underside of the drill frame to allow use of the vacuum restraint device to prevent drill movement. A water hose was directed at the drill bit entry point for cooling and lubrication. Mr. Walters began to drill the first of the two required holes. Mr. Riley watched to learn how to use the drill. After approximately five to ten minutes and four inches of drill depth, the drill frame began to turn and Mr. Walters got out of it's way while Mr. Riley reached over to the toggle switch and turned the drill off. Mr. Walters then "took it easy" and proceeded by bracing the drill with his feet. The hole was successfully completed.

Mr Riley proceeded to drill the second hole. The drill was moved to the new location and the water was redirected to the drill bit. Mr. Riley checked the vacuum sealing gasket and made sure that the vacuum motor was running. He looked at the vacuum gauge but couldn't judge it's meaning because of lack of indication of acceptable readings. He put approximately one half of his body weight on the drill base to secure it and proceeded to drill. When the drill reached a depth of approximately four inches, the bit suddenly jammed and the drill frame began to spin. Mr. Riley was thrown from the base and caught by the flailing power cord. The drill motor continued to run. He was pulled to the ground and then hit in the face by the spinning drill frame, causing serious facial injuries. The drill motor finally stopped when the power cordwas severed by the spinning drill.



### FINDINGS AND OPINIONS

Information is still being developed in the investigation of this case. As that information becomes available it may shed more light on the details of the design, distribution, maintenance and rental of the equipment in question. Based upon review of the material identified above and my background, education and experience in Safety Engineering it is my professional opinion that:

1. At the time of his injury, Mr. Riley was attempting to accomplish his assigned task in a reasonable and foreseeable manner and in a manner directed by his supervisor.

2. At the time of his injury, Mr. Riley was using the DM500 drill in a manner that was reasonably foreseeable to its manufacturer.

3. Mr. Riley's injuries resulted from the frame of the DM500 drill suddenly beginning to spin when driven by the electric drill motor against a binding drill bit. The vacuum restraint system failed to restrain the forces involved.

4. Utilizing even the most basic safety analysis techniques, the hazard of a spinning drill frame should have been clearly recognized by the drill manufacturer and safety controls should have been implemented to adequately abate the hazard.

5. By design, the on-board vacuum system utilized by the manufacturer to stabilize the drill frame is inadequate and subject to numerous single point failures. These include leakage around the base sealing gasket, blockage of the vacuum channel, hose, plumbing or water separator and clogging of the vacuum filter and other components. Some of these failure points are indicated in the following photograph.



6. In accordance with standard Safety Engineering "Order Of Design Precedence" as described in the National Safety Council's Accident Prevention Manual and other publications, the hazard of sudden violent spinning of the drill frame should have been controlled using the following techniques in the following order:

   a. **Design For Minimum Risk.** Such design should have used a drill motor torque or clutch release value that would have kept the frame forces within the stability limits provided by the restraint system as it functioned in the field. Post accident tests revealed the clutch would not release when torques as high as 231 foot-pounds were applied.

   b. **Incorporate Safety Devices.** Such devices should have included a vacuum interlock that sensed loss of vacuum under the drill frame skirt and immediately removed electrical power from the drill. Additionally, the electrical switch should not have been a toggle switch that also rotated when the frame did



making it almost impossible for the operator to turn the run-away drill off. Instead, it should have been a spring loaded "dead man" design that automatically removed power when released.

c. **Provide Warning Devices.** While a gauge existed that, under some circumstances, could give an indication of the status of the vacuum restraint system, this gauge was unsuitable for it's intended purpose for the following reasons.

> 1) The gauge was located at the inlet to the vacuum pump rather than on the vacuum chamber at the base of the frame. Consequently, it would give an false "OK" reading even if 100% blockage existed in the vacuum channels, hose, water separator or plumbing that ran from the pump down to the vacuum chamber.
>
> 2) The gauge face had absolutely no indication of what an acceptable range of pressures was. A color coded band of the acceptable range is normally used for such safety related gauges.



> 3) The gauge was physically located away from the operator's controls and not likely to be

7

monitored continuously.



There was no audible alert to loss of vacuum. Additionally, sudden loss of vacuum would result in immediate loss of drill restraint with no time for operator reaction.

d. **Develop And Implement Operating Procedures and Employee Training Programs.** In my opinion, reliance on training to control this hazard is not reasonable in view of the design measures that were available to positively prevent it. This is especially true in view of the rental nature of the device's distribution. The labels/warnings that were on the drill were ineffective in informing the user of the risk involved or of the steps to be taken to minimize the risk and did not meet industry standards for such warnings. I have seen no indication that United Rentals, the company that rented the drill in question to Mr. Riley's employer, took adequate steps to train any representative of the hazard of the drill and the steps needed to avoid that hazard.

e. **Use Personal protective Equipment.** In my opinion, no reasonable Personal Protective Equipment would have been effective at controlling the hazard of a spinning drill frame of the torque involved in this equipment

7. Utilizing the design techniques discussed above, it is my opinion that it was technologically and economically feasible to adequately control the hazard of loss of frame restraint in the DM 500 Core Drill.

8

8. It is additionally my opinion that at the time Mr Riley and Mr. Walters began to use the DM 500 Core Drill. It was not in a safe condition. In addition to a misplaced water inlet connection and broken teeth on the drill bit, post accident inspection revealed significant Aluminum Oxide blockage in the restraint vacuum pump chamber that is likely to have diminished the vacuum effectiveness and further contribute to the cause of Mr. Riley's injury.



9. Based upon the above findings and my background, training and experience, it is my opinion that when used in a reasonably foreseeable fashion, the design of the DM 500 Core Drill is inherently hazardous, unreasonably dangerous and defective. Furthermore, the hazardous design and condition of the DM 500 Core Drill was the root cause of Mr. Riley's injuries.

10. The above opinions are stated within a reasonable degree of engineering certainty.

## RULE 26 DISCLOSURE INFORMATION

The above report includes an accurate description of all of my opinions developed to date and the basis for these opinions. A summary of my qualifications, education and experience is provided in the attached Curriculum Vitae. I am being compensated for this accident investigation at my normal rate of $250 per hour. A list of cases in which I have provided testimony in the last five years is also attached.

John C. Frost

Date: _____September 25, 2006_____

**FURTHER, AFFIANT SAITH NOT.**

_____
JOHN C. FROST

Sworn to and subscribed before me this
25th day of September, 2006

_____
NOTARY PUBLIC

My Commission Expires: 02-03-07

Reconstructed Testimony Case List: John Frost
06/28/06

2001
Barley v. Cranepro (Personal injury from crane hook malfunction)
Walters v. Altec (Conductive IALD)
Kelly v. Whirlpool (Electrical house fire fatality)
McCall v. Goldkist (Grain auger entrapment)
Sawyer v. Altec (Conductive IALD)

2002
Self v. Golden Construction (Crane power line contact fatality)
Hill v. Tube City (Worker crushed to death by truck)
Mitchel v. GM (Auto accident fatality)
Halsey v. Dillards (Scissors lift collapse)
Mulkey v. NKK Steel (Electrical arc furnace explosion)

2003
Ruiz v. Kia (Vehicle rollover death)
Dallas v. McWayne (Worker injured in industrial equipment)
Henry v. Copeland (Assembly worker amputation in welder)
Calloway v. PPG (Worker fall)
Everts v. Altec (IALD)
Boddie v, Invacare (Wheelchair rollover)


2004
Slaughter v. Altec (IALD)
Almond v. Coop Propane (Residential Propane gas explosion)
Anthony v. Chroen Pokphand (Caustic spray damage to eye)
Wheat v. AEC (Backing dump truck fatality)
Klibanoff v. Country Gas (Residential propane gas explosion)
Walters v. Otterbine (Electrocution)
Everts v. Altec Trial (IALD)
Martinez v. Altec (IALD)

2005
Sharp v. Altec (IALD)
Sawyer v. Altec (IALD)
Tolbert v. Craft Electric (Exhaust Gas Exposure)
Walters v. Otterbine Trial (Electrocution)
Cannon v. Granny's Lemonade (Electrocution)
Tolbert v. Craft Electric (Trial) (Exhaust Gas Exposure)
Coale v. IPSCO (Worker crushed)
Staples v. Fluke Instruments (Electric shock)
Ficker v. Onyx Environmental (Asphyxiation)
Martinez v. Altec (Trial) (IALD)
Bennett v. Altec (IALD)

Potter v. Altec (IALD)
Woods v. Alabama Power (Electric Shock)

2006
Cassey v. Elliot (Electrocution)
Terry v. Schueck (Crushed By Steel Guardrail)

*Curriculum Vitae*

# John C. Frost
## Safety Engineer

2627 Trailway Road, SE
Huntsville, Alabama  35801-1473
(256) 650-6324

## PROFESSIONAL EXPERIENCE

**1985 to Present**

**Principal**
**Safety Engineering Services, Huntsville, Alabama**
Provide safety engineering evaluation and guidance, accident causation determination, accident reconstruction, and forensic safety engineering services as a private consultant.

**1997 to Present**

**Chief, Safety Office**
**US Army Aviation and Missile Command, Redstone Arsenal, Alabama**
Direct and implement a comprehensive safety program for all aspects of a major high technology organization that develops, fields and supports state-of-the-art aircraft and missile systems for the Army worldwide and provides facilities and services for approximately 20,000 residents, workers, visitors and contractors on Redstone Arsenal as well as personnel and operations at multiple remote subordinate activities. Program elements include Product/System Safety for the Army's worldwide fleet of aircraft and missiles as well as Occupational, Industrial, Construction, Radiation, Explosive, and Community Safety for supported workforce. Responsible for safety engineering support for over $13 billion of product research, development and procurement per year (1/3 of the Army's procurements) and over $108 billion worth of facilities and equipment operated by supported population. Serve as the *Designated Safety and Health Official* and *Hazard Classification* and technical safety authority for the largest employer in Alabama. Train and manage approximately 30 Safety Engineers, Safety Specialists, and Health Physicists.

**1995 to 1997**

**Chief, Safety Office**
**US Army Missile Command, Redstone Arsenal, Alabama**
Same as above, but without primary aircraft design safety responsibilities.

**1992 to 1995**

**Chief, System Safety Engineering and Radiation Protection**
**US Army Missile Command, Redstone Arsenal, Alabama**
Direct a System Safety / Product Safety Program to assure the safety of $4-7 billion of missiles, radars, vehicles, test equipment, aircraft and related support facilities and equipment procured and fielded world wide each year. Develop safety requirements, evaluate hardware design, assess contractor design performance and production facilities, investigate accidents, review accident trends, plan and conduct safety tests. Designated Army Interim Hazard Classification authority for explosive shipments. Train and supervise 8-10 Safety Engineers and Health Physicists.

**1981 to 1992**

**Supervisory Safety Engineer**
**US Army Missile Command, Redstone Arsenal, Alabama**
Responsible for the safety of air defense missile systems and support facilities worldwide and the safety of the Redstone Arsenal Support Activity and the public on Redstone Arsenal, Alabama. Utilizing System Safety principles, establish safety design requirements, evaluate existing equipment and facilities and investigate accidents on Redstone and

1

worldwide. Train and supervise 8-10 Safety Engineers, Safety Specialists and Health Physicists.

| | |
|---|---|
| 1978 to 1981 | **Safety Engineer**<br>**US Army Missile Command, Redstone Arsenal, Alabama**<br>Responsible System Safety Engineer for 4-8 major weapon acquisition programs. Detailed design evaluation, safety testing, and daily contractor guidance / oversight. |
| 1974 to 1978 | **Lead Safety Engineer**<br>**US Army Electronics Command, Fort Monmouth, New Jersey**<br>Responsible for the system safety guidance and evaluation of Army electronics systems, equipment and related facilities fielded worldwide. Established Army safety requirements. Audited safety of contractor designs and operations. Evaluated safety test results. Conducted accident investigations. Also served as lead safety engineer for installation industrial / occupational safety issues. Baseline OSHA inspection of Fort Monmouth. |

## EDUCATION

| | |
|---|---|
| 1973 to 1974 | **Master of Engineering: MEIE in Safety Engineering**<br>**Texas A & M University**<br>**College Station and Red River Army Depot, Texas**<br>Alpha Pi Mu National Honorary Engineering Society<br>Graduate Thesis: "Power Fault Grounding Techniques For Personnel Protection" |
| 1972 to 1974 | **US Army Safety Engineering Intern Program**<br>**Army Materiel Command Field Safety Activity**<br>**Charlestown, Indiana**<br>Specialized Safety Engineering courses.<br>Graduate Safety Engineering Intern<br>Office of Personnel Management certified as a Safety Engineer (GS-803) |
| 1968 to 1972 | **Bachelor Of Science: Electrical Engineering**<br>**University Of Virginia**<br>**Charlottesville, VA**<br>Dupont Scholar<br>Full Academic Scholarship |

**Continuing Education**
Regular attendance at, and presentation of, specialized Safety Engineering courses.

## OTHER

**Certifications / Registrations**

- *Certified Utility Safety Administrator (CUSA) by the National Safety Council, Certification #1615*
- *Technician Class Radio Operator License, CPR, and Severe Weather Spotter Certified*

2

**Professional Affiliations:**

- *System Safety Society (Senior Member)*
- *American Society Of Safety Engineers (Professional Member)*
- *National Fire Protection Association*

**Awards / Honors**

- *Commander's Meritorious Service Award* for Safety Engineering support to the Army's largest accident investigation (Pershing II Ignition)
- *Commander's Medal For Civilian Service* for independent review of the Army's System Safety processes.
- Fifteen *Letters Of Commendation / Appreciation* for various Safety Engineering investigations, evaluations and handbooks.
- *Special Act Award* for safety support to Soviet inspections of hazardous operations under the Intermediate Range Nuclear Force (INF) treaty.
- *Session Chairman* for the Accident Investigation session of the 2001 International Conference of the *System Safety Society.*
- Senior Safety Engineer on *Army Safety Investment Strategy Team* that analyzed every Class A-C Army aviation accident for previous 5 years to identify underlying causes and develop countermeasures.
- Guest lecturer to the Army Field Safety Activity and the Army Safety Center on *Safety Engineering Principles And Practices.*
- Author / reviewer for The Army *Safety Engineering Design Handbook* series.
- A Keynote Speaker for the *Alabama Governor's Safety Conference.*
- Question reviewer for international *Certified Safety Professional* exams.

**Committees**

- *Army Materiel Command System Safety Policy Action Committee.*
- *Technical Subpanel Of Army Executive Safety Steering Group.*
- *US Army Ignition Systems Safety Review Committee*
- *US Army Munitions Vulnerability Panel*
- *Tri-Service Lithium Battery Safety Committee*
- *Electronics Industry Association System Safety Committee*

**Personal Information**

- *Born: Birmingham, Alabama. August 29, 1950*
- *Family: Married, with two sons*
- *Citizenship: United States*

3

02/06/05