[1]

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION



MATTHEW RILEY,

        Plaintiff,

Vs.                         CIVIL ACTION NO.

                              1:05 CV-994-W

MILWAUKEE ELECTRIC TOOL

CORPORATION, et al.,

        Defendants.


        VIDEO DEPOSITION OF MATTHEW RILEY, taken

pursuant to notice and stipulation on behalf of the

Defendants, in the conference room of Cochran,

Cherry, Givens, Smith, Lane & Taylor, 163 West Main

Streeet, Dothan, Alabama, before Ricky L. Tyler,

(AL-CSR-212) Certified Shorthand Reporter and Notary

Public in and for the State of Alabama at Large, on

Wednesday, June 21st, 2006, commencing at 10:35 A.M.

[2]

```
1              APPEARANCES
2  FOR THE PLAINTIFF:
3        JOSEPH D. LANE, ESQ.
4        Cochran, Cherry, Givens, Smith,
5        Lane & Taylor
6        P. O. Box 927
7        Dothan, AL 36302
8
9  FOR THE INTERVENOR, RALCORP:
10       JOSEPH T. BRASHER, ESQ.
11       Hamilton, Westby, Antonowich & Anderson
12       One Georgia Center
13       17th Floor
14       600 West Peachtree Street, N.W.
15       Atlanta, Georgia 30308
16
17 FOR THE DEFENDANT, MILWAUKEE ELECTRIC TOOL
18 CORPORATION:
19       W. SCOTT MCGARRAH, III, ESQ.
20       McGarrah & Davenport, P.C.
21       P. O. Box 43548
22       Birmingham, AL 35243
23
```

[4]

```
1                INDEX
2                           Page
3  Direct Examination by MR. SHEEHAN:     8
   Cross-Examination by MR. SPRAIN:      92
4  Cross-Examination by MR. MCGARRAH:    199
   Cross-Examination by MR. STUTTS:      225
5  Examination by MR. LANE:              231
   Redirect Examination by MR. SHEEHAN:  246
6  Recross-Examination by MR. SPRAIN:    260
   Recross-Examination by MR. MCGARRAH:  267
7  Recross-Examination by MR. STUTTS:    268
   Reexamination by MR. LANE:            268
8  Further Redirect Exam by MR. SHEEHAN: 272
   Further Reexamination by MR. LANE:    273
9
10            EXHIBITS
   For Defendant:
11
   1 - 10 Photographs
12 For Identification                      9
13 11   Foam Board containing
       Photographs
14 For Identification                     22
15 12   Photograph
   For Identification                     41
16
   13-15 Polaroid Photographs
17 For Identification                     54
18 16-18 Photographs
   For Identification                    246
19
   19   Maintenance Tag
20 For Identification                     85
21 20   Safety Sheet
   For Identification                     87
22
   21   Rental Out Contract
23 For Identification                     87
```

[3]

```
1  FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
2        ROBERT H. SPRAIN, JR., ESQ.
3        Sprain & Shires, PC
4        1707 29th Court Street
5        Birmingham, AL 35209
6
7  FOR THE DEFENDANT, GAST:
8        EUGENE P. STUTTS, ESQ.
9        Spain & Gillon, LLC
10       The Zinszer Building
11       2117 Second Avenue North
12       Birmingham, AL 35203
13
14 FOR THE DEFENDANT, UNITED RENTALS:
15       C. WINSTON SHEEHAN, JR., ESQ.
16       Ball, Ball, Matthews & Novak
17       2000 Interstate Park Drive
18       Suite 204
19       Montgomery, AL 36109-5413
20
21 ALSO PRESENT:
22       VIC GRISWOLD, Videographer
23       VERNON JAMES, Safety Manager, Flavor House
```

[5]

```
1  22-24  Photographs
       For Identification                 247
2
   25-27  Photographs
3      For Identification                 248
4  28   Foam Board with Photographs
       For Identification                  89
5
   29   Photograph
6      For Identification                 112
7  30   Photograph
       For Identification                 140
8
   31   Photograph
9      For Identification                 181
10 32   Operator's Manual
       (To be marked when provided.)      238
11
   33   Photograph
12     For Identification                 262
13 34   Photograph
       For Identification                 260
14
15
16            STIPULATIONS
17
18     It is stipulated and agreed by and between
19 counsel representing the parties that the deposition
20 of MATTHEW RILEY may be taken before Ricky L. Tyler,
21 Certified Shorthand Reporter and Notary Public in and
22 for the State of Alabama at Large, without the
23 formality of a commission; and all formality with
```

[6]

1  respect to other procedural requirements is waived;
2  that objections to questions, other than objections
3  as to the form of the questions, need not be made at
4  this time, but may be reserved for a ruling at such
5  time as the deposition may be offered in evidence or
6  used for any other purpose by either party as
7  provided by the Federal Rules of Civil Procedure.
8         It is further stipulated and agreed by and
9  between counsel representing the parties in this case
10 that the filing of the deposition of MATTHEW RILEY is
11 hereby waived and that said deposition may be
12 introduced at the trial of this case or used in any
13 other manner by either party hereto provided for by
14 the Statute, regardless of the waiving of the filing
15 of same.
16        It is further stipulated and agreed by and
17 between the parties hereto and the witness, that the
18 signature of the witness to this deposition is hereby
19 waived.
20
21            * * * * *
22
23

[7]

1              PROCEEDINGS
2
3  MR. GRISWOLD:  This is the deposition
4      of Matthew Riley, taken in the
5      matter of Matthew Riley,
6      Plaintiff, vs. Milwaukee Electric
7      Tool Corporation, et al.,
8      Defendants, Civil Action Number
9      1:05 CV-994-W, held in the United
10     States District Court for the
11     Middle District of Alabama,
12     Southern Division.  Today is June
13     21st, 2006.  We're at the law
14     office of Cochran, Cherry, Givens,
15     Smith, Lane & Taylor in Dothan.
16     And the local time is 10:36 A.M.
17     Counsel will introduce themselves
18     for the audio, please.
19 MR. LANE:  Joseph Lane for the
20     plaintiff.
21 MR. STUTTS:  Gene Stutts for Gast.
22 MR. MCGARRAH:  Scott McGarrah for
23     Milwaukee Electric Tool.

[8]

1  MR. BRASHER:  Joe Brasher for
2      Intervenor Ralcorp.
3  MR. SPRAIN:  Robert Sprain for Saint
4      Gobain Abrasives, d/b/a Clipper
5      and Norton.
6  MR. SHEEHAN:  Winston Sheehan, United
7      Rentals.
8
9      MATTHEW RILEY, of lawful age, having first
10 been duly sworn, testified as follows:
11
12         DIRECT EXAMINATION
13 BY MR. SHEEHAN:
14 Q.  Mr. Riley, my name is Winston Sheehan and I
15     represent United Rentals.
16     MR. SHEEHAN:  Before we get started, do
17         we have the usual stipulations?
18         Is that agreeable with everybody?
19     MR. SPRAIN:  Agreeable.
20     MR. BRASHER:  That's fine.
21 Q.  Mr. Riley, if I could, you have before you some
22     photographs that you have been provided by your
23     lawyer, Mr. Lane, which have been identified as

[9]

1  photographs taken after the scene of an
2  accident on or about August the 29th of 2003.
3  Have you had an opportunity to review those
4  photographs, sir?
5  A.  Yes, I've seen -- yes, sir, I believe I have
6      seen these photographs before.
7  Q.  All right, sir.  And as I understand, those
8      were provided by your former employer, Flavor
9      House Products?
10 A.  Correct.
11         (Exhibit Riley 1 through 10 marked
12          for identification.)
13 Q.  Sir, for the record, could you identify the
14     sticker number or exhibit numbers on those
15     photographs there, please, sir?
16 A.  001 through 010.
17 Q.  All right, sir.  If you could, help us
18     understand what those photographs depict?  If
19     you could go through and identify them by
20     exhibit and then tell us what's depicted in
21     that photograph, please, sir?
22 A.  Photograph 001 is the middle-to-lower half of
23     the drill.

[10]

1   Q.   Okay.  When we say drill, is that the core
2        drill machine that you were using on the
3        evening of August the 28th of 2003?
4   A.   Correct.
5            MR. STUTTS:  Matthew, if you would,
6            take that first picture and just
7            let the -- to see which one you're
8            talking about.
9   A.   (Witness complies.)
10           MR. STUTTS:  Okay.
11  A.   Photograph 002, that's the whole drill from the
12       front side.  Photograph 003 looks to be the
13       maintenance tag from the rental company.
14  Q.   All right, sir.
15  A.   Photograph 004 is also the maintenance tag, the
16       checklist.
17  Q.   Okay.  Is that just a -- is it a better copy
18       than the prior exhibit?
19  A.   Yes.  Photograph 005 is of the drill bit used
20       during the accident.
21  Q.   Okay.  And what size drill bit is that, sir?
22  A.   I believe that's a three inch drill bit.
23  Q.   All right, sir.

[11]

1   A.   Photograph 006 is of the base and drill bit,
2        which is not the drill bit that I was using.
3        This looks to be a different drill bit that's
4        on there.
5   Q.   All right, sir.  And, if you could, what size
6        drill bit is depicted on that photograph?
7   A.   I'm not exactly sure.  It looks to be either a
8        three or four inch.
9   Q.   Okay.  Could you hold that up, I'm sorry, just
10       to make sure the --
11  A.   (Witness complies.)
12  Q.   And does that appear to be attached to the core
13       drill machine?
14  A.   Correct.
15  Q.   And who took these photographs?
16  A.   I don't know.
17  Q.   Okay.  Does that fairly and accurately depict
18       the base of the drill that you were using at
19       the time of the accident?
20           MR. LANE:  Well, I object to the form
21           as to clarifying between the base
22           and the bit.
23  Q.   Sure.  Does that fairly and accurately depict

[12]

1        the core drill machine that you were using on
2        the late evening of August the 28th, 2003 and
3        early morning hours of August the 29th, 2003?
4            MR. LANE:  Again, object to the form.
5            He's already testified that wasn't
6            the bit.  That's my --
7   Q.   Oh, I'm sorry, excuse me.  Other than that not
8        being the bit that you were using, does that
9        fairly and accurately depict the condition of
10       the drill that you were using that evening of
11       the accident?
12  A.   Yes.
13           MR. LANE:  Well, again, I'm going to
14           object to the form, but you answer
15           it any way you want to, Matthew.
16           I mean, look at the picture
17           carefully.  I mean, are you saying
18           is it in the exact same condition
19           it was in when he was using it?
20           MR. SHEEHAN:  That would be a good
21           follow-up question.
22  Q.   Is that picture of the core drill machine in
23       the condition it was in when you were operating

[13]

1        it on the late evening of August the 28th, 2003
2        and early morning hours of August the 29th,
3        2003?
4            MR. LANE:  And I'm still going to
5            object to the form, but go ahead.
6   A.   No.  Because the drill was damaged after the
7        accident, so it wouldn't be in the same
8        condition as it was when I was using it.
9   Q.   Okay.
10           MR. STUTTS:  Would the same thing be
11       true of the first couple of pictures of the
12       drill, the first couple of pictures there?
13  Q.   Exhibits 1 through 2?
14  A.   It wouldn't be in the same condition as when I
15       was using it as depicted in the pictures.
16  Q.   Okay.  And, if you could, could you identify
17       then Exhibit Number 1 and 2?  Is that what you
18       are testifying was not in the same condition as
19       when you were using it?
20  A.   Yes.  It's not in the same condition as when I
21       was using it.
22  Q.   Okay.  Could you, again, show that for the
23       benefit of the camera, please?

[14]

1   A.   (Witness complies.)
2   Q.   Do you know when these photographs were taken
3        by Flavor House?
4   A.   No, I don't.
5   Q.   What condition do you see that is different
6        from the condition of that machine when you
7        were using it as depicted in those photographs,
8        Exhibits 1 and 2?
9   A.   The drill bit is not the one I was using and
10       the cord was damaged.
11  Q.   I'm sorry, sir?
12  A.   And the cord, the power cord was damaged.
13  Q.   All right. And how was the power cord damaged?
14  A.   It was broken. Whenever the machine was
15       spinning around, it snapped the cord.
16  Q.   Okay. And which power cord are we speaking of,
17       sir?
18  A.   The one that goes to the outlet.
19  Q.   The one that would be closest to -- was it a
20       wall plug?
21  A.   Right.
22  Q.   Okay. So that was broken at the wall plug, is
23       that your testimony?

[15]

1   A.   I'm not exactly sure where it was broken, but
2        it was in between the wall plug and the drill
3        itself where it was severed at.
4   Q.   All right, sir. And where are those
5        photographs taken, sir?
6   A.   I'm not exactly sure.
7   Q.   Does that appear to be Flavor House Products?
8   A.   Yes, it does.
9   Q.   Okay. Does that appear to be in the general
10       area in which the accident occurred?
11  A.   I really don't know.
12  Q.   All right, sir. And, if you could, you were
13       helping us identify those photographs, if you
14       could please continue?
15  A.   Okay. Photograph 007 is of a drill bit that I
16       was not using at the time.
17  Q.   And, I'm sorry, did you tell us the size of
18       that drill bit that you were not using?
19  A.   I'm not exactly sure what size it is.
20  Q.   Okay. Were there two drill bits being used
21       that evening at Flavor House?
22  A.   No.
23  Q.   How many drill bits were being used?

[16]

1   A.   One.
2   Q.   And do you know where that second drill bit
3        that's depicted on Exhibit Number 7 was at the
4        time of the accident?
5   A.   No, I don't.
6   Q.   Does that drill bit appear to have been used?
7   A.   It does appear to be used.
8   Q.   And can you tell what it was used for?
9   A.   No, I can't.
10  Q.   All right, sir. If you could, please continue?
11  A.   Picture 008, I'm not sure what this photograph
12       is of. I assume it's of where the holes were.
13  Q.   Okay, sir. If you could for the purpose of the
14       camera?
15  A.   (Witness nods head in the affirmative.)
16            MR. STUTTS:  Go ahead with what you
17            were saying.
18  A.   It's not a very clear photograph, but I assume
19       it's of the holes we were drilling.
20  Q.   All right, sir. And there appear to be two
21       holes. Had one hole already been drilled?
22  A.   Yes.
23  Q.   Okay. And who had drilled that first hole?

[17]

1   A.   Mike Walters.
2   Q.   And what position does Mike Walters hold at
3        Flavor House?
4   A.   He's a maintenance mechanic.
5   Q.   Okay. And, I'm sorry, sir, at the time of this
6        accident what position did you hold?
7   A.   Maintenance mechanic.
8   Q.   So you both had the same title?
9   A.   Yes. He was the head shift mechanic for third
10       shift.
11  Q.   All right. And what time had you come on duty
12       that evening?
13  A.   11:00 P.M.
14  Q.   And did you have a time clock that you punched
15       in?
16  A.   Yes.
17  Q.   And your shift would have run through what
18       hour, sir?
19  A.   Through 7:00 A.M.
20  Q.   And how long had you been on the third shift,
21       sir?
22  A.   Approximately two hours.
23  Q.   And how many days had you been working the

[18]

1    third shift at the time of the accident?
2  A.  Approximately three or four.
3  Q.  Three or four days?
4  A.  Yes.
5  Q.  All right, sir.  When did you actually begin
6      work at Flavor House?
7  A.  Approximately three or four days.
8  Q.  All right.  If the accident happened late on
9      August the 28th of 2003 or the early morning
10     hours of August the 29th, 2003, your best
11     judgment of when you first went to work at
12     Flavor House would be what, sir?  What date?
13 A.  What date?  In my best judgment, I think it was
14     the 25th.
15 Q.  All right, sir.  And as I understand, the
16     accident happened either late Thursday the 28th
17     of August or the early morning Friday the 29th
18     of August?
19 A.  Correct.
20 Q.  And you had first gone to work at Flavor House
21     on the 25th, which would have been a Monday?
22 A.  Right.
23 Q.  All right, sir.  Now, the next exhibit there,

[19]

1      sir, if you could help us with that?
2  A.  Picture 009, it's of the holes we were
3      drilling.
4  Q.  Sir, the first hole appears to be more regular
5      than, I guess, the hole on the left there of
6      the photograph, could you hold that up for the
7      camera, please?  And can you help us understand
8      the reason that the hole on the left of that
9      exhibit appears to be irregular?
10 A.  The hole on the left, I assume it was, you
11     know, chipped during the accident when the
12     drill slung out of it, but it wasn't like that
13     prior to the accident.
14 Q.  Okay.  All right, sir.  The next photograph
15     there, please, sir?
16 A.  Picture 010, that's of the -- a side view of
17     the holes.
18 Q.  And do those Exhibits 1 through -- I'm sorry,
19     that last exhibit number there?
20 A.  010.
21 Q.  1 through 10, do those fairly and accurately
22     depict the Flavor House facility at or about
23     the time of your accident?

[20]

1      MR. LANE:  Object to the form.  You can
2      go ahead and answer, but, I mean,
3      overbroad is my objection.
4  Q.  All right.  Or, if you could, maybe just tell
5      us which ones do not fairly and accurately
6      depict the condition of the Flavor House
7      facility at or about the time of the accident?
8      MR. LANE:  And, again, I object to the
9      form.  Go ahead, if you can do
10     that.
11 A.  010 does not.  The rest seem to be okay.
12 Q.  All right, sir.  So Exhibits 1 through 9 appear
13     to be an accurate and fair depiction of the
14     condition of the Flavor House Products facility
15     at or about the time of your accident?
16 A.  Correct.
17 Q.  All right, sir.  Can you help us understand why
18     Exhibit 10 is different from what you recollect
19     the scene of the accident?
20 A.  The pallets in the picture were moved out of
21     the way.  The area was, you know, clear.
22 Q.  Okay.  Now, help me, when you say the area was
23     clear, what do you mean, please?

[21]

1  A.  There was no -- nothing on the floor around the
2      area.
3  Q.  So there were no pallets or --
4  A.  Or any other clutter around.  It was --.
5  Q.  And how do you happen to recollect that, sir?
6  A.  Because we cleared out the area before we
7      started work.
8  Q.  Okay.  And who is we, sir?
9  A.  Myself and Mike Walters.
10 Q.  Okay.  When did you learn that you were going
11     to be drilling some holes that evening?
12 A.  When I came into work that evening.
13 Q.  All right, sir.  And what were the holes being
14     drilled for?
15 A.  They were for two pylons, metal pylons, to
16     protect the sink from forklifts hitting them.
17 Q.  And what sink was that, sir?
18     MR. STUTTS:  Do you call them pylons?
19     Is that what you call them?
20 A.  (Witness nods head in the affirmative.)
21 Q.  Did you say "sink"?
22 A.  A sink.
23 Q.  Okay.  What sink was that, sir?

[22]

1   A.   A sink that was, I believe --
2   Q.   Sir, if I might, there's some enlargements --
3        we have taken these photographs and tried to
4        enlarge them as best we can.  Can you note
5        maybe on that foam board there -- which we will
6        go on and mark as Exhibit Number 11.
7              MR. SHEEHAN: Joe, do you mind putting
8              an exhibit label on there?
9              MR. LANE: Which one?
10             MR. SHEEHAN: Just on the foam board,
11             sir, I guess.
12             MR. LANE: Oh, just the whole thing?
13             MR. SHEEHAN: Please, sir.
14             MR. LANE: Okay.
15             MR. STUTTS: Do you have two boards
16             with pictures?
17             MR. SHEEHAN: Yes.
18             MR. STUTTS: Okay.
19        (Exhibit 11 marked for identification.)
20   BY MR. SHEEHAN:
21   Q.   If you could, on Exhibit Number 11 there,
22        does that help identify where the sink might
23        be?

[23]

1   A.   The sink was going to be in this area right
2        here (Indicating).
3   Q.   Okay.  The sink had not been created as of yet?
4   A.   No.
5   Q.   I'm sorry, that was a poor question.  Had the
6        sink been built yet?
7   A.   No.
8   Q.   Okay.  And when was that to be built?
9   A.   I'm not sure.
10  Q.   And what was the purpose of the sink?
11  A.   I'm not sure.
12  Q.   Okay.  Did you -- how did you know that evening
13       when you came on at 11:00 that y'all were going
14       to drill some holes?
15  A.   I was informed by my supervisor.
16  Q.   And that would have been Mr. Walters?
17  A.   Correct.
18  Q.   Did he have anything or did you receive
19       anything in writing, any written instruction as
20       to what your job was to be that evening?
21  A.   No, I didn't.
22  Q.   Let's see.  You had been there a total of four
23       days at the time of the accident?

[24]

1   A.   Right.
2   Q.   Had you ever received written work orders?
3   A.   No, I haven't.
4   Q.   How did you find out what jobs you might be
5        working on on that third shift?
6   A.   Oh, they just come from my supervisor.
7   Q.   And that would be Mr. Walters?
8   A.   Right.
9   Q.   And where would Mr. Walters receive his
10       instructions?
11  A.   From Ricky Smothers, the Maintenance Manager.
12  Q.   Now, was Mr. Smothers on duty that evening?
13  A.   No, he wasn't.
14  Q.   And who would be above Mr. Smothers there at
15       the Flavor House Products?
16  A.   That would be Marianne.  I don't know her last
17       name.
18  Q.   And what position did she hold?
19  A.   She's the Plant Manager.
20  Q.   And is she still the Plant Manager?
21  A.   I'm not sure, but I believe she is.
22  Q.   Okay.  And who would be over Marianne?
23  A.   I don't know.

[25]

1   Q.   Had you ever had any contact with the Plant
2        Manager, Marianne?
3   A.   No, I haven't.
4   Q.   Had you ever had any contact with Mr. Smothers?
5   A.   Yes.
6   Q.   What sort of contact had you had with him?
7   A.   I did my interviewing for the job through him.
8   Q.   And what shift did he normally appear?
9   A.   First shift.
10  Q.   Would you have breaks during your third shift?
11  A.   Yes.
12  Q.   And when would they occur, sir?
13  A.   They were -- they wouldn't have any set breaks
14       because we -- it was in between, you know,
15       times we weren't busy.
16  Q.   All right.  Would you be allowed a certain
17       number of breaks during a shift?
18  A.   Yes.
19  Q.   And how many would that be?
20  A.   That was usually, you know, two ten minute
21       breaks and a 30 minute lunch.
22  Q.   And where would you get your lunch break?
23  A.   I would bring my lunch and eat it in the

[26]

1    cafeteria.
2    Q.   All right.  And would that occur at a
3         particular time in the evening?
4    A.   Usually around midway of the shift.
5    Q.   Would there be any bell or any signal
6         throughout the plant that you were --
7    A.   No.
8    Q.   -- allowed to take a lunch break?
9    A.   No.
10   Q.   Again, it would just be dependent upon when you
11        had finished a particular project?
12   A.   Right.
13   Q.   During the four days that you had worked there
14        at Flavor House, can you tell us some of the
15        projects you had worked on?
16   A.   Installed emergency lights.  I'm trying to
17        remember.  And just some general, you know,
18        maintenance on the machinery out there.
19   Q.   Can you help us just -- who are not in that
20        field, with an idea of what kind of general
21        maintenance you would have performed?
22   A.   I really can't remember, it's been a long time.
23   Q.   Fair enough.  Would -- the work that you were

[27]

1         performing, did it occupy the entire shift?
2    A.   Yes.
3    Q.   Was there ever any down time where you would be
4         able to take an extra break or so?
5    A.   No.
6    Q.   What about -- would there be a break room where
7         you could go and, say, lie down and take a rest
8         or a nap?
9    A.   No.
10   Q.   Did you ever ask for an opportunity to, say,
11        take a break and be denied an opportunity?
12   A.   No.
13   Q.   All right.  Can you describe your work there?
14        Was it pleasant?  Did you feel coerced or
15        pressured?
16   A.   No, it was -- I did not feel coerced or
17        anything.  It was a pretty steady job, kind of
18        -- a little bit of hard work.
19   Q.   Okay.  And when you say "hard work," what do
20        you mean, sir?
21   A.   You know, some heavy lifting, you know, you're
22        always -- there's always something to do,
23        you're staying busy.

[28]

1    Q.   Okay.  Did -- when had you first interviewed
2         for the job there at Flavor House?
3    A.   It was the week prior when I was hired.
4    Q.   Your first day was Monday, August the 25th,
5         would it be fair to say that it was the Monday
6         before?
7    A.   I'm not exactly sure, but it was around --
8         around that same time period.
9    Q.   All right, sir.  And how did you know to apply
10        for the position there at Flavor House?
11   A.   I have a friend who works there.
12   Q.   And that would be whom, sir?
13   A.   Jay Nolan.
14   Q.   And he had told you about it?
15   A.   Correct.
16   Q.   How long had you known about the position or
17        the opportunity to work there?
18   A.   Probably for a couple of weeks.
19   Q.   And what had you done upon hearing about the
20        position?
21   A.   Went to Flavor House, filled out an
22        application.
23   Q.   Okay.  And were you interviewed that same day

[29]

1         or later?
2    A.   Later.
3    Q.   And how many days later?
4    A.   I'm not sure.
5    Q.   And the application -- did you list on the
6         application your prior employment?
7    A.   Yes.
8    Q.   And what you had done in your prior
9         employments?
10   A.   Yes.
11   Q.   Had you ever used a core drill machine before
12        the date of the accident?
13   A.   No, I haven't.
14   Q.   When you went to work at Flavor House that
15        Monday, would it have been actually that Monday
16        evening at 11:00 P.M. that you went to work?
17   A.   Correct.
18   Q.   When you first showed up for work, were you
19        given any kind of training or orientation?
20   A.   No, I wasn't.
21   Q.   What happened when you appeared there four days
22        before the accident as far as this is your job,
23        this is what we expect you to do?

[30]

1  A.  They gave me a general overview of the job, it
2      should be, you know, maintenance on the
3      facilities and the production equipment.
4  Q.  Okay.  And who is they, sir?
5  A.  That would be Ricky Smothers.
6  Q.  So he had come in that evening?
7  A.  No, that was during my interview.
8  Q.  Okay.  So the week before Mr. Smothers had kind
9      of given you a general overview?
10 A.  Correct.
11 Q.  Did he show you any videos or did he have any
12     test material or any kind of --
13 A.  No.
14 Q.  What did he do to help you understand what your
15     job would be there at Flavor House?
16 A.  He just -- he gave me the overview, you know.
17     I'm kind of -- you know, I'm familiar with
18     maintenance and all, you know.
19 Q.  Okay.  And did he ask you if you had ever used
20     a core drill machine?
21 A.  No, he hadn't.
22 Q.  Did you tell him that you knew how to use a
23     core drill machine?

[31]

1  A.  No.
2      MR. LANE:  We're still talking about
3      Mr. Smothers now, the initial
4      interview?
5      MR. SHEEHAN:  Yes.  Thank you.
6  Q.  And that's a good point.  Did anyone ever ask
7      you if you had ever used a core drill machine?
8  A.  Yes.
9  Q.  And who would that be?
10 A.  That would be Mike Walters.
11 Q.  And how did -- when did he first ask you about
12     your knowledge of a core drill machine?
13 A.  The day of the accident.
14 Q.  And how did it come up, sir?
15 A.  Before we were using -- going to get ready to
16     drill the holes.
17 Q.  What did he say, sir?
18 A.  He asked me if I ever used one before.
19 Q.  And your response?
20 A.  I responded no.
21 Q.  And what did he say?
22 A.  I really don't remember.
23 Q.  Okay.  Was this when you first came on that

[32]

1      evening at 11:00 P.M. or was it later on in the
2      evening?
3  A.  It was shortly after we came in, because that
4      was the first project we were going to start
5      on.
6  Q.  Okay.  When was this accident, approximately,
7      the time that evening?
8  A.  Approximately around 1:00 or 2:00 A.M.
9  Q.  About 2:00 A.M.?  So actually it was on August
10     the 29th at 2:00?
11 A.  Yeah, it would have been actually on Friday,
12     early Friday morning.
13 Q.  And why do you recall it was 2:00 A.M. Friday
14     morning?
15 A.  I remember, you know, looking at my watch.
16 Q.  Okay.  And how was it you happened to be
17     looking at your watch at approximately 2:00
18     A.M. on Friday morning August the 29th?
19 A.  No particular reason, you know.  I've always
20     got my watch on, you know.
21 Q.  All right, sir.  And was that immediately
22     before the accident?
23 A.  I'm not exactly sure.  I'm saying it was

[33]

1      approximately around that time.
2  Q.  Okay.  And did you think, well, I'm going to be
3      able to take my lunch break pretty soon?
4  A.  No.
5  Q.  And after checking your watch and seeing it was
6      approximately 2:00 A.M., what happened then?
7      Were y'all in the office?  Were you in the work
8      area?
9  A.  I'm not sure where I was at when I looked at my
10     watch, but I knew it was around that time when
11     the accident happened.
12 Q.  All right, sir.  And was that approximately the
13     time that Mr. Walters first learned that you
14     did not know how to use a core drill machine?
15 A.  No, it was earlier that evening.
16 Q.  All right.  How did that take place earlier in
17     the evening?
18 A.  We were discussing what we were going to do
19     that night and, you know, we were going to use
20     the drill and how we were going to do the
21     project, you know.
22 Q.  And how did he tell you that you would perform
23     the project?

[34]

1   A.   He said -- he said we were going to drill the
2        holes in the floor and that's -- you know, I
3        really can't remember the conversation, but it
4        was basically we're going to, you know, use the
5        drill and drill the holes in the floor.
6   Q.   Had y'all gone over and decided where the holes
7        would be drilled?
8   A.   Correct.
9   Q.   And how did you go about determining where the
10       holes would be drilled?
11  A.   He decided that. I'm not sure how he, you
12       know, came up with that, but that was his
13       decision where the holes were going to be.
14  Q.   All right. If you could, on Exhibit Number 11
15       there to your deposition, the foam board, the
16       photograph there on the bottom right of the two
17       holes, and I believe you've identified the one
18       on the left is the one that you were actually
19       drilling; is that correct, sir?
20  A.   Correct.
21  Q.   Were they marked by Mr. Walters or by you
22       before you drilled the hole?
23  A.   They were marked by Mr. Walters.

[35]

1   Q.   And how did he mark those positions where the
2        holes would be drilled?
3   A.   He didn't -- he didn't actually mark the floor
4        or anything, you know, he just eyeballed it and
5        set the drill in place and says we're going to
6        drill right here.
7   Q.   Okay. So did Mr. Walters position the drill or
8        did you, sir?
9   A.   For the first hole he positioned it and the
10       second hole I positioned it under his
11       instruction.
12  Q.   All right, sir. And can you tell us, did he go
13       over to the wall and say the sink is going to
14       be in this general area as depicted, I guess,
15       in the top right photograph?
16  A.   I'm not sure how he done it.
17  Q.   All right. But you recall that the sink was to
18       be to the right of the photograph at the top
19       right of the Exhibit Number 11?
20  A.   Correct.
21  Q.   All right, sir. Did he tell you how large this
22       sink was going to be?
23  A.   No.

[36]

1   Q.   Was it laying out to be installed later that
2        evening?
3   A.   No.
4   Q.   Was the sink going to be installed that night?
5   A.   No.
6   Q.   So the only project you knew of that you had
7        that evening was to drill two holes?
8   A.   Correct.
9   Q.   Were there any other holes drilled earlier that
10       day?
11  A.   No.
12  Q.   And how many drill bits did you see there at
13       the site?
14  A.   One.
15  Q.   Okay. And can you describe the drill bit that
16       you used or that was being used that evening?
17  A.   Yes. It was approximately a three inch drill
18       bit and one of the teeth were missing. I know
19       at least one of the teeth were missing off of
20       it.
21  Q.   Now, how do you know that, sir?
22  A.   Because I looked everything over, the drill and
23       everything, before we used it.

[37]

1   Q.   And why did you do that?
2   A.   Because I've never used the drill before and I
3        wanted to, you know, familiarize myself with it
4        and how it works.
5   Q.   And what did you do to ensure that you knew how
6        it worked?
7   A.   Prior to -- prior to even using it, I checked
8        everything. You know, looked at everything and
9        I familiarized myself with it then, assisted
10       Mike Walters in setting it up -- setting it up
11       and using it when he drilled the first hole.
12  Q.   Okay. Did you take care to make sure that you
13       knew how to operate it?
14  A.   Yes.
15  Q.   And what -- what efforts did you make or take
16       to ensure that you knew how to properly operate
17       that drill machine that evening?
18  A.   I observed Mike using it prior to I using it
19       and, you know, familiarized myself with it, you
20       know, looking at all of the different parts and
21       how everything works.
22  Q.   Okay. And did you look at the various
23       information on the drill itself?

6-21-2006                                                                    Matthew Riley

[11]  (Pages 38 to 41)

---

[38]

1   A.   I believe I did.
2   Q.   All right.
3   A.   But, you know, I could have overlooked
4        something.
5   Q.   Okay.  And was this before Mike actually
6        operated the drill --
7   A.   Correct.
8   Q.   -- to drill the first hole?
9   A.   Right.
10  Q.   How much time was there between the drilling of
11       the first hole by Mike Walters and your
12       drilling the second hole?
13  A.   Approximately 10 to 15 minutes.
14  Q.   So immediately after Mike Walters drills the
15       first hole, you begin drilling the second hole?
16  A.   Right.
17       MR. LANE:  Object to the form.
18  Q.   And let me -- since there's been an objection
19       to that question.  Can you tell us what
20       happened after Mike drilled that first hole?
21  A.   After the first hole was drilled -- first hole
22       was drilled, we moved it over, you know,
23       approximately two or three feet, set it up to

---

[39]

1        drill the second hole.
2   Q.   Okay.  Can you show me where you actually moved
3        it over on that photograph there on the top
4        right of Exhibit Number 11?
5   A.   From this area to this area right here
6        (Indicating).
7   Q.   Okay.  And what side -- let me ask you this; is
8        there a vacuum pump on that drill?
9   A.   Correct.
10  Q.   Okay.  Which side of -- is it on the opposite
11       side of the drill bit?
12  A.   Right.
13  Q.   Okay.  Which side of the hole was the vacuum
14       pump facing?
15  A.   This way, to the left.
16  Q.   Okay.  Now, you pointed at the first hole that
17       Mike Walters drilled.  What about the second
18       hole that you were drilling, which side was the
19       vacuum pump on?
20  A.   It was the same way, to the left.
21  Q.   All right.  Can you show us there on that
22       photograph?
23  A.   This side (Indicating).

---

[40]

1   Q.   All right.  And which -- so the drill was
2        actually -- where were you positioned?  I
3        guess, if you would for us, show us where you
4        were actually positioned?
5   A.   I was positioned over here (Indicating).
6   Q.   All right, sir.  And where was Mike Walters
7        while you were drilling the second hole?
8   A.   I'm not sure where he was.  He left the scene.
9        I believe he went back to the maintenance shop.
10  Q.   And why was that, sir?
11  A.   I'm not sure.
12  Q.   Did you tell Mike that you would like for him
13       to stay since you had never used a drill
14       machine?
15  A.   No.
16       MR. LANE:  Object to the form.
17  Q.   Was Mike convinced that you knew how to operate
18       the drill machine properly?
19       MR. LANE:  Object to the form.
20       MR. BRASHER:  Object to the form.
21  A.   Yes.
22  Q.   And how do you know that?
23  A.   He wouldn't have left me there, you know, using

---

[41]

1        it by myself if I didn't know how to do it.
2        (Exhibit Riley 12 marked
3        for identification.)
4   Q.   Okay.  Let me see if I can get your help.  I
5        will show you Exhibit Number 12, which may be
6        -- it's an enlargement of the photographs that
7        were provided to us by your lawyer.  If I
8        could, on Exhibit Number 12 there, could you
9        kind of just draw in where you were on that
10       photograph using that black pen, please, sir?
11       MR. STUTTS:  Why don't you put an X with a
12       circle around it?
13       MR. LANE:  I'm going to object to the
14       form.  You can go ahead and do
15       your best on that, understanding
16       the fact that the perspective in
17       the photograph may not be suitable
18       for such accurate depiction.
19  A.   (Witness complies.)
20  Q.   And does that --
21  A.   That was --
22  Q.   All right.  If you could, maybe -- and did you
23       put an X inside that circle, sir?

---

[42]

1   A.   An X inside it?
2   Q.   Please.
3   A.   (Witness complies.)
4   Q.   Okay.  Now, that's where you were positioned at
5        the time of the accident?
6   A.   Yeah, approximately in that position.
7   Q.   Fair enough.  And can you kind of maybe just
8        draw the drill machine, I guess, with the
9        vacuum pump and which side it was on in
10       reference to the -- I guess since you've got
11       the vacuum pump at one end and the drill bit at
12       the other end, I guess that's what I'm trying
13       to picture.
14          MR. LANE:  Here again, the same
15             objection.
16  A.   That's approximately, you know, how it was.
17          MR. LANE:  He doesn't have a degree in
18             artistry obviously?
19  A.   Right, I'm not an artist.
20          MR. STUTTS:  That's fine.  We're not
21             saying that.
22  Q.   Since I guess what I'm trying to find out is a
23       point of reference, can you show where the

[43]

1        vacuum pump was, using a block or a little
2        rectangle as opposed to a circle?
3   A.   Okay.
4   Q.   And maybe just darken it so that we know --
5          MR. LANE:  Why don't you put a V --
6             well, you've already closed it in
7             there.
8   Q.   I tell you what, why don't you just draw a line
9        out to the side down at the bottom and just put
10       "vacuum pump"?
11  A.   That's about where the vacuum pump was.
12  Q.   All right, sir.  Thank you, sir.  When the
13       first hole was drilled, where were you actually
14       positioned?  I tell you what, let's --
15          MR. LANE:  I don't know if this will
16             help, but if you think it will
17             help, I see that we've got an
18             exemplar over here.  It may not
19             work too good for the record if he
20             can get a shot, but he may be able
21             to show you easier than trying to
22             draw it in on the pictures.
23          MR. SHEEHAN:  Fair enough.

[44]

1          MR. LANE:  Is that something that --
2             it's just up to you.
3          MR. SHEEHAN:  I think that's a good
4             suggestion.  As I understand, for
5             the benefit of the camera, we'll
6             need to move this closer to the
7             camera so that it can actually
8             show up on the camera, if that's
9             fair with you?
10  A.   That's okay.
11          MR. LANE:  I guess, maybe take a quick
12             break while he moves that, I just
13             want to fill up my coffee cup.
14          MR. GRISWOLD:  Going off the record.
15          (Recess.)
16          MR. GRISWOLD:  Okay.  We're back on the
17             record.
18          MR. SPRAIN:  Saint Gobain Abrasives
19             objects to the extent that this
20             product is not the same as the
21             drill used in the accident
22             involving Matthew Riley.  And
23             Saint Gobain objects to the extent

[45]

1             there may be any changes or
2             modifications with this product
3             subsequent to the time of the
4             accident.  We don't have any
5             objection as to using this drill
6             rig for demonstration purposes to
7             aid in this deposition.
8          MR. SHEEHAN:  Thank you, sir.
9   Q.   Mr. Riley, if you don't mind, could you help us
10       understand a core drill machine?  We've been
11       talking about a vacuum pump and it appears that
12       -- if you could, can you show us what you
13       understand the vacuum pump to be?
14  A.   This -- I understand this to be the vacuum
15       pump.
16  Q.   All right, sir.  So at the opposite end of the
17       drill bit, would that be fair?
18  A.   Correct.
19  Q.   So one end of the base of that core drill
20       machine is a vacuum pump and at the other end
21       is the drill bit?
22  A.   Correct.
23  Q.   All right, sir.  Can you identify for us what

Matthew Riley

**[46]**

1      that gauge is on top of the vacuum pump?
2   A.   That is a vacuum gauge.
3   Q.   Okay.  Now, what does that represent, sir?
4      What's the purpose of that gauge?
5   A.   That represents how much vacuum is being used.
6   Q.   All right.  And at the time of your accident
7      how much vacuum was being used?
8   A.   I don't know.
9   Q.   And why is that, sir?
10  A.   I really can't remember.
11  Q.   You can't remember what now, sir?
12  A.   How much vacuum -- exactly how much vacuum was
13     being used.
14  Q.   All right.  Was the vacuum pump being used at
15     the time of the accident?
16  A.   Yes.
17  Q.   And had you set up the machine for use or had
18     Mr. Walters set up the machine for use in
19     drilling the second hole?
20        MR. LANE:  Object to the form.  Broad
21           and vague.
22  Q.   Thank you.  Since there's been -- let me see if
23     I can help clarify and narrow that.  When the

**[47]**

1      first hole was drilled by Mr. Walters, who set
2      the machine up?
3   A.   Myself and Mike Walters.
4   Q.   All right.  And can you describe for us how you
5      set the machine up when that first hole was
6      drilled by Mike Walters?
7   A.   We cleared the area out, we installed the
8      gasket on the base, made sure everything, you
9      know, was level.  We laid a water hose on the
10     floor where we were drilling at and plugged in
11     the machine and everything.
12  Q.   Okay.  And can you describe for us how you
13     installed the -- you say there was something on
14     the base?
15  A.   Yeah, the gasket for the base.
16  Q.   All right.  Can you describe how you installed
17     that?
18  A.   We installed it into the -- there's a groove
19     that it fits in; we installed it into that
20     groove.
21  Q.   And is there a gasket on that particular
22     machine that you're looking at now?
23  A.   Yes.

**[48]**

1   Q.   All right.  And you pointed to something.  Can
2      you show us how you installed that gasket on
3      the base of the machine?
4   A.   Oh, do you want me to actually put it on there?
5   Q.   Please.  If you could for us.
6   A.   (Witness complies.)
7   Q.   All right.  And can you maybe turn the -- I
8      will be glad to help you.  Can we turn that so
9      that we can show it on the camera?
10  A.   (Witness complies.)
11  Q.   All right.  Now, had the gasket been on the
12     machine before that evening?
13  A.   Can you specify when?
14  Q.   Please, yeah, thank you.  You say you actually
15     installed the gasket --
16  A.   Correct.
17  Q.   -- on the base of the machine?
18        MR. LANE:  Object to the form.
19  Q.   All right.  Thank you.  Who installed the
20     gasket on the base of the machine that evening?
21  A.   I did.
22  Q.   And that's before the first hole was drilled by
23     Mike Walters?

**[49]**

1   A.   Correct.
2   Q.   Where had the drill been before you came on
3      scene there at 11:00 A.M. -- or, excuse me,
4      11:00 P.M. that Thursday night?
5   A.   I don't know.  I came into contact -- it was in
6      our maintenance shop when I came to work.
7   Q.   Okay.  Had the machine been used before?
8   A.   Not that I know of.
9   Q.   Okay.  Can you describe the condition of the
10     machine when you arrived there at the
11     maintenance shop?
12  A.   It was in used condition.
13  Q.   Okay.  And what do you mean by that, sir?
14  A.   It wasn't a new machine.  It looked like it had
15     been used several times.
16  Q.   All right.  Can you describe it just in general
17     terms?
18  A.   Everything -- it was in used condition, but
19     everything seemed to working properly on it.
20  Q.   And did you check it out there in the
21     maintenance shop, you and Mr. Walters?
22  A.   Correct.
23  Q.   And how did you go about checking it out to

[50]

1    make sure it was in proper working order there
2    in the maintenance shop?
3  A.  Just, you know, looked at all of the parts and
4    fiddled with it a little bit and looked it
5    over, that's about all.
6  Q.  You checked the gaskets on the machine to make
7    sure they were in good condition?
8  A.  Right.
9  Q.  Why did you do that?  And why did you do that,
10   sir?
11 A.  I was trying to familiarize myself with the
12   machine.
13 Q.  And what was the condition of the gaskets on
14   the machine?
15 A.  The gaskets seemed to be in good shape.
16 Q.  All right, sir.  Did Mike Walters also inspect
17   the gaskets?
18 A.  I'm not sure.  I don't know.
19 Q.  Were you present or had you arrived at the
20   maintenance shop before Mike Walters?
21 A.  I don't know.
22 Q.  Other than checking the gaskets on the machine,
23   what else did you do there at the maintenance

[51]

1    shop?
2  A.  We tightened the drill bit and made sure it was
3    tightened.
4  Q.  Okay.  Now, there's a drill bit here for
5    demonstration purposes.  The drill bit there in
6    the maintenance shop, was that the three inch
7    drill bit that you've previously testified
8    about?
9  A.  Correct.
10 Q.  Did you see more than one drill bit there at
11   the maintenance shop?
12 A.  No, I didn't.
13 Q.  Had the drill bit been used before?
14 A.  It appeared to be used.
15 Q.  And why do you say that, sir?
16 A.  Because one of the teeth were missing and it
17   had, you know, scuffs and burrs on it from use.
18 Q.  Okay.  And when you say burrs, what do you
19   mean, sir?
20 A.  That's scratches, you know.
21 Q.  All right, sir.  Was there any material inside
22   the bit itself?
23 A.  No.

[52]

1  Q.  Did you check to see if the machine appeared to
2    have been properly maintained before you used
3    it?
4      MR. LANE:  Object to the form.
5  A.  It appeared to be maintained.
6  Q.  And what do you base that on, sir?
7  A.  By everything seemed to be working on it, you
8    know.  The vacuum pump was on, the motor come
9    on, it didn't make any funny noises, the lever
10   seemed to go up and down properly.
11 Q.  All right.  And when you say the lever, can you
12   show us what you're talking about, sir?
13 A.  This (Indicating).
14 Q.  All right.  And did you actually start the
15   motor there in the maintenance shop before
16   going out to the floor?
17 A.  No, I didn't.
18 Q.  When did you first operate the machine or when
19   was the machine first put into operation for
20   you to check it?
21 A.  Before drilling the first hole when it was
22   turned on.
23 Q.  There at the --

[53]

1  A.  There at the --
2  Q.  -- site?
3  A.  Right.
4  Q.  All right, sir.  And did you apply power from a
5    wall plug to the machine?
6  A.  True.
7  Q.  And that wall plug was located where in
8    relationship, let's say, to the sink?
9      MR. LANE:  Object to the form.  There
10     was no sink.
11     MR. SHEEHAN:  Oh, I'm sorry.  Thank
12     you.
13 Q.  In the area where the sink was to be
14   positioned, I guess, since we've identified
15   that point, that's what I'm trying to -- if
16   there's a better reference point, please?
17 A.  Approximately maybe 20, 25 feet from the area.
18 Q.  We had gone out this morning to inspect the
19   Flavor House facility and I was able to take a
20   Polaroid camera with me.  Let me show you three
21   Polaroid snapshots and see if I can get you to
22   help us identify maybe the area.
23     MR. LANE:  Do we need to sit down now?

**[54]**

1    MR. SHEEHAN: Maybe if we could still
2        stand.
3    MR. LANE: Yeah, that's fine.
4        (Exhibit Riley 13, 14, 15 marked
5        for identification.)
6  Q.  Let me show you first a Polaroid snapshot which
7        has been marked Exhibit Number 13, I will
8        represent to you it is a photograph taken this
9        morning at the Flavor House facility by myself.
10       I will show you a second Polaroid snapshot,
11       Exhibit Number 14, and a third Polaroid
12       snapshot, Exhibit Number 15. It was
13       represented that the accident occurred in that
14       general area of Exhibits 13, 14 and 15. Does
15       that assist you in responding to the question
16       about where the wall plug may have been that
17       you plugged the core drill machine into?
18 A.  No, it don't. I don't really, you know,
19       recognize this area right here.
20 Q.  Is that not -- is that not the area where the
21       accident occurred?
22       MR. LANE: If you can tell.
23 A.  From what I can tell it doesn't look like it.

**[55]**

1        There's nothing I recognize in these pictures.
2  Q.  All right, sir. Thank you, sir.
3        MR. LANE: I tell you what, I'll try to
4            get these printed off before we
5            finish at a break and these may be
6            more helpful.
7        MR. SHEEHAN: That's great. Thank you,
8            sir.
9  Q.  So did you first plug the machine in when you
10       first came to the scene? Before the accident
11       is that when you -- who actually moved the core
12       drill machine to the site where you were going
13       to make the holes?
14 A.  Mike did.
15 Q.  Were you with him as you wheeled it out?
16 A.  Yeah, I was right alongside of him.
17 Q.  Did you have any trouble getting it out of the
18       maintenance shop?
19 A.  No.
20 Q.  Was there any inspection made by either you or
21       Mike there at the maintenance shop before you
22       took it out to the position where the holes
23       were to be drilled?

**[56]**

1  A.  Yes. We -- I'm not sure about Mike, but, you
2        know, I looked the machine over and, like I
3        said, before, you know, tightened the drill bit
4        up, kind of familiarized myself with it.
5  Q.  Okay. Can you show us maybe on this
6        demonstrative aid how you put the drill on the
7        machine?
8  A.  The bit?
9  Q.  Please.
10 A.  (Witness complies.) And it was tightened down
11       with wrenches.
12 Q.  And what is this attachment there, sir?
13 A.  That's -- this right here?
14 Q.  Please.
15 A.  That's the on/off valve for the water hose.
16 Q.  All right. Now, what is the water hose -- what
17       function does it perform?
18 A.  It's for lubrication and cooling.
19 Q.  And was there an attachment on the machine that
20       you used that evening of the accident?
21 A.  It wasn't the same attachment. It was off in
22       here somewhere, you know, where you couldn't
23       get to it. So we had to lay the water hose on

**[57]**

1        the floor.
2  Q.  Did you connect a water hose to the drill
3        machine?
4  A.  No.
5  Q.  And why not?
6  A.  We couldn't get to the attachment right there.
7        MR. SPRAIN: I'm sorry, I missed that.
8            You couldn't get to what?
9  A.  We couldn't -- actually I didn't even, you
10       know, see this on here on our drill. It was
11       back here where you couldn't see it.
12       MR. STUTTS: Get one of those pictures.
13 Q.  Would Exhibit Number 1 or 2 be of benefit?
14       MR. LANE: Here you go. Well, this is
15           my copy.
16       MR. STUTTS: Matthew, hold that up
17           there and just point to it like
18           that. You were talking about the
19           water hose.
20 A.  Right.
21       MR. STUTTS: Go ahead.
22 A.  What was the question again?
23       MR. STUTTS: Hold it like this and

[58]

1        point it out.
2   Q.  Would a pen maybe help so you could point?  If
3       you could just point in the general area where
4       the water hose was to be connected?
5            MR. LANE:  I object to the form of
6            that.
7   Q.  Does the -- Exhibit Number 2, is that a better
8       or a larger picture of the machine, the second
9       page there?
10  A.  No, this is the better picture of it.
11  Q.  Exhibit Number 1?
12  A.  True.  MR. STUTTS:  All right.  Now, show us
13            on this one where you're talking
14            about, where the water connection
15            was?
16
17  A.  It appeared to be in between these two areas
18      right here (Indicating).
19  Q.  Okay.  What do you call that other area?  I
20      mean, what is this area right here?
21  A.  I'm not exactly sure what it's called.  That's
22      the --
23            MR. STUTTS:  Post?

[59]

1   A.  Post would be a good word.
2            MR. SPRAIN:  Column?
3   A.  Column.
4            MR. STUTTS:  Between the post and the
5            drill bit, is that what you're
6            saying?
7   A.  Right.
8   Q.  All right, sir.  And so can you show us on
9       Exhibit Number 1 where the water attachment
10      would have been?
11  A.  It was between the drill bit and the post.
12  Q.  And did you connect the water hose to that
13      attachment?
14  A.  No.
15  Q.  Was it used that evening?
16  A.  No.
17  Q.  And why not?
18  A.  I didn't see it on there, you know, myself and
19      so we just laid the hose on the floor.
20  Q.  I understand we're about to run out of tape, do
21      you mind if we take just a short break so we
22      can put another one in?
23  A.  That's fine.

[60]

1   Q.  Thank you, sir.
2            MR. GRISWOLD:  We're going off the
3            record.  This is the end of tape
4            one.
5            (Off-the-record discussion.)
6            MR. GRISWOLD:  We're back on the
7            record.  This is the beginning of
8            tape two.
9   Q.  Sir, we've taken a brief break so that we could
10      change the video.  Other than not connecting
11      the water hose to the drill, were there any
12      other things that were not done to set up the
13      machine?
14  A.  Not that I'm aware of.
15  Q.  All right, sir.  How did you connect the plugs
16      on the machine?
17  A.  I mean, they were plugged into an extension
18      cord.
19  Q.  Okay.  And were the -- can you show us how you
20      would connect the machine, how you would
21      connect the machine?
22  A.  I believe ours had a different plug on it, but
23      it was -- the extension cord was plugged into

[61]

1       the same plug as this on here, but, you know,
2       it's a different kind, the same kind of plug
3       though.
4   Q.  What about this?  I see there's an electrical
5       plug here, what --
6   A.  I believe this was -- this must have been
7       already plugged in, because I don't remember,
8       you know, having to plug the drill in.
9   Q.  All right.  Where was it plugged into, sir?
10  A.  I'm not sure how you plug it in.
11  Q.  Okay.  Was it plugged into that same wall plug?
12            MR. LANE:  Object to the form.
13  A.  No.
14  Q.  Was it a different wall plug?
15  A.  We only had one extension cord and we only had
16      to plug it in -- plug it in one slot.
17  Q.  Okay.  Well, was -- where did the -- I guess
18      what would this red item be there on the
19      machine?  What should we call that?
20  A.  The drill motor.
21  Q.  The drill motor.  What was the drill motor
22      plugged into?
23            MR. LANE:  Matthew, look it over if you

[62]

1        need to look it over.
2    A.    Okay.
3    Q.    And we're talking about that evening before the
4        operation of the machine.
5    A.    I assume it was already plugged into this box
6        right here.
7    Q.    Okay. Did you plug it in?
8    A.    No.
9    Q.    All right. Who plugged it in?
10   A.    I don't know.
11   Q.    And what would it have been plugged into? I
12       mean, what should we call that item?
13   A.    I call that the switch box.
14   Q.    And can you show us the switch box then on
15       Exhibit Number 1 to your deposition and maybe
16       use that pen, if you could, to point to it for
17       us?
18   A.    It will be picture 002; it would be this box
19       right here (Indicating).
20   Q.    And can you show us the drill motor there on
21       Exhibit Number 2?
22   A.    Drill motor.
23   Q.    And can you show us the vacuum pump?

[63]

1    A.    Vacuum pump.
2    Q.    And then the drill bit?
3    A.    Drill bit.
4    Q.    Does that drill bit appear to have been used?
5    A.    It does look used.
6    Q.    And did it have material inside the drill bit
7        indicating that it had been recently used?
8            MR. LANE:  Object to the form.
9    A.    That's a different drill bit than I used, so I
10       don't know the answer to that question.
11   Q.    Okay. So that I'm clear then, you never saw
12       the drill bit that is represented in photograph
13       number one on the machine?
14   A.    That would be correct.
15   Q.    All right, sir. Did you call to anyone's
16       attention the fact that one of the teeth was
17       missing on the other drill bit or the drill bit
18       that you were using at the time of the
19       operation of the machine?
20   A.    Yes, Mike Walters knew about that.
21   Q.    All right. Did you say "Mike, there's a tooth
22       missing off this drill bit"?
23   A.    I'm not exactly for sure what my words were,

[64]

1        but he knew that there was a tooth missing off
2        of it.
3    Q.    And how do you know that?
4    A.    Because we -- when we looked at it and all, you
5        know, we both saw that it was missing.
6    Q.    Well, did that cause you any concern?
7    A.    No.
8    Q.    And why not?
9    A.    I assumed it was safe to use if the drill
10       company sent it out there to us like that.
11   Q.    Okay. Did you say "Mike, we need to make sure
12       that this is effective and has all of the
13       teeth"?
14           MR. LANE:  Object. Object to the form.
15   A.    Could you repeat that?
16   Q.    Sure. Did you express any concern to Mike that
17       in order to be effective in the drilling
18       process it needed to have all of the teeth on
19       the drill bit?
20           MR. LANE:  Object to the form.
21   A.    I assumed the -- it would still work, but, you
22       know, it may take a longer time to drill
23       because one of the teeth were missing.

[65]

1    Q.    When the drill was used for the first hole, you
2        say it took approximately ten minutes?
3    A.    Yeah.
4    Q.    Did you have any difficulty drilling that first
5        hole?
6    A.    No.
7    Q.    And as I understand, the second hole was
8        drilled by you without Mike being present?
9    A.    Correct.
10   Q.    And how long before the accident occurred while
11       you were drilling that second hole?
12   A.    About the same time, about ten minutes.
13   Q.    And what happened, sir?
14   A.    The bit lodged inside the hole, the base broke
15       loose, the whole unit began to spin around.
16       And I jumped away from it, but the cord caught
17       my leg from the spinning and I landed on --
18       down on my elbow, and as instantly as I hit the
19       ground, the unit, you know, flung out of the
20       hole, became airborne and hit me in the left
21       side of my face.
22   Q.    Sir, can you help us understand that mechanism
23       of that injury maybe using this demonstrative

[66]

1    aid here?
2         MR. LANE:  Object to the form, but --
3    A.   Could you maybe be more specific?
4    Q.   Surely.  Can you, using this demonstrative aid,
5         show us how and where you were as the hole was
6         being drilled and what happened in the
7         accident?
8    A.   I was positioned like this (Indicating).
9    Q.   You were standing behind -- closest to the
10        wheels and the vacuum pump?
11   A.   Right.
12   Q.   Is that the position you were in at the time?
13   A.   Yeah, approximately, you know, like this,
14        holding onto the drill.
15   Q.   Okay.  And which hand -- what were you holding
16        onto there, sir?
17   A.   I'm not sure if I was holding onto this, that's
18        just, you know, where I had my hand, but my
19        right hand was on the lever.  And I'm not --
20        you know, I'm not sure where my left hand was.
21   Q.   What was that you just touched at the top of
22        the machine there at the top of the column?
23   A.   I'm not sure what that is.  We never messed

[67]

1         with that.
2    Q.   All right.  What is that for, this right here
3         at the top of the column?
4    A.   I don't -- I don't really know.
5    Q.   Can you show us what you were doing during that
6         -- you say it took about ten minutes before the
7         accident occurred as you were drilling the
8         second hole?
9    A.   Correct.
10   Q.   Were you almost through the hole?
11   A.   We was about, I'm saying, probably about four
12        inches deep.
13   Q.   Okay.  What do you base that on, sir?
14   A.   Oh, I'm guessing, you know.
15   Q.   Okay.  Is that your -- what was the thickness
16        of the slab that you were drilling?
17   A.   I'm not sure.
18   Q.   What was the thickness of the hole -- that
19        first hole that had been drilled by Mike
20        Walters?
21   A.   About six inches.
22   Q.   So you were of the opinion you had about
23        two-thirds of the hole already drilled when the

[68]

1         accident occurred?
2    A.   Correct.
3    Q.   Can you show us again then as you were
4         operating the machine what you were actually
5         doing and your position with respect to that
6         demonstrative aid there?
7    A.   I was applying pressure to this handle right
8         here lowering the drill.
9    Q.   Okay.  And where were your feet at the time?
10   A.   They were about in this -- you know, I'm not
11        exactly sure where my feet were, but anyway,
12        you know, if I was standing right here, they
13        were approximately in this position.
14   Q.   Okay.  And what did the pressure gauge read?
15   A.   On the vacuum pump?
16   Q.   Please, sir.
17   A.   I don't know.
18   Q.   What sort of protective clothing or equipment
19        were you using at the time?
20   A.   I was wearing steel-toed boots and pants,
21        T-shirt.
22   Q.   Earplugs?
23   A.   No.

[69]

1    Q.   Eye protector?
2    A.   No.
3    Q.   A hat?
4    A.   Yeah, a ball cap.
5    Q.   So you were able to hear the machine then in
6         operation?
7    A.   Correct.
8    Q.   Okay.  And what noises, if any, did you hear
9         from the machine as you were drilling there for
10        ten minutes?
11   A.   I heard the drill motor running, the vacuum
12        pump running.
13   Q.   Did it make any strange noise?
14   A.   No.
15   Q.   Was there any indication that the vacuum pump
16        was not working properly?
17   A.   No.
18   Q.   When had you actually affixed the base of the
19        core drill machine to the floor before
20        operating the drill the second time?
21        MR. LANE:  Object to the form.
22   A.   Could you repeat that?
23   Q.   Please.  As I understand it, Mike Walters had

[70]

1   affixed the suction to drill the first hole?
2        MR. BRASHER:  Objection.
3        MR. LANE:  Do you mean placed the
4        drill?
5        MR. SHEEHAN:  Placed it, thank you.
6        MR. LANE:  I'm confused on the
7        question, I'm sorry.
8        MR. SHEEHAN:  No, I appreciate you
9        helping me.
10  Q.   The first hole that Mike Walters drilled, you
11       and Mike helped set up the machine; is that
12       correct?
13  A.   Correct.
14  Q.   He had affixed the core drill machine using
15       suction?
16  A.   Correct.
17  Q.   Had he used the anchor bolts?
18  A.   No.
19  Q.   All right.  Can you show me the anchor bolts?
20  A.   These four bolts in each corner of the base.
21  Q.   Okay.  Is there one in the front of the --
22       MR. LANE:  He said the four corners, I
23       think.

[71]

1   Q.   Okay.  Can you point the anchor bolts out to
2        us?
3   A.   (Indicating) And two on the back corners.
4   Q.   And what do you use the anchor bolts for?
5   A.   To secure it to the floor.
6   Q.   And how would you affix that core drill machine
7        to the floor using anchor bolts?
8   A.   I'm not exactly sure on that.  I've never done
9        that.  But I assume you have to have prior
10       holes in the floor with some kind of, you know,
11       attachment for the bolts to get into in the
12       floor.
13  Q.   And what causes you to assume that, sir?
14  A.   I mean, the bolts have to have some threads to
15       get into to hold it down.  I'm not sure about
16       that.  I've never used that; I'm just assuming.
17  Q.   Did you ask Mike Walters about using the anchor
18       bolts to secure the core drill machine before
19       operating it?
20  A.   No.
21  Q.   And why not?
22  A.   I assumed the vacuum pump was sufficient.
23  Q.   Did you check the anchor bolts before you left

[72]

1   the maintenance shop?
2   A.   Yes.
3   Q.   All right.
4   A.   Just to make sure, you know, they weren't in
5        the way of the vacuum pump from working.
6   Q.   And how did you go about checking those four
7        anchor bolts before you left the maintenance
8        shop?
9   A.   Just to make sure they were screwed up enough
10       to not hold the base off the floor.
11  Q.   Okay.  Were those anchor bolts touching the
12       floor at the time of the operation by either
13       Mike Walters or the second hole that you
14       drilled?
15  A.   No.
16  Q.   How do you know that?
17  A.   Because we checked them.
18  Q.   And how did you go about checking them there at
19       the site?
20  A.   Just made sure they weren't holding the base up
21       off the floor, made sure they were screwed up
22       and out of the way.
23  Q.   Were they screwed up into the base or were they

[73]

1   -- could you see the end of the bolt?
2        MR. LANE:  From underneath, do you
3        mean?
4   Q.   In other words, did you actually touch to make
5        sure that those bolts were not making contact
6        with the slab?
7   A.   I didn't actually touch them, but, you know,
8        you can look at them and -- you can just, you
9        know, look at them and tell they're not
10       touching.
11  Q.   You made sure of that?
12  A.   Right.
13  Q.   Before you drilled the second hole?
14  A.   No.  This is before we set it up the first
15       time.
16  Q.   How do you know that they weren't touching the
17       floor while you were drilling the second hole?
18  A.   Just from the feel of the drill.  You know, you
19       could tell it was sitting on the gasket, you
20       know, it's got that cushion play to it.  It
21       wasn't like a hard something hitting the floor.
22  Q.   If you could, sir, show us how you set the
23       machine up to drill the hole that you were

[74]

1      involved with, that second hole?
2   A.   Installed the gasket on it, as I did before.
3   Q.   In other words, the gasket had been taken off
4      after Mike Walters had used it to drill the
5      first hole?
6   A.   Right.  When we moved it, you know, we put the
7      -- you know, made sure the gasket was in there
8      right, made sure it didn't come loose.
9   Q.   All right.  So you actually reinstalled the
10      gasket after the first use?
11   A.   Correct.
12   Q.   Did you do that or did Mike Walters?
13   A.   I did that.
14   Q.   Did you check the gasket to make sure it was in
15      good condition before you drilled the second
16      hole?
17   A.   Yes.
18   Q.   And how did you go about checking the gasket to
19      make sure?
20   A.   Whenever I was installing the gasket, you know,
21      it appeared to be in the same condition, you
22      know.
23   Q.   Pliable, flexible?

[75]

1   A.   Correct.
2   Q.   Any cracks or tears in the gasket?
3   A.   No.
4   Q.   So you moved it approximately how far before
5      installing the gasket the second time?
6   A.   Two or three feet.
7   Q.   And you've shown us on Exhibit, I believe it
8      was, Number 12 where you positioned the drill
9      machine?
10   A.   Correct.
11   Q.   And then what did you do after positioning the
12      drill machine and how did you position it?
13   A.   Well, I got instructions from Mike where to
14      drill the hole from.  We moved it over,
15      installed the gasket, you know, moved the water
16      hose over to where we were drilling, and, you
17      know, it was already plugged up, so all we had
18      to do was, you know, turn the machine on and
19      begin drilling.
20   Q.   Had Mike used the hose and the water attachment
21      to the drill to drill the first hole?
22          MR. LANE:  Object to the form.  Asked
23          and answered.

[76]

1   A.   He didn't use the attachment.  He used the
2      water hose, you know, laying on the floor
3      spraying to the work area.
4   Q.   Okay.  In other words, laying it on the floor
5      and just letting it surround the machine, the
6      base of the machine?
7   A.   Right.
8   Q.   All right.  Did you attach the water hose to
9      the drill --
10   A.   No.
11   Q.   -- for your second -- or the second hole?
12   A.   No.
13   Q.   All right.  Was Mike still there when you
14      started or were in the process of setting the
15      machine up?
16   A.   Right.
17   Q.   Have you now told us everything you did in
18      order to properly set up the machine to drill
19      the second hole?
20   A.   I believe so.
21   Q.   Did you leave anything out?
22          MR. LANE:  Object to the form.
23   A.   Not that I can think of.  I believe we've

[77]

1      covered everything.
2   Q.   Okay.  Did you -- what did you do next after
3      the machine was set up?
4   A.   I began -- I began drilling.
5   Q.   Okay.  And you say that process took about ten
6      minutes?
7   A.   Correct.
8   Q.   And you were listening to the sound of not only
9      the drill motor but also the vacuum motor?
10   A.   Right.
11   Q.   And they were operating properly?
12   A.   They appeared to be operating properly.
13   Q.   Was there any difference between the operation
14      of the motor of the drill or the vacuum pump
15      from Mike's operation of the machine to drill
16      the first hole and your operation of the
17      second?
18          MR. LANE:  Object to the form.
19   A.   They sound -- the sounds were similar from the
20      first to second hole.
21   Q.   And what happened as you're drilling and you're
22      down into the slab, you say, about four inches?
23   A.   True.

[78]

1   Q.   All right. What happened, sir? And if you
2        could show us so we could see on camera what
3        actually happened, please?
4   A.   The bit became lodged in the floor and
5        immediately the machine began to spin. I let
6        go of the lever, jumped away, you know. The
7        cord caught my leg and I land, you know, down,
8        laying down on my elbow. And then immediately,
9        I mean as soon as I hit the ground, the machine
10       broke loose of the hole and struck me in the
11       head.
12  Q.   All right. Can you kind of show us where you
13       were when the cord got wrapped around your leg?
14  A.   I mean, I was kind of, you know, jumping away
15       from the machine.
16  Q.   And why did you jump away?
17  A.   I didn't want to be struck by it.
18  Q.   You knew when it locked up that you had to get
19       away from the machine?
20           MR. LANE: Object to the form.
21  A.   That's --
22  Q.   Since there's been an objection. Why did you
23       get away from the machine or why did you jump

[79]

1        away from the machine?
2   A.   Because it was spinning out of control and I
3        didn't want to be struck by it.
4   Q.   What was spinning around, sir?
5   A.   The base was spinning. And the drill bit was
6        not spinning, but the base was.
7   Q.   So that the entire base was spinning around in
8        a circle?
9   A.   Correct.
10  Q.   And how far away were you when you jumped?
11  A.   I probably made it, you know, two or three
12       feet.
13  Q.   Okay. And what part -- did you fall down?
14  A.   Right.
15  Q.   All right. What did you fall down on?
16  A.   I landed, you know, kind of on my elbow, laying
17       flat.
18  Q.   On your left side? On what side did you fall?
19  A.   It was this side, because I remember splitting
20       my elbow when I hit the concrete.
21  Q.   So you pointed to your left elbow there?
22  A.   Right.
23  Q.   And where are your feet in relation to your

[80]

1        head and the machine?
2   A.   My feet are going to be pointed -- still kind
3        of pointed towards the machine, my head is
4        going to be furthest away from the machine.
5   Q.   And what part of the machine makes contact with
6        you, if any?
7   A.   I don't know. I mean, as soon as -- as soon as
8        I hit the ground, all I know is something hit
9        me.
10  Q.   Okay. Was there anything in the area where you
11       fell that you could have fallen on rather than
12       the machine?
13  A.   No.
14  Q.   You had made sure that the area was clean?
15  A.   Right.
16  Q.   And not cluttered?
17  A.   Right.
18  Q.   And why had you done that?
19  A.   Because we had, you know, a good work area,
20       didn't have to, you know, work around anything.
21  Q.   In other words, you knew it was important to
22       make sure that the area was entirely clean
23       before you began your drilling operation?

[81]

1   A.   Right.
2   Q.   And what happened after -- or you say you split
3        your left elbow. Did anything else happen?
4           MR. LANE: Do you mean injuries?
5           MR. SHEEHAN: Yes.
6   Q.   Or what next happened? I understand you're
7        saying that you fell on your left elbow; is
8        that correct?
9   A.   Right.
10  Q.   Then what happened?
11  A.   As soon as I hit the -- you know, hit the
12       floor, you know, on my elbow, I was struck in
13       the head with the machine.
14  Q.   What part of your head was struck by the
15       machine?
16  A.   I got caught right across this area right here.
17       It broke my nose, cut my eyelid, cut me right
18       here (Indicating).
19  Q.   Right underneath your left eye?
20  A.   Right. Well, I believe it was -- from the way
21       the injuries were, I think it was -- you know,
22       kind of caught me diagonally across my nose and
23       my eye.

[82]

1  **Q.**  All right, sir.  And then what happened?
2  **A.**  I laid there on the floor and, you know, I was
3      thinking, well, you know, I can't see out my
4      eye, I'm thinking my eye got put out.  And then
5      Betty -- what's her name?  One of the
6      supervisors there, you know, come to my aid.
7  **Q.**  And about how long was that before she came to
8      your aid?
9  **A.**  It was probably, you know, 30 seconds.
10 **Q.**  And what did she do?
11 **A.**  She brought me some towels to, you know, kind
12     of control the bleeding, you know, and told me
13     to lay there and she -- she got somebody to
14     call the ambulance.
15 **Q.**  Okay.  And then what happened?
16 **A.**  I laid there for probably five minutes until
17     the ambulance got there.
18 **Q.**  Did anyone come up and ask you what happened?
19 **A.**  No.
20 **Q.**  Did anyone say, we saw what happened?
21 **A.**  No, not that I can remember.
22 **Q.**  Did anyone witness the accident?
23 **A.**  I don't know.

[83]

1  **Q.**  Has anyone told you that they saw the accident
2      and can tell you what happened?
3  **A.**  No.  I mean, there were people -- other people
4      working in the area, but I don't know if
5      anybody seen it or not.
6  **Q.**  Sir, if I could, can I -- I think I'm through
7      asking you questions in reference to the
8      demonstrative aid, if I can get you to -- just
9      for your comfort, maybe we can just sit down.
10 **A.**  Okay.
11 **Q.**  You've identified Exhibit Number 7 as a bit,
12     does that drill bit appear to be -- to have
13     been used?
14 **A.**  It appears to be used.
15 **Q.**  All right.  And what do you base that on, sir?
16 **A.**  By the scuff marks on it.  It doesn't look new
17     like the one that's over there.
18 **Q.**  And let me show you Exhibit Number 6, which may
19     be a more extensive view of that drill bit.
20     Does that appear to be the same drill bit that
21     you described?
22         MR. LANE:  Object to the form.
23 **A.**  Described in --

[84]

1  **Q.**  As being on the machine, but not the drill bit
2      that you used at the time of the accident?
3  **A.**  Yes.  That's not -- that's not the drill bit
4      that I used, but appears to be, you know, a
5      different one.
6  **Q.**  Okay.  Let me show you Exhibit Number 3 and 4.
7      And, if you could, you've identified that as
8      the maintenance tag?
9  **A.**  I assume that's what it is.
10 **Q.**  Okay.  And where was the maintenance tag at the
11     time of the accident?
12 **A.**  It was hanging on the machine.
13 **Q.**  And whereabout on the machine, sir?
14 **A.**  I believe it was attached somewhere to the
15     post, around that area.
16 **Q.**  All right.  Just so we're -- can you identify
17     either on Exhibit Number 1 or 2 where the
18     maintenance tag was on the machine at the time
19     of the accident?  If you could, just for the
20     benefit of the camera, if you could show using
21     that pen where the maintenance tag was at the
22     time of the accident?
23 **A.**  I don't see it on this picture, but I believe

[85]

1      it was on this side, the opposite side that's
2      not in the picture where the lever is.
3  **Q.**  Have you seen a photograph of the side of the
4      machine where the maintenance tag would have
5      been?
6  **A.**  No, I haven't.  Except for I've seen this
7      picture right here, but it doesn't show the
8      machine.
9  **Q.**  All right.  And, if you would, for the benefit
10     of the camera, if you could show what you're
11     talking about?
12 **A.**  (Witness complies.)
13         MR. STUTTS:  That's number what?
14 **A.**  Number 4.
15 **Q.**  So the maintenance tag -- did you read the
16     maintenance tag?
17 **A.**  I believe so.
18         (Exhibit Riley 19 marked
19         for identification.)
20 **Q.**  I will show you what I will mark as Exhibit
21     Number 19, which is a photostatic copy of the
22     -- a photostatic copy of the maintenance tag.
23     If I can -- can you identify Exhibit Number --

Matthew Riley

[86]

1   A.   19.

2   Q.   -- 19?  Is that the maintenance tag or a
3   photostatic copy of the maintenance tag?

4   A.   That doesn't look to be like the maintenance
5   tag right there.

6   Q.   You didn't check both sides of the maintenance
7   tag?

8   A.   No.

9   Q.   Let me see if I can -- if you would, Exhibit
10  Number 19, if you can help me, let me read this
11  and see -- do you see there the fourth line
12  down on the maintenance tag?

13  A.   Okay.

14  Q.   "Confirm that I have received adequate
15  instruction and acknowledge the safety sheet to
16  enable myself and/or my crew to use the
17  equipment in a safe and proper manner without
18  risk to injury;" did I read that correctly?

19  A.   Yes.

20        MR. LANE:  Are you marking this as an
21        exhibit?

22        MR. SHEEHAN:  I believe it's Exhibit
23        Number 19.

[87]

1        MR. LANE:  Oh, I'm sorry.

2        MR. SHEEHAN:  It's the front and back
3        of the maintenance tag.

4   Q.   I'm going to show you what I will mark as
5   Exhibit Number 20.

6        (Exhibit Riley 20 marked
7        for identification.)

8   Q.   Exhibit Number 20 is identified as General
9   Safety at the top; is that correct, sir?

10  A.   Correct.

11  Q.   And do you see item number one, "Only operate
12  if you have been authorized and are trained in
13  equipment's safe operation;" did I read that
14  correctly?

15  A.   Correct.

16  Q.   Were you provided with this safety sheet
17  before --

18  A.   No.

19  Q.   -- you operated the core drill machine?

20  A.   No.

21        (Exhibit Riley 21 marked
22        for identification.)

23  Q.   Let me show you what I will mark as Exhibit

[88]

1        Number 21, which is a rental out contract.
2        Down at the bottom left-hand corner is a
3        customer's signature, do you see a signature
4        down in the bottom left-hand corner there?

5   A.   Yes.

6   Q.   And whose signature is that?

7   A.   I don't know.

8   Q.   And do you see on the right-hand corner there
9   the date 8/28/03?

10  A.   Yes.

11  Q.   And do you recognize those initials?

12  A.   No.

13  Q.   And do you see right above the customer's
14  signature in three it says "Is fully familiar
15  with its operation and use"?

16        MR. LANE:  Beg your pardon?  Where was
17        that?

18  Q.   Right above the customer's signature, number
19  three, "Equipment in good working condition,"
20  and, paren, three, close paren, "is fully
21  familiar with its operation and use"?

22  A.   Yes.

23  Q.   And were you fully familiar with the operation

[89]

1        and use of this core drill machine that was
2        involved in this accident?

3        MR. LANE:  Object to the form.  When?

4   Q.   Well, are you fully familiar with the operation
5   and use of a core drill machine?

6   A.   What time frame are you talking about?

7   Q.   Well, are you now familiar with the proper
8   operation and use of a core drill machine?

9   A.   To the best of my knowledge, I am.

10  Q.   Are you now familiar or were you at the time of
11  the accident familiar with the proper use and
12  operation of a core drill machine?

13  A.   To the best of my knowledge, I was.

14  Q.   Have you learned anything since the accident
15  that would indicate to you that you were not
16  familiar with the proper operation and use of a
17  core drill machine?

18  A.   No.

19  Q.   Sir, if you could, let me mark this second --
20  mark this second foam board as Exhibit Number
21  28 to your deposition.

22        (Exhibit Riley 28 marked
23        for identification.)

Ricky L. Tyler
(334) 262-3331

Montgomery Reporting Service
(877) 834-6048
6edd0c0a-dee4-49d7-a44c-a058...

6-21-2006                                                                 Matthew Riley

[24]  (Pages 90 to 93)

[90]

1   Q.   If you could, sir, up in the left-hand corner
2        of that foam board is Exhibit Number 21;
3        underneath that is the safety sheet, Exhibit
4        Number 20; in the middle there at the top is
5        the maintenance tag, which is Exhibit Number
6        19; underneath the maintenance tag there is a
7        photograph of a label made from the subject
8        core machine.  Did you see the warning on
9        the --
10  A.   No, I didn't.
11  Q.   -- on the Milwaukee tool when you inspected it?
12  A.   No.
13  Q.   To the very far right there is a photograph of
14       a warning on the machine, could you read for us
15       the first item underneath the warning?
16  A.   "For your own safety, read and understand the
17       operator's manual."
18  Q.   And did you read and understand the
19       owner's/operator?
20  A.   I didn't see that warning label.
21          MR. LANE:  No.  He asked if you read
22             the operator's manual.
23  A.   Oh.  No, I didn't.

[91]

1   Q.   And why not?
2   A.   There was none provided.
3   Q.   Did you ask anyone for the operator's manual
4        before you used --
5   A.   No.
6   Q.   -- the drill machine?
7   A.   No.
8   Q.   And why not?
9   A.   Could you repeat that?
10  Q.   Yes, sir.  Did you ask anyone to see the
11       operator's manual before you used the core
12       drill machine?
13  A.   No.
14  Q.   And why not?
15  A.   I didn't know there was one to be looked at.
16          MR. SHEEHAN:  Sir, I appreciate your
17             time.  Thank you.
18          MR. SPRAIN:  Sir, I've got some
19             questions to follow up.
20          MR. SPRAIN:  Do we want to take a break
21             for lunch or to order some
22             sandwiches?
23          MR. LANE:  Yeah, whatever y'all want to

[92]

1            do.
2        (Lunch recess from 12:30 to 1:25 P.M.)
3        MR. GRISWOLD:  Back on the record.
4
5            CROSS-EXAMINATION
6   BY MR. SPRAIN:
7   Q.   Sir, my name is Robert Sprain and I'm
8        representing Saint Gobain Abrasives in this
9        case.  I'm going to ask you a series of
10       questions and if I don't ask the question
11       right, if you don't understand it, then you
12       please let me know and I will try to rephrase
13       it so that you do understand it, okay?
14  A.   Okay.
15  Q.   First I'm going to ask you about your
16       background a little bit.  What is your age?
17  A.   I'm 30 years old.
18  Q.   Okay.  What's your date of birth?
19  A.   May 14th, 1976.
20  Q.   What's your Social Security number?
21  A.   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.
22  Q.   What is your residence?
23  A.   100 Ricky Lane, Taylor, Alabama.

[93]

1   Q.   Zip code?
2   A.   36301.
3   Q.   What is your phone number?
4   A.   (334) 718-5073.
5   Q.   How long have you resided at 100 Ricky Lane?
6   A.   Approximately two and a half months.
7   Q.   Okay.  And before that where did you live?
8   A.   186 County Road 82, Abbeville.
9   Q.   Zip code?
10  A.   36310.
11  Q.   At the time of the accident where were you
12       living?
13  A.   I was living at -- I'm trying to remember the
14       address now.
15  Q.   Just do the best you can.
16  A.   I believe it was 104 Ward Street in Abbeville.
17  Q.   The same zip code?
18  A.   Correct.
19  Q.   Okay.  Other than those three residences, have
20       you lived anywhere else in the past five years?
21  A.   Yes.
22  Q.   Okay.  Tell me.
23  A.   750 County Road 182, Abbeville, the same zip

6-21-2006                                                          Matthew Riley

[94]

1    code.
2  Q.  Okay.  What are you presently doing now?
3  A.  I work at Key Fire Hose.
4  Q.  And where are they located?
5  A.  They're located on Highway 84 East in Dothan,
6    Alabama.
7  Q.  What do you do at Key Fire Hose?
8  A.  I work in the machine shop.
9  Q.  Doing what exactly?
10  A.  Machining fire hose connectors.
11  Q.  And what is your rate of pay?
12  A.  8.50 an hour.
13  Q.  What were you being paid at Flavor House?
14  A.  14.25 an hour.
15  Q.  Okay.  Prior to your job at Flavor House, where
16    were you working?
17  A.  JKM Manufacturing.
18  Q.  What were you making at JKM?
19  A.  Approximately 8.50 an hour, I believe.
20  Q.  8.50 an hour?
21  A.  Yeah.
22  Q.  Okay.  And prior to JKM Manufacturing what were
23    you doing?

[95]

1  A.  I worked for the Georgia Department of Natural
2    Resources.
3  Q.  And what were you being paid with them?
4  A.  Around seven, seven and a half an hour.
5  Q.  All right.  So you were making 14.25 an hour
6    though at Flavor House?
7  A.  Correct.
8  Q.  Okay.  And now you're back to 8.50 an hour.  Is
9    -- what kind of physical duties do you have as
10    a machinist at Key Fire Hose?
11  A.  Physical?  Heavy lifting -- could you be
12    more --
13  Q.  Okay.  Describe the physical nature of your job
14    at Key Fire Hose.
15  A.  Loading C & C machines, using various, you
16    know, hand tools, driving forklifts, some light
17    maintenance, facilities maintenance, equipment
18    maintenance.
19  Q.  Okay.  At the present time do you have any
20    physical limitations with your job at Key Fire
21    Hose?
22  A.  No.
23  Q.  Okay.  Are you under any doctor's orders

[96]

1    prescribing any certain physical limitations
2    with respect to doing your job at Key Fire
3    Hose?
4  A.  No.
5  Q.  Okay.
6      MR. STUTTS:  Is it Tea?
7  Q.  Is it Tea or Key?
8  A.  Key, K-E-Y.
9      MR. STUTTS:  K-E-Y.
10  Q.  K-E-Y.
11  A.  Key Fire Hose.
12  Q.  Okay.  Prior to working or starting to work at
13    Key Fire Hose, did your doctors release you to
14    return to work?
15  A.  Yes.
16  Q.  Okay.  And did your doctors give you any
17    restrictions on your ability to return to work?
18  A.  No.
19  Q.  Okay.  What about your eyesight, were you
20    released to return to full duties with respect
21    to your vision?
22  A.  Yes.
23  Q.  Okay.  And do you have any further surgeries

[97]

1    scheduled?
2  A.  None.
3  Q.  All right.  And are you able to do your duties
4    at Key Fire Hose without any physical problems
5    or restrictions?
6  A.  Yes.
7  Q.  Okay.  How long have you been at Key Fire Hose?
8  A.  Approximately two months.
9  Q.  And before you joined Key Fire Hose, what were
10    you doing?
11  A.  I worked for Mayer Electric.
12  Q.  And they're based in Birmingham?
13  A.  They're based in -- well, they've got a place
14    right here right down the street.
15  Q.  Okay.  What were you doing in Mayer Electric?
16  A.  Worked in the receiving warehouse.
17  Q.  What were you paid at Mayer Electric?
18  A.  Eight dollars an hour.
19  Q.  Okay.  What benefits do you have at Key Fire
20    Hose?
21  A.  None.
22  Q.  What benefits did you have at Flavor House?
23  A.  Full health, dental.