[198]

1   Q.  Bowling?
2   A.  Bowling as in the game.
3   Q.  Okay.  Jean and Carl Bowling.  Okay.  Any other
4       relatives?
5   A.  I've got a brother who lives in Donaldsonville
6       over in Georgia.
7   Q.  Okay.  We won't worry about him.  Any other
8       relatives in this part of Alabama?
9   A.  How about Montgomery, is that close?
10  Q.  Sure.  Go ahead.
11  A.  That's my grandmother, Bess Pierce.
12  Q.  Bess Pierce.  And where does she live?
13  A.  In Montgomery.
14          MR. SPRAIN:  Okay.  That's all I have
15          for right now.  Thank you,
16          Mr. Riley.
17          MR. LANE:  Can we take just a quick
18          break?  I just need a restroom
19          break, is that okay?
20          MR. MCGARRAH:  That's fine.
21          (Recess.)
22          MR. GRISWOLD:  We're back on the
23          record.

[199]

1          CROSS-EXAMINATION
2   BY MR. MCGARRAH:
3   Q.  Mr. Riley, my name is Scott McGarrah and I
4       represent Milwaukee Electric Tool.  I just -- I
5       want to ask a few follow-ups.  We were just
6       talking about your medicals and we'll probably
7       use the medical records primarily for your care
8       and treatment.  One thing that doesn't show is
9       some of the things you might have gone through
10      during your recovery period and that's what I
11      would like to kind of find out a little about,
12      that part of your injury.
13          When you -- well, first of all, do you
14      have any pictures of yourself injured and
15      progressed through your recovery?
16  A.  Oh, no.
17  Q.  No pictures.  Tell me a little bit about how
18      your recovery went though as far as pain and
19      that type of thing that you dealt with.
20  A.  I was in a pretty good bit of pain for the, you
21      know, first six months and then I had pretty
22      good headaches for about a year and a half,
23      this was afterwards.

[200]

1   Q.  So for the first six months you had primarily
2       pain associated with the actual physical injury
3       to your face; is that correct?
4   A.  Correct.
5   Q.  And did that pretty much resolve in about six
6       months then?
7   A.  It's kind of -- not really, because, you know,
8       I went through -- my surgery process lasted
9       more than six months.  So it lasted up until
10      after I, you know, finished up all of my
11      surgeries.
12  Q.  Were you able to eat and drink normally during
13      this period of time with the surgeries and that
14      type of thing?
15  A.  For the first couple of months it was -- you
16      know, it was -- until my bones healed up in my
17      cheek, it was, you know, kind of hard to eat,
18      you know, putting all of that pressure trying
19      to chew, you know.
20  Q.  Right.
21  A.  But after that --
22  Q.  Did you have to like eat pulverized food or
23      something of that nature or were you able to

[201]

1       just kind of get by eating like that?
2   A.  No, I could, you know, mainly chew on this side
3       of my face, you know.  I couldn't, you know,
4       chew on ice or nothing hard like that, you
5       know.
6   Q.  All right.  Did you have anybody to help take
7       care of you at home or were you own during this
8       time?
9   A.  Yes, my family, you know, took care of me.
10  Q.  Were you dating anyone or have you been engaged
11      during any of this period of time?
12  A.  No.
13  Q.  Are you dating anyone now?
14  A.  No.
15  Q.  Did you have -- did you have any dental work
16      done at all related to this accident?
17  A.  No.
18  Q.  And in reviewing your medical records, it also
19      appears that you sought some treatment with
20      respect to memory loss and that type of thing?
21  A.  Right.
22  Q.  Who did you see on that?
23  A.  It was either Doctor Allen or --

6-21-2006                                                    Matthew Riley

[52]  (Pages 202 to 205)

[202]

1              MR. STUTTS:  He can't remember.
2    A.   I've seen so many doctors.
3    Q.   But you saw a physician on that issue; is that
4         correct?
5    A.   Correct.
6    Q.   Do you remember what he told you; what kind of
7         problem you might have or what your situation
8         was?
9    A.   He told me that was -- you know, that was kind
10        of normal for a head injury and that it would
11        either clear up or it wouldn't.
12   Q.   And what kind of problems were you having?
13   A.   My short-term memory was, you know, kind of
14        bad.  You know, I would, you know, lay
15        something down and forget where it was, stuff
16        like that.  And then some stuff, like my
17        long-term memory, you know, I just completely
18        didn't remember it.  You know, I would be
19        talking to somebody and they would be like, do
20        you remember when and, you know, I would be
21        like, no, I don't remember that.
22   Q.   So you were experiencing not only short-term
23        memory loss, but some long-term memory loss?

[203]

1    A.   Right.
2    Q.   From the short-term memory, what area of time
3         were you having a problem with?  Was it like
4         within the previous hour or five minutes, ten
5         minutes or how -- how was that working?
6    A.   It could be -- you know, I might lay my keys
7         somewhere or, you know, lay my pen down or
8         writing on a piece of paper or something and
9         five minutes later I would, you know, forget
10        where I put it; I would have to go search for
11        it.
12   Q.   Has that affected you in any way in any of your
13        work after you returned back to work following
14        your surgeries and stuff?
15   A.   It did a little bit when I was doing, you know,
16        a lot of office work and, you know, having to
17        do -- working in the parts room and having to
18        do inventory, you know, counting a lot of stuff
19        and keeping up with everything.
20   Q.   Did you do anything to accommodate for that
21        problem?
22   A.   Yes.  I started taking a lot more notes and
23        stuff like that.

[204]

1    Q.   What about now, do you still suffer from
2         short-term memory loss?
3    A.   No.  No.
4    Q.   That's no?
5    A.   No.
6    Q.   What about any long-term memory loss?
7    A.   I really don't know, because if I've forgot
8         something, I don't know what it is.
9    Q.   All right.  Well, let me just --
10   A.   The only thing I can tell is if I were, you
11        know, having a conversation with somebody and
12        they were like, you know, do you remember -- do
13        you remember when this, this, this, or when we
14        did that, that's the only time, you know, I can
15        really, you know, know I forgot something.
16   Q.   Well, let me ask you about this deposition,
17        because we've asked you about a lot of stuff
18        that happened back in 2003 and you've been
19        answering questions.  At least during this
20        deposition of what you've told us, is that
21        stuff that you actually recall or were you
22        guessing at any of this stuff to your
23        recollection?

[205]

1    A.   For the -- everything I said I recall, you
2         know.  Sometimes I would say, you know, I don't
3         remember or for the most part this is how it
4         went, but everything I said was, you know, the
5         truth.
6    Q.   Okay.  Do you have any physical pain now at
7         all?
8    A.   I get a headache every once in a while, but
9         it's not like every day like it used to be.
10        Maybe three or four times a month.
11   Q.   During the worst part of your headaches, how
12        frequently would you have those headaches?
13   A.   How frequently?
14   Q.   Right.
15   A.   What time period are you talking about now?
16   Q.   Well, like once a day or --
17   A.   Now?
18   Q.   No.  Back during the worst period of time you
19        were having them.
20   A.   All day every day.
21   Q.   Really.  And for how long a period of time did
22        you have it in that manner?
23   A.   From the beginning it was every day and then,

6-21-2006                                                    Matthew Riley

[53]  (Pages 206 to 209)

[206]

1    you know, probably starting eight or nine
2    months after that they would kind of, you know,
3    taper off.  You know, it wouldn't be every day,
4    it might be, you know, four or five days a
5    week.  And then the longer, you know, time went
6    by and I healed up, you know, the shorter they
7    got.
8  Q.   Did you take any kind of prescription
9       medication for that or was it just strictly
10      over-the-counter?
11 A.   For a while I was taking prescription medicine,
12      it was through the pain management place here.
13 Q.   Right.
14 A.   It was -- I didn't like taking it because it
15      was making me kind of loopy.  So I just started
16      taking the over-the-counter stuff.
17 Q.   Are you on medication now for them?
18 A.   No.  If I do get a headache, I will take
19      Excedrin for it.
20 Q.   Let me ask you a question; I was reading your
21      answers to interrogatories, which are written
22      questions that we asked you to answer and they
23      were filed back with us in the Court.  And on

[207]

1    one question we asked was "Please describe in
2    detail and in chronological order the facts and
3    circumstances surrounding your accident."  And
4    then your response was, "After I bored a red
5    six inch hole in the floor, I prepared for the
6    next hole, which was three feet from the
7    previous hole."  Now, at least in that response
8    I understand that to mean that you bored the
9    first hole, is that your recollection or --
10 A.   That was --
11 Q.   Is that a mistake?
12 A.   That's a mistake.  It was -- you know, it
13      should have been me and Mike Walters.
14 Q.   But then Mike is the one that actually bored
15      that first hole?
16 A.   Right.
17 Q.   It says "a red six inch hole," does red have
18      any significance to you?
19 A.   A red?
20 Q.   It might have supposed to have been "round,"
21      but the answer says "red."
22 A.   No, I don't --
23      MR. LANE:  I think that's a typo on it.

[208]

1        MR. MCGARRAH:  Okay.  All right.
2        MR. LANE:  Sorry.
3        MR. MCGARRAH:  That's fine.
4  Q.   As I understand it, the night you went in there
5       to work when this accident occurred, you had
6       never seen one of these core drills in your
7       life?
8  A.   I had seen them before, but never used it.
9  Q.   Where have you seen them?
10 A.   I'm not exactly sure where I've seen it, but
11      I've been on, you know, a lot of places, a lot
12      of job sites, you know, and I've seen one
13      before.
14 Q.   Okay.  But had you ever operated one before?
15 A.   No.
16 Q.   Had you ever seen one operated?
17 A.   Just from glancing at somebody using it, that's
18      about the extent of it.  Not getting up close
19      to it and watching somebody.
20 Q.   Well, for instance, the night you first saw it,
21      I think you said it was in the maintenance room
22      or something when you first got in there that
23      night?

[209]

1  A.   Right.
2  Q.   And you were looking at it, did you look at it
3       to see about the use of a hose?  Did you
4       realize you were supposed to use a water hose
5       with it at that point?
6  A.   Yes.
7  Q.   You knew that?
8  A.   (Witness nods head in the affirmative.)
9  Q.   Is that a yes?
10 A.   Yes.
11 Q.   Okay.
12      MR. LANE:  Well, I object to the form
13          as to how you use it though.
14 Q.   Okay.  Well, let me straighten that up.  When
15      you first saw it that night, was it your
16      understanding that water should be used in
17      conjunction with the operation of the core
18      drill?
19 A.   Yes.
20 Q.   Did you understand how it was to be used with
21      this particular core drill?
22 A.   No.
23 Q.   So that first time you didn't see the water

[210]

1     connection attached to the core drill; is that
2     accurate?
3  A.   That's pretty accurate.
4  Q.   Had you seen -- did you know that you would
5     just put water on the floor, is that what y'all
6     had planned on doing at that point?
7  A.   Right.
8  Q.   Had you seen it used -- a core drill used like
9     that in the past?
10  A.   I'm not exactly sure if that's the exact way
11     they done it, but, you know, I've seen like
12     going down the -- like somebody drilling a hole
13     in a sidewalk or something, they would have
14     the, you know, water flow while they were
15     drilling.
16  Q.   Okay.  Did you know how this core drill was
17     supposed to be secured to the floor when you
18     first saw it that night?
19  A.   By looking at it, you know, I seen the vacuum
20     pump and the gasket and I assumed, you know,
21     it's a vacuum, and pressure holds it to the
22     floor.
23  Q.   So you knew by looking at it before you went to

[211]

1     work that there was a vacuum system that would
2     be used to secure it to the floor?
3  A.   Correct.
4  Q.   Did you know of the particular procedures that
5     should be used on this core drill to properly
6     implement that vacuum system?
7  A.   No.  Other than installing the gasket, that's
8     the extent of it.
9  Q.   All right.  For instance, the set bolts around
10     the perimeter of the base, did you have an
11     understanding of what those were supposed to be
12     used for?
13  A.   Yeah.  I assumed those were -- if you were
14     going to, you know, bolt it to the floor or
15     bolt it to something to secure it.
16  Q.   All right.  So that was your impression of
17     those four silver bolts around the perimeter
18     was to bolt it to the floor?
19  A.   Correct.
20        MR. LANE:  His assumption.
21  Q.   All right.  So you don't know whether those
22     were actually bolts to be used to apply
23     appropriate pressure to the gasket then; you

[212]

1     were not aware of that?
2  A.   No.
3  Q.   And when you were out there using it that day,
4     you didn't use those bolts to adjust the proper
5     cushioning on the gasket prior to the operation
6     of the gasket, did you?
7  A.   No.
8        MR. LANE:  Object to the form.
9  Q.   Did you and Mike have any discussions about the
10     proper use of those four bolts prior to the
11     operation of the core drill?
12  A.   No.
13  Q.   When you first saw it, was the gasket mounted
14     on the base or was it sitting around loose
15     somewhere?
16  A.   I believe it was, you know, hanging somewhere
17     on the machine itself.
18  Q.   All right.  And did you have knowledge at that
19     point in time as to how that gasket was to be
20     installed on the base?
21  A.   By, you know, looking at the base and the
22     gasket and the groove, you know, I assumed
23     that's -- you know, this is where it goes.

[213]

1  Q.   All right.  Now, when you went out to the floor
2     area to drill the first hole, what is that area
3     called in the plant that y'all were doing these
4     holes?  Has it got a name?
5  A.   It's line something, line -- it's got a number.
6     I'm not sure what the number is.
7  Q.   Okay.  When you went out there, you said you
8     cleaned up the area.  What did you do to clean
9     up the area?
10  A.   Oh, we just -- if there was any junk laying
11     around there, we just moved it all out of the
12     way, you know, made sure there wasn't nothing
13     on the floor that was going to hold off the
14     gasket from getting a good connection with the
15     floor.
16  Q.   Did you sweep the floor, clean it up, or mop it
17     or anything of that nature?
18  A.   No.  It was pretty much clean when we got
19     there.
20  Q.   All right.
21  A.   Because they do a -- at night they do a
22     sanitation, they clean up the plant.  So
23     everything is usually being cleaned up by then.

[214]

1  Q.  Is the production line running at this point in
2      time when y'all are doing this work?
3  A.  No.
4  Q.  So you get out there and Mike places the core
5      drill in the location; is that correct, where
6      that first hole is supposed to be drilled?
7  A.  Correct.
8  Q.  You've got the hose there, correct?
9  A.  Right.
10 Q.  Do you turn the hose on before you start the
11     drilling process?
12 A.  Right.
13 Q.  Did you turn the hose on before the core drill
14     was set in place?
15 A.  I believe we set the drill in place, then
16     turned the water on.
17 Q.  All right.  So you didn't wet the surface
18     before setting the core drill in place?
19 A.  No.
20 Q.  Was it set on a dry surface prior to turning on
21     the hose?
22 A.  I'm trying to think, because they -- they spray
23     everything down at night, so I'm not saying for

[216]

1  Q.  All right.  Did you try to move it around and
2      shake it to see if it was situated tightly on
3      the floor?
4  A.  Not that I'm aware of.
5  Q.  All right.  So Mike starts drilling, he's not
6      standing on the base at that point in time?
7  A.  Not that I'm aware of.
8  Q.  Then he drills for how long before it releases?
9  A.  I would say approximately five -- five minutes.
10 Q.  All right.  Do you know how far he got into the
11     concrete?
12 A.  I would say about three or four inches.
13 Q.  And then at that point in time does the base
14     start to spin?
15 A.  Yes.  After the bit -- I guess the resistance
16     from the bit started to make it spin.
17 Q.  And you reached over and flipped the switch and
18     stopped it?
19 A.  Correct.
20 Q.  So -- and then following that Mike says
21     something that it's not pulling -- the vacuum
22     is not attaching to the floor or something of
23     that nature?

[215]

1      sure, but, you know, there could have been --
2      the floor could have been wet from where they
3      had, you know, sprayed all of the equipment
4      down and everything.
5  Q.  All right.  So are you telling me you don't
6      know whether the floor was wet or not when the
7      core drill was put in place prior to operation?
8          MR. LANE:  Object to the form.
9  A.  Right.
10         MR. STUTTS:  I think he's saying it
11         could have been wet.
12 A.  Yeah, it could have been wet.
13 Q.  But you don't know?
14 A.  Right.
15 Q.  So then when Mike first starts to drill, he is
16     not standing on the base; is that correct?
17 A.  Correct.
18 Q.  When you turned on the drill, did anyone check
19     the pressure gauge to see what vacuum was being
20     pulled?
21 A.  No.  We just -- we listened to the pump and
22     assumed it was working correctly, it was
23     running.

[217]

1          MR. LANE:  Object to the form.
2  Q.  Well, what did he say?
3  A.  Something to the point, you know, this -- the
4      -- it doesn't have enough suction on it to hold
5      it to the floor.
6  Q.  All right.  And was the decision made at that
7      point to keep going on with the drilling?
8  A.  Correct.
9  Q.  Who made that decision?
10 A.  That would have been his decision.
11 Q.  All right.  So at least at that point both of
12     y'all are aware that the core drill apparently
13     is not operating properly because it's not
14     sticking to the floor?
15         MR. LANE:  Object to the form.
16 A.  We -- no.  We assumed it was operating
17     properly; we just assumed, you know, that the
18     vacuum pump wasn't strong enough.  We thought
19     everything was working right like it was
20     supposed to, but, you know --
21 Q.  Well, you knew that it wasn't supposed to
22     release and spin around, isn't that a fact?
23         MR. LANE:  Object to the form.

[218]

1    A.   Not exactly.  We just thought, you know,
2         everything is working right, you know, like
3         it's supposed to, but it's just not -- it don't
4         work good enough to hold it down.
5    Q.   Well, I thought you testified earlier that you
6         knew that the core drill should be securely
7         fastened to the floor for proper operation?
8    A.   Right.
9    Q.   And that if it's not securely attached to the
10        floor, it could spin around?
11   A.   Right.
12   Q.   And if it spun around, there was a possibility
13        of injury; is that correct?
14   A.   Right.
15   Q.   And you knew that when you were drilling this
16        thing that for whatever reason a proper
17        operation did not allow it to spin around?
18        MR. LANE:  Object to the form.
19   Q.   Is that true?
20   A.   Could you repeat that again?
21   Q.   I would be glad to.  You knew that -- when
22        y'all were out there drilling that the way this
23        thing should properly operate is to be secured

[219]

1         to the floor and not spin?
2    A.   Right.
3    Q.   And that for some reason, whatever it was, you
4         knew that first occasion that that was not
5         happening, that it was not operating properly?
6    A.   No.  We thought it was operating properly.  It
7         just wasn't designed good enough to hold it to
8         the floor.
9    Q.   All right.
10   A.   Because everything was working, you know, like
11        it was supposed to.
12   Q.   So you thought that it was okay for it to spin
13        around and not stay securely fastened to the
14        floor?
15        MR. LANE:  Object to the form.
16   A.   No.
17   Q.   You didn't think that was right, did you?
18   A.   Right.  We didn't think, you know --
19   Q.   And regardless of the reason, you knew it was
20        dangerous to operate that core drill in that
21        manner?
22        MR. LANE:  Object to the form.
23   A.   No, we assumed it was still safe to use.

[220]

1    Q.   Even though it would break loose and spin
2         around, that was safe?
3         MR. LANE:  Again, object to the form.
4    Q.   Are you telling me that you thought it was safe
5         to operate that core drill knowing there was a
6         possibility for it to break loose and spin
7         around?
8    A.   To a certain extent.  I never thought, you
9         know, it could become airborne, you know.  We
10        thought the worst that could happen, you know,
11        it would just sit there and spin around.
12   Q.   Well, I thought you just told me a minute ago
13        you knew that if it broke loose it could cause
14        injury?
15        MR. LANE:  Object to the form.
16   Q.   Didn't you just tell me that?
17   A.   Yes.
18   Q.   All right.  So you knew after that first time
19        that it broke away from the concrete that it
20        was dangerous and that it could break away and
21        injure somebody?
22   A.   Right.
23   Q.   And then y'all proceeded after that, knowing

[221]

1         that, to continue to drill that same hole?
2         MR. LANE:  Object to the form.
3    Q.   Is that correct?
4    A.   Right.
5    Q.   And that was Mike's decision?
6    A.   Correct.
7    Q.   And what y'all did then, y'all decided to stand
8         -- put weight on it to try to hold it securely
9         to the floor?
10   A.   Right.
11   Q.   Do you know whether that's a proper and
12        approved procedure operating this core drill,
13        to stand on it or put weight on it?
14   A.   No, it wasn't.  It didn't have a label saying
15        not to.
16   Q.   So you finished that hole up.  When you
17        finished cutting that hole, did you look down
18        there and see what might have caught it inside
19        the hole?  Did you see like rebar or wire or
20        anything in there?
21   A.   Yeah, I looked inside the hole, there wasn't
22        anything but concrete in there, cement.
23   Q.   Okay.  So in that hole you didn't get any kind

6-21-2006                                                    Matthew Riley

[57]  (Pages 222 to 225)

[222]

1       of rebar or anything?
2   A.   Right.
3   Q.   Then you moved to the next hole.  And it's my
4        understanding you moved the core drill over to
5        the next hole?
6   A.   Right.
7   Q.   Did y'all examine it in between those two holes
8        to try to figure out why it was not holding a
9        seal?
10          MR. LANE:  Object to the form.  This
11              has been gone over at least twice
12              before.  And I don't know why
13              we're asking the same questions
14              over and over again, but I would
15              object to it on the fact this has
16              been gone over at least twice
17              before.
18  Q.   Did you examine it when you moved it from the
19       first hole to the second hole?
20  A.   Yes.  Well, you know, checked the gasket to
21       make sure, you know, it was placed properly and
22       make sure everything is working.
23  Q.   All right.  Now, why did Mike leave the scene

[223]

1        when you started to drill the second hole?
2   A.   I'm not exactly sure.
3   Q.   Did you and he have a discussion about, you
4        know, hey, this drill is not doing right, it's
5        breaking loose, we shouldn't do it?  Did y'all
6        have any kind of discussion like that?
7   A.   No, we just -- after it happened the first
8        time, we was like we'll take it easy, you know,
9        try to hold it down.
10  Q.   Did you express any concerns to him about you
11       not wanting to do it with it not operating
12       correctly?
13  A.   No.
14  Q.   And the water is running all this time.  Did
15       y'all clean up the debris from the first hole
16       before y'all went over and bored the second
17       hole?
18          MR. LANE:  Object to the form.
19              Foundation.
20  A.   Yeah, there wasn't -- when we moved it over,
21       there wasn't any, you know, debris in the new
22       area for the second hole.
23  Q.   All right.  Had water gotten over there?

[224]

1   A.   Yes.
2   Q.   Did y'all do anything to mop up that water, dry
3        it up, or clean it up or anything like that?
4   A.   No, there wasn't like a thick layer of water,
5        you know, just surface wetness on the floor.
6   Q.   Okay.  When did you talk with Donna Sims when
7        she was telling you about this shear pin
8        business?  When was that?
9   A.   That was when I returned to work in October.
10  Q.   Did you ever tell anybody at Flavor House that
11       y'all had a problem on the first hole with it
12       breaking loose?  Did you ever tell anybody at
13       Flavor House that?
14  A.   Now, are you talking before I talked to Donna
15       or after?
16  Q.   Any time.
17  A.   Yeah, I believe I talked to Donna and the
18       safety guy out there.
19  Q.   And you told them that on the first hole it
20       broke away from the floor?
21  A.   As far as I can remember, I believe we did talk
22       about that.  We didn't really get into a whole
23       lot of details on everything.  They just told

[225]

1        me what their spiel was.
2   Q.   When you would put your weight on it when you
3        were doing it the second time with your foot,
4        can you give me judgment about how much weight
5        you were putting on with your foot to the base
6        of it?
7   A.   I would say probably half my body weight, 75 or
8        80 pounds.
9           MR. McGARRAH:  Okay.  That's all I've
10              got.  Thank you.
11          MR. STUTTS:  I'm going to try to be
12              short.
13  A.   All right.
14
15          CROSS-EXAMINATION
16  BY MR. STUTTS:
17  Q.   Where did you go to high school?
18  A.   Eufaula High.
19  Q.   Eufaula High.  Did you graduate?
20  A.   Yes.
21  Q.   Have you had any education after high school?
22  A.   Yes.
23  Q.   How much?

6-21-2006                                                          Matthew Riley

[58]  (Pages 226 to 229)

[226]

1  A.    Went to -- I started out and went a year for
2        industrial electronics at Sparks State
3        Technical College and received a lot of
4        training in the military.  And when I got out
5        of the military I attended Wallace College in
6        the Dothan area.
7  Q.    Okay.  Have you gotten any other kind of degree
8        or diploma or anything like that?
9  A.    No.
10 Q.    Okay.  Do you have any plans to go back to
11       school?
12 A.    Not at this point.
13 Q.    It's kind of hard after you've been out a
14       while, isn't it?
15 A.    Yeah.
16 Q.    There's been some information that after this
17       accident they found some white material in the
18       suction pump, are you familiar with that?
19 A.    Just what Joe has told me.  It was what,
20       aluminum oxide?
21 Q.    What your attorney has told you?
22 A.    Right.
23 Q.    Some oxide material?

[227]

1  A.    Correct.
2  Q.    Did you see any kind of white material that
3        night before y'all started drilling or any time
4        during the period you were drilling?
5  A.    No.
6  Q.    You never saw anything that looked like it was
7        off-color or whitish or anything like that?
8  A.    Nothing I'm aware of.
9  Q.    When you drill, was the hole that you were
10       drilling, was that putting out any kind of
11       dust?
12 A.    It wasn't really dust.  It was, you know, kind
13       of some sediment mixed in with the water.
14 Q.    Was there any kind of smoke or dust or anything
15       like that coming up at all?
16 A.    No.
17 Q.    When you and Mike were meeting before you
18       started drilling, did you have any discussions
19       about the fact that this machine could be
20       dangerous and we could get hurt?
21 A.    No.
22 Q.    There was no discussions whatsoever about
23       safety, is that what you're saying?

[228]

1        MR. LANE:  Object to the form.
2  A.    No.
3  Q.    Correct?
4  A.    No.
5  Q.    Okay.  Do you live alone --
6  A.    No.
7  Q.    -- in Taylor, Alabama?
8  A.    No, I have a roommate.
9  Q.    You have a roommate?
10 A.    Yes.
11 Q.    A male roommate?
12 A.    Yes.
13 Q.    What's his name?
14 A.    Jay Nolan.
15 Q.    Jay?
16 A.    Yes.
17 Q.    Where does he work?
18 A.    He works at Flavor House.
19 Q.    Still working there?
20 A.    Right.
21 Q.    Okay.  Have you made any attempt to go back to
22       work at Flavor House?
23 A.    No.

[229]

1  Q.    And I'm not trying to get personal, but I have
2        to ask you this; have you ever been arrested
3        for anything?
4  A.    Yes.
5  Q.    What have you been arrested for?
6  A.    I had a DUI when I was 21.
7  Q.    That's it?
8  A.    And again for not paying fines.
9  Q.    What fines?
10 A.    Well, like speeding tickets.
11 Q.    Speeding ticket.  Those are -- that's it?
12 A.    Yes.
13 Q.    Okay.  Have you ever been in any other
14       automobile accidents or other accidents of any
15       kind that you were hurt?
16 A.    No.
17 Q.    Never had any kind of broken bone or anything
18       like that?
19 A.    I've had -- had stitches a few times where I
20       cut myself up as a kid.
21 Q.    Do you have any hobbies or things that you
22       enjoy doing, hunting, fishing?
23 A.    Going fishing, grilling out, swimming, camping.

**[230]**

1  Q.  Do you still do all of that?
2  A.  Right.
3  Q.  Okay.
4  A.  Outdoors-type stuff.
5  Q.  Who -- who is the insurance carrier that's got
6      your workers' comp?
7  A.  I believe it's Travelers.
8  Q.  Travelers.  And so far as you know they've paid
9      all of your bills?
10 A.  Correct.
11 Q.  All right.  Are you still receiving any money
12     from them?
13 A.  No.
14 Q.  Have you reached a final settlement with them?
15 A.  My claim is still open if I have any more, you
16     know, medical problems, so I reckon that would
17     be no.
18 Q.  So you still hadn't concluded your case with
19     them?
20 A.  Right.
21     MR. STUTTS:  That's all I have.
22     MR. LANE:  I've got a few clarifying
23     questions here.

**[231]**

1      MR. GRISWOLD:  Going off the record.
2      This is the end of tape four.
3      (Recess.)
4      MR. GRISWOLD:  Back on the record.
5      This is the beginning of tape five.
6
7      EXAMINATION
8  BY MR. LANE:
9  Q.  Matthew, you were asked some questions several
10     times about the details of when the first hole
11     was being dug and when the second hole was
12     being dug and I want to revisit that just for a
13     minute.  When --
14     MR. STUTTS:  I'm sorry, those questions
15     have been covered two or three
16     times and I would object.
17     MR. LANE:  They have, and I don't blame
18     you for objecting.  I just want to
19     try to ask a couple of follow-ups.
20     If I repeat some questions, it's
21     just to kind of lay the foundation
22     here.
23 Q.  As I understood your testimony, when

**[232]**

1      Mr. Walters was making the first hole, drilling
2      the first hole, the base broke loose and spun
3      around, you cut it off, and then you and
4      Mr. Walters looked at the device and checked it
5      out to make sure everything was still in the
6      proper order, correct?
7  A.  Correct.
8      MR. STUTTS:  Object as to leading.
9  Q.  Okay.  And that was just foundation.  Is that
10     not what you testified to before?
11 A.  Right.
12 Q.  Okay.  Now, after you and Mr. Walters
13     reinspected it, set it back up, got the bit
14     back in the hole and started the machine back
15     up, Mr. Walters was placing pressure on the
16     base with his foot; is that what you recall?
17 A.  Correct.
18 Q.  All right.  Now, did you feel or did
19     Mr. Walters or anybody express any concern at
20     that point that that was an unsafe setup to
21     finish drilling the hole?
22 A.  No.
23 Q.  Did you feel like it was a dangerous situation

**[233]**

1      at that point?
2  A.  No.
3  Q.  Did the device appear to work properly after
4      that?
5  A.  Yes.
6  Q.  Okay.  The same question with regards to the
7      second hole.  After the Walters' hole was dug,
8      you and Mr. Walters repositioned it for the
9      second hole, correct?
10 A.  Correct.
11 Q.  And you proceeded to use the same -- and you
12     checked it out to make sure the seal was still
13     in place, correct?
14 A.  Correct.
15 Q.  And then you proceeded to use the same
16     technique that Mr. Walters had just used,
17     correct?
18 A.  Correct.
19 Q.  Did you feel like at any time based on that
20     setup, the way that you were drilling the hole
21     as Mr. Walters had done, that you were in any
22     danger at that point?
23 A.  No.

[234]

1  **Q.**  Okay. Did you feel like the machine was
2       working well enough to complete the hole?
3  **A.**  Yes.
4  **Q.**  Okay. I tell you what, I'll save this, because
5       I want to move back over where the device is in
6       a minute, but I will try to come back to that
7       so we don't have to do a lot of moving around.
8       You indicated that the production line -- the
9       Flavor House production line was not in
10      operation at the time y'all were doing this
11      work?
12 **A.**  Correct.
13 **Q.**  Were the machines shut down --
14 **A.**  Yes.
15 **Q.**  -- in that area? So you didn't have any
16      trouble hearing --
17 **A.**  No.
18 **Q.**  -- the device working, correct?
19 **A.**  Correct.
20 **Q.**  You could hear the pump?
21 **A.**  Right.
22 **Q.**  Okay. One of the things I wanted to make sure
23      we did, and I don't know if the camera can pick

[235]

1       this up or not, I understand in one of your
2       surgeries there was a -- the plastic surgery,
3       they had to cut your head. Is there a scar
4       going across your head there?
5  **A.**  Yes.
6  **Q.**  Is that something you could probably turn
7       sideways and let the --
8  **A.**  I don't know. It goes from here to here.
9  **Q.**  All the way across?
10 **A.**  That was two surgeries.
11 **Q.**  I can see it from where I am, I'm not sure --
12      can we see that from -- just kind of move your
13      head slowly. Is that showing up?
14      MR. MCGARRAH: I can see it from back
15      here.
16 **Q.**  Okay. And that goes all the way across?
17 **A.**  Correct.
18 **Q.**  Turn your head on around slowly. There you go.
19      Now, move it back just real slow, because your
20      hair kind of goes over it. Okay. That's fine.
21      Now, you were asked about these bolts that
22      I think you thought they were anchor bolts on
23      those four corners. Did anybody ever indicate

[236]

1       to you at that time that those had anything to
2       do with leveling up the base of the drill?
3  **A.**  No.
4  **Q.**  Okay. All right. Was the drill base, in
5       relationship to the concrete floor y'all were
6       drilling in, was it flat level with the -- not
7       necessarily level horizontally, but was it
8       level perpendicular to the concrete slab you
9       were drilling into?
10 **A.**  Yes.
11 **Q.**  Okay. That ceiling out there at the -- in the
12      area where you were drilling these holes, how
13      high is that ceiling?
14 **A.**  I'm guessing at least 20 or 30 feet.
15 **Q.**  20 or 30 feet up. Would it, to you, seem
16      practical to try to secure that base using that
17      device right there to go all the way to the
18      ceiling and somehow brace it in that fashion?
19 **A.**  No.
20 **Q.**  Okay. Do you have anything out there that's 20
21      or 30 feet long that would reach from the base
22      up to the top that could be hooked up to that
23      device there? Let me -- do you have any 20

[237]

1       foot --
2  **A.**  Not unless we got a couple --
3  **Q.**  -- two-by-fours out there?
4  **A.**  -- connected a bunch of, you know, metal PVC
5       together or something, something like that is
6       the only thing I could think of.
7  **Q.**  Okay. You understood that the vacuum pump
8       system was a secure way to hold this drill,
9       correct?
10 **A.**  Right, I assumed it was.
11 **Q.**  All right. You had seen other people use it on
12      other occasions, not at Flavor House, but in
13      your previous experience?
14 **A.**  Correct.
15 **Q.**  Now, you never knew that there was any manual
16      or anything that was supplied with this -- with
17      this device, correct?
18 **A.**  Right.
19 **Q.**  It may have been, but you're not aware of it,
20      right?
21 **A.**  Correct.
22 **Q.**  Anybody ever told you that a manual was
23      provided with the device --

[238]

1  A.   No.
2  Q.   -- from United Rentals?  Okay.  So you've never
3       seen this manual before?  I'll hold it up to
4       you.
5  A.   No, I've never seen it.
6       MR. STUTTS:  Could we make that an
7           exhibit to the deposition?
8       MR. LANE:  Well, I've written on this
9           one, so it's not a good one.  And
10          I'm not -- he hasn't seen it.  I'm
11          going to ask some questions kind
12          of based on some of the things in
13          here, but I'm not going to
14          reference the manual.
15      MR. STUTTS:  If we can just get a copy
16          and attach it, that's all I'm
17          after.
18      MR. LANE:  Sure.  No problem.
19      MR. STUTTS:  What number would be that?
20      MR. SPRAIN:  It will be 32.
21      MR. LANE:  I don't want to copy this
22          one, but we can leave a slot for
23          it.

[239]

1       MR. STUTTS:  Okay.
2       MR. LANE:  Just because I've written on
3           this one.
4       MR. STUTTS:  Sure.
5  BY MR. LANE:
6  Q.   And I may have already asked this, but did you
7       feel, after that first incident where
8       Mr. Walters was using it and it spun around,
9       that you and Mr. Walters had sufficiently
10      secured the base of that drill?
11 A.   Yes.
12 Q.   Okay.  Did you ever see anything on the product
13      itself or any written material that said that
14      you need to monitor that vacuum gauge at all
15      times during the operation of this drill?
16 A.   No.
17 Q.   Okay.  And I think you've already testified you
18      wouldn't know what it meant even if you did
19      look at the gauge, correct?
20 A.   Correct.
21 Q.   Okay.  Or what the safe range was?
22 A.   Correct.
23 Q.   On the gauge that you've looked at over here

[240]

1       today, does it indicate on there where the safe
2       range and where a danger range might be?
3  A.   I don't believe so.
4  Q.   Okay.  The water that was being used during the
5       operation, did you feel like it was
6       sufficiently flushing out the -- flushing the
7       drill area where you were working?
8  A.   Yes.
9  Q.   It was good water flow?
10 A.   Right.
11 Q.   Was there ever any concern that the debris was
12      clogging up the hole?
13 A.   No.
14 Q.   Okay.  The same with the hole you were
15      drilling, ever any concern?
16 A.   No.
17 Q.   And the water was -- and when you moved that
18      drill to make -- you and Mr. Walters moved it
19      to make the second hole, the floor was damp
20      from the previous area where the water was?
21 A.   Correct.
22 Q.   Was there a drain somewhere that the water was
23      running into?

[241]

1  A.   I believe so, because there wasn't standing
2       water, you know, everywhere.
3  Q.   And that's something that's done on a daily
4       basis cleaning out the production line is they
5       use water to --
6  A.   Right.
7  Q.   -- flush machines out and it runs down in the
8       drains?
9  A.   Correct.
10 Q.   Okay.  And just to be -- just to clarify, when
11      you set up the drill for the second hole, the
12      floor was wet in that area?
13 A.   Yes.
14 Q.   Okay.  But it was not -- there was not debris
15      in that area, correct?
16 A.   Correct.
17 Q.   Was the water sufficiently washing the debris
18      out of the area?
19 A.   Yes.
20 Q.   Okay.  The conversation that you were relaying
21      to us in regards to your -- Ms. Sims, Mrs.
22      Sims?
23 A.   Ms. Senn.

6-21-2006                                                        Matthew Riley

[62]  (Pages 242 to 245)

[242]

1  Q.  Senn? It's Senn?
2  A.  Yeah.
3  Q.  I heard Senn to start with, but then somebody
4      said Sims, so I changed what I wrote down.  So
5      it's Ms. Senn?
6  A.  Right.
7  Q.  S-E-N-N?
8  A.  Right.
9  Q.  I believe your testimony was she had indicated
10     that there was a problem with a shear pin,
11     correct?
12 A.  Correct.
13 Q.  Do you have any other information that
14     indicates there is even a shear pin on this
15     device?
16 A.  No.  That's the only indication that I had on
17     it, just by what they told me.
18 Q.  Okay.  And do you know where she even got that
19     information?
20 A.  No.
21 Q.  Okay.  You were shown some pictures, let's look
22     at the ones behind you here.  The warning that
23     you were shown earlier on -- it's Riley Exhibit

[243]

1      28, up here where this warning label is, you're
2      not sure where that was or even if you saw it,
3      correct?
4  A.  Correct.
5  Q.  All right.  Well, let's talk about it anyway.
6      It says "For your own safety, read and
7      understand the operator's manual."  Again,
8      there was no operator's manual that you were
9      aware of, correct?
10 A.  Correct.
11 Q.  All right.  "Failure to plug cord into properly
12     grounded receptacle may cause electrical
13     shock."  It's your understanding that the cord
14     was plugged into a grounded receptacle,
15     correct?
16 A.  Correct.
17 Q.  All right.  "Failure to properly secure unit
18     before drilling may cause serious injury."  Is
19     it your understanding that based on everything
20     you and Mr. Walters did you felt like the
21     device was properly secured?
22 A.  Correct.
23 Q.  Okay.  I don't know if I've got anything in

[244]

1      here.  Oh, yeah, here we are.  I know we've
2      been looking at the exemplar, we may have to go
3      back to it, or we may have a better picture.
4      Let me show you what -- do we have the one that
5      was marked 01?  Okay.  In Exhibit Riley 1, do
6      you see on the vacuum pump -- well, let me ask
7      you to look at the vacuum -- the exemplar we've
8      got over there.  Is there a power supply going
9      to that vacuum pump over there on the exemplar?
10     And if you need to stand up and look at it.
11 A.  What do you mean by power supply though?
12 Q.  A power supply, electrical power supply going
13     to it?
14 A.  Do you mean a cord?
15 Q.  Yes.
16 A.  Yes.
17 Q.  All right.  Is the power supply that goes to
18     this vacuum pump that's depicted in Riley 1, is
19     the cord showing in that picture?
20 A.  Yes.
21 Q.  Okay.  Where is the cord coming from the vacuum
22     pump itself?
23 A.  I don't see it on here, not coming from the

[245]

1      vacuum pump.
2  Q.  Okay.  And that's what I wanted to ask you.
3      Was there a power supply going to that vacuum
4      pump before the accident?
5  A.  Yes.
6  Q.  Okay.  But you don't see it in the picture
7      marked 1?
8  A.  Correct.
9  Q.  Okay.  So do you know what happened to that
10     power cord from the time you used it until this
11     picture was taken?
12 A.  No.
13 Q.  Okay.  It's not present in the picture though?
14 A.  Correct.
15 Q.  So that would be something that's different in
16     that picture than what you recall the condition
17     of it was before the accident, correct?
18 A.  Right.
19         MR. LANE:  All right.  One last look.
20     I think that's all I have.  That's
21     all I have.
22         MR. SHEEHAN:  Sir, if I could maybe
23     just follow-up with a few things.

[246]

1          (Exhibit Riley 16, 17, 18 marked
2          for identification.)
3
4          REDIRECT EXAMINATION
5   BY MR. SHEEHAN:
6   Q.    Let me show you what's been marked now as
7          Exhibit Number 16, 17, and 18.  And I would
8          represent -- would ask you if you recognize
9          what's depicted in those three photographs?
10  A.    The best I can say on that, it looks like the
11         area where we were at, but they had -- it looks
12         like they've resurfaced the floor since then.
13  Q.    All right.  Who resurfaced the floor?
14  A.    I don't know, whoever --.
15          MR. STUTTS:  Flavor House.
16  A.    Flavor House, right.
17  Q.    When was the floor resurfaced, to your
18         knowledge?
19  A.    I don't know.
20  Q.    While you were working there on -- after the
21         accident, was it in the same condition it had
22         been at the time of the accident and not
23         resurfaced?

[247]

1   A.    I believe so.
2   Q.    So apparently after you were terminated from
3          Flavor House the floor was resurfaced; is that
4          correct?
5   A.    I don't know.  I didn't go out there.  I mean,
6          I worked in the office after the accident and I
7          really didn't go out onto the floor a lot, so
8          they could have done it any time.
9          (Exhibit Riley 22, 23, 24 marked
10         for identification.)
11  Q.    Let me show you what have been marked Exhibits
12         Number 22, 23 and 24, and ask you again if you
13         could identify those photographs?
14  A.    I assume that that's the incident area right
15         there.
16  Q.    Does that appear to be in the same condition it
17         was at the time of your accident?
18  A.    No.
19  Q.    What difference is there, if any?
20  A.    There's two holes missing that were there
21         before.
22  Q.    And why are the holes no longer there?
23  A.    It seems like they have resurfaced the floor,

[248]

1          filled them in.
2          (Exhibit Riley 25, 26, 27 marked
3          for identification.)
4   Q.    Let me show you what's been marked Exhibits
5          Number 25, 26 and 27, and ask you what those
6          are?
7   A.    I'm not sure where -- where this is.  It looks
8          to me like it's in Flavor House somewhere.  It
9          looks like one of the extensions were cutoff
10         close to the floor.
11  Q.    Okay.  So, again, it appears that the condition
12         of the accident scene has been changed since
13         your accident?
14  A.    I don't know, but I don't recognize this area,
15         sir.  I can't answer that question.
16  Q.    What about the prior photographs that you've
17         now been shown where it's been resurfaced, has
18         the condition of the accident site been changed
19         since your accident?
20  A.    I believe so.
21  Q.    Sir, you were in the Navy for two years?
22  A.    Correct.
23  Q.    And what was your highest pay grade while in

[249]

1          the Navy?
2   A.    E-3.
3   Q.    As I understand it, you were aware that a drill
4          bit could get caught up on something in a
5          concrete slab?
6   A.    Yes.
7   Q.    And you were aware of that before the accident?
8   A.    Correct.
9   Q.    Is it your testimony that the drill bit that
10         you were using caught onto some reinforcement
11         bar in that second hole --
12          MR. LANE:  Object to the form.
13  A.    No.
14  Q.    -- which caused it to kickback?
15  A.    No.
16  Q.    It's your testimony you did not hit rebar in
17         that second hole?
18          MR. LANE:  Object to the form.  I think
19          he's already answered the
20          question.
21  A.    From my -- from what I understand, just the
22         resistance from the drilling.  I didn't hit a
23         rebar.

6-21-2006                                                                                      Matthew Riley

[64]  (Pages 250 to 253)

[250]

1   **Q.**   It was just the resistance of the bit in the
2         concrete --
3   A.   Right.
4   **Q.**   -- that caused it to kickback, is that what you
5         understand?
6   A.   When you say "kickback," what do you mean?
7   **Q.**   Caused the bit to stop in the concrete?
8   A.   Correct.
9   **Q.**   And you were aware of that before the accident?
10        MR. LANE:  Object to the form.
11  **Q.**   That resistance on the drill bit could cause
12        the bit to stop?
13  A.   Correct.
14  **Q.**   Now, as I understand while, Mike Walters was
15        drilling the first hole, the drill bit had gone
16        down about four inches, three to four inches,
17        and you saw the suction give way and the drill
18        bit stick due to friction?
19        MR. LANE:  Object to the form.
20  A.   I didn't see the suction give way.  I saw the
21        drill begin to -- the base begin to spin, and
22        that's when I reached out and turned it off.
23  **Q.**   All right.  What began to spin?

[251]

1   A.   The base began to spin.
2   **Q.**   Well, would that not be the suction diminishing
3         or being released?
4         MR. LANE:  He doesn't know why it's
5             doing it.
6   A.   No.  I mean --
7   **Q.**   Well, why did you cut the machine off?
8   A.   Because the base began to spin.
9   **Q.**   How long was the machine off?
10  A.   From the time it happened until we started
11        back?
12  **Q.**   Please, sir.
13  A.   I'm going to say approximately five minutes.
14  **Q.**   And what did you do during that five minutes
15        while the machine was off?
16  A.   Repositioned it and checked the gasket on it
17        and made sure everything was working properly.
18  **Q.**   And was it working properly before you
19        restarted it?
20  A.   In the best of our knowledge it was.
21  **Q.**   Did it give you enough concern that you stopped
22        the machine and checked it again for five
23        minutes?

[252]

1   A.   Could you repeat that?
2   **Q.**   Sure.  I'm sorry, it was a poor question.  So
3         as I understand it, you were concerned enough
4         that you reached up, turned the machine off and
5         then rechecked the machine?
6   A.   Yes.  In my opinion, the -- you know, we
7         thought -- I thought maybe the gasket had come
8         loose.  And so I rechecked it before we started
9         back up.
10  **Q.**   And what did you cut off?
11  A.   The switch on the switch box up there.
12  **Q.**   And what actually stopped?
13  A.   The drill motor, the vacuum pump.
14  **Q.**   Both the vacuum pump and the drill motor
15        stopped when you flipped the switch?
16  A.   Correct.
17  **Q.**   And as I understand, you testified that when
18        you spoke to your health care providers, you
19        would give them accurate information about your
20        condition and what had happened in this
21        accident?
22  A.   Correct.
23  **Q.**   You mentioned that you have a brother who lives

[253]

1         in Donaldsville -- in Georgia?
2   A.   Right.
3   **Q.**   Is his family from Central Alabama?
4   A.   Yes.
5   **Q.**   And what are their last names of, say, his wife
6         and family?
7   A.   It's Stacey Lee, is his wife's maiden name.
8   **Q.**   And do they have any children?
9   A.   Yes.
10  **Q.**   And their last names are?
11  A.   Riley.
12  **Q.**   And Ms. Pierce that lives in Montgomery, what
13        is her address there in Montgomery?
14  A.   I'm not sure.
15  **Q.**   What did she do for a living?
16  A.   She worked for Civil Service.
17  **Q.**   Federal or state?
18  A.   I believe it was federal.  I believe it was
19        federal because she worked usually on, you
20        know, military bases.
21  **Q.**   Okay.  Do you know what she did on the military
22        bases?
23  A.   No.  I think it was at the PX or something like

**[254]**

1    that.
2  Q.  Fair enough.  And your stepfather, what did he
3       do for a living?
4  A.  He's an electrician.
5  Q.  And who does he work with?
6  A.  He works for hisself, C & J Maintenance
7       Specialists.
8  Q.  And has he ever shown you a core drill machine
9       and showed you how to use it?
10  A.  No.
11  Q.  And your mother, what does she do for a living?
12  A.  She doesn't work.
13  Q.  Did she ever work?
14  A.  Yes.  I think her -- well, she -- she does, you
15       know, the paperwork for their business that
16       they've got, but before that she worked at
17       Aladan in Eufaula.
18  Q.  And what did she do there, sir?
19  A.  I think she was a quality assurance person.
20  Q.  Okay.  And your sister, is she -- who is her
21       husband?
22  A.  She's not married.
23  Q.  And does she have any children?

**[255]**

1  A.  Yes.
2  Q.  And their last names are?
3  A.  Brazington.
4  Q.  Brazington?
5  A.  Brazington.
6  Q.  Thank you, sir.  And what does she do for a
7       living?
8  A.  She's -- kind of does house remodeling on
9       and off.
10  Q.  She buys old homes and fixes them up?
11  A.  Well, she usually works for somebody that --
12       she does tile, tile work and stuff like that, a
13       lot of painting.
14  Q.  This accident, as best we can tell, either
15       happened late Thursday evening or early Friday
16       morning; is that correct?
17  A.  Correct.
18  Q.  And what had you been doing that Thursday
19       before going to work at 11:00 P.M.?
20  A.  I woke up and I got ready to go to work.
21  Q.  About what time did you wake up?
22  A.  Probably around 8:00 or 9:00.
23  Q.  At night?

**[256]**

1  A.  Right.
2  Q.  Was it dark outside?
3  A.  Yes.
4  Q.  And when had you gone to bed?
5  A.  Let me think.  Probably around -- approximately
6       around 10:00 that morning.
7  Q.  What had you done from the time you had gotten
8       off until 10:00 that morning?
9  A.  Came home, took a shower, watched TV or read a
10       book or something like that.
11  Q.  Were you having any difficulty adjusting to
12       those shift -- or that night shift?
13  A.  Yeah, it was kind of difficult to get used to.
14  Q.  Why is that?
15  A.  I mean, I'm used to, you know, sleeping during
16       the night, you know, instead of sleeping during
17       the day.
18  Q.  And you had just started that job that Monday?
19  A.  Right.
20  Q.  So three days before?
21  A.  Correct.
22  Q.  And you had not gotten your schedule down?
23       MR. LANE:  Well, I object to the form.

**[257]**

1  Q.  Or had you gotten your schedule down?
2  A.  I had a schedule down.
3  Q.  All right.  What was your schedule?
4  A.  My schedule -- could you -- schedule for --
5       could you kind of clarify that?
6  Q.  Please.  I mean, if you had a schedule down,
7       what was the schedule you had down?
8       MR. LANE:  Do you mean his sleep
9           routine or work schedule?  I
10           object to the form on ambiguity.
11  Q.  Point well taken.  What was -- I assume your
12       work schedule was down, otherwise you would
13       have lost your job?
14  A.  Right.
15  Q.  So your work schedule was down.  How about your
16       sleeping habits?
17  A.  I would usually get off of work and I would
18       probably be up for a couple of hours, two or
19       three hours, and then go to bed and get up, you
20       know, an hour or two before work and get ready.
21  Q.  Okay.  Was anyone staying at the same residence
22       as you at the time?
23  A.  No.

[66]  (Pages 258 to 261)

[258]

1  Q.  Did you have to depend on an alarm clock or how
2       did you --
3  A.  Yeah.
4  Q.  So your normal routine would be you would wake
5       up at 8:00 P.M. at night and then go to work at
6       11:00?
7  A.  It was only a few days there, so I don't know
8       if you could really call it normal, but that's
9       about the time I usually got up.
10 Q.  Sir, there's been some names, I guess, that
11      were mentioned in some initial disclosures
12      provided in this matter; Betty Brown, I believe
13      you described her as a supervisor there at
14      Flavor House?
15 A.  Correct.
16 Q.  Okay.  And what was she over?
17 A.  I believe she was over the production
18      department.
19 Q.  And is she still at Flavor House?
20 A.  To the best of my knowledge, she is.
21 Q.  Okay.  And Donna Senn, S-E-N-N?
22 A.  Correct.
23 Q.  What was her position?

[259]

1  A.  She was the parts buyer in charge of the
2       maintenance -- maintenance parts room.
3  Q.  Okay.  Now, Bruce Cassady, what's his position?
4  A.  I believe he's a supervisor out there, too.
5  Q.  Over what department?
6  A.  I'm not sure.
7  Q.  Jim Mason?
8  A.  Jim Mason?  I never had any interaction with
9       him.
10 Q.  What position or title did he have?
11 A.  I don't know.
12 Q.  Ken Tew?
13 A.  Kenneth Tew, that was the safety guy out there.
14 Q.  Where is Ken Tew now?
15 A.  The last time I talked to him he was -- I think
16      he was going to sell insurance.
17 Q.  Whereabout?
18 A.  I don't know.
19 Q.  Here in Dothan, though?
20 A.  I don't know.
21 Q.  What sort of insurance was he going to sell?
22 A.  I don't know.
23 Q.  Was he going to sell insurance in Alabama?

[260]

1  A.  I don't know.
2  Q.  When did you last speak with Mr. Tew?
3  A.  Probably August of '04.
4  Q.  And what was the gist of that conversation?
5  A.  He's the -- he's the one that took me to do my
6       random drug screen.
7       MR. SHEEHAN:  Thank you, sir.
8       MR. SPRAIN:  I've got just a few more
9           follow-up.
10      MR. LANE:  We're going to be here all
11          night.
12      MR. SPRAIN:  No.  No.  No.  It's going
13          to be simple.
14      (Defendant's Exhibit 34 marked
15          for identification.)
16
17      RECROSS-EXAMINATION
18 BY MR. SPRAIN:
19 Q.  What I'm going to show you is a photograph
20      marked Defendant's Exhibit 34, are you familiar
21      with the water trap that's connected to the
22      vacuum system on the core drill?
23 A.  No.

[261]

1  Q.  Okay.  This right here I'll show you to be the
2       water trap.
3  A.  Correct.
4  Q.  If you look over here, this model that we've
5       used today for demonstration purposes has a
6       water trap.  Are you aware of that now?
7  A.  Yes.
8  Q.  Okay.  And this, I'll represent to you, is a
9       picture of the water trap on the core drill
10      that was used by you on the day of the
11      accident, fair enough?
12 A.  Okay.
13 Q.  Okay.  And do you know what the water trap is
14      for?
15 A.  To the best of my knowledge, that's to filter
16      out the water before it gets into the vacuum
17      system.
18 Q.  Okay.  And you see on the picture there marked
19      as Number 34 that the vacuum hose goes to the
20      water trap?
21 A.  Correct.
22 Q.  Okay.  And did you have occasion on the day of
23      the accident to check the water trap to see

6-21-2006                                                                    Matthew Riley

[262]

1        what kind of condition it was in?
2    A.   No.
3    Q.   Okay.  Did you check inside of the water trap
4        to see if the ball was in there?
5    A.   No.
6    Q.   Okay.  Do you know what the ball is used for?
7    A.   I believe that's in case the water level gets
8        too high, it will keep it from sucking water in
9        there.
10   Q.   Okay.  And do you know whether or not on the
11       day of the accident the water trap was working
12       correctly to ensure that water was not getting
13       into the water --
14   A.   No.
15   Q.   -- the vacuum pump, excuse me?  No?
16   A.   No.
17   Q.   Okay.  After the accident did you gather any
18       information about whether or not the water trap
19       was working to prevent water from sucking into
20       the vacuum pump?
21   A.   No.
22            (Defendant's Exhibit 33 marked
23            for identification.)

[263]

1    Q.   Okay.  Next I'm going to show you what I've
2        marked as Defendant's Exhibit 33.  And, again,
3        I'm going to represent to you that this was
4        taken of the core drill after the accident and
5        that depicts the underside of the drill base,
6        fair enough?
7    A.   Okay.
8    Q.   Okay.  And I've already shown you one picture
9        of the drill base and asked you some questions
10       whether you had noticed any damage to the drill
11       base, not talking about the gasket, but the
12       actual drill base.  And now I'm going to point
13       your attention to the underside of the drill
14       base and the channel, you may have a better
15       words to describe this, but the channeling, and
16       the gasket fits on the perimeter?
17   A.   Right.
18   Q.   Are you with me so far?
19   A.   (Witness nods head in the affirmative.)
20   Q.   And you showed us how the gasket goes in this
21       channeling system.  These grooves and channels,
22       did you see any defects or damage to that area
23       of the drill base?

[264]

1    A.   No.
2    Q.   Okay.  And did you check before actually using
3        the drill on the date of the accident for any
4        damage or defects to any part of the drill
5        base, including the perimeter and the
6        underside?
7            MR. LANE:  I will object to the form,
8            but go ahead.
9    A.   From -- from where I was installing the gasket
10       and everything, I didn't visually see any
11       defects in it.
12   Q.   Okay.  We talked about your supervisor at
13       Flavor House and the Safety Manager.  Did
14       Flavor House have a physical Safety Department?
15       Was there an office or a room that was labeled
16       the Safety Department?
17   A.   No.
18   Q.   Okay.
19   A.   Ken had his own -- Ken had an office.
20   Q.   Okay.  Well, that's what I'm talking about.  He
21       was the Safety Manager, right?
22   A.   Right.
23   Q.   And he had -- the Safety Manager had his own

[265]

1        office, correct?
2    A.   Correct.
3    Q.   Okay.  Did you ever go into his office?
4    A.   Yes, after -- after the fact of the accident.
5    Q.   Okay.  Prior to the accident had you ever been
6        inside his office?
7    A.   Not really, huh-uh.  (Negative response.)
8    Q.   Okay.  Did Flavor House put on classes for
9        employees to teach safety?
10   A.   Yes, they have a yearly day where they, you
11       know, focus on safety.  I think it's Safety
12       Day.
13   Q.   Okay.  Did Flavor House have a library of
14       documents that dealt with how to properly use
15       machinery and equipment?
16   A.   Not that I'm aware of.
17   Q.   Okay.  What about operator's manuals and
18       warnings and other information about machinery
19       and equipment?
20   A.   I believe there's, you know, operator's manuals
21       and warnings, you know, scattered all
22       throughout the plant.
23   Q.   Okay.  Who was in charge of keeping up with

[68]  (Pages 266 to 269)

[266]

1    those documents?
2    A.   I don't know for sure, but --
3         MR. BRASHER:  Object to the form.
4    Q.   Okay.  Who at Flavor House would be in charge
5    of ordering equipment such as the core drill
6    used by you and Mike Walters in this case?
7    A.   That would be -- that would come through Ricky
8    Smothers more than likely.
9    Q.   Okay.
10   A.   Which is the Maintenance Manager.
11   Q.   Okay.  And would Ricky be in charge of getting
12   operator's manuals?
13   A.   Well, I mean, he would more than likely tell
14   Donna what he wanted and then Donna would, you
15   know, call in the order.
16   Q.   Okay.  Had Mike Walters ever used a core drill
17   before?
18        MR. BRASHER:  Object to the form.
19   A.   I don't know.
20   Q.   Okay.  Do you know whether Mike Walters had
21   ever used a core drill before?
22   A.   I don't know.
23   Q.   Thank you.  Are you aware of whether

[267]

1    Mr. Smothers had ever used a core drill prior
2    to August 29, 2003?
3    A.   I don't know.
4    Q.   Okay.  Are you aware of whether anybody at
5    Flavor House had ever had experience using such
6    drills?
7         MR. BRASHER:  Object to the form.
8    A.   No.
9         MR. SPRAIN:  Okay.  Thank you, sir.
10        MR. MCGARRAH:   Just real quick.
11
12        RECROSS-EXAMINATION
13   BY MR. MCGARRAH:
14   Q.   Do you identify the red and silver portion of
15   the core drill as the core motor?  Is that what
16   you called it?
17   A.   Drill motor.
18   Q.   Drill motor?
19   A.   Correct.
20   Q.   Did you ever notice anything that you
21   considered operating improperly, whether noise
22   or vibration or whatever, with respect to that
23   component part of the core drill?

[268]

1    A.   No.
2         MR. MCGARRAH:  That's all.
3
4         RECROSS-EXAMINATION
5    BY MR. STUTTS:
6    Q.   The same thing would be true on the vacuum
7    pump, until the accident happened, you didn't
8    notice anything unusual or hear any unusual
9    sounds about the vacuum pump, did you?
10   A.   No.  Everything seemed to be working properly.
11   Q.   Huh?
12   A.   Everything seemed to be working properly.
13        MR. STUTTS:  All right.
14        MR. LANE:  Y'all don't pack up yet,
15        just a couple of other things.
16
17        RE-EXAMINATION
18   BY MR. LANE:
19   Q.   I want to -- in redirect here you were asked
20   some questions about the -- cutting power to
21   the device.  After -- after the device broke
22   loose while you were using it and you fell and
23   were injured, is it your understanding that the

[269]

1    power was cut to the device?
2    A.   My understanding is that the cord was severed.
3    Q.   The cord was severed.  I mean, was it still
4    running after -- and I know you got hit in the
5    head, but do you recall whether or not any part
6    of the device was running after your incident,
7    if you know?
8    A.   No.
9    Q.   Okay.  When you cut the power when Mr. Walters
10   was -- when it broke loose and spun around and
11   you reached to cut the power, do you know for
12   sure whether or not it cut the power to both
13   motors or just the drill at the time?  Did you
14   unplug it or did you flip the switch?
15   A.   I flipped the switch and I'm -- what I'm
16   positive about is the drill motor stopped.
17   Q.   The drill motor stopped?
18   A.   Right.
19   Q.   So the vacuum motor could have been still
20   going, but the drill motor you know stopped
21   because it stopped spinning?
22   A.   Correct.
23   Q.   Okay.  One last thing.  Were you ever shown --

[270]

1    I'm sure you were already asked this, but were
2    you ever shown Exhibit Number 20, I think, to
3    your deposition, which was the United Rentals
4    general safety sheet?
5  A.  No, I wasn't.
6  Q.  You were not.  Did you remove or in any way
7    defeat, deface or render inoperable any of the
8    safety devices or warnings on that piece of
9    equipment?
10 A.  No.
11 Q.  Okay.  All right.  Did you feel like you were
12   -- at the time you started operating it that
13   you had sufficient training from working with
14   Mr. Walters to operate the device?
15 A.  Yes.
16 Q.  Okay.  Do you feel like you were using this
17   product for its intended purpose?
18 A.  Yes.
19 Q.  And that is to drill holes in the concrete
20   floor?
21 A.  Yes.
22 Q.  Okay.  Were you -- did you feel that you were
23   maintaining control of the equipment during its

[271]

1    operation?
2  A.  Yes.
3  Q.  Okay.  Now, on this list here, which you have
4    not seen, I'm just going to identify, it's
5    Number 8, it says "Always keep equipment away
6    from wet or damp locations.  Water is an
7    electrical hazard which could cause serious
8    electrical shock."  Now, was it your
9    understanding that water was -- was a feature
10   in the use of this product that was
11   recommended?
12 A.  Yes.
13 Q.  So it would be kind of hard to obey that --
14   that particular instruction completely,
15   wouldn't it?
16 A.  Right.
17 Q.  Okay.  Now, did you inspect the work area?  I
18   know you've already talked about this.  Number
19   ten says "Always inspect your work area for
20   hazards that may cause an accident."  You
21   indicated that's what you and Mr. Walters
22   did, correct?
23 A.  Correct.

[272]

1  Q.  You removed the debris and obstacles that might
2    have created some kind of hazard, correct?
3  A.  Yes.
4  Q.  All right.  And was there any safety equipment
5    that you could have been wearing that you think
6    might have in any way reduced the injury that
7    you sustained that day?
8  A.  Not unless I was wearing a motorcycle helmet.
9        MR. LANE:  Okay.  That's all I have.
10       MR. SHEEHAN:  If I could just follow-up
11       on a few things there.
12
13       FURTHER REDIRECT EXAMINATION
14 BY MR. SHEEHAN:
15 Q.  Is it your testimony there were no pallets in
16   the area where you were performing this?
17 A.  None in the immediate area.
18 Q.  It is your testimony you didn't hit your head
19   on a pallet?
20 A.  Correct.
21 Q.  That was a poor question.  Did you hit your
22   head on a pallet?
23 A.  No.

[273]

1  Q.  Was there anything -- as I understand it,
2    you're educated, you're able to read and write,
3    if you had been shown the safety sheet or an
4    operator's manual, you could have read it,
5    could you not?
6  A.  Correct.
7        MR. SHEEHAN:  Thank you, sir.
8        MR. LANE:  One last question based on
9        that.
10
11       FURTHER RE-EXAMINATION
12 BY MR. LANE:
13 Q.  Is there any doubt in your mind that what hit
14   you in the face was the drill that you and
15   Mr. Walters had been operating?
16 A.  No, there's no doubt in my mind.
17 Q.  Okay.  You don't know what part of the drill
18   hit you, you know the drill hit you though,
19   correct?
20 A.  Correct.
21       MR. LANE:  All right.  That's all I
22       have.
23       (Deposition concluded at 4:55 P.M.)



[274]

1     FURTHER DEPONENT SAITH NOT

2

3          * * * * *

4

5          REPORTER'S CERTIFICATE

6

7     STATE OF ALABAMA

8     COUNTY OF MONTGOMERY

9          I, Ricky L. Tyler, Certified Shorthand

10    Reporter and Notary Public in and for the State of

11    Alabama at Large, do hereby certify that on

12    Wednesday, June 21st, 2006, pursuant to notice and

13    stipulation on behalf of the Defendants, I reported

14    the video deposition of MATTHEW RILEY, who was first

15    duly sworn by me to speak the truth, in the matter of

16    MATTHEW RILEY, Plaintiff, vs. MILWAUKEE ELECTRIC TOOL

17    CORPORATION, et al., Defendants, Civil Action Number

18    1:05 CV-994-W, now pending in the United States

19    District Court for the Middle District of Alabama,

20    Southern Division, that the foregoing 273

21    computer-printed pages contain a true and accurate

22    transcription of the examination of said witness by

23    counsel for the parties set out herein; that the

[275]

1     reading and signing of said deposition was waived by
2     witness and counsel for the parties.
3          I further certify that I am neither of kin
4     nor of counsel to the parties to said cause, nor in
5     any manner interested in the results thereof.
6          This 27th day of June, 2006.
7
8
9
10
11
           Ricky L. Tyler (AL-CSR-212)
12         Certified Shorthand Reporter
           and Notary Public
13         State of Alabama at Large
14
15
16
17
18
19
20
21
22
23

6edd0c0a-dee4-49d7-a44e-e959d68a5b8b

## A

**Abbeville** 93:8,16
  93:23 197:12,20
**ability** 96:17
**able** 27:4 33:3
  43:20 53:19
  69:5 97:3 114:1
  191:23 200:12
  200:23 273:2
**about** 9:2 10:8
  19:22 20:7,15
  27:6 28:14,16
  28:19 31:2,11
  32:9 34:9 39:17
  43:11 45:11
  49:23 50:5 51:8
  52:12 54:16
  56:1 57:18
  58:15 59:20
  61:4 62:3 63:20
  65:12,12 67:6
  67:11,11,21,22
  68:10 71:15,17
  72:6,18 74:18
  77:5,22 82:7
  85:11 89:6
  92:15 96:19
  101:18 102:17
  103:11 104:15
  109:11,15,21
  110:9,13,17,17
  110:19,22
  111:20 114:22
  115:5,7 116:9
  116:11,14,16,22
  116:23 117:3,6
  118:3,15,18
  122:3,15 124:1
  126:19,22 128:8
  128:13,21
  129:16 131:5
  132:1 133:1
  135:21 136:2,15
  137:5,6 138:7
  138:20,22

144:21 145:13
149:16 150:3
151:8 160:22
162:20 164:15
165:7,17,23
166:3 168:12,14
169:10,11
170:22 173:8,14
173:15,17 174:2
177:19 178:4,12
178:14 179:5,15
181:15 183:9
184:9,22,23
192:14,19 198:7
198:9 199:6,11
199:17,22 200:5
204:1,6,16,17
205:15 208:18
209:3 212:9
216:12 223:3,10
224:7,22 225:4
227:19,22
231:10 235:21
243:5 248:16
250:16 252:19
255:21 257:15
258:9 262:18
263:11 264:12
264:20 265:17
265:18 268:9,20
269:16 271:18
**above** 24:14
  88:13,18
**Abrasives** 3:1 8:4
  44:18 92:8
**accident** 9:2
  10:20 11:19
  12:11 13:7
  15:10 16:4 17:6
  18:1,8,16 19:11
  19:13,23 20:7
  20:15,19 23:23
  29:12,22 31:13
  32:6,22 33:11
  42:5 44:21 45:4

46:6,15 54:13
54:21 55:10
56:20 65:10
66:7 67:7 68:1
82:22 83:1 84:2
84:11,19,22
89:2,11,14
93:11 98:7
101:2,8,10,13
101:19 102:20
103:13 104:8,12
104:16,18 105:3
105:5,9 106:21
107:3,7 108:9
108:21 109:12
109:15,18,22
110:2,6,10
113:1,11 114:7
114:17 116:12
116:14,17 117:1
117:3,14 118:4
118:8 119:4,15
119:17,19
120:22 122:21
125:5 128:7
136:6 137:22
139:21 140:18
153:16 166:21
170:12,16,21
174:6 179:14
186:9,19 187:14
189:13 190:3,10
190:22 191:5,12
192:5,17 194:5
201:16 207:3
208:5 226:17
245:4,17 246:21
246:22 247:6,17
248:12,13,18,19
249:7 250:9
252:21 255:14
261:11,23
262:11,17 263:4
264:3 265:4,5
268:7 271:20

**accidents** 229:14
  229:14
**accommodate**
  203:20
**account** 189:12
**accurate** 20:13
  41:18 189:8
  210:2,3 252:19
  274:21
**accurately** 11:17
  11:23 12:19
  19:21 20:5
  186:8
**achieve** 123:21
**achieved** 176:9
**acknowledge**
  86:15
**across** 81:16,22
  235:4,9,16
**Action** 1:8 7:8
  274:17
**actual** 141:22
  151:7 170:12,15
  200:2 263:12
**actually** 18:5
  29:15 32:9,11
  34:18 35:3 38:5
  39:2 40:2,4
  43:13 44:7 48:4
  48:14 52:14
  55:11 57:9 68:4
  69:18 73:4,7
  74:9 78:3
  103:14 124:8
  155:4 157:16
  160:7 173:9
  174:9,12 176:7
  204:21 207:14
  211:22 252:12
  264:2
**acute** 190:12
**add** 195:2
**address** 93:14
  253:13
**adequate** 86:14

**adjust** 212:4
**adjusting** 256:11
**admitted** 187:19
  189:19
**advice** 164:13
**affected** 203:12
**affirmative** 16:15
  21:20 107:17
  142:22 149:3
  153:20 209:8
  263:19
**affix** 71:6 164:22
**affixed** 69:18
  70:1,14 120:5
  176:8
**after** 9:1 13:6
  32:3 33:5 38:14
  38:20,21 74:4
  74:10 75:11
  77:2 81:2 98:7
  102:11,12,13
  104:18 105:15
  106:21 107:6,23
  108:9,21 109:18
  109:22 110:2,6
  110:10 113:1
  134:19 135:11
  150:4 153:7
  157:20 167:16
  179:20 187:13
  189:15 194:5
  195:12 200:10
  200:21 203:13
  206:2 207:4
  216:15 220:18
  220:23 223:7
  224:15 225:21
  226:13,16
  232:12 233:3,7
  238:17 239:7
  246:20 247:2,6
  262:17 263:4
  265:4,8 268:21
  268:21 269:4,6
**afterwards**

199:23
**again** 12:4,13
13:22 20:8
26:10 42:14
57:22 68:3
100:2 122:18
139:4,12 149:18
150:7,9 151:22
153:10 154:19
155:2 160:16
167:1 169:20
175:9 183:2,15
184:2 186:10
194:7 218:20
220:3 222:14
229:8 243:7
247:12 248:11
251:22 263:2
**age** 8:9 92:16
**ago** 192:14,19
220:12
**greeable** 8:18,19
**agreed** 5:18 6:8
6:16
**ahead** 13:5 16:16
20:2,9 41:14
57:21 117:11
139:2 143:18
169:21 198:10
264:8
**ahold** 132:9
**aid** 45:7 56:6 66:1
66:4 68:6 82:6,8
83:8 128:12
**ain't** 149:15
**air** 121:15 128:1
130:23
**airborne** 65:20
174:13 220:9
**al** 1:11 2:7,22 3:5
3:12,19 7:7
274:17
**Alabama** 1:2,19
1:21 5:22 7:11
92:23 94:6

197:11 198:8
228:7 253:3
259:23 274:7,11
274:19 275:13
**Aladan** 254:17
**alarm** 258:1
**alcohol** 103:18
104:1,13
**Allen** 201:23
**allow** 218:17
**allowed** 25:16
26:8
**almost** 67:10
**alone** 228:5
**along** 153:2
**alongside** 55:16
**already** 12:5
16:21 43:6 61:7
62:5 67:23
75:17 114:2
162:4 187:14
239:6,17 249:19
263:8 270:1
271:18
**aluminum** 226:20
**always** 27:22,22
32:19 271:5,19
**AL-CSR-212**
1:20 275:11
**ambiguity** 257:10
**ambulance** 82:14
82:17 187:15
**Amy** 197:14
**anchor** 70:17,19
71:1,4,7,17,23
72:7,11 164:15
165:4,13 235:22
**Anderson** 2:11
**and/or** 86:16
**another** 59:22
108:1 151:3
164:16 194:23
195:14,15
**answer** 12:14
20:2 63:10

119:7 139:3
206:22 207:21
248:15
**answered** 75:23
132:23 162:4
249:19
**answering** 204:19
**answers** 148:7
176:13 206:21
**Antonowich** 2:11
**anybody** 83:5
110:8 165:6
201:6 224:10,12
232:19 235:23
237:22 267:4
**anyone** 31:6
82:18,20,22
83:1 91:3,10
110:5 176:17
201:10,13
215:18 257:21
**anyone's** 63:15
**anything** 23:18
23:19 27:17
35:4 76:21
80:10,20 81:3
89:14 98:5
109:14 115:5
131:19 133:21
137:5 142:11,16
143:20 148:5,12
152:14 162:19
167:9 168:4,7
168:20 170:1,16
177:9 179:15
190:8 192:4
203:20 213:17
221:20,22 222:1
224:2,3 226:8
227:6,7,14
229:3,17 236:1
236:20 237:16
239:12 243:23
267:20 268:8
273:1

**anyway** 68:11
243:5
**anywhere** 93:20
171:6 177:19
**apologize** 154:9
160:4 183:2
185:2
**apparatus** 122:17
**apparently**
217:12 247:2
**appear** 11:12
15:7,9 16:6,7,20
20:12 25:8 63:4
83:12,20 140:13
142:19,21
186:18 233:3
247:16
**APPEARANC...**
2:1
**appeared** 29:21
51:14 52:1,5
58:17 74:21
77:12 113:10
142:3 177:8
**appears** 19:4,9
45:11 83:14
84:4 113:13
114:6 201:19
248:11
**application** 28:22
29:5,6 105:22
**applied** 121:14
**apply** 28:9 53:4
156:3 158:11
159:12 160:13
160:18 167:6,17
167:20 176:18
211:22
**applying** 68:7
167:2 168:1
172:1
**appreciate** 70:8
91:16
**appropriate**
211:23

**approved** 221:12
**approximately**
17:22 18:2,7
32:6,8,17 33:1,6
33:12 36:17
38:13,23 42:6
42:16 53:17
65:2 66:13
68:13 75:4 93:6
94:19 97:8
99:13 102:2
108:19 136:13
216:9 251:13
256:5
**area** 15:10 20:21
20:22 21:2,6
23:1 33:8 35:14
39:5,5 47:7
53:13,17,22
54:14,19,20
58:3,19,20 76:3
80:10,14,19,22
81:16 83:4
84:15 144:8
174:2 177:22
197:10,19 203:2
213:2,2,8,9
223:22 226:6
234:15 236:12
240:7,20 241:12
241:15,18
246:11 247:14
248:14 263:22
271:17,19
272:16,17
**areas** 58:17
**around** 14:15
21:1,4 26:4 28:7
28:8 32:8 33:1
33:10 41:12
65:15 78:13
79:4,7 80:20
84:15 95:4
108:19,23 109:1
114:20 122:5

6-21-2006

130:17,19
133:11 137:15
139:10 144:8
146:4 149:6
157:23 171:3,6
173:19 174:11
182:15 193:18
193:20 195:17
211:9,17 212:14
213:11 216:1
217:22 218:10
218:12,17
219:13 220:2,7
220:11 232:3
234:7 235:18
239:8 255:22
256:5,6 269:10
**arrested** 229:2,5
**arrived** 49:10
50:19
**artist** 42:19
**artistry** 42:18
**asked** 31:18
75:22 90:21
122:19 132:22
204:17 206:22
207:1 231:9
235:21 239:6
263:9 268:19
270:1
**asking** 83:7 113:9
113:9,12 222:13
**aspirin** 196:13
**assist** 54:15
**assisted** 37:9
**associated** 131:17
196:3 200:2
**assume** 16:12,18
19:10 62:5 71:9
71:13 84:9
102:10 106:15
139:5 140:1
155:6 178:22
180:17 187:4,6
194:6 196:1

247:14 257:11
**assumed** 64:9,21
71:22 108:14
147:21,22
149:14,19
176:12 179:4
210:20 211:13
212:22 215:22
217:16,17
219:23 237:10
**assumes** 120:20
146:22,22
**assuming** 71:16
145:3
**assumption**
137:13 211:20
**assurance** 254:19
**Atlanta** 2:15
**attach** 76:8
238:16
**attached** 11:12
84:14 210:1
218:9
**attaching** 216:22
**attachment** 56:12
56:19,21 57:6
59:9,13 71:11
75:20 76:1
**attempt** 165:10
228:21
**attend** 134:5
**attended** 226:5
**attention** 63:16
263:13
**attorney** 226:21
**audio** 7:18
**August** 9:2 10:3
12:2,3 13:1,2
18:9,10,17,18
28:4 32:9,18
99:23 101:5,9
101:16,19
103:14 113:3
118:21 185:21
260:3 267:2

**authorized** 87:12
**automobile**
229:14
**available** 175:15
**Avenue** 3:11
**avoid** 125:7,11,15
**aware** 60:14
110:4 112:20
118:2 125:4
144:7 157:14
164:12 165:14
167:7,15 168:23
170:3,18 212:1
216:4,7 217:12
227:8 237:19
243:9 249:3,7
250:9 261:6
265:16 266:23
267:4
**away** 65:16 78:6
78:14,16,19,23
79:1,10 80:4
151:6,8,9,9
177:17,23 184:9
220:19,20
224:20 271:5
**A.M** 1:22 7:16
17:19 32:8,9,13
32:18 33:6 49:3

_____

**B**

**back** 40:9 44:16
57:11 60:6 71:3
87:2 92:3 95:8
98:8,13 100:4
102:16 105:8
111:19,19
114:21 122:19
123:1 136:6
146:21 147:2,16
150:5,8 154:7,9
154:11,19 155:8
161:22 165:3
166:23 170:11
173:2 178:4

179:23 194:6
196:11 198:22
203:13 204:18
205:18 206:23
226:10 228:21
231:4 232:13,14
232:14 234:5,6
235:14,19 244:3
251:11 252:9
**background**
92:16 106:7
**backhoes** 133:13
**backwards** 135:7
**bad** 202:14
**ball** 3:16,16 69:4
262:4,6
**bar** 249:11
**base** 11:1,18,21
45:19 47:8,14
47:15 48:3,17
48:20 52:6
65:14 67:13
69:18 70:20
72:10,20,23
76:6 79:5,6,7
83:15 117:7
138:8 140:12,17
140:17 141:1,3
141:10,22,22
143:8,12,15,21
144:5,15,17,23
145:4 148:22
149:12 150:2
151:10,20 152:7
153:6,17,23
154:10,18,22
155:5,11,22
156:3,6,10,13
157:3,12,15,20
157:21 161:1,5
164:17,22
165:15 171:8,12
171:22 172:2
173:9,12,18
174:3,17 176:15

176:19 179:18
180:8,14,15,19
211:10 212:14
212:20,21
215:16 216:6,13
225:5 232:2,16
236:2,4,16,21
239:10 250:21
251:1,8 263:5,9
263:11,12,14,23
264:5
**based** 97:12,13
112:3 138:19
139:5 233:19
238:12 243:19
273:8
**bases** 253:20,22
**basically** 34:4
116:23 117:5
120:1
**basis** 117:22
139:16 241:4
**became** 65:20
78:4 98:22
150:5 151:20
152:7,13 157:11
157:16,20
174:13 179:18
**become** 127:16
127:20 138:10
148:22 149:12
150:2 171:8
174:9 180:19
220:9
**bed** 256:4 257:19
**beer** 104:4,5,8
**before** 1:19 5:20
8:16,21 9:6 21:6
28:6 29:11,22
30:8 31:15,18
32:22 34:22
36:23 37:2 38:5
48:12,22 49:2,7
50:20 51:13
52:2,15,21 55:4

6-21-2006
Page 279

Matthew Riley

55:10,21 56:3
62:3 65:10 67:6
69:19 71:18,23
72:7 73:13,14
74:2,15 75:4
80:23 82:7
87:17 91:4,11
93:7 97:9
101:10 102:2,10
105:15 107:9
108:15 112:12
113:10 118:16
120:17 133:6
136:6 141:7
157:11,16 173:9
179:14 180:7
190:10,12,22
191:5,7,8,12
192:4 208:8,13
208:14 210:23
214:10,13,18
216:8 222:12,17
223:16 224:14
227:3,17 232:10
238:3 243:18
245:4,17 247:21
249:7 250:9
251:18 252:8
254:16 255:19
256:20 257:20
261:16 264:2
266:17,21
**beforehand**
125:17
**Beg** 88:16
**began** 65:15 77:4
77:4 78:5 80:23
102:6 112:14
115:2,21 151:21
180:14 250:23
251:1,8
**begin** 18:5 38:15
75:19 250:21,21
**ginning** 60:7
173:3 205:23

231:5
**behalf** 1:16
274:13
**behind** 66:9
153:1 155:9
242:22
**being** 12:8 15:20
15:23 21:13
36:16 46:5,7,13
46:14 65:8 66:6
84:1 94:13 95:3
106:8 110:18,19
115:6 124:7
135:2 151:16
156:17 168:15
191:23 213:23
215:19 231:11
231:12 240:4
251:3
**believe** 9:5 10:22
22:1 24:21
34:17 38:1 40:9
60:22 61:6 75:7
76:20,23 81:20
84:14,23 85:17
86:22 93:16
94:19 112:8
114:18,23 126:4
126:21 143:2
158:1 162:16
169:4 183:12
184:16 185:8
187:20 212:16
214:15 224:17
224:21 230:7
240:3 241:1
242:9 247:1
248:20 253:18
253:18 258:12
258:17 259:4
262:7 265:20
**believed** 164:23
**bell** 26:5
**benefit** 13:23
44:5 57:13

84:20 85:9
**benefits** 97:19,22
98:1,20 100:9
195:23
**Benton** 129:22,23
130:1
**Bess** 198:11,12
**best** 18:10,13
22:4 41:15 89:9
89:13 93:15
105:10 116:1
119:7 128:20
152:9 161:16
246:10 251:20
255:14 258:20
261:15
**better** 10:17
53:16 58:7,10
129:8 132:5,15
156:21 157:2
183:21 188:17
244:3 263:14
**Betty** 82:5 258:12
**between** 5:18 6:9
6:17 11:21 15:2
25:14 38:10
58:17 59:4,11
77:13 144:17,22
145:7,13,18
154:8 170:19
181:13,23 185:5
186:23 222:7
**big** 176:13
**Bill** 129:22 130:2
**bills** 196:14 230:9
**Birmingham**
2:22 3:5,12
97:12
**birth** 92:18
**bit** 10:19,21,22
11:1,2,3,6,22
12:6,8 14:9
15:15,18 16:2,6
27:18 36:15,18
39:11 42:11

45:17,21 50:4
51:2,4,5,7,10,13
51:22 56:3,8
59:5,11 63:2,3,4
63:6,9,12,17,17
63:22 64:19
65:14 78:4 79:5
83:11,12,19,20
84:1,3 92:16
106:19 110:19
110:20 111:3
112:7,13 113:1
113:2,15,16
114:5,6,22
115:7,9 116:4
116:10 118:15
120:4 125:18
146:5 147:4
150:17,18 151:6
151:7,17 154:4
157:8 158:20,23
159:1,5 168:15
169:5,7,15,16
169:17,19
170:17 171:4,5
174:12 179:20
179:22 180:1,7
180:13,18
181:13 182:21
183:6,6 184:9
186:11,12,13,14
186:17 191:12
199:17,20
203:15 216:15
216:16 232:13
249:4,9 250:1,7
250:11,12,15,18
**bits** 15:20,23
36:12 169:14
**black** 41:10
**blame** 231:17
**bleeding** 82:12
**block** 43:1
**blurred** 140:15
**board** 4:13 5:4

22:5,10 34:15
89:20 90:2
**boards** 22:15
**body** 225:7
**bolt** 73:1 165:13
211:14,15,18
**bolts** 70:17,19,20
71:1,4,7,11,14
71:18,23 72:7
72:11 73:5
164:16 165:4
211:9,17,22
212:4,10 235:21
235:22
**bone** 189:23
229:17
**bones** 200:16
**book** 256:10
**boots** 68:20
**bored** 207:4,8,14
223:16
**both** 17:8 64:5
86:6 102:21
140:11 155:13
155:14 161:1
173:10 184:4
187:6 217:11
252:14 269:12
**bottom** 34:16
43:9 88:2,4
140:16
**bounces** 172:9
**Bowling** 197:23
198:1,2,3
**box** 2:6,21 62:5
62:13,14,18
154:13 252:11
**brace** 149:22
153:9,14 236:18
**bracing** 161:11
**brand** 104:5
**Brasher** 2:10 8:1
8:1,20 40:20
70:2 196:6
266:3,18 267:7

**Brazington** 255:3 255:4,5
**break** 25:22 26:8 27:4,6,11 33:3 44:12 55:5 59:21 60:9 91:20 111:3 114:20 147:12 153:10 198:18 198:19 220:1,6 220:20
**breaking** 223:5 224:12
**breaks** 25:10,13 25:17,21
**brief** 60:9
**briefly** 164:15 194:21 195:8
**bring** 25:23 156:19 157:1
**Broad** 46:20
**broke** 65:14 78:10 81:17 114:16 153:7 220:13,19 224:20 232:2 268:21 269:10
**broken** 14:14,22 15:1 111:12,15 111:17 112:1,14 112:18 114:9,11 114:15 115:1,6 116:6 131:1 168:15,16 169:17 170:2,17 180:16 188:23 189:20 229:17
**brother** 198:5 252:23
**brought** 82:11 115:10 126:4 185:11 187:15
**Brown** 258:12
**Bruce** 259:3
**Bud** 104:6,9

**Building** 3:10
**built** 23:6,8
**bunch** 237:4
**burrs** 51:17,18
**business** 133:12 224:8 254:15
**busy** 25:15 27:23
**buy** 196:12
**buyer** 259:1
**buys** 255:10
**B-E-N-T-O-N** 130:1

---

**C**

**C** 3:15 7:1 95:15 95:15 254:6
**cafeteria** 26:1
**call** 21:18,19 58:19 61:19 62:12,13 63:15 82:14 136:18 164:12 181:14 181:15,23 191:19 258:8 266:15
**called** 58:21 121:6,7 123:2,7 129:5 136:19 176:6 213:3 267:16
**came** 21:12 23:13 31:23 32:3 34:12 49:2,5,6 55:10 82:7 98:15 104:22 108:2 118:16 174:8,12 256:9
**camera** 13:23 16:14 19:7 44:5 44:7,8 48:9 53:20 78:2 84:20 85:10 234:23
**camping** 229:23
**cap** 69:4

**care** 37:12 196:2 196:14 199:7 201:7,9 252:18
**carefully** 12:17
**Carl** 197:23 198:3
**carpenter** 135:18
**carrier** 230:5
**case** 6:9,12 92:9 111:3 124:10 125:20 126:4,7 128:7 131:11 196:17 230:18 262:7 266:6
**cases** 126:12
**case-by-case** 100:18
**Cassady** 259:3
**caught** 65:16 78:7 81:16,22 221:18 249:4,10
**cause** 64:6 117:13 118:5 138:2,11 170:16 180:18 220:13 243:12 243:18 250:11 271:7,20 275:4
**caused** 99:2,17 108:3 117:2,8 117:19 118:8 130:4 143:2 145:11 149:12 168:21 170:1 180:1 189:5,13 249:14 250:4,7
**causes** 71:13 180:6
**ceiling** 165:17,18 166:5,19 236:11 236:13,18
**cement** 221:22
**Center** 2:12 188:8,16 189:16 192:12 194:3,7 194:16,17

**Central** 253:3
**certain** 25:16 96:1 220:8
**certainly** 175:22 197:4
**certificate** 107:12 274:5
**Certified** 1:20 5:21 274:9 275:12
**certify** 274:11 275:3
**chain** 133:14
**change** 60:10 182:5
**changed** 242:4 248:12,18
**changes** 45:1
**changing** 99:3
**channel** 263:14
**channeling** 263:15,21
**channels** 263:21
**charge** 259:1 265:23 266:4,11
**check** 49:20 52:1 52:20 71:23 74:14 86:6 140:12 141:10 144:8,12 148:2 148:17 175:2 177:10 215:18 261:23 262:3 264:2
**checked** 37:7 50:6 72:17 150:6 163:11 222:20 232:4 233:12 251:16 251:22
**checking** 33:5 49:23 50:22 72:6,18 74:18
**checklist** 10:16
**checkup** 192:23

**cheek** 189:21 194:10 200:17
**Cherry** 1:18 2:4 7:14
**chew** 200:19 201:2,4
**children** 253:8 254:23
**chipped** 19:11
**chips** 173:11
**choice** 104:3
**chronological** 207:2
**circle** 41:12,23 43:2 79:8 182:15
**circumstances** 207:3
**Civil** 1:8 6:7 7:8 253:16 274:17
**claim** 131:16,20 230:15
**claiming** 196:16
**claims** 131:10
**clarified** 179:1
**clarify** 46:23 114:1 115:16 156:14 173:8 241:10 257:5
**clarifying** 11:21 230:22
**classes** 107:9,14 126:19 128:9,13 128:15 129:16 134:5,8,10,13 265:8
**classification** 99:4
**clean** 80:14,22 213:8,16,18,22 223:15 224:3
**cleaned** 213:8,23
**cleaning** 241:4
**clear** 16:18 20:21 20:23 63:11