[1]

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

MATTHEW RILEY,

    Plaintiff,

Vs.                                    CIVIL ACTION NO.

                               1:05 CV-994-T

MILWAUKEE ELECTRIC TOOL

CORPORATION, et al.,

    Defendants.

        DEPOSITION OF GEORGE A. KENNEDY, taken pursuant to notice and stipulation on behalf of the Plaintiff, in the conference room of Cochran, Cherry, Givens, Smith, Lane & Taylor, 163 West Main Street, Dothan, Alabama, before Ricky L. Tyler, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, on Tuesday, August 29th, 2006, commencing at 11:35 A.M.

8-29-2006                                                                 George Kennedy

[2]  (Pages 2 to 5)

[2]

1         APPEARANCES
2  FOR THE PLAINTIFF:
3       JOSEPH D. LANE, ESQ.
4       Cochran, Cherry, Givens, Smith,
5         Lane & Taylor
6       P. O. Box 927
7       Dothan, AL 36302
8
9
10 FOR THE DEFENDANT, MILWAUKEE ELECTRIC TOOL
11 CORPORATION:
12      W. SCOTT MCGARRAH, III, ESQ.
13      McGarrah & Davenport, P.C.
14      P. O. Box 43548
15      Birmingham, AL 35243
16
17
18 FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
19      KEVIN T. SHIRES, ESQ.
20      Sprain & Shires, PC
21      1707 29th Court Street
22      Birmingham, AL 35209
23

[3]

1  FOR THE DEFENDANT, GAST:
2       EUGENE P. STUTTS, ESQ.
3       Spain & Gillon, LLC
4       The Zinszer Building
5       2117 Second Avenue North
6       Birmingham, AL 35203
7
8
9  FOR THE DEFENDANT, UNITED RENTALS:
10      C. WINSTON SHEEHAN, JR., ESQ.
11      Ball, Ball, Matthews & Novak
12      2000 Interstate Park Drive
13      Suite 204
14      Montgomery, AL 36109-5413
15
16
17 FOR FLAVOR HOUSE:
18      HEATHER S. ROBINSON, ESQ.
19      Hamilton, Westby, Antonowich & Anderson
20      One Georgia Center
21      600 West Peachtree Street, N.W.
22      17th Floor
23      Atlanta, GA 30308

[4]

1              I N D E X
2                                    Page
3
   Direct Examination by MR. LANE:      6
4
5            EXHIBITS
6  1   Photograph
       For Identification               83
7
   2   Photograph
8      For Identification               88
9  3   Photograph
       For Identification               99
10
11
12           STIPULATIONS
13
14      It is stipulated and agreed by and between
15 counsel representing the parties that the deposition
16 of GEORGE A. KENNEDY may be taken before Ricky L.
17 Tyler, Certified Court Reporter and Notary Public in
18 and for the State of Alabama at Large, without the
19 formality of a commission; and all formality with
20 respect to other procedural requirements is waived;
21 that objections to questions, other than objections
22 as to the form of the questions, need not be made at
23 this time, but may be reserved for a ruling at such

[5]

1  time as the deposition may be offered in evidence or
2  used for any other purpose by either party as
3  provided by the Federal Rules of Civil Procedure.
4       It is further stipulated and agreed by and
5  between counsel representing the parties in this case
6  that the filing of the deposition of GEORGE A.
7  KENNEDY is hereby waived and that said deposition may
8  be introduced at the trial of this case or used in
9  any other manner by either party hereto provided for
10 by the Statute, regardless of the waiving of the
11 filing of same.
12      It is further stipulated and agreed by and
13 between the parties hereto and the witness, that the
14 signature of the witness to this deposition is hereby
15 waived.
16               * * * * *
17
18           PROCEEDINGS
19
20      GEORGE A. KENNEDY, of lawful age, having first
21 been duly sworn to tell the truth, testified as
22 follows:
23

[6]

1  DIRECT EXAMINATION
2  BY MR. LANE:
3  Q. State your name, please?
4  A. George Kennedy.
5  Q. George Kennedy. Is that your full name?
6  A. George Allen Kennedy.
7  Q. George Allen Kennedy. Okay. And what is your
8     address, Mr. Kennedy?
9  A. It's 103 Radford Circle, Dothan, Alabama 36301.
10 Q. How long have you lived there?
11 A. Four months.
12 Q. Four months. Where did you live before that?
13 A. 115 Bobwhite Drive, Dothan, Alabama.
14 Q. What's your date of birth, Mr. Kennedy?
15 A. April 2nd, 1947.
16 Q. Have you lived in this area all your life?
17 A. No, I have not.
18 Q. Okay. How long have you lived in this area,
19    the Dothan area?
20 A. Three years, five months.
21 Q. Where did you live before that?
22 A. Jacksonville, Florida.
23 Q. Jacksonville, Florida. Are you from the

[7]

1     Jacksonville area?
2  A. No, I am not.
3  Q. You are not. How long did you live in the
4     Jacksonville area?
5  A. One year.
6  Q. One year. Where did you live before that?
7  A. Louisiana. La Place, Louisiana.
8  Q. And how long did you live there?
9  A. 18 months.
10 Q. 18 months. Okay. Where did you live before
11    that?
12 A. Roanoke, Virginia.
13 Q. Roanoke, Virginia. Are we getting close to
14    home?
15 A. No.
16 Q. Okay. How long did you live in the Roanoke,
17    Virginia area?
18 A. 18 months.
19 Q. 19 months?
20 A. 18 months.
21 Q. 18 months. All right. Where did you live
22    before that?
23 A. Moline, Illinois.

[8]

1  Q. Moline. M-O-L-E-N-E?
2  A. M-O-L-I-N-E.
3  Q. Is that home; what you consider home?
4  A. No.
5  Q. All right. How long did you live there?
6  A. Two years.
7  Q. All right. I'm going to cut to the chase.
8     What do you consider to be home as far as where
9     you --
10 A. Nashville, Tennessee.
11 Q. Nashville, Tennessee.
12    Mr. STUTTS: I thought you would never
13       ask that.
14    MR. LANE: Well, I thought we would get
15       there quicker.
16 Q. What has -- let's see. You lived in Moline two
17    years. Where did you live before that?
18 A. Nashville, Tennessee.
19 Q. Okay.
20    MR. STUTTS: You were almost there,
21       Joe.
22 Q. Now, I don't want to waste too much of our time
23    going over your moving history, but what caused

[9]

1     you to move from Nashville to Moline?
2  A. Job.
3  Q. Job?
4  A. Yeah.
5  Q. And what kind of job were you doing in Moline?
6  A. I was a mechanic for a rental company.
7  Q. What rental company?
8  A. Foxx High Reach.
9  Q. Foxx?
10 A. Foxx, F-O-X-X, High Reach.
11 Q. Foxx High Reach?
12 A. Yes, sir.
13 Q. Do they rent aerial equipment?
14 A. Aerial equipment.
15 Q. Okay. And why did you move from Moline to
16    Roanoke?
17 A. My wife's father had Lou Gehrig's disease and
18    she wanted to spend the last remaining years
19    with him.
20 Q. And he was from Roanoke?
21 A. He was in Roanoke, Virginia.
22 Q. What did you do as far as work when you moved
23    to Roanoke?

[10]

1  A.  Worked for Prime Equipment Rental Company,
2      general rental.
3  Q.  Okay. And you worked there for 18 months?
4  A.  I opened a store and 18 months later they moved
5      me.
6  Q.  Okay. Is that when you moved to Louisiana?
7  A.  Yes, it is.
8  Q.  Was that for the same company?
9  A.  Same company.
10 Q.  Prime Equipment. Why were you moved to Prime
11     in --
12 A.  They had problems in the Shell Plant and they
13     needed me out there to try to stabilize the
14     situation.
15 Q.  The Shell Plant. What's the Shell Plant?
16 A.  Shell Oil.
17 Q.  Shell Oil?
18 A.  Norco, Louisiana.
19 Q.  So that was considered the Shell Plant?
20 A.  Refinery.
21 Q.  Okay. What kind of problems did Shell have
22     that caused you to be transferred to Prime
23     Equipment Company in Louisiana?

[11]

1  A.  Their equipment store was inside the plant and
2      they didn't have -- the Maintenance Department
3      in our company was failing and they were about
4      to lose the contract with Shell.
5  Q.  Okay. By saying the Maintenance Department was
6      failing, what are you referring to?
7  A.  Well, the mechanics that worked on their
8      equipment.
9  Q.  Weren't doing a very good job on the equipment?
10 A.  They were not doing a good job at all.
11 Q.  Okay. So you were called in to straighten that
12     out?
13 A.  Right.
14 Q.  All right. And you were there 18 months. Did
15     you get the problem resolved over those 18
16     months?
17 A.  Yes. And then they transferred me --
18 Q.  Okay.
19 A.  -- to another plant in Geismar, Louisiana.
20 Q.  Okay. You were in Louisiana a total of 18
21     months; is that correct?
22 A.  18 months.
23 Q.  And how long were you in the Shell Plant or at

[12]

1      the Prime Equipment Company that supplied the
2      Shell Refinery?
3  A.  I was in Shell nine months.
4  Q.  Okay. And then you spent nine months at the
5      other -- I didn't get the name of that place
6      again. What was the name of the place?
7  A.  I spent approximately nine months, yeah, at
8      BASF Geismar. It's a chemical plant.
9  Q.  Okay. And Prime Equipment had a rental company
10     that's --
11 A.  Inside the plant.
12 Q.  -- inside the plant?
13 A.  Uh-huh. (Positive response.)
14 Q.  Okay. And what was -- why were you transferred
15     there?
16 A.  The whole crew got kicked out for security
17     reasons.
18 Q.  The whole Prime Equipment Company crew?
19 A.  Everybody. We had to -- the Manager on down
20     had to be replaced.
21 Q.  What caused that, do you know?
22 A.  Uh-huh. (Positive response.) One of the
23     mechanics signed a gate pass for somebody that

[13]

1      stole a pickup truck. They drove the pickup
2      truck out through the gate and disappeared with
3      it.
4  Q.  All right. And in these last few locations,
5      what was your job title at the two --
6  A.  Service Manager.
7  Q.  Service Manager. All right. And that's at the
8      two places in Louisiana, correct?
9  A.  Yes.
10 Q.  All right. How about the one in Roanoke?
11 A.  Service Manager.
12 Q.  Service Manager. How about in Moline?
13 A.  Field mechanic.
14 Q.  Field mechanic. Okay. Now, as a field
15     mechanic -- who was it you were working for in
16     Moline?
17 A.  Foxx High Reach.
18 Q.  Foxx High Reach, yeah. Now, before you moved
19     to Moline you were in Nashville?
20 A.  Yes.
21 Q.  What type of work did you do there?
22 A.  I worked for a rental company.
23 Q.  What was the name of the rental company?

[14]

1  A.  Falconite Crane and Lift. I'm sorry, I went
2      blank.
3  Q.  Falconite?
4  A.  Crane and Lift.
5  Q.  Crane and Lift. Did you ever work for -- other
6      than -- is that the first rental company you
7      ever worked for?
8  A.  Yes.
9  Q.  Okay. How long did you work with them?
10 A.  About three years.
11 Q.  Three years. What did you do before that?
12 A.  I was -- I drove a truck.
13 Q.  What kind of truck?
14 A.  A semi, over-the-road.
15 Q.  Semi over-the-road. All right. How long did
16     you drive a semi as a job?
17 A.  About ten years.
18 Q.  Ten years. Okay. Before beginning work at
19     Falconite Crane and Lift, did you ever have any
20     job where you did maintenance on equipment?
21 A.  I ran service stations from 1972 until in the
22     '80s when the economy got bad and went into
23     trucking.

[15]

1  Q.  So you worked on cars?
2  A.  Yes, cars, trucks.
3  Q.  Auto mechanic type business?
4  A.  Well, we had a truck shop, too. I had one
5      station that had a truck shop and one that was
6      just, you know, automobile and gasoline.
7  Q.  Okay. How did you get into the work at
8      Falconite doing maintenance work for rental
9      equipment?
10 A.  A friend of mine that knew me, knew my history
11     as a mechanic, talked me into coming over
12     there.
13 Q.  All right. Why did you leave Foxx High Reach?
14 A.  They sold out to RSE. And, as I said, I needed
15     to be in Virginia because of my wife and her
16     father.
17 Q.  Oh, yeah, that's right. I'm sorry, I asked you
18     the wrong question. Why did you leave
19     Falconite Crane and Lift?
20 A.  Tom Foster and Mike Falconite were friends and
21     we got to talking one day and he offered me a
22     job. And Mike said you should take it, so I
23     did.

[16]

1  Q.  And that was the Moline job?
2  A.  Moline.
3  Q.  I've got you. Now, when you were transferred
4      to the second Louisiana site, you worked there
5      nine months, correct?
6  A.  No. When they transferred me, I told them I
7      did not want to go. So at that time I went to
8      work for Hertz Equipment Rental there in
9      Kenner, Louisiana.
10 Q.  This is when you were at the Shell Plant,
11     correct?
12 A.  Uh-huh. (Positive response.)
13 Q.  All right. And they said they were going to
14     transfer you, so you said no, you don't want to
15     go?
16 A.  I went out there for one week until I was, you
17     know, cleared with Hertz Equipment Rental and I
18     went to work for them as a Service Manager.
19 Q.  All right. And how long did you work there?
20 A.  The remainder of the nine months or the nine
21     months and then they transferred me to
22     Jacksonville.
23 Q.  Okay. So you never took the job at the second

[17]

1      rental company? And I forgot the name -- I
2      can't pronounce the name.
3  A.  It was the same company. It was Prime
4      Equipment. I went from the Shell Norco Plant
5      to BASF Geismar, which BASF is a chemical
6      company. It was the same company I worked for.
7      I went out there for one week. And then Hertz
8      Equipment Rental hired me and I went to work
9      for them.
10 Q.  I see. Okay. So you did go and work one week
11     at the BASF plant?
12 A.  Yes.
13 Q.  All right. And then you were working for Hertz
14     when you transferred to Jacksonville?
15 A.  Right.
16 Q.  And where did you transfer in Jacksonville?
17 A.  To -- well, it's in Jacksonville out on
18     Phillips Highway, Hertz Equipment Rental.
19 Q.  Hertz Equipment Rental. Okay. And what was
20     your job position there?
21 A.  Service Manager.
22 Q.  All right. And, let's see, you worked at that
23     job for three years?

[18]

1  A.  With Hertz?
2  Q.  Yes.
3  A.  Approximately three years, yes.
4  Q.  Three years, five months?
5  A.  Yes. To the best of my recollection, yeah.
6  Q.  Now, why did you leave Hertz Equipment Rental?
7  A.  I decided that I would be more -- I would be
8      happier with United Rentals.
9  Q.  Okay.
10 A.  So I just -- I turned in my resignation and
11     went to work with United Rentals.
12 Q.  Did you have a job offer with United Rentals
13     before you left Hertz?
14 A.  Yes.
15 Q.  All right. How did that come about?
16 A.  One of the salesmen with United Rentals and I
17     were talking on the phone and he told me there
18     was a position open at United Rentals and I
19     applied.
20 Q.  All right. In Jacksonville?
21 A.  Uh-huh. (Positive response.)
22 Q.  All right. Did you go to work in Jacksonville
23     for United Rentals?

[19]

1  A.  No.
2  Q.  All right. How did you -- where did you go to
3      work?
4  A.  Here in Dothan.
5  Q.  Okay. So this was the first job -- here in
6      Dothan is the first time you've worked for
7      United Rentals?
8  A.  Yes.
9  Q.  All right. And you've been here for three
10     years?
11 A.  Three and a half years.
12 Q.  Three and a half years. All right. That's
13     where I wrote down the three and a half years.
14     If your time in Jacksonville was different, go
15     ahead and correct that; I didn't mean to --
16 A.  Jacksonville was a year.
17 Q.  Okay. Jacksonville was a year?
18 A.  I thought you was talking about total time with
19     Hertz Rental.
20 Q.  Okay. That's fine. All right. Let's back up
21     a little bit. You've given me a lot of
22     information, and I appreciate that, as far as
23     background. A little more background

[20]

1      information about your training and education.
2      Do you have college, any college education?
3  A.  No.
4  Q.  None. Do you have a high school diploma?
5  A.  High school diploma.
6  Q.  Okay. Where did you go to high school?
7  A.  New Madrid, Missouri.
8  Q.  Okay. What training did you have to become a
9      mechanic? How did you become a mechanic?
10 A.  I was a mechanic -- well, I grew up on a farm,
11     everybody is mechanically inclined. I went
12     into the Marine Corps and they naturally put me
13     into mechanics.
14 Q.  All right. So you got a lot of your mechanic's
15     training in the Marine Corps?
16 A.  Uh-huh. (Positive response.)
17 Q.  All right. That and on-the-job experience on
18     the farm?
19 A.  Right.
20 Q.  Okay. Any other special training other than
21     the training you received in the Marine Corps?
22 A.  In the rental industry we always have training.
23     There are schools that -- I've been to probably

[21]

1      three dozen schools.
2  Q.  All right. When you started working for -- I
3      believe it was Foxx High Reach that was your
4      first rental company, correct?
5  A.  No. Falconite was the first rental company.
6  Q.  I'm sorry. I ran out of room and I put it on a
7      different list. I apologize. When you went to
8      work for Falconite, did you go through any type
9      of formal training to take on that job?
10 A.  No.
11 Q.  Did not. You received most of your training on
12     the job there?
13 A.  Yes.
14 Q.  All right. At what point, whether it was
15     Falconite -- did you ever receive any what I
16     would call classroom type training while you
17     were at Falconite Crane?
18 A.  No.
19 Q.  How about at Foxx High Reach?
20 A.  Yes.
21 Q.  Okay.
22     (Off-the-record discussion.)
23

[22]

1  BY MR. LANE:
2  Q. I'm going to leave that area, Mr. Kennedy, and
3     try to move on to a different area. I think
4     we've covered your employment history pretty
5     well in terms of your mechanic experience,
6     correct?
7  A. That's correct.
8  Q. All right. Now, who was it that hired you to
9     -- I think you said, but tell me again who it
10    was that hired you to work with United Rentals?
11 A. David Capps.
12 Q. How did you know him?
13 A. I met him through the salesman Donnie Wells.
14 Q. Okay. And where is David Capps?
15 A. He is now the District Sales Manager for this
16    company.
17 Q. All right. Do you know where he resides? I
18    mean, the general area, not his address.
19 A. Here in Dothan.
20 Q. Here in Dothan. Okay. Did you interview with
21    anyone when you heard about this job?
22 A. David Capps.
23 Q. David Capps. What was your understanding of

[23]

1     the position that you were going to take when
2     you went to work for United Rentals?
3  A. Service Manager.
4  Q. All right. When you came to United Rentals,
5     who were you replacing?
6  A. I don't have a clue.
7  Q. You don't know. Was there a Service Manager
8     filling that job whenever you were applying for
9     the job?
10 A. Yes.
11 Q. But you don't know who that was?
12 A. He wasn't there when I got there.
13 Q. All right. But he had not left when you
14    applied for the job; is that correct?
15 A. I don't know.
16 Q. Okay. You don't know?
17 A. I don't know.
18 Q. Did Mr. Capps give you any indication of any
19    problems that were taking place at the United
20    Rentals where you were being hired to work?
21 A. None.
22 Q. He didn't give you any indication of any
23    problems?

[24]

1  A. No indications.
2  Q. Okay. Do you have any understanding as to why
3     this position was opening up?
4  A. Someone left and they needed to fill the
5     position so I was told.
6  Q. Okay.
7  A. Now, it wasn't no in depth; you know, we have a
8     position.
9  Q. When you came to United Rentals, tell me about
10    how -- what took place in the way of training
11    for this job?
12 A. I went through an intensive prehire training
13    basically, you know, when I came to United
14    Rentals. And it's been ongoing training since.
15 Q. Okay. Tell me about the intensive prehire
16    training; what did that involve?
17 A. It's a two day. A lot of it is just company
18    orientated, a lot of it is about your position.
19    It's basically preparing you for the job that
20    you're stepping in to.
21 Q. Where did this take place?
22 A. At the branch.
23 Q. And where is that?

[25]

1  A. Here in Dothan right here.
2  Q. So it happened right down the road here?
3  A. Right. It was on Montana Avenue then.
4  Q. And who conducted that two day orientation?
5  A. The Branch Administrator, Eva Jordan.
6  Q. Eva Jordan?
7  A. Uh-huh. (Positive response.)
8  Q. Where is she located today?
9  A. Here at the branch.
10 Q. She works there all the time?
11 A. Yes.
12 Q. She's called the Branch Administrator?
13 A. Uh-huh. (Positive response.)
14 Q. All right. Was anyone else participating in
15    this two day intensive hire training?
16 A. No.
17 Q. Just you and she?
18 A. Just me.
19 Q. All right. What materials were provided to you
20    for this two day orientation?
21 A. Reviewed several safety videos, various paper
22    works, go over the insurance policies, safety
23    procedures, safety, you know, policies and

**[26]**

1  procedures, I guess you would call it.
2  Q. Were those materials provided to you personally
3     as materials that you would keep or --
4  A. No. They are general materials for a new hire.
5     Now, excuse me, some of it is -- you do take
6     with you and some of it is not.
7  Q. Tell me what was given to you for your --
8  A. Well, all of your specifics to the company,
9     your safety stuff, your insurance stuff, all of
10    that was given to you.
11 Q. Now, the safety videos, you said you reviewed
12    several safety videos, correct?
13 A. Uh-huh. (Positive response.)
14 Q. Are those still used today?
15 A. Yes, they are.
16 Q. The same ones?
17 A. I don't know if it's the same ones or not.
18 Q. Okay. What did those safety videos cover?
19 A. There was some forklift videos, proper lifting,
20    operating, seat belt procedure. There was
21    vehicle safety, driving. Just general safety.
22 Q. Safety for the workers there at the plant?
23 A. Uh-huh. (Positive response.)

**[27]**

1  Q. I called it a plant.
2  A. Store.
3  Q. At the store?
4  A. Uh-huh. (Positive response.)
5  Q. And so this was general safety information for
6     the employees that work there, correct?
7  A. For employees and myself.
8  Q. Right.
9  A. It's general safety policies, yes.
10 Q. Okay. Was there anything in those safety
11    videos that you recall -- first of all, do you
12    remember the name of any of those safety
13    videos?
14 A. No, I do not.
15 Q. Okay. Was there anything in those safety
16    videos that was directed at how you interact
17    with the customers for United Rentals? In
18    other words, items related to safety for the
19    customers in the use of United Rentals'
20    products?
21 A. No.
22 Q. No? How about the safety policies and
23    procedures, not in the video, but the other

**[28]**

1  that you referenced, the safety policies and
2  procedures material?
3  A. Yes.
4  Q. How was that -- what materials were relevant to
5     safety of the customers in the use of the
6     products?
7  A. I don't remember.
8  Q. Okay.
9  A. But I know it was there.
10 Q. You know it was there?
11 A. Yeah.
12 Q. All right. When you came to work there, let's
13    see, it was about three and a half years ago?
14 A. Uh-huh. (Positive response.)
15 Q. Do you remember the date you started?
16 A. March 24th, 2003.
17 Q. Who was working in the Maintenance Department
18    when you started there?
19 A. A young man named Aaron, I don't remember his
20    last name, he was only there a short while, and
21    Jason Lisenby. That's it.
22 Q. Anyone else?
23 A. No.

**[29]**

1  Q. That was it. All right. Is Jason Lisenby
2     still there?
3  A. No.
4  Q. All right. How about Aaron?
5  A. No.
6  Q. Were you involved in the hiring and firing of
7     personnel in the Service Department?
8  A. Yes.
9  Q. From the time you came there?
10 A. Yes.
11 Q. Okay. Have you had an occasion to either fire
12    or have someone transferred out of your
13    department?
14 A. No.
15 Q. You have not?
16 A. No.
17 Q. Has anyone at your instruction been involved in
18    transferring or firing anyone out of your
19    department?
20 A. No.
21 Q. No? Okay. Or a recommendation by you?
22 A. No.
23 Q. No? Has anyone been transferred out of your

[30]

1  department to work in other departments while
2  you've been --
3  A. Yes.
4  Q. Who would that be?
5  A. Chris Waymire.
6  Q. Chris?
7  A. Waymire.
8  Q. Waymire? I'll do my best. And where did he
9     transfer to?
10 A. Into the trucking division of it.
11 Q. All right. Where did Aaron go?
12 A. I don't have a clue; he quit.
13 Q. He just quit. How about Jason Lisenby?
14 A. He quit.
15 Q. He quit. Okay. What did you think about the
16    Service Department when you started working
17    there at United Rentals? What kind of
18    condition was it in when you started?
19 A. It wasn't in bad condition, we just needed some
20    help.
21 Q. Needed some help?
22 A. Yeah, we didn't have enough people.
23    MR. LANE: Okay. Can y'all excuse me?

[31]

1     (Recess.)
2  BY MR. LANE:
3  Q. Now, I'm sorry, Mr. Kennedy, I apologize. I
4     apologize, you don't need to apologize.
5  A. I'm sorry.
6  Q. We were talking about when you first got to
7     United Rentals. You said you felt like it
8     wasn't in too bad of shape, but you felt like
9     you needed more help?
10 A. Yes.
11 Q. How long was Aaron there after you got there?
12 A. One week.
13 Q. One week. Okay. So then you were left with
14    just you and Jason Lisenby?
15 A. I hired a man.
16 Q. You hired a man. Who did you hire?
17 A. Steven Forehand.
18 Q. Steven Forehand. Is he still at United
19    Rentals?
20 A. Yes.
21 Q. What was he hired on as?
22 A. Mechanic.
23 Q. Mechanic. Did he have previous experience as a

[32]

1     mechanic?
2  A. Yes.
3  Q. What kind of mechanic experience did he have?
4  A. He worked for a John Deere dealer for about
5     eight years.
6  Q. John Deere. All right. Did you hire anyone
7     else?
8  A. Yes.
9  Q. Who else?
10 A. Josh Jordan.
11 Q. Was this all just right after you started
12    working there? How long after you started
13    working there did you hire these fellows?
14 A. Those two probably within three weeks of my
15    coming there.
16 Q. All right. And tell me again the name of the
17    next one.
18 A. Josh Jordan.
19 Q. Josh Jordan. Is he still there?
20 A. Yes.
21 Q. How was he hired on? What was he?
22 A. A mechanic.
23 Q. As a mechanic. And what was his experience?

[33]

1  A. John Deere dealer.
2  Q. Okay. The same place?
3  A. Yes.
4  Q. They both worked together before?
5  A. Yes.
6  Q. Do you know why they were leaving John Deere?
7  A. Money.
8  Q. Because you hired them away, right?
9  A. Uh-huh. (Positive response.)
10 Q. All right. Had either one of them had any
11    experience working in the rental industry
12    before that?
13 A. Yes.
14 Q. Which one?
15 A. Both of them.
16 Q. Both of them. Who did they work for before?
17 A. John Deere. They had a rental division.
18 Q. Okay. I've got you. So then it was
19    Mr. Forehand, Mr. Jordan, Mr. Lisenby and you?
20 A. Yes.
21 Q. All right. And how long did Mr. Lisenby work
22    there before he quit?
23 A. About a month.

**[34]**

1  Q. Okay. After you came there?
2  A. Uh-huh. (Positive response.)
3  Q. Why did he quit? Do you know?
4  A. He didn't say.
5  Q. He didn't say?
6  A. No.
7  Q. Do you know where he went?
8  A. No, I don't.
9  Q. Okay. So after one month of you coming there,
10    you were back down to two persons in the shop
11    along with yourself?
12 A. Yes.
13 Q. All right. Did you feel like you had enough in
14    the shop at that point?
15 A. No.
16 Q. All right. Did you hire more after that?
17 A. Yes.
18 Q. Who else did you hire after Mr. Lisenby left?
19 A. Oscar.
20 Q. O-S-C-A-R?
21 A. Yeah. Now, he was there when I came there. I
22    had forgotten about him because he was on the
23    road.

**[35]**

1  Q. He was like a field mechanic?
2  A. Field mechanic, uh-huh. (Positive response.)
3  Q. Okay.
4  A. We were referring to shop mechanics.
5  Q. Yes.
6  A. I had two field mechanics when I came there.
7  Q. Okay. That you were in charge of as well?
8  A. Right.
9  Q. Who were they? Oscar somebody?
10 A. Yeah. I'm horrible with names. I've worked
11    with the guy for three and a half years. Ray
12    Dennison and Oscar Jacobs.
13 Q. What was Oscar's last name again?
14 A. Jacobs.
15 Q. Jacobs. All right. And they were field
16    mechanics. What was their job?
17 A. They go out in the field and repair equipment
18    when it breaks down in the field.
19 Q. Okay. Are they still there now?
20 A. Oscar is still there.
21 Q. Mr. Dennison is not?
22 A. Ray Dennison was fired.
23 Q. He was fired? Why was he fired?

**[36]**

1  A. Misuse of a company vehicle.
2  Q. When was he fired?
3  A. A year and a half ago.
4  Q. Who fired him?
5  A. David Capps.
6  Q. David Capps. Okay. Has Mr. Capps fired anyone
7     else in your department since you've been
8     there?
9  A. No.
10 Q. Just Mr. Dennison?
11 A. Uh-huh. (Positive response.)
12 Q. How was he misusing the vehicle?
13 A. He had his son in a company vehicle on the
14    weekend and was in some place he wasn't
15    supposed to be.
16 Q. I see. Okay. Unauthorized use?
17 A. Unauthorized use.
18 Q. I've got you. Do you know where Mr. Dennison
19    is today?
20 A. No, I don't.
21 Q. You don't. You haven't seen him since then?
22 A. No.
23 Q. All right. Earlier I was asking you about --

**[37]**

1     well, during the time that these guys were
2     field mechanics, did you use them in the shop
3     to fill in at any time?
4  A. Yes, I use my road men. When they're not in
5     the field, they work in the shop.
6  Q. Okay. We were talking about when you hired
7     Mr. Forehand and Mr. Jordan. Was there -- even
8     with using Mr. Jacobs and Mr. Dennison in the
9     shop when they weren't out in the field, did
10    you feel like you had enough -- still feel like
11    you didn't have enough help in the shop itself?
12 A. No.
13 Q. You did not?
14 A. Are you talking about when I hired --
15 Q. I didn't ask that very clearly and that's why I
16    don't understand your answer. It's my fault,
17    not yours. Previously you had indicated that
18    you had Mr. Forehand, Mr. Jordan and yourself
19    there after Mr. Lisenby left, correct?
20 A. Right.
21 Q. After he quit. And that you felt like you
22    still needed more people in the shop. Did you
23    hire anybody else in the shop at that point or

[38]

1   did you just rely on Mr. Jacobs and
2   Mr. Dennison filling in?
3   A.  I hired Steven Forehand and Josh Jordan.
4   Q.  No. I meant after you hired Mr. Forehand and
5   Mr. Jordan.
6   A.  No, not right away.
7   Q.  Okay. Who was the next -- did you hire anyone
8   else after Mr. Forehand and Mr. Jordan at any
9   time?
10  A.  Recent.
11  Q.  Okay. Do you know when this accident occurred?
12  Let's talk in terms of before and after the
13  accident, that will help. Are you familiar
14  with when this accident occurred?
15  A.  Yes.
16  Q.  And it was like August 29th of 2003, correct?
17  A.  Yes.
18  Q.  Was Mr. Forehand and Mr. Jordan working in your
19  shop at the time this accident occurred?
20  A.  Yes.
21  Q.  Was Mr. Lisenby or Mr. -- Aaron, you didn't
22  know his name, but was Aaron or Mr. Lisenby
23  working in the shop then?

[39]

1   A.  No.
2   Q.  And they had been gone for some time at that
3   point?
4   A.  Right.
5   Q.  All right. Was Mr. Dennison and Mr. Jacobs
6   working in the shop prior to this accident in
7   August?
8   A.  They were working in the field. I used them in
9   the shop as necessary.
10  Q.  Okay. That's what I'm asking. Were you using
11  them as necessary before the accident?
12  A.  Yes.
13  Q.  Okay. Was anyone else hired before August 29th
14  of 2003 by you to work in the shop other than
15  the ones we've talked about?
16  A.  No.
17  Q.  Okay. Who has been hired since August 29th,
18  2003?
19  A.  Chad Proctor.
20  Q.  When was he hired?
21  A.  Approximately five months ago.
22  Q.  Okay. Who else?
23  A.  We transferred one in from Orlando about that

[40]

1   time, too, but he was with the company. He
2   transferred from Orlando to this store.
3   Q.  Within the last five months?
4   A.  Uh-huh. (Positive response.)
5   Q.  What's his name?
6   A.  Jimmy -- it will come to me in a minute.
7   Q.  No problem. When you think of it, that's fine.
8   A.  All right.
9   Q.  Anyone else?
10  A.  No.
11  Q.  Any other field mechanics?
12  A.  No.
13  Q.  Who are your field mechanics today?
14  A.  Steven Forehand and Josh Jordan.
15  Q.  Okay. Is it considered a promotion to move up
16  to the field mechanic position?
17  A.  It's not any more money, no.
18  Q.  Not any more money. When those positions open
19  up, do the --
20  A.  I hire mechanics and I place them where I need
21  them. I don't hire a road mechanic or a field
22  mechanic or, I mean, a shop mechanic, I hire a
23  mechanic and I place them where I need them.

[41]

1   Q.  All right. When did Steven Forehand and Josh
2   Jordan start working as field mechanics?
3   A.  Josh Jordan, approximately a year and a half
4   ago; Steven Forehand, approximately a year and
5   a half ago, I guess.
6   Q.  The same?
7   A.  Uh-huh. (Positive response.) That's the best
8   of my recollection.
9   Q.  That's fine. Is Oscar Jacobs still a field
10  mechanic?
11  A.  No.
12  Q.  Where is he?
13  A.  He's in my small engine department.
14  Q.  Why was he moved from field mechanic to the
15  small engines department?
16  A.  Because that's where he's best suited. He is a
17  whiz on small engines and can do it all, so I
18  put him over there.
19  Q.  Not because he couldn't do the field mechanic,
20  but just --
21  A.  No, sir.
22  Q.  -- because you think he's --
23  A.  He's a well qualified rounded mechanic, he just

[42]

1     does me more good in this position.
2  Q. Do you still just have two field mechanics?
3  A. Yes.
4  Q. As a title?
5  A. Right.
6  Q. All right. Was anyone by the name of Norman
7     working in the Maintenance Department at any
8     time you've worked there?
9  A. No.
10 Q. You're not aware of anybody?
11 A. No.
12 Q. Let's talk a little bit about the policies and
13    procedures in the Service Department. Who is
14    responsible for the -- for establishing what
15    the policies and procedures are in the Service
16    Department?
17 A. They come down from corporate.
18 Q. They come down from corporate. Those are
19    written policies and procedures?
20 A. PPBs, Policies and Procedure Bulletins.
21 Q. Okay. Is there a -- are you the person who
22    those are addressed to? How do those get to
23    the shop?

[43]

1  A. They come to the branch. They are made public.
2     They usually come to the Manager and anyone at
3     any time has access to them.
4  Q. All right.
5  A. They're also stored in the computer.
6  Q. Okay. That's what I want to ask you. They're
7     stored in the computer. Is there a hard copy
8     of the policies and procedures for the Service
9     Department that's kept in the shop?
10 A. No.
11 Q. Or in an office there at the facility?
12 A. There's probably one in the office, in Mike's
13    office, the Manager's office.
14 Q. And that's Mike Waters?
15 A. Uh-huh. (Positive response.)
16 Q. Are these policies and procedures that are
17    updated periodically, is that what the
18    bulletins are?
19 A. Yes.
20 Q. In other words, when a new one comes in, you
21    replace --
22 A. Yes.
23 Q. -- the old one or supplement what's there; is

[44]

1     that correct?
2        MR. SHEEHAN: Let him finish his
3     question before you answer,
4     because he added some words to the
5     question. Just let him finish the
6     question before you answer it.
7  Q. And that's as much my fault as it is yours,
8     Mr. Kennedy, because I tend to pause between
9     phrases and I apologize. Let me ask that again
10    if I can. The policies and procedures, as far
11    as the way they come in, are the hard copies of
12    the policies and procedures added to or
13    replaced with current policies and procedures
14    in some notebook somewhere?
15 A. I don't know.
16 Q. You don't know?
17 A. No.
18 Q. As they come to you, how did you become
19    familiar with the -- are you familiar with the
20    policies and procedures?
21 A. All policies and procedures bulletins are on
22    the Internet or on our intranet site.
23 Q. Intranet site?

[45]

1  A. Uh-huh. (Positive response.)
2  Q. All right. How did you become knowledgeable
3     about the policies and procedures of United
4     Rentals in terms of the Service Department?
5  A. When you go through your training in the
6     beginning, they make you aware of the policies
7     and procedures bulletins.
8  Q. Do you actually review and read all of the
9     policies and procedures in that two day period
10    of time?
11 A. At that time I read -- went through them,
12    skimmed through them, and I had a copy of them.
13    But if you asked me where it's at, I don't
14    know.
15 Q. Okay. So you were provided a copy of the
16    policies and procedures?
17 A. Yes.
18 Q. Is it the policy and procedure of United
19    Rentals to supplement copies with the policies
20    and procedure bulletins that come in,
21    supplement whatever copy you've got with those
22    policies and procedure bulletins?
23 A. I don't understand the question.

[46]

1  Q.  Okay. At the time you were hired you had --
2      there was a certain set of policies and
3      procedures --
4  A.  Yes.
5  Q.  -- that applied to the Service Department,
6      correct? Correct?
7  A.  Yes.
8  Q.  Okay. And since you were hired, additional
9      policies and procedures are provided to you as
10     the Service Manager at United Rentals that come
11     down in the form of bulletins, correct?
12 A.  Yes.
13 Q.  All right. Do you have a policy and procedure,
14     you yourself as the Manager, where you take the
15     new bulletins and add those to your previous
16     collection of policies and procedures?
17 A.  Not personally.
18 Q.  Okay. Who does?
19 A.  I don't know.
20 Q.  Do you know of anyone at United Rentals who is
21     responsible for updating the policies and
22     procedures in the Service Department?
23 A.  Corporate updates them.

[47]

1  Q.  As far as what is in the shop itself or in the
2      unit here in Dothan, the United Rentals unit
3      that you work at, the store?
4  A.  That would be the Manager.
5  Q.  The Manager, Mr. Waters?
6  A.  Uh-huh. (Positive response.)
7  Q.  Okay. Take me through the general categories
8      of policies and procedures there are for the
9      Service Department as you recall them when you
10     were hired. What did those policies and
11     procedures cover?
12 A.  Various categories I cannot remember. They are
13     on the intranet, I can look at them at any
14     time.
15 Q.  They are on the intranet?
16 A.  Intranet.
17 Q.  Okay. When was the last time you referred to
18     the policies and procedures for the Service
19     Department at United Rentals?
20 A.  Last week.
21 Q.  What was the occasion for doing that?
22 A.  Concerning wearing jewelry in the shop.
23 Q.  Okay. And what is the policy and procedure for

[48]

1      wearing jewelry in the shop?
2  A.  It's prohibited.
3  Q.  Prohibited. No jewelry?
4  A.  No metal jewelry.
5  Q.  Okay. How did that come up as a question?
6  A.  One of the employees wanted to wear his wedding
7      ring.
8  Q.  Okay. Are the actual policies and procedures
9      for how equipment is handled in the shop
10     addressed in the policies and procedures
11     collection that we've been talking about?
12         MR. SHEEHAN: Object to the form.
13 A.  No.
14 Q.  It is not?
15 A.  No.
16 Q.  Okay. Who determines the policies and
17     procedures for how equipment is handled in the
18     shop?
19 A.  Corporate.
20 Q.  Corporate. Where are those policies and
21     procedures?
22 A.  In the policies and procedures is a checklist
23     for the equipment.

[49]

1  Q.  And that's separate and apart from the policies
2      and procedures that we've been talking about
3      that's on the intranet, correct?
4  A.  Yes. Yes.
5  Q.  Where are those checklists that you're talking
6      about located?
7  A.  I have a file that has a checklist for each
8      piece of equipment with the exception of a few,
9      which we use a miscellaneous.
10 Q.  So for each piece of equipment that United
11     Rentals rents, there is a checklist that
12     applies to that piece of equipment?
13         MR. SHEEHAN: Object to the form.
14 A.  Yes.
15 Q.  And in some cases that's a miscellaneous
16     checklist, but there is a list that applies to
17     every piece of equipment, correct?
18 A.  Yes.
19 Q.  Okay. Now, I'm going to ask this the best way
20     I know how. I apologize, I don't know what
21     terminology you use. But for a checklist for a
22     piece of equipment, and we can talk about the
23     checklist for the core drill that we're here

[50]

1  about today, okay? Is that okay with you?
2  A. (Witness nods head in the affirmative.)
3  Q. Okay. Well, let me ask you this; are you
4     familiar with the core drill that we're here
5     about today?
6  A. Yes.
7  Q. You are. Okay. Are you aware of whether or
8     not there is a checklist that fits the category
9     we've been talking about, a policies and
10    procedures checklist for that core drill?
11       MR. SHEEHAN: Object to the form.
12 A. No.
13 Q. Okay. It was poorly asked. Is there a
14    checklist that applies to the core drill that
15    we're here about today?
16       MR. SHEEHAN: Object to the form.
17 A. Say that again.
18 Q. Okay. Well, let me ask a couple of other
19    questions that may help us. You indicated
20    there is a checklist that applies to every
21    piece of equipment that United Rentals rents.
22    At the time of this accident, if that helps
23    you, was there a checklist that applied to this

[51]

1  unit that we're here about today, the core
2  drill, the Norton core drill that we're here
3  about today?
4  A. Not specific.
5  Q. What applied to this core -- when you say not
6     specific, are you saying it was a miscellaneous
7     checklist?
8  A. Yes.
9  Q. All right. What was on that miscellaneous
10    checklist?
11 A. Safety features.
12 Q. Safety features of the unit?
13 A. Yes. Appearance and safety features.
14 Q. Okay. Have you had an opportunity to review
15    the checklist that applied to this unit at the
16    time it was rented and used in this case?
17 A. Yes.
18 Q. All right. And you've seen that?
19 A. Yes.
20 Q. How recently have you seen that?
21 A. Yesterday.
22 Q. Yesterday? Okay. I may or may not have it.
23    I'll try to just give you some --

[52]

1     MR. SHEEHAN: It's Exhibit Number 1 to
2        the deposition.
3     MR. LANE: Good. Thank you, Winston.
4        To whose deposition?
5     MR. SHEEHAN: That gentleman, Mr.
6        Mixon.
7     MR. LANE: Okay. Good. Thanks for
8        helping me out, because I didn't
9        know how to ask the questions to
10       get to that.
11 Q. What we've got here is an exhibit that was
12    marked as Exhibit Number 1 to Mr. Mixon's
13    deposition earlier today. And I'm going to --
14    and 2, Exhibit Number 1 and 2, it's two pages.
15    And I'm going to ask you if this is the policy
16    and procedure checklist that you're talking
17    about that applied to the core drill in this
18    case?
19 A. It's not a policy and procedure. This is a
20    checklist that applied to that -- to that piece
21    of equipment.
22 Q. Okay. I misunderstood what you were saying
23    earlier. Are there any other policies and

[53]

1  procedures written that apply to this piece of
2  equipment?
3  A. No.
4  Q. Okay. The only policy -- the only procedures
5     that apply to this equipment is what we see on
6     Exhibit Number 1 and 2 of Mr. Mixon's
7     deposition?
8  A. And manufacturer's warnings.
9  Q. Manufacturer's warnings. How is that a
10    procedure for United Rentals? As far as the
11    warnings are concerned, how does that impact
12    what the mechanics do at United Rentals?
13 A. They check and make sure that it's all present
14    and accounted for.
15 Q. All of the warnings?
16 A. Warnings.
17 Q. On product warnings, warnings that are on the
18    product itself?
19 A. Right.
20 Q. Okay. And that's part of the procedure that
21    they are to follow in checking out a piece of
22    equipment?
23 A. That's correct.

[54]

1  Q.  And I didn't mean that in terms of checking it
2      out, I mean in examining a piece of equipment,
3      correct?
4  A.  Right.
5  Q.  Making sure it's in good working order?
6  A.  Right.
7  Q.  All right. Are there any other checklists that
8      the mechanics follow at United Rentals other
9      than what we see on Exhibit Number -- really
10     Exhibit Number 2 to Mr. Mixon's deposition that
11     would apply to the core drill that is the
12     subject of this litigation that a mechanic
13     would use on this piece of equipment?
14 A.  No.
15 Q.  Okay. When a piece of equipment that uses this
16     miscellaneous checklist that's marked as
17     Mr. Mixon Exhibit 1 and 2 -- well, tell me the
18     circumstances under -- or tell me how it is
19     that the mechanic utilizes this checklist that
20     we've identified in Mixon Number 2. What is
21     the procedure for using this checklist? In
22     other words, when is it used, how is it used,
23     what's the purpose of it?

[55]

1  A.  Equipment -- smaller equipment that is not as
2      complicated, this is used for. The mechanic
3      goes and checks everything that is applicable
4      on this sheet that is to be checked.
5  Q.  When does he do that?
6  A.  Prior to rental.
7  Q.  How long before rental?
8  A.  The way this stuff moves, usually the day
9      before.
10 Q.  Okay. Well, my question is --
11 A.  But that's not constant.
12 Q.  Okay. Well, my question is this; is there a
13     procedure at United Rentals in the Dothan store
14     where this checklist is filled in when the
15     piece of equipment comes back in or is it
16     usually done at a later time before it's
17     re-rented again?
18 A.  It's done at a later time before it's re-rented
19     again in most cases.
20 Q.  In most cases. Okay. And I want to understand
21     the procedure, and I apologize, because it's
22     not clear in my mind. How would a mechanic
23     know when to do the inspection or whatever is

[56]

1      involved in filling out this checklist? How
2      would he be aware of when to do that? Is it
3      after an order comes in?
4  A.  When it comes back off of a rental --
5  Q.  Right.
6  A.  -- it goes into a return status.
7  Q.  Okay.
8  A.  It cannot be rented again until it is checked
9      and made available.
10 Q.  Okay. So my question then is, with that
11     knowledge, is it just in a line where if the
12     mechanic can get to it, he goes ahead and
13     checks it, checks it out? In other words,
14     checks off these items even before a new rental
15     comes in -- new rental request comes in?
16 A.  Yes.
17 Q.  Okay. And so it's just as they get to it, they
18     go through this checklist, correct?
19 A.  Yes.
20 Q.  All right. It's not done in response to an
21     order, it's done in response to when they can
22     get to the unit and check it out, correct?
23 A.  Before it's rented it has to be checked out.

[57]

1  Q.  Right. Okay.
2  A.  It has to be --
3  Q.  I understand that. But in terms of -- they
4      don't wait for an order to come in before they
5      check it out?
6  A.  In some cases.
7  Q.  In some cases that's the way it happens, but
8      that's not required?
9  A.  Right, that's not required.
10 Q.  Okay. I understand. Now, when this Ready to
11     Rent -- we've been calling this a Ready to Rent
12     tag, is that all right with you to use that
13     terminology?
14 A.  Yeah.
15     MR. STUTTS: RTR.
16 Q.  Yeah, RTR, Ready to Rent. I'll call it Ready
17     to Rent, because I'll get confused on those
18     acronyms. When this Ready to Rent tag -- and
19     we will use this one as an example, this Mixon
20     Number 1 and 2. When this one is completed, as
21     this one is in this case, is that the end of
22     the checkout for that piece of equipment, the
23     examination or the review of that to establish

[58]

1  that it's Ready to Rent?
2  A. No.
3  Q. What else occurs?
4  A. When it goes out on rent, prior to being loaded
5     on the customer's vehicle or unloaded at the
6     job site, it is gone over again and this is
7     re-verified.
8  Q. How is it re-verified?
9  A. They go down and check each item that is
10    checked there to make sure it was done.
11 Q. Okay. Is there a place for -- well, on this
12    particular one, Mr. Mixon Exhibit 2, down at
13    the bottom left-hand corner -- close to the
14    bottom left-hand corner in the white portion it
15    says, "Inspected by TW," do you see that?
16 A. Yes.
17 Q. Okay. Now, when TW puts his initials on there,
18    is that the first inspection or is that the
19    last inspection?
20 A. That's the first inspection.
21 Q. Okay. When it's rented out again, is there a
22    place anywhere on that tag to indicate that
23    somebody else has checked it out as well?

[59]

1  A. No, it's just policy.
2  Q. It's just policy. Okay. So there's no written
3     confirmation that someone else has
4     double-checked the previous checkout, correct?
5  A. No.
6  Q. All right. Has that changed since this
7     accident, that policy?
8  A. No.
9       MR. SHEEHAN: Have you got any other
10         questions for this?
11      MR. LANE: Yeah, I've got more
12         questions.
13      MR. SHEEHAN: All right. Well, let him
14         look at it. If you're going to
15         ask him questions, he needs to
16         look at it.
17      MR. LANE: Well, Winston, let me see
18         the thing so I can ask the
19         question and then I will hand it
20         back to him.
21 Q. Since this -- was that the policy before this
22    accident?
23 A. Yes.

[60]

1  Q. All right. Was that the policy when you
2     started working there?
3  A. Yes.
4  Q. All right. And that's been maintained ever
5     since?
6  A. Yes.
7  Q. All right. But the policy hasn't changed as to
8     whether or not anyone actually signs off a
9     second time on the second --
10 A. No.
11 Q. Okay. Now, on this particular Ready to Rent
12    tag we've got a list. I'm going to show it
13    back to you again, but there's two columns of
14    lists on that second page or the flip side of
15    that Ready to Rent tag, correct?
16 A. Are you talking about this side?
17 Q. Yes.
18 A. Yes.
19 Q. Exhibit Number 2 to Mr. Mixon's deposition.
20 A. Yes.
21 Q. All right. And the mechanic is to -- the items
22    that he checks, that's to ensure that he has
23    actually verified those items that are actually

[61]

1  checked, correct?
2  A. That's correct.
3  Q. The items that are not checked, there is no
4     verification on that, correct? What does it
5     mean when they're not checked?
6  A. They're not applicable.
7  Q. They're not applicable?
8  A. Right.
9  Q. Okay. So would there be times when one of
10    these items on a checklist is applicable for
11    the same piece of equipment, but not applicable
12    on the same piece of equipment at a different
13    time?
14      MR. SHEEHAN: Object to the form of the
15         question.
16 A. I don't understand what you're asking, quite
17    frankly.
18 Q. Okay. If a mechanic checks one of those items
19    on one occasion for the same piece of equipment
20    -- let's talk about this core drill. If a
21    mechanic goes down a list and checks an item on
22    that checklist on one occasion, but then on
23    another occasion he leaves that same item

[62]

1  blank, I want to know why it would be
2  applicable in one instance and not in the
3  other; do you have an explanation for that?
4  A. Evidently the mechanic missed it.
5  Q. The first time or the second time?
6  A. All I've got is this, I don't know what you're
7     referring to.
8  Q. Okay. Well, I will refer you to the second
9     column there where it says "manual." Do you
10    see there where it says "manual"?
11 A. Yes.
12 Q. All right. What does that mean?
13 A. I'm supposing it means the operators manual or
14    the owners manual.
15 Q. Okay. And when you check it off, what does
16    that mean?
17 A. It means it's present.
18 Q. It means it's present with the piece of
19    equipment?
20 A. Right.
21 Q. Okay. And if it's not present, they leave it
22    blank, correct?
23 A. That's correct.

[63]

1  Q. All right. Under what occasions would that
2     block for manual be checked for the same piece
3     of equipment but not in another case?
4  A. If the manual -- if it has a storage box and
5     the manual is in the storage box, it would be
6     checked.
7  Q. What is your understanding concerning United
8     Rentals' policy --
9        (Off-the-record discussion.)
10 Q. What is your understanding of United Rentals'
11    policy concerning providing manuals with its
12    rental equipment?
13 A. If it has a compartment for the manual, the
14    manual is supposed to be in it.
15 Q. And if it doesn't have a compartment, the
16    manual is not supposed to go with it?
17 A. The manual is there -- I mean, it's there, but
18    it's not present with the machine.
19 Q. Well, it's where? Where is the manual if it's
20    not with the machine?
21 A. It's probably in the office.
22 Q. Probably in the office. Under what
23    circumstances is the manual provided with the

[64]

1  product if there's no compartment on the device
2  itself to hold the manual?
3  A. The customer could ask for it.
4  Q. Okay. Any other?
5  A. On this piece of equipment?
6  Q. Yes.
7  A. No.
8  Q. Okay. Now, this is a miscellaneous Ready to
9     Rent tag. Do you have --
10    MR. LANE: I'm sorry. Do you want to
11       take a break or what?
12    MR. SHEEHAN: No. I'm just going to
13       object to the form of the
14       question. That is a checklist.
15       It's not a miscellaneous
16       checklist. It's a checklist.
17 Q. All right. Well, maybe I misunderstood. Is
18    this a specific checklist for this equipment or
19    is it a miscellaneous one that's applicable to
20    a lot of different pieces of equipment, --
21    MR. SHEEHAN: Object to the form of the
22       question.
23 Q. -- Mr. Kennedy?

[65]

1  A. It's applicable to a lot of different pieces of
2     equipment.
3  Q. All right. Is it different than the specific
4     checklist you made a reference to earlier in
5     your testimony?
6     MR. SHEEHAN: Object to the form.
7  A. Yes.
8  Q. How is it different?
9  A. It is a Ready to Rent tag and the others are
10    checklists. I mean, they're just condition
11    reports.
12 Q. Condition reports. Is there any type of
13    condition report, other than this Ready to Rent
14    tag that I'm holding up right here, Mixon
15    Number 2, --
16 A. No, there is not.
17 Q. -- for this piece of equipment?
18 A. There is not.
19 Q. There is not. Okay. Is this same list
20    applicable to a lot of different pieces of
21    equipment at United Rentals?
22 A. Yes, it is.
23 Q. Okay. I was calling this a miscellaneous Ready

[66]

1    to Rent tag, is that improper terminology?
2  A. That is improper.
3  Q. That's improper?
4  A. Uh-huh. (Positive response.)
5  Q. Okay. Why?
6  A. Because it's -- it's for all equipment.
7  Q. Well, that's why I was just using the term
8     "miscellaneous." You're saying it's for all
9     equipment. It's used on every piece of
10    equipment?
11        MR. SHEEHAN: Object to the form.
12 Q. Is it used on every piece of equipment?
13        MR. SHEEHAN: We're going to let you
14            ask questions; we're not going to
15            let you argue with the witness.
16        MR. LANE: I'm not arguing. I just
17            want to understand the
18            terminology.
19        MR. SHEEHAN: Do you understand the
20            reason for my objection?
21        MR. LANE: I don't really, Winston.
22        MR. SHEEHAN: All right. Do you want
23            me to state on the record the

[67]

1            reason?
2        MR. LANE: Yeah. I don't know what the
3            problem is.
4        MR. SHEEHAN: Are you asking me to
5            state it on the record?
6        MR. LANE: I'm asking you --
7        MR. SHEEHAN: I'm going to ask you
8            before I make a comment.
9        MR. LANE: Sure. Go ahead. Go ahead.
10       MR. SHEEHAN: All right. The problem
11           with your question is you're
12           referring to a maintenance
13           checklist for the core drill
14           machine as a miscellaneous item
15           and it's not a miscellaneous
16           checklist. It's a checklist for
17           the core drill machine as well as
18           other items of equipment.
19       MR. LANE: That's all I want to know.
20       MR. SHEEHAN: Well, then I think we can
21           agree. The problem with your
22           question is you're calling it a
23           miscellaneous as if it's something

[68]

1            other than a checklist.
2        MR. LANE: I called it a miscellaneous
3            Ready to Rent tag is what I called
4            it.
5        MR. SHEEHAN: Well, it's not a
6            miscellaneous Ready to Rent tag.
7            It's a Ready to Rent tag.
8        MR. LANE: Okay.
9   Q. Well, are there Ready to Rent tags other than
10       this one right here that have a different list
11       on it, Mr. Kennedy?
12  A. No.
13       MR. LANE: I don't know why we're
14           arguing over this.
15       MR. SHEEHAN: Well, that's why I'm
16           saying you're arguing with the
17           witness. You're welcome to ask
18           him questions.
19       MR. LANE: I'm arguing with you,
20           Winston.
21       MR. SHEEHAN: And we objected to the
22           form of the question as referring
23           to it as a miscellaneous

[69]

1            checklist.
2  BY MR. LANE:
3  Q. Okay. For the record, I don't care what we
4     call it, Mr. Kennedy, I was just trying to
5     distinguish between this and what I understood
6     to be some separate specific list.
7        MR. SHEEHAN: All right. If you don't
8            care, then let's refer to it as a
9            Ready to Rent tag, which is what
10           we've referred to it as for the
11           last three months.
12       MR. LANE: Winston, that's fine. For
13           the record, Winston, and just let
14           me state this and we'll move on.
15           I don't know why we're beating up
16           -- going over and over this. My
17           only reason for adding the term
18           "miscellaneous" was because I
19           either incorrectly or otherwise
20           understood Mr. Kennedy to say that
21           there is a -- there are in some
22           cases specific checklists for
23           products and then in other cases

[70]

1   there is a miscellaneous
2   checklist.
3  Q. Did I hear you testimony correctly,
4   Mr. Kennedy?
5  A. There are other checklists.
6  Q. Okay. Now --
7  A. That is for all equipment.
8  Q. That's fine. And I did not know that. And I
9   certainly apologize if I mischaracterized this
10  or made this seem somehow inappropriately
11  labeled by calling it miscellaneous. I am
12  ready to move on and we'll just call this the
13  Ready to Rent tag that's used on all of United
14  Rentals products if that's correct?
15 A. That's correct.
16 Q. Okay. No problem. We don't have an argument
17  on that. I just want to make sure that we're
18  distinguishing this, if there is anything to
19  distinguish it from. Okay. Do you understand?
20 A. Yes.
21 Q. All right. I'm not trying to mislabel
22  anything. Now, on the Ready to Rent tag that
23  we've got here as Mixon Number 2, the list

[71]

1   that's a part of that Ready to Rent tag, is
2   there any other product-specific checklist that
3   applies to the core drill?
4  A. No.
5  Q. Okay. I thought that was our testimony, I just
6   wanted to make sure we're clear. And this
7   Ready to Rent tag applies to all of the
8   products, correct?
9  A. All products.
10 Q. All right. And I'm not sure where we were, so
11  why don't we take a break and eat our lunch and
12  then I'll try to get back on track here, if
13  that's okay with everybody?
14     (Lunch recess from 12:45 to 1:15 P.M.)
15 BY MR. LANE:
16 Q. Mr. Kennedy, before our lunch break we were
17  going over the Ready to Rent tag. And I think
18  we've covered most of that. I want to ask you
19  some general questions related to the
20  completion of the Ready to Rent tag. But in
21  getting a unit ready to rent, other than going
22  through and checking the applicable items on
23  the Ready to Rent tag, what would a mechanic

[72]

1   do? For instance, we can be specific, if you
2   want to, about the core drill. What else is
3   involved other than reviewing the items on the
4   Ready to Rent tag?
5  A. None.
6  Q. None. Does the mechanic at any time after
7   receiving a product back in, such as a core
8   drill -- on what occasions would he actually
9   check the operation of the unit itself?
10 A. When the machine is checked out; when the green
11  tag is completed.
12 Q. Okay.
13 A. The Ready to Rent tag.
14 Q. Okay. I'm going to go over the items that are
15  checked off here and I just want to ask you
16  specifically about the items that are checked.
17  On the left-hand side the first item checked is
18  the "tire condition," do you see that?
19 A. Yes.
20 Q. Okay. What does the mechanic do in order to
21  check off on the tire condition? In other
22  words, what does he have to do in order to
23  check that block right there for the core

[73]

1   drill?
2  A. Make sure that the tires are there and again
3   they're operable, not damaged.
4  Q. Okay. Is that just a visual thing, a visual
5   inspection, or is there any procedure he goes
6   through to check that?
7  A. Visual.
8  Q. Visual. Okay. The next thing that is marked
9   there, it says "all functions;" do you see that
10  next item?
11 A. Yes.
12 Q. What does he do in order to complete that check
13  box? What are the functions that he checks
14  out?
15 A. Works the machine just like if you were going
16  to drill a hole or if you were going to use the
17  machine, the same operation.
18 Q. Okay. So he actually sets up the machine?
19 A. Yes.
20 Q. Tell me what he goes through in order to set up
21  the machine to complete that part of the
22  checklist.
23 A. You put the gaskets on it, you adjust the

[74]

1     leveler screws, you suction it down to the
2     floor, you turn the motor on, you make sure it
3     goes up and down, that's all the functions.
4  Q. That's all the functions?
5  A. That's all the functions.
6  Q. Okay. Now, does he hook up the water?
7  A. Yes.
8  Q. He does hook up the water?
9  A. Yes.
10 Q. I didn't hear you say that, but that's
11    something else that would be done?
12 A. Yes.
13 Q. Where does he perform this procedure?
14 A. In the shop.
15 Q. In the shop itself. All right. So every time
16    a mechanic checks off that box right there, he
17    has gone through the entire operation of the
18    unit itself, correct?
19 A. Yes.
20 Q. Where it says "all functions"?
21 A. Yes.
22 Q. Okay. Does he actually drill into the floor
23    with the drill?

[75]

1  A. No.
2  Q. No? All right. How does he verify that the --
3     well, let's go through this a little bit
4     slower. Have you actually gone through this
5     procedure yourself before?
6  A. Yes.
7  Q. Okay. How many times would you say you've gone
8     through that procedure with the core drill?
9  A. I don't know, 50 or a hundred.
10 Q. 50 or a hundred times yourself?
11 A. Yes.
12 Q. Okay. So you're not just managing these other
13    guys, you're actually hands-on doing the work,
14    too?
15 A. No, right now I am managing, but I have done
16    this in the past.
17 Q. Oh, okay. Not while you were managing at
18    United Rentals, but just in the past at these
19    other --
20 A. I've done it at United Rentals, yes.
21 Q. Okay. All right. But the 50 you're talking
22    about was at United Rentals and the other
23    places?

[76]

1  A. This is not my job.
2  Q. I understand. I just want to know what level
3     of experience you've got operating core drills.
4  A. Yes.
5  Q. Have you ever actually used the core drill to
6     drill a hole?
7  A. No.
8  Q. You have not?
9  A. (Witness shakes head in the negative.)
10 Q. Okay. How many times would you say you have
11    gone through this procedure at United Rentals
12    since you've been there three and a half years?
13 A. 15.
14 Q. 15. Okay. During the time you've been at
15    United Rentals -- well, before this accident,
16    August the 29th, 2003, what type of core drills
17    did United Rentals have there available to be
18    rented?
19 A. I'm sure there were Ned-Kut.
20 Q. Ned-Kut?
21 A. Ned-Kut.
22 Q. Any others?
23 A. I don't recall.

[77]

1  Q. Do you know when this particular unit came in,
2     the Norton --
3  A. No.
4  Q. -- core drill? Do not?
5  A. I do not.
6  Q. Were you involved in the purchase of it at all?
7  A. No.
8  Q. Okay. Are you ever involved in selecting or
9     purchasing equipment for rental at United
10    Rentals?
11 A. No.
12 Q. They don't ask your opinion on it?
13 A. Opinion. I'm not involved in purchasing it.
14 Q. Okay. Do they ask your opinion about what
15    products to actually purchase?
16 A. Sometimes.
17 Q. Okay. Now, getting back to checking the "all
18    functions" box here, how does the operator know
19    -- well, let me ask you this; when you operate
20    this Norton core drill, first of all, does it
21    operate like the other core drills you're
22    familiar with?
23 A. Yes.