[1]

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

        Plaintiff,

Vs.                                    CIVIL ACTION NO.

                              1:05 CV-994-W

MILWAUKEE ELECTRIC TOOL

CORPORATION, et al.,

        Defendants.



        DEPOSITION OF KENNETH TEW, taken pursuant

to notice and stipulation on behalf of the

Defendants, in the conference room of Cochran,

Cherry, Givens, Smith, Lane & Taylor, 163 West Main

Street, Dothan, Alabama, before Ricky L. Tyler,

Certified Court Reporter and Notary Public in and for

the State of Alabama at Large, on Monday, July 17th,

2006, commencing at 1:05 P.M.

f60fb274-36d8-4b62-9e7a-603e3bc3a337

7-17-2006                                                                    Kenneth Tew

[2]  (Pages 2 to 5)

[2]

1               APPEARANCES
2   FOR THE PLAINTIFF:
3       JOSEPH D. LANE, ESQ.
4       Cochran, Cherry, Givens, Smith,
5         Lane & Taylor
6       P. O. Box 927
7       Dothan, AL 36302
8
9
10  FOR THE DEFENDANT, MILWAUKEE ELECTRIC TOOL
11  CORPORATION:
12      W. SCOTT MCGARRAH, III, ESQ.
13      McGarrah & Davenport, P.C.
14      P. O. Box 43548
15      Birmingham, AL 35243
16
17
18  FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
19      KEVIN T. SHIRES, ESQ.
20      Sprain & Shires, PC
21      1707 29th Court Street
22      Birmingham, AL 35209
23

[3]

1   FOR THE DEFENDANT, GAST:
2       EUGENE P. STUTTS, ESQ.
3       Spain & Gillon, LLC
4       The Zinszer Building
5       2117 Second Avenue North
6       Birmingham, AL 35203
7
8
9
10  FOR THE DEFENDANT, UNITED RENTALS:
11      C. WINSTON SHEEHAN, JR., ESQ.
12      Ball, Ball, Matthews & Novak
13      2000 Interstate Park Drive
14      Suite 204
15      Montgomery, AL 36109-5413
16
17
18
19
20
21
22
23

[4]

1                   I N D E X
2                                      Page
3
    Direct Examination by MR. SHEEHAN:      6
4   Cross-Examination by MR. SHIRES:       69
    Cross-Examination by MR. MCGARRAH:     72
5   Cross-Examination by MR. STUTTS:       74
    Cross-Examination by MR. LANE:         78
6   Redirect Examination by MR. SHEEHAN:  100
    Recross-Examination by MR. MCGARRAH:  105
7   Recross-Examination by MR. STUTTS:    107
    Recross-Examination by MR. LANE:      111
8
                   EXHIBITS
9
    For Defendant:
10
      1    Handwritten Notes
11    For Identification                   18
12    2 and 3 Accident Report
      For Identification                   57
13
14    4    Statement of James Mason
      For Identification                   62
15    5, 6, 7 Typewritten Notes of Ken Tew,
         8/29/03
16    For Identification                   63
17
18    8    Statement by Donald Cody
      For Identification                   64
19
20
21
22
23

[5]

1                 STIPULATIONS
2
3           It is stipulated and agreed by and between
4   counsel representing the parties that the deposition
5   of KENNETH TEW may be taken before Ricky L. Tyler,
6   Certified Court Reporter and Notary Public in and for
7   the State of Alabama at Large, without the formality
8   of a commission; and all formality with respect to
9   other procedural requirements is waived; that
10  objections to questions, other than objections as to
11  the form of the questions, need not be made at this
12  time, but may be reserved for a ruling at such time
13  as the deposition may be offered in evidence or used
14  for any other purpose by either party as provided by
15  the Federal Rules of Civil Procedure.
16          It is further stipulated and agreed by and
17  between counsel representing the parties in this case
18  that the filing of the deposition of KENNETH TEW is
19  hereby waived and that said deposition may be
20  introduced at the trial of this case or used in any
21  other manner by either party hereto provided for by
22  the Statute, regardless of the waiving of the filing
23  of same.

[6]

1    It is further stipulated and agreed by and
2  between the parties hereto and the witness, that the
3  signature of the witness to this deposition is hereby
4  waived.
5
6              * * * * *
7
8         P R O C E E D I N G S
9
10    KENNETH TEW, of lawful age, having first been
11  duly sworn to tell the truth, testified as follows:
12
13         DIRECT EXAMINATION
14  BY MR. SHEEHAN:
15  Q.  Mr. Tew, my name is Winston Sheehan.  If I ask
16    you a question that you do not understand or
17    don't hear, if you would just let me know;
18    otherwise I will assume that you are answering
19    the question honestly and completely?
20  A.  Okay.
21  Q.  Is that fair?
22  A.  Okay.
23  Q.  Mr. Tew, your full name, please, sir?

[7]

1  A.  It's Kenneth Lamar Tew.
2  Q.  And where do you live, sir?
3  A.  I live here in Dothan.
4  Q.  And your address?
5  A.  Is 1211 Teal Trail, that's T-E-A-L, and that's
6    Dothan, 36305.
7  Q.  And how long have you lived at that address?
8  A.  Seven years.
9  Q.  And where did you live before that, sir?
10  A.  I lived at 100 East Boyce.
11  Q.  And would that also be here in Dothan?
12  A.  That's Dothan, 36305.
13  Q.  And about how long at that address?
14  A.  I was there five or six years.
15  Q.  Is Dothan your home?
16  A.  Yes.
17  Q.  Born and reared here in Dothan?
18  A.  Yes.
19  Q.  Can you give us just a brief synopsis of your
20    educational background?
21  A.  I went through high school; I've got some
22    college.  I started early on in manufacturing
23    at about the age of 19 or 20, worked with Sony

[8]

1  Corporation.  I was there for 14 years and went
2  through various trainings with them, management
3  trainings.  I have been through -- got my
4  certificate in Safety Management through the
5  American Society of Safety Engineers.  And then
6  since I've been with Progressive I have gone
7  through various claim schools that they
8  require.
9  Q.  And when did you receive your certificate from
10    the American Academy of Safety?
11  A.  Let's see.  It must have been March of '04.
12  Q.  So about four months prior to this accident for
13    which we're here?
14  A.  No, it was after that.  Didn't this accident
15    happen in '03?
16  Q.  You're right, I'm sorry, sir.  I apologize.
17    Before this accident had you received and been
18    taking courses in reference to safety
19    management?
20  A.  Nothing official other than when I was working
21    with -- when I worked with Sony they sent us
22    through a lot of classes, a lot of schools.
23  Q.  How would they characterize that?  Would it be

[9]

1  credit hours or would it be --
2  A.  Basically just general education, I guess, no
3    kind of creditation for it.
4  Q.  What did you do for Sony, sir?
5  A.  I started out in the warehouse driving a
6    forklift, worked my way up through as a
7    injection molding technician, and then into
8    management.  And I was a supervisor and a
9    process specialist for injection molding.
10  Q.  And can you help me with that?  What does that
11    mean?
12  A.  What that is, at that time Sony molded the
13    plastic parts for VHS cassettes.  And they --
14    all of the plastic parts for the VHS cassette
15    was injection molded.  And, you know, if the
16    technicians or the supervisors couldn't get the
17    defects out of it, then they called me to come
18    in and take care of it to see if I could work
19    out the defects.
20  Q.  And what position did you hold at Flavor House,
21    sir?
22  A.  I started out as a supervisor.  I worked a year
23    as a floor supervisor.  And then about the

**[10]**

1    second year I was there I got promoted to
2    Production Superintendent.
3    Q.   And how long were you Production
4    Superintendent?
5    A.   Until I left in -- it must have been about
6    August of '04.
7    Q.   So about a year after this accident when you
8    received -- is when you left?
9    A.   Uh-huh.  (Positive response.)
10   Q.   And how long had you been a Production
11   Superintendent?
12   A.   For about three years.
13   Q.   So you had been a Production Superintendent at
14   Flavor House since 2001?
15   A.   Yes.
16   Q.   Did you hold any position or did you perform
17   the functions of a Safety Director for Flavor
18   House at the time of this accident?
19   A.   I can't remember if -- at the time.  I know our
20   Safety Director, Levin Hamm, had left and there
21   was a female, I can't remember her name, she
22   stayed for about three months.  And I can't
23   remember if she was still there or not.  It

**[11]**

1    might have been right after she left, I'm not
2    sure on that.  But after she left, I kind of
3    filled in, kind of did the production and also
4    did -- kind of filled in for safety.
5    Q.   And the female's name was?
6    A.   I can't remember her name.
7    Q.   And when did you start filling in as Safety
8    Director?
9    A.   Whenever she left I kind of filled in.  But,
10   like I say, I don't remember the dates, you
11   know, when she left.
12   Q.   In relation to the accident in August of 2003,
13   how long had you been Safety Director?
14        MR. LANE:  Object to the form.
15   A.   I don't remember.
16   Q.   Okay.  Can you help us?  I mean, was it days or
17   months?
18   A.   No, not right off.  Because, like I said, I
19   can't remember when that lady -- the one that
20   was there.  She was there about three months,
21   but I can't remember when she left or even if
22   she was still there when this accident
23   happened.  I think she had gone, but I don't

**[12]**

1    know.  I'm not sure.
2         MR. LANE:  Winston, can I ask you a
3         question?
4         MR. SHEEHAN:  Please.
5         MR. LANE:  So I don't keep objecting
6         unnecessarily.  Did he say he was
7         serving as Safety Director at the
8         time of this accident?  Because
9         your question kind of led me to
10        think that --
11        MR. SHEEHAN:  I think that's a good
12        follow-up question.
13   A.   I was actually -- I was still Production
14   Superintendent, but I was acting as a Safety
15   Director, I guess you could say.
16        MR. LANE:  At the time of the accident?
17        MR. STUTTS:  Filling two roles kind of?
18   A.   Yeah.  Yeah, I think -- if the girl had already
19   left, like I said, y'all probably have the
20   dates of when she left, if she had already
21   left, then I was filling in for that spot.
22   Q.   And you say it's Levin Hamm?
23   A.   Levin Hamm, H-A-M-M.  He was Safety Director

**[13]**

1    for a couple of years that I was there.
2    Q.   And where did he leave for, sir?
3    A.   He actually was terminated from the company, so
4    I don't know where he went to after that.
5    Q.   And the reason for his termination?
6    A.   I really don't know.
7    Q.   Did you hear through the rumor mill as to why
8    the gentleman whose position you ultimately
9    took had left the company?
10   A.   Are you talking about the reason Levin left?
11   Q.   Yes.
12   A.   I understand that he left because there were
13   some inappropriate things he was saying to
14   females.
15   Q.   Had any of them been said to the female who
16   came in for three months?  Was that part of the
17   problem as well?
18   A.   No, because he had already gone before they
19   hired her.
20   Q.   Okay.  And why did she leave?
21   A.   She went back to General Electric.  There was,
22   I think, a better opportunity back at General
23   Electric than there was at Flavor House.

[14]

1  **Q.**  And General Electric where, sir?
2  **A.**  She went to -- she went to the plant here in
3       Dothan, the General Electric plant in Dothan.
4       And then I've heard that she has since -- I
5       think they closed that plant and she's moved
6       back to Pennsylvania, I think.
7  **Q.**  In your job as Safety Director, Acting Safety
8       Director, what were your duties and
9       responsibilities, sir?
10 **A.**  Basically just kind of keeping up with the
11       minimum, I guess, for the program.  If there
12       was an accident, make sure there was an
13       accident report filled out, kind of
14       investigating to see what went on, what
15       happened, and try to correct the problem.
16 **Q.**  Any other duties and responsibilities as the
17       Safety Director?
18 **A.**  I did -- well, the training that we were doing
19       -- really the only safety training that I was
20       really involved in was forklift training.  We
21       had a lot of untrained people in forklifts, so
22       that was the main thing that I was training.
23 **Q.**  And are you certified as an instructor of a

[15]

1       forklift?
2  **A.**  No.
3  **Q.**  I assume --
4  **A.**  They really don't have a -- well, they have
5       train the trainer type programs, but basically
6       the only thing OSHA requires is somebody
7       competent in forklift, knowing the forklift,
8       which I did.
9  **Q.**  And you were certified as a forklift operator?
10 **A.**  Not certified by anyone, no -- oh, yeah, as a
11       forklift operator, yes, but not as a trainer.
12 **Q.**  Okay.
13 **A.**  But I had been originally certified when I
14       first started with Sony.
15 **Q.**  Okay.  Which forklifts were you certified to
16       operate?
17 **A.**  I could operate most any of them; stand-up,
18       sit-down, whatever size was there, I could
19       operate all of them.
20 **Q.**  And you actually had the certificate for all of
21       those pieces?
22 **A.**  Yes.
23 **Q.**  As I understand it, you had notes that you

[16]

1       prepared of the accident that we're here about
2       today, Mr. Riley's accident?
3  **A.**  Uh-huh.  (Positive response.)
4  **Q.**  And did you bring those with you?
5  **A.**  No, I did not.  They're still with Flavor
6       House.
7  **Q.**  Okay.  And what records does Flavor House have?
8  **A.**  What I know is they have a copy of the accident
9       report and just general notes that I made at
10       the time of the accident of who I talked to at
11       the time of the accident.
12 **Q.**  Anything else, sir?
13 **A.**  Not that I can recall.  There were some photos
14       that were made.  The Plant Manager at the time,
15       Dan Rewis, and I made photos of the equipment
16       and the area and I know that's in the file.
17 **Q.**  Okay.
18          MR. LANE:  What was that last name
19             again?
20 **A.**  Rewis, R-E-W-I-S.  It's like Lewis with an R.
21          MR. LANE:  Okay.  Thank you.
22 **Q.**  Where is Mr. Rewis now?
23 **A.**  The last I heard he was with Tom's Foods in

[17]

1       Columbus, Georgia.
2  **Q.**  And what does he do for them?
3  **A.**  I think he was over quality.
4  **Q.**  When did he leave the employ of Flavor House?
5  **A.**  It was probably around May of '04.
6  **Q.**  And approximately how many photographs were
7       made by you and Mr. Rewis?
8  **A.**  I don't know.
9  **Q.**  Just your best judgment as you sit here today?
10 **A.**  Best judgment, there was probably eight or ten.
11       There was a printout of the photos and there
12       was also a photo card that we made and we also
13       put the card in the file also.
14 **Q.**  And when is the last time you reviewed those
15       photographs on the photo card?
16 **A.**  I stopped by out there on -- this past Friday,
17       which was the 14th.  I stopped by Flavor House
18       just for a minute to look over the file to kind
19       of refresh my memory on some of the things that
20       happened.
21 **Q.**  And who did you meet with on Friday the 14th?
22 **A.**  The Safety Director out there now.  I don't
23       know his last name, his first name is --

7-17-2006                                                      Kenneth Tew

[6]  (Pages 18 to 21)

[18]

1   Q.  Vernon?
2   A.  Vernon, yes.
3   Q.  Okay.  And did you make notes from your review
4        of those?
5   A.  I made just a couple of notes.
6   Q.  Okay.  Could we see those, please, sir?
7   A.  Sure.  It's just that one page.
8   Q.  Oh, I'm sorry.  Do you mind if we make this --
9            MR. LANE:  Do you want me to make a
10           copy of it?
11           MR. SHEEHAN:  Do you want to make a
12           copy of this?
13           MR. LANE:  All right.  I'll make
14           several copies.
15           (Off-the-record discussion.)
16  BY MR. SHEEHAN:
17  Q.  It looks like you're taking notes as we speak?
18  A.  I just put your name down there.
19  Q.  Thank you.
20       (Exhibit 1 marked for identification.)
21  Q.  Sir, I'm going to show you what I've marked as
22       Exhibit 1.
23  A.  Okay.

[19]

1   Q.  Mr. Lane has been kind enough to make a copy of
2        your notebook there.
3   A.  Okay.
4   Q.  Is that an accurate depiction of the notes that
5        you took on Friday, July the 14th after your
6        review of the safety report?
7   A.  It is.
8   Q.  Thank you, sir.  The accident report, can you
9        describe it for us?
10  A.  Basically it's just, the best I remember, a
11       front and back sheet of basically the name,
12       address of the person, kind of what happened.
13       And then if I remember right, on the back is
14       kind of the cause and effects of the accident.
15  Q.  And when did you prepare the accident report,
16       sir?
17  A.  Actually the supervisor, Matthew Riley's
18       supervisor, I believe he's the one that filled
19       out the accident report.
20  Q.  And who is that, sir?
21  A.  Ricky -- I can't remember Ricky's last name.
22  Q.  Smothers?
23  A.  Smothers.  Ricky Smothers, that's correct.

[20]

1   Q.  Did you prepare any of the information on the
2        accident report?
3   A.  I don't remember.
4   Q.  Okay.  And why was it that Mr. Smothers
5        prepared the accident report rather than
6        yourself?
7   A.  That was something that was started when Levin
8        Hamm was there.  He had each supervisor -- when
9        the accident happened, basically he had the
10       supervisors fill out the accident report with
11       all of the information and then turn it into
12       the Safety Department.
13  Q.  I'm sorry, where is Mr. Hamm now?
14  A.  I don't know where he's at now.  I think he
15       still lives here in Dothan, but I don't know
16       where he's working.
17  Q.  Did you have any input into the accident
18       report?
19  A.  Not that I can remember.
20  Q.  Okay.  What about preparation of statements?
21       To be fair to you, I've seen some statements, I
22       guess, with your -- some typed statements with
23       your name on them.

[21]

1   A.  Uh-huh.  (Positive response.)
2   Q.  Would there be -- what other involvement would
3        there have been?
4   A.  The best I can remember, I think I remember
5        some statements being made, but I can't
6        remember exactly what they were.  I know Donald
7        Cody made a statement in regards to us
8        inspecting the equipment that following
9        morning.  I think I made a statement on what I
10       saw that following morning.  And I don't
11       remember any other statements.
12  Q.  Okay.  Did Mr. Mike Walters, the lead mechanic
13       on that shift, did he prepare a statement?
14  A.  I don't remember.  He is on third shift and he
15       was already gone when I came in the next
16       morning.  I didn't find out about the accident
17       until I came in the following morning.
18  Q.  And about what time was that, sir?
19  A.  Somewhere around 7:00.
20  Q.  And how did you learn of the accident?
21  A.  Well, I was Production Superintendent, so I was
22       on the floor every day.  And as soon as I
23       walked in somebody said "Did you hear about the

[22]

1    accident last night?"
2  **Q.**  Was it just someone on the shift or was it a
3    supervisor or the Plant Manager?
4  A.  I don't remember.
5  **Q.**  Did this person who told you about the accident
6    say it's time for you to get busy on your
7    accident report, or did he just in passing say
8    something and you said, "Oh, my goodness, I've
9    got to get working on an accident report"?
10       MR. LANE: Object to the form.
11  A.  At that time I would have been the only one
12    there as far as -- you know, there was other
13    supervisors and all there, but it would have
14    been somebody just in passing told me, "Hey,
15    this happened last night."
16  **Q.**  So what did you do when you heard from this
17    person in passing?
18  A.  At that point, the best I can remember, I went
19    to find out what happened, where did it happen,
20    you know, kind of try to gather up details of
21    what happened and try to locate the piece of
22    equipment.
23  **Q.**  And who did you first go to for information?

[23]

1  A.  I don't remember. I don't know who I first
2    went to. I know I -- I think Jim Mason was one
3    of them. He was the Sanitation Manager at the
4    time. And then Donald Cody is kind of a lead
5    man in maintenance. I remember those two.
6  **Q.**  Okay. What did Mr. Mason tell you?
7  A.  He just -- I remember him giving me details of
8    what happened or told me what he knew that
9    happened. I think there was somebody else out
10    there. I don't remember if he was actually
11    standing there or not. I can't remember that,
12    if he was there when the accident happened or
13    if he was just in the building.
14  **Q.**  Okay. What did he tell you?
15  A.  I don't remember exactly.
16  **Q.**  Just your best judgment as you sit here today?
17       MR. LANE: Object to the form.
18  A.  The best I can remember, you know, what -- you
19    know, he basically told me what happened as far
20    as Matthew was operating a piece of equipment.
21    It was equipment that was digging a hole for a
22    pole, that they would be putting a pole in. I
23    understand he was standing on that piece of

[24]

1    equipment and it -- the bit bound up and the
2    thing started turning. And he fell and the
3    drill hit him in the head and then they called
4    911.
5  **Q.**  And did Mr. Mason tell you anything else?
6  A.  Not that I can remember.
7  **Q.**  Did he tell you anything about the accident
8    other than that initial conversation that you
9    had with him?
10  A.  Not that I can remember, no.
11  **Q.**  And about what time was this conversation with
12    Mr. Mason?
13  A.  It would have been shortly after 7:00, because
14    I knew he was getting off. He gets off at --
15    you know, he usually tries to leave about 7:00
16    or so, so it was right around the time that I
17    got in there.
18  **Q.**  And what, if anything, did Mr. Donald Cody tell
19    you?
20  A.  Donald works on day shift. And the best I can
21    remember, I asked Donald if he knew where the
22    drill was and he said it was in the maintenance
23    shop. So him and I, and I can't remember,

[25]

1    there was probably two or three others that
2    went in the shop at the same time and we kind
3    of looked at the drill to find out, you know,
4    what happened.
5       My question to them was, you know, what
6    happened? Why did it jam? That kind of thing.
7    And then Donald's -- one response I remember
8    Donald telling me, that normally those drills
9    have a shear pin. He said they always come
10    with a bag of shear pins. And he said that
11    particular model did not have -- it didn't come
12    with a bag of shear pins, but he just assumed
13    that it had a pin in it when they received the
14    drill the day before. So I was standing there
15    with him when they actually took it apart and
16    that's when we discovered we didn't see an area
17    or a place where a shear pin would go.
18  **Q.**  Before you took it apart, did you photograph
19    it?
20  A.  I don't remember. I would have to look at the
21    photographs to --
22  **Q.**  Well, what do you recall taking a photograph
23    of, sir?

7-17-2006                                                                      Kenneth Tew

[26]

1  A.  I remember taking a photo of the wall where it
2      happened at.  I remember taking a photo -- I
3      would think I took a photo of the drill before
4      we took it apart.  I remember taking a photo
5      of, I think, the tags on the drill, because the
6      rental company was wanting to come pick it up.
7      So we took photos of the tags.  I can't
8      remember if we took photos after we took it
9      apart.  I feel sure that we probably did, but I
10     don't remember.
11 Q.  And who took the photographs of the drill
12     before it was taken apart?
13 A.  It would have been probably me.  It was either
14     -- I was trying to think the other day, it was
15     either me or Dan Rewis, but I think it was -- I
16     think I did.
17 Q.  All right.  And what sort of camera did you
18     use, sir?
19 A.  It was a digital camera that belonged to the
20     Marketing Department.
21 Q.  And who was over the Marketing Department from
22     whom you got the camera?
23 A.  I borrowed it from Josh Sowell.

[27]

1  Q.  Is he still there?
2  A.  Yes.
3  Q.  And would he have that card?
4  A.  The card should be in the file in an envelope.
5      I put the card in an envelope and stapled it to
6      the folder.
7  Q.  Do you know if any other type camera was used
8      other than the digital camera from Marketing?
9  A.  Not that I'm aware of.
10 Q.  The photographs that you took of the drill
11     before it was taken apart, where were these
12     photographs actually taken?
13 A.  At the maintenance shop.
14 Q.  And the photographs of the tag on the drill,
15     where was that taken, sir?
16 A.  It was also the maintenance shop.
17 Q.  And the photographs of the wall where it
18     happened, who took those photographs?
19 A.  I believe I did.
20 Q.  And about what time was it you took the
21     photographs of the wall where it happened?
22 A.  Probably -- we didn't have a camera available
23     right off, probably shortly after 8:00 when

[28]

1      Josh came in and we got the camera.
2  Q.  And that would have been the morning after the
3      accident?
4  A.  Yes, sir.  The accident happened shortly after
5      midnight, this would have been 8:00 that
6      morning.
7  Q.  So less than eight hours from the time of the
8      accident a photograph was made of the wall?
9  A.  Yeah.
10 Q.  And what was the purpose of taking a photograph
11     of the wall where it happened less than eight
12     hours after the accident?
13 A.  Just basically taking a photo of the area that
14     it happened just to have for records.  When I
15     got there everything was cleaned up, sanitized,
16     because third shift sanitation comes in at
17     night and basically washes down the entire
18     plant, washes and sanitizes the floors,
19     completely wet and squeegeed down.  So the area
20     was completely clean when I got there the next
21     morning.
22 Q.  Did that cause you any concern?
23 A.  I didn't like it.  I wished I had been called

[29]

1      during the night, but, you know, it was in a
2      transition period, you know.  I don't
3      understand why I wasn't called other than, you
4      know, they just weren't sure who to call.
5  Q.  And why is it that you wished they had called
6      you when the accident happened?
7  A.  Basically to see what -- you know, what
8      happened, get to the scene before it would, as
9      I would call it, get cold and take photos of it
10     right then.
11 Q.  What photographs did Mr. Rewis take?
12 A.  It would have been that same group of photos.
13     I'm not sure.  Like I said, I think him and I
14     were both out there and I'm not sure exactly
15     what photos I took or which ones he took.  I
16     may have taken all of them, I'm just not sure.
17     But they were all on that same -- everything
18     was on that disk and everything was printed
19     out.
20 Q.  No one else had a camera, even a disposable
21     camera that you buy at the drugstore down here?
22 A.  No.  Not that I'm aware of, no.
23 Q.  So you talked to both Mr. Mason and Mr. Cody

[30]

1    and then what did you do, sir?
2  A.  I do remember calling, I think his name was,
3      Mike at United Rentals letting him know what
4      happened.  Asked him about -- if that was
5      supposed to have shear pins and he did not
6      know.  And I do remember getting a call from
7      him shortly after that, I guess he had
8      discussed it with someone, and they were
9      wanting to come pick up the drill.  And then
10     shortly after that the drill was picked up.
11     And in the middle of all of this, you know,
12     there was safety going on and then I also had
13     the shift starting up, so I was also working on
14     handling production of the shift also.  So I
15     was kind of running back and forth.
16  Q.  Let me show you what's previously been marked
17     for attachment to Mr. Walters' deposition as
18     Exhibit Number 1 and Exhibit Number 2 and ask
19     you what those photographs are?
20  A.  That's the whole drill that was used to drill
21     the hole.
22  Q.  And are those two of the photographs you took
23     there in the maintenance shop?

[31]

1  A.  Yes.
2  Q.  And that was before it was taken -- the drill
3      was taken apart?
4      MR. LANE:  Object to the form.
5  A.  I believe it was.
6  Q.  The drill, had it been modified in any way
7      before you took photographs of it?
8  A.  Not that I'm aware of.  I understand it was
9      just brought to the maintenance shop to get out
10     of the way and then they left it.
11  Q.  As I understand it, it was brought to the
12     maintenance shop in order to sanitize the area
13     where the accident happened?
14  A.  Yes.
15  Q.  And the purpose of you taking those photographs
16     before it was disassembled was to ensure that
17     it stayed in the same condition as it was at
18     the time of the accident with Mr. Riley?
19  A.  Yes.
20  Q.  And do those two photographs fairly and
21     accurately depict the condition of the core
22     drill machine at the time of Mr. Riley's
23     accident?

[32]

1      MR. LANE:  Object to the form.
2  A.  Yes.
3  Q.  Since there's been an objection.  Did you
4      verify that that was the condition of the core
5      drill machine as part of your investigation?
6  A.  Yes.  When I was -- when I took the photos, I
7      took the photos as it was when I came in.  And
8      my understanding was that it was picked up from
9      the location where the accident happened,
10     carried to the maintenance shop, and then I
11     took the photos just as it sat there.  As far
12     as I know it hadn't been touched since the
13     accident.
14  Q.  And that was important for you as the Safety
15     Director?
16  A.  Yeah.
17     MR. LANE:  Just so you understand my
18         objection, it's to -- your
19         question didn't specify before the
20         accident versus after the
21         accident.
22     MR. SHEEHAN:  Okay.
23     MR. LANE:  That's the purpose for my

[33]

1      objection.
2  A.  No photos were taken before the accident.
3      MR. LANE:  Right.
4  Q.  Sir, if I could, let me show you Exhibit Number
5      3 to Mr. Walters' deposition and ask you what
6      that is, sir?
7  A.  It looks like a rental contract for the
8      drilling machine.
9  Q.  All right, sir.  And whose signature appears
10     there on the left-hand corner of that document?
11  A.  I'm not sure.  I can't read it.
12  Q.  Can you give us your best judgment?
13  A.  I don't know.
14  Q.  It's been represented to us that that's the
15     signature of Adam Hall.  Would you find fault
16     with that or dispute that?
17     MR. LANE:  Well, I object to the form.
18  A.  I don't know.  I don't know.  I've never seen
19     his signature.
20  Q.  Okay.  Is it the signature of Mr. Cody?
21  A.  I don't know.
22  Q.  Okay.  What are the policies and procedures as
23     far as accepting rental equipment there at

7-17-2006                                                         Kenneth Tew

**[34]**

1       Flavor House?
2   A.   I'm not real sure.  As far as any written
3       policies or anything, I'm not aware of any.
4   Q.   What about unwritten policies as far as
5       accepting rental equipment?
6   A.   I've never heard.  I remember asking some
7       questions, you know, when this happened, you
8       know, about, you know, is the equipment checked
9       out and that kind of thing, you know, when it
10      comes in.  And the answer I got was, you know,
11      normally we just use it as it is when it comes
12      in and we hadn't had any problem with any of
13      the equipment.
14  Q.   And who did you investigate or interview with
15      respect to the --
16  A.   I talked to Donald Cody about that.
17  Q.   Okay.  And what did Mr. Cody tell you?
18  A.   Just that, you know, basically there was no
19      procedures, you know, when the equipment came
20      in as far as -- you know, when it came in, they
21      just signed for it and used it.
22  Q.   After this accident did you change that
23      procedure?

**[35]**

1   A.   No.
2   Q.   Did you recommend to anyone that that procedure
3       be changed?
4   A.   No.
5   Q.   Let me show you Exhibit Number 4 to
6       Mr. Walters' deposition and ask you what that
7       is?
8   A.   It looks like it's a General Safety sheet
9       provided by United Rentals on using their
10      equipment.
11  Q.   And have you ever seen that sheet, sir?
12  A.   No.
13  Q.   Have you ever asked United Rentals for safety
14      information or safety manuals of any type?
15  A.   No.
16  Q.   Have you ever asked United Rentals for any
17      owner's manuals?
18  A.   No.
19  Q.   Are you aware of whether or not there are any
20      owner's manuals for the use of any kind of
21      rental equipment there at Flavor House?
22  A.   I'm not aware of any.
23  Q.   Flavor House didn't have a library of owner's

**[36]**

1       manuals and equipment use and operating
2       procedures?
3   A.   Anything as far as equipment was kept in the
4       maintenance shop.  As far as the safety office,
5       there was not any.  I know Ricky, in his office
6       he had -- he had lots of books and things in
7       his office, but I'm not sure exactly what he
8       had.
9   Q.   As part of your investigation you didn't seek
10      to determine whether or not Mr. Smothers had an
11      owner's manual on this particular piece of
12      equipment?
13  A.   No.
14  Q.   Let me show you Exhibit Number 5 to
15      Mr. Walters' deposition and ask you what that
16      is, sir?
17  A.   That is the actual core drill, the drill bit.
18  Q.   Okay.  And who took that photograph, sir?
19  A.   As far as I can remember, I did.
20  Q.   Okay.  When did you take that picture, sir?
21  A.   At the initial inspection of the equipment
22      after the accident.
23  Q.   Within eight hours after the accident?

**[37]**

1   A.   Yes.
2   Q.   Okay.  And why did you take a picture of that
3       core drill bit?
4   A.   So basically we would have a record of
5       everything, you know, all of the pieces of the
6       drill.
7   Q.   And did you determine the size of the drill bit
8       that was being used by Mr. Riley at the time of
9       the accident?
10  A.   What do you mean?
11  Q.   The diameter of the drill bit?
12  A.   No.
13  Q.   Did you ask anybody about the size of the drill
14      bit being used by Mr. Riley?
15  A.   No.
16  Q.   Did you -- I'm sorry, sir.
17  A.   Go ahead.
18  Q.   Did you check as to the condition of the drill
19      bit being used by Mr. Riley?
20  A.   Other than just looking at this bit, you know,
21      I could tell the bit matched the hole, because
22      I went out and looked at the hole that they had
23      attempted to drill.  You know, I looked at the

[38]

1   bit, but I'm not familiar enough, you know,
2   with drill bits to know -- especially this type
3   of drill bit, to know if anything was wrong
4   with the bit or not.
5   Q.   All right, sir.  Did you -- you say you
6   compared that drill bit on the machine with the
7   hole at the location of the accident?
8   A.   I didn't take it out and match it, but just
9   physically looked, you know, where the hole
10   would have been drilled.  And, you know, it
11   just visually appeared to match the size of
12   this drill bit.
13   Q.   All right.  So in your opinion the drill bit
14   depicted in Exhibit Number 5 was the drill bit
15   that was being used by Mr. Riley at the time of
16   the accident?
17   A.   Yes.  And that's what I was told also, that it
18   was the same bit.
19   Q.   And who were you told that by, sir?
20   A.   By the Maintenance Department.
21   Q.   And who with maintenance?
22   A.   Because that's the only bit that they had for
23   that hole.

[39]

1   Q.   And who were you told that by?
2   A.   It was probably Donald.  I'm not sure.
3   Q.   Donald Cody?
4   A.   Donald Cody.
5   Q.   Sir, let me show you a series of three
6   photographs, Exhibits 6, 7 and 8, attached to
7   Mr. Walters' deposition and ask you what those
8   are, sir?
9   A.   Number 6 looks like a tag, but I'm not sure
10   exactly what it's supposed to be showing in
11   that photo.  7, the Ready to Rent tag, the
12   equipment number and basically a safety or an
13   inspection check showing it's ready to be
14   rented.  It looks like it was checked on August
15   the 25th.
16   Q.   Before we move on, in Exhibit Number 6, whose
17   hand is that in that photograph, sir?
18   A.   I don't know.
19   Q.   Did you take that photograph or these series of
20   three photographs depicting the Ready to Rent
21   tag?
22   A.   I think I did.
23   Q.   And, again, would that have been in the

[40]

1   maintenance shop?
2   A.   Yes.
3   Q.   Within eight hours after the accident?
4   A.   Yes.
5   Q.   And when is the last time you've seen that
6   Ready to Rent tag?
7   A.   It was the morning after the accident when we
8   was taking the photos.  Just shortly after we
9   finished looking at it, it was picked up by
10   United Rentals.
11   Q.   Okay.  Let me show you Exhibit Number 9 and ask
12   you what that is, sir?
13   A.   It looks like a United Rental checkout tag.
14   I've never seen one like it before.
15   Q.   Okay.  Is it your testimony you've never looked
16   at the back of the maintenance or Ready to Rent
17   tag?
18   A.   No.
19   Q.   I notice that whoever is making this photograph
20   that apparently there is a back to this Ready
21   to Rent tag in photograph 6; is that correct?
22   A.   Yes, sir.
23   Q.   There's a front and a back?

[41]

1   A.   It looks like a front and a back in that photo.
2   Q.   Sir, if I could look at this, let me see if I
3   can read this Exhibit 9.  It states "I
4   understand the correct operation and function
5   of the controls and confirm that I have
6   received adequate instruction, and acknowledge
7   the safety sheet, to enable myself and/or my
8   crew to use the equipment in a safe and proper
9   manner without risk to injury."  Did I read
10   that correctly?
11   A.   You did.
12   Q.   What steps were taken to ensure that Mr. Riley
13   knew how to properly operate this core drill
14   machine, sir?
15        MR. LANE:  Object to the form.
16   A.   I'm not -- I don't know of anything.  The
17   Maintenance Department kind of handled that.  I
18   don't know of any.  I don't know what kind of
19   instructions were given to him, if any.
20   Q.   As part of your investigation, did you try to
21   determine if he was given any instruction?
22   A.   I asked and I think Mike -- I think it was Mike
23   Walters that was working with him at the time,

[42]

```
 1      I believe, I think he had already gone when I
 2      got there that morning.  And I understand
 3      through the Maintenance Department, I asked
 4      what kind of training he had, and basically,
 5      the way I understand, they -- he was watching,
 6      I think, Mike do it and then he said he wanted
 7      to do it.  So Mike just stepped back and let
 8      him start operating the equipment.
 9   Q.  Was Mike Walters present while Mr. Riley was
10      operating the core drill machine?
11           MR. LANE:  Object to the form.
12   A.  I don't know, I wasn't there.
13   Q.  I mean, what did --
14   A.  Now, what --
15   Q.  What did you learn in your investigation?
16   A.  The way I understand, the best I can remember,
17      was that I think Mike had left, I think, if I
18      remember right.  I think Matthew started the
19      drilling machine and Mike had stepped away from
20      the actual accident site.
21   Q.  For what reason, sir?
22   A.  I don't know.
23   Q.  Would that have been proper for the lead
```

[43]

```
 1      mechanic, who knew how to operate the core
 2      drill machine, to have left the inexperienced
 3      mechanic there to operate the core drill
 4      machine?
 5           MR. LANE:  Object to the form.
 6   A.  I wouldn't think so.
 7   Q.  Would that have been in violation of Flavor
 8      House policy?
 9           MR. LANE:  Object to the form.
10   A.  As far as I know, there is no policy on that.
11   Q.  There's no policy with respect to the employee
12      who is operating the machinery to know how to
13      properly operate the machinery?
14           MR. LANE:  That's a different -- I
15           object to the form.
16   A.  I'm not sure what --
17   Q.  I guess I would -- if I'm not mistaken, does
18      not Flavor House have a policy that if you're
19      going to operate a piece of equipment, you
20      should know how to properly operate it?
21   A.  Yes.
22   Q.  And that is the policy of Flavor House, is it
23      not?
```

[44]

```
 1   A.  Yes.  You should know how to operate it, yes.
 2   Q.  And be familiar with it?
 3   A.  Yes.
 4   Q.  And know what dangers do exist if not properly
 5      operated?
 6   A.  Yes.
 7   Q.  Well, did Matthew Riley properly operate this
 8      core drill machine?
 9           MR. LANE:  I'm going to object to the
10           form.
11   A.  As far as I know he did not properly operate
12      it.
13   Q.  Okay.  Well, how did he not properly operate
14      it?
15   A.  There's a couple of things that seemed to
16      happen.  One, of course, the drill was not
17      anchored.  And then we understand Matthew was
18      also standing on the drill base to weight it
19      down.
20   Q.  What else did Mr. --
21           MR. LANE:  Let me object generally to
22           his testimony about this.  I
23           haven't seen any foundation for
```

[45]

```
 1      this line of questioning or any
 2      expertise on his part calling for
 3      that information.
 4   Q.  What other problems were there with Mr. Riley
 5      operating this core drill machine?
 6   A.  I don't know of anything for sure because I
 7      wasn't there.
 8   Q.  Just based upon your investigation as the
 9      Acting Safety Director at Flavor House at the
10      time?
11   A.  It appeared that -- that he didn't have
12      complete instructions on how to use it.  It was
13      a wet floor environment and so the area was
14      slick.  And we understood that he stood on the
15      base of the drill and then when the drill
16      caught, he lost his balance and was injured.
17   Q.  Based upon your investigation, did Mr. Riley do
18      anything else to cause this accident?
19   A.  Through the drug test, it came back positive --
20      it showed positive for marijuana.  So we felt
21      like he was also impaired.
22           MR. LANE:  I object to this line of
23           questioning, but feel free to
```

[46]

1      answer questions.
2   **Q.**  Anything else that you, as part of your
3      investigation as the Safety Director at Flavor
4      House, determined?
5   A.   Not that I can remember right now.
6   **Q.**  And how do you know that Mr. Riley was
7      impaired?
8   A.   We got the results back from the hospital.
9   **Q.**  And what did they show, sir?
10  A.   They showed that he had marijuana in his
11     system.
12  **Q.**  Any other scheduled narcotic or drug?
13  A.   Not that I can recall.
14  **Q.**  As a result of his testing positive for
15     marijuana, did Flavor House take any action?
16  A.   Matthew was required to go through a -- kind of
17     a rehab program.  He could keep his job as long
18     as he went through that program.  And we
19     understand he did go through that.
20  **Q.**  And when did Mr. Riley begin that rehab
21     program?
22  A.   I don't know any dates, but it was basically
23     after he had recuperated enough from his

[47]

1      injuries to attend.
2   **Q.**  And did Mr. Riley take advantage of that
3      program and stop using marijuana?
4   A.   He went through the program.  And I don't know
5      if he -- you know, the continued use of
6      marijuana I don't know.
7   **Q.**  Was Mr. Riley terminated ultimately from Flavor
8      House?
9   A.   I think he was.
10  **Q.**  And the reason for his termination?
11  A.   I don't really remember, because there was --
12     by that time Glenn Warren had come in and I
13     can't remember exactly what the termination was
14     for.  I can't remember if I was still there
15     when he was terminated.
16  **Q.**  I mean, still there, what --
17  A.   Still was at Flavor House or not or if I had
18     already left whenever -- I don't know the date
19     of Matthew's termination.
20  **Q.**  And Glenn Warren was who, sir?
21  A.   Glenn Warren came in with -- he was over Safety
22     and Human Resources.  The corporate -- Flavor
23     House was changed to Nut Cracker or was in the

[48]

1      process of changing.  We got a new Plant
2      Manager.  They brought Glenn Warren in, which
3      was over Safety and HR.  And so Glenn kind of
4      picked up from there and run the show from
5      there.
6   **Q.**  And why did you leave Flavor House?
7   A.   A better job opportunity came along.
8   **Q.**  And that was with Progressive?
9   A.   Yes.
10  **Q.**  You mentioned as part of the causation of the
11     accident and injury to Mr. Riley that you had a
12     wet floor environment and slick, what do you
13     mean by that, sir?
14  A.   There is -- like I said, I wasn't there at the
15     time of the accident, but the way I understand,
16     of course, they were using water for the drill
17     bit to keep it cooled and then also sanitation
18     is in cleaning.  And when they clean, they --
19     it's all stainless equipment, they're spraying
20     cleaner on that equipment, spraying it down,
21     scrubbing it down, and, of course, the floor
22     gets saturated with water and peanut residue.
23     As far as that area, I know it was wet, but I

[49]

1      don't know how wet.
2   **Q.**  And how were they using the water in the
3      operation of this core drill machine at the
4      time of the accident?
5   A.   I think -- like I said again, I wasn't there,
6      but I think that, you know, they have -- the
7      way I understand, if I remember correctly, is
8      they use water also, you know, to put around
9      the hole, you know, to keep the bit wet and
10     keep it cool.  As far as how they were
11     administering the water, I don't know if it was
12     hose or bucket or what.  I don't know.
13  **Q.**  Okay.  Have you ever used a core drill machine,
14     sir?
15  A.   No.
16  **Q.**  Have you ever seen a core drill machine in
17     operation?
18  A.   Yes.
19  **Q.**  And approximately how many times?
20  A.   Two probably.
21  **Q.**  When is the last time you saw one in operation?
22  A.   I never saw one at Flavor House.  The only time
23     I ever saw one used was probably -- it was when

[50]

1     I was with Sony.  The last one I probably saw
2     was around the early '90s.
3   Q.   And what is your understanding of how the water
4     is to be applied to the drill to keep it cool?
5   A.   You know, as far as how it was administered,
6     you know, during that time, the best I can
7     remember, you know, Sony had a lot larger
8     equipment than this and it actually had kind of
9     a drizzle hose to go with it to keep it cool.
10    But this one, I'm not sure.
11  Q.   Okay.  As part of your investigation did anyone
12    ever comment or say that there was a problem
13    with the application of the water to the drill
14    bit?
15  A.   No.
16  Q.   And before I move on, you mentioned that
17    Mr. Riley was impaired, was that based upon the
18    results from the hospital of his lab tests?
19  A.   Yes.
20  Q.   You also mentioned that Mr. Riley did not have
21    proper instruction, what do you mean by that,
22    sir?
23         MR. LANE:  I object to the form.

[51]

1   A.   Just of what I found out, you know, that he
2     really didn't -- you know, there was no
3     basically step-by-step instruction, it was just
4     kind of an on-the-job type training.
5   Q.   Did you question Mr. Mike Walters as to what
6     instructions he had given to Mr. Riley before
7     allowing him to operate the core drill machine?
8   A.   I don't remember asking him that, no.
9   Q.   Did you ever find out what instructions had
10    been given?
11  A.   Not that I can remember for sure, no.
12  Q.   And why do you fault Mr. Riley for standing on
13    the machine?
14  A.   To me it just looked like an unsafe place to
15    stand on a piece of equipment.  It just don't
16    look like you're supposed to be standing there.
17  Q.   Why is that, sir?
18  A.   It's moving equipment.
19  Q.   What dangers could be encountered with moving
20    equipment?
21         MR. LANE:  Object to the form.
22  A.   Such as what happened.  You know, the drill bit
23    stops and, you know, if something don't shear,

[52]

1     the whole thing is going to spin.
2   Q.   In other words, common sense would say that a
3     piece of equipment, such as a core drill
4     machine, if you stand on it, you run the risk
5     of being knocked off the machine?
6         MR. LANE:  Object to the form.
7   A.   Yeah, common sense, but I would think that.
8     But the last two years I've been in the
9     insurance business and it seems like common
10    sense goes out the window.
11  Q.   Sir, you also indicated that you determined the
12    drill was not anchored, what did you mean by
13    that, sir?
14  A.   The best I can remember, and I'll see if it's
15    got a -- it has posts in the side and screws in
16    the side, and the way that I understand, Donald
17    Cody told me that morning that, you know, the
18    correct procedure would have been that holes
19    would have been drilled in the floor, small
20    holes, for these screws to fit into so the
21    drill wouldn't spin or wouldn't slip.
22  Q.   All right.  And you're referring to Exhibit
23    Number 5, this photograph that's been attached

[53]

1     to Mr. Walters' deposition?
2   A.   Yes.
3   Q.   And the bolts are those bolts -- are there four
4     bolts at each corner of the base of that drill
5     bit?
6   A.   There is a bolt on each corner.
7   Q.   I guess looking at photograph Number 1 attached
8     to Mr. Walters' deposition, are those bolts
9     also shown at the corner of the base of that
10    core drill machine?
11  A.   Yes.
12  Q.   And as you understand from Mr. Cody, who was a
13    lead mechanic on the first shift?
14  A.   Yes, he's first shift.
15  Q.   That it should -- or the core drill machine
16    should have been anchored using those four
17    bolts at the corner of the base of the drill
18    machine?
19  A.   Yes.
20  Q.   And the procedure for anchoring would have been
21    what, sir?
22  A.   The way I understand, that they drill holes in
23    the floor where these anchor bolts can go down

7-17-2006                                                    Kenneth Tew

[15]  (Pages 54 to 57)

[54]

1      into the floor, so if the core bit snags or
2      stops, then the base won't go spinning, it's
3      actually anchored to the floor.
4   Q.   And did you determine whether or not those core
5      bolts had been used prior to the accident
6      involving Mr. Riley?
7         MR. LANE: Object to the form. As to
8            the use of the term "used."
9   A.   As far as I know, those bolts were not properly
10     used, because there was no bolt holes in the
11     floor where they would have been anchored.
12  Q.   Was there any indication that those bolts had
13     made any kind of impression on the floor of
14     the --
15  A.   Not that I can remember.
16  Q.   Okay. Did it appear from your inspection of
17     the core drill machine base that the bolts had
18     been used since -- or during the operation
19     either of the drilling of the first hole by
20     Mr. Mike Walters or the second hole by Mr. Matt
21     Riley?
22        MR. LANE: Object to the form.
23  A.   I couldn't tell. I couldn't tell if they had

[55]

1      been turned or used or not.
2   Q.   Okay.
3   Q.   Let me show you photograph Number 10 attached
4      to Mr. Walters' deposition, as well as
5      photograph Number 11 and photograph Number 12.
6      These appear to be photographs of the scene of
7      the accident. Can you assist us with who took
8      these photographs?
9   A.   As far as I remember, I did.
10  Q.   All right, sir. And that would have been after
11     taking photographs of the core drill machine in
12     the maintenance shop?
13  A.   It was -- I'm not sure if it was before or
14     after, but it was all basically in sequence
15     within a short time period, you know, 8:00 to
16     9:00, you know, somewhere in that range. They
17     were all taken within a few minutes of each
18     other.
19  Q.   All right, sir. And if I could, sir, are there
20     some pallets? Were those pallets moved at any
21     time during the evening?
22        MR. LANE: Object to the form.
23  A.   I don't know.

[56]

1   Q.   What are those pallets used for?
2   A.   Normally a large 2,000 pound bag of peanuts are
3      sitting on them. They bring them in, they use
4      a crane to pick them up, put them on the
5      machine, and then the pallets are just stacked
6      over to the side. The forklift driver comes
7      and takes the pallets out.
8   Q.   All right. Had those pallets been there the
9      evening before?
10        MR. LANE: Object to the form.
11  A.   I don't know. I would -- normally what would
12     happen is everything is cleared off the floor
13     so they can wash the floor. If I had to guess,
14     I would say, no, they would not be because of
15     their cleaning procedures.
16  Q.   All right, sir. Did you examine these two
17     holes that are depicted in Exhibits Number 10,
18     11 and 12?
19  A.   I do remember looking at them.
20  Q.   Did you measure those holes?
21  A.   No, I did not.
22  Q.   Do you have, as you sit here today, a
23     recollection of the depth of those holes?

[57]

1   A.   I don't remember.
2   Q.   Did you determine whether there was any rebar
3      that was struck during the process of drilling
4      these two holes?
5   A.   No.
6   Q.   And that was a poor question. Was any rebar
7      hit during the drilling of these two holes?
8   A.   Not that I'm aware of and nobody ever said
9      anything about it.
10  Q.   All right, sir. Sir, let me show you what I'll
11     mark as Exhibits Number 2 and 3 to your
12     deposition.
13        (Exhibits 2 and 3 marked for
14           identification.)
15  Q.   And I'll ask you what those are?
16  A.   It's the front and back sheet of the accident
17     report.
18  Q.   And who filled in that accident report?
19  A.   I don't know.
20  Q.   Does your handwriting appear on that accident
21     report?
22  A.   The only thing that may be my handwriting is
23     the date of visit and Flowers Hospital for the

7-17-2006                                                                        Kenneth Tew

[58]

1       medical provider.  The other writing is not
2       mine.
3    Q.   And you don't recognize the handwriting on that
4       accident report?
5    A.   No.  I would -- it would have been Ricky
6       Smothers or Michael Walters, I would think, but
7       I don't know.
8    Q.   Have you ever seen Exhibits 2 and 3 before?
9    A.   Yes.
10   Q.   And when did you last see Exhibits 2 and 3?
11   A.   Probably shortly after the accident.
12   Q.   Okay.  I mean, a day or two or the day of the
13      accident?
14   A.   Probably within a couple of days.
15   Q.   Okay.  The report that you examined on July the
16      14th, how did it differ from this -- these two
17      sheets, Exhibits 2 and 3?
18   A.   The report on July 14th?
19   Q.   The report that you examined last Friday on the
20      accident?
21   A.   Oh, it appeared to be the same -- a copy of
22      that report.
23   Q.   Well, I mean, is this the copy you reviewed on

[59]

1       Friday?
2           MR. LANE:  Do you mean is that a copy
3              of the one he reviewed?
4    Q.   Exhibits 2 and 3, are those -- is that the
5       report you reviewed last Friday?
6    A.   Yes.  It appears to be a copy of the ones I
7       reviewed, yes.
8    Q.   All right, sir.  Were there more than these two
9       sheets that you reviewed?
10   A.   Not as far as an accident report, no.
11   Q.   Okay.  Did you ask Mr. Smothers at any time
12      after he completed Exhibits 2 and 3 what he
13      meant by the marks that he's put on the report?
14   A.   Not that I can remember.
15   Q.   Did you inquire as to what he meant by "no
16      safety switch on drill"?
17   A.   No.
18   Q.   Or inquire as to what "installation of guard or
19      safety device" meant?
20   A.   No.
21   Q.   Was there a safety device on the core drill
22      machine that was involved in this accident?
23   A.   Not that I know of.

[60]

1    Q.   What kind of personal safety devices, if any,
2       was Mr. Riley using at the time of the
3       accident?
4    A.   I don't know.
5    Q.   Did Mr. Smothers indicate on his report?
6           MR. LANE:  I object to the form.  The
7              report speaks for itself.
8    A.   No.
9    Q.   Maybe I misunderstood.  Did I read gloves up
10      here?  "List safety required for the job.  List
11      equipment worn when injured."  Maybe the sixth
12      line down, "gloves/gloves," or I might be
13      reading that incorrectly.
14   A.   It's got "List safety equipment required for
15      the job.  List equipment worn when injured."
16      It looks like gloves were required and gloves
17      were worn.
18   Q.   Okay.  Any other safety equipment being used by
19      Mr. Riley, to your knowledge?
20          MR. LANE:  Object to the form.
21   A.   Not to my knowledge.
22   Q.   What safety equipment is issued to employees at
23      Flavor House when they come to work?

[61]

1    A.   It depends on the job.  There's always -- well,
2       hearing protection is always required in the
3       plant and safety glasses are provided.  And,
4       you know, if the job, like this job, would have
5       been required for safety glasses.  A lot of
6       times when they're cleaning they have to use
7       compressed air and they would have to wear
8       safety glasses.
9    Q.   Would hearing protection have been required of
10      Mr. Riley in operating this core drill machine?
11   A.   Not necessarily with this core drilling
12      machine, but just in the plant, once you reach
13      a certain part of the plant, hearing protection
14      is required just because of the general noise
15      in the plant.
16   Q.   And this accident took place near the wall next
17      to line three roaster?
18   A.   Yes.
19   Q.   Would hearing protection have been required
20      there?
21          MR. LANE:  Object to the form.
22   A.   Yes.
23   Q.   Would the plant have been operational at the

f60fb274-36d8-4b62-9e7a-603e3bc3a337

7-17-2006                                                        Kenneth Tew

[62]

1    time -- or not operational, but would the
2    equipment have been operating?
3  A.  That time of night, it could have been.  I
4    don't know what lines were running.  It's kind
5    of a cross-over between second shift finishing
6    up.  And if they're behind on orders, second
7    shift may work until 2:00 or 3:00 in the
8    morning.  And as roasters become available as
9    soon as they get through, sanitation is there
10   starting to clean.  So, you know, I don't know
11   what equipment was running, but if the
12   equipment was running, it would have been
13   required to wear hearing protection.
14  Q.  All right, sir.  What about safety glasses,
15   would they have been required of Mr. Riley at
16   the time of the accident shortly after
17   midnight?
18  A.  Not as far as in the plant, but operating a
19   drill, I would think so.
20  Q.  Was he wearing safety glasses based upon your
21   investigation?
22  A.  I don't know.
23      (Exhibit 4 marked for identification.)

[63]

1  Q.  Let me show you what I'll mark as Exhibit
2    Number 4 and ask you if you could identify
3    that?  Now that you've had an opportunity to
4    read that, if you will look up so I know you've
5    finished?
6  A.  Yes.
7  Q.  Okay.  And what is that, sir?
8  A.  It's a statement from James Mason on what he
9    saw the night of the accident.
10  Q.  Did he actually see the accident?
11  A.  It's got down here that he observed it, yes.
12  Q.  And who took that statement from Mr. Mason?
13  A.  It was one, I think, Dan Rewis asked him to
14   write up.  Dan Rewis being the Plant Manager.
15  Q.  And did you ask him to prepare a statement as
16   well?
17  A.  I don't remember.
18  Q.  Have you ever seen a statement other than this
19   one from Mr. Mason?
20  A.  I don't remember if there's another one or not.
21      (Exhibits 5, 6 and 7 marked for
22       Identification.)
23  Q.  Sir, let me show you three statements which

[64]

1    appear to be typed statements and ask if you
2    can identify Exhibits 5, 6 and 7 to your
3    deposition?
4  A.  Okay.
5  Q.  And do those bear your signature, sir?
6  A.  Yes.
7  Q.  And were those statements prepared by you as
8    part of your accident investigation?
9  A.  Yes.
10      (Exhibit 8 marked for identification.)
11  Q.  Let me show you Exhibit Number 8 and ask you
12   what that is?
13  A.  This is a statement given by -- a written
14   statement given by Donald Cody.
15  Q.  And who requested Mr. Cody prepare that
16   statement?
17  A.  I believe I did.
18  Q.  All right.  And what was the purpose of asking
19   Mr. Cody for that?
20  A.  Donald seemed to know more about the equipment
21   and the equipment rented in the past.  And he
22   was the -- Donald is a lead man, but he's kind
23   of second in charge for the whole Maintenance

[65]

1    Department.
2  Q.  What do you mean by that?
3  A.  Ricky Smothers was the Maintenance Manager and
4    then Donald is -- basically Donald is -- he's
5    not just a lead man, you know, he basically has
6    control of all shifts also.  And so I went to
7    him because usually I can -- just of the
8    maintenance people, I know I can get more
9    information out of him than I can anybody else.
10  Q.  Okay.  In other words, a good source of
11   information?
12  A.  Yes.
13  Q.  And who does he reflect was involved in taking
14   the machine apart, or does he?
15  A.  He's got down here Harold, Roy and Clay.
16  Q.  All right.  Was that in your presence?
17  A.  Yes.
18  Q.  Okay.  May I see that, sir?  Do you know where
19   the maintenance tag is now, the Ready to Rent
20   tag?
21  A.  No.
22  Q.  Donald Cody, Ricky Smothers, Adam Hall, Harold
23   Mixon and Roy Donley, they were involved along

7-17-2006                                                    Kenneth Tew

[66]

1    with you in taking the drill apart?
2  A.  Yes, I believe all of that group was in the
3    maintenance shop.
4  Q.  And Roy Donley, what position does he hold?
5  A.  He was -- he worked in maintenance.
6  Q.  And did he have a title?
7  A.  Just mechanic.
8  Q.  Okay.  Was he the mechanic actually taking it
9    apart?
10  A.  I don't remember.  I want to say Harold Mixon
11    may have been the one taking it apart, but I'm
12    not sure.
13  Q.  And why Harold as opposed to Roy?
14  A.  I'm just trying to remember who was taking it.
15    I don't remember for sure who was actually
16    physically removing it.
17  Q.  And was Harold just a mechanic as well?
18  A.  Harold is a mechanic also.
19  Q.  Is he a lead?
20  A.  He is now, but he was just a mechanic at the
21    time.
22  Q.  How about Adam Hall, what position did he hold?
23  A.  Mechanic.

[67]

1  Q.  And Ricky Smothers was the supervisor?
2  A.  Yes.
3  Q.  And Donald Cody was under Ricky Smothers?
4  A.  Yes.
5  Q.  Did Harold -- Adam Hall, Harold Mixon or Roy
6    Donley have any particular specialization?
7  A.  Not that I'm aware of.
8  Q.  How long had Roy Donley been working there?
9  A.  I don't know.
10  Q.  I mean, was he a ten year, 20 year employee,
11    get his pen or anything?
12  A.  I don't know.
13  Q.  Just as you sit here now, was he a long-time
14    employee of Flavor House?
15  A.  I would probably, if I had to guess, say a
16    year.
17  Q.  Okay.  Fair enough.  Harold Mixon, how long had
18    he been working at Flavor House at the time of
19    the accident?
20  A.  Harold had -- he came after I did, because I
21    heard his -- somebody asked me about his name
22    because he came from Sony.  He had worked with
23    Sony and I highly recommended him.  I said I

[68]

1    didn't know him, but I heard a lot of good
2    things about him when I was with Sony.  So I
3    know he came after I did.  I would say at the
4    time of the accident he had been there probably
5    a year and a half, two years.
6  Q.  Fair enough.  Adam Hall?
7  A.  I would have to probably say a year and a half,
8    two years.
9  Q.  Fair enough.  Aaron Myers, what involvement did
10    he have?  Did I show you a statement from James
11    Mason?
12  A.  Yeah.
13  Q.  I noticed in his statement that he identifies
14    Aaron Myers as assisting Mr. Riley at the time
15    of the accident?
16  A.  Uh-huh.  (Positive response.)
17  Q.  Is that what your investigation revealed?
18  A.  Yeah.
19  Q.  And how was he assisting?
20  A.  As far as what he was doing, I do not know.  I
21    just know he was out there -- I understand he
22    was out there with him at the time, but I don't
23    know what he was doing.

[69]

1  Q.  And what position did he hold with Flavor House
2    at the time?
3  A.  Aaron was in sanitation.  I'm not sure what, if
4    he was just a -- I think Aaron kind of held an
5    unofficial lead type position in sanitation,
6    mainly because I think he was one of the older
7    ones that had been there.
8  Q.  How long had he been at Flavor House?
9  A.  I don't know, because I'm very unfamiliar with
10    sanitation, as far as third shift sanitation,
11    because they came in after I left.
12  Q.  I mean, did he appear to be an older gentleman?
13  A.  If he walked in this room, I wouldn't know him.
14  Q.  Okay.  Sir, if we could take maybe a five
15    minute recess, I think I might be through, if
16    that's okay with you?
17    (Recess.)
18    MR. SHEEHAN:  Mr. Tew, thank you.
19
20    CROSS-EXAMINATION
21  BY MR. SHIRES:
22  Q.  Mr. Tew, my name is Kevin Shires, we met
23    earlier.  You were going over a couple of the

7-17-2006

Kenneth Tew

[70]

1   things that you said that Mr. Riley may or may
2   not have done correctly in operating the core
3   drill, and one thing I think you said is that
4   he had incomplete instruction on the use of the
5   core drill?
6   A.  Uh-huh. (Positive response.)
7   Q.  And if you've already answered, I apologize,
8   but what exactly do you mean by that?
9   A.  Well, I don't know if he had incomplete
10   instructions. I don't know what instructions
11   he had. As far as the information that I could
12   gather, basically he was physically shown how
13   to operate the core drill and then it was
14   basically turned over to let him run it.
15   Q.  Okay.
16   A.  As far as what instructions, I don't know what
17   he was told.
18   Q.  And do you think that's -- and are you
19   characterizing what he was just simply shown as
20   that being incomplete?
21       MR. LANE:  Object to the form.
22   Q.  Is that what you mean by incomplete, simply
23   just showing him how to do it?

[71]

1   A.  I don't know if I said incomplete, but I just
2   -- I don't know what was -- what instructions
3   he was given, you know, so I can't say how much
4   he knew or what he didn't know about it.
5   Q.  Okay. Well, how about this; as the Safety
6   Director out there at Flavor House, what would
7   you like for him to be given to operate that
8   core drill?
9   A.  I know with every -- you know, of course, with
10   rental equipment being brought in, you know,
11   there should be, you know, some kind of
12   instructions, you know, on how to use it. I
13   don't know if -- the best I can remember, you
14   know, I think, if I remember right, there was
15   no instruction manual that actually came with
16   it at that point. I don't know if there was
17   any on file at Flavor House or not, but no
18   instruction manuals came with that. But, you
19   know, I think there should be a manual and then
20   the employee should be required to read that
21   manual.
22       MR. SHIRES:  Okay. Thank you, Mr. Tew.
23

[72]

1       CROSS-EXAMINATION
2   BY MR. MCGARRAH:
3   Q.  Let me ask you -- I've just got a couple of
4   questions regarding when you and the other
5   gentlemen went back there and took apart the
6   drill to some extent to look for the supposed
7   shear pin in there. What exactly did y'all do
8   as far as taking that apart?
9   A.  The only thing that was taken apart was
10   basically the -- if I remember right, just the
11   -- let me find the drill on the exhibit. If I
12   remember right, basically the drill bit was
13   taken off and then this housing right up in
14   here was taken off to look and see if there was
15   -- if this was a straight shaft or a shear pin.
16   Q.  All right. I'm just going to circle that
17   housing on Exhibit 1. You took off the bit and
18   you took off that housing?
19   A.  Uh-huh. (Positive response.)
20   Q.  Did you have to open up any of the part above
21   the housing you indicated where the motor is
22   located?
23   A.  Not that I can remember.

[73]

1   Q.  All right. And y'all made a determination that
2   there was not a shear pin there?
3   A.  I was going by mainly what Donald Cody had told
4   me, because he's the one that -- you know, in
5   conversation before it happened, or before we
6   started inspecting the drill, he's the one that
7   told me, he said normally these came with a
8   shear pin and it comes with a bag of pins. He
9   said this one did not. We just assumed that
10   they didn't send any extra pins. When we got
11   to looking, he said this one is different than
12   the others that he had had. I had never seen
13   the other ones that had been brought in the
14   past.
15   Q.  Was Mixon the one that actually did the
16   hands-on removal of that?
17   A.  I think he was. I'm kind of foggy on that, but
18   I think he was involved with it, yes.
19   Q.  And then y'all put it back together?
20   A.  Yeah, it was --
21       MR. LANE:  Object to the form.
22   A.  -- put back together while I was standing
23   there.

[74]

1  **Q.**  All right.  And no pictures were taken when it
2      was -- after it was taken apart?
3  **A.**  I don't think so.  I didn't see any here.
4          MR. MCGARRAH:  That's all I've got.
5          Thank you.
6
7          CROSS-EXAMINATION
8  BY MR. STUTTS:
9  **Q.**  Mr. Tew, when Flavor House goes to rent a piece
10     of equipment like this, what are the procedures
11     -- policies and procedures at Flavor House to
12     make sure that when they get the equipment they
13     get all of the documentation that comes with it
14     that they need to operate it safely?  In other
15     words -- let me back up just a minute.
16 **A.**  Okay.
17 **Q.**  How do they, in first place, go about getting
18     permission to rent a piece of equipment?
19 **A.**  That is pretty much run through the Maintenance
20     Department.  You know, like this, if they need
21     a drill --
22 **Q.**  Do they have to fill out any kind of
23     paperwork --

[75]

1  **A.**  Not that I'm aware of.
2  **Q.**  -- making a request?
3  **A.**  Not that I'm aware of.  I think Ricky or
4      Donald, somebody just picks up the phone and
5      orders it.
6  **Q.**  Have they got the authority to do that without
7      getting the Plant Manager or somebody to
8      approve it?
9  **A.**  Yes.
10 **Q.**  All right.  So that's all they do, they call
11     United Rentals and say I need a core drilling
12     machine on a certain date?
13 **A.**  As far as I know, that's all that's required.
14 **Q.**  Okay.  Now, when that core drilling machine is
15     delivered by United Rentals, what does the
16     person who signs for it do to make sure that
17     he's got all of the safety documents so that
18     whoever is going to be using that machine can
19     use it safely?
20 **A.**  As far as I know, basically whoever signs for
21     it is basically signing just like they would a
22     package from UPS and just sign for it saying I
23     received it.  I don't -- as far as I know, I

[76]

1      don't know if they -- you might check with
2      Ricky Smothers and see, but as far as I know, I
3      don't know of anything in place to say, "Okay,
4      is all of the paperwork and documentation,
5      instruction manuals and everything with it?"  I
6      don't know, I haven't heard of anything.
7  **Q.**  Okay.  Even though the tag on there says very
8      distinctly that you should look at the
9      operational manual?
10 **A.**  Uh-huh.  (Positive response.)
11 **Q.**  They would accept it and use it even if it
12     didn't have that with it?
13 **A.**  At the time I think they would.
14 **Q.**  Okay.  Is it different now, do you think?
15 **A.**  I don't know.  Flavor House is under a
16     different umbrella of people than they were at
17     the time that this happened.
18 **Q.**  All right.  Now, I counted 11 pictures which
19     you identified that you took.  Did you take
20     more than 11 pictures?
21         MR. LANE:  Object to the form.  Asked
22         and answered.
23 **A.**  I don't know.  I don't know the exact number.

[77]

1  **Q.**  Do you recall any pictures that you took that
2      are not in that?
3  **A.**  No.  I don't remember what was taken and what
4      was not taken, it's been three years, but we
5      could probably get the disk out of the folder
6      and look and see what's there and what's not
7      there.
8  **Q.**  Okay.  Now, that disk was there when you left,
9      the disk was in the folder, the accident
10     folder, right?
11 **A.**  Yes.  It was in there the other day when I -- I
12     didn't look at it, I saw the envelope stapled
13     to the folder and the disk was -- it's just a
14     little small card, and it was in an envelope
15     the other day.  I didn't pull it out, but I did
16     note there was a disk in that envelope still in
17     that file this past Friday.
18 **Q.**  The one thing that I've noticed is there's no
19     pictures that seem to be taken on the other
20     side of this machine, all of the pictures are
21     taken on this side where it's got United
22     Rentals' sticker on it or decal?
23 **A.**  Uh-huh.  (Positive response.)

[78]

1  **Q.**  Do you recall if you took some pictures around
2      on the other side?
3  **A.**  I don't remember.  I just don't remember.  The
4      maintenance room is small and was extremely
5      crowded at the time, but I don't remember if
6      there was any taken or not.
7          MR. STUTTS:  Okay.  Thank you, sir.
8
9          CROSS-EXAMINATION
10 BY MR. LANE:
11 **Q.**  I have a few questions, Mr. Tew.  Again, my
12     name is Joe Lane.  I don't believe we've met
13     before, have we?
14 **A.**  No.
15 **Q.**  Okay.  You look kind of familiar, that's why I
16     asked.  I don't remember meeting you.  You were
17     asked some questions about the disassembly of
18     some of the parts and I'm down here on this end
19     so I really couldn't see what you were pointing
20     to.  Did you actually examine the component
21     parts that were disassembled at the time of the
22     disassembly?
23 **A.**  Yeah.  Basically all it was was just a couple

[79]

1      of parts that was taken off.
2  **Q.**  The drill bit?
3  **A.**  The drill bit and then just above it, if I
4      remember right, just the housing above it.
5  **Q.**  Can you show me that one more time?  I know you
6      pointed it out earlier, I just didn't see it.
7  **A.**  Right in there (Indicating).
8  **Q.**  That silver part?
9  **A.**  Yeah.
10 **Q.**  Okay.  Do you know what -- and that's circled
11     in the picture and that's Exhibit Number 1,
12     Walters' Exhibit Number 1.  And that part is
13     actually circled, correct?
14 **A.**  Uh-huh.  (Positive response.)
15 **Q.**  Okay.  Do you know what this is sticking out
16     the back here, it's kind of a brass-colored
17     piece in that circled area?
18 **A.**  No, I don't.
19 **Q.**  Okay.
20 **A.**  Again, it was basically just taking -- what was
21     being taken apart was Donald was wanting to
22     look and see if this one had a shear pin in it
23     that he had said the others had.

[80]

1  **Q.**  Okay.
2  **A.**  So he just took it -- he took it apart far
3      enough to say, "Hey, this one isn't like the
4      other ones we normally get."
5  **Q.**  I've got you.  Okay.  So you didn't take the
6      actual gray-colored housing -- or the
7      gray-colored housing that's right below the red
8      housing on the drill motor itself was not
9      disassembled at the time?
10 **A.**  As far as I remember, no.
11 **Q.**  Okay.  Now, this picture, Mr. Walters' Number
12     1, it's your recollection that this was taken
13     before that drill bit and the little housing
14     right above it was disassembled?
15 **A.**  Yes.
16 **Q.**  Okay.  You didn't take any pictures after it
17     was reassembled that you recall?
18 **A.**  I don't think so.
19 **Q.**  Okay.  Now, we were talking about the
20     instructions, the source of your information
21     concerning instructions, you don't have any
22     direct information from Mr. Walters about the
23     instructions he gave Mr. Riley, correct?

[81]

1  **A.**  Correct.
2  **Q.**  Okay.  It's just your understanding it was some
3      hands-on on-the-job type of instruction?
4  **A.**  As far as I know, yes.
5  **Q.**  All right.  Now, you mentioned that you would
6      expect the employee to read the manual.  If an
7      employee is familiar with the operation of the
8      drill, would you require the employee, every
9      time that a drill is rented, to read the entire
10     manual, assuming one was provided with it?
11 **A.**  If they've read it before, you know, I would --
12     I think that we should have had something in
13     place where, you know, they read it and sign
14     off on it saying they did read it.
15 **Q.**  Okay.
16 **A.**  You know, if it's a month later, the drill
17     comes in, if it's the same drill, they would
18     sign off that they've read that manual.
19 **Q.**  Okay.  And that wasn't a policy that was in
20     effect at Flavor House?
21 **A.**  No.
22 **Q.**  Now, did you feel at the time you were acting
23     as the Safety Director, along with your other

[82]

1    role -- and I've forgot your title, I
2    apologize.
3  A.   I was Production Superintendent.
4  Q.   Production Superintendent.  Did you feel that
5    the policies and procedures that Flavor House
6    were following at the time with regards to
7    safety were inadequate or unsafe?
8  A.   I felt like that at the time there was a group
9    out of Billerica, Massachusetts that was
10    basically the money that held the purse strings
11    to everything and I think that they would not
12    allow the people at Flavor House in Dothan to
13    do the job they needed to do to be as save as
14    they needed to be.
15  Q.   Oh, really.  Well, did you personally identify
16    and list and take notes on areas where you felt
17    like the safety needed to be improved at Flavor
18    House when you were acting in that capacity?
19  A.   We would have group safety meetings.  It
20    started when the Safety Manager Levin Hamm was
21    there.  He had safety meetings and groups would
22    go around and make lists of safety items that
23    needed to be improved and corrected.

[83]

1  Q.   When you were acting as Safety Director though,
2    what new or what modifications or notes did you
3    make concerning areas that you felt like were
4    problems as far as safety is concerned, if you
5    did?
6  A.   Yeah, we would have regular safety meetings
7    and, like I said, we would all go around and do
8    it.
9  Q.   And were those --
10  A.   I'm trying to remember anything specific that
11    we did.  You know, there was a -- there was
12    usually a list of a lot of small things that
13    needed to be done.
14  Q.   All right.  Was there anything that -- prior to
15    Mr. Riley's incident, that you were doing as a
16    safety -- as the Director of Safety that you
17    feel like would have prevented this incident
18    from occurring as far as safety policies and
19    procedures?
20  A.   Not that I know of right off.
21  Q.   Okay.  Now, based on the secondhand information
22    that you received, again, you never talked to
23    Mr. Walters about this incident that you can

[84]

1    recall?
2  A.   Right.
3  Q.   You got your information primarily from
4    Mr. Cody; is that correct?
5  A.   Yes, Donald Cody.
6  Q.   Okay.  Did you gather any information about the
7    extent of Mr. Riley's injuries?
8  A.   Well, I knew the extent, because after I came
9    in that day and we finished the photos and all,
10    then I went over to the hospital to visit
11    Mr. Riley.
12  Q.   Okay.  What type of injuries did he sustain?
13    Where were his injuries?
14  A.   Mainly in the face area.
15  Q.   Okay.
16  A.   Around the eye a lot I remember.
17  Q.   Okay.
18  A.   I don't remember all of the injuries right off,
19    but I do remember he had a lot of facial
20    injuries.
21  Q.   All right.  Struck pretty hard in the head, is
22    that your understanding?
23  A.   Yeah.

[85]

1  Q.   Do you personally operate power equipment in
2    your personal life?
3  A.   Yes.
4  Q.   Do you use power saws and power drills, things
5    of that nature?
6  A.   Yes.
7  Q.   All right.  Have you purchased power saws and
8    power drills over the years?
9  A.   Yes.
10  Q.   More than one?
11  A.   Yes.
12  Q.   Okay.  Every time you purchase a power saw or a
13    power drill or other power tools, if it's a
14    replacement to a previous implement, do you
15    read the manual that came with that device
16    every time you buy a new one?
17  A.   Well, actually I thumb through it, especially
18    if there is anything new or different.  My wife
19    does make fun of me because I do read manuals.
20    Normally, yeah, I do.  You know, if it's a Skil
21    saw replacing an old Skil saw, I'll kind of
22    look through it and see if there's anything
23    different or --

7-17-2006                                                     Kenneth Tew

**[86]**

1  **Q.**  You don't read it word-for-word?

2  **A.**  Not word-for-word, no.

3  **Q.**  Okay.  If you buy a new car, do you read --

4  before you get in that car and drive it home,

5  do you read the operator's manual from cover to

6  cover?

7  **A.**  Not before I drive it.  Usually within the next

8  week I pretty much go through it and see what

9  all is there.

10  **Q.**  Okay.  I'm just about through, just one second.

11  I know there's something else I'm supposed to

12  ask you.  Oh, yeah, I know what it was.  First

13  of all, you said you're in the insurance

14  business now?

15  **A.**  Yes.

16  **Q.**  What type of insurance business are you in?

17  **A.**  I'm a claims adjuster.

18  **Q.**  Claims adjuster?

19  **A.**  Yes.

20  **Q.**  Who do you work for?

21  **A.**  Progressive.

22  **Q.**  How long have you been a claims adjuster?

23  **A.**  Two years.

**[87]**

1  **Q.**  Okay.  Was there a job between you becoming --

2  is that full-time?

3  **A.**  Yes.

4  **Q.**  Okay.  You're not doing any other jobs right

5  now?

6  **A.**  No.

7  **Q.**  Okay.  After you left Flavor House, is that the

8  job you took?

9  **A.**  Yes.  I left Flavor House, if I remember right,

10  on the end of September -- no, the end of

11  August and started, I think, with Progressive

12  in, I think, the first of September or either

13  the first of October, I can't remember which

14  one it was.  It was either August or September

15  I started with Progressive.

16  **Q.**  All right.  Do you work this area?

17  **A.**  Yes.

18  **Q.**  Is there a particular -- I don't know what all,

19  but I know Progressive is more than just auto

20  insurance, I assume?

21  **A.**  Uh-huh.  (Positive response.)

22  **Q.**  Other than auto claims -- well, first of all,

23  do you adjust auto claims?

**[88]**

1  **A.**  I do a small amount of autos.  I specialize in

2  what they call their special lines or

3  multi-lines, which is motorcycles, RVs, boats,

4  and we also insure a lot of log trucks, so I

5  have log trucks.  And if an automobile has some

6  kind of accident with some kind of specialty

7  equipment, farm equipment, tractors, then I

8  handle the tractor portion of the property

9  damage.

10  **Q.**  What kind of training did you receive to become

11  a claims adjuster?

12  **A.**  I spent two weeks in Cleveland, Ohio in

13  casualty school.  I spent two weeks in Tampa in

14  property damage.  I spent three weeks in

15  Phoenix, Arizona, a week for motorcycles, a

16  week for boats, a week for RVs.  And then I've

17  gone through Alabama legal and injury and

18  advanced investigations.

19  **Q.**  Okay.  Have you ever worked with any of the

20  lawyers in this room on any matters involving

21  claims?

22  **A.**  No.  No.

23  **Q.**  How about -- I don't know the names of all of

**[89]**

1  the law firms either, but as far as their law

2  firms, have you worked on any claims where any

3  of the law firms represented in this room by

4  the lawyers here were involved in those cases?

5  **A.**  None that I'm aware of, no.

6  **Q.**  None that you're aware of.  Now, there were

7  some questions about the -- I think it's

8  Exhibit 5 to Mr. Walters' deposition, do you

9  have that there in front of you?

10  **A.**  Exhibit 5?

11  **Q.**  There we go, that's it.  On this particular

12  photograph, Mr. Walters' Exhibit Number 5, you

13  were asked questions about these bolts right

14  here and I believe you got information from

15  Mr. Cody about those bolts as well?

16  **A.**  Yes.

17  **Q.**  All right.  Did Mr. Cody specifically tell you

18  that he and the other mechanics in Flavor House

19  would drill holes and then screw those bolts

20  into the holes to anchor the device?

21  **A.**  The best I can remember he said that's what is

22  supposed to be done.  There is a --

23  **Q.**  Did he say that -- I'm sorry, go ahead.

[90]

1   A.   If I can remember right, on the drills they
2        normally get, there's another kind of base that
3        actually holds the floor different than this
4        base does.  This base and this drill was
5        different than what they normally get.  But
6        I've never seen one of the other bases, so I'm
7        not sure what that was or what he was talking
8        about.
9   Q.   You have no idea what he's talking about there?
10  A.   No.
11  Q.   Okay.  Maybe we can get him to answer some
12       questions for us.  But did he ever tell you
13       that that's the method that they used, that
14       they would drill holes on four corners and
15       screw those bolts down in the holes?
16  A.   The best I can remember, he said that is the
17       way it's supposed to be done.  He didn't say
18       that that's what they've done in the past.  The
19       way I understand, this is the first time they
20       had used one of these.  He said that this
21       particular model was supposed to have been
22       anchored on all four corners.  But he also --
23       like I said, as far as I know, that's the first

[91]

1        one they had gotten like this.
2   Q.   Is that what he told you, that it's supposed to
3        be anchored by those bolts on all four corners?
4   A.   Yes.
5   Q.   Okay.  He didn't tell you that the vacuum was
6        supposed to hold it and serve as the anchor?
7   A.   The way I understand the ones in the past,
8        there was a vacuum that would do that.
9   Q.   Is it your understanding there was no vacuum on
10       this pump -- on this --
11  A.   That was my understanding.
12  Q.   Okay.  You were told that there was no vacuum
13       that was incorporated into the design of this
14       unit?
15  A.   Right.
16  Q.   Okay.  Did you go through with anybody in the
17       shop there -- and let's look at Exhibit Number
18       1, Mr. Walters' Exhibit Number 1.  And this is
19       -- again, you've identified this as the core
20       drill that was in issue?
21  A.   Uh-huh.  (Positive response.)
22  Q.   Did you go through with anybody and identify
23       the different component parts that make up that

[92]

1        entire unit?
2   A.   No.
3   Q.   You did not?
4   A.   No.
5   Q.   So do you know what this gray device is down in
6        the lower one half of the photo on the
7        right-hand side of the device right above the
8        base, the orange base?
9   A.   No.
10  Q.   Okay.  Do you know where the switches were to
11       operate this unit?
12  A.   Not right off, no.
13  Q.   Okay.  Do you know -- when you plug in this
14       unit, is there a switch that determines whether
15       or not power is going to the drill motor
16       itself?
17  A.   There should be, but I don't know if there was
18       one.
19  Q.   You don't know where it is?
20  A.   Not on this one, no.
21  Q.   Okay.  When you plug in this device -- well,
22       first of all, at the time that you looked at it
23       and examined it in the shop there, did anybody

[93]

1        ever plug it in or operate it in any way while
2        you were in there?
3   A.   No.
4   Q.   Okay.  You've never seen it powered up at all?
5   A.   No.
6   Q.   Okay.  You haven't heard it operate?
7   A.   No.
8   Q.   Is that something that you would want to do in
9        your investigation is to power it up and see if
10       the components appear to be working properly?
11  A.   Probably to do it over again, yes.
12  Q.   Let me ask you one more question about the --
13       in that same picture, Mr. Walters' Number 1, do
14       you know what this is laying in the floor over
15       here, this round circular object?
16  A.   No.
17  Q.   Okay.  And you didn't ask anybody about what
18       that was?
19  A.   Huh-uh.  (Negative response.)  Nobody said
20       anything about it.
21  Q.   Okay.  Do you know if that has anything to do
22       with the drill at all?
23  A.   Not that I'm aware of.

7-17-2006                                                    Kenneth Tew

[94]

1  **Q.**   Okay. After this incident occurred, did you
2        ever try to locate a manual yourself and review
3        that manual?
4  **A.**   No.
5  **Q.**   So you haven't reviewed the manual to determine
6        whether or not Mr. Walters or Mr. Riley failed
7        to operate the device properly based on the
8        manual?
9  **A.**   Just if I can remember right, I'm thinking that
10       there was not a -- that a manual did not come
11       with it is what they told me.
12  **Q.**   I understand. But did you personally call up
13       United Rentals or have anyone call up United
14       Rentals to try to locate a manual to review?
15  **A.**   No.
16  **Q.**   Okay. In the time after this incident
17       occurred, do you know whether or not any of the
18       mechanics at Flavor House used another core
19       drill anywhere in the plant to drill additional
20       holes such as what they were trying to do in
21       this case?
22  **A.**   Are you talking about during this same time?
23  **Q.**   Well, any time afterwards?

[95]

1  **A.**   I don't know.
2  **Q.**   Okay. And there were no changes in the
3        procedures based on your investigation, no
4        changes in the procedures out there?
5  **A.**   Not that I'm aware of, no.
6  **Q.**   Okay. And that's procedures related to the use
7        of the core drill?
8  **A.**   Not that I'm aware of. There was -- shortly,
9        what was his name --
10  **Q.**   The new safety guy came in?
11  **A.**   Yeah, he came in, so as far as I know there was
12       not anything.
13  **Q.**   Okay. You mentioned that Mr. Riley tested
14       positive for marijuana after this incident?
15  **A.**   Uh-huh. (Positive response.)
16  **Q.**   Are you -- in any way have you received any
17       training to determine -- based upon a positive
18       test result coming back for marijuana, have you
19       received any training in determining whether or
20       not whatever that level is represents an
21       impairment level?
22  **A.**   No.
23  **Q.**   Okay. Have you talked to anybody who saw test

[96]

1        results who indicated to you that this was a
2        quantitative test that could be used to
3        determine or be an indication of any level of
4        impairment?
5  **A.**   No.
6  **Q.**   Now, have you received any statements from
7        anybody -- and I've reviewed the statements
8        that we've identified here, I didn't see
9        anything, but you review them if you need to.
10       Have you taken any statements or heard anybody
11       who witnessed this incident occur and witnessed
12       Mr. Riley's behavior prior to this incident
13       that in any way indicated to you that Mr. Riley
14       was impaired in the hours before this incident
15       occurred and at the time of this incident?
16  **A.**   No, it was not brought up until we actually got
17       the report back.
18  **Q.**   Right. Nobody indicated to you that he was
19       impaired in any way before this incident
20       occurred or at the time of the incident,
21       correct?
22  **A.**   No.
23  **Q.**   And that's something you would want to know,

[97]

1        isn't it?
2  **A.**   Yeah.
3  **Q.**   Okay. Mr. Mason didn't tell you he was
4        impaired, did he?
5  **A.**   Huh-uh. (Negative response.)
6  **Q.**   Okay. And Mr. Walters has not reported that he
7        was impaired in any way, correct?
8  **A.**   Correct.
9  **Q.**   Okay. Did Mr. Walters have a -- I don't know
10       if y'all keep records on this kind of thing.
11       As far as safety is concerned, did Mr. Walters
12       have any poor safety records at the plant?
13  **A.**   Not that I'm aware of. I don't remember any --
14       I can't remember any accident reports or
15       anything. There was a book kept, but I don't
16       remember, you know. There may be something in
17       it, but I just don't know it.
18  **Q.**   Okay. Now, I made a note here, and I
19       apologize, I don't want to rehash ground here,
20       but I've got a note here that somebody called
21       Mike at United Rentals, was that you that
22       called Mike?
23  **A.**   Yes.