IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

MATTHEW RILEY,

    Plaintiff,

Vs.                    CIVIL ACTION NO.

                      1:05 CV-994-T

MILWAUKEE ELECTRIC TOOL

CORPORATION, et al.,

    Defendants.

       DEPOSITION OF **DONALD CURLEY CODY, JR.**, taken pursuant to notice and stipulation on behalf of the Defendants, in the conference room of Cochran, Cherry, Givens, Smith, Lane & Taylor, 163 West Main Street, Dothan, Alabama, before Ricky L. Tyler, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, on Tuesday, August 29th, 2006, commencing at 2:35 P.M.

|   |    |                                                              |
|---|----|--------------------------------------------------------------|
| 1 |    | Mr. Riley's accident?                                        |
| 2 | A. | Yes.                                                         |
| 3 | Q. | And were they on machines similar to the one                 |
| 4 |    | that Mr. Riley was using at the time of the                  |
| 5 |    | accident?                                                    |
| 6 | A. | Yes, sir.                                                    |
| 7 | Q. | Did they all have a vacuum system on it?                     |
| 8 | A. | Some of them did have a vacuum. Some of them                 |
| 9 |    | had the little things that go out where you put              |
| 10|    | your anchor bolts in.                                        |
| 11| Q. | Okay. But you've operated some with vacuum                   |
| 12|    | systems on it; is that correct?                              |
| 13| A. | Yes.                                                         |
| 14| Q. | Have you ever stood on a machine like the one                |
| 15|    | involved in this accident while it was in                    |
| 16|    | operation?                                                   |
| 17| A. | Yes, sir.                                                    |
| 18| Q. | You have?                                                    |
| 19| A. | Uh-huh. (Positive response.)                                 |
| 20| Q. | On what occasion have you stood on a core drill              |
| 21|    | machine during operation?                                    |
| 22| A. | Oh, it would have been when I was drilling a                 |
| 23|    | hole, probably years and years ago.                          |

```
 1  Q.    While you were at Flavor House?
 2  A.    Yes.
 3  Q.    And why did you stand on the machine at that
 4        time?
 5  A.    Just because it was an easier place to get to
 6        the handle.
 7  Q.    All right.  So were you utilizing the vacuum
 8        system on those occasions?
 9  A.    Yes, sir.
10  Q.    Did you ever have to stand on it to stabilize
11        it during operation?
12  A.    Not that I can recall, no.
13  Q.    So the only time you stood on it is for ease of
14        operation?
15  A.    Right.  Just stand on the back side, that way,
16        you know, it's up against the wall.
17  Q.    You couldn't just reach over it and operate the
18        lever on those occasions?
19  A.    The time I'm recollecting is like, say, if you
20        was drilling up against that wall right there
21        and you didn't have room for the base of it to
22        be and your front part was down up against the
23        wall, it's easier -- when the back part sticks
```

1  Q.    You wouldn't have done that; is that correct?
2              MR. LANE:  Done what?  Object to the
3        form.
4  A.    Right, I wouldn't have wanted him to stand on
5        it.
6  Q.    You wouldn't have instructed anyone else to do
7        that?
8  A.    I would be more apt to do it myself.
9              MS. ROBINSON:  I didn't understand -- I
10             just verbally didn't understand
11             that last question.  You wouldn't
12             have what?
13 Q.    You wouldn't have instructed anyone else to get
14       on the machine?
15             MS. ROBINSON:  Object to the form.
16             MR. LANE:  Object to the form.
17 A.    Correct.
18 Q.    Okay.  And you recognize that as a hazardous
19       and unsafe thing to do?
20             MR. LANE:  Object to the form.  When?
21 A.    I do now, yeah.
22 Q.    Okay.  Did you at the time?
23 A.    Not as much as I do now.

1  Q.   Somewhat?
2  A.   Right. Because, like I said, the ones with the
3       vacuum, they're pretty secure, they're not like
4       the older ones.
5  Q.   All right. But still with just a little bit of
6       looking and thinking, you could recognize that
7       as being a dangerous thing to do, correct?
8            MR. LANE: Object to the form.
9            MS. ROBINSON: Object to the form.
10 A.   Correct.
11 Q.   All right. Now, in the investigation that took
12      place, did you hear of any problem with the
13      suction pump?
14           MR. LANE: Object to the form.
15 A.   No, sir.
16 Q.   As far as you know, everything that you heard,
17      the suction pump was performing correctly and
18      operating properly?
19           MS. ROBINSON: Object to the form.
20           MR. LANE: Object to the form.
21 A.   I really didn't ask about the suction thing.
22 Q.   I'm just asking about what you've heard.
23 A.   I haven't heard about the suction thing.

```
 1            screen, or once somebody gets hurt they do a
 2            drug thing then.
 3    Q.      Okay.
 4    A.      And that he had failed it.
 5    Q.      Okay.  And he had only been there for a few
 6            days, correct?
 7    A.      Correct.
 8    Q.      Okay.  So do you know whether or not he was
 9            using drugs at the time this incident occurred?
10                    MR. LANE:  Object to the form.
11    A.      I don't know if he was or not.
12    Q.      Okay.  Have you reached any of your own
13            opinions whether or not drug use played any
14            part in whether or not Mr. Riley was injured?
15    A.      No, I haven't come to any conclusions on that.
16    Q.      Okay.  You've operated a core drill before you
17            said?
18    A.      Yes, sir.
19    Q.      And some of them had a vacuum suction pump,
20            right?
21    A.      Correct.
22    Q.      On any of those occasions did your -- while you
23            were operating the core drill, did the vacuum
```

```
 1        fail to hold?
 2   A.   No, sir.  I broke some shear pins on them, but
 3        I've never had one spin on me.
 4   Q.   Okay.  If it had lost vacuum pressure, would
 5        you have continued to operate the core drill?
 6             MR. LANE:  Object to the form.
 7   A.   Probably not, if I couldn't have bolted it
 8        down.
 9   Q.   Okay.  Why not?  Why would you not have
10        continued to operate the drill had it lost that
11        pressure?
12   A.   Because it would be kind of dangerous.
13             MR. SHIRES:  Okay.  Thank you very much
14                  for your time today.
15   A.   Okay.
16
17                 CROSS-EXAMINATION
18   BY MR. LANE:
19   Q.   I think it's my turn, Mr. Cody.  And I will try
20        to -- we'll kind of work backwards from what
21        you were just talking about.
22   A.   All right.
23   Q.   You indicated that in operating core drills
```

| | | |
|---|---|---|
| 1 | Q. | You never operated a unit that didn't have a |
| 2 | | shear pin before to your knowledge, correct? |
| 3 | A. | Never have.  I have found some that people have |
| 4 | | put bolts through there that they shouldn't |
| 5 | | have. |
| 6 | Q. | Improperly? |
| 7 | A. | Right. |
| 8 | Q. | Because that's a safety feature, correct? |
| 9 | A. | Right. |
| 10 | Q. | There could be another safety feature that does |
| 11 | | the same purpose as a shear pin, but you're |
| 12 | | just not aware of what that is, correct? |
| 13 | A. | Right.  Right, I didn't know. |
| 14 | Q. | And I'm assuming if that safety feature is |
| 15 | | working properly, but the vacuum isn't, you |
| 16 | | could have the same result here, correct?  If |
| 17 | | the vacuum fails, the base can spin, correct? |
| 18 | A. | Right.  If he's trying to force it down through |
| 19 | | the concrete too fast. |
| 20 | Q. | Now, you mentioned that there are -- you were |
| 21 | | asked some questions about rebar.  These bits |
| 22 | | -- these bits are designed to drill through |
| 23 | | rebar, correct? |

1  A.  Correct.
2          MR. SHIRES: Object to the form.
3  Q.  That's correct, correct?
4  A.  I've drilled through rebar before.
5  Q.  You've drilled through rebar yourself with
6      these bits, correct?
7  A.  Right.
8  Q.  All right. Now -- and you can't always predict
9      where the rebar is going to be running in the
10     concrete, can you?
11 A.  I have no idea.
12 Q.  Yeah. You don't have any idea where the rebar
13     is, correct?
14 A.  Correct.
15 Q.  So if you're going to drill a hole, it's got to
16     drill through rebar in case there's some there,
17     correct?
18 A.  That's correct.
19 Q.  Now, when you did -- when you came in that
20     morning, as far as the extent of your
21     investigation, it was simply to determine why
22     the shear pin didn't break, correct?
23 A.  Right. I was worried that somebody had screwed

1  MR. STUTTS: No, they're already
2      attached. They're already
3      attached to Walters.
4  MR. LANE: Yeah. I mean, we're
5      identifying them by Mr. Walters.
6  MR. SPIRES: That's fine. I didn't
7      know if you wanted to throw some
8      into his.
9  Q. Let me show you what was marked as Number 20 to
10    Mr. Walters' deposition and ask you if you
11    recognize what's shown in that photograph? And
12    I will give you some other photographs if you
13    need some reference to it.
14 A. That's teeth broke off of the core drill.
15 Q. I'm going to mark as Exhibit 1 to your
16    deposition a couple of pictures and ask you to
17    take a look at those, Mr. Cody.
18        (Plaintiff's Exhibit 1 marked
19         for identification.)
20 Q. Do you recognize what's depicted in those
21    pictures?
22 A. Yes, sir.
23 Q. All right. What is in those pictures?

| | | |
|---|---|---|
| 1 | A. | It's a core drill with the pieces broke off of |
| 2 | | it. |
| 3 | Q. | All right.  Is that the bit that you recall |
| 4 | | seeing that morning that Mr. Walters said was |
| 5 | | being used on the drill at the time of the |
| 6 | | accident? |
| 7 | A. | Yes, sir.  It's a core drill bit and it's |
| 8 | | busted like the one that I seen that morning. |
| 9 | Q. | Okay.  Now, before that day -- you've had a |
| 10 | | chance to kind of refresh your recollection |
| 11 | | about the drill itself by looking at the |
| 12 | | photographs.  Before that day do you recall |
| 13 | | whether you had ever used a Norton brand?  And |
| 14 | | I will represent to you this is a Norton brand |
| 15 | | core drill. |
| 16 | A. | I can't recall what brand I've used before. |
| 17 | Q. | You can't recall.  You don't recall if you ever |
| 18 | | used the Norton brand before? |
| 19 | A. | No. |
| 20 | Q. | Okay.  Now, you were asked questions about the |
| 21 | | size of the bit and the size of the hole; if |
| 22 | | you're using three inch pipe, would you drill |
| 23 | | the hole exactly the same size or bigger than |





PLAINTIFF'S EXHIBIT

f. Cody