IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

      Plaintiff,

Vs.                                    CIVIL ACTION NO.

                              1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

      Defendants.


DEPOSITION OF DONALD R. SHAVER, taken
pursuant to notice and stipulation on behalf of the
Defendants, in the conference room of Cochran,
Cherry, Givens, Smith, Lane & Taylor, 163 West Main
Street, Dothan, Alabama, before Ricky L. Tyler,
Certified Court Reporter and Notary Public in and for
the State of Alabama at Large, on Friday, October
27th, 2006, commencing at 8:50 A.M.

Page 2

```
1              APPEARANCES
2   FOR THE PLAINTIFF:
3        LARRY GIVENS, ESQ.
4     Cochran, Cherry, Givens, Smith,
5        Lane & Taylor
6     P. O. Box 927
7     Dothan, AL 36302
8
9
10  FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
11       ROBERT H. SPRAIN, JR., ESQ.
12     Sprain & Shires, PC
13     1707 29th Court South
14     Birmingham, AL 35209
15
16
17  FOR THE DEFENDANT, UNITED RENTALS:
18       C. WINSTON SHEEHAN, JR., ESQ.
19     Ball, Ball, Matthews & Novak
20     2000 Interstate Park Drive
21     Suite 204
22     Montgomery, AL 36109-5413
23
```

Page 3

```
1              INDEX
                          Page
2
3   Direct Examination by MR. SPRAIN:      6
    Cross-Examination by MR. SHEEHAN:     201
4   Redirect Examination by MR. SPRAIN:   309
    Recross-Examination by MR. SHEEHAN:   325
5
              EXHIBITS
6
    For Defendant:
7
    1    Deposition Notice
8   For Identification              8
9   2    Shaver Report
    For Identification              8
10
    3    Shaver's Alabama Engineering
11       License
    For Identification              8
12
    4    Invoices
13  For Identification             12
14  5    Copies of Photographs
    For Identification             41
15
    6    Milwaukee Operators Manual
16  For Identification             48
17  7    Inspection Roster 5/12/05
    For Identification             58
18
    8    Core Drill Operators Manual
19  For Identification             62
20  9    Color Copies of Photographs
    For Identification             74
21
    10   Wiring Diagram
22  For Identification             76
23  11   Chemical Test Report
    For Identification             80
```

Page 4

```
1   12    Protocol
    For Identification             82
2
    13    Affidavit
3   For Identification             83
4   14    Correspondence File
    For Identification             83
5
    15    Photos of Clutch Slip Rings
6   For Identification             95
7   16    Photos of Clutch Slip Rings
    For Identification             95
8
    17    Photos of Core Drill
9   For Identification            112
10  18    Bound Documents Provided by Lane
    For Identification            112
11
    19    Warnings on Core Drill
12  For Identification            156
13  20    Affidavit
    For Identification            201
14
    21    Affidavit Signature Page
15  For Identification            203
16  22    Shaver's Report
    For Identification            208
17
    23 - 47 Photographs (Exhibit 17)
18  For Identification            223
19  48    Emailed Depositions
    For Identification            236
20
    49    All Emails
21  For Identification            236
22  50    Photograph
    For Identification            270
23
```

Page 5

```
1   51    Photograph
    For Identification            294
2
    52    Photograph
3   For Identification            294
4   53    Photograph
    For Identification            294
5
    54    Photographs of Shaver
6       Alternative Design
    For Identification            317
7
8
9              STIPULATIONS
10
11      It is stipulated and agreed by and between
12  counsel representing the parties that the deposition
13  of DONALD R. SHAVER, may be taken before Ricky L.
14  Tyler, Certified Court Reporter and Notary Public in
15  and for the State of Alabama at Large, without the
16  formality of a commission; and all formality with
17  respect to other procedural requirements is waived;
18  that objections to questions, other than objections
19  as to the form of the questions, need not be made at
20  this time, but may be reserved for a ruling at such
21  time as the deposition may be offered in evidence or
22  used for any other purpose by either party as
23  provided by the Federal Rules of Civil Procedure.
```

Page 6

1       It is further stipulated and agreed by and
2  between counsel representing the parties in this case
3  that the filing of the deposition of DONALD R.
4  SHAVER, is hereby waived and that said deposition may
5  be introduced at the trial of this case or used in
6  any other manner by either party hereto provided for
7  by the Statute, regardless of the waiving of the
8  filing of same.
9       It is further stipulated and agreed by and
10  between the parties hereto and the witness, that the
11  signature of the witness to this deposition is hereby
12  not waived.
13              * * * * *
14           P R O C E E D I N G S
15
16     DONALD R. SHAVER, of lawful age, having first
17  been duly sworn, testified as follows:
18
19           DIRECT EXAMINATION
20  BY MR. SPRAIN:
21  Q.   State your name, please?
22  A.   Donald Robert Shaver.
23  Q.   What is your occupation?

Page 7

1  A.   I'm a professional engineer.
2  Q.   What is your address?
3  A.   It's -- mailing address is P. O. Box 29092,
4       Atlanta, Georgia 30359; physical address is
5       2480 Pangborn Circle, Decatur, Georgia 30033.
6  Q.   Are you employed through a company or are you
7       self-employed?
8  A.   I'm self-employed. Yeah, it's a sole
9       proprietor.
10  Q.   Okay. It's not set up as a separate legal
11       entity?
12  A.   No.
13  Q.   And your company name or your d/b/a is Shaver
14       Engineering & Design?
15  A.   Actually it's Shaver Engineering & Design
16       Consultants, yes. But, yeah, it's shorten for
17       -- legally set up with "Consultants" on the
18       end.
19  Q.   Okay. Well, we discussed off the record
20       briefly, but are you licensed in the State of
21       Georgia?
22  A.   Yes.
23  Q.   Are you licensed as a P.E. in the State of

Page 8

1       Alabama?
2  A.   Yes.
3  Q.   When was that done?
4  A.   That was -- y'all have got a copy of the
5       license. The Board met on the 13th and I
6       believe it was issued around October 13th.
7       Here we go. The 13th of October. I had it
8       right. Do you want to make an exhibit or
9       whatever of that?
10  Q.   I'm going to mark that as Defendant's Exhibit
11       3. And let's go off the record for a second to
12       organize the documents.
13           (Exhibit 1, 2 and 3 marked for
14            Identification.)
15           (Off-the-record discussion.)
16  BY MR. SPRAIN:
17  Q.   We are back on the record. We've organized our
18       plan to go through the materials which you have
19       reviewed as part of your testimony. And I'm
20       going to go through some discovery materials
21       first, fair enough?
22  A.   Okay.
23  Q.   Now, this binder here is labeled "Shaver

Page 9

1       Documents," can you tell me, in summary form,
2       what this folder contains?
3  A.   Let me take a look at it real quick. This will
4       be -- you know, it's things that have been
5       provided to me in discovery, including a manual
6       of the drill, the subject drill in this case.
7       It's, you know, some letters and correspondence
8       that were first sent to me when the Beauchamp
9       law firm was involved in the case. And it
10       involves copies of photographs taken by their
11       experts at the first inspection that we had; I
12       don't recall the date of that. There were a
13       lot of photographs there. Again, you know,
14       answers to interrogatories and notice to
15       produce documents by, you know, the parties
16       involved.
17  Q.   Okay. When were you first hired to be a
18       consultant in the case?
19  A.   I want to say it was in 2003 I was contacted by
20       Robert Beauchamp out of Albany. If I may, let
21       me just refresh my memory here.
22  Q.   If you can find any notes or correspondence
23       which documents that --

Page 10

1  A.   Yeah. Wait, I think it's right there, the
2       letter from Bob Beauchamp, I'm sorry. But I
3       was contacted by Mr. Beauchamp that this
4       accident had occurred. And we discussed the --
5       you know, I did some preliminary investigation
6       into the drills and the designs and what not.
7       And in the beginning, either through
8       Mr. Beauchamp or Mr. Lane, we were discussing
9       at the same time, I made arrangements for the
10      storage of the drill. It was in Mr. Herskowitz
11      -- Mike Herskowitz's office in Atlanta. We
12      made arrangements -- I went to his office and
13      unloaded the drill. You know what, I know of a
14      better way of determining it.
15          MR. GIVENS:  Can we go off the record
16          for one second?
17          MR. SPRAIN:  Yes.
18          (Off-the-record discussion.)
19  A.   But that was in, you know, late 2003 that he
20      first contacted me. And, you know, the -- I
21      started getting involved in it by setting up
22      the storage and all in the first of 2004. And,
23      you know, as time progressed, the different

Page 11

1       parties were notified. And we set up an
2       inspection in, I believe it was, 2005, May of
3       '05. Let me check and make sure. But that was
4       at Applied Technical Services. Let's see here.
5       May 12th of 2005. That was the quickest way I
6       could pick it up.
7  Q.   That date signifies what again?
8  A.   That was the first inspection that was held
9       with the parties. And I've got a list of the
10      people that were present here somewhere, if I
11      may. Is that important?
12  Q.   Sure.
13  A.   I just saw that.
14          MR. SPRAIN:  Off the record.
15          (Off-the-record discussion.)
16  A.   There's the sign-in sheet and those were the
17      people present at that inspection in May.
18  Q.   Okay. This can be marked?
19  A.   Sure.
20          MR. GIVENS:  Let me get a copy of it.
21          (Off-the-record discussion.)
22  Q.   Okay. You pulled out a folder that deals with
23      billing; is that correct?

Page 12

1  A.   Yes. Yes.
2  Q.   Okay. How much have you billed to date?
3  A.   Oh, I would have to -- whatever the total of
4       all of that would be. I believe there have
5       been three invoices.
6  Q.   Is this file complete?
7  A.   I have not invoiced, you know, for, I guess,
8       approximately the last week or so of work and,
9       you know, the prep time for this deposition.
10 Q.   Well, what I'm going to do is I'm going to mark
11      the billing file that says "Shaver Billing" as
12      Exhibit 4.
13          MR. GIVENS:  There's probably two
14          copies in that file, I suspect.
15          MR. SPRAIN:  You are correct.
16 Q.   What I'm going to do is I'm going to pull one
17      out and I'm going to mark this set of documents
18      as Exhibit 4 to your deposition.
19          (Exhibit 4 marked for identification.)
20 Q.   And the first invoice is dated October 20, '06
21      on the stack of documents. I know that's not
22      the most recent -- I mean, this is the most
23      recent invoice, probably there are others

Page 13

1       behind it?
2  A.   Correct.
3  Q.   But just in terms of identification, the
4       exhibit label is attached to the October 20,
5       '06 invoice.
6  A.   Okay.
7  Q.   All right. But you're saying this would not
8       include the most recent billing for the past
9       week or so?
10 A.   Right. Correct.
11 Q.   Well, what is your hourly rate?
12 A.   It's 200 dollars per hour.
13 Q.   And in terms of housekeeping, I've labeled your
14      license in Alabama as Exhibit 3.
15          Okay. What do you charge for trial time?
16 A.   If it's out of town, out of the metro Atlanta
17      area, it's the same, it's 200 dollars per hour
18      including, you know, travel time. If it's in
19      the metro Atlanta area, for depositions and
20      trial I charge 500 dollars for the first two
21      hour minimum, and that includes my time to and
22      from the deposition, deposition or trial. That
23      being most of the Courthouses are within a half

Page 14

1    hour of my home.  So I've just kind of built
2    that in, a 500 dollar minimum for a two hour
3    deposition, and then it goes to 200 dollars per
4    hour thereafter.  That's the only step or, you
5    know, difference in billing that I give and
6    that only encompasses out of town and in town.
7  Q.  I've got it.  What have you done in preparation
8    in the past week and a half after your latest
9    invoice for this deposition?
10 A.  Okay.  I made a trip down here last Friday, met
11   with Mr. Lane, went over some of the aspects of
12   the case; went ahead and started building the
13   alternate design -- alternative design subject
14   drill; reviewed, you know, case file material
15   just to kind of review it, even though I had
16   been over it before, just to kind of update and
17   refresh.
18 Q.  I understand.
19 A.  But primarily most of the time was spent,
20   believe it or not, on, you know, working on the
21   alternate design.
22 Q.  Okay.  How much time would you estimate you
23   spent doing all of that in preparation for the

Page 15

1    deposition?
2  A.  Probably 20 to 25 hours.
3  Q.  Okay.  So that's going to be four to 5,000
4    dollars in preparation expense and then you've
5    got this deposition, of course?
6  A.  And this deposition.  And, of course, there's
7    expenses, travel expenses, hotels and some
8    other things, I don't know if you're interested
9    in that or not.
10 Q.  Well, what I will ask you to do on the record
11   is to -- is to send your invoice for services
12   up through the deposition, you know, to
13   Mr. Lane and then he can forward it to my
14   office?
15 A.  Okay.  Let me just -- I know different states
16   have -- and I don't know if this needs to be on
17   the record or not.  Can we go off the record?
18      MR. SPRAIN:  Sure.
19      (Off-the-record discussion.)
20      MR. GIVENS:  He will want to read and
21          sign and we all agree we have the
22          normal stipulations.
23 Q.  All right.  So to keep this deposition moving

Page 16

1    smoothly, put aside in the stack, as matters
2    we've already been over, this folder containing
3    billing.
4  A.  Okay.
5  Q.  And hopefully eventually we will clean off this
6    conference table and we can move to the --
7      MR. GIVENS:  What I'm going to do is
8          put things that we've already
9          discussed in this chair down here,
10         that way it's off the table, but
11         within reach.
12     MR. SPRAIN:  Okay.
13 Q.  Now, I pulled out a stack of documents from
14   your shuck labeled "Shaver Documents," and all
15   of these documents relate to this case; is that
16   correct?
17 A.  Yes.
18 Q.  Okay.  And the first series of documents are
19   United Rentals' initial disclosures.
20 A.  Okay.
21 Q.  What I plan to do is go over them for the
22   record, but I don't plan to mark anything
23   unless we need to.  Is there any particular

Page 17

1    document in United Rentals' disclosures that's
2    particularly relevant to your opinions in this
3    case?
4  A.  There is, and I don't know if it's in these
5    particular ones here.  You know, you have the
6    rental invoice, the invoice material having to
7    do with the drill, you know, just showing that
8    it was rented to Flavor House during that time
9    period; that it was sold with a new gasket,
10   what appears to be a new gasket core for that
11   drill; and that it shows that it was sent out
12   with a three and a half inch and a four inch
13   bit; and that the rental protection was
14   accepted.  There is also another document.
15 Q.  That last part you said "the rental" --
16 A.  Protection.
17 Q.  Okay.
18 A.  In other words, Flavor House accepted the
19   rental protection.
20 Q.  Okay.  I understand.
21 A.  There's also a -- they provided preparation
22   safety precautions that must be observed.  It
23   just goes through the -- you know, how to

Page 18

```
 1        operate the machine.  You know, that it's --
 2        you know, that was something that I obviously
 3        looked at and reviewed at the time, and as well
 4        as the operators manual that was supplied
 5        subsequently to for the subject drill.
 6   Q.   Okay.  You said subsequently, is there any
 7        evidence that the product operating manual was
 8        not supplied with the tool when it was rented
 9        and delivered to Flavor House?
10   A.   I believe there was some deposition testimony,
11        and I would have to go back to see, that there
12        was not an operators manual with it there at
13        Flavor House is my understanding; they did not
14        have one.
15   Q.   Okay.  Now, the next series of documents appear
16        to be photographs.  Were those photographs
17        taken of the product involved in this case?
18        What was the product, by the way?
19   A.   A concrete core cutting drill manufactured by
20        Norton.
21   Q.   Okay.
22   A.   Well, yeah, Norton, I guess, puts everything
23        together, the different components.  The drill
```

Page 19

```
 1        itself is manufactured by Milwaukee.
 2   Q.   Okay.  What about the drill stand and column,
 3        who manufactured that component?
 4   A.   I believe it's my understanding that Norton
 5        did, but it goes by another name.  There's
 6        another name that has been mentioned that
 7        Norton operates under.
 8   Q.   All right.  Does Diamond Products ring a bell?
 9   A.   Yes, I believe they manufacture the bits, the
10        drill bits.  But I think that's also handled
11        through Norton as well.
12   Q.   Okay.  Now, what is the model name of the core
13        drill involved in this case?
14   A.   It's a DM500 or some designation.  Dymodrill is
15        the name that's given here on the -- well,
16        that's for the actual motor.  Here we go.  A
17        DM500 Dymodrill core drill.
18   Q.   Okay.  What I'll do for this deposition is
19        refer to the product as a core drill.
20   A.   Okay.
21   Q.   And by doing that we understand that it's the
22        DM500 that is the subject matter of the
23        photographs I just handed you.
```

Page 20

```
 1   A.   It incorporates a frame, the Milwaukee drill
 2        motor and the Gast vacuum pump put together,
 3        that entire assembly, when we're talking about
 4        a core drill.
 5   Q.   Exactly.  Would you agree that there are three
 6        main components; the stand and column, the
 7        Milwaukee motor and the Gast vacuum pump?
 8   A.   Those are the -- correct.  Yes.
 9   Q.   All right.  Now, if you can flip through the
10        photographs, and my intent here is not to
11        belabor this, but if there are any photographs
12        that are of particular importance for your
13        opinions in this case, let's mark those?
14   A.   Okay.  Yeah, there's a photograph right here
15        that I feel is of importance.  It's the vacuum
16        gauge that goes with the pump.  There is no
17        indication on that particular gauge face of
18        what is an acceptable vacuum pressure and what
19        is not.  There's no writing or indication on
20        the drill itself that would alert anyone.  And
21        I believe also in the instruction manual that
22        came with this drill at that time, and I would
23        have to look, but I don't believe there's a --
```

Page 21

```
 1        well, I'll have to look into that.  Let's go on
 2        through the photographs and we will go to that
 3        in the material.
 4            There's broken wires, which subsequent
 5        deposition testimony has revealed the violent
 6        action of the drill spinning around was the
 7        cause of that.  One of the drill bits, I
 8        believe it was the three and a half inch drill
 9        bit, but I'm not -- I would have to look back
10        for sure, the ends were chewed up and broken.
11        The wire was pulled off of the vacuum pump as
12        well.
13   Q.   Was that done prior to the incident or as a
14        result of the incident?
15   A.   As a result of the incident.
16   Q.   And that's based on deposition testimony?
17   A.   Deposition and also the way that -- the way
18        that it appears to me to have been from a
19        violent act.  In other words, it wasn't just,
20        you know, where somebody purposefully had
21        disconnected it or removed it for any reason.
22   Q.   Do you have any opinions as to whether the
23        vacuum pump was operational at the time of the
```

Page 22

1    accident?
2  A.   I do.  It's my opinion that it was operational
3      at the time.  Well, let me correct that.
4      Immediately prior to the incident occurring, it
5      was operational.  I think that comes from the
6      deposition testimony that they had used the
7      vacuum pump.
8          Now, whether it was fully efficient or
9      not, I can't say.  You know, was it able to
10     pull a vacuum, the seal that I observed on the
11     subject drill had almost a separation where
12     it's glued together.  So the gasket may not
13     have had a good firm fit.  So to what degree
14     they were able to achieve a vacuum in the
15     system, I can't say for sure, but it's my
16     understanding that the vacuum pump was
17     operating and was functioning.  Now,
18     functioning properly, I can't say.
19         With regards to that, there was some
20     material, a white powder, that in that
21     inspection was uncovered that was later
22     analyzed, I believe, to be aluminum oxide that
23     had gotten into the diaphragm of the pump.

Page 23

1      It's my opinion that that was from some kind of
2      slurry that had gotten introduced to the system
3      at some point in time.
4  Q.   Was that before the incident involved in this
5      case or as a result of the incident?
6  A.   I believe it was before the incident occurred.
7      And it's my understanding at Flavor House that
8      when they used it it was only -- they had only
9      drilled one hole prior to this.  And the amount
10     of material in there, if it was from a slurry,
11     with the ball -- the ball check valve in the
12     filtration, I just don't believe that there
13     could have been that much material that would
14     have been sucked up into that vacuum pump from
15     drilling one hole and partial into the second.
16 Q.   What effect, if any, would the slurry, as
17     revealed by the aluminum oxide, have on the
18     functioning of the vacuum system?
19 A.   It would tend to make it less efficient;
20     inhibit the movement of the diaphram, which
21     would prohibit it from developing a full
22     vacuum.
23 Q.   All right.  What I want you to do is mark that

Page 24

1      picture you've already --
2  A.   Oh, there are a bunch of them.
3  Q.   Just mark some of those pictures with these
4      tabs showing the slurry as you call it.
5  A.   Okay.
6  Q.   What is the slurry?  What comprises the slurry
7      material in the vacuum system?
8  A.   It would be -- the aluminum oxide would have
9      likely come from a material that had been cut
10     that contained aluminum.  The other thing that
11     is possible as well, that if water and material
12     were sucked up into the pump, I believe the
13     housing of that motor is aluminum and it could
14     have resulted from some kind of corrosion from
15     material that was sucked up into the vacuum
16     pump as a reaction with the aluminum.  That's
17     also a possibility that that's why you had the
18     aluminum in it, it could have just been from
19     water and concrete mixture that was sucked up
20     into the vacuum pump.
21 Q.   Now, the ball inside the vacuum container is
22     supposed to trap water and such things as
23     slurry material from entering the vacuum pump;

Page 25

1      is that correct?
2  A.   That's correct.  As the water level were to
3      rise in that bowl -- if you want to I can show
4      you, but you know what I'm talking about.  The
5      water catch basin, water trap is what it's
6      called, as that water level rises, there is a
7      ping-pong -- approximate ping-pong size plastic
8      ball that will float up to the top and will
9      seal off an orifice at the top that will cut
10     off the vacuum and would prohibit the machine
11     from operating.  It would, you know, prevent
12     any suction going through there.
13 Q.   So then what caused this slurry to enter the
14     vacuum system?
15 A.   What --
16 Q.   What caused the slurry to enter the diaphram of
17     the vacuum system?  Does that indicate that the
18     water trap was not functioning on a prior
19     occasion or what does it signify?
20 A.   That's what it would indicate to me, yes, that
21     there had been a time that water had gotten
22     around the ball, that it had been allowed to
23     get too much water in it.  And even though that

Page 26

1  thing is supposed to be emptied and kept
2  drained, even though that ball is intended to
3  rise, that's when it would be level. And in
4  sloshing it around or moving it around with the
5  vacuum pump on, you could get movement and
6  still get water up in there. There are certain
7  situations that could cause that.
8  Q.  Okay.
9  A.  And also the -- I believe these are the clutch
10  bushings that were removed when we disassembled
11  the clutch on the drill motor, these next
12  photographs, and I will go through these.
13  These indicate to me, and it's not as clear on
14  these photographs as it was firsthand, --
15  Q.  If you will, put them on the side and that way
16  we can copy them later.
17  A.  Okay. Sure. It indicated to me that the
18  clutch had not slipped. There was no galling,
19  G-A-L-L-I-N-G or G-A-U, I'm not sure of the
20  spelling, I shouldn't try, but it's where
21  metals would rub together. And these were
22  alternate, I believe, brass and steel rings.
23  There was no indication there had been slippage

Page 27

1  or anything like that of overloading the clutch
2  on this or anything that would have caused a
3  clutch malfunction. That was also confirmed by
4  within specification readings of the torque on
5  the clutch assembly prior to it being
6  disassembled.
7  Q.  So based on your review of the materials in
8  this case and the product, the clutch was
9  functioning?
10  A.  Yes.
11  Q.  Okay. And you didn't take any exception to the
12  clutch in the Milwaukee electric motor?
13  A.  I'm not aware of any -- any problems with that.
14  Q.  How would the clutch function in the event that
15  the drill bit on a core drill hung up or bound
16  up or locked into the concrete?
17  A.  Okay. If you had the base securely affixed to
18  the floor or you otherwise had the jacks -- the
19  stand secured with the ceiling jack or anchor
20  bolts and you run into something that would
21  bind it, that would overload it. The clutch
22  would begin to slip and that would keep it from
23  burning up the motor or introducing enough

Page 28

1  torque to break something. It just keeps it
2  from being -- I believe it's about a two
3  horsepower motor on that drill, which is quite
4  a bit of power.
5  Q.  Right. The clutch then protects the motor in
6  the event that the drill bit binds up?
7  A.  It would protect the motor. It could also act
8  as an overload, a safety feature for people as
9  well.
10  Q.  Okay. That was my next question. How can it
11  act as a safety feature?
12  A.  Well, if you had -- if you didn't have the
13  clutch, you would have no limiting power on how
14  much power output would come from that electric
15  motor other than the horsepower and that. I
16  mean, obviously there is a limit to what it can
17  produce. But that motor could overcome any
18  anchorage methods that you would use to cause
19  the anchoring methods that had been designed
20  for use with that clutch situation. If the
21  clutch was not present and it was a direct
22  drive, it would be an unknown amount of force.
23  It would be difficult to predict what force the

Page 29

1  motor would have as an output to know how to
2  design the rest of the machine to contain that
3  energy.
4  Q.  Okay. Now, in this case if the core drill base
5  or stand -- what do you call the base or the
6  stand?
7  A.  Well, I would call the base the part that
8  attaches to the floor and the stand, if you
9  would -- you could refer to the entire unit of
10  the base and the vertical pole, I believe it's
11  about a four square inch pole with a racked
12  gear on it, as the stand. I think you would
13  refer to, you know, both parts, but you have a
14  -- the base would just be the part that vacuums
15  down to the floor.
16  Q.  Okay. We're on the same page. I will refer to
17  the base as that part that has the gasket
18  underneath --
19  A.  Okay.
20  Q.  -- that sucks down through negative pressure by
21  virtue of the vacuum system in this case on the
22  floor?
23  A.  Okay.

Page 30

1  Q.   And you mentioned that there are two other
2       methods to secure the core drill, one being the
3       ceiling jacks and the other being the anchor
4       bolts?
5  A.   Correct.
6  Q.   But in this case it's your understanding from
7       the documents and the testimony that the
8       plaintiff, Matthew Riley, and his supervisor
9       had used the vacuum system?
10 A.   That's correct.
11 Q.   Okay.  Do you take any exception to the other
12      two methods to secure the base to a work area?
13 A.   The only one -- obviously there are certain
14      situations where the ceiling jack would be
15      appropriate and, you know, I don't take
16      exception to that.  The only one I have with
17      the anchoring bolts, I just -- it appears to me
18      to be very laborious, labor intensive, to, you
19      know, drill the anchor bolts in.  Plus you're
20      putting an imperfection into the surface that
21      you're drilling a, you know, three, four,
22      whatever size hole you're trying to core.  Now
23      you have, depending on how many anchor bolts,

Page 31

1       you know, two to four other smaller holes that
2       you've just put into the floor that you either
3       leave or have to patch.  So it just -- even
4       though that's mentioned in the manual, I just
5       -- I don't envision that as being a -- in most
6       instances that I see a core drill being used, I
7       don't see that as a likely method to use to
8       anchor.
9  Q.   Okay.  But it is one alternative to secure the
10      base to the work area, correct?
11 A.   It is, yes.
12 Q.   Okay.  And do you see any safety problems with
13      using the anchoring method to secure the core
14      drill?
15 A.   Yes.  Yes.
16 Q.   What safety problems do you see?
17 A.   You know, you're drilling holes into the floor.
18      And just from experience that I personally have
19      in drilling holes in concrete, you can run into
20      concrete of such varying hardness and strength
21      that I believe it would be entirely possible to
22      have concrete that was soft enough that those
23      anchor bolts would not firmly secure the thing

Page 32

1       in.  And you have an unknown as well.  You have
2       no way of measuring how strong and how firm
3       your base would be attached to the floor as
4       opposed to the vacuum method.
5           You know if you have a sufficient amount
6       of vacuum as designed and you know the square
7       inch area that the vacuum base is attached,
8       it's possible for the engineer to calculate
9       that that would exceed what the motor output
10      would put through its clutch mechanism.  With
11      anchor bolts I don't think you could be assured
12      of that; I think there's too many variables in
13      using anchors.
14 Q.   Okay.  Now, what about the ceiling jacks, do
15      you see any safety hazards related to use of
16      the ceiling jacks to secure the core drill?
17 A.   Just that it would be overhead, you could have
18      it fall and all, but none in particular, no.
19 Q.   Okay.  In regard to this particular case, what
20      would be your preferred method to secure the
21      core drill to the work area?
22 A.   My understanding of the work area would be with
23      the vacuum pump, a properly operating vacuum

Page 33

1       pump, operating with the vacuum in the proper
2       range and constrained to the proper range for
3       the design of the drill motor output.
4  Q.   In this case Mr. Riley was injured on August
5       29, 2003; is that correct?
6  A.   I believe that's correct, yes.
7  Q.   Okay.  I will refer to it as the accident date
8       or the accident --
9  A.   Okay.
10 Q.   -- in this deposition.  On the accident or at
11      the time of the accident, would it be your
12      opinion in regard to the vacuum system working
13      with the motor clutch, that if the vacuum
14      system had resulted successfully in the drill
15      being secured properly to the work area, and if
16      the drill then locked up or hung up and the
17      clutch worked, the accident would not have
18      happened because the base would not have spun
19      or rotated around the axis of the drill?
20 A.   If it were designed properly to where the force
21      of that base calculated by the pressure that
22      would be created over that square footage or
23      square inch area, that should -- that force

9 (Pages 30 to 33)

Page 34

1   should exceed the output of the drill. And
2   I've done a quick, you know, kind of a
3   calculation of the torque of the motor on the
4   drill and, you know, it's my opinion that the
5   torque that the clutch -- the torque output, as
6   limited by the clutch in that drill, would be
7   less than the force that would be available to
8   it with the vacuum available.
9  Q.  What does that mean?
10 A.  Okay. That means that if the vacuum is
11  properly working and you have a 20 inch Mercury
12  vacuum, you know, applied to the area of that
13  base and it's maintained, that it would -- it
14  would hold that mechanism down to the point
15  that the clutch would take over and start to
16  slip.
17 Q.  Okay. So that answers my question, I believe.
18  If you did have adequate vacuum pressure, the
19  base was secured to the work area, and if the
20  clutch had worked in this case so that it
21  slipped, the base would not have spun out of
22  control?
23 A.  That's correct.

Page 35

1  Q.  Okay. And that would have avoided the
2   accident?
3  A.  To the best of my understanding of how the
4   accident occurred and what I know, yes.
5  Q.  Well, what is your understanding of how the
6   accident occurred?
7  A.  That the bit bound and it spun around four or
8   five times. You know, it was striking
9   Mr. Riley or taking him for a ride, I believe
10  one -- you know, just around and around, you
11  know. And when I use that term of how it
12  occurred, I mean, you know, absent of any
13  unusual abnormalities with the situation, it
14  should, and I can't think of it. Yeah, it
15  would be -- it should have avoided an incident
16  from occurring.
17 Q.  Okay. And by saying it should have, if the
18  vacuum system had held the base securely to the
19  work area, in this case it was a concrete
20  floor?
21 A.  Correct.
22 Q.  All right. And, again, just so we're clear, at
23  the time of the accident, did the clutch work?

Page 36

1  A.  I have every reason to believe that the clutch
2   was operational. Because when the torque of
3   the clutch was measured, it was within the --
4   what the Milwaukee representative said the
5   torque -- and I believe it was a little over
6   200 pounds -- 200 foot pounds of torque was
7   measured on the clutch to create a slippage.
8       MR. GIVENS: Mr. Sprain, just for my
9           own clarification, when you say
10          did the clutch work, are you
11          intending to ask was it
12          operational as intended at the
13          time or are you saying did it
14          somehow engage during the process
15          of this event? Do you see the
16          distinction I'm drawing?
17      MR. SPRAIN: Sure. Sure.
18 Q.  The same meaning essentially, operational, did
19  it engage, was it working, you know, did it
20  work as intended? Do you have any opinion that
21  it did not engage or did not operate?
22 A.  Oh, I see. I'm glad you clarified that,
23  because I took that question to mean was there

Page 37

1   anything wrong with the clutch. Was that not
2   the intent of your question?
3  Q.  Well, that was a question and you said there
4   was not anything wrong with the clutch?
5  A.  I have no indication that there was any
6   malfunction of the clutch.
7  Q.  And then the next question would be, at the
8   time of the accident or thereabout, did the
9   clutch operate or did it engage as a result of
10  the drill bit locking up?
11 A.  I can't say for a hundred percent positive, but
12  I would say it probably did not, because -- it
13  could have momentarily. It could be right at
14  that critical juncture of where the force that
15  was available on the base would have been equal
16  to the torque, but still, you know, broke
17  loose. Yeah, you could have an area where
18  those forces could be equal. But it would be
19  my opinion that there was not a sufficient
20  excess of force available through the vacuum
21  base that would have caused the clutch to have
22  just continuously spin --
23 Q.  All right.

1  A.  -- and engage.  It may have engaged momentarily
2      during the process of this.  But, you know,
3      there's two reasons I have that opinion.  One
4      is there was no -- there was a catastrophic
5      event, so the clutch did not sit there and be
6      the limiting factor and keep this from
7      occurring.  And also there were no signs in the
8      clutch mechanism when we disassembled it, the
9      disks, that that had sat there and spun for a
10     long period of time.
11 Q.  All right.  Now, is there a relationship
12     therefore between the engagement of the clutch
13     from the motor and the proper functioning of
14     the vacuum system?
15 A.  Yes.
16 Q.  Okay.  And what is that relationship?
17 A.  That relationship would be that with the vacuum
18     system operating properly and maintaining in
19     range suction between the floor and the base,
20     that that force should have exceeded what the
21     torque output would have been from the drill
22     motor.
23 Q.  Okay.  And that would mean that the clutch

1      would slip and the motor would keep running,
2      but the drill would not rotate or turn and the
3      vacuum system would hold the base down?
4  A.  Correct.
5          MR. GIVENS:  And when you say "drill,"
6              you're talking about the drill bit
7              as opposed to the drill motor?  In
8              other words, the drill motor would
9              no longer be turning the drill
10             bit?
11 Q.  Exactly.  It would still be on, but the drill
12     bit would not be rotating into the working
13     surface?
14 A.  Right.  Unless the operator was just sitting
15     there and ignoring it.  But, you know,
16     obviously when you're operating something and
17     the bit stops and the motor is running, you
18     know that that's not a favorable situation and
19     you immediately move to shut the motor off and
20     move on.
21 Q.  Okay.
22 A.  To realign.  I think the instruction manual
23     says to do that, to realign and get your

1      situation back.
2  Q.  All right.  Let's do this at a break, maybe we
3      can go -- well, let's do it right now.  Let's
4      go back through and we have marked three
5      categories of photographs in this set of
6      documents.  One dealt with the slurry or the
7      aluminum oxide; one series of documents dealt
8      with the clutch?
9  A.  Rings of the clutch, yes.
10 Q.  The rings of the clutch.  And --
11 A.  Actually, you know, the others had to do with
12     the vacuum gauge.  We actually have four.  I
13     know we discussed the cords, the electrical
14     cords, it appearing to have been from a violent
15     event.  I don't know that we marked those
16     though.  Let me go back and do that.
17         MR. GIVENS:  So we're going to call
18             that cord damage or, I mean, what
19             are we calling it?  I was putting
20             down three things and I think now
21             we're going to have four
22             categories of photographs.
23         MR. SPRAIN:  That's fine.  Cord damage,

1      electrical cord damage.  Let's go
2      off the record.
3         (Off-the-record discussion.)
4  Q.  Now, what I want to do is we'll mark those
5      collectively as Defendant's Exhibit 5.
6         (Exhibit 5 marked for identification.)
7  A.  There is one thing I would like to point out
8      that the photographs show as well.  The drill
9      unit -- I know there's been some discussion
10     about where Mr. Riley was standing and whether
11     that was the proper area as far as standing on
12     the drill.  I would like to note that the drill
13     itself, a photograph of the drill, and we'll
14     mark that with a tab, shows the electrical
15     outlets on the box, the control box, on the
16     back side which faces the drill bit itself, the
17     core bit.  And so the amp meter and the on/off
18     switch for the drill itself is on the opposite
19     side facing the bit.
20     And the operator is supposed to monitor
21     the amperage output of the motor, that's one of
22     the things, to make sure it's not exceeding;
23     that's a thing that they can monitor.  And that

Page 42

1    amp meter is on the back side, which would
2    indicate that that was intended for the person
3    to be on the back side of the drill as opposed
4    to the front side of the drill.
5  Q.    Okay. And was it proper for Mr. Riley, as the
6    operator, to stand on the core drill?
7  A.    There is no warning that I have been able to
8    find that warns or advises that it's improper
9    or that tells you not to stand on the drill.
10    And in fact we'll look at -- there are some
11    photos, I'm not sure that it's going to show up
12    in any of these though. There is a worn spot
13    on the base of the subject drill. We'll find
14    it in some of the photos. It may not be in
15    these particular ones. I'm going to go over to
16    this drill just for the purposes of describing.
17    I know I'm going over to this one, so I'm going
18    to help describe it for the record where it is
19    and then we will find a photograph later.
20    It would be, as I am facing the back side
21    of the approximately three inch square vertical
22    post, on the right side of the drill where it
23    says "Norton," there's a thing there that's

Page 43

1    just about the right size for a shoe. The
2    paint on the subject drill is just worn through
3    the -- worn off. The paint is worn off and the
4    metal is worn into that area where it's
5    apparent that numerous people had stood right
6    at that point. That's a perfect match-up. So
7    if this is the side that it's intended to
8    stand, which I have not noted, it would be, you
9    know, sort of intuitive for someone, you know,
10    to be holding it to control -- to feel they had
11    control of the drill to stand on it. And I
12    have not found any warning against doing so.
13  Q.    Right now you've got your right foot on the
14    base --
15  A.    Right. Correct.
16  Q.    Okay. -- above the name of Norton, and you've
17    got your right hand on the lever. What do you
18    call this, the handle or lever?
19  A.    Yes, this would be the lever. It's the force
20    application handle for applying the downward
21    force onto the core bit.
22  Q.    Okay. And then you've got your left hand on
23    the top of the column?

Page 44

1  A.    Well, that's where I had it right there,
2    correct.
3  Q.    Okay. And what we're looking at now, so that
4    the record is clear, is the alternatively
5    designed core drill --
6  A.    Correct.
7  Q.    -- that you have developed --
8  A.    Correct.
9  Q.    -- as part of this case?
10  A.    Correct.
11  Q.    Okay. That's fine.
12    MR. GIVENS: One thing I kind of want
13    to do is get a point of reference
14    for when we've been referring to
15    the front or the back of
16    something. And as I've visually
17    seen what y'all have verbally
18    described, I take the back to be
19    that side of the stand on which
20    the vacuum pump sits and the wheel
21    sits, and the front is the side of
22    the post on which the drill motor
23    sits; are we in agreement with all

Page 45

1    of that?
2  A.    In my discussion that's how I referred to it,
3    correct.
4  Q.    That's fine. Okay. Are we through with your
5    review of the photographs?
6  A.    Yes.
7  Q.    Okay. And what I'm going to do is I'm going to
8    let Rick help me later with copying the
9    photographs that he has labeled with stickers.
10    Right now I'm going to put into the record my
11    document entitled Defendant's Exhibit 5 and it
12    has five categories of photographs, electrical
13    cord damage, rings of the clutch, slurry in the
14    vacuum, vacuum gauge, and a photograph showing
15    the amp meter on the drill stand.
16  A.    No, not slurry in the vacuum gauge, in the
17    vacuum pump.
18  Q.    Excuse me. That is what I wrote down though.
19    And then the next category would be the vacuum
20    gauge. I probably read those together, but you
21    had five categories. One category was
22    separate, it was about the vacuum gauge.
23  A.    Oh, yes. Yes. Yes. But not slurry in the

Page 46

1    vacuum gauge, it was just the visual face of
2    the vacuum gauge, to the operator or observer
3    there is no delineation.
4    Q.  That's what I've written down, I just read it
5    all together to you.
6    A.  All right.
7    Q.  All right.
8    A.  If we're at a stopping point, I would like to
9    get some water. I've done a lot of talking and
10   my mouth is kind of -- my throat is dry.
11   Q.  No problem.
12       (Recess.)
13   BY MR. SPRAIN:
14   Q.  I have another series of documents again that
15   was contained within your shuck entitled
16   "Shaver Documents," and you've got some
17   disclosures from Saint Gobain Abrasives. Is
18   there anything that you reviewed from Saint
19   Gobain that's relative to your opinions in this
20   case?
21   A.  No.
22   Q.  Okay. And the next set of documents is in
23   regard to the Milwaukee motor. We've discussed

Page 47

1    the clutch and I don't want to be redundant.
2    Is there anything from the Milwaukee operators
3    manual that is relevant or has any bearing?
4    A.  Let me look at that real quick and scan through
5    it.
6    Q.  What about the parts list, is there anything in
7    this parts list?
8    A.  I don't think so.
9    Q.  Okay. Off the record.
10       (Off-the-record discussion.)
11   A.  You know, we have something else that's
12   different from what we noticed on the subject
13   drill and I just want to point it out. They
14   show in this photograph the handle to the left,
15   okay? Which would imply that you're standing
16   to this side of it. This one is a little
17   different, this is a different layout, you
18   know, because this here has a nameplate up here
19   and we obviously don't have that. We've got
20   the -- well, I'm sorry, there's a nameplate
21   here. But I just want to point out that in
22   this particular one the person would be
23   standing in front of the drill here, you know,

Page 48

1    because your --
2    Q.  Well, let's explain for the record what you're
3    looking at. It's a page out of the Milwaukee
4    operators manual?
5    A.  It's page six.
6    Q.  Page six?
7    A.  Page six and figure four.
8    Q.  Now, let's do this for the record, let's mark
9    the Milwaukee operators manual as Defendant's
10   Exhibit 6 for the deposition.
11       (Exhibit 6 marked for identification.)
12   Q.  All right.
13   A.  Here the meter box shows the amp meter gauge
14   now facing the front side of the drill.
15       MR. SHEEHAN: And you're talking about
16       the diagram, sir?
17   A.  Yes, figure four. So, you know, it's different
18   from the one we observed on the subject drill
19   that we have that the incident occurred in.
20       MR. GIVENS: Is that the same page?
21   A.  Right here? Yes, it is. Yeah.
22       MR. GIVENS: One thing I would like for
23       us to do when we start talking

Page 49

1    about the Milwaukee operators
2    manual is to ensure that we, with
3    as much specificity as we can,
4    identify that manual in the event
5    that there is more than one
6    floating around.
7    A.  Yes, there is, because there was a manual --
8    there's a manual for the old drill and there's
9    differences. There's a different manual for
10   this new drill. There's different wording in
11   it.
12       MR. GIVENS: I don't know if there is
13       any kind of identifying -- and
14       I'll be looking while y'all are
15       talking if you want to.
16   A.  You know, it's obvious here what this is about
17   and I just noticed it. This is just showing --
18   this is moving the handle to the other side.
19   It shows reversibility. You can move this
20   handle from this side to this side.
21   Q.  Right.
22   A.  And I guess that, you know, then you would
23   switch this to this side as well. In other

Page 50

1  words, it provides for, you know, different
2  configurations of rotating the handle for a
3  left-handed person and a right-handed person.
4 Q.  Okay.
5 A.  And the monitoring -- amp meter monitoring
6  gauge can also face either direction, which
7  does not -- which indicates to me that they
8  don't have a recommended preference of which
9  side is appropriate to stand on.
10 Q.  What about the front or the back, is there a
11  recommended stance, in your opinion, as to the
12  front or back of the core drill?
13 A.  Yes, I have a preferred place to stand, and
14  that would be to the back of the drill.
15 Q.  Okay.  Why is that?
16 A.  First of all, standing to the front of the
17  drill, in case something happens, you know,
18  it's going to fly out and hit you.  It's coming
19  that direction towards you.
20 Q.  Sure.
21 A.  Plus if you happen to have loose clothing or,
22  you know, you're moving or if you're standing
23  here at the thing -- the handle, if you had

Page 51

1  loose clothing, it could get tangled up into
2  the -- you know, into the movement of the
3  drill, especially if you -- you know, when you
4  were to bring it up.  To me it's just safer,
5  you are away from the moving part, to stand on
6  the back side.
7 Q.  I see.  In this particular assembly of the
8  Norton core drill, the inlet for the water hose
9  is mounted on the motor?
10 A.  Correct.
11 Q.  For the core drill that Mr. Riley was using on
12  the day of the accident where was the water
13  mount?
14 A.  From the best I recall, I would have to look
15  back, but it was in the same location.  Yeah,
16  that's what I recall.
17  MR. GIVENS:  For the purposes of
18  identification on the Milwaukee
19  operators manual, the one that
20  we're looking at on the back page
21  has an identifying number of
22  58-14-3005D8.  It also has the
23  date 09/03 and indicates it was

Page 52

1  printed in the USA.  So hopefully
2  that will differentiate this one
3  from any others.
4 A.  It's unlikely that that was the manual that
5  went out with that drill since the accident
6  occurred in 2003 in August, whatever that date
7  is.  I believe it's on the front here.  In
8  August of 2003.
9  MR. GIVENS:  Well, do you want to mark
10  that whole manual or just that one
11  page?
12  MR. SPRAIN:  What I want to do is mark
13  the whole manual.
14 Q.  And we haven't finished determining whether
15  there are any other aspects of the manual that
16  relate to this case.  And I don't want to rush
17  you again, Mr. Shaver, but --
18 A.  Okay.  This was also printed in 09 of 2003.  So
19  this appears to be the same one that he has
20  there.
21 Q.  Okay.
22  MR. SHEEHAN:  So Defendant's Exhibit 6,
23  the Milwaukee operators manual in

Page 53

1  which you're referring to figure
2  four on page six, is a manual that
3  was printed, we believe, in
4  September of 2003?
5 A.  Yes.
6  MR. SHEEHAN:  Okay.  And that's the
7  exhibit that's going to be marked
8  composite Exhibit 6, Defendant's
9  Exhibit 6?
10 A.  I assume so, yes.  There is one thing here in
11  the manual, too, that I would point out.  I
12  know that in one of the depositions I read
13  where -- I believe it was Cody, I'm not sure,
14  but he was asked about rebar, you know, was it
15  possible that the bit hit rebar.  And on page
16  eight of the manual it says "some building
17  materials contain steel reenforcements,
18  Milwaukee Dymobits can cut through embedded
19  steel, but are not recommended for coring solid
20  steel plates."  So, you know, that would not
21  have been a reason for the failure there.
22  There is one other in here in the -- and I
23  need to clarify this.  On page nine of this

Page 54

1  manual that was printed in 09 of 2003, it's
2  figure 13 -- right above figure 13 that says
3  "using expansion bolts." It says "Warning, the
4  vacuum gauge must read a minimum of 20 inches
5  of Mercury to reduce the risk of injury. Do
6  not core if the gauge reads less than 20 inches
7  of Mercury." And if I'm not mistaken, the
8  manual that I saw that would have been in print
9  prior to that, I don't believe it carried that
10  warning. We can look and see, but that was
11  something that I had noticed in going through
12  this.
13      They also actually have that warning again
14  on page 11 between number five and six.
15      MR. SHEEHAN: Is that figure five and
16          six?
17  A.  On page 11.
18      MR. GIVENS: I think it's Figure 13, is
19      it not?
20  A.  Well, it was on Figure 13. And then after that
21  between -- they're going through different
22  steps, like four, five, six and seven, it's
23  between steps five and six.

Page 55

1      "Always monitor the vacuum gauge during
2  coring. If water collects in the vacuum pump
3  jar, empty it to prevent damage to the pump."
4  So that kind of goes back to what we were
5  talking about before.
6      Okay. And then it goes to the French
7  section and we won't go through that.
8  Q.  All right. I'm going to try to speed through
9  this, but you've got a volume of documents that
10  relate to various pleadings filed of record and
11  I don't suppose any of these would be
12  particularly relevant, but you can scan through
13  this stack of lawyer filings?
14  A.  Right now, as I sit, there's nothing in there
15  that was relevant to the technical aspects that
16  I am blatantly aware of. I can't -- for the
17  sake of helping you do that, I can't say that
18  there might not be a bit of information in
19  there that might not support the technical
20  opinions that I have.
21  Q.  Are there any answers to interrogatories of any
22  of the defendants that have provided any basis
23  for your opinions in this case?

Page 56

1  A.  To interrogatories?
2  Q.  Well, that would be Saint Gobain, Milwaukee,
3  Gast, United Rentals; has anybody given any --
4  A.  You're saying that as opposed to production of
5  documents, from reviewing the documents,
6  correct? Any -- I don't think so. You know,
7  none of my opinions are based solely on any
8  admissions or answers to interrogatories that
9  they've made. That's not to say that there's
10  not things in there that don't support other
11  aspects that have led to my opinions, but I'm
12  not aware of anything in those documents that's
13  the sole source for my opinion.
14  Q.  Please thumb through this next series of
15  documents, which appears to be information
16  supplied by United Rentals pursuant to
17  discovery requests, and I will ask you the same
18  thing, just point out any item that is relevant
19  for your opinions in this case?
20  A.  Significant, no. About the date of the
21  incident occurring, there's a squabble about
22  whether it was the 28th or the 29th, that has
23  no bearing.

Page 57

1      No. Let me -- well, they talk about a
2  Ready to Rent tag and I think that's -- a copy
3  of that I've seen in some of the documents.
4  The General Safety thing appears to be a
5  generic thing to go out with all equipment, not
6  just the core drilling, so that was not of much
7  use, I don't think. Things I see in these
8  photographs are duplicative of what we
9  discussed in the others; we don't need to go
10  through it again, right?
11  Q.  Please. I mean, I'm not trying to speed you
12  up, but I don't want to be repetitive and I
13  don't think anybody here does. But just go
14  through them and if you see anything that's of
15  particular relevance that we haven't already
16  discussed, you know, stop me.
17  A.  Okay. No, we're done.
18  Q.  The next set is a series of photographs as
19  well, if you can flip through those and answer
20  the same question? And while you're doing
21  that, I've got a stack of documents from the
22  Warren Group, it's another expert, and I don't
23  suppose that there's anything in here that is

Page 58

1 forming the basis of any opinions you have in
2 this case, but let me know. It's Mr. Davis,
3 Roger Davis.
4 A. Let me see. No. No.
5 Q. Okay.
6 A. These are of an exemplar drill that was at one
7 of the depositions or a series of the
8 depositions. Okay. We're good. There's
9 nothing there.
10 (Exhibit 7 marked for identification.)
11 Q. Okay. I'm going to mark as Exhibit 7 to your
12 deposition the May 12, 2005 roster of
13 participants in the first inspection of the
14 product.
15 A. Yes.
16 Q. Okay. And did you have any relevant
17 discussions with any of the individuals who
18 were in attendance; Michael Herskowitz, Paul
19 Guthorn, Kevin Hornyak, Gabriel Uriegas or Mark
20 Hicks?
21 A. Mark Hicks was the Milwaukee representative and
22 he and I worked together. Primarily everybody
23 was there observing, but I was there when he

Page 59

1 was measuring the torque on the drill. And
2 each segment of the torque on the clutch of the
3 drill measured to what it was supposed to and,
4 you know, I think we've already discussed that
5 though.
6 Q. Sure.
7 A. No, there were no discussions, nothing
8 significant.
9 Q. Okay.
10 (Off-the-record discussion.)
11 A. I would like to go back and correct something,
12 if I could.
13 Q. Please do.
14 A. You know, we were talking about the differences
15 in the manual. I've gone back and found my
16 copy of the manual that was printed on 11 of
17 '04, which would be the manual that would have
18 been applicable to the -- for when this
19 accident occurred. And it does have the
20 warning about the 20 inches of Mercury.
21 Q. But that would be postdated, wouldn't it? The
22 accident was August 29, '03, so is that
23 manual --

Page 60

1 A. You know, you're right.
2 Q. Well, it gets confusing.
3 A. But thank you for pointing that out. Yeah, I
4 think there's -- we've got more than two
5 versions of these manuals floating around is
6 the problem here. Yeah, this was 11/04, excuse
7 me. Yeah, I got confused with the dates, I'm
8 sorry. There's no correction warranted there,
9 I'm sorry.
10 MR. SHEEHAN: Mr. Shaver, do we need to
11 -- I guess since it's been
12 identified, why don't we go on and
13 mark it, too?
14 A. Yeah, I've got other things over here, too, and
15 my photographs are in these books.
16 Q. What I want to do is clear off what we have on
17 the table and then --
18 A. That's what I thought and then we would move.
19 Q. And then we'll move. Okay. Now, we've got
20 your deposition, which we've marked as Exhibit
21 1, so I'm going to turn this over. And you've
22 got a stack of documents and it looks like
23 you've got several copies of United Rentals'

Page 61

1 disclosures in this case, thumb through that
2 for me. And you've been given copies of
3 answers to the complaint of Matthew Riley filed
4 by all defendants in this case, I don't suppose
5 that has any relevance to your opinions?
6 A. No.
7 Q. Okay. And we have some more --
8 A. Okay. Yes, here we go. This is -- the date is
9 on the front of this one, 08 of '00.
10 Q. Okay. That would be which manual, sir?
11 A. The owners manual for the DM450 and DM500 core
12 manuals.
13 Q. Okay. Just so the record is clear, we're not
14 talking about the Milwaukee manual now, but
15 rather the manual for the DM450 and DM500?
16 A. That's correct.
17 Q. All right. Now --
18 A. And that's a Clipper.
19 MR. GIVENS: And just by way of further
20 identification, it has Clipper
21 form on it.
22 A. And it has United Rentals Bates Number 0020.
23 Q. Okay. Let's do this; we will mark that

Page 62

1    document, the complete operators manual for the
2    core drill in question, as Exhibit 8 to your
3    deposition.
4         (Exhibit 8 marked for identification.)
5 Q.   As you go through that, are there any relevant
6    aspects of the DM500 core drill operators
7    manual?
8 A.   Yes.  In the area here where it talks about
9    vacuum pump, this is going back to what I had
10    said before, if this is the owners that was
11    applicable and available to anyone or could
12    have been available to anyone at the time of
13    the accident, it does not state what the proper
14    vacuum pressure is for the unit that I can find
15    in this manual.  This is the one I was -- and
16    even though it talks -- you said it was
17    differentiated from Milwaukee, its name is
18    Clipper, however it depicts a Milwaukee drill
19    motor unit in that manual.
20         Also in here they mention leveling screws,
21    allowing the slurry to accumulate on the
22    threads can cause damage to the threads.
23    That's just kind of going back to, you know,

Page 63

1    slurry and to metal parts and things can create
2    problems, that's just confirming that.  That
3    probably has to do with it being -- I believe
4    that concrete slurry would be alkaline, and I'm
5    not a chemist or anything, but I know there
6    could be chemical reactions involved in that.
7 Q.   In this case were the leveling screws used?
8 A.   Were the leveling screws used?
9 Q.   Yes.
10 A.   I believe they were.  I know that --
11 Q.   If they were not used, would that impair the
12    functioning of the vacuum system?
13 A.   It could.  However, I would point out with my
14    alternative design that it would not matter.
15 Q.   Okay.  But in the design applicable to this
16    case, the absence of use of the leveling screws
17    could impair the function of the vacuum system?
18 A.   It's a possibility they could.  I'm just not --
19    I'm not sure of the particular setup that was,
20    you know, applicable of whether it would have
21    or not.
22 Q.   Okay.  Well, what is the purpose of the
23    leveling screws?

Page 64

1 A.   The purpose of the leveling screws is to make
2    sure that the unit does not rock on that
3    gasket.
4 Q.   Okay.  And that helps to ensure a more secure
5    fit to the work area, correct?
6 A.   It would, yes.
7 Q.   Okay.  And that helps to secure that the gasket
8    fits snugly on the work surface?
9 A.   Correct.
10 Q.   Okay.  And so if it's not used, it could impair
11    the functioning of the vacuum system; is that
12    correct?
13 A.   There are some situations that I can envision
14    where it would, yes.
15 Q.   Okay.  Now, we'll talk about your alternative
16    system in a while, but for right now we're
17    going to focus on the core drill that was
18    involved in this case.
19 A.   Okay.
20 Q.   All right.  And it's your testimony that you
21    believe that the leveling screws were used
22    though?
23 A.   Yes.

Page 65

1 Q.   All right.  Other than your comment about the
2    vacuum gauge, do you have any other criticisms
3    of the DM500 operating -- operators manual?
4    And, of course, you're going through it, so in
5    all fairness, you're thumbing through it as we
6    speak?
7 A.   Yes.
8 Q.   Please take your time, but that's a question
9    I'm posing now as you do go through it.
10 A.   And I'm not an expert in layout and design in
11    technical writing.  It's not a very easy to
12    follow manual for ease of reading and quick
13    understanding, I'll say that.
14 Q.   All right.  What about the warnings and
15    instructions and the guidelines for the safe
16    use of the core drill, do you have any opinions
17    as to those areas with regard to the operators
18    manual?
19 A.   Sure.  Other than what I've already mentioned
20    about the 20 inches of vacuum minimum not being
21    -- it's not in any of the print and it's
22    certainly not out in any bold letters or
23    anything that would catch someone's attention

1  to do that. It speaks of vacuum in sufficient
2  force in generic terms and does not define what
3  sufficient force and sufficient vacuum is to
4  attain in that area.
5  Q.  All right. Now, you passed the manual and
6  you're going through some photographs?
7  A.  Pictures.
8  Q.  And that's fine. And again the same question
9  with the photographs, they may be duplicative,
10  but if you see any that have any particular
11  relevance to this case, point them out and
12  we'll tab them?
13  A.  Okay. Sure. This appears to be a photograph
14  of the bit that was damaged or broken. The
15  teeth are kind of chiseled and whittled off.
16  Even though the photograph doesn't show this, I
17  recall it's in one area of the bit around the
18  circle.
19  Q.  Okay. What does that indicate to you? What is
20  the significance about the broken teeth on the
21  bit?
22  A.  That either, A, it was worn out or, you know,
23  it had been broken or damaged before, or that

1  -- it could have indicated that they hit
2  something hard or something to bind it up or
3  something to that effect. However, deposition
4  testimony and statements are that -- well, it's
5  uncertain that the bit may have been in that
6  condition when it was delivered.
7  Q.  Okay. Now, what effect, if any, could that
8  have caused or contributed to cause the
9  accident?
10  A.  You know, it could have -- say it did hit a
11  piece of rebar or hit something unusual in the
12  floor, if the bit was -- you know, if it had
13  teeth on it in some sections and didn't in the
14  other, it could step down into that area and
15  catch on one of the edges of the teeth and
16  would increase the likelihood of a bind
17  situation or, you know, a seizing of the drill
18  bit that would have a tendency to rotate the
19  base. So it would not be the cause of the
20  accident, because I think any time you have
21  something that's drilling in concrete, the
22  machine has to be able to handle events that
23  would cause the bit to seize up because that's

1  an occurrence that can occur at any time.
2      So in my opinion the cause of the
3  accident, you know, with respect to that, or
4  one of the major causes would be the inadequate
5  design of the unit itself not to have
6  incorporated a foreseeable event into that.
7  Still going back to what I said originally with
8  a vacuum suction of 20 inches of Mercury, it's
9  my opinion that even that bit, if it were
10  inadequate and created a seizing opportunity,
11  that the base should have held firmly.
12  Q.  Okay.
13  A.  So -- and I know that's -- it may have been the
14  cause of the bit to seize up, but it's still --
15  well, I think I explained it.
16      MR. SHEEHAN: I'm sorry, I
17  misunderstood, I was trying to
18  write. You said the bit may have
19  been the cause of it seizing up?
20  A.  Yes. But I guess what I'm saying and trying to
21  distinguish here is the seizing of that bit is
22  not the direct cause of the failure of the
23  machine, the overall machine.

1      MR. SPRAIN: Let's go back to this real
2  quickly. We photographed --
3  excuse me, we made copies of
4  photographs that were produced in
5  this case. Who produced these
6  photographs? And they comprised a
7  part of the documents that Don
8  Shaver has reviewed.
9      MR. GIVENS: My understanding is -- let
10  me look at them.
11      MR. SPRAIN: Was that produced by the
12  plaintiff in this case?
13      MR. SHEEHAN: Keith, if I might speak
14  up, I think what --
15      MR. GIVENS: It's -- go ahead.
16      MR. SHEEHAN: Oh, no.
17      MR. GIVENS: I was just going to tell
18  you I'm Larry and not Keith.
19      MR. SHEEHAN: Larry, I'm sorry.
20      MR. GIVENS: I had a judge in
21  Enterprise do that. So don't give
22  it -- if I had a nickel for every
23  time, don't give it a thought.

Page 70

1    But this, to my understanding, and
2    from looking at the background in
3    the photographs, and it's got a
4    United Rentals sign on it, this
5    photograph is of a drill that was
6    used at a deposition. I mean,
7    have you seen them before today?
8    MR. SPRAIN: We've already flipped
9    through those and then we made
10   some copies because Winston said
11   that we were never given copies of
12   those and so your office kindly
13   made color copies for us.
14   MR. GIVENS: And again looking at that
15   and the fact that it's on a wooden
16   floor similar to the wooden floors
17   in our office, it appears to me to
18   probably be in our third floor
19   conference floor on the north end.
20   I can't swear to that. If I could
21   see the rest of them, I could
22   probably figure it out. Are these
23   photographs that were taken of a

Page 71

1    core drill at a deposition earlier
2    in this case?
3  A.  Yes. Yes.
4    MR. GIVENS: And, of course, the
5    photographs speak for themselves,
6    but it appears to be a core drill
7    that has at least a partial -- or
8    actually a full United Rentals
9    decal on it.
10 A.  Correct.
11   MR. GIVENS: And then it's got various
12   shots of that. So is the question
13   where did the photos come from?
14   Who produced them?
15   MR. SPRAIN: Well, I'm trying to, just
16   for the record, clarify that, and
17   then I'm going to mark them as
18   Defendant's Exhibit 9 to
19   Mr. Shaver's deposition.
20 A.  I believe, and just from my recollection, I
21   think that is United Rentals' representative,
22   you've got Waters and Walters, his name is
23   Waters. That's who I -- just as we're sitting,

Page 72

1    I think that's whose deposition those were used
2    in.
3    MR. GIVENS: I will say this, as you go
4    through all of these photographs
5    there are two different core
6    drills; one has a blue bottom and
7    one has an orange bottom. Both of
8    them have United Rentals' decals
9    on them. One of them may be the
10   actual drill, because it has the
11   worn spot on the base that he
12   alluded to earlier that he
13   interpreted to be where people had
14   put their foot on the drill.
15   So as to how you handle these
16   in terms of identifying them and
17   introducing them, I would
18   certainly not -- you do that
19   however you want to. In trying to
20   address your questions as to
21   what's the source of the pictures,
22   that's the best I can come up
23   with.

Page 73

1    MR. SPRAIN: All right. Well, let's do
2    this; we're going to mark these
3    collectively --
4  A.  And that being the case, that is the photograph
5    where I saw the footprint. And I am looking at
6    the subject drill that was taken at Applied
7    Technical Services, as I recall. And for the
8    record, that indicates what may have been foot
9    traffic in that same area, but nowhere near the
10   degree that those photographs that you have
11   right there do.
12 Q.  Okay.
13 A.  In fact, on the one at Applied Technical
14   Services, which we know to be the subject
15   drill, the warning label, the yellow warning
16   label is worn off from what would be my opinion
17   of foot traffic. And there's obviously a
18   footprint right there where somebody had
19   stepped on it right there or a smudge which
20   very closely resembles what the sole of a shoe
21   would be.
22 Q.  Now, this doesn't appear to be the same.
23   MR. GIVENS: No, that's what he's

Page 74

1    saying.
2  A.    That's what I'm saying.  That is not our drill
3      that's the subject of this litigation.
4      (Exhibit 9 marked for identification.)
5  Q.    Okay.  Just so we understand, Exhibit 9 are
6      photographs of two core drills, but neither one
7      is the drill at issue in this case involving
8      Mr. Riley's accident?
9  A.    Correct.  Those are exemplars, I believe, that
10     were brought by United Rentals for their
11     deposition.
12       MR. GIVENS:  What was 8?
13       MR. SPRAIN:  8 was the operators manual
14         for the DM450 and 500 core drill.
15       MR. GIVENS:  Okay.
16  Q.   And I think we're done with that.  Have you
17     finished any opinions or comments or criticisms
18     in regard to the operator manual for the DM500?
19  A.   No.  We've finished that, yes, and we're back
20     into the photographs which we've gone through.
21  Q.   All right.  So we're done with that?
22  A.   Yes.
23  Q.   Okay.  And just to recap, you had two comments

Page 75

1      about the operators manual for the core drill,
2      one being about the vacuum gauge?
3  A.    Right.
4  Q.    And we discussed that.  And the other you said
5      in general you felt it was just hard to read
6      and go through?
7  A.    Correct.  Yes.  Well, when you're talking about
8      the vacuum gauge, yes, that it did not say what
9      the proper reading for the vacuum gauge should
10     be.
11  Q.   Okay.  Now, this next stack I don't want to
12     spend much time on.  It appears to be more
13     lawyer filings and various pleadings and it
14     does not appear those would be highly relevant
15     to your opinions, but you be the judge of that.
16       (Off-the-record discussion.)
17  A.   No, there's nothing there.
18  Q.   We're done with this stack.  There's a bunch of
19     versions or maybe it's the same version of the
20     operators manual which we've already marked as
21     Defendant's Exhibit 8.  And then embedded in
22     this stack is a copy of the complaint.  Does
23     the complaint and the allegations have any

Page 76

1      bearing on your opinions?  I mean, we all know
2      there was a complaint filed, there were
3      allegations of product defect and negligence
4      and blah, blah, blah, we understand that.  But
5      go through this and let me know again if
6      there's anything that we need to talk about.
7      (Off-the-record discussion.)
8  A.    There's nothing there.
9      (Exhibit 10 marked for identification.)
10  Q.   Now, I've marked this as Defendant's Exhibit
11     10.  Could you explain for the record what that
12     is, Mr. Shaver?
13  A.    That's a wiring diagram for the alternate
14     design drill stand.
15  Q.    When did you prepare that document?
16  A.    I didn't prepare this document.  John Frost and
17     I had talked about the wiring setup and we
18     talked about how we were going to do it when we
19     met here last Friday.  Mr. Lane was here with
20     Mr. Frost.
21  Q.    Who did prepare that document?
22  A.    Mr. Frost did.
23  Q.    Okay.  And what is it in essence?

Page 77

1  A.    It's the wiring diagram for incorporating a
2      microvacuum switch that is tied in to the
3      vacuum portion of the base of the drill via a
4      tee into the smooth rubber tubing that pulls
5      the vacuum into the base from the vacuum pump.
6      That microswitch is tied to one terminal of a
7      three-way toggle switch at one end.  The other
8      end is teed into a contactor from another
9      position of the toggle switch, the opposite
10     end, and it is in a serial -- series circuit
11     with the kill button or deadman switch.
12        That circuit is so designed that you can
13     operate the machine two different ways.  You
14     can operate it using the vacuum, in which case
15     if the vacuum pump is turned on in this manner,
16     if the vacuum falls -- the switches actually
17     can be set variable by the manufacturer and
18     designed for whatever, but I have that
19     particular one set to shut off at about 18 and
20     a half or 19 inches of Mercury, which is just
21     below the 20.
22        And so one circuit -- one position of the
23     toggle switch would close a circuit to the

Page 78

1  activator coils of a relay switch that would
2  contact and close the circuit for the drill
3  motor to allow the drill motor to operate when
4  two conditions have been met. Those two
5  conditions are the vacuum inside the base of
6  that drill is more than -- a number more than
7  approximately 20 inches of Mercury, and the
8  other event that must occur is the palm button
9  on top of the control box must be depressed for
10 the drill to operate. If you take your hand
11 off of the palm button, the drill motor stops.
12     If the vacuum falls below whatever that
13 setting -- as I say right now it's
14 approximately 18 and a half inches of Mercury.
15 You could set it to 20, you could set it to 22,
16 but whatever it would be. Now, when I say you
17 can set it, it's internally inside the control
18 box. That would be something that
19 manufacturing and service would set to the
20 needs; that's not something that an operator
21 would be setting variable, that would be a
22 fixed number.
23     The third position -- well, the middle

Page 79

1  position of the toggle switch is the unit is
2  off. The drill will not -- is off; the vacuum
3  motor is off.
4     And then the third position is -- the
5  third position operates the -- operates just
6  the drill only. The vacuum pump is not
7  engaged. And I've got it so labeled over there
8  on the position of the toggle. This would be a
9  situation to use when you're using the anchor
10 bolts or you were using the ceiling brace.
11 That would still allow you to use the drill in
12 those situations without the vacuum pump
13 operating and creating a suction vacuum in the
14 base.
15     However, the deadman switch, the palm
16 switch, is hooked into that circuit and bridged
17 across. So that if you're using it with the
18 ceiling brace or with the anchor bolts, while
19 the operator is holding that switch down, if
20 something were to occur to move that drill, the
21 theory is it jerks it out of his hand and
22 therefore kills the motor on the drill and
23 prohibits it from operating.

Page 80

1      This model that -- well, do you want to
2  get into the alternative design? You asked me
3  what this was and I got into probably more than
4  you really wanted.
5  Q.  Well, what I'll do later is for you to
6  enumerate your opinions.
7  A.  Okay.
8  Q.  And you've already been through some of them,
9  so that just expedites it.
10 A.  Okay.
11 Q.  But just in recap, this is a wiring diagram
12 related to the alternative design that you and
13 Mr. Frost have collaborated on to develop?
14 A.  Correct.
15 Q.  In regard to this case specifically?
16 A.  Correct.
17 Q.  All right. Please identify this document for
18 me, sir. I'm going to mark it as Defendant's
19 Exhibit 11.
20     (Exhibit 11 marked for identification.)
21 A.  Okay. That is the test report from Applied
22 Technical Services in Marietta, Georgia.
23 Q.  What does it reveal or show?

Page 81

1  A.  It shows the chemical analysis of the white
2  powder that was removed on the day of the May
3  inspection, May of 2005. I believe two petri
4  dishes of the white material were removed from
5  the pump and sealed and kept to be submitted
6  later to an agreeable lab to everybody. And it
7  just so happens that Applied Technical
8  Services, which is where the drill had been
9  stored, is, you know, one of your largest
10 chemical labs -- chemical testing labs in
11 Atlanta, too. And it revealed that it
12 contained aluminum and oxygen, that was the
13 EDS. And I believe it was aluminum oxide is
14 what -- yeah, the white powder sample is
15 predominately aluminum oxide.
16 Q.  And these findings relate to your opinions
17 about the slurry material inside the vacuum
18 pump?
19 A.  Slurry material or, you know, it could have
20 been water that got into the vacuum pump and
21 reacted with the aluminum to form aluminum
22 oxide as well.
23 Q.  What's in this folder right here, sir?

Page 82

1  A.   It's a copy of my protocol and it's a copy of
2       what we've already identified as an exhibit.
3       That was my protocol. And that's not the only
4       page, there's more pages to that protocol that
5       you have in other areas, too. It continues on.
6       I don't know why that's just one page of it.
7  Q.   Okay. We will go ahead and mark this as
8       Defendant's Exhibit 12.
9           (Exhibit 12 marked for identification.)
10  A.   Okay. And that was just the proposed protocol
11       that I came up with for that May 12th
12       inspection at ATS.
13  Q.   Okay. We're done with this one now. We've got
14       to find the other pages to this at some point,
15       I'm going to leave this out.
16  A.   Yeah. And they're here, because I've seen it
17       in some of the documents.
18  Q.   Okay. I'm going to make a note. This is
19       Exhibit 12 and this is a protocol dated May 5,
20       2005, and we need to find the other pages to
21       this document.
22           MR. GIVENS: Give me about 15 seconds.
23           (Off-the-record discussion.)

Page 83

1  Q.   I'm going to mark your affidavit --
2  A.   Okay. We're back on the record now?
3  Q.   Yeah, we're back on the record. I'm going to
4       mark your affidavit, which apparently was
5       executed in October of 2006. And this
6       apparently was done in conjunction with your
7       effort to be licensed in Alabama?
8  A.   Yes, it is.
9           (Exhibit 13 marked for identification.)
10  Q.   Okay.
11  A.   Can we go off the record just a second?
12  Q.   Sure.
13           (Off-the-record discussion.)
14  Q.   In the interest of saving time, I'm going to
15       mark this set of documents, which is the
16       correspondence file you maintain on this case,
17       as Defendant's Exhibit 14.
18  A.   Okay.
19           (Exhibit 14 marked for identification.)
20  Q.   And just real quickly identify that for the
21       record and then we'll move on?
22           MR. GIVENS: While he's doing that,
23       let's go off for one second and

Page 84

1           let me alert y'all to something.
2           (Off-the-record discussion.)
3  Q.   You have a box over here.
4  A.   Some of this may be duplicative of what we've
5       already seen.
6  Q.   Put this aside, we've seen this.
7  A.   One thing, let me just say, these are just some
8       receipts for some of the stuff of building the
9       drill up over there. And it's not all
10       inclusive, there's others, too, that I've got.
11  Q.   Well, those costs have been incorporated into
12       your bills?
13  A.   Not yet. I haven't done it yet.
14  Q.   Not yet, but they will be?
15  A.   They will be, yes.
16  Q.   Okay. Well, let's do this, just leave the box
17       up here.
18  A.   All right. And put it in it when we finish?
19  Q.   And what I'll do is -- you stop me if I'm going
20       too fast, and I don't want to not allow you
21       sufficient time to give your opinions, but we
22       have a binder of some photographs. Again,
23       these could be repetitive of what we've already

Page 85

1       talked about?
2  A.   Yes.
3  Q.   Okay. So I'm going to put this back in the
4       box. A photo disk, there's nothing in here
5       apparently. It must have been a CD disk that
6       fell out at some point?
7  A.   Yeah.
8  Q.   All right. Here are some documents, again I
9       say documents, photographs of the core drill
10       and look at these as I thumb through them.
11  A.   They're duplicative of what we've already seen
12       or these are that I've got and I think those
13       are, too. Let me just glance through that and
14       make sure, but I'm pretty sure. Yeah, they
15       are.
16  Q.   One thing I notice is that these, of course,
17       are color and the others we marked are black
18       and whites, but I don't think that makes any
19       difference in terms of explaining your
20       opinions?
21  A.   No.
22           MR. GIVENS: I think those you've got
23           in your hand are the same ones

Page 86

1              that I had Tessie go make color
2          copies of, or at least some of
3          them are.
4  A.   They sure are because of the deposition floor.
5          MR. GIVENS: Yeah. Any of them that's
6          got wooden floors and a blue core
7          drill, those are the ones that
8          were taken in our office.
9  Q.   All right. Right here we have some testimony
10        and this must be Mr. Riley's deposition?
11 A.   It is.
12 Q.   And you reviewed Mr. Riley's deposition?
13 A.   Yes.
14 Q.   What about handwritten notes? Do you have any
15        handwritten notes of --
16 A.   Not really. You know, if I saw something at
17        the inspection, I, you know, basically
18        photographed it.
19 Q.   All right. You reviewed Mr. Cody's deposition?
20 A.   Yes.
21 Q.   Okay. Now, back to Mr. Riley's deposition, I
22        assume that any statements he made in his
23        deposition are incorporated into your report?

Page 87

1          If not, let me know now. But we've got your
2          written report we're going to talk about later,
3          but I assume that his testimony, in that he was
4          a plaintiff, would have been incorporated into
5          the factual underpinnings of your opinions?
6          MR. GIVENS: I want to put in an
7          objection to form on that with
8          regard to the use of the word any
9          statements that he made in his
10        deposition being incorporated. I
11        think the report speaks for itself
12        and I would just not want that all
13        inclusive language to indicate
14        that virtually the deposition in
15        its entirety is reflected in the
16        report. The report has a section
17        that I believe goes into a
18        synopsis of the facts in this
19        case, but I wouldn't want it to be
20        characterized as all inclusive of
21        Mr. Riley's deposition.
22        MR. SPRAIN: Okay. Fair enough.
23 Q.   And what I was trying to do was just perhaps

Page 88

1          expedite it in view of the time this is taking.
2          But if you can tell us today what aspects of
3          his testimony were relevant in relation to the
4          formation of your opinions in this case?
5  A.   It's been so long since I've read his
6          deposition. To answer that and to be sure that
7          I accurately answered that, I would have to go
8          back through his deposition and others. Do you
9          see what I'm saying, it would just be --
10 Q.   Okay. Well, right now you don't have any
11        specific recollection without having to go back
12        and re-review it, in other words?
13 A.   Correct.
14 Q.   But if later when we go through your written
15        report about the facts of the case as you set
16        them out and then your opinions, if anything
17        comes to mind, let me know?
18 A.   Okay. I think that's good.
19 Q.   Okay. Now, this is Mr. Cody's deposition?
20 A.   Correct.
21 Q.   Is there anything that stands out after your
22        review of his deposition that impacts on this
23        case? And for the record, it's Donald Curley

Page 89

1          Cody.
2  A.   No. And, of course -- no.
3  Q.   Okay. Mr. George Kennedy, you reviewed his
4          deposition?
5  A.   Yes.
6  Q.   All right. And the same question, if anything
7          in particular is significant that comes to mind
8          based on your review of the testimony?
9  A.   No.
10 Q.   The next one is Joseph Adam Hall, you reviewed
11        his deposition?
12 A.   Yes.
13 Q.   Again anything significant that comes to mind
14        right now?
15 A.   No.
16 Q.   And then you had Mr. Mixon's deposition and you
17        reviewed it, correct?
18 A.   Correct. Yes.
19 Q.   Okay. Anything significant?
20 A.   No.
21 Q.   All right. This is the CD that's labeled
22        "Joe's photos from the depositions Myers,
23        Whitecotton, Mason and other similar core

Page 90

1  drills." Are there any photographs on this
2  disk that may be different from other
3  photographs you have reviewed today that may be
4  significant?
5  A.  I think this is the same as what we've seen.
6  Q.  It's probably just repetitive of what you've
7  already seen?
8  A.  Right.
9  Q.  All right. We have here an operators manual
10  and maintenance manual for the Milwaukee motor,
11  but this appears to be a compilation of
12  different things, and then you've got some
13  photographs in there and some information on
14  Milwaukee. Tell me what this is.
15  A.  That is something that was sent to me from
16  Mr. Lane's office here.
17  Q.  Okay.
18  A.  And that was kind of early on in the case, too,
19  from what I recall.
20  Q.  These pictures here appear to be the pictures
21  of the core drill involved in the accident as
22  it was still located at Flavor House?
23  A.  I believe so.

Page 91

1  Q.  I'm not sure if you've seen these.
2  A.  It's been a while since I've looked at that.
3  Q.  Flip through those in particular and let me
4  know if any of those are significant for your
5  opinions?
6  A.  Well, it did confirm that the bad drill bit was
7  not -- not on the machine when the photographs
8  were taken and one would assume that they did
9  not change the bit. And I believe the good bit
10  there was the four and a half inch.
11  Q.  Okay. But are you aware that the product was
12  disassembled and changed after the accident?
13  A.  Looking for a shear pin and some other things,
14  yeah, I did. I said it would tend to indicate
15  that, I didn't say it was definitive. That's
16  why I can't -- I can't say for certain which
17  bit was used at the time.
18  Q.  Right.
19  A.  And I know that in the depositions there's no
20  clarity -- there's no more clarity there in
21  that. And I guess the only way to -- well --
22  Q.  What about Mr. Riley, did he testify as to
23  which drill bit he used at the time of the

Page 92

1  accident, or do you have any recollection?
2  A.  I don't have instant recollection of that.
3  Q.  Okay. Now, you mentioned a shear pin. And the
4  testimony and the documentation of record in
5  this file indicates that some individuals at
6  Flavor House thought that the core drill had a
7  shear pin and that the shear pin did not break,
8  but in fact, and you tell me if I'm wrong or
9  not, this core drill did not have a shear pin,
10  but rather a clutch?
11  A.  That's correct.
12  Q.  Okay. And so the shear pin does not have
13  anything to do with this case?
14  A.  Nope. There's not even one in the drill to my
15  -- we disassembled it, there's no --.
16  Q.  Okay.
17  A.  I was going to say some of the manuals though
18  for these Milwaukee drills talks about a shear
19  pin. So apparently some of these stands with
20  Milwaukee drills do incorporate shear pins.
21  Q.  Okay.
22  A.  So I guess I just say that to say that it's not
23  unreasonable for the employees at Flavor House

Page 93

1  to believe that.
2  Q.  Sure. Sure. But the shear pin has nothing to
3  do with this case?
4  A.  Correct.
5  Q.  Now, these are some photographs in a binder and
6  please explain briefly what these are?
7  A.  Those are my photographs of the rings that we
8  talked about. And these photographs -- I know
9  that my photographs -- I know what I was
10  taking. When I look at other people's
11  photographs, I can, you know, point things.
12  These were photographed as it was laid out as
13  they were removed in the order they were,
14  you know, done that way, you know, they're laid
15  out. And then I moved in and photographed them
16  in sequence up close. And so that's how, you
17  know, I came up with the condition of these.
18  And this was after they were cleaned of the
19  grease.
20  Q.  And those are the rings of the clutch?
21  A.  That's correct. These are the slip rings and
22  how they -- in the order that they were removed
23  from the shaft.

Page 94

1  Q.   All right.  And we've already discussed your
2       opinions about the rings and the clutch?
3  A.   Sure.  Back in the box?
4  Q.   What I may do is just mark these as Exhibit 15
5       to your deposition, if I can mark this binder?
6  A.   Okay.  Is he going to take those?
7           MR. GIVENS:  I was going to say, can we
8              do it in such a way that we get to
9              -- I mean, he needs to retain that
10             material, and if there's some way
11             we can identify it and I can get
12             Tessie to make copies of them or
13             whatever y'all want to do in that
14             regard so that --
15          MR. SPRAIN:  What would be okay for me
16             is if we made the laser copies,
17             and it would be several pages of
18             laser copies, and we mark the
19             first copy of the laser copy
20             photographs as Exhibit 15 and that
21             way he retains his binder.
22          MR. GIVENS:  Okay.  When you say laser
23             copies, are you talking about --

Page 95

1           MR. SPRAIN:  It's just what she did
2              just a minute ago.
3           MR. GIVENS:  The color copies?
4           MR. SPRAIN:  The color copies.
5           MR. GIVENS:  Okay.
6  A.   It's going to be harder for her to do that with
7       these, because she can't automatically feed
8       them though.  They're going to have to be hand
9       fed.
10          MR. GIVENS:  Well, that's all right.
11             It's not a problem.
12          MR. SPRAIN:  But right now I'm going to
13             lay this right here.
14          (Exhibit 15 marked for identification.)
15 A.   It's just that I don't want to leave here today
16      without these, because there's about four
17      depositions right now that the court reporters
18      are holding my photographs and I don't get
19      them.  And that just -- I don't get them back
20      and two years later I'm looking for them.  No
21      offense to court reporters.
22          (Exhibit 16 marked for identification.)
23 Q.   The same thing with Exhibit 16, we're going to

Page 96

1       mark these and the same rules will apply.  We
2       will have Tessie or your office make color
3       copies of these photographs.  And these appear
4       to be duplicates of what we just marked as
5       Exhibit 15.  Look at those, Don, and let me
6       know?
7  A.   It's a good possibility.  Actually, no.
8  Q.   Those are --
9  A.   These are just -- they're of the same thing,
10      but they're different photographs.  They're not
11      duplicates, they're the rings.  It looks like I
12      took two rolls of the rings.  I had to to get
13      them all, I guess.
14 Q.   Okay.  Well, let's do this; we'll show both of
15      these as Exhibit 15, it's the same series of
16      photographs?
17 A.   Yes.
18          MR. GIVENS:  And those are the clutch
19             rings?
20 A.   Yes.
21          MR. SPRAIN:  The clutch rings.
22 Q.   And then we have another series of photographs
23      that you probably took of the first inspection,

Page 97

1       it might have been the second inspection, of
2       the core drill involved in this case?
3  A.   Okay.  Yes.  I want to point out in this
4       photograph, and I haven't been able to do this
5       in the other photographs.  If you will notice
6       the gasket right there, it's slightly torn.
7  Q.   Okay.  I think you had referenced that before.
8  A.   I had referenced it, but not in a photograph.
9          (Off-the-record discussion.)
10 Q.   Now, you previously testified about the gasket,
11      and again we've had a brief break, but you said
12      again something about the gasket?
13 A.   Yeah, the glue for this thing.  And, of course,
14      it's a continuous strip and it's glued around.
15      It's a foam type rubber material.  And I've got
16      a good gasket over here.  On that gasket it's
17      firm and smooth, and this appears to have been
18      pulled apart.
19      Now, there again, I can't say that -- I
20      mean this drill has been around a lot, you
21      know, from the accident site to Atlanta to ATS,
22      you know, but it is an indication that there is
23      a gap in the joint there that could make

Page 98

1  obtaining a vacuum with that a little
2  difficult. Although we did -- you know, we
3  were not able to pull a vacuum, that's right.
4  We took the --
5  Q. Why could you not obtain a vacuum from the core
6  drill involved in this case?
7  A. In Atlanta or in Marietta when we tested it?
8  Q. Exactly. I'm referring back to your inspection
9  of the core drill.
10 A. Because the vacuum pump was not functioning.
11 Q. Okay. And the power cord was not connected?
12 A. Correct.
13 Q. Okay.
14 A. I mean, yeah.
15 Q. Okay. But back to what we said before, in your
16 opinion the vacuum pump system was operational
17 or functioning at the time of the accident?
18 A. The motor was running and it was pulling at
19 least a partial vacuum, yes.
20 Q. Okay. But later, after the accident, your
21 inspection could not confirm whether or not it
22 was working or not?
23 A. Correct.

Page 99

1  Q. Now, this -- I'll call it a separation glued
2  together, is that a fair estimate of what it
3  is?
4  A. It is. And while you could obtain -- if that
5  were present at the time of the accident, okay,
6  if it were, you would get a reduced efficiency
7  of your vacuum. And, I mean, it's possible
8  that could keep you from obtaining the full 20
9  inches of Mercury. I don't know that for sure.
10 But any leaks whatsoever, I just know from
11 working with this particular drill that I've
12 made the model, if you get this thing on the
13 floor or concrete that has a crack in it or
14 something, it's hard to build up a vacuum and
15 to get it going, if there is any unevenness in
16 there, to get a full vacuum. Because it will
17 (Indicating); it kind of bleeds through and
18 sucks through that imperfection in the surface.
19 So knowing that and that's there, that could
20 create a -- let's say that drill was pulling a
21 vacuum and it was only eight inches of Mercury,
22 then you had a binding of the drill; then that
23 would allow it to kick around and do what it

Page 100

1  did.
2  Q. Okay. Any other defects or exceptions that you
3  noticed with the gasket?
4  A. No.
5  Q. Okay. And you can't tell whether or not this
6  separation defect was in existence at the time
7  of the accident or maybe came about later, or
8  do you know?
9  A. I don't know. You know, it appeared to have,
10 you know, dust and dirt in the -- you know, in
11 the interstices where it came open. So it did
12 not appear to be a fresh break, but, you know,
13 from that --
14 Q. When was it glued back together?
15 A. Well, it wasn't. I'm just saying it's
16 partially torn. See right there, the little
17 hole right there in the middle?
18 Q. Yes.
19 A. And, you know, when you would compress that,
20 that could open up, you know, a tiny hole in
21 the -- you know, through the surface and just
22 -- you know, it creates a slight opening to
23 lose vacuum.

Page 101

1  Q. What confused me was the glue. Was this ever
2  glued back together?
3  A. No, it's manufactured that way. This is a
4  brand-new one that came with this. That's just
5  how it's made. See, it's manufactured in a
6  continuous roll.
7  Q. I see.
8  A. And that's just the manufacturing process, they
9  take and glue it. So if that -- see, that's
10 smooth and you've got a good smooth surface
11 there. This particular one, the glue is opened
12 right there.
13 Q. Okay. Do you know the age of this gasket? Was
14 it a week old, was it a year old, or do you
15 have any opinion as to the age of the gasket
16 used at the time of the accident on the core
17 drill?
18 A. Well, according to the invoice, they charged
19 Flavor House -- United Rentals charged Flavor
20 House, I believe it was, 11 or 16 dollars, we
21 can look back, for a gasket. They charged them
22 a price for the gasket. Now, if that's a
23 rental on the gasket -- you know, I don't know

Page 102

1    if it's a separate rental for the gasket. To
2    me I would think a gasket like that, if I'm
3    charged for it, that that's kind of a throwaway
4    disposable item and you should get a new one
5    each time it goes out, you know, but that would
6    be speculation. I have no -- other than what's
7    on that invoice, it prices out a gasket. So if
8    you're asking me that, the age of that gasket
9    when we looked at it here would have been from
10   August of 2003 until May of 2005, you know,
11   from the date of the accident until the date of
12   the inspection.
13  Q.   Well, what I'm asking you is at the time of the
14   accident do you have any opinion as to the age
15   of the gasket?
16  A.   Flavor House was charged for a gasket. It
17   doesn't specify whether it's new or used. So
18   -- and I haven't seen any deposition testimony
19   or anything else from Flavor House if they sell
20   these gaskets new or if they charge a usage fee
21   for the gaskets like they do the drill bits.
22  Q.   Okay. I understand.
23  A.   No. As far as looking at it and telling the

Page 103

1    age, no, I can't.
2    Q.   Okay. Right here, that may be you or somebody
3    else, but somebody is pointing to something on
4    the gasket. What is that person pointing to?
5    A.   What this -- the purpose of this is to get the
6    length of the gasket when it's pulled out.
7    Q.   Okay.
8    A.   In other words, they were -- and, see, on the
9    tape measure there it's just showing that it's
10   approximately two feet.
11  Q.   Okay. I'm going to go back to the beginning.
12   Anything significant about the drill bit?
13  A.   No.
14  Q.   You've got a few photographs there and we've
15   already discussed the drill bit, of course?
16  A.   Right.
17  Q.   And then you've got a picture of the drill
18   stand. And this is the other side where you
19   believe someone had put their footprint?
20  A.   No. That's the opposite side.
21  Q.   Is that the same side?
22  A.   That's the opposite side of where the footprint
23   would be.

Page 104

1    Q.   Okay. Well, that's what I was trying to say.
2    A.   Oh, okay.
3    Q.   That would be if -- if you're standing from the
4    back of the drill, it would be to the left?
5    A.   Yes.
6    Q.   Okay. In this case do you know whether
7    Mr. Riley was standing on the base at the time
8    of the accident?
9    A.   I believe he was.
10  Q.   Was it one foot or two feet?
11  A.   It's my understanding it was one foot.
12  Q.   Okay. Now, do you think it's a good practice
13   or a bad practice for an operator to stand on
14   the base?
15  A.   I'm not aware of anything that would make it a
16   bad practice. I don't know that the operator
17   gains anything by standing on the base.
18  Q.   All right. If he had not been standing on the
19   base, would he have been injured?
20  A.   I can't really answer that.
21  Q.   Okay. Why not?
22  A.   You have a whole different set of
23   circumstances. I mean, it's entirely possible

Page 105

1    if he hadn't been standing on the base his
2    injuries could have been much worse or fatal.
3    When that drill spun around, you don't know how
4    it would have hit him had he been standing a
5    foot to the right, a foot to the left. Let's
6    say, for instance, he was standing to the
7    opposite side of where it would have spun.
8    See, it could have come around him standing
9    still and whacked him and there's no telling
10   what his injuries would have been. As it was
11   with this, it partially carried him and spun
12   him around and then hit him. There's no way
13   that I can answer that question.
14  Q.   Well, why was he standing on the base?
15  A.   It was -- there was some testimony, and I would
16   have to look back if it was his or whether he
17   stated that, he may have, it was to help hold
18   it down.
19  Q.   Okay. And what does that indicate to you, if
20   anything?
21  A.   It indicates that the vacuum pump was not -- it
22   would be an indication to me that the vacuum
23   pump was not developing sufficient force to

Page 106

1  hold it down on its own.
2  Q.  Okay.  And that in turn shows that he was
3  trying to apply physical pressure by his weight
4  to steady the base onto the work surface?
5  A.  It could have, yes.
6  Q.  Okay.  Now, if -- let's back up.  Couldn't the
7  operator in that situation realize the vacuum
8  system is not working, the base is not being
9  stabilized to the work area, and he shouldn't
10  use the product?
11  A.  No.
12      MR. GIVENS:  Object to the form.
13  Q.  Okay.  Why is that?
14  A.  I just -- there's nothing to indicate on the
15  instructions of the machine, there's nothing to
16  indicate that that's something that would
17  intuitively be dangerous, in my opinion, and I
18  don't -- I don't see one as following the other
19  in sequence.
20  Q.  Okay.  Now, what if prior to Mr. Riley
21  attempting to drill a hole he had been working
22  with a supervisor to drill a preceding hole and
23  the core drill did not have a sufficient vacuum

Page 107

1  pressure to hold the base to the work surface
2  and it spun out of control, but they were able
3  to get out of the way, and then he used it
4  again; would that not indicate that Mr. Riley,
5  as an operator, should have taken precautions
6  to avoid that from happening again?
7  A.  Not necessarily.  Because in the other case
8  they were able to successfully anchor it and
9  get it -- get the drill -- you know, get the
10  hole drilled.
11  Q.  Well, you're saying that the fact that on the
12  same day in question the core drill does not
13  have sufficient vacuum pressure to secure the
14  base to the floor and it in fact rotates on the
15  axis, that wouldn't put anyone on notice of a
16  problem with the operation of the core drill?
17  A.  Not necessarily.  Not if -- not if there was
18  any indication as to what the vacuum of the
19  drill is supposed to be.  There's no indication
20  that -- there's no direct indication that
21  there's a problem with the vacuum hold-down
22  system in that.  It's -- in other words, it's
23  not putting somebody on notice that something

Page 108

1  is wrong with it inherently, because, you know,
2  the vacuum is pulling down a certain force.
3  They are not made aware of the fact that that
4  force is significantly greater than the output
5  of the shaft.  There's no way that they can --
6  as a layperson, that they can know that
7  relationship like I was explaining it to you
8  earlier about the torque on the motor and it
9  overcoming that.  They are not aware of the --
10  I guess the design mechanism of all of those.
11  So to me it doesn't put them on notice, no.
12  Q.  All right.  If you assume that Mr. Riley knew
13  that the base had to be properly secured to the
14  floor for safe operation, wouldn't then the
15  fact that he had just used it with his
16  supervisor and it didn't work point out to him
17  as an operator that the base was not being
18  properly secured to the floor?
19      MR. GIVENS:  Object to the form.
20  A.  There again, without understanding that,
21  there's no -- there's no evidence to show that
22  Mr. Riley knew that that vacuum was supposed to
23  hold it down securely without -- with such

Page 109

1  excess that -- in other words, that vacuum
2  holds that thing down very firmly when it's
3  operating properly, okay.  There's no way for
4  Mr. Riley to have known what that safety margin
5  was, that it was so much greater than what the
6  output force of the drill motor was.  Myself
7  knowing that that is designed into it as a
8  safety factor, I would know that, but there's
9  no way that, you know, Mr. Riley could have
10  known that.
11  Q.  Well, what would indicate to a layperson that
12  the base was not being properly secured?
13  A.  When you turned the drill and tried to applied
14  pressure, that just immediately it would spin
15  around with almost no resistence.  There is no
16  way of knowing -- it's kind of difficult to
17  answer because it's to what degree.  If he's
18  receiving no resistence from the vacuum, then
19  it may indicate to him that it's not operating
20  properly, but, you know, without knowing that,
21  I can't answer it.
22  Q.  Okay.  But in this case isn't that in fact what
23  happened, prior to him drilling the second hole

Page 110

1    the base became disengaged from the work
2    surface and spun around the drill bit?
3  A.   I would have to look back at the deposition. I
4    would have to review back for that.
5  Q.   Assuming that was the sworn testimony, wouldn't
6    that indicate that the vacuum system did not
7    operate correctly as intended with respect to
8    the drilling of the first hole?
9  A.   Not necessarily, because you -- you could even
10    have different surfaces in there, too. I mean,
11    like I talked about, the surface could be
12    different from one to the other.
13  Q.   Is the base supposed to rotate, spin around the
14    column?
15  A.   No.
16  Q.   Okay. Is the base -- I might have said that
17    incorrectly, but is the base supposed to rotate
18    and spin around the drill bit?
19  A.   No.
20  Q.   Okay. Does that indicate a problem?
21  A.   To me it does, yes.
22  Q.   Okay. And if it did that on the day of the
23    accident prior to the time Mr. Riley was hurt,

Page 111

1    would that indicate that the vacuum system was
2    not working correctly?
3  A.   To me it does, yes.
4  Q.   Okay. What about the rest of these pictures,
5    anything in here that looks like it may be
6    important for your opinions? And by the way,
7    we've seen so many photographs it's mind
8    boggling, and a lot of them are the same thing
9    or somebody has a different angle or whatever.
10  A.   Oh, that's not good. These are not supposed to
11    be --
12         MR. SHEEHAN: If those are negatives,
13            why don't we get prints made?
14  A.   But I don't have them of all of them here. I
15    keep the negatives, I don't take the negatives
16    out of the office generally.
17         MR. SHEEHAN: Okay. While you're here,
18            could we get Tessie to maybe take
19            those to Wal-Mart, maybe the one
20            hour printing, and we can go on
21            and get copies of them?
22  A.   It will just be this one book, but that's fine.
23         MR. SHEEHAN: It will just give us good

Page 112

1         copies or good prints.
2         MR. GIVENS: Let's take two seconds.
3         (Off-the-record discussion.)
4  BY MR. SPRAIN:
5  Q.   Okay. Back on the record. I've labeled that
6    last series of photographs we've discussed as
7    Exhibit 17.
8         (Exhibit 17 marked for identification.)
9  Q.   And the only thing I want to point out is that
10    I have a sticky note on there with an arrow
11    pointing to the separation that was glued
12    together that we discussed, okay?
13  A.   And clarifying, glue means the original
14    manufacturing process.
15  Q.   Exactly. That's just for point of clarity,
16    it's an arrow to show what our testimony
17    concerned.
18  A.   Okay.
19         (Exhibit 18 marked for identification.)
20  Q.   And then we've already been through this, it's
21    a bound set of documents and I've labeled it
22    Exhibit 18. You've already thumbed through it,
23    there wasn't anything in there that you really

Page 113

1    testified about?
2  A.   No.
3  Q.   I put aside Mr. Frost's report. Have you
4    reviewed Mr. Frost's report?
5  A.   Briefly right after it was -- the thing.
6  Q.   Okay. Do you agree with what he was saying?
7    Is there anything that you disagree with?
8  A.   No, not that I recall. There's nothing that
9    jumps out. I mean, he talks about some of the
10    things that I -- you know, that obviously are
11    not in my area of expertise that I don't have
12    an opinion on.
13  Q.   Okay. Well, what is his expertise?
14         MR. GIVENS: Are you asking me or him?
15         MR. SPRAIN: Well, I guess --
16  A.   I think you better ask him that. I mean, I
17    don't know what all of his areas of expertise
18    are. I really don't.
19  Q.   Okay. We've discussed two different
20    inspections of the core drill at Applied
21    Technical whatever it's called?
22  A.   Right, Services.
23  Q.   Okay. Did you inspect the core drill there on

Page 114

1    any other occasions?
2  A.  Yes.
3  Q.  Okay.  When was that?
4  A.  I believe that was in February of this year.
5  Q.  Well, what did you do on that occasion?
6  A.  I didn't do anything.  Whenever that later
7      inspection was, it was -- and when I say I
8      didn't do anything, there were people who were
9      not present for the first inspection that had
10     not seen it, so I was essentially attending the
11     inspection.
12  Q.  Okay.  I'm referring to that one as the second
13     inspection.  The first one you did was in May
14     of '05?
15  A.  Right.
16  Q.  Okay.  And we've marked a roster of the people
17     who were in attendance?
18  A.  Right.
19  Q.  So we've dealt with that.  And I believe you
20     pointed out some photographs that relate to
21     that inspection?
22  A.  Yes.
23  Q.  And then the lawyers get involved and everybody

Page 115

1      goes back --
2  A.  Uh-huh.  (Positive response.)  Yes.
3  Q.  -- and does it in February of '06.  Other than
4      those two inspections, have there been any
5      inspections of the core drill?
6  A.  No.
7  Q.  Okay.  Have you seen the core drill since
8      February of '06?
9  A.  No.
10  Q.  All right.  Who did you work with to develop
11     the alternative design?
12  A.  John Frost.
13  Q.  Okay.  Who --
14  A.  Well, let me clarify that a little bit.  I
15     mean, before I even knew John Frost, I had in
16     mind, you know, and you will see it from my
17     report, a couple of safety ideas that could be
18     incorporated into this drill for an alternative
19     design.  Mr. Frost and -- we worked together to
20     find the components basically.
21     I know one of his areas.  I believe he's
22     an electrical engineer.  So he was able to help
23     with the schematic diagram of how to get all of

Page 116

1      these components and verify that.  I could have
2      done it and, you know, figured it out, it was
3      just much quicker for him to help me with the
4      wiring diagram.  But, I mean, I knew what I
5      wanted it to do.  And, you know, it was -- he
6      helped with assistance in some of the technical
7      matters of actually accomplishing it.
8  Q.  Okay.  What is the cost of the alternative
9      design?
10  A.  What runs the cost up a little higher in this
11     is that there's a relay involved.  And Mr. Lane
12     bought the relay.  We bought that at an
13     electrical supply store here, I believe it's
14     Mayers, last Friday.  It was about 110 dollars,
15     from my recollection.  And it's a double pole
16     relay.  You would only need a single pole
17     relay.  The cost of that relay could be brought
18     down significantly buying in quantities like a
19     manufacturer would for the proper relay.
20     And incidently the vacuum switch that we
21     got, the reason you have to have a relay with
22     this is the switches that we have that we were
23     able to obtain will not handle the 20 amp

Page 117

1      current load of the drill.  So it's a big bulky
2      switch or it's a heavier contactor switch.
3      The microswitch company actually has a 25
4      amp rated microswitch.  So it would be possible
5      to incorporate larger switches.  And the
6      microswitch company said that it would only add
7      50 cents per switch to do that and that would
8      eliminate the relay.  The microswitch itself,
9      in quantities of -- and don't hold me to this
10     exactly, but they are approximate quantities.
11     I didn't write it down as I was talking to the
12     man on the phone, Larry -- it starts with an H,
13     at Magnetic -- I've got the name there on that
14     envelope that was in there.  It's about $6.80
15     apiece in buying them in quantities of 250 to a
16     thousand.
17  Q.  Okay.  Let me stop you there, I'm a little bit
18     confused.  Are you saying the microswitch is
19     something that you could use as an alternative
20     to the relay or is that something you need in
21     addition to the relay?
22  A.  No.  We have a microswitch there, but that
23     microswitch is rated much less, so it has to

Page 118

1    have a relay, you know.
2  Q.   It's got to have the relay?
3  A.   It's got to have a relay.
4  Q.   It's got to have a new microswitch?
5  A.   The microswitch.
6  Q.   All right. And what else?
7  A.   And the -- so in quantities of 25 to 249 the
8       cost of that switch was down around $6.50 --
9       no, I'm sorry, 11 dollars; the higher quantity
10      it was six dollars, seven dollars, right in
11      that range. And to add the higher current
12      rating of 25 amps only adds about 50 cents a
13      switch to it. So you could eliminate the
14      relay. And for the electronic portion of just
15      the vacuum safety control you're looking at a
16      cost of less than ten bucks to have just that
17      vacuum interlock system incorporated. Now, you
18      know, you've obviously got some, you know,
19      wiring that's incidental cost, but, you know,
20      in quantities it could be done for, I would
21      say, a total cost, labor and everything, to the
22      manufacturer, of under 15 bucks for that alone.
23         The deadman switch, I think what we've

Page 119

1       got, that deadman switch and everything that we
2       got was 20 or 30 bucks, I'm not sure. I don't
3       have an immediate recollection on that. But
4       those things can also be obtained. That also
5       was a lower amp rating, we couldn't run the
6       voltage directly.
7  Q.   What I've got so far is a relay for 110, a
8       microswitch for 6.80, a vacuum interlock for
9       ten dollars --
10 A.   No. The microswitch is the vacuum interlock,
11      so that's what I was referring to. You can
12      eliminate the ten dollars.
13 Q.   Okay. Well, that's why I'm recapping so I can
14      make sure.
15 A.   Okay.
16 Q.   So the microswitch is also referred to as the
17      vacuum interlock?
18 A.   Yes.
19 Q.   Okay. And that's 6.80?
20 A.   Yes.
21 Q.   All right. And the kill switch or the deadman
22      switch, is that the same thing? Is that
23      interchangeable?

Page 120

1  A.   Yeah. Yes.
2  Q.   All right. Kill switch/deadman switch is about
3       30 dollars, you said 20 to 30?
4  A.   Yeah. And that's in the one we've got. Now,
5       keeping in mind, building it the way we do --
6       we have, you know, we've got brass tees that
7       were expensive. Of course, I had to buy a pack
8       of five to get the one at Grainger. There's
9       more expenses in that that I have incurred that
10      a manufacturer making it from the ground up
11      would not incur.
12 Q.   Okay. What are you total out as the cost to
13      add these features to the alternative design?
14 A.   The total out cost in excess of what was
15      already there, because there's some duplicative
16      parts in that, right now as it's designed would
17      probably be about 150 to 160 dollars.
18 Q.   Okay.
19 A.   And I am confident that that cost could be
20      reduced to well under a hundred dollars.
21 Q.   Have you tested your alternative design?
22 A.   Yes.
23 Q.   Okay. And when did you test it?

Page 121

1  A.   Yesterday afternoon when I finished it.
2  Q.   What did you do to test it?
3  A.   Okay. I powered up the -- you know, applied
4       power to the input power plug. Turned the
5       three-way toggle switch to the vacuum only or
6       to the vacuum side. The vacuum pump comes on.
7       Depress the kill switch or the deadman switch,
8       the drill will not run, because I've not
9       applied a vacuum. The vacuum pump is running,
10      but there is no vacuum in the vacuum plate zone
11      or in that system.
12         Then I switch it to the middle switch.
13      The motor doesn't run; the vacuum doesn't run.
14      Hit the deadman switch, it doesn't run, because
15      that's the off position and it shouldn't.
16         I switch it to the brace/other method of
17      anchoring position on the toggle switch, the
18      vacuum pump does not come on, it's off, and the
19      drill motor is off. You have to press the
20      deadman switch and the drill motor runs. That
21      position would be for only if you had it
22      anchored with anchor bolts and the ceiling jack
23      method or an alternative method. But still the

Page 122

```
 1      deadman switch is there as a safety feature for
 2      that.  You do lose the redundancy of the vacuum
 3      interlock when you're using an anchor brace or
 4      a --
 5  Q.  Or a ceiling jack?
 6  A.  -- ceiling jack, yeah.
 7          So then I closed the vacuum.  There's a
 8      plug that goes into the base.  And what I did,
 9      I teed the vacuum microswitch in with a rubber
10      hose teed into that area where it goes into the
11      base, and you reach a common vacuum area
12      throughout the hose and the base.  As I said,
13      ideally you would want to drill a separate hole
14      into the base of that and thread it and run
15      your microswitch activation line directly into
16      the base so you're getting the vacuum in the
17      base.  But for purposes of showing the design
18      is feasible and to keep from drilling a hole
19      into a brand new base before knowing whether
20      this was going to work out or not for sure, I
21      just teed into it.  It accomplishes the same
22      end result.
23          Then without any suction on it, again you
```

Page 123

```
 1      put it to that position, press the on switch,
 2      the, slash, deadman switch, it doesn't come on.
 3      Place my finger over the intake to close the
 4      vacuum, and actually you can put a golf tee in
 5      there and help you do it so it doesn't pull a
 6      blister on your finger, but closed off the
 7      vacuum and gradually increased the pressure,
 8      you know, in the zone on the gauge.  And when
 9      it got up to about 23 inches of Mercury, that's
10      when depressing the deadman switch would cause
11      the drill motor to run.
12          It can lose vacuum, the way it's currently
13      set, down to about 18 and a half to 19 inches
14      of Mercury.  It's got about a four inches of
15      Mercury zone in there as a hysteresis.  It's an
16      area where you go up and it's so that you don't
17      have something where it's clicking on and off.
18      It has a band in there for activation and it
19      can lower slightly and still remain
20      operational.
21          So the way I tested it, when I have a
22      vacuum above about 23 inches of Mercury, the
23      drill motor will come on and operate.  As I
```

Page 124

```
 1      allow the vacuum, by bleeding it off, to open
 2      up to where I only have about 18 and a half or
 3      19 inches of Mercury, still holing the kill
 4      switch down, the circuit breaks and the drill
 5      motor shuts off because there's insufficient
 6      vacuum pressure in the base.
 7  Q.  Okay.  Did you have occasion to put the
 8      alternative design to an actual use situation?
 9      For example, like what Mr. Riley was doing on
10      the day of the accident?
11  A.  I have not done that, no.
12  Q.  Okay.  And do you know what would happen -- you
13      know, if you haven't done it, I guess it would
14      be a theory, but what would happen if your
15      alternative design was applied in such a way
16      that the drill bit went into a concrete surface
17      and it got hung up --
18  A.  Okay.
19  Q.  -- and the base became disengaged from the work
20      surface?
21  A.  If the vacuum pump were running, unless there
22      was a malfunction of the clutch on the drill,
23      the only way that you could have that occur was
```

Page 125

```
 1      if the clutch malfunctioned.  Okay.  And I
 2      don't believe that even that motor would be
 3      capable of overcoming the force of that base on
 4      that vacuum.  I don't believe that motor has
 5      enough energy available to it to overcome that,
 6      so I don't believe that's possible to even
 7      occur with that vacuum interlock in place.
 8  Q.  Okay.  So what you're saying is if the clutch
 9      worked as it's supposed to work, as
10      intended, --
11  A.  Right.
12  Q.  -- and if the drill bit hung up in the concrete
13      work surface --
14  A.  Correct.
15  Q.  -- and the vacuum pressure was insufficient to
16      maintain a secure hold on the work surface,
17      then what would happen?
18  A.  I kind of got lost in the question there.
19          MR. GIVENS:  Go ahead.
20  Q.  Okay.  What I will do is I will reask it.  What
21      I'm trying to understand is what would be the
22      end result of this alternative design as
23      opposed to what you believe happened in this
```

Page 126

1    case. And so we've not attempted to re-create
2    the accident based on your alternative design,
3    so I'm giving you this hypothetical. And so
4    we're assuming that the Milwaukee motor is the
5    same, the clutch is working, there is a drill
6    bit similar in size and type as the one used in
7    this accident, the drill bit is used in a
8    similar type of concrete surface. The drill
9    bit hangs up and then it seizes and the base
10   becomes dislodged from the surface due to
11   insufficient vacuum pressure. What would
12   happen different with your alternative design
13   in that scenario?
14 A.   There would have been no accident, because when
15   the base lost vacuum, well above the range of
16   where it would have broken loose, the drill
17   motor shuts down. So there's no energy to
18   cause it to rotate and it doesn't occur.
19 Q.   Okay. Now, what would Mr. Riley have done --
20   and I'm assuming, just to keep this scenario
21   moving forward, the same set of facts, I think
22   you're following me now. Let's say Mr. Riley
23   is the operator and you've got this deadman

Page 127

1    switch, what would he do in relation to that
2    deadman switch, if anything?
3 A.   That is a redundancy in that -- the deadman
4    switch is a redundancy to the vacuum portion to
5    where if it were to malfunction, let's say a
6    piece of thrash got up into the vacuum thing,
7    and the way we have it teed in right now
8    there's one opening down there.
9 Q.   If it got dislodged in there?
10 A.  Dislodged and it closed the vacuum off, our
11   microswitch is measuring still that 20 inches
12   of vacuum, but you don't have it in the base,
13   okay? So his hand is on the deadman switch.
14   As the drill starts to move, you know, he's
15   holding the deadman switch, it's there, as it
16   starts to move, the natural thing is he will
17   become dislodged from the deadman switch and it
18   shuts down.
19 Q.   So he releases his hold on the deadman switch
20   and the entire core drill stops to operate?
21 A.  Yes.
22 Q.   All right. And that's the redundancy that
23   you're talking about?

Page 128

1 A.   That's the redundancy there. When you are
2    using the ceiling jack method or the anchor
3    bolt method, the deadman switch -- there is no
4    redundancy in that, there is just simply the
5    deadman switch.
6 Q.   Okay. Now, what would happen if the operator
7    is standing on the base and the vacuum system
8    does not adequately secure the base to the
9    floor and the drill bit seizes up, would this
10   cutoff switch or this interlock device still
11   prevent the accident in that the operator would
12   not be thrown off the machine?
13 A.   Yes. Because -- I mean, you're talking about
14   if you had it set on the -- well, if the vacuum
15   -- if you've got it set where the vacuum pump
16   is running and you're attempting to use the
17   vacuum pump?
18 Q.   And you're standing on it?
19 A.   And you're standing on it?
20 Q.   And you're on this base?
21 A.   It doesn't matter, because the vacuum is going
22   to hold that base secure. And if the vacuum is
23   not sufficient to hold the base secure, it will

Page 129

1    shut the drill motor down well before any time
2    that it would become dislodged.
3 Q.   Okay.
4 A.   Now, let me back up. The reason I said that
5    you would want to have another opening in the
6    base down there is -- rather than teeing it
7    into your input line, is because then you would
8    have -- for you to have a failure of this
9    system you would have to have two things fail.
10   You would have to have both inlets to the
11   vacuum get clogged up, both holes, both your
12   activation switch and your source. So I think
13   I needed to put that in there to answer your
14   question of that.
15 Q.   Okay. Well, one aspect of my question has to
16   do with timing. Are you saying that there's no
17   split second moment wherein -- even though the
18   interlock device will stop further operation of
19   the machine, there's no split second moment
20   when it's destabilized and an operator who is
21   standing on the machine could be thrown off?
22 A.   You would have -- you've got the inertia of the
23   motor. What you're saying is the motor is

Page 130

1    running?
2  Q.    All right.  We've got a motor running and that
3        base becomes dislodged, and by my review of the
4        testimony, you tell me if I'm wrong, but it
5        looks like it starts rotating in a split
6        second.  Are you saying that with your
7        alternative design it's going to shut it down
8        so that there's not any -- even a split second
9        interval whereby the base is spinning out of
10       control which could cause the operator to be
11       thrown off and injured?
12 A.    I'm not sure that question can be answered with
13       yes or no.  But I'm going to explain to you
14       what I think you were trying to ask, if that's
15       okay?
16 Q.    Please.  You're the engineer, you please help
17       me.
18 A.    No, it would not have occurred.  It would not
19       have spun around momentarily the way it's set
20       up now, because the vacuum that's on there
21       would be at a higher level.  It shuts off
22       before it falls below a threshold that allows
23       the base to be -- to be --

Page 131

1  Q.    Dislodged?
2  A.    -- dislodged.
3  Q.    Okay.
4  A.    And if you had a loss of vacuum, vacuum has a
5        lag time.  I mean, absent of taking a
6        sledgehammer and cracking that top, that
7        aluminum top, and cracking it wide open and
8        creating a huge hole in there, vacuum is not
9        going to suddenly lose, you know, when it's
10       that high of vacuum.  You've got 20 inches of
11       Mercury or greater, (Indicating), it's really
12       sucked down on there.  It's on there.  And so
13       you're going to develop a slow leak or a slow
14       loss of that vacuum relatively so in a
15       situation like that, it's going to creep down
16       typically, or you're not going to be able to
17       build up to the vacuum due to your surface or
18       conditions.  But either way, you're not able to
19       operate.  That drill motor will not get
20       electricity to the motor unless that vacuum
21       pressure is above a safe threshold.
22 Q.    Well, let's do this; let's call your
23       alternative design the Shafer design, because

Page 132

1        that's your design, right?
2  A.    Shaver, but yes.
3  Q.    I'm thinking of the famous Shafers in
4        Birmingham, the eye folks.  The Shaver design,
5        okay, that way we know what we're talking
6        about.
7  A.    Okay.
8  Q.    What you're saying is once this microswitch
9        detects a lapse in the vacuum pressure, it's
10       going to shut it down before there's any moment
11       of instability with the base?
12 A.    Yes.
13 Q.    So that with the Shaver design the operator is
14       not at risk of being injured by virtue of being
15       thrown off the core drill?
16 A.    That is correct.
17 Q.    All right.  I mean, basically with the Shaver
18       design you're saying he's standing there, the
19       microswitch/interlock device kicks in, it's
20       triggered because of a lapse of vacuum
21       pressure, and the machine stops?
22 A.    Correct.
23 Q.    Okay.  Now, do you know of any actual core

Page 133

1        drills in use that use the Shaver design?
2  A.    I'm not aware of any core drills, no.
3  Q.    Okay.
4  A.    But the principle of deadman switches, vacuum
5        interlock, pressure interlock switches is in a
6        multitude of machinery and equipment used in
7        industry, you know.  Even though I'm flattered
8        that you call it the Shaver design, there is
9        nothing inherently unique about that setup.
10 Q.    Well, I'm calling it that so that the record is
11       clear.
12 A.    I understand.
13 Q.    But I guess unintentionally I flattered you.
14       But I'm trying to make the record clear,
15       because we have a core drill with its own
16       design?
17 A.    Yes.
18 Q.    And now you've come up with, in relation to
19       your work with Mr. Frost, an alternative.  So
20       I'm calling it that just so we're clear for the
21       record.  Now, are you saying that you are not
22       aware of any drills such as this that have this
23       design or you just don't know of any?

Page 134

1        MR. GIVENS: How is that different?
2  Q.  Well, I will reask the question. The first
3       question, are you aware of any similar drills
4       that have adopted this type of design such as
5       the one that you've --
6  A.  No.
7  Q.  Okay. Well, why not?
8        MR. GIVENS: Why is he not aware of it?
9  Q.  Well, why -- okay. If you're not aware of any
10      drills that have this design, do you know of a
11      reason why similar drills do not have this type
12      of design and these mechanisms as you've just
13      testified to?
14 A.  No.
15 Q.  Okay. Is there any down side to employing the
16      Shaver design on core drills such as the one
17      involved in this case?
18 A.  No.
19 Q.  Okay. Is there any negative effect on the
20      operation and performance of the drill?
21 A.  No.
22 Q.  Okay. Have you consulted with anyone else
23      other than Mr. Frost and, of course, Mr. Lane

Page 135

1       about your design?
2  A.  No.
3  Q.  Okay. Is there any literature or information
4       in general that deals with this design and
5       these types of mechanisms?
6  A.  On core drills?
7  Q.  That you consulted?
8  A.  No.
9  Q.  Okay.
10 A.  Except a brochure off the Internet, and I don't
11      have that, from the World Magnetics Company
12      that manufactured the vacuum microswitch.
13 Q.  Okay. Is there any peer-reviewed book,
14      treatise or periodical that relates to a vacuum
15      interlock device and a kill switch on such
16      products as the core drill?
17 A.  There may be. I did not consult any for that
18      design.
19 Q.  Okay. In general are you aware of any
20      information like books, treatises, periodicals,
21      literature of any type that relates to vacuum
22      interlock devices and kill switches?
23 A.  I haven't looked for any.

Page 136

1  Q.  Okay. And so I assume that this design is
2       something that you --
3  A.  You're talking about that specific design?
4  Q.  Well, not this specific design, but in general.
5       In general vacuum interlock devices or switches
6       and kill switches that may have similar
7       applicability to products such as the one
8       involved in this case?
9  A.  Well, let's just -- you know, I'm sure there
10      are, but let's just -- kill switches are in a
11      multitude of devices and industrial devices
12      that I'm aware of in having worked in industry
13      for a number of years, and limit switches. In
14      other words, there are devices that detect
15      pressure. When the pressure in a boiler or a
16      vessel reaches a dangerous level, then it shuts
17      off the supply. You know, that's not
18      necessarily a vacuum.
19      The -- what's the word I'm looking for?
20      The design of a safety device that incorporates
21      a switch either opening or closing a circuit
22      based on whether conditions are safe, whether
23      that be an excessive temperature, whether it be

Page 137

1       excessive pressure, whatever, if there's an
2       environmental component in something that
3       inherently a change in it or a range of it
4       makes it unacceptable to safety, there are
5       numerous devices that incorporates a switch to
6       detect that variation and to create a circuit.
7       So, you know, there's likely to be dozens
8       of devices out there that would incorporate
9       that. As far as whether that switch being a
10      vacuum or not, that might narrow that band
11      down, you know, simply because, you know, a
12      vacuum is kind of a unique thing. You're using
13      it to hold in this situation. This could work
14      in other devices that have a vacuum hold-down
15      or other devices where it's desirable to have a
16      vacuum in a particular region of a machine and
17      the failure to have that vacuum there can cause
18      a catastrophic failure.
19 Q.  Okay. Well, what I'm gathering therefore is
20      that your Shaver design is something that you
21      formulated based on your experience and
22      education and background as an engineer?
23 A.  Yes.

Page 138

1   Q.   Okay.  Please review -- somewhere you had a
2        copy of my notice for the taking of your
3        deposition, but I'll go over it briefly.  I've
4        marked it as Exhibit 1.  Have you produced all
5        documents related to opinions and conclusions
6        in this case?
7   A.   Yes.
8   Q.   Okay.  Have you produced, as to number two, all
9        information that you reviewed in preparation
10       for your testimony?
11  A.   Yes.
12  Q.   Okay.  Number three, have you provided all
13       documents regarding tests and data that you may
14       have relied upon or utilized in connection with
15       this case?
16  A.   Like I say, with the exception of that brochure
17       we printed off of the Internet that had, you
18       know -- it was a marketing thing from the World
19       Magnetics, but, yeah, other than that, yes, I
20       have.
21  Q.   Okay.  As to number four, have you produced all
22       documents or things or items that you received
23       in your capacity as an expert in this case?

Page 139

1   A.   Yes.
2   Q.   Okay.  Number five, have you produced all
3        documents, notes, reports, memoranda and other
4        written information that you prepared or
5        created in connection with this case?
6   A.   Yes.
7   Q.   All right.  As to number six, have you provided
8        us all documents that relate to standards and
9        literature which you may use at trial?  And we
10       just discussed --
11  A.   That I'm aware of.  I mean, I may -- you know,
12       before trial I may, you know, research
13       literature and find particular examples of what
14       we've done here, you know, as far as machines
15       that have these or similar types of interlocks.
16  Q.   Well, make sure -- right now for the record,
17       you know, we will ask you to supplement
18       anything you may rely upon at trial?
19  A.   Okay.
20  Q.   Now, the core drill involved in this case, did
21       it violate any known manufacturers' standards,
22       rules or regulations?
23  A.   Not that I'm aware of.

Page 140

1   Q.   Okay.  Have you consulted with any applicable
2        ANSI standards or regulations that may pertain
3        to the core drill?
4   A.   I did search for those and did not find any
5        applicable to the core drill that was in this
6        particular case.
7   Q.   Okay.  Are you aware of any standards or
8        regulations that relate to the core drill?
9   A.   No.
10  Q.   Okay.  Number seven seeks information about
11       cases in which you have been retained as an
12       expert for the past five years.  Have you
13       produced that?
14  A.   Yes.  You have that in the Rule 26 disclosure.
15  Q.   Okay.
16  A.   And we do need to supplement that.  We can do
17       that verbally here or I can do it in written
18       form.  I'll pick up -- under trial testimony
19       we're going to need to add the State of Georgia
20       versus Amanda Troupe.
21  Q.   Okay.  Well, what are you referring to?
22  A.   My Rule 26 disclosure.  Well, you have it there
23       in front of you.  What is that exhibit?

Page 141

1   Q.   It's 2.  And so what you're saying is we would
2        add some more cases on the tail end?
3   A.   Yes.
4   Q.   And so after Womble v. Crews, what was the next
5        case that you --
6   A.   The next case would be the State of Georgia
7        versus Troupe, August of 2006.
8   Q.   T-R-O-U-P-E for Troupe?
9   A.   Yes.  Superior Court of Coffee County, Georgia.
10  Q.   Well, what was the basis of your testimony in
11       that case?
12  A.   That was an automobile accident reconstruction.
13  Q.   Okay.  Any other cases?
14  A.   Not on trials.  Now, on depositions there's
15       going to be.
16  Q.   I think what we asked for is not just trials,
17       but also any case in which you have rendered
18       opinions as an expert witness?
19  A.   I'm sorry, what now?
20  Q.   Okay.  What we asked for as to number seven in
21       the deposition notice was any case in which you
22       were retained as an expert and rendered
23       opinions, not just trial testimony, but that

Page 142

1      could be depositions or, like in this case, a
2      written report.
3  A.   I do not have a list like that. I have not
4      maintained a list like that and it would take
5      me an inordinate amount of time to do that.
6  Q.   Inordinate?
7  A.   Well, I shouldn't use that word. That is not
8      something that I have prepared.
9  Q.   Well, let's do this; I'm not sure we'll need
10     all of that, but we reserve the right to have
11     more information in response to the deposition
12     notice as to number seven, but let's move
13     forward. Any other cases in which you have
14     testified that would supplement what you have
15     already disclosed?
16 A.   Yes. Okay. We have Mann versus McGinnis,
17     Superior Court of Montgomery County.
18 Q.   Is that Georgia?
19 A.   No, it's Alabama. And that was in August of
20     2006.
21 Q.   What was that case about?
22 A.   That case is about a lowboy trailer. A man was
23     -- it would not raise and he --

Page 143

1  Q.   Well, what was the bottom line opinion? Well,
2      what side were you on, first of all? Were you
3      plaintiff or defendant?
4  A.   The defense.
5  Q.   Okay. And what was your opinion in that case?
6  A.   That -- gosh, changing gears here it's --
7  Q.   Well, what I'm trying to do for this is just
8      get the bottom line. I don't want to limit it,
9      but what was the case about, a trailer?
10 A.   Yeah, it was about a ramp, a drive-up ramp.
11 Q.   A trailer ramp?
12 A.   A trailer ramp. It fell on a gentleman and
13     killed him.
14 Q.   All right. And you testified for the
15     defendant?
16 A.   Yes.
17 Q.   I mean, what was, in summary form, your
18     opinions?
19 A.   The lifting up of the gate when it was down and
20     wouldn't raise. They took an excavator and
21     pulled the ramps up and it forced the hydraulic
22     fluid out of the ramps and there was not a
23     resistance hydraulic fluid. And it had two

Page 144

1      safety bars that were holding the ramps up into
2      place. And when the gentleman got ready to
3      unload the trailer, he stood underneath the
4      ramp and took a pry bar and prided the safety
5      latch off. And when he did, the heavy thing
6      just came down and crushed him.
7  Q.   And so I take it your opinion was that the
8      operator was negligent in his use of the ramp?
9  A.   In his -- in his taking the excavator and
10     pulling it up, because it wouldn't work on the
11     hydraulics itself.
12 Q.   Okay.
13 A.   So he was negligent in -- my opinion was he was
14     negligent in forcing that up and, you know,
15     misusing and abusing the equipment in a way it
16     was not intended to be done.
17 Q.   Okay. Any other cases that are not on our
18     list?
19 A.   Yes.
20 Q.   All right. Is this something that you have
21     written down?
22 A.   Yeah, I do. It's just that from the time this
23     was -- and I have it, I can print that out for

Page 145

1      you. It's like a couple of cases.
2  Q.   Okay. It's two more. Let's talk about it.
3  A.   Two or three.
4  Q.   Two or three more?
5  A.   Yeah.
6  Q.   What's the next one?
7  A.   The next one is going to be Rose or -- yeah, I
8      think it's Rose versus Diaz Chavez.
9  Q.   D. H. Chavez?
10 A.   Diaz Chavez.
11 Q.   All right.
12 A.   And that's the State Court of Gwinnett County.
13 Q.   And that's Georgia. Who hired you in that
14     case, the plaintiff or the defendant?
15 A.   The plaintiff.
16 Q.   All right. Let me go back real quick. In the
17     State of Georgia versus Troupe case, who hired
18     you in that case, plaintiff or defendant?
19 A.   The defendant.
20 Q.   Okay. Was that case a criminal case?
21 A.   Criminal, yes.
22 Q.   It was a criminal case. Okay. Now, in the
23     Rose case, the plaintiff retained you. Was

Page 146

1    there a product involved?
2  A.   No.
3  Q.   Okay.  It was not a product liability case.
4       What kind of case was it?
5  A.   Well, it was a case where a vehicle ran out of
6       gas in the middle lane of a three lane
7       interstate road and the gentleman parked it
8       right in the middle lane.  And then his wife,
9       who was following him, came and pulled in right
10      behind him.  And a car in front of the
11      plaintiff moved out very quickly and left her
12      to hit the wife's car in the rear and it was a
13      multi-car pile-up.
14 Q.   All right.  What were your opinions in that
15      case?
16 A.   My opinions were that given the grade of the
17      hill where the gentleman was coming off of,
18      that he should have been able to have gotten
19      the vehicle over preferably to the right-hand
20      side of the road into a safety area.  It was a
21      long gradual hill, and absent of him applying
22      the brakes and leaving them on, he would have
23      continued to have coasted and in my opinion

Page 147

1       likely could have -- there was no reason for
2       him to have stopped his vehicle in the middle
3       lane.
4  Q.   Okay.  And you mentioned one or two other
5       cases, could you identify those?
6  A.   Yes.  The name of the deceased is Decker versus
7       -- and I'm going to have a hard time.  I happen
8       to have that file in the car.  When we go on
9       break next I will get that for you.
10 Q.   Okay.
11 A.   And it's in Muscogee County, Georgia and it's a
12      pedestrian fatality.
13 Q.   Who hired you in that case?
14 A.   The plaintiff.
15 Q.   All right.  And that case did not involve a
16      product?
17 A.   No.
18 Q.   All right.  Now, back to my deposition notice.
19      As to number eight, you've produced your file
20      in regard to your expert witness fees?
21 A.   Yes.
22 Q.   And that file was complete --
23 A.   Yes.

Page 148

1  Q.   -- as of this date?
2  A.   Yes.
3  Q.   Okay.  And as to number nine, it requests your
4       complete file, including handwritten notes, et
5       cetera, et cetera, about your involvement in
6       this case.  Have you produced everything that
7       would be in your file in relation to your
8       expert work in this case for the plaintiff?
9  A.   Yes.
10 Q.   All right.  Exhibit 2 is your expert report; is
11      that correct?
12 A.   Yes.
13 Q.   And you've already identified this as the
14      complete report that you've authored in this
15      case?
16 A.   Yes.
17 Q.   Have you supplemented this, added to this,
18      amended this, or changed this in any way since
19      it was authored at least a few months ago
20      because that's when I got it?
21 A.   I think there was an affidavit, where an
22      affidavit had to be attached to that.  I'm not
23      sure.  We did an affidavit that those were my

Page 149

1       opinions included in the reports, but there
2       were no changes made or supplement to that, no.
3  Q.   All right.  This is what I want to do now,
4       we're probably going to have lunch in a minute,
5       but we've already discussed some of your
6       opinions.  So I will not be repetitive and go
7       back and reask things, but I want to identify
8       separately each of your opinions in this case?
9  A.   Okay.
10 Q.   Okay.  And let's start with number one, you
11      know, what are your opinions?  And I'm going to
12      write them down and then we will discuss them.
13 A.   Okay.  Can I refer to my report, please?
14      MR. GIVENS:  Here is one, I believe.
15 A.   Yes, I'm sorry, I did have a copy.
16 Q.   Please let me know which page you're referring
17      to.
18 A.   Okay.  There's no page numbers on here.  Not
19      including the cover page, you know, page two,
20      under "Opinions."
21 Q.   All right.
22 A.   You know, I don't think I've gone into my
23      analysis that went into, you know, coming up

Page 150

1    with the alternative design. But, you know,
2    that's -- you know, my opinion is, in this
3    particular case, a sound engineering analysis
4    of the engineers in the embodiment phase when
5    they were coming up with this design. It
6    appears to me, and I don't want to -- this is
7    kind of difficult because I am criticizing the
8    engineering to this degree, but what they have
9    here is a stand and they've bought accessory
10   devices and attached it to this stand to come
11   up with a product that is different from -- you
12   know, from the everyday uses of those items.
13       The drill, of course, goes on a stand, but
14   they've got a specific proprietary type stand
15   for this. And they've taken components and
16   attached it to this stand without any real
17   thought to incorporating any safety mechanism
18   in the event -- here you have a method of
19   holding this drill down that is dependent on
20   obtaining a proper vacuum in that base area.
21   Otherwise, it is -- to the engineer, it is
22   foreseeable that the failure either by loss of
23   vacuum, gradual loss of vacuum or slightly more

Page 151

1    than gradual loss of vacuum, while the drill
2    was operating would create a hazardous
3    condition. Also, if someone turned the vacuum
4    pump on and was not able to achieve a
5    sufficient vacuum, then it is a hazardous
6    condition. So you have that.
7        You have also the fact that if that drill
8    were to lock up and -- you know, due to a
9    seizing of the concrete core drilling bit, that
10   you would have very violent motion with regard
11   to the entire stand if there was not an
12   adequate force to hold it down.
13       So the engineer should have anticipated
14   that as it was foreseeable and should have
15   given some thought as to eliminating that risk
16   and hazard. And, in my opinion, the most
17   feasible way of doing that is to not allow the
18   machine to operate if there is either
19   insufficient buildup of vacuum in that base or
20   if the vacuum falls below a certain level in
21   that base; that it would shut the machine down
22   and prohibit its use until the problem was
23   corrected.

Page 152

1    Also, as a backup or redundant guard
2    against sudden movement of the mechanism, the
3    deadman/kill switch is one way of incorporating
4    that. And I'm not saying that there are not
5    other ways that could be -- I'm not saying that
6    there are not other ways that could have been
7    developed or designed to have eliminated this
8    hazard, but in my opinion there was no attempt
9    on this particular machine to try to design out
10   a foreseeable and known hazard.
11       You know, they certainly warn in their
12   manuals and they're aware of the dangers of an
13   insufficient vacuum. It's in their literature
14   where they talk about the importance of having
15   enough vacuum, even though in the manual that
16   was available at the time of Mr. Riley's
17   injuries they didn't say what an adequate
18   vacuum was. Subsequent literature does say 20
19   inches of Mercury.
20       So, you know, you either eliminate it, or
21   if you can't eliminate it, you guard against
22   it. And I guess it's sort of debateable
23   whether my design either eliminates it or

Page 153

1    guards against it. It's kind of in that fine
2    line in between. In attempting to use the
3    vacuum, you can't operate the drill unless
4    there is sufficient vacuum to hold it down. So
5    I guess in that aspect it may not completely
6    eliminate the hazard, because there are other
7    things that could occur, such as a stopping up
8    of the vacuum line or a massive malfunction of
9    the drill motor or whatever that could -- there
10   is still enough energy and force there that
11   potentially could create a hazard. So I guess,
12   you know, it would be my opinion these devices
13   are somewhere in between designing it out and
14   -- designing the hazard out and actually
15   creating a guard for it.
16       And if you can't do any of those, you warn
17   for it; you know, you warn, you give adequate
18   warning. It's my opinion they didn't even give
19   adequate warning in this case. In the owners
20   manual there's no indication that the -- what
21   the sufficient vacuum was or where it would be
22   dangerous for it to fall below. So, you know,
23   just saying that you need, and whatever their

Page 154

1  wording was, just kind of a generic ambiguous
2  term for sufficient vacuum to hold it down to
3  avoid injury was not enough.
4      It is my opinion that in this drill that
5  the most likely method of holding down or
6  securing this drill for its use is going to be
7  utilizing the vacuum system. That's not to say
8  there aren't applications where they're more
9  likely to use the ceiling jack, but it would be
10  my opinion that the most likely use would be
11  the vacuum system. The anchoring of the bolts
12  is difficult and labor intensive for each hole,
13  so you've got that. But any of the methods are
14  appropriate for holding it down if they're, you
15  know, properly done. I would point out that
16  the deadman switch would be sufficient to guard
17  against movement of the drill to shut it down
18  in any of these methods.
19      Now, we've already gone over the gasket
20  showed some signs of damage and separation upon
21  inspection; that was the glue in my opinion.
22  We've gone over the potential for injury due to
23  the vacuum loss. It would be reasonably

Page 155

1  foreseeable to a designer, we've gone over
2  that. Identified hazards should be eliminated
3  by design, I went over that, if economically
4  feasible; by guarding if they cannot be
5  identified. I've gone over that the
6  manufacturer did not do either of those. And
7  if identified hazards cannot be eliminated by
8  design or minimized by guarding should warning
9  alone be used to address the hazard. They did
10  not adequately do that.
11  Q.  What page are you on now?
12  A.  The next page, it would be page three, not
13  including the cover page. And in my opinion
14  the hazards could have been eliminated or
15  designed out of the system and/or guarding as
16  I've done here. You know, with the design of
17  this system, this event doesn't occur in my
18  opinion.
19      The vacuum loss hazard could have been
20  economically and technically eliminated. The
21  interlock vacuum, we've talked about that.
22  Q.  Well, let's stop right there, because I think
23  you mentioned -- maybe you're getting to the

Page 156

1  warnings, but I think you mentioned the
2  warnings some on the bottom of page four?
3  A.  Yes.
4  Q.  And you mention this audible warning. Did you
5  incorporate that into your design?
6  A.  Oh, on the vacuum loss? No. That would be
7  where if you didn't have an interlock to shut
8  the motor down, you could just have it where if
9  the vacuum fell below a certain level you would
10  get a loud audible warning. No, I've not
11  discussed that. To me that would be a sign of,
12  you know, an active warning from the machine
13  itself as opposed to a written warning.
14      (Exhibit 19 marked for identification.)
15  Q.  Let me show you what I've marked as Defendant's
16  Exhibit 19, and it's really two pages. And
17  I'll kind of reach over you, excuse me, but
18  this is a core drill and you recognize this as
19  one similar to the one involved in the
20  accident?
21  A.  Yes.
22  Q.  Although it's new, but we did this to show the
23  warnings. But these are warnings on the core

Page 157

1  drill, one is up by the column and one is on
2  the stand, and this is a blown up picture.
3  A.  Okay.
4  Q.  Now, is there anything ambiguous or unclear
5  about this one that says "Failure to secure rig
6  properly may result in serious injury"?
7  A.  Yeah, what's properly? You know, there's no
8  advice on the required vacuum. And even in the
9  owners manual, if they go read, you know, in
10  there, there's nothing in there to properly
11  identify the proper level of vacuum for that
12  machine.
13  Q.  Okay. Have you taken it upon yourself to write
14  any warnings that you think would be
15  appropriate for the drill?
16  A.  I have not done that, no.
17  Q.  Okay. Are you a warning's expert?
18  A.  No.
19  Q.  Okay. Do you know whether or not Mr. Riley in
20  this case ever attempted to read the warnings
21  or to consult the operators manual?
22  A.  I'm not sure. I don't know.
23  Q.  Okay. Do you have an opinion as to whether or

Page 158

1    not warnings would have made any difference in
2    this case?
3  A.   I don't.
4  Q.   Okay.  For example, if the testimony is --
5  A.   That's why warnings are kind of a last resort,
6    you know, on hazards.
7  Q.   In this case you can't provide any opinion,
8    within a reasonable degree of engineering
9    certainty, as to whether or not warnings would
10   have made a difference in causing or not
11   causing the accident?
12  A.   In general terms, without a specific instance,
13   I can't think of any.
14  Q.   Well --
15  A.   You know, I'm -- there again, I would have to
16   review back through it.  As I'm sitting right
17   here and it's getting kind of late in the day
18   of this deposition and we haven't had lunch,
19   but I can't -- you know what, I take that back.
20   I think that an adequate visible warning on the
21   vacuum gauge itself could have possibly clued
22   them in.
23      Let me go back over to the drill.  There

Page 159

1    is one thing that we have not pointed out.
2    There is one additional modification to this
3    drill that I don't believe we've mentioned.
4    There is a modification to the vacuum gauge
5    dial here.
6  Q.   Is that something that was done after this
7    case?
8  A.   Yes.
9  Q.   Okay.  Just for the record, we reserve any
10   right to object to any subsequent remedial
11   changes.
12      MR. GIVENS:  No, this is something he
13      did.
14  A.   I did.
15  Q.   I'm sorry, this is something you did?
16  A.   Yes.
17      (Off-the-record discussion.)
18  A.   This is a gauge that I have taken to show that,
19   you know, by taking a red marker -- this one
20   can be erased, but you would want something
21   more permanent.  This is just for illustrative
22   purposes.  I have put green in the glass zone
23   where you have an acceptable vacuum level and

Page 160

1    it is red where it is not.  Now, you could get
2    a gauge that actually printed on the gauge to
3    do that, on the gauge dial.  There are numerous
4    gauges that show that, similar type warnings,
5    red, green, go, no go type things.  And I put
6    the lettering in here, right here it says "base
7    vacuum," and it says "base secure" in the green
8    zone and "base unsecure" in the red zone.
9  Q.   What you're saying is you've relabeled and
10   color coded the vacuum gauge as a warning to
11   the operator?
12  A.   Correct.  Let's say you just had that alone in
13   the case of this incident.  If, as you were
14   saying before, they had difficulty drilling
15   that first hole with movement and it was
16   because the base was unsecure, if they had a
17   known gauge, he could say "Well, hey, look, our
18   gauge down here is in the red zone, what does
19   that mean?"  And they see the writing "base
20   unsecure."  If it's moving, they know the base
21   is unsecure.  But now they look at that and
22   they know that the base is unsecure because the
23   vacuum is not what it's supposed to be.  In

Page 161

1    other words, the base was unsecure, they had
2    the vacuum pump running, it had some vacuum on
3    it, but it would still move.  Now if they have
4    that gauge like that, they then know that that
5    needle on that vacuum gauge is not where it's
6    supposed to be.
7  Q.   Okay.  But, now, if the gauge shows that you're
8    in the red zone, it still wouldn't make any
9    difference, would it?  Would it enable the
10   operator to get off of the base of the drill
11   he's standing on and avoid injury?  That goes
12   back to my timing issue.  With your marking --
13  A.   And that alone is not sufficient -- that alone
14   is not sufficient, in my opinion, for this
15   problem as a warning.  I have it on here
16   because if the person is sitting here and
17   they've got it operating, they've got it on the
18   vacuum only -- it's off now, good -- they've
19   got it on the vacuum setting and it's not
20   operating, they can look there and see the
21   needle is in the red zone and that it will not
22   operate until it gets to the green zone.  They
23   know why.

Page 162

1  Q.   Well, go let's back to this question.
2  A.   Okay.
3  Q.   Would the warning on the vacuum gauge, as you
4      have prepared it now, have made a difference in
5      this case? Would that alone have prevented the
6      accident?
7  A.   I can't say for certain, but it may have.
8  Q.   Okay. Well, what I want you to do is to say
9      within a reasonable degree of engineering
10      certainty. Do you have an opinion as to
11      whether or not Mr. Riley could have utilized
12      such a function and it could have prevented the
13      accident?
14  A.   He could have, yes.
15  Q.   All right. Now, any other opinions about
16      warnings in this case? You commented about the
17      operators manual in regard to the vacuum gauge
18      issue?
19  A.   Right.
20  Q.   And you've now testified about the warning that
21      you've formulated for the core drill as a
22      modification --
23  A.   Right.

Page 163

1  Q.   -- as a part of what I will call your Shaver
2      design?
3  A.   Okay. And one other thing, too, the audible
4      thing certainly would be nice to have that
5      incorporated. I haven't incorporated it on
6      this because it's not -- I didn't feel it was
7      necessary. The machine shuts down. I mean,
8      it's irrelevant to me -- or I wouldn't say
9      irrelevant, but it's not as important that the
10      operator get a beep-beep before the machine
11      shuts down necessarily, you know.
12  Q.   Okay. Well, this may be a good time to stop.
13      Now, what I would like to do is after lunch
14      maybe we can turn it on and make this thing
15      rock and roll.
16          MR. SPRAIN: I would like for you to
17      see it.
18          MR. GIVENS: I have seen it.
19          MR. SPRAIN: Oh, you have?
20          MR. GIVENS: Yeah. It works, as far as
21          I can tell. Of course, I'm about
22          as far away from being an engineer
23          as you can get and still be

Page 164

1      breathing.
2          (Lunch recess.)
3  BY MR. SPRAIN:
4  Q.   Before we took a lunch break, we were going
5      through your various opinions and we -- I
6      believe we concluded your opinions in regard to
7      warnings, but you had demonstrated the warning
8      you created with the vacuum gauge --
9  A.   Correct.
10  Q.   -- on your design? Are there any other
11      opinions you have about the warnings in this
12      case?
13  A.   No, not -- no. Not specifically, no.
14  Q.   Okay. Now, what page of your report are you
15      on? It appears to me you're finished with page
16      four, but you tell me, because I want to make
17      sure I understand all of your opinions.
18  A.   Okay. Now, I guess we've got these things in
19      the report. Are you wanting if I have anything
20      in addition to here that we need to go over or
21      do we basically need to list all of these that
22      are in here one by one and go through them?
23  Q.   Well, I mean, let's go through them. I mean,

Page 165

1      just to recap, you've given me what I view to
2      be your big opinion about the design and you
3      said that there is a design problem and you've
4      created this alternative design?
5  A.   Right.
6  Q.   So I put that as number one.
7  A.   Well, I think -- in warnings I think I've
8      covered that. I say "Vacuum gauges clearly
9      define minimum safe operating ranges and
10      dangerous operating ranges," and that's what
11      we've corrected that to do. And I say "If
12      warnings are used, they must provide those who
13      are potentially in danger with a means to
14      prevent or minimize injury." You know, the
15      warnings that are available on that machine,
16      you know, are not standalone warnings. You
17      know, the warning -- I think the one that tells
18      you to, you know, read the operators manual,
19      it's not that conspicuous. It's not -- you
20      know, the things that are clear and immediate
21      dangers should be specifically warned of on the
22      machine and that's not -- that's not really
23      done. And part of that is that, you know,

Page 166

1    you've got the vacuum pump and all of that kind
2    of incorporated into one. I don't believe
3    there's a warning on there that specifically
4    states anything about the pressure or the
5    adequacy of the pressure of the vacuum pump
6    being required. I think we've got that.
7        Then on the next page, "The product is
8    defective and unreasonably dangerous as a
9    result of the designer or manufacturer's
10   failure to address the vacuum loss hazard by
11   design or guarding." I've already said that.
12 Q.  I believe we've discussed that.
13 A.  Yeah. I mean, I don't really know of any other
14   way of doing this other than just kind of
15   reading through these one by one and checking
16   them off.
17 Q.  Well, it seems like it's repetitive.
18 A.  It does. It really does.
19 Q.  This third thing, you say "The designer or
20   manufacturer unreasonably failed to address the
21   vacuum loss hazard by design and guarding."
22   Haven't you already told me about your basis
23   for that and your opinion --

Page 167

1  A.  Yeah.
2  Q.  -- as to how the product could be designed
3    differently?
4  A.  Sure.
5  Q.  Okay.
6  A.  The drill core cutting rig offers no built in
7    redundancy or backup in the event of the
8    failure. You know, we do have redundancy in
9    this one with the deadman switch and the
10   vacuum.
11 Q.  All right. And the next thing, we've discussed
12   the clutch --
13 A.  Right.
14 Q.  -- on the motor?
15 A.  Right.
16 Q.  Okay. And you have defined what you call the
17   vacuum loss hazard?
18 A.  Uh-huh. (Positive response.)
19 Q.  And I'll hopefully summarize it briefly, but if
20   I'm correct, you're saying that the hazard is
21   that the core drill, as designed, can lose
22   vacuum and that can cause the base to become
23   dislodged and to rotate around the axis of the

Page 168

1    drill and could cause injury; is that what
2    you're calling the vacuum loss hazard?
3  A.  I think so, yeah.
4  Q.  Okay.
5  A.  I'm sorry, because I'm kind of reading and
6    listening to you and I apologize. I was going
7    through my report. Would you repeat the
8    question, I'm sorry?
9  Q.  Well, no. I think I understand what you refer
10   to as the vacuum loss hazard.
11 A.  Yeah.
12 Q.  I think you've covered that.
13 A.  Okay. I've got one here that I haven't
14   discussed previously. The presence of an
15   available container or pouch on the machine.
16   It is common for machines that I've been
17   familiar with that the owners/operator manual
18   or instructions, if the use of that manual is
19   critical to the safe operation of that device,
20   there is a pouch or a holder on that device, on
21   a lot of the devices, that the manual goes in.
22   And what that does, that let's anybody know
23   that there's supposed to be a manual there if

Page 169

1    there's not one. So it just kind of says, hey,
2    this thing is not complete and whole, it
3    doesn't have the manual that is intended to be
4    here.
5        There's no indication on that machine
6    obvious, you know, physically that there's a
7    manual there. And therefore if there's not a
8    place on that machine to put that manual for it
9    to go, in a situation like this where there is
10   rental, it minimizes the likelihood that a
11   manual will go out with it.
12       Okay. "United Rentals failed to
13   reasonably maintain the core drill and ensure
14   that it and component parts were in proper
15   working order. Based upon the condition of the
16   core drill on inspection, the product was
17   poorly maintained. The drill bit in use at the
18   time of the incident showed some signs of
19   damage. The vacuum pump was non-functioning
20   and found to have foreign material that was
21   resulting from either corrosion of internal
22   parts or pick-up from the vacuum process from
23   previous use." You know, we've talked about

Page 170

1    the vacuum pump and the pick-up and that.
2        And there is -- you know, I will have to
3    concede, after reading some depositions that I
4    don't think were taken prior to that, it's
5    questionable, we're not sure which drill bit
6    really was in use at the time. So one bit is
7    good, one bit is bad. I think I would have to
8    see concede that.
9        "Actions of Matthew Riley: Mr. Matthew
10   Riley was not negligent in the operation on or
11   about August 29th."
12 Q.   Well, let's stop right there.
13 A.   Okay.
14 Q.   Now, we've discussed briefly about the
15   operation of the drill for the first hole. Do
16   you think there was any negligence there in
17   terms of Mr. Walters, the supervisor, and
18   Mr. Riley in using the drill for the first
19   hole?
20 A.   No.
21 Q.   Okay. Do you think there was any negligence --
22   I don't want to use that word, that's a legal
23   term. But do you think that there was any

Page 171

1    responsibility -- well, strike that. As to
2    Mr. Riley's supervisor, Mr. Walters, do you
3    think he did anything wrong in training or
4    instructing Mr. Riley on how to properly use
5    the drill?
6 A.   I don't have an opinion that he did not do
7    that. I'm not aware of anything he did wrong.
8 Q.   Okay. Do you think he properly instructed
9    Mr. Riley on how to use the core drill?
10 A.   He probably did. I'm not -- I can't really --
11   I think he did, yes.
12 Q.   Okay. Now, do you think that Flavor House, as
13   the employer, has any responsibility in terms
14   of training Mr. Riley on safe use of the core
15   drill?
16 A.   I'm confused. When you're talking about do
17   they have any responsibility --
18 Q.   Okay. Well, that's my first question. In this
19   case does the employer, Flavor House, have any
20   responsibility to ensure that an operator like
21   Mr. Riley can safely use the core drill?
22 A.   Yes, within their ability and knowledge of the
23   equipment, they have a responsibility involved

Page 172

1    in it. But, now, if you're talking about
2    responsibility as far as the accident, I mean,
3    that's a different story.
4 Q.   Okay. Well, you are aware that they have a
5    Maintenance Department, correct?
6 A.   Correct.
7 Q.   And they have a Safety Department?
8 A.   Correct.
9 Q.   And they had a Safety Director; in fact, he was
10   deposed in this case?
11 A.   Right.
12 Q.   And you're aware that they use various types of
13   products, machinery and equipment?
14 A.   Correct.
15 Q.   All right. And there's been some testimony
16   that one worker had used a core drill over ten
17   times, are you aware of that?
18 A.   No, I don't recall.
19 Q.   Okay. Well, assuming that's true, that one of
20   the coworkers of Mr. Riley testified that he
21   had used a core drill in excess of ten times,
22   and that Flavor House uses and has used many
23   types of machinery and equipment, wouldn't you

Page 173

1    therefore assume that they are sophisticated in
2    how to use machinery, equipment and products,
3    including a core drill?
4        MR. GIVENS: Object to the use of the
5        term "sophisticated" just as an
6        objection to form.
7 A.   I was thinking the same thing, the word
8    "sophisticated."
9 Q.   Well, knowledgeable. Let's use the word
10   "knowledgeable." The same question, but
11   substitute "knowledgeable." Wouldn't you view
12   Flavor House as a knowledgeable employer about
13   educating and training its employees on safe
14   use of machinery and equipment?
15 A.   I would think they would be.
16 Q.   Okay. And in that event, they have some
17   responsibility to make sure their employees
18   know how to safely use machinery and equipment?
19 A.   Yes.
20        MR. GIVENS: Object to the form.
21 Q.   And do you think that in this case Mr. Riley
22   was safely trained to operate and use the core
23   drill?

Page 174

1   A.   I think he was with regards to what was
2        available with the core drill and the method
3        and manner in which it was provided.
4   Q.   Okay.  Now, what would be a proper procedure if
5        during the course of using a product it's
6        deemed to be unsafe, and I'm talking about in
7        general, should you cease using the product;
8        should you go back to the employer and attempt
9        to gain more understanding of the product?
10       What would be the procedure of you as an
11       engineer?
12  A.   Me as an engineer, if a device is deemed
13       unsafe, I would look at it to see if I could
14       determine why it was unsafe.  If I could take
15       any corrective action on my own with available
16       resources to me to correct that condition, I
17       would do so.  If not, I would seek information
18       in operators guides, manuals, whatever.  Then
19       after that I would contact the manufacturer to
20       see if they had any suggestions.
21  Q.   Okay.  I'm sorry, I cut you off before you
22       finished.
23  A.   Yeah, I was finished.

Page 175

1   Q.   Okay.  Would it be advisable for an operator to
2        continue to use a product when it was operating
3        unsafely?
4   A.   If they knew it was unsafe to operate it, yes.
5   Q.   Okay.  And would a supervisor who's training
6        the employee on how to properly use a machine
7        or piece of equipment be advised to cease using
8        it if it started to operate unsafely?
9   A.   If it were unsafe to operate it and they knew
10       it, yes.
11  Q.   Okay.  I believe you were down to page seven.
12       And you've written a mighty lengthy report, so
13       we will just keep going here.  Page eight, and
14       I'm not trying to be repetitive, I don't want
15       you just to read from your report, but if there
16       is anything in addition that you have not
17       discussed today, I want to hear your opinions
18       and we'll discuss them if we need to.
19  A.   Are you talking about page eight including the
20       cover sheet?
21  Q.   Well, no, sir.
22  A.   Page nine including the cover sheet, eight not
23       counting it, right?

Page 176

1   Q.   Right.  It starts at the top "Mr. Matthew Riley
2        did not alter or otherwise use," et cetera, et
3        cetera.
4   A.   Right.
5   Q.   Okay.  Go ahead.
6   A.   That's -- yeah.  Okay.
7   Q.   Well, let me stop you there.  On the second
8        paragraph you state that "Mr. Riley did not
9        fail to abide by any warnings that would have
10       averted the serious injury incident."  But if
11       he had made sure that the base was secure to
12       the work surface, this accident would not have
13       happened, correct?
14  A.   If we knew that he knew what the definition of
15       the word "secure" meant with respect to that
16       and we had that defined, then we may have
17       something to go with.  But the warnings on the
18       machine and the description of it is unclear to
19       define that for him.
20  Q.   Okay.
21           MR. GIVENS:  How are y'all temperature
22           wise?
23           MR. SPRAIN:  I think we're fine.

Page 177

1   Q.   But back to my question, isn't it true that if
2        the base of the core drill had been secure to
3        the work area, the accident would not have
4        happened?
5   A.   I believe that to be true, yes.
6   Q.   Okay.  Now, do you know whether Mr. Riley in
7        fact testified that he knew that it was
8        important for the drill to be secure to the
9        work area?
10  A.   What's the question?
11  Q.   Well, did Mr. Riley testify that he knew that
12       the drill base needed to be secure to the work
13       area?
14  A.   I would have to go back and review his
15       deposition.
16  Q.   Okay.
17  A.   But as I sit right here, I don't recall that
18       being said.
19  Q.   Fair enough.  There's been a lot of testimony,
20       I understand that.  But my question is this;
21       assuming that Mr. Riley testified that he knew
22       the core drill needed to be firmly secured to
23       the work area, wouldn't that obviate the need

Page 178

1      for any warning to tell him that point?
2  A.    Without knowing what context he said that in,
3      you know, what was he referring to, the
4      necessity --
5  Q.    In terms of a safety hazard, in terms of safe
6      operation of the drill?  And I will ask it
7      again.  In the context of safe operation of the
8      core drill, assuming that Mr. Riley testified
9      that he knew the core drill needed to be
10     secured to the work area and stable, would that
11     not in fact obviate the need for a warning on
12     that subject?
13 A.    I don't think it negates the necessity of a
14     warning from the manufacturer, if that's what
15     you're asking with that question.
16 Q.    Well, that's not quite what I'm asking.  In
17     other words, you would agree that if an
18     operator of a product already knows about a
19     danger, they don't need to be there to
20     tell him something he already knows?  That
21     doesn't negate the importance of the warning to
22     be there for some other operator who may not
23     know, but for that operator who already knows,

Page 179

1      it's just redundant, wouldn't you agree with
2      that?
3  A.  No.
4  Q.  You would not?
5  A.  No.
6  Q.  Okay.  So even if someone knows of a danger and
7      understands how to avoid the danger, they still
8      have to read a warning just to be told again?
9  A.  Well, it doesn't negate the necessity for a
10     warning, you know, even for that person to have
11     it there, just because they may already be
12     aware of that hazard.
13 Q.  Okay.  Well, I think we're talking on the same
14     page, but what I'm trying to understand is, do
15     you know in fact whether Mr. Riley already knew
16     about the danger of the drill base not being
17     properly secured to the floor and in fact he
18     needed to make sure and take steps that the
19     drill base was secure to the floor?
20 A.    I think that was two questions in one.
21 Q.    Okay.  I will reask it.  Do you know whether
22     Mr. Riley already knew, irrespective of any
23     warning, that the drill base had to be secured

Page 180

1      to the floor for safe operation?
2  A.    Yes, I believe he did.
3  Q.    He did know that?
4  A.    I believe so, yes.
5  Q.    Okay.  And you're saying that despite that
6      knowledge he still needed to be warned about
7      something he already knew?
8  A.    But what is the definition of it being secured?
9  Q.    Well, I'm not asking you to second guess his
10     testimony, but I'm asking you to assume that he
11     testified under oath that he knew that the
12     drill base had to be secured to the work
13     area --
14 A.    Okay.
15 Q.    -- for safe operation?
16 A.    Okay.
17 Q.    Okay.  And further assume that he knew it
18     couldn't be dislodged, it needed to be firmly
19     secure?
20 A.    Okay.
21 Q.    Then wouldn't you take that as he already knew
22     of the possible danger of the core drill
23     becoming dislodged and not stable and thus

Page 181

1      could lead to serious injury?
2  A.    I don't know that he knew the consequences.  I
3      have no way of knowing that.
4  Q.    All right.  Back to my question before, and I'm
5      trying to figure out this cause and effect of
6      warnings.  But if he already knew about the
7      dangers of securing or not securing the base of
8      the drill to the floor, do you have any opinion
9      as to whether any additional warnings would
10     have made a difference?
11 A.    I don't.
12 Q.    Okay.
13 A.    I mean, with that information, I can't -- I
14     can't draw a conclusion on it.
15 Q.    Okay.  And that's based as an engineer and to a
16     reasonable degree of engineering certainty, you
17     just can't draw a conclusion as to what cause
18     and effect the warnings would have for somebody
19     who already knew about dangers?
20 A.    Correct.  That's -- yeah, I'm not sure I fully
21     a hundred percent understand what that
22     involves.  Is that getting into like a human
23     factors type thing of --

1  Q.   Well, it may, but you're the expert.  Is that
2       something that you know about?  I mean, do you
3       view yourself as a warning expert, first of
4       all?
5  A.   In generalized terms with equipment.  But now
6       as far as -- you know, in equipment, you know,
7       I've analyzed and can analyze, you know,
8       warnings and whether it's adequate and that is
9       something that I do.  But --
10 Q.   Well, what training do you have to analyze
11      warnings and --
12 A.   It would be from experience in having dealt in
13      engineering situations and manufacturing and
14      industrial situations for 20 some odd years.
15 Q.   Okay.
16          (Off-the-record discussion.)
17 Q.   Okay.  Let's see.  Warnings, you said that your
18      knowledge about warnings comes through
19      experience?
20 A.   Yes.
21 Q.   Okay.  Have you ever drawn or written any
22      warnings?
23 A.   Yes.

1  Q.   Okay.  Have you rendered testimony before in
2       regard to warnings?  And if you know, you would
3       know; if you don't, you don't.
4  A.   I can't think right now of any.
5  Q.   Have you ever --
6  A.   When I read and sign the deposition, if I can
7       think of any, I'll put it down.
8  Q.   Okay.  Have you ever been precluded from giving
9       any opinions about warnings?
10 A.   No.
11 Q.   Okay.  Have you ever been disqualified as an
12      expert witness in any case?
13 A.   No.
14 Q.   Okay.  Now, back to this case.  I'm probably
15      not asking the question in a good way, but I'll
16      try again.  I'm trying to figure out whether or
17      not you have an opinion, as an engineer and an
18      expert in this case, as to whether the warnings
19      could have changed the result if in fact
20      Mr. Riley already knew about the hazards of
21      safe operation of the drill and specifically
22      about adequately securing the drill to the work
23      surface?

1  A.   Yes.
2  Q.   Okay.  And what is that opinion?  I think I
3       asked you do you have an opinion?  Do you have
4       an opinion as to whether or not the warnings
5       could have changed the result and prevented the
6       accident if in fact he already knew about safe
7       operation of the drill and the hazards of the
8       drill?
9  A.   Oh, I misunderstood.
10 Q.   Well, I think we're both getting tired.
11 A.   Yeah.
12 Q.   Tell me what I should do.  Should I reask the
13      question or --
14 A.   Well, I mean, as I understand it, are you
15      asking if it was something that he was already
16      aware of would have resulted in the injury or
17      hazard, would a warning that warned against
18      that, for that hazard, would it have made any
19      difference if the warning was there if he
20      already knew that?
21 Q.   Exactly.  That's pretty much the question.
22      Stated differently, but that's pretty much the
23      question.

1  A.   Yeah.  No, if he already knew that, it wouldn't
2       make any difference.
3  Q.   Okay.  All right.  Now --
4  A.   And, I'm sorry, I wasn't trying to be
5       difficult, it was just that it was coming
6       across --
7  Q.   You've done great.  I mean, it's been -- we
8       took what, a 20 minute lunch break and we've
9       been going steady.  So, I mean, just let me
10      know if I don't ask a good question and I'll
11      try to rephrase it.
12          In your report you give an overall opinion
13      about Mr. Riley and you seem to state or you do
14      state that you don't see that he did anything
15      that was negligent that caused or contributed
16      to cause the injury, is that a fair assessment?
17 A.   Yes.
18 Q.   Okay.  Is there anything that he did or didn't
19      do that you think might have been against
20      common sense?
21 A.   No.
22 Q.   Okay.  Do you think standing on the drill stand
23      was something that a person ought to know not

Page 186

1    to do out of common sense?
2  A.   No.
3  Q.   Okay.  And do you think that continuing to
4       operate the drill when it had already
5       malfunctioned once before was something that
6       was against common sense?
7          MR. GIVENS:  Object to the form, as to
8              the characterization of
9              malfunction.
10 A.   Yeah.  Yeah.  I don't know that -- they were
11      able to get the hole drilled before and to do
12      so safely.  And there's no indication that he
13      didn't anticipate to be able to do it, you
14      know, on the second one safely.
15 Q.   Well, I mean, you saw the testimony where they
16      said they had to jump out of the way and turn
17      the drill off, didn't you?
18 A.   Yeah, I believe so.
19 Q.   Okay.  And wouldn't you call the situation with
20      the first use of the drill for the first hole a
21      malfunction in that the entire drill stand
22      became dislodged from the work surface and it
23      spun around the axis?

Page 187

1  A.   Yeah, I don't know what caused it to do so, but
2       it certainly wasn't supposed to have done that.
3  Q.   I mean, that's not correct operation of the
4       drill, right?
5  A.   No, it's not.
6  Q.   And you can't drill the hole if it's operating
7       in that manner, right?
8  A.   Correct.
9  Q.   And it's an unsafe situation, is it not?
10 A.   It would be.
11 Q.   Okay.  But you don't think continuing to
12      operate a drill that had already done that to
13      be something against common sense?
14 A.   No.
15 Q.   Okay.  And you don't see any fault on the part
16      of Walters, as the supervisor, in letting
17      Mr. Riley use the drill after that situation
18      with the first hole to be something that was
19      negligent or improper?
20 A.   No.
21 Q.   Okay.  And you don't see any -- strike that.
22      You don't find any fault with Mr. Riley in
23      continuing to use the drill after he had known

Page 188

1    that it had not operated correctly with regard
2       to the first hole?
3  A.   No.
4  Q.   Okay.  I think we're about done with your
5       report.  Do you want to finish sort of flipping
6       through it, because there can't be much left?
7  A.   Yeah, we've covered all of this.
8  Q.   And, again, I don't want to rush you.  If
9       there's something that you've missed, you know,
10      you let me know.  It seems like we've covered
11      so much ground that --
12 A.   Okay.  No, I've gone to the end, I'm fine.
13 Q.   All right.  Now, here's what I want to do with
14      your education real brief.  You're a graduate
15      of Georgia Institute of Technology?
16 A.   Correct.
17 Q.   Georgia Tech?
18 A.   Right.
19 Q.   Do you have any Master's degrees?
20 A.   No.
21 Q.   Okay.  You said you worked in manufacturing,
22      where did you work in manufacturing?
23 A.   I worked for a company called Georgia Duck and

Page 189

1    Cordage Mill, it's on there, for approximately
2       ten years.  Before that I worked for a company
3       -- well, actually immediately before Georgia
4       Duck and Cordage I worked for Georgia Tech as a
5       project research assistant for one of the
6       professors on a NASA project.  Is that in my
7       resume?
8  Q.   Well, maybe.  I might be able to short-cut
9       this.  How long have you worked at Shaver
10      Engineering and Design?
11 A.   Since 1993.
12 Q.   Okay.  And then what was your immediately
13      preceding job?
14 A.   Georgia Duck and Cordage Mill.
15 Q.   Okay.  And before that you were in school?
16 A.   I was in school, yes.  And during school I held
17      a couple of jobs in manufacturing.  One was for
18      an injection molding company; the other was in
19      research and design of a space suit for NASA as
20      part of a research project at Georgia Tech.
21      And then prior to attending Georgia Tech, I
22      worked in my father's business.
23 Q.   Which is what?

Page 190

1   A.   Manufacturing farm machinery.
2   Q.   Okay.  So for 13 years you've been at Shaver
3        Engineering?
4   A.   Correct.
5   Q.   And is Shaver Engineering principally involved
6        in consulting with and giving opinions for law
7        firms or is it broader than that?
8   A.   It's a little broader than that.  It's for law
9        firms, engineering -- I'm sorry, insurance
10       companies and manufacturers.  I've done work
11       for manufacturers as well.
12  Q.   Okay.  If you had to allocate a percentage of
13       work between -- you've heard this question
14       before, haven't you, between defendants and
15       plaintiffs, how would you break it down?  You
16       have heard this question before.
17  A.   Oh, yeah.  And the thing is it's different
18       every time it's asked, because it's time.  And
19       as time goes on, it's different, you know, your
20       time period.  You know, that's one of those
21       moving answers because it changes.  And it also
22       has to do with, and I'm giving this as part of
23       the answer, how do you define your work.  Is it

Page 191

1        the amount that creates most of your revenues?
2        Is it the number of cases?  You know, it's just
3        a hard number, you know, without proper --
4   Q.   Well, let's --
5   A.   I'm going to break it down as close as I can
6        with some variation.  I'm getting to the answer
7        and I'm not going to do that.  It's about 60
8        percent plaintiff, I would say, and 40 percent
9        defense.  There are times, such as one time
10       back in 2001 -- 2000 and 2001 when I was
11       working for the Justice Department on defending
12       a couple of tort claims cases that those two
13       defense cases made up 80 percent of my income
14       for one particular -- well, actually about two
15       years.  So, you know, the amount of work that I
16       do on the defense side can skyrocket.
17       Likewise, in a following year it can be the
18       other way.
19  Q.   Okay.
20  A.   So overall, the overall period, I would say,
21       balancing out all of those factors, it's
22       probably about 60/40.  It could be closer to
23       50/50, you know, but it's somewhere in that

Page 192

1        range.
2   Q.   Okay.  Now, what I would like to do is to list
3        some of the various types of products that
4        you've testified about --
5   A.   Okay.
6   Q.   -- over the last 13 years.  And, of course,
7        this is a drill case and specifically it's a
8        stand up core drill.  Just name some of the
9        other products that you've worked with, whether
10       cars or tools or, you know, you name it?
11  A.   Okay.
12  Q.   Let's just sort of go through this and just get
13       an idea of your experience.
14  A.   Okay.  I did not start keeping this list until,
15       I believe it was, 1996.  So for about three
16       years I did some work that's not going to be
17       included on this list.  And the first one is
18       Douglas versus Henri's Bakery.  That involved a
19       defective chair, manufactured chair.  Gregory,
20       et al. versus Surgical Appliance Industries,
21       Incorporated, et al., that involved an elevated
22       toilet seat.
23  Q.   Elevated toilet seat?

Page 193

1   A.   Yeah.
2   Q.   Okay.
3   A.   One of the bolts broke in it that was holding
4        it together due to hydrogen embrittlement.
5   Q.   Which side were you on there, plaintiff or
6        defendant?
7   A.   Plaintiff.
8   Q.   All right.  What about the chair case,
9        plaintiff or defendant?
10  A.   Plaintiff.
11  Q.   All right.  Keep going.
12  A.   Blake versus General Motors, that was a seat
13       belt case.
14  Q.   All right.  And was that plaintiff or
15       defendant?
16  A.   That was plaintiff.
17  Q.   All right.  What about Morris v. Metropolitan
18       Atlanta Rapid Transit, was that --
19  A.   That was a bus case, a car/bus.
20  Q.   Okay.
21  A.   Henley, et al. versus Chrysler Corporation,
22       that was a products case with a -- do you just
23       want it in general or very quickly specifics?

Page 194

1  Q.   I think you're doing it right now just fine.
2       We can always go back and --
3  A.   It was a steering defect case.  There was
4       actually two recalls on that vehicle.  The
5       steering wheel -- the back of the steering
6       wheel, the air bag module, and the backing of
7       the cowl were situated in such a way that when
8       the wheel was turned, if a set of keys got in
9       from the key chain, it would get in there and
10      wedge and actually bind the steering.  It
11      happened in several cases.  So that's what that
12      case was about.
13 Q.   Which side were you on there?
14 A.   The plaintiff.
15 Q.   Okay.
16 A.   Estate of Sylvia Towns versus Culpepper, that
17      was an air bag case where there was no air bag
18      in a car that had been repaired.  Okay.
19 Q.   Which side were you representing in the air bag
20      case?
21 A.   I don't represent, but I work for.
22 Q.   Which side were you -- who was your client?
23 A.   Okay.  It was the plaintiff.

Page 195

1  Q.   Okay.
2  A.   I've got to correct that because you just say
3       represent.  I know lawyers use that term.
4  Q.   It's the wrong word for you, I understand.
5  A.   Yeah.  Martin Zachary as Executor for Jesse
6       Zachary, et al. versus Bridgestone/Firestone.
7  Q.   Is that a tire case?
8  A.   That was a Firestone -- Bridgestone/Firestone
9       case.
10 Q.   Which side were you?
11 A.   Plaintiff.  Zilly Transport, LLP versus
12      Bridgestone Metalpha.
13 Q.   Was that a tire case?
14 A.   No.  That was an improper loading case on a
15      tractor-trailer for -- well, alleged improper
16      loading case from Bridgestone Metalpha.
17 Q.   What product was involved in that case, if any?
18 A.   It really wasn't a product case, I guess.  It
19      was steel tire cord and how it was loaded on
20      the trucks, it was how it was anchored.  I
21      mean, it was a failure of the loading technique
22      that was in question in that case.  So, I mean,
23      that's really not a product case per se, so

Page 196

1       skip on that one.
2       Champlin versus General Motors
3       Corporation.  That was tied into the -- well,
4       that was going on at the same time as the case
5       with the Justice Department, it had to do with
6       that.  And that was a steering case on the CK
7       series vehicle platforms, an electronic
8       variable orifice steering mechanism that
9       malfunctioned.  There were several NTS
10      investigations on that.  There never was a
11      recall issued on it though -- oh, yes, there
12      was.  I take that back.  There was no recall
13      issued.  There was technical service bulletins
14      and it was kind of almost like one of those
15      silent warranty things, that if people came in
16      and complained about it, they fixed it.  There
17      was no recall.
18      Rodgers versus Woodbine Manufacturing,
19      that was where a lift gate on the back of a
20      Coca-Cola truck, the chain broke, failed, so
21      that was a products case.
22 Q.   Who was your client in the Rodgers case?
23 A.   The plaintiff.

Page 197

1  Q.   What about in the Champlin case?
2  A.   Actually neither.  In Champlin versus General
3       Motors, that was a three party claim and
4       neither Champlin nor General Motors was my
5       client.
6       MR. GIVENS:  You were one of the et
7       als.?
8  A.   This was a case where somebody sued Champlin,
9       Champlin sued -- yeah, it was an et al.,
10      because Champlin sued Champlin.  The daughter
11      was injured and the mother was driving the car.
12      And the daughter/child was seriously injured
13      and so Champlin's insurance company paid her
14      and then Champlin and Farm Bureau, who I worked
15      for Farm Bureau, both sued General Motors
16      because of the underlying defect of the
17      vehicle.
18 Q.   Okay.
19 A.   That was too complicated, sorry about that.  We
20      already got Woodbine.  Okay.  Cole versus Ford
21      Motor Company, that's a Ford Explorer roll-over
22      issue.
23 Q.   Who was your client in that case?

1  A.  Cole.  Rodgers versus Woodbine, we just -- two
2      depositions.  U.S. Tsubacki was added on to the
3      case and so they came back and took my
4      deposition a second time.
5  Q.  Okay.
6  A.  Briggs versus Genie Scissor Lift and Sunbelt
7      Rentals, that was a scissor lift that the
8      controls malfunctioned and it raised up and
9      killed the operator.
10 Q.  Who was your client?
11 A.  Briggs would have been.
12 Q.  Okay.
13 A.  Okay.  Blanchard versus Ford Motor Company,
14     that's a Ford Explorer case.
15 Q.  What was wrong with the Ford Explorer?
16 A.  That's one where -- it's a crash worthiness,
17     roof crush type thing.  Now, I'm just doing the
18     accident reconstruction in that one, you know,
19     the speeds and things on the vehicle, not
20     getting involved in the product defect.
21     Okay.  Tim Campbell, et al. versus General
22     Motors, that is a seat belt case, and I'm
23     working for the plaintiff in that case.

1      And then the trial testimony, I'll just --
2  we probably, especially the product cases, have
3  gone over them in deposition before they got to
4  trial for sure.  There's no new ones.
5  Q.  Okay.  Now, have you ever been involved in a
6      case involving a drill before?
7  A.  No.
8  Q.  Okay.  Have you ever done any design work in
9      regard to a product that had a vacuum system?
10 A.  Have I ever done any design work?
11 Q.  Well, let me reask that question.  Have you
12     ever been involved in a case involving a
13     product with a vacuum system?
14 A.  No.
15 Q.  Okay.  Is this your first case essentially with
16     this type of product, the core drill?
17 A.  Yes.
18 Q.  Okay.  What is the time period for your listing
19     of testimony as reflected on Exhibit 2,
20     starting with the Douglas versus Henri's Bakery
21     case?
22 A.  It's Henri's, it's a French bakery.
23 Q.  Well, I'm just not as complicated as you.  I

1      couldn't read that little sign right there.
2      MR. GIVENS:  It's kind of like
3          Beauchamp, isn't it?
4      MR. SPRAIN:  Yeah.
5  A.  '96, June of '96.
6  Q.  Okay.
7  A.  And this was in response to the Rule 26
8      disclosure and I think you had to go back four
9      years.  And so it was probably 2000 when I had
10     to go back four years and I went back that far
11     through my records as far as I had to go.  And
12     since then I've just added to the list and I've
13     not bothered to drop names off as they get four
14     years old to maintain the list of the current
15     four years.
16 Q.  Okay.  So prior to '96 do any product liability
17     cases stand out?
18 A.  I can't recall right now.
19     MR. SPRAIN:  Okay.  I'm going to pass
20         you on to Mr. Sheehan, he's
21         probably got some questions for
22         you.  I will review my notes and
23         hopefully I won't have any

1      follow-ups.
2  A.  Okay.
3
4      CROSS-EXAMINATION
5  BY MR. SHEEHAN:
6  Q.  Mr. Shaver, you had mentioned that you had
7      submitted an affidavit.  Let me see if I can
8      show you what I'll mark as Exhibit Number 20 to
9      Shaver.
10     (Exhibit 20 marked for identification.)
11 Q.  Is that the affidavit that you were referring
12     to, sir?
13 A.  I believe so.  It doesn't look -- it's not
14     signed.  Because the affidavit I'm referring
15     to, I signed it.
16 Q.  That was the affidavit that was attached to the
17     response to the Motion for Summary Judgment
18     filed with the Court and I was just curious if
19     that was the affidavit?
20 A.  I know that was the purpose of it, but I know I
21     signed one, but it doesn't look like your copy
22     there is signed.
23 Q.  That's the Court's copy.

Page 202

1   A.   Okay.
2   Q.   The copy that shows that it was filed with the
3        Court.
4   A.   Okay.  That is it.  It was just an affidavit
5        that the report was true and accurate was my
6        understanding.  I mean, I did an affidavit to
7        that effect.
8   Q.   In fairness could it be that your signature
9        appears within the report and you were just
10       confirming that that was your -- that you were
11       certifying that the information contained in
12       the report was correct?
13  A.   Yes, that's exactly right.  That's exactly what
14       it was.  Thanks for clarifying that.
15  Q.   All right.
16  A.   Well, oh, here it is.  No, this is what I was
17       looking for.  See, there's my report, that's
18       where I signed my report, and then that's what
19       I was looking for.  It's at the end of the
20       report, that's what was throwing me.
21  Q.   Let's mark that page, since we've referred to
22       it in the record, let's mark the page where
23       your signature appears as Exhibit Number 21 to

Page 203

1        your deposition.  Just so the record is clear,
2        we have marked as a composite exhibit a
3        document showing it's been filed on September
4        the 26th of 2006 in the Middle District of
5        Alabama as a composite Exhibit 20 to
6        Mr. Shaver's deposition.  And within that
7        composite exhibit, would you mind marking the
8        page where your signature and the notary
9        appears?
10  A.   Okay.  Right there.
11       (Exhibit 21 marked for identification.)
12  Q.   So you actually signed a document again
13       confirming that this report, Exhibit Number 20,
14       was true and correct?
15  A.   Correct.
16  Q.   All right, sir.  Now, that appears to have been
17       notarized by Ms. Tessie Steverson, the
18       paralegal here in the law firm representing
19       Mr. Riley?
20  A.   Yes.
21  Q.   And the date that your signature was notarized,
22       sir?
23  A.   9/22 -- no, 9/25.  September 25, 2006.

Page 204

1   Q.   All right, sir.  And how many times have you
2        been to this law firm concerning this case of
3        Matthew Riley?
4   A.   Oh, three times, I believe.
5   Q.   Okay.  So this would have been -- as I
6        understand it, you and Mr. Frost met here on
7        Friday, October the 20th of 2006?
8   A.   Yes.
9   Q.   And that would have been the third time you've
10       met here at this law firm representing
11       Mr. Riley?
12  A.   Well, no, today would be the third time.
13  Q.   Oh, thank you, sir.  All right.  So today,
14       October the 27th, is the third time you've met
15       at the law firm?
16  A.   Right.
17  Q.   Did you actually meet before this deposition
18       with counsel representing Mr. Riley to prepare
19       for your deposition?
20  A.   Today?  Other than last Friday, no.  Well, this
21       morning I got here about 30 minutes before.
22  Q.   Before your deposition began?
23  A.   Yes.

Page 205

1   Q.   All right, sir.  And the second time you came
2        to this law firm here in Dothan from -- is your
3        office in --
4   A.   Atlanta.
5   Q.   -- would have been on September the 25th of
6        2006?
7   A.   No, I wasn't here on the 25th.
8   Q.   Okay.  I'm sorry, it appears to be notarized by
9        the paralegal here on the 25th of September?
10  A.   Okay.  I wasn't here then.
11  Q.   Well, was Ms. Steverson with you when you
12       notarized that signature or signed that
13       document?
14  A.   No.
15  Q.   How many reports have you prepared, sir?
16  A.   Total?
17  Q.   Please, sir.
18  A.   I don't know, 40, 50.
19  Q.   Okay.
20       MR. GIVENS:  Are you talking about
21       reports in general or reports as
22       to this particular case?
23  Q.   This case that you're here on today in this

Page 206

```
 1       deposition.
 2  A.   Oh, on this case?
 3  Q.   Please, sir.
 4  A.   Oh, just the one report.
 5  Q.   And is that the report that's attached to your
 6       affidavit?
 7  A.   Well, let's see, I believe it is.
 8            MR. SPRAIN:  Thank God it's not 40 or
 9            50.
10  A.   I misunderstood the question.  Yeah, I think
11       the front here is a little different, that's
12       the only difference.  I think the wording is
13       the same.  Yes, it -- well --
14            MR. SPRAIN:  Right there is a change or
15            is there?
16            MR. GIVENS:  No, it's just in two
17            pages.
18  A.   Yeah.  And the font shows up different the way
19       it's printed from one to the other.  These are
20       bullets and these are -- I think the difference
21       was it was printed out probably on two
22       different printers, one from the other, is why
23       it -- well, there's a page missing on this one
```

Page 207

```
 1       here.
 2  Q.   Which one is that, sir?
 3  A.   The one -- the affidavit one.  Well -- okay.
 4       All right.  The affidavit was for the report
 5       and then --
 6  Q.   I'm sorry, so the record is clear, the
 7       affidavit that was filed with the Court is
 8       missing a page?  Is that what you're testifying
 9       to?
10  A.   Just a minute.  Are you counting the last page
11       Continued Trial Testimony?  It appears that the
12       Continued Trial Testimony, the page that --
13       Continued Trial Testimony, the next page,
14       there's not a page following on that one;
15       however, there was supposed to be this page
16       attached to it.
17  Q.   I'm confused, sir.  The affidavit that was
18       filed with the Court, is it missing a page?
19  A.   It appears to be, yes.
20  Q.   And what page is it missing, sir?
21  A.   The last page of the Rule 26 disclosures of the
22       testimony.
23  Q.   All right.  And that well could have been made
```

Page 208

```
 1       when it was copied and filed with the Court,
 2       would that be -- in all fairness?
 3  A.   True.  Yes.
 4  Q.   Do you mind if we mark your report, the one
 5       that you've been referring to during your
 6       deposition?
 7  A.   That's fine.  I think it's the same as that one
 8       that's already been done, but that's fine.
 9  Q.   All right, sir.
10            (Exhibit 22 marked for identification.)
11  Q.   In other words, I have now marked as a
12       composite Exhibit 22 what would be a complete
13       report to include the page that may have not
14       been filed with the Court?
15  A.   Right.  If you are -- and I think the -- the
16       affidavit is for the report and the report is
17       complete.  It's the trial testimony which is in
18       compliance with Rule 26 is missing a page,
19       which is actually --
20  Q.   Missing from what?
21  A.   It's missing from the one filed with the
22       report.
23  Q.   Do you mean the one filed with the Court?
```

Page 209

```
 1  A.   Yes.
 2  Q.   Okay.
 3  A.   The one filed with the Court is missing not a
 4       page of the report itself, but of the last page
 5       of the Rule 26 disclosure, one page of the
 6       trial testimony is missing, the last page.
 7  Q.   All right, sir.  Could you do us a favor, could
 8       you take Exhibit Number 22 to your deposition
 9       and just write one through whatever it turns
10       out, start with that cover sheet there?
11  A.   One?  Okay.
12            MR. GIVENS:  Number the pages, in other
13            words.
14  A.   Got you.  (Witness complies.)  It's 24 pages.
15  Q.   All right, sir.  So you now have before you
16       your complete report consisting of 24 pages; is
17       that right, sir?
18  A.   Yes.
19  Q.   And that's been marked as Exhibit Number 22 to
20       your deposition?
21  A.   Correct.
22  Q.   All right, sir.  And so that we're clear, this
23       report consisting of 24 pages, when was it
```

Page 210

1   prepared?
2   A.   You know, the report was prepared August 29th.
3   Q.   Of what year, sir?
4   A.   I'm sorry, not August 29th. I'm looking at
5        the --
6             MR. SPRAIN: At the date of the
7             accident.
8   A.   Yeah. Well, I usually include the date on that
9        front page and it's typically down there. Oh,
10       okay. I can tell you. I didn't put it in date
11       form, but I believe it was 6/22 of 2006. It
12       would have been June 22nd of 2006.
13  Q.   And since June 22nd of 2006 have your opinions
14       changed in this action, --
15  A.   No.
16  Q.   -- this lawsuit?
17  A.   No.
18  Q.   Okay. You indicated that you had examined the
19       machine on May the 12th, 2005 outside of
20       Atlanta, sir?
21  A.   Yes.
22  Q.   And you again examined the machine on February
23       the 23rd of 2006?

Page 211

1   A.   I was there for an inspection. I did not do
2        any examination or testing that went beyond
3        what I had done on -- in May of '05.
4   Q.   Fair enough. And did you make any additional
5        observations or form any different opinions at
6        that second inspection on February 23rd of
7        2006?
8   A.   No.
9   Q.   All right, sir.
10            (Off-the-record discussion.)
11  Q.   How many times have you met with Mr. Frost in
12       reference to this lawsuit involving Mr. Riley,
13       sir?
14  A.   Once.
15  Q.   And that, again, would have been on the 20th of
16       October of 2006?
17  A.   That's correct. That's correct.
18  Q.   Have you read the report prepared by Mr. Frost?
19  A.   I got a copy of it and I glanced through it.
20       To be quite honest, I guess it was right after
21       I submitted my report and then his report came
22       in and I looked at it and glanced at it. And
23       to be honest with you, I haven't really had a

Page 212

1        chance to review it that thoroughly since then
2        before this deposition.
3   Q.   All right, sir. So that I'm clear then,
4        Mr. Frost -- you received Mr. Frost's report at
5        or about the time you submitted your report on
6        June the 22nd of 2006?
7   A.   It was after. Because I didn't even know
8        Mr. Frost -- I didn't even know him before then
9        or know about him before then.
10  Q.   Had you ever spoken to Mr. Frost before he
11       submitted his report?
12  A.   No. In fact, I had never spoken with Mr. Frost
13       before October 20th.
14  Q.   And how many conversations have you had with
15       Mr. Frost concerning this lawsuit?
16  A.   Well, that day. I mean, we spent several hours
17       together.
18  Q.   I'm sorry, help me?
19  A.   Okay. On October the 20th.
20  Q.   Of?
21  A.   2006.
22  Q.   All right, sir.
23  A.   And then I spoke with him, I believe, on

Page 213

1        Tuesday of this week and then I spoke with him
2        again yesterday twice.
3   Q.   Okay. And what was the purpose of speaking
4        with him on Tuesday?
5   A.   I called to let him know that we had gotten the
6        vacuum microswitch in. I'm sorry, it wasn't
7        Tuesday, I talked to him Wednesday. I let him
8        know that we got the microswitch in, the vacuum
9        activation switch, and I was starting to put it
10       together and that's pretty much it.
11  Q.   That would have been October the 25th of 2006?
12  A.   Okay.
13  Q.   Is that correct, sir?
14            MR. GIVENS: Yes, that was day before
15            yesterday.
16  A.   Yes.
17  Q.   And when did you next talk to Mr. Frost, sir?
18  A.   Yesterday probably about midday.
19  Q.   Okay. That would have been October the 26th,
20       2006?
21  A.   Correct.
22  Q.   All right. And that was on two telephone
23       conversations?

Page 214

1  A.   Yes.  Once I had tested the components of the
2      drill to see that it worked, I called him, and
3      then after I got everything put together I
4      called him to let him know it went together and
5      worked okay.
6  Q.   Have you applied for a patent on your design?
7  A.   No.
8          MR. GIVENS:  Not yet.
9  Q.   Have you read the report prepared by Mr. Roger
10     Davis in this lawsuit?
11 A.   No.
12 Q.   I saw you had a copy of it in your file?
13 A.   Yeah, I did, but I haven't read it.
14 Q.   Have you read the report of any other expert
15     witness who has been designated in this
16     lawsuit?
17 A.   No.
18 Q.   Have you discussed with anyone the expert
19     opinions of anyone designated as an expert in
20     this lawsuit?
21 A.   No.
22 Q.   Do you know Mr. Roger Davis?
23 A.   No.

Page 215

1  Q.   Do you --
2  A.   I've heard the name.  I know Mr. -- I think
3      Mr. Lane mentioned his name once before, but I
4      didn't.
5  Q.   Okay.  What is the distinction between your
6      testimony and Mr. Roger Davis?
7  A.   I don't know.  I haven't reviewed his
8      testimony.
9  Q.   I mean, what did Mr. Lane say he was hiring
10     Mr. Roger Davis to do that you couldn't do?
11 A.   I guess it's okay for me to say what Mr. Lane
12     told me.
13 Q.   Absolutely.
14 A.   Specifically he told me it had to do with the
15     licensing issue.  I believe Mr. Davis is
16     licensed in Alabama.  And when there may have
17     been some concern about the licensing is why I
18     believe -- is the reason I was told.
19 Q.   Okay.  So Mr. Davis and you both are experts in
20     the same discipline?
21 A.   I suppose.  As I say, even though I have a copy
22     of his report, I haven't read it, so I can't
23     comment on that.  But I would assume so based

Page 216

1      on what you're saying.
2  Q.   Well, no, I'm not under oath.
3  A.   Okay.  And I would also assume that based on
4      the fact of what Mr. Lane said he hired him for
5      as well.
6  Q.   And that being that he was licensed in Alabama
7      while you were not?
8  A.   That's correct.  At least during the time he
9      hired him to do that.
10 Q.   And what is the difference in you and
11     Mr. Frost?  How will a jury be assisted by
12     having Mr. Frost testify as an expert in this
13     case as opposed to yourself?
14 A.   I don't know.
15 Q.   So it would be fair to say that your testimony
16     would be cumulative?
17         MR. GIVENS:  I would object to the
18         form.  I don't think it's fair to
19         characterize his testimony as --
20         the testimony of he and Frost as
21         being cumulative when he just said
22         he doesn't know what Frost does
23         different from what he does.  So I

Page 217

1      don't see how he can characterize
2      that as cumulative and I would
3      object to the form on that basis.
4  Q.   Well, I thought you had reviewed Mr. Frost's
5      report?
6  A.   I have when it was sent to me.  After I
7      submitted my report, it came to me, and I glanced
8      at it and looked at it.  I recall I did not
9      disagree with anything that he had said and
10     nothing jumped out, but I didn't sit there and
11     analyze his report of how it -- you know,
12     whether it overlapped what I had said or
13     whether it complimented what I said.  I have
14     not rendered an opinion as to where his work
15     stacks up versus mine.  I have no idea.
16 Q.   What expertise does Mr. Frost bring to this
17     lawsuit that you don't have?
18 A.   I don't know.
19 Q.   Well, now, you said that you had conferred with
20     him in reference to the Shaver design?
21 A.   He did mention to me that I believe he has
22     either an electrical engineering degree or
23     electrical background.  So he was of some

Page 218

1    assistance in helping with the electrical
2    circuitry on that unit, yes.
3  Q.  Well, are there any electrical issues that he
4    would be needed for in this lawsuit involving
5    Mr. Riley?
6  A.  I don't know.
7  Q.  Well, do you know of any electrical issues?
8  A.  No.
9  Q.  Have you examined any other core drill machines
10    other than the subject core drill machine and
11    then the exemplar that you've brought here to
12    the deposition with you today?
13  A.  No.
14  Q.  Have you ever used a core drill machine?
15  A.  Yes.
16  Q.  And how many times, sir?
17  A.  Once.
18  Q.  And when was that, sir?
19  A.  Oh, probably five -- four or five years ago.
20  Q.  So 2001?
21  A.  That's probably close.  It could be a year
22    either way.
23  Q.  All right.  And where was that?

Page 219

1  A.  It was in my driveway.
2  Q.  And what was the purpose of your use of the
3    core drill machine on that occasion?
4  A.  My brother-in-law had rented one to anchor a
5    building that he had built that some
6    construction workers had and I wanted a hole in
7    my driveway to put a fence gate post.
8  Q.  And how many holes did you drill?
9  A.  Just one.
10  Q.  And how deep was that?
11  A.  Well, I never got it through the concrete.  I
12    drilled down probably about four to six inches
13    and did not reach the concrete and I just -- I
14    finally decided I didn't really want to keep
15    going any deeper.  It was pretty hard work and
16    I was using it on the tail-end of a four hour
17    rental from Home Depot and it was going to run
18    into the time and I just abandoned the hole
19    cutting and took it back.
20  Q.  And did you have an accident while drilling
21    that one hole?
22  A.  No.
23  Q.  Have you ever rented anything from United

Page 220

1    Rentals?
2  A.  No.
3  Q.  Have you ever spoken to anyone at United
4    Rentals?
5  A.  Yes.
6  Q.  And how many times, sir?
7  A.  Once.
8  Q.  And when was that, sir?
9  A.  Probably about five or six years ago.
10  Q.  Again, that would be in the 2000, 2001 area?
11  A.  Yes.  It would have been before this accident
12    occurred.
13  Q.  And what was the gist of that conversation on
14    that one occasion?
15  A.  That involved the Genie Scissor Lift case.  I
16    was doing research into the scissor lift,
17    different scissor lifts, and the scissor lift
18    that had been in question in that Genie Scissor
19    Lift case had been rented from Sunbelt Rentals.
20    And I called someone at United Rentals to ask a
21    question about the Genie Scissor Lift series.
22    And I've forgot -- today I forget what question
23    it was I had about it.  But since Sunbelt was a

Page 221

1    named party in the suit, I avoided calling them
2    to ask the question.  And so my next
3    alternative was to call -- I just happened to
4    remember, you've got Sunbelt and United
5    Rentals, and when you asked me if I had ever
6    spoke, that's what I remembered.  It was
7    probably not the answer you were looking for.
8  Q.  Oh, no.
9  A.  Okay.
10  Q.  The answer I'm looking for is just the truth.
11  A.  Okay.
12  Q.  In that case did they help you?
13  A.  I can't remember.  I just remember calling them
14    and talking to them.  I think I would have
15    remembered it had it been something earth
16    shattering with regard to the case.
17  Q.  Okay.  Did they assist you?
18  A.  Yes.
19  Q.  Have you spoken to any other rental company in
20    reference to the lawsuit filed by Mr. Matthew
21    Riley?
22  A.  I have not.
23  Q.  Have you ever testified against a rental

Page 222

1    company?
2  A.  No. Because at the time I testified in that --
3    the other case, the Genie Scissor Lift, that
4    was just against Genie. No, I have not.
5  Q.  All right, sir. Have you ever testified in
6    favor of any rental company?
7  A.  No.
8  Q.  What is your understanding as to the training
9    that Mr. Riley received prior to operating the
10    subject core drill machine in this lawsuit?
11  A.  Just that he was showed how to -- you know, how
12    to put it there with the water, how to anchor
13    it with the vacuum, and how to make the -- how
14    to drill the holes. Basically he was watching
15    Mr., I believe it was, Mike Walters. It's not
16    Waters, Walters, right.
17  Q.  Did he receive any other training?
18  A.  I don't believe so. Do you know what, I hate
19    to do this, can we take a short break?
20      MR. SHEEHAN: Sure.
21      (Recess.)
22  BY MR. SHEEHAN:
23  Q.  Sir, we've taken a recess and we're back on the

Page 223

1    record. And I notice that you were kind enough
2    to provide us with some negatives from one of
3    the notebooks that had previously been
4    identified?
5  A.  Yes.
6  Q.  Which notebook was that, sir, that the
7    negatives came out of?
8  A.  Oh, I'll have to look and see. Which
9    photographs are those? The one showing the
10    drill bit. This notebook.
11  Q.  And that was marked Exhibit Number?
12  A.  17.
13      (Exhibits 23 through 47 marked for
14      identification.)
15  Q.  All right, sir. Let me show you photographs
16    that have been made from the negatives that
17    came out of the notebook previously identified
18    as Exhibit 17 to your deposition.
19  A.  Okay.
20  Q.  They have been marked on the back Exhibits 23
21    through 47 to your deposition.
22  A.  Okay.
23  Q.  If you would check those and --

Page 224

1  A.  Okay.
2  Q.  Are those photographs you took, sir?
3  A.  Yes, they are.
4  Q.  And when did you take those, sir?
5  A.  In May of 2005.
6  Q.  Did you take any other photographs in May?
7  A.  That's my wife, I'm sorry.
8      (Off-the-record discussion.)
9  Q.  Did you take any other photographs there in May
10    of 2005?
11  A.  I don't believe so, no.
12  Q.  So, again, the purpose of the negatives in that
13    particular notebook, I guess, was so you would
14    have all of your negatives together of your
15    observations at that first inspection on May
16    the 12th, 2005?
17  A.  No. The negatives were not supposed to be in
18    the notebook. I don't normally take negatives
19    out of my office. They just happened to be in
20    the folder in that book. They had not been
21    removed and put with the other negatives.
22  Q.  Well, are there any other negatives you have
23    not produced here today?

Page 225

1  A.  Yeah, I have negatives of the other three.
2  Q.  The other three what?
3  A.  Of the other three notebooks. I don't have the
4    negatives here of those. That's what I had
5    said before, it's just only by -- you know, I
6    don't normally bring negatives of my
7    photographs to depositions, you know.
8  Q.  Did you take any photographs of the second
9    inspection on February the 23rd, 2006?
10  A.  I looked to see if I had and apparently I
11    didn't. They were not in the file.
12  Q.  But you have removed negatives from your file
13    before coming to the deposition here today?
14  A.  Well, I didn't do it before coming to the
15    deposition. It's when I go -- when I have
16    pictures made, when I have them developed --
17    which now I use digital, so it's not even an
18    issue. But what I did back then was -- you
19    know, I either do one of two things. I either
20    leave the pack, the pack that comes from the
21    developer, with the negatives until I have a
22    chance to go through them and put them in a
23    notebook like this and then file the negatives

Page 226

1    away.  And they are not kept with the case file
2    itself, they're kept separate.  And, you know,
3    only the photographs themselves, only a copy of
4    the photographs are kept with the files.
5         You know, because most of the time laser
6    copies of photographs are made for depositions
7    and it's only upon request do we go back and
8    get the negatives to make photographs from.  I
9    mean, that's how I've been doing it since I've
10   been doing this.
11  Q.    Have you brought here to the deposition
12       photographic prints of all of the photographs
13       that you are aware of involving Mr. Riley's
14       lawsuit?
15  A.    With the exception of about a dozen and a half
16       photographs taken over the last two to three
17       days as I was making the Shaver design, as
18       y'all are calling it, drill.  I took
19       photographs of that in various -- various
20       things with it and they're in digital form and
21       I don't have those printed out yet.  I haven't
22       done it yet.
23  Q.    Could you provide those to Mr. Lane?

Page 227

1    A.    Yes, I will.
2    Q.    Thank you, sir.  So other than the, you say,
3         dozen and a half photographs made within the
4         last week of the exemplar machine described as
5         the Shaver design, you have brought with you
6         all of the photographic prints involving
7         Mr. Riley's lawsuit?
8    A.    Yes.
9    Q.    Do you have any videotapes?
10   A.    Not that I have found.  I went through my
11        videotapes to see.  I think what happened, I
12        took my video camera, and as it turned out, my
13        recollection, Mr. Lane did not have videotape
14        for his camera, brought a camera, but my tape
15        and his tape were identical.  He put a tape in
16        his camera, one of my blank tapes, and used it.
17        Because I was busy involved with the inspection
18        and I don't think I -- I certainly did not
19        videotape the entire thing.
20   Q.    But you turned that over to Mr. Lane?
21   A.    He took it, he kept it, I never had it.
22   Q.    All right, sir.
23   A.    That was his.

Page 228

1    Q.    And that's the only videotape that you're aware
2         of?
3    A.    That I'm aware of, yeah.
4    Q.    So we have all of the photographic evidence
5         here with us today with the exception of those
6         12 and a half of the exemplar machine called
7         the Shaver design?
8    A.    Right.  Right.
9              MR. GIVENS:  Just by way of keeping the
10            record straight, I don't know that
11            we've got -- when you say 12 and a
12            half, are you talking about 12 and
13            a half photographs?  And I'm just
14            curious about the half of
15            photograph.
16   Q.    Your lawyer is correct.  You had said 12 and a
17        half and so I --
18   A.    I said 12 and a half?
19   Q.    Whatever the record -- I heard 12 and a half,
20        but, I mean, that's --
21   A.    Oh, okay.
22   Q.    What would you say?
23   A.    I would say 12 or so.

Page 229

1    Q.    12 or so.  And I probably misunderstood you and
2         I apologize.  Thank you.
3              MR. GIVENS:  Sure.
4    Q.    I had written down 12 and a half and I
5         apologize.  So we can expect to receive about
6         12 photographs digital?
7    A.    Maybe more.
8    Q.    But, again, they're just going to be what was
9         made within the last week?
10   A.    Correct.  It's not going to have anything to do
11        with the subject drill in this case.  It's only
12        this alternate design.
13   Q.    All right, sir.  And I noticed in one of your
14        exhibits you had copies of the photographs made
15        by Mr. Tew the morning after the accident
16        involving Mr. Riley?
17   A.    Correct.
18   Q.    Okay.  Do you have those, sir?
19   A.    I think they're here somewhere.  I think
20        they're going to be over here in this chair,
21        because I think as we were going through that
22        stuff -- it was in the folder, if I'm not
23        mistaken.  No, no, no.

58 (Pages 226 to 229)

Page 230

```
 1          MR. GIVENS:  Is it in one of the
 2              notebooks?
 3  A.   No.  Yeah, it's in a bound form.
 4          MR. GIVENS:  I think there's one under
 5              there.
 6  A.   That's it there.  Thank you.  I believe it's in
 7       here.  Yeah, right there.
 8  Q.   All right, sir.  And that's contained within
 9       composite Exhibit Number?
10  A.   18.
11  Q.   And how many photographs do you have of the
12       machine?
13  A.   And they're just xerox copies, they're not --
14       ten.
15  Q.   Okay.  And have you asked to be provided with
16       all of the photographs taken of the machine
17       there at Flavor House?
18  A.   I haven't personally asked for it, no.  I don't
19       know if the attorneys -- I mean, this is what
20       was sent to me.  You know, the material comes
21       in, they compile it and send it to me.  Have I,
22       after getting this, called up and said send me
23       all of the photographs?  No, I haven't done
```

Page 231

```
 1       that.  I just review what they send me.
 2  Q.   Okay.  Well, have you reviewed the photographs
 3       taken at Flavor House after the accident
 4       involving Mr. Riley?
 5  A.   Other than these right here, these copies, no.
 6  Q.   So the only photographs you've seen of the
 7       subject machine after the accident are the ten
 8       photographs contained within that composite
 9       Exhibit Number --
10          MR. GIVENS:  18.
11  Q.   -- 18?
12  A.   That is correct.  Unless in some of these other
13       color photographs those are slipped in there
14       and I've missed them and I'm just looking at
15       the machine.  I think these are the only ones
16       I've seen at the scene.
17  Q.   And so that I'm clear then, you haven't asked
18       to see the photographs taken of the machine
19       there at Flavor House after the accident?
20  A.   Well, I didn't know that there were any other
21       photographs besides these.
22  Q.   Those ten?
23  A.   Yes.
```

Page 232

```
 1  Q.   And you haven't been shown any other
 2       photographs of the machine there at Flavor
 3       House after the accident?
 4  A.   No.  I don't believe so, no.
 5  Q.   Well, were you satisfied with those
 6       photographs, those ten photographs that you
 7       have there in that composite Exhibit 18?
 8  A.   Yeah.
 9  Q.   They showed you what you needed in order to
10       form your opinion in this case?
11  A.   Yes.
12  Q.   Well, do those photographs -- do they
13       accurately depict the condition of the drill
14       when you saw it on May the 12th of 2005?
15  A.   I believe -- I believe it does.  Yes, I would
16       say so.
17  Q.   Have you inspected the facility at Flavor House
18       to see where the accident occurred?
19  A.   No.  I believe they wouldn't -- we were
20       scheduled to do it several weeks ago and then
21       they wouldn't permit any experts at the -- at
22       the plant.
23  Q.   Who wouldn't permit any experts at the plant?
```

Page 233

```
 1  A.   I'm not sure.  They just -- I think it wasn't
 2       -- they were having some depositions and I was
 3       on standby to inspect, then I was told that
 4       they had said no experts would be allowed to
 5       come to the plant.  I'm assuming it was Flavor
 6       House put those conditions on it.
 7  Q.   That's what you're talking about when you say
 8       they wouldn't allow you?
 9  A.   That was my understanding.  That during the
10       depositions of their people, they were going to
11       be -- were the depositions taken out there at
12       Flavor House?
13  Q.   No, sir.
14  A.   Okay.  Well, I don't know.  At the time there
15       were depositions and I was assuming they are at
16       that time.  I wasn't in on the loop of exactly
17       what was going on.  It was just that -- and I
18       was -- I believe that was back in August,
19       because I was going down to Destin on vacation
20       and I was on standby to come through here at
21       the time to go to inspect the facility.  And
22       then for whatever reason it could not take
23       place due to a logistics thing with the Flavor
```

Page 234

1       House people.
2  Q.   You testified that it's your understanding that
3       the core drill machine, in the instruction
4       given to Mr. Riley, that it was put there with
5       the water, is that what I understood your
6       testimony to be, when he was taught how to use
7       the machine?
8  A.   Yes.
9  Q.   Okay.  What did you mean by that?
10 A.   Well, with the water hose.  It was not run
11      through the nozzle, is my understanding, of the
12      drill bit; that a water hose was laid down
13      there, you know, around the bit.  At least
14      that's what I picked up from the deposition
15      testimony.
16 Q.   And whose deposition was that, sir?
17 A.   I can't recall right now.
18 Q.   What depositions have you read, sir?
19 A.   I would have to go through and get them out.  I
20      know Mike Waters -- Mike Walters.
21 Q.   Well, did you bring them with you, sir?
22 A.   Yes.  I thought we had gone through them here
23      in the exhibits.

Page 235

1  Q.   So you've identified all of the depositions
2       you've read?
3  A.   I believe so.  Except I didn't see Mike -- was
4       Mike Walters' deposition in here?
5           MR. SPRAIN:  I don't remember seeing
6           that one.
7  A.   Okay.  Well, I did read that one.  I've read
8       that one.  Well, you know what, there are some
9       depositions that were emailed to me that are on
10      my computer, too, that I've looked at through
11      there.  They're not going to be in here
12      physically either.
13 Q.   Okay.  Could you provide -- well, is the e-mail
14      contained within the correspondence file
15      showing what depositions were sent to you?
16          MR. SPRAIN:  I don't think I saw that.
17 A.   I don't know.  I'll have to look through it and
18      see.
19 Q.   Okay.  Well, is it there in front of you?
20 A.   This is it.  You know, it's not in here.
21 Q.   Okay.  Could you provide that to Mr. Lane so he
22      could then attach that to this deposition as
23      Exhibit Number 48?

Page 236

1  A.   Yes.
2  Q.   And if there are any other e-mails, do you mind
3       providing those?
4  A.   I don't mind at all.
5  Q.   And we will mark those other e-mails then as a
6       composite Exhibit 49, fair enough?
7  A.   Fair enough.
8           (Exhibits 48 and 49 marked for
9           identification.)
10          MR. GIVENS:  All right.  The 48 is
11          going to be -- you want the -- if
12          a deposition was sent via email,
13          as an attachment to an email, you
14          want that to be 48.  And we think
15          that's, by his testimony, probably
16          going to be Mr. -- is it Walters?
17 A.   Oh, there's going to be three or four or five.
18      There's going to be several of the depositions
19      that I received.
20          MR. GIVENS:  That were e-mailed?
21 A.   Oh, yes.  Yes.
22          MR. GIVENS:  All right.  So 48 is going
23          to be any depositions that he got

Page 237

1       by e-mail, correct?
2           MR. SHEEHAN:  Yes, sir.
3           MR. GIVENS:  And then 49 is going to be
4           what?
5           MR. SHEEHAN:  Will be any other e-mails
6           that were not provided or
7           contained within the
8           correspondence file.
9           MR. GIVENS:  All right.  I'm just
10          trying to make myself notes to
11          make sure we follow-up.
12          MR. SHEEHAN:  Thank you.
13 Q.   So that I'm clear then, you say that the water
14      hose was not connected to the water attachment
15      on the drill assembly?
16 A.   And that was somewhere in some of the
17      depositions of how they were doing it that I
18      picked up and I'm not exactly sure where that
19      came from.
20 Q.   What is the function of the water hose
21      attachment to the drill assembly?
22 A.   It's my understanding that it sprays a blast of
23      water down at the drill bit as it's drilling

Page 238

1    the --
2  Q.  Well, why is that?
3  A.  It would be to cool the bit and to lubricate
4      the cutting surface.
5  Q.  Well, is that necessary?
6  A.  I believe so.
7  Q.  Why?
8  A.  To keep the bit cool and to keep down dust and
9      things.  It's just -- I'm not sure I know all
10     of the reasons, but it would provide for a
11     better cutting and, of course, you know, less
12     dust.
13 Q.  What do you mean a better cutting?
14 A.  Well, it will cut better if it's lubricated.
15     Like on any saw, any metal type cutting, you
16     normally use an oil.  On a lot of cutting
17     methods you use oil to lubricate.  In this
18     particular one it would be my understanding
19     this water would be used as a lubricant, you
20     know, to assist in the cutting of the hole.
21 Q.  Would that help prevent a binding in the hole?
22 A.  It could.
23 Q.  Well, do you have an opinion, based upon a

Page 239

1      reasonable degree of engineering, whether or
2      not it would prevent binding in the hole?
3  A.  I believe that, yeah, water could prevent
4      binding in the hole.
5  Q.  And it's your understanding that the water
6      attachment was not connected?
7  A.  It's my understanding that water was -- the
8      hose was placed down next to the bit and was
9      applying water at the cutting surface via a
10     hose on the floor rather than being sprayed
11     down.
12 Q.  And do you have an opinion as to whether or not
13     that contributed to the binding of the bit in
14     the hole?
15 A.  No.  As long as there was water present, it
16     wouldn't -- I wouldn't have an opinion that
17     that would be anything negative.
18 Q.  Okay.  The water that was present, where was
19     it?  Was it on the outside or the interior of
20     the drill bit?
21 A.  It would have been on the outside of the drill
22     bit.
23 Q.  And if the water hose had been attached to the

Page 240

1      drill assembly, where would the water have been
2      going?
3  A.  Let me look at the bit.  I believe it's also on
4      the outside of the bit.  Let me see.
5  Q.  Just so I'm clear before you look, do you know
6      one way or another?
7  A.  No, not right here.
8  Q.  No, sir.  The question is do you know without
9      looking?
10 A.  No.  It looks like it could divert it to the
11     inside.  I don't.
12 Q.  Okay.  So before looking at the drill here that
13     you have brought with you as the Shaver
14     exemplar, you don't know whether or not the
15     water hose connection to the drill assembly --
16 A.  Yes.
17 Q.  Yes what?
18     MR. GIVENS:  Well, let him ask the
19       question.
20 Q.  Yes what, sir?  Yes what?
21 A.  Go ahead with the question.
22 Q.  No.  What were you answering yes to and maybe
23     that will satisfy the --

Page 241

1  A.  Well, what I was going to say is, out at
2      Applied Technical Services I do remember
3      hooking up the -- a water hose to the --
4      somebody there hooked up the water hose to the
5      attachment when the drill was operated and --
6  Q.  Did you have any difficulty hooking it up?
7  A.  I don't recall so, no.
8  Q.  All right.  If you had had any difficulty would
9      you have noted it in your report?
10 A.  I probably would have, yes.
11 Q.  Did you note it in the report that's now been
12     marked as your complete report, Exhibit Number
13     22?
14 A.  No.  No.
15 Q.  So that I'm clear then, before you looked at
16     your Shaver design exemplar machine, did you
17     know whether or not the water hose attachment
18     would direct water inside the drill bit?
19 A.  I guess I did know that at the time we
20     inspected out at Applied Technical Services.
21     That was May of '05, that was a little over a
22     year ago, and I had forgotten that that is how
23     that it operated.  After looking at it and

Page 242

1    refreshing my memory on how it operated, I
2    believe it does do that, yes.
3  Q.   Okay.  Does that assist in the drill bit not
4    binding in the hole?
5  A.   I don't -- I don't know.
6  Q.   And you have no opinion?
7  A.   It would be my opinion that water -- if it was
8    diverted and there was water on the outside,
9    that as long as there was water present into
10   the cut, that that would be sufficient.
11 Q.   But, sir, the question is, if there's water
12   going down the drill bit lubricating the
13   interior of the drill bit?  That's the question
14   on the floor, not whether or not there was a
15   hose on the outside and with water on the
16   outside of the bit.
17 A.   Okay.  I see what you're saying.  It would
18   assist in lubricating, yes.
19 Q.   Now, what would assist?
20 A.   Having it on the inside.
21 Q.   Having the water hose connected to the water
22   hose attachment so that water ran down the
23   drill bit would assist in the drill bit not

Page 243

1    binding in the hole; is that correct, sir?
2  A.   It could do that, yes.
3  Q.   "Could do that," what do you mean, sir?
4  A.   Well, I mean, it's not -- I don't know that if
5    every time you were to do it without it that it
6    would create in a binding situation.  When you
7    say the word "would," that means that it would
8    every time you used it.  If you say the word
9    "could," it may or may not depending on the
10   situation, the speed or the pressure that
11   someone was applying.  That's my only
12   difference in those words.
13 Q.   So that I'm clear, it's your opinion in this
14   case that the water hose not being attached to
15   the drill assembly itself did not contribute to
16   the accident?
17 A.   No.  I have no -- I have no evidence that it
18   did.
19 Q.   Well, do you have an opinion as to whether it
20   did or not?
21 A.   No.
22 Q.   You also said that in instructing Mr. Riley he
23   was taught to anchor it by Mr. Walters?

Page 244

1  A.   I believe so, yes.
2  Q.   And how was he taught to anchor the core drill
3    machine?
4  A.   With the vacuum system.
5  Q.   Was he taught any other way to anchor it?
6  A.   Not that I'm aware of.
7  Q.   Was Mr. Riley taught anything else by
8    Mr. Walters, his supervisor?
9          MR. GIVENS:  Object to the form.
10         That's a remarkably broad
11         question.
12 A.   Yeah.  Without going back through the
13   depositions and looking at them, I can't -- you
14   know, other than in just general terms in the
15   operation, I don't know.
16 Q.   All right, sir.  What was the condition of the
17   leveling screws on the subject core drill
18   machine before the accident involving
19   Mr. Riley?
20 A.   I know that there was some -- there was some
21   testimony that the screws were leveled and then
22   there was some testimony that they may not have
23   been leveled.  There was some discrepancy or

Page 245

1    some variation of what one said to the other,
2    and who said it, I don't recall.
3  Q.   Well, would it make any difference, the
4    condition of the leveling screws?
5  A.   The condition of them?  There could be a
6    situation where if the leveling screws were
7    unlevel that it could create a break in the
8    vacuum or -- a break in the vacuum meaning that
9    the vacuum pressure would drop or not be able
10   to build to sufficient pressure, and that, you
11   know, would be the importance of having the
12   interlock system in the thing.  The leveling
13   screws, if that were creating a problem with
14   it, the machine would not operate.
15 Q.   How should the leveling screws be used on a
16   core drill machine?
17 A.   Well, it's my understanding that you back off
18   on the screws.  And I would have to read back
19   through it, but it's my understanding you back
20   off on the screws, apply the vacuum and let it
21   go -- let it suction down and then take the
22   screws and snug them down to the floor, you
23   know, in the four corners.  And then using the

Page 246

1      leveling bubble to --
2   Q.   I'm sorry, what floor?
3   A.   The concrete floor.  You would take the
4      leveling screws, bring them into contact with
5      the floor, and then, you know, look at your
6      sight bubble and use those to level your
7      machine.
8   Q.   Why do you do that?
9   A.   To make it hold to create a vertical hole into
10      the floor.
11   Q.   Well, why is it important to have a vertical
12      hole into the floor?
13   A.   Well, if you're sticking a post in there or you
14      need a vertical hole, you would -- you would
15      want it to be vertical.  You wouldn't want it
16      to go in at an angle.  I mean, there are some
17      situations you may want it to go in at an
18      angle, but, you know, typically you want a hole
19      that is at a right angle or level to --
20      perpendicular to the floor surface.
21   Q.   Well, was this hole being drilled at an angle?
22   A.   Not to my knowledge, no.
23   Q.   Should it have been drilled at an angle?

Page 247

1   A.   I don't know.  I don't know if they -- I don't
2      know if they were intending -- I have no
3      information that indicates they were intending
4      to drill it at an angle.
5   Q.   Would that have any effect on the vacuum
6      system?
7   A.   If it were a -- if it were off enough severely,
8      it may.
9   Q.   Off how much, sir?
10   A.   I don't know.  A slight difference, I would not
11      expect it to be.
12   Q.   Slight being what, sir?
13   A.   A quarter of an inch, quarter to half inch.
14   Q.   And have you conducted any scientific testing
15      or made any calculations to determine that?
16   A.   No.
17   Q.   Do you have any basis to support that opinion?
18   A.   No.  Other than -- no.  No, I don't.
19   Q.   Now, if you would, sir, on page four of your
20      report, and that's the one marked Exhibit 22;
21      is that correct, sir?
22   A.   Yes.
23   Q.   At the top of the page there you say that "some

Page 248

1      damage and separation upon inspections of the
2      separate drill core cutting rig which may have
3      contributed to the failure of the vacuum;" what
4      did you mean by "may have contributed," sir?
5   A.   Let me read here.  "The gasket shows signs of
6      some damage and separation."  That was where
7      the two ends were glued together that we went
8      into earlier.  The little gap in the gasket
9      where the ends were glued.
10   Q.   All right, sir.  My question is, what did you
11      mean by "may have contributed"?
12   A.   If you have a gap where the two ends of the
13      seal come together, if that is torn or the glue
14      has come loose, there would be an opening or a
15      breach in that seal that could create to the
16      loss of the vacuum pressure inside the vacuum
17      base.  When I say vacuum pressure, I'm talking
18      about negative pressure for the record.  And
19      saying the term negative vacuum is actually a
20      double negative term, but I think everybody
21      understands what I mean.
22   Q.   All right, sir.  My question to you though is
23      what did you mean by "may have contributed"?

Page 249

1   A.   It may have contributed.  That may be one of
2      the reasons that not enough vacuum force was
3      available to hold the drill down to the floor.
4   Q.   And did you perform any testing or have any
5      research or analysis to support that opinion?
6   A.   Well, no.  That is the subject gasket and I
7      don't believe that it has been used -- that
8      gasket has been used on a drill to try to hold
9      it down.
10   Q.   Okay.  So that I'm clear, do you have an
11      opinion, based upon a reasonable degree of
12      engineering, whether or not that gasket had any
13      contributing factor to the accident involving
14      Mr. Riley?
15   A.   Oh, I see what you're saying.  I can't say for
16      certain that it did, if that's what you're
17      asking.  I don't have any information.  It was
18      just an observation that it was torn; it's an
19      observation in my report that it may.
20      Obviously before you could say for certain that
21      it did, additional -- I agree, additional
22      testing would need to be performed to determine
23      if that particular gasket, in that condition,

Page 250

1     would create a leak.
2        I mean, that's -- I think that's what I
3     meant by the -- I understand what you're
4     saying, the word "may have." I was offering it
5     as a possibility in my report and that's the
6     meaning of that language. I was in no way
7     trying to imply that, hey, that's what caused
8     it to leak or caused it not to.
9        I think the main thing here with this --
10    at least my opinion with this, and I'm
11    elaborating a little bit, there could be
12    numerous reasons not to build up a sufficient
13    vacuum under that base. And that just
14    underlines the importance of having a system in
15    there that will prevent the energizing of the
16    drill motor if you do not have sufficient
17    vacuum under the base, which can happen for
18    numerous reasons.
19 Q.  All right, sir. I guess, in all fairness, what
20    I'm trying to ask you is, do you have an
21    opinion as to a reasonable degree of certainty
22    or is that, in fairness, speculation?
23       MR. GIVENS: Object to the form. Go

Page 251

1       ahead, you can answer.
2 A.  No, I do not have an opinion to within a degree
3    of reasonable engineering certainty that that
4    did cause a breach in the vacuum of the base.
5    It is just a condition that I observed that may
6    have.
7 Q.  Okay. And a condition that you do not know
8    when occurred?
9 A.  That is true.
10 Q.  So, again, in all fairness, would that be
11    speculation as opposed to a reasonable degree
12    of certainty?
13       MR. GIVENS: Object to the form.
14 A.  I'm not going to use the term "speculation." I
15    disagree with the term "speculation." It's a
16    little stronger than speculation. Looking at
17    that -- at that gap and that fault line in the
18    gasket, I think there's a fairly good
19    likelihood that that could create a leak when
20    that was used in a vacuum situation and put
21    under compression, but I don't know that for
22    certain.
23 Q.  Okay. Would it more likely than not?

Page 252

1 A.  I believe so, yes.
2 Q.  Okay. And what facts or testing or analysis or
3    research have you performed to make that
4    determination?
5 A.  I told you before I had not.
6 Q.  If I could, on page four there of your report,
7    your last bullet point, you state, on the
8    second line to the bottom of the page there,
9    "eliminated or minimized;" what did you mean by
10    "minimized"?
11 A.  That is typically, you know, a generic term.
12 Q.  What did you mean by it, sir?
13 A.  Decreased the likelihood of a hazard occurring.
14    Decreased it to the level that it is a
15    diminumous risk.
16 Q.  So you're talking about loss of vacuum?
17 A.  Yes.
18 Q.  What caused -- what caused the core drill bit
19    to become bound in the hole?
20 A.  I don't know.
21 Q.  Now, I notice there in the next line it says
22    "sensing switch that would immediately cut
23    power;" what did you mean "immediately"?

Page 253

1 A.  Immediately, you know, virtually instant.
2 Q.  Okay. And what happens when there's a cut in
3    the power?
4 A.  There is no additional torque applied by the
5    electromagnetic force of the armature and
6    windings of the drill motor.
7 Q.  Is there still any movement or motion?
8 A.  There could be some inertia motion of the --
9    involving the mass of the drill motor itself.
10    However, you do have the base there, the weight
11    of the base, plus --
12 Q.  How much does the base weigh?
13 A.  I don't know, but I'm about to get to the next
14    thing. Plus, since this device shuts down at
15    -- you can have it set at 20 or plus inches of
16    Mercury, but since it shuts down at about 18
17    and a half to 19 inches of Mercury the way it's
18    set now, by the time the vacuum level would
19    decrease to a likelihood of where you would
20    overcome the forces, all of the inertia would
21    have been bound down in the motor to where you
22    would get no movement in the drill base were
23    this event to occur.

Page 254

1  Q.  Now, when you say 20 inches, are you talking
2      about the exemplar Shaver designed machine?
3  A.  That is correct. Correct, yes.
4  Q.  All right. What was the subject machine, how
5      much Mercury, how many inches?
6  A.  How much did they have out there that day?
7  Q.  Yes, sir.
8  A.  I don't know.
9  Q.  At the time of the accident was there a
10     complete loss of vacuum?
11 A.  I don't know. Well, let me rephrase that. At
12     the instant that the base moved, there was an
13     instantaneous loss of vacuum, because once that
14     base lost contact with the floor, yes. I think
15     you understand -- we're in an understanding of
16     what happened in that.
17 Q.  All right, sir. So that I'm clear then, before
18     the base lost contact with the concrete slab,
19     what was the gauge reading?
20 A.  I don't know.
21 Q.  In your opinion?
22 A.  I don't know.
23 Q.  Have you performed any tests or analysis or

Page 255

1      research to determine what it would have been?
2  A.  No.
3  Q.  On page five of your report there, sir, you say
4      the -- in the middle of the page you say "The
5      potential for vacuum loss and the resulting
6      loss of control can occur suddenly and without
7      warning"?
8  A.  Yes.
9  Q.  Is that because the vacuum -- well, let me just
10     ask you. What did you mean by that?
11 A.  Well, there's a saying, I've heard it before,
12     "nature abhors a vacuum." And that simply
13     means you have a vacuum there and any breach or
14     any hole to the outside environment is going to
15     result in a balance of forces. So that's what
16     I meant by that. That you have -- you have a
17     situation of rather than having a bomb waiting
18     to explode, you have one waiting to implode.
19     And the first chance it gets, that's
20     essentially what it's going to do, it's going
21     to suck in air. Actually the vacuum doesn't
22     escape from that hole, and we've been saying it
23     that way, but what happens is air rushes in

Page 256

1      through any breach in the system.
2  Q.  Okay. Were there any breaches in the system?
3  A.  I can't say for certain what the -- well, yes.
4      For whatever reason, the vacuum force was not
5      sufficient enough to hole the base down.
6  Q.  And what force would have been required to hold
7      the base down on that subject machine, sir?
8  A.  Well, the literature, the new literature,
9      recommends 20 inches of Mercury, to not operate
10     the machine at less than 20 inches of Mercury
11     vacuum.
12 Q.  We're talking about the subject machine.
13 A.  Okay. I'm not sure that there is any
14     literature on the subject machine that states.
15 Q.  That's why I'm asking you for your opinion.
16 A.  Oh, for my opinion?
17 Q.  Please, sir.
18 A.  I have not gone through the calculations to
19     determine the torque of what it is there, but I
20     have done a quick numeric calculation of the
21     torque available to the drill motor and what it
22     would produce. And --
23 Q.  For the subject machine?

Page 257

1  A.  Yes. And it's my opinion that times -- the
2      approximate one square foot of gasket area
3      times 20 PSI, which is approximately two-thirds
4      of an atmosphere, that that would hold that
5      base down with sufficient force that a 200-plus
6      foot pound torque at the drill motor is not
7      going to overcome that force on that vacuum
8      base. Now, if you're asking me would ten do
9      it, you know, I don't know. I haven't done the
10     testing and the determination to determine
11     exactly what that critical cutoff point is. I
12     haven't gone that far with the design yet.
13 Q.  Well, that was my next question. What was the
14     operational range?
15 A.  What was the what?
16 Q.  As I understand it, you don't have an opinion
17     as to the range?
18 A.  As far as the very lowest you could get by
19     with, no. I feel 20 is adequate and I have no
20     argument with 20.
21 Q.  Okay. But you're unable to give us a range?
22 A.  No, I'm not prepared to do that.
23 Q.  Okay. And you haven't done any testing or

Page 258

1    analysis or research to make that
2    determination?
3  A.  No. I just got the actual model built
4    yesterday afternoon.
5  Q.  You're talking about the Shaver design?
6  A.  Correct.
7  Q.  Okay.
8  A.  And you would have to have that design
9    basically to do that.
10 Q.  So that I'm clear, have you told me what leaks
11   there were to the vacuum system?
12      MR. GIVENS:  What leaks there were?
13      MR. SHEEHAN:  Yes.
14 A.  Other than the potential one to the gasket that
15   we talked about, you know, in depth, I don't
16   believe so.
17 Q.  You don't believe what?
18 A.  That I told you.
19 Q.  Okay. Would you tell me what the leaks are to
20   the vacuum system of the subject machine that
21   injured Mr. Riley?
22 A.  I don't know.
23 Q.  I noticed in your report that you've got 13

Page 259

1    different actions and deficiencies listed on
2    pages six and seven; is that correct, sir --
3    excuse me, six, seven and eight?
4  A.  I haven't counted them, but there are 13.
5  Q.  All right. And if I'm correct, only the 13th
6    action of deficiency refers to United Rentals;
7    is that correct, or relates to United Rentals?
8    In other words, can I jump to the 13th bullet
9    point or do I need to go over the first 12 with
10   you?
11      MR. GIVENS:  With all due respect, I
12        would suggest that this witness is
13        not in a position to tell you how
14        to --
15      MR. SHEEHAN:  I just need to know
16        whether I need to go over one
17        through 12 or whether I can go to
18        13 and ask him about 13 as opposed
19        to asking him about the first 12.
20      MR. GIVENS:  Okay. The underlying
21        question then is, does anything
22        above 13 have anything whatsoever
23        to do with United Rentals? And I

Page 260

1    would ask him to establish that
2    one way or the other. And then
3    whether or not you want to ask him
4    about the first 12 or the last
5    13th is up to you, not up to him.
6    That's kind of the point I was
7    trying to make.
8      MR. SHEEHAN:  Fair enough. Thank you.
9  A.  Let me just look over those top 12 without us
10   going through them one by one and I will try to
11   give you an answer.
12 Q.  Please.
13 A.  And I'll try to speed that up. I want to make
14   sure that I don't --
15 Q.  And I appreciate Larry's comment.
16 A.  Number 12.
17 Q.  All right, sir.
18 A.  Possibly.
19 Q.  Okay. Please, sir.
20 A.  Where I talk about the container for the
21   owners/operators instructions, it's my opinion
22   that it would be a good business practice for
23   any rental company or anyone else that is

Page 261

1    supplying equipment for others to use to
2    provide -- if the manufacturer did not, to
3    provide an obvious and conspicuous container or
4    holder that it was known contained
5    instructions. I've seen that on other
6    equipment. For two reasons, that gives a place
7    that it's readily available; and also if that
8    container or box is there and it's empty,
9    before it goes out to the -- you know, on like
10   your Ready to Rent form that United Rentals
11   has, then it would be an alert or it would be
12   something on their list they could check out,
13   in place, out of place, whatever, it would be
14   an item there. So potentially number 12 of
15   that list could involve United Rentals.
16 Q.  All right, sir. Any others before the 13th
17   bullet?
18 A.  I think going through it that was the only one
19   that I saw that could.
20 Q.  Fair enough. And so where would this container
21   be placed on the subject core drill machine?
22 A.  There --
23 Q.  On the subject core drill machine? You're

Page 262

1    welcome to refer to the photographs that you
2    took on May the --
3  A.    Well, I will say that the subject core drilling
4    machine in dimensions, shape, size is virtually
5    the same as this one.
6  Q.    Well, if you will, refer to your photographs
7    and, if you will, show me on the photographs
8    that you identified as --
9  A.    Okay. And I understand, I wasn't trying to be
10    difficult.
11        MR. GIVENS:  23 through 47.
12        MR. SHEEHAN:  Thank you, sir.
13  A.    You know, I believe there could be a little
14    pouch put in beside the vacuum pump, you know.
15  Q.    Okay. If you will, why don't you take a pen
16    there and circle --
17  A.    Well, I'm going to take that back. There are
18    vents, fins, there that would preclude that.
19    That's an exhaust. Can I take this photograph
20    over and look at that machine?
21  Q.    Sure.
22  A.    It helps me to visualize --
23  Q.    Yes, sir.

Page 263

1  A.    -- 3-D and spatial work.
2  Q.    All right. Now, what photograph number are you
3    taking, sir?
4  A.    Well, I'm taking, it's on the back, 38.
5  Q.    Exhibit Number 38 to your deposition you're
6    using to compare with the Shaver design
7    machine?
8  A.    Correct. Okay. Of course, we will have to get
9    another photograph for another place I see.
10    There could be a pouch put right back here
11    between the wheels.
12  Q.    All right. If you would, if you will circle
13    that with a pen on the photograph that you
14    have?
15  A.    And, you know, a container like that could be a
16    round tube that the instructions -- a copy of
17    the instructions could be rolled up in even.
18    (Witness complies.)
19  Q.    All right. Is that legible?
20  A.    I think so. Sure.
21        MR. GIVENS:  Is it going to stay or is
22        it going to wipe off?
23  A.    I've scratched it. Now, whether it will show

Page 264

1    up on a copy or not, I don't know if it stays.
2        MR. GIVENS:  The thing I would be
3        concerned about is that that ink,
4        in all likelihood, the first time
5        it's touched will rub off.
6  A.    It's staying pretty good. It's staying pretty
7    good on there.
8        (Off-the-record discussion.)
9  A.    Right here is another place it could be.
10  Q.    All right. If you will circle that so we can
11    see it?
12  A.    (Witness complies.) And that is Number 32. So
13    it's 32 and 38.
14  Q.    Any other locations that the manual could be
15    placed or a container for a manual?
16  A.    Also on Number 32 I'll put another potential
17    place for it.
18  Q.    Where would that be, sir?
19  A.    Between the vacuum pump and the vertical stand.
20  Q.    And is it legible?
21  A.    No. Larry, let me know if I get one of your
22    expensive favorite pens and try this.
23        (Off-the-record discussion.)

Page 265

1  A.    I'm going to go back and mark this one between
2    the wheels, Number 38, again with this one.
3    That black shows up better. I've got three
4    potential places marked that could be. I mean,
5    that's not exclusive.
6  Q.    All right. And those are contained on what
7    exhibits?
8  A.    32 and 38.
9  Q.    All right, sir. So now, if we could, sir,
10    let's discuss this 13th bullet point in your
11    report?
12  A.    Okay.
13  Q.    What facts do you have that United Rentals
14    failed to reasonably maintain the core drill?
15  A.    Two mainly. The condition of the one bit,
16    that's an indication. Certainly if testimony
17    and other evidence shows that that drill bit
18    was put into that shape by use at Flavor House,
19    and that can be established, then, you know, I
20    think that would tend to remove that one from
21    United Rentals' responsibility as long as that
22    bit was received. I saw some deposition
23    testimony that the bit was in poor shape when

Page 266

1    they received it at Flavor House in one of the
2    depositions.
3        I will tell you what may be fair to
4    expedite this, since I'm going to read and sign
5    this deposition, when I read and sign it, when
6    I've done that, I will try to insert the place
7    in the deposition when I refer to statements
8    like that. Is that fair enough?
9  Q.   No, sir. You're under oath now and it's
10    instantaneous.
11 A.   Okay.
12        MR. GIVENS: The only thing you can do
13            when you read and sign is if you
14            see a word you've actually said
15            today and you don't agree that you
16            said that word, you can make a
17            change, but you can't add things
18            to the deposition.
19 A.   I have had them have me do it before, but
20    that's fine.
21        MR. SPRAIN: Yeah, but that's not
22            correct though.
23 A.   Okay. Then I won't do it. No, again, with

Page 267

1    response to that, one of the depositions from
2    some of the people there at Flavor House, and I
3    can't recall the name, it could have been -- I
4    just don't remember, but one of them, I
5    believe, stated that the bit was received in
6    poor condition.
7  Q.   So, I mean, should you use a bit that's
8    received in poor condition?
9  A.   If that's what you are sent with and based on
10    your limited knowledge of the understandings of
11    the machine, should you? Obviously I would say
12    from my personnel experience and what I know, I
13    would not.
14 Q.   Well, why not?
15 A.   Well, can I finish my answer?
16 Q.   No, sir. I'm just curious, why wouldn't you
17    use a drill bit that had missing teeth?
18 A.   Well, because of my knowledge as an engineer, I
19    would know that that would create abnormal and
20    excessive forces as it was trying to cut
21    through the cement. I'm not sure that the
22    people that were using this would have that
23    knowledge and experience to know that.

Page 268

1  Q.   Would that have caused the bit to have become
2    bound in the hole?
3  A.   It could have contributed to the binding of the
4    drill, if that were the bit that was even used.
5    You know, we had two bits there; one that was
6    and one that wasn't.
7  Q.   Well, which bit was being used at the time of
8    the accident, sir?
9  A.   I've already answered that. I don't know which
10    one.
11 Q.   Would it have been reasonable to use a drill
12    bit with missing teeth?
13 A.   If that is what they were provided with by the
14    company that owned and maintained it, it's not
15    unreasonable for them to assume that that bit
16    was still in condition to possibly get the job
17    done. Otherwise the people in that position
18    and the mechanics could have opined that if the
19    rental company sent that bit out there, that it
20    must still be capable of cutting.
21 Q.   Well, was it capable of cutting?
22 A.   The bit that I saw, I would not expect it to be
23    capable of cutting a hole through, but, you

Page 269

1    know.
2  Q.   When did the teeth on the drill bit that you
3    saw, when did they break?
4  A.   I don't know.
5  Q.   And you only saw one drill bit?
6  A.   No, I saw two.
7  Q.   Did you examine the other drill bit?
8  A.   Yes.
9  Q.   And what, if any, observations did you make
10    based upon your examination?
11 A.   It seemed to be in good condition.
12 Q.   The question is, in comparison of the two,
13    what, if any, observations did you make?
14 A.   It had all of the teeth on it. It did not have
15    missing teeth and did not seem to be abnormally
16    worn.
17 Q.   Had it been used?
18 A.   Yes.
19 Q.   When had it been used?
20 A.   I don't know.
21 Q.   When had the drill bit with the missing teeth
22    been used?
23 A.   I don't know.

Page 270

1  Q.   Sir, in the box of materials that you went over
2       with Mr. Sprain there was one single photograph
3       that was out and let's mark that as Exhibit
4       Number 50. Is that right?
5            MR. GIVENS: I've got that that should
6            be 48 by my count.
7            MR. SHEEHAN: 48 and 49 are the two for
8            the e-mails.
9            MR. GIVENS: I'm sorry, you are
10           correct. I've got it right down
11           there written down, if I could
12           only read.
13           MR. SHEEHAN: Let me mark this as
14           Exhibit Number 50 to the Shaver
15           deposition.
16           (Exhibit 50 marked for identification.)
17 Q.   And this appears to be a photographic print
18      that was not made from negatives.
19 A.   Okay.
20 Q.   Why was that out of the notebooks?
21 A.   I would say it probably fell out of the sleeves
22      of the notebooks. They're not sealed in.
23 Q.   Was there any significance of you taking that

Page 271

1       photograph, Number 50?
2  A.   No. I did not specifically take that
3       photograph out individually for any purpose.
4  Q.   Was there any significance of you taking that
5       photograph?
6  A.   It showed the drill bit. I mean, it -- I
7       typically try to photograph just about every
8       surface that I can find on something and a lot
9       of times multiple times in case, you know, the
10      picture doesn't turn out, out of focus or
11      whatever.
12 Q.   Okay. Was that the drill bit that was on the
13      subject machine at the time of your examination
14      in May?
15 A.   Yes, it was.
16 Q.   All right, sir. Now, would a jammed core bit
17      allow the base to separate from the concrete?
18 A.   Not with -- not with the proper vacuum
19      pressure, no.
20 Q.   And the proper vacuum pressure would have been
21      what?
22 A.   At least 20 inches of Mercury. It's possible
23      that a lower number would also prevent a jammed

Page 272

1       bit or -- yeah, a jammed bit from displacing
2       the base.
3  Q.   And that's the range that you cannot provide us
4       with?
5  A.   That's correct.
6  Q.   All right, sir.
7  A.   That we went over before.
8  Q.   All right, sir. Now, if the gasket is pushed
9       down on one side and not on the other so
10      there's not an even force pushing down on the
11      base of that drill machine, what effect would
12      there be on the machine?
13 A.   I would anticipate you having difficulty --
14      and, in fact, in the time that I have taken it,
15      you know, with this machine and --
16 Q.   All right. Let's identify this machine?
17 A.   The alternate design, but before the alternate
18      design was incorporated. You have to get a
19      fair amount of water around the gasket to
20      create a suction.
21 Q.   All right. Now, did you hook the water
22      attachment to the -- or hook a hose to the
23      water attachment and turn the water on?

Page 273

1  A.   No. No. I just poured water around the base.
2       I've done that.
3  Q.   How long did you operate it on that occasion?
4  A.   Two or three minutes. And I did not put a bit
5       in and drill a hole with that on there. That
6       was just to create a suction to the concrete to
7       do that. And, of course, if you have a lot of
8       weight on one side versus the other, I mean,
9       you don't even start to build up a vacuum. The
10      vacuum gauge does not move.
11 Q.   And why is that, sir?
12 A.   Because it doesn't have a seal. You've got to
13      get the -- you've got to get -- on a wet
14      surface or a good smooth surface, you've got to
15      get it over just right and apply even pressure.
16      You have to -- at least with that one, you have
17      to kind of press down on it and move it
18      slightly to get it started to suck down. And
19      it pretty well compresses that gasket down.
20           And once it gets it compressed down, you
21      know, moving it and rocking it around, even
22      without the leveling bolts, you know, placed
23      down to maintain it, you're not going to break

Page 274

1    that vacuum by hand motion.  And I would not
2    expect with a full vacuum force that you're
3    going to with that drill motor either, even
4    with the rocking around due to -- if there were
5    any, due to the leveling bolts that we had
6    talked about before.
7  Q.    I'm confused.  I didn't understand a word you
8        said.  I'm sorry, can you explain to me what
9        you just said?
10  A.    The base, if you -- to suction it down, you
11       have to kind of move that gasket, because there
12       will be gaps between the gasket and there and
13       openings where it can -- you have to kind of
14       press down on the gasket and get it started to
15       kind of help it suck down.
16  Q.    To a concrete slab?
17  A.    To a concrete slab with water there.  And it
18       pulls and compresses down on that rubber.  Once
19       it gets sealed, you know, that seal is made.
20       And if it's a full vacuum in there, it's not
21       going to dislocate or you're not able to move
22       it and rock it around and dislocate it.  Was
23       that better that time?

Page 275

1  Q.    Well, I think I understand what you're telling
2        me now.
3  A.    Okay.
4  Q.    Did you use the leveling bolts when you tried
5        to operate it without drilling a hole?
6  A.    No.
7  Q.    Did you use the leveling bolts when you used
8        the Home Depot rental six or seven years ago?
9  A.    I don't recall.  I really don't.
10  Q.    What model core drill machine was that?
11  A.    I don't remember.
12  Q.    And so I'm clear, you've never examined any
13       other model core drill machine other than a
14       Norton?
15  A.    No.
16  Q.    Never even seen another model?
17  A.    Oh, I've seen them, you know, but -- yes, I've
18       seen them.  I've seen numerous drills.
19  Q.    I mean, let's don't play games.  In other
20       words, you've never observed or examined other
21       core drill machines; is that fair?
22  A.    Fair.  And I wasn't trying to play games.  You
23       asked that and then you said you've never even

Page 276

1    seen them, and I didn't think that was, you
2    know, a fair --
3  Q.    I just didn't want us to get back into the 40
4        reports and all of that kind of --
5  A.    Okay.
6  Q.    Okay.  Now, we were going over the 13th bullet
7        point there and you were telling me about what
8        it was that we had failed -- we being United
9        Rentals, had failed to maintain.  And, I'm
10       sorry, I've lost my list.  What did you tell me
11       to begin with?
12  A.    Well, we had that item in Number 12, do you
13       want to go back to that or just in 13?
14  Q.    All right.  Just tell me so I can write it
15       down.
16  A.    That was the container for the manuals, the
17       operators manual.
18  Q.    All right.  Anything else that United Rentals
19       failed to maintain?
20  A.    The bit.
21  Q.    All right.  Now, you're talking about which
22       bit?
23  A.    The one bit.  If that bit were involved and it

Page 277

1    is established that United Rentals delivered
2    that bit to Flavor House in that condition,
3    then that -- you know, that would be
4    applicable.  And, you know, I think I say that.
5    You know, I say that "based upon the condition
6    of the core drill on inspection, the product
7    was poorly maintained.  The drill bit in use at
8    the time of the accident shows some signs of
9    damage."
10  Q.    Right.  But as far as -- in all fairness, do
11       you know what drill bit was being used at the
12       time of the accident?
13  A.    No.
14  Q.    Okay.  Let's move on then.
15  A.    Okay.  Fine.  All right.  The vacuum pump, when
16       we examined it, was non-functioning and found
17       to have foreign material internally.
18  Q.    Okay.  Why was it not working when you examined
19       it?  And I assume that's May of 2005?
20  A.    Yes.
21  Q.    Okay.  Why was it not working in May of 2005?
22  A.    Because the powder, the aluminum oxide powder,
23       was inside the diaphram of the vacuum pump.

Page 278

1  Q.    Any other reason that the vacuum pump was not
2         working in May of 2005?
3  A.    Well, the electrical wires were -- had been
4         pulled loose from it as a result of the
5         accident. It had to be wired back up by the
6         factory technicians that were there and, you
7         know, all of us together we wired it.
8  Q.    Okay. Any other reason that the vacuum pump
9         was not operating in May of 2005?
10 A.    Not that I'm aware of.
11 Q.    Okay. So we've covered the vacuum pump. And
12        how was United Rentals to maintain the vacuum
13        pump?
14 A.    United Rentals should have kept the water
15        collection cup drained, made sure that it was
16        emptied and not allowed to build up. Upon
17        receipt of the machine, they should have
18        examined it to have, you know, looked in there
19        to see if it looked like the customer had
20        allowed the cup to get too full and to allow
21        water to get up into that area, just an
22        inspection of the device -- of the units when
23        they came back in.

Page 279

1  Q.    Anything else?
2  A.    No.
3  Q.    Okay. Let's talk about the -- is there any
4         evidence to support your contention that the
5         water collection device was not drained?
6  A.    That there was either water or slurry present
7         in the vacuum pump, that it found its way in
8         there.
9  Q.    Well, what facts do you have to support that?
10 A.    It was inside the pump when we opened it up.
11 Q.    I'm sorry, water was inside the pump when you
12        opened it up in May of 2005?
13 A.    No, but the white powder, the aluminum oxide.
14        And the only way it could have gotten inside
15        the pump would have been had a slurry, which is
16        a mixture of concrete and other material, dust,
17        mixed with water, had been sucked into there,
18        or if water had sucked into there and had
19        reacted to form aluminum oxide with the
20        aluminum housing of the vacuum pump.
21 Q.    And when did the slurry get sucked into the
22        machine?
23 A.    It would have had to have been, you know, prior

Page 280

1         -- when the machine was operational.
2  Q.    Was it sucked in post-accident?
3  A.    No.
4  Q.    And what facts do you have to support your
5         contention that it was not post-accident
6         suction of slurry?
7  A.    Well, the -- post-accident the vacuum pump was
8         not operational. The power cord had been
9         disconnected, you know, had been pulled loose.
10        So there could have been no suction without a
11        power cord to have created one.
12 Q.    Okay. What about after the first hole was
13        drilled and they had the machine turned over?
14 A.    I don't believe that there would have been
15        enough water, you know, sucked in to have --
16        had that cup arrived empty, as it should have,
17        there would not have been enough water that
18        would have been sucked into that cup and
19        bypassed to have allowed it to have gotten up
20        into the pump.
21 Q.    And what facts do you have to support that
22        theory?
23 A.    Well, it takes a significant volume of water

Page 281

1         that's pulled in through that vacuum pump to
2         fill that container all the way up. It would
3         have to be from a long-term usage to even --
4  Q.    No. The question is, what facts do you have to
5         support that opinion?
6  A.    Okay. There was only one hole drilled prior to
7         this happening at Flavor House and the amount
8         of water that would have sucked into that
9         vacuum pump, it just would not have had enough
10        time to fill that container up with one hole.
11 Q.    How much water was sucked in, sir?
12 A.    Well, enough water to have filled the cup.
13 Q.    How much water is that, sir?
14 A.    I don't know the exact volume, but I would say
15        a cup to --
16 Q.    Just give us an approximate for the subject
17        machine?
18 A.    Sure. I would say eight ounces, eight to ten
19        ounces.
20 Q.    And what do you base that on?
21 A.    The approximate volume of the water cup.
22 Q.    Did you measure the subject machine water cup?
23 A.    No.

Page 282

1  Q.  Was there any water in the subject machine
2      water cup?
3  A.  No.
4  Q.  Did you perform any testing to determine how
5      much water had been in the water cup
6      post-accident?
7  A.  No.
8          MR. GIVENS:  Real quick, it's about
9          3:45, do we have any reasonable
10         expectation that we're going to be
11         able to get to John Frost today?
12         And, again, you take as long as
13         you want here, but at this point I
14         was just going to see if we were
15         in a position to make a call on
16         that.
17         MR. SHEEHAN:  Sure.  I think what we
18         need to do, in order to save time
19         with his deposition, is to go on
20         and get him on the record to
21         provide us with the information so
22         we can speed through --
23         MR. SPRAIN:  I agree with that.

Page 283

1          MR. SHEEHAN:  -- his deposition at a
2          subsequent time.  But we need to
3          go on and get his stuff so we can
4          go on and have time to review it
5          rather than take the time that we
6          did with this deposition just
7          identifying documents, is that
8          fair enough, since he's already
9          here from Huntsville?
10         MR. GIVENS:  Yeah.
11         MR. SPRAIN:  One thing I can say, when
12         Winston is done, I've got three
13         follow-up questions.  One is to
14         turn this drill on real quick and
15         would that take a minute or so?
16  A.  Yeah.
17         MR. SPRAIN:  Show me how it works.  I
18         want to get photographs of the new
19         components of the drill that
20         comprise the Shaver design.  And I
21         want to ask him just one more
22         follow-up question, so I'm
23         thinking two or three minutes.

Page 284

1          MR. GIVENS:  I mean, you're not done
2          and the only reason I posed that
3          question at this juncture is just
4          to make a note of what the time
5          is, and I don't know how late
6          we're planning on going, but just
7          to broach that subject and us get
8          our heads together and see what we
9          want to do.
10  BY MR. SHEEHAN:
11  Q.  So that I'm clear then, sir, as far as testing
12      or research or analysis, you haven't performed
13      any on that fact to support whether or not the
14      vacuum pump was, how did you put it, not
15      functioning?
16  A.  Not functioning when?
17  Q.  I was just reading from your report on page
18      eight, you say "The vacuum pump was
19      non-functioning?"
20  A.  The vacuum pump was non-functioning.  When we
21      plugged it in, it wouldn't operate.
22  Q.  All right.  But you're talking about in May of
23      2005?

Page 285

1  A.  That's right.
2  Q.  Okay.  But you haven't performed any tests to
3      determine -- where you say "pick-up from the
4      vacuum process from previous years," you don't
5      -- you haven't performed any testing, research
6      or analysis to determine what the -- when that
7      pick-up from the vacuum process had occurred,
8      whether it was pre or post-accident?
9  A.  I don't know physically how it could have done
10     it post-accident.  I mean, just physically --
11  Q.  No, sir.  The question is you haven't performed
12     any tests or research or analysis?
13  A.  Well, we had the lab analysis done at Applied
14     Technical Services to find out that that was an
15     aluminum oxide, which could be a by-product of
16     corrosion, which indicates that there was water
17     present in the vacuum pump.
18  Q.  All right, sir.  But my question is, to
19     determine whether it's pre-accident slurry or
20     post-accident slurry -- excuse me, the timing,
21     and I think --
22         MR. GIVENS:  What I'm about to observe
23         is that that's what he said, is

Page 286

1              that he did not see any way that
2              it could have been post-accident.
3              And while I certainly don't mean
4              to testify, the logic in that to
5              me stands out from the fact that
6              at the time of the accident the
7              cord was broken on the vacuum pump
8              and it was still broken when they
9              went to test it in May of 2005.
10             So what he further testified was
11             that he could not see a way
12             physically that that material
13             could have gotten up in there
14             post-accident, because there's no
15             expectation the vacuum pump could
16             have run.
17   A.   Correct.
18   Q.   Fair enough.  And I appreciate the distinction
19        and I appreciate you bringing that out.
20        Because I guess what I'm trying to figure out
21        is, do you have an opinion, based upon a
22        reasonable degree of certainty from an
23        engineering standpoint, as to the time that the

Page 287

1        slurry would have been picked up in the vacuum
2        process?
3    A.   Yes.
4    Q.   All right.  And, now, have you performed any
5         calculations to make that determination?
6    A.   No.
7    Q.   Have you performed any tests to determine --
8    A.   No.
9    Q.   -- when it occurred?  Have you performed any
10        analysis to determine when it occurred?
11   A.   Yes.
12   Q.   And what analysis have you performed to
13        determine the timing of when the slurry was
14        picked up by the machine?
15   A.   It would be an analysis that on the subject
16        machine or this machine there's --
17   Q.   Let's talk about the subject machine.
18   A.   Okay.  The subject machine.  There is not a
19        label on that container that says "after every
20        use empty this."
21   Q.   No.  The question is, when -- the timing that
22        the slurry went into the machine?  That's the
23        only question.

Page 288

1    A.   Okay.
2    Q.   Have you performed any analysis to determine
3         when the slurry went into that machine?
4    A.   All right.  We may have a difference of
5         definition of analysis here.  But an analysis
6         is an analysis analyzing what -- you know, what
7         situation you have.  Are we on the same
8         wavelength with analysis?
9    Q.   No, sir.  Maybe I don't understand what you are
10        interpreting to be analysis.
11   A.   Okay.  I can say with a reasonable degree of
12        certainty that that water, slurry, whatever,
13        was into that pump prior to the time that
14        Flavor House received it.
15   Q.   And what facts do you have to support that?
16   A.   Okay.  They drilled one hole prior to that --
17        to the time of the accident, okay.  With the
18        cup having -- if it had been emptied properly
19        and drained, you know, when they received it,
20        it should have been empty, okay?  Agreed?
21        Unless United Rentals sent it out half full or
22        full, whatever, the cup should have been empty.
23        In one application of a vacuum pump, you know,

Page 289

1        sucking down, one application of a vacuum is
2        not going to suck enough water into that cup to
3        fill that cup up.
4             It's just not going to do it for two
5        reasons.  You're not going to pull in enough
6        water around that seal once that vacuum is
7        suctioned down.  And there is not a label or
8        anything written on the cup or on the machine
9        that says "empty this cup after every use."
10       Because for it to fill up after one use that
11       way, there would be water basically pouring
12       into that cup.  And it would be unreasonable to
13       expect someone to have to empty that cup after
14       every use, that would just be -- it's just not
15       going to happen.
16   Q.   Well, did anyone empty the cup after the first
17        hole was drilled?
18   A.   I don't know.  I'm just saying one hole is not
19        going to -- drilling one hole and applying the
20        vacuum is not going to suck enough water in
21        that for it to go from empty to all the way
22        full and suck water into the pump in the volume
23        that I would have expected would have gone in

73  (Pages 286 to 289)

Page 290

1  there from the material that we saw.

2  Q.  How much water went into that machine based on
3      the material you saw on the diaphram of that
4      pump?

5  A.  I don't have a measured quantity of that, but
6      based on the -- based on the amount of material
7      and the corrosion that I saw inside the pump, I
8      would say several ounces, several fluid ounces
9      of water.

10  Q.  I'm sorry, can you tell me -- I've gone to the
11      Supreme Court on what several means.  What does
12      several mean to you?

13  A.  I would say more than three.  More than three
14      ounces.

15  Q.  And what do you base that on?

16  A.  Just the volume of the white corrosion.

17  Q.  How much corrosion was there on it?  Did you
18      measure it?

19  A.  The photographs show the entire -- the
20      diaphram, the entire cover of it was covered.

21  Q.  All right, sir.  But what I'm asking you is how
22      much -- give me a measurement or some unit so
23      we can compare?

Page 291

1  A.  I did not measure the volume or weight of the
2      amount that was in there.

3  Q.  Okay.  And why not?

4  A.  Well, we had the number of people that were
5      there.  We removed enough of a sample at that
6      time to analyze what it was.

7  Q.  How much did you remove, sir?

8  A.  It was two petri dishes that Applied Technical
9      Services used and, to my knowledge, would have
10      retained those samples, as it would have only
11      required a minimal amount to have analyzed the
12      content.

13  Q.  So how much did y'all remove, sir?

14  A.  I don't know.  The volume was two petri dishes.

15  Q.  Were they full?

16  A.  I don't recall how full they were, but they
17      were -- you know, enough to have two samples to
18      do a chemical analysis of what we thought was
19      enough.

20  Q.  Do your photographs depict the condition of the
21      diaphragm as you saw it there that day?

22  A.  I think we can probably find some in here that
23      do.

Page 292

1  Q.  Your photographs there that you've identified?

2  A.  I've got three other books of photographs here.

3      MR. GIVENS:  They're also identified.

4  A.  Oh, okay.  Well, he keeps pointing to these as
5      I'm reaching for my books, so I don't know.

6      MR. GIVENS:  What he's asking is if
7          there's a photograph in this set
8          that would serve the purpose?

9  A.  No, because these are external.  We have a
10     whole set in there of the inside.

11     MR. GIVENS:  While he looks for that,
12         can I take about four or five
13         minutes?

14     MR. SHEEHAN:  Sure.

15     (Recess.)

16 BY MR. SHEEHAN:

17  Q.  Sir, we've taken a recess and you were going to
18      find us a photograph of the --

19  A.  I didn't see any in my photographs.  I saw -- I
20      knew I had seen them here earlier showing all
21      of the powder.  This is a series of photographs
22      that was in my file of the photocopies that
23      were in here.  They had already been labeled in

Page 293

1  the previous thing about the -- by Mr. Sprain.
2  And this is one of the ones that had been
3  marked to be copied.

4      That is the white powder material inside
5  the vacuum pump.  And as you can see, the
6  diameter of that vacuum pump is about five to
7  six inches.  It is completely -- this is the
8  top half of the Gast vacuum pump that was
9  removed from the bottom half.  You know, this
10  is the main body, this is the top half.  And as
11  you can see, there is this white powder
12  material all in here that's almost like a
13  crystal -- well, it is, it's like a crystalline
14  material and it's just completely filled in.

15  Q.  How long did it take that crystalline material
16      to set up, sir?

17  A.  I'm not sure.

18  Q.  Just your judgment as an engineer?

19  A.  You know, several -- several weeks would be
20      what I would say.

21  Q.  And you're talking about several, what do you
22      mean several?

23  A.  We got back to that.

Page 294

1  Q.  Please, sir.

2  A.  You know, two to three months of moisture

3      exposure.

4  Q.  Let's go on and mark those, so we'll know what

5      you're talking about, as Exhibit Number 51 to

6      your deposition.

7  A.  Okay.

8          (Exhibit 51 marked for identification.)

9  Q.  Are there any other photographs?

10 A.  52, and we'll include that one, too, 53.

11         (Exhibits 52 and 53 marked for

12         Identification.)

13 A.  All right.  Anyway, that shows that.

14 Q.  All right.  Let's take those so we will know

15     that these have been separated.  And they were

16     taken out of what composite exhibit, sir?

17 A.  The folder over here that I guess had been put

18     together.  Mr. Sprain, you were going to make

19     copies of these for exhibits?

20         MR. GIVENS:  Actually, I don't know if

21             those were necessarily going to be

22             used if they got over there.  I

23             think what was going to be used

Page 295

1          was left on the table and what got

2          over here --

3  A.  Well, you had me put these purple tabs on them

4      for some reason.  I assume that was to do

5      something with them.

6          MR. SPRAIN:  Yeah, we did label them.

7              This is --

8  A.  As a composite exhibit.

9          MR. SPRAIN:  Yes.  What we did was --

10 A.  It doesn't have a sticker on it though.

11         MR. SPRAIN:  No.  I was Exhibit 5 and

12             we were going to make copies.

13         MR. GIVENS:  Yeah, that's right.  He

14             wrote down the list and then we're

15             going to get copies.  That's

16             right.

17         MR. SPRAIN:  So we tabbed that and

18             then -- what we could do is we

19             could have Tessie or one of your

20             staff persons do that now to

21             expedite matters.  So that was the

22             deal.  I actually did -- and, see,

23             Rick can help us do that later.

Page 296

1          Actually I had two or three pages

2          where I simply -- to expedite

3          matters, I made an exhibit to go

4          back later and make copies.

5          MR. GIVENS:  Okay.

6          MR. SPRAIN:  Of course, I didn't think

7              we would be here until 4:00.

8          MR. GIVENS:  The best laid plans --

9          MR. SPRAIN:  That's right.

10         MR. GIVENS:  -- of mice and men.

11 BY MR. SHEEHAN:

12 Q.  Sir, have you now identified the three

13     maintenance deficiencies that you attribute to

14     United Rentals?

15 A.  Yes.

16 Q.  Are there any other maintenance deficiencies

17     that you attribute --

18 A.  Not that I'm aware of, no.

19 Q.  -- to United Rentals?

20 A.  No.  Not that I'm aware of.

21         MR. GIVENS:  Let him finish his

22             questions.

23 A.  Okay.

Page 297

1  Q.  So you've now told me about all of the

2      maintenance deficiencies that you will opine at

3      trial concerning United Rentals?

4          MR. GIVENS:  Object to the form.

5  A.  I don't know if I will opine those at trial or

6      not.  I don't know if I will be asked to or

7      not.

8  Q.  Okay.  Well, if you have any additional

9      opinions with respect to United Rentals, will

10     you let your lawyer, Mr. Joe Lane, know so that

11     he can notify me and we can redepose you prior

12     to your trial testimony?

13 A.  Sure.  Yes.

14 Q.  Thank you, sir.  Sir, on page nine of your

15     report, prior to your topic "Inspections and

16     Analysis," you have a bullet point, "Mr. Riley

17     was not adequately warned of the risk involved

18     in the hidden or non-inherent risks associated

19     with the operation of this equipment."  What

20     did you mean "non-inherent risks"?

21 A.  Okay.  Those would be risks that would not be

22     -- my meaning, that would not be obvious.  One

23     such example of that would be to get loose

Page 298

1    clothing in and around the rotating drill bit,
2    you know, hands, fingers around moving parts.
3    Those would be, you know, inherent risks I
4    should say. You know, for instance, if you
5    lift the hood of your car and the fan blade is
6    whirling there, sticking your finger into that
7    moving blade would be an inherent risk of
8    having your fingers in and around that. It's
9    not something that's hidden or something that
10   someone cannot look at and readily detect an
11   immediate danger to.
12 Q.  Okay. And what were those risks?
13 A.   The fact that the vacuum could suddenly break
14   away or fall below a level that would allow the
15   drill motor to spin around with a violent
16   reaction.
17 Q.   Any other risk?
18 A.   No.
19 Q.   What was the foreseeable misuse of this
20   product?
21        MR. GIVENS: Object to the form.
22 A.   The foreseeable misuse?
23 Q.   Yes, sir.

Page 299

1 A.   Are you saying I -- is that a word that I used
2    that I should be -- oh, that's just from you.
3 Q.   Well, I'm asking you, did you use that word
4    "foreseeable" and "risk"?
5 A.   I don't know without reading through there.
6 Q.   Okay.
7        MR. GIVENS: Are you asking him did he
8        use the phrase "foreseeable
9        misuse?" I understood that to be
10       the question.
11 Q.   Yes. Did you use that in your report?
12 A.   I don't believe so, but without reading through
13   my report this late in the day, I can't, you
14   know -- in other words, I don't want to say no,
15   you know, and it be there.
16 Q.   Sure. All right. Do you know of any
17   foreseeable misuse of the product?
18       MR. GIVENS: Object to the form.
19 A.   I can't think of one right now.
20 Q.   Do you know of any deficiencies of Flavor House
21   that caused the accident?
22 A.   No, I don't.
23 Q.   If I could, at the top of page nine there, that

Page 300

1    bullet point -- the first bullet point?
2 A.   Okay.
3 Q.   That seems to be a double negative, would you
4    agree?
5 A.   I don't agree that that's a double negative, --
6 Q.   Okay.
7 A.   -- but I may be wrong.
8 Q.   Fair enough. What did Mr. Riley do that he
9    should not have done before the accident?
10 A.   Nothing that I'm aware of.
11 Q.   Okay. What did Mr. Riley not do that he should
12   have done before the accident?
13 A.   I'm not aware of anything.
14 Q.   Okay. Did Mr. Riley do anything wrong before
15   the accident?
16 A.   Not that I'm aware of.
17 Q.   Okay. On page ten of your report, sir, the
18   fifth line down, you say "unevenness in the
19   surface or discontinuity between that gasket
20   seal and the cutting surface;" what did you
21   mean by that, sir?
22 A.   It's not that I don't know what I meant by
23   that, I'm trying to figure out what's ambiguous

Page 301

1    about it. Any unevenness in the surface, say a
2    crack in the concrete, you know how concrete
3    sometimes cracks and one moves up from the
4    other. A discontinuity, it could be -- one
5    example would be if that gasket, the glued end,
6    were not -- was not glued or there was a
7    misalignment of it, that would be a
8    discontinuity. Also, let's say a twig or a
9    stick or, you know, a small obstacle got
10   between the floor and the gasket.
11 Q.   In other words, if the floor had not been
12   properly cleared or the work area had not been
13   properly cleared?
14 A.   That's true, yes.
15 Q.   How would that have made a difference?
16 A.   It would reduce the vacuum building potential
17   of the unit to the floor.
18 Q.   Would it still create a vacuum?
19 A.   It could. It may or it may not, depending on
20   how severe it was.
21 Q.   Do you have an opinion as to whether or not
22   that occurred in this case, whether there was
23   any unevenness or discontinuity?

Page 302

1    A.    I'm not aware of any.
2    Q.    If there had been an unevenness or
3          discontinuity, could this accident have
4          occurred as described by either Mr. Walters or
5          by Mr. Riley?
6    A.    It could have.
7    Q.    Did you see the inconsistencies between the
8          testimony of Mr. Walters and Mr. Riley in their
9          deposition testimony?
10              MR. GIVENS:  Object to the form.
11   Q.    That's probably a poor question.  Did you, in
12         reading the deposition of Mr. Riley and reading
13         the deposition testimony of Mr. Walters, note
14         any inconsistent testimony?
15   A.    No.  None jumps out at me right now.
16   Q.    All right, sir.  So that I'm clear then, the
17         testimony of Mr. Walters and Mr. Riley was
18         consistent?
19   A.    As far as I can recall, basically it was.
20   Q.    All right, sir.  Well, that begs the question.
21         Basically, what do you mean?  Did you see any
22         inconsistencies in the testimony of Mr. Riley
23         and his supervisor Mr. Walters?

Page 303

1    A.    No.  No.
2    Q.    So that I'm clear, would a jammed core bit
3          allow the base to separate?
4    A.    With sufficient vacuum?  No.
5    Q.    Now, I notice on page ten of your report, the
6          second from the bottom -- excuse me, the line
7          second from the bottom, I guess that
8          next-to-the-last sentence on that page, you say
9          "The core bit accompanying the unit displayed
10         scarring and scratches consistent with a
11         violent event."  Which core bit were you
12         talking about?
13   A.    That was -- I believe that would have been the
14         one with the broken teeth, because the other
15         one did not -- I didn't note anything on it.
16         So it was the one with the broken teeth.
17   Q.    Okay.  And that was the bit that was on the
18         machine when you saw it in May of 2005?
19   A.    That bit wasn't on the machine, the one that
20         was broken, it was accompanying the machine.
21   Q.    All right.  Which bit was on the machine when
22         you examined it in May of 2005?
23   A.    The one with the good teeth.

Page 304

1    Q.    Now, "the overall condition of the unit
2          supported the occurrence of a harsh violent
3          event associated with the unit;" what did you
4          mean by that, sir?
5    A.    Electrical cords pulled loose.  I'm trying to
6          remember if there were any scarring that I
7          attributed to it.  I don't recall any.  But
8          just for now in expediency I will say the cord
9          -- you know, the cord pulled loose, the cords
10         pulled loose.
11   Q.    Okay.  Any other evidence that this was a
12         violent event, the accident?
13   A.    Mr. Riley's injuries.
14   Q.    All right.  Anything else?
15   A.    Witness testimony that saw it, the people who
16         were there when it happened.  That's all I can
17         think of right now.
18   Q.    Okay.  So we've got the bit, we've got the
19         witnesses, what else?
20   A.    Mr. Riley's injuries.
21   Q.    Oh, and the injury.  Okay.  Now, what about the
22         bit that accompanied the machine indicated that
23         it was the bit involved in the accident, if it

Page 305

1          was?  Or was there anything about the bit with
2          the missing teeth that indicated it was the bit
3          involved in the accident?
4    A.    I'm not aware of anything specifically that it
5          -- I don't know that we know which bit was in
6          use at the time right now.
7    Q.    Well, based upon your observations at either of
8          the inspections of the bits, did you conclude
9          or are you able to opine which bit was in use
10         at the time of the accident involving
11         Mr. Riley?
12   A.    Based on what I know to date, I can't say which
13         one.  The bit with the good teeth was the one
14         -- that bit was on the drill at the time of the
15         inspection.  But as you pointed out, there had
16         been some inspection at Flavor House looking
17         for a -- I don't think you pointed it out,
18         Mr. Sprain may have, looking for a shear pin.
19         So whether they took the bit off, you know, and
20         stuck another one back on, you know, I don't
21         know what the sequencing was.
22   Q.    Why would they do that?
23   A.    What's that?

1  Q.   Why would they change the bit on the machine?
2  A.   Well, I don't think they would have done it
3       intentionally.  I mean, I'm not saying they
4       would have done it intentionally.  I'm just
5       saying that if they were looking for the -- you
6       know, if they have an extra bit there, they
7       have one they took off, and if they removed the
8       bit to look for a shear pin and, you know, if
9       somebody stuck one back on so that you don't
10      have two bits rolling around, they could have
11      picked up the bit that was not necessarily on
12      the machine.  I'm just saying that as a
13      possibility.  I was not implying that there was
14      any other motives for them doing so.
15 Q.   Have you spoken to anybody at Flavor House or
16      any representative or attorney for Flavor
17      House?
18 A.   No. No.
19 Q.   Let me see if I -- I believe you've answered
20      this question, but just so I'm clear, have you
21      done any testing with respect to any of the
22      maintenance issues that you fault United
23      Rentals for, other than, I guess, the lab test

1       that you've already testified which was of the
2       white powdery substance?
3  A.   Uh-huh, the lab test.  No.
4  Q.   Performed any research?
5  A.   Outside of previous observations of equipment
6       having holders, you know, for instructions and
7       operators manuals, you know, that being -- it
8       was not specific research, but it is
9       observations of numerous other equipment --
10 Q.   Fair enough.
11 A.   -- that that occurs on.
12 Q.   Anything else, sir?
13 A.   No.
14 Q.   And if you do any further testing, will you
15      please let Mr. Lane know so that I can redepose
16      you before your trial testimony?
17 A.   Yes, I will.  Yes, I will.
18 Q.   What was the mechanism which caused the vacuum
19      to be less than as manufactured?
20      MR. GIVENS:  Object to the form.
21 A.   Vacuum is not --
22 Q.   You know, the vacuum system?
23 A.   What could cause the vacuum, what method?

1  Q.   What was the mechanism that caused -- is it
2       your testimony or your opinion that the vacuum
3       system failed prior to the accident involving
4       Mr. Riley?
5  A.   My opinion is that there was insufficient
6       vacuum at the base to hold the drill base down.
7  Q.   Okay.  And what caused that?
8  A.   I'm not certain.  I don't know what caused
9       that.
10 Q.   Do you have an opinion based upon a reasonable
11      degree of engineering certainty?
12 A.   I don't believe I do.
13 Q.   Okay.
14 A.   Other than -- well, wait.  One thing that
15      caused -- and this is where these kind of
16      questions are tricky.  One thing that caused
17      the machine to have an insufficient level of
18      vacuum is the lack of a fail-safe system to
19      ensure that the machine must have that vacuum
20      present for the drill motor to operate, but I
21      think I've already stated that numerous times.
22      If you're talking about the specific discrete
23      mechanism that was the reason for not building

1       that vacuum up, which is, I assume, what you
2       were looking for, no, I don't.
3  Q.   Sir, I know that Mr. Sprain has asked for an
4       opportunity to ask you some questions, and as
5       he asks you questions, I'm going to try to go
6       over my notes so that I don't waste your time.
7  A.   Okay.
8
9           REDIRECT EXAMINATION
10 BY MR. SPRAIN:
11 Q.   I will be very brief, because I know we're all
12      tired.  To follow-up on the vacuum pump, and
13      this is going to be one of my questions, we've
14      already established that after the accident the
15      vacuum pump was not functional, correct?
16 A.   Correct.
17 Q.   Okay.  How do we know that the vacuum pump was
18      actually functional at the time of the
19      accident?
20 A.   We don't have any discrete physical evidence
21      that it was not functioning other than
22      testimony that it was.
23 Q.   Okay.  And that would have been from Riley and

Page 310

1    I assume Walters, but I have not read Walters?
2  A.   Yeah.
3  Q.   I think Riley said he turned it on, but do you
4       question whether Riley knew that he was in fact
5       turning on and putting into operation the
6       vacuum pump?
7  A.   No, I don't. I don't question that. You know,
8       I have no reason to believe that he didn't
9       know.
10 Q.   All right. And I'm asking you only because in
11      other respects you question his knowledge and
12      training and experience to properly use the
13      core drill and --
14         MR. GIVENS: Object to the form. Go
15            ahead.
16 Q.   Okay. And the next logical step is would you
17      therefore, you know, question whether he really
18      knew as to whether he was effectively using the
19      vacuum system?
20         MR. GIVENS: Object to the form.
21 Q.   Especially in light of the fact that after the
22      accident you didn't see that it was in fact
23      functioning?

Page 311

1  A.   Well, effectively using; you know, I think you
2       corrected it then, you said effectively using
3       it. Yeah, I would question his ability to know
4       whether it was effectively being used. I would
5       not question is ability to know whether the
6       vacuum pump motor was on and running and making
7       the noise of a pump operating.
8  Q.   Okay. Well, do you know at the time of the
9       accident whether he turned it on, but it wasn't
10      making a vacuum at all?
11 A.   I don't.
12 Q.   Okay.
13 A.   I mean, I don't have any independent way of
14      knowing that, no.
15 Q.   But you know for a fact after the accident it
16      was incapable of being operated?
17 A.   Correct.
18 Q.   All right. It was incapable of producing a
19      vacuum?
20 A.   Correct.
21         MR. GIVENS: You said after the
22            accident?
23         MR. SPRAIN: After the accident.

Page 312

1         MR. GIVENS: Okay.
2  Q.   Now, what would Mr. Riley have done to have
3       turned on the vacuum pump?
4  A.   What would he have done?
5  Q.   Yeah. What physically would he have done to
6       have started the operation of the vacuum system
7       on the day of the accident?
8  A.   He would have plugged -- plugged the vacuum
9       pump into the outlet on the control box.
10 Q.   Okay. And that starts the vacuum pump?
11 A.   Yes.
12 Q.   Okay. And then the switch is for the motor
13      specifically?
14 A.   Yes.
15         MR. GIVENS: When you say the motor
16            specifically, are you talking
17            about the drill motor as opposed
18            to vacuum motor?
19 A.   Yes.
20 Q.   Excuse me, the drill motor. I think you knew
21      what I was talking about, but I'm talking about
22      the Milwaukee electric drill motor, but you're
23      right. Now, is it possible today, I'm not sure

Page 313

1       whether you have a camera, somebody brought a
2       camera, to take photographs of your alternative
3       design?
4  A.   Sure.
5  Q.   And then we can supplement the record. Which
6       exhibit are we on?
7         MR. GIVENS: About 54 by my count.
8         MR. SHEEHAN: The next one would be 54.
9  Q.   All right. I don't know how many photographs
10      you'll take, but I assume it would have to be
11      at least a few, but I want to have the vacuum
12      gauge, the kill switch --
13 A.   I probably have already taken photos of that,
14      but we will make sure.
15         MR. GIVENS: Is that camera digital?
16 A.   It is. You know, for that matter -- well, it's
17      got a compact memory flash with it.
18         MR. GIVENS: Okay. Do you want to pick
19            the pictures?
20 Q.   Well, I want an overall picture. I want a zoom
21      of the kill switch. I want a zoom of the
22      vacuum gauge.
23 A.   All right. Let's take them one at a time,

Page 314

1    okay?
2  Q.   Okay.
3  A.   You know, it's hard with background clutter.
4        (Off-the-record discussion.)
5        MR. GIVENS:  Does the flash need to
6            have gone off?
7  A.   No, it's fine.  The kill switch.  Okay.  That
8        got it.
9  Q.   Now, what's different about the electrical
10       cords?
11 A.   Okay.
12 Q.   Because you may want to take these and just --
13       is there a way to make it stand out?
14 A.   Yeah.  Well, anyway, there is a double outlet
15       box.
16 Q.   That's inside here?
17 A.   No.  There is a double outlet box that you plug
18       them into on the box that comes with the drill.
19       I have pigtails out here to allow more room
20       inside the box to contain my relays and stuff.
21       This is also -- this is convenience.  You could
22       have a bigger box and have the same plug in.
23       The only thing that is good about this is

Page 315

1        before there was a plug on here that you could
2        have -- an adapter that you could -- if you
3        didn't have different plugs, you could miss --
4        for the drill and all, you could misswitch
5        them.  So the way we've got it wired to ensure
6        that you can't do that, there are different
7        plugs for the vacuum pump versus the adapter.
8        They had a plug and adapter on here before for
9        the drill.  And that's kind of --
10 Q.   What about this box, is it the same or is it --
11 A.   That's a different box.
12 Q.   Well, why don't you get the front?  I'm not
13       sure which angle you photographed the kill
14       switch, but I want to get that.
15 A.   Okay.  We got the kill switch in that one, too.
16       And what we'll do with my lettering that I've
17       got here --
18 Q.   Now, one thing I noticed, there aren't any
19       warning labels on this product, why is that?
20 A.   Just a second.  Any warning labels on what?
21 Q.   On this product, on the core drill?
22 A.   Okay.  Are you saying why didn't I add labels
23       to it?

Page 316

1  Q.   Right.
2  A.   Oh, well, my purpose was not to make this --
3        you know, are you asking warning labels on --
4        MR. GIVENS:  Are you asking wherever it
5            came from were there warning
6            labels on it when he got it and
7            what happened to them?
8  A.   I haven't removed any warning labels.
9  Q.   Okay.  But it came with the box and they
10       weren't put on the product?
11 A.   I haven't seen the box for it.
12 Q.   Okay.  Well, what I understand, and you tell me
13       if I'm wrong or right, the product is
14       assembled, there is the Diamond Products base,
15       which is this with the column, there is the
16       Milwaukee motor, and there is a Gast pump, and
17       then it's all put together and assembled, is
18       that your understanding?
19 A.   When -- I don't know if Mr. Lane had anybody
20       assemble it.  When I got it, it was assembled
21       and put together fully and in this office when
22       I received it.
23 Q.   Okay.  What I'm going to do is I've marked a

Page 317

1        document as Exhibit 54 to Mr. Shaver's
2        deposition and it states these are photographs
3        of his alternative design.
4        (Exhibit 54 marked for identification.)
5  Q.   I think you've got sufficient photographs.  Now
6        what I want to do is turn this on.
7  A.   Okay.
8  Q.   And let's figure out the protocol, because I
9        don't want to belabor this, but I want to turn
10       it on.  Is this going to cause any racket or
11       any --
12 A.   A little bit, but not a lot.
13 Q.   Okay.
14 A.   All right.  We're turning this to "use vacuum"
15       and you will hear the vacuum pump come on.
16       There's the vacuum.
17 Q.   Okay.
18 A.   All right.  Now, if we were to --
19 Q.   Now, what's different about the core drill at
20       the time of the accident?  Because I thought
21       there was a switch to turn the motor on and you
22       said before just a minute ago that you would
23       plug the cord into the outlet to activate the

Page 318

1    vacuum pump?
2  A.   Correct.
3  Q.   So this alternative design is different in that
4      you've got one switch that turns on the vacuum
5      pump?
6  A.   Correct.
7  Q.   And that's because you've changed the linkage,
8      you first get a good vacuum. Then what turns
9      on the motor?
10  A.   Okay. Just the kill switch.
11  Q.   Oh, the kill switch?
12  A.   Yes.
13  Q.   And so you depress -- the vacuum is on now.
14      What do you do with your design --
15  A.   Right now the motor will not turn on.
16  Q.   All right.
17  A.   Okay. The vacuum is running, but you will see
18      where the vacuum gauge is, it's at zero.
19  Q.   All right. It's in the red, so the --
20  A.   Now, right here is the thing that you would
21      normally --
22  Q.   That's the vacuum slot?
23  A.   That's the vacuum slot where it goes in. We're

Page 319

1      not building up any vacuum, you can't get the
2      drill to operate. If we had this thing in
3      there and out on, you know, concrete or a solid
4      floor and we could get it wet enough to stick
5      down, then we would start building up a vacuum.
6        To replicate a vacuum -- and, see, the
7      vacuum switch is built into here. It is in
8      here. And this is a hollow hose that is
9      actually transmitting the vacuum. The vacuum
10      that's available to this unit is now coming up
11      through this tube into the box to activate our
12      box, our thing.
13        All right. That's not going to do it.
14      I'm just going to do it with my finger.
15  Q.   So what are you doing now so the record is
16      clear? You're putting your finger in the
17      vacuum slot?
18  A.   Yeah. Hold on just a second. We just did this
19      this morning.
20  Q.   This right here --
21  A.   There is only one place that it could be loose
22      and that's inside that box at the switch.
23  Q.   Okay.

Page 320

1  A.   And that would be if you were pulling on this,
2      you know, when you were over here doing that,
3      and I may not have the clamps tight in here.
4      You see, this is a prototype that we put
5      together and I don't have everything clamped
6      down as tight inside the box maybe as you
7      normally would.
8  Q.   So you're saying when I lifted it up a little
9      while ago, maybe it could have jarred something
10      loose?
11  A.   You jarred it, yeah. And it will take me just
12      a minute. Let me go out and get a screwdriver
13      and I can pull it loose and put it back on.
14  Q.   Okay. We will cut the switch.
15  A.   And I'm going to unplug it, too, since I'm
16      going to open the box. Let's take a short
17      break and I'll take care of that.
18        (Recess.)
19  BY MR. SPRAIN:
20  Q.   Mr. Shaver has turned the core drill, and it's
21      his alternative design core drill, back in
22      operation and please resume with your testimony
23      about what you're doing?

Page 321

1  A.   And I will explain what the problem was before.
2      Mr. Sprain had loosened the water collection
3      cup and it wasn't tight back on and we weren't
4      building a vacuum.
5  Q.   I did it intentionally to sabotage his efforts.
6  A.   Yeah, you thought you were going to throw me
7      there, didn't you? All right. Well, here we
8      have the activation switch. And as you will
9      note, the drill will not operate.
10  Q.   Okay.
11  A.   The drill motor will not come on. Notice that
12      the needle is in the red zone.
13  Q.   So that's showing the vacuum pressure is
14      inadequate?
15  A.   Right.
16  Q.   Now, you put your finger inside the vacuum slot
17      to sort of stop up the vacuum hose?
18  A.   Right. I'm still having trouble. Okay. Hang
19      on.
20        MR. GIVENS: Will that do it?
21  A.   No, that's not as good as your hand. All
22      right. There we go. As you'll see in the red
23      zone, now in the green zone it works. All

Page 322

1    right.  I'm going to gradually -- I'm going to
2    gradually reduce the vacuum and you'll see when
3    it gets to the red zone, shortly thereafter, my
4    hand is still pressed down, it shuts off.  The
5    pressure goes back up.  (Demonstrating.)  Okay.
6        All right.  Next to show how it's wired
7    and how it functions, the middle, the drill is
8    shut off.  So activation of the deadman switch
9    will not --
10            MR. GIVENS:  It just won't work?
11  A.    It just doesn't work, everything is off.  I'm
12    going to turn it to the next setting, which, as
13    we said before, was brace, otherwise using the
14    ceiling jacks or whatever, and the drill
15    operates.
16        Okay.  Now, to, you know, expound upon
17    when you're using this, the method of
18    protection here would be for the operator
19    having his hand on this.  If this was spinning
20    around and you do like that and it will shut
21    off.  And you can tell it's still moving, but
22    if that were bound down --
23            MR. GIVENS:  It wouldn't run that long.

Page 323

1  A.    It's not going to run that long if it has, you
2    know, a bit and tension in there like that.
3    The other thing, if someone is back here, the
4    thing about it is, as far as standing on it, if
5    you're going to lose your balance, I will say
6    this, depressing this and holding it while
7    standing on it, you would have to be an acrobat
8    to ride that thing around and keep your hand
9    pressing that button down for it not to shut it
10    down and to stop.  You know, it may move you
11    initially and get you started, but it's not
12    going to keep beating you around.
13  Q.    Okay.  Fair enough.  That's the end of my
14    questioning.
15  A.    You need to get photographs inside now.  This
16    is the microswitch.  This is the vacuum
17    microswitch.
18  Q.    Well, what about you, have you photographed it?
19  A.    Yeah.
20  Q.    Take a couple of shots and just add those to my
21    exhibit when you get them developed.
22  A.    (Witness complies.)  All right.  This is
23    tricky, believe me, but building a prototype is

Page 324

1    never that hard.  It's so easy to knock these
2    wires loose here.
3            (Off-the-record discussion.)
4            MR. SPRAIN:  Saint Gobain Abrasives
5        does make a request that we be
6        allowed to have our people inspect
7        and examine this drill, because it
8        does have changes to it and
9        modifications.  And I'm sure y'all
10        wouldn't object, Larry.
11  A.    Uh-huh.
12            MR. GIVENS:  I would leave that up to
13        Joe.
14            MR. SPRAIN:  Sure.
15            MR. GIVENS:  I wouldn't envision we do,
16        but I'm not going to make
17        decisions like that in his case.
18            MR. SPRAIN:  Oh, sure.
19  A.    Keep in mind when I said uh-huh, I wasn't
20    agreeing you can.
21            MR. SPRAIN:  But this is a principal
22        part of his opinions and so we'll
23        need to look at it.

Page 325

1        RECROSS-EXAMINATION
2  BY MR. SHEEHAN:
3  Q.    Sir, before you leave, and I won't take Larry's
4    picture, but can I get you to show me how you
5    would use this exemplar when we're taking the
6    picture?
7  A.    Sure.  We're plugged in.  All right.  We would
8    use it -- no, we're not plugged in, sorry.  Or
9    do you want me to --
10  Q.    Well, that's fine, you can plug it in.
11  A.    I'm kind of curious if it's still going to work
12    after we -- that part works.  Hopefully this
13    still will.  And it doesn't and it's supposed
14    to.
15            MR. SPRAIN:  I didn't touch it that
16        time.
17            MR. GIVENS:  It probably needs
18        tightening in there, doesn't it?
19        It went to the green.
20  A.    Yeah, but it won't activate.  We knocked the
21    wire --
22            MR. GIVENS:  We knocked something loose
23        inside.  I shouldn't have

Page 326

1              tightened it up.
2   A.   Yeah.  All right.  I know what we knocked
3        loose.
4              MR. GIVENS:  By process of elimination,
5                   it's got to be something on the
6                   inside of that.
7   Q.   That's all right, sir.  If I could get you to
8        stand and show me how an operator should
9        properly operate it with the new configuration?
10  A.   Oh, okay.
11  Q.   Are we calling that the front of the machine?
12  A.   Now, I'm saying if I'm standing on the front of
13       the machine, this is how you would do it.
14             MR. GIVENS:  But you could still do it
15                  from either side?
16  A.   That's right.
17  Q.   Now, I'm going to take a photograph of the
18       position.  Now, is this the proper way to use
19       your Shaver design machine?
20  A.   Either way.  I don't recommend one way or the
21       other, either the front or the back of the
22       machine.  This would be standing on the front.
23  Q.   All right, sir.

Page 327

1              MR. GIVENS:  If we get in the frame let
2                   us know.
3   A.   This would be from the back side.  Pressing
4        down, you would lift up on the handle like
5        that.  You didn't get it, did you?
6   Q.   All right.  If you would show me, I'm sorry?
7   A.   Okay.  (Indicating)
8   Q.   All right, sir.
9   A.   I tell you what, while y'all are -- if y'all
10       want to ask any other questions, I will try to
11       be taking this out, because I want to leave it
12       in operational condition if I can.
13  Q.   Before you move, sir, I notice that when you
14       stand in the back you put your right foot on
15       the right side of the machine?
16  A.   Okay.
17  Q.   Is that correct, sir?
18  A.   That's what I did, yes.  I'm not saying that
19       that's -- there's an incorrect way of standing
20       on -- you know, to positioning yourself either.
21  Q.   And before standing on the machine, do you
22       adjust the leveling screws?
23  A.   I mean, I would, yes.  I mean, according to the

Page 328

1        instructions of letting the vacuum attach down
2        and then, you know, making sure that they were
3        snug, you know, to keep the machine level.
4   Q.   Now, when do you adjust the leveling screws?
5   A.   I would have to look back through the
6        instructions to be sure, it's been sometime,
7        you know, since I reviewed this.  But I
8        believe, from the best of my recollection as we
9        stand, that you apply the vacuum and allow it
10       to suck down to create that vacuum and then you
11       take the leveling screws and adjust it slightly
12       to that -- to level the base to that.
13  Q.   And the function of the leveling screws being
14       engaged is what?
15  A.   To drill the hole into the concrete
16       perpendicular to the floor surface or
17       perpendicular to -- it's actually horizontal
18       since you're using this bubble level, I would
19       assume, or you could use any reference, any
20       outside reference of what you wanted to do
21       within a certain limitation.
22  Q.   And why is it important for it to be
23       perpendicular to the concrete slab?

Page 329

1   A.   Either perpendicular to the concrete slab, if
2        that's what you were looking to adjust, or
3        plumb.  I mean, normally when people are
4        drilling holes into the concrete floor, they
5        want them to go, you know, perpendicular to the
6        surface.  They want it to go straight down;
7        they don't want it going at an angle.
8   Q.   Would the fact that the drill bit is not going
9        straight down in the concrete and could
10       possibly be misaligned, would that have any
11       effect?
12  A.   I don't believe so.  You asked that question
13       before and I think that, you know, I may have
14       misunderstood, but as we've just gone through
15       it, I don't think that it would.
16  Q.   Okay.
17             MR. GIVENS:  Here's the screwdriver.
18  A.   We're unplugged, the screwdriver.
19             MR. SPRAIN:  Okay.  What's the status?
20                  Are we done with Mr. Shaver?
21             MR. SHEEHAN:  I've got a few more
22                  questions that don't require his
23                  standing next to the machine?

Page 330

1  A.   Can I answer them while standing next to the
2       machine and doing this? I'm just trying to
3       save a little time to get out of here.
4            (Off-the-record discussion.)
5  BY MR. SHEEHAN:
6  Q.   Sir, I noted in composite Exhibit Number 18 to
7       your deposition --
8  A.   This was too easy. Well, I spoke too soon, way
9       too soon.
10           MR. GIVENS: Let's go ahead and get
11               this done and then we can do that
12               later.
13  A.   Okay. I'm sorry.
14  Q.   I noticed in composite Exhibit Number 18 to
15       your deposition, which apparently is marked on
16       the second page, there appears to be a document
17       to Don Shaver prepared by Joseph D. Lane on the
18       front page and then actually the second page,
19       the table of contents, is the one that's been
20       marked with the exhibit label. Within the
21       photographs taken by Mr. Tew, the leveling
22       bolts as reflected in his photographs taken the
23       morning after the accident, how would you

Page 331

1       describe those leveling screws?
2  A.   They are near flush; maybe slightly protruding
3       beyond the plane of the base of the aluminum
4       base.
5  Q.   Were those leveling screws engaged at the time
6       of the accident?
7  A.   They could have been. I mean, there's nothing
8       there that -- you know, these two I see. I
9       don't know what it would have had to have been
10       adjusted to to have gotten it plumb on that
11       particular floor.
12  Q.   All right, sir. Have you ever seen a
13       photograph identified as Mr. Walters' Exhibit
14       Number 5 to his deposition?
15  A.   Yes.
16  Q.   You've seen the deposition exhibits then?
17  A.   Well -- no, I haven't seen this.
18           MR. GIVENS: Isn't that one and the one
19               you're showing him the same?
20           MR. SHEEHAN: Yes, sir.
21  A.   Okay. No, I don't recall having seen these.
22  Q.   All right, sir.
23  A.   I --

Page 332

1  Q.   So that I'm clear then, the photographs that
2       you have contained within Exhibit Number 18 to
3       your deposition, the composite exhibit, are the
4       only photographs you've ever seen other than
5       the ones you took?
6  A.   Yes. Well, no. I mean, I've seen -- there are
7       some other photographs in my folder over there
8       that we went through earlier.
9  Q.   That were taken by you, sir?
10  A.   No.
11  Q.   Who were they taken by?
12  A.   By different people. I mean, I've got -- I've
13       got photographs that are similar to these of
14       the machine. I've got probably four or five
15       sets of photographs of this core drill machine
16       and different core drilling machines.
17  Q.   And who were they taken by, sir?
18  A.   Different people. I mean, they're in the
19       folder over here.
20  Q.   Okay. If you would, identify those people that
21       have taken the photographs to your knowledge?
22  A.   Here we go. These are photographs that were
23       taken at the inspection at Applied Technical

Page 333

1       Services.
2  Q.   In May of 2005?
3  A.   Yes. Those were taken by persons other than
4       myself.
5  Q.   Who would that have been, sir?
6  A.   Some of the people on that list.
7  Q.   The attendees?
8  A.   Yes. Let's see. I've got stacks of color
9       photos over here.
10  Q.   I believe it's been represented in my file that
11       those were photographs taken by Mr. Joe Lane
12       during the deposition of Mr. Myers.
13  A.   Okay. That's these. And then these are of the
14       inspection.
15  Q.   Taken by yourself, sir?
16  A.   No.
17  Q.   Who were those taken by?
18  A.   I am not sure.
19  Q.   But one of the attendees at the inspection in
20       May of 2005?
21  A.   Yes. Yes.
22  Q.   All right, sir. For the record then, let me
23       ask you, the composite Exhibit Number 18

Page 334

1   containing the photographs, and I guess, as
2   pointed out by your attorney, is Mr. Riley's --
3       MR. GIVENS:  For the record, he doesn't
4           have an attorney in this case.
5       MR. SHEEHAN:  By the attorney for
6           Mr. Riley, I apologize.
7       MR. GIVENS:  Thank you.
8       MR. SHEEHAN:  Thank you.
9   Q.  The photograph identified in Mr. Walters'
10      deposition, 005, --
11  A.  Okay.
12  Q.  -- is the same photograph as contained within
13      your Exhibit Number 18?
14  A.  Okay.
15  Q.  Is that true, sir?
16  A.  Yes.
17  Q.  All right.  And that was the condition of the
18      leveling screws as you saw them in May of 2005
19      at the inspection in Atlanta?
20  A.  I don't recall without looking back at my
21      photographs.
22  Q.  All right.  If you would, look back at your
23      photographs, sir.

Page 335

1       MR. GIVENS:  Mr. Sheehan, just as a
2           matter so you can hopefully kind
3           of do what you need to do, I'm
4           going to call a halt to these
5           proceedings no later than 5:30.
6           If you are not through with him by
7           that time, in that we've got to
8           reconvene to do Mr. Frost, we will
9           certainly agree to make him
10          available for additional
11          questions, but just as a matter of
12          fair warning, at 5:30 I'm done.
13      MR. SHEEHAN:  Thank you, sir.
14  A.  It appears to be that they are in that
15      approximate same position, yes.
16  Q.  All right.  Do you see any difference in the
17      position of the leveling screws --
18  A.  No.
19  Q.  -- in the photographs taken by Mr. Tew after
20      the accident and the photographs you took after
21      your inspection in May of 2005?
22  A.  No, I don't.
23  Q.  All right.  Sir, if at the time of Mr. Riley's

Page 336

1   accident the leveling bolts are in the position
2   as shown in the photograph taken by Mr. Tew,
3   what is the propensity of the drill bit
4   becoming bound in the hole?
5   A.  I don't believe it would increase it any.
6   Q.  All right, sir.  Does the likelihood of the
7       drill bit becoming bound in the hole increase
8       as weight is applied to the corner of the base
9       or on one of the sides of the base of the core
10      drill machine which is the subject of this
11      lawsuit?
12  A.  It could conceivably do that.
13  Q.  Given --
14  A.  I'm not saying that it did, but it could.
15  Q.  And how is that, sir?
16  A.  If you were on an unlevel surface, a rocky
17      surface, I can envision how it would if you
18      want to --
19  Q.  Please, if you would, tell me those instances
20      where you envision that it would?
21  A.  Or could.  And it would be if it were on a
22      crowned surface to where the unit would rock
23      from side to side.  If you could get it to --

Page 337

1   that surface would have to be crowned enough
2   that it would result in a binding of the drill
3   bit.  You know, it would increase the
4   propensity of it, but it's still not likely
5   that it would.  You would -- you would still
6   get advanced warning of any likelihood of
7   binding from a build up of the amperage, you
8   know, on the amp meter, and you would hear
9   differences in the sound of the drill motor.
10  Q.  Did either Mr. Riley or Mr. Walters hear any
11      difference in the machine during its operation?
12  A.  I don't believe so.
13  Q.  And that's your recollection of their
14      testimony?
15  A.  Yes, it is.
16  Q.  If the pump is operating as manufactured and
17      the gasket was performing with no weakened glue
18      joint and the machine is properly set up, would
19      the binding cause the base to rotate, the
20      binding of the drill bit?
21  A.  It depends on whether there was sufficient
22      vacuum in between the base.  Just because the
23      -- just because the vacuum pump is operating

Page 338

1    and just because the seal doesn't have a tear
2    in it, you've not eliminated all of the
3    possibilities for there not being a vacuum in
4    place.
5  Q.   What are the other possibilities for the vacuum
6    not --
7  A.   Oh, they're too numerous to list. Well, I
8    guess we could go through them, but you could
9    easily miss some, too. Like we said, a foreign
10    object, a crack in the concrete, not having the
11    little -- you know, the little valve shut,
12    having the cup not screwed onto the water
13    collection like we experienced before.
14  Q.   Using your Shaver design machine?
15  A.   Correct.
16  Q.   Anything else?
17  A.   No. Well, oh, yeah, there are other things,
18    too. I mean, I could go on. We would go well
19    past, you know, the 5:30 time period if we sat
20    here and thought of every conceivable thing of
21    why you could not build up a vacuum under
22    there.
23  Q.   Let me ask you to assume that the base was

Page 339

1    properly set up and the pump was properly
2    operating and that someone was standing on the
3    machine, would the base have rotated when the
4    bit became bound in the hole?
5  A.   Do we have the vacuum pump operating and a full
6    vacuum underneath the -- under the base?
7  Q.   Yes, sir.
8  A.   No, it would not rotate.
9  Q.   If you eliminated from that hypothetical that
10    the machine was not properly set up, would that
11    have any effect?
12      MR. GIVENS: As I understood the first
13        hypothetical, the machine was
14        properly set up, and as you've
15        just phrased it, you eliminated it
16        not being properly set up?
17      MR. SHEEHAN: Exactly.
18  A.   It would depend on what specifically was not
19    proper about the setup.
20  Q.   And how would you properly set up the machine?
21  A.   Make sure all of the vacuum lines were
22    attached, have the gasket in place, get water
23    in the area to create a suction, and move the

Page 340

1    base, make any adjustments, moving it to make
2    -- to get good contact to create a seal between
3    the floor and the base. That would be --
4  Q.   The proper setup?
5  A.   Yes.
6  Q.   Assuming that there was a proper setup and
7    assuming that the vacuum pump were operating as
8    manufactured and as intended, but the leveling
9    bolts were not engaged -- were not in contact
10    with the concrete slab, would the drill bit
11    become bound?
12  A.   It could. It's a possibility.
13  Q.   And how would it be possible to become bound in
14    the hole?
15  A.   It's possible that with extra movement in the
16    hole, that if you had movement in it, that it
17    could increase the likelihood possibly of the
18    drill binding.
19  Q.   What do you mean extra movement in the hole?
20  A.   Well, if the leveling screws act as a
21    stabilizing -- you know, to stabilize the base
22    once you get it there, you know, we talked
23    about a crown in the floor, if you had that

Page 341

1    situation where it was rocking around, I
2    suppose that, you know, it could increase the
3    binding tendency of the drill.
4  Q.   Any other way?
5  A.   No, not that I can think of right now.
6  Q.   Assuming that the pump was operating properly,
7    that the machine was properly set up and the
8    leveling bolts are not engaged and touching the
9    concrete, and also assume that weight is
10    applied to one side of the base of the core
11    drill machine, would the drill bit become bound
12    in the hole?
13  A.   Not necessarily.
14  Q.   Could it?
15  A.   Sure, it could.
16  Q.   How is that?
17  A.   Well, certainly none of those things that you
18    just mentioned would preclude it from doing so,
19    from being bound. I mean, we know that drill
20    bits do become bound while drilling in surfaces
21    and through surfaces, and, you know, if that
22    standing on one side created movement, it could
23    -- could assist it in binding.

Page 342

```
 1          MR. SHEEHAN:  Thank you, sir.  I
 2              appreciate your time.
 3  A.    Thank you.
 4          MR. SHEEHAN:  Oh, I'm sorry, one last
 5              question.
 6  Q.    Do you have any relatives by blood or marriage
 7        in Central Alabama?
 8  A.    No.
 9  Q.    Or in Alabama?
10  A.    No.  The Shaver name came from Montgomery, but
11        we're talking probably at least four
12        generations away, so I don't think.
13          MR. SHEEHAN:  I appreciate your time.
14          MR. GIVENS:  Okay.
15          FURTHER DEPONENT SAITH NOT
16
17      DEPONENT:                .
18  Subscribed and sworn to before me this
19  day of            , 2006.
20
21
            NOTARY PUBLIC
22
23  My Commission Expires:               .
```

Page 344

```
 1  any manner interested in the results thereof.
 2      This 2nd day of November, 2006.
 3
 4
 5
 6
 7
            Ricky L. Tyler
 8          Certified Court Reporter
            and Notary Public
 9          State of Alabama at Large
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 343

```
 1      REPORTER'S CERTIFICATE
 2
 3  STATE OF ALABAMA
 4  COUNTY OF MONTGOMERY
 5      I, Ricky L. Tyler, Certified Court
 6  Reporter and Notary Public in and for the State of
 7  Alabama at Large, do hereby certify that on Friday,
 8  October 27th, 2006, pursuant to notice and
 9  stipulation on behalf of the Defendants, I reported
10  the deposition of DONALD R. SHAVER, who was first
11  duly sworn by me to speak the truth, in the matter of
12  MATTHEW RILEY, Plaintiff, vs. UNITED RENTALS (NORTH
13  AMERICA), INC., et al., Defendants, Civil Action
14  Number 1:05 CV-994-T, now pending in the United
15  States District Court for the Middle District of
16  Alabama, Southern Division, that the foregoing 342
17  computer-printed pages contain a true and accurate
18  transcription of the examination of said witness by
19  counsel for the parties set out herein; that the
20  reading and signing of said deposition was not waived
21  by witness and counsel for the parties.
22      I further certify that I am neither of kin
23  nor of counsel to the parties to said cause, nor in
```