**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MATTHEW RILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.: 1:05cv994-MHT** |
| vs. | ) | |
| | ) | |
| **UNITED RENTALS (NORTH AMERICA), Inc. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**ORDER ON PRETRIAL HEARING**</u>

A pretrial hearing was held in this case on November 29, 2006, wherein the following proceedings were held and actions taken:

1.  <u>PARTIES AND TRIAL COUNSEL:</u>  The parties before the court are correctly named as set out below; and the designated trial counsel for the parties are as set out below:

| <u>PARTIES</u> | <u>TRIAL COUNSEL</u> |
|---|---|
| Plaintiff:<br>Matthew Riley | Joseph D. Lane, Esq.<br>Farrest Taylor, Esq.<br>Cochran, Cherry, Givens,<br>Smith, Lane & Taylor, PC<br>163 West Main Street<br>Dothan, Alabama 36301 |
| Plaintiff/Intervenor:<br>Ralcorp Holdings, Inc. | Joseph T. Brasher, Esq.<br>Hamilton, Westby, Antonowich & Anderson<br>One Georgia Center<br>17th Floor<br>600 W. Peachtree Street, N.W.<br>Atlanta, Georgia 30308 |
| Defendants:<br>United Rentals, Inc. | C. Winston Sheehan, Jr., Esq.<br>Ball, Ball, Matthews & Novak, P.A.<br>Post Office Box 2148<br>Montgomery, Alabama 36102-2148 |

Saint-Gobain Abrasives, Inc.   Robert H. Sprain, Jr., Esq.
Kevin T. Shires, Esq.

Sprain & Shires PC
1707 29th Court South
Homewood, Alabama 35209

2. JURISDICTION AND VENUE

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 and 1441(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a). Personal jurisdiction is not contested.

3. PLEADINGS: The following pleadings and amendments were allowed:

Plaintiff's Complaint

Plaintiff's Amended Complaint

Answer of United Rentals (North America), Inc.

Answer of Saint-Gobain Abrasives, Inc.

RalCorp Holdings, Inc.'s Motion to Intervene

Plaintiff's Response to RalCorp's Motion to Intervene

Complaint by the plaintiff against Gast Manufacturing, Inc., Milwaukee Electric Tool Corporation, United Rentals, Inc., and St. Gobian Abrasives, Inc.

Answer to Complaint by Gast Manufacturing, Inc.

Answer to Complaint by Milwaukee Electric Tool Corporation

Amended Answer by St. Gobian Abrasives, Inc.

Amended Answer to the Complaint by Gast Manufacturing, Inc.

Amended Answer to Complaint by United Rentals, Inc.

Second Amended Answer by St. Gobian Abrasives, Inc.

Second Amended Answer by United Rentals, Inc.

4. CONTENTIONS OF THE PARTIES:

**(a) The plaintiff contends that:**

1. This is a products liability action for damages arising out of personal injuries suffered by Matthew Riley on August 29th, 2003.

2. On or about August 29, 2003, Mr. Riley's employer (Flavor House) rented "the product," a DM 500 (Norton) Core Drill, from the Dothan location of Defendant United Rentals. The product was to be used in the drilling of several holes for the Flavor House located at their facility in Dothan, Alabama.

3. As a part of his job assignment on the day of the incident, Plaintiff Matthew Riley was using the drill for its intended and reasonably foreseeable purpose, i.e., to drill holes through the concrete flooring of the building.

4. During the course of using the product, the base of the drill broke free from the concrete floor causing the entire core drill assembly to violently shift or spin uncontrollably.

5. In his attempt to get out of the way of the core drill assembly, Matthew Riley was struck about the face and head by the core drill assembly, breaking numerous facial bones surrounding Matthew Riley's eye and causing severe and permanent damage and injuries to Matthew Riley.

6. At the time of the incident, the product was being used in a reasonably foreseeable manner, for a person in the same or similar circumstances.

7. United Rentals rented the product, a DM 500 (Norton) Core Drill, to Flavor House on our about August 28th, 2003.

8. United Rentals is subject to liability under the Alabama Extended Liability Doctrine (AEMLD), in that United Rentals placed a defectively designed product into the stream of commerce.

9. United Rentals owed a duty to Plaintiff not to place a defective and unreasonably dangerous product into the stream of commerce.

10. Matthew Riley used the product as it was intended or in a reasonably foreseeable manner.

11. At the time of Matthew Riley's use of the product, it was in substantially the same condition as when it was received from United Rentals for use on August 28th, 2003.

12. At the time of his injury, Matthew Riley was a reasonably expected user of the product.

13. At the time the product was placed into the stream of commerce an economically feasible alternative design was available that would have eliminated or reduced the likelihood of injury.

14. As a result of the defective and unreasonably dangerous condition of the product, Matthew Riley was injured when the product malfunctioned as a result of the defective condition of the product on August 29th, 2003.

15. United Rentals was negligent in the maintenance of the product.

16. As a direct and proximate result of United Rentals' negligence in the maintenance of the product, the product malfunctioned and caused Matthew Riley's injuries and damages, including, but not limited to, medical expenses, extensive medical treatment including surgeries, pain and suffering, disfigurement, and permanent damages resulting from his injuries.

17. United Rentals failed to adequately warn of the hazard associated with the loss of vacuum

pressure in the use of the product.

18. As a direct and proximate result of United Rentals negligent failure to adequately warn of the loss of vacuum pressure hazard, Matthew Riley was injured and suffered damages, including, but not limited to, medical expenses, extensive medical treatment including surgeries, pain and suffering, disfigurement, and permanent damages resulting from his injuries.

19. Saint-Gobain placed the product, a DM 500 (Norton) Core Drill, into the stream of commerce on or about March 14th of 2003, when it sold the product to United Rentals.

20. Saint-Gobain owed a duty to Plaintiff not to place a defective and unreasonably dangerous product into the stream of commerce.

21. Matthew Riley used the product as it was intended or in a reasonably foreseeable manner.

22. At the time of Matthew Riley's use of the product, it was in substantially the same condition as when it was placed into the stream of commerce by Saint-Gobain in March of 2003.

23. Saint-Gobain is subject to liability under the Alabama Extended Liability Doctrine (AEMLD), in that United Rentals placed a defectively designed product into the stream of commerce.

24. At the time of his injury, Matthew Riley was a reasonably expected user of the product.

25. At the time the product was placed into the stream of commerce an economically feasible alternative design was available that would have eliminated or reduced the likelihood of injury.

26. As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Matthew Riley was injured when the product malfunctioned as a result of the

defective condition of the product on August 29th, 2003.

27. Saint-Gobain was negligent in the design of the subject product and in the safety analysis, testing, and marketing of the product.

28. As a direct and proximate result of Saint-Gobain's negligence, the product malfunctioned and caused Matthew Riley's injuries and damages, including, but not limited to, medical expenses, extensive medical treatment including surgeries, pain and suffering, disfigurement, and permanent damages resulting from his injuries.

29. Saint-Gobain failed to adequately warn of the hazard associated with the loss of vacuum pressure in the use of the product.

30. Saint-Gobain failed to conduct an adequate hazard analysis to address the loss of vacuum hazard in the use of the product.

31. As a direct and proximate result of Saint-Gobain's negligent failure to adequately warn of the loss of vacuum pressure hazard, Matthew Riley was injured and suffered damages, including, but not limited to, medical expenses, extensive medical treatment including surgeries, pain and suffering, disfigurement, and permanent damages resulting from his injuries.

32. Defendants United Rentals and/or Saint-Gobain, and Fictitious Defendants ABC, DEF, and JKL were merchants or sellers with respect to goods of the same kind as "the product" and its major component parts.

33. Defendants United Rentals and/or Saint-Gobain, sold, distributed, rented or leased "the product" and/or its major component parts.

34. The product was used for the ordinary purposes for which such products are used.

35. The product was defective, or unmerchantable, i.e., not fit for the ordinary purposes for which such products are used.

36. As a direct and proximate result of the defect or defects in the product Plaintiff Matthew Riley was severely and permanently injured and damaged.

37. Defendants United Rentals and Saint-Gobain were notified of the breach of warranty within a reasonable time after Plaintiff discovered or should have discovered the breach of warranty.

38. Plaintiff Matthew Riley adopts and incorporates all allegations against these defendants raised in its original complaint and amended complaint, as if set forth more fully herein

### (b) The defendant United Rentals, Inc., contends that:

1. On August 28, 2003, Flavor House Products ("Flavor House") rented a Norton Model DM500 core drill machine from the Defendant, United Rentals Dothan Branch. The subject core drill machine was purchased new by United Rentals in March of 2003 from St. Gobian Abrasives, Inc. (Norton). According to the rental history the core drill machine was first rented out on April 10, 2003. The rental to Flavor House on August 23 was the l4th rental of the core drill machine. At the time of the accident, the equipment was approximately 4-l/2 to 5 months old. Including this occasion, it had been rented out only 14 times. The machine was delivered with the READY TO RENT tag attached to it and accompanied by the United Rentals General Safety document, Form 1524-000. Flavor House had rented core drill machines from the Dothan facility on five prior occasions between April 17, 2000 and June 30, 2003.

2. Mike Walters was the Flavor House third shift head shift mechanic and Riley's supervisor.

    Since Mr. Riley had never used a core drill before, he took care to make sure he knew how to use it by observing Walters, familiarizing himself with the machine, looking at all the different parts and looking at the various information on the drill. Mr. Riley believes he read the READY TO RENT tag that was attached to the machine. Mr. Riley was not sure if he read the warning labels on the machine. Mr. Riley did not read the operator's manual and did not ask anyone to see the operator's manual before using the machine. Mr. Riley checked the leveling screws, apparently believing they were anchor bolts, before leaving the maintenance shop to make sure they were screwed up enough to not hold the base off the floor. Regarding the machine description, Mr. Riley said it was in used condition but everything seemed to work properly on it. It appeared to be maintained. Mr. Riley observed that the vacuum pump was operating, the motor came on, it didn't make any funny noises, and the lever seemed to go up and down properly. Mr. Riley checked the gasket and it seemed to be in good shape.

3. Mike Walters drilled the first hole. Mr. Riley helped set up the machine for the first hole. They did not use the leveling screws on the base. Mr. Riley did not have any discussions with 'Walters about the proper use of the four leveling screws prior to operation of the core drill. Mr. Riley understood that the machine could go out of control and cause injury if the vacuum system didn't keep the base secure to the ground. While Walters was drilling the first hole, the base became dislodged and started spinning until Mr. Riley turned the switch off. They then checked the gasket, set the machine back up and Walters finished drilling the hole without incident while standing on the machine base. Mr. Riley positioned the core drill machine for the second hole under Walters' instruction. Mr. Riley checked the gasket before

drilling the second hole and did not see any cracks or tears. Walters left while he was drilling the second hole.

4. Mr. Riley knows the leveling screws were not touching the floor and that the machine was sitting on the gasket while he was drilling the second hole because there was a cushion-like play to it rather than something hard hitting the floor. While drilling the second hole, Mr. Riley heard the drill motor running and the vacuum pump running. It did not make any strange noise. Mr. Riley was applying pressure to the handle, lowering the drill and standing with one foot on the base when the bit lodged inside the hole, the base broke loose, and the whole unit began to spin around.

5. Mr. Walters was the third shift lead mechanic. He inspected the core drill before using it to make sure it was in proper operating condition. As best he could remember, Walters checked the gasket and the warning labels. Matthew Riley was with him in the maintenance shop when he inspected the core drill. Mr. Riley stated that he had never used a core drill before. Walters said that he took care and precautions to make sure that Mr. Riley understood how to properly use the core drill. Walters had used core drills probably a dozen times before. He felt that he knew how to use core drills sufficiently to instruct Mr. Riley. He told Riley that he would show him how to operate the core drill and drill the first hole. He did not consult the operator's manual before operating. Walters felt he had the knowledge that he could operate the core drill without the operator's manual because he had run it before. Walters did not look for an operator's manual because he didn't feel they needed it. Walters thought he had sufficient knowledge to operate it safely and efficiently based on previous usage.

6. Regarding the core bit he used, Walters inspected it before using it to make sure that it had

all of its teeth. He also inspected the bit while in use and saw that all of the teeth were intact. Kenneth Tew was the production superintendent and acting safety director for Flavor House Products at the time of the accident. He took photographs of the machine before it was disassembled in the maintenance shop. It was his understanding that the machine was picked up from the accident location and carried to the maintenance shop after the accident and that it was unaltered from the accident configuration when photographed. Mr. Tew looked at the core bit that was installed on the machine and could tell that it matched the hole that was drilled. He was also told, probably by Donald Cody, that the core bit on the machine, as depicted in his photographs, was the one used to drill the holes.

7. Walters set the machine up at the job site and used the leveling screws at the base to level the machine. Walters drilled the first of two holes which he estimated to be 2 To 2-1/2 inches deep. During the drilling of that hole, the vacuum came loose and the base spun around. Mr. Riley unplugged the machine from the wall to stop the machine from spinning. Walters then cleaned off and inspected the gasket, checked the core bit, set the machine back over the hole, releveled with leveling screws and continued to use the machine. The vacuum sealed back to the floor and, with Walters standing on the base, finished drilling the hole. Mr. Tew asked what kind of training Mr. Riley had and was informed that Mr. Riley had watched Walters use the machine and then Walters let Mr. Riley use it. Mr. Tew didn't think it was proper for Walters to leave Mr. Riley operating the core drill machine. He believed that Mr. Riley did not operate the machine properly. Mr. Riley did not have the machine properly anchored and Mr. Riley was standing on the base. According to both Mr. Riley and Walters, the vacuum pump was operational during their use of the core drilling machine. Walters

stated that he reviewed the READY-TO-RENT tag before using the equipment. The READY-TO-RENT tag includes the following information:

> "...I understand the correct operation and function of the controls and confirm that I have received adequate instruction, and acknowledge the safety sheet, to enable myself and./or my crew to use the equipment in a safe and proper manner without risk to injury."

8. Walters stated that he had seen the United Rentals General Safety Sheet (Form 1524-000) which provides that the operator must carefully read and follow any warnings, safety signs and instructions provided with, or located on, the equipment. The Safety Sheet provides:

(1) Only operate if you have been authorized and are trained in equipment's safe operation.

(2) Check with Rental Yard on correct operating procedures. Call if you have any questions!

(3) Always maintain total control of the equipment you are operating.

(4) DO NOT OPERATE DAMAGED OR FAULTY EQUTPMENT! CALL RENTAL LOCATION IMMEDIATLEY FOR REPLACEMENT. STOP USING UNTIL REPLACEMENT ARRIVES.

9. If the person receiving this handout will not be the user of the equipment, forward these instructions to the operator. If there is any doubt as to the operation or safety of the equipment, DO NOT USE!!!  CALL US IMMEDIATELY!!!  FAILURE TO FOLLOW THESE INSTRUCTIONS COULD RESULT IN INJURY OR DEATH.

10. Flavor House Products received a Rental Contract from United Rentals. The terms and conditions page of the contract contained the following language:

> **DISCLAIMER OF. WARRANTIES**: UNITED MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO THE MERCHANT ABILITY OF THE EQUIPMENT OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. THERE IS NO WARRANTY THAT THE EQUIPMENT IS SUITED FOR CUSTOMERS INTENDED USE, OR THAT IT IS FREE FROM DEFECTS. EXCEPT AS MAYBE SPECIFICALLY SET FORTH IN THIS RENTAL AGREEMENT, LINITED DISCLAIMS ALL OTHER WARRANTIES, EITHER ÐGRESS OR IMPLIED, MADE IN CONNECTION V/ITH THIS RENTAL TRANSACTION.

11. The first occasion of an unanticipated response from the equipment was as Mr. Walters was nearing completion of the first hole. At that time, the core bit reportedly jammed causing the machine to spin. Mr. Riley was present when this occurred and unplugged the power cord from the wall to stop the machine. Both Mr. Riley and Walters knew the machine was not supposed to operate like this and that it could create a danger if the base came loose. Mr. Riley understood before the accident that there was the potential for injury if the base came loose. Both acknowledged that the equipment, including the vacuum, appeared to be working normally. After the first spinning event, the machine was inspected, tested, and re-used. Riley is not sure if he saw the warning label on the machine that included the following information:

> "For your own safety, read and understand the operator's manual"
> "Failure to properly secure unit before drilling may cause serious injury."

12. Although this information was on the machine, Mr. Riley did not read or request an operator's manual.

13. The condition of the core drill machine was changed from the time of the accident during the morning of August 29, 2003. The machine was disassembled and no longer in the same condition when returned to United Rentals.

14. United Rentals adopts the contentions set out below by Saint-Gobain as if set out in full and United Rentals adopts and incorporates all defenses raised in its answer, amended answer, and second amended answer, as if set forth more fully herein.

**(c) The defendant Saint-Gobain Abrasives, Inc., contends:**

1. Saint-Gobain Abrasives, Inc., (hereinafter "Saint-Gobain"), denies all material allegations of Riley's complaint. Saint Gobain Abrasives has further pled several affirmative defenses to the Plaintiff's Complaint and his alleged damages.

2. Saint-Gobain Abrasives has pled the defenses of product misuse and contributory negligence. Saint-Gobain contends that Mr. Riley was aware of the dangers and hazards of using such products as the DM 500 core drill and failed to exercise reasonable care for his own safety at the time of the accident. The vacuum pump that secures the core drill to the surface lost suction while he and his supervisor, Mike Walters, were drilling the first of two holes. Saint-Gobain contends Mr. Riley knew or should have known that the drill malfunctioned after he and Mike Walters drilled the first hole; however, Riley continued to use the drill in violation of safety precautions and warnings by standing on the drill and by failing to secure the drill's base to the floor. Riley knew that the vacuum pump was not holding the base securely to the floor. He failed upon such notice to seek advice from this employer, failed to seek technical help from any defendant and failed to read and study warnings and the operator's manual. Riley failed to discontinue operation of the drill until he knew how to safely operate it. Riley also failed to connect the water supply to the drill and failed to use the leveling screws. At no time did Riley attempt to secure the drill to the floor using an accepted alternative method. Riley further failed to wear a hard hat and safety glasses. Riley's acts and omissions constituted a misuse of the drill and

13

contributory negligence. Riley's injuries were the proximate result of his negligence and product misuse,

    3.    Saint-Gobain has pled the defense of learned intermediary and sophisticated user and that Plaintiff's employer had a duty to warn him of hazards associated with his job environment. Flavor House (Riley's employer at the time of the incident made the basis of the Plaintiff's Complaint) was knowledgeable about the use and operation of machinery and equipment, including core drills such as the DM 500 core drill. Through its safety department and maintenance department, Flavor House had the knowledge and skill to train and educate employees such as Plaintiff on the proper and safe use of machinery and equipment such as the DM 500 core drill. Flavor House did not adequately train, educate and warn Plaintiff on the proper and safe use of the DM core drill. Flavor House failed to pass on important warnings about the core drill, including those warnings contained within the Operator's Manual, to Plaintiff. Flavor House's knowledge about machinery and equipment, its knowledge of safe work practices and duty to maintain a safe work place and to warn employees of hazards and the breach of its duties as an employer with respect to Plaintiff in this case breaks any causal connection between Saint-Gobain's failure to warn and/or inadequate warning and Plaintiff's injuries; or Plaintiff's employer's knowledge and sophistication of machinery, equipment and safe operation of such relieves Saint Gobain of its duty to warn.

    4.    Saint-Gobain contends that the evidence will show that the DM core drill was reasonably safe when used as intended, was merchantable and fit for its intended purpose. Saint-Gobain contends that the drill, as designed and manufactured, was not defective or unreasonably dangerous to use by Mr. Riley. Instead, Saint-Gobain contends that if properly operated the drill

is reasonably safe to operate. Saint-Gobain contends that Mr. Riley did not properly or safely operate the drill or operate it in a foreseeable manner. All of the warnings in the manual and on the drill advise against the continued operation of the drill if the base is not secure. As stated previously, vacuum pressure was lost while drilling the first holes, but Riley was permitted and did continue to drill the second hole knowing of this hazard and despite such warning. Saint-Gobain contends that there was no defect in the core drill, but that the core drill was not properly set up. Specifically, Mr. Riley and Mr. Walters did not use leveling screws attached to the machine to ensure that the drill was flush with the work area. Further, water was not supplied to the machine to ensure proper functioning of the machine. Saint-Gobain contends that these failures were the proximate cause of the incident. Saint-Gobain further contends that if the core drill had been properly set up and used then the incident would not have occurred.

    5. Saint-Gobain Abrasives further states that an economically feasible alternative design is not available and/or practical.

    6. The warnings and operating manual were reasonable and adequate to warn users of hazards associated with the drill and were non-defective.

    7. Saint-Gobain also contends that the Plaintiff's claims are barred by the doctrine of spoliation of evidence. Immediately following the incident involving Mr. Riley, employees and/or representatives of Flavor-House took apart the core drill to supposedly look for a shear pin. Saint-Gobain contends that this act constitutes spoliation of evidence that hindered or prevented Saint-Gobain from examining the core drill in its condition at the time of Mr. Riley's injury in order to determine the root cause of his injury. Saint-Gobain contends that Flavor-House knew or should of known of the importance of maintaining the drill in its post-accident condition, but chose to

disassemble and otherwise spoil the drill as evidence.

8. Saint-Gobain contends that the Plaintiff is not entitled to recover lost wages as part of his claimed damages in this case. Saint-Gobain contends that Mr. Riley passed a pre-employment drug screen before working at Flavor-House and that the incident occurred on the third day of his employment. Mr. Riley failed a post-accident drug screen. After returning to work from his injury with equal or increased wages, Mr. Riley again failed a random drug screen and was terminated for such failure. Saint-Gobain contends that because Mr. Riley returned to work with an equal or increased wage, but was terminated for cause, he can not claim lost wages as part of his claimed damages.

9. Saint-Gobain also claims that Riley has failed to join an indispensable party to this cause of action. Saint-Gobain did not manufacture or design the core drill involved in the incident. Instead, Saint-Gobain's liability is premised on the fact that it sold the core drill under its trade name. The core drill was manufactured and designed by Diamond Products and they are not a party to this cause of action. Saint-Gobain contends that Diamond Products is an indispensable party to this case and that such failure to include Diamond Products subjects Saint-Gobain to the possibility of a verdict that is "hollow" or otherwise fails to afford complete relief to all of the parties to this cause of action. (Saint-Gobain has filed a Motion to Consolidate an action filed against Diamond Products in the U.S. District Court, Middle District of Alabama).

10. Saint-Gobain claims a set off as to any settlement paid by a co-defendant, dismissed or not dismissed, paid or unpaid, as of this filing, to Plaintiff. Saint-Gobain sought and received leave of Court to file an Amended Answer claiming set-off. Saint-Gobain has learned that Plaintiff has entered into pro tanto settlements with two Defendants: Gast Manufacturing, Inc., and Milwaukee

16

Electric Tool Corporation. Saint-Gobain contends that it is entitled to a set-off under Alabama law from any judgment or verdict that may be entered in the Plaintiff's favor in the amount of those settlements.

11. Saint-Gobain adopts and incorporates by reference all defenses raised in its Answer, Amended Answer and Second Amended Answer, as if set forth more fully herein.

**(d) The Intervenor RalCorp Inc., contends:**

1. Intervenor adopts the contentions of the Plaintiff as set forth above.

2. Intervenor further contends that it has paid $96,332.10 in workers compensation benefits to Plaintiff ($73,424.73 in medical benefits and $22,907.37 in indemnity benefits).

3. Plaintiff and Defendants have been placed on notice of Intervenor's workers compensation subrogation lien and Intervenor's intention to pursue recovery of said lien pursuant to the formula set forth in Fitch v. Insurance Company of North America, 408 So.2d 1017; 1981 Ala.Civ.App LEXIS 1401.

It is ORDERED that:

(1) The jury selection and trial of this cause, which is to last two (2) weeks, are set for January 8, 2007, at 10:00 a.m., at the Federal Courthouse in Dothan, Alabama;

(1) The parties are to file their pre-trial briefs by January 3, 2007;

(2) Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk), three copies of the list of his or her exhibits;

(3) At least three days before trial, counsel are to contact the courtroom deputy clerk about the procedures for pre-marking all trial exhibits;

(4) Each party shall have available a sufficient number of copies of each photostatically reproducible exhibit for each of the jurors, opposing counsel, the courtroom deputy clerk, the law clerk, and the judge; and

(5) All understandings, agreements, and stipulations contained in this pretrial order shall be binding on all parties unless an objection is noted and filed with the court within seven (7) days from the date of this order.

DONE, this the 30th day of November, 2006.

    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE