**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MATTHEW RILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:  1:05cv994-T** |
| | ) | |
| **UNITED RENTALS (NORTH** | ) | |
| **AMERICA), Inc. et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' CONSOLIDATED MOTION IN LIMINE
(Including Daubert Challenges) AND
MEMORANDUM BRIEF IN SUPPORT THEREOF**

COMES NOW Plaintiff, by and through his attorneys of record, and file this Consolidated Motion in Limine:

### 1.  Payment of Medical Bills by Collateral Sources

The existence or amount of health, disability or other insurance payments, including worker's compensation payments compensating Plaintiff for any medical bills or other damages, constitutes a collateral source and is inadmissible. "The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor. Married to this substantive rule is an evidentiary rule that proscribes introduction of evidence of collateral benefits out of concern that such evidence might prejudice the jury." *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243-44 (5th Cir. 1994)(providing detailed description of public policy underlying collateral source rule).  Thus, the existence of health, disability or other insurance payments made to the Plaintiff or on behalf of the Plaintiff is independent of the tortfeasor and, therefore, is inadmissible.

2. **Evidence of, or Reference to, or Reliance on Any Records or Content of Records arising out of Matthew Riley's Treatment at Altacare and treatment provided by Dr. Roby Hicks, or Altacare staff, or Testimony from C. Andrew Robinson.**

Evidence of or reference to, or reliance upon any records or testimony arising out of Matthew Riley's treatment at Altacare, including, but not limited to any testimony from Psychiatrist Dr. Roby Hicks or staff working for Altacare, or C. Andrew Robinson, are protected by the Psychiatrist/patient privilege. Code of Alabama § 34-26-2 provides:

> For the purpose of this chapter, the confidential relations and communications between licensed psychologists, licensed psychiatrists, or licensed psychological technicians and their clients are placed upon the same basis as those provided by law between attorney and client, and nothing in this chapter shall be construed to require any such privileged communication to be disclosed.

Code of Alabama § 34-26-2 (1975).

Following Mathew Riley's injury on August 29th, 2003, he was required to attend a drug abuse program as a condition of his continued employment. The treatment was provided by Dr. Roby Hicks (psychiatrist) and staff and/or counselors working with Altacare in Dothan, Alabama. Plaintiff has specifically preserved the privilege during the discovery phase of this matter, with the agreement that discovery may be taken on the issue of marijuana impairment. A primary basis for Defendants; expert's opinion concerning whether Matthew Riley was impaired at the time of his injury as a result of marijuana use are the hearsay notes taken during Matthew Riley's treatment at Altacare (along with a positive urine drug screen for marijuana taken after the incident).

Any evidence utilized from Matthew Riley's Altacare treatment is protected by this privilege and Plaintiff specifically objects to any use of these records at trial. And Plaintiff specifically objects to any testimony relying upon this evidence in support of any

witnesses testimony, including but not limited to any opinion testimony presented under Rule 701, 702, or 703 of the Federal Rules of Evidence. Plaintiff hereby Moves this Honorable Court to prohibit any use of this evidence and any testimony relying upon such testimony.

### 3. Evidence of, or Reference to, the Results of any Drug Screens Reflecting the Presence of Marijuana or its Metabolites pertaining to Matthew Riley at Any Time, Whether Before or After Matthew Riley's Injuries.

The issue here is whether the defendants can meet their respective burdens of proof to show that positive qualitative urine drug screen for marijuana is relevant, i.e., that it shows that Mr. Riley was significantly impaired as a result of marijuana intoxication, and that this proposed "significant impairment" was the proximate cause of the incident. Defendants cannot meet this burden. Furthermore, any probative value of such evidence would be unfairly prejudicial to Plaintiff's prosecution of this action, and should be excluded pursuant to Rule 403, Fed. R. Evi.

Following Matthew Riley's incident in the early morning hours of August 29th, 2003, he underwent a urine drug screen (as required following a work related injury). The results of that test indicated the presence of a marijuana inactive metabolite in Mr. Riley's urine. Defendants assert that the presence of the marijuana metabolite in Mr. Riley's urine indicates that he was impaired as a result of marijuana intoxication and that any such impairment was a proximate cause of his injuries. See Robinson's deposition excerpts (Attachment 1) and Reports (Attachment 1a).

Defendants have not produced one witness to this incident that has indicated that Matthew Riley appeared in any way to be impaired at the time of this incident. In fact, to the contrary, each witness who has been asked has indicated just the opposite. (Further discussion below).

The positive drug screening test relied upon by the defendants is irrelevant and cannot be used as a basis standing alone, to support defendants' claim that Matthew Riley was impaired to any degree that contributed to cause this incident and his injuries.

Even defendants' proposed expert, C. Andrew Robinson agreed that the test was merely a qualitative test, not quantitative, that it did not tell anything about the amount of marijuana that was in Matthew Riley's blood at the time of the incident, that the test only indicates the presence of a marijuana metabolite in the urine, and that the drug screening test could be positive even if use was days or even weeks before the incident.  Robinson depo., p. 17.

**4.  Evidence of, or Opinion Testimony from C. Andrew Robinson, Defendants' Proposed Expert Witness Concerning the Results of Drug Screens or the Effects of Marijuana in purportedly Causing Matthew Riley's Injuries.**

C. Andrew Robinson's opinion testimony in this case should be excluded in its entirety since it fails to meet the requirements of Federal Rules of Evidence 701, 702 or 703, and the reliability standards as set out in *Daubert* and its progeny.

Rule 702 of the Federal Rules of Evidence, governing expert testimony, provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evi. 702.  In evaluating the admissible of evidence falling under the parameters of Rule 702 the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993).

The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific,* technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto.*" (Emphasis added.)   The subject of an expert's testimony must be "scientific ... knowledge."  The adjective "scientific" implies a grounding in the methods and procedures of science.   Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. *Daubert*, 509 U.S. 579, 589-590, 113 S. Ct. 2786, 2795.

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."   This condition goes primarily to relevance.   "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."   3 Weinstein & Berger ¶ 702[02], p. 702-18.   See also  *United States v. Downing,* 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration under Rule 702-and another aspect of relevancy-is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). *Daubert*, 509 U.S. 579, 589-590-91, 113 S. Ct. 2786, 2795-96.  Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. *Id.* @ 592.

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert*, 509 U.S. 579, 589-592-93.

      C. Andrew Robinson fails to meet the requirements of Rule 702, *Daubert* or its progeny to sufficiently establish that his opinions are reliable. It should first be noted that it is doubtful that Mr. Robinson possesses the qualifications to offer opinions about whether Matthew Riley was impaired due to marijuana at the time of the incident, or whether any purported impairment was a proximate cause of the incident. Robinson's qualifications to provide such opinions were woefully inadequate as presented in his CV and his testimony. See attached CV (Attachment 1b) and deposition excerpts (Attachment 1) below:

```
Page 112
18   Q.   All right.  What experience and training -- you
19        were asked questions about -- that the basis of
20        your opinion was in part your experience and
21        training.  What experience and training do you
22        have in the -- a determination of -- or that
23        provides you guidance in determining when

Page 113
1         someone is intoxicated with marijuana?
2    A.   Based on the medical literature.
3    Q.   Are you a medical doctor?
4    A.   No.
5    Q.   As a forensic toxicologist, in doing your job,
6         other than this type of consulting work, is it
7         part of your job to teach about marijuana
8         intoxication?
9    A.   No.
10   Q.   No.  Is it your job to do research in marijuana
11        intoxication?
12   A.   No.
13   Q.   Okay.  So other than reading medical
14        literature, that I assume you've provided us
15        with here today?
16   A.   You've been provided with it.
17   Q.   Other than reading that material for purposes
18        of forming the opinion that Matthew Riley was
19        impaired at the time of his incident, you don't
20        have any other experience and training
21        associated with making such a determination,
22        correct?
```

23    A.    I did not examine Matthew Riley, no.


Page 114
1    Q.    Okay.  Well, otherwise, experience and training
2          in any other situation?
3    A.    Other than just interpreting the drug data.
4    Q.    Interpreting the drug data.  Which we don't
5          have any data here today, do we?
6    A.    Well, you've got a positive urine drug test.
7    Q.    A screening test, but we don't have any
8          quantitative data, correct?
9    A.    That's correct.


Page 122
3    Q.    All right.  Have you told us everything about
4          your experience and training today that is in
5          any way related to forming opinions concerning
6          marijuana intoxication?
7    A.    I think so.
8    Q.    Okay.  And to the extent you've got experience
9          and training, you've told us about that here
10         today, correct?
11   A.    I think so.

(Robinson deposition Excerpts).

Robinson is not a medical doctor or medical toxicologist.  He primarily is involved in the evaluation of testing methodologies and the conduct of testing, both for drugs and alcohol.  He has little if any expertise concerning the impairing effects of marijuana at any given degree of exposure.

Aside from his apparent lack of professional qualifications, the methodology and basis for Robinson's opinions in this case is strikingly inadequate.  Robinsons has no basis to conclude that Mr. Riley was impaired from marijuana use at the time of the incident.

Robinson provided two reports.  The first was provided on August 30th, 2006.  He provided a modified report on November 29th, 2006.  Both are attached (Attachment 1a).  The modified report changed the relevant date Robinson believes Matthew Riley used marijuana.  Otherwise the reports were identical.

In both reports, Robinson concludes that "could have" caused Mr. Riley to be impaired and "could have" contributed to cause the incident. Yet, during his deposition, hours after he prepared his amended report of November 29th, Robinson changed his third opinion to conclude that marijuana "did" cause Matthew Riley to be impaired and did "cause" the incident. Robinson depo., pp. 57, 59.

Robinson admitted that he had no way of knowing how impaired Matthew Riley when he was injured:

```
Page  110
  17   Q.    Doctor Robinson, how impaired was Matthew Riley
  18         at the time of his incident?
  19   A.    He had marijuana in his system.
  20   Q.    That's all you know, correct?
  21   A.    Correct.
  22   Q.    That is all you know is that he tested positive
  23         for marijuana; is that correct?

Page  111
   1   A.    That is correct.
   2   Q.    And on a screening test, correct?
   3   A.    Correct.
   4   Q.    And you don't know what degree -- what blood
   5         levels that represented, correct?
   6   A.    Correct.
   7   Q.    It represented something above or at the level
   8         at which the screening test would test
   9         positive, correct?
  10   A.    Correct.
```

Robinson deposition excerpts.

Robinson testified that the only basis for his opinion that Matthew Riley would have been experiencing the effect of marijuana at the time of the incident if he used it within 24 hours of the incident was the articles he reviewed, identified collectively as Exhibit 6 to his deposition. (See Attachment 2).

Exhibit 6 to Robinson's deposition consists of two items he pulled from an Internet search on November 16, 2006, that are of dubious reliability at best. He also pulled one single

article from the Internet that purports to come from the Schaffer Library of Drug Policy. This article purports to be a study conducted in the Netherlands, and pertains to "Marijuana's Effects on Actual Driving Performance." No date of the article is provided. In any event, Robinson proclaims that these three references are his only support for his conclusion that Mr. Riley could have been impaired (and later proclaimed that he was impaired) at the time of the incident, and that this impairment could have (and later proclaimed did) contribute to cause the incident, if he used marijuana within 24 hours of the incident.

A closer look at his supporting documentation would seem to indicate otherwise. The first item he cites as support is a National Institute on Drug Abuse Internet page from what is called NIDA Notes. The title of the article is "Marijuana Impairs Driving-Related Skills and Workplace Performance." No where in the article does it indicate that a person would be impaired from the use of marijuana 24 hours after use, or even 6 hours after use. In fact, the study that discussed in the article involved the testing of participants twenty minutes after smoking marijuana cigarettes. After smoking two marijuana cigarettes and being tested 20 minutes later, the subjects were found to have significance impairment on some of the test protocols. There is no indication in the article how long the impairment would last or at what doses the impairment occurred (other than the fact that two marijuana cigarettes were used by each). In no way does this article support Robinson's opinion that use within 24 hours conclusively indicates that Mr. Riley was significantly impaired or that the incident was caused by any such impairment. The only conclusion reached from the referenced study was that the observed impairment "may be related to reported marijuana-induced impairment of automobile driving."

The second Internet article cited by Robinson as support for his opinion is a totally non-peer reviewed hearsay page that appears to come from a question/answer section of

"About.com." The question, "How does Marijuana Affect Driving?" Without quoting any authoritative source, the site proclaims that the harmful effects of marijuana "can last up to 24 hours after smoking marijuana." What does this mean? What are the parameters? Effects "can" last up to 24 hours? Under what circumstances? What dose? What effects? And, what degree of impairment? This purely, unsubstantiated, unscientific, pure hearsay page simply does not provide any background information to answer any questions. Certainly, the information contained in this site is not the sort of information that is relied upon by experts in the field of toxicology. And it provides no relevant useful information on the issue of whether Matthew Riley was injured as a result of marijuana intoxication.

The final source cited by Robinson in support of his opinion is purportedly from the Schaffer Library of Drug Policy, entitled "Marijuana's Effects on Actual Driving Performance." This source actually provides data from three separate Netherlands driving studies. The date of the studies is not provided, but the article "describes the results of a research program that was set up to determine the dose-response relationship between marijuana and objectively and subjectively measured aspects of real world driving; and to determine whether it is possible to correlate driving performance impairment with plasma concentrations of the drug or a metabolite." In the first study, doses of 100 ug/kg, 200 ug/kg and 300 ug/kg were given to test subjects, then the subjects were tested 30-90 minutes later. Significant effects as compared to the placebo group were seen only over a two hour period as compared to the placebo group.

In the second study, the same doses of marijuana were given, and 45 minutes after smoking, the subjects began driving tests. Significant effects were seen in only the higher dose category of subjects, i.e.,300 ug/kg.

The third study involved combining a 100 ug/kg dose of marijuana with alcohol at a dose to yield a .05 g% of blood alcohol. Obviously, that study is not relevant to the issues in this case.

Importantly, no where in this article does the length of time effects can be seen after marijuana use, other than the times indicated for each study. And in each study, the effects measured, if any, were detected within an hour to 90 minutes after use of the marijuana. Simply put, this article, cited by Robinson as support for his opinion that if Matthew Riley used marijuana within 24 hours of the incident, he was impaired to the extent that the accident was caused by the impairment, does not provide any support for Robinson's conclusion.

Importantly, this set of studies was utilizing **quantitative** data to support the conclusions. We have no such quantification here. If anything, this study indicates that nothing can be stated about the impairment level of an individual from a drug testing standpoint alone, without quantification of the blood levels. Robinson confirmed that he relied solely on these articles to support his impairment opinion.

Robinson's qualitative urine detection test, that serves as the sole basis for his opinion that Matthew Riley was impaired at the time of the incident, can detect trace amounts of marijuana for up to 21 days after use, even according to Robinson. The test is for an inactive metabolite as well. Robinson has provided no indication or correlation between the inactive metabolite in Mr. Riley's urine (that has no impairment affects) and the active component of marijuana that might have been in Mr. Riley's blood. Robinson depo., pp. 15-16.

Furthermore, Robinson admits that he has no evidence to establish accurately when Matthew Riley purportedly used marijuana before this incident. Robinson merely assumes it was within 24 hours of the incident. Yet the only basis for Robinson's conclusion that Matthew Riley used marijuana anytime in the 24 hours before the incident (he initially assumes in the late hours of August 28th, and later recants) are the hearsay notes taken by Altacare personnel weeks after the incident wherein Matthew Riley indicates that he used marijuana the one to two days before the incident, and that he had not used marijuana since the accident on August 29th. None of the

statements indicate that Mr. Riley used marijuana any earlier (if then) than 8-10 hours before the incident.

As previously stated, Robinson admits that no quantification of the amount of marijuana in Matthew Riley's system is available in this case to establish any potential for Matthew Riley's impairment. The qualitative test merely indicates that a non-active metabolite of marijuana was found in Matthew Riley's urine. Without such quantification, or other reliable eyewitness testimony, reliable opinions concerning any impairment cannot be established.

Plaintiff's expert, Dr. Kevin Merigian is a medical toxicologist who has provided the Plaintiff with a rebuttal report to Robinson's report and opinions. Dr. Merigian addressed the problem surrounding the absence of any quantification of marijuana. Dr. Merigian is board certified in Emergency Medicine, Medical Toxicology, Clinical Pharmacology, Forensic Medicine and Geriatrics. He has been a licensed medical doctor since 1983, and holds medical licenses in Ohio and Tennessee. A copy of his CV and Report is attached as (Attachment 3).

Dr. Merigian has reviewed all of the material that was provided to Robinson. It is undisputed that a positive drug screen was documented for marijuana after the incident on the morning of August 29th, 2003. According to Dr. Merigian, this qualitative test alone is insufficient to establish any degree of impairment associated with marijuana. "Dr. Sherrer did not provide quantitation associated with the report of a positive cannabinoid. Without quantitation, one cannot fully assess the possibility of impairment at the time of the accident. There are no scientifically accepted impairment nomograms associated with marijuana use." Dr. Merigian concluded that based upon his review of the material, including medical records indicating that, immediately after the incident, Mr. Riley's mental functions were normal with no indications of impairment, Matthew Riley was not impaired at the time of the accident.

Dr. Roby Hicks, a psychiatrist who provided treatment to Mr. Riley also provided

testimony (under reservation of privilege rights) on the efficacy of using a drug screen without

more to support any opinion concerning impairment.  See Hick's deposition excerpts attached as

(Attachment 4).

```
Page 50
14   Q.    Okay.  Does the fact that there was a positive
15         drug screen indicate that the individual that
16         tested positive was impaired to any certain
17         degree as a result of marijuana?
18   A.    No, sir.
```

(Roby Hicks deposition excerpt attachment 4).

As admitted by Robinson, without other independent evidence of impairment, such as eye

witness testimony indicating impairment, a qualitative positive drug screen result in inadequate

to make any determination of the degree of impairment or the significance of impairment.  And

not a single witness who has testified has indicated that Matthew Riley was in any way impaired

prior to this incident.  To the contrary, each witness asked has indicated that Matthew Riley was

not impaired and appeared to know what he was doing.  For example, James Mason, an

employee of Flavor House, indicated that Matthew Riley did not appear to be impaired in any

way prior to the incident.  Mason depo., pp. 89-90 (Attachment 5).  Likewise, Aaron Myers,

another employee working close by Matthew at the time of the incident indicated that Matthew

Riley appeared to him to know what he was doing prior to the incident.  He did not testify to any

signs of impairment.  Myers depo., pp. 91-92 (Attachment 6).

Mr. Robinson could not state what the minimum amount of active marijuana in the blood

would be expected to provide a significant impairment.  Robinson depo., p. 39.  In fact, Robinson

opined, without any supporting documentation or basis, that if any amount of marijuana is found

in a person's system, he would consider the person impaired, although he could not state any

degree of impairment of state whether it would be significant impairment.  Robinson depo., pp. 40, 41.

Furthermore, Robinson indicates that he cannot state whether Matthew Riley was "significantly" impaired as a result of marijuana at the time of the incident, or whether the incident would have occurred, but for the presence of the metabolite in Matthew Riley's urine. Mr. Robinson indicated that he does not have any information from any source at all that Matthew Riley was significantly impaired from marijuana at the time of this accident.  Robinson depo., p. 42.

When questioned about other cases Mr. Robinson had provided opinions concerning the effects of marijuana, he could not name one where he testified that an individual was impaired without having either supporting "quantitative" testing support, or witness testimony that would indicate obvious impairment.  (See attached Robinson deposition excerpts Attachment 1).

Finally, Robinson definitively admits that he cannot say that if Matthew Riley hadn't smoked marijuana the day of the incident, the accident would not have occurred.  Robinson depo., p. 67.  If Mr. Robinson cannot state that, but for, Matthew Riley's purported marijuana use the day of the incident, the accident would not have occurred, how can Robinson opine that Matthew Riley's purported impairment was the proximate cause of the accident?  Obviously, Robinson's opinion lacks any substance whatsoever and should not be admitted.

The admission into evidence the fact of a bare positive result for the trace presence of a marijuana inactive metabolite is highly inflammatory evidence that lacks sufficient probative value to justify its admission.  Fed. R. Evi. 403.  The evidence has little if any probative value to the issue of whether Matthew Riley was impaired at all, much less whether any such impairment contributed to cause the incident.

Defendants have failed to meet their burden to establish that the evidence is relevant, much less reliable. The evidence and support relied upon by Robinson does not even come close to supporting Robinson's bare opinion testimony concerning Mr. Riley's purported marijuana induced impairment, and any purported impairment's impact in causing this incident. Robinson's opinion is unreliable, unsupported by any reliable basis and should be inadmissible.

5. **Evidence of, or Reference to, Whether Saint Gobain was the Designer or Manufacturer of the Product in Question.**

Plaintiff brings this action on the basis of the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). In order to establish liability under the AEMLD, the Plaintiff must show:

(1) he suffered injury or damages to himself [...] by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Halsey v. A.B. Chance Company*, 695 So. 2d 607, 608 (Ala. 1997). "A defective product is one that is unreasonably dangerous, i.e., one that is not fit for its intended purpose or that does not meet the reasonable expectations of the parties." *Beam v. Tramco, Inc.*, 655 So. 2d 979, 981 (Ala. 1995). Whether a product is defective is a question for the jury. *Casrell v. Altec Industries, Inc.*, 335 So. 2d 128, 133 (Ala. 1976).

In this case, it is undisputed that Saint-Gobain (Norton) "sold" the product in question to United Rentals. It is also undisputed that Saint-Gobain, was in the business of selling the product (Norton core drill) and that the core drill reached the user (Matthew Riley) without substantial change in the condition in which it was sold. The only issue to be decided by the jury

15

is whether the product was defective with regards to Saint-Gobain's liability under AEMLD. Consequently, any evidence concerning whether Saint-Gobain, Inc., or any of its dba's or subsidiaries, designed or manufactured the product is irrelevant to the issues in this action and should not be admitted into evidence. To allow the admission of such evidence will only serve to confuse the jury and will unfairly prejudice Plaintiff in the prosecution of this action in violation of Rule 403 of the Federal Rules of Evidence.

**6.  Evidence of, or Reference to, Whether Personal Injury Recovery is Taxable.**

During the trial the Defendants may attempt by direct statement or by implication to the jury that a personal injury recovery is not taxable. For example, the Defendants may attempt to imply this fact when cross-examining Plaintiff, possibly by emphasizing the distinction between gross and net pay. In addition, the defendants may make reference to the fact that a personal injury recovery is not taxable in closing argument. Such evidence, whether direct or implied, as well as any argument on the matter is improper under state and federal law because it is irrelevant.

In *Croce v. Bromley*, the Fifth Circuit Court of Appeals held that where federal concerns are lacking, state law controls the issue of damages and the admissibility of tax-exempt status on personal injury awards. 620 F.2d 1084, 1097 (5th Cir. 1980). Because the instant action is a products liability action predicated on state law, the instant action does not implicate federal concerns. *See Port Terminal R. R. Ass'n v. Richardson*, 808 S.W.2d 501, 511 (Tex. App.-Hous. (14th Dist.)) 1991. Under Texas law, the fact "that damage awards are not subject to federal income taxation" is "an immaterial collateral matter." Accordingly, any reference, argument or instruction on the applicability of taxation is irrelevant and should not be permitted.

**7.  Evidence of, or Reference to, When Plaintiff First Contacted Counsel and his Reasons for Contacting Counsel.**

Defendants may attempt to introduce evidence or make reference to the timing of and/or reasons for contacting a lawyer. Federal Rule of Evidence 401 dictates that all evidence must bear a direct relationship to a fact of consequence to the determination of the action before it may be deemed admissible. Given the limited issues involved in the present action, any evidence or argument regarding the time or circumstances under which Plaintiff employed his present attorney is irrelevant and inadmissible. Similarly, any contract or retainer agreement addressing the nature of pay to Plaintiff's counsel—i.e., contingency—is also lacking in any relevance. The probative value, if any, of such argument or evidence is substantially outweighed by the danger of unfair prejudice to Plaintiff under Federal Rule of Evidence 403.

### 8. Evidence of, or Reference to, Objections Made to Discovery.

Plaintiff anticipates that the defendants may make reference to or attempt to convey to the jury that Plaintiff has from time to time objected to requested discovery by the defendants. Plaintiff has exercised his rights under the Federal Rules of Civil Procedure, and the Defendants are not entitled to draw any adverse inferences before the jury or present the jury evidence of objections to discovery in an attempt to convey any adverse inferences by the exercise of rights under the federal rules. Were that to be allowed, Plaintiff would be penalized for exercising the rights of objecting to improper discovery.

Whether or not Plaintiff objected to the discovery requests of Defendants does not make the existence of any fact that is of consequence to the determination of this action more probable or less probable than it would be without the evidence. Therefore, it is irrelevant and inadmissible. Fed. R. Evid. 401. Moreover, such evidence or argument would be unfairly prejudicial, confuse the issues, and mislead the jury, and, therefore, should be excluded on those grounds. Fed. R. Evid. 403.

9. **Evidence of, or Reference to, Any Opinions of Defendant Saint-Gobain's Expert Gabe Uriegas concerning the cause of this incident.**

Defendants have identified Gabe Uriegas as an expert expected to testify at the trial of this action. It is anticipated that Mr. Uriegas will offer opinions concerning the cause of this accident. However, it is clear from his deposition testimony that Mr. Uriegas lacks the expertise and basis to offer such opinions. Mr. Uriegas could not provide a reasonable basis for his opinions as set out in his report and as testified to during deposition. He cannot qualify as an expert on the issues he addressed in his written opinion, nor can he provide an adequate basis to support his bald opinions. Consequently, Mr. Uriegas fails to meet the requirements of Rule 701, 702 or 703 of the Federal Rules of Evidence and the requirements of *Daubert* and its progeny. Furthermore, Mr. Uriegas should be prohibited from testifying in this matter at all, and certainly should not be allowed to offer opinion testimony concerning the cause of the incident or any comparisons of risks or comparative risk analysis concerning core drills of the subject core drill design and other core drill designs or other products. Generally, federal courts addressing this issue have found any probative value of such comparisons to be substantially outweighed by the risk of introducing extraneous issues and confusing the jury.

For example, in *City of Greenville v. W.R. Grace & Co.*, the Fourth Circuit Court of Appeals upheld the trial court's decision to exclude evidence comparing the miniscule risk posed by the low levels of asbestos at the Greenville City Hall with evidence of risks posed by other products more familiar to the jury, such as peanut butter and diet soft drinks. 827 F.2d 975, 981 (4th Cir. 1987). The purported purpose of the proffered evidence was to put the risks associated with the exposure to low levels of asbestos into a perspective that the jury could understand. *Id.* The district court concluded (and the appellate court affirmed) that, pursuant to Federal Rule of Evidence 403, the probative value of comparing the risks was substantially outweighed by the

risk of juror confusion and undue delay. *Id.* Similarly, a Georgia District Court excluded the comparative risk assessment of a statistician. Again, the asbestos defendant sought to offer testimony through its expert of comparative risks of eating peanut butter or drinking soft drinks. *Corporation of Mercer University v. National Gypsum Co.*, 1986 WL 12445 (M.D. Ga. 1986). And, again, the district court found any probative value to be substantially outweighed by the risk of confusing the jury and unduly delaying the trial. *Id.*

A New Jersey District Court questioned not only the prejudicial nature of comparative risks assessments but also the actual relevance of such assessments. *Hulmes v. Honda Motor Co., Ltd.*, 960 F. Supp. 844, 864 (D.N.J. 1997). Wryly observing that there "there is some degree of risk of any unhappy outcome with almost every human endeavor," the *Hulmes* Court generally excluded evidence of comparative risks of ATV riding, snow mobiling or bungee jumping on the basis that such evidence was irrelevant. *Id.*; see also *Laing v. American Honda Motor Co., Inc.*, 628 So. 2d 196 (La. App. 2 Cir. 1993)(excluding evidence of expert comparing risks of riding an all-terrain vehicle with risks encountered in other recreational activities such as snowmobiling, skate-boarding, and parachuting because such evidence would "only serve to confuse the jury, introduce extraneous, arcane and abstruse issues into the trial and needlessly prolong the presentation of evidence in a case which is already promising to be quite tedious and lengthy.").

Aside from any hearsay issues related to Mr. Uriegas' comparative risks assessment, the probative value of such testimony is questionable while the danger of confusing the jury and unnecessarily delaying the trial with irrelevant testimony is substantial. See attached Uriegas' report (Attachment 7) and deposition (Attachment 7a).

**10. Evidence of, or Reference to, the Absence or Limited Number of Vacuum Securing System Failure Injuries.**

Defendant will likely argue that because it has no reports of injuries from the use of the core drill, the product is not dangerous or defective. Evidence referencing or insinuating an "absence" of prior accidents or a comparatively small and/or inconsequential history of accidents during the hours of operation should not be permitted because: (1) United Rentals and/or Saint Gobain cannot satisfy the foundational requirements necessary for the admission of such evidence and (2) such evidence would be highly prejudicial to Plaintiff and mislead the jury.

The Third Circuit Court of Appeals recently summarized the analytical framework federal courts should apply in determining whether to admit evidence of an absence of prior accidents. *Forrest v. Beloit Corp.*, 424 F.3d 344 (3rd Cir. 2005). Noting that the admissibility of such evidence is governed by federal law, the court observed that:

> the admissibility of such evidence turns on the facts and circumstances of each case. Testimony concerning an alleged absence of prior accidents will usually satisfy the relevance threshold established by Rule 402. Such testimony, however, by its very nature, raises significant concerns regarding unfair prejudice to the plaintiff, and these concerns are heightened in product liability cases . . . District courts are required under Rule 403 to balance the probative value of such evidence against its likely prejudicial effect, but the evidence may not be excluded unless the unfair prejudice created by admitting the evidence would substantially outweigh its probative value. In an effort to ascertain probative value and minimize undue prejudice, other courts considering such evidence have consistently insisted that the offering party lay a proper foundation. In most cases the required foundation has involved three elements: (a) *similarity*--the defendant must show that the proffered testimony relates to substantially identical products used in similar circumstances; (b) *breadth*--the defendant must provide the court with information concerning the number of prior units sold and the extent of prior use; and (c) *awareness*--the defendant must show that it would likely have known of prior accidents had they occurred.

*Id.* at 358.

In this case, the defendants cannot meet the foundational requirements required to demonstrate that the absence of accidents occurred under conditions substantially similar to those in this case. Nor can the defendant lay an appropriate foundation proving that the purported

absence of reports of injuries is indicative of the lack of failure of the vacuum securing system or injury resulting from such failure.

Plaintiff has no way of obtaining evidence of near-misses or fortuitous escapes—all events that would be highly probative of the existence of a danger, and thus of the existence of a defect. *See Forrest*, 424 F.3d at 357. Such evidence is extremely difficult, if not impossible, to obtain, if for no other reason than that a user who has fortuitously escaped injury is unlikely to report a near-injury to the defendants.

To permit the defendants to introduce testimony concerning an alleged absence of prior accidents will create a misleading impression as to whether the defect exists, due to the potential inaccessibility of contrary probative evidence that would cast doubt upon the product's safety. It would be patently unfair and extremely prejudicial to allow defendants to argue that the absence of reported injuries is a basis for concluding that the vacuum securing system is not defective. Allowing evidence of the absence of reported injuries would only confuse and mislead the jury. More importantly, such evidence would not tend to prove that other consumers had not experienced vacuum securing failures or near misses while using Defendant's product. As such, Defendant should be precluded from offering any evidence of absence of similar occurrences or statistical extrapolations.

## 11. Evidence of, or Reference to, the Corporate History of United Rentals (North America), Inc. or Saint Gobain, Inc.

The defendants may attempt to introduce evidence concerning the corporation's history, its community service, contributions to society or the local community, or the amount of jobs provided within the community and throughout the United States.

Any reference to such information would be solely an effort to garner and elicit sympathy from the jury. This type of evidence has no probative value and is irrelevant to the issues before

the Court and jury.  It would be unfairly prejudicial to the Plaintiff, confuse the issue and mislead the jury.  Accordingly, such evidence should be excluded from the trial of this matter.  Fed. R. Evid. 403.

**12. Any Evidence, Testimony or Argument Stating, Suggesting or Implying the Effect Any Potential Recovery by Plaintiff Might Have Upon Insurance Rates, Premiums, Insurability, or Costs to Consumers.**

Federal Rule of Evidence 401 dictates that all evidence must bear a direct relationship to a fact of consequence to the determination of the action before it may be deemed admissible.  Given the limited issues involved in the present action, any evidence or argument regarding the potential effect a recovery by Plaintiff may have upon insurance rates (either generally or as particularly applied to the parties in this case) is irrelevant and inadmissible.  Additionally, the probative value, if any, of such argument or evidence is substantially outweighed by the danger of unfair prejudice to Plaintiff under Federal Rule of Evidence 403.

**13. Written Expert Witness Reports Prepared by Defense Experts in this Action as Direct Evidence in this Matter.**

The written expert reports are inherently hearsay pursuant to the Federal Rules of Evidence 801 and are inadmissible pursuant to Rule 802.  These reports constitute an out-of-court written statement by the proposed witness that would only be offered by Defendants as direct evidence at trial to prove the truth of the matter asserted.  The written reports fall outside of any exceptions or exclusions found in Rules, 801, 803 and/or 804.  Additionally, these written reports contain numerous double hearsay statement references and opinions that are in and of themselves hearsay.  Consequently, Plaintiff request this Court to issue an Order preventing the admission of any of these expert witness written reports as direct evidence at the trial of this matter.

**14. Testimony or Argument Suggesting Jurors Recreate Accident or Perform Testing on Product Outside the Supervision of the Court.**

Plaintiff expects that during closing arguments defendants will exhort the jurors to test the product for themselves once they are in the jury room and to recreate the circumstances of the accident. Plaintiff requests all counsel be prohibited from making such argument as it may confuse the jury and/or contradict the Court's instructions not to perform outside experiments or testing and to treat such experiments and/or testing as evidence. *See* 3 FED. JURY PRAC. & INSTR. § 101.11 (5TH ED.)*(*preliminary charge cautioning jurors not to "do any research, such as checking dictionaries, or make any investigation about the case on your own").

**WHEREFORE**, Plaintiff respectfully requests the Court to instruct Defendant (witnesses and counsel) not to mention, refer to, interrogate concerning, voluntarily answer, or attempt to convey before the jury, at any time during these proceedings in any manner either directly or indirectly, the subject matters listed above, and further, to instruct the Defendant (witnesses and counsel) not to make any reference or inference to the fact that this Motion has been filed, argued, or ruled upon by the Court, and further, that counsel be instructed to warn and caution each and every witness appearing in their phase of this litigation to strictly comply with the ruling of this Court.

**ALTERNATIVELY**, Plaintiff respectfully requests the Court to instruct the defendants (witnesses and counsel) not to mention, refer to, interrogate concerning, voluntarily answer, or attempt to convey before the jury, at any time during these proceedings in any manner either directly or indirectly, the subject matters as listed above **without first informing the Court outside the presence and hearing of the jury,** and further, to instruct the Defendant (witnesses and counsel) not to make any reference or inference to the fact that this Motion has been filed, argued, or ruled upon by the Court, and further, that counsel be instructed to warn and caution

each and every witness appearing in their phase of this litigation to strictly comply with the ruling of this Court.

**RESPECTFULLY SUBMITTED** this 26th, day of December, 2006.

**COCHRAN, CHERRY, GIVENS,
SMITH, LANE & TAYLOR, P.C.**


/s/ Joseph D. Lane
**JOSEPH D. LANE (lane9991)**
Alabama Bar No. 118498
163 W. Main Street
Post Office Box 927
Dothan, Alabama  36302
(334) 793-1555
(334) 793-8280 (facsimile)
Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon all counsel of record in this cause by emailing a copy to each recipients email address on file and by placing a copy of the same in the United States mail, postage pre-paid, addressed as follows, on this the 26th day of December, 2006:

C. Winston Sheehan, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, Alabama  36102-2148

Robert H. Sprain, Jr., Esq.
Sprain & Shires, P.C.
1707 29th Court South
Homewood, Alabama 35209

Joseph T. Brasher, Esq.
Hamilton, Westby, Antonowich & Anderson
One Georgia Center

17th Floor
600 W. Peachtree Street, N.W.
Atlanta, Georgia 30308

/s/ Joseph D. Lane
**OF COUNSEL**