# ATTACHMENT  1

[1]

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

          Plaintiff,

Vs.                                    CIVIL ACTION NO.

                                       1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

          Defendants.



          DEPOSITION OF C. ANDREW ROBINSON, taken

pursuant to notice and stipulation on behalf of the

Plaintiff, in Room P230, West Pavilion, UAB

Department of Pathology, 619 South 19th Street,

Birmingham, Alabama, before Ricky L. Tyler, Certified

Court Reporter and Notary Public in and for the State

of Alabama at Large, on Thursday, November 30th,

2006, commencing at 10:05 A.M.

**Robinson Deposition Excerpts:**

6

14  BY MR. LANE:
15  Q.    Would you state your name, please?
16  A.    C. Andrew Robinson.
17  Q.    You are a Ph.D?
18  A.    That is correct.

7

4  Q.    Let me show you what I've marked as Plaintiff's
5        Exhibit Number 1, Doctor Robinson, and ask you
6        to identify that document for me, please?
7  A.    Yes.  This is a report I wrote up actually the
8        first time in August and then reissued it again
9        the 29th.

7

19  Q.    And basically my question is, has the substance
20        of your report changed since your August
21        30th --
22  A.    The substance hasn't.  I was unsure as to the
23        last day that Mr. Riley had smoked marijuana,

8

1        whether it was late hours of the 28th of August
2        2003 or early hours of the 29th.  And from
3        reviewing the records a second time, it looked
4        like it was probably closer to the late hours
5        of the 28th of August, so I changed that date
6        in this second report.
7  Q.    Okay.  That's the only change in the substance
8        of your report?
9  A.    Correct.
10  Q.    Now, what is the basis of you saying that
11        Mr. Riley smoked marijuana on the late hours of
12        August the 28th?
13  A.    Well, he admits to smoking marijuana in his
14        AltaCare notes on the day prior to his

15    accident.

8

16  Q.   Can you find the notations that you're
17       referring to for me, please?
18  A.   Yes, I can.  Here's one, it says -- it states
19       here he was injured -- "27-year-old single
20       white male failed a drug specimen at work on
21       8/29/03.  He was injured in an accident and the
22       urine drug screen was done as part of that
23       procedure.  His screen showed positive for

9

1        marijuana.  Matt reports that he had been using
2        marijuana periodically to help him sleep.  He
3        had recently changed shifts and was having
4        difficulty sleeping.  Denies any other drugs.
5        Moderate alcohol intake.  Has been prescribed
6        Percoset and Darvocet for the pain resulting
7        from his injuries.  He had two facial surgeries
8        in the past.  He denies misusing the pain meds.
9        Denies depression.  Appears compliant and
10       motivated for treatment.  Stated he has not
11       used marijuana since the accident on 8/29."
12  Q.   Okay.  What I'm going to do is mark this
13       separate, Doctor Robinson, --
14  A.   Okay.
15  Q.   -- as Plaintiff's Exhibit Number 2.
16            (Plaintiff's Exhibit 2 marked
17            for identification.)

10

4   Q.   Okay.
5   A.   And here in another note by Bailey or Brantley
6        it says he was given a drug screen after a
7        work-related accident 8/29.  "He denied using
8        the day of the accident, but admitted use one
9        to two days prior."

10  Q.    I'm going to mark that one Plaintiff's Exhibit
11         Number 3 to your deposition.
12                (Plaintiff's Exhibit 3 marked
13                for identification.)
14  A.    Here it states he was given a urine drug test.
15         He stated "recently started working third shift
16         and was having trouble sleeping during the day
17         so he used marijuana or MJ to relax.  He claims
18         to have used when he was in early 20's, but had
19         only recently begun to use again.  His
20         workplace does not do drug screens so he
21         thought he would not be caught."
22              And there was another notation, I believe,
23         by Deborah Kirkland on the 6th which he states


                              11
1         he used the day before, but I can't find it.
2   Q.    I'm marking that last one you referenced, which
3         was signed by Deborah Kirkland on October the
4         6th as Plaintiff's Exhibit Number 4.
5                (Plaintiff's Exhibit 4 marked
6                for identification.)


                              11
7   Q.    Was it another form like that, is that what
8         you're referring to?
9   A.    Yeah, it was some of Deborah Kirkland's notes.
10  Q.    Take your time.
11  A.    You know, it's in one of these blurbs where
12         they're questioning him about his drug use.
13         It's in here.  I can't lay my hands on it right
14         now, but I assure you it's in here.
15  Q.    Well, if you need to review back over this, I
16         want to find every reference that you're
17         referring to that supports your --
18  A.    But, you know, that was my conclusion, that he
19         used marijuana within the last 24 hours prior
20         to his accident.

11

21  Q.   Okay.  Well, let me make sure I'm clear on
22       this.  And go ahead and get your papers
23       organized there.  As I understood your initial

12

1       statement, you said that Mr. Riley used
2       marijuana the late evening of August the 28th
3       or early morning of August 29th; is that
4       correct?
5   A.   Within the last -- within 24 hours prior to his
6       accident.
7   Q.   Okay.  Well, maybe I misunderstood what your
8       initial statement was.
9   A.   I said I didn't know when, but it could have
10      been late evening or early morning, but it was
11      -- based on these notes, it was within the last
12      24 hours.
13  Q.   What time did his -- well, let's make sure now.
14      We've got some conflicting notes here.  We've
15      got one that says he didn't use the day of the
16      accident, but may have one to two days before;
17      did you see that one?
18  A.   I saw that.
19  Q.   Okay.  So we've got that one -- we've got one
20      saying that and then we've got one or two
21      saying that he used it for sleep, to get sleep,
22      because he was having trouble getting to sleep
23      because of the shift change, correct?

13

1   A.   Correct.
2   Q.   All right.  Am I misstating anything that's
3       been said and the substance of what's been said
4       in the notes you flagged for us?
5   A.   Correct.
6   Q.   Am I misstating anything?
7   A.   Not that I know of.
8   Q.   Okay.  So we've got maybe one to two days
9       before and maybe the day of the accident --
10  A.   Right.
11  Q.   -- or the day before he went into work; is that
12      correct?
13  A.   Right.  Based on these two notes.
14  Q.   And you say within 24 hours; it could be within

15     48 hours, too, correct?
16          MR. SPRAIN:  Object to the form.
17          MR. SHEEHAN:  Object to the form.
18  A.   It could have been.
19  Q.   Okay.
20  A.   But I think more accurately it was within 24.
21  Q.   What is the basis for you saying that -- well,
22       are you saying that it's more likely than not
23       that Mr. Riley used it in the late evening

14

1       hours of August 28th than the morning of August
2       the 28th?  Do you have any basis to rule one
3       out versus the other?
4   A.   No, I do not.
5   Q.   Okay.  So it could be the morning of August the
6        28th instead of the evening of August the 28th,
7        right?
8   A.   Right.
9   Q.   And you have no basis to conclude it was one or
10       the other, correct?
11  A.   Right.

14

12  Q.   Okay.  Well, how long does a -- how long is --
13       let's talk about the drug screen, because
14       that's the basis for the presence -- the
15       determination there's the presence of
16       marijuana, correct?
17  A.   Right.
18  Q.   What kind of a test was this?
19  A.   I don't know since I didn't run the test, but I
20       assume it was an enzyme immunoassay test, which
21       is usually what's done to detect marijuana.
22  Q.   Okay.  And that's an assumption on your basis?
23  A.   Correct.

15

1   Q.   Well, what does that test detect?
2   A.   It picks up the marijuana metabolite.
3   Q.   Okay.  And this is a urine --
4   A.   A urine drug test.

5  Q.    Urine drug test.  Okay.  And assuming that that
6         was the test that was run, what is the
7         detection time for this marijuana metabolite
8         that is detected by this test?  In other words,
9         how far back can a person have been exposed to
10        marijuana and the test still test positive for
11        marijuana?
12  A.    It depends on the type of drug abuser, whether
13        it's a heavy drug abuser, which would be
14        greater than one marijuana cigarette, or just
15        an occasional drug abuser.
16  Q.    Well, let's break it down.
17  A.    But it can be positive for up 21 days in a
18        heavy drug abuser.
19  Q.    In a heavy drug abuser.  How about somebody who
20        has smoked one marijuana cigarette
21        occasionally, what would be your --
22  A.    How occasional?
23  Q.    Well, let's say three days before this incident

                              16

1         occurred?
2   A.    They may not be positive at all.
3   Q.    Could they be positive?
4   A.    They could be.
5   Q.    Could be, one cigarette three days before the
6         incident?
7   A.    But they could be negative.
8   Q.    Could be negative; could be positive.  How
9         about two days before?
10  A.    The same thing.
11  Q.    Do you have any way of knowing?
12  A.    No.
13  Q.    This isn't a quantitative test, is it?
14  A.    No, it's a qualitative test.
15  Q.    A qualitative test.  There isn't any indication
16        about what his blood levels were, correct?
17  A.    Correct.
18  Q.    All right, sir.  It's a urine screen test,
19        correct?
20  A.    Correct.
21  Q.    And you have no way of knowing whether or not
22        that was a positive test from two days before,
23        correct?

                              17

```
 1          MR. SHEEHAN:  Object to the form.
 2  A.   Yes.
 3  Q.   Is that correct?
 4  A.   That's correct.
 5  Q.   And you don't have any basis for concluding
 6       that this was positive from one day before,
 7       correct?
 8          MR. SHEEHAN:  Object to the form.
 9  A.   That's correct.
10  Q.   And it would be positive -- it could be
11       positive if he smoked it ten minutes before
12       this incident; is that a fair statement?
13  A.   That's fair.
14  Q.   And it could be positive if he smoked it 24
15       hours before this incident?
16  A.   That's fair.
17  Q.   And it could be positive if he smoked a
18       marijuana cigarette two days before this
19       incident, correct?
20  A.   Correct.
21  Q.   And there is no -- you have no basis to
22       conclude which that was, correct?
23          MR. SHEEHAN:  Object to the form.
```

18

```
 1  A.   Based on these medical records, it indicated he
 2       had smoked it within the last 24 hours.
```

18

```
10  Q.   What time does he go into work?
11  A.   He works the midnight shift.
12  Q.   11:00 to 7:00 shift?
13  A.   I believe that's correct.
14  Q.   Okay.  Comes in around 11:00 in the evening?
15  A.   You know, I haven't seen any records relating
16       to his time, you know, his employment.  I
17       understood the ambulance run was shortly after
18       midnight and --
19  Q.   Well, you weren't provided with the incident
20       report in this case?
21  A.   No, I wasn't.
22  Q.   Okay.  So you don't know what time the incident
```

23     occurred?

19

1  A.  No, I do not.
2  Q.  Okay.  Do you know when Mr. Riley slept that
3     day prior to coming into work?
4  A.  No, I do not.
5  Q.  But we do know in the records that you're
6     relying on that it says that he had smoked
7     marijuana to initiate sleep; is that correct?
8  A.  Correct.
9  Q.  Is that a fair summary of the notes?
10  A.  Correct.
11  Q.  Well, is it your opinion that Mr. Riley was
12     trying to get sleep at -- just before he came
13     into work that night?
14  A.  That would be my assumption.
15  Q.  That he was trying -- he was smoking marijuana
16     before he came into work because he thought it
17     would help him sleep?
18  A.  No, that he got off his prior shift --
19  Q.  The morning of the --
20  A.  -- the morning of it and then smoked it
21     sometime that day to go to sleep.
22  Q.  Okay.  And how many hours would you expect a
23     person to, on average, sleep a day?

20

1  A.  Six to eight.
2  Q.  Six to eight hours.  And if Mr. Riley got six
3     to eight hours of sleep prior to getting up and
4     getting ready to come to work, that would put
5     him six, seven, eight, nine hours prior to that
6     smoking a marijuana cigarette, assuming that
7     was what happened, correct?
8  A.  Correct.

23

8  Q.  Okay.  Good.  Now, we've marked several pages
9     here, four pages out of, it looks like, a set
10     of records you've got here that you're relying
11     upon in support of your conclusions, correct?

12          MR. SHEEHAN:  Object to the form.

13   A.    Well, not -- my conclusions aren't totally

14         contained in those four pages.

15   Q.    All right.

16   A.    But those four pages give the time frame.

17   Q.    Those give you the time frame?

18   A.    Right.

19   Q.    Are you sufficiently satisfied with this

20         documentation that we've marked as Plaintiff's

21         Exhibit Number 2 through Plaintiff's Exhibit

22         Number 5, that that sufficiently gives you the

23         time frame that you need to support your

                          24

1          opinions?

2    A.    Correct.

3    Q.    All right.  And do you have any other basis for

4          the support of your time frame?

5    A.    No, I do not.

                          26

19   Q.    Okay.  Thank you.  And we will reserve an

20         exhibit for that, if you just won't let me

21         forget, whatever the last one is.  Now, did you

22         actually pull these articles here that are

23         circled?

                          27

1    A.    No, I did not.

2    Q.    Article number 93 and 94?

3    A.    No, I didn't.

4    Q.    Okay.  Is it your conclusion that these two

5          articles indicated there was a significant

6          impairment after 24 hours --

7    A.    It is.

8    Q.    -- from the use of marijuana?

9    A.    Correct.

10   Q.    Okay.  Where does it actually say that in this

11         -- on this Exhibit Number 7 that you've got

12         here?

13   A.    It's in the text itself.

14   Q.    In the text itself?

15  A.  Yes.
16  Q.  All right.  And that was for aircraft pilots,
17      correct?
18  A.  It was in airplane simulators.
19  Q.  Which simulates flying an airplane?
20  A.  Flying an airplane.
21  Q.  Yes. Okay.  What else did you review?
22  A.  That's it.

37

1  Q.  Okay.  And what was your -- what was the
2      substance of your opinions in that case?
3  A.  Well, I had done the drug screens in that case.
4  Q.  You did the drug screens.  Did you provide any
5      opinions that he was intoxicated from the
6      marijuana or cocaine in that case?
7  A.  I don't recall whether I did or not.  You know,
8      they were more interested in the chain of
9      custody and how we did the drug test.  It would
10     have been my opinion that he was under the
11     influence if I recall correctly.
12  Q.  All right.  Now, Paul Garrison, is he an
13     attorney in Jefferson County?
14  A.  I believe he's with Hare, Wynn, but I'm not
15     sure.  I'm sure you've heard of Hare, Wynn.
16  Q.  I've heard of them.
17  A.  I think he's with them, but I don't guarantee
18     that.
19  Q.  Okay.  And what kind of drug screens did you do
20     in that case?
21  A.  We did urine drug -- well, I don't recall what
22     samples we had, but we usually do urine or
23     blood.  And if anything is positive, then we

38

1      quantitate with mass spectrophotometry.
2  Q.  Okay.  So you actually did quantification tests
3      in that case, right?
4  A.  Correct.
5  Q.  Have you attempted to do a quantitative test in
6      Matthew Riley's case?
7  A.  No, I don't have the samples.

38

8  Q.    What is the -- what is the quantity -- the
9        blood level quantity of marijuana that results
10       in a significant impairment to the person who
11       is exposed to the marijuana?
12  A.   According to the medical literature that varies
13       depending on the person because you develop a
14       tolerance to marijuana.  So it would be lower,
15       it can be -- and it's also some sort of
16       psychological effect, sometimes it can be lower
17       and some higher.  I think the average is around
18       five nanograms per ML of active marijuana, if I
19       recall correctly.
20  Q.    Five nanograms?
21  A.    NG/ML.
22  Q.    Per milliliter?
23  A.    But that can vary.

39

1  Q.    That's blood, right?
2  A.    Correct.
3  Q.    And that can vary a lot?
4  A.    I don't know how much, but it can vary
5        depending on a person's tolerance.
6  Q.    Okay.  What's the minimum level you would
7        expect to see significant impairment?
8  A.    I don't know.
9  Q.    You don't know.  Okay.  But you're saying the
10       average is five nanograms per milliliter?
11  A.    The average is five nanograms per ML.
12  Q.    Okay.  And what do you define significant
13       impairment as?
14  A.    Slowed reaction time, staggering.  Marijuana is
15       a mind altering drug, it impairs your reaction
16       time, it impairs your ability to concentrate.
17       I think there's some field sobriety tests that
18       marijuana affects.

39

19  Q.  Okay.  So is it -- well, at what point do you
20       consider a person significantly impaired, and
21       what signs and symptoms would you expect to see
22       to determine that?
23  A.   In my opinion, anybody that's got marijuana on

40

1        board is impaired.
2   Q.   Do you mean positive on the drug screen?
3   A.   Because they've got an illegal drug on board.
4   Q.   Okay.  I'm talking physically.
5   A.   Physically?
6   Q.   Mentally, physically, whatever, do you have a
7        basis to form an opinion as to what the signs
8        and symptoms of an individual is who you would
9        consider to be significantly impaired?
10  A.   Personally I've never conducted sobriety tests,
11       but based on what I've learned from the medical
12       literature, you know, any amount of marijuana I
13       would consider someone impaired.
14  Q.   Any amount?
15  A.   Correct.
16  Q.   Whether they smoked 21 days ago?
17  A.   They've still got it in their system.
18  Q.   Okay.  So is it your professional opinion as a
19       Ph.D that a positive drug screen is indicative
20       of significant impairment in the person who
21       tested positive?
22  A.   It's indicative of impairment.
23  Q.   Within a reasonable degree of --

41

1   A.   Now, they're going to be more significant
2        closer to the time they've smoked it.
3   Q.   Within a reasonable degree of medical -- I'm
4        sorry, of toxicological certainty, can you --
5        is it your opinion that a person who tests
6        positive in a drug screen, such as what you've
7        described, is, in your opinion, impaired
8        significantly?
9   A.   Impaired.  We've got a difference with
10       significantly.

41

16  Q.  Well, I want you to give me your definition of
17      what a significant impairment is?
18  A.  A significant impairment would be somebody
19      obviously intoxicated, in my opinion.
20  Q.  Okay.  And what are the signs of someone who is
21      obviously intoxicated?
22  A.  Under marijuana?
23  Q.  Yes, under marijuana.

42

1  A.  You know, their eyes are bloodshot, their talk
2      is slurred.  As far as putting someone through
3      a sobriety test, I've never done that, but
4      someone, you know, significantly impaired would
5      be obviously intoxicated or obviously under the
6      influence of drugs.
7  Q.  Okay.  That's what you would call a significant
8      impairment?
9  A.  Right.
10  Q.  Of marijuana?
11  A.  Correct.
12  Q.  And you've mentioned bloodshot eyes, slurred
13      speech, what else?
14  A.  Inability to concentrate, going from one
15      subject to another.
16  Q.  Okay.  Anything else?
17  A.  That's all.

42

18  Q.  Okay.  Do you have any -- any information from
19      whatever source at all that Matthew Riley was
20      significantly impaired from marijuana at the
21      time of this accident?
22  A.  I do not.

45

3  Q.   Okay.  2003, you've got Rankin Sneed versus
4       Logan's Roadhouse?
5  A.   Dram shop case.
6  Q.   Michael Petway was the attorney?
7  A.   It was a plaintiff's case.

46

2  Q.   Okay.  And did you do forensic tests in that
3       case?
4  A.   I did not do the testing in that case.  I was
5       employed to interpret the testing that was done
6       by -- I believe the testing was done by the
7       Huntsville Police Department.  I'm not sure who
8       did the testing.
9  Q.   Right.  Basically your opinions in that case
10      was that the man was intoxicated?
11 A.   He was intoxicated and they shouldn't have
12      served him.
13 Q.   And that was based on the --
14 A.   The blood alcohol.
15 Q.   And that's a quantitative test, correct?
16 A.   Right.
17 Q.   And did you rely on the witness statements?
18 A.   Yes.
19 Q.   Okay.  Because blood alcohol -- alcohol is also
20      a drug that can -- you can build up tolerance
21      to as well, correct?
22 A.   Correct.
23 Q.   So you need to know about what his symptoms are

47

1       as well as what the blood alcohol is, correct?
2  A.   Well, the legal limit is point 08, but when do
3       you --
4  Q.   Somebody could be point 08 though and, if he's
5       got a lot of tolerance, he can function pretty
6       well under those circumstances, correct?
7  A.   Well, he's still going to -- his reaction times
8       are still going to be slow compared to a blood
9       alcohol of zero.

10  Q.   Yeah.  But what I'm saying is one person at
11       point 08 might not be the same as another
12       person at point 08 --
13  A.   That's correct.
14  Q.   -- as far as their ability to function,
15       correct?
16  A.   Correct.
17  Q.   All right.  So it's important to correlate that
18       with the witness statements?
19  A.   Correct.

47

20  Q.   All right.  Daniel E. Jackson versus A & M
21       Express, there's Eugene Stutts, I know him.
22       That was a case in Federal Court, which Federal
23       Court was that?

48

1  A.   In Montgomery.
2  Q.   Montgomery.  Okay.  And who were you working --
3       you were working for Eugene Stutts there, I
4       guess?
5  A.   Right.

48

17  Q.   And what was the purpose of your testimony?
18  A.   An automobile driver ran up under this
19       tractor-trailer rig when it was stopped at a
20       traffic light and they had methamphetamine,
21       they had a number of different drugs.  I don't
22       recall what all they had, but they had emptied
23       the medicine cabinet.

49

1  Q.   The persons in the car?
2  A.   Yeah.
3  Q.   Okay.  And what were your conclusions in that
4       case?

5  A.   They shouldn't have been driving.

6  Q.   Well, did you conclude that they were

7        intoxicated from --

8  A.   I did.

9  Q.   -- drugs?

10  A.   Correct.

11  Q.   All right.  And what was the basis of your

12       opinions in that case?

13  A.   They shouldn't have been driving.

14  Q.   No.  What was the basis?  Was there blood

15       levels drawn?

16  A.   There were drug screens, there were

17       quantitation screens, and plus the action.

18  Q.   Okay.  So you had quantitative information as

19       well as qualitative screening information,

20       correct?

21  A.   Right.

22  Q.   And did the quantitative information provide

23       you with blood levels of these different

50

1        medications in their blood?

2  A.   Yes.  Yes.

50

3  Q.   All right.  Cynthia Davis versus Kawasaki,

4        that's from Martin Bloom.  Was he taking or was

5        he -- you were working for Martin Bloom?

6  A.   He represented Kawasaki.  This was a motorcycle

7        accident and they sued Kawasaki for lack of

8        road worthiness and the operator of the

9        motorcycle was intoxicated.

10  Q.   Okay.  And what was the -- did you provide

11       testimony in that case or opinions concerning

12       that intoxication?

13  A.   Yes.

14  Q.   And you concluded the person was intoxicated?

15  A.   Yes.

16  Q.   And did you have blood alcohol quantitative

17       information in that case?

18  A.   Yes.

53

11  Q.   Okay.  And then we've got Cathy Garza versus On
12       Tap Sports Cafe, Kenneth Riley; who is Kenneth
13       Riley?
14  A.   He's a plaintiff attorney in Birmingham.
15  Q.   Who did you --
16  A.   It was a dram shop case.  I worked for Kenneth
17       Riley.  The person was obviously intoxicated.
18       The people in the bar told them to quit serving
19       him.  His wife phoned and said he's an
20       alcoholic, call a cab.  And he hit a pizza
21       delivery guy on the way home.
22  Q.   Did you have forensic testing information in
23       that case?

54

1  A.   I'm not sure whether we did or not.  I think my
2       basis was all these people had told the
3       bartender to quit serving him.

54

4  Q.   I see.  And then we've got Fern Franks versus
5       Anthony Clanton and we've got Rick Alvis down
6       here, who is he?
7  A.   He's a plaintiff attorney with Willingham and
8       Alvis here in Birmingham.

55

1  Q.   Okay.
2  A.   So all I did was pharmacokinetics in that case.
3  Q.   Pharmacokinetics, is that the word?
4  A.   Uh-huh.  (Positive response.)
5  Q.   And so you testified on behalf of --
6  A.   The plaintiff.

55

11  Q.   I've got you.  Okay.  And basically what your
12       conclusions were there is that he wouldn't have
13       any detectable metabolites of hydrocodone if he
14       had taken it four days before?
15  A.   Well, he had a -- I forgot what his
16       concentration was, but if he had taken it four
17       days before and had the concentration he did on
18       the day of the accident, he would have been
19       dead from a hydrocodone overdose.
20  Q.   Four days before?
21  A.   Right.
22  Q.   Okay.  And you had quantitative information in
23       that case?

56

1  A.   Correct.
2  Q.   Okay.  As opposed to drug screen information,
3       correct?
4  A.   Correct.

56

5  Q.   All right.  And then in 2006 you've got Melvin
6       Edwards versus Lisa Motor Lines and Michael
7       Blalock is listed as the attorney here, is that
8       who you were working for or who deposed you?
9  A.   Michael Blalock is who deposed me, I believe.
10      This was -- it was a trucking case and it was
11      one of -- it was a Jefferson County Medical
12      Examiner case.  Somebody was killed, I don't
13      recall who, but either the truck driver or the
14      decedent had cocaine.  I don't recall which
15      one.
16  Q.  Do you know who you were --
17  A.   I was deposed because I did the forensic
18      toxicology.
19  Q.  I see.  Did you do quantitative testing in that
20      case?

21  A.  We did.

57

6   Q.  Okay.  Let's look at your opinions in the case,
7       Doctor Robinson.  I want to go over this in a
8       little more detail.  Now, we talked about
9       number one, but I want to be clear on it,
10      number one on your list.  Have your opinions
11      changed since you -- well, since yesterday,
12      November 29th?
13  A.  No, they haven't.
14  Q.  Okay.  So is this a complete -- other than
15      opinions related to these major opinions, is
16      this a complete listing of your major opinions
17      in the case?
18  A.  I think so.

59

2   Q.  Now, let's look at number three, "The marijuana
3       Mr. Matthews smoked on the day of the accident
4       could have contributed to his lack of attention
5       to detail, and could have contributed to the
6       cause of the accident."  Now, that's what you
7       wrote, correct?
8   A.  Correct.
9   Q.  And that's what you wrote back in August of --
10      on August 30th of this year, correct?
11  A.  Right.
12  Q.  All right.  Now, when you say "The marijuana
13      Mr. Matthews smoked on the day of the accident
14      could have contributed to his lack of attention
15      to detail," what does that mean, "could have"?
16      It could not have as well, correct?
17          MR. SHEEHAN:  Object to the form.
18  A.  Well, I probably should have stated that a
19      little stronger.

59

20  Q.   Well, that's what I want to ask you about.
21       Because you've written down here on two
22       occasions that it "could have contributed to
23       his lack of attention to detail."  Do you have

60

1       a basis to support the conclusion within a
2       reasonable degree of toxicological probability
3       or certainty that the marijuana Mr. Matthews
4       may have smoked on the day of the accident
5       contributed to his lack of attention to detail?
6   A.   Medical literature supports the fact that
7        marijuana contributes to the lack of attention
8        to detail if smoked within the last 24 hours.
9   Q.   Okay.  What is the lack of attention to detail
10       that you're referring to in your statement
11       here?
12  A.   Well, I wasn't with him when he had the
13       accident, but did he operate the equipment as
14       prescribed by the manufacturer?  You know, I
15       don't -- I don't know the answer to that.
16  Q.   You don't know the answer.  Do you know
17       anything about whether or not there was any
18       evidence to support your conclusion that he had
19       a lack of attention to detail?
20  A.   Well, he had an accident.
21  Q.   Are all accidents the result of the injured
22       person's lack of attention to detail, is that
23       your conclusion?

61

1   A.   It can be.  Sometimes they are.
2   Q.   Sometimes they are?
3   A.   Right.
4   Q.   Do you have any evidence to suggest that
5        Mr. Riley exhibited any actions that support
6        your conclusion that he had a lack of attention
7        to detail?
8   A.   Nothing other than he smoked marijuana when he
9        was on a job and shouldn't have.

61

16  Q.   All right.  So we've got -- I don't want to go
17       in a circle here.  You're saying the fact that
18       he smoked the marijuana was the symptoms that
19       showed lack of detail -- attentionn to detail?
20  A.   Well, that could show lack of attention to his
21       employer's instructions.
22  Q.   All right.  Have you got any other facts -- are
23       you aware of any facts to support your

62

1        conclusion that Mr. Riley exhibited actions
2        that support your conclusion that he lacked
3        attention to detail at the time of this
4        accident?
5   A.   The only thing I have is that he smoked
6        marijuana while on the job.
7   Q.   Now, let's make sure we're clear.  Do you have
8        any evidence to suggest that Matthew Riley
9        smoked marijuana while he was on the job?
10  A.   I have evidence that he smoked marijuana while
11       being employed by this company.

62

14  Q.   All right.  Do you have any evidence to support
15       your statement that you just made that
16       Mr. Riley smoked marijuana while he was on the
17       job?
18  A.   Do you mean at the work site?
19  Q.   At the work site, while he was on the job?
20  A.   Well, I consider on the job while under the
21       employment.

63

6   Q.   Okay.  Now, I want to talk about what -- the

7    next part of your opinion number three there.
8    And I'm going to read the whole thing so we get
9    it in context.  Again number three, "The
10   marijuana Mr. Matthews smoked on the day of the
11   accident could have contributed to his lack of
12   attention to detail," and this is the next part
13   I want to ask you some questions about, it says
14   "and could have contributed to cause the
15   accident -- contributed to the cause of the
16   accident."
17       All right.  And that was your opinion on
18   August 30th and that's your opinion today,
19   correct?
20  A.   I should have stated that a little stronger.
21  Q.   Okay.  Are you saying there that his lack of
22   attention to detail could have contributed to
23   the cause of the accident?  I want to make sure

                                  64
1    I'm clear on what your statement means.  Is
2    that what you're saying?
3   A.   I'm saying that the marijuana that he smoked --
4   Q.   Could have contributed to the cause of the
5    accident?
6   A.   -- could have contributed to his lack of
7    attention to detail and thus he had an
8    accident.

                                  64
9   Q.   Now, give me, as detailed as you can, your
10   complete basis for the statement that
11   Mr. Matthews' marijuana use potentially on the
12   day of the accident contributed to cause the --
13   could have contributed to cause the accident?
14  A.   Well, he used marijuana.
15  Q.   All right.  There's number one, he used
16   marijuana based on the information you've
17   looked at?
18  A.   Correct.
19  Q.   All right.
20  A.   He has an accident on the job.
21  Q.   All right.

22  A.    We all know that.
23  Q.    So you're saying the fact he had an accident

65

1         means that the marijuana contributed to cause
2         the accident, is that what you are saying?
3   A.    Why do they run drug screens on people that
4         have accidents?
5   Q.    You tell me.  Why didn't they run a
6         quantitative test, Doctor Robinson?
7   A.    I can't answer that.
8   Q.    Okay.  So they didn't run a quantitative test,
9         did they?
10  A.    Not that I saw.

65

11  Q.    Have you asked for any testimony from any of
12        the witnesses who were exposed to Mr. Riley
13        before this accident that evening, have you
14        asked to look at any of their testimony to see
15        whether or not they indicated that Mr. Riley
16        was exhibiting any signs of what you've
17        identified as significant marijuana
18        intoxication?
19  A.    I have not seen any -- are you talking about in
20        the form of a deposition from these other
21        people?
22  Q.    Deposition, statements or otherwise?
23  A.    I have not seen any of that.

66

1   Q.    Okay.  Other than the fact that Mr. Riley, in
2         your opinion, used marijuana on the day of the
3         accident and he had an accident, is there
4         anything else that you're using to support your
5         conclusion that the marijuana contributed to
6         cause the accident?
7   A.    No, there is not.

66

8   Q.   Okay.  Well, you said that you thought you
9        should have stated that opinion more strongly.
10        Give me how you would rewrite your opinion as
11        we sit here today?  I want to know the words
12        you're going to use as far as the strength of
13        your opinion in support of your conclusion
14        here.
15   A.   I would have said "The marijuana Mr. Matthews
16        smoked within the last 24 hours prior to the
17        accident contributed to the cause of the
18        accident."
19   Q.   Okay.
20   A.   I would have left the "could" out.
21   Q.   You would have left the "could have" out?
22   A.   Yeah.
23   Q.   And would you leave the "could have" out on

67

1        both of those phrases?
2   A.   Marijuana certainly contributes to the lack of
3        attention to detail.

67

4   Q.   Okay.  Give me the -- based on the information
5        you have, give me the degree to which
6        Mr. Riley's attention to detail was diminished?
7   A.   I can't, I wasn't there.
8   Q.   Do you have any way of saying whether or not it
9        was a significant decrease in his attention to
10        detail?
11   A.   No, I don't.
12   Q.   You have no basis for that, correct?
13   A.   Correct.
14   Q.   Do you have any basis for saying how much his
15        marijuana may have contributed to cause the
16        accident?
17   A.   How much?
18   Q.   Yes.
19   A.   Can I say if he didn't smoke marijuana he
20        wouldn't have had the accident?

21  Q.   Right.
22  A.   I can't say that.

68

13  Q.   What information have you reviewed to inform
14       you about what actually happened that evening
15       to cause Mr. Riley's injuries?
16  A.   The only thing I've reviewed is that -- the
17       AltaCare notes which I gave you a copy of.
18  Q.   Okay.  And do they give you details about
19       actually what happened to cause his injuries?
20  A.   No, they did not.

70

5   Q.   That's not my question, Doctor Robinson.  I
6        want to make sure I'm clear.  Can you say that
7        the marijuana that you say contributed to cause
8        the accident, can you say that it was a
9        significant cause of the accident?
10  A.   I've got a problem with "significant."
11  Q.   Because you have no way of quantifying that at
12       all, do you?
13  A.   I mean, we've got -- I mean, what is
14       significant?  If he hadn't had marijuana would
15       he have had the accident?
16  Q.   You don't have any way of knowing, correct?
17  A.   That's right.
18  Q.   Okay.  I want to look at -- have you got an
19       extra copy of your handwritten notes?
20  A.   Yeah, right here.
21  Q.   Okay, good.  I just want you to kind of go over
22       that and let me see if we can read it.  When
23       were these notes taken?

71

1   A.   They were taken during, you know -- I think I
2        wrote this stuff down when I was doing this
3        with Gene Stutts.  Now, this is a clean copy of

4      it, because I had scrawl everywhere.

5  Q.    Okay.  When did you make this clean copy of the

6       notes?

7  A.    Last night.

8  Q.    Last night.  All right.

9  A.    And I had phone numbers on there and everything

10      else.  And he said you wanted a copy, so I

11      didn't figure you wanted -- I mean, they were

12      phone numbers unrelated to this case.

13  Q.    Do you still have the original notes that you

14      took?

15  A.    I threw them away.


73

20  Q.    When you have an automobile accident and an

21      individual is tested for alcohol, that's

22      usually a quantitative test, correct?

23  A.    Right.


74

1  Q.    And they can do that by either blood test or

2      breathalyzer test, correct?

3  A.    Right.

4  Q.    And that actually gives you some type of level

5      of the drug in their system, correct?

6  A.    Right.

7  Q.    But these screening tests do not do that,

8      correct?

9  A.    Correct.


75

8  Q.    All right.  I've got you.  Now, again, you have

9      no way of knowing what the degree of that

10      balance and coordination effect would be,

11      correct?

12  A.    Correct.

13  Q.    Or the ability to concentration, ability to

14      react or any of those items, correct?

15  A.   Correct.
16  Q.   All right.  And I'm talking about in this case?
17  A.   Right.
18  Q.   "Matthew Riley accident, 8/28/03 last used THC,
19       failed drug test 8/29/03."  Now, that's an
20       updated note, correct?
21  A.   Right.
22  Q.   That wasn't your original note, because you
23       thought it was August 29th when he last used

76

1        it, correct?
2   A.   Right.
3   Q.   And that was when you wrote your August
4        opinions?
5   A.   Correct.

76

20  Q.   What would you have liked to have had in this
21       case?
22  A.   It would have been -- you know, like you say,
23       the witness reports could have been helpful.

77

1        And, you know, I think this will apply to your
2        expert as well, he doesn't have the witness
3        reports either.  You know, some follow-up on
4        the drug screen would have been helpful for
5        both of us, but, you know, we've got what we've
6        got.
7   Q.   When you say follow-up on the drug screen, what
8        are you referring to?
9   A.   Some additional studies would have been nice.
10  Q.   Quantitative studies?
11  A.   That would have been helpful.

78

12  Q.   All right.  Now, what do consider yourself to

13     be today?  I mean, are you -- what's your --
14  A.   Currently?
15  Q.   Yes.
16  A.   I'm a forensic toxicologist.
17  Q.   Forensic toxicologist.  What do you have to do
18     to become a forensic toxicologist?
19  A.   Well, I've been involved in drug testing since
20     1972.
21  Q.   So you're involved in drug testing?
22  A.   Right.  Drug testing and the interpretation of
23     drug tests.

79

1  Q.   When you say the interpretation of drug tests,
2     what do you mean by that?
3  A.   If someone has a certain drug, what does that
4     mean?  You know, I've been involved in that
5     since 1972.

79

19  Q.   Are you talking about you interpret it in terms
20     of whether or not he's got a high level of some
21     drug in his system or a low level in his system
22     or --
23  A.   Both.

80

1  Q.   -- the effects of the drug or what?
2  A.   Both.
3  Q.   Okay.
4  A.   All inclusive.
5  Q.   All right.  And what was your -- what was your
6     special training or what special training do
7     you have in the effects of marijuana?
8  A.   I have no special training in marijuana in and
9     of itself, it's just a drug of abuse.

10  Q.   All right.  How many times have you provided an
11       opinion, such as what you've given us here on
12       number three on your list of opinions, in a
13       case such as this?
14  A.   Do you mean in a case -- what do you mean such
15       as this?
16  Q.   Well, where it was alleged by the defendant or
17       otherwise that an individual was under the
18       influence of marijuana at the time of an
19       injury?
20  A.   This is the third marijuana case I've had.
21  Q.   What are the other two?
22  A.   One is currently going on and the other one was
23       an attorney at Lange, Simpson and it was

81

1        settled before I gave a deposition or before it
2        went to court.
3   Q.   Well, what were you -- what were you doing in
4        each one of those cases?  What have you done?
5   A.   Basically the same thing.
6   Q.   Let's talk about the one that's settled, the
7        Lange, Simpson one.
8   A.   Basically the same thing I'm doing now.  I
9        don't even recall the details of the case other
10       than it was a marijuana case.
11  Q.   And were you working on behalf of the defendant
12       in the Lange, Simpson?
13  A.   I was working on behalf of the defendant.
14  Q.   Okay.  And were you -- did you provide opinions
15       concerning the plaintiff's marijuana
16       intoxication?
17  A.   I do not recall.
18  Q.   When was that case?
19  A.   It's been -- it never went -- you know, they
20       sent me the medical record or the case report
21       and it was settled before I gave a deposition
22       or it went to trial.
23  Q.   Okay.  But do you remember when this was?

82

1   A.   No, I do not.  Within the last seven or eight
2        years, but I don't remember when.
3   Q.   Were you relying on a qualitative screening
4        test in that case?
5   A.   I believe I was.

6 Q.   Did you have any quantitative tests?
7 A.   No.

82

18     Well, I will keep it confidential.  I don't
19       mind putting that on the record.
20 A.   Well, the attorney that contacted me is John
21       Geer.
22 Q.   Defense or plaintiff?
23 A.   Defense.

83

1 Q.   How do you spell his name?
2 A.   G-E-E-R.
3 Q.   All right.  Defense.  Have you reviewed
4       materials in that case?
5 A.   I have.
6 Q.   And this is marijuana?
7 A.   Correct.
8 Q.   Is this a case where the defense has alleged
9       marijuana intoxication?
10 A.   Correct.
11 Q.   Have you got qualitative or quantitative tests?
12 A.   Both.

84

12 Q.   That's all you've got.  Okay.  As you sit here
13       you don't recall if the quantitative test
14       resulted in a level greater than or equal to
15       five nanograms per milliliter of blood?
16 A.   I don't recall.
17 Q.   Okay.
18 A.   My recollection is it's 4.8, but that could be
19       wrong.

90

9   Q.   Nobody ever does.  Have you been involved in
10       any way in the testing of individuals -- let me
11       rephrase that.  Obviously you've done tests,
12       forensic tests, involving determining -- or
13       doing drug screens for marijuana, correct?
14  A.   Correct.
15  Q.   And you've done quantitative tests to get the
16       blood levels of marijuana in individuals,
17       correct?
18  A.   Correct.
19  Q.   What other quantitative tests have you done
20       concerning marijuana?
21  A.   That's all.
22  Q.   That's all?  Now, have you ever been involved
23       in any research involving marijuana

91

1        intoxication?
2   A.   No.
3   Q.   You have not.  You've never been involved in
4        doing any testing in any research projects
5        involving marijuana?
6   A.   No.
7   Q.   Okay.  You haven't been involved in research to
8        determine the degree of the effects of
9        marijuana at different blood levels?
10  A.   No.
11  Q.   Okay.  Have you written any articles concerning
12       research associated with marijuana
13       intoxication?
14  A.   No.

92

13  Q.   All right.  Under the publications, I want to
14       go ahead and move over to that, I think it's
15       page three.  Let's see, I think I marked --
16       yeah, looking at page three and four, which I
17       believe is your papers since 1990, correct?
18  A.   Right.
19  Q.   I may have already asked you this, but are

20    there any articles listed on page three and
21    four dealing with marijuana intoxication that
22    you've been involved in?
23  A.  No.

97

17  Q.  Presentations since 1990 that begins on page
18    seven, any of those presentations deal with
19    just marijuana in general?
20  A.  No.
21  Q.  Okay.  So I take it none of those presentations
22    dealt with the issue of signs and symptoms of
23    intoxication from marijuana?

98

1  A.  Correct.
2  Q.  Have you had any experience treating patients
3    or individuals who have been -- have abused
4    marijuana?
5  A.  No.

100

2  Q.  Okay.  Are you aware of any actions on the part
3    of Matthew Riley that were any different than
4    any other individual who used that same machine
5    that evening?
6  A.  I did not witness the use of that machine.
7  Q.  And you haven't read any depositions to that
8    effect?
9  A.  I have not.
10  Q.  Okay.  Would that information be important to
11    you?
12  A.  It could have been helpful.
13  Q.  Would information concerning -- from
14    Mr. Matthew's immediate superior, foreman,
15    supervisor, whatever term you want to use, who
16    was working with Matthew Riley that evening be
17    important to you in the formation of your

18    opinions?
19  A.   It could have.  I didn't see that.

108

6  Q.   In terms of rendering that opinion on
7       impairment and whether such an impaired person
8       should use machinery and equipment, does it
9       matter whether it's a significant impairment or
10     not?
11          MR. LANE:  Object to the form.
12  A.   Sure it matters whether it's a significant
13       impairment.  If you're impaired, you should not
14       use equipment.  I mean, it can be -- there are
15       different degrees of impairment and we seem to
16       be stuck over arguing what significant is.  If
17       you are impaired, you should not use the
18       equipment, or if you are impaired, you
19       shouldn't drive.  Now, there's more impairment
20       and less impairment.

110

17  Q.   Doctor Robinson, how impaired was Matthew Riley
18       at the time of his incident?
19  A.   He had marijuana in his system.
20  Q.   That's all you know, correct?
21  A.   Correct.
22  Q.   That is all you know is that he tested positive
23       for marijuana; is that correct?

111

1  A.   That is correct.
2  Q.   And on a screening test, correct?
3  A.   Correct.
4  Q.   And you don't know what degree -- what blood
5      levels that represented, correct?
6  A.   Correct.
7  Q.   It represented something above or at the level
8      at which the screening test would test

9     positive, correct?
10  A.   Correct.

112

6  Q.   All right.  But by Matthew Riley's own
7     admission, he used marijuana sometime on the
8     28th, maybe on the 27th, correct?
9  A.   Correct.
10  Q.   All right.  But you don't know when it was on
11     the 27th or the 28th, correct?
12        MR. SHEEHAN:  Object to the form.
13  A.   That is correct.
14  Q.   And you have no idea about what level of
15     intoxication Matthew Riley was experiencing in
16     the early morning hours of the 29th, correct?
17  A.   Correct.

112

18  Q.   All right.  What experience and training -- you
19     were asked questions about -- that the basis of
20     your opinion was in part your experience and
21     training.  What experience and training do you
22     have in the -- a determination of -- or that
23     provides you guidance in determining when

113

1     someone is intoxicated with marijuana?
2  A.   Based on the medical literature.
3  Q.   Are you a medical doctor?
4  A.   No.
5  Q.   As a forensic toxicologist, in doing your job,
6     other than this type of consulting work, is it
7     part of your job to teach about marijuana
8     intoxication?
9  A.   No.
10  Q.   No.  Is it your job to do research in marijuana
11     intoxication?
12  A.   No.

13  Q.   Okay.  So other than reading medical
14       literature, that I assume you've provided us
15       with here today?
16  A.   You've been provided with it.
17  Q.   Other than reading that material for purposes
18       of forming the opinion that Matthew Riley was
19       impaired at the time of his incident, you don't
20       have any other experience and training
21       associated with making such a determination,
22       correct?
23  A.   I did not examine Matthew Riley, no.

114

1   Q.   Okay.  Well, otherwise, experience and training
2        in any other situation?
3   A.   Other than just interpreting the drug data.
4   Q.   Interpreting the drug data.  Which we don't
5        have any data here today, do we?
6   A.   Well, you've got a positive urine drug test.
7   Q.   A screening test, but we don't have any
8        quantitative data, correct?
9   A.   That's correct.

122

3   Q.   All right.  Have you told us everything about
4        your experience and training today that is in
5        any way related to forming opinions concerning
6        marijuana intoxication?
7   A.   I think so.
8   Q.   Okay.  And to the extent you've got experience
9        and training, you've told us about that here
10       today, correct?
11  A.   I think so.

124

3   Q.   Well, what questions are you asked by
4        physicians concerning marijuana?
5   A.   Usually will such and such interfere with it;

6      what causes a -- you know, they see somebody
7      diluting their urine with water, you know, we
8      do a variety of things when we do a urine drug
9      screen.  We do specific gravity and creatinine
10     to determine whether or not somebody has added
11     water to it and they want to know what that
12     means.
13  Q.   Okay.  So that's dealing with the actual
14     testing?
15  A.   That's dealing with the testing.
16  Q.   Not with the effects of the marijuana, correct?
17  A.   Correct.