# ATTACHMENT   7a

[1]

## IN THE UNITED STATES DISTRICT COURT FOR

## THE MIDDLE DISTRICT OF ALABAMA

## SOUTHERN DIVISION

MATTHEW RILEY,

        Plaintiff,

Vs.                                    CIVIL ACTION NO.

                          1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

        Defendants.


        DEPOSITION OF GABRIEL ANTHONY URIEGAS,
taken pursuant to notice and stipulation on behalf of
the Plaintiff, in the conference room of Cochran,
Cherry, Givens, Smith, Lane & Taylor, 163 West Main
Street, Dothan, Alabama, before Ricky L. Tyler,
Certified Court Reporter and Notary Public in and for
the State of Alabama at Large, on Monday, November
27th, 2006, commencing at 11:05 A.M.

11-27-2006                                                          Gabriel Uriegas

[2]  (Pages 2 to 5)

[2]

```
 1              APPEARANCES
 2  FOR THE PLAINTIFF:
 3      JOSEPH D. LANE, ESQ.
 4      Cochran, Cherry, Givens, Smith,
 5        Lane & Taylor
 6      P. O. Box 927
 7      Dothan, AL 36302
 8
 9
10  FOR THE DEFENDANT, SAINT-GOBAIN ABRASIVES, INC.:
11      ROBERT H. SPRAIN, JR., ESQ.
12      Sprain & Shires, PC
13      1707 29th Court South
14      Birmingham, AL 35209
15
16
17  FOR THE DEFENDANT, UNITED RENTALS:
18      C. WINSTON SHEEHAN, JR., ESQ.
19      Ball, Ball, Matthews & Novak
20      2000 Interstate Park Drive
21      Suite 204
22      Montgomery, AL 36109-5413
23
```

[3]

```
 1          I N D E X
                                          Page
 2
 3  Direct Examination by MR. LANE:        6
 4          EXHIBITS
 5  1   Deposition Notice
      For Identification                   12
 6
 7  2   DM500 Core Drill Manual
      For Identification                   65
 8  3   ATS Inspection Attendance List
        With Business Cards
 9  For Identification                     73
10  4   Letter Confirming Gabriel
        Uriegas Available for Inspection
11      On 5/12
      For Identification                   75
12
13  5   Fax from Sprain to Uriegas with
        Notice of Inspection at ATS on
        2/23/06
14  For Identification                     75
15  6   Inspection Protocol
      For Identification                   76
16
17  7   Handwritten Opinions of Uriegas
      For Identification                   78
18  8   Plaintiff's Response to
        Saint-Gobain Interrogatories
19  For Identification                     79
20  9   Alternative Design Electrical
        Schematic
21  For Identification                     79
22  10  Form LM708CPD Report of Injury
      For Identification                   81
23
```

[4]

```
 1  11  Photos of Sample DM500
      For Identification                   82
 2
    12  Exhibits attached to Don
 3      Shaver's Deposition
      For Identification                   89
 4
    13  Purchasing Documentaion
 5  For Identification                    214
 6  14  CD Containing Photographs
      For Identification                  217
 7
 8
 9
```

```
10          STIPULATIONS
11
12      It is stipulated and agreed by and between
13  counsel representing the parties that the deposition
14  of GABRIEL ANTHONY URIEGAS, may be taken before Ricky
15  L. Tyler, Certified Court Reporter and Notary Public
16  in and for the State of Alabama at Large, without the
17  formality of a commission; and all formality with
18  respect to other procedural requirements is waived;
19  that objections to questions, other than objections
20  as to the form of the questions, need not be made at
21  this time, but may be reserved for a ruling at such
22  time as the deposition may be offered in evidence or
23  used for any other purpose by either party as
```

[5]

```
 1  provided by the Federal Rules of Civil Procedure.
 2      It is further stipulated and agreed by and
 3  between counsel representing the parties in this case
 4  that the filing of the deposition of GABRIEL ANTHONY
 5  URIEGAS, is hereby waived and that said deposition
 6  may be introduced at the trial of this case or used
 7  in any other manner by either party hereto provided
 8  for by the Statute, regardless of the waiving of the
 9  filing of same.
10      It is further stipulated and agreed by and
11  between the parties hereto and the witness, that the
12  signature of the witness to this deposition is hereby
13  waived.
14
15
16          * * * * *
17
18          P R O C E E D I N G S
19
20      GABRIEL ANTHONY URIEGAS, of lawful age,
21  having first been duly sworn, testified as
22  follows:
23
```

11-27-2006                                                    Gabriel Uriegas

**[6]**

1          DIRECT EXAMINATION
2   BY MR. LANE:
3   Q.   Okay.  Would you give me your full name,
4        please?
5   A.   Gabriel Anthony Uriegas.
6            MR. SPRAIN:  Let's stop a minute.
7            We've got the usual stipulations?
8            MR. LANE:  Yes.
9            MR. SPRAIN:  Okay.
10  Q.   And how do you spell your last name?
11  A.   U-R-I-E-G-A-S.
12  Q.   Okay.  And where do you currently reside,
13       Mr. Uriegas?  Tell me how to pronounce your
14       name again.
15  A.   Uriegas.
16  Q.   Uriegas, I'm sorry.  Mr. Uriegas, where do you
17       currently reside?
18  A.   5550 Ashmoore, A-S-H-M-O-O-R-E, Court, Flowery
19       Branch, Georgia.
20  Q.   Is that up near Atlanta?
21  A.   Yes.
22  Q.   Okay.  And where do you currently work?
23  A.   I work for Saint-Gobain Abrasives.  I'm located

**[7]**

1        at an office in Flowery Branch, Georgia.
2   Q.   What do you do with Saint-Gobain?
3   A.   At the present I am a Product Manager for
4        diamond blades.
5   Q.   All right.  And how long have you worked with
6        Saint-Gobain in that capacity?
7   A.   In this capacity, approximately one year.
8   Q.   One year.  What did you do -- did you work with
9        them before that?
10  A.   Yes.
11  Q.   How long have you worked for Saint-Gobain?
12  A.   23 years.
13  Q.   23 years.  And what did you do for them before
14       you started doing what you're doing now?
15  A.   Prior to this current function, I was a -- an
16       equipment engineer.
17  Q.   And as an equipment engineer, what did you do
18       for Saint-Gobain?
19  A.   I basically responded to technical questions; I
20       taught classes on our products; developed
21       documentation on equipment; and assisted in the
22       development of marketing literature.
23  Q.   Okay.

**[8]**

1   A.   Assisted in the sales of our products as well.
2   Q.   All right.  How long did you work in that
3        capacity with Saint-Gobain?
4   A.   Six years.
5   Q.   Six years.  So you were doing that at the time
6        of Matthew Riley's incident on August the 29th
7        of 2003?
8   A.   Yes, I believe I was.
9   Q.   Okay.  What products were you involved in?  All
10       of these items that you talked about,
11       responding to technical questions, teaching
12       classes, development of documentation on
13       equipment and assisting in sales of products,
14       what products -- what Saint-Gobain products
15       were you dealing with during August of 2003?
16  A.   Any piece of equipment we sold at the time,
17       which could have been a concrete saw, masonry
18       saw, tile saw, core drills.
19  Q.   Core drills?
20  A.   Yeah, core drills.
21  Q.   And that was during the entire year of 2003?
22  A.   Yes, I believe so.
23  Q.   Okay.  Were you involved in any way in the

**[9]**

1        hazard analysis associated with any of the
2        products that you sold?
3   A.   Yes.  Yes.  Inasmuch as someone would most
4        likely run them by me.
5   Q.   All right.  Tell me about that.  What does
6        hazard analysis mean to you?
7   A.   Basically evaluating a product to determine if
8        -- if in fact there are any foreseeable hazards
9        that may develop.
10  Q.   Okay.  How long has Saint-Gobain sold core
11       drills?
12  A.   The entire period that I have been associated
13       with this group, which is about at least 22
14       years.
15  Q.   22 years at least.  Have you, at any time
16       during those 22 years, been involved in the
17       hazard analysis associated with the use of core
18       drills?
19  A.   Yes, but not formally.
20  Q.   All right.  Tell me about informal hazard
21       analysis on core drills that you've been
22       involved in.
23  A.   If there's a situation where someone would

11-27-2006                                        Gabriel Uriegas

[10]

1   develop a product or request that we purchase a
2   product from another vendor, they would ask me
3   to evaluate the product, perhaps make some
4   suggestions, recommendations, observations.
5   Q.   Who is they?
6   A.   It would either be a business manager at the
7   time or perhaps another product engineer. It
8   could be a purchasing manager.
9   Q.   Saint-Gobain though?
10  A.   Yes.
11  Q.   Someone with Saint-Gobain?
12  A.   Someone with Saint-Gobain.
13  Q.   All right. And you say that would not be a
14  formal hazard analysis, but it would be -- you
15  would participate in hazard analysis?
16  A.   Yes.
17  Q.   Tell me about the instances where you've been
18  involved informally in hazard analysis in any
19  way related to core drills.
20  A.   There are instances we purchase -- for example,
21  the core drill in question was not manufactured
22  by Saint-Gobain Abrasives. It was manufactured
23  and designed by Diamond Products. And when the

[11]

1   unit is brought in, we basically evaluate the
2   unit to see if it's going to fit into our
3   market scheme and also to make sure that the --
4   the unit is reasonably safe in terms of our
5   introduction of that product into the market.
6   Does it meet what we establish as minimum
7   criteria?
8   Q.   Okay. And for the subject model core drill
9   that you're talking about, what hazard analysis
10  actually was done on that product when you
11  first began selling that model?
12  A.   I think in terms of -- if you were going to
13  define it as hazard analysis, we would have
14  asked for documentation from the vendor to
15  evaluate --
16  Q.   Documentation of what?
17  A.   Any information on the appropriate use of that
18  particular piece of equipment, parts list, part
19  numbers, assembly diagrams, warning labels, of
20  course, and then any instructions.
21  Q.   I'm going to come back to some of that. What I
22  want to do right now, Mr. Uriegas -- tell me
23  one more time, I'm sorry.

[12]

1   A.   Uriegas. That's correct.
2   Q.   Uriegas. I didn't know where to put the
3   emphasis on it. I want to just mark some
4   documents to start with here and let you
5   identify them for me, the documents you've
6   produced here today.
7        (Plaintiff's Exhibit 1 marked
8        for identification.)
9   Q.   We will mark as Plaintiff's Exhibit Number 1
10  the notice of deposition that was prepared for
11  your deposition and ask you if you've had an
12  opportunity to see that before?
13  A.   Yes, I have.
14  Q.   Okay. We had asked you to provide us with
15  various documents. I just want to go down the
16  list and ask you what's been provided and what
17  may not have been provided, okay?
18  A.   Sure.
19  Q.   Number one on the notice says -- asked you to
20  produce documents related to any and all
21  opinions, conclusions, or other testimony to be
22  offered by you at the trial in this case. Have
23  you -- have you brought documents that are

[13]

1   responsive to that request here?
2   A.   To my opinions there's a handwritten document
3   that I brought here.
4   Q.   Okay. But in terms of documents that support
5   your opinions and conclusions, have you made an
6   attempt to produce all documents that you have
7   in your file to date that would in any way be
8   related to your opinions or support your
9   opinions in any way?
10  A.   No. No, other than the owners manual and the
11  documentation that's already been provided.
12  Q.   Is there anything else other than the owners
13  manual and the documentation that's been
14  provided?
15  A.   At this point all of my opinions are based on
16  what I've seen to date.
17  Q.   All right. And you've brought those with you
18  here today?
19  A.   Yes.
20  Q.   Okay. That's what I wanted to know.
21       MR. SPRAIN:  Except for Riley's
22       deposition, which he has read
23       which we didn't reproduce.

11-27-2006                                                          Gabriel Uriegas

[5] (Pages 14 to 17)

**[14]**

1        MR. LANE: That's fine.
2        MR. SPRAIN: But he has read
3            Mr. Riley's deposition.
4    **Q.**    Okay. And I'll -- hopefully when we go through
5        this I'll ask you is there anything else you've
6        looked at that you have not produced here
7        today? And your counsel says Mr. Riley's
8        deposition is one of those things, but if there
9        is anything else, I will try to remember to ask
10       you that. But if you think of something along
11       the way, feel free to add that you've looked at
12       this or looked at that even if it's not here
13       today, okay?
14   A.    Okay.
15   **Q.**    Number two says documents related to any and
16       all information or items reviewed by this
17       expert in connection with preparation for
18       testimony in this lawsuit. Have you produced
19       or have you made an attempt -- other than
20       what's already been stated that you haven't
21       brought, have you made an attempt to provide
22       documents responsive to number two?
23   A.    Yes.

**[15]**

1    **Q.**    Okay. And in terms of what you -- have you
2        brought everything here today that's responsive
3        to number two with the exception of what --
4    A.    Yes.
5    **Q.**    -- was stated? All right. Number three,
6        documents related to any and all tests or data
7        relied upon or utilized in connection with this
8        case, including without limitation, engineering
9        tests or studies, test, data or studies
10       performed by third parties or medical
11       diagnostic tests. Have you produced any such
12       materials here?
13   A.    Everything I have that is available to me is
14       here.
15   **Q.**    Okay. Number four -- I know a lot of this is
16       redundant or overlaps, but let me just ask you;
17       number four states -- asked you to produce
18       documents related to any and all information,
19       things or items received by you or considered
20       by you in connection with this case?
21   A.    Everything --
22   **Q.**    Okay.
23   A.    -- is available here.

**[16]**

1    **Q.**    Number five says documents, e-mails, notes,
2        reports, memoranda, correspondence or other
3        written materials prepared by, created by or
4        generated by you in connection with this
5        matter?
6    A.    Everything that I have done is available to you
7        at this point.
8    **Q.**    Okay. You've brought with you anything
9        responsive to number five, including e-mails,
10       notes, reports or memoranda?
11   A.    If those were part of it, yes.
12   **Q.**    Okay.
13       MR. SPRAIN: Now, we would claim
14           privilege on a lot of that now.
15           Of course, he's retained as an
16           expert, too.
17       MR. LANE: Yeah, that's an issue I
18           have.
19       MR. SPRAIN: Yeah. Well, but his
20           expert work has been very, very --
21           it's been limited. I mean, you
22           know, for a long time he is not
23           even retained and he has e-mails

**[17]**

1        from me. And in terms of his
2        expert work there might be a
3        letter, which I will be happy to
4        supplement and produce, that says,
5        you know, please review this
6        deposition.
7        MR. LANE: I understand. Well, let me
8            ask you this on the record if I
9            could, Robert.
10       MR. SPRAIN: Sure.
11       MR. LANE: To the extent there are
12           items that you consider to be
13           privileged, could you prepare a
14           privilege log of those items?
15       MR. SPRAIN: Sure.
16       MR. LANE: Okay. And then if we need
17           to, we can take that up at some
18           point later.
19       MR. SPRAIN: All right.
20       MR. LANE: Okay. Thanks.
21   **Q.**    Number six, documents related to any and all
22       standards and literature which you plan to use
23       at trial and/or on any -- to support any of the

[18]

1    opinions that you have in this case?
2  A.   At this point what is in front of us is what
3      was available to me.
4  Q.   Okay. But you have -- the reason I'm going
5      over these, Mr. Uriegas, is just to make sure
6      that you have made an attempt to respond to
7      these items I have requested?
8  A.   Yes, I have made an attempt.
9  Q.   Okay. And to the extent you had such
10     materials, you brought them?
11  A.   You have them in your possession or on the
12     table now.
13  Q.   Okay. And I understand your attorney has
14     indicated there may be some items that are
15     privileged, and I understand that, and we will
16     address that at a later date. Number seven,
17     documents for the past five years relating to
18     all cases in which you, as an expert, have been
19     retained to render opinions. And what I would
20     like is, have you prepared me a list of any
21     cases that gives me the retaining attorney or
22     the attorney you're working for, subject matter
23     of the case, and a copy of any deposition given

[19]

1      by you that's still in your possession?
2  A.   I haven't been retained in any cases.
3  Q.   Okay. You have served as an expert in other
4      cases?
5  A.   No. I have been asked to participate, but I've
6      never served as an official expert.
7  Q.   Have you ever provided expert opinion in the
8      last five years in any case?
9  A.   Again, I don't know how you would qualify an
10     expert, but I have provided opinions. I don't
11     know that they've deemed me an expert.
12  Q.   Okay. Let's stop right there and let me just
13     ask you some questions about that.
14  A.   Sure.
15  Q.   Do you have a list here today -- I know we're
16     going to go over it. Do you have a list of any
17     and all cases in which you've provided expert
18     opinion in in the last five years?
19  A.   No.
20  Q.   You do not. And in the last five years have
21     you provided expert opinion -- opinions in any
22     cases?
23  A.   I've provided opinions, but not as an expert.

[20]

1  Q.   Well, what kind of opinions have you provided?
2  A.   Basically it's been more of interrogatories
3      where there have been information that's been
4      required, discoveries, parts manuals, owners
5      manuals, do you know the location, can you
6      provide these sort of documents? And that's
7      typically how I respond to that.
8  Q.   Okay. Do you make a distinction between
9      opinions and factual testimony? I want to make
10     sure we're on the same page here. Do you make
11     a distinction --
12  A.   I don't understand your question. What do you
13     mean?
14  Q.   Well, do you understand that there is a
15     distinction between opinion testimony and fact
16     testimony?
17  A.   Yes. Inasmuch as one requires hard evidence
18     and one does not necessarily. One you can
19     substantiate -- opinions you substantiate with
20     testing. It doesn't necessarily mean it will
21     occur, but you substantiate it with testing.
22     Facts requires evidence and there has to be --
23  Q.   Okay. And I just want to make sure from the

[21]

1      standpoint of this request --
2  A.   Sure.
3  Q.   -- that we're operating on the same
4      definitions.
5  A.   Sure.
6  Q.   When I'm asking -- have you provided -- let me
7      just ask you this; in the last five years have
8      you provided any deposition testimony?
9  A.   Yes.
10  Q.   How many times?
11  A.   Maybe three.
12  Q.   Three times. Tell me about those.
13  A.   The last one I did was maybe two years ago.
14     And it was more discovery, providing answers to
15     interrogatories.
16  Q.   Okay. Were you asked to sit in a room like
17     this with a court reporter and answer
18     questions?
19  A.   Yes.
20  Q.   All right. And what -- well, tell me about it.
21     When you gave your deposition, what was that
22     case about? What product were you dealing
23     with?

11-27-2006                                                          Gabriel Uriegas

[7]  (Pages 22 to 25)

[22]

1   A.   It was a high horsepower concrete saw.
2   Q.   All right.  What was the name of the case?  I
3        assume Saint-Gobain was a party?
4   A.   Yeah.  Well, Saint-Gobain versus -- oh, I don't
5        want to be incorrect here.  I don't recall at
6        the moment, but it was definitely a high
7        horsepower saw.
8   Q.   Okay.  Where was this case?
9   A.   Kansas City, Missouri.
10  Q.   And what were the allegations against
11       Saint-Gobain?  To the best of your knowledge,
12       what was being alleged or claimed by the
13       plaintiff?
14  A.   It was a guarding issue.
15  Q.   And what were your opinions in that case?
16  A.   Basically I really filed no opinions.  I just
17       responded to discoveries on parts manuals.
18       Were there manuals available for the machine?
19       Were there parts lists available for the
20       machine?
21  Q.   Did you have any opinions or express any
22       opinions concerning whether or not the product
23       was properly guarded?

[23]

1   A.   Yes, I believe I did.
2   Q.   And did you -- what was your opinion?
3   A.   That in fact the machine was properly guarded.
4   Q.   Okay.  Was this high horsepower concrete saw,
5        was it a saw manufactured by Saint-Gobain?
6   A.   Yes.
7   Q.   Now, when I say manufactured, I'm talking about
8        -- you said that the hole saw, the core drill
9        that we're dealing with here today, was not
10       manufactured by Saint-Gobain?
11  A.   Correct.
12  Q.   Was the concrete saw that you're talking about
13       actually manufactured by Saint-Gobain?
14  A.   It in fact was manufactured by a contracted
15       vendor.
16  Q.   And how is that different than what we have in
17       the incident case where the core drill was
18       manufactured by a contract vendor?
19  A.   Basically we provide -- to a contract vendor we
20       would provide the drawings; we would provide a
21       bill of material, a parts list; we would
22       supervise the manufacture and assembly of a
23       piece of equipment.

[24]

1   Q.   Is it your contention that that was not what
2        was done in this case as far as the core drill
3        is concerned?
4   A.   The core drill in question?
5   Q.   Yes.
6   A.   The core drill in question was a purchase of an
7        existing product in a vendor's product line.
8   Q.   Okay.  Did you provide specifications to the
9        vendor for the manufacture of the core drill?
10  A.   We told the vendor that it needed to be either
11       blue or orange.
12  Q.   Well, is that the only specification that was
13       made by Saint-Gobain in the design of the core
14       drill that was manufactured by Diamond
15       Products?
16  A.   Yes.
17  Q.   Did Saint-Gobain evaluate the -- you mentioned
18       earlier the process that you were involved in
19       in the hazard analysis was to evaluate the
20       product that was being manufactured by Diamond;
21       is that correct?
22  A.   Manufactured and sold by Diamond Products, yes.
23  Q.   Manufactured and sold by Diamond Products.  And

[25]

1        that's the DM500 that we're talking about,
2        correct?
3   A.   Correct.
4   Q.   That model?
5   A.   That is our designation of the model.  They had
6        a different designation for the same machine.
7   Q.   Okay.  DM500 is Saint-Gobain's designation?
8   A.   Correct.
9   Q.   Before -- well, did Saint-Gobain contract with
10       Diamond Products to manufacture the DM500?
11  A.   To manufacture, no.  To purchase, yes.  We
12       basically issued a purchase request for a --
13       their model M-1 unit to be painted orange or
14       blue and labeled either DM500 or NDL DM500.
15  Q.   Okay.  Now, what's the difference in the DM500
16       and the exemplar that we have over here that
17       you inspected earlier today?
18  A.   This exact unit?
19  Q.   Yes.
20  A.   Well, there have been modifications to the
21       switch and modifications to the vacuum pump
22       plumbing system.
23  Q.   I'm sorry, I didn't make my question -- we

11-27-2006                                          Gabriel Uriegas

[8]  (Pages 26 to 29)

[26]

1    weren't communicating. The model -- and I know
2    this has got -- the plaintiffs have made
3    modifications to this unit as part of the
4    alternative feasible design. Except for those
5    modifications, what is the difference in this
6    model as it would have been received by
7    Saint-Gobain and the DM500 that is the subject
8    of Matthew Riley's incident?
9  A.  Can I take an opportunity to look at the
10   machine and check the nameplate?
11  Q.  Sure.
12  A.  I just want to make sure. They're all very
13   similiar. The design is pretty much an
14   industry standard. Point by point?
15  Q.  Yeah. I just want to know what the difference
16   is, yes.
17  A.  Essentially the foundation is the same. You
18   still have a base, you still have a column.
19   The dimensions of the column are still the same
20   height, the same squareness. The base is
21   essentially the same. This particular model is
22   set up so that the dolly assembly on the back
23   is wider so that it's a little bit easier --

[27]

1  Q.  The wheels you're talking about?
2  A.  Yeah, the wheels in the back to roll it around.
3  Q.  Okay.
4  A.  It has a handle on the back so that the
5   operator can carry it. The column is attached
6   with two bolts. The point being so that you
7   can remove the top bolt and adjust it so that
8   the column will pivot if required. The base
9   design is just a little bit more progressive in
10   appearance, not necessarily in function, but
11   definitely it's just a little more fresh
12   design. But essentially the principle is
13   almost exactly the same.
14  Q.  Okay. And the drill motor that's on there, is
15   that identical to -- in terms of the model of
16   drill motor, essentially the same as the drill
17   motor that was on the DM500 that Mr. Riley was
18   using?
19  A.  This particular model number may be a little
20   different, but for the most part, yes, the unit
21   -- the motor unit, the power pack, has pretty
22   much stayed the same.
23  Q.  The specifications are the same?

[28]

1  A.  Yes. Yeah, they're both the clutch-type motor.
2  Q.  How about the Gast vacuum pump, is that the
3   same as the one that was on Mr. Riley's?
4  A.  I would have to check it by model number, but
5   based on -- can I take an opportunity to look
6   at a photograph? That appears to be a little
7   bit different model.
8  Q.  Okay. You can. Do you have your --
9  A.  Sure.
10       (Off-the-record discussion.)
11  A.  Okay. So the motor is the same model.
12  Q.  Okay.
13  A.  And the pump is different, it's got a different
14   model number. I'm not exactly sure of the
15   details of the differences, but it is a
16   different model number.
17  Q.  Okay.
18  A.  The same series, but a different model number.
19  Q.  The same series. Is the pump on the exemplar
20   that we've talked about designed to function
21   identical to the pump that was on the DM500
22   that Mr. Riley was --
23  A.  Based on my observations right now, yes, I

[29]

1   would say that's the case.
2  Q.  All right. Now, if there were any changes --
3   well, let me ask you this; that's called a
4   DM550; is that correct?
5  A.  That's not correct.
6  Q.  What's the model number on that one, on the
7   exemplar?
8  A.  It is a model DR520.
9  Q.  I'm sorry, DR520. Who changes the model
10   numbers on the -- let me ask you this, I'm
11   sorry; is that a Saint-Gobain core drill?
12  A.  Inasmuch as we sell the machine, yes.
13  Q.  Yes, that's what I'm asking. That's a core
14   drill that would have come from Saint-Gobain,
15   correct?
16  A.  Yes. It's listed in our catalogue.
17  Q.  All right. And does Saint-Gobain still
18   manufacture the DM -- or still sell the DM500?
19  A.  No.
20  Q.  It does not. Is this an evolution of the
21   DM500?
22  A.  That's a good way to put it. Yes, it is.
23  Q.  The DR520?

11-27-2006                                                          Gabriel Uriegas

[9]  (Pages 30 to 33)

[30]

1  A.   Correct.
2  Q.   Okay.  And you mentioned what the differences
3       were, correct?
4  A.   Correct.
5  Q.   It's designed to do the same thing the DM500 is
6       designed to do?
7  A.   Yes.
8  Q.   Now, who would have been involved in the
9       changes that you've identified in the DR520
10      model?
11 A.   There would have been a group of -- an
12      equipment team that would have worked with a
13      contractor to develop any changes that were
14      made on that machine.
15 Q.   A team from where?
16 A.   Saint-Gobain.
17 Q.   It would be Saint-Gobain personnel?
18 A.   Yes.
19 Q.   All right.  And who manufactured the exemplar
20      that we see right here, the plaintiff's
21      exemplar?
22 A.   That's a good question.  It would have been
23      manufactured by a contractor.  The name of the

[31]

1       contractor I don't know off the top of my head.
2  Q.   Okay.
3  A.   Again, I don't participate actively in that
4       group for the last year.
5  Q.   Okay.  That would not have been Diamond
6       Products that manufactured that?
7  A.   No.  No.
8  Q.   And why is it that Diamond Products would not
9       have manufactured the exemplar, the DR520?
10 A.   Given the volume of the machine and the type of
11      changes that were requested, there has to be
12      significant volume to justify making
13      modifications to castings, and Diamond Products
14      would not be interested in such a low volume.
15 Q.   Okay.  So how did this design that we're
16      looking at, the DR520 that is the evolution of
17      the DM500, how did that design get to the
18      vendor who manufactured that DR520?
19 A.   There is a vendor who does contract
20      engineering.  He would have -- or we would have
21      approached the vendor and asked him to come up
22      with a more progressive looking machine.  And
23      he would have developed it, presented it to us,

[32]

1       we would have made an evaluation, and then
2       requested modifications until we came upon an
3       agreed format for the machine.
4  Q.   Okay.  And is that the way the process worked
5       in this case that we're talking about, the
6       DR520?
7  A.   For this particular machine, yes.
8  Q.   Okay.  How would I go about finding out who the
9       vendor is for this particular DR520 product?
10 A.   I can attempt to make that inquiry for you.  I
11      just don't know because I haven't participated
12      in a team in the last year.
13 Q.   Okay.  But just so we're all clear, the DR520
14      and the DM500 operate substantially the same?
15 A.   Yes.
16 Q.   Okay.  Now, what products does Saint-Gobain
17      manufacture?
18 A.   In terms of equipment?
19 Q.   Yes.
20 A.   In general we have a masonry saw line, concrete
21      saw line, tile saw line and a core drill line.
22      We also manufacture the accessories that go on
23      those units.  We make diamond blades and

[33]

1       diamond core bits.  We also provide abrasive
2       wheels, sandpaper and floor care items.
3  Q.   Okay.
4  A.   Polishing pads and that sort of thing.
5  Q.   Now, we talked about this a little bit, about
6       the concrete saw.  Does Saint-Gobain actually
7       manufacture masonry saws in terms of -- how is
8       the manufacture of the masonry saws different
9       than the production of the core drills?
10 A.   To date manufacturing is done by contract
11      vendors for all of the existing items.
12 Q.   For all of the existing items?
13 A.   For all of the existing equipment.
14 Q.   Including the diamond blades or are you talking
15      about just the --
16 A.   The equipment.
17 Q.   The equipment?
18 A.   Right.
19 Q.   That's the masonry saw line, the concrete saw
20      line, the tile saw line and the core drill
21      line?
22 A.   Yes.
23 Q.   How long has that been the case?

11-27-2006                                                           Gabriel Uriegas

[10]   (Pages 34 to 37)

[34]

1   A.   Oh, at least five or six years, the best I can
2        recall.
3   Q.   Okay. And that's the same for the masonry saw
4        line, the concrete saw line, the tile saw line
5        and the core drill line?
6   A.   Correct.
7   Q.   Okay. On each one of those lines that we
8        talked about, the equipment lines that we just
9        listed, does Saint-Gobain place its label on
10       the product? And when I say label, I'm talking
11       about -- I see you're wearing a shirt here
12       today that says "Norton" and "Clipper." Are
13       those product labels for Saint-Gobain products?
14  A.   Norton, Clipper and Pro-Cut are brand names.
15       And those are the labels that we sell products
16       to the distribution market -- those are the
17       brand names we use when we introduce products
18       into the distribution market.
19  Q.   Okay. Those are Saint-Gobain brand names?
20  A.   Correct.
21  Q.   Okay. And do each one of those lines that you
22       just listed for me, the masonry saw line,
23       concrete saw line, tile saw line and core drill

[35]

1        line, carry one of those brand names?
2   A.   Typically the Norton is associated with the
3        sandpaper and abrasive wheels, whereas Clipper
4        and Pro-Cut would be associated with the
5        equipment.
6   Q.   Okay. And was that the case back in 2003?
7   A.   Yes.
8   Q.   Have there been any changes in that practice
9        any time prior to the spring of 2003?
10  A.   To date we continue to sell equipment under the
11       Pro-Cut and Clipper brand names.
12  Q.   Okay. Now, you're aware that the Norton brand
13       name was on the DM500 that Mr. Riley was using,
14       correct?
15  A.   It was on the nameplate, yes.
16  Q.   Okay. Has that changed -- how long has the
17       Norton brand name been on the core drills that
18       are sold by Saint-Gobain?
19  A.   That's been in existence for probably at least
20       five to six years.
21  Q.   Okay. Why has the -- why is Norton on that
22       line, the DM500 model, I guess, the core drill
23       line, as opposed to the Pro-Cut or Clipper

[36]

1        brand name?
2   A.   Ask me that again, you lost me.
3   Q.   I'm sorry, it was poorly asked. You indicated
4        that most of the time Clipper and Pro-Cut are
5        the brand names that you market this equipment
6        line under. Why was Norton the brand name for
7        the DM500 core drill? I mean, is there any
8        reason?
9   A.   I'm not sure -- I'm not sure of the reasoning,
10       but we basically have -- as I explained, you
11       have a Norton product line which is composed,
12       for the most part, of abrasive-type products,
13       stem wheels, grinding wheels, sandpaper, floor
14       care items. And that is the higher volume
15       product lines that are sold to the distribution
16       market. So in order to establish some
17       continuity or relationship between the Clipper
18       and the Pro-Cut line, we used Norton as the
19       primary brand name with Clipper or Pro-Cut as a
20       brand name. So it would have been Norton
21       Clipper, Norton Pro-Cut.
22  Q.   Okay. Now, you mentioned that as a part of
23       your hazard analysis that you would ask for

[37]

1        documentation from vendors?
2   A.   Yes.
3   Q.   Okay. And in the case of the DM500 model that
4        Mr. Riley was using in August of 2003, would
5        you have been involved in the development of
6        manuals associated with that product?
7   A.   I believe I would have been.
8   Q.   Okay. Are the manuals produced by
9        Saint-Gobain?
10  A.   Yes.
11  Q.   What determines what goes in the manuals? How
12       do you determine what to place in the manuals
13       for the DM500 core drill prior to -- I'm
14       talking about prior to the spring of 2003?
15  A.   Typically the way it has been done is to take
16       existing documentation for similar products.
17       And the core drills, for the most part the
18       design is fundamental, it's a stand and it's a
19       base and it's a motor. There is a separate
20       manual for the motor, separate operator/owners
21       manual for the motor, and a separate
22       operator/owners manual for the Gast vacuum
23       pump. And then we developed a third piece of

[38]

1    documentation which would be basically an
2    operators instruction and general instructional
3    type literature with parts lists and part
4    numbers.  That is typically developed based on,
5    again, history, what is required in order to
6    safely operate the machine in order to provide
7    enough information to make sure that the
8    operator can reasonably operate the machine.
9  Q.   Okay.  And are all of those documents that you
10   just listed, the Milwaukee motor manual, drill
11   motor manual, and the vacuum pump manual and
12   the third documentation produced by
13   Saint-Gobain supplied with the product?
14 A.  Yes.
15 Q.  All right.  As separate documents?
16 A.  Yes.
17 Q.  Okay.  And was that the case back in the --
18   before the spring of 2003?
19 A.  Yes.  In this particular case the unit could be
20   purchased as a DM500, but it would be shipped
21   to the distributor in three pieces.  I mean,
22   the distributor has the option to pick the
23   power of the motor that he wants to use.  Does

[39]

1    he want to use a 15 amp?  Does he want to use a
2    20 amp?  He may or may not want the vacuum
3    pump.  So there were separate boxes.  The
4    stand, as we call it, came in one box, the
5    motors were in another box, and then the Gast
6    vacuum pump was in yet another box.  Each
7    individual box had its own owners manual,
8    because it's possible to pick and choose and
9    develop your own machine.
10 Q.  Okay.  In terms of the operators manual that
11   Saint-Gobain produced, and that's correct that
12   Saint-Gobain produced the operators manual for
13   the complete unit, correct?
14 A.  Yes.  Correct.
15 Q.  How was it determined what instructions and
16   what warnings to put in the manual?
17 A.  Going back and using previous issues of that
18   documentation, it was essentially just an
19   evolution on to a newer document.  The
20   principles and many, many of the components
21   were essentially the same.  Typically what
22   would happen is you would review other
23   manufacturers' documentations, any publications

[40]

1    that may exist, and add some additional
2    information to the document, provided that
3    information was within the technical ability of
4    the operator.
5  Q.   Were you personally involved in the development
6    of the operators manual for the DM500?
7  A.   Yes, I believe I was.
8  Q.   Okay.  What role did you play?
9  A.   At that point I believe I had written some of
10   the original documentation, which, for the most
11   part, was information taken from either the
12   Gast vacuum pump document or the Milwaukee
13   motor document or existing previous issues of
14   similar type manuals that already existed.
15 Q.  All right.  Were you involved in the -- you
16   said that the -- in the entire time you've been
17   at Saint-Gobain they have sold a line of core
18   drills, correct?
19 A.  Correct.
20 Q.  All right.  Was there an operators manual for
21   Saint-Gobain's line of core drills when you
22   first --
23 A.  Yes.

[41]

1  Q.   -- came to work there?
2  A.   Yes, there was an operators manual.
3  Q.   Okay.  And did that manual change over the
4    years as a result of your input?
5  A.   Yes.  Yeah, they evolved.
6  Q.   They evolved?
7  A.   Yes.
8  Q.   And what process did you go through in that
9    evolution?  When I say you, I'm speaking of you
10   and Saint-Gobain to the extent you have
11   knowledge of --
12 A.   Yeah, there were several individuals that are
13   involved in the development of the manual.  One
14   person usually ends up coordinating all of the
15   activity and then publishing the document, the
16   original document.  But typically what would
17   happen is we would develop the new product.  We
18   would go to publish the manual.  And if there
19   were any features that were now offered on a
20   newer machine, we would publish a marketing
21   piece of literature to show those features.
22       And then the operators manual, if in order
23   to help a salesman sell the product we needed

11-27-2006                                                    Gabriel Uriegas

[12]  (Pages 42 to 45)

[42]

1    to explain in a little more detail how the
2    machine was to be used, they would make
3    suggestion as to what areas of the machine
4    needed more explanation.  And we would go in as
5    the technical people and find existing
6    literature on that particular component and
7    then add that information into the document.
8  Q.  Okay.  Now, with regards to the operators
9    manual for the drill motor itself, and I'm
10   speaking prior to the spring of 2003 -- by the
11   way, when was this product sold by United
12   Rentals -- I mean, by Saint-Gobain to United
13   Rentals?
14  A.  I believe that's in the documentation
15   somewhere.  I don't have it.
16  Q.  Okay.  It was in the spring of 2003, correct,
17   roughly?
18  A.  You would have to check the documentation.  Off
19   the top of my head I don't recall.
20  Q.  That's fine.  Do you have the documentation in
21   your documents?
22  A.  I don't believe I have the bill of sale.  I
23   think it's in that.

[43]

1  Q.  Oh, I see.  Let me hand it to you and you find
2    the document for me, please?
3  A.  Sure.  The date on this particular document --
4    oh, wait, here we go.  I was looking at the
5    wrong document.  That was sale or rental to
6    Flavor House.  This is the sale of the items to
7    United Rentals.  The ship date shows to be
8    3/14/03.
9  Q.  3/14/03.  So March of '03 is roughly when the
10   product left Saint-Gobain?
11  A.  That's what's on the document.
12  Q.  Okay.  Now, getting back to my question, we'll
13   work with March of 2003 as kind of the date
14   that the product left Saint-Gobain; is that
15   fair?
16  A.  That's fair.
17  Q.  Okay.  Prior to March of 2003, this manual
18   process you're talking about was the same as
19   you've just described, right?  In other
20   words --
21  A.  Development of the owners manual?
22  Q.  Yes.
23  A.  Yes.

[44]

1  Q.  Okay.  And there was a manual that came from
2    Milwaukee for the Milwaukee drill motor,
3    correct?
4  A.  Correct.
5  Q.  And there was a manual for the pump that came
6    from Gast; is that correct?
7  A.  Correct.
8  Q.  But there was no separate motor -- I mean,
9    separate manual for the combination of those
10   products, correct?
11  A.  That's essentially what the third piece of
12   documentation was.
13  Q.  And that's the document that Saint-Gobain, with
14   your assistance and others, developed, correct?
15  A.  Correct.
16  Q.  Now, the manual for the Milwaukee drill --
17   well, would you agree with me that by combining
18   those components, the drill motor, the vacuum
19   pump and the base, that there are additional --
20   well, the product is used differently, correct?
21       MR. SHEEHAN:  Object to the form.
22       MR. SPRAIN:  Object to the form.
23  Q.  In other words, it's designed to do something

[45]

1    with the combination of those components that
2    you wouldn't do with one of the components by
3    itself, correct?
4       MR. SPRAIN:  Object to the form, but go
5       ahead and answer.
6  A.  I'm not sure what you're trying to ask me at
7    this point.
8  Q.  Okay.  Let me ask you this way; the core drill
9    design that's represented by the exemplar and
10   by Mr. Riley's DM500 model, it would be
11   difficult to function as a core drill without
12   the combination of the base, the drill motor
13   and the vacuum pump that we have here, correct?
14  A.  Well, the intent of offering the pieces
15   individually is so that you didn't have to buy
16   the stand and you didn't have to buy the vacuum
17   pump.  A core drill motor is exclusively
18   designed to be used on a core drill stand,
19   whether it's a Norton Clipper stand, whether
20   it's a Target stand, which is another brand
21   name, or whether it's a Diamond Products stand.
22   That same unit will literally mount straight to
23   one of those different stands.

11-27-2006                                                    Gabriel Uriegas

[13]  (Pages 46 to 49)

[46]

1    Q.    You're talking about the Milwaukee motor,
2          correct?
3    A.    Correct.
4    Q.    Is that motor specifically not designed for use
5          on a core drill?
6    A.    That's what I just said.  It is designed
7          exclusively for use on a core drill, but not on
8          our core drill.
9    Q.    I didn't hear you say that.  And is the Gast
10         vacuum pump that appears on the base of our
11         exemplar specifically designed exclusively for
12         use on a core drill?
13   A.    That is not a true statement.  That is
14         basically a catalogue item.  And it has -- a
15         vacuum can be used to draw vacuum in a lab for
16         testing purposes, but it's basically a
17         catalogue item.
18   Q.    Okay.  Does the Milwaukee operators manual or
19         owners manual -- do you distinguish between
20         those two?
21   A.    They're the same.
22   Q.    They're the same.  Does the manual that comes
23         with the Milwaukee drill motor address issues

[47]

1          associated with using that motor on core
2          drills?
3    A.    Yes.
4    Q..   All right.  Where does Saint-Gobain get its
5          information as far as -- let's back up.  The
6          hazard analysis, let's go back to that issue,
7          that you participated in, what -- other than
8          pulling information from Milwaukee manuals,
9          what other information is utilized in the
10         development of the hazard analysis for a core
11         drill?
12   A.    Well, typically we rely on the manufacturer's
13         documentation to direct us as to the
14         appropriate use of their particular component.
15   Q.    And who is the manufacturer you're referring to
16         here?
17   A.    Well, in this case you were referring to
18         Milwaukee, so it's Milwaukee for a core drill
19         motor.  It could have been Black and Decker or
20         DeWalt, depending on the brand of the motor, or
21         Gast, but we would go back to their
22         documentation.  They are the experts on their
23         components and we wouldn't begin to define how

[48]

1          their product should be used and maintained.
2          It's their product, that's why they provided
3          the manual to us.
4    Q.    Okay.  Is it your position that the Milwaukee
5          manual that came with the drill motor before
6          March of 2003, the Milwaukee motor -- the
7          manual that came with the Milwaukee motor prior
8          to that date, contained all of the warnings and
9          instructions necessary for the operation of the
10         core drill?
11   A.    For the operation of the core drill motor.
12         That motor will fit anyone's drill and column
13         assembly.  Now, that doesn't necessarily mean
14         that you can generally express all of the
15         warnings in that document to fit every possible
16         application, because that particular motor fits
17         many, many different types of bases and
18         columns.
19   Q.    That's my question.  What did Saint-Gobain do
20         to supplement the information that's provided
21         with the Milwaukee drill motor prior to March
22         of 2003?
23   A.    Basically we would have taken the relevant

[49]

1          information for that motor and applied that to
2          an additional piece of documentation that would
3          be most relevant to safely or properly
4          operating the core drill.
5    Q.    As it appears in an assembled fashion, correct?
6    A.    Correct.
7    Q.    With the motor, the pump, the vacuum pump, and
8          the stand, correct?
9    A.    Not necessarily.  Again, the parts can be --
10         can be purchased individually.  The use of a
11         vacuum pump is not all that common.  Typically
12         what takes place with a core drill is you use a
13         five-eighths inch anchor and you anchor the
14         base to the floor.  The use of a vacuum pump is
15         very limited and is really only appropriate in
16         those areas where the surface is very smooth
17         and the texture is very consistent.
18   Q.    Where do you get -- what's the basis for that
19         comment?
20   A.    22 years of experience.
21   Q.    22 years of experience.  22 years of experience
22         -- well, give me the basis for your statement
23         that the vacuum is not commonly used on a core

11-27-2006                                    Gabriel Uriegas

[14]  (Pages 50 to 53)

[50]

1       drill that is supplied with a vacuum pump as a
2       system for holding the base to the --
3    A.   That's a different question than what I
4       responded to.  What I'm telling you is that
5       just because you see the three items listed in
6       a catalogue does not mean that the three items
7       are purchased and sold as a single unit.  What
8       I'm telling you is you can buy the core drill
9       motor, you can buy the stand and you can buy
10      the vacuum pump.  You buy 15 or 20 amp core
11      drill motors and you put them on a stand, you
12      don't have to buy the vacuum pump.  Many
13      contractors prefer not to use the vacuum pump.
14   Q.   I'm asking for your basis for stating that
15      vacuums are not -- what was your words,
16      commonly used?
17   A.   Commonly used.
18   Q.   That vacuum pumps are not commonly used as a
19      means of securing core drills such as what we
20      see here today?
21   A.   Sales.  Sales.  We sell many, many, many
22      stands.  We sell about a third with vacuums.
23   Q.   Okay.  Can you get me that data?

[51]

1    A.   Not for that particular core drill I cannot.
2    Q.   Well, what do you mean?
3    A.   I can't go back and get those records at this
4       point.  The facility we were working is no
5       longer open.  I can get you current data.
6    Q.   Current data on --
7    A.   Core drill sales.
8          MR. SPRAIN:  What I have to do, of
9          course, is make an objection,
10         because I don't know -- I have not
11         seen it, Joe.  I don't know
12         whether it's proprietary, whether
13         it's confidential, whether it's
14         privileged, I haven't seen it.  I
15         don't want to voluntarily produce
16         like internal sales data which a
17         competitor may use to our
18         disadvantage.  So with that
19         objection noted, he'll look for
20         it.
21         MR. LANE:  Okay.
22   Q.   How far back do your records go on the sale of
23      core drills?

[52]

1    A.   I can't tell you.  I don't -- I don't maintain
2       those records.
3    Q.   Just so I'm clear, it's your position though
4       that back in 2003 -- prior to 2003, that for
5       new units Saint-Gobain sold more units without
6       vacuum pump hold-down systems than it did units
7       with it, correct?
8    A.   Yes.
9    Q.   And to the extent that you sold two-thirds more
10      without -- new units without vacuum system
11      hold-downs than you did with, correct?
12   A.   Correct.
13   Q.   All right.  On the unit that we're -- the
14      exemplar that we've got over here, which you've
15      indicated is substantially the same in function
16      as the DM500, how do you secure that with an
17      anchor bolt?
18   A.   You basically -- without the pump in place?
19   Q.   Yes.
20   A.   All core drill units that are of this similar
21      design have a slot in the center.  You use one
22      five-eighths inch anchor, and it's a wedge-type
23      anchor, typically it's a wedge-type anchor.

[53]

1       You drill with a rotor hammer, you drill down,
2       you place the anchor down, and then you take a
3       -- either a piece of all-thread rod with a
4       washer and a nut or you could -- they now make
5       a -- it's basically a bolt with a fast head on
6       it, you can spin it down and lock the head in
7       place.
8    Q.   Okay.  Have you reviewed the manual that was
9       provided by Saint-Gobain to United Rentals when
10      they sold this product, the DM500?
11   A.   Yes.
12   Q.   Okay.  Can you pull that out for me of your
13      documents?
14   A.   Nothing is stapled together.
15   Q.   Do you have that there in front of you?
16   A.   Yes.
17   Q.   Okay.  If you will, direct me to the
18      instructions in there that -- on how to use the
19      anchor bolt that you were just describing for
20      me?
21   A.   Page seven.
22   Q.   Page seven?
23   A.   Yes.

[54]

1   Q.  Okay.
2   A.  "Anchor bolting is a method used quite often in
3       both horizontal and vertical drilling.  The
4       anchor is secured in the work surface and the
5       core drill is placed over the anchor bolt so
6       that the bolt goes through the hole in the
7       center of the drill base.  A nut and washer is
8       used to pull the base down as the nut is
9       screwed onto the anchor bolt."
10  Q.  Okay.  And that is the entire instructions for
11      the use of an anchor bolt, correct?
12  A.  Correct.
13  Q.  All right.  Does Saint-Gobain supply the
14      anchoring system to be used for the anchor bolt
15      that's described there?
16  A.  No.
17  Q.  It does not supply that with the product?
18  A.  No.
19  Q.  All right.  That anchoring system that you're
20      talking about requires the use of a separate
21      drill system to drill the hole, correct?
22  A.  Correct.
23  Q.  All right.  And which one of these -- which one

[55]

1       of these systems that you've indicated here on
2       page seven of the operators manual is the most
3       common method for securing the base for the
4       core drills we've been talking about, the
5       DM500?
6   A.  In general I would say anchor bolting.  I would
7       say anchor bolting is the most common.  When
8       you're placing the core drill on the wall,
9       anchor bolting is the generally accepted
10      standard and method for mounting the unit to
11      the wall.
12  Q.  Okay.  You mentioned it's the standard -- well,
13      now, how often is this core drill used to drill
14      through walls?
15  A.  Often.  Very often.
16  Q.  Okay.  How about when it's used to drill holes
17      in the floor, which is the most commonly used
18      anchoring system for the base?
19  A.  It would depend on -- it would depend on the
20      surface you're trying to go through.  If the
21      surface is very rough --
22  Q.  I want to -- every surface that the core drill
23      would be used in, what's the most common use of

[56]

1       anchoring the base?
2   A.  Anchor bolting.
3   Q.  Okay.  And, again, your basis for that?
4   A.  The only thing I can give you other than
5       experience and sales.
6   Q.  All right.  Now, the ceiling bracing that we
7       see on page seven there, that's something that
8       requires you to at least have something to push
9       up against, correct?
10  A.  Correct.
11  Q.  If you don't have a ceiling that's low enough
12      or with a strong enough ceiling to brace up
13      against, that method is basically not
14      available, correct?
15  A.  For vertical, yes.  But it's very common with
16      horizontal drilling.
17  Q.  Okay.  That wouldn't be a ceiling brace though,
18      would it?
19  A.  No.
20  Q.  It would be a horizontal wall brace?
21  A.  You could define it that way.  It's basically a
22      jack screw.
23  Q.  Okay.  And it's your understanding that --

[57]

1       well, in the use of one of these products,
2       what's more common, drilling holes in the floor
3       or drilling through walls?
4   A.  Well, you have to add a third -- well, you
5       would call it drilling holes in a wall if you
6       wanted to put fence posts in; now you're
7       drilling vertically in a wall.  So I would say
8       it's about a 50/50 split.
9   Q.  Okay.  And what do you base that on?
10  A.  Basically the typical applications that
11      customers ask questions about.
12  Q.  Where are the records on that?
13  A.  There would be no records.  There would be
14      phone conversations or face-to-face
15      conversations at distributor locations.
16  Q.  Okay.  You don't do any type of questionnaires
17      or anything on product development?
18  A.  No, I do not.
19  Q.  Okay.  Is that information that comes through
20      your review at Saint-Gobain, customer requests,
21      things of that nature?
22  A.  Technical questions, yes.
23  Q.  Okay.  And are those questions then used to

11-27-2006                                                    Gabriel Uriegas

                          [16]   (Pages 58 to 61)

[58]

1        require vendors to modify the designs of the
2        core drills?
3   A.   To require a vendor?  I wouldn't use the word
4        "require."  We would basically have a
5        conversation with the vendor about the
6        feasibility of making the modification to the
7        machine.
8   Q.   Okay.  And then if the vendor would not make
9        the modification, would you try to find a
10       vendor who would?
11  A.   A vendor will always make a modification if you
12       throw enough money at him.
13  Q.   I see.  Okay.  Now, Diamond Products was the
14       vendor for the -- Mr. Riley's drill, correct?
15  A.   Yes.
16  Q.   That's what you're referring to when you say
17       vendor?
18  A.   In this case, yes, for the DM500.
19  Q.   All right.  How has the design changed -- well,
20       I think I already asked you this once, but did
21       Diamond Products have any control over the
22       design of that product such that when you
23       switched vendors you had to make some type of

[59]

1        arrangement with Diamond Products in order to
2        continue to have that product manufactured by a
3        different vendor?
4   A.   We could not have taken that design and given
5        it to another vendor.  It was a design for
6        Diamond Products.  It's their -- it's their
7        design.  So we could not have picked that up,
8        given it to someone else and had them make it.
9   Q.   Well, how are you having the DR520 manufactured
10       then?
11  A.   The base is different.  As you saw, the --
12  Q.   The wheels?
13  A.   The wheels are different.  I mean,
14       dimensionally you could not use the same set of
15       drawings and build that DR520.
16  Q.   Okay.  So you're saying that the changes made
17       to the DR520 are different enough that you
18       didn't have to make an arrangement with Diamond
19       Products?
20  A.   Correct.
21  Q.   Okay.  Was that why the changes were made to
22       the DR520?
23  A.   Not specifically, no.  The idea was to give it

[60]

1        a more progressive and fresh look.
2   Q.   Okay.  Who manufactured or who was the vendor
3        for the DM500 type core drill that Diamond
4        supplied you prior to that model being provided
5        by Diamond?
6   A.   We had a contract vendor out of, I believe it
7        was, Carrollton, Georgia that was manufacturing
8        a machine that was similar to that.
9   Q.   Who was that?
10  A.   Production CNC, I believe, was the name.
11  Q.   Production CNC?
12  A.   Yes.
13  Q.   And what were the model numbers for that line?
14  A.   To the best of my memory, and it's been a
15       while, I believe we still used the letter D
16       designation and then it was D15, 18, 20.  15
17       for a 15 amp motor, 18 for an 18 amp motor, 20
18       for a 20 amp motor.
19  Q.   Okay.  And when did Production CNC produce core
20       drills for Saint-Gobain?
21  A.   The best I can recall, it was prior to 2000.
22  Q.   How long did Diamond Products produce core
23       drills for Saint-Gobain?

[61]

1   A.   We purchased those drills from them -- again,
2        to the best of my recollection, there was a
3        period when I wasn't involved in the purchasing
4        side of that, but I want to say from at least
5        2000 forward.  From the time we stopped
6        purchasing from Production CNC.
7   Q.   Okay.  And when did they cease to produce core
8        drills for Saint-Gobain?
9   A.   Again, to the best of my knowledge, all I can
10       tell you is sometime around 2004, I would say.
11       It may have been sooner than that.
12  Q.   Did Diamond Products produce the DM500 core
13       drill for any other customer during the time
14       they were producing it for Saint-Gobain?
15  A.   I have no evidence to support that.  I suspect
16       that was the case, but I have no evidence to
17       support that position.
18  Q.   Does Diamond Products still manufacture core
19       drills for any entity to your knowledge?
20  A.   Yes.
21  Q.   For whom?
22  A.   For themselves.  They sell it under the
23       Core-Cut brand name.

11-27-2006                                                    Gabriel Uriegas

[17]  (Pages 62 to 65)

[62]

1  **Q.**  They sell it under what brand name?
2  **A.**  C-O-R-E, C-U-T.
3  **Q.**  Okay.  During the time they were manufacturing
4     core drills for Saint-Gobain, did they market
5     core drills under the brand name Core-Cut?
6  **A.**  Yes.
7  **Q.**  They did.  All right.  Were those -- were those
8     core drills different in design than the DM500?
9  **A.**  I believe they were different.
10  **Q.**  How were they different?
11  **A.**  The base had some modifications.  Many of the
12     components were interchangeable, but I believe
13     the base had just a little bit different look.
14     There may have been an extra fin just so that
15     it had a different appearance.
16  **Q.**  I see.  When -- I'm sorry, did I ask you who
17     was currently manufacturing the core drills?
18  **A.**  Yes, you did.
19  **Q.**  And did you tell me?
20  **A.**  No, because I don't know.
21  **Q.**  Okay.  Who was responsible for the changes in
22     the design between the DM500 and the DR520
23     that's our exemplar here that you've previously

[63]

1     identified for us?
2  **A.**  We had a contract engineering group come in and
3     we solicited suggestions from that particular
4     group.  And we did surveys, I guess, requesting
5     from customers what would you like to see that
6     would be different in a core drill.
7  **Q.**  Okay.  And were any of the suggestions
8     implemented into the design of the DR520?
9  **A.**  Yes.
10  **Q.**  All right.  You mentioned the handle on the
11     back up at the column on the slide mechanism,
12     right?
13  **A.**  Correct.
14  **Q.**  That's one change.  And then you mentioned
15     there was a change in the wheelbase?
16  **A.**  The wheel dollies.  We made the wheel dolly --
17     the base is the same, but the dolly is wider.
18  **Q.**  Okay.  The wheelbase on the rolling mechanism
19     is wider, correct?
20  **A.**  Yes.
21  **Q.**  And were those changes that Saint-Gobain
22     implemented as a result of this survey that was
23     done and the engineering group that came in --

[64]

1  **A.**  Yes.
2  **Q.**  -- for Saint-Gobain, correct?
3  **A.**  Correct.
4  **Q.**  Now, the engineering group was hired by
5     Saint-Gobain?
6  **A.**  Yes.
7  **Q.**  All right.  Was the current vendor for the
8     DR520 in any way involved in the development of
9     the design changes that we've just talked
10     about, other than actually implementing those
11     in the manufacture?
12  **A.**  Yeah, they did make suggestions.
13  **Q.**  Okay.  Were any of those suggestions
14     implemented into the design?
15  **A.**  The base, the appearance of the base, changing
16     the casting, adding a wing, adding a boss, but
17     it was more for appearance than anything
18     structural.
19  **Q.**  Okay.  The function didn't change in any way as
20     a result --
21  **A.**  No.
22  **Q.**  -- of the changes?
23  **A.**  No.

[65]

1  **Q.**  Now, let's mark, if we will -- well, just to
2     make sure, I know we've previously marked this,
3     but I want to just hand you what I'll mark as a
4     copy of the manual that you've brought here
5     today and just ask you to confirm that that's a
6     complete and accurate copy of the manual that
7     you referred to earlier that you brought with
8     you today for the DM500 core drill that
9     Mr. Riley was using?
10  **A.**  It appears to be.
11        (Plaintiff's Exhibit 2 marked
12        for identification.)
13  **Q.**  Okay.  What I want to do, let's go back and --
14     we'll take a break here in just a little while,
15     but I just want to identify some documents
16     first.  Now, before we get off our question,
17     you had mentioned that you had testified three
18     times before in the last five years?
19  **A.**  Yes.
20  **Q.**  You talked about one that was in Kansas City.
21     What are the other ones?
22  **A.**  I honestly don't recall.  I wasn't prepared to
23     answer that question.  There have been several,

[66]

1    I think. It's been some time since I've had
2    any participation in those kinds of suits. The
3    latest one was in Kansas City. Before that I
4    think there may have been some outside of that
5    five year period.
6  Q.  Okay.
7  A.  And I can't recall that far back without going
8    through some notes.
9  Q.  Well, have you ever provided deposition
10    testimony or trial testimony in a case
11    involving a core drill?
12  A.  No.
13  Q.  Okay. In the cases that you have testified in,
14    the three you mentioned, in any of those cases
15    did Saint-Gobain deny any allegations that they
16    were the manufacturer of any of those products?
17  A.  Yes.
18  Q.  In any of the product lines that you've
19    mentioned earlier, has Saint-Gobain ever
20    admitted to being the manufacturer of any of
21    those product lines?
22  A.  Yes.
23  Q.  Which ones?

[67]

1  A.  The one I can tell you specifically, the high
2    horsepower saw, I think we -- no, I take that
3    back, we didn't manufacture that one.
4  Q.  Okay.
5  A.  But we did claim that we provided the
6    specifications and drawings for that machine.
7  Q.  Is your -- and by your I'm speaking of -- let
8    me ask you this; does Saint-Gobain make a
9    determination as to whether or not they're the
10    designer of a product based upon the fact of
11    whether or not they actually created the
12    drawings to the product line?
13  A.  Yes.
14  Q.  And if Saint-Gobain does not produce the
15    drawings, you would consider them to not be the
16    manufacturer of a product -- the designer of a
17    product?
18  A.  That is correct.
19  Q.  And what is the criteria for Saint-Gobain's
20    determination as to whether or not they
21    manufacture the product or not?
22  A.  If we physically purchase the raw material,
23    transform that raw material into a product, and

[68]

1    then assemble that product, place our label and
2    put it in the market, we are a manufacturer.
3    If we simply go out and purchase a particular
4    vendor's existing product, we don't consider
5    ourselves the manufacturer of that product,
6    we're basically purchasing an item.
7  Q.  Okay. And on the product lines that you listed
8    for me earlier, is Saint-Gobain the
9    manufacturer of any of those product lines?
10    Let me list them, the masonry saw line, the
11    concrete saw line, the tile saw line and the
12    core drill line.
13  A.  No.
14  Q.  Is Saint-Gobain the designer of any of those
15    product lines; the masonry saw line, the
16    concrete saw line, the tile saw line and the
17    core drill line?
18  A.  The masonry saw line, we would have had some
19    participation in particular models.
20  Q.  And that participation would be what?
21  A.  We would have requested modifications to
22    drawings. We would have supplied drawings to
23    the vendor.

[69]

1  Q.  Well, that's a little bit different. There's
2    two different answers there. Let me make sure
3    I'm clear. Let's break it down. Is supplying
4    the drawings the key factor in your opinion?
5  A.  Yes. Because we are determining the
6    transformation of a raw material.
7  Q.  Okay. And you're saying that just asking a
8    vendor to make changes in a drawing is
9    different than supplying them with drawings,
10    correct, in terms of defining manufacturer?
11  A.  If it's our drawings and we request the
12    changes, it's still ours, it doesn't matter.
13    If on the other hand, as it was in the case of
14    this core drill, it's his product, you can ask
15    him to make modifications, but he's going to
16    say no, this is my product. You can purchase
17    it. I'll give it to you blue; I'll give it to
18    you orange, but you purchase my product and I
19    will put your label on it, pack it and ship it
20    out the door for you.
21  Q.  Well, my question is this; when you made
22    these suggestions for the changes to the vendor
23    for the DR520, were you participating in the

[70]

1  design of that product at that point?
2  A.  I'm not positive, because I wasn't fully
3  involved in that particular group.  But I do
4  believe that we did make or we participated in
5  payment for the development of drawings.
6  Q.  Okay.  Let's see if -- so, as you sit here
7  today, you can't tell me anything about the
8  other two cases that you believe --
9  A.  I don't recall.  I apologize, I just -- I
10  wasn't prepared for that.
11  Q.  Where would you get that information?  Where
12  could you find that information?  Do you have a
13  file somewhere?
14  A.  I don't, but the Product Safety Group would
15  have --
16  MR. SPRAIN:  Well, let's do this; you
17  can, after this deposition,
18  provide that to me and then I can
19  communicate that to Mr. Lane.
20  A.  Sure.
21  MR. SPRAIN:  What do you want exactly?
22  Do you want the name of the case
23  and where it was pending?

[71]

1  MR. LANE:  The name of the case, yeah,
2  where it was -- well, basically
3  what we've got right here in
4  number seven, I believe.
5  MR. SPRAIN:  Okay.
6  A.  But only those cases in which I provided
7  testimony?
8  Q.  That's all I'm asking for right now, yes.
9  A.  Okay.  And I may have been a bit confused,
10  because a report is pretty typical.  A field
11  report will come in and it may or may not lead
12  anywhere.  And I basically will take the
13  report, make a copy, and I forward that to
14  Product Safety so they're put on notice that
15  something took place.
16  Q.  What's contained in Product Safety?  You said
17  Product Safety, that's a department in
18  Saint-Gobain?
19  A.  Yes.
20  Q.  What's their function?
21  A.  Basically to catalogue and gather all
22  information and data on incidents that take
23  place with products sold by the abrasives

[72]

1  group.
2  Q.  Okay.  And would Product Safety have
3  information concerning incidents involving core
4  drills?
5  A.  If any exist, they might.
6  Q.  Who is the head of Product Safety?
7  A.  There is a World Product Safety Manager.  His
8  name is Ron Karbowski.
9  Q.  With a K?
10  A.  With a K.  K-A-R-B-O-W-S-K-I.
11  Q.  And where is he?
12  A.  Worcester, Massachusetts.
13  Q.  Who do you send information to when you receive
14  it in terms of the Product Safety Group?
15  A.  Typically to Ron.
16  Q.  Okay.  Just so we can finish up with the notice
17  here.  Number eight, you said you're not being
18  paid any extra fees for your services as an
19  expert witness in this case?
20  A.  No.
21  Q.  Okay.  You're working as a Saint-Gobain
22  employee; is that correct?
23  A.  That's correct.

[73]

1  Q.  All right.  Number nine, I asked you to provide
2  your complete file on this case, including all
3  handwritten or typed notes and correspondence
4  to you or from you to anyone else related to
5  this case.  We have already talked about
6  potentially privileged information that your
7  lawyer may have received.  Have you produced
8  everything else other than that here today?
9  A.  With the exception of the two cases, yes.
10  Q.  Okay.
11  A.  And those two may be irrelevant; they may be --
12  Q.  That's fine.
13  A.  -- just passing documentation.
14  Q.  Let's just identify some more documents here.
15  I'm going to go through this quickly and then
16  we'll take a break here.
17  (Plaintiff's Exhibit 3 marked
18  for identification.)
19  Q.  Can you identify that for me, what we've marked
20  as Plaintiff's Exhibit Number 3?
21  A.  Yeah, I think this was the attendance list for
22  the first inspection at ATS.
23  Q.  Okay.  That was the inspection of the subject

11-27-2006                                          Gabriel Uriegas

[20]  (Pages 74 to 77)

[74]

1    core drill; is that correct?
2    A.    Correct.  I believe Don Shaver had that list
3          copied for everyone.
4    Q.    Okay.  I think all of this is together.
5    A.    That goes with this.  This is everybody's
6          business cards from that.  We all handed
7          business cards to Don and Don had them copied
8          and then we came up with a list.
9    Q.    Okay.  I'm just going to group those together
10         for the record.  Now, we've added to
11         Plaintiff's Exhibit Number 3 two pages that
12         you've indicated go along with the list which
13         are copies of business cards of those attending
14         the inspection; is that correct?
15   A.    The first inspection, yes.
16   Q.    Okay.  We'll clip those together.  I tell you
17         what, I'm going to hand you all of this, does
18         this collection go together?  Here, let me give
19         you these two as well and just ask you to group
20         them as you would group them in your file and
21         then we'll mark your grouping.
22   A.    They're individual, is that going to be a
23         problem?

[75]

1    Q.    No.  We can mark them any way you want to.
2          Group them the way you would want to group them
3          as far as related documents.
4    A.    As I have them.
5                (Plaintiff's Exhibit 5 marked
6                for identification.)
7    Q.    Okay.  Identify for me what we've marked, two
8          pages, as Exhibit Number 5 to your deposition?
9    A.    This is basically a notice about an inspection
10         that was to take place at Applied Technical
11         Services in Atlanta on Thursday, February 23rd,
12         2006 at 10:00 A.M.
13   Q.    Okay.  And that's again referring to the
14         inspection where we've got the list of names?
15   A.    Correct.
16               (Plaintiff's Exhibit 4 marked
17               for identification.)
18   Q.    Okay.  And I got these out of order and I
19         apologize.  Identify for me what we've marked
20         as Plaintiff's Exhibit Number 4?
21   A.    This is basically an acknowledgement from
22         Mr. Karbowski that -- confirming a conversation
23         that I, Gabriel Uriegas, would be available on

[76]

1    May 12th for the inspection of the drill at
2    ATS.
3    Q.    Okay.  And that's the Mr. Karbowski that's the
4          head of Product Safety for Saint-Gobain?
5    A.    Correct.
6    Q.    Okay.  And that's dated May the 2nd, 2005,
7          correct?
8    A.    Correct.
9    Q.    And, again, just for the sake of clarity,
10         that's a letter from The Cochran Firm to
11         Mr. Ronald Karbowski, correct?
12   A.    Correct.
13               (Plaintiff's Exhibit 6 marked
14               for identification.)
15   Q.    And let me show you what we've marked as
16         Plaintiff's Exhibit Number 6 and ask you to
17         identify that for me?
18   A.    This is a letter from Tessie, legal assistant
19         to Joseph D. Lane, to three individuals, the
20         one concerning Saint-Gobain is Ron Karbowski,
21         basically describing the protocol for the
22         inspection that was to take place at ATS.
23   Q.    Okay.  Was the -- did you participate in any

[77]

1    way in the review of the protocol for the
2    inspection?
3    A.    The review of the protocol, no.
4    Q.    The development of the protocol?
5    A.    No.
6    Q.    Have you looked at the protocol?  Prior to the
7          inspection did you look at the protocol?
8    A.    Yes, I did see it.
9    Q.    Did you have any objections to the protocol as
10         it was listed?
11   A.    That wasn't presented to me.  I was basically
12         requested to attend the inspection and
13         everything was already established by the time
14         I was really involved at that point.
15   Q.    Okay.  Generally speaking, and we'll maybe get
16         into more detail if we need to on the
17         inspection, but you participated in the
18         inspection on May the 12th of 2005, correct?
19   A.    As much as I attended the inspection, yes.
20   Q.    Did you have any objections to anything that
21         was done during the inspection?
22   A.    No.
23   Q.    You did not.