[78]

1          (Plaintiff's Exhibit 7 marked
2          for identification.)
3    Q.   Okay.  Let me show you what we've marked as
4          Plaintiff's Exhibit Number 7 and ask you to
5          identify those three pages, please?
6    A.   These are my general statements and opinions
7          regarding the DM500 core drill.
8    Q.   Okay.  When were those -- those are handwritten
9          -- those are your handwritten notes?
10   A.   That's correct.
11   Q.   And when did you develop those handwritten
12         notes?
13   A.   That was actually this morning.  The date has
14         been chopped off of this one.
15   Q.   Yeah, the copy apparently got chopped off.  If
16         you will, just so we don't have to recopy it,
17         can you just write in there and initial the
18         dates that are chopped off of the top there?
19   A.   Sure.
20              MR. SPRAIN:  It should be the 27th.
21   A.   (Witness complies.)
22   Q.   Thank you.
23   A.   You're welcome.

[79]

1          (Plaintiff's Exhibit 8 marked
2          for identification.)
3    Q.   All right.  Let me show you what we've marked
4          as Plaintiff's Exhibit Number 8, if you will
5          identify that for me, please?
6    A.   It's a response to interrogatories from
7          Saint-Gobain by Mr. Riley.
8    Q.   Okay.  And you reviewed those in preparation
9          for providing your opinions in this case?
10   A.   Yes.
11   Q.   Okay.  Thank you.
12         (Plaintiff's Exhibit 9 marked
13         for identification.)
14   Q.   How about Number 9, Plaintiff's Exhibit Number
15         9?
16   A.   This is a schematic, an electrical schematic
17         for an alternative design for a core drill.
18   Q.   All right.  And did you review that --
19   A.   Yes.
20   Q.   -- in the formulation of your opinions?
21   A.   Yes, I did.
22   Q.   Okay.  Where did that come from, that
23         schematic?

[80]

1    A.   It was supplied to me by counsel.
2    Q.   Okay.  Do you know who prepared that schematic?
3    A.   As a matter of fact, I do not.
4    Q.   Okay.  Did you ask who prepared it?
5    A.   I assumed it was Don Shaver.
6    Q.   Okay.  Do you understand what the purpose of
7          the schematic was?
8    A.   It's an alternative vacuum pressure design or
9          vacuum switch design.
10   Q.   All right.  Do you have any criticisms of the
11         schematic as it exists here in Plaintiff's
12         Exhibit Number 9?
13   A.   It's a little simple in detail, but it's
14         definitely understandable.
15   Q.   It's understandable.  Do you have any problems
16         with the functionality of the design that's
17         represented in Plaintiff's Exhibit Number 9?
18   A.   It would function.
19   Q.   It would function.  Okay.  Are there any
20         changes you would recommend to the schematic --
21         of the design that's represented by the
22         schematic that's represented in Plaintiff's
23         Exhibit Number 9?

[81]

1    A.   I have no reason to make any changes.  I see no
2          short-circuits; I see no electrical issues with
3          the design.
4          (Plaintiff's Exhibit 10 marked
5          for identification.)
6    Q.   Okay.  Let me show you what we've marked as
7          Plaintiff's Exhibit Number 10 and ask you to --
8          I believe that's all one collection, but if you
9          will make sure that's -- that all of those
10         documents go together and then identify that
11         for me, please?
12   A.   This is the Form LM708CPD, a report of injury
13         involving abrasive blades, diamond blades, bits
14         or equipment, with an additional supplemental
15         describing my findings and observations at the
16         inspection that took place.
17   Q.   Okay.  When was that generated, that collection
18         of documents?
19   A.   Shortly after the inspection that took place on
20         May 12th, 2005.
21   Q.   Okay.  And was that a standard -- you mentioned
22         there's a form there, is that a standard form
23         used by Saint-Gobain in the investigation of

11-27-2006                                                    Gabriel Uriegas

[22]  (Pages 82 to 85)

[82]

1      incidents involving injury with their products?
2  A.    Yes, it is.
3  Q.    All right.  And is that kept in the ordinary
4        course of business?
5  A.    Yes, it is.
6  Q.    All right.  And you have used that form before
7        prior to this inspection that's represented in
8        that one?
9  A.    Yes, I have used this form.
10 Q.    Okay.  What is the purpose of that form?
11 A.    The purpose of the form is to gather
12       information and data regarding the incident.
13       Basically what -- what product was used,
14       potentially what took place with the product,
15       the individuals' names, conditions at the work
16       site.
17 Q.    Okay.  And is everything that's contained in
18       Plaintiff's Exhibit Number 10 related to the
19       inspection that you conducted in May of 2005?
20 A.    Yes, that is correct.
21 Q.    Okay.  Thank you.
22 A.    You're welcome.
23            (Plaintiff's Exhibit 11 marked

[83]

1        for identification.)
2  Q.    I'm going to show you a -- I don't know how
3        many pages are here, but I'm just going to mark
4        them collectively.  They look like they're a
5        collective set of photographs.  And, if you
6        will, just identify for me what this collection
7        of photocopies of photographs represents?
8  A.    This collection of copies represents an example
9        unit very similar -- in fact the same as the
10       DM500 in its states of packaging, as well as
11       individual shots of the components as they
12       appear when they come out of the packaging.
13 Q.    Prior to the spring of 2003, who was
14       responsible for the application of warning
15       placards on the product itself?
16 A.    Saint-Gobain Abrasives.
17 Q.    So when the product comes in, Saint-Gobain is
18       the entity who would affix the warning placards
19       on the product itself?
20 A.    No, we would not affix the placards.  We would
21       pull a sample inspection and make sure that the
22       placards, according to the bill of material,
23       were in place.  If they weren't, then we would

[84]

1      notify whoever was doing the finally assembly
2      on the machine and let them know that the
3      placards was missing and they would be getting
4      the machine back which required some rework and
5      expect a corrective action.
6  Q.    But who was responsible for what placards were
7        actually put on the machine?
8  A.    Saint-Gobain Abrasives.  We would give them a
9        detailed list.
10 Q.    All right.  And would you be responsible for
11       the content on the warning placards?
12 A.    Yes.
13 Q.    Okay.  So all of those photographs contained in
14       Plaintiff's Exhibit Number 11 represent
15       photographs of a DM500 as it would be received
16       by Saint-Gobain back prior to the spring of
17       2003?
18 A.    Yes.
19 Q.    Okay.  And that would be the way it's received
20       from Diamond Products?
21 A.    That is correct.
22 Q.    Who was -- who was -- this collection of
23       photographs, who took them, first of all?

[85]

1  A.    One of the gentlemen in the office.  I believe
2        -- I'm not positive, but I believe it was Paul
3        Edwards.
4  Q.    All right.  And do you know when they were
5        taken?
6  A.    No, I don't.
7  Q.    Would it have been recently?
8  A.    Within the last year, yeah.
9  Q.    Within the last year.  Where did the containers
10       that are shown on the first page there --
11 A.    The boxes?
12 Q.    -- of Plaintiff's Exhibit Number 11, where were
13       those received from?  Where did you get those
14       from?
15 A.    Our distribution center in Plainfield, Indiana.
16 Q.    Okay.  Does your distribution center in Indiana
17       still have DM500 component parts that would be
18       found in those containers on the first page of
19       Plaintiff's Exhibit 11?
20 A.    It's possible, but not very likely.
21 Q.    Where would those have come from?  Is that an
22       actual DM500 collection of --
23 A.    Yes, it is.

11-27-2006                                                    Gabriel Uriegas

[23]  (Pages 86 to 89)

[86]

1   **Q.** -- parts contained in those three containers?
2   **A.** Yes, it is. And to my understanding, these are
3       the last parts.
4   **Q.** Okay. So those were photographed from whatever
5       remaining components were in the warehouse --
6   **A.** Correct.
7   **Q.** -- in the distribution center?
8   **A.** That is correct.
9   **Q.** All right. Okay. Thank you. Now, would the
10      containers that are shown on the first page of
11      Plaintiff's Exhibit 11 come directly from --
12      originally come directly from Diamond Products?
13  **A.** The large container, which includes the base
14      and drill stand, would come directly from
15      Diamond Products. There are times that the
16      Gast pumps may have been shipped directly from
17      Gast and the same thing with the Milwaukee
18      motor. But --
19  **Q.** They would come directly from Milwaukee?
20  **A.** Yes. In general the components were all
21      received from Diamond Products, provided they
22      had the inventory. If not, then sometimes they
23      would drop ship to us, but in general the

[87]

1       practice was to receive all three components
2       directly from Diamond Products.
3   **Q.** Did Saint-Gobain ever buy directly from
4       Milwaukee for drill motors?
5   **A.** Yes.
6   **Q.** I'm talking about drill motors for the DM500?
7   **A.** For the DM500, I can't substantiate that, but I
8       know we did have a direct relationship with
9       them for drill motors.
10  **Q.** Okay. How about the Gast pumps, did
11      Saint-Gobain, again prior to the spring of
12      2003, purchase vacuum pumps directly from Gast?
13  **A.** Yes. There was a period when we were
14      purchasing pumps directly from Gast.
15  **Q.** Would that period include the period of time in
16      which the DM500 Mr. Riley was operating was --
17  **A.** I don't think so.
18  **Q.** -- shipped?
19  **A.** I don't think so. At that point we were
20      requested to make our purchases through Diamond
21      Products.
22  **Q.** Would it be during -- at any time during the
23      time that Diamond Products was supplying the

[88]

1       DM500 to Saint-Gobain?
2   **A.** Would what be?
3   **Q.** The purchasing of vacuum pumps directly from
4       Gast?
5   **A.** I can't answer that. I don't have any evidence
6       to support that position.
7   **Q.** Okay. Well, just so I'm clear, the Milwaukee
8       motors, at any time during the period that
9       Diamond Products was providing the DM500 to
10      Saint-Gobain, did Saint-Gobain purchase drill
11      motors directly from Milwaukee that were drill
12      motors that could be used on the core drill in
13      question?
14  **A.** As best I can remember, we were purchasing
15      motors direct from Milwaukee for a period of
16      time. I'm not sure what conspired so that the
17      purchasing avenue changed, but I do know we
18      started purchasing them through Diamond
19      Products.
20  **Q.** But there was a period when you purchased
21      directly from Milwaukee, even though Diamond
22      Products was supplying -- as you call it,
23      manufacturing the product for Saint-Gobain,

[89]

1       correct?
2   **A.** That is my understanding.
3   **Q.** Okay. And that's the drill motors we're
4       talking about here as shown on the --
5   **A.** The 20 amp motor, yes.
6   **Q.** -- on the DM500?
7   **A.** Correct.
8           (Plaintiff's Exhibit 12 marked
9           for identification and retained by
10          Mr. Sprain.)
11  **Q.** Okay. So just so we're complete on everything,
12      I'm going to mark as Plaintiff's Exhibit Number
13      12 another collection of documents in your file
14      and ask you to identify that for me, please?
15          MR. SPRAIN: Just real quick off the
16          record.
17          (Off-the-record discussion.)
18  **A.** I guess this appears to be the deposition of
19      Mr. Don Shaver, along with photographs.
20  **Q.** Or the exhibits to Mr. Shaver's deposition?
21  **A.** Yes. I believe that's the case, yes.
22  **Q.** Okay. And we've got Mr. Don Shaver's
23      deposition here, I won't mark it, but did you

11-27-2006                                                    Gabriel Uriegas

[24]   (Pages 90 to 93)

[90]

1      read Mr. Don Shaver's deposition in preparation
2      for your deposition here today?
3   A.   Yes, I did.
4   Q.   All right. And did you review the exhibits
5      represented in Plaintiff's Exhibit Number 12 in
6      preparation for your deposition?
7   A.   Briefly.
8   Q.   Briefly. Okay.
9         MR. LANE:  Do y'all want to take a
10        break?
11        MR. SPRAIN:  Yeah.
12        (Lunch recess.)
13  BY MR. LANE:
14  Q.   Let's talk a little bit about the bits -- the
15      bits that are used on the Norton DM500. Those
16      are manufactured by Saint-Gobain, correct?
17  A.   Correct.
18  Q.   All right. Now, the bits that were used --
19      that were supposedly used on this particular
20      unit at the time of Mr. Riley's incident, those
21      were Saint-Gobain diamond core bits; is that
22      correct?
23  A.   The two bits I observed at the inspection at

[91]

1         ATS, those were bits manufactured by
2         Saint-Gobain. There was some issue at the time
3         of the inspection as to whether those bits were
4         in use at the time of the accident.
5   Q.   Okay. Have you been provided any information
6      that would indicate to you that one of those
7      bits was not used during the incident involving
8      Mr. Riley?
9   A.   I haven't seen any further information that
10      would lead me to believe that either of those
11      bits was used during the incident.
12  Q.   Okay. Assuming those were -- that one of those
13      bits was being used in the drilling of the hole
14      Mr. Riley was drilling at the time of the
15      incident, would that have been a Saint-Gobain
16      bit?
17  A.   As labeled, yes.
18  Q.   Okay. Now, what is the purpose -- or what are
19      those bits designed to be used for?
20  A.   For wet drilling into cured concrete or brick
21      or other masonry type materials.
22  Q.   All right. And in concrete -- well, are they
23      designed to drill through concrete floors such

[92]

1      as the concrete floor it was being used on at
2      the time of Mr. Riley's --
3   A.   I don't specifically know what the contents of
4      that concrete floor was at Flavor House. I've
5      never had an opportunity to inspect the floor.
6      Provided that it's just a normal concrete floor
7      with no hardeners applied to the top, yeah,
8      that would be an appropriate bit to use.
9   Q.   Okay. And concrete floors such as that come --
10      they're manufactured with reinforcement,
11      correct?
12  A.   Typically, yes.
13  Q.   Typically. And that consists of rebar and
14      things of that nature?
15  A.   A mat of rebar, yes.
16  Q.   And those bits are designed to cut through
17      rebar that may be in the concrete as well,
18      correct?
19  A.   Not rebar by itself, but rebar suspended or
20      emersed inside the concrete, yes.
21  Q.   Right. And it's not improper use of the core
22      drill bit to drill through concrete that has
23      rebar that has to be drilled through as well,

[93]

1      correct?
2   A.   No, it wouldn't be considered improper.
3   Q.   Okay. And the bits are designed to cut through
4      that material, correct, if it's in concrete?
5   A.   Depending on the amount of rebar that's in the
6      concrete. If it's several layers of matted
7      rebar, that may not be appropriate. But if
8      it's a single layer, that's expected.
9   Q.   It's expected. Certainly not something that
10      would be unexpected, correct?
11  A.   True.
12  Q.   All right. Tell me what the safety features on
13      the DM500 core drill are.
14  A.   In general?
15  Q.   Yes. Just all of the safety features that are
16      built into the DM500 core drill.
17  A.   Depending on the appropriate application, for
18      vertical drilling you basically have a column
19      that's fixed to the base so that the column
20      remains hard fastened to the base, it doesn't
21      wobble.
22  Q.   That's a safety feature?
23  A.   Yes, it is.

11-27-2006                                                    Gabriel Uriegas

[25]  (Pages 94 to 97)

[94]

1   **Q.**   Okay.
2   **A.**   You can have a tilting column.  So it is
3         possible for a column to break loose.  With
4         that particular machine it's a fixed column.
5         The on/off switch itself is mounted in such a
6         way so that the operator can hold his hand on
7         the switch and he can hold his hand on the
8         control bar so that he can basically operate
9         both things at the same time, turn the machine
10        off and on at the same time.
11  **Q.**   Are you talking about the toggle switch?
12  **A.**   The toggle switch.
13  **Q.**   And that controls the --
14  **A.**   It controls the motor.
15  **Q.**   The drill motor?
16  **A.**   The drill motor.
17  **Q.**   Right.
18  **A.**   So you can shut the motor off.
19  **Q.**   Okay.
20  **A.**   You basically have -- if the machine is used
21        with a vacuum pump system on it, the vacuum
22        pump is set up so that if you drown it and it
23        gets submerged for whatever reason, if you were

[95]

1         to place the -- place the pump in a pool of
2         water, it will suck up all of the water and
3         prevent electrical shock.  It will get
4         collected into the trap and it won't let the
5         majority of water get sucked up into the --
6         into the motor of the vacuum pump itself.
7   **Q.**   Are you talking about the ball valve?
8   **A.**   I'm talking about the water trap.  The little
9         plastic water trap jar there.  That has a seat
10        in there so that if it sucks up water it
11        basically -- it limits the amount of water that
12        can get sucked up into the motor and cause an
13        electrical shock.
14  **Q.**   Okay.  Now, are you talking about the ball
15        valve that's inside the cup; is that what
16        you're referring to?
17  **A.**   There is no ball valve.  There is a seat and a
18        mylar ping ball shaped --
19  **Q.**   It looks like a ball, that's what I'm referring
20        to.
21  **A.**   Okay.  Yeah.
22  **Q.**   And maybe a ball valve is a technical term that
23        I'm using inappropriately.

[96]

1   **A.**   Right.  Yeah, it's not a valve.  It's a ball
2         and seat.
3   **Q.**   It's a ball and seat.  Yes.  And you're saying
4         that when the device is running -- when it's
5         sitting upright, the device, --
6   **A.**   Right.
7   **Q.**   -- the core drill is sitting upright, if
8         sufficient water collects in the cup, the trap,
9         that it will float this ball up and actually
10        position itself --
11  **A.**   Make contact against this little conical-shaped
12        seat at the bottom.
13  **Q.**   Right.
14  **A.**   And that limits the amount of water that can
15        get sucked into the head itself.
16  **Q.**   Limits the amount of water?
17  **A.**   Yeah.  It doesn't prevent it, but it limits it.
18  **Q.**   Okay.  Does it impede the vacuum that's being
19        pulled on the pump at that time?
20  **A.**   Yes, it will impede the vacuum.
21  **Q.**   It will impede the vacuum.  It can stop the
22        vacuum, can't it?
23  **A.**   Intermittently, yes.

[97]

1   **Q.**   Intermittently?
2   **A.**   As the water gets sucked in, the water level
3         will drop, and the vacuum will come back on.
4         But there is a check valve in the system to
5         make sure it doesn't instantaneously lose
6         suction.
7   **Q.**   How so?  What's the check valve you're talking
8         about?
9   **A.**   You have a check so you get one-way flow up
10        inside the top section of this water trap, so
11        that once it sucks pressure, it can't
12        instantaneously lose pressure.  The only way to
13        get it to lose pressure instantaneously is to
14        open this little petcock in the back.
15  **Q.**   Okay.  And you're saying that the instantaneous
16        -- that the loss of vacuum pressure is only
17        intermittent under those circumstances?
18  **A.**   Inasmuch as the water level keeps dropping.  As
19        the ball falls away from the little conical
20        seat, it allows it to draw a vacuum again.  So,
21        in other words, the ball comes down, it sucks
22        water, it fills it back up, it stops the
23        vacuum, it sucks some more water, the level

11-27-2006                                          Gabriel Uriegas

[98]

1    drops, and it will just keep doing that
2    intermittently.
3    Q.   If the ball valve is --
4    A.   Floating up and contacting the seat.
5    Q.   -- up in the seat, how does it suck water out?
6    A.   It doesn't -- it doesn't -- as I said, it
7         doesn't absolutely prevent water from getting
8         -- it's not a completely closed seat.  The
9         water can still seep around there.  If you
10        don't shut it off or you tilt the machine to
11        either side, you can actually allow that ball
12        to move sideways and it will suck the water
13        past the seat, the level will drop and the pump
14        will start working again.
15   Q.   So that would require you to actually tilt it
16        one way or the other you're talking about?
17   A.   Either that or -- yeah, either that or the
18        water -- just seepage around the ball itself.
19        Again, it's not a perfect fit.
20   Q.   So in order to move that base back and forth,
21        tilt it like you're talking about, that
22        requires the vacuum to not be on the base at
23        that point, correct?

[99]

1         MR. SPRAIN: Object to the form.
2    Q.   In other words, that requires the vacuum to
3         have dropped sufficiently to allow you to
4         actually rock the machine, correct?
5    A.   No.
6    Q.   Well, how are you going to rock it if the base
7         is holding it firm to the floor?
8    A.   As you apply pressure -- as you apply a
9         pressure, you have a bit in place.  As you move
10        -- again, if things are done properly, as you
11        move -- let me try and put this all the way
12        down without wrecking your floor.  I'm going to
13        have to take this all the way down since we
14        don't have a bit.  As you're applying pressure
15        and driving the bit into the floor, do you see
16        the movement in the base?
17   Q.   I sure do.
18   A.   The front of the base is coming up.  That is
19        where you can get that movement.  Now, again if
20        you just have -- if all you have is the base
21        just resting on the gasket, the gasket is
22        pliable, so the base is going to float each
23        time you apply pressure there.

[100]

1    Q.   All right.  Let me make sure for the record.
2         You have lowered the drill all the way to the
3         floor so that it's simulating bit contact with
4         the floor, correct?
5    A.   Correct.
6    Q.   And you're saying that in the proper operation
7         of this unit that when you apply this pressure
8         you expect this base to move as the pressure is
9         applied to this drill bit?
10        MR. SPRAIN: Object to the form.
11   A.   If it's not properly mounted to the floor.
12   Q.   If it's not receiving sufficient vacuum to hold
13        it to the floor?
14   A.   No.  I said if it's not properly mounted,
15        secured to the floor.
16   Q.   All right.  If it's -- and what do you call
17        properly secured to the floor?
18   A.   It doesn't allow any movement whatsoever.
19   Q.   If it's properly secured to the floor?
20   A.   Correct.
21   Q.   So if it's properly secured to the floor and
22        your water builds up in that trap, how are you
23        going to get that rocky movement that you're

[101]

1         talking about that would allow the water level
2         to drop a little bit and then the vacuum start
3         back up again?
4    A.   You won't get it at that point if it's properly
5         secured to the floor.  But that's not the only
6         thing -- as I said, that is not the only thing
7         that causes that water level to drop.  You get
8         seepage which can also cause the water level to
9         drop.
10   Q.   Okay.  Well, I'm making sure I'm clear now on
11        what your testimony was, because earlier I
12        thought you said that one of the ways for that
13        ball to move back and forth to allow the
14        sucking of the minute amounts of water in there
15        was for the device to rock back and forth?
16   A.   That is one of the ways.  If it's not properly
17        secured to the floor, that is one of the ways.
18   Q.   Okay.  Well, I want to make sure I'm clear.  If
19        it was properly secured, then you're not going
20        to get that rocking back and forth, correct?
21   A.   Correct.
22   Q.   Even when you put pressure on the drill bit,
23        correct?

11-27-2006                                                    Gabriel Uriegas

**[102]**

1   A.   Correct.
2   Q.   All right. And you're certainly not going to
3        be able to rock it back and forth if there's
4        sufficient vacuum, correct?
5            MR. SPRAIN: Object to the form.
6   A.   No, that's not true at all. You could have
7        sufficient vacuum and still have it rock. If
8        you don't set the leveling screws, you will get
9        that rock. That is the purpose of the leveling
10       screws.
11  Q.   Okay. As you sit here today, you're saying
12       that if you're drawing 20 -- negative 20 --
13       what's the units for that vacuum, by the way?
14  A.   Inches of Mercury, whatever you want to --
15       whatever is registered on the gauge.
16  Q.   And the cut off is -- I mean, the magic number
17       is 20?
18  A.   No. The magic number can be anywhere. It
19       depends on the size of the base, it depends on
20       the surface that you're trying to adhere to.
21       Vacuum pressure -- let me be very clear.
22       Vacuum pressure is no indication of how secure
23       that base is to the floor. It is no

**[103]**

1        indication. You could have a slippery floor,
2        you could have a porous floor, you could have a
3        frozen floor, all of those things change the
4        amount of vacuum pressure required to get that
5        base to seat, to secure.
6   Q.   It changes the amount of vacuum that it will
7        pull, doesn't it? In the case of a porous
8        floor, for instance?
9   A.   It will pull -- it will pull the same amount of
10       vacuum, but it's bleeding through. So your
11       gauge will read -- it will still read 20, but
12       it's not secured to the floor.
13  Q.   Really? Are you aware of the -- now, the DM --
14       excuse me, the DR520 that we're looking at here
15       today, did Saint-Gobain participate in the
16       development of the manual for that unit?
17  A.   I believe we did.
18  Q.   What does the manual say about the minimum
19       pressure required to sufficiently hold that
20       unit to the base using the vacuum system?
21  A.   I can't tell you. I haven't seen the manual
22       for that machine. I did not participate in the
23       development of that particular manual.

**[104]**

1   Q.   Well, if the manual indicates that it's a
2        negative 20, then would the manual be incorrect
3        as far as guiding the operator in whether or
4        not he's got sufficient vacuum to secure the
5        unit to the base?
6   A.   I believe the manual would tell you that the
7        base has to be secured to the floor. Without
8        reading it, I don't see any correlation between
9        the amount of vacuum pressure drawn and the
10       base being secured to the floor.
11  Q.   Okay. How does an operator using the vacuum
12       hold-down method that is set out in the
13       operators manual, how does he know when the
14       unit is properly secured to the floor? I'm
15       talking about the DM500 that Mr. Riley was
16       using.
17  A.   Typically it is good practice for the operator
18       to turn the vacuum pump on, watch the gauge to
19       see if there is movement in the gauge, wait to
20       see if the gauge shows any -- any movement at
21       all to see if you're drawing any pressure
22       whatsoever. And then once it draws itself
23       down, you adjust the four leveling screws to

**[105]**

1        make sure that -- most importantly that the
2        column, the section that the carriage is
3        mounted to and the motor and the bit are
4        attached to, is vertical. And then you grab it
5        on the top and you make sure there's no
6        floating movement in it. You have to use the
7        four screws to make sure there's no movement.
8        That's the most bulletproof way to do it.
9   Q.   And as long as there is no movement, then you
10       would consider it to be properly secured?
11  A.   It's not so much just the movement, I mean, you
12       would literally have to try and break it free
13       with your hand to see if you could break it
14       free. Again, you could be on a slippery floor,
15       you could be on a frozen floor, you could be on
16       a flooded floor, for that matter, and you may
17       be seeing proper vacuum, but the water is
18       getting sucked up through the bottom of the
19       base. And you're trying to move it and if all
20       you do is just touch it, then it may not be
21       secured whatsoever. If you push it just a
22       little bit and it breaks free, you don't have
23       it secured to the floor, period.

11-27-2006                                         Gabriel Uriegas

[28]  (Pages 106 to 109)

[106]

1   Q.   Okay. So you're saying that the operator needs
2        to pull the vacuum, adjust the leveling screws,
3        and then shake it back and forth to see if he
4        can move it?
5   A.   Yeah. And you shouldn't be able to shake it.
6   Q.   Okay. And as long as it's secure at that
7        point, then he's good to go, correct?
8             MR. SPRAIN: Object to the form.
9   A.   That would be about the best you could do given
10       that system.
11  Q.   Now, there's a leveling bubble on that moving
12       track on the column there, are you familiar
13       with what I'm talking about?
14  A.   The carriage.
15  Q.   All floors are not completely level, are they?
16  A.   That's an accurate statement.
17  Q.   All right. And is the bit supposed to be
18       exactly perpendicular to the floor surface?
19  A.   Yes.
20  Q.   All right. So if you level it up using that
21       leveling bubble and the floor is not level, is
22       the bit perpendicular to the floor under those
23       circumstances? It's not, is it?

[107]

1   A.   I can't tell you that. I would think if it's
2        not, then you can take a square and level it
3        up. But it should be for the most part. And
4        number one, if the floor is not level, the
5        vacuum system is not the appropriate system to
6        be using on there, because you're going to have
7        a problem.
8   Q.   Well, how unlevel does it have to be before the
9        vacuum system is not the appropriate method to
10       use?
11  A.   There would have to be a variation of probably
12       a quarter of an inch within a one foot square
13       section.
14  Q.   How does the operator make that determination?
15  A.   Typically when you go to set the base in place,
16       it will rock so much that you won't be able to
17       get the four sides to make contact with the
18       surface. There will always be a hole. No
19       matter how much adjustment you try to apply,
20       there will always be an air gap under the
21       bottom of the gasket.
22  Q.   Okay. Have you conducted tests on all of this
23       stuff you're testifying about right now?

[108]

1   A.   Typically what I do, as part of my job back in
2        the period before I became a diamond product
3        manager, I taught instructional hands-on
4        classes with all of the equipment. And one of
5        the things we -- we go out of our way to
6        instruct individuals who come to the schools.
7        We take the drills, we set them up, we take a
8        flat slab that is smooth on one side, we set
9        the base in place, we put a concrete block
10       under there, and we slowly show them how to
11       drill. We lock the bit in place to show that
12       the slip clutch motors slip before the base
13       will break loose.
14           Then we take that same pavement slab with
15       a very rough surface, it basically has a washed
16       aggregate surface on it, so you have large
17       pieces of stone about the size of a quarter.
18       And we try and suck the base down onto that
19       surface to show them that you have to have a
20       smooth surface in order to get that vacuum pump
21       to work. If it doesn't, then you have to
22       switch to an anchoring method.
23  Q.   You mentioned a slip in the clutch. The motor

[109]

1        that's on this -- on the DM500, which is
2        identical to the one that's on our exemplar,
3        correct?
4   A.   Correct.
5   Q.   That device is intended to, I don't know if you
6        would call it engage the clutch or disengage
7        the clutch, at a certain force, correct?
8   A.   Correct.
9   Q.   What do you call it, disengage or engage the
10       clutch?
11  A.   It's a slip clutch, so I guess in this case you
12       would probably call it engaging the clutch.
13  Q.   Engaging the slip clutch, we'll talk about it
14       that way. And the engagement of the slip
15       clutch is intended to engage before the base
16       breaks loose on the unit if it's set up
17       properly, correct?
18  A.   If it's set up properly, yes.
19  Q.   And that's a safety feature, correct?
20  A.   On the motor itself it is. And typically what
21       happens is the more you engage the slip clutch,
22       the lower that slip value becomes, to the point
23       where you can just -- it will get so loose that

11-27-2006                                              Gabriel Uriegas

[110]

1    you just touch the bit to the floor and it will
2    stop spinning, but the motor will keep running.
3    So the more you engage it, the lower that slip
4    value becomes.
5  Q.  Which would make it even further away from the
6    base moving, correct?
7  A.  Correct.
8  Q.  In other words, your gap between the base
9    moving -- the forces required to move the
10    clutch are much less than the force that moves
11    the base?
12  A.  Right. The clutch is wearing is the best way
13    to define it.
14  Q.  The clutch is wearing. But it improves -- as
15    it wears, it improves the safety margin as far
16    as the clutch engaging, slipping, and the base
17    breaking loose, correct? It doesn't go in the
18    other direction?
19  A.  It doesn't get worse, yes. I don't know that I
20    would use the words that improves any safety
21    margin. I mean, it actually makes the machine
22    unusable very quickly.
23  Q.  Well, it increases the difference between the

[111]

1    forces required to engage the slip of the
2    clutch and the forces that the base is supposed
3    to withstand if it's properly secured, correct?
4  A.  Say that again. It increases or decreases the
5    force?
6  Q.  As the clutch wears, it increases the
7    difference between the forces required to
8    engage the clutch and the force required to
9    break the base loose if it's properly secured,
10    correct?
11  A.  It doesn't increase the force. It would
12    decrease the amount of force. It gets easier
13    to break it loose. To the point where the bit
14    makes contact, the motor is running, and the
15    bit doesn't spin. So then --
16  Q.  I think that's what I was trying to say, was
17    that --
18  A.  Okay.
19  Q.  -- the force required -- let's say the force is
20    a hundred whatever, a hundred units, if the
21    motor is brand-new. As it wears, as you say,
22    the force would be something less than a
23    hundred, correct?

[112]

1  A.  Correct.
2  Q.  And if the force required to engage the clutch
3    is a hundred, you expect the base to be -- if
4    it's secured properly, to withstand a force
5    greater than that 100, correct?
6  A.  Yes.
7  Q.  So if the force that engages the slip clutch
8    reduces below a hundred, that increases the
9    difference between those two forces, correct?
10  A.  Okay. Yes.
11  Q.  Okay. That's all I was saying. I'm sorry,
12    it's hard to describe what I'm talking about.
13    So as far as that safety feature is concerned,
14    that slip clutch, it's dependent upon the base
15    holding at a force greater than the force
16    required to slip the clutch, correct?
17  A.  Yes.
18  Q.  Okay. Now, in this case in the inspection that
19    you participated in or were present during, was
20    the clutch operating in the proper range when
21    it was inspected on May 12th, 2005?
22  A.  According to the technician who did the
23    inspection on the clutch, the technician from

[113]

1    Milwaukee Electric Drill, it was in fact
2    operating within the specified parameter.
3  Q.  Okay. And assuming that was the parameters in
4    which it was operating on August the 29th, the
5    morning of August 29th when this occurred, is
6    it safe to say that the force required to
7    dislodge the base from the floor was less than
8    the force required to engage the slip clutch?
9  A.  Yes.
10  Q.  Okay. Which means that the base, which was
11    utilizing the vacuum system, was not securely
12    holding the base to the floor, correct?
13  A.  I can't tell you that. There's -- without
14    having been present to see what was taking
15    place. It may not have been. I have no
16    assurance that upon --
17  Q.  It may not have been?
18  A.  It may not even have been based on
19    everything I've read. There's nothing to
20    indicate that the operator even knew the pump
21    was on, that the pump was drawing pressure
22    whatsoever.
23  Q.  Okay. And you've read Mr. Riley's deposition,

[114]

1    correct?
2    A.   Yes.
3    Q.   You haven't read any others?
4    A.   Mr. Shaver's, I believe.
5    Q.   Mr. Shaver's.  Okay.  You haven't read any of
6         the other fact witness depositions?
7    A.   No.
8    Q.   Okay.  Well, did Mr. Riley say the vacuum pump
9         was not on?
10   A.   I think he was questioned and the question was
11        asked if he knew it was on, did he hear the
12        motor; I don't think he had a definite reply to
13        that.  He was asked if he monitored the vacuum
14        gauge, and he didn't have a rely to that,
15        inasmuch as he saw the arrow move or even knew
16        what the purpose of that gauge was as it was
17        mounted on the vacuum pump.
18   Q.   Look at your owners manual and let's go over
19        some things in the owners manual real quick.
20        First of all, before we get to that, take me
21        through how you set up the vacuum -- the vacuum
22        securing mechanism and set up the drill for
23        use, if you will?

[115]

1    A.   Okay.  Typically what takes place is you hook
2         the water hose to the petcock here on the
3         front.  And you have to make sure that it's
4         hooked to the petcock so that you make sure you
5         get water to the inside of the bit.
6    Q.   Is that a critical feature?
7    A.   Absolutely 100 percent critical feature.
8    Q.   Come back to your manual now and show me in
9         there where there -- well, do this for me on
10        your operators manual; show me all of the
11        warnings in the operators manual, if you will?
12        Let's go through all of the warnings in your
13        operators manual, your owners manual.
14   A.   Okay.  As it is produced here, single-sided
15        copy, one, two, three, page four.
16   Q.   Which is the -- it's labeled at the top
17        "Preparation"?
18   A.   "Preparation, Safety Precautions, Important!
19        The following safety precautions must be
20        observed."
21   Q.   Okay.
22   A.   Basically item one is "Know your core drilling
23        machine!  Read the operator manual carefully."

[116]

1    Number two, "Ground the machine," it covers the
2    electrical section.
3    Q.   Okay.
4    A.   Number three, some basic warnings, "Never
5         connect the green or green and yellow wire to a
6         live terminal."
7    Q.   Okay.
8    A.   Electrically make sure you establish a ground.
9         Four, "Use only three-wire grounded extension
10        cords suitable for use outdoors and of
11        sufficient gauge to accommodate power
12        requirements."  Five --
13   Q.   Now, that's again electrical, right?
14   A.   Electrical.  Number five, also electrical,
15        "Replace frayed or damaged extension cords."
16   Q.   Okay.
17   A.   "Keep the work area clean avoiding cluttered
18        work areas."
19   Q.   Okay.
20   A.   "Consider the work environment!  Do not expose
21        power tools to rain.  Wear rubber boots to
22        further insulate --"
23   Q.   Let me stop you right there real quick.

[117]

1    A.   Sure.
2    Q.   Now, this -- water is intended to be -- this
3         unit is intended to be exposed to water,
4         correct?  So when you say don't expose your
5         power tools to rain, you're not referring to
6         not exposing this product to water, correct?
7    A.   Correct.  We're saying don't leave it out in
8         the open so that raindrops could fall into the
9         armature of the motor.
10   Q.   Okay.  Now, go ahead.
11   A.   Number six, "Keep the work area clean avoiding
12        cluttered work areas."  Number seven, "Consider
13        the work area environment!"  Again, "do not
14        expose power tools to rain.  Wear rubber boots
15        to further insulate yourself from the drill.
16        Mop up all excessive water around the work area
17        before and after drilling.  Keep the work area
18        well lit.  Use extreme caution when drilling
19        through floors.  Provide for protection of all
20        personnel and material below the area.  Cores
21        generally drop from the drill bit at the
22        completion of the hole."
23   Q.   Let me stop you right there.  That's talking

11-27-2006                                                    Gabriel Uriegas

[118]

1      about hitting people below you if you're
2      drilling through a concrete floor, correct?
3   A.   Yes.
4   Q.   All right. Number nine?
5   A.   Number nine, "Keep visitors away. Do not let
6      visitors contact tool or extension cord. All
7      visitors should be kept at a safe distance from
8      the work area. Do not force the bit into the
9      drilling surface. Use an anchor bolt, ceiling
10      jack, or vacuum hold-down attachment when
11      drilling vertically into floors."
12   Q.   Okay.
13   A.   And we use two arrows just in case there's some
14      question as to which direction vertically is,
15      top to bottom.
16   Q.   Right. Now, that doesn't offer any suggestion
17      as to the best method, does it? It just says
18      use one of those methods, correct?
19   A.   Correct.
20   Q.   All right. Next?
21   A.   "Only use an anchor bolt or ceiling jack when
22      drilling horizontally --" and, again, we use
23      two arrows just in case you don't understand

[119]

1      what is meant by the word "horizontally" --
2      "into a wall or any other vertical surface."
3   Q.   Okay.
4   A.   "Dress properly for the work being performed.
5      Do not wear loose clothing or jewelry which can
6      get caught in moving or rotating parts. Rubber
7      gloves and nonskid footwear is recommended when
8      working outside. Wear protective covering to
9      contact long hair -- or to contain long hair,"
10      I'm sorry. "Don't abuse the cord. Never carry
11      the tool by the cord or yank the cord to
12      disconnect the plug from the receptacle.
13      Secure the drill stand to the work surface.
14      Use an anchor bolt, ceiling jack or vacuum
15      attachment to secure the drill stand to the
16      work surface. NEVER," all capitals," NEVER
17      stand on the drill stand base as a method of
18      securing the drill to the stand!"
19   Q.   Let me stop you right there on that one since
20      you stressed "NEVER stand on the drill base as
21      a method of securing the drill stand." Now,
22      that's talking about using that method as a
23      means of securing it, correct?

[120]

1   A.   Securing the base to the floor, yes.
2   Q.   If that base is properly secured to the base,
3      it's not going to make any difference if you
4      put your foot on one side of that base or the
5      other, is it?
6         MR. SPRAIN: Object to the form.
7   A.   Provided you're not using that foot to assist
8      in any way in keeping that base attached to the
9      floor.
10   Q.   All right. If it's securely fastened, whether
11      you're using the ceiling jack or the anchor
12      bolt or the vacuum system is working properly,
13      you're not going to move that thing by putting
14      your foot on one side or the other of that
15      base, are you?
16   A.   You should not be able to move it.
17   Q.   All right. Next, 15?
18   A.   "Don't overreach! Keep proper footing and
19      balance at all times. The slippery surface
20      created during the drilling operation results
21      in unstable footing."
22   Q.   Okay. Now, that's not anything unexpected, is
23      it?

[121]

1   A.   I wouldn't think so, no.
2   Q.   Okay. You're putting water all over the floor,
3      correct?
4         MR. SPRAIN: Object to the form.
5   A.   Correct.
6   Q.   And it's not unexpected -- it's actually
7      expected that the floor is going to be wet
8      where you're using this product, correct?
9         MR. SPRAIN: Object to the form.
10   A.   The floor should be damp, wet; it shouldn't be
11      flooded.
12   Q.   It shouldn't be flooded?
13   A.   No, it should not be.
14   Q.   All right. Now, we've got a little dilemma
15      there, don't we? Because we've got water
16      flushing through this drill bit flushing out
17      the hole keeping all of the particulate matter
18      coming out of it, don't we, during the
19      operation of the drill?
20   A.   Yes, we do.
21   Q.   All right. When is it too much and when is it
22      not enough?
23   A.   If it looks like milk, it's smooth as silk. If

[122]

1    what's coming up out of that cut is cloudy like
2    milk, that's the appropriate amount of water to
3    be used.
4    Q.    Where do you tell the operator that in your
5    manual?
6    A.    I don't think we call that out, because that's
7    more of a -- more of a good practice.
8    Q.    Okay. That's more of a good practice, but you
9    don't tell the operator in the operators manual
10    anywhere about how to determine when there is
11    sufficient water flow versus not enough water
12    flow?
13    A.    Only inasmuch as we say on page five, "It is
14    important when wet cutting to maintain an
15    adequate supply of clean water to the diamond
16    drill bits." We explain the purpose of the
17    input adapter. "The hose input adapter on the
18    water swivel at the base of the core drill
19    motor is used to connect the water supply hose
20    to the core drilling unit."
21    Q.    And we're going to talk about that in just a
22    second. But is there anywhere else -- are you
23    saying that that describes how an operator is

[123]

1    supposed to know when he's got the proper
2    amount of water flow through the drill bit?
3    A.    Inasmuch as it tells him that it is important
4    to have a flow of water into the center of the
5    drill bit.
6    Q.    Okay. Let's go back to our safety precautions
7    on the previous page.
8    A.    Where did we stop?
9    Q.    I think we were at number 16.
10    A.    16, "Always," in bold capitals, "disconnect the
11    power before servicing or changing accessories
12    or bits."
13    Q.    Okay.
14    A.    17, "Always," again --
15    Q.    Now, let's stop at 16. That's got in bold
16    "always," that's an electrical issue as well,
17    correct?
18    A.    Correct.
19    Q.    All right. 17?
20    A.    Again "Always," bold capital letters, "check,
21    then make sure wrenches are removed from the
22    motor spindle and bit adapter before connecting
23    power or starting the drill motor."

[124]

1    Q.    Okay. Again, that "always" is in bold, is that
2    some type of safety issue as well?
3    A.    It could be, yes.
4    Q.    All right. Number 18?
5    A.    "Always," again bold capitals, "make sure power
6    switch is in off position before connecting
7    drill to power."
8    Q.    Okay.
9    A.    And finally at the bottom --
10    Q.    And why is that important?
11    A.    In the event that the drill may not be attached
12    to anything and may just be sitting on the
13    floor or sitting up on the side of a pallet.
14    If you plug it in and the bit starts to spin,
15    there's a possibility the drill could just tip
16    over and fall onto somebody, fall onto a foot,
17    knock somebody over.
18    Q.    All right. And there's nothing on the DM500,
19    as it was designed and supplied by Saint-Gobain
20    to United Rentals, that prevents someone from
21    having the switch on when the base is not
22    properly secured, is there, the drill motor
23    switch?

[125]

1    A.    That's correct.
2    Q.    Okay. And then the last thing is not numbered,
3    but there's a caution there. It says "It is
4    very important that the drilling machine is
5    properly secured to the work surface. Movement
6    during drilling will cause bit chatter against
7    the work surface, fracturing diamonds or
8    binding bit in the hole," correct?
9    A.    Correct.
10    Q.    Now, where in that list of safety precautions
11    does it say anything about always -- you've got
12    three "always" in bold there at the bottom, 16,
13    17 and 18; where does it say anything about
14    always connecting the water supply to the --
15    what do you call that?
16    A.    The water inlet valve.
17    Q.    -- water inlet valve on the drill motor?
18    A.    It doesn't. It's pretty much very obvious that
19    if you have a water spigot that the water hose
20    needs to be connected to that water --
21    Q.    Is it your understanding that you should never
22    use this core drill without water supply going
23    to that water inlet?

11-27-2006                                                     Gabriel Uriegas

[126]

1   A.  Yes. That's the purpose of the petcock valve.
2   Q.  Where is that anywhere in your manual?
3   A.  "The hose input adapter on the water swivel at
4       the base of the core drill motor is used to
5       connect the water supply hose to the core
6       drilling unit."
7   Q.  You're on page five?
8   A.  I'm on page five under "Water Supply."
9   Q.  Right, under "Water Supply." And I want to
10      read that carefully.
11  A.  Sure.
12  Q.  "It is important when wet cutting to maintain
13      an adequate supply of clean water to the
14      diamond drill bits." When would you not be wet
15      cutting? This implies that there's a dry
16      cutting process as well. Is there a dry
17      cutting process?
18  A.  If you're drilling asphalt, that's potentially
19      possible, yes.
20  Q.  Okay. So you can drill asphalt without the
21      water supply, correct?
22  A.  Yes.
23  Q.  All right. So am I wrong, when you just said

[127]

1       you always connect the water supply when you're
2       using this core drill, that's not so, is it?
3           MR. SPRAIN: Object to the form.
4   A.  Inasmuch as you're trying to make an absolute,
5       yeah, that's not so.
6   Q.  All right. And you don't have any warnings
7       anywhere in this device -- this manual that
8       you're talking about where it says always use a
9       water supply when using this core drill,
10      because you don't always use a water supply, do
11      you?
12  A.  I think it's pretty clear to anyone who reads
13      the manual that it is important -- it's very
14      clear that it's important when wet cutting, and
15      the bits are defined as either wet or dry
16      cutting. So if you're putting a wet cutting
17      bit on there, you have to have a water supply
18      connected to the petcock on the motor.
19  Q.  Okay. You're saying that's clear to any
20      operator?
21  A.  Yes, that's clear to any operator who reads the
22      manual.
23  Q.  Okay. And are you relying on Matthew Riley's

[128]

1       testimony about the water supply in your -- I
2       believe in your opinions, which we marked as
3       Exhibit Number 7, you indicated that there was
4       no water supply being used to --
5   A.  No. I indicated that the water hose was not
6       connected to the petcock.
7   Q.  And you indicated that was improper; is that
8       correct, in your opinion?
9   A.  That's correct.
10  Q.  And what happens if you've just got water
11      supply flushing out the hole as you drill; not
12      connected there, but just flushing the drill
13      bit?
14  A.  First off, you're not flushing anything; all
15      you're doing is just running water by the drill
16      bit.
17  Q.  All right. You're saying that's improper?
18  A.  That's improper.
19  Q.  Okay. And that makes a big difference in your
20      opinion, correct?
21  A.  Yes.
22  Q.  All right. And what happens if you use a drill
23      bit in that fashion -- the core drill in that

[129]

1       fashion?
2   A.  It's essentially -- after about the first
3       three-quarters of an inch and deeper, you are
4       essentially starting to drill dry and it starts
5       to overheat the segment portion of it.
6   Q.  The segment portion of what?
7   A.  The segment portion of the core bit.
8   Q.  Okay. So it starts heating up the bit?
9   A.  It starts heating up the bit to the point where
10      you can cause the segments to come off. You
11      can get it so hot that it will cause the
12      segments to come off and, in some severe cases,
13      will cause the bit to literally lock down in
14      the hole.
15  Q.  What happens if the bit locks down in the hole
16      if the core drill is working properly?
17  A.  Either the motor shuts down or the motor keeps
18      running and the clutch slips.
19  Q.  The clutch slips, yes. Right. So regardless
20      of whether there was water flowing through the
21      bit or not, you would expect that the clutch
22      would slip in the event that the bit stops
23      moving, correct?

11-27-2006                                                    Gabriel Uriegas

[34] (Pages 130 to 133)

[130]

1  A.  You would expect that, but typically the
2     operator will start to sense that and they
3     start to back off. An operator will literally
4     not apply as much pressure and begin to
5     regulate that point.
6  Q.  What point is this?
7  A.  And won't let the clutch get to the point of
8     slipping.
9  Q.  When the bit stops for any reason, the unit is
10     designed for the clutch to slip, correct?
11  A.  The motor is designed for the clutch to slip,
12     yes.
13  Q.  Right. And if the clutch didn't slip and it's
14     working properly, that means the base gave way
15     before it was intended to, correct?
16        MR. SPRAIN: Object to the form.
17  Q.  In this case.
18  A.  Say that again. I want to make sure I
19     understood what you said.
20  Q.  Well, in this case if the clutch didn't slip --
21     let's say the bit stopped from lack of water,
22     from -- for any reason, and the clutch didn't
23     slip on this properly adjusted motor, that

[131]

1     means the base broke loose before -- at a force
2     that was less than expected, correct?
3  A.  Well, the motor can also shut down. It doesn't
4     necessarily have to slip. You can overwhelm
5     the breaker. I mean, you can apply enough
6     pressure -- and that is another issue with
7     these type motors, is that as the operator gets
8     more and more stubborn, instead of fixing the
9     issue, continues to try and ride that edge of
10     the clutch slipping, you're starting to
11     overheat the power. You're starting to
12     overdraw power. So it is possible to literally
13     not cause the clutch to slip and the motor will
14     just start tripping breakers and then you end
15     up running back and forth to the breaker box.
16  Q.  Well, I'm talking about in this case. We know
17     that the motor didn't stop, don't we?
18  A.  No, we don't know that. I don't know that.
19  Q.  Well, how do you -- if there's no motor
20     running, what made the base spin around?
21  A.  It could be a situation where a breaker
22     tripped, and you know, unplugged, which the
23     operator did testify to, and the motor

[132]

1     continued to spin down. And maybe as he was
2     falling, he grabbed the unit and pulled it over
3     and broke it free. That's a possibility,
4     especially if he was standing on the base and
5     using his weight to secure the base to the
6     floor.
7  Q.  Mr. Uriegas, are you telling me that if that
8     motor stops that that base will continue to
9     spin for any significant period when somebody
10     is standing on it or otherwise?
11  A.  I'm not saying that at all.
12  Q.  Well, then how do you explain if the motor
13     stopped, as you hypothesized may have happened,
14     what was the force -- the opposite force that
15     caused that base to spin? Are you talking
16     about the momentum of the motor spinning down
17     would cause that base to spin?
18  A.  Not so much that.
19  Q.  Then what?
20  A.  It could be a matter of what took place as a
21     result of the incident. If he binds the -- if
22     the bit binds in the cut and everything shuts
23     down, or for whatever reason you lose your

[133]

1     footing if your standing on it, and you don't
2     have any vacuum pressure whatsoever, you're
3     just standing on it as a means of securing that
4     base to the floor. It's just using your body
5     weight, you have no vacuum pressure whatsoever.
6     You don't even know that it's on, don't care
7     that it's on, you're just standing on it. When
8     that bit stops, it could lurch, even though the
9     motor is winding down, it could potentially
10     swing you off and you could pull the drill over
11     onto yourself.
12  Q.  Okay. If the testimony is that the base spun
13     around two or three times, that would be
14     inconsistent with your hypothesis, correct?
15  A.  That would be inconsistent with what I read.
16  Q.  That's fine. And, again, in the design of this
17     product, it's anticipated that the bit can hang
18     up in the hole, correct?
19  A.  Yes.
20  Q.  Yes.
21  A.  If improperly used, yes.
22  Q.  All right. While we're on page four, the
23     preparation of safety precautions in the

Ricky L. Tyler                           Montgomery Reporting Service
(334) 262-3331                                    (877) 834-6048

c67ddcbd-7b3d-49a5-a861-f3e5c12ef3e5

11-27-2006                                                          Gabriel Uriegas

[35] (Pages 134 to 137)

[134]

1    manual that Saint-Gobain prepared for this
2    device, tell me what -- I want to know in your
3    opinion which ones of these items Mr. Riley
4    violated at the time of this incident?  You can
5    just give me numbers if you want to.
6  A.   Okay.  Number one, "Know your core drilling
7       machine."
8  Q.   Okay.
9  A.   Not only Mr. Riley, but I'm sure his supervisor
10     didn't understand how to use it.
11 Q.   Mr. Walters?
12 A.   If that was his supervisor.  I believe that's
13     the supervisor.
14 Q.   Okay.
15 A.   He had no idea how to use the machine.
16 Q.   Okay.
17 A.   Nor took the time to find out.
18 Q.   Now, where do you get the information that
19     Mr. Walters did not know how to use this
20     machine?
21 A.   Basically if in fact -- what I read in the
22     depositions, Mr. Riley specifically, is that
23     they laid the water hose on the ground and did

[135]

1    not connect the water hose to the core drill
2    whatsoever.
3  Q.   All right.  Are you aware of other testimony
4       which indicates that the water hose was
5       connected?
6  A.   No.  So does that mean they took it off the
7       second time when Mr. Riley did it?
8  Q.   I'm just asking have you read any other
9       testimony --
10 A.   No.
11 Q.   -- indicating that the water hose was
12     connected?
13 A.   No.  I can only go based on what I've seen and
14     that's what I was attesting to.  Because
15     everything that I saw said Mr. Riley placed it
16     on the ground and it was not connected.
17 Q.   All right.  Now, you said that the purpose of
18     the water is to cool the bit, correct?
19 A.   Yes.
20 Q.   That's what you're concerned with is keeping
21     that bit cool, correct?
22 A.   And flushing -- yes, and flushing the fines
23     from inside to out.

[136]

1  Q.   All right.  Flushing the fines is part of the
2       process of keeping it cool, correct?
3  A.   Yes.
4  Q.   If you keep it cool, that's the goal?  The
5       fines may increase the heat, but keeping it
6       cool is the goal, correct?
7  A.   Actually the goal is to cause the bond that
8       suspends the diamond to wear so that you're
9       continuously exposing fresh diamond.  If you
10     use too much water, then you flush all of the
11     fines away and diamonds will get crushed flat
12     and the bit slows down.  If you don't use
13     enough water, you can actually start to
14     generate the heat and you end up with the same
15     problem, the bit starts to slow down.
16 Q.   Okay.  And you're saying that the operator of
17     this device is supposed to know all of that
18     from this manual you've drafted or that
19     Saint-Gobain has drafted?
20 A.   Either that or ask for instructions when they
21     rent the drill.  All of those things are
22     available.  If there's any concern, you can
23     contact the person that rents the drill and

[137]

1    they'll be happy to explain that.  You can get
2    onto our website and get that information as
3    well.
4  Q.   Okay.  Well, what website is that?
5  A.   Www.nortonclipper.com, www.nortonprocut.com.
6  Q.   And these detailed instructions about how to
7       properly get water flow and things of that are
8       on there?
9  A.   The owners manuals are on there as well.
10 Q.   Okay.  And where in this manual does it say to
11     go on your website and get this information?
12 A.   It's not in the manual.
13 Q.   It's not in the manual.  Well, is it on the
14     product anywhere?
15 A.   It's on our catalogues.
16 Q.   It's on your catalogues?
17 A.   Yes.
18 Q.   So if someone who is renting one of these
19     devices from United Rentals, such as Flavor
20     House, would need to -- where would they get
21     that information about where to find all of
22     this operating information that you're talking
23     about?

11-27-2006                                                                 Gabriel Uriegas

[36]  (Pages 138 to 141)

[138]

1    A.   They could ask anyone at United Rentals, they
2         have a tech number.
3    Q.   Oh, okay.  All right.  Next -- what else on
4         here?  We've got number one you said he
5         violated, what else?
6    A.   Well, I would say number seven, they didn't
7         consider the work area environment.
8    Q.   How is that?
9    A.   If in fact they did just lay a hose --
10        according to Mr. Riley's deposition, if he did
11        just lay a hose on the floor and flood the area
12        around the core drill, you're not -- you're
13        basically submerging that core drill, the base
14        section of that, in water.  It's not supposed
15        to be submerged in water.
16   Q.   And where does it say in here -- doesn't it
17        actually say in the setup of this device to wet
18        the floor?
19   A.   Wetting the floor and submerging are two very
20        different -- very different -- would you rather
21        have your head wet or submerged?
22   Q.   Well, I'm just saying I believe there's -- how
23        is he supposed to know when it's being

[139]

1         submerged, as you put it, versus wet as
2         indicated in the instructions?
3    A.   The difference is if you hook the water hose to
4         the petcock, it contains all of the water
5         inside the bit.  If you just flood -- if you
6         just flood the area around the drill, you're
7         not getting any water down into the hole.
8    Q.   Did Mr. Riley say that he flooded the area?
9    A.   He had -- the best I can recall of the
10        deposition, they had the water hose laying on
11        the floor and it was open, wide open, I
12        believe, were his words.
13   Q.   Okay.  Are you aware of drains in the area?
14   A.   He did say they used it for washdown, yes.
15   Q.   And are you aware of there being any slope on
16        the floor in that area?
17   A.   No, I'm not aware.  I don't have any indication
18        of whether the floor was slick or sloped or an
19        uneven surface.
20   Q.   So I want to make sure I'm clear on this.
21        Which one of these items underneath number
22        seven are you talking about?
23   A.   I would say "mop up all excessive water around

[140]

1         the work area before and after drilling."
2    Q.   Okay.  Now, let's go over that.  "Mop up all
3         excessive water around the work area before and
4         after drilling," correct?
5    A.   Correct.
6    Q.   It doesn't say during drilling, does it?
7    A.   No, it does not.
8    Q.   And you know there's going to be water flowing
9         in the area during the drilling process,
10        correct?
11            MR. SPRAIN:  Object to the form.
12   A.   No.  There's not going to be water flowing in
13        the area.
14   Q.   That's fine.  Well, where are you going to get
15        this need to mop up after the drilling process
16        if there's not going to be water?
17   A.   Typically what can happen is as you disconnect
18        the hoses and you lay the hoses on the floor,
19        water is going to drain out of the hose and
20        it's going to leave a big puddle.
21   Q.   Now, so far the things you've told me indicate
22        to me that this appears to be a complicated
23        piece of machinery to operate, correct?

[141]

1            MR. SPRAIN:  Object to the form.
2    Q.   Would you consider this a complicated piece of
3         machinery to operate?
4    A.   In terms of the whole range of construction
5         equipment that's available, it's -- it's more
6         complex than some, but not as complex as most.
7         I wouldn't say it falls in the higher
8         complexity level.
9    Q.   Would you say this product requires special
10        training to operate?
11   A.   Yes, I would say it does require special
12        training and some knowledge.
13   Q.   All right.  And is the instructions for the
14        operation of this device supposed to be
15        contained in your operators manual, your owners
16        manual?
17   A.   Yes.
18   Q.   All right.  Sufficient to allow someone to
19        properly train themselves in the operation of
20        the device?
21   A.   Yes.
22   Q.   Okay.  So we've got the third item under number
23        seven, "Mop up all excessive water around the

11-27-2006                                                                        Gabriel Uriegas

[37]  (Pages 142 to 145)

[142]

1   work area before and after drilling." Anything
2   else under number seven?
3   A.   Under number seven, no, that would be my major
4   concern.
5   Q.   All right.  What else on that page?
6   A.   Number ten.
7   Q.   Number ten?
8   A.   "Do not force the bit into the drilling
9   surface."
10  Q.   What information do you have to indicate that
11  Mr. Riley was forcing the bit into the drilling
12  surface?
13  A.   The bit hung up.  If he wasn't forcing the bit,
14  it wouldn't hang up.
15  Q.   Is the force required to hang up the bit
16  dependent on the resistance of the base to the
17  floor?
18  A.   No.
19  Q.   What I'm saying -- let me make sure I'm clear
20  on this.
21  A.   Sure.
22  Q.   If the base is not secure to the floor, there's
23  no securing mechanism to the base on the floor,

[143]

1   and you drill down with that bit, what is
2   supposed to be the resistive force to that bit
3   hanging up in the floor?  In other words, what
4   is the opposite force that allows that bit to
5   continue to drill in the hole?
6   A.   Yeah, there is none if you don't have anything
7   secured to the floor.
8   Q.   All right.  And the bit can hang up at a force
9   much lower than required to engage the clutch,
10  correct?
11  A.   Yes.
12  Q.   Yes.  With water or without water, correct?
13  A.   Correct.
14  Q.   That's my point, is that if the base is not
15  holding, the force required to hang up the bit
16  becomes less, correct?
17  A.   Correct.  That's why there's warnings on the
18  base that say it must be secured to the floor.
19  Q.   So how do you know whether or not Mr. Riley --
20  you've indicated he didn't have the base
21  secured properly, correct?
22  A.   Correct.
23  Q.   How do you know that the force applied to the

[144]

1   bit was too great then just because of the fact
2   it hung up?  How can you make that
3   determination?
4   A.   Because there was a section where he
5   acknowledged he was having to use intermittent
6   pressure to keep it from locking down.  So he
7   knew that if he applied too much pressure he
8   was going to cause it to hang up.
9   Q.   All right.  So he was trying to regulate the
10  pressure required to keep it from hanging up,
11  correct?
12  A.   Correct.
13  Q.   All right.  And that's what you're supposed to
14  do, right?
15  A.   You shouldn't even begin to approach a state of
16  hang up.  You should get slow steady drilling.
17  Q.   That's a judgment call, correct?
18  A.   No, that's in the manual.
19  Q.   Okay.  What else?  You mentioned number ten.
20  A.   I would say they didn't exercise good judgment
21  as to when to apply what method, you know,
22  using anchor bolts.
23  Q.   Where is that one?  Are you talking about under

[145]

1   number ten?
2   A.   Number ten, "use an anchor bolt, ceiling jack
3   or vacuum hold-down attachment when drilling
4   vertically into floors."  If in fact you know
5   that you're having an issue with a vacuum
6   hold-down, it's not a difficult task,
7   especially if you're a maintenance person, to
8   switch from the vacuum system to just using an
9   anchor to hold that in place, especially for
10  two holes.  It doesn't add any significant
11  amount of additional work to drive an anchor
12  into the ground and anchor that machine in and
13  drill the hole and then move it over and put a
14  second anchor in and drill a hole.
15  Q.   As long as you've got the anchoring tools?
16  A.   If you're a maintenance person, you should have
17  those anchoring tools, especially in a large
18  facility that uses a lot of equipment.  You
19  have to maintain your --
20  Q.   You've got to have a bit that would drill
21  through the concrete, right?
22  A.   Again, if you're a maintenance person working
23  in a facility with large equipment, that large

11-27-2006                                                    Gabriel Uriegas

[38]  (Pages 146 to 149)

[146]

1    equipment has to be secured to the floor. You
2    should already have all of those devices
3    readily available to you.
4    Q.  That's fine. I'm just asking you what you need
5        in order to --
6    A.  Okay. And I am responding.
7    Q.  What do you need in order to anchor it to the
8        floor with the anchor bolt?
9    A.  You would need a hammer drill and an anchor
10       bolt.
11   Q.  A hammer drill and an anchor bolt?
12   A.  And an extension cord.
13   Q.  All right. And the anchor bolt, is that just a
14       regular old bolt?
15   A.  No. An anchor bolt is a concrete anchor bolt
16       that has -- it could be one that uses an
17       expanding wedge down at the bottom. You would
18       drill a hole, clean out the hole, put the wedge
19       down in the bottom, you set the drill over that
20       hole, you run a bolt through the top or a piece
21       of all-thread rod, and then you literally just
22       bolt the base --
23   Q.  Tighten it?

[147]

1    A.  -- bolt the base down to the floor.
2    Q.  Okay. Anything else? You mentioned number
3        ten?
4    A.  Yeah, number ten. He wasn't drilling
5        horizontally, so it's not an issue there.
6        Number 11, "Dressing properly for the work
7        being performed."
8    Q.  You think Mr. Riley was not dressed properly?
9    A.  I didn't see anything. In fact, he made a
10       statement about the one thing he could have
11       been wearing that might have helped him and I
12       think he said a helmet, which in fact might
13       have been a hard hat, a pair of safety glasses.
14       I haven't seen any medical reports, all I know
15       is what I have heard his injuries were and he
16       supposedly sustained an injury to one of his
17       eyes.
18   Q.  Does this say in here to wear a hard hat and
19       safety glasses in the operation of this drill?
20   A.  No, it doesn't. But I believe those articles
21       are -- I'm not positive, hold on just a second.
22       No, it does not specifically say wear a hard
23       hat.

[148]

1    Q.  Okay. What next?
2    A.  Number 13, "Secure the drill stand to the work
3        surface."
4    Q.  Okay. We've been through that. What next?
5    A.  Number 14, "Never stand on the drill stand base
6        as a method of securing the drill stand."
7    Q.  Okay. And you think that's what he was doing?
8    A.  Yes, I think that's what he was doing.
9    Q.  All right. What next?
10   A.  I would just note the caution statement, "It is
11       very important that the drilling machine is
12       properly secured to the work surface."
13   Q.  Why is that?
14   A.  Because you don't want to try and drill with
15       the base not secured to the floor --
16   Q.  Why is that?
17   A.  -- by some method.
18   Q.  Why is that? Because what can happen?
19   A.  There's a possibility that the base could spin,
20       the base could -- the drill could fall over.
21       There are several different things that could
22       happen.
23   Q.  And can cause injury, correct?

[149]

1    A.  Correct.
2    Q.  All right. And does it tell you that in the
3        caution about injury, potential for injury?
4    A.  That's on the base itself. It's on a tag on
5        the base itself.
6    Q.  And you've got pictures in your -- well, let me
7        just ask you this, we can find a picture if we
8        need to, but did you consider -- during your
9        inspection did you consider the labels to be in
10       proper order on the device that Mr. Riley was
11       using on August 29th? I believe that's a
12       picture in your Form LM708CPD.
13   A.  What do you mean in proper form?
14   Q.  Well, were the labels properly maintained?
15   A.  In the picture it looks as if there is some
16       sort of material that's covering the label. So
17       the label was dirty, but it didn't appear to be
18       damaged to me when I looked at it. It just
19       looks like it has slurry all over it.
20   Q.  Okay. Well, I'm looking at a picture that you
21       took in your inspection, it's a part of your
22       Exhibit Number 10 to your deposition, which is
23       your report of the inspection, correct?

11-27-2006                                                    Gabriel Uriegas

[150]

1  A.   Correct.
2  Q.   And it's your testimony that the picture on
3       page 26 of that report was merely dirty and not
4       damaged?
5  A.   It has slurry on it, yeah.  To the best of my
6       recollection, it didn't look like it was torn
7       or missing any pieces.
8  Q.   Okay.  And that's the warning you're referring
9       to that says you can get hurt if you don't
10      secure the base?
11  A.  I believe -- let's see.  I believe it says
12      "Danger, read operations manual before using.
13      Failure to secure rig properly may result in
14      serious injury."
15  Q.  Okay.
16  A.  And it says that in two languages, Spanish and
17      English.
18  Q.  Okay.
19           (Recess.)
20  BY MR. LANE:
21  Q.  Look on page seven of your manual, if you
22      would?
23  A.  Uh-huh.  (Positive response.)

[151]

1  Q.   Well, let me just ask you this general
2       question.  What parts of this manual were not
3       generated by Saint-Gobain, Norton or Clipper?
4       Is that too difficult to --
5  A.   No.  I guess at this point, again one of the
6       things I had stated, is we take some
7       information from Gast, for example, and it's --
8       we produce it, but it's the same information
9       that is in the Gast mini document, additional
10      document, that's supplied with the little
11      vacuum pump piece itself.  But we literally
12      produce, reprint, or however you want to say
13      that, the document.
14  Q.  All right.  This is Saint-Gobain's document
15      though?
16  A.  Yes.
17  Q.  All right.  Well, let me ask you a couple of
18      specific questions about that.  Are the
19      instructions on page eight Saint-Gobain's
20      instructions on how to operate this device?
21  A.  Yes.
22  Q.  Who actually came up with that list of
23      instructions that -- those eight instructions

[152]

1       there for using the vacuum hold-down system?
2  A.   Either myself or one of the previous engineers.
3       It may be just a carry-over from previous
4       documentation.
5  Q.   Okay.  Let's go down the list here.  Number
6       one, "Mount the column and carriage in the
7       large vacuum hold-down base."  That's already
8       done, correct?
9  A.   Correct.
10  Q.  When the unit is delivered to United -- I mean,
11      to Ralcorp in this case, Flavor House, correct?
12  A.  If it's a rental unit.
13  Q.  Who actually puts the component parts together
14      when the unit is shipped -- well, let's talk
15      about this particular unit.  The unit that was
16      shipped to United Rentals on March 14th or so,
17      2003, who was responsible for assembling that
18      product?
19  A.  Can I see the document?  Do we have that
20      document, the invoice, so I can see whether it
21      was sold as a single unit?  I think it was sold
22      in three pieces.
23           MR. SPRAIN:  There's a series of

[153]

1       documents that were marked.
2  Q.   We marked it, right?
3  A.   Yeah, we marked it.
4  Q.   It's here somewhere if we marked it.
5           MR. SPRAIN:  It's marked from Walters'
6       deposition.  It may be that it
7       wasn't marked.
8  A.   This is what we referred to last time.
9  Q.   Okay.  Do you remember the question?
10  A.  I believe you asked who put the components
11      together?
12  Q.  Yes.  Who was responsible for the assembly of
13      the product, final assembly?
14  A.  I think in terms of how it was supplied, we
15      shipped the machine in three pieces, the stand,
16      the motor and the vacuum assembly with
17      fittings.
18  Q.  And who would have been responsible for
19      assembling that product, the components?
20  A.  The owner of the piece of equipment.
21  Q.  In this case United Rentals?
22  A.  In this case, yes.
23  Q.  Okay.  So as far as page eight of the operators

11-27-2006                                                                 Gabriel Uriegas

[40]  (Pages 154 to 157)

[154]

1    manual, the owners manual that you've been
2    looking at, that -- mounting the column and
3    carriage in the large vacuum hold-down base
4    would have been -- that would have been United
5    Rentals that did that?
6    A.  No, that would have already been done by the
7    time they received it.  The column and carriage
8    would have been already assembled.
9    Q.  How about the motor, would the motor already be
10   on the carriage?
11   A.  The motor would not have been.
12   Q.  Okay.  Number two says "Connect the vacuum pump
13   to the vacuum base."  Now, that would have
14   already been done by United Rentals?
15   A.  When Flavor House received the machine, yes.
16   Q.  And then it says, number three, "Wet the work
17   area in order to achieve an effective seal" --
18   before we get to that one, let me ask you; this
19   page eight of this operators manual, part of
20   this is applicable to the operator in a rental
21   situation and part of it is applicable to the
22   owner, which was United Rentals in this case,
23   correct?

[155]

1         MR. SHEEHAN:  Object to the form.
2    A.  I'm not sure I understand what you're trying to
3    say.
4    Q.  Well, we've already established number one and
5    number two would have had no application to
6    Matthew Riley or Mr. Walters?
7    A.  Okay.  In that respect, yeah, correct.
8    Q.  Okay.  Number three, we start with something
9    that does have to do with Mr. Riley and
10   Mr. Walters, correct?
11   A.  That would be something an operator would have
12   to do.
13   Q.  And it says "Wet the work area in order to
14   achieve an effective seal"?
15   A.  Yes.
16   Q.  How do you wet the work area to achieve an
17   effective seal using the vacuum hold-down?
18   A.  Typically what's done after you hook the water
19   hose to the water inlet valve, you have the bit
20   up in the air above it, and you basically just
21   open the valve just slightly to let it moisten
22   the surface, and then you close the valve up
23   and then you turn everything on.

[156]

1    Q.  Okay.  It doesn't say connect the -- it doesn't
2    say connect the water hose there, does it?
3    A.  No, but that's implicit in the design of the
4    machine with the water inlet valve.
5    Q.  Number four, "Connect the vacuum pump cord into
6    the top outlet of the receptacle in the switch
7    box above the motor," correct?
8    A.  Correct.
9    Q.  All right.  And "this will start the pump and
10   create a seal between the base and the work
11   surface;" is that correct?
12   A.  That's what it says, yes.
13   Q.  So at instruction number four is that the point
14   where the vacuum is turned on and the base is
15   pulled down to the floor?
16   A.  If the power is supplied to the switch box,
17   yes.
18   Q.  Okay.  Well, when it says "this will start the
19   pump and create a seal between the base and the
20   work surface," that implies that power is being
21   supplied, correct?
22   A.  No, I don't think so.  I think it just tells
23   you this will start the pump and create a seal

[157]

1    between the base and the work surface.  It
2    tells you that it should energize or at least
3    complete the circuit.
4    Q.  Okay.  I think we're saying the same thing.
5    A.  I think we are.  I'm not disagreeing with you.
6    Q.  When number four is conducted, there should be
7    power going to the pump, correct, the vacuum
8    pump?
9    A.  The circuit is complete.
10   Q.  Yes.  And the pump turns on, correct?
11   A.  If power is supplied to the drill, yes.
12   Q.  Okay.  And the surface is wet and the seal
13   should be formed at that point, correct?
14   A.  It should start to form at that point, yes.
15   Q.  Yes.  And it's drawing a vacuum, correct?
16   A.  It should start to draw a vacuum, yes.
17   Q.  Then we've got number five, "Adjust the
18   leveling screws so that the core drill is level
19   and resting lightly on the vacuum seal"?
20   A.  Correct.
21   Q.  All right.  What does that mean to you?  How
22   much should you turn those leveling screws at
23   that point?

**[158]**

1  A.  The base should be resting on the leveling
2      screws and not on the gasket is basically what
3      that means.
4  Q.  Okay. It says "Adjust the leveling screws so
5      that the core drill is level and resting
6      lightly on the vacuum seal"?
7  A.  Correct.
8  Q.  How do you determine when it is resting lightly
9      on the vacuum seal after that device has pulled
10     it down to the surface?
11 A.  It won't pull it all the way down to the
12     surface. The sponge rubber is thick enough to
13     where even at maximum pressure it doesn't pull
14     it all the way down to the surface.
15 Q.  Okay. So how do you know when to stop turning
16     the leveling screws to have it properly
17     adjusted at that point?
18 A.  You screw the screw in until the tip of the
19     screw makes contact with the surface, all four
20     screws make contact with the surface.
21 Q.  And you just want to make contact with the
22     floor at that point, correct?
23 A.  Right.

**[159]**

1  Q.  All right. So that's pulled it down?
2  A.  As far as it can.
3  Q.  As far as it can. And then you basically put
4      the anchors --
5  A.  The leveling screws.
6  Q.  -- the feet down on the corners, correct?
7  A.  They're not anchors, they're basically leveling
8      screws to square everything up.
9  Q.  Yeah. Okay. Then it says, number six, "Plug
10     the vacuum pump cord into the live outlet of
11     the receptacle in the switch box." What's
12     going on there? Haven't you already done that?
13 A.  It would appear to be redundant.
14 Q.  It's not only redundant, it's flipping two
15     different instructions there, isn't it? In
16     other words, you've just adjusted the leveling
17     screws before that, correct?
18 A.  Number five is "Adjust the leveling screws so
19     that the core drill is level." Yes, okay.
20 Q.  So then we've got number six which seems to be
21     doing what number four has already done, and it
22     says "Plug the vacuum pump cord into the live
23     outlet of the receptacle in the switch box.

**[160]**

1      This will start the pump and create a seal
2      between the base and the work surface." Well,
3      that's a little confusing at best, isn't it?
4          MR. SPRAIN: Object to the form.
5  Q.  Well, Mr. Uriegas --
6  A.  It does appear to be a little confusing, yes.
7  Q.  Okay. And then we've got number seven which
8      says "Adjust the leveling screws so that the
9      base is snug against the work surface." All
10     right. Now, it looks like we're going back to
11     number five again, doesn't it?
12         MR. SPRAIN: Object to the form.
13 A.  I think it's basically providing some detail to
14     number five. I wouldn't say it's going back.
15 Q.  Would you agree with me that that's a little
16     confusing considering the fact that you --
17 A.  No, absolutely not. I a hundred percent
18     disagree to you.
19 Q.  Okay.
20 A.  I think it's adding additional detail to number
21     five.
22 Q.  All right. So you don't find anything wrong
23     with number four, number five, number six and

**[161]**

1      number seven of the instructions, is that your
2      statement? That's clear to the operator who
3      would be expected to read this?
4  A.  I think it's pretty straightforward to him, but
5      if he were to follow it I don't think it would
6      be confusing to him.
7  Q.  Well, let me ask you this; do you adjust the
8      leveling screws before or after you pull the
9      vacuum? Because reading four, five, six and
10     seven, I can't tell. Can you tell me, do you
11     adjust the leveling screws before or after you
12     pull the vacuum?
13 A.  You can -- it depends on where you are in the
14     process. If it's the initial time to set up
15     the machine, you would basically adjust them
16     after you set the vacuum.
17 Q.  You could do it either way, is that your
18     testimony?
19 A.  It's too broad a statement. It depends. The
20     first time you set it up, if you're drilling in
21     the same area, you need to pull the vacuum
22     first and then adjust the leveling screws.
23     After you make that initial hole and you're in

11-27-2006                                    Gabriel Uriegas

[42]  (Pages 162 to 165)

**[162]**

1     the same area, you can disengage the vacuum
2     assembly, move it over, and then check your
3     leveling screws again to make sure they haven't
4     moved, and then suck it down to the floor.
5   **Q.**   So once the leveling screws are set on the
6     first hole, then you may not need to set them
7     on the second hole?
8   **A.**   That's correct.  They have jam nuts so that
9     theoretically they hold themselves in place and
10    they don't vibrate loose, but that's assuming
11    that you use the jam nuts and you tighten the
12    jam nuts.
13  **Q.**   So to make sure I'm clear though, under what
14    circumstances would you not pull it down first
15    in order to set the leveling screws?
16  **A.**   If you've already establish it with an initial
17    hole, that would be --
18  **Q.**   Is that how you explain the -- what appears to
19    be an inconsistency in the instructions of
20    number four, five, six and seven?
21      MR. SPRAIN:  I object to the form.
22  **A.**   What you have in both of those situations in
23    four and six and five and seven is providing

**[163]**

1     some additional detail.  Number four basically
2     says "connect the vacuum pump cord into the top
3     outlet of the receptacle in the switch box
4     above the motor."  Number six says "plug the
5     vacuum pump cord into the live outlet of the
6     receptacle in the switch box."  The way that
7     particular machine is designed, one of the
8     outlets remains live at all times.
9   **Q.**   I don't think we've got any problem with that,
10    Mr. Uriegas.
11  **A.**   Okay.
12  **Q.**   That's the same outlet we're talking about in
13    four and five, isn't it?
14  **A.**   Yes.  And it's letting you know that the top
15    outlet is the one that should be the live
16    outlet.
17  **Q.**   Well, if you follow number four, the pump would
18    start up, correct?
19  **A.**   If the machine is connected to power.
20  **Q.**   Right.
21  **A.**   Just plugging that vacuum pump plug into that
22    receptacle doesn't provide power.  The switch
23    box has to have power coming to it.

**[164]**

1   **Q.**   Well, I mean, that applies to number six, too,
2     though, doesn't it?
3   **A.**   Yes.
4   **Q.**   If you plug it in in number six, it's not going
5     to come on if the power cord is not plugged
6     into the wall, correct?
7   **A.**   You're missing the point.  Number four tells
8     you it's the top outlet.  Number six tells you
9     it's that top outlet, but it's a live outlet.
10  **Q.**   Okay.  And number four tells you "this will
11    start the pump and create a seal between the
12    base and the work surface," correct?
13  **A.**   Correct.
14  **Q.**   If it's not plugged in, it's not going to do
15    that, is it?
16  **A.**   Correct.
17  **Q.**   All right.  You know, I don't want to beat a
18    dead horse, but I don't see any difference
19    between number four and number six; you're
20    saying you do, correct?
21  **A.**   It's detail.
22  **Q.**   Okay.  Let's look over at page nine of the
23    manual.

**[165]**

1       (Recess.)
2   BY MR. LANE:
3   **Q.**   The maintenance instructions on page 11, do you
4     see that?
5   **A.**   Yep.
6   **Q.**   You must be following me over there.  Is that
7     the complete maintenance instructions for the
8     vacuum pump?
9   **A.**   No.
10  **Q.**   The ones at the top of the page?
11  **A.**   No.
12  **Q.**   All right.  Where are the other maintenance
13    instructions for the vacuum pump?
14  **A.**   Page 20.
15  **Q.**   Page 20?
16  **A.**   Yeah.  Those are basically just adopted
17    straight off the document provided with the
18    Gast vacuum pump.
19  **Q.**   You were at the inspection on May the 12th,
20    what happened to your inspection document?  Let
21    me show you Plaintiff's Exhibit Number 10.
22  **A.**   Okay.
23  **Q.**   If you will, look over at page 20, start at

[166]

1       page 20 of Plaintiff's Exhibit Number 10?
2  A.   Okay. I'm there.
3  Q.   And that's photographs you took?
4  A.   Yes.
5  Q.   Did it appear that the vacuum pump -- and you
6       can look at page 20, page 21, page 22, page 23,
7       and tell me -- if those assist you in any way,
8       tell me did it appear during the inspection
9       that the vacuum pump had been properly
10      maintained?
11 A.   That was hard to tell given the level of
12      deterioration that had taken place on the pump.
13      It was my understanding that the unit had been
14      sitting for a pretty good period of time.
15 Q.   We talked about that cup over there, the cup
16      that has the ball in it, the check valve?
17 A.   The water trap.
18 Q.   Do you call that a check valve?
19 A.   A check valve in the top portion, yes.
20 Q.   A check valve in the top portion. If there is
21      water in that device and let's say the drilling
22      is over and you've accumulated water in that
23      device and you load that device up in the back

[167]

1       of a truck or whatever and you lean it over and
2       lay it down, how effective is that check valve
3       in preventing the flow of water into that pump
4       under those circumstances?
5  A.   If it's left to sit for a pretty good period
6       and some water contaminated with slurry gets
7       into that, the slurry could harden and it would
8       render -- it would pretty much render the pump
9       useless.
10 Q.   Okay. And at some point the pump decreases in
11      its effectiveness, correct?
12 A.   It will usually seize. It will literally lock
13      down.
14 Q.   It may seize, it may reduce in function,
15      correct?
16      MR. SHEEHAN: Object to the form.
17 Q.   The diaphragms may not seal properly, correct,
18      the flapper valves?
19      MR. SHEEHAN: Object to the form.
20 A.   That's an option that could happen, yes.
21 Q.   That's an option that could happen. Okay. And
22      that would decrease the effectiveness of the
23      vacuum pump, correct?

[168]

1  A.   It would pretty much render it useless.
2  Q.   How do you maintain -- how do you address that
3       in the maintenance instructions, that potential
4       problem?
5  A.   I believe -- okay. In the manual, and you'll
6       have to follow with me, on page 11.
7  Q.   Page 11, okay.
8  A.   There's a picture of the optional Gast vacuum
9       pump.
10 Q.   Right.
11 A.   It says "The required maintenance procedure for
12      the vacuum pump is listed in the parts list and
13      operating and mainenance instructions pamphlet.
14      Parts of the vacuum pump are available from
15      local distributors of Gast products. A listing
16      of Gast distributors is available in this drill
17      manual and in the vacuum pump pamphlet."
18      From that you go to page 20. "Operating
19      and Maintenance Instructions, Model
20      DOA-V185A-AA." There's a section "Do not at
21      any time lubricate any of the parts with oil,
22      grease, or petroleum products nor clean with
23      acids, caustics or chlorinated solvents. Be

[169]

1       very careful to keep the diaphragm from
2       contracting any petroleum product or hydro
3       carbons. It can affect the service life of the
4       pump. Danger: To prevent explosive hazard, do
5       not pump combustible liquids or vapors with
6       these units. Personal injury and/or property
7       damage would result. To replace the diaphragm,
8       remove the socket cap screws from the head of
9       the pump. The diaphragm is held in place by
10      two Phillips head screws. Remove screws,
11      retainer plate, and the diaphragm. The
12      diaphragm will fit in any position on the
13      connecting rod. Replace the plate and two
14      Phillips head screws. Torque to 30 inch-pounds
15      on DOA and DAA. Torque to 12 inch-pounds on
16      MOA and MAA."
17 Q.   Let me stop you right there. Who are those
18      instructions intended for?
19 A.   They are intended for the operator.
20 Q.   For the operator?
21 A.   For either the operator or whoever is going to
22      service the piece of equipment.
23 Q.   Okay.

c67ddcbd-7b3d-49a5-a861-f3e5c12ef3e5

11-27-2006                                                    Gabriel Uriegas

[44]  (Pages 170 to 173)

[170]

1   A.   I guess the owner would be the more
2        appropriate.
3   Q.   You wouldn't expect an operator who is renting
4        this product to go through this process that's
5        on page 20, correct?
6   A.   I would not expect that.
7   Q.   Okay.  And let me ask you this; is that -- the
8        process you just read there, is that the
9        process you're talking about that a person
10       conducting maintenance on this device should do
11       to the device in some period, some regular
12       basis?  In other words, how do they know when
13       to do what you've just described there?
14  A.   I would think if it's a rental piece of
15       equipment, if you're getting reports that the
16       vacuum is tending to lose pressure, vacuum
17       pressure, then it would probably be a good
18       point in time to stop and do an evaluation of
19       the -- the state of the interior on that pump.
20  Q.   Okay.  And that would require some type of
21       notification you're talking about, correct?
22  A.   Someone would have to let you know.
23  Q.   Okay.

[171]

1   A.   And that typically only takes place unless
2        something has gone wrong.
3   Q.   You would agree with me that something can go
4        wrong in a graded type fashion though, correct?
5        It might not all go wrong at once, it may be a
6        decrease in function, correct?
7   A.   That's correct.
8   Q.   And you don't know how fast that degradation
9        will take place or not, correct?
10       MR. SHEEHAN:  Object to the form.
11  A.   Part of the problem with rental equipment is
12       usually if it's rental equipment and the
13       customer breaks it, he's usually not going to
14       own up to having done damage to it for fear of
15       you making him pay for the repair or the
16       maintenance.
17  Q.   Well, that condition we were just talking about
18       is not something that would be an immediate --
19       necessarily an immediate type of problem,
20       correct?
21  A.   Water containment?
22  Q.   Yes.
23  A.   It could be immediate.

[172]

1   Q.   Could be, but not necessarily?
2        MR. SHEEHAN:  Object to the form.
3   A.   I think it could be immediate.  And I think it
4        could be necessarily.  It would almost have to
5        happen instantaneously.  The water trap jar
6        would have to fill, the water would get into
7        the head, and if no one says anything and the
8        drill is put back in the truck, taken back to
9        the owner of the drill, and there's no report,
10       it may function fine, but as soon as it's used
11       again, if it sits for a period of time, it may
12       have a problem, it may not function at all.
13  Q.   May not function at all or may not function up
14       to its expected capacity, correct?
15       MR. SHEEHAN:  I object to the form.
16  Q.   Is that a fair statement?
17       MR. SHEEHAN:  Object to the form.
18  A.   That's a possibility.  Not likely, but it's a
19       possibility.
20  Q.   Now, what's the basis of you saying that's not
21       likely, Mr. Uriegas?
22  A.   Typically when you run into a situation like
23       this and you get water contamination, the

[173]

1        deterioration is pretty quick.  The water
2        usually tends to damage the -- there are little
3        fiber filters and those filters tend to
4        deteriorate fairly quickly.  So within a matter
5        of two or three days that pump can completely
6        seize.  So it happens pretty quickly.  And then
7        anything beyond that point is -- doesn't matter
8        anymore, you've already pretty much rendered
9        the pump useless.
10  Q.   Well, I need to know what the basis is for you
11       saying that.  I hear what you're saying.  Where
12       do you get that information from?
13  A.   Just experience from having opened up those
14       pumps.
15  Q.   So you at Saint-Gobain have opened up those
16       pumps to investigate problems with the pumps,
17       correct?
18  A.   Correct.  I answer technical questions, so I
19       will get that inquiry.
20  Q.   As a part of your job that's what you've done?
21  A.   Yes.
22  Q.   You take apart the component parts to determine
23       problems associated with them?

11-27-2006                                                          Gabriel Uriegas

[45]  (Pages 174 to 177)

**[174]**

1   A.   At times, yes.
2   Q.   Okay.  Do you have any records to support your
3        statistical -- to statistically support what
4        you're saying?
5   A.   No, I have no records.
6   Q.   When you've taken these pumps apart, do you
7        know when the last time it was used or how long
8        it was when the water was exposed to it?
9   A.   Not for all.  As I said, I teach some of the
10       classes and as I'm teaching the classes, I've
11       run across that incident myself.
12  Q.   Okay.  What kind of materials do you use to
13       teach these classes?
14  A.   Do you mean in terms of materials cut and
15       drilled or equipment?
16  Q.   Let me cut to the chase.  Have you taught any
17       classes on the maintenance and repair of core
18       drill components?
19  A.   No.
20  Q.   You have not.  Haven't taught any classes
21       dealing with vacuum pump maintenance and
22       repair?
23  A.   No.

**[175]**

1   Q.   Okay.  So that wouldn't be a basis for your --
2   A.   Teaching classes, no.
3   Q.   Okay.  Look at page nine of the operators
4        manual.  What's going on there where it's
5        talking about, the top paragraph there, "The
6        DeWalt motor is designed to operate with two
7        speeds"?  Is that pertaining to this particular
8        model?
9   A.   It's a different brand.  This is DeWalt.  The
10       motor in question is a Milwaukee.
11  Q.   Yeah.  Should that be in this manual that was
12       intended for the DM500?
13  A.   And DM450 as well.  So it's a manual for
14       multiple -- the same base could have different
15       motors.
16  Q.   Okay.  So this is a different motor with a
17       different amperage, the DeWalt motor?
18  A.   18 amp versus 20 amp.
19  Q.   Okay.
20  A.   The next page is the Milwaukee motor and both
21       models, a 15 amp and a 20 amp.
22  Q.   All right.  When you're talking about amperage,
23       you're talking about the power of the motor,

**[176]**

1        correct?
2   A.   That is correct.
3   Q.   Now, look at page 15, if you would, for me?
4   A.   Okay.
5   Q.   It says "Assembly drawings of the DM450 and 500
6        core drills," correct?
7   A.   Correct.
8   Q.   Who generated these drawings right here in this
9        manual?
10  A.   The drawings are actually a copy of the Diamond
11       Products M-1 assembly.
12  Q.   Okay.  Did you have to get permission to
13       reprint these?
14  A.   I'm not sure if we did or not.
15  Q.   The parts list on page 17 for the drill base
16       and column, is that generated by Saint-Gobain?
17  A.   It is generated by Saint-Gobain.
18  Q.   Okay.  That's Saint-Gobain's parts list,
19       correct?
20  A.   Those are our part numbers and our parts list.
21  Q.   And do people who need replacement parts order
22       these parts from you?
23  A.   Typically they would order the parts from one

**[177]**

1        of our distributors, not directly from us.  We
2        do not sell direct to customers.
3   Q.   Oh, I understand.  But your distributors would
4        get them from you?
5   A.   Correct.
6   Q.   Okay.  Now, look at page 21, if you will.  It's
7        got a page there that says "DeWalt, Milwaukee
8        and Gast" on that page, is that --
9   A.   That's correct.
10  Q.   Okay.  Was this produced by Saint-Gobain?
11  A.   Yes.
12  Q.   All right.  And then page 22, "Service Centers,
13       Service Centers, Service Centers."  Whose
14       service centers are those?
15  A.   DeWalt, Milwaukee and Gast.
16  Q.   Okay.  So that's just a listing for each one of
17       those manufacturer's service centers, correct?
18  A.   That is correct.
19  Q.   All right.  Where is the service centers for
20       Diamond Products in this manual?  You don't
21       have a listing for Diamond Products in here,
22       correct?
23  A.   That is correct.

11-27-2006                                          Gabriel Uriegas

[46]  (Pages 178 to 181)

[178]

1  **Q.**  Do you have anything in here that references
2       Diamond Products?
3  A.  No, we do not.
4  **Q.**  You do not.  And just so we're clear, on page
5       30 there, the last page of the manual, there is
6       a -- it says "Clipper."  Clipper is also the
7       Norton -- I mean, a Saint-Gobain --
8  A.  A subbrand name of --
9  **Q.**  -- subbrand name, correct?
10 A.  Right.
11 **Q.**  So when we say Norton and we say Clipper,
12      that's still Saint-Gobain's brand name,
13      correct?
14 A.  Yes.
15 **Q.**  Now, on that last page we've got what appears
16      to be a warning, is that a fair statement?
17 A.  That's correct.
18 **Q.**  Do you have any other type of labeling in this
19      manual that says "warning" on it?
20 A.  Page 20.  And typically in terms of the
21      components that have their own manuals, any
22      warnings would be contained with that
23      particular unit.  If it's the motor, then the

[179]

1       pamphlet or owners/operators manual that's
2       supplied with the motor would contain all of
3       the warnings, because it doesn't necessarily
4       mean that the motor would be used with our
5       drill stand, it could be used with anyone's
6       drill stand.  Same situation for the pump.
7  **Q.**  Well, let's look at the warning on page 20.
8       Where did that warning come from?
9  A.  That is the warning that is on the pamphlet
10      that is supplied with the Model DOA-V185A-AA
11      Gast vacuum pump.
12 **Q.**  The Gast vacuum pump.  And that warning says
13      "The motor may be thermally protected and can
14      automatically restart when the overload resets.
15      Always disconnect power source before
16      servicing.  Personal injury and/or property
17      damage could result."  Did I read that
18      correctly?
19 A.  Correct.
20 **Q.**  All right.  So that's warning that you need to
21      disconnect the power when you service it,
22      correct, to keep from being --
23 A.  When you service the pump, yes.

[180]

1  **Q.**  So you're not shocked in any way, correct?
2  A.  Correct.
3  **Q.**  All right.  Any other warnings?  Well, let's
4       see, there's a danger up there, too, under
5       that?
6  A.  Yes.  And a caution.
7  **Q.**  It says "Danger:  To prevent explosive hazard,
8       do not pump combustible liquids and vapors with
9       these units.  Personal injury and/or property
10      damage would result."  Now, that has nothing to
11      do with the loss of vacuum problem that we've
12      been talking about here today, correct?
13 A.  As far as I can see, it does not.
14 **Q.**  Yeah.  Neither does the warning down there,
15      correct?
16 A.  The thermal protection?
17 **Q.**  Yes.
18 A.  No, I don't believe it does.
19 **Q.**  Okay.  And then under the caution it says "Do
20      not raise any burrs or nicks on the heads of
21      these screws.  These burrs could cause damage
22      to the inlet valve."  That has nothing to do
23      with the problem we're talking about here today

[181]

1       either, does it?
2  A.  Based on the evidence presented, no.
3  **Q.**  Okay.  Any other warnings in the manual other
4       than that caution, that warning and that danger
5       on page 20?
6  A.  And there's a caution under Safety Precautions,
7       it doesn't use the word "warning."  The whole
8       section is categorized important.  "The
9       following safety precautions must be observed,"
10      and then down at the bottom there is the word
11      "caution."
12 **Q.**  So we've got a caution?
13 A.  Right.
14 **Q.**  Any other warnings?
15 A.  Not using the word "warning."
16 **Q.**  Okay.  And then that last warning over there
17      though, the one we started with, page 30, what
18      is the purpose in having a big warning across
19      the top like that?  Do you know what the
20      components of a warning are?  Tell me what the
21      components of a warning is.
22 A.  I do not specifically establish these warning
23      labels, so I can't answer that question sitting

11-27-2006                                                    Gabriel Uriegas

[47]  (Pages 182 to 185)

[182]

1    in front of you right now.
2    Q.  Okay.  Do you know what the critical components
3        of a danger placard would be?
4    A.  I cannot answer that sitting in front of you
5        right now.
6    Q.  How about a caution, what are the essential
7        requirements of a caution placard?
8    A.  In general I can't answer that statement.
9    Q.  Okay.
10   A.  Typically when we have to establish those
11       criteria, we refer to the Society of Automotive
12       Engineers Code, and I don't have those in front
13       of me at the moment.
14   Q.  Okay.  Do you feel that the warnings that were
15       on the DM500 that Mr. Riley was using, that the
16       warning placards that were on the product
17       itself, met that code that you just mentioned,
18       met the requirements of that code or that
19       standard you're referring to?
20   A.  Without having reviewed them directly against
21       the code, I can't answer that, but in general I
22       would say they did.
23   Q.  What was the standard you were referring to

[183]

1    again?
2    A.  It's an SAE code.  I don't remember, SAE-J.  I
3        don't remember it off the top of my head.  I
4        can get that for you.
5    Q.  Okay.  Would you please do that and provide
6        your attorney with a copy of that?
7    A.  (Witness nods head in the affirmative.)
8    Q.  Okay.  And that's the standard that you say
9        would apply to the warnings that Saint-Gobain
10       would be responsible for placing on the
11       product?
12   A.  Yes.
13   Q.  All right.  How about the warnings in the
14       manual, is there a standard that Saint-Gobain
15       would refer to as far as warnings and cautions
16       and dangers that would be included in the
17       manual, operators manual?
18   A.  I think at the time of the publication of this
19       manual there was no standard that was referred
20       to in establishing the criteria and print of
21       the warnings.  Again, part of what has taken
22       place with the documentation is as -- as the
23       market becomes more sophisticated, the need for

[184]

1    more sophisticated warnings increases.  And so
2    we attempt to evolve the documentation with the
3    needs of the market.
4    Q.  Okay.  Let me ask you a few questions about
5        Plaintiff's Exhibit Number 11.  And just so
6        we're clear, I think we may have covered this,
7        but this -- these photographs that you have
8        provided in Plaintiff's Exhibit Number 11,
9        those are photographs of the component parts
10       and all of the parts that make up the DM500; is
11       that correct?
12   A.  That's correct.
13   Q.  Do you know -- do you still have that pump
14       today?  Not you personally, but does
15       Saint-Gobain still --
16           MR. SPRAIN:  That drill?
17   Q.  -- maintain possession of that pump?
18   A.  The pump in this picture?
19   Q.  I'm sorry, the drill, the whole assembly.
20           MR. SPRAIN:  I think we do.
21   A.  I think we do.  I can't say that with --
22   Q.  All right.  Do you know whether or not that
23       pump that we see in the photographs there, does

[185]

1    that appear to be the pump that we see on the
2    DR520 or does it appear to be the pump that was
3    on the -- do you see the rounded cap on that
4    pump?  If you need to look at the other ones, I
5    can --
6    A.  If I can get to the model number that may
7        resolve some.
8    Q.  Yeah.  If you've got a photograph that shows
9        it, that would be great.
10   A.  I can't be positive.
11   Q.  Okay.  That's fine.  That's fine.  Well --
12       that's fine.
13   A.  From the exterior they would appear the same.
14   Q.  That appears the same as the exemplar we've got
15       here, is that what you're saying?
16   A.  It's close, but the model number would tell me
17       for sure.
18   Q.  Okay.  Functionally there's no significant
19       difference, is that a fair statement?
20   A.  I think that's a fair statement.
21   Q.  Okay.  Now, I want to look at Plaintiff's
22       Exhibit Number 7.  I think you've got another
23       copy, but I've got to find my copy of that.

11-27-2006                                                    Gabriel Uriegas

[48]  (Pages 186 to 189)

[186]

1          MR. SPRAIN: What about that, do y'all
2          want to mark that or have you
3          already finished with that?
4          MR. LANE: I think we marked it as
5          Plaintiff's Exhibit Number 2,
6          because I don't find Plaintiff's
7          Exhibit Number 2, but we'll see in
8          a minute.  Okay.  Then I didn't
9          mark it.  We'll mark it.
10   Q.   Looking at Plaintiff's Exhibit Number 7, you
11        said that you wrote these handwritten notes?
12   A.   Yes, I wrote them.
13   Q.   This morning?
14   A.   This morning.
15   Q.   This morning.  Okay.  And did you receive
16        assistance of counsel in the preparation of
17        these notes that you provided us in Plaintiff's
18        Exhibit 7?
19   A.   I had discussions with counsel.
20   Q.   Okay.  Does this represent a complete listing
21        of your opinions in this case?
22   A.   Yes.
23   Q.   All right.  Just very briefly we'll go over

[187]

1          these opinions.  These aren't numbered, but the
2          first one there says "Saint-Gobain did not
3          design or manufacture the DM500 core drill.
4          The drill DM500 was sold under the Norton brand
5          name at the time of the accident in 2003;" is
6          that correct?
7    A.   That's correct.
8    Q.   All right.  And you've given us -- have you
9          given me the basis for your opinion on that?
10   A.   Yes.
11   Q.   Which is that you just -- based on your
12        understanding of what manufacture means, that
13        Saint-Gobain did not manufacture this product?
14        What's your definition of manufacture?  Let me
15        ask you that.
16   A.   That would mean converting, transforming raw
17        material into a finished good.  In this case we
18        simply purchased an existing product from a
19        vendor.
20   Q.   Okay.  Second opinion, "The DM500 core drill is
21        a reasonably safe," I guess you mean "product
22        for the intended use"?
23   A.   Yes.

[188]

1    Q.   Okay.  Number three, "The drill design has a
2          proven historical performance as a reliable and
3          safe piece of equipment;" is that correct?
4    A.   That's correct.
5    Q.   All right.  Have you had any -- have you had
6          any reports of injury on a core drill that have
7          come back to Saint-Gobain?
8    A.   Not in my 23 years.
9    Q.   Not in your 23 years.  Okay.  Do you know how
10        many times the base breaks loose on a core
11        drill that is utilizing a vacuum pump as a
12        system for holding it down?
13   A.   No one has reported that information to me.
14   Q.   Okay.  The next opinion, "The design of the
15        DM500 is an accepted industry standard."  Now,
16        what is the industry standard you're referring
17        to there?
18   A.   Standard meaning that there is no printed piece
19        of documentation establishing manufacturing
20        criteria.  There is basically a most
21        conventional design, which would be a flat base
22        with a vertical column and a carriage that
23        moves up and down on a vertical column with an

[189]

1          pinion rack.
2    Q.   Is the use of a vacuum pump a standard industry
3          practice?
4    A.   It's a common industry practice.
5    Q.   Common industry practice.  The next opinion,
6          "The core drill design for the DM500 complies
7          with general engineering standards."  What are
8          your general engineering standards you're
9          referring to there?
10   A.   Basically accepted practices.  Any basic ASME
11        codes that would apply to the components that
12        make up the core drill.
13   Q.   All right.  Are you an engineer?
14   A.   Yes, I am.
15   Q.   All right.  Are you licensed anywhere?
16   A.   No, I'm not.
17   Q.   How long have you been an engineer?
18   A.   Since 1983.
19   Q.   Where did you go to school?
20   A.   Texas A & M University.
21   Q.   All right.  Are you -- do you consider yourself
22        a design engineer?
23   A.   I would not consider myself a design engineer.

11-27-2006                                                      Gabriel Uriegas

[49]  (Pages 190 to 193)

[190]

1    **Q.**  Okay.  What kind of engineer do you consider
2        yourself?
3    **A.**  Basically for the time period that I have been
4        with Norton I have been defined as a product
5        engineer.
6    **Q.**  Product engineer?
7    **A.**  Yes.
8    **Q.**  And what's the difference between a product
9        engineer and a design engineer -- a design
10       engineer of products?
11   **A.**  What is the difference between a product
12       engineer and a design engineer of products, is
13       that the distinction?
14   **Q.**  A designer of products; an engineer who designs
15       products?
16   **A.**  A product engineer and a product designer.  A
17       product designer basically develops concepts
18       and then takes those concepts from raw material
19       to finished goods.
20   **Q.**  What do you do?
21   **A.**  A product engineer would -- typically I take
22       the finished good and help take that to the
23       market and then assist in the introduction of

[191]

1        those products into the market with technical
2        assistance.
3    **Q.**  Well, are you just a marketer of the products
4        or do you participate in how the product is
5        designed and engineered?
6    **A.**  I may have some input into and make
7        recommendations.
8    **Q.**  As an engineer?
9    **A.**  As an engineer, yes.  I may be asked for
10       recommendations, to give an opinion on a
11       design, but I wouldn't make those final
12       changes.
13   **Q.**  Okay.  Are you familiar with -- in your
14       experience are you familiar with the process of
15       hazard analysis in the design of a product?
16   **A.**  No.
17   **Q.**  You are not?
18   **A.**  No, I am not.
19   **Q.**  Okay.  Are you familiar with an order of
20       precedence in addressing hazards associated
21       with the use of a product?
22   **A.**  No, I am not.
23   **Q.**  You are not.  Okay.  Do you know what I'm

[192]

1        talking about when I say that?
2    **A.**  Yes, I've heard the phrase, the terminology.
3    **Q.**  Where have you heard the phrase?
4    **A.**  From other engineers in the group, from other
5        design groups.
6    **Q.**  Engineers in Saint-Gobain?
7    **A.**  Engineers within Saint-Gobain.
8    **Q.**  And what is the principle known as the order of
9        precedence in the design of a product?
10   **A.**  To my understanding you look for the most
11       serious hazards and ranking them by order,
12       that's my understanding in simple statement.
13   **Q.**  And when you identify hazards associated with a
14       product, what is the process you go through to
15       address those hazards as an engineer?
16   **A.**  Again, I wasn't -- I wasn't a part of any
17       formal group that went through defining hazards
18       and identifying how we would warn of the hazard
19       or prevent the hazard.  So it's speculation in
20       my opinion for me to come out and define how we
21       did that.  It would strictly be my opinion, it
22       doesn't necessarily affect how it took place in
23       developing this piece of equipment or any of

[193]

1        our pieces of equipment.
2    **Q.**  What is the hazard associated with this piece
3        of equipment that you're referring to?
4    **A.**  Well, any hazard in general.
5    **Q.**  Okay.  Well --
6    **A.**  You asked me for a routine or a procedure and I
7        can't provide that to you because I didn't
8        participate in any routines or procedures.
9    **Q.**  No.  I asked you what the hazard was that you
10       just referred to in your response.  What hazard
11       are you referring to when you were talking
12       about that you didn't participate in addressing
13       the hazard?
14   **A.**  Again, the statement was made generally, it
15       could be any hazard.
16   **Q.**  Okay.  That's fine.  "Based on a safe
17       historical record for the DM500 there is little
18       evidence to justify modification of the
19       design," is that -- did I read that correctly?
20   **A.**  "To the design," yes.
21   **Q.**  "To the design."  Okay.  Did I read that
22       correctly?
23   **A.**  You read that correctly.

11-27-2006                                                          Gabriel Uriegas

[50]  (Pages 194 to 197)

[194]

1  Q.  All right.  Is it your understanding that in
2      order to address a hazard that's been
3      identified that you need to have someone
4      injured before that hazard is addressed from an
5      engineering design standpoint?
6  A.  No, I don't believe someone has to be injured.
7  Q.  Okay.  Let's look at the next one.  "Proposed
8      changes by experts would not have prevented the
9      accident and create a more complex piece of
10     equipment with additional hazards," is that a
11     correct statement?
12 A.  Yes.
13 Q.  Did I read that right?  What's the basis for
14     you saying that the -- now, you've inspected
15     this drill this morning, correct?
16 A.  Correct.
17 Q.  You've inspected the plaintiff's alternative
18     feasible design, correct?
19 A.  And the drill we're referring to is the drill
20     with the modifications, it's the DR620 with the
21     modifications, correct?
22 Q.  DR520.
23 A.  Correct, DR520.

[195]

1  Q.  Which you've indicated operates essentially the
2      same as the DM500, correct?
3  A.  Correct.
4  Q.  Okay.  Now, for the DR520, you wrote this
5      opinion before you had inspected plaintiff's
6      alternative feasible design, correct?
7  A.  Correct.
8  Q.  What was the basis for you concluding that the
9      plaintiff's proposed design changes would not
10     have prevented this from happening?
11 A.  Basically descriptions of the modifications in
12     depositions by, I believe it was, Mr. Shaver
13     and exhibits provided by Mr. Shaver.
14 Q.  Okay.  Now -- so you relied on the deposition
15     to form the basis for that opinion then,
16     correct?
17 A.  Correct.
18 Q.  All right.  You're not a design engineer
19     though, correct?
20 A.  That's correct.
21 Q.  All right.  Now, after having inspected the
22     alternative design, the DR520 that we've got in
23     here, do you still maintain that that design

[196]

1      change would not have prevented the accident?
2  A.  In my opinion, it would not have.
3  Q.  And why do you say that?
4  A.  Because the accident was not a result of a
5      component failing.  It was a result of an
6      operator who failed to properly use the tool.
7  Q.  So in your opinion -- now, you mentioned
8      earlier that there is a safety feature on the
9      DM500 associated with the toggle switch,
10     correct?  That the toggle switch is there as a
11     safety feature to turn the drill motor off?
12 A.  Yes.
13 Q.  Do you see any advantage to having a push
14     button that has to be pressed at all times in
15     the operation of the drill in terms of the
16     ability to turn the drill motor off?
17 A.  Do I see an advantage?
18 Q.  A safety advantage?
19 A.  No, I do not see an advantage.
20 Q.  You don't see any safety advantage to that.  So
21     it's your opinion that that toggle switch is
22     just as good of a safety device as that push
23     button that is incorporated in plaintiff's

[197]

1      feasible design, correct?
2            MR. SPRAIN:  Object to the form.
3  A.  In my opinion I think it's a better solution,
4      inasmuch as it's easier for the operator to
5      replace and will result in a more long-term
6      solution.  The particular design in question
7      has a very large knob that hangs off the top,
8      and in my experience, even though I am not a
9      design engineer, I do know that any components
10     that hang off the top of that box will get
11     broken frequently.  And part of the features of
12     these particular types of core drill is to keep
13     them simple and basic and durable.  And adding
14     switches and other components in addition to
15     what's already on the machine are just more
16     likely to reduce the durability of the piece of
17     equipment.
18 Q.  Okay.  So your reason for saying that is that
19     you feel that plaintiff's design is less
20     durable, is that what you're telling me?
21            MR. SPRAIN:  Object to the form.
22 A.  It's less durable and more likely to be damaged
23     and rerouted.

11-27-2006                                                    Gabriel Uriegas

[51]  (Pages 198 to 201)

[198]

1   Q.  And if it's damaged, it has to be repaired,
2       correct?
3   A.  You would hope so.
4   Q.  And if it's damaged, you're not going to be
5       using it until it's repaired, correct?
6   A.  I think we have to make a distinction, repaired
7       does not necessarily mean placed in its
8       original state.  Typically what will take place
9       on a job site at 11:00 in the morning is that
10      the operator will tend to bypass that
11      particular component, which puts us right back
12      where we started from in the first place.
13  Q.  So Saint-Gobain is aware through you as an
14      employee there, an engineer, that under
15      circumstances of nighttime use of a product
16      such as this that the operator is going to do
17      his best to get the job done and try to make
18      the machine work, correct?
19          MR. SPRAIN:  Object to the form.
20  Q.  Is that what you just told me, Mr. Uriegas?
21          MR. SPRAIN:  Now, you're talking about
22      your redesign or your design
23      modifications, so he's putting it

[199]

1       in that context.  So I object to
2       the form of the question.
3   Q.  I'm talking about what you just told me, is
4       that under these circumstances that an operator
5       will try to bypass any problems with the
6       machine, is that what you just told me?
7   A.  If you add more obstacles to the piece of
8       equipment as you have in this case, the
9       operator will have no choice other than to
10      attempt to bypass that.  Now, is that a good
11      practice?  Absolutely not.  Do we expect that
12      to happen?  Absolutely not.  We expect the
13      operator to heed good judgment when using the
14      piece of equipment.  If it begins to fail or
15      begins to assume a state of disrepair, we
16      expect the operator to immediately stop and
17      contact someone to either replace the piece of
18      equipment, if it's rental, it's just as easy as
19      making a phone call, or have someone come out
20      and repair the piece of equipment.
21  Q.  Well, my questions is this; you would prefer
22      not to have any safety features rather than to
23      have safety features that may be bypassed?

[200]

1   A.  That's not a true statement at all.
2   Q.  That's what I'm trying to ask you, Mr. Uriegas.
3       You just said I don't want to put safety
4       features on this device because they will
5       bypass them if they fail; is that not what you
6       just told me?
7   A.  There is a possibility that the operator will
8       attempt to bypass those.
9   Q.  So you would rather not have safety features if
10      they fail and when you bypass them?
11  A.  I am not saying that in any way.  What I'm
12      saying is that these particular features as
13      proposed in this room on that model are not, in
14      my opinion, of durable enough design to be
15      feasible in the market.
16  Q.  Okay.  Now, you've entered another thing into
17      the mix here, a market issue.  Are you saying
18      that you're afraid that you will not sell as
19      many of these products with these safety
20      features on them than you would if you did not
21      have them on there?
22  A.  I can't tell you that.  I don't know.
23  Q.  Well, what did you mean when you just said they

[201]

1       won't be feasible in the market?  Is it going
2       to decrease your sales if you have these safety
3       features do you feel?
4   A.  If it increases the price significantly, yes,
5       it will.
6   Q.  Okay.  All right.  Has there been any work at
7       Saint-Gobain or Diamond Products or the current
8       vendor of this product to investigate the
9       economic and technical feasibility of
10      interlocks such as what we've got on this
11      alternative feasible design?
12  A.  I cannot speak for Diamond Products, as we no
13      longer purchase product from them.  I can speak
14      for Saint-Gobain and, to my knowledge, there
15      has been no work on interlocking devices.
16  Q.  Okay.  Do you, as an engineer with
17      Saint-Gobain, believe in the -- in the use of
18      interlock systems to improve the safety of a
19      product generally?
20  A.  I would say generally it would be a good
21      practice.
22  Q.  Okay.  And do you, as an engineer at
23      Saint-Gobain, understand that the vacuum system

11-27-2006                                                                 Gabriel Uriegas

[52]  (Pages 202 to 205)

[202]

1      that comes on the DM500 unit, such as what
2      Mr. Riley was using, can fail for a number of
3      reasons, correct, the hold-down system?
4   A.   When improperly used and not maintained, there
5      is a possibility that that unit can fail.
6   Q.   And you said when improperly used, are you
7      saying that there are no circumstances where
8      the product is properly used that the vacuum
9      system can fail on that unit?
10  A.   If the operator is properly trained and knows
11      how to use the machine, there should be no
12      instance where that unit fails.
13  Q.   Okay. And that's your opinion; is that
14      correct?
15  A.   That is my opinion.
16  Q.   Okay. And under no circumstances -- well,
17      let's say the cord fails on the vacuum pump,
18      that would shut the pump off immediately,
19      wouldn't it?
20  A.   Yes. But how does that constitute proper use?
21      At that point the machine is in a state of
22      disrepair. The operator should stop, repair
23      the machine, and then put it back into service.

[203]

1   Q.   Now, let's see, we've got an operator, he's in
2      the middle of drilling a hole, he's got a large
3      20 amp drill motor running, it's very loud,
4      isn't it? Substantially louder than the vacuum
5      pump, would you agree with me on that?
6   A.   Yeah, but you can feel the vibrations from the
7      vacuum pump.
8   Q.   Okay. So now we've got to test the feeling of
9      the vibrations of the vacuum pump, is that what
10      you're telling me?
11  A.   You can usually feel it in the floor. I mean,
12      it does provide enough of a vibration where you
13      can feel it on the floor as you're standing
14      next to the machine.
15  Q.   So we've got a three and a half inch or four
16      inch, four and a quarter inch, four and a half
17      inch core drill going drilling down in a hard
18      concrete floor with possibly rebar in it and
19      you're telling me that the operator has to rely
20      on his senses in his toes to tell whether or
21      not the vacuum pump is still running or not?
22  A.   No. He can look down at the gauge and tell
23      whether the vacuum pump is running.

[204]

1   Q.   He needs to have a reason for that, doesn't he?
2   A.   A reason to look down at the gauge?
3   Q.   Well, is he going to be monitoring the gauge
4      the whole time he's drilling the hole?
5   A.   Not the entire time, but a good competent
6      operator would be looking at the amp gauge and
7      he would be looking at the vacuum pressure
8      gauge, if he's using a vacuum pump system.
9   Q.   Okay. And you tell him that in the manual; is
10      that correct?
11  A.   To monitor the --
12  Q.   Monitor the gauge constantly along with the amp
13      gauge?
14  A.   We don't say to monitor the gauge constantly.
15      We do say to monitor the gauges.
16  Q.   Okay. You're saying that's in your operators
17      manual?
18  A.   I think it's part of the technique. Do you
19      want me to find it for you?
20  Q.   Well, I hate to take time, but you find it in
21      there for me, if you will?
22  A.   Okay. In terms of monitoring the amp gauge,
23      that's part of the motor manual and I don't

[205]

1      have a copy of the motor manual present.
2   Q.   Well, did you represent to me that this manual
3      that you're referring to is the manual that
4      comes with the DM500?
5   A.   Yes. Yes, I did.
6   Q.   The complete manual?
7   A.   That comes with the stand, yes.
8   Q.   Yes. Okay. Is it in there --
9   A.   No.
10  Q.   -- to monitor either the amp gauge or the
11      pressure gauge, vacuum pressure gauge?
12  A.   No, I don't see it.
13  Q.   Okay. Let's move on to the next opinion you've
14      got down there. I'm on the last one, the last
15      item, the last bullet on the first page, it
16      says "The operators manual and warnings are
17      adequate to inform the user of hazards and
18      provide adequate instruction on the proper use
19      of the core drill." Did I read that correctly?
20  A.   You read that correctly.
21  Q.   Now, you've already told me that you don't know
22      what the essential elements of warnings are in
23      the formulation of warnings, correct?

11-27-2006                                                    Gabriel Uriegas

[53]  (Pages 206 to 209)

[206]

1   A.   That is correct.
2   Q.   All right.  And you don't know what the
3        essential elements of a caution are in terms of
4        providing cautions to users as well, correct?
5   A.   That is correct.
6   Q.   And you don't know what the essential elements
7        of a danger item is in terms of providing
8        information to an operator as well, correct?
9   A.   That is correct.
10  Q.   How do you form that opinion that the operators
11       manual and warnings are adequate to inform the
12       user of hazards and provide adequate
13       instruction on the proper use of the core
14       drill?
15  A.   Because I am not the only one that reviews the
16       material that goes into this manual nor is this
17       the only manual.  It's not this single manual
18       that is supplied with the piece of equipment.
19       There are other -- there are two other
20       additional pamphlets, manuals, owners/operators
21       manuals that are supplied, one with the motor,
22       one with the Gast vacuum pump.
23  Q.   Well, is the owners manual that you've been

[207]

1        referring to here today the manual that would
2        presumably be the manual that the operator
3        would use in the operation of this --
4   A.   I think that would be a fair presumption.
5   Q.   Okay.  The next page you've got a different set
6        of bullets here.  You had circles on the front
7        page, or dots, and now you've got some dashes.
8        I don't know why the change, but it says
9        "United Rentals is passing on documentation and
10       instruction;" what does that mean?
11  A.   It means on request, if the operator desires to
12       have documentation, it's available through
13       United Rentals.  If he has technical questions,
14       that information is also available through
15       United Rentals.
16  Q.   And was that Saint-Gobain's knowledge?  Did
17       Saint-Gobain have knowledge of that practice,
18       United Rentals' practice, prior to August 29th
19       of 2003?
20  A.   Did we have knowledge?  I can't define whether
21       anyone in the company specifically had
22       knowledge, but it was not just a practice of
23       United Rentals.  Most of the distributors, the

[208]

1        national distributors, have that same practice.
2   Q.   National distributors who sell these products?
3   A.   Or rent the products.
4   Q.   Okay.  And you consider United Rentals to be a
5        distributor of your product, correct?
6   A.   Yes.
7   Q.   All right.  And you're saying that Saint-Gobain
8        was aware that United Rentals was not supplying
9        the manual as a matter of course when they
10       would rent this unit to customers, correct?
11  A.   To my understanding, unless it was requested.
12  Q.   That's not my question.  As a matter of course
13       Saint-Gobain was aware that United Rentals was
14       not providing the operators or owners manual
15       with the product when they rented it?
16  A.   I personally was not aware of that.  Now, who
17       Saint-Gobain may entail, I can't tell you, but
18       I personally was not aware that that was not
19       taking place.
20  Q.   Is that something you would agree with as an
21       engineer at Saint-Gobain?
22  A.   To supply the manual with every piece of
23       equipment that's rented?

[209]

1   Q.   To not supply the manual unless requested?
2   A.   I don't know that I would necessarily agree or
3        disagree with it.  I think it might be a good
4        practice to supply the manual, but provided the
5        manual is always available on request and
6        readily available, I don't see a problem with
7        not supplying it with the unit when it goes
8        out.  There's no guarantee that if you do
9        supply it with the unit it will make it past
10       the delivery truck.
11  Q.   Well, one thing we know is if it's not
12       supplied, it's not going to be read by the
13       operators, correct?
14  A.   And there's no guarantee that if it is supplied
15       it's even going to make it to the operator.
16  Q.   Do you agree or disagree that if it's not
17       supplied, the operator is not going to read it?
18       MR. SPRAIN:  Object to the form.
19  A.   I disagree with you.  The operator could
20       certainly have an issue, pick up the phone and
21       ask for the manual and get it.
22  Q.   In which case it would be supplied, correct?
23  A.   Correct.  And there's no argument, we're not

11-27-2006                                    Gabriel Uriegas

[54]  (Pages 210 to 213)

[210]

1    saying that it wasn't supplied.
2  Q.  It's no problem. But it's your opinion that
3    United Rentals was adequately passing on
4    documentation and instructions is the first --
5  A.  It is my opinion that they were doing their
6    utmost to provide the documentation and
7    instruction on request.
8  Q.  Did you see anywhere in the records that United
9    Rentals provided concerning this unit or the
10   sister unit that was sold with it, the DM500s,
11   where United Rentals ever provided an operators
12   manual to its customers?
13 A.  I didn't see any documentation that they had
14   provided a --
15 Q.  Did you ask for such documentation?
16 A.  From United Rentals?
17 Q.  Yes.
18 A.  No, I did not.
19 Q.  Okay. Next item, "The Flavor House supervisors
20   and/or safety officer should have trained the
21   operator and passed on all warnings." Okay.
22   Now, what's the basis for that opinion?
23 A.  After having read depositions.

[211]

1  Q.  Depositions?
2  A.  Depositions, Mr. Shaver and Mr. Riley.
3  Q.  And that's the only depositions you've read,
4    correct?
5  A.  To date those are the only depositions I have
6    read.
7  Q.  Okay.
8  A.  I am concerned that no one in the Flavor House
9    organization attempted, based on what I've seen
10   so far, to impose any type of safety regulation
11   or control on the unit.
12 Q.  Do you have experience in engineering practices
13   or safety programs in an industry such as
14   Flavor House?
15 A.  Specifically as it relates to administrating
16   safety regulation, no. But as a participant in
17   a very large corporation that does manufacture
18   products, there are certain guidelines that you
19   expect to see when you walk into a
20   manufacturing facility. One would be the
21   requirement of appropriate safety equipment.
22   If a contractor is to do work in your facility,
23   you would want to qualify that contractor as

[212]

1    being knowledgeable and capable of doing that
2    work for the safety of your employees and the
3    contractor.
4  Q.  In the manufacturing operations that you've
5    observed, did you see safety features
6    incorporated into the design of manufacturing
7    equipment?
8  A.  Guarding, shielding, those sort of things, yes.
9  Q.  Interlocks?
10 A.  I didn't see many interlocks, but I saw a lot
11   of guarding and shielding.
12 Q.  Okay. You don't deny that there are many, many
13   manufacturing machines that have built-in
14   interlocks, correct?
15 A.  I can't deny that, certainly there are.
16 Q.  And they serve a safety feature, correct, a
17   safety function?
18 A.  In the appropriate environment, yes, they do.
19 Q.  Okay. And that's to prevent injury to
20   operators, correct?
21 A.  In the appropriate environment, yes, they do.
22 Q.  Okay. Now, the next one, it looks like, is a
23   long list of -- it says "The product was

[213]

1    misused by the operator or operators and both
2    operators were negligent," is that your
3    opinion?
4  A.  That's my opinion.
5  Q.  Okay. Are you an accident reconstructionist?
6  A.  No, I am not.
7  Q.  Okay. We've already gone over, I think, the
8    list of things you say they did wrong, correct?
9  A.  I think we've addressed the majority of them.
10 Q.  Okay. All right. I'm not going to go through
11   each one of these, I think we covered all of
12   them. If there's something we haven't covered,
13   you can point it out to me, but I don't think
14   it's -- let's do this --
15 A.  Are these your documents?
16 Q.  Yeah, we will attach it to your deposition, the
17   ones that have the red labels on it.
18     What I would like is for you to provide me
19   with the name of the current vendor of the core
20   drill that was the successor to the DM500?
21 A.  Okay.
22 Q.  Would you do that?
23 A.  Yes.

11-27-2006                                                    Gabriel Uriegas

[214]

1   Q.   And provide that to your attorney?
2   A.   Yes.
3   Q.   Okay. With identifying information, who, what,
4        when, where, you know, address, that kind of
5        thing?
6   A.   I will do.
7             MR. SPRAIN:  We can do that.
8             MR. LANE:  Thanks. I'm just going to
9        mark the invoices here.
10            MR. SPRAIN:  The whole thing?
11            MR. LANE:  Well, I can mark the whole
12       thing if you want to, but I
13       thought I would just --
14            MR. SPRAIN:  Well, whatever you want
15       to do.
16            MR. LANE:  Well, I will mark the whole
17       thing.
18            MR. SPRAIN:  Yeah, it would be simple.
19       I think that's in Walters'
20       deposition.
21            MR. LANE:  Okay.
22       (Plaintiff's Exhibit 13 marked
23       for identification.)

[215]

1             MR. SPRAIN:  Something I mentioned off
2        the record I need to mention on
3        the record, but he will be reading
4        other depositions in this case as
5        they progress.  And we don't have
6        a whole lot of notice to get him
7        ready with the Thanksgiving
8        holidays, so he did not get a
9        stack of depositions that he would
10       have liked to have read.  So if
11       anything changes with regards to
12       his opinions, we will let you
13       know.  There may be some
14       supplementation.  We don't expect
15       anything to change dramatically,
16       but he will be reading more
17       depositions, especially Mr. Davis
18       whose testimony was taken recently
19       and then Mr. Frost who is going to
20       give his deposition next week.
21            MR. LANE:  I am just about finished.
22            MR. SPRAIN:  Okay.
23   Q.   I'm going to show you what I've marked as

[216]

1        Plaintiff's Exhibit Number 13 to your
2        deposition, and it's five pages that appears to
3        have Bates-stamp numbers United Rentals 62
4        through 66.  If you will, confirm for me that
5        these are the purchase documents and invoices
6        pertaining to the DM500 core drill that was
7        purchased by United Rentals in March of 2003
8        and sold by Saint-Gobain or Norton or Clipper
9        in March of 2003?
10  A.   Yes, these are the invoice -- appear to be the
11       invoices for those components.
12  Q.   Purchase document and invoice?
13  A.   Purchase order, --
14  Q.   Yeah, purchase order.
15  A.   -- invoice and then a receiver document from
16       United Rentals.
17  Q.   Okay.  And was that for two units?  Two units
18       were purchased at that time, is that correct?
19  A.   Two sets of components were purchased, yes.
20  Q.   Two sets of components?
21  A.   Yes.
22  Q.   Okay.  And they were shipped in the three boxes
23       that you've identified on the first page of

[217]

1        Plaintiff's Exhibit Number 11?
2   A.   It would have been two sets of three boxes or
3        six boxes.
4   Q.   Two sets of three boxes.  And then the product
5        would have been assembled at United Rentals
6        after they received those?
7   A.   The motor would have been attached and the
8        vacuum pump assembly attached.
9             MR. LANE:  I see.  Okay.  I think
10       that's all I have.
11            MR. SPRAIN:  Okay.
12       (Off-the-record discussion.)
13       (Plaintiff's Exhibit 14 marked
14       for identification.)
15  BY MR. LANE:
16  Q.   We've marked as Plaintiff's Exhibit 14 a copy
17       of a CD you produced here today.
18  A.   Right.
19  Q.   Is that the photographs you took at the
20       inspection?
21  A.   Yes.
22            MR. LANE  Okay.  Thanks.
23       (Deposition concluded at 5:20 P.M.)

11-27-2006                                          Gabriel Uriegas

[56]  (Pages 218 to 219)

[218]

1          FURTHER DEPONENT SAITH NOT

2

3              * * * * *

4

5          REPORTER'S CERTIFICATE

6

7   STATE OF ALABAMA

8   COUNTY OF MONTGOMERY

9         I, Ricky L. Tyler, Certified Court

10  Reporter and Notary Public in and for the State of

11  Alabama at Large, do hereby certify that on Monday,

12  November 27th, 2006, pursuant to notice and

13  stipulation on behalf of the Plaintiff, I reported

14  the deposition of GABRIEL URIEGAS, who was first duly

15  sworn by me to speak the truth, in the matter of

16  MATTHEW RILEY, Plaintiff, vs. UNITED RENTALS (NORTH

17  AMERICA), INC., et al., Defendants, Civil Action

18  Number 1:05 CV-994-T, now pending in the United

19  States District Court for the Middle District of

20  Alabama, Southern Division, that the foregoing 217

21  computer-printed pages contain a true and accurate

22  transcription of the examination of said witness by

23  counsel for the parties set out herein; that the

[219]

1   reading and signing of said deposition was waived by

2   witness and counsel for the parties.

3         I further certify that I am neither of kin

4   nor of counsel to the parties to said cause, nor in

5   any manner interested in the results thereof.

6         This 5th day of December, 2006.

7

8

9

10

11

12         Ricky L. Tyler
           Certified Court Reporter
           and Notary Public

13         State of Alabama at Large

14

15

16

17

18

19

20

21

22

23

Ricky L. Tyler                          Montgomery Reporting Service
(334) 262-3331                              (877) 834-6048

c67ddcbd-7b3d-49a5-a861-f3e5c12ef3e5