IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW RILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 1:05cv994-T |
| vs. ) | |
| ) | |
| UNITED RENTALS (NORTH ) | |
| AMERICA), Inc. et al., ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT SAINT-GOBAIN ABRASIVES, INC.'S MOTION IN LIMINE

COMES NOW Plaintiff in the above-styled matter and submits his Brief in Opposition to Defendant Saint-Gobain Abrasives, Inc.'s (Saint-Gobain) Motion in Limine.

Saint-Gobain ask that the jury be prevented from hearing:

1. Any evidence of settlement Discussions between the parties.

Plaintiff has no intention of presenting any such evidence to the jury, but reserves the right to present such evidence should evidence be inappropriately presented to the jury by any party that would warrant the admission of such evidence.

2. Any mention of the relative wealth of the parties or Saint-Gobain's financial condition.

Plaintiff has no intention of presenting any such evidence to the jury, but reserves the right to present such evidence should evidence be inappropriately presented to the jury by any party that would warrant the admission of such evidence.

3. Mistreatment or neglect.

Plaintiff has no intention of presenting any such evidence to the jury, but reserves the right to present such evidence should evidence be inappropriately presented to the jury by any party that would warrant the admission of such evidence.

4. Difficult economic times.

The impact this incident has had on Matthew Riley necessarily may involve some economic impact and is certainly relevant to Matthew Riley's damages. To the extent Saint-Gobain is attempting to prevent Matthew Riley from testifying about the impact this incident has had on his life, which may include economic elements, Plaintiff would reserve the right to present such evidence. Plaintiff requests that this Motion be denied, as too vague at this time.

5. Medical Records and Bills not properly authenticated or proven.

To the extent that defendants have not previously agreed or stipulated to the admissibility of these records, Plaintiff will establish the basis for the admissibility of any such records at trial. Plaintiff has subpoenaed necessary witnesses to provide necessary authentication of records, not stipulated to by defendants. Plaintiff would seek costs associated with providing this testimony at trial.

Plaintiff asks that Saint-Gobain's Motion be denied at this time as untimely.

6. Any arguments concerning Res Ipsa Loquitur.

Plaintiff has no intention of presenting any such evidence or argument to the jury. However to the extent that Plaintiff's expert witnesses draw conclusions from facts in the case, Plaintiff reserves the right to present such evidence and argument based upon such expert testimony.

7. Any arguments or evidence of other claims against Saint-Gobain.

Plaintiff has no intention of presenting any such evidence to the jury, but reserves the right to present such evidence should evidence be inappropriately presented to the jury by any party that

would warrant the admission of such evidence. Plaintiff would also request that Saint-Gobain be prevented from arguing the absence of any such claims as set out in his MIL.

8.  Evidence of Insurance coverage.

Plaintiff has no intention of presenting any such evidence to the jury, but reserves the right to present such evidence should evidence be inappropriately presented to the jury by any party that would warrant the admission of such evidence.

9.  Evidence of Plaintiff's hourly wage.

As the Court is aware, Ralcorp, Inc., (Matthew Riley's employer) has a subrogation interest in this matter. To the extent that evidence of Matthew Riley's hourly wage is necessary to prove his lost wages in this case, the evidence is relevant and Plaintiff certainly intends to present such evidence. Plaintiff has no intention of discussing Matthew Riley's current wages.

Saint-Gobain's Motion to exclude should be denied to the extent that wages after the accident may be relevant in determining the net indemnity subrogation interest.

10. Exhibit 9 to Dr. Turok's deposition.

Exhibit 9 is a part of Dr. David Turok's medical records, and is identified as a letter from Dr. Don Barham that sets out the findings of Dr. Barham's examination of Matthew Riley. Dr. Turok confirmed that the letter from Dr. Barham was a part of his official medical chart that is kept in the ordinary course of his practice. Turok depo., at 67. The examination conducted by Dr. Barham confirmed that Matthew Riley sustained a permanent injury. As Dr. Barham's examination reveals, Matthew suffers from permanent double vision as a result of the injuries sustained on August 29th, 2003. In providing his opinions concerning Matthew Riley's permanent double vision, Dr. Turok reviewed Dr. Barham's letter for the second time during the deposition (the first time being before the deposition). Based upon Dr. Barham's examination and Dr. Turok's own

3

examination, Dr. Turok agreed that Matthew Riley's double vision was a permanent condition resulting in an impairment of 12-14% to the whole body. Turok depo., pp. 67-71.

The record is clearly a part of Dr. Turok's chart for Matthew Riley that was reviewed and utilized by Dr. Turok during his deposition testimony for additional support for his opinions concerning Matthew Riley's permanent injury and his permanent impairment. For these reasons, this evidence is relevant and should not be excluded. Plaintiff requests this Honorable Court to deny Saint-Gobain's Tenth Motion in Limine accordingly.

11. All medical records and medical expenses not properly authenticated.

Plaintiff has previously addressed this Motion under number 5. To the extent that defendants have not previously agreed or stipulated to the admissibility of these records, Plaintiff will establish the basis for the admissibility of any such records at trial. Plaintiff has subpoenaed necessary witnesses to provide necessary authentication of records, not stipulated to by defendants. Plaintiff would seek costs associated with providing this testimony at trial.

Plaintiff asks that Saint-Gobain's Motion be denied at this time as untimely.

12. All exhibits identified by Plaintiff and timely objected to by Saint-Gobain.

Saint-Gobain asks that no documents be admitted that were objected to in its Objections to Plaintiff's Exhibits previously filed. Plaintiff will address the specific objections at trial if and when any such exhibits are presented.

Plaintiff requests this Honorable Court to deny Saint-Gobain's Twelfth Motion in Limine accordingly at this time.

13. Any reference to Saint-Gobain as the manufacturer or designer of the subject core drill.

Plaintiff has previously filed a Motion in Limine requesting that the Court issue an Order prohibiting any party from arguing that Saint-Gobain is not the designer or manufacturer of the

subject core drill, or that any other entity is. It is Plaintiff's position that under AEMLD, the identity of the designer and manufacturer of the core drill is irrelevant in this case. AEMLD only requires that the defendant "sell" or otherwise place the product (alleged to be defective) into the market and that they be in the business of selling such product. In this case, Saint-Gobain, dba Norton, placed its name on the product and sold the product as its own. Who manufactured or designed the product is totally irrelevant.

Plaintiff has no intention of arguing that Saint-Gobain designed or manufactured the product. However, for purposes of AEMLD, if Saint-Gobain is allowed, inappropriately to argue they are not the designer or manufacturer, Plaintiff reserves the right to argue that Saint-Gobain stands in the shoes of the designer and manufacturer, and in effect, is the designer and manufacturer. Saint-Gobain can't have it both ways.

14. Any reference to OSHA regulation in regard to the manufacture or design of the subject core drill.

To the extent that Plaintiff's experts utilize OSHA regulations, proper foundation will be laid. However, to the extent such regulations are relevant to provide a basis for expert opinion, Plaintiff's reserve the right to present such evidence to the jury through expert testimony. Certainly such evidence will be subject to cross examination. Saint-Gobain's motion goes to the weight of the potential evidence, not its admissibility.

Plaintiff requests this Honorable Court to deny Saint-Gobain's Fourteenth Motion in Limine accordingly.

15. Adoption of Motions in Limine filed by United Rentals.

Plaintiff has filed responses to United Rentals Motions in Limine and incorporates those responses by reference herein.

5

RESPECTFULLY SUBMITTED this 3rd day of January, 2007.

        COCHRAN, CHERRY, GIVENS,
        SMITH, LANE & TAYLOR, P.C.

        /s/ Joseph D. Lane
        **JOSEPH D. LANE**
        Alabama Bar No. 118498
        163 W. Main Street
        Post Office Box 927
        Dothan, Alabama 36302
        (334) 793-1555
        (334) 793-8280 (facsimile)
        Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

     I hereby certify that I have this date served a copy of the foregoing upon all counsel of record in this cause by emailing a copy to each recipients email address on file and by placing a copy of the same in the United States mail, postage pre-paid, addressed as follows, on this the 3rd day of January, 2007:

C. Winston Sheehan, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, Alabama 36102-2148

Robert H. Sprain, Jr., Esq.
Sprain & Shires, P.C.
1707 29th Court South
Homewood, Alabama 35209

Joseph T. Brasher, Esq.
Hamilton, Westby, Antonowich & Anderson
One Georgia Center
17th Floor
600 W. Peachtree Street, N.W.
Atlanta, Georgia 30308

        /s/ Joseph D. Lane
        **OF COUNSEL**

# ATTACHMENT 1

[1]

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

    Plaintiff,

Vs.                                          CIVIL ACTION NO.

                                        1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

    Defendants.


       VIDEOTAPE DEPOSITION OF DAVID TUROK, M.D., taken pursuant to notice and stipulation on behalf of the Plaintiff, in the offices of Southeast Eye Clinic, 102 Doctors Drive, Dothan, Alabama, before Ricky L. Tyler, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, on Tuesday, November 28th, 2006, commencing at 5:00 P.M.

[66]

1   questions about it?
2   A.  (Witness complies.) All right.
3   Q.  Now, this was a letter apparently written by --
4       I'll ask you to assume this is a letter written
5       by Doctor Barham on May 26th of 2005.
6           MR. SHEEHAN: Doctor, have you ever
7               seen this letter before?
8   A.  I think we have a copy of it in the chart. I
9       saw it about an hour before we started just
10      glancing through the chart.
11  Q.  Okay.
12          Mr. SHEEHAN: Had you read it before an
13              hour before?
14  A.  No.
15          MR. SHEEHAN: Did you rely upon this
16              letter in any way?
17          MR. LANE: Winston, I'll ask the
18              questions. Winston, I'll ask the
19              questions.
20          MR. SHEEHAN: I just want to see if we
21              can lay a foundation for --
22          MR. LANE: I'm going to lay a
23              foundation right now based on what

[67]

1       he's told me.
2   Q.  This is a letter that's in your chart; is that
3       correct?
4   A.  This is in our chart.
5   Q.  All right. If it's in your chart, that's --
6       that's a record that's kept in the ordinary
7       course of your practice in treating this
8       patient, correct?
9   A.  That is a record that would be kept.
10  Q.  Okay. And you say you have seen this letter
11      before your deposition today?
12  A.  Just before -- just right before the
13      deposition.
14  Q.  All right. And what do you understand this
15      letter to be?
16  A.  It's a letter to Ms. Carlisle by Doctor Barham.
17  Q.  All right.
18  A.  And it states that his -- Mr. Riley's complaint
19      was of double vision when he looks to either
20      side or up or down. He has no double vision in
21      primary straight ahead gaze and is thus able to
22      read and drive with normal binocular vision.
23  Q.  Okay.

[68]

1   A.  His visual acuity is currently 20/30 in each
2       eye with glasses correction. The slit lamp
3       examination of the external eye and its lids is
4       normal. He has a repaired lacrimal tear drain
5       system on the left which appears to be working
6       very well. The fundus exam, the retina exam,
7       is likewise normal with no evidence of any
8       retinal or nerve problems noted at this time.
9       The orbital fracture repair looks excellent
10      with no asymmetry.
11          Matthew and I discussed the diplopia
12      problem, the double vision problem, and I
13      advised him that he is better adjusting to it
14      and living with it than trying to undergo any
15      further corrective surgery. The reason for
16      this is that his vision is good straight ahead
17      and any attempt to try to correct his
18      peripheral diplopia, the double vision of the
19      sides, might easily cause diplopia in the
20      primary. He understands this and is
21      comfortable with turning his head to the left
22      or right instead of turning his eyes in extreme
23      position. He has done very well with his

[69]

1       corrective surgeries and his prognosis is
2       excellent except for probable persistent
3       diplopia, double vision, in far left, right, up
4       and down gaze.
5   Q.  Okay. Now, Doctor Barham states that he
6       examined Matthew on May 23rd of 2005, correct?
7   A.  Uh-huh. (Positive response.)
8   Q.  Were the findings that Doctor Barham made and
9       placed in this letter consistent with your
10      understanding of the problems Matthew was
11      having with his double vision?
12          MR. SHEEHAN: Object to the form.
13  A.  Again, on May 17th I didn't address that nor
14      had I addressed it for a couple of visits
15      before, but this was consistent with what we
16      had noted earlier.
17  Q.  And on May 23rd of 2005, that's a year and -- a
18      year and nine months roughly from the date of
19      his original injury, correct?
20  A.  I believe so.
21  Q.  All right. And do you agree with Doctor Barham
22      that it is -- that Mr. Riley's double vision is
23      likely to be a permanent condition?

[70]

1  MR. SHEEHAN: Object to the form.
2  A. I believe so.
3  Q. Okay. And do you agree with Doctor Barham that
4     that's a condition that Matthew will -- his
5     best -- his best chance of handling that is
6     just to adjust to the double vision; is that
7     correct?
8        MR. SHEEHAN: Object to the form.
9  A. Again, because he doesn't have double vision in
10    primary gaze, straight ahead gaze, --
11 Q. Right.
12 A. -- most doctors wouldn't recommend doing
13    anything for that at this point.
14 Q. Okay. Now, the source materials -- let's go
15    back to just a couple of questions on the
16    impairment rating. You gave Matthew an
17    impairment rating of 12 to 14 percent to the
18    body as a whole, correct?
19 A. I thought it was a little higher, let me check.
20 Q. I may have written it down wrong.
21 A. I'm sorry, 12 to 14 percent whole person
22    impairment.
23 Q. Okay.

[71]

1  A. Eight percent to ocular impairment.
2  Q. I see. The materials that you used to make
3     your impairment rating or arrive at your
4     impairment rating, do you still have those
5     materials?
6  A. I don't believe so.
7  Q. Okay.
8  A. It's not in the chart. I'm not sure what we
9     did with those.
10 Q. And you say that Cheryl Carlisle is the one
11    that provided you with that material?
12 A. Correct.
13 Q. Was that instructional material in doing
14    impairment ratings, is that what that was?
15 A. It was a chapter on impairment ratings from
16    some handbook. It may have been an AMA
17    handbook, I'm uncertain.
18 Q. I see. Okay. Did you have any reason to doubt
19    the validity of the instructions that you were
20    provided in doing your evaluation, your
21    impairment evaluation?
22 A. No. No.
23    MR. LANE: Okay. I have no further

[72]

1     questions. I do want to confirm
2     the office notes over there and
3     see if we can get a copy -- did
4     y'all have that May 17th or May --
5  MR. SHEEHAN: No, sir.
6  MR. LANE: May 17th, that's it. Again,
7     I would offer the exhibits into
8     evidence, but I would assume we
9     would do that at the Courthouse.
10 MR. GRISWOLD: This concludes the
11    deposition, the time is 6:13 P.M.
12 (Off-the-record discussion.)
13 MR. GRISWOLD: We're back on the
14    record.
15
16    CONTINUED REDIRECT EXAMINATION
17 BY MR. LANE:
18 Q. Doctor Doctor Turok, in reviewing your records
19    you indicated that there was a note that may
20    have been out of place in your file dated
21    October 28th of 2003?
22 A. 2005.
23 Q. 2005. Okay. And what was the purpose of that

[73]

1     visit?
2  A. It was a follow-up visit of Matthew Riley. It
3     states that patient complains of double vision
4     laterally out of his left eye for two years
5     worsening lately. Does not go away if one eye
6     is covered. At that time his vision was 20/25.
7     He was not having tearing. He was measured by
8     me at that point with prisms. He had six
9     prisms diopters of esotropia in left gaze,
10    which means when he looked over to the left the
11    left eye did not fully go out. And he had one
12    diopter of left hypertropia in down gaze, which
13    means when he looked down his left eye did not
14    fully look down.
15 Q. And that was measured objectively using the
16    prisms?
17 A. Again, it's partially objectively, partially
18    subjectively, as I said.
19 Q. I see.
20 A. Because we use prisms, but he's the one who has
21    to tell me when the double vision is gone --
22 Q. I see.
23 A. -- using the prisms. And at that point I felt