Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

MATTHEW RILEY,

    Plaintiff,

Vs.                              CIVIL ACTION NO.
                                1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

    Defendants.


DEPOSITION OF GABRIEL ANTHONY URIEGAS, taken pursuant to notice and stipulation on behalf of the Plaintiff, in the conference room of Cochran, Cherry, Givens, Smith, Lane & Taylor, 163 West Main Street, Dothan, Alabama, before Ricky L. Tyler, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, on Monday, November 27th, 2006, commencing at 11:05 A.M.

1           at an office in Flowery Branch, Georgia.
2    Q.     What do you do with Saint-Gobain?
3    A.     At the present I am a Product Manager for
4           diamond blades.
5    Q.     All right. And how long have you worked with
6           Saint-Gobain in that capacity?
7    A.     In this capacity, approximately one year.
8    Q.     One year. What did you do -- did you work with
9           them before that?
10   A.     Yes.
11   Q.     How long have you worked for Saint-Gobain?
12   A.     23 years.
13   Q.     23 years. And what did you do for them before
14          you started doing what you're doing now?
15   A.     Prior to this current function, I was a -- an
16          equipment engineer.
17   Q.     And as an equipment engineer, what did you do
18          for Saint-Gobain?
19   A.     I basically responded to technical questions; I
20          taught classes on our products; developed
21          documentation on equipment; and assisted in the
22          development of marketing literature.
23   Q.     Okay.

Page 9

1          hazard analysis associated with any of the
2          products that you sold?
3     A.   Yes.  Yes.  Inasmuch as someone would most
4          likely run them by me.
5     Q.   All right.  Tell me about that.  What does
6          hazard analysis mean to you?
7     A.   Basically evaluating a product to determine if
8          -- if in fact there are any foreseeable hazards
9          that may develop.
10    Q.   Okay.  How long has Saint-Gobain sold core
11         drills?
12    A.   The entire period that I have been associated
13         with this group, which is about at least 22
14         years.
15    Q.   22 years at least.  Have you, at any time
16         during those 22 years, been involved in the
17         hazard analysis associated with the use of core
18         drills?
19    A.   Yes, but not formally.
20    Q.   All right.  Tell me about informal hazard
21         analysis on core drills that you've been
22         involved in.
23    A.   If there's a situation where someone would

1   develop a product or request that we purchase a
2   product from another vendor, they would ask me
3   to evaluate the product, perhaps make some
4   suggestions, recommendations, observations.
5   Q. Who is they?
6   A. It would either be a business manager at the
7   time or perhaps another product engineer. It
8   could be a purchasing manager.
9   Q. Saint-Gobain though?
10  A. Yes.
11  Q. Someone with Saint-Gobain?
12  A. Someone with Saint-Gobain.
13  Q. All right. And you say that would not be a
14  formal hazard analysis, but it would be -- you
15  would participate in hazard analysis?
16  A. Yes.
17  Q. Tell me about the instances where you've been
18  involved informally in hazard analysis in any
19  way related to core drills.
20  A. There are instances we purchase -- for example,
21  the core drill in question was not manufactured
22  by Saint-Gobain Abrasives. It was manufactured
23  and designed by Diamond Products. And when the

| | | |
|---|---|---|
| 1 | | unit is brought in, we basically evaluate the |
| 2 | | unit to see if it's going to fit into our |
| 3 | | market scheme and also to make sure that the -- |
| 4 | | the unit is reasonably safe in terms of our |
| 5 | | introduction of that product into the market. |
| 6 | | Does it meet what we establish as minimum |
| 7 | | criteria? |
| 8 | Q. | Okay.  And for the subject model core drill |
| 9 | | that you're talking about, what hazard analysis |
| 10 | | actually was done on that product when you |
| 11 | | first began selling that model? |
| 12 | A. | I think in terms of -- if you were going to |
| 13 | | define it as hazard analysis, we would have |
| 14 | | asked for documentation from the vendor to |
| 15 | | evaluate -- |
| 16 | Q. | Documentation of what? |
| 17 | A. | Any information on the appropriate use of that |
| 18 | | particular piece of equipment, parts list, part |
| 19 | | numbers, assembly diagrams, warning labels, of |
| 20 | | course, and then any instructions. |
| 21 | Q. | I'm going to come back to some of that.  What I |
| 22 | | want to do right now, Mr. Uriegas -- tell me |
| 23 | | one more time, I'm sorry. |

| | | |
|---|---|---|
| 1 | A. | I have no reason to make any changes. I see no |
| 2 | | short-circuits; I see no electrical issues with |
| 3 | | the design. |
| 4 | | (Plaintiff's Exhibit 10 marked |
| 5 | | for identification.) |
| 6 | Q. | Okay. Let me show you what we've marked as |
| 7 | | Plaintiff's Exhibit Number 10 and ask you to -- |
| 8 | | I believe that's all one collection, but if you |
| 9 | | will make sure that's -- that all of those |
| 10 | | documents go together and then identify that |
| 11 | | for me, please? |
| 12 | A. | This is the Form LM708CPD, a report of injury |
| 13 | | involving abrasive blades, diamond blades, bits |
| 14 | | or equipment, with an additional supplemental |
| 15 | | describing my findings and observations at the |
| 16 | | inspection that took place. |
| 17 | Q. | Okay. When was that generated, that collection |
| 18 | | of documents? |
| 19 | A. | Shortly after the inspection that took place on |
| 20 | | May 12th, 2005. |
| 21 | Q. | Okay. And was that a standard -- you mentioned |
| 22 | | there's a form there, is that a standard form |
| 23 | | used by Saint-Gobain in the investigation of |

1       incidents involving injury with their products?
2  A.   Yes, it is.
3  Q.   All right. And is that kept in the ordinary
4       course of business?
5  A.   Yes, it is.
6  Q.   All right. And you have used that form before
7       prior to this inspection that's represented in
8       that one?
9  A.   Yes, I have used this form.
10 Q.   Okay. What is the purpose of that form?
11 A.   The purpose of the form is to gather
12      information and data regarding the incident.
13      Basically what -- what product was used,
14      potentially what took place with the product,
15      the individuals' names, conditions at the work
16      site.
17 Q.   Okay. And is everything that's contained in
18      Plaintiff's Exhibit Number 10 related to the
19      inspection that you conducted in May of 2005?
20 A.   Yes, that is correct.
21 Q.   Okay. Thank you.
22 A.   You're welcome.
23                 (Plaintiff's Exhibit 11 marked