IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW RILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 1:05cv994-T |
| vs. ) | |
| ) | |
| UNITED RENTALS (NORTH ) | |
| AMERICA), Inc. et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE**

COMES NOW Plaintiff in the above-styled matter and, submits his Brief in Support of his Response in Opposition to Defendants' Motion to Exclude. Defendants' Motion is without merit and is due to be denied.

## INTRODUCTION

Defendant United Rentals "rented" the Norton DM 500 Core Drill (the product) in question to Flavor House Products, Inc. (Flavor House) on August 28th, 2003. Just past midnight, on August 29th, 2003, Matthew Riley was seriously injured while operating the product. This is a products liability action involving claims brought pursuant to the Alabama Extended Manufacturers Liability Doctrine, as well as negligence theories against Saint-Gobain Abrasives, Inc and United Rentals (North America) Inc. United Rentals filed its Motion to Exclude the testimony of Plaintiff's three liability expert witnesses, John Frost, Don Shaver and Roger Davis. Saint-Gobain purportedly incorporated United Rentals' Motion to Exclude in its Motions in Limine. Plaintiff files this Brief in Opposition in response to Untied Rentals claims that Plaintiff's experts' opinion testimony fails to meet the reliability standards of *Daubert*. For the reasons set out below, Plaintiff requests this

Honorable Court to deny United Rentals' Motion to Exclude, and by reference, Saint-Gobain's Motion to Exclude.

### A. Plaintiff's Experts Satisfy The <u>Daubert</u> Requirements And, Therefore, Their Testimony is Reliable and Should Not Be Excluded.

Defendant United Rentals objects to Plaintiff's expert witnesses, contending their testimony is unreliable because, United Rentals contends, the facts upon which the experts base their opinions is unrealible. United Rentals' contentions are disingenuous at best. As it exercises its gate-keeping function, the Court will see that, in fact, each of Plaintiffs' experts are more than qualified and the reliability of their testimony is unquestionable.

### 1. Federal Standard for Admission of Expert Witness Opinion Testimony:

Federal Rule of Evidence 702 governs the admissibility of expert opinion evidence. The Rules of Evidence embody a strong and undeniable preference for admitting any evidence having the potential for assisting the trier of fact. See Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 780 (3d Cir.1996). Indeed, Rule 702 has a liberal policy of admissibility. See Id. at 780.

When faced with a proffer of expert testimony, the district court must determine whether the expert witness is qualified and has specialized knowledge that will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see generally United States v. Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993), cert. denied, 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). Under the Federal Rules of Evidence, it is the role of the trial judge to act as a "gatekeeper" to ensure that any and all expert testimony or evidence is not only relevant, but also reliable. Daubert, 509 U.S. at 589.

2

First, the court has broad discretionary powers in determining whether or not the proposed expert is qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see generally Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19, 21 (1st Cir.1992). Next, the court decides if the proposed subject matter of the expert opinion properly concerns "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Finally, the court performs a gate-keeping function to ascertain whether the testimony is helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case. See Vadala v. Teledyne Indus., Inc., 44 F.3d 36, 39 (1st Cir.1995); see also Daubert, 509 U.S. at 591 (characterizing this consideration as one of "fit").

The Daubert Court made it clear, however, that when a court is determining relevance and reliability, the list of factors found in Daubert do not constitute a "definitive checklist or test." Id. at 593. Instead, the gate-keeping inquiry must be "'tied to the facts' "of a particular "case." Id., at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985)). The Daubert Court observed that the list of factors contained in its opinion was meant to be helpful rather than definitive. Indeed, the Supreme Court has noted that the factors listed in Daubert do not *all* necessarily apply in every instance when the reliability of scientific testimony is challenged. Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167, 1175 (1999). In fact, under Daubert, the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under Frye, but the trial judge is left to serve as "gatekeeper" in screening the evidence. Fed. R. Evid. 702; General Elec. Co. v. Joiner, 522 U.S. 136 (1997).

**B. The Methodology used by Each of Plaintiff's Expert Witnesses Meets or Exceeds the Requirements of Daubert and its Progeny.**

This is not a case of unique or novel science requiring a stricter application of the factors set out in Daubert. Here, Plaintiff has retained three liability experts, each of whom has done an independent evaluation of this product. Each expert has reviewed an enormous amount of material in preparing their respective opinions, and each has participated separately and jointly in the design of an alternative feasible design, that not one defense expert criticized in its function or technical or economic feasibility. See the attached reports (with attached CV's) setting out the materials reviewed prior to each expert preparing his respective report, along with each expert's qualifications. Exhibits 1 (Frost), 2 (Shaver) and 3 (Davis). Plaintiff also attaches each experts' deposition testimony in support of response in opposition to defendants' Motion to Exclude. Exhibits 4 (Frost), 5 (Shaver), and 6 (Davis). The opinions of each expert is provided in his attached report / affidavit.

Don Shaver, a licensed engineer, participated in the two inspections of the subject product near Atlanta, GA, with representatives from all parties being present. His inspection revealed that the vacuum pump was not functional. The power cord had been detached during the incident, however, even after rewiring the unit, the vacuum pump was found to be non-functional. The participants of the inspection agreed to partially disassemble the vacuum pump to investigate the reason for the pump's failure. Inspection revealed a large amount of corrosion in the pump itself.

Mr. Shaver's inspection also revealed that the Milwaukee drill motor was operating according to the manufacturers specifications. Rather than having a sheer pin (as searched for and expected by Donald Cody), the unit was equipped with a "clutch" mechanism that served as a safety feature and to prevent damage to the drill motor should the drill bit jam. The inspection also indicated that the rubber seal that is installed on the bottom of the base to form a seal between the metallic base and the floor, was slightly torn at its end joint. No other party attending the inspection

or party to this action has criticized or disputed the facts arrived at through these inspections. The data is reliable and any contention to the contrary flies in the face of reason.

Each expert relied in part on the data collected by Don Shaver in these subject product inspections. Evaluating the facts learned from the inspection, along with the factual information learned from a review of countless fact witnesses, each expert reached an independent conclusion as to the cause of the product failure, i.e., loss of effective vacuum at the base that allowed the base to break lose from the floor during operation. This conclusion is uncontested; no witness from any other party has come forward to contest this conclusion.

Each expert had access to an exemplar core drill for inspection and review, and each expert utilized the exemplar in the development of an alternative feasible design that, had the design been utilized would have prevented the injury producing event. As a safety engineer, John Frost conducted a hazard analysis of the product, using the same methodology he has used over a long distinguished career as the chief safety engineer for the Redstone Arsenal in Huntsville, Alabama. His analysis indicated that the product lacked a mechanism to address the injury producing hazard associated with a loss of vacuum pressure at the base of the unit.

Similar evaluations were performed by Don Shaver and Roger Davis. Each engineer found that the product was defectively designed and unreasonably dangerous and that the defective condition of the product proximately caused Mr. Riley's injuries. Each opined that Mr. Riley's use of the machine was reasonably foreseeable by United Rentals. Each found that the core drill vacuum pump was not properly maintained and that the resulting corrosion found in the pump contributed to cause the loss of vacuum. Each concluded that warnings were non-existent that would have had any impact on the outcome of this incident. Each opined that alternative feasible designs, such as a constant pressure switch, vacuum switch interlock,

dynamic warnings, etc. were available that would have eliminated or minimized the hazard. The complete sworn report of each expert shows the analysis and basis for these conclusions. Clearly, each expert's opinions are relevant and will assist the triers of fact.

**C. Each expert is highly trained and experienced in their respective field and utilized their respective education, training and experience in the evaluation of this matter.**

Each expert is highly qualified though education, experience, training and knowledge to address the hazards giving rise to Mr. Riley's injuries in this case. Each has a somewhat differing background and brings different methodologies and experiences to bear in the formation of their respective opinions. Both Don Shaver and Roger Davis are Alabama licensed engineers who have extensive experience in the evaluation of products from a design engineering perspective. Each relied on their experience as forensic engineers to evaluate the cause of this incident and their experience and training and education in the evaluation of the factual materials. Each arrived at similar conclusions as to the cause, the defect resulting in the injury and the alternative designs that could have been used in the design that would have prevented the injury producing event.

John Frost, on the other hand, is an electrical engineer with special training as a safety engineer. As a safety engineer, Mr. Frost's work, by definition, is protecting humans from injury. In this vein, Mr. Frost has received a great deal of education as indicated by his CV. In 1972 Mr. Frost received his B.S. in Electrical Engineering from the University of Virginia. He was a DuPont Scholar on full Academic Scholarship. In 1974, Mr. Frost completed the U.S. Army Safety Engineering Intern Program. This program provided him specialized safety engineering courses, and he was certified as a Safety Engineer through this program. Also in

1974, he received his Master of Engineering in Safety Engineering from Texas A&M University. Id.

Of particular note is Mr. Frost's certification as a Utility Safety Administrator by the National Safety Council. The National Safety Council is an international organization chartered by Congress and dedicated to educate and influence society to adopt safety, health and environmental policies, practices and procedures that prevent and mitigate human suffering and economic losses arising from preventable causes. Finally, Mr. Frost has received numerous awards and honors for his work as a safety engineer. Clearly, Mr. Frost's education has more than qualified him in the area of system safety engineering, especially in the electrical utilities field as well as electrical matters in general.

Mr. Frost's entire working career has involved the area of system safety engineer work in one form or another as indicated by his work history on his CV. From 1974 to the present, he has been involved in occupational safety issues, design evaluation and safety testing, and evaluating existing equipment utilizing system safety principals. From 1997 to the present, he has been responsible for safety engineering support for over $13 billion of product research, development and procurement, and he continues to serve as the "Designated Safety and Health Official and Hazard Classification for the Redstone Arsenal."

Mr. Frost's methodology is based upon reliable techniques utilized by System Safety Engineers. As a certified System Safety Engineer, Mr. Frost is charged with the duty and purpose of protecting humans from injury. He achieves this purpose through a methodology of investigating incidents or accidents, identifying the hazards responsible for causing injuries, suggesting and evaluating remedies for eliminating or minimizing the hazard that causes the

injury, and evaluating whether the proposed remedy will create other hazards or in some other way create other problems. This is the method that he utilized in this case.

Mr. Frost's System Safety Engineering methodology in forming his opinions is sound and reliable, and it is the same methodology utilized by other System Safety Engineers in his field. The methodology is that which he has used throughout his career as a safety engineer for military installations, consistent with the <u>Daubert</u> requirement that an expert "have a reliable basis in the knowledge and experience of his discipline." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 591 (1993). <u>Daubert</u> acknowledges that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 591 (1993).

## CONCLUSION

United Rentals (and by reference Saint-Gobain) implies that in order to satisfy the <u>Daubert</u> reliability requirements, an expert witness must meet all of the factors outlined in <u>Daubert</u>. As previously stated, <u>Daubert</u> made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 119 S. Ct. 1167, 1175 (1999). In this case, the <u>Daubert</u> have little applicability.

The methodology used by each of Plaintiff's experts more than satisfies the requirement of Daubert and Rules 702, 104, 402, and 403. Each expert is highly qualified in his respective field by education, training and experience, to provide the opinions testified to in this case. The materials relied upon by these experts is of the sort ordinarily and regularly relied on by experts in their

8

respective fields and the conclusions drawn from the work performed and the analysis of each expert is reliable. The opinion testimony is highly reliable and will assist the triers of fact on the issue of defect, causation and alternative feasible design.

WHEREFORE, Plaintiff requests this Honorable Court to deny Defendant United Rentals' (and Saint-Gobain's by reference) Motion to Exclude the testimony of Don Shaver, John Frost and Roger Davis.

**RESPECTFULLY SUBMITTED** this 3rd day of January, 2007.

COCHRAN, CHERRY, GIVENS,
SMITH, LANE & TAYLOR, P.C.


/s/ Joseph D. Lane
**JOSEPH D. LANE**
Alabama Bar No. 118498
163 W. Main Street
Post Office Box 927
Dothan, Alabama 36302
(334) 793-1555
(334) 793-8280 (facsimile)
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing upon all counsel of record in this cause by placing a copy of the same via E-mail, addressed as follows, on this the 3rd day of January, 2007:

C. Winston Sheehan, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
Post Office Box 2148
Montgomery, Alabama 36102-2148

Robert H. Sprain, Jr., Esq.
Sprain & Shires, P.C.
1707 29th Court South
Homewood, Alabama 35209

Joseph T. Brasher, Esq.
Hamilton, Westby, Antonowich & Anderson
One Georgia Center
17th Floor
600 W. Peachtree Street, N.W.
Atlanta, Georgia 30308

/s/ Joseph D. Lane
**OF COUNSEL**