# EXHIBIT  4

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

        Plaintiff,

Vs.                              CIVIL ACTION NO.

                                1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

        Defendants.


VOLUME II


DEPOSITION OF JOHN C. FROST, taken
pursuant to notice and stipulation on behalf of the
Defendants, in the conference room of Cochran,
Cherry, Givens, Smith, Lane & Taylor, 163 West Main
Street, Dothan, Alabama, before Ricky L. Tyler,
Certified Court Reporter and Notary Public in and for
the State of Alabama at Large, on Monday, December
4th, 2006, commencing at 9:15 A.M.

Page 37

APPEARANCES

FOR THE PLAINTIFF:

    JOSEPH D. LANE, ESQ.

    Cochran, Cherry, Givens, Smith,

      Lane & Taylor

    P. O. Box 927

    Dothan, AL 36302


FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:

    ROBERT H. SPRAIN, JR., ESQ.

    Sprain & Shires, PC

    1707 29th Court South

    Birmingham, AL 35209



FOR THE DEFENDANT, UNITED RENTALS:

    C. WINSTON SHEEHAN, JR., ESQ.

    Ball, Ball, Matthews & Novak

    2000 Interstate Park Drive

    Suite 204

    Montgomery, AL 36109-5413

---

Page 38

I N D E X

Page

Direct Examination by MR. SPRAIN:      45
Cross-Examination by MR. SHEEHAN:      239
Redirect Examination by MR. SPRAIN:    348
Recross-Examination by MR. SHEEHAN:    354

EXHIBITS

For Defendant:

10    Invoice
For Identification                     45
11    OSHA Machine Guarding Standard
For Identification                     174

12    OSHA Construction Standards
For Identification                     192
13    OSHA Construction Standard
For Identification                     193

14    Fundamental Machine Guarding
For Identification                     194
15    Color Coded Gauge
For Identification                     196

16    Human Factor in Engineering and
      Design
For Identification                     196
17    Human Performance Engineering
For Identification                     197

18    Human Factors in Product Design
For Identification                     196
20    CD Inspection Video
For Identification                     239

---

Page 39

21    CD Photos 10/9/06
For Identification                     239

22    CD Product Inspection Photos
For Identification                     239
23    CD Disclosures, etc.
For Identification                     239

24    Note Pad 1
For Identification                     243
25    Note Pad 2
For Identification                     243

26    Notes from viewing Inspection
For Identification                     243
27    Photograph
For Identification                     251

28    Photograph
For Identification                     251
29    Photograph
For Identification                     251

30    Milwaukee Operators Manual
For Identification                     256
31    Photograph
For Identification                     266

32    Photograph
For Identification                     324
33    Photograph
For Identification                     325

34    Photograph
For Identification                     326
35    Photograph
For Identification                     326

---

Page 40

36    Photograph
For Identification                     328

37    Photograph
For Identification                     329

STIPULATIONS

It is stipulated and agreed by and between counsel representing the parties that the deposition of JOHN C. FROST, may be taken before Ricky L. Tyler, Certified Court Reporter and Notary Public in and for the State of Alabama at Large, without the formality of a commission; and all formality with respect to other procedural requirements is waived; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose by either party as provided by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of the deposition of JOHN C. FROST,

Page 41

1  is hereby waived and that said deposition may be
2  introduced at the trial of this case or used in any
3  other manner by either party hereto provided for by
4  the Statute, regardless of the waiving of the filing
5  of same.
6       It is further stipulated and agreed by and
7  between the parties hereto and the witness, that the
8  signature of the witness to this deposition is hereby
9  waived.
10
11                * * * * *
12
13       P R O C E E D I N G S
14
15  MR. LANE:  What I want to put on the
16       record concerns John's -- John
17       Frost's testimony here today in
18       light of the licensing issues that
19       we have.  John has talked to the
20       -- is it the Board?  Do you call
21       it the Board?
22  THE WITNESS:  Yes, I believe so.
23  MR. LANE:  And has a -- they have

Page 42

1       referred him to an opinion on his
2       testimony outside of the fact that
3       he is not yet licensed in Alabama.
4       And I'm just going to read part of
5       the opinion.  This was an opinion
6       from -- it's an advisory opinion
7       of the State Board of Licensure
8       for Professional Engineers and
9       Land Surveyors.
10       And on page six of my copy of
11       that opinion it states,
12       "Furthermore, testimony that
13       constitutes the practice of
14       engineering is also limited by the
15       Board's administrative definition
16       of testimony by being applicable
17       only to testimony related to
18       engineering activities in the
19       State of Alabama.  This opinion,
20       for instance, would not prevent a
21       person who is not licensed in
22       engineering in Alabama from
23       testifying in Alabama about

Page 43

1       engineering work or design
2       performed outside of Alabama, such
3       as the design of an automobile
4       part or other product designed
5       outside the State of Alabama.
6       Nor would it prevent an unlicensed
7       individual from offering opposing
8       testimony should the court declare
9       the opposing expert otherwise
10       qualified."
11       And that is the primary basis
12       for John's -- John Frost's
13       testimony here today.  That being
14       said, he is in the process of --
15       he has an application with the
16       State of Alabama, which has not
17       been ruled on yet, which we expect
18       some ruling in the next couple of
19       weeks, I believe.
20  THE WITNESS:  I believe so.
21  MR. LANE:  They're supposed to meet on
22       that.  But he is -- his work is --
23       he is operating under that example

Page 44

1       that's listed in the advisory
2       opinion.
3  MR. SPRAIN:  What are you reading from?
4  MR. LANE:  We can make this a copy.
5       Now, this one has got highlighting
6       on it, we probably need to get a
7       clean copy, but I don't make mind
8       making this a part of --
9  MR. SPRAIN:  Is that a recent
10       publication?
11  MR. LANE:  It is an advisory opinion of
12       the State Board of Licensure for
13       Professional Engineers and Land
14       Surveyors, August 28th of 2006,
15       issued August 28th of 2006.  So
16       whether or not that totally clears
17       it up, that's the advisory opinion
18       under which he is providing
19       testimony today.
20  MR. SPRAIN:  Well, let's do this; let's
21       make a copy of that at a break.
22  MR. LANE:  Sure.
23  MR. SPRAIN:  So that way we can have

Page 45

1    that for the record.

2

3        JOHN C. FROST, of lawful age, having first

4    been duly sworn, testified as follows:

5

6        CONTINUED DIRECT EXAMINATION

7    BY MR. SPRAIN:

8    Q.   Sir, my name is Robert Sprain and we've already

9        started your deposition back on October 27,

10       2006 and this is the continuation of your

11       deposition.  Have you had a chance to think of

12       any other documents or things in response to

13       Exhibit 1B, which is your deposition notice for

14       this deposition?

15   A.   I have brought some information on my billing.

16   Q.   Okay.  Could you please produce that, sir?

17   A.   Yes.

18       MR. SPRAIN:  Off the record.

19       (Off-the-record discussion.)

20       (Defendant's Exhibit 10 marked

21       for identification.)

22   Q.   On the record, I've just labeled your invoice

23       dated December 2, 2006 as Exhibit 10 to your

Page 46

1    deposition.  And is this an accurate statement

2    of your billings for this case up to the

3    present date?

4    A.   Yes, it is.

5    Q.   Okay.  And the total is $24,163.70?

6    A.   That's correct.

7    Q.   Okay.  And that would not include your time

8        here today?

9    A.   That's correct.

10   Q.   What do you charge for deposition and/or court

11       time?

12   A.   All of my work is the same rate at 250 an hour.

13   Q.   What do you plan to do between now and the

14       trial on this case?

15   A.   Right now I have no plans other than the

16       deposition.  If something comes up today that

17       needs addressing, I will address it.

18   Q.   Okay.  Back to my question --

19       MR. LANE:  And for the record, I don't

20       know if he's been updated on

21       recent depositions, but we may ask

22       him to review some of the

23       discovery that has just recently

Page 47

1    taken place, plus discovery that

2    we have scheduled, expert

3    depositions, things of that

4    nature.

5    Q.   But back to my question, you've produced all

6        documentation and things in response to our

7        deposition notice?

8    A.   Yes, to the best of my knowledge.

9    Q.   All right.  I'm going to go over your resume

10       which we had received marked as Exhibit 1A to

11       your deposition.  You're now retired as the

12       Chief at the Safety Office at the U.S. Army

13       Missile Command; is that correct?

14   A.   That's right.

15   Q.   Okay.  What did you do with respect to design

16       of products, any kind of role --

17   A.   -- there?

18   Q.   -- there?

19   A.   Yes.

20   Q.   Okay.

21   A.   The majority of my time was spent on what we

22       call systems safety; that's the safe design of

23       quite a number of products, to include all of

Page 48

1    the Army's missiles fielded around the world,

2    the ground support equipment that goes with

3    those, the radars, the vans, all of the Army's

4    helicopters and fixed-wing aircraft since 1997.

5    Q.   Do you consider yourself a design engineer?

6    A.   I am a safety engineer.  I apply that to

7        prevention of accidents.  Quite a bit of my

8        work has been system safety or the safe design

9        of products.

10   Q.   Okay.  So I take that to mean that you do

11       consider yourself an expert in safety in terms

12       of design?

13   A.   Yes.

14   Q.   Okay.  Have you ever designed any products,

15       machinery or equipment?

16   A.   Well, the way it's normally done, the safety

17       engineer supports a design team.  I have been

18       on the teams that designed a number of

19       products.

20   Q.   What products?

21   A.   Probably thousands of products from radios and

22       radars and communication equipment at Fort

23       Monmouth, to a number of different missile

Page 49

1    systems to include nuclear and conventional, to
2    aircraft such as the Apache and the Black Hawk.
3  Q.   Okay.  Have you ever designed any consumer
4       products?
5  A.   I've evaluated consumer products for the Army.
6  Q.   Okay.  Just listen to my question.  Have you
7       ever designed any products, equipment or
8       machinery that would be sold to the general
9       public?
10           MR. LANE:  Object to the form.  Go
11              ahead.
12  A.   Some Army equipment is sold to the general
13       public.
14  Q.   Okay.  What equipment have you designed that
15       would be sold to the general public?
16  A.   I believe the antenna that I -- I designed the
17       tip protector for the AS-1729 antenna, and I
18       believe that makes its way onto the market
19       occasionally.
20  Q.   Okay.  What is the antenna?
21  A.   It's a whip antenna used on vehicles.  And I
22       had had accidents where it skewered people.  It
23       was tied down and it would hit pedestrians in

Page 50

1    Vietnam.  And I designed a tip protector for
2    that and I have seen that in use in commercial
3    applications.
4  Q.   Okay.  Have you designed any industrial
5       machinery or equipment?
6  A.   I've been on the design team for quite a bit of
7       ground support equipment which is industrial in
8       nature.  Pressurized gases --
9  Q.   Okay.  I'm confused.  You've designed
10       pressurized gases?
11  A.   Ground support equipment that handles
12       pressurized gases, for instance.
13  Q.   Okay.  What product specifically?
14  A.   It comes to mind immediately a charging station
15       for pressure vessels.
16  Q.   For pressure vessels?
17  A.   Pressure vessels.
18  Q.   Okay.  And the pressure vessels would contain
19       gas?
20  A.   Would contain gas, correct.
21  Q.   Is that similar to a propane tank or something
22       of that sort?
23  A.   It would be similar, higher pressure.

Page 51

1  Q.   Okay.  What other products have you designed or
2       played a role in designing that would relate to
3       industrial equipment or machinery?
4  A.   Generators used on many Army missile systems
5       are essentially commercial generators that are
6       militarized and I was on design teams that
7       designed those.  Air conditioners used in
8       shelters are essentially commercial air
9       conditioners modified for field use.
10  Q.   Okay.  And that would be for the military
11       though?
12  A.   Yes.
13  Q.   Okay.  The pressurized vessel, that would be
14       for the military, correct?
15  A.   Yes.
16  Q.   Okay.  Have you ever designed any industrial
17       products or equipment that would be used in
18       private industry?
19  A.   As I say, I have evaluated a number of them for
20       use of the employees that I supported.
21  Q.   I'm talking about design now.
22  A.   I evaluated the design; I didn't perform the
23       design.

Page 52

1  Q.   Okay.  Now, what products have you evaluated?
2  A.   The other half of my job is providing
3       occupational safety support to 20,000 employees
4       at various times.  They used a number of
5       different products in the laboratory and in
6       construction and on assembly lines, thousands
7       of different products.  I've been to many
8       assembly lines and looked at the safety of the
9       equipment on there, conveyor belts, packaging
10       material, pressing material, wrapping machines.
11  Q.   Well, what about drills such as a core drill
12       involved in this case, have you had any design
13       experience with such a product?
14  A.   I have evaluated the safety of propellant
15       drills where our laboratory workers were
16       drilling into live propellant.
17  Q.   Okay.  But as to a core drill, have you had any
18       experience with the design of such a piece of
19       machinery?
20  A.   Not that I recall, no.
21  Q.   Okay.  Have you ever evaluated any similar
22       product in the past?
23           MR. LANE:  Object to the form.

Page 53

1 A.  I've done construction site inspections where
2      core drills were in use.
3 Q.  All right.  What core drills were in use, do
4      you know?
5 A.  I don't recall.
6 Q.  Okay.  And what was your role in that matter or
7      those matters?
8 A.  General site inspections to look at
9      construction safety practices.
10 Q.  Okay.  And that involved not just the
11     equipment, but also the personnel who were
12     engaged in practices?
13 A.  Yes.
14 Q.  Okay.  And what were your conclusions?
15 A.  The time that come to mind, I had found no
16     problems at the location where they were
17     drilling.  I checked four ground fault
18     interrupters which they were using at that
19     location and they were wearing proper personal
20     protective equipment.  I believe that was an
21     elevated floor and they had fall protection.
22 Q.  Okay.  Were the workers using the core drill
23     wearing personal protection?

Page 54

1 A.  They would have been.  It was a Corps of
2      Engineers' job, they had on hard hats and
3      glasses.
4 Q.  Safety glasses?
5 A.  I believe so.
6 Q.  Okay.  And that's important for operators of
7      machinery such as a core drill?
8        MR. LANE:  Object to the form.
9 A.  Different machines require different
10     protection.  A core drill is not particularly
11     bad about throwing -- spalling concrete, but on
12     most construction sites safety glasses are a
13     good idea.
14 Q.  Okay.  What do you recommend in general in
15     terms of wearing or not wearing personal
16     protective equipment such as safety glasses and
17     hard hats?
18 A.  You can't make a general recommendation, it
19     depends on the exact operation.
20 Q.  Okay.  Well, in this case do you think that
21     Mr. Riley should have been wearing a hard hat
22     and safety glasses?
23 A.  I don't see any need for a hard hat.  But

Page 55

1      safety glasses would probably be a good idea.
2      I don't think they are essential.  They had
3      nothing to do with his injuries here.
4 Q.  What is that based on?
5 A.  The safety glasses are meant for fragments.
6      When you're impacted by a heavy object, such as
7      the base of this device, they're not intended
8      for that purpose.  They might provide some
9      incidental protection, but when you're hit with
10     this kind of momentum, they're going to crush
11     your face either way.
12 Q.  And so you're saying safety glasses would not
13     have helped Mr. Riley in this case?
14 A.  They're not the right protection to stop the
15     injuries.  It may or may not have randomly
16     changed where the forces were distributed near
17     his eyeballs, but that's not the protection for
18     this hazard.
19 Q.  Okay.  What about a hard hat?
20 A.  A hard hat is meant essentially for objects
21     being dropped from above and that's not the
22     hazard of drilling.
23 Q.  Okay.  So you've talked about various --

Page 56

1      various design roles with respect to military
2      equipment and you said you've evaluated the
3      design of many products used in private
4      industry, is that a fair summary?
5 A.  That is fair.
6 Q.  Okay.  Do you hold any patents?
7 A.  No, I don't.
8 Q.  Okay.  Do you hold any proprietary role with
9      respect to design drawings or any design of a
10     product, whether military application or
11     private industry application?
12 A.  I don't understand the question.
13 Q.  Okay.  I've seen design information for
14     redesign in this case, are you with me?
15 A.  Yes.
16 Q.  Okay.  Have you done that in any other cases?
17 A.  Yes.
18 Q.  Okay.  Do you have any patents or any ownership
19     rights over design parameters or design
20     drawings for products?
21 A.  Within the military I didn't patent the work
22     that we did.  I have signed probably thousands
23     of drawings.  I have made design changes or

Page 57

1    caused design changes to occur in thousands of
2    cases, but I don't -- my initials are on many
3    drawings approving the drawings, but I don't
4    own any drawings.
5  Q.   Okay. With respect to design for private
6    industry applications, have you ever had any
7    design of a product that made its way to the
8    marketplace?
9  A.   I did some work on the Humvee, a version of it
10    is on the marketplace. I don't know if the
11    pieces of it I was involved in are.
12  Q.   What work did you do on the Humvee?
13  A.   Some center of gravity issues.
14  Q.   In that situation did you actually come up with
15    a design drawing?
16  A.   No. If I recall right, we were evaluating
17    early Humvee designs to see if they would meet
18    our center of gravity needs.
19  Q.   Okay. What recommendations did you, as a
20    safety engineer, recommend for the operators of
21    the Humvee?
22  A.   I don't think I had any recommendations for the
23    operator at that time. It was conceptual

Page 58

1    designs of the Humvee.
2  Q.   What safety hazard were you concerned with with
3    respect to the Humvee?
4  A.   Stability when carrying the loads that my
5    organization needed it to carry.
6  Q.   Okay. What responsibility did you at that time
7    believe the operator of the Humvee had with
8    respect to that safety issue?
9  A.   The part that I recall, and that was 20
10    something years ago probably, was simply
11    insuring that the centers of gravity that we
12    needed to be able to carry for certain
13    missiles, that the unit could handle those
14    safely. And there are standard tests for
15    stability at various centers of gravity. So
16    that was a physical capability of the vehicle
17    issue.
18  Q.   Okay. It was not an issue that interrelated to
19    operator usage of the product?
20  A.   Certainly. The hazard was rollover during
21    operational use of the Humvee.
22  Q.   Okay. Is there any safety issue that the
23    operator has that would prevent a rollover?

Page 59

1  A.   There are inputs from the operator that can
2    contribute to a rollover, yes.
3  Q.   Like going too fast around a curve?
4  A.   For instance, or running off the road.
5  Q.   Thank you, sir. In general do you consider the
6    operator's role in the design of a product?
7  A.   Absolutely.
8  Q.   Okay. Is that something important to you?
9  A.   Yes, it is.
10  Q.   Is it important for an operator or a user of a
11    product, or in this case a Humvee, to exercise
12    safety for themselves to make sure an accident
13    does not happen?
14  A.   To a reasonable degree, depending upon their
15    training and their understanding of the hazard.
16  Q.   Sure, within reason. But you would expect
17    somebody who is reasonably trained to
18    understand that they shouldn't go too fast in a
19    vehicle like the Humvee which could cause a
20    rollover, correct?
21  A.   Within the field of safety engineering, the use
22    of the human performance is the least reliable
23    method of controlling a hazard. The safety

Page 60

1    engineering hierarchy places that as the very
2    least effective means of controlling a hazard,
3    because we have learned from experience, and
4    the Humvee is an example, and other vehicles,
5    that you can't control everything that a
6    operator does completely.
7  Q.   Okay. Now, at this time has the Humvee been
8    developed to be fail-safe?
9  A.   No.
10  Q.   Okay. So operator control and usage is still
11    very important, correct?
12  A.   Yes.
13  Q.   Okay. And it's important for the Humvee
14    operator to be trained and to exercise
15    reasonable safety for their own good, correct?
16  A.   Yes.
17  Q.   Okay. And during the years of your involvement
18    in the military as a safety officer or safety
19    engineer or the Chief of the Safety Office, did
20    you ever prepare or publish any information
21    about operator safety?
22  A.   Yes.
23  Q.   Okay. And what were some of those articles or

Page 61

1    publications?
2  A.    Operator safety is part of all operations.
3    I've reviewed hundreds of standard operating
4    procedures for hazardous operation.  They
5    included detailed steps for the operators and
6    they included evaluation of the engineering of
7    the equipment that were being operated.  I've
8    been involved in preparation of the Army's
9    standard on electrical safety for laboratory
10    environments that involved operator procedures.
11    I've reviewed hundreds of technical manuals
12    that included warnings and procedures for
13    operators.
14  Q.    Okay.  Have you taught any classes on operator
15    safety?
16  A.    I've taught safety classes principally aimed at
17    designers of equipment, some operators were
18    there.
19  Q.    All right.  And have you in your experience
20    found that even through design and redesign of
21    products, with a mind toward heightened safety,
22    that operators still need to be trained and
23    still need to exercise reasonable care for

Page 62

1    their own safety?
2  A.    Various products require various levels of
3    training.  The ultimate might be a fighter
4    aircraft requires extreme levels of training;
5    this coffee cup requires essentially no
6    training beyond childhood.  So there's a range
7    of training that is required.
8  Q.    Okay.  But that is something that as a safety
9    engineer you are concerned about, and that is
10    proper training of employees and operators of
11    products and equipment so that they know how to
12    safely use those products and equipment?
13  A.    At the conclusion of design, the hazards that
14    are not controlled by design that you do rely
15    on training to control them, then you evaluate
16    the method of that training and the quality of
17    it, yes.
18  Q.    Okay.  Well, that's something that's
19    interesting to me.  What led to the safety
20    design of the Humvee?  I mean, was it prior
21    accidents, was it some concern, some known
22    hazard?
23  A.    I did not design the Humvee.  I simply

Page 63

1    established what the center of gravity
2    requirements were for the missiles that we had,
3    so I can't answer that.
4  Q.    Okay.  What criteria would lead to a redesign
5    of a product or a piece of machinery?
6  A.    Quite a few events.  If it didn't perform as
7    anticipated; certainly if accidents occur that
8    are design related and redesign can fix it.
9  Q.    All right.  The first thing you said, it did
10    not perform as intended, is that what you said?
11  A.    Yes.
12  Q.    Okay.  And that would be the first thing.  And
13    the second thing would be accidents; is that
14    correct?
15  A.    That's another.  You might redesign to lower
16    cost.
17  Q.    Excuse me?
18  A.    You might redesign to lower cost.  If your
19    question is what would lead to redesigns.  You
20    might redesign if components became
21    unavailable.
22  Q.    All right.  Now, what would tell you that a
23    product had not performed as intended?

Page 64

1  A.    Testing of the initial design is the first
2    place.  If you've failed to properly design it,
3    a comprehensive test program can determine
4    that, a verification/validation program first.
5  Q.    All right.  So testing.  What else?
6  A.    The principal method would be analysis, that
7    you would analyze what the hazards are and
8    determine whether they've been corrected by the
9    design.  After that would come the testing.
10    And then during fielding, if there are problems
11    with operator use of the equipment, that would
12    be another.
13  Q.    Okay.  And what would tell you that there are
14    problems with operator use?
15  A.    Hopefully close contact of the designers with
16    the users, talking to them about how is it
17    working, do you like the performance of it.
18  Q.    What about safety issues?  What issues in the
19    field would tell somebody that there is a
20    safety problem?
21  A.    Well, again, most safety problems are dormant.
22    They only manifest themselves when the right
23    set of conditions come along.  You want to

Page 65

1  catch them before that set of conditions comes
2  along.  If you have failed to do that,
3  eventually that set of conditions will occur
4  such that an accident occurs.
5  Q.   Okay.  And that was the second thing you
6  mentioned.  How many accidents should occur to
7  give a design engineer an idea that the product
8  should be redesigned?  Should it be one, should
9  it be two, should it be ten, should it be 20?
10 A.   No, as I've said, the safety engineer should
11 identify the hazard before any accidents occur.
12 So you don't wait and count bodies and then say
13 it's successful or not successful.
14 Q.   Okay.  What happens if the product has gone
15 through testing and it's hit the field, it's
16 being used, and there aren't any adverse
17 reports about operator misuse or problems with
18 the intended usage of the product?
19 A.   And your question is what --
20 Q.   Okay.  Back to your criteria for redesign, I'm
21 trying to figure out when a product should be
22 redesigned.  And you said the first thing would
23 be -- you know, one criteria would be whether

Page 66

1  the product is not being used as intended,
2  correct?
3  A.   No, I don't think I said that.
4  Q.   Okay.  What did you say?  Let's start over.
5  A.   Redesign, there are many causes of redesign,
6  which is different than proper design
7  originally.  But redesign might be it not
8  working effectively.
9  Q.   Okay.  I think you said it does not perform as
10 intended?
11 A.   Right.
12 Q.   Okay.  And then you said if there are a history
13 of accidents, if there are accidents that
14 happen with the machine?
15 A.   Certainly that would be critical.
16 Q.   Okay.
17 A.   Near misses are a much better indication.
18 Q.   Okay.  Accidents, near misses.  Now, my
19 question was, what would happen if a product is
20 tested, it's put into the stream of commerce,
21 it's used, and the testing period has passed
22 and there aren't any reports of incidents of
23 the product failing to perform as intended;

Page 67

1  would that be some evidence that the product is
2  in fact being used as intended and there's no
3  reason for redesign?
4      MR. LANE:  Object to the form.
5  A.   No.  If you have an unsafe product and it has
6  worked for a period of time without killing
7  anybody, that doesn't make it a safe product.
8  Q.   Okay.  How much time then would pass before
9  somebody can say it's a safe product; a year,
10 two years of safe operation, three years, ten
11 years?
12     MR. LANE:  Object to the form.
13 Q.   How many years would you think, as a safety
14 engineer, would qualify a product for not being
15 deemed a candidate for redesign?
16 A.   We don't judge safety by body count.  We judge
17 safety by determining what the hazard is, can
18 it occur, and has it been controlled.  The only
19 item of interest on the accident might be that
20 if you've missed something, if you weren't
21 aware of it, it might draw your attention to
22 it.  But just performing for a number of years
23 without killing anybody does not make an unsafe

Page 68

1  product into a safe product.
2  Q.   Okay.  Have you ever worked in private
3  industry?
4  A.   I've worked with private industry.
5  Q.   Listen to my question.  Have you ever worked in
6  private industry?
7      MR. LANE:  Object to the form.
8  A.   I have been to a number of private industry
9  firms that design equipment and worked with
10 them.
11 Q.   Have you ever worked for a company?
12     MR. LANE:  Object to the form.
13 Q.   I mean he can answer the question.  Have you
14 ever received a W-2 from a private company?
15 A.   Yes, in high school I did.
16 Q.   Okay.
17 A.   But when I have evaluated companies like this,
18 I was being paid by the government, that's
19 correct.
20 Q.   Okay.  Have you ever worked for a private
21 company?
22 A.   No.
23 Q.   Have you ever worked for a manufacturer?

Page 69

1   A.   I'm sorry, the answer --
2   Q.   Have you ever worked for a private
3        manufacturer?
4            MR. LANE:  Where he's being paid by the
5            manufacturer?
6        MR. SPRAIN:  Yes.
7        MR. LANE:  Okay.  That's my question.
8            I'm sorry, I don't mean to -- it's
9            a semantic thing.
10       MR. SPRAIN:  We're going to be here all
11           day and it's okay, I understand
12           that now.
13       MR. LANE:  It's a semantic thing is
14           all, he's just trying to be
15           accurate.
16  A.   No, my paycheck came from the government, not
17       from the manufacturer.
18  Q.   All right.  But your testimony would be,
19       despite no incidents of a product failing to
20       perform as intended and despite no accidents
21       for years, you would say a product should be
22       redesigned if there's one accident every 20
23       years?

Page 70

1            MR. LANE:  Object to the form.
2   A.   No.  Even if there are zero accidents, if you
3        look at a product and it has a potential to
4        suddenly begin spinning at a high rate of speed
5        and injure an operator, I would not wait for
6        the first accident, I would fix the design.
7   Q.   Even if there has been no reports of similar
8        incidents?
9   A.   Absolutely.
10  Q.   Well, where is the foreseeability?
11  A.   The foreseeability is if you have a force
12       that's greater than the hold-down capability in
13       foreseeable situations and no indication to the
14       operator that that can occur and he not become
15       aware of it and spin this device that he's
16       holding such that it's going to always cause
17       injury, forcing him to operate the unit from a
18       position that's within the danger zone of the
19       equipment.
20  Q.   But there's no reports of it ever happening
21       before, do you find that odd?
22  A.   No, I don't.
23           MR. LANE:  Object to the form.

Page 71

1   Q.   For years there's no reports of any similar
2        incident?
3            MR. LANE:  Object to the form.
4   A.   I mean, we have even on this day two reports of
5        similar incidents just from the testimony in
6        this case.
7   Q.   And you don't think that's because of misuse of
8        the product, sir?
9   A.   No, I don't.
10  Q.   Okay.  You don't attribute any responsibility
11       to the operator in this case, the Riley case?
12           MR. LANE:  Object to the form.
13  A.   I don't know of any way that you can operate
14       this equipment safely.  If I were to operate
15       it, I don't know how to do it safely with this
16       design.
17  Q.   Assuming it had been used safely for years with
18       no similar incident, assuming this very product
19       had had a successful rental history prior to
20       the time this fellow used it, doesn't that show
21       you that it can be safely used?
22           MR. LANE:  Object to the form.
23  A.   I think that there are times that it can

Page 72

1        successfully drill the hole, I believe that.  I
2        think there are also times that it's going to
3        come loose and start to spin and it's luck
4        whether your hand is near enough the switch to
5        turn it off or you are able to jump out of the
6        way.
7   Q.   So you think if this product -- and assume for
8        me, for purposes of this deposition, this
9        product had been used successfully for 20
10       years, you're saying in all of those times,
11       thousands of times, it was just luck?
12           MR. LANE:  Object to the form.  It's
13           argumentative.
14  Q.   Is that your testimony, that it was just luck
15       that it was secured to the base of a floor, and
16       you, as an engineer, worked for the military
17       and it was luck, is that your testimony?
18           MR. LANE:  Object to the form.
19  A.   I haven't seen any indication yet that there is
20       an effective data system to find out the
21       performance of the unit on all of those
22       thousands of times.  I would expect -- fully
23       expect that you have had near misses where the

Page 73

1    base did come loose. Looking at the design, I
2    think that will happen periodically. And then
3    whether that causes injury or not is just
4    circumstances.
5  Q.  Have you seen any evidence of other reports of
6    injuries, accidents or near misses in this
7    case?
8  A.  I've seen no reports of performance either way.
9  Q.  So back to my question, you're saying by your
10    testimony that the years of successful use of
11    this product, you're saying it was luck?
12      MR. LANE: Object to the form.
13  Q.  That's your testimony, correct?
14  A.  My analysis of this design indicates that it
15    will come loose periodically depending on the
16    situation.
17  Q.  No. You used the word "luck," did you not,
18    sir?
19  A.  I do believe it's luck whether or not it hits
20    you and causes injury.
21  Q.  So you're saying that if the evidence shows for
22    years it's successfully used with no
23    similar incident as in this case, the Riley

Page 74

1    case, you're saying it's luck; is that correct?
2      MR. LANE: Object to the form.
3  A.  I have not seen any indication that such data
4    is being collected, so you would have to be
5    very careful about trying to evaluate the
6    reports like that.
7  Q.  Okay. But you haven't seen any reports?
8  A.  No. I've analyzed --
9  Q.  You have seen no evidence of reports, correct?
10  A.  Correct.
11  Q.  You've been given this entire file, correct,
12    sir?
13  A.  I've brought everything I've been given.
14  Q.  Okay. Well, Mr. Lane is a very thorough lawyer
15    and I've seen lots of depositions you've read,
16    correct?
17  A.  Yes.
18  Q.  And you've been provided, as best you can tell,
19    with a lot of material to analyze about the
20    Riley case, correct?
21  A.  Yes.
22  Q.  But you've seen no evidence of prior near
23    misses, correct?

Page 75

1  A.  I don't have any reports of how the product has
2    performed in the past.
3  Q.  Okay. So the answer is no, you've not,
4    correct?
5  A.  Well, we know -- we have testimony on two uses
6    of this drill. We have testimony on --
7  Q.  No, sir. This is the accident. I'm talking
8    about prior to August 28, 2003, have you seen
9    any evidence of near misses?
10  A.  Prior to the injury, which was on hole number
11    two, the exact same condition occurred on hole
12    number one and did not cause an injury. That's
13    an example of the near misses that I believe
14    probably happen on a regular basis.
15  Q.  Okay. So your opinion is then based -- this
16    happened on a regular basis, correct?
17      MR. LANE: Object to the form.
18  A.  I would expect it to occur periodically, yes.
19  Q.  Okay. And so you would expect that the seller
20    of this product would have notice of this
21    hazard? And I'm talking about the hazard
22    you've identified in your report, which is the base
23    been marked for your deposition, as the base

Page 76

1    becoming unsecure, the vacuum system not
2    working and it spinning around, is that the
3    hazard you've identified?
4  A.  The hazard is the fact that it uses a vacuum
5    system for restraint, but there's no positive
6    assurance that the vacuum system is working.
7    There is no indication to the operator what
8    acceptable vacuum is. There is no disconnect
9    for the unit if you lose vacuum. It has a
10    constant on switch, so the unit will spin and
11    spin until it hits something. All of these
12    make up the hazard.
13  Q.  Okay. And that hazard or those hazards, as
14    you've identified in your capacity as an expert
15    for Mr. Riley in this case, your testimony is
16    that there would be other incidents or reports
17    of accidents of a similar nature?
18      MR. LANE: Object to the form.
19  A.  I would expect that there would be other
20    occurrences where the base lost grip. And
21    whether or not that injured people is a
22    probability of it yes, a probability of it no;
23    the likelihood of that injury being reported

Page 77

1  back to the manufacturer is unknown. I don't
2  see any data collection system yet from the
3  manufacturer to do that. So I think -- I would
4  expect the base coming loose to have occurred
5  over the life of these products, yes.
6  Q.  Okay. But you haven't seen any evidence of
7      that in this case, correct?
8  A.  I have on hole number one.
9  Q.  Okay. Hole number one.
10  A.  And hole number two.
11  Q.  Okay. And what happened on hole number one was
12     the same thing that happened on hole number
13     two, correct?
14  A.  Except that luckily it didn't cause the injury
15     that time.
16  Q.  Okay. For hole number one, the base of the
17     drill became insecured from the floor and spun
18     around the axis of the drill bit, correct?
19  A.  Correct.
20  Q.  And on hole number two the base of the drill
21     became insecured -- excuse me, unsecured from
22     the floor of the work area and spun around the
23     axis of the drill bit, correct?

Page 78

1  A.  Yes.
2  Q.  Okay. And in both instances, hole number one
3      and hole number two, Mr. Riley was either
4      watching the operation or was the operator,
5      correct?
6  A.  Correct.
7  Q.  And you assume Mr. Riley did in fact see what
8      was going on with respect to the operation of
9      the drill for hole number one, correct?
10  A.  Yes.
11  Q.  Now, do you know how long the DM500 core drill
12     had been in operation prior to this injury in
13     2003?
14  A.  This particular unit or the series?
15  Q.  Well, this product, how long had it been on the
16     market?
17  A.  I don't know that.
18  Q.  Okay. Would that factor into your opinion
19     about its prior use and whether there was any
20     need for redesign?
21  A.  No, it wouldn't.
22  Q.  It doesn't matter whether it had been in use
23     effectively for two years?

Page 79

1  A.  That's correct. The hazard is the design.
2  Q.  Okay. Well, it wouldn't matter if it had been
3      effectively and reliably and safely used for
4      five years?
5  A.  It would not matter, because I have no
6      indication that we really know what its
7      performance has been.
8  Q.  Okay. It would not matter if it had been used
9      reliably and safely for ten years?
10  A.  It would not. I believe that during that time
11     you would have, because of this design, had
12     occasions where it spun.
13  Q.  Okay. And again you're basing that on your
14     views in this case and you think there's just
15     bound to be other instances where the drill
16     base has spun like it did on August 28th, 2003?
17  A.  This design violates a number of safety
18     engineering principles. It --
19  Q.  Okay. But my question is you're saying that
20     this had to have happened in your expert
21     opinion prior to the date of this accident?
22  A.  In my opinion this in all likelihood has
23     happened before, yes.

Page 80

1  Q.  Okay. But you don't know whether the seller in
2      this case, Saint-Gobain Abrasives, had any
3      notice of a similar incident or accident,
4      correct?
5  A.  I don't know what they knew about that. No, I
6      don't.
7  Q.  Okay.
8         (Recess.)
9  BY MR. SPRAIN:
10  Q.  I'm looking at your resume and it says in part
11     that you were a panelist on adding discipline
12     to our discipline, what was that all about?
13  A.  That was at the International System Safety
14     Conference. There was a group of, I think,
15     probably four panelist that discussed to the
16     conference ways of improving system safety,
17     more rigor to the techniques that are used.
18  Q.  Okay. And that involved actual safety for
19     systems, not specific products?
20  A.  Correct. The process of how do you analyze
21     systems to identify the hazards and correct
22     them.
23  Q.  Okay. And is that publication in print? Is it

Page 81

1    available for copying?
2  A.   The System Safety Society has it.  It is, I
3       assume, I don't know.
4  Q.   Okay.  Well, it's on your resume, I'm wondering
5       if you have a copy that you can provide for
6       this deposition?
7  A.   I don't know.  I did at one time.
8  Q.   Okay.  If you can --
9  A.   I'm not sure what -- that was a panel
10      presentation.  I'm not sure what was published
11      on that, it was a panel that I presented at.
12  Q.   Okay.  I'm seeing on your resume where you were
13      the Session Chairman for the Accident
14      Investigation session, and describe what
15      information was included in that -- in that
16      session or seminar?
17  A.   That was a series of briefings by personnel
18      such as, I think, NTSB and organizations like
19      that about advances in how to investigate
20      accidents.
21  Q.   Okay.  What investigation of an accident do you
22      do or do you recommend that be done in terms of
23      the operator or the individual involved in the

Page 82

1    accident?
2  A.   Whenever you investigate an accident, there are
3       a number of things that you look at, whether it
4       be weather, environment, design, operator
5       steps, training, but the operator performance
6       is one thing you look at in any accident
7       involving a manned system.
8  Q.   Involving a manned system?
9  A.   A manned system.
10  Q.   Okay.  What criteria do you look at when you
11      analyze the operator performance and the safety
12      of the operator in terms of an accident
13      investigation?
14  A.   You would look at what he did and was it
15      reasonable, what he did, and was he -- was he
16      sufficiently trained?  Did he operate as his
17      supervisor told him to do?
18  Q.   What if the supervisor does not operate the
19      machinery correctly?
20  A.   You look at why.
21  Q.   Okay.  And do you also look at the supervisor
22      or the employer or the supervisor's boss in
23      terms of how they were operating the machinery

Page 83

1    or equipment in question.
2  A.   The human element of an accident investigation
3       involves all of the humans, the operator, his
4       supervisor, the personnel that distributed and
5       maintained the equipment, the designer, the
6       human that designed it.  All of those are human
7       issues.
8  Q.   Now, the first thing you said was that you look
9       at the role of the operator and whether what he
10      did was reasonable.  What criteria do you
11      examine to determine whether the operator was
12      reasonable or not?
13  A.   Essentially what he had been told to do, what
14      his training was and his experience level.
15           (Off-the-record discussion.)
16  Q.   All right.  We're talking about the role of an
17      operator in an accident investigation and you
18      said the experience level would be one thing to
19      look at to determine whether he or she acted
20      reasonably under the circumstances, correct?
21  A.   Yes.
22  Q.   And would having experience with the same or
23      similar hazard prior to the accident be

Page 84

1    something that would provide that operator
2       experience?
3  A.   Yes.  His whole life provides him experience.
4       So other use with the equipment would provide
5       experience.
6  Q.   Okay.  And if other use of the equipment also
7       entailed the same or similar hazard, that would
8       be a factor in determining his experience
9       level, correct?
10  A.   To a degree.
11  Q.   All right.  To a degree.  But that would --
12      that would affect his experience if the person
13      had used the equipment before and had knowledge
14      of a potential hazard, correct?
15  A.   Yes, sir.
16  Q.   All right.  And that operator would have
17      experience if the operator had used the same
18      equipment and had experienced the same or
19      similar hazard, correct?
20  A.   Yes.  Of course, in this case Mr. Riley did not
21      understand that the drill could do the damage
22      that it did.
23  Q.   Okay.  Sure.  And you were standing in his

Page 85

1    shoes on August 28th, 2003, correct?
2        MR. LANE:  Object to the form.
3  A.   No.
4  Q.   Okay.
5  A.   I've read his testimony and seen what his
6      supervisor told him to do.
7  Q.   You've already testified here today -- and you
8      are under oath, correct?
9  A.   Correct.
10 Q.   All right.  And if you want to take any of your
11     statements back, you let me know, but you did
12     say here today that what happened on the first
13     hole with the drill stand spinning around was
14     the same hazard as with the second hole,
15     correct?
16 A.   It involves --
17 Q.   Correct?  Didn't you say that?
18 A.   No.  I've described that the hazard is a
19     complicated series of events that --
20 Q.   You didn't say that it was the same hazard?
21 A.   It's the same physics, but whether or not it
22     does the damage, I've described many times
23     there's an element of luck.  Hazard in the

Page 86

1      field that I'm in normally has three
2      components, source, mechanism and outcome.  The
3      outcome in this case was probabilistic, it had
4      a different outcome in these two events.
5  Q.   So you're saying -- back to your Humvee.  If a
6      Humvee rolls over on accident one, nobody is
7      hurt, it would be a totally different hazard if
8      the Humvee rolled over on day two with another
9      accident but somebody gets hurt?
10 A.   No.  The hazard would depend on what the
11     potential outcome is, not the outcome that you
12     happen to get.
13 Q.   Okay.  I just feel like we're talking in
14     circles.  Didn't you say earlier in this
15     deposition that the drill base spinning around
16     the axis of the drill bit on hole one was the
17     same hazard that occurred with hole two,
18     correct?
19 A.   I think it's the same source and the same
20     mechanism, it's a different outcome.  So to be
21     precise, it is two of the three elements of the
22     hazard were identical, but it had a different
23     outcome.

Page 87

1  Q.   Sure.  Mr. Riley wasn't hurt in hole one?
2  A.   Correct.
3  Q.   And neither was the supervisor, correct?
4  A.   Correct.
5  Q.   All right.  But the hazard was the same,
6      correct, other than the outcome?
7  A.   Other than the outcome, correct.
8  Q.   All right.  And that would be true with the
9      Humvee rollover incident, the hazard was the
10     same, it has the potential to roll over, but
11     the outcome was different with accident two
12     because somebody was hurt, correct?
13 A.   No.  To be precise, the hazard -- you need all
14     three components when you describe the hazard.
15     Simply spinning -- simply binding is not a
16     hazard completely in itself.  Even spinning is
17     not a hazard completely in itself.  But
18     spinning such that it can hit somebody is a
19     hazard.  For instance --
20 Q.   Okay.  All right.  I'm starting to follow you.
21     Are you saying that the spinning of the drill
22     base was acceptable?
23 A.   No.  I'm saying by itself that could be not a

Page 88

1      dangerous condition.  For instance, if this
2      were a remote operation, if you put the drill
3      switch 20 feet away and operated it, spinning
4      is not a dangerous condition.
5  Q.   Okay.  I want to make sure I understand you.
6      What is the drill bit -- excuse me, the drill
7      base made of?
8  A.   Oh, it's metal.  Probably aluminum.
9  Q.   Is it cast iron?
10 A.   It might be.
11 Q.   Have you examined the drill?
12 A.   Yes, I have.
13 Q.   Okay.  When did you examine the machine in this
14     case?
15 A.   I've examined an exemplar, a similar design.
16 Q.   Okay.  Have you actually examined the core
17     drill involved in Mr. Riley's accident?
18 A.   No.  I've watched videotapes of an examination
19     and I've seen still photos, but I haven't seen
20     it myself.
21 Q.   Okay.  And do you know how much the drill base
22     weighs?
23 A.   I don't think I've seen that.  I could estimate

Page 89

1     it, but I don't --
2 Q.   All right. What would you estimate?
3 A.   For the base alone?
4 Q.   Yes, sir.
5 A.   I would estimate maybe 30 or 40 pounds.
6 Q.   Okay. 30 or 40 pounds. And it's metal, you
7     said that, you weren't sure what kind, but it's
8     metal. And do you know the force -- now, I'm
9     not an engineer, but you tell me, the force by
10    which it spun around the drill bit for hole one
11    and hole two?
12 A.   Yes. I need my notes with the red tag on them.
13 Q.   And what I would like for you to tell us is the
14     speed of the revolutions. Was it going ten
15     miles per hour, 20 miles per hour, 30 miles per
16     hour?
17 A.   First, let me find my notebook with the red
18     tab.
19        MR. LANE: Is it in the folder?
20 A.   It might be. That's it right there. Okay.
21     Give me just a moment. It's my understanding
22     that the drill was in the slow speed setting on
23     its transmission, which is 450 RPM. So the

Page 90

1     fastest that it could spin would be 450 RPM,
2     which is seven and a half revolutions per
3     second. When it bound up it would begin at
4     zero and then it would begin to accelerate. I
5     can't tell how much it accelerated by the time
6     it hit him. It would have had a maximum speed
7     of 7.5 RPS.
8 Q.   Okay. What does that mean?
9 A.   Revolutions per second.
10 Q.   Okay.
11 A.   That would have been point 133 seconds. In
12     other words, 13 hundredths of a second per
13     revolution.
14 Q.   That's pretty fast, isn't it?
15 A.   That's very fast.
16 Q.   Okay. And in fact you read the testimony of
17     Mr. Riley, he jumped out of the way and they
18     turned off the machine, correct?
19        MR. LANE: Object to the form.
20 A.   I believe he said that they unplugged the
21     machine -- I'm sorry, Mr. Riley said turned
22     off, Mr. Walters said unplugged. But he was
23     thrown clear or was able to clear it.

Page 91

1 Q.   Okay. But your testimony is that the metal
2     drill base of the core drill spinning around
3     the drill bit at seven and a half seconds you
4     said?
5        MR. LANE: Object to the form.
6 A.   At a maximum. It could go no faster than seven
7     and a half revolutions per second.
8 Q.   And a maximum of seven and a half revolutions
9     per second is not a hazard or a danger?
10 A.   No. With this operator location it is. I'm
11    saying by itself it's not necessarily.
12 Q.   Okay. And you would agree that was not
13    intended by the manufacturer for this product,
14    correct?
15        MR. LANE: Object to the form.
16 A.   No, I disagree. The operation of this product
17     requires you to be within the danger zone of
18     the product.
19 Q.   Okay. So you're saying that the manufacturer
20    intended for the drill base to spin around the
21    axis at up to seven and a half revolutions per
22    second?
23        MR. LANE: Object to the form.

Page 92

1 A.   I have no idea that he intended for that occur.
2     He should have seen that that would occur when
3     binding occurred.
4 Q.   Okay. And what do you base your opinion that
5     the manufacturer should have foreseen it?
6 A.   He's got a very heavy duty motor with a
7     transmission creating 231 foot pounds of torque
8     being held in place by a vacuum that may or may
9     not be effective on any given job location. If
10    the vacuum is effective, this base will retain
11    that force. If the vacuum is lost, it will not
12    retain it and the base will begin to spin.
13 Q.   Okay. And so you're saying that the designer
14     and manufacturer of this product should have
15     foreseen this occurring?
16 A.   Absolutely.
17 Q.   Okay. But you don't believe that the spinning
18     base like happened on hole one was a danger or
19     a hazard?
20 A.   That's not what I said.
21 Q.   Okay. What did you say then?
22 A.   I said the hazard of this product has three
23     components. The source is the heavy duty motor

Page 93

1  creating great torque in a situation that can
2  bind. The mechanism is that with failure of
3  the vacuum system spinning the base. The
4  outcome might be luck, you might be thrown
5  clear or you might not be thrown clear and then
6  be hit by it. That's the hazard.
7  Q.  All right. I will just try to break it down
8  and make it real simple. Is it dangerous for
9  the metal base of the core drill to spin around
10  the axis of the drill bit?
11  A.  With this design, yes.
12  Q.  Okay. For any design, is it safe for a metal
13  drill base to spin around like it did on hole
14  one?
15  A.  As I said, for a human, if you had to have this
16  design for some reason, you could put the
17  operator's controls somewhere else. I've done
18  many remote operations to pull the operator out
19  of the danger zone. There's no reason to do
20  that here, it can be fixed. But you need all
21  three components to understand this hazard.
22  Q.  Okay. But back to my question, and we're going
23  to be here all day long until you answer it.

Page 94

1  Is it a danger --
2      MR. LANE: Object to the commentary.
3  Q.  -- to have the metal drill base spin around
4  like it did on hole one?
5  A.  With this piece of equipment, yes.
6  Q.  Okay. If it hits somebody, it could hurt them,
7  correct?
8  A.  Absolutely.
9  Q.  All right. And you would recommend that the
10  drill base not spin around the axis of the
11  drill bit like it did on hole one, correct?
12  A.  I would recommend the design be such that it
13  insures that it doesn't spin around.
14  Q.  Well, period, you would recommend that the
15  drill base not spin around the axis of the
16  drill bit like it did on hole one on August 28,
17  2003, correct?
18  A.  I can't recommend what a base does. What I can
19  recommend is the design be changed such that
20  the base follows the laws of physics.
21  Q.  Well, I'm going to ask it again. Don't you
22  recommend that the drill base not spin around
23  the axis of the drill bit like it did at hole

Page 95

1  one on August 28, 2003?
2  A.  I recommend that the design be such that it
3  prevents the drill base from spinning like it
4  did.
5  Q.  Okay. Well, forget the design in general. I
6  mean, are you saying that it didn't matter
7  whether in drilling hole one that the drill
8  base became free from the work surface and spun
9  around the axis of the drill bit?
10  A.  No, I'm not saying that.
11  Q.  Okay. And so you do recommend that that
12  spinning of the drill base should have been
13  stopped?
14  A.  We can agree on those words, yes.
15  Q.  Okay.
16  A.  There we go.
17  Q.  All right. And that was something that was
18  dangerous, correct?
19  A.  Spinning of the base with this unit is
20  dangerous, I agree.
21  Q.  Okay. Now, this accident never would have
22  happened if anchor bolts had been used,
23  correct?

Page 96

1      MR. LANE: Object to the form.
2  A.  Well, it depends on how well the anchor bolt
3  was restrained.
4  Q.  Have you seen how that's done?
5  A.  I've seen how it's done on the unit. But, for
6  instance, if the anchor bolt put into the
7  concrete is not deep enough, such as at the
8  tunnel up in Boston, anchor bolts can fail, in
9  other words. That didn't happen in this
10  accident, an anchor bolt wasn't involved. But
11  if an anchor bolt had been used and it had not
12  come loose, it would have kept the base from
13  spinning, I would agree.
14  Q.  All right. And you would agree that using a
15  mechanical faster such as anchor bolts to
16  secure the metal base of this drill would be a
17  proven way to secure the drill?
18      MR. LANE: I'm going to object to the
19      form, but go ahead.
20  A.  You can -- I'm sure you can secure the base
21  with an anchor bolt given sufficient depth and
22  strength.
23  Q.  Okay. Well, you referenced a failure of anchor

Page 97

1   bolts, so I want to make sure I understand.
2       You're not saying that in general anchor bolts
3       fail?
4   A.   Anchor bolts can fail.
5   Q.   Sure.
6   A.   They have to be designed just like a vacuum
7       system.
8   Q.   Okay.  But in this case you've not analyzed the
9       anchor system by use of anchor bolts to secure
10      the drill base?
11  A.   That's correct.
12  Q.   All right.  And you would agree it was not
13      attempted or done in this case, correct?
14  A.   That's correct.
15  Q.   All right.  And if Mr. Walters, the supervisor,
16      and if Mr. Riley, the maintenance employee, had
17      used anchor bolts, you don't have any opinion
18      one way or another whether that would have
19      prevented the accident, is that what you're
20      saying?
21  A.   I believe it would have prevented the accident
22      if it was sufficiently strong.
23  Q.   Okay.  And that is one accepted method to

Page 98

1       secure the core drill to the base of a work
2       area, correct?
3   A.   That's one of three methods recommended by the
4       manufacturer.
5   Q.   Okay.  Which one would you recommend be used of
6       the three?
7   A.   In this case?
8   Q.   In this case.
9   A.   In this case the vacuum is a reasonable way,
10      because it doesn't require you damaging the
11      floor, which you would prefer not to do
12      especially in a hygienic environment.
13  Q.   Okay.  Well, what is the most common way, if
14      you know, to secure the core drill to the
15      floor?
16  A.   I've seen core drills used with a vacuum and
17      I've seen core drills used with braces from
18      above.  I don't recall seeing them with anchor
19      bolts.  I may have.
20  Q.   All right.  In what other situations have you
21      seen core drills being used?
22  A.   I recall an outdoor use drilling holes in a
23      sidewalk and I recall an indoor use with a

Page 99

1       brace from above.
2   Q.   Okay.  With regard to the core drill being used
3       on a sidewalk, was it being secured to the
4       floor by a vacuum system or some other system?
5   A.   I believe a vacuum system, because I didn't see
6       any anchor bolts after it was moved.
7   Q.   Okay.  What --
8   A.   It could have been weight.  It was a very large
9       machine.  I just don't recall anchor bolts
10      being used.
11  Q.   What factors influence whether the vacuum
12      system will effectively secure a core drill to
13      the ground?
14  A.   The degree of vacuum maintained in the vacuum
15      chamber is the primary factor.  The coefficient
16      of friction between the gasket and the concrete
17      would be another.
18  Q.   Okay.  What factors would influence the
19      coefficient of friction?
20  A.   The material that the gasket is made of is one
21      of the principal ones.  The material that it's
22      resting on could effect it.
23  Q.   Okay.  What about the condition of the floor,

Page 100

1       would that effect it?
2   A.   Yes.
3   Q.   Okay.  What about whether the floor was wet,
4       whether it was greasy, would those factors
5       influence whether the vacuum system was
6       effective to hold the drill to the floor?
7   A.   They could in extreme situations.
8   Q.   Okay.  What about whether the operator was
9       standing on the drill base, would that effect
10      whether the vacuum system was working or not?
11  A.   Yes.  In my testing of the exemplar, it
12      required standing on it to get it to suck down
13      and work.  The manual on the -- the new manual
14      on the equipment in fact recommends you do
15      that.
16  Q.   Okay.  Which manual is that?  Where is that?
17  A.   I have a folder entitled "Manuals."
18  Q.   You're saying that a new operators manual for
19      this product recommends that the user actually
20      stand on the drill base?
21  A.   Yes, sir.  In order to set the vacuum.  Step
22      six of the new manual says "Plug the vacuum
23      pump into the power source, the pump will start

Page 101

1    automatically.  Step on the vacuum pad or the
2    vacuum pad stud until the vacuum pad lowers and
3    adheres to the work surface."
4  Q.   Let me see what you're looking at.  Oh, okay.
5       That's why we have to look at this.  You're
6       referring to the Milwaukee operators manual?
7  A.   That's how it's labeled, yes.
8  Q.   Okay.  And this is a new manual and by that
9       you're saying that it post-dates the accident
10      in this case?
11 A.   That's my understanding.
12          MR. LANE:  It came with the exemplar,
13              that's what he's referring to.
14 Q.   All right.  But this manual was not published
15      by Diamond Products, for example?
16 A.   I don't know that.
17 Q.   Okay.  Who designed and manufactured the
18      product involved in this case, do you know?
19 A.   Norton is on the label.  I understand there are
20      a number of different corporate relations, I
21      don't know what they are.
22 Q.   Okay.  But you've not seen a manual that came
23      with the DM500 core drill involved in this case

Page 102

1       that recommended an operator stand on the drill
2       base to activate the vacuum pressure?
3  A.   No.  The manual that I understand came with
4       this unit in fact does not have the warnings
5       that the new manual has and says never stand on
6       the drill base as a method of securing the
7       drill stand.
8  Q.   Okay.  Do you agree with that?
9  A.   Actually probably not.  I think the drill is
10      going to turn so fast that there's no safe
11      place that you can stand and not be hit by the
12      drill as it breaks loose.  So standing on it
13      gives it a little extra strength, makes it a
14      little more likely that you will be thrown
15      clear.  It may be the safest place to be.
16 Q.   Okay.  And so by your answer I take it that
17      you're assuming that this spinning phenomenon
18      is a common occurrence?
19 A.   I believe it will occur from time to time, yes.
20 Q.   Okay.  And, again, you don't have any reports
21      or any written material to back that up,
22      correct?
23 A.   I don't have any performance reports on the

Page 103

1       drill.
2  Q.   Okay.  So your testimony would be you would
3       recommend an operator to stand on the base of
4       the drill?
5  A.   I would recommend this drill nobody use.  If
6       you had to use it, probably the safest place to
7       be is on the base of the drill.
8  Q.   All right.  Now, in this case have you --
9          MR. LANE:  Off the record.
10         (Off-the-record discussion.)
11 Q.   Now, you testified about how you would analyze
12      operator's performance in an accident and you
13      gave me essentially three or four criteria; one
14      is the role of the operator, one is whether he
15      was sufficiently trained, another is whether
16      the operator followed his or her supervisor's
17      instructions, and I think you said one other
18      element and I didn't write it down.
19 A.   I don't recall.
20 Q.   Okay.  Have you written any papers or published
21      any materials that set out your views on an
22      operator's role in an accident?
23 A.   I don't recall publishing any papers about

Page 104

1       that.  I have worked on several tasks force
2       that dealt with that issue.  The ASIT was one.
3  Q.   The ASIT?
4  A.   Aviation Safety Investment Team, I believe it
5       was.
6  Q.   Okay.  Is that listed in your resume?
7  A.   I don't know.  That was an Army group.  We
8       looked at all of the Army aviation accidents
9       over a five year period and found that a number
10      of them had been blamed on pilot error when in
11      fact we found underlying causes that induced
12      those pilot errors.
13 Q.   Okay.  Have you ever done any accident
14      investigation and found that the operator was
15      in error which contributed to cause the
16      accident?
17 A.   I'm sure I have.  The ones that occur to me now
18      we found engineering causes for.  There have
19      been automobile accidents involving Army
20      personnel that -- a man turned in front of an
21      oncoming truck, I recall that.
22 Q.   Okay.  And that was blatent obvious error on
23      the operator, right?

Page 105

1  A.   That was an error on his part. We found that
2     the vehicle itself wasn't crashworthy enough
3     and we shifted the rental cars that our people
4     had to more crashworthy vehicles.
5  Q.   Okay. Well, let me back up. So you're saying
6     that you've never found operator error as the
7     sole cause of an accident?
8  A.   I wouldn't say that. I'm thinking on --
9     certainly there have been aviation accidents
10    that were purely operator error, I can think of
11    those. So I would not say that, no.
12 Q.   Okay. How many cases have you been involved
13    with in terms of accident investigation?
14 A.   I couldn't even estimate. In 34 years, I
15    think, of doing this it would be --
16 Q.   Just a rough estimate, you know, a hundred, a
17    thousand?
18 A.   Involved in would maybe be in the thousand
19    range.
20 Q.   A thousand. So how many times have you found
21    operator error as a factor in causing the
22    accident?
23        MR. LANE: Object to the form.

Page 106

1  Q.   I think you mentioned one?
2  A.   Yes. I don't keep that kind of track.
3     Typically there are several factors involved.
4     Sometimes those involve humans and sometimes
5     they don't. I don't keep track of it that way.
6  Q.   All right. Other than the aviation incident, I
7     think you said that y'all found that the pilot
8     was in error and that caused the accident,
9     correct?
10 A.   I have been involved in aviation accidents
11    where pilots were hot rodding and caused
12    accidents, I recall that.
13 Q.   Okay. Can you identify any other accident
14    investigations wherein you found that the
15    operator was responsible or had -- or made
16    errors that led to the accident?
17 A.   Oh, many times operators have made errors that
18    were part of the accident sequence, but as far
19    as solely responsible, I recall automobile
20    accidents, the one that I mentioned turning in
21    front of oncoming traffic. There was another
22    automobile accident that involved crossing over
23    a median, which was a human error. We thought

Page 107

1     sleep deprivation may have contributed to that.
2     So those are there. There have been operator
3     errors involved in many accidents that I am
4     involved with.
5  Q.   All right. What about workplace safety
6     situations, have you ever investigated -- well,
7     I'm sure you have investigated accidents that
8     involve workplace safety, correct?
9  A.   Yes.
10 Q.   Okay. And what responsibilities do workers
11    have to be safe?
12 A.   They should be prudent and careful and follow
13    procedures that are established for their work.
14    They should exercise reasonable precautions and
15    perform as well as they can.
16 Q.   Okay. What procedures do you recommend as a
17    safety engineer an employer like Flavor House
18    have to protect workers from accidents?
19        MR. LANE: I object to the form.
20 A.   They should have a safety program with their
21    safety policies and procedures. They should
22    have safety procedures for their fixed
23    operations. They should have safety training

Page 108

1     as appropriate for their workers. They should
2     have an incident reporting system. There are a
3     number of steps that go into a safety program.
4  Q.   Okay. And what specific procedures should an
5     employer like Flavor House have when an
6     operator uses a machine or piece of equipment
7     and they feel like it might not be safe?
8  A.   If Flavor House feels like it might not be
9     safe, they should not ask the operator to use
10    it.
11 Q.   Okay. Well, what if they don't know that and
12    they have workers in the field using a machine
13    or piece of equipment and they discover in the
14    field that it may not be safe; what procedures
15    should be in place to instruct that worker or
16    those workers what to do in such a scenario?
17 A.   Flavor House should have a policy that says if
18    you become aware of a safety violation, stop
19    work.
20 Q.   Okay. What can be done to a machine or piece
21    of equipment physically to indicate that it
22    shouldn't be used? Is there a lock-out method
23    that should be employed or a tag-out method?

Page 109

1    What in your opinion, as a safety engineer,
2    should be done?
3  A.   If you discover an unsafe piece of equipment,
4    it should be preferably locked out, but at
5    least tagged out. And I like to tag it out and
6    put it in a locked room.
7  Q.   Okay. And then what would be the next step
8    that an employer should do if it has such a
9    situation such as when a product is tagged out
10   or locked out?
11 A.   That would depend completely on the equipment.
12   You might -- if it were just a maintenance
13   issue, you might throw the equipment away and
14   buy a new one. If it were rental, you might
15   talk to the rental company. It just depends on
16   the situation.
17 Q.   Okay. You just mentioned talking to the rental
18   company. What procedures specifically should
19   govern how an employer like Flavor House would
20   relate to a rental company in terms of safety?
21 A.   There are a number of elements to that. If
22   they discover that the rental company had
23   delivered an unsafe piece of equipment, they

Page 110

1    would tag it out, call the rental company and
2    ask for it be picked up and a safe piece of
3    equipment brought.
4  Q.   Okay. And do you know whether in this case,
5    for example, Flavor House had rented other
6    pieces of machinery from United Rentals?
7  A.   I believe that they had.
8  Q.   Okay. And do you know whether United Rentals
9    has an 800 number to provide customers like
10   Flavor House with technical support?
11 A.   They have an 800 number. It's not clear to me
12   how much technical support they have. I don't
13   know.
14 Q.   Okay. That's just something you don't know?
15 A.   Yes.
16 Q.   Okay. And you don't know if they could have
17   sent a technician to Flavor House to help out
18   with training or operation of the DM500 core
19   drill?
20 A.   Well, the United personnel that were available,
21   one had not read the manual at all, in general
22   they did not understand the safety issues with
23   this piece of equipment. I haven't seen

Page 111

1    anybody there sufficiently understanding of the
2    hazard to have been of much use.
3  Q.   Okay. What do you know about the rental
4    history of this particular core drill prior to
5    the date of the accident?
6  A.   It had been rented a number of times. We have
7    the documentation to whom that was.
8  Q.   Okay. And with regard to any of those prior
9    rentals, is there any indication that the DM500
10   core drill had not operated as intended?
11 A.   I have no data that says how it operated one
12   way or the other.
13 Q.   All right. And you've not seen anything that
14   suggests that any of the prior rentals of the
15   core drill involved in this case failed to
16   operate as intended, correct?
17 A.   That's correct.
18 Q.   All right. Do you know whether anyone at
19   Flavor House requested the operators manual on
20   the core drill involved in this case?
21 A.   I have not seen that they did.
22 Q.   Okay. And do you know whether the employee at
23   Flavor House who actually picked up the core

Page 112

1    drill signed paperwork saying that they
2    understood how to use it?
3  A.   I think the drill was delivered, but paperwork
4    was signed that said something like that on the
5    back, I think.
6  Q.   Okay. And I'm just paraphrasing, but someone
7    at Flavor House did sign a rental contract or
8    some type of rental paper associated with the
9    core drill saying that they understood how to
10   safely use and operate the tool, correct?
11 A.   I believe the testimony is that they did sign
12   for it like you sign for packages and they
13   thought it was just a signature saying that
14   it's here.
15 Q.   Okay. But Flavor House had used core drills
16   previous to August 28, 2003, correct?
17 A.   Personnel at Flavor House had, yes.
18 Q.   So they had experience with the same product as
19   involved in this case, correct?
20 A.   I don't know if it was the same product or not.
21 Q.   Okay. But similar products?
22 A.   Yes.
23 Q.   Okay. And you've seen and read testimony

Page 113

1  whereby Flavor House stated that they had used
2  core drills on prior occasions --
3  A.  Yes.
4  Q.  -- at this same facility in Dothan, Alabama?
5  A.  Yes.
6  Q.  Okay.  Have you done any investigation to
7  determine whether in those situations the
8  operator was trained, whether they used the
9  product as intended, how they secured the base,
10  did the base spin?  Have you answered any of
11  those questions?
12  A.  I haven't seen any reports of base spinning.
13  Mr. Walters had used several different models
14  of core drills to include in the -- yes,
15  Mr. Walters, to include in the military and he
16  had a variety of experiences with those.
17  Q.  All right.  So you would conclude that Flavor
18  House was knowledgeable as of the day of this
19  accident as to how to use machinery and
20  equipment including a core drill?
21      MR. LANE:  Object to the form.
22  A.  I haven't seen anyone at Flavor House that
23  understood the danger of the fact of how much

Page 114

1  damage this base could cause if it were to
2  bind.  They seemed -- the Flavor House
3  employees that I've read the testimony of
4  seemed to understand that it could come loose,
5  but they didn't understand how much damage it
6  could do.
7  Q.  Okay.  But they had used core drills before,
8  correct?
9  A.  Yes.
10  Q.  And they did not have any injuries from those
11  core drills, correct?
12  A.  Correct.
13  Q.  Have you been to the Flavor House manufacturing
14  plant?
15  A.  No, I have not.
16  Q.  Okay.  And you would agree though that they use
17  a whole host of different kinds of machinery
18  and equipment?
19      MR. LANE:  Object to the form.
20  A.  I've seen equipment in photographs and I would
21  assume that type of plant does.
22  Q.  Okay.  And they have a Maintenance Department,
23  correct?

Page 115

1  A.  Yes.
2  Q.  And you've seen testimony whereby the
3  Maintenance Department uses a variety of
4  machinery and equipment, correct?
5  A.  I assume they do.  I don't recall that
6  testimony, but that sounds consistent.
7  Q.  All right.  Would you not conclude that Flavor
8  House was knowledgeable as of the date of this
9  accident in general as to the use and operation
10  of machinery and equipment?
11  A.  Mr. Walters seemed to have experience with
12  industrial equipment.  I see no indication that
13  he knew the proper vacuum level that was
14  required on the equipment.
15  Q.  No, listen to my question.
16  A.  Okay.
17  Q.  In general wouldn't you agree that Flavor
18  House, the employer of Mr. Riley in this case,
19  was knowledgeable in general about the
20  operation and use of machinery and equipment?
21      MR. LANE:  Object to the form.
22  A.  I can't answer that general of a question.  If
23  you brought in a laser welding machine, I would

Page 116

1  say no; a tig welder, they might not, depending
2  on --
3  Q.  I'm saying in general you agree they use
4  machinery and equipment at Flavor House?
5  A.  Yes.
6  Q.  Okay.  You've not seen the plant though,
7  correct?
8  A.  Correct.
9  Q.  But you know they've got three shifts of the
10  Maintenance Department, I mean, that they're
11  working 24 hours a day, seven days a week,
12  wouldn't you agree?
13      MR. LANE:  Object to the form.
14  A.  My memory is their production was not 24/7, but
15  it may be.
16  Q.  Okay.  But Mr. Riley, what shift was he on in
17  this case?
18  A.  He started at 11:00, I believe that was shift
19  two.
20  Q.  All right.  And Mr. Riley testified that he
21  used different types of machinery and equipment
22  at Flavor House, correct?
23  A.  Yes.

Page 117

1  Q.  All right.  And Mr. Walters testified to that,
2      correct?
3  A.  I believe so, yes, sir.
4  Q.  Okay.  And based upon what you've read and the
5      testimony you've seen, wouldn't you conclude
6      therefore that Flavor House, at the time of
7      this accident, had knowledge in general about
8      the use and operation of machinery and
9      equipment?
10 A.  They used industrial equipment.  Depending on
11     the type of equipment, that answer might be yes
12     or no.  There are certainly industrial
13     equipment that they would not have experience
14     with and there are some that they did.
15 Q.  Well, I'm not talking about specific, I'm
16     talking about in general.  This is an employer
17     that has a Safety Department, correct?
18 A.  Yes.  Safety person.
19 Q.  A safety person.  Well, a Safety Department,
20     that's what they testified to?
21 A.  I don't recall if it was called a department or
22     not.
23 Q.  Okay.  Well, they had, as of August 28, 2003, a

Page 118

1      Safety Director, correct?
2  A.  They had a safety -- yes, he was filling in as
3      Safety Director.
4  Q.  Okay.  And you know, of course, that they have
5      a Maintenance Department?
6  A.  Yes.
7  Q.  And you know they had rented core drills on
8      prior occasions, correct?
9  A.  Yes.
10 Q.  All right.  And they use forklifts there, you
11     know that, correct?
12 A.  Yes.
13 Q.  All right.  And based upon your experience for
14     many years as a safety engineer, you know that
15     manufacturing plants like Flavor House use a
16     variety of machinery and equipment, correct?
17 A.  Not necessarily.  There are industries that use
18     fixed equipment and rarely change, their
19     production line is the same from
20     day-to-day-to-day.  There are other types of
21     industries that have a variety of changes in
22     equipment.  So it would depend on the industry.
23 Q.  Okay.  And so you believe therefore in this

Page 119

1      case that Flavor House, as the employer, did
2      not have knowledge about the proper use of
3      machinery and equipment in general?
4          MR. LANE:  Object to the form.
5  A.  I can't answer that question because you're not
6      specific to the type of equipment.  There are
7      certain --
8  Q.  What about forklifts?
9  A.  They used forklifts, so I assume that they knew
10     how to use them.
11 Q.  Okay.  What about core drills, they had used
12     core drills?
13 A.  They had.
14 Q.  Excuse me?
15 A.  They had, yes.
16 Q.  They had.  And so based on the same premise
17     would you assume they knew how to use core
18     drills?
19 A.  The testimony is that they did not.  They did
20     not know the safety features of this core drill
21     that were required to perform --
22 Q.  Whose testimony?
23 A.  Mr. Walters and Mr. Riley, two Flavor House

Page 120

1      employees, for instance, did not know the
2      vacuum that was required to secure the base of
3      this unit.
4  Q.  Okay.  Even though it became unsecured from the
5      floor?
6          MR. LANE:  Object to the form.
7  Q.  Doesn't that tell you that the vacuum didn't
8      work?
9  A.  That tells you that the vacuum did not work, so
10     they took action to make it work better.
11 Q.  All right.  So you would agree to that, that
12     you don't have to be warned or told or
13     instructed that when the base became
14     disconnected from the floor, the vacuum didn't
15     work in that instance, correct?
16 A.  No, I don't think that you can draw that
17     conclusion.  You would need to know --
18 Q.  If this thing lifted off, you wouldn't say it
19     came disconnected from the table?
20         MR. LANE:  Object to the form.
21 A.  The fact that the base moved does not
22     automatically mean that the vacuum failed until
23     you know the design.  The clutch could have

22  (Pages 117 to 120)

Page 121

1    failed, for instance.
2  Q.   Let me back up.  You're saying that as to the
3    first hole when the drill base became
4    disconnected from the floor and spun around,
5    that doesn't indicate that the base lost its
6    vacuum pressure and in fact became unsecured
7    from the work surface?
8         MR. LANE:  Now, that's a different
9             question.
10 A.   That is.
11 Q.   Well, if I'm asking it different, I apologize.
12 A.   I believe the base spinning is an indication
13    that it lost vacuum and became unsecured.
14 Q.   Sure.
15 A.   That's not the only thing that could cause a
16    base to spin, depending on the torque available
17    at the clutch would be one thing.  Now, knowing
18    the design, I believe that in this case the
19    vacuum had to be lost for this base to spin.
20 Q.   Okay.  And that was evident to Mr. Walters and
21    Mr. Riley when the base became disconnected
22    from the floor, correct?
23         MR. LANE:  Object to the form.  What

Page 122

1             was evident?
2  Q.   That it was not secure.
3  A.   They realized it was not secure and took steps
4    to make a better vacuum.
5  Q.   Okay.  By standing on it?
6         MR. LANE:  Object to the form.
7  A.   No, by removing the unit, cleaning the floor
8    again, checking it, making sure the gasket was
9    good, and then putting their weight on it.
10 Q.   Okay.  Now, what operator error do you see in
11    this case?  And by operator I'm going to
12    include Mr. Walters with Mr. Riley.
13 A.   Operator error that contributed to the
14    accident?
15 Q.   Operator error, period.
16 A.   Let me check the manual.  Based on the
17    testimony, I'm not aware of any operator error
18    directly.  The piece that comes closest is this
19    statement of "never stand on the base as a
20    method of securing the drill stand."  I don't
21    believe they were using that as a method; they
22    were using that as an additional method.  They
23    had the vacuum on, they weren't relying on

Page 123

1    their own weight alone, so I don't think even
2    that they violated.  So I don't think there was
3    any operator error.
4  Q.   Sure, I expected you to say that.  What about
5    the water, was that correctly applied?
6  A.   I believe it was.  We have two different
7    testimonies on that, but Mr. Walters says very
8    clearly that he attached the hose to the
9    connector.  The location of the connector after
10    the accident is consistent with being pulled
11    out of alignment up against the vertical arm of
12    the device.
13 Q.   But Mr. Riley didn't testify to that, did he?
14 A.   No.
15 Q.   Okay.  He testified that he laid the hose on
16    the floor, didn't he?
17 A.   He thought it was laying on the floor, that's
18    correct.
19 Q.   Not what he thought, that's what he testified
20    under oath like you are here today, correct?
21 A.   Yes.  But Mr. Walters testified under oath that
22    he personally connected the hose.
23 Q.   Okay.

Page 124

1  A.   Which is of more importance to me.
2  Q.   Well, he also testified that he used the
3    leveling screws, didn't he?
4  A.   Yes, he did.
5  Q.   And he also testified that he had a good vacuum
6    on the ground, did he not?
7  A.   He thought he did.  Neither of them could tell
8    what a good vacuum was because the gauge is not
9    labeled.
10 Q.   Okay.  And so -- now, what about the water on
11    the floor?  If the hose was not connected to
12    the inlet adapter on the core drill, but rather
13    laid on the floor by the drill, do you think
14    that was operator error?
15 A.   If that was done, it might have put less water
16    in the hole and could have worn the teeth on
17    the drill bit and I would rather they connect
18    it up top.  I don't think that would have
19    played a role in the accident.  Water would
20    have been on the floor which aids in the
21    vacuum, which is a good thing.
22 Q.   Okay.  And you've already stated that standing
23    on the drill base was not operator error?

Page 125

1   A.   In my opinion, no.
2   Q.   Okay.  What about using a drill bit that had
3        segments of the drill missing, would that be
4        operator error?
5   A.   The photographs that I've seen indicate that
6        the drill that was in use did not have segments
7        missing.  If there were segments missing, that
8        could slow down the use of it.  The rental
9        company thought it was a good enough drill bit
10       for them to use, they relied on that.  I don't
11       have any data that tells me what a missing
12       tooth would do to the speed of drilling.
13  Q.   Okay.  What about not reading warnings or the
14       operator manual, would that be operator error?
15  A.   Well, they weren't given the manual, so they
16       didn't have that option.  So I don't consider
17       that operator error.
18  Q.   So you don't put any responsibility on the
19       operator is what you're saying?
20  A.   No, I put a lot of responsibility on him.  I
21       don't see that he did anything other than what
22       I would expect him to do.
23  Q.   Okay.  He shouldn't ask to see the operators

Page 126

1        manual?
2             MR. LANE:  Object to the form.
3   A.   The operator -- Mr. Riley or Mr. Walters didn't
4        have that opportunity.  United --
5   Q.   That's not my question.  Should an operator ask
6        to see the manual?
7             MR. LANE:  Object to the form.
8   A.   Mr. Riley should do what his supervisor says.
9   Q.   Well, should the supervisor ask to see the
10       manual?
11  A.   If he had known that there was something unique
12       here that he needed to know about, what -- the
13       correct level of vacuum, for instance, which
14       even that is not in the manual.
15  Q.   All right.  Back to the supervisor, you said he
16       should do what the supervisor does.  So
17       regardless of what the supervisor does, the
18       operator should follow, correct?
19  A.   Within reason.
20  Q.   Okay.  We're using reason now.  So within
21       reason.  So within reason Mr. Riley should
22       follow instructions of his supervisor,
23       Mr. Walters?

Page 127

1   A.   Yes.
2   Q.   Okay.  But if he sees the drill base spinning
3        around at seven and a half seconds maximum RPS,
4        he shouldn't do anything to safeguard his own
5        safety, correct?
6             MR. LANE:  Object to the form.
7   A.   No, that's not correct.  The speed of the unit
8        is not correct.  He should take action.  They
9        took actions to better secure the base.
10  Q.   Of course, you know now the base wasn't
11       secured, don't you?
12            MR. LANE:  Object to the form.
13  A.   At some point it became unsecure.
14  Q.   Okay.
15  A.   And they would not have any notice of that,
16       because the unit gave no feedback that it had
17       become unsecured.
18  Q.   Even though you've already testified under oath
19       today that the same thing happened on the first
20       hole, you say they didn't have any notice of
21       it?
22  A.   They had notice on the first hole that it
23       became unsecured.  On the second hole they

Page 128

1        didn't have notice that it was becoming
2        unsecured before the accident.
3   Q.   Okay.  I guess we're talking in circles again,
4        so I will leave that alone.  Are there any
5        written materials that set out the procedures
6        for operator safety?  And you provided some of
7        those here today, but are there any
8        publications, articles or treatises that deal
9        with that issue?
10  A.   In the broad sense of all operators?
11  Q.   In terms of accident investigation?
12  A.   Yes.
13  Q.   I don't want to go back into it, but you've
14       laid out these elements on how to analyze
15       operator's performance in an accident and I
16       want to know whether or not there's any written
17       information on that subject?
18  A.   Yes.
19  Q.   One way to ask that is, you know, what's the
20       basis of your testimony about operator safety?
21  A.   Across the entire spectrum of the safety
22       engineering publications, to include the
23       Accident Prevention Manual of the National

Page 129

1  Safety Council, the order of design priority
2  for controlling hazards is laid out. And it
3  varies slightly on wording, but the first most
4  reliable method of controlling is to design it
5  for minimum risk. Next most effective is
6  incorporating safety devices. Third is
7  providing warning devices. Fourth is
8  developing and implementing procedures and
9  training programs. And last is personal
10  protective equipment. So PPE and reliance on
11  training operators and controlling their
12  procedures are the two least effective means of
13  stopping an accident. And that is consistent
14  in all of the articles that I've brought.
15  Q.  Oh, sure I've heard all of that before. But if
16  a product has a reliable and safe design
17  without any prior notice of any incidents or
18  accidents like in this case, don't you then go
19  down to the last two elements, which is
20  training, supervision and operator safety?
21       MR. LANE:  Object to the form.
22  A.  If a product has a safe design, then you don't
23  need to rely on training or personal protective

Page 130

1  equipment.
2  Q.  What about aircraft? I mean, I thought you
3  said that some things are specialized and you
4  need to know how to use it before you can --
5  A.  That's correct. If there's an uncontrolled
6  hazard, such as stalling of an aircraft, for
7  instance, that can't be controlled by design,
8  then you have to have training programs to
9  prevent that.
10  Q.  Are you saying that even in this case if the
11  redesign is implemented, that operators don't
12  have to have any training with respect to the
13  core drill?
14       MR. LANE:  Object to the form.
15  A.  If the design -- no, you would still need
16  training for other hazards. This hazard would
17  be taken care of by redesign.
18  Q.  Okay. And so you're not saying that training
19  is not needed for the use of industrial
20  equipment?
21  A.  No.
22  Q.  I mean, that would be silly, wouldn't it?
23  A.  No, it depends on the equipment. When you buy

Page 131

1  a ballpoint pen, there's no training given to
2  you.
3  Q.  Okay. Well, let's don't get silly. We're
4  talking about industrial equipment and
5  machines. You would agree that training is
6  necessary, correct?
7  A.  On most of the equipment I can think of, yes.
8  Q.  Okay. And especially with regard to a core
9  drill whereby a motor is drilling a drill bit
10  into a concrete surface, correct?
11       MR. LANE:  Object to the form.
12  A.  I would agree that you need some training. A
13  person off the street with zero training should
14  be shown how to operate it safely.
15  Q.  All right. Now, I think I asked you about the
16  criteria for operator safety and you pointed me
17  to the manual about the design parameters.
18  Back to my question. Is there any -- what is
19  your basis for rendering the opinions about the
20  criteria for operator safety?
21  A.  The basis is the fact that time has shown
22  conclusively that relying on operator
23  procedures to control a design hazard is an

Page 132

1  ineffective means of doing that.
2  Q.  Well, that's not what I asked you.
3       MR. LANE:  Are you talking about in
4       this specific case, Robert?
5  Q.  Well, he testified -- it's going to be a long
6  deposition. That's okay. In the investigation
7  of an accident, sir, do you remember we talked
8  about that?
9  A.  Yes, I do.
10  Q.  We talked about operator's performance and you
11  laid out three or four points or criteria,
12  correct?
13  A.  Yes.
14  Q.  And I want to know the basis for your testimony
15  for your opinions about the role of the
16  operator and whether the operator was
17  sufficiently trained and whether the operator
18  followed instructions and all of those points
19  about you, as a safety engineer, investigating
20  the accident and looking at the operator's
21  performance? Is there written information on
22  that? Is there a treatise? Is there some OSHA
23  handbook?

Page 133

1  A.   Yes, if you're now talking about accident
2       investigation, I'm sorry, I didn't understand
3       that.  The way to treat operator error in
4       accident investigation is covered in various
5       investigation books.  I don't have any with me
6       today.  NTSB has guidance on it; the National
7       Safety Council has guidance on it.
8  Q.   Okay.  Well, what I need to know is specific
9       cites so that I can go to them, because you've
10      given me opinions and you're saying it's based
11      on something, so I want to know.  You said N --
12 A.   National Transportation Safety Board.
13 Q.   Okay.
14 A.   I've been to classes of theirs and they have
15      forms, which I don't know the numbers of, that
16      identify elements to consider in an accident
17      investigation, such as power plant performance,
18      weather, human performance and others.  So
19      that's an example of places where that's called
20      out.
21 Q.   All right.  What else?  You said something
22      other than the NTSB?
23 A.   I believe the National Safety Council and the

Page 134

1       training that I've had on accident
2       investigation includes a list of factors to
3       consider.
4  Q.   All right.
5  A.   The other companies, I believe one in Knoxville
6       called Fault something, Fault Ease, I believe,
7       does similar training.  So whenever I've been
8       to courses in accident investigation, they
9       typically have checklists of elements to
10      consider.
11 Q.   Okay.  Have you ever been involved in an
12      accident investigation involving industrial
13      equipment or machinery wherein the operator
14      stated that he knew that the product could be
15      unsafe in this manner and that -- and that
16      hazard that he knew about caused the accident?
17      Have you ever been involved in a case like
18      that?
19           MR. LANE:  Object to the form.
20 A.   I don't agree that Mr. Riley knew --
21 Q.   No, no, no, no, no.  Here we go again.  I'm
22      asking you about other cases.  Have you ever
23      been involved in any cases -- and if I

Page 135

1       mentioned the Riley case, I apologize, but I'm
2       putting the Riley case aside.  Have you ever
3       been involved in an accident investigation
4       wherein you found that the operator knew about
5       the hazard, understood it, and that hazard is
6       what caused the accident?
7  A.   Yes.
8  Q.   Okay.  And what case was that?
9  A.   I mean, just right off the top we've named the
10      automobile accident where the operator turned
11      in front of an oncoming truck; I have no doubt
12      that he understood that if he were hit that
13      would be a --
14 Q.   Well, that made it easy for you, there was
15      intentional screw-up and that was obvious to
16      anybody, wouldn't you agree with that, if
17      somebody turns in front of the traffic?
18           MR. LANE:  Object to the form.
19 A.   No, there were reasons for that.  The sun, I
20      believe, was in his eyes and other issues that
21      caused him to misjudge it we believed.
22 Q.   Okay.
23 A.   The aircraft accident that I talked about with

Page 136

1       the --
2  Q.   And that was where the person was hot rodding?
3  A.   Hot rodding.  I have no doubt they knew that if
4       you exceeded the bank limits on the helicopter
5       that it would lose lift.  They probably -- they
6       died, so we don't know.  They probably thought
7       they weren't going to exceed bank limits.
8  Q.   Okay.  Any other situations where you felt
9       operator error in terms of the operator
10      understanding the hazard and that hazard
11      causing the accident?  You mentioned three.
12 A.   No.  Very frequently operators think they
13      understand the hazard and don't fully
14      understand the degree and severity of the
15      injury or the likelihood.  So they know that
16      something can happen, but they don't know how
17      likely it is or how bad it's going to be if it
18      does happen.  That's a common occurrence.
19 Q.   A common occurrence.  Now, what gives you the
20      expertise to sort of dig in somebody's mind and
21      testify about what they knew or didn't know?
22 A.   Having interviewed hundreds and hundreds of
23      accident victims and read depositions of even

Page 137

1    more, I believe I've seen quite a bit of what
2    people knew at the time of an accident.
3  Q.   Okay.  So you've named three cases so for.
4    Now, in general would you point to operator
5    error as the cause of the accident if the
6    operator knew about the hazard, knew about the
7    danger, but proceeded anyway to use the machine
8    or piece of equipment despite that knowledge?
9  A.   If he knew about the hazard, knew the severity
10    of what would occur and the likelihood of it
11    occurring, then intentionally caused it to do
12    the thing that would damage him, yes, I would
13    consider that suicide.
14 Q.   Suicide.  Well --
15        MR. LANE:  In a general sense, I'm
16    sure.
17 Q.   I'm talking about operator error.  You would
18    consider that to be operator error, if those
19    elements happened?
20 A.   Maybe I'm missing you, but if you intentionally
21    caused a failure mode to occur and put yourself
22    in the position intentionally knowing that you
23    would be seriously injured, I don't recall ever

Page 138

1    seeing that.
2  Q.   Okay.  I'm not surprised to hear that.  Now,
3    that's not really what I asked.  I think you
4    used the word "reasonable," didn't you use that
5    word a few times?  For example, when you talked
6    about accident investigation you said whether
7    the role of the operator was reasonable,
8    correct?
9  A.   Whether the performance and steps that he took
10    were reasonable, something I would expect.
11 Q.   All right.  And are there times when you would
12    find that an operator's performance is not
13    reasonable?
14 A.   Yes.
15 Q.   Okay.  And would one of those situations be if
16    an operator understood a hazard or danger and
17    continued to use a product or machine despite
18    that understanding and knowledge?
19 A.   That depends on the situation.  I've seen cases
20    where workers were worried about a particular
21    production line and their supervisor said keep
22    working here or you lose your job.  And in my
23    view, that's likely that he's going to keep on

Page 139

1    the line.  I've seen accidents that occurred
2    like that.
3  Q.   Okay.  But was that operator error?
4  A.   That was a dangerous piece of equipment that --
5    I don't recall it involving operator error, but
6    he continued to work at the plant with a
7    dangerous piece of equipment under pressure.
8  Q.   Okay.  I don't know whether you've answered my
9    question, but back to my question.  Would it be
10    operator error for an operator to continue to
11    use a machine or piece of equipment if he or
12    she knew that there was a hazard with it?
13 A.   No.  I think if they took reasonable steps to
14    control the hazard, which I believe Mr. Riley
15    thought he was taking reasonable steps --
16 Q.   I'm not asking you about the Riley case.  Let
17    me back up again and ask the question again.
18    Okay.  And we'll keep going around in these
19    circles.  But you talked about the role of an
20    operator and how you want to look at whether or
21    not the operator's performance was reasonable
22    in terms of investigating an accident?
23 A.   Yes.

Page 140

1  Q.   And I asked you whether or not it would be
2    reasonable for an operator to continue to use a
3    machine or piece of equipment if he or she
4    understood or knew about a hazard, correct?
5  A.   Yes.
6  Q.   Okay.  I'm talking about in general.
7  A.   In general.
8  Q.   Would you agree it would be operator error and
9    not reasonable for an operator to continue to
10    use a product if he or she was aware of a
11    hazard but continued to use the product anyway?
12 A.   If the operator took what he thought or she
13    thought were reasonable precautions that would
14    protect him and in his or her mind they thought
15    it would be safe to operate it, that's
16    reasonable.  An operator using a chain saw
17    knows that the chain can cut their leg off.
18    And if they take what they think are reasonable
19    steps to stay away from the chain, then that's
20    reasonable.
21 Q.   All right.  And you don't see -- just so I've
22    got you sort of pinned down on this thing, you
23    don't see any operator error when an operator

Page 141

1  is aware of a danger or a hazard and continues
2  to use the product despite that knowledge?
3       MR. LANE: Object to the form.
4  A.  If he takes steps that he believes have
5  controlled the hazard, which in this case he
6  did, I believe that's reasonable behavior.
7  Q.  Okay. What would be instances of operator
8  error then?
9  A.  I'm sorry?
10 Q.  What would be examples of operator error?
11      MR. LANE: In general, Robert? I'm
12      sorry.
13 Q.  Well, I think I understand what you're saying.
14 You view operator error as something
15 intentional like hot rodding in an airplane or
16 driving on the wrong side of the road,
17 something like that, correct?
18      MR. LANE: Object to the form.
19 A.  No.
20 Q.  Okay. But you used in your own words
21 reasonable conduct of an operator, correct?
22 A.  Correct.
23 Q.  In terms of performance of an operator in the

Page 142

1  cause or not of an accident, correct?
2  A.  Yes.
3  Q.  All right. And you do think it's important to
4  look at the reasonableness of the conduct and
5  performance of an operator when investigating
6  an accident, correct?
7  A.  Yes.
8  Q.  All right. And in general you would agree that
9  operator error can be a cause or contributing
10 cause to an accident, correct?
11 A.  Yes.
12 Q.  All right. And you've also agreed today that
13 -- well, I think you have, that if an employer
14 or the supervisors or the actual worker is
15 knowledgeable about dangers and hazards, they
16 should take safety precautions as to those
17 hazards, correct?
18 A.  Yes. If a worker is aware of a potential
19 danger, he should take steps that in his mind
20 are reasonable to protect himself from it.
21 Q.  Okay. And those steps may be to go get help
22 from your employer, correct?
23 A.  They might be.

Page 143

1  Q.  Okay. And I'm talking about in general.
2  A.  Right.
3  Q.  You mentioned about the lock-out or the tag-out
4  procedure, that could be a reasonable step,
5  correct?
6  A.  In certain cases, yes.
7  Q.  Okay. It could be that you could call outside
8  help from third parties to gain further
9  assistance on the proper usage of a given
10 product, correct?
11 A.  In some cases that could be, yes.
12 Q.  All right. Now, in this case was Mr. Riley
13 hurried in the performance of his job?
14      MR. LANE: Object to the form.
15 Q.  Was he -- okay. I will reask the question. In
16 this case do you see any evidence that
17 Mr. Riley was given any strict time guidelines
18 to perform his job?
19 A.  They had work to do, they had more work to do,
20 I understand. I don't see any rush
21 contributing to this accident. His estimate
22 was he spent maybe ten minutes on this hole.
23 Q.  All right.

Page 144

1  A.  So I'm not seeing rushing as an issue here.
2  Q.  Okay. And in fact in the end they didn't even
3  install the work sink that they had
4  contemplated putting in, correct?
5  A.  It's not there today. I don't know if it was
6  temporarily or not.
7  Q.  Okay. But as far as you can tell he was not
8  rushed?
9  A.  I have seen no indication of rush.
10 Q.  Okay. And do you see any indication that he
11 would have been disciplined in any way if he
12 had sought more training or sought help or done
13 any -- anything to learn more about how to
14 perform the task at hand?
15 A.  He was a new employee under the direct
16 supervision of a maintenance supervisor. If he
17 had refused to do what the maintenance
18 supervisor told him to do, I would expect
19 repercussions.
20 Q.  Well, is that a guess or is that based on
21 testimony?
22 A.  My experience in the work force.
23 Q.  Okay.

Page 145

1  A.   That if an employee refuses to do an
2       assignment, many industries, they are pretty
3       severe on them, some are not.
4  Q.   Okay.  So you're saying -- we'll ask Flavor
5       House at trial, but you're saying that Flavor
6       House would have disciplined Mr. Riley if he
7       knew there was a hazard and a danger and if he
8       had refused to continue to proceed, is that
9       what you're saying?
10 A.   No.  I'm saying in some -- I may be confusing
11      you, you switch between hypothetical and this
12      case, but Mr. Riley, being a new employee, in
13      my experience would tend to do what his
14      supervisor told him to do, even an experienced
15      employee.
16 Q.   That wasn't the question.  The question was, is
17      there any evidence that he would have faced
18      disciplinary action by stopping his work,
19      asking for more help, seeking more training,
20      wanting to review the operators manual or other
21      things that we've talked about today?
22 A.   I don't think any of the testimony addresses
23      that.  A new employee, if he refused to do a

Page 146

1       job that his supervisor told him to do, I would
2       expect him to have concern about his image with
3       the new employer.
4  Q.   Okay.  And that's what I'm saying.  You're
5       saying therefore you haven't seen any testimony
6       about possible discipline, but you're assuming
7       that Flavor House would have disciplined him if
8       he had refused to perform the job, even though
9       he knew about hazards?
10      MR. LANE:  Object to the form.
11 A.   No, I'm saying that typically in my experience
12      an employee --
13 Q.   Typically, okay?
14 A.   -- an employee would be concerned with his
15      image with his new employer if he refused to do
16      a job.
17 Q.   Okay.  Now, are you factoring into your
18      opinions in this case any drug use?
19 A.   I have looked at that, yes.
20 Q.   Okay.  Do you know whether Mr. -- well, let me
21      back up.  Do you -- I know you've got sort of a
22      military background.  Do you recommend that
23      workers use drugs?

Page 147

1       MR. LANE:  Object to the form.
2  A.   That's a broad question.  Certainly some drugs
3       I do, yes.
4  Q.   Okay.  Well, I will ask you better.  Do you
5       have any position on whether workers using
6       industrial equipment and machinery should use
7       illegal drugs such as marijuana?
8       MR. LANE:  Object to the form.  Go
9            ahead, John.
10 A.   The key is his abilities on the day that he
11      does the work.
12 Q.   Stop there.  So you don't have any position?
13      In other words, you don't really care whether
14      workers use illegal drugs or not?
15 A.   Well, for instance, drinking to a certain level
16      and operating machinery is dangerous, but
17      drinking several days before and operating
18      machinery is --
19 Q.   Drinking is not illegal, is it?
20 A.   It is in some areas.
21 Q.   Is marijuana legal or illegal?
22 A.   I believe it's illegal, yes.
23 Q.   Okay.  Do you recommend people use marijuana?

Page 148

1  A.   No.
2  Q.   Okay.  I didn't think so, but we're taking a
3       long time to get somewhere.  Do you recommend
4       that Mr. Riley should have or should not have
5       used marijuana?
6  A.   Based on the testimony, he had no impairment.
7       Impairment was not an issue in this accident
8       that I've seen.
9  Q.   Have you read Doctor Robinson's testimony?
10 A.   I have not.
11      MR. LANE:  Mr. Robinson's testimony was
12           just taken this week for your
13           information, John.  And we will
14           certainly provide him with that
15           testimony, although he is not
16           offering testimony concerning the
17           effects of marijuana.
18      MR. SPRAIN:  Well, but he is on
19           operator safety and cause of the
20           accident, he said that the role of
21           the operator is an important
22           factor to look at.
23 Q.   Now, would you recommend that an operator like

29 (Pages 145 to 148)

Page 149

1    Mr. Riley be impaired by use of any illegal
2    substance when he's operating a machine like
3    the core drill?
4  A.    I don't think operating potentially dangerous
5    industrial equipment you should have any
6    impairment, whether it be illegal or otherwise,
7    sleep deprivation, alcohol or anything else,
8    impairment I don't recommend.
9  Q.    But you certainly would recommend that he not
10    be impaired by use of marijuana in terms of
11    using a core drill?
12        MR. LANE:  Objection to the form.
13 Q.    Okay.  I will restate it.
14        MR. LANE:  I mean, it's asked and
15            answered, that's my problem.  He
16            said any substance, whether it's
17            -- I don't know why that's an
18            issue.
19        MR. SPRAIN:  Well, because he mentioned
20            sleep deprivation.  That's true
21            with his deposition, he talked
22            about drugs and he talked about
23            sleep deprivation.

Page 150

1  Q.    With respect to illegal controlled substances
2    like marijuana, do you have an opinion as to
3    whether Mr. Riley should have operated a core
4    drill if he was under the influence of such an
5    illegal substance?
6        MR. LANE:  And I object to the form on
7            the basis of foundation for his
8            expertise in that area based on
9            your question.
10 A.    As a safety engineer and accident prevention
11    specialist, I would recommend that you not have
12    impairment when you're operating potentially
13    hazardous equipment.
14 Q.    And that would include impairment by use of
15    illegal drugs?
16 A.    It could, depending on the recency of use.
17 Q.    Okay.  And do you think that using marijuana
18    within 24 hours of the time of the accident is
19    something that you would recommend against?
20        MR. LANE:  And I object to the form
21            just on his expertise.
22 A.    I have no knowledge of the blood chemistry
23    involved there.  The performance issue is the

Page 151

1    key.  And the employees around him noticed no
2    impairment, seemed to think that he was
3    operating reasonably.
4  Q.    Okay.  And so if he was using marijuana, you
5    wouldn't have any problem with that as long as
6    he wasn't impaired?
7        MR. LANE:  Object to the form.
8  A.    I'm not evaluating his morales of that, I'm
9    evaluating the accident sequence, and I've seen
10    no indication of impairment.
11 Q.    All right.  Do you have an opinion as to
12    whether Flavor House had any prior experience
13    using anchor bolts for any type of application?
14 A.    I don't have any direct evidence of that.  I
15    would think that they did; they're very common
16    in industrial situations.
17 Q.    Okay.  And that was my question.  That was
18    going to be my next question.  I think you've
19    answered it, but the use of anchor bolts is a
20    common practice, correct?
21 A.    It is.
22 Q.    Okay.  And I'm talking about industrial
23    situations, correct?

Page 152

1  A.    Yes.  It's normally permanent use.  Temporary
2    use is less common.
3  Q.    Okay.
4  A.    Could we take a short break?
5        MR. SPRAIN:  Okay.
6        (Recess.)
7  BY MR. SPRAIN:
8  Q.    What I would like to do with you, Mr. Frost, is
9    go through your opinions.  We have an affidavit
10    of John Frost and a Report of Findings, which
11    are labeled Exhibit 7A and 7B to your
12    deposition.  And do these two exhibits
13    accurately and completely set out your opinions
14    that you may render at trial in this case?
15 A.    I believe they do, yes.
16 Q.    All right.  And what I'll do is I want to go by
17    what looks like -- it looks like your Report of
18    Findings sets out identical language as to what
19    I'm seeing in your affidavit, so because we've
20    got color copies here, I'll use your Report of
21    Findings.
22 A.    That's fine with me.
23 Q.    Okay.  And you set out your opinions on page

Page 153

1  five of Exhibit 7B, which is your Report of
2  Findings. And we've already discussed some of
3  this, but number one you state that Mr. Riley
4  was attempting to accomplish his task in a
5  reasonable and foreseeable manner; is that
6  correct?
7  A.  Yes.
8  Q.  Okay. And you read his testimony?
9  A.  Yes.
10 Q.  Okay. And you read where he said he understood
11  that the spinning drill base could cause
12  injury, correct?
13 A.  Yes.
14 Q.  Do you remember that?
15 A.  Yes.
16 Q.  Okay. And number two you state --
17 A.  He recognized that the drill base could spin.
18  I don't recall what he said about it causing
19  injury. He said he understood it is important
20  to keep the drill secured to the ground. He
21  said he knew it could spin and injure him if
22  not properly secured to the floor.
23 Q.  Okay.

Page 154

1  A.  But he thought it was safe to operate.
2  Q.  All right. But he testified under oath that he
3  knew that the drill base not being secured to
4  the floor could cause injury, correct?
5  A.  Yes.
6  Q.  All right. Now, number two you state "At the
7  time of his injury, Mr. Riley was using the
8  DM500 drill in a manner that was reasonably
9  foreseeable to its manufacturer," correct?
10 A.  Yes.
11 Q.  What is that based on?
12 A.  The testimony of how it was used. I don't see
13  anything that should not be expected based on
14  the warnings that are on the machine and in the
15  manual and the placement of the control handles
16  and the physical design of the machine.
17  Looking at the sister unit, it had wear
18  patterns showing that others had put their foot
19  in the same location.
20 Q.  Okay. But you've not seen any -- any evidence
21  of any prior accidents like what happened with
22  Mr. Riley, correct?
23 A.  That's correct.

Page 155

1  Q.  All right. Number three, you state that
2  "Mr. Riley's injuries resulted from the frame
3  of the DM500 drill suddenly beginning to spin
4  when driven by the electric drill motor against
5  a binding drill bit." Now, I'm going to stop
6  right there. And that's what happened with
7  respect to hole number one, correct?
8  A.  There were no injuries.
9  Q.  Well, I stopped you there -- okay. Thank you.
10  Except for the injuries, that's what happened
11  with hole number one, correct?
12 A.  I believe it is, yes.
13 Q.  All right. Now, paragraph three states further
14  that "The vacuum restraint system failed to
15  restrain the forces involved." Is that what it
16  reads?
17 A.  Yes.
18 Q.  Now, in this case did the clutch of the
19  Milwaukee motor slip?
20 A.  We don't know.
21 Q.  Okay. But you assume it didn't if the drill
22  base spun around the axis of the drill bit,
23  correct?

Page 156

1      MR. LANE: Object to the form.
2  A.  No.
3  Q.  How is that?
4  A.  Even if it spun, it would -- the level at which
5  it spins is the torque that was measured after
6  the accident. It would still induce torque
7  even as it slipped, it just limits how much
8  torque it would induce.
9  Q.  Okay. So you're saying that the Milwaukee
10  motor -- well, let me back up. Is the clutch
11  in the Milwaukee motor a safety device?
12 A.  I believe it is, yes.
13 Q.  Okay. And if the clutch slips or is released,
14  that will disengage or that will turn off the
15  motor?
16 A.  I don't believe it would turn off the motor.
17 Q.  Okay. What would it do? It would stop the
18  drill bit from turning?
19 A.  It would limit the amount of torque induced in
20  the drill bit.
21 Q.  Okay. Now, I thought that the slippage of the
22  clutch in the motor would cause the drill bit
23  to cease to turn; is that not correct?

Page 157

1  A.    If the drill bit was bound, the drill bit would
2        stop turning.  It would induce a torque into
3        the drill bit trying to turn it.
4  Q.    Okay.  What would the clutch do if it slipped
5        then?
6  A.    I believe, based on the video disassembly, that
7        it would allow torque to continue to be
8        applied, but limit the level at which it's
9        applied.
10 Q.    All right.  But some force had to have been
11       exerted from the motor, because the drill base
12       did spin around the drill bit, correct?
13 A.    Yes.
14 Q.    And that force to do that would have to come
15       from the motor still running?
16 A.    Yes.
17 Q.    All right.  And you're saying that does not
18       indicate that the clutch of the motor failed to
19       slip?
20 A.    We don't know if it slipped or not, I believe.
21       If the base -- depending on the level at which
22       the base let go, it may or may not have gone
23       beyond the limits of the clutch.

Page 158

1  Q.    Okay.  And there's been some testimony on that,
2        but what is your understanding about the point
3        at which the clutch of the motor will slip
4        relative to the forces of the vacuum holding
5        down the drill base.
6  Q.    The post-accident test of the clutch found 198
7        foot pounds, 231 and 217 foot pounds on three
8        different tests of it.  So I am working on the
9        assumption that it worked the same on the
10       accident day.  So that's the clutch setting.
11           The base, when it had 20 inches of vacuum,
12       based on approximately 140 square inches of
13       surface area, would produce about 1,375 pounds
14       of force, clamping force against the concrete.
15       And for that clutch setting at the center of
16       effort of that vacuum, it would take about 205
17       pounds to keep the unit from spinning.
18 Q.    Okay.  So what you're saying is that -- if
19       things are operational, the motor clutch should
20       slip before the vacuum pressure is ever
21       released?
22 A.    Yes, by a significant factor.
23 Q.    Okay.  And so in this case you don't know one

Page 159

1        way or another though, do you?
2            MR. LANE:  Object to the form.
3  A.    We know that the motor force should not have
4        gone above the clutch force.  So it was limited
5        to 231 foot pounds of torque.  So the vacuum
6        force became much smaller than normal for it to
7        release.
8  Q.    Okay.  And that's what happened on the first
9        hole, too, though, correct?
10 A.    I believe so, yes.
11 Q.    Okay.  The force of the vacuum was far less
12       than 190 pounds?
13           MR. LANE:  Object to the form.
14 A.    Was far less than 20 inches of Mercury.
15 Q.    Okay.  Well, I thought -- excuse me.  One way
16       to say that would be the clutch slips at 190
17       pounds, correct?
18 A.    No.  The clutch slips at 231 foot pounds of
19       torque.
20 Q.    Okay.  If the clutch slips at 231 foot pounds,
21       then the fact that the drill base became
22       dislodged from the floor indicates that there
23       was, at a minimum, vacuum pressure less than

Page 160

1        231 pounds, correct?
2  A.    Less than 205 pounds.
3  Q.    Okay.  Where did you get 205 pounds?  I thought
4        you said 231 pounds.
5  A.    231 foot pounds of torque, that's how much
6        twisting is occurring at the bit, and you apply
7        the moment arm, which is 13.5 inches out to
8        where the base is operating.  And if you divide
9        those numbers, you would get 205 pounds of
10       horizontal force that that amount of torque can
11       induce.
12 Q.    Okay.  And so -- see if I get this right then.
13       Your opinion would be that the vacuum pressure
14       had to drop below 205 pounds?
15 A.    Had to drop below a level that would create 205
16       pounds of horizontal force.
17 Q.    Okay.  For it to disengage, but the clutch not
18       to slip?
19 A.    Yes.
20 Q.    Okay.  Because you would agree that in this
21       case if the clutch had slipped, the drill base
22       would have stopped, the spinning would not have
23       happened, correct?

Page 161

1          MR. LANE: Object to the form.
2     A.   No, I don't.
3     Q.   Okay. And that goes back to what you were
4          saying that even if the clutch slips, there's
5          going to be some torque exerted on the drill
6          bit?
7     A.   That's my understanding.
8     Q.   Based on what is that your understanding?
9     A.   It appears to be a friction clutch with
10         friction elements that rub up against each
11         other and limit the amount of torque that can
12         be applied. So in this case either the clutch
13         didn't slip at all or it slipped and continued
14         to allow torque to be applied because the unit
15         spun.
16    Q.   Okay. But what you're saying also is that what
17         happened with the first hole in terms of the
18         clutch slipping but still causing the drill bit
19         to turn somewhat or it not slipping at all, is
20         the same with what happened with the second
21         hole?
22    A.   The net result is that the base was spun.
23         Whether the clutch released or not, I can't say

Page 162

1          in each case.
2     Q.   All right. But with respect to the first hole
3          and the second hole, it was the same result in
4          terms of the drill base becoming dislodged from
5          the floor and spinning?
6     A.   Correct. I think the degree was probably far
7          less on the first event. Whether that was
8          because they were able to turn it off quicker
9          or if less forces were involved, I don't know,
10         but we certainly didn't see the severity of an
11         event.
12    Q.   Okay. Now, you don't comment on paragraph
13         three about any other alternative system, but
14         you would agree that the anchor bolt system
15         could have restrained the drill base to the
16         floor, correct?
17    A.   An anchor bolt theoretically could provide
18         these forces easily, yes.
19    Q.   Okay. Theoretically, but in application an
20         anchor bolt system is an accepted and prudent
21         way to hold a drill base to the floor, correct?
22    A.   If done properly, yes.
23    Q.   All right. And it was not done here, correct?

Page 163

1     A.   Correct. And it was not required.
2     Q.   Well, it was not done here, right?
3     A.   That's correct.
4     Q.   Okay. What were the requirements?
5     A.   The manual, which was not provided to Mr. Riley
6          or Mr. Walters, gave three methods of securing
7          the base.
8     Q.   One is the vacuum system?
9     A.   Right.
10    Q.   One is the anchor bolt system?
11    A.   Correct.
12    Q.   And one is the ceiling jack, correct?
13    A.   Correct.
14    Q.   All right. But there was no requirement in
15         this case either that they use the vacuum
16         system, correct?
17    A.   That's correct. Mr. Riley had a requirement
18         placed on him, Mr. Walters said to do it this
19         way, but there's no requirement from the
20         manufacturer, for instance.
21    Q.   Okay. And no requirement from Flavor House,
22         the employer, either, right?
23    A.   I don't know what directions Mr. Walters got on

Page 164

1          that.
2     Q.   But you've seen no testimony indicating that
3          Mr. Walters, the supervisor, was required to
4          use only the vacuum system to hold the drill
5          base to the floor, correct?
6     A.   There's testimony that the ceiling was too far
7          away to be an effective brace, so physics
8          prevented that one. Whether he was told to use
9          the vacuum versus the anchor bolt, I have no
10         testimony.
11    Q.   Now, paragraph four you state "Utilizing even
12         the most basic safety analysis techniques;"
13         what are the most basic safety analysis
14         techniques?
15    A.   Probably the most basic is simply a preliminary
16         hazard analysis that you do any time that you
17         start to design a product. And that is
18         considering the energy sources involved, what
19         are the basic accidents that could happen with
20         your equipment?
21    Q.   All right. And you would agree though that
22         1,300 pounds of pressure created by the vacuum
23         system on the DM500 core drill, if used

Page 165

1    properly, would secure the drill base to a work
2    surface, correct?
3        MR. LANE: Object to the form.
4  A.   As long as you maintain 1,375 pounds on the
5    base, I believe it would secure it, yes.
6  Q.   Okay. And so there's no design flaw with that
7    system if you maintain the adequate vacuum
8    pressure, correct?
9        MR. LANE: Object to the form.
10  A.   The design flaw is not having a system to
11    insure that you maintain the correct vacuum.
12  Q.   Well, the question was, there's no design flaw
13    with the drill in terms of a vacuum system
14    whereby the drill base will be secured to the
15    floor with 1,300 pounds of vacuum pressure?
16        MR. LANE: Object to the form. Asked
17            and answered.
18  A.   It is a design flaw to rely on the vacuum
19    system giving you 1,375 pounds unless you take
20    steps to insure that that occurs. If that
21    pressure is there, it will hold the base.
22  Q.   Okay. Well, that's what I'm saying. If that
23    pressure is there, it will hold the base and

Page 166

1    therefore that in and of itself is not the
2    design problem?
3  A.   The force of the vacuum is not the problem,
4    maintaining the vacuum is.
5  Q.   Okay. And you don't have any criticism of the
6    fact that a vacuum system is used?
7  A.   Yes, if you don't have a system for insuring
8    the vacuum remains.
9  Q.   All right. Sure. I do understand that, but
10    I'm saying in general with respect to the
11    design or manufacture of this product using a
12    vacuum system to secure the base, you don't
13    have a problem with the design in that respect?
14  A.   A properly implemented vacuum system can be
15    safe.
16  Q.   Okay. And you don't have any design criticism
17    of the anchor bolt system?
18  A.   No, I don't.
19  Q.   Okay.
20  A.   Well, I would. I see no guidance on how to
21    properly install the anchor bolt to make sure
22    it provides the necessary forces. That's not a
23    design issue, that's a manual issue.

Page 167

1  Q.   Okay. But from a design perspective, you don't
2    see any design problem with using anchor bolts
3    to secure the drill base of the core drill in
4    this case?
5  A.   No, I don't.
6  Q.   Okay. And your problem with the vacuum system
7    is the design issue about how to assure that
8    adequate vacuum pressure is maintained?
9  A.   Yes.
10  Q.   All right. And you are aware of vacuum systems
11    being used in other industrial equipment
12    applications, correct?
13  A.   Yes.
14  Q.   All right. So your problem is not with the
15    fact that the vacuum system was used, you
16    recognize that is and can be an effective
17    design to hold down a piece of machinery or
18    equipment to a work surface?
19  A.   It can. It's very widely known the multiple
20    failure modes of vacuum systems, so you have to
21    take into account the possibility of failure of
22    the vacuum system.
23  Q.   Okay. And that's one reason why alternative

Page 168

1    methods to secure the drill base are used,
2    wouldn't you agree?
3        MR. LANE: Object to the form.
4  A.   My understanding is that the alternatives are
5    to handle different conditions. For instance,
6    surfaces that won't maintain a vacuum.
7  Q.   Okay. And what information have you seen that
8    the surface in this case was not a good surface
9    to maintain a vacuum?
10  A.   None.
11  Q.   Okay. And you don't have any opinion as to
12    whether the floor was greasy or uneven?
13  A.   No. It appears to be in good condition.
14  Q.   Okay. If upon examination operators of a core
15    drill determine that the work surface is not
16    suitable for use of the vacuum system, would
17    you then instruct them or recommend to use the
18    alternative system of anchor bolts?
19  A.   Yes, or braces.
20  Q.   Okay. We know in this case that the ceiling
21    jack might not have been as practical because
22    of the height of the ceiling, but the anchor
23    bolts could have been used, correct?

Page 169

1  A.  It's my understanding, yes.  You would have
2      damaged the floor, which makes them
3      undesirable.
4  Q.  Okay.  But despite that, the anchor bolts could
5      have been a system used to restrain the drill
6      base to the floor, correct?
7  A.  Given that caveat, yes.
8  Q.  Okay.  You say further in paragraph four that
9      "safety controls should have been implemented
10      to adequately abate the hazard."  And by safety
11      controls are you talking about the redesign
12      that you've taken part in?
13  A.  Some controls should have been implemented.
14      The redesign that I presented is a very
15      reasonable -- or two different reasonable
16      alternatives.
17  Q.  Probably what I should have asked you is what
18      safety controls are you talking about?
19  A.  Controls like I've provided.
20  Q.  Okay.  Deadman switch and the vacuum sensor?
21  A.  Yes.
22  Q.  Okay.
23  A.  And the changes to the gauge so that you know

Page 170

1      how to work it.
2  Q.  Okay.  Did you collaborate with Don Shaver on
3      the redesign that you and he have proposed for
4      the DM500 core drill?
5  A.  We discussed it and picked out some of the
6      components, yes.
7  Q.  Okay.  Who physically put the parts of the
8      redesign on the core drill?  Was it you or was
9      that Don Shaver?
10  A.  Mr. Shaver.
11  Q.  Okay.  What role did you play with the
12      redesign?
13  A.  We discussed what the hazard was and we both
14      had similar concepts for corrective systems.
15      And we went to a parts store in Dothan and
16      bought the components.  And I drew up the
17      electrical diagram and we discussed how to wire
18      it together.
19  Q.  Okay.  Have you determined whether or not the
20      redesign creates any additional hazards for
21      operators?
22  A.  Well, his implementation of it is just to show
23      the concept and how it would work.  I would

Page 171

1      certainly, and he would too, would ruggedize
2      it.  There are some other enhancements that I
3      would do in a production version.  I would --
4      we didn't want to drill a hole in the side of
5      the unit, but I would sense the vacuum in the
6      vacuum chamber rather than teeing it off of the
7      vacuum chamber.  And I would improve the
8      ergonomics by moving the vacuum gauge up to
9      where you can see it, and gauging the vacuum
10      chamber, not the vacuum pump.  So those are a
11      couple of things we would do in the future to
12      make it more useful in an industrial situation.
13  Q.  Okay.  Back to my question, have you considered
14      any additional hazards that the redesign may
15      create?
16  A.  I've considered that, yes.  The implementation
17      and the use of the connectors that he had
18      available are -- I would prefer to have
19      connectors built into the box.  He didn't have
20      the components to do that.  And as I've
21      mentioned, the ruggedization of the electrical
22      cables, I would want to make it more rugged for
23      production use.  Those could induce hazards, so

Page 172

1      you would want to take care of those.
2  Q.  Okay.  Are you qualified to state as to whether
3      or not the redesign is practical and feasible
4      from an economic standpoint for a manufacturer?
5  A.  In my opinion it is.  The cost in a final
6      production design would be under a hundred
7      dollars, probably very similar to the current
8      box that's there.
9  Q.  Okay.  Are you aware of any core drills on the
10      market today that implement any of the redesign
11      aspects of your redesign?
12  A.  Certainly I'm aware of vacuum sensing systems
13      that shut equipment down when you lose vacuum,
14      but I'm not aware -- I have not assessed the
15      market of the other core drills.
16  Q.  Okay.  Are there any ANSI standards or specific
17      standards that relate to the core drill
18      involved in this case?
19  A.  There's --
20  Q.  I think I saw some hand power tools, but this
21      is not a hand power tool, is it?
22  A.  Just a moment, let me get the words on that.
23      Portable power tool, I believe, is your phrase.

Page 173

1    Under portable power tools, there's a section
2    on handheld power drills, tappers, fasteners,
3    fastener drivers, horizontal, vertical and
4    angle grinders, disk sanders, belt sanders,
5    reciprocating saws, sabre scroll jigsaws and
6    others, and then it says other similarly
7    operating power tools.  And it requires that
8    they be -- they shall be equipped with a
9    constant pressure switch or control.
10   Q.   Well, what is a constant pressure switch or
11        control?
12   A.    That's a deadman switch.  One that as you
13        release it it stops power to the equipment.
14   Q.   Let me see that.  Now, this standard here
15        pertains to portable tools and specifically
16        handheld tools, correct?
17   A.    It does.
18   Q.   Okay.  And this is not a portable tool or a
19        handheld tool, correct?
20   A.    It is a portable tool.
21   Q.   Okay.  You refer to this as a portable tool?
22   A.    I would consider this device a --
23   Q.   One you can hold?  Have you tried to pick up

Page 174

1    this drill?
2    A.   I didn't say handheld.  It's got wheels and
3         it's wheeled around.  It's not a fixed tool
4         like a table saw or other fixed equipment.
5    Q.   Okay.  And who is governed by OSHA?
6    A.   Employers.
7    Q.   Okay.  And this does not govern manufacturers,
8         correct, this standard right here?
9    A.   OSHA applies to the employer/employee
10        relationship.  Employers procure equipment that
11        complies with the OSHA requirements.
12   Q.   But my question was, this -- what you referred
13        to -- and I need to mark it now.  We're on 11.
14        (Defendant's Exhibit 11 marked
15        for identification.)
16   Q.   Sir, I've marked this document as Exhibit 11 to
17        your deposition and this is the U.S. Department
18        of Labor OSHA Standards for guarding of
19        portable power tools, correct?
20   A.   Yes, it is.
21   Q.   And this standard does not apply or regulate
22        manufacturers and designers of products,
23        correct?

Page 175

1    A.    This regulates the design of products used by
2         an employer.
3    Q.    But this is not something that would govern the
4         designer and manufacturer of this product in
5         this case, correct?
6    A.    OSHA would write the citation against the
7         employer that used a product that didn't meet
8         that.
9    Q.    That's what I'm saying, OSHA governs employers?
10   A.    Correct.
11   Q.    All right.  And this is what an employer would
12        follow with respect to products that it uses at
13        its work sites?
14   A.    That's correct.
15   Q.    Okay.  This is not a manufacturing standard
16        like an ANSI standard that relates to products,
17        correct?
18   A.    This establishes the requirements -- the safety
19        requirements for the products that will be used
20        in the workplace.
21   Q.    And specifically you're pointing to Section
22        1910.243(a)(2)(i) and then (ii) wherein it
23        states that "other similarly operating power

Page 176

1    tools shall be equipped with a constant
2    pressure switch or control."  And would you
3    equate that to the deadman switch which is a
4    part of your redesign?
5    A.   Yes.
6    Q.   Can't that deadman switch be bypassed?
7    A.   That allows it to be bypassed in a certain
8         fashion.  I'm sorry, in the redesign?
9    Q.   Yes.
10   A.   Yes, if you intentionally put it in the anchor
11        bolt or brace position, you can bypass it.
12   Q.   Okay.
13        MR. LANE:  I think we're talking about
14            two different things.  He's
15            talking about the push button.
16   A.   I'm sorry.  That's correct.
17        MR. LANE:  Is that not what you're
18            talking about?
19        MR. SPRAIN:  Yes.
20   A.   I'm sorry.  The switch can bypass the vacuum
21        sensor for those times when you're not using
22        vacuum.
23   Q.   Okay.

Page 177

1  A.  It does not bypass the constant pressure
2      switch.
3  Q.  But can't the deadman switch be bypassed?
4  A.  In the redesign that we have?
5  Q.  Yes.
6  A.  Only if you took the equipment apart and
7      redesigned it.
8  Q.  Why couldn't you simply just keep it pressed
9      down?
10  A.  Then it wouldn't be bypassed, it would be
11      pressed down.  Do you mean taped down?
12  Q.  Taped down, artificially held down.
13  A.  You could do that.  I have in my folder here
14      the type of switches I would use if we were to
15      go into production.  And those are devices that
16      require less pressure, are more comfortable,
17      the operator likes them better, they're
18      smaller, and they can also incorporate anti-tie
19      down features into them.
20  Q.  All right.  But you can't point to any similar
21      product in the marketplace that uses a deadman
22      switch and a vacuum sensor?  I'm talking about
23      a core drill.

Page 178

1  A.  In a core drill, no.
2  Q.  Okay.  And this OSHA standard refers to a
3      constant pressure switch or control, are you
4      saying that is the equivalent or another way to
5      name a deadman switch?
6  A.  Yes.  It's probably a better way to name it.
7  Q.  All right.  And by that the operator has to
8      maintain constant pressure on the push down
9      button for the drill to stay in operation?
10  A.  Correct.
11  Q.  Okay.  Now, how do you know that the accident
12      would have been prevented by the worker having
13      to maintain pressure on the deadman switch?
14  A.  There are two main components of the redesign.
15      The predictive one, the prevention one, is the
16      vacuum sensing one.  That will cut off the
17      motor before you ever lose enough vacuum to
18      become a danger.  The deadman switch is a fall
19      back position.  If something happens or, for
20      instance, if you're using an anchor bolt and
21      other restraint mechanism and it fails, as
22      motion begins, it will limit the amount of
23      motion because your hand will come off of the

Page 179

1      switch and it will reduce the severity of the
2      event.
3  Q.  Now, what Mr. Riley said was he was thrown off
4      the machine and the drill went airborne,
5      correct?
6  A.  That's what he remembers, yes.
7  Q.  I believe he said that.  And the drill struck
8      him in the left side of the face, correct?
9  A.  It hit his face, yes.
10  Q.  Okay.  And so you're saying that your redesign
11      would have stopped the machine -- or rather
12      stopped the motor in sufficient time for the
13      spinning not to have occurred, correct?
14  A.  Some spinning would have occurred.  As soon as
15      it began to spin, his hand would come off the
16      switch and it would greatly limit the time that
17      it spun.
18  Q.  Okay.  But an accident could still happen,
19      correct, if it's spinning?
20  A.  Depending on where you're standing.  If you
21      stood beside the machine, as I understood the
22      manufacturer wishes, if you stood too close to
23      it, it could still hit your ankles.  It's not

Page 180

1      going to spin wildly, get up to high speeds and
2      leave the hole.
3  Q.  Okay.  But if you fell down and it spun around,
4      it could still hit you in the face?  That's
5      what happened to Mr. Riley, he fell down,
6      right?
7  A.  He fell down.  This would greatly limit the
8      amount of time that the machine could
9      accelerate and the number of revolutions -- or
10      I don't think it would make a revolution, it
11      would move inches instead of feet.
12  Q.  Okay.  Have you proven that?
13  A.  No.  The switch would act immediately, we just
14      factor in the human response time, and torque
15      would be removed instantly once the switch
16      activated.
17  Q.  All right.  So your testimony is that it would
18      really limit the accident, but it would not
19      absolutely prevent an accident, correct?
20          MR. LANE:  Object to the form.
21  A.  The switch by itself would not prevent the base
22      from coming loose.  It would minimize the
23      damage that the base did when it became loose.

Page 181

1  Q.  Okay.  But the redesign would not absolutely
2      prevent an accident and an injury, correct?
3          MR. LANE:  Object to the form.
4  A.  The redesign would because it has two elements,
5      the vacuum --
6  Q.  You're saying it would absolutely prevent an
7      accident and injury even though the base would
8      continue to spin?
9  A.  The redesign has multiple components, one of
10     which is the vacuum sensing.  If the vacuum
11     stays above 20 inches of Mercury, this base
12     will not come loose from this torque.
13 Q.  Okay.  And you factored in all of the factors
14     that could interplay with that?  What factors
15     could influence whether the base becomes
16     disconnected from the work surface?
17 A.  The primary factor is the level of vacuum
18     that's maintained.  That pounds per square inch
19     applied over 140 square inches gives you the
20     retaining force of the base.  And maintaining
21     that vacuum is the key.  The base coefficient
22     of friction would have to be enough for that
23     force to provide the restraining force that we

Page 182

1      talked about, and let me find that.
2  Q.  What would happen if water was sucked into the
3      vacuum pump?
4  A.  Which it certainly can be on this design.  With
5      the current design that would stop the vacuum
6      from operating.  If the water come into the
7      cup, the ball would float to the top of the
8      cup, you would lose vacuum on the base, but the
9      gauge would still give you the indication that
10     you had vacuum, because it's on the wrong side
11     of the cutoff.  With the new design, as soon as
12     the water came up and the ball blocked the
13     intake to the pump, you would lose vacuum in
14     the chamber and the switch would turn the motor
15     off.
16 Q.  Okay.  Now, what would happen if the drill bit
17     hung up?
18 A.  With which design?
19 Q.  Well, with your redesign?  Let's say you had
20     adequate vacuum pressure to keep the drill
21     stand properly secured to the work surface, but
22     the drill bit hung up, and Mr. Riley has
23     testified that's what happened, hung up,

Page 183

1      correct?
2  A.  I believe it did hang up in some fashion.
3  Q.  Okay.  It hung up.  And what will happen to
4      the drill base if the drill bit did in fact
5      hang up?
6  A.  With the redesign, you would be sure that you
7      had at least 20 inches of Mercury, the base
8      would not move.
9  Q.  Okay.  Now, wouldn't that cause an almost
10     immediate loss of vacuum pressure if the drill
11     bit hung up?
12 A.  With the redesign you would have 1,375 pounds
13     holding this device down.  The torque would not
14     be enough to move the frame any and I don't
15     believe you would lose vacuum, no.
16 Q.  Okay.  All right.  So you're saying that your
17     redesign would result in a fail-safe product
18     and there would absolutely be no chance of an
19     accident or injury?
20         MR. LANE:  Object to the form.
21 A.  No.  This redesign is aimed at this hazard
22     that's involved in Mr. Riley's injury.  It
23     would prevent that type of accident if properly

Page 184

1      implemented.
2  Q.  Well, that's what I'm saying.  You're
3      guaranteeing that there would be no accident
4      from a drill base spinning around the drill bit
5      based on this redesign?
6          MR. LANE:  Object to the form.
7  A.  No accident due to loss of vacuum causing an
8      unsecured base resulting in this type of
9      injury, correct.
10 Q.  Okay.  And your redesign wouldn't be necessary
11     if you simply used the anchor bolts, correct?
12 A.  Well, you've got three options to use.  If you
13     are using anchor bolts, the loss of vacuum
14     accident can't happen.
15 Q.  Right.
16 A.  The loss of anchor bolt accident could happen.
17     If the concrete weren't cured, for instance, or
18     if the anchor bolt didn't go far enough in or
19     those types of issues.
20 Q.  All right.
21 A.  So the switch could help even in those.  The
22     constant pressure switch could help even in
23     those kind of situations.

Page 185

1   Q.   Now, with the constant pressure switch, you
2        would have to have an operator to stand on the
3        machine to operate the handle and put a hand on
4        the deadman switch, correct?
5   A.   No.
6            MR. LANE:  Object to the form.
7   Q.   Okay.  Where would the operator stand at?
8   A.   The way we implemented it, he stands on the
9        opposite side, on the drill bit side, and
10       operates it from there.
11  Q.   Oh, he stands in front of the drill?
12  A.   Yes.
13  Q.   And that wouldn't create any more hazards?
14  A.   Not if you're sure the vacuum is applied.
15  Q.   All right.
16           MR. LANE:  Or the anchor.
17  Q.   Okay.  Now, with your redesign, would you
18       recommend that a worker use personal protective
19       equipment, like safety glasses and a hard hat?
20  A.   I would not require a hard hat for use of a
21       core drill.  Safety glasses are a good idea.  I
22       don't think it's a serious threat, but I would
23       recommend it.

Page 186

1   Q.   Okay.
2   A.   Especially at the higher speeds.
3   Q.   And just so I understand this, what you're
4        saying is that if there was a situation
5        involving loss of vacuum pressure, with the
6        redesign, the motor would stop and there would
7        be very little spinning, but there could be
8        some spinning of the drill base?
9   A.   There would be no torque.  There would be zero
10       torque being produced by the motor the instant
11       that the vacuum got below 20 inches of Mercury.
12  Q.   You're saying that motor cuts off immediately?
13  A.   The motor cuts off.  There would be some slight
14       momentum in the drill bit, very minor.
15  Q.   Okay.  And what you're saying is eliminated is
16       any opportunity for the drill base to become
17       unsecured from the floor and spinning around
18       the drill bit?
19  A.   If you shut the vacuum off at 20 inches of
20       Mercury and you're placed on any reasonable
21       work surface, it will positively prevent that.
22       If you insure 1,375 pounds of force of the base
23       against the floor we have in this condition,

Page 187

1        it's not going to move.
2   Q.   Okay.  The drill base will not move?
3   A.   That's correct.
4   Q.   Okay.  Now, you've not tested the redesign,
5        correct?
6            MR. LANE:  Well, object to the form.
7   A.   I have tested it to make sure that it functions
8        at the right levels.
9   Q.   Okay.  Have you actually performed any real
10       live testing, like actually put a drill bit on
11       the redesign and drilled?
12  A.   Have not drilled.  I don't recall a drill bit
13       being in place, but I have not drilled with it.
14  Q.   Okay.  And, of course, it's not been field
15       tested?
16  A.   That's correct.
17  Q.   Okay.  And you've not done any of this --
18       excuse me, you've not performed any hazard
19       analysis like you recommended for products in
20       general?
21  A.   No, I have looked at the hazards of that and
22       specifically that's what drove the design.
23  Q.   Okay.  Well, that probably was a poor question.

Page 188

1        But you've not done any real testing in the
2        marketplace of this product, correct?
3            MR. LANE:  Object to the form.
4   A.   Safety devices like this are on many products
5        that are in the marketplace, but I have not
6        tested this design in the marketplace, no.
7   Q.   Okay.  And, of course, we've already said
8        you're not aware of any similar core drills
9        having these redesign features, correct?
10  A.   That's correct.
11  Q.   And so there's nothing like it in the
12       marketplace and what you've done is something
13       novel, correct?
14  A.   No.  For instance, the constant --
15  Q.   Well, for a core drill.
16           MR. LANE:  Object to the form.
17  Q.   Is it novel for a core drill?
18  A.   I have not done a market survey of all of the
19       core drills out there.  The constant pressure
20       switch is used in many similar pieces of
21       equipment.
22  Q.   Okay.  What similar pieces of equipment?
23  A.   As we see, just the OSHA requirement lists a

Page 189

1    number of types of equipment that require it.
2    If you go into Sears and buy many power tools,
3    they have constant pressure switches.
4    Q.  Okay.  Now, those would be consumer type
5    products, like a chain saw, for instance, it's
6    got a constant pressure switch, right?
7    A.  Of a type, yes.
8    Q.  If you don't keep it pressed down, it's not
9    going to operate?
10   A.  The motor will keep running.
11   Q.  But the chain doesn't keep going?
12   A.  On good designs, that's correct.
13   Q.  Okay.  What other products that I might
14   understand have a constant pressure switch or a
15   deadman switch?
16   A.  If you go into any maintenance shop of an
17   industrial plant, you'll find drills and other
18   devices, you know, circular saws, other
19   components that have constant pressure switches
20   specifically for this type of hazard.
21   Q.  Okay.  What type of hazard?  I mean, a circular
22   saw, I mean, the hazard is very apparent,
23   you've got a rotating saw that could cut off

Page 190

1    your finger or your hand, so I understand that
2    hazard.  But you're saying a similar hazard, a
3    rotating saw blade is a different hazard?
4    A.  One of the primary features of a constant
5    pressure switch is if you lose control of the
6    equipment, if it starts moving.  If a circular
7    saw, for instance, binds, it doesn't jump out
8    of your hand and run across the room and cut
9    somebody up or cut you up.  So if the equipment
10   binds in some fashion.  A drill bit that you're
11   using can bind and if it pulls loose from your
12   hand, you don't want it spinning around and
13   around like this core drill did.  So its safety
14   purpose is if you begin to lose control of the
15   equipment, it shuts itself off.
16   Q.  With the circular saw, when did manufacturers
17   start putting the constant pressure switches on
18   such products?
19   A.  I don't recall.  They've been there as long as
20   I can remember.
21   Q.  Okay.  And what led to that design change?
22   A.  I don't know the history.
23   Q.  Were there accidents?  Were there injuries?

Page 191

1    A.  I don't know the history.  I'm sure there would
2    have been.
3    Q.  Well, that's what I'm saying.  I mean,
4    in your opinion other accidents and injuries
5    led to the design change for circular saws,
6    correct?
7        MR. LANE:  Object to the form.
8    A.  Many of the safety standards that we have today
9    are written in blood is the phrase.  They're
10   based on the past.
11   Q.  Okay.  Are your opinions in this case based on
12   any other standards or regulations or rules
13   that may relate to manufacturers, in your
14   opinion?
15   A.  The OSHA requirements on machine guarding do
16   point out the requirement for tripping devices,
17   two hand devices, when rotating parts are
18   involved.  And that's a version.  Two hand
19   tripping is another constant pressure.  Two
20   hand, as opposed to one hand, are when you
21   might get your hand involved.  So that's just
22   another requirement for constant pressure.
23   Q.  And this pertains to machine guarding?

Page 192

1    A.  Yes, it does.  The OSHA construction standards
2    have a similar requirement to what we've
3    already gone over.
4        (Defendant's Exhibit 12 marked
5        for identification.)
6    Q.  I'm a little bit confused about the machine
7    guarding standard.  But that typically pertains
8    to any -- or a hazard that's open, like a
9    conveyor belt, and you've got a rotating piece
10   or you've got a saw and there's a guard over
11   the saw.  What would be the hazard that is
12   subject to an operator being injured by in this
13   case?
14       MR. LANE:  Object to the form.
15   A.  That requirement addresses rotating parts.
16   This core drill becomes a rotating part when it
17   binds and so that's just an example of the use
18   of constant pressure switches.
19   Q.  Okay.  I'm sorry, say that again?
20   A.  It's an example of the use of constant pressure
21   switches.
22   Q.  Okay.  This right here you've got highlighted
23   two handed tripping devices.  What is a two

Page 193

1    handed tripping device?
2  A.   It's a constant pressure switch.  In that case
3      it involves both hands to keep both hands out
4      of the danger zone.  I'm not recommending a two
5      hand tripping device, but it's just an
6      indication of the use of constant pressure
7      switches.
8  Q.   All right.  What do you have next for me?
9  A.   Next is the construction OSHA standard that has
10      the same requirement as the general industry.
11  Q.   Okay.
12  A.   So, for instance, if this core drill is used in
13      a construction environment, that would apply.
14          (Defendant's Exhibit 13 marked
15          for identification.)
16  Q.   Okay.
17  A.   Next is a publication, Facility Safety
18      Management, and they're talking about the
19      fundamentals of machine guarding.  And they
20      talk about safety trip controls provide a quick
21      means for deactivating the machine in an
22      emergency situation.  It's just an example of
23      the technology.

Page 194

1  Q.   Okay.  We marked as Exhibit 13 the OSHA General
2      Requirement Standard.  I'm going to mark as
3      Exhibit 14 to your deposition this article
4      entitled Fundamental Machine Guarding.
5  A.   Yes.
6          (Defendant's Exhibit 14 marked
7          for identification.)
8  Q.   And you've highlighted on this tabbed page, it
9      will be page three, it says here "Safety trip
10      controls provide a quick means of deactivating
11      the machine in an emergency situation,"
12      correct?
13  A.   Yes.
14  Q.   Okay.  And by a safety trip control, are you
15      saying that is the same thing as the deadman
16      switch?
17  A.   There are two versions of it.  One is -- and
18      probably the most effective one is you release
19      the control to stop the machine.  There are
20      other applications where you push, say, an
21      emergency stop switch.  Your hand falls into
22      it, for instance, on calendars and some
23      industrial equipment.  So that addresses both,

Page 195

1      I think.
2  Q.   What you're saying is the general principle of
3      some safety device to deactivate the machine in
4      the case of an emergency?
5  A.   Using the natural motion of the hand is the
6      key.
7  Q.   Okay.  In your and Shaver's redesign, it's not
8      pushing it down, it's releasing it?
9  A.   That's right.  Which in the event of rotation
10      of the device, first, it's easy for you to let
11      go, but even if you don't, the machine will
12      pull away from you and cause it to stop.
13  Q.   All right.  Any other standards, regulations or
14      rules that may govern this situation?
15  A.   Yes.  The third element that's wrong with the
16      current design is the gauge is marked in
17      numbers, but you have no idea what the numbers
18      mean.  So I've shown an example of how a proper
19      gauge should be marked and here are a couple of
20      standards that address that.  The first is
21      Human Factors in Engineering and Design.  And
22      on the chapter on qualitative scales, it
23      addresses that, and it says "In such cases the

Page 196

1      perception of the correct reading is aided by
2      some method of coding the separate ranges."
3      One way to do this is with color codes as shown
4      in the illustration 5-10, which is a similar
5      guage.
6  Q.   Okay.  What I've done is I've marked this
7      picture with the color coded gauge as Exhibit
8      15 to your deposition and I'm going to mark the
9      Human Factors in Engineering and Design article
10      as Exhibit 16.
11          (Defendant's Exhibits 15 and 16
12          marked for identification.)
13  A.   Next is a publication, Human Factors in Product
14      Design, and it has a similar requirement and a
15      similar example of a gauge marked in a safe and
16      unsafe zone.
17  Q.   All right.  We will mark this as Exhibit 18.
18          (Plaintiff's Exhibit 18 marked
19          for identification.)
20  Q.   And this is entitled Human Factors in Product
21      Design.  And you've tabbed a page here and
22      you've highlighted a diagram which shows a
23      gauge and in black it's unsafe.  So if the

Page 197

1    needle was in the black range, it would be
2    unsafe?
3  A.   I would need to see that.  Correct.
4  Q.   Okay.
5  A.   And these are simply addressing the issue where
6      there's a continuum of readouts and it's less
7      important what the exact readout is than it is
8      what zone you're in.  The same kind of
9      requirement in Human Performance Engineering
10     and a similar example.
11          (Defendant's Exhibit 17 marked
12           for identification.)
13 Q.   All right.  Your article Human Performance
14     Engineering is marked as Exhibit 17.  And
15     you're relying on a page you tabbed which gives
16     other examples of how to have a gauge read?
17 A.   Yes.  The proper way to --
18 Q.   It says safe, hot or cold?
19 A.   Yes.
20 Q.   Anything else as far as standards or
21     regulations or otherwise which may govern this
22     case?
23 A.   I've brought some articles on the proper way to

Page 198

1    do a design process, but that's not the
2    specific engineering features.
3  Q.   Okay.  Let's go ahead and look at those right
4      now.  Now, these books, you've showed us three
5      books, Accident Prevention Manual, Human
6      Factors Evaluation in System Development, and
7      Product Safety Management Guidelines, correct?
8  A.   Yes.
9  Q.   And then you've copied specific pages from
10     those books?
11 A.   Yes.
12 Q.   And these pages relate to your opinions, I
13     suppose, in this case?
14 A.   Yes.  These have to do with the process you go
15     through to identify the hazards when you're
16     designing equipment and then the proper way of
17     controlling the hazards.  I believe that
18     article does not have a book associated with
19     it, that's from a magazine.
20 Q.   All right.  This is Designing Safety into
21     Machines?
22 A.   Yes.
23 Q.   And this is a fourth -- a fourth part of this

Page 199

1    folder which has been marked previously as
2    Exhibit 8 to your deposition?
3  A.   Yes.
4  Q.   Now, what would I do to get these full books?
5      I could just take your books, but you wouldn't
6      like that, would you?
7  A.   I can buy more.  These two are available from
8      the National Safety Council now.  And this is
9      an old, old book I brought to show that this is
10     not new.
11 Q.   Okay.  I may look through this later.  Okay.
12     We've got to get this copied, of course, y'all
13     know that.
14 A.   I hate to do it again, can we take a short
15     break?
16 Q.   All right.
17          (Recess.)
18          MR. SPRAIN:  A housekeeping matter, I
19     marked two Exhibit 17s.  The
20     article entitled Human Factors in
21     Product Design is going to be
22     relabeled as Exhibit 18 to
23     Mr. Frost's deposition.

Page 200

1          MR. LANE:  What was the other 17?
2          MR. SPRAIN:  The other 17, which will
3      continue to be 17, is Human
4      Performance Engineering.
5  Q.   Now, sir, I'm going to turn to paragraph six of
6      your opinions and you have a segment entitled
7      Design for Minimum Risk?
8  A.   Yes.
9  Q.   All right.  And it says "Such design should
10     have used a drill motor torque or clutch
11     release value that would have kept the frame
12     forces within the stability limits provided by
13     the restraint system as it functioned in the
14     field."  Have I read that correctly?
15 A.   I believe so, yes.
16 Q.   What did you mean by that?
17 A.   Simply the first order of business in
18     correcting the design is design the hazard out.
19     That would involve reducing the torque that
20     might be developed.  That's difficult to do in
21     this case, because you need torque to do the
22     work.  But if you could reduce the clutch value
23     to a level that you could be assured of

Page 201

1    withstanding with the current design of the
2    base, then that would be the ideal solution.
3    And that would mean putting a much lower power
4    clutch in that location.
5 Q.   Okay.
6 A.   I'm going on the assumption that that would
7    impact performance and that you can't go that
8    way.
9 Q.   Okay.  So you're saying that that couldn't be
10    done in this case?
11 A.   It could be.  The drill would work slower and
12    that's probably not the desired solution.
13 Q.   Okay.  And by releasing -- excuse me, by
14    reducing the power of the clutch, you're saying
15    it would slip at a lesser force?
16 A.   Yes.
17 Q.   All right.  And that lesser force would be, for
18    example, if it hung up, then it would slip, and
19    the motor would stop?
20 A.   The drill bit would stop turning.  The motor
21    would continue turning, but the bit would stop.
22 Q.   And, again, what would be the factors that
23    causes the clutch to slip?

Page 202

1 A.   If something hung up the -- whether it be
2    binding or a chip off the bit or whatever might
3    cause binding, which is a known problem with
4    drills.  If you reduced the force down to such
5    level that the weight of the machine would
6    prevent it from moving, then you wouldn't care
7    if the vacuum system didn't work right.
8 Q.   Okay.  So you're saying theoretically one
9    solution would be to adjust the activation of
10    the clutch of the motor so that it would slip
11    sooner?
12    MR. LANE:  Object to the form.
13 A.   A combination.  You could either increase the
14    weight of the base unit to add to its automatic
15    stability or reduce the factor of the clutch
16    and/or motor to reduce the forces being
17    induced.  You could handle this problem and not
18    require a vacuum, in other words.
19 Q.   Okay.  But you're saying that it's not
20    practical and you didn't think that was the way
21    to go?
22 A.   I'm assuming that that's not practical.  That
23    would slow down the speed of the drill -- not

Page 203

1    the speed of the drill, but the speed of the
2    drilling, because you could apply less force.
3 Q.   Okay.  And then you get into what you do
4    recommend is the incorporation of safety
5    devices as we have discussed?
6 A.   Yes.
7 Q.   All right.
8 A.   Plus warning devices.
9 Q.   Plus the warning device.  And that's the gauge
10    essentially, right?
11 A.   That's right.
12 Q.   Okay.  Change the location of the gauge and
13    then change the reading of the gauge?
14 A.   The location the gauge is sensing and then put
15    indicators on the gauge so you'll know what
16    it's telling you.
17 Q.   Okay.  How will changing the location of the
18    gauge add to the safety?
19 A.   The current design is simply measuring the
20    vacuum that's being produced by the pump.  That
21    vacuum is not the same as on the other side of
22    the water filter or in the base of the unit.
23    And the most obvious problems would be if the

Page 204

1    water filter fills up with water, the ball
2    floats to the top and stops any air flow into
3    the vacuum pump, at which point you would have
4    no vacuum in the system, but the gauge would
5    still read everything is fine.
6 Q.   Okay.  And that's because the vacuum gauge is
7    hooked into the vacuum pump and it's measuring
8    the vacuum from the vacuum pump?
9 A.   Exactly.
10 Q.   And not from the actual cavity of the base
11    where the vacuum pressure is actually in
12    existence?
13 A.   Yes.
14 Q.   Okay.  If I'm saying that correctly.
15 A.   You did.
16 Q.   All right.  Now, turning the page to 6-D, you
17    state that the labels and warnings that were on
18    the drill were ineffective of informing the
19    user of the risk involved, I'm going to stop
20    right there.  But if you assume that Mr. Riley
21    knew that if the base became unsecured from the
22    floor injury would occur, then the warning was
23    effective, correct?

Page 205

1          MR. LANE: Object to the form.
2  A.    No.
3  Q.    How do you figure that?
4  A.    The entire philosophy of this design that's
5        keeping the base restrained is to have a
6        certain level of vacuum, 20 inches of Mercury.
7        There's nothing on the unit, either on the
8        gauge or on the warnings, that say "danger, you
9        must maintain 20 inches of vacuum or the base
10       can damage you and injure you." There is a
11       warning like that in the new manual.
12 Q.    Okay. Let's find that real quick.
13 A.    I'm sorry?
14 Q.    Let's find that new manual. Here you go, it's
15       a folder labeled Exhibit 4 to your deposition.
16       And just read into the record which manual
17       you're looking at, first of all?
18 A.    This manual is for a very similar piece of
19       equipment, it's entitled "Milwaukee Operators
20       Manual."
21          MR. SHEEHAN: What's the date on that
22       one?
23 A.    I don't see a date on the cover.

Page 206

1          MR. LANE: It's the one that came with
2        the exemplar.
3          MR. SHEEHAN: Okay. I'm sorry, I
4        didn't mean to interrupt you.
5  A.    It has the date of 09/03 on the back.
6  Q.    Okay.
7  A.    First it has the warning "To reduce the risk of
8        injury, always secure the rig to the work
9        surface to help prevent personal injury and to
10       protect the rig. An unsecured rig could rotate
11       during coring and possibly cause injury."
12       That's one warning.
13          The next warning is on page nine, "The
14       vacuum gauge must read a minimum of 20 inches
15       of Mercury vacuum. To reduce the risk of
16       injury do not core if the gauge reads less than
17       20 inches of Mercury vacuum."
18          A similar warning is repeated on page 11
19       during the steps of the coring procedure, it
20       says, "Warning, to reduce the risk of injury,
21       do not operate the Diamorg if the gauge reads
22       less than 20 inches of Mercury vacuum."
23 Q.    These warnings and operator manuals are only as

Page 207

1        good so long as the user reads them, correct?
2  A.    The manual warnings are only good if they are
3        provided to the user, the user reads them, and
4        they're written in a way, with pictographs and
5        the proper language, that they work.
6  Q.    We've already discussed this, but in this case
7        Mr. Riley was not provided the manual, correct?
8  A.    That's correct.
9  Q.    And at the time that the machine was rented,
10       Flavor House was not provided the operators
11       manual for the DM500 core drill, correct?
12 A.    That's correct.
13 Q.    All right. So the manual therefore is not an
14       issue in the cause of this accident one way or
15       another because it was never even consulted?
16          MR. LANE: Object to the form.
17 A.    Well, I believe your question was the labels on
18       the machine and I referred to similar warnings
19       that are in the new manual.
20 Q.    Okay.
21 A.    I think the old manual certainly should have
22       had similar warnings, it did not, but they
23       wouldn't have changed this accident because

Page 208

1        United did not give them the manual.
2  Q.    All right. So your criticism is based
3        primarily on the warnings on the machine
4        itself, correct?
5  A.    Well, yes, but the manual also should have had
6        the same warnings and the manual should have
7        been provided.
8  Q.    Okay. I understand that, but we've already
9        been -- I don't want to be redundant, but
10       you've already said that the manual would not
11       have changed the result because he never had
12       it?
13 A.    That's correct. If it had been written
14       properly and given to him, it could have
15       changed the result.
16 Q.    Could have, but, of course, that didn't happen;
17       he didn't have the manual and he never read it,
18       correct?
19 A.    That's correct.
20 Q.    So that's not involved in the cause of this
21       accident, that being the manual?
22 A.    Yes, the fact that he was not provided the
23       manual and the manual was improperly written is