Page 209

1    involved in this accident.
2  Q.   Okay. I'm not following you, because if he
3      never had it, never read it, never saw it, then
4      very obviously it could not have changed the
5      result; you're just speculating that if he had
6      had it and if it had been written differently,
7      correct?
8  A.   There are two failures. If the design is not
9      going to be safe and we're relying on
10     procedures to provide the safety, then
11     procedures have to be given to him and they
12     have to be better than they were. And if you
13     fail on either of those two, the procedures
14     don't work.
15 Q.   Okay. But I don't care how well they're
16     written, if they're perfect in your view, they
17     still have to get into the hands of the user,
18     correct?
19 A.   Absolutely.
20 Q.   And if they don't, it doesn't really matter
21     what it says in the manual, correct?
22 A.   Not for Mr. Riley. It might for others, but
23     not for Mr. Riley.

Page 210

1  Q.   Sure. So in any event, in this case he didn't
2      have it, and as you said, it did not change the
3      result or affect the result in this case?
4  A.   The fact that he didn't have it and that they
5      were improper did affect the result. Just
6      fixing the manual, if it wasn't provided,
7      wouldn't have impacted the result.
8  Q.   All right. I'm trying to understand the cause
9      and effect here, because you're suggesting the
10     manual should have been altered in some
11     respect, correct?
12 A.   Yes.
13 Q.   But if the manual in its altered state was --
14     if it was changed or altered or rewritten in
15     any respect as you're talking about, had not
16     been delivered to Mr. Riley, then it wouldn't
17     have mattered, correct?
18 A.   I agree. You have to do both things; you have
19     to fix the manual and provide it to him.
20 Q.   Okay. And you agree that warnings have to be
21     read and heeded for them to have any meaning,
22     correct?
23 A.   Yes.

Page 211

1  Q.   All right.
2  A.   Read and understood and heeded.
3  Q.   All right. Read, understood and heeded. And
4      that would be true for warnings on a given
5      machine and warnings in a manual, correct?
6  A.   That's right.
7  Q.   All right. So regardless of how they're
8      written and how many warnings are contained on
9      the machine or manual, they have to be read,
10     understood and heeded?
11 A.   Yes.
12 Q.   All right. And you would put some
13     responsibility on an operator obviously to do
14     that, to read them, understand them and heed
15     them?
16 A.   To the best of his ability, yes.
17 Q.   Okay. And you're aware that Mr. Riley said he
18     didn't read the warnings on the machine in this
19     instance, correct?
20 A.   And I believe the design of the warnings is a
21     major contributor to that.
22 Q.   Okay.
23 A.   They're written in the wrong direction, they're

Page 212

1      not clear, they don't address the issues, they
2      don't have a pictograph, they're fine print.
3  Q.   Okay. Have you come up with any design
4      template for a warning that you think would be
5      better?
6  A.   I have not, because I think the fix on this is
7      to design the hazard out, not to rely on
8      warnings.
9  Q.   Okay.
10 A.   If you're not going to fix the design, then
11     warnings could certainly be greatly improved.
12 Q.   And going -- excuse me, referring to paragraph
13     6-D of your written opinions, by the risk
14     involved, I assume you're talking about the
15     spinning drill base?
16 A.   Yes.
17 Q.   And you say that the warnings did not meet
18     industry standards for such warnings; what
19     industry standards are you referring to?
20 A.   There are several standards. ANSI Z-535, I
21     believe it is, addresses warnings.
22 Q.   Well, what I would like for you to do is to
23     point to any specific point of the ANSI Z-535

Page 213

1  standard?
2  A.  I guess we should wait.
3       MR. LANE:  Did you find it?
4  A.  Yes.  ANSI Z-535, I didn't bring it with me,
5      it's referred to on page 74 of the National
6      Safety Council Product Safety Management
7      Guidelines.  And it mentions that first is the
8      signal word, either danger, warning or caution,
9      so that the person understands that it's not
10     just minor guidance, that it involves -- the
11     danger word would involve a serious injury or
12     death.  To get his attention you would use the
13     proper colors, which in the case of danger
14     would be red and black.  It would have a
15     pictograph showing a symbol of what could
16     happen to communicate the degree of damage that
17     could be caused.  And then you would have
18     specific instructional language telling you how
19     to avoid the problem.  Which if the reliance is
20     on maintaining 20 inches of Mercury, you would
21     say you must maintain 20 inches of Mercury.  If
22     the reliance is on standing in a certain
23     location, you would tell him where to stand.  I

Page 214

1  don't think that would work very well.  But
2  whatever information he has to have to operate
3  this safely would go there.
4  Q.  Okay.  Well, what kind of pictogram could you
5      put on this machine to point out the hazard
6      that you've been talking about?
7  A.  I've seen several and I've used several and
8      I've designed several that -- basically you
9      like to use a series of figures that are in the
10     ANSI standard.  They're essentially stick
11     figures.  And you would show the machine
12     spinning and contacting you.  It would probably
13     be a unique pictograph designed for this
14     warning.
15 Q.  Okay.  Do you consider yourself to be an expert
16     on warnings?
17 A.  I do, yes.
18 Q.  Okay.  Is that part of your background as a
19     safety engineer?
20 A.  It is.  I've designed many, many warnings.
21 Q.  Okay.  What I would like to do is go through
22     your prior cases starting with 2001, the Barley
23     case, and just in general, how many times have

Page 215

1  you testified over the course of your career?
2  Just give us a good faith estimate?
3  A.  I don't know the number.  I've been involved in
4      litigation and this type of work since 1985.
5      That would be 21 years.
6  Q.  21 years.
7  A.  Okay.  I've been involved several times a year,
8      maybe -- I don't know, maybe three to ten or
9      maybe 15, but average five or ten maybe.
10 Q.  Well, let's say -- let's say an average of
11     seven a year, an average?
12 A.  It might be.
13 Q.  And over 20 years, so that would be about 140
14     times?
15 A.  It could be.
16 Q.  Okay.  How often are you on the defense side
17     versus the plaintiff's side?  Can you give us a
18     percentage breakdown?
19 A.  I don't keep a percent like that, but it's most
20     of the time I'm retained by the injured party.
21 Q.  Okay.  The first case you have listed is the
22     Barley versus Cranepro case.  And what I want
23     you to do is name the party who hired you,

Page 216

1  whether the plaintiff or the defendant, and
2  specify the type of product involved and where
3  the case was pending?
4  A.  All right.  Barley was an overhead crane in an
5      industrial plant and it failed and dropped down
6      and injured a worker.  I was retained by the
7      plaintiff.
8  Q.  Okay.  Did you find any operator error involved
9      in that case?
10 A.  I don't recall.  There was a metal failure, I
11     think the end cap on the crane, I believe, but
12     there was a mechanical malfunction.
13 Q.  Okay.  In that case did you find that the crane
14     was defective?
15 A.  Yes.
16 Q.  Okay.  The next case is the Walters versus
17     Altec case?
18 A.  Yes.  That was an electric injury in a bucket
19     truck, retained by the plaintiffs.
20 Q.  Okay.
21 A.  And that involved --
22 Q.  What product specifically was involved and did
23     you find a defect with the product?

Page 217

1  A.  I found the cause was a defect in the design of
2      the bucket truck that was involved.
3  Q.  Kelly v. Whirlpool?
4  A.  That was a fire.  There were fatalities in a
5      rental house when it caught fire in the middle
6      of the night.  I was retained by the plaintiff.
7  Q.  Okay.  Was there a product involved in that
8      case?
9  A.  Yes.  I determined the cause of the fire was an
10     air conditioner malfunction.
11 Q.  And did you find that the air conditioning unit
12     was defective?
13 A.  A component in it was, yes.
14 Q.  Okay.  The next case is McCall versus Goldkist?
15 A.  Yes.  That was a truck driver who fell into an
16     unguarded auger, retained by the plaintiff, the
17     cause was removal of a guard.
18 Q.  All right.  Now, what about the product
19     involved in that case, the auger, did you find
20     it was defective?
21 A.  No.
22 Q.  All right.  And you testified on behalf of the
23     plaintiff?

Page 218

1  A.  Yes.
2  Q.  Okay.  And did you find that anybody was
3      responsible for the removal of the guard?
4  A.  Yes.
5  Q.  Who was responsible?
6  A.  An individual, I don't recall his name.
7  Q.  Okay.
8  A.  But he had done it to speed up production.
9  Q.  Okay.  So in that case the product was altered?
10 A.  Yes.
11 Q.  Okay.  And you found that the alteration of the
12     product is what caused the accident?
13 A.  Yes.
14 Q.  All right.  The next case is Sawyer versus
15     Altec, did that case also involve a bucket
16     truck?
17 A.  It did.
18 Q.  And were you on the plaintiff's side?
19 A.  I was on the side of investigating the
20     accident.  I was retained by the plaintiff.
21 Q.  All right.  Did you find that the bucket truck
22     was defective?
23 A.  Yes.

Page 219

1  Q.  Okay.  In 2002 you've listed six cases starting
2      with Self, tell me about that case.
3  A.  That was an electrocution involving a power
4      line contact by a crane.  I was retained by the
5      plaintiff's representative.
6  Q.  What product was involved?
7  A.  There were a number of products there.  There
8      was a crane, there was a crane line, there was
9      a power line, and there was a load being moved.
10     I determined that it was the process being used
11     on the construction site, they set up and
12     operated too close to a power line.
13 Q.  Okay.  And you found that the defendant was
14     liable for having not implemented good
15     construction procedures and work practices?
16 A.  Essentially, yes.
17 Q.  Okay.  Hill versus Tube City?
18 A.  I believe that was a backing accident.
19 Q.  Who hired you in that case?
20 A.  That was the defense, I believe.
21 Q.  All right.  What product was involved, a truck?
22 A.  Yes.  There was a -- there was a pickup truck.
23     There was a facility where the pickup truck

Page 220

1      operated.
2  Q.  Okay.  What firm hired you, do you remember?
3  A.  No, I don't.
4  Q.  Okay.
5  A.  They were in Birmingham, I don't know the name.
6  Q.  And what happened there?  Did the truck back up
7      and hit the worker?
8  A.  Yes, it did.
9  Q.  Okay.  And what was the plaintiff's contention?
10 A.  That the facility -- I believe, it's been some
11     time, I believe that they felt that the
12     facility where it happened should have stopped
13     the truck from coming onto the facility and
14     operating.
15 Q.  Okay.  Did that case involve a product claim
16     against the truck's manufacturer?
17 A.  Not that I recall, no.
18 Q.  Okay.  The next case is Mitchell versus GM,
19     tell me about that case; who hired you and the
20     product involved?
21 A.  That was a young child that was killed when a
22     piece of the rearview mirror of the vehicle
23     came through the side glass on the vehicle

Page 221

1     during a sidewipe accident. I was retained by
2     the child's family's lawyer.
3  Q.  Okay. So the plaintiff?
4  A.  Yes.
5  Q.  And did you find that the car involved in the
6     accident was defective?
7  A.  Right. The child was in a safety seat, he was
8     impacted, the choice of the glass on the sides
9     of that vehicle contributed to the accident.
10 Q.  Halsey versus Dillards?
11 A.  That was a sissors lift that collapsed in a
12    retail store injuring the operator. And I
13    found that the sissors lift failed. I don't
14    recall the specifics of the cause for that, I
15    don't recall.
16 Q.  Who hired you?
17 A.  The plaintiffs.
18 Q.  The plaintiff. And you found that the sissors
19    lift had a defect that caused the --
20 A.  I don't think I found -- I think it was the
21    procedures at the establishment, the way they
22    used the sissors lift, I believe. I don't
23    recall exactly. I do recall that a metal

Page 222

1     component on the sissors lift failed and I
2     think it wasn't being used properly, but I
3     don't recall.
4  Q.  Okay. Mulkey versus NKK Steel?
5  A.  That was a very large industrial electric arc
6     furnace that had a steam explosion and severely
7     injured a worker. And I found the cause to be
8     defects in the electric furnace allowed water
9     to leak into the molten steel and explode.
10 Q.  Okay. Who hired you?
11 A.  The plaintiff's representative.
12 Q.  Did you find a product defect with the furnace?
13 A.  It was a combination of an original product
14    defect and a failure of the designers to take
15    action when they saw it leaking.
16 Q.  And by designers, are you referring to the
17    designers of the furnace?
18 A.  Yes.
19 Q.  Okay. In 2003 it looks like you have also
20    listed six cases starting with Ruiz versus Kia?
21 A.  Yes, that was a vehicle rollover. And the seat
22    restraint system failed and the passenger in
23    the back seat was thrown from the vehicle and

Page 223

1     killed.
2  Q.  Okay.
3  A.  I was retained by the plaintiff.
4  Q.  Okay. And you testified that the vehicle
5     involved in the accident was defective?
6  A.  Yes.
7  Q.  Okay. Dallas versus McWayne?
8  A.  That was an industrial operation, a worker was
9     injured when a pipe exploded. I was retained
10    by the plaintiff and I found that a safety
11    device had been bypassed on the product.
12 Q.  Okay. What product was involved?
13 A.  It's a large pipe testing machine that had an
14    interlocked guard on it.
15 Q.  Okay. And what was bypassed?
16 A.  The guard was left open.
17 Q.  The guard was left open. Now, what kind of
18    guard was it?
19 A.  A large mesh piece of steel.
20 Q.  Okay. And someone had bypassed the interlock
21    and the guard was left in the open position?
22 A.  I don't recall the specifics of how they left
23    it in the open position. They had left it open

Page 224

1     and I think that the interlock had been
2     bypassed. I'm not sure of that.
3  Q.  Okay. Henry versus Copeland?
4  A.  That was a worker on an assembly line and she
5     was doing a welding operation and the device
6     cycled and came down and welded her hand and
7     amputated her hand. I was retained by the
8     plaintiff. And I found that modification of
9     the welder by the company that ran the welder
10    bypassed an integral safety feature of the
11    welder and caused it to happen.
12 Q.  So in that case you didn't find that the
13    product failed or was defective, rather someone
14    bypassed a safety device on the product?
15 A.  The product failed because someone bypassed an
16    internal safety device.
17 Q.  Okay. Did you give opinions that the
18    manufacturer or designer of the product was
19    liable?
20 A.  No.
21 Q.  Okay. Who bypassed the safety device?
22 A.  A maintenance worker.
23 Q.  All right. Calloway versus PPG?

Page 225

1   A.   That was a worker working in a plant and he
2        fell through, I believe, a ceiling that he
3        thought he could walk on.  And I was retained
4        by the plaintiff.  And I found that the
5        position where they sent this worker to go work
6        was not safe to walk on.
7   Q.   Okay.  Everts versus Altec?
8   A.   That was a bucket truck.  An IALD is an
9        insulated aerial lift device.  I was retained
10       by the plaintiff and I found the same defect in
11       the bucket truck as the others.
12  Q.   All right.  The next one is Boddie versus
13       Invacare?
14  A.   That was a child thrown from a motorized
15       wheelchair.  And I was retained by the
16       plaintiff.  And I determined the ergonomics of
17       the way that he was restrained in the chair led
18       to him falling from it.
19  Q.   Did you find that the wheelchair was defective?
20  A.   The wheelchair, as well as the people that
21       fitted the wheelchair to the child didn't do it
22       properly.
23  Q.   In 2004 starting with Slaughter, is that also a

Page 226

1        bucket truck?
2   A.   It is.
3   Q.   And were you retained by the plaintiff?
4   A.   Yes.
5   Q.   And did you find that the bucket truck had
6        defects?
7   A.   Yes.
8   Q.   All right.  Almond versus Coop Propane?
9   A.   That was a home that exploded from propane gas.
10       And I determined, I believe, that there was a
11       failure to do the proper leak testing, I think,
12       so that a leak was not detected.  I was
13       retained by the plaintiff.
14  Q.   Did you find that the propane gas tank or some
15       component of the propane gas system was
16       defective?
17  A.   No.  That was a process used by the propane
18       company that failed to meet code.
19  Q.   Okay.  Anthony versus Chroen Pokphand?
20  A.   That was a pressure sprayer cleaner, a worker
21       had injuries to his eyes from caustic spray.
22       And I determined the design of the -- I was
23       retained by the plaintiff and found that the

Page 227

1        design of the sprayer was defective.
2   Q.   All right.  Wheat versus AEC?
3   A.   That was an industrial lot, it involved a dump
4        truck that was backing.  I found that the dump
5        truck lacked the required backup alarms that it
6        should have had.  I was retained by the
7        plaintiff.
8   Q.   Okay.  Klibanoff versus Country Gas?
9   A.   That was a propane gas explosion in a gas
10       grill.  I determined that the -- I was retained
11       by the plaintiff and determined that the gas
12       grill was not properly connected.  It was an
13       open gas line and was not properly leak tested
14       by the gas company.  And the design of the gas
15       grill made -- is what caused it to be left
16       open.
17  Q.   Okay.  The plaintiff hired you in that case?
18  A.   Yes.
19  Q.   Walters versus Otterbine?
20  A.   Otterbine.  That was a young man that was
21       electrocuted at a golf course pond when he was
22       sent out to work on a fountain in the middle of
23       the lake.  And I found the cause of that and

Page 228

1        determined that the manufacturer's failure to
2        include a ground fault interrupter as required
3        by code was the cause.
4   Q.   Okay.  Well, what product did the manufacturer
5        make?
6   A.   A fountain system.
7   Q.   A fountain system.  And the plaintiff hired
8        you?
9   A.   Yes.  I also found that the installation of it
10       was defective, the electrical company that
11       installed it failed to install it properly.
12  Q.   These next two cases are also Altec cases,
13       Everts and Martinez, did those also involve
14       bucket trucks?
15  A.   Yes.
16  Q.   And you were retained by the plaintiff?
17  A.   Yes.
18  Q.   And you found that the bucket trucks were
19       defective?
20  A.   Yes.
21  Q.   All right.  And we have Sharp and Sawyer in
22       2005, were those also bucket truck cases?
23  A.   Yes.

Page 229

1  Q.  And you were retained by the plaintiff?
2  A.  Yes.
3  Q.  And I assume you also found that the bucket
4      trucks were defective?
5  A.  Yes.
6  Q.  Tolbert versus Craft Electric?
7  A.  That was a toxic poisoning of a worker in a
8      shop where they work on trucks. I was retained
9      by the plaintiff. I found that an outside
10     company had brought a gasoline powered vehicle
11     in and operated it and it created the toxic
12     poisoning of the worker.
13 Q.  Okay. That case did not involve a product?
14 A.  There was a product, but there was not a defect
15     in the product. It was misuse of the product.
16 Q.  Okay. And next you have the trial testimony of
17     Walters v. Otterbine; is that correct?
18 A.  Yes. The same case as above.
19 Q.  All right. What about Cannon versus Granny's
20     Lemonade?
21 A.  That was an electrocution of a worker and a
22     family member of a company that sells lemonade.
23     He was electrocuted when he was setting up the

Page 230

1      equipment. I was retained by the plaintiff.
2      And I found the cause was incorrect wiring had
3      been done to the truck after its original
4      assembly by the owner of the company
5      essentially. And also there was a defect in
6      the wiring, the premises wiring that it was
7      plugged in to.
8  Q.  Okay. And Tolbert versus Craft Electric?
9  A.  That's the same case as above, but that was the
10     trial testimony.
11 Q.  Okay. What about Coale versus IPSCO?
12 A.  A steel company, a worker was at the steel
13     company and was crushed to death. I was
14     retained by the plaintiff. I found that the
15     facility that had the steel equipment installed
16     had improper procedures and didn't use proper
17     lock-out/tag-out procedures that resulted in
18     the death.
19 Q.  Did that case involve a defective product?
20 A.  Not that I recall. It was defective processes
21     at the plant.
22 Q.  Okay. Staples versus Fluke Instruments?
23 A.  That was an electrical worker that was shocked

Page 231

1      when he touched wiring that a piece of test
2      equipment had said was safe to touch. I was
3      retained by the plaintiff and I found the cause
4      was intermittent operation of the test
5      equipment, it was defective.
6  Q.  Okay. What product was involved again?
7  A.  A Fluke voltmeter.
8  Q.  A Fluke voltmeter?
9  A.  Fluke is a company. Voltmeter is the test
10     equipment.
11 Q.  Okay. And you found it was defective?
12 A.  Yes.
13 Q.  The next case is Ficker versus Onyx
14     Environmental?
15 A.  Onyx. That was an affixation at an
16     environmental cleanup company. I was retained
17     by the plaintiff and I determined that there
18     had been a cross-connection of his breathing
19     air with improperly labeled nitrogen at the
20     plant and that's what resulted in his
21     affixation.
22 Q.  Which side retained you?
23 A.  By the plaintiff.

Page 232

1  Q.  Okay. What product was involved in that case?
2  A.  A number of different products. There was a
3      mask, there was a hose, there was a filter,
4      there was a set of piping, and I determined
5      that the piping was improperly labeled by the
6      plant operators.
7  Q.  Okay. Now, these last two cases are also Altec
8      cases, and I assume the plaintiff hired you and
9      those cases involved bucket trucks?
10 A.  Yes.
11 Q.  Okay. Have you ever been involved in a case
12     involving an industrial used saw?
13 A.  Yes.
14 Q.  Okay. And what kind of saw were you --
15 A.  One that occurs to me right away is a metal
16     tube making company up in Northeast Alabama.
17     And I believe it resulted in an amputation.
18 Q.  Okay. What kind of saw was it? Was it a
19     circular saw? Was it a table saw?
20 A.  It was a fixed circular saw used in a
21     production line.
22 Q.  Okay. What caused the accident?
23 A.  I believe it was -- I don't recall. I believe

Page 233

1   a guard was bypassed, but I don't recall. I
2   don't think that ever went to trial.
3 Q.   Okay. Now, what about drills, have you been
4   involved in any other cases involving drills,
5   whether handheld drills or fixed operated
6   drills?
7 A.   I've had a large drill, an under river drill,
8   underground drilling from an above ground
9   location that killed a man. That's not a
10   handheld drill, that's a large drill.
11 Q.   Okay. What caused the accident?
12 A.   The procedures that they used on guiding the
13   drill in the exit procedures.
14 Q.   What about chain saws, have you ever testified
15   in a case -- involved in a case involving a
16   chain saw?
17 A.   No, not that I recall.
18 Q.   Okay. I think you mentioned vehicles, you've
19   been involved in some vehicular product cases,
20   correct?
21 A.   Yes.
22 Q.   All right. What about aircraft, have you been
23   involved in any cases involving defects with

Page 234

1   airplanes?
2 A.   Of course, as I've mentioned, I have
3   investigated or I have reviewed all of the
4   Army's class A, B and C aircraft accidents for
5   a five year period, but that was not for cases.
6   I don't think I have been -- well, I have been
7   representing the government in a case where a
8   Chinook was alleged to be defective.
9 Q.   What were your opinions in that case?
10 A.   That we had assessed it and found it to be a
11   hazard. It involved a whistleblower case
12   against, I think, Boeing. And I had assigned a
13   risk assessment to it.
14 Q.   All right. And you found the Chinook
15   helicopter to be defective?
16 A.   It had -- it required replacing. We required
17   the transmission to be replaced by Boeing with
18   the gears that were in it.
19 Q.   I'm looking for the diagram that you put
20   together. I'm just about done, I think. I've
21   got to find the diagram that you did for your
22   redesign.
23 A.   Okay. That should be alternative design, it

Page 235

1   should be right here.
2 Q.   All right. We've got these manuals, we've done
3   that. What's that right there? Have I looked
4   at that?
5 A.   This is the manuals.
6 Q.   Okay. Well, you probably just want to eat
7   lunch, but I'm about done, I think.
8       (Lunch recess.)
9 BY MR. SPRAIN:
10 Q.   Let's go back on the record. I'm only going to
11   be a few more minutes, because then I'm going
12   to go through all of the notes and have a whole
13   bunch more questions after he finishes. Maybe
14   not. Exhibit nine to your deposition is a
15   folder that contains a few documents. One is a
16   diagram. Is this one page diagram the
17   electrical diagram for the redesign which you
18   have proposed in conjunction with Mr. Shaver
19   for the DM500 core drill?
20 A.   For the functional redesign, yes.
21 Q.   The functional redesign. What is this exactly?
22 A.   That's a diagram of the equipment that we have
23   here in the building.

Page 236

1 Q.   Okay.
2 A.   For a production model I would use some
3   different components. We can probably leave
4   out the relay. We didn't have a push button
5   that would handle the right currents. I would
6   use a safety certified push button like I have
7   in the folder.
8 Q.   Which one of these is the safety certified push
9   button?
10 A.   This would be an example.
11 Q.   This is an example. And I won't mark this
12   separately, but this is part of Exhibit 9 and
13   it's entitled "Opto-Touch;" is that right?
14 A.   Yes.
15 Q.   And it's got an infrared sensor as I read
16   before?
17 A.   I believe it does, yes. There are different
18   methods of doing that.
19 Q.   Okay. And if this was installed on the core
20   drill, the operator would put their finger
21   inside this opening and they wouldn't have to
22   press it?
23 A.   That's right.

Page 237

1  Q.  And if they stepped away from the machine, the
2      machine would turn off essentially?
3  A.  Yes.
4  Q.  Okay.  And by stepping away, that would include
5      removing your finger from the inside of the
6      Opto-Touch sensor?
7  A.  Correct.
8  Q.  Okay.  And that would serve the same purpose as
9      the push button deadman switch --
10 A.  Yes.
11 Q.  -- which currently Mr. Shaver has installed on
12     the core drill?
13 A.  Right.
14 Q.  All right.  And what do we have in my hand
15     here?  Just read into the record what that is.
16 A.  It's a Design Flex catalogue, it's a series of
17     vacuum switches available from one
18     manufacturer.
19 Q.  Okay.  In your system diagram, it includes a
20     vacuum sensor switch; is that right?
21 A.  Yes.
22 Q.  Okay.  And just point where that is?
23 A.  That's labeled vacuum switch.

Page 238

1  Q.  Okay.  Did Mr. Shaver install a vacuum switch
2      on his proposed redesign?
3  A.  He did.
4  Q.  Okay.  Is this the vacuum switch he used?
5  A.  I believe it is.  I called that company, I
6      believe, and asked for one.
7          MR. SPRAIN:  Okay.  I'm going to let
8          Mr. Sheehan ask some questions of
9          you at this time.  I may have some
10         further questions a little bit
11         later on.
12         MR. SHEEHAN:  Mr. Frost, we had some
13         CDs, there were four CDs that I
14         think you brought with you.
15         MR. LANE:  She's still copying them.
16         MR. SHEEHAN:  Why don't we go and get
17         those and let's mark them?
18         MR. LANE:  They're not finished.  She
19         was having problems and I went up
20         there and helped her, Winston, but
21         she's in the process of --
22         MR. SHEEHAN:  Why don't we go on and
23         mark them then, at least get the

Page 239

1          case so we can mark the case?
2          MR. LANE:  Okay.
3          MR. SHEEHAN:  What I'm going to do is
4          mark everything.
5          MR. LANE:  Okay.
6          (Off-the-record discussion.)
7
8              CROSS-EXAMINATION
9  BY MR. SHEEHAN:
10 Q.  Just so we can try to identify everything, we
11     will begin, if that's agreeable with you, Mr.
12     Frost, with Frost Exhibit Number 20?
13 A.  Yes.
14 Q.  As I understand, you brought with you four CDs
15     that you had reviewed?
16 A.  Yes.
17         (Defendant's Exhibits 20, 21, 22, 23
18         marked for identification.)
19 Q.  One was the Riley video of the first
20     inspection?
21 A.  Yes.
22 Q.  That's Exhibit Number 20.  Exhibit Number 21,
23     what was that CD of, sir?

Page 240

1  A.  I would have to see the CD.  The label is on
2      the CD.
3  Q.  Okay.  What were the three CDs that you had
4      reviewed?
5  A.  I believe they were photographs taken at
6      various times in the case.
7  Q.  Exhibit Number 22, what was that of, sir?
8  A.  I would have to see the CD.  They were filed
9      with my photographs, so I believe they were all
10     photographs or videos.
11 Q.  And Exhibit Number 23?
12 A.  The same answer.
13 Q.  And you've brought with you three books.  Are
14     these three books material you relied upon in
15     forming your opinion in this case?
16 A.  Yes.
17         MR. LANE:  We object to the form.
18 Q.  Those three books are Human Factors Evaluation
19     in System Development, copyright 1967?
20 A.  That sounds correct, yes.
21 Q.  And that's a book that you own?
22 A.  Yes.
23 Q.  Product Safety Management Guidelines, 2nd

Page 241

1    edition, copyright 1997?
2  A.   Yes.
3  Q.   Also a book you own?
4  A.   Yes.
5  Q.   Accident Prevention Manual for Business and
6       Industry, copyright 1997 as well?
7  A.   Yes.
8  Q.   And these three books are books that you own
9       and you maintain in your library?
10 A.   Yes.
11 Q.   You've also brought with you certain file
12      folders.  The file folders you brought, some of
13      them include notes that you have made during
14      the examination of the depositions that you
15      have provided that are contained within Frost
16      Exhibit Number 2?
17 A.   That's correct.
18 Q.   Are there any notes on any of these deposition
19      transcripts contained within Exhibit Number 2
20      to your deposition?
21 A.   I sometimes make a note on the front page just
22      of who the person is.
23 Q.   Now, I noticed you have a copy of your

Page 242

1    deposition transcript dated October the 27th of
2    2006?
3  A.   I do.
4  Q.   And in there there was an agreement that copies
5       of your files will be provided?
6  A.   I don't recall if that's in the deposition or
7       not.
8        MR. LANE:  And they are being provided,
9           but there will be a cost
10          associated with copying, but other
11          than that they are provided.
12       MR. SHEEHAN:  Or will be provided,
13          because we haven't gotten them
14          yet.
15       MR. LANE:  Will be provided, yes.
16 Q.   And as I understand it, the summaries of the
17      depositions that you have are in Exhibit
18      Number --
19 A.   Number 1.
20 Q.   All right, sir.  And what are these three pads
21      here, sir?
22 A.   Two pads are notes from reviewing the
23      depositions, that's called book one and book

Page 243

1    two.  And the third pad is notes that I made
2    during a review of the inspection video and
3    notes from an inspection that I did on October
4    20th.
5  Q.   All right, sir.  Can we mark then the first
6       note pad as Frost Exhibit Number 24?
7  A.   Yes.
8  Q.   And the second note pad as Frost Exhibit Number
9       25?
10 A.   Yes.
11 Q.   And the third note pad as Exhibit Number 26 to
12      your deposition?
13 A.   Yes.
14        (Defendant's Exhibits 24, 25, 26
15         marked for identification.)
16 Q.   And as I understand it, you've previously told
17      us that the notes you've highlighted will
18      not show up on the copy?
19 A.   No, I think they don't show up very well on my
20      copier; I think they do on some copiers.
21       MR. LANE:  Winston, if it will help you
22          any, we just copied this document
23          apparently earlier and the copy

Page 244

1    that he had, there was -- a little
2    bit did show up, but most of it
3    did not show up on our copy
4    machine.  So I don't know if that
5    helps you any.
6        MR. SHEEHAN:  Okay.  Thank you, sir.
7  Q.   If you could, sir, could you read to us what
8       you have here on Exhibit Number 26 so we can
9       interpret your handwriting there?
10 A.   Yes, I'm sorry about that.  The first line is
11      "Inspection video, paren, 55 minutes.  Drill
12      motor turns clockwise viewed from above.
13      Therefore base countertorque will be
14      counterclockwise."  And I have a picture.
15      "Some liquid is in the separator.  Cable torn
16      at entrance to the vacuum pump.  Bit is hollow.
17      Bar code number on the pump.  Pump hums, but
18      doesn't run, paren, GAST brand.  Pump found to
19      have water in filters at top."  And I have a
20      diagram.
21 Q.   And where was the water found?
22 A.   In the -- when the top was removed from the
23      vacuum pump water was found there.

Page 245

```
 1   Q.   In what part of the pump, sir?
 2   A.   At the very top surface, which is an area where
 3        filters and I believe maybe valves are present.
 4        It's the same area where the contamination was
 5        found.
 6   Q.   What's the name of that area of the pump?
 7   A.   I don't think I have a name for it.
 8   Q.   Do you know?
 9   A.   Let me check to see if the manual names that.
10   Q.   Well, before you look, do you know?
11   A.   No, I don't.
12   Q.   As we sit here today, you don't know what part
13        that was that had the water on it?
14            MR. LANE:  Object to the form.
15   A.   No, I don't.  There was water in the water
16        separator vial, but it was also in the top of
17        the pump.
18   Q.   Where the white powdery substance was located?
19   A.   Yes, sir.
20   Q.   What did that indicate to you, sir?
21   A.   The water, what did the water indicate?
22   Q.   Yes, sir.
23   A.   Water had entered into that area through some
```

Page 246

```
 1        fashion either during normal operation or when
 2        the unit was laid on its side or in some other
 3        way.
 4   Q.   And when did the water get on the top of that
 5        -- can we describe that as a diaphragm?
 6   A.   I expect there is a diaphragm in the area.  I
 7        don't know when it got there.
 8   Q.   Any way to tell?
 9   A.   From the water, I think not.  You could
10        possibly do some sort of carbon dating on the
11        water, but I don't know the method.
12   Q.   What about the white powdery substance, when
13        did that occur?
14   A.   I believe you would have had to have had some
15        operation of the pump to draw that material
16        around like I saw in the top of the pump.
17   Q.   And what do you base that on, sir?
18   A.   The fact it appears to me to have been spread
19        around, it's not all in just one location such
20        as a droplet of water would cause.
21   Q.   Do you have any basis for that or scientific
22        basis for that opinion?
23   A.   No, I can't be sure of when the corrosion
```

Page 247

```
 1        occurred.
 2   Q.   Is that corrosion, that white powdery
 3        substance?
 4   A.   It's an aluminum oxide that is commonly
 5        associated with corrosion in aluminum parts.
 6   Q.   Do you have any basis or scientific basis for
 7        opining as to when that corrosion occurred?
 8   A.   Well, it occurred before the inspection is all
 9        that we know for certain, I think.
10   Q.   And when was that inspection, sir?
11   A.   I don't think I have the date of the
12        inspection.
13   Q.   How long after the accident?
14   A.   A number of months.  I think I may have heard
15        18 months, I'm not sure.
16   Q.   All right, sir.  And you've identified where
17        you saw the water?
18   A.   No, that's an identification of the vacuum path
19        from the vacuum pump to the vent and then to
20        the gauge and then to the water separator and
21        then to the housing.
22   Q.   I'm sorry.  Can you help me with that diagram
23        there?
```

Page 248

```
 1   A.   Yes.  On the right is the vacuum pump labeled
 2        V-A-C.  It is then connected to a vent, labeled
 3        V-E-N-T.  It then goes to the analog gauge and
 4        then through the water separator vial, then
 5        through a hose to the base of the unit.
 6   Q.   All right, sir.  If you will continue there,
 7        sir?
 8   A.   "The area below filters full of white debris."
 9        That's in the top of the vacuum pump.  "Switch
10        controls top outlet."
11   Q.   What did you mean by that?
12   A.   The electrical switch, based on watching the
13        examination, appeared to turn on and off the
14        top outlet, which was the outlet intended to be
15        used for the drill motor.
16   Q.   And why did you highlight "switch control top"?
17   A.   Simply there's no control of the vacuum pump,
18        that it runs all the time that it's plugged in.
19        Do you want me to go on?
20   Q.   Please, sir.
21   A.   "Motor draws in the green current range when
22        free, turning free."  They x-rayed the unit,
23        just a sketch of the unit.
```

54  (Pages 245 to 248)

Page 249

1  Q.    And can you help us with that diagram you have
2         there, sir?
3  A.    The unit is set up such that -- depending on
4         which side you operate it from, but if you push
5         the handle down from the side where the base
6         is, then it causes the motor to go down.
7  Q.    And you've got some writing out to the side
8         there?
9  A.    "Down to lower drill and slides to opposite
10        side." Oh, that was the -- the handle itself
11        would slide through the rotating mechanism. It
12        could be operated from either side.
13 Q.    All right, sir.
14 A.    Next is "difficulty causing the clutch to
15        slip." As they tried to cause the clutch to
16        slip, it was of such strength that they
17        couldn't retain the motor very easily.
18        "Finally released at 198.6 foot pounds and
19        231.2 foot pounds and 217.5 foot pounds."
20 Q.    And why did you circle "231.2 foot pounds"?
21 A.    That was the highest of the three.
22 Q.    All right, sir.
23 A.    On the next page, "Nut on bottom of

Page 250

1         transmission had 47.2 foot pounds, 47.1 and
2         48.7," those are all in foot pounds. "39.2
3         foot pounds in the opposite direction. Rotated
4         in the same direction as the bit which releases
5         the nut. Clutch disk is a sandwich of
6         washers."
7  Q.    And the third sheet there, sir?
8  A.    This is an inspection on October 20th of a new
9         version of the unit. It had a transmission
10        output of 900 and 450 RPM. And I calculated
11        that to be 15 and 7.5 revolutions per second,
12        which works out to be point 067 and point 133
13        seconds per revolution.
14 Q.    And what did you inspect on October the 20th of
15        2006?
16 A.    The similar unit with the Milwaukee title on
17        it.
18 Q.    And where was that inspection?
19 A.    That was at this office.
20 Q.    And who was present for that inspection?
21 A.    Mr. Lane and Mr. Shaver.
22 Q.    And did you take any photographs of that?
23 A.    I did.

Page 251

1  Q.    And where are they?
2  A.    They're in the photograph folder. These are
3         those photographs, plus an adjusted version
4         that I've already produced.
5  Q.    So you only have three sheets of photographs,
6         sir?
7  A.    That's right. This a second copy of the same
8         photographs. At my last deposition someone
9         asked me to bring a copy of these, so that's
10        what this is.
11 Q.    Would you rather us use the copy?
12 A.    They're the same.
13 Q.    All right, sir.
14        (Defendant's Exhibits 27, 28, 29
15        marked for identification.)
16 Q.    So the only photographs you have of that
17        inspection have now been marked as Frost
18        Exhibits 27, 28 and 29?
19 A.    Yes.
20 Q.    All right, sir. If you will, continue with
21        your notes there?
22 A.    There is a diagram below that gives the
23        dimensions of the vacuum area of the base as 10

Page 252

1         by 14 inches, and a measurement from the center
2         of rotation of the drill to the center of the
3         vacuum pressure area, which was 13 and a half
4         inches. Out to the side, the 10 by 14 is shown
5         to be 140 square inches. I confirmed that
6         rotation is clockwise as viewed from above and
7         that the torque on the base unit is
8         counterclockwise as viewed from above. Down
9         below I calculated or showed that when we took
10        it to 20 inches of Mercury it compressed the
11        gasket, it would suck down at that level. And
12        I calculated one inch of Mercury is point 491
13        pounds per square inch, therefore, 20 inches is
14        equal to 9.823 pounds per square inch. Given
15        140 square inches at 20 inches of Mercury, that
16        gives a 1,375 pound force available at normal
17        vacuum acting at the center.
18 Q.    And what did you mean acting at the center?
19 A.    The effective force location of a vector for
20        calculations would be at the center of the
21        vacuum area.
22        Next is a calculation using that moment
23        arm of 13.5 inches and the 231 foot pounds of

Page 253

1  force found during the inspection, which
2  converts to 2,772 inch pounds of force. And
3  resolving that equation, it says you would need
4  205 pounds of force at the center of the vacuum
5  area to withstand a 231 foot pound torque. In
6  other words, you need that much strength to
7  hold the base from sliding horizontally.
8      I calculated the 1,375 pounds of force
9  available from the vacuum, divided it by the
10  205 foot pounds -- or pounds horizontal force
11  needed and found a ratio of 6.7 to one. In
12  other words, that much more force available
13  than required. And that implies that a surface
14  with a coefficient of friction of point 15 is
15  required for that vacuum to hold the base at
16  the maximum torque on the clutch.
17  Q.   And where did you arrive at that coefficient of
18      friction?
19  A.   One over 6.7.
20  Q.   And based upon what?
21  A.   That's how you calculate coefficient of
22      friction.
23  Q.   And what was the condition of the flooring

Page 254

1  there at Flavor House?
2  A.   It was a wet concrete floor. Typically in my
3  experience, and I've measured those several
4  times, they can range point seven or point
5  eight down to maybe point four. So point 15 is
6  essentially slippery ice.
7  Q.   Do you have any notes other than these on Frost
8  Exhibit Number 26 with respect to the
9  calculations?
10  A.   No.
11  Q.   Now, you've got these books, I guess you have
12  described them as book one and book two with
13  your summaries?
14  A.   Yes.
15      SHEEHAN: Joe, are you sure this isn't
16          going to copy, this blue?
17      MR. LANE: We can try it again.
18      MR. SHEEHAN: I mean, could she put it
19          on dark so we don't have to go
20          over it?
21      MR. LANE: Sure.
22      MR. SHEEHAN: Let's try one and it
23          might save some time.

Page 255

1  A.   That will probably work on dark.
2      MR. SHEEHAN: Just do the first one or
3          maybe a couple of them and make
4          some samples so we can save some
5          time.
6      MR. LANE: Sure.
7      (Off-the-record discussion.)
8  Q.   Sir, we've tested the blue highlighter on the
9      Exhibit Number 24 and it does appear that the
10      blue will come up if we put it on dark. And
11      we've agreed that we'll make one set on light
12      so that we don't have a bleed through and then
13      a second set on dark so that the blue does pick
14      up; is that fair?
15  A.   That's my understanding, yes.
16  Q.   Just as an example I will put Frost Exhibit 24.
17      Have you summarized all of the depositions
18      you've reviewed in this case, sir?
19  A.   I have. I scanned over mine, I didn't take any
20      notes from that.
21  Q.   And as I understand it, you've submitted a
22      report of findings and it's been marked Exhibit
23      7B?

Page 256

1  A.   Yes.
2  Q.   Do you plan to do any further work on this
3      case?
4  A.   Only if asked. I understand there will be
5      depositions of more of the parties; if they
6      affect the work I've done, I would expect I
7      might review those.
8  Q.   All right. Would you let Mr. Lane know if you
9      change your opinions or add to your opinions in
10      this matter?
11  A.   Yes.
12  Q.   So that we can redepose you so we're not
13      surprised at the trial; is that fair?
14  A.   I understand, yes.
15  Q.   All right, sir. And as I understand it, this
16      Milwaukee operators manual appears to have been
17      published after the accident?
18  A.   It appears to be, yes.
19  Q.   And I notice you've tabbed certain parts of
20      this Milwaukee operators manual, maybe just for
21      point of reference what if we mark it as Frost
22      Exhibit Number 30.
23      (Defendant's Exhibit 30 marked

Page 257

1              for identification.)
2    Q.    And what do your color tabs indicate to you,
3          sir, and why the use of different colors?
4    A.    Well, the tabs are just items of interest and I
5          think the orange ones were of more interest.
6          Let me see.  Yes.
7    Q.    All right, sir.  Now, on Exhibit Number 30, the
8          Milwaukee operators manual, you've also
9          highlighted areas here.  And I notice on page
10         three you've also put in blue and highlighted
11         paragraph six, and what was the purpose of
12         that, sir?
13   A.    Simply the statement that it requires the use
14         of water and that was just a note that that
15         helps with the vacuum, water in the area will
16         help with the vacuum.
17   Q.    On page, it looks like, six of the manual
18         you've also got some highlighted material in
19         blue?
20   A.    Yes.  In this case the new unit has the drive
21         -- linear drive gear for the up and down
22         movement on the opposite side of the vertical
23         post.

Page 258

1    Q.    And what significance was that to you?
2    A.    I don't think a major significance, it was just
3          a difference.
4    Q.    On page eight you've highlighted "Methods for
5          securing equipment to work surface," and what
6          was the purpose of that, sir?
7    A.    This is procedures for how you properly attach
8          the unit to the work surface to prevent
9          rotation.  And it's followed by a warning which
10         appears to have been in color, I don't have the
11         color version, with a statement of the
12         importance of securing the rig surface.
13   Q.    And you've also highlighted the note there?
14   A.    Yes.
15   Q.    Why was that?
16   A.    They're pointing out that the bits can cut
17         through embedded steel in concrete.
18   Q.    On page nine you also have a red tab?
19   A.    Yes.
20   Q.    And what was the purpose of that, sir?
21   A.    In this case the instructions are to step on
22         the vacuum pad until the vacuum pad lowers and
23         adheres to the work surface.  So it's a

Page 259

1          recognition that you do need to in fact step on
2          the vacuum pad to get it to work right.
3    Q.    Okay.  And should you remain on the vacuum pad?
4    A.    It doesn't say get off or not, therefore, I
5          mean, if you follow it specifically, you would
6          step on and never step off.
7    Q.    And would that have been proper procedure for
8          either Mr. Riley or Mr. Walters?
9    A.    In my opinion, if you're going to operate this,
10         you're better off stepping on the vacuum pad
11         because it helps it retain vacuum.
12   Q.    And should you stand on the base with both
13         feet?
14   A.    If you can do that comfortably that would help
15         even more.  I'm not sure there's room to do
16         that.
17   Q.    What would you recommend?
18   A.    As far as stance?
19   Q.    Yes, sir.
20   A.    First, I don't think you can operate it safely
21         given its design.  If for some reason you had
22         to operate this, I would recommend putting a
23         foot up on the center of it where people appear

Page 260

1          to put their foot and putting as much pressure
2          as you can on it.
3    Q.    Should more than one person stand on the base
4          of the machine at one time while it's
5          operating?
6    A.    I don't think so.  That would double the number
7          of people exposed to the equipment.
8    Q.    Okay.  Would that help hold it down though?
9              MR. LANE:  Object to the form.
10   A.    It would add some force to it.  The weight of
11         the people is fairly small compared to the
12         1,300 pounds of force the vacuum should
13         provide.
14   Q.    Okay.  I'm confused.  Are you recommending then
15         if this machine is used that people ought to
16         stand on it?
17   A.    If this machine is used, which I don't think it
18         should be, I think it's better to stand on the
19         machine than to stand next to it.
20   Q.    Are you recommending that they stand on the
21         machine?
22   A.    I am, as you can comfortably and ergonomically
23         do it.  You shouldn't stand on top of the

Page 261

1    vacuum pump or something like that, but resting
2    your left foot on the machine I think would
3    make it more stable.
4  Q.  All right, sir.  And should they face the drill
5    bit or should they face the vacuum pump when
6    they're standing on the machine?
7  A.  Well, by its design you have to face with your
8    hand on the handle that raises and lowers it.
9    If you are right hand dominant, you would be 45
10    degrees roughly.
11  Q.  All right.  So do you face the vacuum pump or
12    do you face the drill bit?
13       MR. LANE:  Object to the form.
14  A.  I would think approximately in between the two.
15  Q.  I'm sorry, which way are you facing as you're
16    standing on the machine?
17  A.  Your right hand is towards the handle that
18    raises and lowers the drill bit, your face is
19    catty-cornered to the base.
20  Q.  I'm sorry.  Are you looking at the drill bit or
21    are you looking at the vacuum pump when you're
22    standing on the machine?
23  A.  You're looking essentially at the vertical post

Page 262

1    that the drill motor is mounted to.
2  Q.  And if you look down would you see the vacuum
3    pump or would you see the drill bit?
4  A.  You would look down and see roughly the base of
5    the vertical post.
6  Q.  I know, but would you see the vacuum pump or
7    would you see the drill bit?
8       MR. LANE:  Object to the form.
9  A.  I believe you would see both.  They're both
10    within your field of view.
11  Q.  All right.  I'm sorry, I'm just confused here.
12  A.  Let me get the right photos.
13  Q.  Please.  Why don't we use that one right there?
14  A.  Very good.
15       MR. LANE:  Well, that's not looking
16       down, if you've got one.
17       MR. SHEEHAN:  We've got one right here.
18       MR. LANE:  That's not looking down
19       though, Winston.
20       MR. SHEEHAN:  This will do.  This will
21       help me understand where he would
22       position himself.
23  Q.  We're looking at Exhibit Walters Number 27; is

Page 263

1    that right, sir?
2  A.  That's what that is, yes.
3  Q.  All right, sir.  If you will, show me on
4    Exhibit Number 27, if you will circle where
5    they should be standing?
6       MR. LANE:  Object to the form.
7  Q.  And you're welcome to use that blue pen there,
8    sir.
9  A.  All right.  And, again, let me start, I don't
10    think you can safely stand on this and survive
11    a vacuum failure.  If you were going to try and
12    do that, putting your foot generally --
13  Q.  Why don't you draw the foot and, if you will,
14    sir, maybe show toes so we'll know which
15    direction they would be facing?
16       MR. LANE:  Object to the form.
17  Q.  Five toes.
18       MR. LANE:  I don't think that's -- I
19       don't think that's justified at
20       all showing toes.  If you want to
21       draw the front of a shoe or a
22       boot, that's fine, but toes is a
23       little bit --

Page 264

1  Q.  That's fine.
2  A.  I will draw the shoe outline and the direction
3    they're facing.
4  Q.  Sir, just so we're clear, if you will, draw the
5    -- what we're trying to picture is where the
6    operator would have been facing; with that
7    understanding, can you draw a shoe?
8  A.  He would be facing slightly different than his
9    shoe is facing.
10  Q.  All right.  Why don't we start with the shoe
11    and then we will go from there using Exhibit
12    Number 27 there?
13  A.  I'm going to first point out the general area
14    that I believe you would typically put your
15    foot in and then I'm going draw a most likely
16    area.  With the heel in this direction.
17  Q.  All right.  Why don't you put heel there, sir?
18  A.  (Witness complies.)
19  Q.  Let's stop at one.  Let's just work at one
20    thing at a time, you think it would help
21    all of us?  Is that fair?
22  A.  Yes.  I'm trying to use the best exhibit
23    possible, but you want to use this?

Page 265

1 Q.   All right.  So you've got a heel.  And why
2     don't you put "front" so we know that that's
3     the front of the shoe?
4 A.   (Witness complies.)
5 Q.   And that would be your recommendation of where
6     someone should put their foot when standing on
7     this machine?
8         MR. LANE:  Object to the form.
9 A.   Again, I don't think anyone should operate this
10     machine in its condition.  If you were going to
11     try and do that, this would help stabilize it.
12 Q.   And, I'm sorry, you've got two circles there,
13     can you help me understand why you have two
14     circles?
15 A.    Yes.  The larger circle is the areas that your
16     foot might rest in.  There's not an exact
17     position.  There's no reason the foot couldn't
18     be an inch to the left or to the right.
19 Q.    All right.  Let's mark that photograph since
20     you've identified it as Frost Exhibit Number
21     31, which is also Mr. Walters' Exhibit Number
22     27; is that fair, sir?
23 A.    Yes.

Page 266

1         (Defendant's Exhibit 31 marked
2         for identification.)
3 Q.    All right.  Now, we were talking about page
4     nine.  And I see you've highlighted page nine
5     there.  Paragraph three, why did you underline
6     that?
7 A.    That has step three, leveling the rig with the
8     four leveling screws and using the bubble
9     level.
10 Q.    And why did you highlight level the rig with
11     the four leveling screws?
12 A.    In the manual that the accident unit had, the
13     manual is in error and it has incorrect
14     statements about when to use those and how to
15     use them.  This manual is clearer.
16 Q.    And this is the Milwaukee manual?
17 A.    Yes.
18 Q.    Published after the accident?
19 A.    Yes.
20 Q.    And you've put this red tab here over paragraph
21     five?
22 A.    It's above paragraph six.
23 Q.    Okay.  And why did you highlight paragraph six?

Page 267

1 A.    Because in this manual it specifically tells
2     you to step on the vacuum pad and some have
3     criticized Mr. Riley for stepping on the vacuum
4     pad.
5 Q.    Do you find -- do you find that an unwarranted
6     criticism of Mr. Riley?
7 A.    I do.
8 Q.    And why is that, sir?
9 A.    His stepping on the pad did not cause the
10     accident, it probably helped reduce the
11     probability of the accident.  It's not
12     prohibited.  It's not a contributor to the
13     accident.
14 Q.    And paragraph seven, you have highlighted that,
15     too?
16 A.    In seven I've highlighted the fact that they
17     clearly point out that 20 inches of Mercury is
18     required to tighten the vacuum pad down.  And
19     then there's a warning immediately after that
20     drawing further attention to that requirement.
21 Q.    Is this the only red tab you have in this
22     operators manual?
23 A.    The only one I recall.

Page 268

1 Q.    And on page ten you've highlighted "coring
2     procedure"?
3 A.    Yes.
4 Q.    And what is that, sir?
5 A.    This is just the beginning of the section that
6     tells you how to drill a core.
7 Q.    And did Mr. Riley follow the coring procedures
8     as set out on page ten and page 11?
9 A.    Of course, he didn't have these, let me see if
10     his steps did.  Step five says "If you're using
11     a vacuum system, read the instructions for
12     specific setup."  He did not do that because
13     such instructions didn't exist and he didn't
14     have even the manual that did exist.  It goes
15     on to say "don't continue until the vacuum
16     gauge reads at least 20 inches of Mercury."  He
17     checked the gauge, but didn't know how high it
18     should be.  Step nine has specifics about water
19     flow rates, I don't think he had any knowledge
20     of that.
21 Q.    I'm sorry, what did he do with respect to nine,
22     paragraph nine there?
23 A.    He observed that water was flowing.  His memory

Page 269

```
 1      is that the hose was laying next to the bit.
 2      His supervisor's memory is that he -- clear
 3      memory is that he connected the hose to the
 4      fitting.
 5   Q.   Well, did he properly operate that using the
 6      hose?
 7   A.   Did Mr. Riley properly operate it?
 8   Q.   Yes, sir.
 9   A.   The hose should have been connected to the
10      fitting at the top of the core bit as
11      Mr. Walters said he did.
12   Q.   And why would you do that?
13   A.   That helps provide lubrication to the drill bit
14      down in the hole.
15   Q.   And what happens if you don't connect the hose?
16   A.   It can cause increased wear on the drill bit
17      and could contribute to problems drilling the
18      hole, such as if the friction increased and
19      grit built up.
20   Q.   Could that cause an accident such as in this
21      matter?
22   A.   It wouldn't cause the accident.  It could make
23      binding more likely possibly.
```

Page 270

```
 1   Q.   Could it contribute to the accident?
 2        MR. LANE:  Object to the form.
 3   A.   Well, binding I expect to happen on a regular
 4      basis.  There will be many events of binding,
 5      it's just one of the reasons you might get
 6      binding.
 7   Q.   And are you finished reading the operating
 8      instructions?
 9   A.   Let me check ten.  Well, he didn't get to
10      completing the cut, so that wouldn't apply.
11      But other than the notes that I've mentioned, I
12      think he in general did follow this procedure.
13   Q.   All right, sir.  If you will, just in summary
14      then, tell us what procedures Mr. Riley did not
15      follow as outlined?  And I assume -- would
16      these be the procedures that you would follow
17      in operating a core drill machine?
18   A.   Again, this core drill machine I don't think,
19      even following these procedures, is safe
20      because of the fact that you can lose vacuum,
21      but these procedures are much better than what
22      was in the manual for this machine.
23   Q.   All right.  And if you would, sir, what
```

Page 271

```
 1      procedures did Mr. Riley not follow as set out
 2      in the Milwaukee manual which was published
 3      after the accident?
 4   A.   The specifics of the section called "Assembling
 5      and using the vacuum system" he did not have
 6      available to him.
 7   Q.   No, sir.  I've noticed this entire deposition,
 8      if you will, if you will answer the question,
 9      it will just save time, but then again --
10        MR. LANE:  Object to the form.
11   Q.   Would that be fair?
12   A.   He did not follow --
13   Q.   Wait just a minute.  Would that be fair?
14   A.   It sounds fair, yes.
15   Q.   Just to answer the question; is that fair?
16        MR. LANE:  He's trying to answer the
17          question.
18   Q.   Just so we've got some framework here, if we
19      ask a question, would you answer it for us?
20        MR. LANE:  Object to the form.
21   A.   I am trying to do that, I will continue.
22        MR. LANE:  Object to the form.
23          Winston, that's uncalled for.
```

Page 272

```
 1          That is uncalled for.
 2   Q.   If you will, sir, what procedures did Mr. Riley
 3      not follow as set out in the Milwaukee manual?
 4        MR. LANE:  As set out -- okay.
 5   A.   The procedure in the Milwaukee manual tells him
 6      not to continue until he has 20 inches of
 7      Mercury vacuum.  As I said, he checked that he
 8      had some vacuum, but he did not know what
 9      vacuum level to check for.
10   Q.   Is that the only procedure that he --
11   A.   Let me find -- this references you to another
12      section.  This refers you to the section on
13      page nine, which includes leveling the rig with
14      the screws.  He doesn't recall doing that, but
15      his supervisor says that was done before he got
16      on the machine, so I think he met that.
17   Q.   And if he hadn't, what effect, if any, would
18      that have been?
19   A.   I don't think it would have significant effect.
20      When the base unit sucks down in the case where
21      I've tested it, it has very little movement.
22      It compresses the gasket and it's relatively
23      stable.
```

Page 273

1  Q.  And you're talking about the modified Shaver,
2      Davis, Frost machine?
3  A.  Yes.  The vacuum system itself is not modified,
4      but the vacuum housing is almost, if not,
5      identical to the accident unit.
6  Q.  But we're talking about the Shaver, Frost,
7      Davis modified machine?
8  A.  If you would like to call it that, yes.  These
9      procedures again say after the pad is secured
10     with at least 20 inches of Mercury.  I don't
11     think that this pad had 20 inches of Mercury on
12     it at the time of the injury.
13 Q.  All right.  What was the gauge reading at the
14     time of the injury?
15 A.  I don't think we know.  At the time of the
16     injury that can be calculated.  I haven't done
17     that.  It would be something on the order of
18     less than five inches of Mercury.
19 Q.  Was it an immediate loss of vacuum or a gradual
20     loss of vacuum?
21 A.  It could be either.
22 Q.  Well, in your opinion, what was it in this
23     case?

Page 274

1  A.  In my opinion it could have been either.
2  Q.  Over what period of time did that vacuum lose
3      pressure?
4  A.  It could have been gradual from the beginning
5      of his ten minute drilling cycle or it could
6      have occurred in the last minute, I have no way
7      of knowing.
8  Q.  And what would have happened as it gradually
9      lost pressure?
10 A.  With this design?  The gauge would slowly
11     change and go to a lower level and at a certain
12     point the effectiveness of the restraint would
13     be lost.  And if there is any binding, it would
14     spin.
15 Q.  Have you now told us all of the procedures that
16     you are aware of that Mr. Riley did not follow
17     in properly setting up the machine?
18 A.  Again, these are procedures from a manual that
19     didn't exist at the time, but those are steps
20     in this manual that he did not follow.
21 Q.  Are there any other steps that he didn't
22     follow?
23 A.  Not that I'm aware of.

Page 275

1  Q.  What is glazing?
2  A.  Glazing is a polishing of the cutting surface
3      and it loses its effectiveness of cutting.
4  Q.  And I see you've tabbed page 13 of the
5      Milwaukee manual and why was that, sir?
6  A.  This describes how to clean the filter on the
7      vacuum pump.
8  Q.  And why did you tab that page, sir?
9  A.  It's important to keep the filter clean in
10     order to maintain vacuum.  And I believe that
11     the original owners manual did not address
12     that.
13 Q.  Why did you tab this particular page 13 of the
14     Milwaukee manual?
15 A.  Because that's something that should have been
16     in the original manual.
17 Q.  I guess more particular, why did you highlight
18     those particular sections on page 13?
19 A.  The first section I've highlighted is simply
20     the subject of replacing the gaskets.
21 Q.  Why did you highlight that, sir?
22 A.  Because the gasket is one component involved in
23     this accident.

Page 276

1  Q.  Okay.  And how was it involved in the accident?
2  A.  It is the method of transmitting the vacuum
3      from the vacuum pad to the concrete itself.
4  Q.  Okay.  And did that function properly?
5  A.  I believe that it failed to maintain that seal.
6      I don't think there's a defect in the gasket
7      itself.
8  Q.  And why did it fail?
9  A.  Probably through irregularities in the surface
10     that it was resting on.
11 Q.  And what do you mean by that?
12 A.  Normal bumps in concrete.
13 Q.  And what do you mean by that?
14 A.  Up and down variations in the concrete, it
15     might be dirt, it might be just the normal
16     ripples in the concrete.
17 Q.  And that caused the vacuum to fail?
18     MR. LANE:  Object to the form.
19 A.  I would think that's a likely cause.
20 Q.  And up here you've highlighted paragraph four
21     on page 13?
22 A.  Yes.  This manual requires a bead of rubber
23     cement to be installed with the gasket, which

Page 277

1  was not done with the accident unit.
2  Q.  And you've also highlighted certain areas --
3      other areas of page 13?
4  A.  Yes.  As I mentioned, the process for cleaning
5      the filter on the vacuum pump.
6  Q.  And was that not done?
7  A.  Testimony from United indicates that they did
8      not clean the filters.
9  Q.  Well, do you believe they were cleaned?
10 A.  I trust the testimony, that they were not
11     cleaned.
12 Q.  And what filters were not cleaned?
13 A.  The vacuum pump filters.
14 Q.  And where are they located?
15 A.  In the vacuum pump.
16 Q.  And where on the vacuum pump are they located?
17 A.  My understanding is they are at the top of the
18     vacuum pump.
19 Q.  And where in the top of the vacuum pump are
20     they located?
21     MR. LANE:  Object to the form.
22 A.  In the top half inch.  The top is removed I
23     think with four screws and they're behind that,

Page 278

1  maybe five screws.
2  Q.  And what is this filter made of?
3  A.  I do not know.
4  Q.  And how do you clean this filter?
5  A.  I can tell how Milwaukee recommends it, if you
6      would like me to read that.
7  Q.  Well, do you know as we sit here today?
8      MR. LANE:  Object to the form.
9  A.  No, sir.
10 Q.  Are you opining as to any maintenance problem
11     caused by United Rentals or is that a matter
12     for another expert?
13 A.  One of the potential causes for this machine to
14     lose vacuum would be a dirty filter.  We know
15     the whole area was clogged with corrosion after
16     the accident.  I believe it's likely that there
17     were problems with the filter before the
18     accident.
19 Q.  And is that based upon a reasonable degree of
20     engineering certainty?
21 A.  I know the filter had clogging, I don't know
22     when that clogging occurred.
23 Q.  All right.  My question to you is, was that

Page 279

1  based upon a reasonable degree of engineering
2  certainty?
3  A.  Yes, it is.
4  Q.  Okay.  And what scientific analysis or support
5      do you have for that opinion, sir?
6  A.  The material in the area was analyzed and we
7      have a report of what that material was and
8      I've seen photographs of the material.
9  Q.  And it's your opinion, based upon a reasonable
10     degree of engineering certainty, that that was
11     present at the time of the accident?
12 A.  That part I can't be certain of, the exact time
13     when it occurred.
14 Q.  How long does it take for that aluminum oxide
15     to occur?
16 A.  It depends on the temperature, humidity and --
17 Q.  What temperature, sir?
18 A.  I don't know what the temperature it was
19     exposed to was, so I can't determine when it
20     occurred.
21 Q.  What about humidity, what amount of humidity
22     would be necessary for the amount of aluminum
23     oxide on the diaphragm to have appeared?

Page 280

1  A.  I don't know that.
2  Q.  So I guess how are you able to state with any
3      degree of engineering certainty?
4  A.  That contamination was present is based on the
5      post-accident examination.
6  Q.  Right, sir.  And so what is the scientific
7      basis for your opinion that that was present at
8      the time of the accident?
9  A.  No.  I've said that I think it was present in
10     the post-accident examination.  I don't know
11     when it occurred.
12 Q.  Right, sir.  And my question to you is, is that
13     opinion based upon any degree of engineering
14     certainty that it was present at the time of
15     the accident?
16 A.  My opinion is that it was present at the time
17     of the examination.  I don't know if it was
18     present at the time of the accident.
19 Q.  All right.  Help me if you would, I'm not sure
20     whether -- maybe we're getting hung up on
21     semantics, but is it your opinion, based upon a
22     reasonable degree of engineering certainty,
23     that that aluminum oxide was present at the

Page 281

1    time of the accident?
2  A.   My opinion is that United apparently had no
3    program for cleaning the filter --
4  Q.   Wait just a minute, sir. If you would, let him
5    read the question again and, if you will, if
6    you will pay attention to the question so you
7    and I are on the same wavelength, would that be
8    fair?
9  A.   That would be fine.
10          (Question read by the Reporter.)
11  A.   In my opinion, it's likely that there was
12    contamination present at the time of the
13    accident. That's based on finding
14    contamination after the accident and based on
15    United's statements that they had no filter
16    cleaning program.
17  Q.   And I'm sorry, sir, I'm still confused. My
18    question to you is, based upon a reasonable
19    degree of engineering certainty, was the
20    aluminum oxide present at the time of the
21    accident? Yes or no?
22          MR. LANE: Object to the form.
23  A.   I have no engineering data that can tell me

Page 282

1    exactly when the contamination occurred. But
2    analysis of the facts tells me, as an accident
3    investigator, that it was likely to have had
4    some contamination at the time of the accident.
5  Q.   And what amount of contamination was there at
6    the time of the accident?
7  A.   I don't know.
8  Q.   Can you give us a percentage?
9  A.   No, I can't.
10  Q.   Can you tell us how many ounces?
11          MR. LANE: Object to the form.
12  A.   No, I can't.
13  Q.   Can you tell us what passageways were blocked
14    at the time of the accident?
15  A.   Excuse me, if you could give me a little more
16    space, we're getting some --
17  Q.   Sure.
18  A.   Thank you. No, I cannot.
19          MR. LANE: Winston, I agree with John,
20      I think unless you are reading
21      from the manual, I would prefer
22      that you stand over by the court
23      reporter.

Page 283

1          MR. SHEEHAN: That's fine. The problem
2      was, you know, we had asked for
3      copies and these are the only
4      copies we have.
5          MR. LANE: I understand. I said unless
6      you are reading from the manual,
7      that's what I'm asking.
8          MR. SHEEHAN: Sure. No problem.
9          MR. LANE: I'm not asking you not to --
10          MR. SHEEHAN: We just -- copies would
11      have helped and we wouldn't have
12      had to look over each other's
13      shoulder.
14          MR. LANE: Those are documents that
15      have certainly been produced for
16      you. Not from his file, but they
17      are documents that have been
18      produced in the course of
19      discovery.
20          MR. SHEEHAN: Well, sir, what we are
21      going over are the highlighted
22      portions of his documents.
23          MR. LANE: That's fine.

Page 284

1          MR. SHEEHAN: These were not provided.
2      We had requested them at the
3      beginning of his deposition in
4      order to save time.
5          MR. LANE: I understand. Again, I'm
6      not saying don't go over it with
7      him.
8          MR. SHEEHAN: Fair enough.
9  BY MR. SHEEHAN:
10  Q.   If you can, sir, let's go over these materials
11    here and just make sure we've got an
12    understanding of what you felt was important.
13    As I understand it, you've highlighted the
14    areas that you feel are important?
15          MR. LANE: Well, object to the form.
16  A.   Yes.
17  Q.   And if I go through it and you see some areas
18    that you feel are important, please let me
19    know, fair enough?
20  A.   Yes. This area has similar warnings in other
21    language, I don't think that relates to this
22    case.
23  Q.   So we've now gone over the Milwaukee manual and

Page 285

1    the areas that you felt were important?
2  A.  Yes.
3  Q.  All right, sir.  And that's composite Exhibit
4      Number 4?
5  A.  This was in it also.
6  Q.  All right, sir.  Thank you.  And that's the
7      owners manual for the DM500 core drill?
8  A.  Yes.
9  Q.  On United Rentals page 0023 or Bates-stamped to
10     that effect, I see that you've highlighted
11     certain areas, can you help us with that,
12     please, sir?
13 A.  Yes.  In step seven it says to mop up all
14     excessive water around the work area, which is
15     unclear, because water around the vacuum seal
16     in fact helps it seal.  And, of course, water
17     is being intentionally injected into the area.
18         Step ten allows you to use one of three
19     alternatives for securing the base, that would
20     be anchor bolt, ceiling jack or vacuum
21     hold-down.  Step 13 again tells you to use an
22     anchor bolt, ceiling jack or vacuum attachment
23     to secure the drill.  Step 14 says "Never stand

Page 286

1      on the drill base as a method of securing the
2      drill stand."  It gives no warning about not
3      standing on the base.
4          The caution at the bottom says to "make
5      sure the drilling machine is properly secured
6      to the work surface.  Movement during drilling
7      will cause bit chatter against the work surface
8      fracturing the diamonds or binding the bit in
9      the hole."  There is no mention that it can
10     cause serious injury or begin to swing at the
11     speeds we've talked about.  In fact, there are
12     no warnings at all on the page.  There's no
13     mention of the filter.  There's no mention of
14     the 20 inches of Mercury that are required for
15     safe operation.
16 Q.  And what is chatter, sir?
17 A.  Jumping, not a smooth cutting action, bouncing
18     against the work surface.
19 Q.  What does that tell you when you're operating a
20     core drill machine?
21 A.  That tells you it's not cutting efficiently.
22 Q.  Anything else?
23 A.  As they say here, you can fracture the diamonds

Page 287

1      or cause binding of the bit.
2  Q.  Does chatter observed by an operator indicate
3      that the bit might bind?
4          MR. LANE:  Object to the form.
5  A.  I'm not sure the operator at these speeds would
6      observe the chatter.  If you're going 450 RPM,
7      I'm not sure you would feel it.
8  Q.  And, I'm sorry, have you ever operated a core
9      drill machine, sir?
10 A.  I don't recall a core drill, no.  I've operated
11     various kinds of drills.
12 Q.  Well, have you operated a core drill machine?
13 A.  No, not that I recall.
14 Q.  All right, sir.  And I see you've tabbed
15     certain pages, but you have also got some
16     highlighting on others.  Again, as we go
17     through this, if you will, stop me if you see
18     something that's of significance to you; is
19     that fair?
20 A.  Yes, it is.
21 Q.  All right, sir.  On page seven of the
22     owners/operator manual which is identified
23     Bates-stamp United Rentals 26, I see you've

Page 288

1      tabbed this page?
2  A.  Yes.
3  Q.  And if you will, tell us why?
4  A.  This tells you how to position the core bit and
5      it says to level the drill bit with the purpose
6      of to insure that the drill bit will drill a
7      straight vertical hole.
8  Q.  Why is that important, sir?
9  A.  There is no mention of leveling being a safety
10     feature.
11 Q.  Well, why is it important to drill a straight
12     hole?
13 A.  A vertical hole I don't think is important for
14     safety.  The leveling of the unit and the use
15     of the feet could become important for safety
16     if lack of the feet down could cause binding.
17 Q.  I don't understand.  What do you mean by that,
18     sir?
19 A.  Well, the point is that there is no warning at
20     all here about that leveling being important.
21     If it is important, it should have a warning.
22 Q.  My question to you is, why is it important for
23     it to be level?

Page 289

1        MR. LANE:  Object to the form.
2  A.    I don't think it is important for it to be
3      level.  In fact, you may want to drill holes
4      that are not level.
5  Q.    Okay.  And you may want -- as I understand it
6      then, it's not important to insure that the bit
7      will drill a straight vertical hole?
8        MR. LANE:  I'm going to object to the
9          form just because I think there is
10         ambiguity as to whether or not
11         you're talking about perpendicular
12         to the surface versus level as in
13         plumb.  And they are two different
14         things and it can be very
15         confusing.
16 Q.    I'm just curious as -- you, as an expert,
17     whether you believe it's important that the bit
18     will drill a straight vertical hole?
19        MR. LANE:  Object to the form.
20 A.    The contribution of the leveling screws, where
21     they could help, is to prevent movement of the
22     bit so that it binds, which is unrelated to the
23     hole being vertical.

Page 290

1  Q.    And I don't understand what you're saying.
2  A.    If, for instance, you wanted to drill a hole
3      that was at a one degree angle, I believe you
4      would be perfectly safe to raise the back of
5      the drill an appropriate amount to do that.
6      Verticality is unimportant to this.  Holding
7      the fixture rigid could be important.
8  Q.    And why?
9  A.    If it's not held rigid enough that could
10     contribute to binding of the bit.
11 Q.    How?
12 A.    If the bit is part way through the concrete and
13     then the base moves significantly, it could put
14     friction on the sides of the drill bit.
15 Q.    And what would that do?
16 A.    That could increase the chance of binding.
17 Q.    What degree?
18 A.    I don't know the answer to that.
19        MR. LANE:  Object to the form.
20 Q.    What about five degrees?  You said one it
21     wouldn't make any difference; is that true?
22        MR. LANE:  Five degrees of tilt, is
23          that what you're talking about?

Page 291

1        MR. SHEEHAN:  I think he and I are
2          talking.
3        MR. LANE:  In relation to what?
4        MR. SHEEHAN:  We understand my
5          question.  You are welcome to come
6          back and cross-examine him.
7        MR. LANE:  Well, your question is
8          ambiguous, I object to the form.
9  A.    I don't know the number of degrees of tilt that
10     could cause that.  It would depend on the depth
11     of the hole and the size of the drill bit.
12 Q.    And what depth would it start making a
13     difference?
14 A.    It would depend on depth at all times.  I don't
15     have a number of degrees regardless of the
16     depth.  For instance, an oil rig going a
17     thousand feet down can stand much less of an
18     offset than a three inch hole drilling.
19 Q.    All right.  Since we're talking about a core
20     drill machine in this case, what about an inch,
21     would the drill bit down one inch have any
22     effect?
23        MR. LANE:  Object to the form.

Page 292

1  A.    The deeper the hole, the less tilt you could
2      stand.  I don't know the amount of tilt you
3      could stand at various depths.
4  Q.    Well, what difference does the tilt make?
5  A.    As I've described, if the unit tilted
6      significantly during operation, it could make
7      binding more likely.
8  Q.    And do you have an opinion at what depth
9      binding would be more likely?
10 A.    That depends on the degree of tilt.
11 Q.    And do you have an opinion as to the degree of
12     tilt when binding would be more likely?
13        MR. LANE:  Object to the form.
14 A.    That depends on the depth.  The two are related
15     and I don't have an equation for the two.
16 Q.    I see you've highlighted paragraph B-1?
17 A.    Yes.
18 Q.    "Secure the core drill to the work surface so
19     that there is no movement in the drill that
20     would cause the core bit to bind in the hole."
21     Did I read that correctly?
22 A.    Yes.
23 Q.    And what does that mean?

Page 293

1 A.   That's a confusing sentence, because securing
2     it to the work surface is the vacuum system.
3     That alone does not address the use of the
4     leveling screws.  The leveling screws do not
5     secure it to the surface.  So I think they've
6     mixed the concept of the use of leveling screws
7     with the vacuum system.
8 Q.   The next page you've tabbed and have put
9     several notations on, that's page eight or
10    United Rentals Bates-stamp 27?
11 A.   Yes.
12 Q.   Can you help us with that, sir?
13 A.   Yes.  This is the basic procedure for using the
14    vacuum hold-down operation.  And the first
15    comment is that nowhere in it is there a
16    warning, despite the fact that this is the only
17    thing that stands between you and a spinning
18    drill.  There are steps, one through eight, and
19    they are out of sequence and duplicative.  It
20    looks like it's been cut and pasted from
21    something and butchered.
22       Step four says "connect the vacuum pump to
23    the top outlet," and then that is repeated down

Page 294

1     in step six, "plug the vacuum pump cord into
2     the live outlet."  Section five says "adjust
3     the leveling screws," that's after you've
4     turned on the vacuum.  Step seven says adjust
5     the leveling screws again.  Then there is a
6     note about excessive tightening of the leveling
7     screws breaking the seal.  Notes are reserved
8     for performance, not safety related, that
9     should be a warning.  Nowhere in this process
10    do they identify the requirement to have 20
11    inches of vacuum, which is the critical safety
12    number for this unit.
13 Q.   And you've highlighted paragraph D there?
14 A.   Yes.  That was just an error.  That's water
15    collection of a different type, I don't think
16    that relates.
17 Q.   All right, sir.  And the next page that you
18    have tabbed is page 11, United Rentals
19    Bates-stamp 30, why was that, sir?
20 A.   At the top there's a discussion of the vacuum
21    pump, this is under maintenance and component
22    description.  It describes the vacuum pump, but
23    doesn't have a warning about it being a safety

Page 295

1     critical item.  It doesn't describe the
2     importance of the water trap being emptied and
3     the ball being in place and functional.  It
4     doesn't describe the need to clean the filter
5     to keep the safety device operating properly.
6     Below that is paragraph D on use of the
7     leveling screws, there's no warning, there's no
8     -- nothing at all to draw your attention to
9     that being important to safety.
10 Q.   Page 12, Bates-stamped 31, you've tabbed as
11    well?
12 A.   Section H, it describes the vacuum seal, but
13    never mentions the critical role it plays and
14    the warning that it should be inspected before
15    each use and how to make sure that it works
16    properly.
17 Q.   Page 13, Bates-stamp 32?
18 A.   Simply a wiring diagram for the unit.  I don't
19    think that is significant at this point.
20 Q.   And why is that, sir?
21 A.   I don't think there's any wiring error in the
22    unit.
23 Q.   Page 14, Bates-stamp 33?

Page 296

1 A.   It gives the part number for the vacuum
2     hold-down, which is called an optional
3     accessory.  And it says it provides a means for
4     securing the drill on smooth evenly textured
5     surfaces without using anchors.
6 Q.   And why did you highlight that, sir?
7 A.   That's the system that failed in this case and
8     it did not provide a means of securing the
9     core.
10 Q.   And how did the system fail?
11 A.   It failed to maintain vacuum and let the base
12    spin.
13 Q.   And what caused it to fail?
14 A.   It could have been any of several causes as
15    I've described, either irregularities on the
16    concrete or contamination in the pump or the
17    water cup being full of water and the other
18    items I've identified.
19 Q.   I'm sorry, I don't recall the other items that
20    you've identified.
21 A.   In my report I showed places that you could
22    have blockage in the system.  The input to the
23    hose that goes to the vacuum would be very

Page 297

1    subject to contamination and blockage.
2  Q.   Was there blockage there, sir?
3  A.   I've seen nobody that found it at the time of
4     the examination.
5  Q.   Any other areas that could be blocked?
6  A.   The top of the water separation device has
7     orifices in it that could be blocked.  The
8     water separation device, as I say, if it had
9     filled up with water, could block the flow.
10  Q.   And did that happen in this case?
11  A.   I don't think we know.  The unit has been
12     stored on the side, which there is no warning
13     or caution or statement not to store it on its
14     side.  It's possible that water flowed out of
15     the water trap during that storage.
16  Q.   Any other blockage?
17  A.   Blockage in the top portion of the vacuum pump
18     can occur.  You would see that on the gauge,
19     but since you don't know what the gauge should
20     read, you might not be aware of it.
21  Q.   Any other areas of blockage?
22  A.   Those are the ones that occurred to me.
23  Q.   And do you have an opinion, based upon a

Page 298

1    reasonable degree of engineering certainty, as
2     to which area, if any, was blocked?
3  A.   No, I don't.  It could have been blockage on
4     the suction side or leakage on the seal side.
5  Q.   And the only other area I see here that you've
6     tabbed is page 18, United Rentals 37; is that
7     correct, sir?
8  A.   Yes.
9  Q.   And why did you tab that, sir?
10  A.   That shows the components that make up the
11     vacuum pump system and that includes number
12     five, which is the float ball, which is a
13     built-in failure mode.  Any time that the unit
14     picks up water, which it's intentionally
15     operating in water, it will pick it up, and as
16     soon as you reach a certain level, that float
17     ball will come up, cut off vacuum, and you will
18     immediately lose your safety restraint.
19  Q.   And why did you highlight those sections on
20     that page 18, sir?
21  A.   That is simply a designed in failure mode that
22     will occur as the cup fills up with water.
23  Q.   And why did you highlight these particular

Page 299

1    areas?
2  A.   These are components that are important, just
3     the titles, the vacuum gauge, the air petcock,
4     that had the size of the hose that we used to
5     tap into the system for the improvement.
6  Q.   I'm sorry?
7  A.   I highlighted this because of the size of
8     fittings.
9  Q.   Is that a problem?
10  A.   No, that was just the size to be matched as we
11     modified the equipment.
12  Q.   Any problem with any of these parts?
13  A.   As I say, components such as the water
14     separation device, which will intentionally
15     cause loss of vacuum, without some system to
16     tell you that that is occurring is guaranteeing
17     that eventually you will lose vacuum.
18  Q.   All right.  So were there any problems in this
19     case with any of the parts identified on page
20     18 or the page also identified as United
21     Rentals Bates-stamp 37?
22          MR. LANE:  Object to the form.  Are you
23          talking about other than he's

Page 300

1          already testified to?
2          MR. SHEEHAN:  I don't think he's
3          testified to any parts being a
4          problem.
5          MR. LANE:  Problem, that's the word
6          that has problems.
7  A.   Not listed on this page is the filter area
8     where contamination was found.
9  Q.   Is that the only problem you found?
10  A.   That's the only one I'm aware of.
11  Q.   Have you marked any other pages or found any
12     other significance in the owners manual?
13  A.   Keep checking and I will let you know.  That is
14     all.
15  Q.   So we've now reviewed the owners manual and the
16     faults that you have with the owners manual to
17     the DM500 core drill?
18  A.   Yes.
19  Q.   And, I'm sorry, this goes in --
20  A.   It does.
21  Q.   Exhibit Number --
22  A.   4.
23          MR. LANE:  We've got two, she's working

Page 301

1        on the others.
2        MR. SHEEHAN:  All right.  Why don't we
3           go on and identify those?
4        MR. LANE:  Well, we can put them in.
5        There's one that goes into --.
6   Q.   Let's see.  Exhibit Number --
7   A.   Only one of these had -- that one is movie.
8        MR. LANE:  That one she hasn't done,
9           it's a DVD.
10  A.   So the others can be anything.
11       MR. LANE:  So it will be either one of
12          those two.
13  Q.   And if you will identify what you're putting
14       into which exhibit, sir?
15  A.   I have placed in Exhibit 23 --
16  Q.   Why don't we do it in order and that way we'll
17       keep it --
18  A.   In Exhibit 22 is a CD labeled "Product
19       Inspection Photos/J. Lane, Site Inspection
20       Photos/J. Lane, Depo Photos/J. Lane Original."
21  Q.   All right, sir.
22  A.   And Exhibit 23 contains a CD labeled "Selected
23       United Rentals Disclosures, Inspection Photos,

Page 302

1        Invoices, Original."
2   Q.   All right.  And I think Mr. Lane has been kind
3        enough to have these copies made and I
4        understand the others will be produced today so
5        we can put those before we get off the record.
6        Exhibit Number 9, does that have any
7        material that relates to United Rentals?
8   A.   The fact that the gauge was not labeled made it
9        critical that United Rentals explain to the
10       user what the proper pressure levels should
11       have been.
12  Q.   Anything else contained within your folder?
13  A.   No, I think not.
14  Q.   And what's that folder?
15  A.   This is folder 9 labeled "Alternative Design."
16  Q.   So the only fault you find with United Rentals
17       with respect to the alternative design is
18       failure to inform the user of the -- how did
19       you put it?
20  A.   Correct vacuum level that's required for safe
21       operation of the unit.
22       MR. LANE:  And I'm going to make an
23          objection on the record as to the

Page 303

1        legal issues concerning United
2        Rentals' liability for, aside from
3        what he's talking about, which are
4        unrelated to the defective --
5        analysis he's done on the defect.
6        He may or may not know that has
7        anything to do with United
8        Rentals, but I don't want to --
9        he's not here to offer opinions
10       about who the defective product
11       pertains to.  That's a legal issue
12       that he would not be involved in.
13  A.   And let me add, you've removed items from
14       alternative design that I have not addressed in
15       your question.  The vacuum switch and the
16       constant pressure switch, the fact that those
17       didn't exist should have been explained to the
18       operator and what that meant to the safe
19       operation.
20  Q.   Anything else, sir?
21  A.   That's all.
22  Q.   So we've now covered the material in Exhibit 9
23       and the material that has been removed from

Page 304

1        Exhibit 9 and marked and attached to your
2        deposition; is that correct, sir?
3   A.   I believe we have, yes, sir.
4   Q.   We've got some items here that have been marked
5        separately.  Does Exhibit Number 11 to your
6        deposition relate in any way to United Rentals?
7   A.   The fact that this equipment did not meet the
8        requirement for a constant pressure switch that
9        OSHA requires for similar items should have
10       been pointed out to the renter and explained
11       what that meant to him.
12  Q.   And I don't understand, what should United
13       Rentals have told them?
14  A.   Essentially that this does not have a constant
15       pressure switch and could start spinning and do
16       damage.  I would want them to say we don't
17       think you ought to use it and not rent it to
18       them, but if they're going to rent it, then
19       whatever they think the safety precautions that
20       should have been used should have been
21       explained.
22  Q.   And what would you have recommended that United
23       Rentals explain?

Page 305

1  A.   As I say, I would have recommended that it not
2       be rented, that it's unsafe.
3  Q.   But if it were to be rented, what would United
4       Rentals need to have said?
5  A.   Point out that it does not have a constant
6       pressure switch.  I would suggest keeping your
7       hand on the switch that was there.  For sure
8       point out the need for the 20 inches of vacuum
9       and to constantly monitor the gauge, because if
10      it changes it could become unsafe.
11 Q.   Anything else, sir?
12 A.   That's all I can think of that might minimize
13      the risk.
14 Q.   Exhibit Number 12 to your deposition?
15 A.   Again, this addresses tripping devices.  As I
16      discussed, that's related to the constant
17      pressure switch, so it would be the same
18      comments as Exhibit Number 11.
19 Q.   Again that United Rentals should have advised
20      the operator it should have had a pressure
21      switch?
22 A.   A constant pressure switch.
23 Q.   Anything else that United Rentals should have

Page 306

1       advised the ultimate user?
2          MR. LANE:  Object to the form.  You
3             misstated his testimony, but
4             that's fine.
5  Q.   Well, since there's been an objection, how have
6       I misstated it, sir?
7  A.   With regard to Exhibit 11, that simply talks
8       about the tripping devices and pressure
9       switches and that's the only part on that
10      exhibit.
11 Q.   I'm sorry, he's objected and said I
12      misrepresented something and I'm just trying to
13      figure out what it was that I misrepresented.
14         MR. LANE:  And I don't mind telling
15            you.  I thought you said that he
16            recommended that United Rentals
17            should tell Flavor House that it
18            needs a constant pressure switch
19            and I understood his previous
20            testimony to be that they should
21            warn them that it doesn't have
22            one.  And if I'm misrepresenting
23            something, straighten it out, but

Page 307

1       that's what I understood the
2       answer to be and there's a subtle
3       difference there is all I'm
4       saying.
5          MR. SHEEHAN:  And the objection was
6             that I had misrepresented
7             something and I was just curious
8             if he understood that I had
9             misrepresented something.
10         MR. LANE:  Okay.
11 A.   I do not remember the question.
12 Q.   Okay.  As I understand it, Exhibit Number 11
13      and 12, who are these directed to, sir?
14 A.   Those are the OSHA standards setting what the
15      safety requirements are for that type of
16      equipment in the workplace.
17 Q.   And who are they directed to, sir?
18 A.   They are directed to insuring a safe workplace.
19      Their regulatory authority is aimed at the
20      employer that provides that workplace.
21 Q.   Okay.  And did Flavor House comply with these
22      two OSHA requirements, Exhibit Number 11 and
23      Exhibit Number 12?

Page 308

1  A.   In my opinion, the equipment that they rented
2       in this case did not have a constant pressure
3       switch and should have and in that regard I
4       think they did not.
5  Q.   How did Flavor House not comply with the OSHA
6       regulations?
7  A.   Using the equipment that they rented from
8       United without a constant pressure switch on
9       it.
10 Q.   Violated the OSHA standard?
11 A.   I believe it did.  The intent under other
12      similarly operated power tools.
13 Q.   Would that also apply to Exhibit Number 13 to
14      your deposition, another OSHA standard?
15 A.   I think OSHA would not find this to be a
16      construction operation, although it would be
17      very close to one.  I think they would induce
18      the 1910 requirement rather than the 1926.
19 Q.   Okay.  I'm sorry, which is the 19 --
20 A.   The 1910 is point 243.
21 Q.   And how does that apply to Flavor House?
22 A.   This applies to the kind of equipment that
23      should be used by a worker in a general

Page 309

1    industry application.  Flavor House rented this
2    equipment and to me this equipment did not meet
3    this requirement.
4 Q.  Is it your opinion that Flavor House violated
5    the OSHA regulation that's been marked as
6    Exhibit Number 11 to your deposition?
7 A.  The requirement itself names a number of pieces
8    of equipment and then says other similar pieces
9    of equipment.  In my opinion, this, from a
10   safety engineering standpoint, is similar.  So
11   in my opinion, yes.
12 Q.  Are you aware of any other OSHA violations by
13   Flavor House with respect to this accident
14   involving Mr. Matthew Riley?
15 A.  No, I'm not.
16 Q.  Does OSHA have a requirement that an employer
17   train its employees on certain equipment?
18 A.  I would want to look at that.  They address
19   training, they have some very significant
20   training requirements on some equipment, like
21   forklifts and cranes.  I would have to look at
22   what their wording is for this situation.
23 Q.  How should Matthew Riley have been trained

Page 310

1    before operating a core drill machine?
2 A.  Again, I don't think that you can train a
3    person -- I don't think that I could safely
4    operate this piece of equipment regardless of
5    the amount of training I had.  If you were
6    going to try and control it with training, he
7    and Mr. Walters should have been trained in the
8    20 inch Mercury requirement, the danger that
9    exists if you lose vacuum, the requirement to
10   constantly monitor vacuum, and to exercise
11   extreme caution when standing anywhere near
12   this piece of equipment.
13 Q.  Any other training that Mr. Walters and
14   Mr. Riley should have received from Flavor
15   House before operating the core drill machine?
16 A.  The leveling screws operation, Mr. Walters
17   understood them, but I don't believe Mr. Riley
18   did.  That's all that occurs to me.
19 Q.  I'm sorry, I'm looking for another folder here.
20      MR. SPRAIN:  Is it this one?
21      MR. SHEEHAN:  Maybe it's this one.
22      MR. SPRAIN:  Off the record.
23      (Off-the-record discussion.)

Page 311

1 Q.  Let me show you what's previously been marked
2    as Exhibit Number 3 to your deposition and
3    again you've tabbed certain pages here, if you
4    could help us with this?
5 A.  Yes.
6 Q.  The first page is Exhibit 4 to Mr. Walters'
7    deposition.
8 A.  Yes.
9 Q.  Why did you tab that, sir?
10 A.  It was a general safety requirement that United
11   had and it had some specific steps which I have
12   highlighted.
13 Q.  And why was that, sir?
14 A.  They were safety precautions that were
15   identified on this piece of paper.
16 Q.  And why was that of significance to you, sir?
17 A.  They did not include any specific safety
18   requirements for this piece of equipment was
19   the most important thing.  These were general.
20   They say things like keep the equipment away
21   from wet locations and yet they are
22   specifically told to connect water to the unit
23   and spray it on the floor.  So this general

Page 312

1    safety has no bearing on this particular
2    equipment.
3 Q.  All right.  And you've highlighted the general
4    safety heading, paragraphs one, two, eight and
5    then -- excuse me, you've highlighted -- why
6    did you highlight paragraph one there?
7 A.  "Only operate the equipment if you've been
8    authorized and are trained in the equipment's
9    safe operation."
10 Q.  And why did you highlight that?
11 A.  That's a statement in the piece of paper and
12   yet there was no effort on United's part to
13   provide the manual to him or provide any
14   training or insure that he had training.
15 Q.  Any other criticism with respect to paragraph
16   number one?
17 A.  No.
18 Q.  Paragraph two, sir?
19 A.  "Check with the rental yard on correct
20   operating procedures, call if you have any
21   questions."
22 Q.  And your criticism there, sir?
23 A.  It's my understanding this document was not

Page 313

1    transmitted to Mr. Riley or his supervisor.
2  Q.   Okay.  And any criticism of United Rentals with
3        respect to that?
4  A.   To not providing it?
5  Q.   That Mr. Riley or Mr. Walters did not
6        acknowledge receipt of that general safety
7        sheet?
8  A.   The fact that no safety instructions were given
9        to the supervisor or the employee is my
10       criticism.
11 Q.   Okay.  And how do you fault United Rentals for
12       that?
13 A.   They did not provide the safety instructions
14       that went with the equipment, the operators
15       manual, to anyone at Flavor House.
16 Q.   Is that the only criticism?
17 A.   Yes.
18 Q.   Paragraph number eight, your criticism there of
19       United Rentals?
20 A.   The statement says to keep the equipment away
21       from wet or damp locations when specifically
22       the equipment is unsafe -- can be less safe to
23       operate if water is not used to help secure the

Page 314

1        base.
2  Q.   Any other criticism with respect to paragraph
3        number eight?
4  A.   No.
5  Q.   And, I'm sorry, I skipped paragraph six there.
6  A.   Yes.  That says "Always maintain control of the
7        equipment you're operating."  And in this case
8        it's certainly not the operator relinquishing
9        control, with the forces involved the equipment
10       takes itself away from control.
11 Q.   So it's your opinion that Mr. Riley maintained
12       control of the equipment?
13 A.   No.  I think it's impossible to maintain
14       control of this equipment if it loses vacuum
15       and binds.
16 Q.   And this sentence, "If the person receiving
17       this handout will not be the user of the
18       equipment, forward these instructions to the
19       operator"?
20 A.   Yes.
21 Q.   Why do you criticize United Rentals for that
22       sentence?
23 A.   I don't criticize them for that sentence.  I

Page 315

1        think my understanding is that this document
2        was not given to anyone at Flavor House to pass
3        down.
4  Q.   Exhibit Number 3 to Mr. Walters' deposition,
5        why did you tab that, sir?
6  A.   That is for the accident unit and includes the
7        four inch drill bit, not the smaller one that
8        had the teeth missing, which is consistent with
9        them using the four inch drill bit which did
10       not have teeth missing.
11 Q.   Okay.  Well, which drill bit was used?
12 A.   There's conflicting testimony.  I believe it
13       was the four inch drill bit in greatest
14       probability.
15 Q.   Why do you say that, sir?
16 A.   That's the one that was on the unit after the
17       accident and it's the one that apparently was
18       ordered.
19 Q.   Well, would the use of a three and a half inch
20       drill bit with missing teeth have contributed
21       to this accident that Mr. Riley sustained?
22       MR. LANE:  Object to the form.
23 A.   I think the renting out of a drill bit with

Page 316

1        missing teeth is unsafe and it could make
2        binding more likely if it was used.
3  Q.   And did that three and a half inch drill bit
4        bind in this hole causing this accident?
5        MR. LANE:  Object to the form.
6  A.   We have conflicting testimony.  I think it's
7        more likely that it was the four inch bit.
8  Q.   What do you base that on?
9  A.   As I just said, the fact that it was in the
10       equipment after the accident and the fact that
11       that apparently was what was ordered for the
12       job.
13 Q.   I see you've tabbed the page Bates-stamped
14       United Rentals 67, why is that, sir?
15 A.   That was a note taken by the United
16       representatives after the accident and
17       describes the first report they had.
18 Q.   And why did you highlight that?
19 A.   Simply collecting information on reports of the
20       accident.
21 Q.   Okay.  And how many reports of the accident
22       have you seen?
23 A.   We have information from Flavor House, I

Page 317

1    believe. I think there's a one page report
2    there that said that --
3  Q.    Would -- I'm sorry.
4  A.    Let me find it. That's labeled
5       "Investigations."
6  Q.    Was it a two page report?
7  A.    It could be.
8  Q.    All right. Was OSHA required to investigate
9       this accident?
10  A.    No.
11  Q.    Why not?
12  A.    They don't have to be notified unless it
13       involves a fatality or multiple injuries. I
14       have that investigation.
15  Q.    All right. That's been marked as Exhibit
16       Number 2 to Mr. Tew's deposition?
17  A.    Yes.
18  Q.    And Exhibit Number 3 to Mr. Tew's deposition?
19  A.    Correct.
20  Q.    And why have you highlighted those portions on
21       those two exhibits?
22  A.    The issues that gloves were required and were
23       worn. The time is identified and the date. I

Page 318

1    think that time is not consistent with some of
2    the other testimony.
3  Q.    What's the time shown on the accident report as
4       the time of the accident?
5  A.    It's shown as approximately 005 A.M., I assume
6       they mean 5:00 A.M., that might be a misprint.
7       The fact that he had been at the job for three
8       days.
9  Q.    Of what significance was that?
10  A.    He had very little experience at the plant and
11       is new and is very prone to be taking very
12       clear direction from his bosses at that point.
13  Q.    Why did you highlight drilling holes in floor?
14  A.    That was the procedure they were doing.
15  Q.    And why did you highlight drill hole in floor?
16  A.    That's a report of the sequence of event.
17  Q.    I'm sorry, "spun employee around until he
18       fell," did I read that correctly?
19  A.    "Drill hung on floor, spun employee around
20       until he fell, then hit him."
21  Q.    What did you understand "spun employee around
22       until he fell"?
23  A.    It has been reported that he was carried around

Page 319

1    some bit, he held onto the equipment naturally
2    trying to keep his balance, and then he was
3    thrown off of it and then it hit him.
4  Q.    What's your understanding as to how it
5       happened?
6       MR. LANE: Object to the form.
7  A.    Of how the whole accident happened?
8  Q.    Yes, sir.
9  A.    In summary form, he was drilling the hole, had
10       been drilling the hole for some time, had
11       approximately half of his body weight on the
12       machine to help keep the vacuum. Some type of
13       binding occurred. The vacuum was lost by that
14       time to a point where it was not able to resist
15       the binding and the drill began spinning. He
16       was carried with the spinning drill, couldn't
17       grab the off switch as he spun. After a
18       revolution or two or some portion, he was
19       thrown from the machine. He believes the
20       machine came out of the hole and then hit him
21       in the face.
22  Q.    And have you spoken to Mr. Riley?
23  A.    No, I haven't.

Page 320

1  Q.    On page three you've highlighted certain
2       portions there, why?
3  A.    Yes. "Put an X on the lines responsible for
4       any unsafe condition that contributed to the
5       accident," and they've identified "no safety
6       switch on the drill." And "preventative
7       correction/action," they've identified which
8       action was taken to prevent recurrence is
9       "installation of guard or safety device."
10  Q.    Would you agree with the assessments contained
11       on that accident report, Exhibits 2 and 3?
12       MR. LANE: Object to the form.
13  A.    The safety switches that I would recommend -- I
14       would recommend safety switches, one is the
15       constant pressure switch and the other is the
16       vacuum switch. In addition, I would recommend
17       the improvements to the gauge and to the
18       manual.
19  Q.    No, sir. My question to you, would you agree
20       with the findings on this accident report
21       that's been identified as Exhibits 2 and 3 to
22       Mr. Tew's deposition?
23       MR. LANE: Object to the form.

Page 321

1  A.   The use of an unsafe piece of equipment that --
2  Q.   No, sir.  Would you agree, yes or no?
3  A.   I think there was more to it than this.  I
4      agree with this.  I think there was more to it
5      than this.
6  Q.   And what was there more to it?
7  A.   In addition to the constant pressure switch, a
8      vacuum switch is needed.  In addition to that,
9      a clearly identified vacuum gauge, and clear
10     instructions from the provider of the equipment
11     to the user of the equipment on how to use it
12     safely.
13  Q.   And who should have instructed Mr. Riley on how
14     to use the equipment properly?
15  A.   The manufacturer should have written a clear
16     and concise manual.  He should have put clear
17     and concise warning labels on the equipment.
18     That manual should have been transferred from
19     the rental company to the Flavor House
20     employees so they would be aware of the
21     restrictions.
22  Q.   And then what, sir?
23  A.   Then the supervisor should have read and

Page 322

1     transmitted that information to Mr. Riley or
2     made sure he followed it.
3  Q.   On Exhibit Number 8 to Mr. Tew's deposition
4     you've highlighted certain portions of
5     Mr. Cody's statement?
6  A.   Yes.
7  Q.   And why?
8  A.   The sequence of events being that the drill
9     hung up, spun around, and hit him in the head
10     is consistent with the other reports that
11     that's how it happened.  The fact that they had
12     taken the drill apart and found no shear pin in
13     it was of interest.
14  Q.   Why is that, sir?
15  A.   Part of the safety systems of any device like
16     this is either a clutch or a shear pin to limit
17     the total energy that can be transmitted.  They
18     found no shear pin.  I found later that a
19     clutch was involved.
20  Q.   Why was that significant to you?
21  A.   It's an element that had the potential for
22     minimizing the severity of the damage, but it
23     was set at such a high level that significant

Page 323

1     damage still occurred.
2        MR. LANE:  Winston, I don't know how
3        much more you've got.  I've got to
4        make a call on another matter.
5        MR. SHEEHAN:  Okay.  Why don't we stop?
6        (Recess.)
7  BY MR. SHEEHAN:
8  Q.   Sir, Mr. Lane has provided us with a copy of
9     another CD, and if you could identify the
10     exhibit and what's contained within that
11     exhibit case?
12  A.   This case is marked Exhibit 21 and the CD is
13     labeled "Riley versus United Rentals, et al.,
14     Joe's photos from depos 10-9-06, Myers,
15     Whitecotton, Mason, other similar core drills."
16  Q.   All right, sir.  And have you reviewed those
17     photographs?
18  A.   I've opened the disk and looked at it, it's
19     been sometime.  I think I printed some of the
20     photos in my folder here, so I've seen them.
21  Q.   All right.  And could you identify what
22     photographs you thought were significant enough
23     to print out from that Exhibit Number 21?

Page 324

1  A.   I don't know which of the photos came from
2     that.
3        MR. LANE:  I saw them in this folder
4        right over here, John.
5  A.   That would be; that would be.
6        MR. LANE:  That's the new one.
7  A.   I would have to see the CD to trace the photos
8     to which CD they came from.
9  Q.   Okay.  Why don't we go on and let's mark these
10     then?  This is Exhibit Number 13 to
11     Mr. Walters' deposition and what is that of,
12     sir?
13  A.   That's Mr. Riley and that appears to be the
14     accident unit, although I can't confirm that
15     from here.
16  Q.   All right, sir.  Let's mark that Exhibit Number
17     32 to your deposition.
18        (Defendant's Exhibit 32 marked
19        for identification.)
20        MR. LANE:  Do you need to look at your
21        CD copies in order to determine
22        which picture came from which CD?
23  A.   I would.  I would need to open those up and

Page 325

1    look at them.
2  Q.   All right, sir.
3  A.   These came from other depositions, that one
4       did.
5  Q.   All right, sir.  That's Exhibit Number 32.
6  A.   Yes.
7            (Defendant's Exhibit 33 marked
8             for identification.)
9  A.   I believe this is a photograph of a -- it's
10      Frost 33 and it's a similar unit, but not the
11      accident unit, I believe.
12 Q.   And what was the significance of that, sir?
13 A.   Just another exemplar of the design.
14           MR. LANE:  For the record, I pulled
15           these photographs out earlier from
16           his stack of photographs which are
17           in this folders if he needs to go
18           back and look at the entire folder
19           to acclimate himself.
20 Q.   What was the significance of Exhibit Number 33?
21 A.   Well, it shows the design, it shows the fixed
22      switch, it shows the vacuum gauge reading from
23      the incorrect location, and the features that

Page 326

1       we've talked about.
2            (Defendant's Exhibit 34 marked
3             for identification.)
4  Q.   And Exhibit Number 34?
5  A.   That shows on this unit the gauge again not
6       labeled as to what is acceptable and what's
7       not.
8            (Defendant's Exhibit 35 marked
9             for identification.)
10 Q.   Okay.  And Exhibit Number 35 and it has a
11      yellow stickum on it?
12 A.   Yes, that's my note.  This again is the sister
13      unit and the wear on the paint, it's clear that
14      people have been regularly putting their foot
15      at that location.
16 Q.   And that's your stickum note, yellow stickum?
17 A.   Yes.
18 Q.   What does it read, sir?
19 A.   "Sister unit, note the foot wear."
20 Q.   Any other photos of significance to your
21      recollection as we sit here now?
22           MR. LANE:  Object to the form.
23 A.   Well, all of the photos are of interest.  This

Page 327

1       is a close-up from one of the CDs of a warning
2       that's horizontal on the equipment.  It has no
3       pictograph, is the wrong color, doesn't tell
4       you the degree of vacuum that is required, does
5       not transmit the seriousness of the hazard.
6       This is a series of photos of the accident unit
7       showing the drill bit in place in the unit.
8  Q.   And why did you tab these particular
9       photographs?
10 A.   That photo shows a --
11 Q.   That's marked Mr. Walters' Exhibit Number 19?
12 A.   Right.  It shows what appears to be teeth
13      without damage on this particular drill bit.
14      The next tab is on Walters' Number 7, it was a
15      checklist initialed TW.
16 Q.   Do you have any criticism of that checklist?
17 A.   It's difficult to read this version.  Let's
18      see.  This says safety decals are in place.
19      One safety decal is badly damaged on the vacuum
20      housing itself.  The manual is unchecked and in
21      my opinion it should have been checked and the
22      manual provided.
23 Q.   Any other criticism of the checklist?

Page 328

1  A.   No.
2  Q.   I see you have a stickum note on one of these,
3       we'll mark that as Exhibit Number 36 to your
4       deposition.
5            (Defendant's Exhibit 36 marked
6             for identification.)
7  Q.   What is that, sir?  And, if you will, read the
8       stickum note into evidence?
9  A.   My note says "Other brand at United."  New
10      Englan is the brand, I believe.
11 Q.   And that's Exhibit Number 36?
12 A.   Yes.
13 Q.   Any significance in why you marked that?
14 A.   No.  I notice that the operational location is
15      the other side of the unit, but no
16      significance.
17 Q.   Have you tabbed or find any other photographs
18      of significance within your folder of
19      photographs?
20 A.   This photograph shows a unit.  This looks like
21      the sister unit, I would need to compare, but
22      it shows wear along the edge.  It looks like
23      people have been putting their foot on the left

Page 329

1  side.
2  Q.  We will mark that as Exhibit Number 37 to your
3      deposition.
4  A.  Yes.
5          (Defendant's Exhibit 37 marked
6          for identification.)
7  A.  That is the sister unit, I believe.  There are
8      several other photographs of the same equipment
9      from different angles, there's nothing new
10     shown on those photographs.
11 Q.  Just any photograph that you need or will rely
12     upon in rendering your opinion.
13          MR. LANE:  Well, I object to the form.
14 Q.  In other words, we don't want to be surprised
15     at trial if you pull a different photograph out
16     of this folder.
17          MR. LANE:  Well, these photographs are
18          part of his file and I'm going to
19          object to trying to limit him to
20          only the photographs that he's
21          going to mark right here in this
22          deposition.  There may be
23          photographs that may be pertinent

Page 330

1          to any particular issues that he
2          may want to testify at trial and
3          it's in his file.  There's no
4          surprise about the photographs, so
5          I object to the attempt to limit
6          him at this point to try to make
7          him pick out photographs that may
8          or may not be the only photographs
9          pertinent to his testimony at
10         trial.  All of the photographs
11         have been provided and may be
12         pertinent to his testimony.
13 Q.  And my point is we need to know which exhibits
14     and photographs you intend to rely upon at the
15     time of trial and that's what I'm asking to you
16     do, is to identify the exhibits you intend to
17     at use trial, please, sir?
18          MR. LANE:  And I object to that.
19 A.  I have used every bit of data that I have in my
20     investigation of the case.  I don't know which
21     photographs best show the features that I've
22     described today.  It would take some time to go
23     through and pick the best lighting and the best

Page 331

1          view of each one.
2  Q.  And if I could maybe put on the record, that
3      would be, in my opinion, the reason that we
4      need to have an exchange of exhibits wherein we
5      are notified of which exhibits you intend to
6      offer at the time of trial so that we can make
7      an informed decision as to whether or not to
8      object or not to object.
9          MR. LANE:  The photographs speak for
10         themselves.  To ask him to pick
11         out at this point, where he has
12         not done it up to this point and
13         has said every photograph he's
14         looked at is pertinent to his
15         evaluation, to try to get him to
16         limit it to certain photographs at
17         this time I think is burdensome to
18         do that on the spot.  He has not
19         specifically done his evaluation
20         in that sense.
21             To the extent that, you know,
22         you want us to update our list at
23         a later date, maybe he can do

Page 332

1          that, but not here in this
2          deposition on the spur of the
3          moment.  He's already said he's
4          reviewed all of the photographs,
5          all of the material that he's
6          brought here today as a part of
7          his file that he's reviewed and
8          relied on.  One photograph may be
9          subtly more important than another
10         one depending on what question is
11         asked.  And that's the whole
12         point, it's burdensome for him to
13         have to do that as he sits here in
14         this deposition today.
15             We will do our best, Winston,
16         I'm not trying to be difficult
17         here.  We will do our best to try
18         to do that.  Obviously a lot of
19         the photographs are duplicative.
20         But to try to go through it right
21         at this moment and say we like
22         this one that shows roughly the
23         same angle or a little different

Page 333

1   angle than that one is certainly
2   burdensome to do right at this
3   point. And I don't think it's
4   fair to ask him to sit here and
5   say, I will use this one, but I
6   will not use that one.
7   MR. SHEEHAN: Again, we would
8   respectfully request that you
9   identify those exhibits that you
10  intend to use at the time of trial
11  so we can make an informed
12  decision as to whether or not to
13  enter an objection to those
14  exhibits.
15  MR. LANE: All of the photographs,
16  that's our position on that. At
17  this point all of the photographs
18  are pertinent to his evaluation
19  and may be used at trial. And
20  he's not going to sit here and try
21  to pick out every single
22  photograph that may be used at
23  trial. There are hundreds and

Page 334

1   hundreds of photographs in this
2   case and that is unduly
3   burdensome.
4   BY MR. SHEEHAN:
5   Q.  Sir, as I understand it, you've reviewed the
6       report of several experts in this case?
7   A.  Yes, I have.
8   Q.  And what experts have you reviewed?
9   A.  I have an expert disclosure from Saint-Gobain
10      that summarizes opinions, do you want me to
11      describe that?
12  Q.  No. If you will just identify them, sir, the
13      ones that you've reviewed?
14          MR. LANE: And what he was referring
15          to, Winston, just for the record,
16          was the disclosure, the disclosure
17          pleadings.
18  A.  I have a report entitled "Vollmer-Gray" at the
19      top, dated August 31st of 2006, that I've
20      reviewed. Defendant's Rule 26 information that
21      includes a letter by Mr. William Cloyd dated 31
22      August. A letter by Doctor Andrew Robinson
23      dated August 30th. A report by Shaver

Page 335

1   Engineering and Design. A report by Roger
2   Davis. And that is all, I believe.
3   Q.  All right, sir. And have you reviewed all of
4       those reports, sir?
5   A.  I have looked at them to varying degrees of
6       detail.
7   Q.  And which ones have you looked at in the most
8       detail?
9   A.  I think I've read them all. I wouldn't say
10      that -- the medical one is very short, but I've
11      reviewed them all.
12  Q.  All right. And which more than others?
13  A.  I don't think any more than others, I've just
14      reviewed them all. I don't see any notes.
15  Q.  As you thumbed through there, I saw you were
16      looking at Mr. Roger Davis' report, do you find
17      any criticism with his report?
18  A.  I have not tried to summarize my criticism of
19      the reports.
20  Q.  Do you have any criticize of that report as you
21      sit here today?
22          MR. LANE: Object to the form.
23  A.  I would have to go through it. I did not

Page 336

1   evaluate the reports, I evaluated the accident.
2   Q.  Well, you've read the report, as I understand
3       it?
4   A.  Yes, I have.
5   Q.  Did you have any criticism as you read the
6       report of Mr. Davis?
7          MR. LANE: Object to the form.
8   A.  I would have to go back and reread it. I
9       didn't see anything new that I was not aware
10      of. That's what I was looking for, additional
11      facts.
12  Q.  Okay. So the reason you were looking at the
13      reports was for additional facts?
14  A.  Principally, yes.
15  Q.  Did you find any additional facts in the report
16      of Shaver Engineering and Design?
17  A.  I didn't make any notes on the report, but I
18      don't recall specifically.
19  Q.  Any criticisms of the report from Mr. Shaver?
20  A.  I do not remember.
21          MR. LANE: Object to the form. Asked
22          and answered four times.
23      MR. SHEEHAN: No, we asked him about

Page 337

1          Mr. Davis'. We have not asked him
2          about Mr. Shaver's.
3  Q.   But just to make sure the record is clear, I'm
4      specifically asking you now about Mr. Shaver's
5      report. Do you have any criticism of his
6      report?
7  A.   No, I don't recall it in detail.
8  Q.   You also reviewed a letter from Doctor
9      Robinson?
10  A.   Yes.
11  Q.   Did you find any additional information in it?
12  A.   He states that Mr. Riley admits to smoking
13      marijuana on 29 August. What I had seen was a
14      couple of days before that, I think.
15  Q.   Any other criticism of Mr. Robinson's
16      deposition?
17          MR. LANE: Object to the form. It's
18          not a deposition.
19  Q.   Excuse me, Mr. Robinson's report?
20          MR. LANE: And I object to the form.
21          He's not an expert in that area.
22  A.   That's exactly right.
23  Q.   I'm sorry, sir?

Page 338

1  A.   I do not have an opinion about the medical part
2      of this case.
3  Q.   What did you mean he's not an expert in this
4      area?
5  A.   No, I am --
6          MR. LANE: He said he's not an expert
7          in that area.
8  A.   My expertise is in the accident investigation
9      and the safety engineering. The testimony I've
10      seen indicated nobody observed an impairment.
11      I'm not a medical toxicology expert.
12  Q.   All right. The next report you have there is
13      the report from Vollmer-Gray?
14  A.   Yes.
15  Q.   Did you find any additional information in it?
16  A.   I do have highlighted the core drill machine
17      and a four inch diamond core bit were reserved
18      by Flavor House, which is consistent with the
19      documentation that I've referred to. I
20      highlighted their statement that he looked at
21      -- well, Mr. Tew's testimony says he looked at
22      the core bit and could tell that it matched the
23      hole that was drilled. He was told probably by

Page 339

1      Donald Cody that the core bit on the machine as
2      depicted in his photographs was the one used to
3      drill the holes.
4  Q.   And would you agree with that?
5  A.   The testimony certainly varies on that. I
6      think the four inch is likely to have been the
7      one used.
8  Q.   Is that based upon your examination of the
9      photographs of the hole there at Flavor House?
10          MR. LANE: Object to the form.
11  A.   As I stated, based upon the fact that's what
12      was reserved and that appears to be what was
13      found after the accident on the machine, they
14      concluded that it is probable that the four
15      inch bit was being used by Mr. Riley at the
16      time of his incident -- accident. I have
17      circled on page 12 their statement that Riley
18      is not sure if he saw the warning label on the
19      machine that included the following
20      information, "For your own safety, read and
21      understand the operators manual. Failure to
22      properly secure unit before drilling may cause
23      serious injury."

Page 340

1  Q.   I think there was some other highlighted
2      material there, did you find that significant
3      as well?
4  A.   Below that, "Although this information was on
5      the machine, Mr. Riley did not read or request
6      an operators manual," he states. Those are the
7      only notes that I see.
8  Q.   Did you find any criticism of the report
9      prepared by Mr. Paul Guthorn?
10          MR. LANE: Object to the form.
11  A.   I'm not sure which one that is.
12  Q.   That was the report you're looking at now, sir.
13  A.   Oh, Vollmer-Gray?
14  Q.   Yes, sir.
15  A.   I do not have an analysis of the report. I
16      don't even recall what its conclusions were.
17  Q.   So do you have any criticisms of Mr. Guthorn's
18      report, sir?
19          MR. LANE: Object to the form.
20  A.   I would need to reread it.
21  Q.   Well, you've read the other ones just as well
22      as you read this one, have you not, sir?
23  A.   And as I said, I have not compiled my

Page 341

1  criticisms of the reports, because that's not
2  what I'm doing here.
3  Q.   What are you doing?
4  A.   Investigating the accident to determine how to
5  prevent a recurrence in my opinion.
6  Q.   What do you understand your role in this is?
7  A.   As a safety engineer, my training is prevention
8  of accidents, and that's the main function that
9  I have here; determine what caused the
10  accident, identify what should have been done
11  to prevent it, and identify what needs to
12  change to prevent future occurrences.
13  Q.   On any of the lawsuits that you've testified in
14  court before, have you ever testified on behalf
15  of the party being sued?
16  A.   Yes.
17  Q.   Okay. When was that, sir?
18  A.   I've listed on the testimony summary. Let's
19  see, I recall the case involving Tube City
20  being sued for the backing accident.
21  Q.   And when was that, sir?
22  A.   I don't recall the year. It's listed on the
23  sheet.

Page 342

1  Q.   And what court was that in, sir, that you
2  testified?
3  A.   That was in deposition testimony, I believe,
4  and the court I think was near Birmingham,
5  Bessemer or somewhere.
6  Q.   All right, sir. Have you ever testified in
7  court on behalf of a party being sued?
8  A.   I can't recall court testimony like that.
9  Q.   Is the only case you've testified either by
10  deposition or in court the Tube City case
11  outside of Bessemer, Alabama, and that by
12  deposition?
13       MR. LANE: Object to the form.
14  A.   No. I have -- I have other cases involving
15  defendants. I'm trying to remember if they had
16  testimony or not. I don't recall.
17  Q.   As we sit here today then, you're unable to
18  recall any testimony that you've ever tendered
19  by deposition or in trial on behalf of a party
20  being sued?
21       MR. LANE: Object to the form. He just
22          answered to the contrary.
23  A.   I can think of one now. A sausage packing

Page 343

1  piece of equipment, the manufacturer of the
2  sausage packing piece of equipment.
3  Q.   Any others, sir?
4  A.   I recall a fall down a stairway that I
5  investigated and advised the attorney that his
6  defendant's area was dangerous, so there was
7  not testimony there.
8  Q.   Any others, sir?
9  A.   Those are the ones that occur to me now.
10  Q.   And where did this fall down the stairwell case
11  take place?
12  A.   That was in Huntsville.
13  Q.   And when was that, sir?
14  A.   I don't know the year. Maybe ten years ago.
15  Q.   And who were you employed by?
16  A.   Harvey Morris.
17  Q.   And the sausage packing piece of equipment,
18  where was that case pending?
19  A.   North Alabama, I think maybe Florence.
20  Q.   And when was that, sir?
21  A.   I don't know. Maybe five years ago or more,
22  maybe ten.
23  Q.   And who employed you in that case?

Page 344

1  A.   I can't recall right now the attorney.
2  Q.   And who employed you in the Tube City case
3  outside of Bessemer?
4  A.   I don't recall. They were a Birmingham firm.
5  Q.   And when was that, sir?
6  A.   Roughly five or seven years ago, I would say --
7  well, I'm sorry, it's listed on the summary
8  that I provided.
9  Q.   And those are the only three matters that you
10  can recall testifying on behalf of someone who
11  has been sued?
12  A.   Those are the ones that I can think of right
13  now.
14  Q.   You were going through the reports that you've
15  reviewed?
16  A.   Yes, sir.
17  Q.   You've said that you had a letter from
18  Mr. Cloyd? I guess we need to look at that,
19  don't we? I see you've highlighted some
20  portions here, page two of Mr. Reitmeier's
21  report?
22  A.   Yes. I think it's a summary of what his
23  opinions are expected to be.

Page 345

1  Q.    And what did you highlight there, sir?
2  A.    The statement "He also is expected to testify
3        that proper warnings were given with the core
4        drill, including an operator manual and
5        warnings on the core drill itself regarding the
6        safe operation of the drill.  He will testify
7        that the core drill was misused."
8  Q.    And why did you highlight that, sir?
9  A.    Those were opinions of his that I disagree
10       with.
11 Q.    All right.  You were looking for Mr. Cloyd, I
12       believe?
13 A.    Yes.  What was that a part of?  I don't know.
14       Yes, this is part of Defendants Rule 26
15       information.  And I have highlighted "The pump
16       system was simply to provide a vacuum source
17       and there's no evidence that it did not do
18       exactly that."  He said that "if in this
19       special use case the designer or the
20       manufacturer of the drill unit considered that
21       feature necessary, they easily could have added
22       it."  I would agree with that.
23 Q.    And why did you highlight the first sentence

Page 346

1        there?
2  A.    He said that there's no evidence that it didn't
3        do exactly that, which is provide a vacuum.
4  Q.    And you find fault with that opinion?
5  A.    I was not evaluating the report to find fault
6        with it.
7  Q.    Do you disagree with that statement?
8  A.    I think there is a probability that it didn't
9        provide the desired level of vacuum.
10 Q.    And what probability is that, sir?
11 A.    I don't have a number for it.
12 Q.    Well, more than 50 percent?
13       MR. LANE:  Object to the form.  Are we
14          talking about the pump or the base
15          or the system?  It's ambiguous and
16          I object to the form.
17       MR. SHEEHAN:  You're welcome to
18          cross-examine him once we get
19          through.
20 A.    The system failed to provide 20 inches of
21       vacuum in my opinion.  There are several areas
22       that could have failed to cause that, the pump
23       clogging like was found in the inspection after

Page 347

1        the accident is one of the potential causes.
2  Q.    And which area failed?
3        MR. LANE:  Object to the form.
4  A.    Which of those areas contributed how much, I
5        cannot allocate.  Any of them could have caused
6        it.
7  Q.    And how many areas were there?
8  A.    Anything that seals the pump -- the vacuum base
9        to the concrete is one area, that includes the
10       interface between the gasket and the concrete,
11       it includes the interface between the gasket
12       and the metal.  Any of the fittings on the hose
13       and the vacuum assembly at the top of the base
14       could have leaked and allowed a loss of vacuum.
15       There could have been defects at the top of the
16       hose, clogging in the water trapping vial, or
17       leakage on either side of the water trapping
18       vial, leakage around the release vent, clogging
19       anywhere in that system, to include clogging
20       like we saw in the tear-down inspection in the
21       top of the pump.
22 Q.    And do you have an opinion, based upon a
23       reasonable degree of engineering certainty, as

Page 348

1        to which area failed?
2  A.    I think any of those would have caused this.  I
3        can't allocate which one did cause it in this
4        case.  The presence of the contamination in the
5        pump makes that a very suspect area.
6  Q.    Have you now gone over with us the reports that
7        you have reviewed, sir?
8  A.    Yes.  With the explanation that I haven't
9        listed where I believe they're in error, I've
10       not attempted to do that here.
11       MR. SPRAIN:  I've got a few follow-ups
12          if you want to look around.
13       MR. SHEEHAN:  All right.
14
15          REDIRECT EXAMINATION
16 BY MR. SPRAIN:
17 Q.    Sir, I saw some more cases in your affidavit.
18       I thought it was the same, but I stand
19       corrected.  And you've got two more on an
20       additional page that showed up for the year
21       2005, one is Potter and that was also an Altec
22       case?
23 A.    Yes.

Page 349

1  Q.   And were you retained by the plaintiff in that
2       case?
3  A.   Yes.
4  Q.   And you found that the bucket truck was
5       defective, I assume, like the others you
6       testified in?
7  A.   No, it was a different defect.  It was similar,
8       but it was different defect.
9  Q.   Okay.  What product was involved?
10 A.   The bucket truck.
11 Q.   All right.  Woods versus Alabama Power, were
12      you retained by the plaintiff or the defendant
13      in this case?
14 A.   The plaintiff.
15 Q.   And what was the subject of the case?
16 A.   That was an electrocution of a ground
17      inspector.  And I found the cause was a
18      violation of the National Electrical Safety
19      Code by the equipment, the Alabama Power
20      equipment.
21 Q.   Okay.  And so you found a product defect
22      existed?
23 A.   I wouldn't call it a product.  It was a series

Page 350

1       of components assembled by Alabama Power in an
2       unsafe fashion.
3  Q.   Okay.  And you found that that system was
4       defective?
5  A.   Yes.
6  Q.   And moving to 2006, and I'm going to try to go
7       through these quickly, the Cassey v. Elliott,
8       were you retained by the plaintiff in that
9       case?
10 A.   Yes.
11 Q.   Is that case still pending or do you know?
12 A.   I believe it's settled, I believe.
13 Q.   Okay.  Was a product involved in that case?
14 A.   There were products there, they weren't the
15      cause of it.
16 Q.   Okay.  What was the cause of the accident?
17 A.   The procedure being used by the electric
18      company.  The issue there was did the employee
19      violate the OSHA standards himself.  And I
20      determined that he did not, that he stayed
21      outside the minimum assured distance.
22 Q.   Okay.  Terry v. Schueck, this case involved a
23      crushed -- somebody crushed by a steel

Page 351

1       guardrail.  Were you retained by the plaintiff
2       in that case?
3  A.   Yes.
4  Q.   And was there a product involved?
5  A.   No.  Well, there was a product, but there was
6       not a defective product.
7  Q.   Okay.  Peyton v. Wheeler Laboratory?
8  A.   Yes.
9  Q.   And that also involved someone who was crushed
10      in a blast machine auger?
11 A.   Yes.
12 Q.   Were you retained by the plaintiff?
13 A.   Yes.
14 Q.   Was the auger deemed to be defective?
15 A.   Yes.
16 Q.   Okay.  Newman v. Auto Shread, in this case
17      someone was crushed by a wall.  Were you
18      retained by the plaintiff or the defendant?
19 A.   The plaintiff.
20 Q.   And was there a product involved in the Newman
21      case?
22 A.   There were products, yes.
23 Q.   Okay.  As part of your role in the Newman case

Page 352

1       did you find that one of the products was
2       defective?
3  A.   No.
4  Q.   Okay.  And Curtis v. Geocenters, were you
5       retained by the plaintiff or the defendant?
6  A.   Retained by the plaintiff.
7  Q.   Okay.  And what did that case involve?
8  A.   That involved a fire on board a ship.
9  Q.   Did that case involve a defective product?
10 A.   No.
11 Q.   You were most recently employed at the U.S.
12      Army Command; is that correct?
13 A.   Well, I'm currently employed by NASA.  I have
14      retired from the U.S. Army Aviation and Missile
15      Command.
16 Q.   Okay.  I didn't see that in your resume.  Right
17      now you're employed by NASA?
18 A.   As a consultant on the NASA Aerospace Safety
19      Advisory Panel.  I advise the head of NASA,
20      Doctor Griffin, and Congress on the safety of
21      manned space flight.
22 Q.   Okay.  Is that a day-to-day job whereby you
23      show up and work a set number of hours per day

Page 353

1    or per week or is it just simply a consulting
2    type job?
3  A.   It's a panel, we're asked to meet approximately
4    quarterly.  We go to various centers and look
5    at their safety programs and evaluate how
6    they're doing, evaluate special subjects at the
7    request of the administrator, a few dozen times
8    a year I think we will meet.
9  Q.   Okay.  How many hours do you anticipate that
10   you will devote to your NASA consulting job in
11   2006?
12 A.   I think 60 days is my estimate.
13 Q.   Okay.  So that's roughly two months?
14 A.   More than that, because it's 60 work days.
15 Q.   60 work days?
16 A.   Yeah.
17 Q.   All right.  Now, what led to your retirement at
18   the U.S. Army Aviation and Missile Command?
19 A.   I reached retirement age where I was eligible
20   and I was working pretty hard.
21 Q.   So you elected to retire from that position?
22 A.   Yes.
23 Q.   All right.  And what do you do full-time; your

Page 354

1    safety consulting job?
2  A.   I work for NASA on the Aerospace Safety
3    Advisory Panel.  I'm a member of the Board of
4    Directors for APT Corporation, I'm the
5    technical advisor on safety analysis.
6  Q.   What is APT?
7  A.   It's a safety analysis company in Huntsville
8    that works on complex analytical issues.  Space
9    debris assessment and things like that.
10 Q.   Okay.  So APT, NASA and then your safety
11   engineering job, is that all you do?
12 A.   It seems like there's one more, I can't think
13   of it right now.
14      MR. SPRAIN:  Okay.  Winston, you may
15   have some more.
16      MR. SHEEHAN:  Please.
17
18      RECROSS-EXAMINATION
19 BY MR. SHEEHAN:
20 Q.   Sir, have you ever spoken to anyone at United
21   Rentals either on this matter or any matter?
22 A.   I don't know about that.  I've dealt with
23   rental companies on other injuries, I don't

Page 355

1    know if they were United Rentals.  I don't
2    know.
3  Q.   Have you ever testified in a case against
4    United Rentals?
5  A.   Not that I remember, but I can't be sure of
6    that.
7  Q.   Have you ever testified in a case involving a
8    rental company?
9  A.   I can't recall one at this time, this late in
10   the day.
11 Q.   Have you ever testified in favor of a rental
12   company?
13 A.   I don't recall testimony involving a rental
14   company.
15 Q.   Have you ever been denied an opportunity to
16   provide expert opinion testimony?
17 A.   I may have -- I've investigated accidents where
18   rental companies were involved.  At this time I
19   just can't recall how far they went.  What was
20   your last question, I'm sorry?
21 Q.   Yes, sir.  Have you ever been denied the
22   opportunity to provide an expert opinion?
23 A.   No.

Page 356

1  Q.   And do you understand what a Daubert challenge
2    is?
3  A.   Yes.
4  Q.   And have you ever been denied the opportunity
5    due to Daubert to provide testimony?
6  A.   Not that I'm aware of.
7       MR. SHEEHAN:  Thank you, sir.
8       MR. LANE:  I just have -- that's all.
9       FURTHER DEPONENT SAITH NOT
10
11      * * * * *
12
13      REPORTER'S CERTIFICATE
14
15 STATE OF ALABAMA
16 COUNTY OF MONTGOMERY
17      I, Ricky L. Tyler, Certified Court
18 Reporter and Notary Public in and for the State of
19 Alabama at Large, do hereby certify that on Monday,
20 December 4th, 2006, pursuant to notice and
21 stipulation on behalf of the Defendants, I reported
22 the deposition of JOHN C. FROST, who was first duly
23 sworn by me to speak the truth, in the matter of

Page 357

1  MATTHEW RILEY, Plaintiff, vs. UNITED RENTALS (NORTH

2  AMERICA), INC., et al., Defendants, Civil Action

3  Number 1:05 CV-994-T, now pending in the United

4  States District Court for the Middle District of

5  Alabama, Southern Division, that the foregoing 321

6  computer-printed pages contain a true and accurate

7  transcription of the examination of said witness by

8  counsel for the parties set out herein; that the

9  reading and signing of said deposition was waived by

10  witness and counsel for the parties.

11      I further certify that I am neither of kin

12  nor of counsel to the parties to said cause, nor in

13  any manner interested in the results thereof.

14      This 8th day of December, 2006.

15

16

17

18

19

        Ricky L. Tyler

20      Certified Court Reporter

        and Notary Public

21      State of Alabama at Large

22

23