# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

       Plaintiff,

Vs.                          CIVIL ACTION NO.

                             1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

       Defendants.


       DEPOSITION OF DONALD R. SHAVER, taken
pursuant to notice and stipulation on behalf of the
Defendants, in the conference room of Cochran,
Cherry, Givens, Smith, Lane & Taylor, 163 West Main
Street, Dothan, Alabama, before Ricky L. Tyler,
Certified Court Reporter and Notary Public in and for
the State of Alabama at Large, on Friday, October
27th, 2006, commencing at 8:50 A.M.

Page 2

```
 1           APPEARANCES
 2  FOR THE PLAINTIFF:
 3      LARRY GIVENS, ESQ.
 4      Cochran, Cherry, Givens, Smith,
 5        Lane & Taylor
 6      P. O. Box 927
 7      Dothan, AL 36302
 8
 9
10  FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
11      ROBERT H. SPRAIN, JR., ESQ.
12      Sprain & Shires, PC
13      1707 29th Court South
14      Birmingham, AL 35209
15
16
17  FOR THE DEFENDANT, UNITED RENTALS:
18      C. WINSTON SHEEHAN, JR., ESQ.
19      Ball, Ball, Matthews & Novak
20      2000 Interstate Park Drive
21      Suite 204
22      Montgomery, AL 36109-5413
23
```

Page 4

```
 1  12    Protocol
        For Identification            82
 2
     13    Affidavit
 3      For Identification            83
 4  14    Correspondence File
        For Identification            83
 5
     15    Photos of Clutch Slip Rings
 6      For Identification            95
 7  16    Photos of Clutch Slip Rings
        For Identification            95
 8
     17    Photos of Core Drill
 9      For Identification            112
10  18    Bound Documents Provided by Lane
        For Identification            112
11
     19    Warnings on Core Drill
12      For Identification            156
13  20    Affidavit
        For Identification            201
14
     21    Affidavit Signature Page
15      For Identification            203
16  22    Shaver's Report
        For Identification            208
17
     23 - 47 Photographs (Exhibit 17)
18      For Identification            223
19  48    Emailed Depositions
        For Identification            236
20
     49    All Emails
21      For Identification            236
22  50    Photograph
        For Identification            270
23
```

Page 3

## INDEX

```
 1                               Page
 2
 3  Direct Examination by  MR. SPRAIN:      6
     Cross-Examination by  MR. SHEEHAN:    201
 4  Redirect Examination by  MR. SPRAIN:   309
     Recross-Examination by  MR. SHEEHAN:  325
 5
 6           EXHIBITS
 7
     For Defendant:
 8    1    Deposition Notice
        For Identification             8
 9   2    Shaver Report
        For Identification             8
10
     3    Shaver's Alabama Engineering
11       License
        For Identification             8
12
     4    Invoices
13      For Identification            12
14   5    Copies of Photographs
        For Identification            41
15
     6    Milwaukee Operators Manual
16      For Identification            48
17   7    Inspection Roster 5/12/05
        For Identification            58
18
     8    Core Drill Operators Manual
19      For Identification            62
20   9    Color Copies of Photographs
        For Identification            74
21
     10    Wiring Diagram
22      For Identification            76
23   11    Chemical Test Report
        For Identification            80
```

Page 5

```
 1  51    Photograph
        For Identification            294
 2
     52    Photograph
 3    For Identification            294
 4  53    Photograph
        For Identification            294
 5
     54    Photographs of Shaver
 6       Alternative Design
        For Identification            317
 7
```

 8
 9           STIPULATIONS
10
11       It is stipulated and agreed by and between
12  counsel representing the parties that the deposition
13  of DONALD R. SHAVER, may be taken before Ricky L.
14  Tyler, Certified Court Reporter and Notary Public in
15  and for the State of Alabama at Large, without the
16  formality of a commission; and all formality with
17  respect to other procedural requirements is waived;
18  that objections to questions, other than objections
19  as to the form of the questions, need not be made at
20  this time, but may be reserved for a ruling at such
21  time as the deposition may be offered in evidence or
22  used for any other purpose by either party as
23  provided by the Federal Rules of Civil Procedure.

Page 6

1    It is further stipulated and agreed by and
2  between counsel representing the parties in this case
3  that the filing of the deposition of DONALD R.
4  SHAVER, is hereby waived and that said deposition may
5  be introduced at the trial of this case or used in
6  any other manner by either party hereto provided for
7  by the Statute, regardless of the waiving of the
8  filing of same.
9    It is further stipulated and agreed by and
10 between the parties hereto and the witness, that the
11 signature of the witness to this deposition is hereby
12 not waived.
13        * * * * *
14    P R O C E E D I N G S
15
16    DONALD R. SHAVER, of lawful age, having first
17 been duly sworn, testified as follows:
18
19        DIRECT EXAMINATION
20 BY MR. SPRAIN:
21 Q.   State your name, please?
22 A.   Donald Robert Shaver.
23 Q.   What is your occupation?

Page 7

1  A.   I'm a professional engineer.
2  Q.   What is your address?
3  A.   It's -- mailing address is P. O. Box 29092,
4     Atlanta, Georgia 30359; physical address is
5     2480 Pangborn Circle, Decatur, Georgia 30033.
6  Q.   Are you employed through a company or are you
7     self-employed?
8  A.   I'm self-employed.  Yeah, it's a sole
9     proprietor.
10 Q.   Okay.  It's not set up as a separate legal
11    entity?
12 A.   No.
13 Q.   And your company name or your d/b/a is Shaver
14    Engineering & Design?
15 A.   Actually it's Shaver Engineering & Design
16    Consultants, yes.  But, yeah, it's shorten for
17    -- legally set up with "Consultants" on the
18    end.
19 Q.   Okay.  Well, we discussed off the record
20    briefly, but are you licensed in the State of
21    Georgia?
22 A.   Yes.
23 Q.   Are you licensed as a P.E. in the State of

Page 8

1     Alabama?
2  A.   Yes.
3  Q.   When was that done?
4  A.   That was -- y'all have got a copy of the
5     license.  The Board met on the 13th and I
6     believe it was issued around October 13th.
7     Here we go.  The 13th of October.  I had it
8     right.  Do you want to make an exhibit or
9     whatever of that?
10 Q.   I'm going to mark that as Defendant's Exhibit
11    3.  And let's go off the record for a second to
12    organize the documents.
13        (Exhibit 1, 2 and 3 marked for
14        Identification.)
15        (Off-the-record discussion.)
16 BY MR. SPRAIN:
17 Q.   We are back on the record.  We've organized our
18    plan to go through the materials which you have
19    reviewed as part of your testimony.  And I'm
20    going to go through some discovery materials
21    first, fair enough?
22 A.   Okay.
23 Q.   Now, this binder here is labeled "Shaver

Page 9

1     Documents," can you tell me, in summary form,
2     what this folder contains?
3  A.   Let me take a look at it real quick.  This will
4     be -- you know, it's things that have been
5     provided to me in discovery, including a manual
6     of the drill, the subject drill in this case.
7     It's, you know, some letters and correspondence
8     that were first sent to me when the Beauchamp
9     law firm was involved in the case.  And it
10    involves copies of photographs taken by their
11    experts at the first inspection that we had; I
12    don't recall the date of that.  There were a
13    lot of photographs there.  Again, you know,
14    answers to interrogatories and notice to
15    produce documents by, you know, the parties
16    involved.
17 Q.   Okay.  When were you first hired to be a
18    consultant in the case?
19 A.   I want to say it was in 2003 I was contacted by
20    Robert Beauchamp out of Albany.  If I may, let
21    me just refresh my memory here.
22 Q.   If you can find any notes or correspondence
23    which documents that --

Page 10

1  A.   Yeah.  Wait, I think it's right there, the
2       letter from Bob Beauchamp, I'm sorry.  But I
3       was contacted by Mr. Beauchamp that this
4       accident had occurred.  And we discussed the --
5       you know, I did some preliminary investigation
6       into the drills and the designs and what not.
7       And in the beginning, either through
8       Mr. Beauchamp or Mr. Lane, we were discussing
9       at the same time, I made arrangements for the
10      storage of the drill.  It was in Mr. Herskowitz
11      -- Mike Herskowitz's office in Atlanta.  We
12      made arrangements -- I went to his office and
13      unloaded the drill.  You know what, I know of a
14      better way of determining it.
15           MR. GIVENS:  Can we go off the record
16               for one second?
17           MR. SPRAIN:  Yes.
18           (Off-the-record discussion.)
19  A.   But that was in, you know, late 2003 that he
20      first contacted me.  And, you know, the -- I
21      started getting involved in it by setting up
22      the storage and all in the first of 2004.  And,
23      you know, as time progressed, the different

Page 11

1       parties were notified.  And we set up an
2       inspection in, I believe it was, 2005, May of
3       '05.  Let me check and make sure.  But that was
4       at Applied Technical Services.  Let's see here.
5       May 12th of 2005.  That was the quickest way I
6       could pick it up.
7  Q.   That date signifies what again?
8  A.   That was the first inspection that was held
9       with the parties.  And I've got a list of the
10      people that were present here somewhere, if I
11      may.  Is that important?
12  Q.   Sure.
13  A.   I just saw that.
14           MR. SPRAIN:  Off the record.
15           (Off-the-record discussion.)
16  A.   There's the sign-in sheet and those were the
17      people present at that inspection in May.
18  Q.   Okay.  This can be marked?
19  A.   Sure.
20           MR. GIVENS:  Let me get a copy of it.
21           (Off-the-record discussion.)
22  Q.   Okay.  You pulled out a folder that deals with
23      billing; is that correct?

Page 12

1  A.   Yes.  Yes.
2  Q.   Okay.  How much have you billed to date?
3  A.   Oh, I would have to -- whatever the total of
4       all of that would be.  I believe there have
5       been three invoices.
6  Q.   Is this file complete?
7  A.   I have not invoiced, you know, for, I guess,
8       approximately the last week or so of work and,
9       you know, the prep time for this deposition.
10  Q.   Well, what I'm going to do is I'm going to mark
11      the billing file that says "Shaver Billing" as
12      Exhibit 4.
13           MR. GIVENS:  There's probably two
14               copies in that file, I suspect.
15           MR. SPRAIN:  You are correct.
16  Q.   What I'm going to do is I'm going to pull one
17      out and I'm going to mark this set of documents
18      as Exhibit 4 to your deposition.
19           (Exhibit 4 marked for identification.)
20  Q.   And the first invoice is dated October 20, '06
21      on the stack of documents.  I know that's not
22      the most recent -- I mean, this is the most
23      recent invoice, probably there are others

Page 13

1       behind it?
2  A.   Correct.
3  Q.   But just in terms of identification, the
4       exhibit label is attached to the October 20,
5       '06 invoice.
6  A.   Okay.
7  Q.   All right.  But you're saying this would not
8       include the most recent billing for the past
9       week or so?
10  A.   Right.  Correct.
11  Q.   Well, what is your hourly rate?
12  A.   It's 200 dollars per hour.
13  Q.   And in terms of housekeeping, I've labeled your
14      license in Alabama as Exhibit 3.
15           Okay.  What do you charge for trial time?
16  A.   If it's out of town, out of the metro Atlanta
17      area, it's the same, it's 200 dollars per hour
18      including, you know, travel time.  If it's in
19      the metro Atlanta area, for depositions and
20      trial I charge 500 dollars for the first two
21      hour minimum, and that includes my time to and
22      from the deposition, deposition or trial.  That
23      being most of the Courthouses are within a half

Page 14

```
 1      hour of my home.  So I've just kind of built
 2      that in, a 500 dollar minimum for a two hour
 3      deposition, and then it goes to 200 dollars per
 4      hour thereafter.  That's the only step or, you
 5      know, difference in billing that I give and
 6      that only encompasses out of town and in town.
 7   Q.  I've got it.  What have you done in preparation
 8      in the past week and a half after your latest
 9      invoice for this deposition?
10   A.  Okay.  I made a trip down here last Friday, met
11      with Mr. Lane, went over some of the aspects of
12      the case; went ahead and started building the
13      alternate design -- alternative design subject
14      drill; reviewed, you know, case file material
15      just to kind of review it, even though I had
16      been over it before, just to kind of update and
17      refresh.
18   Q.  I understand.
19   A.  But primarily most of the time was spent,
20      believe it or not, on, you know, working on the
21      alternate design.
22   Q.  Okay.  How much time would you estimate you
23      spent doing all of that in preparation for the
```

Page 15

```
 1      deposition?
 2   A.  Probably 20 to 25 hours.
 3   Q.  Okay.  So that's going to be four to 5,000
 4      dollars in preparation expense and then you've
 5      got this deposition, of course?
 6   A.  And this deposition.  And, of course, there's
 7      expenses, travel expenses, hotels and some
 8      other things, I don't know if you're interested
 9      in that or not.
10   Q.  Well, what I will ask you to do on the record
11      is to -- is to send your invoice for services
12      up through the deposition, you know, to
13      Mr. Lane and then he can forward it to my
14      office?
15   A.  Okay.  Let me just -- I know different states
16      have -- and I don't know if this needs to be on
17      the record or not.  Can we go off the record?
18          MR. SPRAIN:  Sure.
19          (Off-the-record discussion.)
20          MR. GIVENS:  He will want to read and
21              sign and we all agree we have the
22              normal stipulations.
23   Q.  All right.  So to keep this deposition moving
```

Page 16

```
 1      smoothly, put aside in the stack, as matters
 2      we've already been over, this folder containing
 3      billing.
 4   A.  Okay.
 5   Q.  And hopefully eventually we will clean off this
 6      conference table and we can move to the --
 7          MR. GIVENS:  What I'm going to do is
 8              put things that we've already
 9              discussed in this chair down here,
10              that way it's off the table, but
11              within reach.
12          MR. SPRAIN:  Okay.
13   Q.  Now, I pulled out a stack of documents from
14      your shuck labeled "Shaver Documents," and all
15      of these documents relate to this case; is that
16      correct?
17   A.  Yes.
18   Q.  Okay.  And the first series of documents are
19      United Rentals' initial disclosures.
20   A.  Okay.
21   Q.  What I plan to do is go over them for the
22      record, but I don't plan to mark anything
23      unless we need to.  Is there any particular
```

Page 17

```
 1      document in United Rentals' disclosures that's
 2      particularly relevant to your opinions in this
 3      case?
 4   A.  There is, and I don't know if it's in these
 5      particular ones here.  You know, you have the
 6      rental invoice, the invoice material having to
 7      do with the drill, you know, just showing that
 8      it was rented to Flavor House during that time
 9      period; that it was sold with a new gasket,
10      what appears to be a new gasket core for that
11      drill; and that it shows that it was sent out
12      with a three and a half inch and a four inch
13      bit; and that the rental protection was
14      accepted.  There is also another document.
15   Q.  That last part you said "the rental" --
16   A.  Protection.
17   Q.  Okay.
18   A.  In other words, Flavor House accepted the
19      rental protection.
20   Q.  Okay.  I understand.
21   A.  There's also a -- they provided preparation
22      safety precautions that must be observed.  It
23      just goes through the -- you know, how to
```

Page 18

1    operate the machine.  You know, that it's --
2    you know, that was something that I obviously
3    looked at and reviewed at the time, and as well
4    as the operators manual that was supplied
5    subsequently to for the subject drill.
6  Q.  Okay.  You said subsequently, is there any
7    evidence that the product operating manual was
8    not supplied with the tool when it was rented
9    and delivered to Flavor House?
10  A.  I believe there was some deposition testimony,
11    and I would have to go back to see, that there
12    was not an operators manual with it there at
13    Flavor House is my understanding; they did not
14    have one.
15  Q.  Okay.  Now, the next series of documents appear
16    to be photographs.  Were those photographs
17    taken of the product involved in this case?
18    What was the product, by the way?
19  A.  A concrete core cutting drill manufactured by
20    Norton.
21  Q.  Okay.
22  A.  Well, yeah, Norton, I guess, puts everything
23    together, the different components.  The drill

Page 19

1    itself is manufactured by Milwaukee.
2  Q.  Okay.  What about the drill stand and column,
3    who manufactured that component?
4  A.  I believe it's my understanding that Norton
5    did, but it goes by another name.  There's
6    another name that has been mentioned that
7    Norton operates under.
8  Q.  All right.  Does Diamond Products ring a bell?
9  A.  Yes, I believe they manufacture the bits, the
10    drill bits.  But I think that's also handled
11    through Norton as well.
12  Q.  Okay.  Now, what is the model name of the core
13    drill involved in this case?
14  A.  It's a DM500 or some designation.  Dymodrill is
15    the name that's given here on the -- well,
16    that's for the actual motor.  Here we go.  A
17    DM500 Dymodrill core drill.
18  Q.  Okay.  What I'll do for this deposition is
19    refer to the product as a core drill.
20  A.  Okay.
21  Q.  And by doing that we understand that it's the
22    DM500 that is the subject matter of the
23    photographs I just handed you.

Page 20

1  A.  It incorporates a frame, the Milwaukee drill
2    motor and the Gast vacuum pump put together,
3    that entire assembly, when we're talking about
4    a core drill.
5  Q.  Exactly.  Would you agree that there are three
6    main components; the stand and column, the
7    Milwaukee motor and the Gast vacuum pump?
8  A.  Those are the -- correct.  Yes.
9  Q.  All right.  Now, if you can flip through the
10    photographs, and my intent here is not to
11    belabor this, but if there are any photographs
12    that are of particular importance for your
13    opinions in this case, let's mark those?
14  A.  Okay.  Yeah, there's a photograph right here
15    that I feel is of importance.  It's the vacuum
16    gauge that goes with the pump.  There is no
17    indication on that particular gauge face of
18    what is an acceptable vacuum pressure and what
19    is not.  There's no writing or indication on
20    the drill itself that would alert anyone.  And
21    I believe also in the instruction manual that
22    came with this drill at that time, and I would
23    have to look, but I don't believe there's a --

Page 21

1    well, I'll have to look into that.  Let's go on
2    through the photographs and we will go to that
3    in the material.
4        There's broken wires, which subsequent
5    deposition testimony has revealed the violent
6    action of the drill spinning around was the
7    cause of that.  One of the drill bits, I
8    believe it was the three and a half inch drill
9    bit, but I'm not -- I would have to look back
10    for sure, the ends were chewed up and broken.
11    The wire was pulled off of the vacuum pump as
12    well.
13  Q.  Was that done prior to the incident or as a
14    result of the incident?
15  A.  As a result of the incident.
16  Q.  And that's based on deposition testimony?
17  A.  Deposition and also the way that -- the way
18    that it appears to me to have been from a
19    violent act.  In other words, it wasn't just,
20    you know, where somebody purposefully had
21    disconnected it or removed it for any reason.
22  Q.  Do you have any opinions as to whether the
23    vacuum pump was operational at the time of the

Page 22

1    accident?
2 A.    I do.  It's my opinion that it was operational
3    at the time.  Well, let me correct that.
4    Immediately prior to the incident occurring, it
5    was operational.  I think that comes from the
6    deposition testimony that they had used the
7    vacuum pump.
8        Now, whether it was fully efficient or
9    not, I can't say.  You know, was it able to
10    pull a vacuum, the seal that I observed on the
11    subject drill had almost a separation where
12    it's glued together.  So the gasket may not
13    have had a good firm fit.  So to what degree
14    they were able to achieve a vacuum in the
15    system, I can't say for sure, but it's my
16    understanding that the vacuum pump was
17    operating and was functioning.  Now,
18    functioning properly, I can't say.
19        With regards to that, there was some
20    material, a white powder, that in that
21    inspection was uncovered that was later
22    analyzed, I believe, to be aluminum oxide that
23    had gotten into the diaphragm of the pump.

Page 23

1    It's my opinion that that was from some kind of
2    slurry that had gotten introduced to the system
3    at some point in time.
4 Q.    Was that before the incident involved in this
5    case or as a result of the incident?
6 A.    I believe it was before the incident occurred.
7    And it's my understanding at Flavor House that
8    when they used it it was only -- they had only
9    drilled one hole prior to this.  And the amount
10    of material in there, if it was from a slurry,
11    with the ball -- the ball check valve in the
12    filtration, I just don't believe that there
13    could have been that much material that would
14    have been sucked up into that vacuum pump from
15    drilling one hole and partial into the second.
16 Q.    What effect, if any, would the slurry, as
17    revealed by the aluminum oxide, have on the
18    functioning of the vacuum system?
19 A.    It would tend to make it less efficient;
20    inhibit the movement of the diaphram, which
21    would prohibit it from developing a full
22    vacuum.
23 Q.    All right.  What I want you to do is mark that

Page 24

1    picture you've already --
2 A.    Oh, there are a bunch of them.
3 Q.    Just mark some of those pictures with these
4    tabs showing the slurry as you call it.
5 A.    Okay.
6 Q.    What is the slurry?  What comprises the slurry
7    material in the vacuum system?
8 A.    It would be -- the aluminum oxide would have
9    likely come from a material that had been cut
10    that contained aluminum.  The other thing that
11    is possible as well, that if water and material
12    were sucked up into the pump, I believe the
13    housing of that motor is aluminum and it could
14    have resulted from some kind of corrosion from
15    material that was sucked up into the vacuum
16    pump as a reaction with the aluminum.  That's
17    also a possibility that that's why you had the
18    aluminum in it, it could have just been from
19    water and concrete mixture that was sucked up
20    into the vacuum pump.
21 Q.    Now, the ball inside the vacuum container is
22    supposed to trap water and such things as
23    slurry material from entering the vacuum pump;

Page 25

1    is that correct?
2 A.    That's correct.  As the water level were to
3    rise in that bowl -- if you want to I can show
4    you, but you know what I'm talking about.  The
5    water catch basin, water trap is what it's
6    called, as that water level rises, there is a
7    ping-pong -- approximate ping-pong size plastic
8    ball that will float up to the top and will
9    seal off an orifice at the top that will cut
10    off the vacuum and would prohibit the machine
11    from operating.  It would, you know, prevent
12    any suction going through there.
13 Q.    So then what caused this slurry to enter the
14    vacuum system?
15 A.    What --
16 Q.    What caused the slurry to enter the diaphram of
17    the vacuum system?  Does that indicate that the
18    water trap was not functioning on a prior
19    occasion or what does it signify?
20 A.    That's what it would indicate to me, yes, that
21    there had been a time that water had gotten
22    around the ball, that it had been allowed to
23    get too much water in it.  And even though that

Page 26

1   thing is supposed to be emptied and kept
2   drained, even though that ball is intended to
3   rise, that's when it would be level. And in
4   sloshing it around or moving it around with the
5   vacuum pump on, you could get movement and
6   still get water up in there. There are certain
7   situations that could cause that.
8   Q.   Okay.
9   A.   And also the -- I believe these are the clutch
10  bushings that were removed when we disassembled
11  the clutch on the drill motor, these next
12  photographs, and I will go through these.
13  These indicate to me, and it's not as clear on
14  these photographs as it was firsthand, --
15  Q.   If you will, put them on the side and that way
16  we can copy them later.
17  A.   Okay. Sure. It indicated to me that the
18  clutch had not slipped. There was no galling,
19  G-A-L-L-I-N-G or G-A-U, I'm not sure of the
20  spelling, I shouldn't try, but it's where
21  metals would rub together. And these were
22  alternate, I believe, brass and steel rings.
23  There was no indication there had been slippage

Page 27

1   or anything like that of overloading the clutch
2   on this or anything that would have caused a
3   clutch malfunction. That was also confirmed by
4   within specification readings of the torque on
5   the clutch assembly prior to it being
6   disassembled.
7   Q.   So based on your review of the materials in
8   this case and the product, the clutch was
9   functioning?
10  A.   Yes.
11  Q.   Okay. And you didn't take any exception to the
12  clutch in the Milwaukee electric motor?
13  A.   I'm not aware of any -- any problems with that.
14  Q.   How would the clutch function in the event that
15  the drill bit on a core drill hung up or bound
16  up or locked into the concrete?
17  A.   Okay. If you had the base securely affixed to
18  the floor or you otherwise had the jacks -- the
19  stand secured with the ceiling jack or anchor
20  bolts and you run into something that would
21  bind it, that would overload it. The clutch
22  would begin to slip and that would keep it from
23  burning up the motor or introducing enough

Page 28

1   torque to break something. It just keeps it
2   from being -- I believe it's about a two
3   horsepower motor on that drill, which is quite
4   a bit of power.
5   Q.   Right. The clutch then protects the motor in
6   the event that the drill bit binds up?
7   A.   It would protect the motor. It could also act
8   as an overload, a safety feature for people as
9   well.
10  Q.   Okay. That was my next question. How can it
11  act as a safety feature?
12  A.   Well, if you had -- if you didn't have the
13  clutch, you would have no limiting power on how
14  much power output would come from that electric
15  motor other than the horsepower and that. I
16  mean, obviously there is a limit to what it can
17  produce. But that motor could overcome any
18  anchorage methods that you would use to cause
19  the anchoring methods that had been designed
20  for use with that clutch situation. If the
21  clutch was not present and it was a direct
22  drive, it would be an unknown amount of force.
23  It would be difficult to predict what force the

Page 29

1   motor would have as an output to know how to
2   design the rest of the machine to contain that
3   energy.
4   Q.   Okay. Now, in this case if the core drill base
5   or stand -- what do you call the base or the
6   stand?
7   A.   Well, I would call the base the part that
8   attaches to the floor and the stand, if you
9   would -- you could refer to the entire unit of
10  the base and the vertical pole, I believe it's
11  about a four square inch pole with a racked
12  gear on it, as the stand. I think you would
13  refer to, you know, both parts, but you have a
14  -- the base would just be the part that vacuums
15  down to the floor.
16  Q.   Okay. We're on the same page. I will refer to
17  the base as that part that has the gasket
18  underneath --
19  A.   Okay.
20  Q.   -- that sucks down through negative pressure by
21  virtue of the vacuum system in this case on the
22  floor?
23  A.   Okay.

Page 30

1  Q.   And you mentioned that there are two other
2       methods to secure the core drill, one being the
3       ceiling jacks and the other being the anchor
4       bolts?
5  A.   Correct.
6  Q.   But in this case it's your understanding from
7       the documents and the testimony that the
8       plaintiff, Matthew Riley, and his supervisor
9       had used the vacuum system?
10 A.   That's correct.
11 Q.   Okay.  Do you take any exception to the other
12      two methods to secure the base to a work area?
13 A.   The only one -- obviously there are certain
14      situations where the ceiling jack would be
15      appropriate and, you know, I don't take
16      exception to that.  The only one I have with
17      the anchoring bolts, I just -- it appears to me
18      to be very laborious, labor intensive, to, you
19      know, drill the anchor bolts in.  Plus you're
20      putting an imperfection into the surface that
21      you're drilling a, you know, three, four,
22      whatever size hole you're trying to core.  Now
23      you have, depending on how many anchor bolts,

Page 31

1       you know, two to four other smaller holes that
2       you've just put into the floor that you either
3       leave or have to patch.  So it just -- even
4       though that's mentioned in the manual, I just
5       -- I don't envision that as being a -- in most
6       instances that I see a core drill being used, I
7       don't see that as a likely method to use to
8       anchor.
9  Q.   Okay.  But it is one alternative to secure the
10      base to the work area, correct?
11 A.   It is, yes.
12 Q.   Okay.  And do you see any safety problems with
13      using the anchoring method to secure the core
14      drill?
15 A.   Yes.  Yes.
16 Q.   What safety problems do you see?
17 A.   You know, you're drilling holes into the floor.
18      And just from experience that I personally have
19      in drilling holes in concrete, you can run into
20      concrete of such varying hardness and strength
21      that I believe it would be entirely possible to
22      have concrete that was soft enough that those
23      anchor bolts would not firmly secure the thing

Page 32

1       in.  And you have an unknown as well.  You have
2       no way of measuring how strong and how firm
3       your base would be attached to the floor as
4       opposed to the vacuum method.
5           You know if you have a sufficient amount
6       of vacuum as designed and you know the square
7       inch area that the vacuum base is attached,
8       it's possible for the engineer to calculate
9       that that would exceed what the motor output
10      would put through its clutch mechanism.  With
11      anchor bolts I don't think you could be assured
12      of that; I think there's too many variables in
13      using anchors.
14 Q.   Okay.  Now, what about the ceiling jacks, do
15      you see any safety hazards related to use of
16      the ceiling jacks to secure the core drill?
17 A.   Just that it would be overhead, you could have
18      it fall and all, but none in particular, no.
19 Q.   Okay.  In regard to this particular case, what
20      would be your preferred method to secure the
21      core drill to the work area?
22 A.   My understanding of the work area would be with
23      the vacuum pump, a properly operating vacuum

Page 33

1       pump, operating with the vacuum in the proper
2       range and constrained to the proper range for
3       the design of the drill motor output.
4  Q.   In this case Mr. Riley was injured on August
5       29, 2003; is that correct?
6  A.   I believe that's correct, yes.
7  Q.   Okay.  I will refer to it as the accident date
8       or the accident --
9  A.   Okay.
10 Q.   -- in this deposition.  On the accident or at
11      the time of the accident, would it be your
12      opinion in regard to the vacuum system working
13      with the motor clutch, that if the vacuum
14      system had resulted successfully in the drill
15      being secured properly to the work area, and if
16      the drill then locked up or hung up and the
17      clutch worked, the accident would not have
18      happened because the base would not have spun
19      or rotated around the axis of the drill?
20 A.   If it were designed properly to where the force
21      of that base calculated by the pressure that
22      would be created over that square footage or
23      square inch area, that should -- that force

Page 34

```
 1      should exceed the output of the drill.  And
 2      I've done a quick, you know, kind of a
 3      calculation of the torque of the motor on the
 4      drill and, you know, it's my opinion that the
 5      torque that the clutch -- the torque output, as
 6      limited by the clutch in that drill, would be
 7      less than the force that would be available to
 8      it with the vacuum available.
 9   Q.  What does that mean?
10   A.  Okay.  That means that if the vacuum is
11      properly working and you have a 20 inch Mercury
12      vacuum, you know, applied to the area of that
13      base and it's maintained, that it would -- it
14      would hold that mechanism down to the point
15      that the clutch would take over and start to
16      slip.
17   Q.  Okay.  So that answers my question, I believe.
18      If you did have adequate vacuum pressure, the
19      base was secured to the work area, and if the
20      clutch had worked in this case so that it
21      slipped, the base would not have spun out of
22      control?
23   A.  That's correct.
```

Page 35

```
 1   Q.  Okay.  And that would have avoided the
 2      accident?
 3   A.  To the best of my understanding of how the
 4      accident occurred and what I know, yes.
 5   Q.  Well, what is your understanding of how the
 6      accident occurred?
 7   A.  That the bit bound and it spun around four or
 8      five times.  You know, it was striking
 9      Mr. Riley or taking him for a ride, I believe
10      one -- you know, just around and around, you
11      know.  And when I use that term of how it
12      occurred, I mean, you know, absent of any
13      unusual abnormalities with the situation, it
14      should, and I can't think of it.  Yeah, it
15      would be -- it should have avoided an incident
16      from occurring.
17   Q.  Okay.  And by saying it should have, if the
18      vacuum system had held the base securely to the
19      work area, in this case it was a concrete
20      floor?
21   A.  Correct.
22   Q.  All right.  And, again, just so we're clear, at
23      the time of the accident, did the clutch work?
```

Page 36

```
 1   A.  I have every reason to believe that the clutch
 2      was operational.  Because when the torque of
 3      the clutch was measured, it was within the --
 4      what the Milwaukee representative said the
 5      torque -- and I believe it was a little over
 6      200 pounds -- 200 foot pounds of torque was
 7      measured on the clutch to create a slippage.
 8          MR. GIVENS:  Mr. Sprain, just for my
 9              own clarification, when you say
10              did the clutch work, are you
11              intending to ask was it
12              operational as intended at the
13              time or are you saying did it
14              somehow engage during the process
15              of this event?  Do you see the
16              distinction I'm drawing?
17          MR. SPRAIN:  Sure.  Sure.
18   Q.  The same meaning essentially, operational, did
19      it engage, was it working, you know, did it
20      work as intended?  Do you have any opinion that
21      it did not engage or did not operate?
22   A.  Oh, I see.  I'm glad you clarified that,
23      because I took that question to mean was there
```

Page 37

```
 1      anything wrong with the clutch.  Was that not
 2      the intent of your question?
 3   Q.  Well, that was a question and you said there
 4      was not anything wrong with the clutch?
 5   A.  I have no indication that there was any
 6      malfunction of the clutch.
 7   Q.  And then the next question would be, at the
 8      time of the accident or thereabout, did the
 9      clutch operate or did it engage as a result of
10      the drill bit locking up?
11   A.  I can't say for a hundred percent positive, but
12      I would say it probably did not, because -- it
13      could have momentarily.  It could be right at
14      that critical juncture of where the force that
15      was available on the base would have been equal
16      to the torque, but still, you know, broke
17      loose.  Yeah, you could have an area where
18      those forces could be equal.  But it would be
19      my opinion that there was not a sufficient
20      excess of force available through the vacuum
21      base that would have caused the clutch to have
22      just continuously spin --
23   Q.  All right.
```

10 (Pages 34 to 37)

Page 38

1  A.    -- and engage. It may have engaged momentarily
2         during the process of this. But, you know,
3         there's two reasons I have that opinion. One
4         is there was no -- there was a catastrophic
5         event, so the clutch did not sit there and be
6         the limiting factor and keep this from
7         occurring. And also there were no signs in the
8         clutch mechanism when we disassembled it, the
9         disks, that that had sat there and spun for a
10        long period of time.
11 Q.    All right. Now, is there a relationship
12        therefore between the engagement of the clutch
13        from the motor and the proper functioning of
14        the vacuum system?
15 A.    Yes.
16 Q.    Okay. And what is that relationship?
17 A.    That relationship would be that with the vacuum
18        system operating properly and maintaining in
19        range suction between the floor and the base,
20        that that force should have exceeded what the
21        torque output would have been from the drill
22        motor.
23 Q.    Okay. And that would mean that the clutch

Page 39

1         would slip and the motor would keep running,
2         but the drill would not rotate or turn and the
3         vacuum system would hold the base down?
4  A.    Correct.
5              MR. GIVENS: And when you say "drill,"
6              you're talking about the drill bit
7              as opposed to the drill motor? In
8              other words, the drill motor would
9              no longer be turning the drill
10             bit?
11 Q.    Exactly. It would still be on, but the drill
12        bit would not be rotating into the working
13        surface?
14 A.    Right. Unless the operator was just sitting
15        there and ignoring it. But, you know,
16        obviously when you're operating something and
17        the bit stops and the motor is running, you
18        know that that's not a favorable situation and
19        you immediately move to shut the motor off and
20        move on.
21 Q.    Okay.
22 A.    To realign. I think the instruction manual
23        says to do that, to realign and get your

Page 40

1         situation back.
2  Q.    All right. Let's do this at a break, maybe we
3         can go -- well, let's do it right now. Let's
4         go back through and we have marked three
5         categories of photographs in this set of
6         documents. One dealt with the slurry or the
7         aluminum oxide; one series of documents dealt
8         with the clutch?
9  A.    Rings of the clutch, yes.
10 Q.    The rings of the clutch. And --
11 A.    Actually, you know, the others had to do with
12        the vacuum gauge. We actually have four. I
13        know we discussed the cords, the electrical
14        cords, it appearing to have been from a violent
15        event. I don't know that we marked those
16        though. Let me go back and do that.
17             MR. GIVENS: So we're going to call
18             that cord damage or, I mean, what
19             are we calling it? I was putting
20             down three things and I think now
21             we're going to have four
22             categories of photographs.
23             MR. SPRAIN: That's fine. Cord damage,

Page 41

1         electrical cord damage. Let's go
2         off the record.
3         (Off-the-record discussion.)
4  Q.    Now, what I want to do is we'll mark those
5         collectively as Defendant's Exhibit 5.
6         (Exhibit 5 marked for identification.)
7  A.    There is one thing I would like to point out
8         that the photographs show as well. The drill
9         unit -- I know there's been some discussion
10        about where Mr. Riley was standing and whether
11        that was the proper area as far as standing on
12        the drill. I would like to note that the drill
13        itself, a photograph of the drill, and we'll
14        mark that with a tab, shows the electrical
15        outlets on the box, the control box, on the
16        back side which faces the drill bit itself, the
17        core bit. And so the amp meter and the on/off
18        switch for the drill itself is on the opposite
19        side facing the bit.
20             And the operator is supposed to monitor
21        the amperage output of the motor, that's one of
22        the things, to make sure it's not exceeding;
23        that's a thing that they can monitor. And that

Page 42

1    amp meter is on the back side, which would
2    indicate that that was intended for the person
3    to be on the back side of the drill as opposed
4    to the front side of the drill.
5  Q.   Okay.  And was it proper for Mr. Riley, as the
6    operator, to stand on the core drill?
7  A.   There is no warning that I have been able to
8    find that warns or advises that it's improper
9    or that tells you not to stand on the drill.
10    And in fact we'll look at -- there are some
11    photos, I'm not sure that it's going to show up
12    in any of these though.  There is a worn spot
13    on the base of the subject drill.  We'll find
14    it in some of the photos.  It may not be in
15    these particular ones.  I'm going to go over to
16    this drill just for the purposes of describing.
17    I know I'm going over to this one, so I'm going
18    to help describe it for the record where it is
19    and then we will find a photograph later.
20      It would be, as I am facing the back side
21    of the approximately three inch square vertical
22    post, on the right side of the drill where it
23    says "Norton," there's a thing there that's

Page 43

1    just about the right size for a shoe.  The
2    paint on the subject drill is just worn through
3    the -- worn off.  The paint is worn off and the
4    metal is worn into that area where it's
5    apparent that numerous people had stood right
6    at that point.  That's a perfect match-up.  So
7    if this is the side that it's intended to
8    stand, which I have not noted, it would be, you
9    know, sort of intuitive for someone, you know,
10    to be holding it to control -- to feel they had
11    control of the drill to stand on it.  And I
12    have not found any warning against doing so.
13  Q.   Right now you've got your right foot on the
14    base --
15  A.   Right.  Correct.
16  Q.   Okay. -- above the name of Norton, and you've
17    got your right hand on the lever.  What do you
18    call this, the handle or lever?
19  A.   Yes, this would be the lever.  It's the force
20    application handle for applying the downward
21    force onto the core bit.
22  Q.   Okay.  And then you've got your left hand on
23    the top of the column?

Page 44

1  A.   Well, that's where I had it right there,
2    correct.
3  Q.   Okay.  And what we're looking at now, so that
4    the record is clear, is the alternatively
5    designed core drill --
6  A.   Correct.
7  Q.   -- that you have developed --
8  A.   Correct.
9  Q.   -- as part of this case?
10  A.   Correct.
11  Q.   Okay.  That's fine.
12      MR. GIVENS:  One thing I kind of want
13        to do is get a point of reference
14        for when we've been referring to
15        the front or the back of
16        something.  And as I've visually
17        seen what y'all have verbally
18        described, I take the back to be
19        that side of the stand on which
20        the vacuum pump sits and the wheel
21        sits, and the front is the side of
22        the post on which the drill motor
23        sits; are we in agreement with all

Page 45

1        of that?
2  A.   In my discussion that's how I referred to it,
3    correct.
4  Q.   That's fine.  Okay.  Are we through with your
5    review of the photographs?
6  A.   Yes.
7  Q.   Okay.  And what I'm going to do is I'm going to
8    let Rick help me later with copying the
9    photographs that he has labeled with stickers.
10    Right now I'm going to put into the record my
11    document entitled Defendant's Exhibit 5 and it
12    has five categories of photographs, electrical
13    cord damage, rings of the clutch, slurry in the
14    vacuum, vacuum gauge, and a photograph showing
15    the amp meter on the drill stand.
16  A.   No, not slurry in the vacuum gauge, in the
17    vacuum pump.
18  Q.   Excuse me.  That is what I wrote down though.
19    And then the next category would be the vacuum
20    gauge.  I probably read those together, but you
21    had five categories.  One category was
22    separate, it was about the vacuum gauge?
23  A.   Oh, yes.  Yes.  Yes.  But not slurry in the

Page 46

1    vacuum gauge, it was just the visual face of
2    the vacuum gauge, to the operator or observer
3    there is no delineation.
4  Q.   That's what I've written down, I just read it
5    all together to you.
6  A.   All right.
7  Q.   All right.
8  A.   If we're at a stopping point, I would like to
9    get some water. I've done a lot of talking and
10    my mouth is kind of -- my throat is dry.
11  Q.   No problem.
12      (Recess.)
13  BY MR. SPRAIN:
14  Q.   I have another series of documents again that
15    was contained within your shuck entitled
16    "Shaver Documents," and you've got some
17    disclosures from Saint Gobain Abrasives. Is
18    there anything that you reviewed from Saint
19    Gobain that's relative to your opinions in this
20    case?
21  A.   No.
22  Q.   Okay. And the next set of documents is in
23    regard to the Milwaukee motor. We've discussed

Page 47

1    the clutch and I don't want to be redundant.
2    Is there anything from the Milwaukee operators
3    manual that is relevant or has any bearing?
4  A.   Let me look at that real quick and scan through
5    it.
6  Q.   What about the parts list, is there anything in
7    this parts list?
8  A.   I don't think so.
9  Q.   Okay. Off the record.
10      (Off-the-record discussion.)
11  A.   You know, we have something else that's
12    different from what we noticed on the subject
13    drill and I just want to point it out. They
14    show in this photograph the handle to the left,
15    okay? Which would imply that you're standing
16    to this side of it. This one is a little
17    different, this is a different layout, you
18    know, because this here has a nameplate up here
19    and we obviously don't have that. We've got
20    the -- well, I'm sorry, there's a nameplate
21    here. But I just want to point out that in
22    this particular one the person would be
23    standing in front of the drill here, you know,

Page 48

1    because your --
2  Q.   Well, let's explain for the record what you're
3    looking at. It's a page out of the Milwaukee
4    operators manual?
5  A.   It's page six.
6  Q.   Page six?
7  A.   Page six and figure four.
8  Q.   Now, let's do this for the record, let's mark
9    the Milwaukee operators manual as Defendant's
10    Exhibit 6 for the deposition.
11      (Exhibit 6 marked for identification.)
12  Q.   All right.
13  A.   Here the meter box shows the amp meter gauge
14    now facing the front side of the drill.
15      MR. SHEEHAN:  And you're talking about
16        the diagram, sir?
17  A.   Yes, figure four. So, you know, it's different
18    from the one we observed on the subject drill
19    that we have that the incident occurred in.
20      MR. GIVENS:  Is that the same page?
21  A.   Right here? Yes, it is. Yeah.
22      MR. GIVENS:  One thing I would like for
23        us to do when we start talking

Page 49

1    about the Milwaukee operators
2    manual is to ensure that we, with
3    as much specificity as we can,
4    identify that manual in the event
5    that there is more than one
6    floating around.
7  A.   Yes, there is, because there was a manual --
8    there's a manual for the old drill and there's
9    differences. There's a different manual for
10    this new drill. There's different wording in
11    it.
12      MR. GIVENS:  I don't know if there is
13        any kind of identifying -- and
14        I'll be looking while y'all are
15        talking if you want to.
16  A.   You know, it's obvious here what this is about
17    and I just noticed it. This is just showing --
18    this is moving the handle to the other side.
19    It shows reversibility. You can move this
20    handle from this side to this side.
21  Q.   Right.
22  A.   And I guess that, you know, then you would
23    switch this to this side as well. In other

Page 50

```
 1      words, it provides for, you know, different
 2      configurations of rotating the handle for a
 3      left-handed person and a right-handed person.
 4   Q.    Okay.
 5   A.    And the monitoring -- amp meter monitoring
 6      gauge can also face either direction, which
 7      does not -- which indicates to me that they
 8      don't have a recommended preference of which
 9      side is appropriate to stand on.
10   Q.    What about the front or the back, is there a
11      recommended stance, in your opinion, as to the
12      front or back of the core drill?
13   A.    Yes, I have a preferred place to stand, and
14      that would be to the back of the drill.
15   Q.    Okay.  Why is that?
16   A.    First of all, standing to the front of the
17      drill, in case something happens, you know,
18      it's going to fly out and hit you.  It's coming
19      that direction towards you.
20   Q.    Sure.
21   A.    Plus if you happen to have loose clothing or,
22      you know, you're moving or if you're standing
23      here at the thing -- the handle, if you had
```

Page 51

```
 1      loose clothing, it could get tangled up into
 2      the -- you know, into the movement of the
 3      drill, especially if you -- you know, when you
 4      were to bring it up.  To me it's just safer,
 5      you are away from the moving part, to stand on
 6      the back side.
 7   Q.    I see.  In this particular assembly of the
 8      Norton core drill, the inlet for the water hose
 9      is mounted on the motor?
10   A.    Correct.
11   Q.    For the core drill that Mr. Riley was using on
12      the day of the accident where was the water
13      mount?
14   A.    From the best I recall, I would have to look
15      back, but it was in the same location.  Yeah,
16      that's what I recall.
17         MR. GIVENS:  For the purposes of
18         identification on the Milwaukee
19         operators manual, the one that
20         we're looking at on the back page
21         has an identifying number of
22         58-14-3005D8.  It also has the
23         date 09/03 and indicates it was
```

Page 52

```
 1      printed in the USA.  So hopefully
 2      that will differentiate this one
 3      from any others.
 4   A.    It's unlikely that that was the manual that
 5      went out with that drill since the accident
 6      occurred in 2003 in August, whatever that date
 7      is.  I believe it's on the front here.  In
 8      August of 2003.
 9         MR. GIVENS:  Well, do you want to mark
10         that whole manual or just that one
11         page?
12         MR. SPRAIN:  What I want to do is mark
13         the whole manual.
14   Q.    And we haven't finished determining whether
15      there are any other aspects of the manual that
16      relate to this case.  And I don't want to rush
17      you again, Mr. Shaver, but --
18   A.    Okay.  This was also printed in 09 of 2003.  So
19      this appears to be the same one that he has
20      there.
21   Q.    Okay.
22         MR. SHEEHAN:  So Defendant's Exhibit 6,
23         the Milwaukee operators manual in
```

Page 53

```
 1      which you're referring to figure
 2      four on page six, is a manual that
 3      was printed, we believe, in
 4      September of 2003?
 5   A.    Yes.
 6         MR. SHEEHAN:  Okay.  And that's the
 7         exhibit that's going to be marked
 8         composite Exhibit 6, Defendant's
 9         Exhibit 6?
10   A.    I assume so, yes.  There is one thing here in
11      the manual, too, that I would point out.  I
12      know that in one of the depositions I read
13      where -- I believe it was Cody, I'm not sure,
14      but he was asked about rebar, you know, was it
15      possible that the bit hit rebar.  And on page
16      eight of the manual it says "some building
17      materials contain steel reenforcements,
18      Milwaukee Dymobits can cut through embedded
19      steel, but are not recommended for coring solid
20      steel plates."  So, you know, that would not
21      have been a reason for the failure there.
22         There is one other in here in the -- and I
23      need to clarify this.  On page nine of this
```

Page 54

1 manual that was printed in 09 of 2003, it's
2 figure 13 -- right above figure 13 that says
3 "using expansion bolts." It says "Warning, the
4 vacuum gauge must read a minimum of 20 inches
5 of Mercury to reduce the risk of injury. Do
6 not core if the gauge reads less than 20 inches
7 of Mercury." And if I'm not mistaken, the
8 manual that I saw that would have been in print
9 prior to that, I don't believe it carried that
10 warning. We can look and see, but that was
11 something that I had noticed in going through
12 this.
13    They also actually have that warning again
14 on page 11 between number five and six.
15    MR. SHEEHAN: Is that figure five and
16    six?
17 A. On page 11.
18    MR. GIVENS: I think it's Figure 13, is
19    it not?
20 A. Well, it was on Figure 13. And then after that
21 between -- they're going through different
22 steps, like four, five, six and seven, it's
23 between steps five and six.

Page 55

1    "Always monitor the vacuum gauge during
2 coring. If water collects in the vacuum pump
3 jar, empty it to prevent damage to the pump."
4 So that kind of goes back to what we were
5 talking about before.
6    Okay. And then it goes to the French
7 section and we won't go through that.
8 Q. All right. I'm going to try to speed through
9 this, but you've got a volume of documents that
10 relate to various pleadings filed of record and
11 I don't suppose any of these would be
12 particularly relevant, but you can scan through
13 this stack of lawyer filings?
14 A. Right now, as I sit, there's nothing in there
15 that was relevant to the technical aspects that
16 I am blatantly aware of. I can't -- for the
17 sake of helping you do that, I can't say that
18 there might not be a bit of information in
19 there that might not support the technical
20 opinions that I have.
21 Q. Are there any answers to interrogatories of any
22 of the defendants that have provided any basis
23 for your opinions in this case?

Page 56

1 A. To interrogatories?
2 Q. Well, that would be Saint Gobain, Milwaukee,
3 Gast, United Rentals; has anybody given any --
4 A. You're saying that as opposed to production of
5 documents, from reviewing the documents,
6 correct? Any -- I don't think so. You know,
7 none of my opinions are based solely on any
8 admissions or answers to interrogatories that
9 they've made. That's not to say that there's
10 not things in there that don't support other
11 aspects that have led to my opinions, but I'm
12 not aware of anything in those documents that's
13 the sole source for my opinion.
14 Q. Please thumb through this next series of
15 documents, which appears to be information
16 supplied by United Rentals pursuant to
17 discovery requests, and I will ask you the same
18 thing, just point out any item that is relevant
19 for your opinions in this case?
20 A. Significant, no. About the date of the
21 incident occurring, there's a squabble about
22 whether it was the 28th or the 29th, that has
23 no bearing.

Page 57

1    No. Let me -- well, they talk about a
2 Ready to Rent tag and I think that's -- a copy
3 of that I've seen in some of the documents.
4 The General Safety thing appears to be a
5 generic thing to go out with all equipment, not
6 just the core drilling, so that was not of much
7 use, I don't think. Things I see in these
8 photographs are duplicative of what we
9 discussed in the others; we don't need to go
10 through it again, right?
11 Q. Please. I mean, I'm not trying to speed you
12 up, but I don't want to be repetitive and I
13 don't think anybody here does. But just go
14 through them and if you see anything that's of
15 particular relevance that we haven't already
16 discussed, you know, stop me.
17 A. Okay. No, we're done.
18 Q. The next set is a series of photographs as
19 well, if you can flip through those and answer
20 the same question? And while you're doing
21 that, I've got a stack of documents from the
22 Warren Group, it's another expert, and I don't
23 suppose that there's anything in here that is

Page 58

1    forming the basis of any opinions you have in
2    this case, but let me know.  It's Mr. Davis,
3    Roger Davis.
4  A.    Let me see.  No.  No.
5  Q.    Okay.
6  A.    These are of an exemplar drill that was at one
7    of the depositions or a series of the
8    depositions.  Okay.  We're good.  There's
9    nothing there.
10    (Exhibit 7 marked for identification.)
11  Q.    Okay.  I'm going to mark as Exhibit 7 to your
12    deposition the May 12, 2005 roster of
13    participants in the first inspection of the
14    product.
15  A.    Yes.
16  Q.    Okay.  And did you have any relevant
17    discussions with any of the individuals who
18    were in attendance; Michael Herskowitz, Paul
19    Guthorn, Kevin Hornyak, Gabriel Uriegas or Mark
20    Hicks?
21  A.    Mark Hicks was the Milwaukee representative and
22    he and I worked together.  Primarily everybody
23    was there observing, but I was there when he

Page 59

1    was measuring the torque on the drill.  And
2    each segment of the torque on the clutch of the
3    drill measured to what it was supposed to and,
4    you know, I think we've already discussed that
5    though.
6  Q.    Sure.
7  A.    No, there were no discussions, nothing
8    significant.
9  Q.    Okay.
10    (Off-the-record discussion.)
11  A.    I would like to go back and correct something,
12    if I could.
13  Q.    Please do.
14  A.    You know, we were talking about the differences
15    in the manual.  I've gone back and found my
16    copy of the manual that was printed on 11 of
17    '04, which would be the manual that would have
18    been applicable to the -- for when this
19    accident occurred.  And it does have the
20    warning about the 20 inches of Mercury.
21  Q.    But that would be postdated, wouldn't it?  The
22    accident was August 29, '03, so is that
23    manual --

Page 60

1  A.    You know, you're right.
2  Q.    Well, it gets confusing.
3  A.    But thank you for pointing that out.  Yeah, I
4    think there's -- we've got more than two
5    versions of these manuals floating around is
6    the problem here.  Yeah, this was 11/04, excuse
7    me.  Yeah, I got confused with the dates, I'm
8    sorry.  There's no correction warranted there,
9    I'm sorry.
10    MR. SHEEHAN:  Mr. Shaver, do we need to
11      -- I guess since it's been
12      identified, why don't we go on and
13      mark it, too?
14  A.    Yeah, I've got other things over here, too, and
15    my photographs are in these books.
16  Q.    What I want to do is clear off what we have on
17    the table and then --
18  A.    That's what I thought and then we would move.
19  Q.    And then we'll move.  Okay.  Now, we've got
20    your deposition, which we've marked as Exhibit
21    1, so I'm going to turn this over.  And you've
22    got a stack of documents and it looks like
23    you've got several copies of United Rentals'

Page 61

1    disclosures in this case, thumb through that
2    for me.  And you've been given copies of
3    answers to the complaint of Matthew Riley filed
4    by all defendants in this case, I don't suppose
5    that has any relevance to your opinions?
6  A.    No.
7  Q.    Okay.  And we have some more --
8  A.    Okay.  Yes, here we go.  This is -- the date is
9    on the front of this one, 08 of '00.
10  Q.    Okay.  That would be which manual, sir?
11  A.    The owners manual for the DM450 and DM500 core
12    manuals.
13  Q.    Okay.  Just so the record is clear, we're not
14    talking about the Milwaukee manual now, but
15    rather the manual for the DM450 and DM500?
16  A.    That's correct.
17  Q.    All right.  Now --
18  A.    And that's a Clipper.
19    MR. GIVENS:  And just by way of further
20      identification, it has Clipper
21      form on it.
22  A.    And it has United Rentals Bates Number 0020.
23  Q.    Okay.  Let's do this; we will mark that

Page 62

1    document, the complete operators manual for the
2    core drill in question, as Exhibit 8 to your
3    deposition.
4        (Exhibit 8 marked for identification.)
5  Q.   As you go through that, are there any relevant
6    aspects of the DM500 core drill operators
7    manual?
8  A.   Yes. In the area here where it talks about
9    vacuum pump, this is going back to what I had
10    said before, if this is the owners that was
11    applicable and available to anyone or could
12    have been available to anyone at the time of
13    the accident, it does not state what the proper
14    vacuum pressure is for the unit that I can find
15    in this manual. This is the one I was -- and
16    even though it talks -- you said it was
17    differentiated from Milwaukee, its name is
18    Clipper, however it depicts a Milwaukee drill
19    motor unit in that manual.
20        Also in here they mention leveling screws,
21    allowing the slurry to accumulate on the
22    threads can cause damage to the threads.
23    That's just kind of going back to, you know,

Page 63

1    slurry and to metal parts and things can create
2    problems, that's just confirming that. That
3    probably has to do with it being -- I believe
4    that concrete slurry would be alkaline, and I'm
5    not a chemist or anything, but I know there
6    could be chemical reactions involved in that.
7  Q.   In this case were the leveling screws used?
8  A.   Were the leveling screws used?
9  Q.   Yes.
10  A.   I believe they were. I know that --
11  Q.   If they were not used, would that impair the
12    functioning of the vacuum system?
13  A.   It could. However, I would point out with my
14    alternative design that it would not matter.
15  Q.   Okay. But in the design applicable to this
16    case, the absence of use of the leveling screws
17    could impair the function of the vacuum system?
18  A.   It's a possibility they could. I'm just not --
19    I'm not sure of the particular setup that was,
20    you know, applicable of whether it would have
21    or not.
22  Q.   Okay. Well, what is the purpose of the
23    leveling screws?

Page 64

1  A.   The purpose of the leveling screws is to make
2    sure that the unit does not rock on that
3    gasket.
4  Q.   Okay. And that helps to ensure a more secure
5    fit to the work area, correct?
6  A.   It would, yes.
7  Q.   Okay. And that helps to secure that the gasket
8    fits snugly on the work surface?
9  A.   Correct.
10  Q.   Okay. And so if it's not used, it could impair
11    the functioning of the vacuum system; is that
12    correct?
13  A.   There are some situations that I can envision
14    where it would, yes.
15  Q.   Okay. Now, we'll talk about your alternative
16    system in a while, but for right now we're
17    going to focus on the core drill that was
18    involved in this case.
19  A.   Okay.
20  Q.   All right. And it's your testimony that you
21    believe that the leveling screws were used
22    though?
23  A.   Yes.

Page 65

1  Q.   All right. Other than your comment about the
2    vacuum gauge, do you have any other criticisms
3    of the DM500 operating -- operators manual?
4    And, of course, you're going through it, so in
5    all fairness, you're thumbing through it as we
6    speak?
7  A.   Yes.
8  Q.   Please take your time, but that's a question
9    I'm posing now as you do go through it.
10  A.   And I'm not an expert in layout and design in
11    technical writing. It's not a very easy to
12    follow manual for ease of reading and quick
13    understanding, I'll say that.
14  Q.   All right. What about the warnings and
15    instructions and the guidelines for the safe
16    use of the core drill, do you have any opinions
17    as to those areas with regard to the operators
18    manual?
19  A.   Sure. Other than what I've already mentioned
20    about the 20 inches of vacuum minimum not being
21    -- it's not in any of the print and it's
22    certainly not out in any bold letters or
23    anything that would catch someone's attention

Page 66

1  to do that. It speaks of vacuum in sufficient
2  force in generic terms and does not define what
3  sufficient force and sufficient vacuum is to
4  attain in that area.
5  Q.  All right. Now, you passed the manual and
6  you're going through some photographs?
7  A.  Pictures.
8  Q.  And that's fine. And again the same question
9  with the photographs, they may be duplicative,
10  but if you see any that have any particular
11  relevance to this case, point them out and
12  we'll tab them?
13  A.  Okay. Sure. This appears to be a photograph
14  of the bit that was damaged or broken. The
15  teeth are kind of chiseled and whittled off.
16  Even though the photograph doesn't show this, I
17  recall it's in one area of the bit around the
18  circle.
19  Q.  Okay. What does that indicate to you? What is
20  the significance about the broken teeth on the
21  bit?
22  A.  That either, A, it was worn out or, you know,
23  it had been broken or damaged before, or that

Page 67

1  -- it could have indicated that they hit
2  something hard or something to bind it up or
3  something to that effect. However, deposition
4  testimony and statements are that -- well, it's
5  uncertain that the bit may have been in that
6  condition when it was delivered.
7  Q.  Okay. Now, what effect, if any, could that
8  have caused or contributed to cause the
9  accident?
10  A.  You know, it could have -- say it did hit a
11  piece of rebar or hit something unusual in the
12  floor, if the bit was -- you know, if it had
13  teeth on it in some sections and didn't in the
14  other, it could step down into that area and
15  catch on one of the edges of the teeth and
16  would increase the likelihood of a bind
17  situation or, you know, a seizing of the drill
18  bit that would have a tendency to rotate the
19  base. So it would not be the cause of the
20  accident, because I think any time you have
21  something that's drilling in concrete, the
22  machine has to be able to handle events that
23  would cause the bit to seize up because that's

Page 68

1  an occurrence that can occur at any time.
2  So in my opinion the cause of the
3  accident, you know, with respect to that, or
4  one of the major causes would be the inadequate
5  design of the unit itself not to have
6  incorporated a foreseeable event into that.
7  Still going back to what I said originally with
8  a vacuum suction of 20 inches of Mercury, it's
9  my opinion that even that bit, if it were
10  inadequate and created a seizing opportunity,
11  that the base should have held firmly.
12  Q.  Okay.
13  A.  So -- and I know that's -- it may have been the
14  cause of the bit to seize up, but it's still --
15  well, I think I explained it.
16  MR. SHEEHAN: I'm sorry, I
17  misunderstood, I was trying to
18  write. You said the bit may have
19  been the cause of it seizing up?
20  A.  Yes. But I guess what I'm saying and trying to
21  distinguish here is the seizing of that bit is
22  not the direct cause of the failure of the
23  machine, the overall machine.

Page 69

1  MR. SPRAIN: Let's go back to this real
2  quickly. We photographed --
3  excuse me, we made copies of
4  photographs that were produced in
5  this case. Who produced these
6  photographs? And they comprised a
7  part of the documents that Don
8  Shaver has reviewed.
9  MR. GIVENS: My understanding is -- let
10  me look at them.
11  MR. SPRAIN: Was that produced by the
12  plaintiff in this case?
13  MR. SHEEHAN: Keith, if I might speak
14  up, I think what --
15  MR. GIVENS: It's -- go ahead.
16  MR. SHEEHAN: Oh, no.
17  MR. GIVENS: I was just going to tell
18  you I'm Larry and not Keith.
19  MR. SHEEHAN: Larry, I'm sorry.
20  MR. GIVENS: I had a judge in
21  Enterprise do that. So don't give
22  it -- if I had a nickel for every
23  time, don't give it a thought.

18 (Pages 66 to 69)

Page 70

1    But this, to my understanding, and
2    from looking at the background in
3    the photographs, and it's got a
4    United Rentals sign on it, this
5    photograph is of a drill that was
6    used at a deposition. I mean,
7    have you seen them before today?
8    MR. SPRAIN: We've already flipped
9    through those and then we made
10    some copies because Winston said
11    that we were never given copies of
12    those and so your office kindly
13    made color copies for us.
14    MR. GIVENS: And again looking at that
15    and the fact that it's on a wooden
16    floor similar to the wooden floors
17    in our office, it appears to me to
18    probably be in our third floor
19    conference floor on the north end.
20    I can't swear to that. If I could
21    see the rest of them, I could
22    probably figure it out. Are these
23    photographs that were taken of a

Page 71

1    core drill at a deposition earlier
2    in this case?
3  A.    Yes. Yes.
4    MR. GIVENS: And, of course, the
5    photographs speak for themselves,
6    but it appears to be a core drill
7    that has at least a partial -- or
8    actually a full United Rentals
9    decal on it.
10  A.    Correct.
11    MR. GIVENS: And then it's got various
12    shots of that. So is the question
13    where did the photos come from?
14    Who produced them?
15    MR. SPRAIN: Well, I'm trying to, just
16    for the record, clarify that, and
17    then I'm going to mark them as
18    Defendant's Exhibit 9 to
19    Mr. Shaver's deposition.
20  A.    I believe, and just from my recollection, I
21    think that is United Rentals' representative,
22    you've got Waters and Walters, his name is
23    Waters. That's who I -- just as we're sitting,

Page 72

1    I think that's whose deposition those were used
2    in.
3    MR. GIVENS: I will say this, as you go
4    through all of these photographs
5    there are two different core
6    drills; one has a blue bottom and
7    one has an orange bottom. Both of
8    them have United Rentals' decals
9    on them. One of them may be the
10    actual drill, because it has the
11    worn spot on the base that he
12    alluded to earlier that he
13    interpreted to be where people had
14    put their foot on the drill.
15    So as to how you handle these
16    in terms of identifying them and
17    introducing them, I would
18    certainly not -- you do that
19    however you want to. In trying to
20    address your questions as to
21    what's the source of the pictures,
22    that's the best I can come up
23    with.

Page 73

1    MR. SPRAIN: All right. Well, let's do
2    this; we're going to mark these
3    collectively --
4  A.    And that being the case, that is the photograph
5    where I saw the footprint. And I am looking at
6    the subject drill that was taken at Applied
7    Technical Services, as I recall. And for the
8    record, that indicates what may have been foot
9    traffic in that same area, but nowhere near the
10    degree that those photographs that you have
11    right there do.
12  Q.    Okay.
13  A.    In fact, on the one at Applied Technical
14    Services, which we know to be the subject
15    drill, the warning label, the yellow warning
16    label is worn off from what would be my opinion
17    of foot traffic. And there's obviously a
18    footprint right there where somebody had
19    stepped on it right there or a smudge which
20    very closely resembles what the sole of a shoe
21    would be.
22  Q.    Now, this doesn't appear to be the same.
23    MR. GIVENS: No, that's what he's

Page 74

1    saying.
2  A.   That's what I'm saying.  That is not our drill
3    that's the subject of this litigation.
4      (Exhibit 9 marked for identification.)
5  Q.   Okay.  Just so we understand, Exhibit 9 are
6    photographs of two core drills, but neither one
7    is the drill at issue in this case involving
8    Mr. Riley's accident?
9  A.   Correct.  Those are exemplars, I believe, that
10    were brought by United Rentals for their
11    deposition.
12      MR. GIVENS:  What was 8?
13      MR. SPRAIN:  8 was the operators manual
14        for the DM450 and 500 core drill.
15      MR. GIVENS:  Okay.
16  Q.   And I think we're done with that.  Have you
17    finished any opinions or comments or criticisms
18    in regard to the operator manual for the DM500?
19  A.   No.  We've finished that, yes, and we're back
20    into the photographs which we've gone through.
21  Q.   All right.  So we're done with that?
22  A.   Yes.
23  Q.   Okay.  And just to recap, you had two comments

Page 75

1    about the operators manual for the core drill,
2    one being about the vacuum gauge?
3  A.   Right.
4  Q.   And we discussed that.  And the other you said
5    in general you felt it was just hard to read
6    and go through?
7  A.   Correct.  Yes.  Well, when you're talking about
8    the vacuum gauge, yes, that it did not say what
9    the proper reading for the vacuum gauge should
10    be.
11  Q.   Okay.  Now, this next stack I don't want to
12    spend much time on.  It appears to be more
13    lawyer filings and various pleadings and it
14    does not appear those would be highly relevant
15    to your opinions, but you be the judge of that.
16      (Off-the-record discussion.)
17  A.   No, there's nothing there.
18  Q.   We're done with this stack.  There's a bunch of
19    versions or maybe it's the same version of the
20    operators manual which we've already marked as
21    Defendant's Exhibit 8.  And then embedded in
22    this stack is a copy of the complaint.  Does
23    the complaint and the allegations have any

Page 76

1    bearing on your opinions?  I mean, we all know
2    there was a complaint filed, there were
3    allegations of product defect and negligence
4    and blah, blah, blah, we understand that.  But
5    go through this and let me know again if
6    there's anything that we need to talk about.
7      (Off-the-record discussion.)
8  A.   There's nothing there.
9      (Exhibit 10 marked for identification.)
10  Q.   Now, I've marked this as Defendant's Exhibit
11    10.  Could you explain for the record what that
12    is, Mr. Shaver?
13  A.   That's a wiring diagram for the alternate
14    design drill stand.
15  Q.   When did you prepare that document?
16  A.   I didn't prepare this document.  John Frost and
17    I had talked about the wiring setup and we
18    talked about how we were going to do it when we
19    met here last Friday.  Mr. Lane was here with
20    Mr. Frost.
21  Q.   Who did prepare that document?
22  A.   Mr. Frost did.
23  Q.   Okay.  And what is it in essence?

Page 77

1  A.   It's the wiring diagram for incorporating a
2    microvacuum switch that is tied in to the
3    vacuum portion of the base of the drill via a
4    tee into the smooth rubber tubing that pulls
5    the vacuum into the base from the vacuum pump.
6    That microswitch is tied to one terminal of a
7    three-way toggle switch at one end.  The other
8    end is teed into a contactor from another
9    position of the toggle switch, the opposite
10    end, and it is in a serial -- series circuit
11    with the kill button or deadman switch.
12       That circuit is so designed that you can
13    operate the machine two different ways.  You
14    can operate it using the vacuum, in which case
15    if the vacuum pump is turned on in this manner,
16    if the vacuum falls -- the switches actually
17    can be set variable by the manufacturer and
18    designed for whatever, but I have that
19    particular one set to shut off at about 18 and
20    a half or 19 inches of Mercury, which is just
21    below the 20.
22       And so one circuit -- one position of the
23    toggle switch would close a circuit to the

Page 78

1    activator coils of a relay switch that would
2    contact and close the circuit for the drill
3    motor to allow the drill motor to operate when
4    two conditions have been met.  Those two
5    conditions are the vacuum inside the base of
6    that drill is more than -- a number more than
7    approximately 20 inches of Mercury, and the
8    other event that must occur is the palm button
9    on top of the control box must be depressed for
10   the drill to operate.  If you take your hand
11   off of the palm button, the drill motor stops.
12       If the vacuum falls below whatever that
13   setting -- as I say right now it's
14   approximately 18 and a half inches of Mercury.
15   You could set it to 20, you could set it to 22,
16   but whatever it would be.  Now, when I say you
17   can set it, it's internally inside the control
18   box.  That would be something that
19   manufacturing and service would set to the
20   needs; that's not something that an operator
21   would be setting variable, that would be a
22   fixed number.
23       The third position -- well, the middle

Page 79

1    position of the toggle switch is the unit is
2    off.  The drill will not -- is off; the vacuum
3    motor is off.
4        And then the third position is -- the
5    third position operates the -- operates just
6    the drill only.  The vacuum pump is not
7    engaged.  And I've got it so labeled over there
8    on the position of the toggle.  This would be a
9    situation to use when you're using the anchor
10   bolts or you were using the ceiling brace.
11   That would still allow you to use the drill in
12   those situations without the vacuum pump
13   operating and creating a suction vacuum in the
14   base.
15       However, the deadman switch, the palm
16   switch, is hooked into that circuit and bridged
17   across.  So that if you're using it with the
18   ceiling brace or with the anchor bolts, while
19   the operator is holding that switch down, if
20   something were to occur to move that drill, the
21   theory is it jerks it out of his hand and
22   therefore kills the motor on the drill and
23   prohibits it from operating.

Page 80

1        This model that -- well, do you want to
2    get into the alternative design?  You asked me
3    what this was and I got into probably more than
4    you really wanted.
5    Q.  Well, what I'll do later is for you to
6        enumerate your opinions.
7    A.  Okay.
8    Q.  And you've already been through some of them,
9        so that just expedites it.
10   A.  Okay.
11   Q.  But just in recap, this is a wiring diagram
12       related to the alternative design that you and
13       Mr. Frost have collaborated on to develop?
14   A.  Correct.
15   Q.  In regard to this case specifically?
16   A.  Correct.
17   Q.  All right.  Please identify this document for
18       me, sir.  I'm going to mark it as Defendant's
19       Exhibit 11.
20           (Exhibit 11 marked for identification.)
21   A.  Okay.  That is the test report from Applied
22       Technical Services in Marietta, Georgia.
23   Q.  What does it reveal or show?

Page 81

1    A.  It shows the chemical analysis of the white
2        powder that was removed on the day of the May
3        inspection, May of 2005.  I believe two petri
4        dishes of the white material were removed from
5        the pump and sealed and kept to be submitted
6        later to an agreeable lab to everybody.  And it
7        just so happens that Applied Technical
8        Services, which is where the drill had been
9        stored, is, you know, one of your largest
10       chemical labs -- chemical testing labs in
11       Atlanta, too.  And it revealed that it
12       contained aluminum and oxygen, that was the
13       EDS.  And I believe it was aluminum oxide is
14       what -- yeah, the white powder sample is
15       predominately aluminum oxide.
16   Q.  And these findings relate to your opinions
17       about the slurry material inside the vacuum
18       pump?
19   A.  Slurry material or, you know, it could have
20       been water that got into the vacuum pump and
21       reacted with the aluminum to form aluminum
22       oxide as well.
23   Q.  What's in this folder right here, sir?

21 (Pages 78 to 81)

Page 82

1  A.   It's a copy of my protocol and it's a copy of
2       what we've already identified as an exhibit.
3       That was my protocol. And that's not the only
4       page, there's more pages to that protocol that
5       you have in other areas, too. It continues on.
6       I don't know why that's just one page of it.
7  Q.   Okay. We will go ahead and mark this as
8       Defendant's Exhibit 12.
9          (Exhibit 12 marked for identification.)
10 A.   Okay. And that was just the proposed protocol
11      that I came up with for that May 12th
12      inspection at ATS.
13 Q.   Okay. We're done with this one now. We've got
14      to find the other pages to this at some point,
15      I'm going to leave this out.
16 A.   Yeah. And they're here, because I've seen it
17      in some of the documents.
18 Q.   Okay. I'm going to make a note. This is
19      Exhibit 12 and this is a protocol dated May 5,
20      2005, and we need to find the other pages to
21      this document.
22          MR. GIVENS: Give me about 15 seconds.
23          (Off-the-record discussion.)

Page 83

1  Q.   I'm going to mark your affidavit --
2  A.   Okay. We're back on the record now?
3  Q.   Yeah, we're back on the record. I'm going to
4       mark your affidavit, which apparently was
5       executed in October of 2006. And this
6       apparently was done in conjunction with your
7       effort to be licensed in Alabama?
8  A.   Yes, it is.
9          (Exhibit 13 marked for identification.)
10 Q.   Okay.
11 Q.   Can we go off the record just a second?
12 Q.   Sure.
13          (Off-the-record discussion.)
14 Q.   In the interest of saving time, I'm going to
15      mark this set of documents, which is the
16      correspondence file you maintain on this case,
17      as Defendant's Exhibit 14.
18 A.   Okay.
19          (Exhibit 14 marked for identification.)
20 Q.   And just real quickly identify that for the
21      record and then we'll move on?
22          MR. GIVENS: While he's doing that,
23          let's go off for one second and

Page 84

1       let me alert y'all to something.
2          (Off-the-record discussion.)
3  Q.   You have a box over here.
4  A.   Some of this may be duplicative of what we've
5       already seen.
6  Q.   Put this aside, we've seen this.
7  A.   One thing, let me just say, these are just some
8       receipts for some of the stuff of building the
9       drill up over there. And it's not all
10      inclusive, there's others, too, that I've got.
11 Q.   Well, those costs have been incorporated into
12      your bills?
13 A.   Not yet. I haven't done it yet.
14 Q.   Not yet, but they will be?
15 A.   They will be, yes.
16 Q.   Okay. Well, let's do this, just leave the box
17      up here.
18 A.   All right. And put it in it when we finish?
19 Q.   And what I'll do is -- you stop me if I'm going
20      too fast, and I don't want to not allow you
21      sufficient time to give your opinions, but we
22      have a binder of some photographs. Again,
23      these could be repetitive of what we've already

Page 85

1       talked about?
2  A.   Yes.
3  Q.   Okay. So I'm going to put this back in the
4       box. A photo disk, there's nothing in here
5       apparently. It must have been a CD disk that
6       fell out at some point?
7  A.   Yeah.
8  Q.   All right. Here are some documents, again I
9       say documents, photographs of the core drill
10      and look at these as I thumb through them.
11 A.   They're duplicative of what we've already seen
12      or these are that I've got and I think those
13      are, too. Let me just glance through that and
14      make sure, but I'm pretty sure. Yeah, they
15      are.
16 Q.   One thing I notice is that these, of course,
17      are color and the others we marked are black
18      and whites, but I don't think that makes any
19      difference in terms of explaining your
20      opinions?
21 A.   No.
22          MR. GIVENS: I think those you've got
23          in your hand are the same ones

Page 86

1        that I had Tessie go make color
2        copies of, or at least some of
3        there are.
4  A.   They sure are because of the deposition floor.
5        MR. GIVENS:  Yeah.  Any of them that's
6        got wooden floors and a blue core
7        drill, those are the ones that
8        were taken in our office.
9  Q.   All right.  Right here we have some testimony
10       and this must be Mr. Riley's deposition?
11 A.   It is.
12 Q.   And you reviewed Mr. Riley's deposition?
13 A.   Yes.
14 Q.   What about handwritten notes?  Do you have any
15       handwritten notes of --
16 A.   Not really.  You know, if I saw something at
17       the inspection, I, you know, basically
18       photographed it.
19 Q.   All right.  You reviewed Mr. Cody's deposition?
20 A.   Yes.
21 Q.   Okay.  Now, back to Mr. Riley's deposition, I
22       assume that any statements he made in his
23       deposition are incorporated into your report?

Page 87

1        If not, let me know now.  But we've got your
2        written report we're going to talk about later,
3        but I assume that his testimony, in that he was
4        a plaintiff, would have been incorporated into
5        the factual underpinnings of your opinions?
6        MR. GIVENS:  I want to put in an
7        objection to form on that with
8        regard to the use of the word any
9        statements that he made in his
10       deposition being incorporated.  I
11       think the report speaks for itself
12       and I would just not want that all
13       inclusive language to indicate
14       that virtually the deposition in
15       its entirety is reflected in the
16       report.  The report has a section
17       that I believe goes into a
18       synopsis of the facts in this
19       case, but I wouldn't want it to be
20       characterized as all inclusive of
21       Mr. Riley's deposition.
22       MR. SPRAIN:  Okay.  Fair enough.
23 Q.   And what I was trying to do was just perhaps

Page 88

1        expedite it in view of the time this is taking.
2        But if you can tell us today what aspects of
3        his testimony were relevant in relation to the
4        formation of your opinions in this case?
5  A.   It's been so long since I've read his
6        deposition.  To answer that and to be sure that
7        I accurately answered that, I would have to go
8        back through his deposition and others.  Do you
9        see what I'm saying, it would just be --
10 Q.   Okay.  Well, right now you don't have any
11       specific recollection without having to go back
12       and re-review it, in other words?
13 A.   Correct.
14 Q.   But if later when we go through your written
15       report about the facts of the case as you set
16       them out and then your opinions, if anything
17       comes to mind, let me know?
18 A.   Okay.  I think that's good.
19 Q.   Okay.  Now, this is Mr. Cody's deposition?
20 A.   Correct.
21 Q.   Is there anything that stands out after your
22       review of his deposition that impacts on this
23       case?  And for the record, it's Donald Curley

Page 89

1        Cody.
2  A.   No.  And, of course -- no.
3  Q.   Okay.  Mr. George Kennedy, you reviewed his
4        deposition?
5  A.   Yes.
6  Q.   All right.  And the same question, if anything
7        in particular is significant that comes to mind
8        based on your review of the testimony?
9  A.   No.
10 Q.   The next one is Joseph Adam Hall, you reviewed
11       his deposition?
12 A.   Yes.
13 Q.   Again anything significant that comes to mind
14       right now?
15 A.   No.
16 Q.   And then you had Mr. Mixon's deposition and you
17       reviewed it, correct?
18 A.   Correct.  Yes.
19 Q.   Okay.  Anything significant?
20 A.   No.
21 Q.   All right.  This is the CD that's labeled
22       "Joe's photos from the depositions Myers,
23       Whitecotton, Mason and other similar core

1      drills." Are there any photographs on this
2      disk that may be different from other
3      photographs you have reviewed today that may be
4      significant?
5   A.   I think this is the same as what we've seen.
6   Q.   It's probably just repetitive of what you've
7      already seen?
8   A.   Right.
9   Q.   All right. We have here an operators manual
10     and maintenance manual for the Milwaukee motor,
11     but this appears to be a compilation of
12     different things, and then you've got some
13     photographs in there and some information on
14     Milwaukee. Tell me what this is.
15  A.   That is something that was sent to me from
16     Mr. Lane's office here.
17  Q.   Okay.
18  A.   And that was kind of early on in the case, too,
19     from what I recall.
20  Q.   These pictures here appear to be the pictures
21     of the core drill involved in the accident as
22     it was still located at Flavor House?
23  A.   I believe so.

1   Q.   I'm not sure if you've seen these.
2   A.   It's been a while since I've looked at that.
3   Q.   Flip through those in particular and let me
4      know if any of those are significant for your
5      opinions?
6   A.   Well, it did confirm that the bad drill bit was
7      not -- not on the machine when the photographs
8      were taken and one would assume that they did
9      not change the bit. And I believe the good bit
10     there was the four and a half inch.
11  Q.   Okay. But are you aware that the product was
12     disassembled and changed after the accident?
13  A.   Looking for a shear pin and some other things,
14     yeah, I did. I said it would tend to indicate
15     that, I didn't say it was definitive. That's
16     why I can't -- I can't say for certain which
17     bit was used at the time.
18  Q.   Right.
19  A.   And I know that in the depositions there's no
20     clarity -- there's no more clarity there in
21     that. And I guess the only way to -- well --
22  Q.   What about Mr. Riley, did he testify as to
23     which drill bit he used at the time of the

1      accident, or do you have any recollection?
2   A.   I don't have instant recollection of that.
3   Q.   Okay. Now, you mentioned a shear pin. And the
4      testimony and the documentation of record in
5      this file indicates that some individuals at
6      Flavor House thought that the core drill had a
7      shear pin and that the shear pin did not break,
8      but in fact, and you tell me if I'm wrong or
9      not, this core drill did not have a shear pin,
10     but rather a clutch?
11  A.   That's correct.
12  Q.   Okay. And so the shear pin does not have
13     anything to do with this case?
14  A.   Nope. There's not even one in the drill to my
15     -- we disassembled it, there's no --.
16  Q.   Okay.
17  A.   I was going to say some of the manuals though
18     for these Milwaukee drills talks about a shear
19     pin. So apparently some of these stands with
20     Milwaukee drills do incorporate shear pins.
21  Q.   Okay.
22  A.   So I guess I just say that to say that it's not
23     unreasonable for the employees at Flavor House

1      to believe that.
2   Q.   Sure. Sure. But the shear pin has nothing to
3      do with this case?
4   A.   Correct.
5   Q.   Now, these are some photographs in a binder and
6      please explain briefly what these are?
7   A.   Those are my photographs of the rings that we
8      talked about. And these photographs -- I know
9      that my photographs -- I know what I was
10     taking. When I look at other people's
11     photographs, I can, you know, point things.
12     These were photographed as it was laid out as
13     they were removed in the order and they were,
14     you know, done that way, you know, they're laid
15     out. And then I moved in and photographed them
16     in sequence up close. And so that's how, you
17     know, I came up with the condition of these.
18     And this was after they were cleaned of the
19     grease.
20  Q.   And those are the rings of the clutch?
21  A.   That's correct. These are the slip rings and
22     how they -- in the order that they were removed
23     from the shaft.

Page 94

1  Q.  All right.  And we've already discussed your
2      opinions about the rings and the clutch?
3  A.  Sure.  Back in the box?
4  Q.  What I may do is just mark these as Exhibit 15
5      to your deposition, if I can mark this binder?
6  A.  Okay.  Is he going to take those?
7          MR. GIVENS:  I was going to say, can we
8          do it in such a way that we get to
9          -- I mean, he needs to retain that
10         material, and if there's some way
11         we can identify it and I can get
12         Tessie to make copies of them or
13         whatever y'all want to do in that
14         regard so that --
15         MR. SPRAIN:  What would be okay for me
16         is if we made the laser copies,
17         and it would be several pages of
18         laser copies, and we mark the
19         first copy of the laser copy
20         photographs as Exhibit 15 and that
21         way he retains his binder.
22         MR. GIVENS:  Okay.  When you say laser
23         copies, are you talking about --

Page 95

1          MR. SPRAIN:  It's just what she did
2          just a minute ago.
3          MR. GIVENS:  The color copies?
4          MR. SPRAIN:  The color copies.
5          MR. GIVENS:  Okay.
6  A.  It's going to be harder for her to do that with
7      these, because she can't automatically feed
8      them though.  They're going to have to be hand
9      fed.
10         MR. GIVENS:  Well, that's all right.
11         It's not a problem.
12         MR. SPRAIN:  But right now I'm going to
13         lay this right here.
14     (Exhibit 15 marked for identification.)
15 A.  It's just that I don't want to leave here today
16     without these, because there's about four
17     depositions right now that the court reporters
18     are holding my photographs and I don't get
19     them.  And that just -- I don't get them back
20     and two years later I'm looking for them.  No
21     offense to court reporters.
22     (Exhibit 16 marked for identification.)
23 Q.  The same thing with Exhibit 16, we're going to

Page 96

1      mark these and the same rules will apply.  We
2      will have Tessie or your office make color
3      copies of these photographs.  And these appear
4      to be duplicates of what we just marked as
5      Exhibit 15.  Look at those, Don, and let me
6      know?
7  A.  It's a good possibility.  Actually, no.
8  Q.  Those are --
9  A.  These are just -- they're of the same thing,
10     but they're different photographs.  They're not
11     duplicates, they're the rings.  It looks like I
12     took two rolls of the rings.  I had to to get
13     them all, I guess.
14 Q.  Okay.  Well, let's do this; we'll show both of
15     these as Exhibit 15, it's the same series of
16     photographs?
17 A.  Yes.
18         MR. GIVENS:  And those are the clutch
19         rings?
20 A.  Yes.
21         MR. SPRAIN:  The clutch rings.
22 Q.  And then we have another series of photographs
23     that you probably took of the first inspection,

Page 97

1      it might have been the second inspection, of
2      the core drill involved in this case?
3  A.  Okay.  Yes.  I want to point out in this
4      photograph, and I haven't been able to do this
5      in the other photographs.  If you will notice
6      the gasket right there, it's slightly torn.
7  Q.  Okay.  I think you had referenced that before.
8  A.  I had referenced it, but not in a photograph.
9          (Off-the-record discussion.)
10 Q.  Now, you previously testified about the gasket,
11     and again you've had a brief break, but you said
12     again something about the gasket?
13 A.  Yeah, the glue for this thing.  And, of course,
14     it's a continuous strip and it's glued around.
15     It's a foam type rubber material.  And I've got
16     a good gasket over here.  On that gasket it's
17     firm and smooth, and this appears to have been
18     pulled apart.
19         Now, there again, I can't say that -- I
20     mean this drill has been around a lot, you
21     know, from the accident site to Atlanta to ATS,
22     you know, but it is an indication that there is
23     a gap in the joint there that could make

Page 98

1    obtaining a vacuum with that a little
2    difficult.  Although we did -- you know, we
3    were not able to pull a vacuum, that's right.
4    We took the --
5  Q.   Why could you not obtain a vacuum from the core
6    drill involved in this case?
7  A.   In Atlanta or in Marietta when we tested it?
8  Q.   Exactly.  I'm referring back to your inspection
9    of the core drill.
10 A.   Because the vacuum pump was not functioning.
11 Q.   Okay.  And the power cord was not connected?
12 A.   Correct.
13 Q.   Okay.
14 A.   I mean, yeah.
15 Q.   Okay.  But back to what we said before, in your
16    opinion the vacuum pump system was operational
17    or functioning at the time of the accident?
18 A.   The motor was running and it was pulling at
19    least a partial vacuum, yes.
20 Q.   Okay.  But later, after the accident, your
21    inspection could not confirm whether or not it
22    was working or not?
23 A.   Correct.

Page 99

1  Q.   Now, this -- I'll call it a separation glued
2    together, is that a fair estimate of what it
3    is?
4  A.   It is.  And while you could obtain -- if that
5    were present at the time of the accident, okay,
6    if it were, you would get a reduced efficiency
7    of your vacuum.  And, I mean, it's possible
8    that could keep you from obtaining the full 20
9    inches of Mercury.  I don't know that for sure.
10    But any leaks whatsoever, I just know from
11    working with this particular drill that I've
12    made the model, if you get this thing on the
13    floor or concrete that has a crack in it or
14    something, it's hard to build up a vacuum and
15    to get it going, if there is any unevenness in
16    there, to get a full vacuum.  Because it will
17    (Indicating); it kind of bleeds through and
18    sucks through that imperfection in the surface.
19    So knowing that and that's there, that could
20    create a -- let's say that drill was pulling a
21    vacuum and it was only eight inches of Mercury,
22    then you had a binding of the drill; then that
23    would allow it to kick around and do what it

Page 100

1    did.
2  Q.   Okay.  Any other defects or exceptions that you
3    noticed with the gasket?
4  A.   No.
5  Q.   Okay.  And you can't tell whether or not this
6    separation defect was in existence at the time
7    of the accident or maybe came about later, or
8    do you know?
9  A.   I don't know.  You know, it appeared to have,
10    you know, dust and dirt in the -- you know, in
11    the interstices where it came open.  So it did
12    not appear to be a fresh break, but, you know,
13    from that --
14 Q.   When was it glued back together?
15 A.   Well, it wasn't.  I'm just saying it's
16    partially torn.  See right there, the little
17    hole right there in the middle?
18 Q.   Yes.
19 A.   And, you know, when you would compress that,
20    that could open up, you know, a tiny hole in
21    the -- you know, through the surface and just
22    -- you know, it creates a slight opening to
23    lose vacuum.

Page 101

1  Q.   What confused me was the glue.  Was this ever
2    glued back together?
3  A.   No, it's manufactured that way.  This is a
4    brand-new one that came with this.  That's just
5    how it's made.  See, it's manufactured in a
6    continuous roll.
7  Q.   I see.
8  A.   And that's just the manufacturing process, they
9    take and glue it.  So if that -- see, that's
10    smooth and you've got a good smooth surface
11    there.  This particular one, the glue is opened
12    right there.
13 Q.   Okay.  Do you know the age of this gasket?  Was
14    it a week old, was it a year old, or do you
15    have any opinion as to the age of the gasket
16    used at the time of the accident on the core
17    drill?
18 A.   Well, according to the invoice, they charged
19    Flavor House -- United Rentals charged Flavor
20    House, I believe it was, 11 or 16 dollars, we
21    can look back, for a gasket.  They charged them
22    a price for the gasket.  Now, if that's a
23    rental on the gasket -- you know, I don't know

Page 102

1    if it's a separate rental for the gasket. To
2    me I would think a gasket like that, if I'm
3    charged for it, that that's kind of a throwaway
4    disposable item and you should get a new one
5    each time it goes out, you know, but that would
6    be speculation. I have no -- other than what's
7    on that invoice, it prices out a gasket. So if
8    you're asking me that, the age of that gasket
9    when we looked at it here would have been from
10   August of 2003 until May of 2005, you know,
11   from the date of the accident until the date of
12   the inspection.
13   Q.   Well, what I'm asking you is at the time of the
14   accident do you have any opinion as to the age
15   of the gasket?
16   A.   Flavor House was charged for a gasket. It
17   doesn't specify whether it's new or used. So
18   -- and I haven't seen any deposition testimony
19   or anything else from Flavor House if they sell
20   these gaskets new or if they charge a usage fee
21   for the gaskets like they do the drill bits.
22   Q.   Okay. I understand.
23   A.   No. As far as looking at it and telling the

Page 103

1    age, no, I can't.
2    Q.   Okay. Right here, that may be you or somebody
3    else, but somebody is pointing to something on
4    the gasket. What is that person pointing to?
5    A.   What this -- the purpose of this is to get the
6    length of the gasket when it's pulled out.
7    Q.   Okay.
8    A.   In other words, they were -- and, see, on the
9    tape measure there it's just showing that it's
10   approximately two feet.
11   Q.   Okay. I'm going to go back to the beginning.
12   Anything significant about the drill bit?
13   A.   No.
14   Q.   You've got a few photographs there and we've
15   already discussed the drill bit, of course?
16   A.   Right.
17   Q.   And then you've got a picture of the drill
18   stand. And this is the other side where you
19   believe someone had put their footprint?
20   A.   No. That's the opposite side.
21   Q.   Is that the same side?
22   A.   That's the opposite side of where the footprint
23   would be.

Page 104

1    Q.   Okay. Well, that's what I was trying to say.
2    A.   Oh, okay.
3    Q.   That would be if -- if you're standing from the
4    back of the drill, it would be to the left?
5    A.   Yes.
6    Q.   Okay. In this case do you know whether
7    Mr. Riley was standing on the base at the time
8    of the accident?
9    A.   I believe he was.
10   Q.   Was it one foot or two feet?
11   A.   It's my understanding it was one foot.
12   Q.   Okay. Now, do you think it's a good practice
13   or a bad practice for an operator to stand on
14   the base?
15   A.   I'm not aware of anything that would make it a
16   bad practice. I don't know that the operator
17   gains anything by standing on the base.
18   Q.   All right. If he had not been standing on the
19   base, would he have been injured?
20   A.   I can't really answer that.
21   Q.   Okay. Why not?
22   A.   You have a whole different set of
23   circumstances. I mean, it's entirely possible

Page 105

1    if he hadn't been standing on the base his
2    injuries could have been much worse or fatal.
3    When that drill spun around, you don't know how
4    it would have hit him had he been standing a
5    foot to the right, a foot to the left. Let's
6    say, for instance, he was standing to the
7    opposite side of where it would have spun.
8    See, it could have come around him standing
9    still and whacked him and there's no telling
10   what his injuries would have been. As it was
11   with this, it partially carried him and spun
12   him around and then hit him. There's no way
13   that I can answer that question.
14   Q.   Well, why was he standing on the base?
15   A.   It was -- there was some testimony, and I would
16   have to look back if it was his or whether he
17   stated that, he may have, it was to help hold
18   it down.
19   Q.   Okay. And what does that indicate to you, if
20   anything?
21   A.   It indicates that the vacuum pump was not -- it
22   would be an indication to me that the vacuum
23   pump was not developing sufficient force to

Page 106

1   hold it down on its own.
2  Q.   Okay.  And that in turn shows that he was
3        trying to apply physical pressure by his weight
4        to steady the base onto the work surface?
5  A.   It could have, yes.
6  Q.   Okay.  Now, if -- let's back up.  Couldn't the
7        operator in that situation realize the vacuum
8        system is not working, the base is not being
9        stabilized to the work area, and he shouldn't
10       use the product?
11 A.   No.
12          MR. GIVENS:  Object to the form.
13 Q.   Okay.  Why is that?
14 A.   I just -- there's nothing to indicate on the
15       instructions of the machine, there's nothing to
16       indicate that that's something that would
17       intuitively be dangerous, in my opinion, and I
18       don't -- I don't see one as following the other
19       in sequence.
20 Q.   Okay.  Now, what if prior to Mr. Riley
21       attempting to drill a hole he had been working
22       with a supervisor to drill a preceding hole and
23       the core drill did not have a sufficient vacuum

Page 107

1        pressure to hold the base to the work surface
2        and it spun out of control, but they were able
3        to get out of the way, and then he used it
4        again; would that not indicate that Mr. Riley,
5        as an operator, should have taken precautions
6        to avoid that from happening again?
7  A.   Not necessarily.  Because in the other case
8        they were able to successfully anchor it and
9        get it -- get the drill -- you know, get the
10       hole drilled.
11 Q.   Well, you're saying that the fact that on the
12       same day in question the core drill does not
13       have sufficient vacuum pressure to secure the
14       base to the floor and it in fact rotates on the
15       axis, that wouldn't put anyone on notice of a
16       problem with the operation of the core drill?
17 A.   Not necessarily.  Not if -- not if there was
18       any indication as to what the vacuum of the
19       drill is supposed to be.  There's no indication
20       that -- there's no direct indication that
21       there's a problem with the vacuum hold-down
22       system in that.  It's -- in other words, it's
23       not putting somebody on notice that something

Page 108

1        is wrong with it inherently, because, you know,
2        the vacuum is pulling down a certain force.
3        They are not made aware of the fact that that
4        force is significantly greater than the output
5        of the shaft.  There's no way that they can --
6        as a layperson, that they can know that
7        relationship like I was explaining it to you
8        earlier about the torque on the motor and it
9        overcoming that.  They are not aware of the --
10       I guess the design mechanism of all of those.
11       So to me it doesn't put them on notice, no.
12 Q.   All right.  If you assume that Mr. Riley knew
13       that the base had to be properly secured to the
14       floor for safe operation, wouldn't then the
15       fact that he had just used it with his
16       supervisor and it didn't work point out to him
17       as an operator that the base was not being
18       properly secured to the floor?
19          MR. GIVENS:  Object to the form.
20 A.   There again, without understanding that,
21       there's no -- there's no evidence to show that
22       Mr. Riley knew that that vacuum was supposed to
23       hold it down securely without -- with such

Page 109

1        excess that -- in other words, that vacuum
2        holds that thing down very firmly when it's
3        operating properly, okay.  There's no way for
4        Mr. Riley to have known what that safety margin
5        was, that it was so much greater than what the
6        output force of the drill motor was.  Myself
7        knowing that that is designed into it as a
8        safety factor, I would know that, but there's
9        no way that, you know, Mr. Riley could have
10       known that.
11 Q.   Well, what would indicate to a layperson that
12       the base was not being properly secured?
13 A.   When you turned the drill and tried to applied
14       pressure, that just immediately it would spin
15       around with almost no resistence.  There is no
16       way of knowing -- it's kind of difficult to
17       answer because it's to what degree.  If he's
18       receiving no resistence from the vacuum, then
19       it may indicate to him that it's not operating
20       properly, but, you know, without knowing that,
21       I can't answer it.
22 Q.   Okay.  But in this case isn't that in fact what
23       happened, prior to him drilling the second hole

28 (Pages 106 to 109)

Page 110

1     the base became disengaged from the work
2     surface and spun around the drill bit?
3  A.   I would have to look back at the deposition.  I
4     would have to review back for that.
5  Q.   Assuming that was the sworn testimony, wouldn't
6     that indicate that the vacuum system did not
7     operate correctly as intended with respect to
8     the drilling of the first hole?
9  A.   Not necessarily, because you -- you could even
10     have different surfaces in there, too.  I mean,
11     like I talked about, the surface could be
12     different from one to the other.
13  Q.   Is the base supposed to rotate, spin around the
14     column?
15  A.   No.
16  Q.   Okay.  Is the base -- I might have said that
17     incorrectly, but is the base supposed to rotate
18     and spin around the drill bit?
19  A.   No.
20  Q.   Okay.  Does that indicate a problem?
21  A.   To me it does, yes.
22  Q.   Okay.  And if it did that on the day of the
23     accident prior to the time Mr. Riley was hurt,

Page 111

1     would that indicate that the vacuum system was
2     not working correctly?
3  A.   To me it does, yes.
4  Q.   Okay.  What about the rest of these pictures,
5     anything in here that looks like it may be
6     important for your opinions?  And by the way,
7     we've seen so many photographs it's mind
8     boggling, and a lot of them are the same thing
9     or somebody has a different angle or whatever.
10  A.   Oh, that's not good.  These are not supposed to
11     be --
12     MR. SHEEHAN:  If those are negatives,
13        why don't we get prints made?
14  A.   But I don't have them of all of them here.  I
15     keep the negatives, I don't take the negatives
16     out of the office generally.
17     MR. SHEEHAN:  Okay.  While you're here,
18        could we get Tessie to maybe take
19        those to Wal-Mart, maybe the one
20        hour printing, and we can go on
21        and get copies of them?
22  A.   It will just be this one book, but that's fine.
23     MR. SHEEHAN:  It will just give us good

Page 112

1        copies or good prints.
2     MR. GIVENS:  Let's take two seconds.
3     (Off-the-record discussion.)
4  BY MR. SPRAIN:
5  Q.   Okay.  Back on the record.  I've labeled that
6     last series of photographs we've discussed as
7     Exhibit 17.
8     (Exhibit 17 marked for identification.)
9  Q.   And the only thing I want to point out is that
10     I have a sticky note on there with an arrow
11     pointing to the separation that was glued
12     together that we discussed, okay?
13  A.   And clarifying, glue means the original
14     manufacturing process.
15  Q.   Exactly.  That's just for point of clarity,
16     it's an arrow to show what our testimony
17     concerned.
18  A.   Okay.
19     (Exhibit 18 marked for identification.)
20  Q.   And then we've already been through this, it's
21     a bound set of documents and I've labeled it
22     Exhibit 18.  You've already thumbed through it,
23     there wasn't anything in there that you really

Page 113

1     testified about?
2  A.   No.
3  Q.   I put aside Mr. Frost's report.  Have you
4     reviewed Mr. Frost's report?
5  A.   Briefly right after it was -- the thing.
6  Q.   Okay.  Do you agree with what he was saying?
7     Is there anything that you disagree with?
8  A.   No, not that I recall.  There's nothing that
9     jumps out.  I mean, he talks about some of the
10     things that I -- you know, that obviously are
11     not in my area of expertise that I don't have
12     an opinion on.
13  Q.   Okay.  Well, what is his expertise?
14     MR. GIVENS:  Are you asking me or him?
15     MR. SPRAIN:  Well, I guess --
16  A.   I think you better ask him just.  I mean, I
17     don't know what all of his areas of expertise
18     are.  I really don't.
19  Q.   Okay.  We've discussed two different
20     inspections of the core drill at Applied
21     Technical whatever it's called?
22  A.   Right, Services.
23  Q.   Okay.  Did you inspect the core drill there on

Page 114

1    any other occasions?
2  A.   Yes.
3  Q.   Okay.  When was that?
4  A.   I believe that was in February of this year.
5  Q.   Well, what did you do on that occasion?
6  A.   I didn't do anything.  Whenever that later
7    inspection was, it was -- and when I say I
8    didn't do anything, there were people who were
9    not present for the first inspection that had
10    not seen it, so I was essentially attending the
11    inspection.
12  Q.   Okay.  I'm referring to that one as the second
13    inspection.  The first one you did was in May
14    of '05?
15  A.   Right.
16  Q.   Okay.  And we've marked a roster of the people
17    who were in attendance?
18  A.   Right.
19  Q.   So we've dealt with that.  And I believe you
20    pointed out some photographs that relate to
21    that inspection?
22  A.   Yes.
23  Q.   And then the lawyers get involved and everybody

Page 115

1    goes back --
2  A.   Uh-huh.  (Positive response.)  Yes.
3  Q.   -- and does it in February of '06.  Other than
4    those two inspections, have there been any
5    inspections of the core drill?
6  A.   No.
7  Q.   Okay.  Have you seen the core drill since
8    February of '06?
9  A.   No.
10  Q.   All right.  Who did you work with to develop
11    the alternative design?
12  A.   John Frost.
13  Q.   Okay.  Who --
14  A.   Well, let me clarify that a little bit.  I
15    mean, before I even knew John Frost, I had in
16    mind, you know, and you will see it from my
17    report, a couple of safety ideas that could be
18    incorporated into this drill for an alternative
19    design.  Mr. Frost and -- we worked together to
20    find the components basically.
21         I know one of his areas.  I believe he's
22    an electrical engineer.  So he was able to help
23    with the schematic diagram of how to get all of

Page 116

1    these components and verify that.  I could have
2    done it and, you know, figured it out, it was
3    just much quicker for him to help me with the
4    wiring diagram.  But, I mean, I knew what I
5    wanted it to do.  And, you know, it was -- he
6    helped with assistance in some of the technical
7    matters of actually accomplishing it.
8  Q.   Okay.  What is the cost of the alternative
9    design?
10  A.   What runs the cost up a little higher in this
11    is that there's a relay involved.  And Mr. Lane
12    bought the relay.  We bought that at an
13    electrical supply store here, I believe it's
14    Mayers, last Friday.  It was about 110 dollars,
15    from my recollection.  And it's a double pole
16    relay.  You would only need a single pole
17    relay.  The cost of that relay could be brought
18    down significantly buying in quantities like a
19    manufacturer would for the proper relay.
20         And incidently the vacuum switch that we
21    got, the reason you have to have a relay with
22    this is the switches that we have that we were
23    able to obtain will not handle the 20 amp

Page 117

1    current load of the drill.  So it's a big bulky
2    switch or it's a heavier contactor switch.
3         The microswitch company actually has a 25
4    amp rated microswitch.  So it would be possible
5    to incorporate larger switches.  And the
6    microswitch company said that it would only add
7    50 cents per switch to do that and that would
8    eliminate the relay.  The microswitch itself,
9    in quantities of -- and don't hold me to this
10    exactly, but they are approximate quantities.
11    I didn't write it down as I was talking to the
12    man on the phone, Larry -- it starts with an H,
13    at Magnetic -- I've got the name there on that
14    envelope that was in there.  It's about $6.80
15    apiece in buying them in quantities of 250 to a
16    thousand.
17  Q.   Okay.  Let me stop you there, I'm a little bit
18    confused.  Are you saying the microswitch is
19    something that you could use as an alternative
20    to the relay or is that something you need in
21    addition to the relay?
22  A.   No.  We have a microswitch there, but that
23    microswitch is rated much less, so it has to

Page 118

1  have a relay, you know.
2  Q.  It's got to have the relay?
3  A.  It's got to have a relay.
4  Q.  It's got to have a new microswitch?
5  A.  The microswitch.
6  Q.  All right. And what else?
7  A.  And the -- so in quantities of 25 to 249 the
8  cost of that switch was down around $6.50 --
9  no, I'm sorry, 11 dollars; the higher quantity
10  it was six dollars, seven dollars, right in
11  that range. And to add the higher current
12  rating of 25 amps only adds about 50 cents a
13  switch to it. So you could eliminate the
14  relay. And for the electronic portion of just
15  the vacuum safety control you're looking at a
16  cost of less than ten bucks to have just that
17  vacuum interlock system incorporated. Now, you
18  know, you've obviously got some, you know,
19  wiring that's incidental cost, but, you know,
20  in quantities it could be done for, I would
21  say, a total cost, labor and everything, to the
22  manufacturer, of under 15 bucks for that alone.
23  The deadman switch, I think what we've

Page 119

1  got, that deadman switch and everything that we
2  got was 20 or 30 bucks, I'm not sure. I don't
3  have an immediate recollection on that. But
4  those things can also be obtained. That also
5  was a lower amp rating, we couldn't run the
6  voltage directly.
7  Q.  What I've got so far is a relay for 110, a
8  microswitch for 6.80, a vacuum interlock for
9  ten dollars --
10  A.  No. The microswitch is the vacuum interlock,
11  so that's what I was referring to. You can
12  eliminate the ten dollars.
13  Q.  Okay. Well, that's why I'm recapping so I can
14  make sure.
15  A.  Okay.
16  Q.  So the microswitch is also referred to as the
17  vacuum interlock?
18  A.  Yes.
19  Q.  Okay. And that's 6.80?
20  A.  Yes.
21  Q.  All right. And the kill switch or the deadman
22  switch, is that the same thing? Is that
23  interchangeable?

Page 120

1  A.  Yeah. Yes.
2  Q.  All right. Kill switch/deadman switch is about
3  30 dollars, you said 20 to 30?
4  A.  Yeah. And that's in the one we've got. Now,
5  keeping in mind, building it the way we do --
6  we have, you know, we've got brass tees that
7  were expensive. Of course, I had to buy a pack
8  of five to get the one at Grainger. There's
9  more expenses in that that I have incurred that
10  a manufacturer making it from the ground up
11  would not incur.
12  Q.  Okay. What are you total out as the cost to
13  add these features to the alternative design?
14  A.  The total out cost in excess of what was
15  already there, because there's some duplicative
16  parts in that, right now as it's designed would
17  probably be about 150 to 160 dollars.
18  Q.  Okay.
19  A.  And I am confident that that cost could be
20  reduced to well under a hundred dollars.
21  Q.  Have you tested your alternative design?
22  A.  Yes.
23  Q.  Okay. And when did you test it?

Page 121

1  A.  Yesterday afternoon when I finished it.
2  Q.  What did you do to test it?
3  A.  Okay. I powered up the -- you know, applied
4  power to the input power plug. Turned the
5  three-way toggle switch to the vacuum only or
6  to the vacuum side. The vacuum pump comes on.
7  Depress the kill switch or the deadman switch,
8  the drill will not run, because I've not
9  applied a vacuum. The vacuum pump is running,
10  but there is no vacuum in the vacuum plate zone
11  or in that system.
12  Then I switch it to the middle switch.
13  The motor doesn't run; the vacuum doesn't run.
14  Hit the deadman switch, it doesn't run, because
15  that's the off position and it shouldn't.
16  I switch it to the brace/other method of
17  anchoring position on the toggle switch, the
18  vacuum pump does not come on, it's off, and the
19  drill motor is off. You have to press the
20  deadman switch and the drill motor runs. That
21  position would be for only if you had it
22  anchored with anchor bolts and the ceiling jack
23  method or an alternative method. But still the

Page 122

1    deadman switch is there as a safety feature for
2    that. You do lose the redundancy of the vacuum
3    interlock when you're using an anchor brace or
4    a --
5  Q.  Or a ceiling jack?
6  A.  -- ceiling jack, yeah.
7        So then I closed the vacuum. There's a
8    plug that goes into the base. And what I did,
9    I teed the vacuum microswitch in with a rubber
10   hose teed into that area where it goes into the
11   base, and you reach a common vacuum area
12   throughout the hose and the base. As I said,
13   ideally you would want to drill a separate hole
14   into the base of that and thread it and run
15   your microswitch activation line directly into
16   the base so you're getting the vacuum in the
17   base. But for purposes of showing the design
18   is feasible and to keep from drilling a hole
19   into a brand new base before knowing whether
20   this was going to work out or not for sure, I
21   just teed into it. It accomplishes the same
22   end result.
23        Then without any suction on it, again you

Page 123

1    put it to that position, press the on switch,
2    the, slash, deadman switch, it doesn't come on.
3    Place my finger over the intake to close the
4    vacuum, and actually you can put a golf tee in
5    there and help you do it so it doesn't pull a
6    blister on your finger, but closed off the
7    vacuum and gradually increased the pressure,
8    you know, in the zone on the gauge. And when
9    it got up to about 23 inches of Mercury, that's
10   when depressing the deadman switch would cause
11   the drill motor to run.
12        It can lose vacuum, the way it's currently
13   set, down to about 18 and a half to 19 inches
14   of Mercury. It's got about a four inches of
15   Mercury zone in there as a hysteresis. It's an
16   area where you go up and it's so that you don't
17   have something where it's clicking on and off.
18   It has a band in there for activation and it
19   can lower slightly and still remain
20   operational.
21        So the way I tested it, when I have a
22   vacuum above about 23 inches of Mercury, the
23   drill motor will come on and operate. As I

Page 124

1    allow the vacuum, by bleeding it off, to open
2    up to where I only have about 18 and a half or
3    19 inches of Mercury, still holing the kill
4    switch down, the circuit breaks and the drill
5    motor shuts off because there's insufficient
6    vacuum pressure in the base.
7  Q.  Okay. Did you have occasion to put the
8    alternative design to an actual use situation?
9    For example, like what Mr. Riley was doing on
10   the day of the accident?
11 A.  I have not done that, no.
12 Q.  Okay. And do you know what would happen -- you
13   know, if you haven't done it, I guess it would
14   be a theory, but what would happen if your
15   alternative design was applied in such a way
16   that the drill bit went into a concrete surface
17   and it got hung up --
18 A.  Okay.
19 Q.  -- and the base became disengaged from the work
20   surface?
21 A.  If the vacuum pump were running, unless there
22   was a malfunction of the clutch on the drill,
23   the only way that you could have that occur was

Page 125

1    if the clutch malfunctioned. Okay. And I
2    don't believe that even that motor would be
3    capable of overcoming the force of that base on
4    that vacuum. I don't believe that motor has
5    enough energy available to it to overcome that,
6    so I don't believe that's possible to even
7    occur with that vacuum interlock in place.
8  Q.  Okay. So what you're saying is if the clutch
9    worked as it's supposed to work, as
10   intended, --
11 A.  Right.
12 Q.  -- and if the drill bit hung up in the concrete
13   work surface --
14 A.  Correct.
15 Q.  -- and the vacuum pressure was insufficient to
16   maintain a secure hold on the work surface,
17   then what would happen?
18 A.  I kind of got lost in the question there.
19       MR. GIVENS: Go ahead.
20 Q.  Okay. What I will do is I will reask it. What
21   I'm trying to understand is what would be the
22   end result of this alternative design as
23   opposed to what you believe happened in this

Page 126

1    case. And so we've not attempted to re-create
2    the accident based on your alternative design,
3    so I'm giving you this hypothetical. And so
4    we're assuming that the Milwaukee motor is the
5    same, the clutch is working, there is a drill
6    bit similar in size and type as the one used in
7    this accident, the drill bit is used in a
8    similar type of concrete surface. The drill
9    bit hangs up and then it seizes and the base
10   becomes dislodged from the surface due to
11   insufficient vacuum pressure. What would
12   happen different with your alternative design
13   in that scenario?
14   A.   There would have been no accident, because when
15   the base lost vacuum, well above the range of
16   where it would have broken loose, the drill
17   motor shuts down. So there's no energy to
18   cause it to rotate and it doesn't occur.
19   Q.   Okay. Now, what would Mr. Riley have done --
20   and I'm assuming, just to keep this scenario
21   moving forward, the same set of facts, I think
22   you're following me now. Let's say Mr. Riley
23   is the operator and you've got this deadman

Page 127

1    switch, what would he do in relation to that
2    deadman switch, if anything?
3    A.   That is a redundancy in that -- the deadman
4    switch is a redundancy to the vacuum portion to
5    where if it were to malfunction, let's say a
6    piece of thrash got up into the vacuum thing,
7    and the way we have it teed in right now
8    there's one opening down there.
9    Q.   If it got dislodged in there?
10   A.   Dislodged and it closed the vacuum off, our
11   microswitch measuring still that 20 inches
12   of vacuum, but you don't have it in the base,
13   okay? So his hand is on the deadman switch.
14   As the drill starts to move, you know, he's
15   holding the deadman switch, it's there, as it
16   starts to move, the natural thing is he will
17   become dislodged from the deadman switch and it
18   shuts down.
19   Q.   So he releases his hold on the deadman switch
20   and the entire core drill stops to operate?
21   A.   Yes.
22   Q.   All right. And that's the redundancy that
23   you're talking about?

Page 128

1    A.   That's the redundancy there. When you are
2    using the ceiling jack method or the anchor
3    bolt method, the deadman switch -- there is no
4    redundancy in that, there is just simply the
5    deadman switch.
6    Q.   Okay. Now, what would happen if the operator
7    is standing on the base and the vacuum system
8    does not adequately secure the base to the
9    floor and the drill bit seizes up, would this
10   cutoff switch or this interlock device still
11   prevent the accident in that the operator would
12   not be thrown off the machine?
13   A.   Yes. Because -- I mean, you're talking about
14   if you had it set on the -- well, if the vacuum
15   -- if you've got it set where the vacuum pump
16   is running and you're attempting to use the
17   vacuum pump?
18   Q.   And you're standing on it?
19   A.   And you're standing on it?
20   Q.   And you're on this base?
21   A.   It doesn't matter, because the vacuum is going
22   to hold that base secure. And if the vacuum is
23   not sufficient to hold the base secure, it will

Page 129

1    shut the drill motor down well before any time
2    that it would become dislodged.
3    Q.   Okay.
4    A.   Now, let me back up. The reason I said that
5    you would want to have another opening in the
6    base down there is -- rather than teeing it
7    into your input line, is because then you would
8    have -- for you to have a failure of this
9    system you would have to have two things fail.
10   You would have to have both inlets to the
11   vacuum get clogged up, both holes, both your
12   activation switch and your source. So I think
13   I needed to put that in there to answer your
14   question of that.
15   Q.   Okay. Well, one aspect of my question has to
16   do with timing. Are you saying that there's no
17   split second moment wherein -- even though the
18   interlock device will stop further operation of
19   the machine, there's no split second moment
20   when it's destabilized and an operator who is
21   standing on the machine could be thrown off?
22   A.   You would have -- you've got the inertia of the
23   motor. What you're saying is the motor is

Page 130

1    running?
2  Q.    All right.  We've got a motor running and that
3       base becomes dislodged, and by my review of the
4       testimony, you tell me if I'm wrong, but it
5       looks like it starts rotating in a split
6       second.  Are you saying that with your
7       alternative design it's going to shut it down
8       so that there's not any -- even a split second
9       interval whereby the base is spinning out of
10      control which could cause the operator to be
11      thrown off and injured?
12 A.    I'm not sure that question can be answered with
13      yes or no.  But I'm going to explain to you
14      what I think you were trying to ask, if that's
15      okay?
16 Q.    Please.  You're the engineer, you please help
17      me.
18 A.    No, it would not have occurred.  It would not
19      have spun around momentarily the way it's set
20      up now, because the vacuum that's on there
21      would be at a higher level.  It shuts off
22      before it falls below a threshold that allows
23      the base to be -- to be --

Page 131

1  Q.    Dislodged?
2  A.    -- dislodged.
3  Q.    Okay.
4  A.    And if you had a loss of vacuum, vacuum has a
5       lag time.  I mean, absent of taking a
6       sledgehammer and cracking that top, that
7       aluminum top, and cracking it wide open and
8       creating a huge hole in there, vacuum is not
9       going to suddenly lose, you know, when it's
10      that high of vacuum.  You've got 20 inches of
11      Mercury or greater, (Indicating), it's really
12      sucked down on there.  It's on there.  And so
13      you're going to develop a slow leak or a slow
14      loss of that vacuum relatively so in a
15      situation like that, it's going to creep down
16      typically, or you're not going to be able to
17      build up to the vacuum due to your surface or
18      conditions.  But either way, you're not able to
19      operate.  That drill motor will not get
20      electricity to the motor unless that vacuum
21      pressure is above a safe threshold.
22 Q.    Well, let's do this; let's call your
23      alternative design the Shafer design, because

Page 132

1       that's your design, right?
2  A.    Shaver, but yes.
3  Q.    I'm thinking of the famous Shafers in
4       Birmingham, the eye folks.  The Shaver design,
5       okay, that way we know what we're talking
6       about.
7  A.    Okay.
8  Q.    What you're saying is once this microswitch
9       detects a lapse in the vacuum pressure, it's
10      going to shut it down before there's any moment
11      of instability with the base?
12 A.    Yes.
13 Q.    So that with the Shaver design the operator is
14      not at risk of being injured by virtue of being
15      thrown off the core drill?
16 A.    That is correct.
17 Q.    All right.  I mean, basically with the Shaver
18      design you're saying he's standing there, the
19      microswitch/interlock device kicks in, it's
20      triggered because of a lapse of vacuum
21      pressure, and the machine stops?
22 A.    Correct.
23 Q.    Okay.  Now, do you know of any actual core

Page 133

1       drills in use that use the Shaver design?
2  A.    I'm not aware of any core drills, no.
3  Q.    Okay.
4  A.    But the principle of deadman switches, vacuum
5       interlock, pressure interlock switches is in a
6       multitude of machinery and equipment used in
7       industry, you know.  Even though I'm flattered
8       that you call it the Shaver design, there is
9       nothing inherently unique about that setup.
10 Q.    Well, I'm calling it that so that the record is
11      clear.
12 A.    I understand.
13 Q.    But I guess unintentionally I flattered you.
14      But I'm trying to make the record clear,
15      because we have a core drill with its own
16      design?
17 A.    Yes.
18 Q.    And now you've come up with, in relation to
19      your work with Mr. Frost, an alternative.  So
20      I'm calling it that just so we're clear for the
21      record.  Now, are you saying that you are not
22      aware of any drills such as this that have this
23      design or you just don't know of any?

Page 134

1         MR. GIVENS:  How is that different?
2    Q.   Well, I will reask the question.  The first
3         question, are you aware of any similar drills
4         that have adopted this type of design such as
5         the one that you've --
6    A.   No.
7    Q.   Okay.  Well, why not?
8         MR. GIVENS:  Why is he not aware of it?
9    Q.   Well, why -- okay.  If you're not aware of any
10        drills that have this design, do you know of a
11        reason why similar drills do not have this type
12        of design and these mechanisms as you've just
13        testified to?
14   A.   No.
15   Q.   Okay.  Is there any down side to employing the
16        Shaver design on core drills such as the one
17        involved in this case?
18   A.   No.
19   Q.   Okay.  Is there any negative effect on the
20        operation and performance of the drill?
21   A.   No.
22   Q.   Okay.  Have you consulted with anyone else
23        other than Mr. Frost and, of course, Mr. Lane

Page 135

1         about your design?
2    A.   No.
3    Q.   Okay.  Is there any literature or information
4         in general that deals with this design and
5         these types of mechanisms?
6    A.   On core drills?
7    Q.   That you consulted?
8    A.   No.
9    Q.   Okay.
10   A.   Except a brochure off the Internet, and I don't
11        have that, from the World Magnetics Company
12        that manufactured the vacuum microswitch.
13   Q.   Okay.  Is there any peer-reviewed book,
14        treatise or periodical that relates to a vacuum
15        interlock device and a kill switch on such
16        products as the core drill?
17   A.   There may be.  I did not consult any for that
18        design.
19   Q.   Okay.  In general are you aware of any
20        information like books, treatises, periodicals,
21        literature of any type that relates to vacuum
22        interlock devices and kill switches?
23   A.   I haven't looked for any.

Page 136

1    Q.   Okay.  And so I assume that this design is
2         something that you --
3    A.   You're talking about that specific design?
4    Q.   Well, not this specific design, but in general.
5         In general vacuum interlock devices or switches
6         and kill switches that may have similar
7         applicability to products such as the one
8         involved in this case?
9    A.   Well, let's just -- you know, I'm sure there
10        are, but let's just -- kill switches are in a
11        multitude of devices and industrial devices
12        that I'm aware of in having worked in industry
13        for a number of years, and limit switches.  In
14        other words, there are devices that detect
15        pressure.  When the pressure in a boiler or a
16        vessel reaches a dangerous level, then it shuts
17        off the supply.  You know, that's not
18        necessarily a vacuum.
19        The -- what's the word I'm looking for?
20        The design of a safety device that incorporates
21        a switch either opening or closing a circuit
22        based on whether conditions are safe, whether
23        that be an excessive temperature, whether it be

Page 137

1         excessive pressure, whatever, if there's an
2         environmental component in something that
3         inherently a change in it or a range of it
4         makes it unacceptable to safety, there are
5         numerous devices that incorporates a switch to
6         detect that variation and to create a circuit.
7         So, you know, there's likely to be dozens
8         of devices out there that would incorporate
9         that.  As far as whether that switch being a
10        vacuum or not, that might narrow that band
11        down, you know, simply because, you know, a
12        vacuum is kind of a unique thing.  You're using
13        it to hold in this situation.  This could work
14        in other devices that have a vacuum hold-down
15        or other devices where it's desirable to have a
16        vacuum in a particular region of a machine and
17        the failure to have that vacuum there can cause
18        a catastrophic failure.
19   Q.   Okay.  Well, what I'm gathering therefore is
20        that your Shaver design is something that you
21        formulated based on your experience and
22        education and background as an engineer?
23   A.   Yes.

Page 138

1  Q.   Okay.  Please review -- somewhere you had a
2       copy of my notice for the taking of your
3       deposition, but I'll go over it briefly.  I've
4       marked it as Exhibit 1.  Have you produced all
5       documents related to opinions and conclusions
6       in this case?
7  A.   Yes.
8  Q.   Okay.  Have you produced, as to number two, all
9       information that you reviewed in preparation
10      for your testimony?
11 A.   Yes.
12 Q.   Okay.  Number three, have you provided all
13      documents regarding tests and data that you may
14      have relied upon or utilized in connection with
15      this case?
16 A.   Like I say, with the exception of that brochure
17      we printed off of the Internet that had, you
18      know -- it was a marketing thing from the World
19      Magnetics, but, yeah, other than that, yes, I
20      have.
21 Q.   Okay.  As to number four, have you produced all
22      documents or things or items that you received
23      in your capacity as an expert in this case?

Page 139

1  A.   Yes.
2  Q.   Okay.  Number five, have you produced all
3       documents, notes, reports, memoranda and other
4       written information that you prepared or
5       created in connection with this case?
6  A.   Yes.
7  Q.   All right.  As to number six, have you provided
8       us all documents that relate to standards and
9       literature which you may use at trial?  And we
10      just discussed --
11 A.   That I'm aware of.  I mean, I may -- you know,
12      before trial I may, you know, research
13      literature and find particular examples of what
14      we've done here, you know, as far as machines
15      that have these or similar types of interlocks.
16 Q.   Well, make sure -- right now for the record,
17      you know, we will ask you to supplement
18      anything you may rely upon at trial?
19 A.   Okay.
20 Q.   Now, the core drill involved in this case, did
21      it violate any known manufacturers' standards,
22      rules or regulations?
23 A.   Not that I'm aware of.

Page 140

1  Q.   Okay.  Have you consulted with any applicable
2       ANSI standards or regulations that may pertain
3       to the core drill?
4  A.   I did search for those and did not find any
5       applicable to the core drill that was in this
6       particular case.
7  Q.   Okay.  Are you aware of any standards or
8       regulations that relate to the core drill?
9  A.   No.
10 Q.   Okay.  Number seven seeks information about
11      cases in which you have been retained as an
12      expert for the past five years.  Have you
13      produced that?
14 A.   Yes.  You have that in the Rule 26 disclosure.
15 Q.   Okay.
16 A.   And we do need to supplement that.  We can do
17      that verbally here or I can do it in written
18      form.  I'll pick up -- under trial testimony
19      we're going to need to add the State of Georgia
20      versus Amanda Troupe.
21 Q.   Okay.  Well, what are you referring to?
22 A.   My Rule 26 disclosure.  Well, you have it there
23      in front of you.  What is that exhibit?

Page 141

1  Q.   It's 2.  And so what you're saying is we would
2       add some more cases on the tail end?
3  A.   Yes.
4  Q.   And so after Womble v. Crews, what was the next
5       case that you --
6  A.   The next case would be the State of Georgia
7       versus Troupe, August of 2006.
8  Q.   T-R-O-U-P-E for Troupe?
9  A.   Yes.  Superior Court of Coffee County, Georgia.
10 Q.   Well, what was the basis of your testimony in
11      that case?
12 A.   That was an automobile accident reconstruction.
13 Q.   Okay.  Any other cases?
14 A.   Not on trials.  Now, on depositions there's
15      going to be.
16 Q.   I think what we asked for is not just trials,
17      but also any case in which you have rendered
18      opinions as an expert witness?
19 A.   I'm sorry, what now?
20 Q.   Okay.  What we asked for as to number seven in
21      the deposition notice was any case in which you
22      were retained as an expert and rendered
23      opinions, not just trial testimony, but that

Page 142

1    could be depositions or, like in this case, a
2    written report.
3  A.    I do not have a list like that. I have not
4    maintained a list like that and it would take
5    me an inordinate amount of time to do that.
6  Q.    Inordinate?
7  A.    Well, I shouldn't use that word. That is not
8    something that I have prepared.
9  Q.    Well, let's do this; I'm not sure we'll need
10    all of that, but we reserve the right to have
11    more information in response to the deposition
12    notice as to number seven, but let's move
13    forward. Any other cases in which you have
14    testified that would supplement what you have
15    already disclosed?
16  A.    Yes. Okay. We have Mann versus McGinnis,
17    Superior Court of Montgomery County.
18  Q.    Is that Georgia?
19  A.    No, it's Alabama. And that was in August of
20    2006.
21  Q.    What was that case about?
22  A.    That case is about a lowboy trailer. A man was
23    -- it would not raise and he --

Page 143

1  Q.    Well, what was the bottom line opinion? Well,
2    what side were you on, first of all? Were you
3    plaintiff or defendant?
4  A.    The defense.
5  Q.    Okay. And what was your opinion in that case?
6  A.    That -- gosh, changing gears here it's --
7  Q.    Well, what I'm trying to do for this is just
8    get the bottom line. I don't want to limit it,
9    but what was the case about, a trailer?
10  A.    Yeah, it was about a ramp, a drive-up ramp.
11  Q.    A trailer ramp?
12  A.    A trailer ramp. It fell on a gentleman and
13    killed him.
14  Q.    All right. And you testified for the
15    defendant?
16  A.    Yes.
17  Q.    I mean, what was, in summary form, your
18    opinions?
19  A.    The lifting up of the gate when it was down and
20    wouldn't raise. They took an excavator and
21    pulled the ramps up and it forced the hydraulic
22    fluid out of the ramps and there was not a
23    resistance hydraulic fluid. And it had two

Page 144

1    safety bars that were holding the ramps up into
2    place. And when the gentleman got ready to
3    unload the trailer, he stood underneath the
4    ramp and took a pry bar and prided the safety
5    latch off. And when he did, the heavy thing
6    just came down and crushed him.
7  Q.    And so I take it your opinion was that the
8    operator was negligent in his use of the ramp?
9  A.    In his -- in his taking the excavator and
10    pulling it up, because it wouldn't work on the
11    hydraulics itself.
12  Q.    Okay.
13  A.    So he was negligent in -- my opinion was he was
14    negligent in forcing that up and, you know,
15    misusing and abusing the equipment in a way it
16    was not intended to be done.
17  Q.    Okay. Any other cases that are not on our
18    list?
19  A.    Yes.
20  Q.    All right. Is this something that you have
21    written down?
22  A.    Yeah, I do. It's just that from the time this
23    was -- and I have it, I can print that out for

Page 145

1    you. It's like a couple of cases.
2  Q.    Okay. It's two more. Let's talk about it.
3  A.    Two or three.
4  Q.    Two or three more?
5  A.    Yeah.
6  Q.    What's the next one?
7  A.    The next one is going to be Rose or -- yeah, I
8    think it's Rose versus Diaz Chavez.
9  Q.    D. H. Chavez?
10  A.    Diaz Chavez.
11  Q.    All right.
12  A.    And that's the State Court of Gwinnett County.
13  Q.    And that's Georgia. Who hired you in that
14    case, the plaintiff or the defendant?
15  A.    The plaintiff.
16  Q.    All right. Let me go back real quick. In the
17    State of Georgia versus Troupe case, who hired
18    you in that case, the plaintiff or defendant?
19  A.    The defendant.
20  Q.    Okay. Was that case a criminal case?
21  A.    Criminal, yes.
22  Q.    It was a criminal case. Okay. Now, in the
23    Rose case, the plaintiff retained you. Was

Page 146

1    there a product involved?
2  A.   No.
3  Q.   Okay.  It was not a product liability case.
4    What kind of case was it?
5  A.   Well, it was a case where a vehicle ran out of
6    gas in the middle lane of a three lane
7    interstate road and the gentleman parked it
8    right in the middle lane.  And then his wife,
9    who was following him, came and pulled in right
10    behind him.  And a car in front of the
11    plaintiff moved out very quickly and left her
12    to hit the wife's car in the rear and it was a
13    multi-car pile-up.
14  Q.   All right.  What were your opinions in that
15    case?
16  A.   My opinions were that given the grade of the
17    hill where the gentleman was coming off of,
18    that he should have been able to have gotten
19    the vehicle over preferably to the right-hand
20    side of the road into a safety area.  It was a
21    long gradual hill, and absent of him applying
22    the brakes and leaving them on, he would have
23    continued to have coasted and in my opinion

Page 147

1    likely could have -- there was no reason for
2    him to have stopped his vehicle in the middle
3    lane.
4  Q.   Okay.  And you mentioned one or two other
5    cases, could you identify those?
6  A.   Yes.  The name of the deceased is Decker versus
7    -- and I'm going to have a hard time.  I happen
8    to have that file in the car.  When we go on
9    break next I will get that for you.
10  Q.   Okay.
11  A.   And it's in Muscogee County, Georgia and it's a
12    pedestrian fatality.
13  Q.   Who hired you in that case?
14  A.   The plaintiff.
15  Q.   All right.  And that case did not involve a
16    product?
17  A.   No.
18  Q.   All right.  Now, back to my deposition notice.
19    As to number eight, you've produced your file
20    in regard to your expert witness fees?
21  A.   Yes.
22  Q.   And that file was complete --
23  A.   Yes.

Page 148

1  Q.   -- as of this date?
2  A.   Yes.
3  Q.   Okay.  And as to number nine, it requests your
4    complete file, including handwritten notes, et
5    cetera, et cetera, about your involvement in
6    this case.  Have you produced everything that
7    would be in your file in relation to your
8    expert work in this case for the plaintiff?
9  A.   Yes.
10  Q.   All right.  Exhibit 2 is your expert report; is
11    that correct?
12  A.   Yes.
13  Q.   And you've already identified this as the
14    complete report that you've authored in this
15    case?
16  A.   Yes.
17  Q.   Have you supplemented this, added to this,
18    amended this, or changed this in any way since
19    it was authored at least a few months ago
20    because that's when I got it?
21  A.   I think there was an affidavit, where an
22    affidavit had to be attached to that.  I'm not
23    sure.  We did an affidavit that those were my

Page 149

1    opinions included in the reports, but there
2    were no changes made or supplement to that, no.
3  Q.   All right.  This is what I want to do now,
4    we're probably going to have lunch in a minute,
5    but we've already discussed some of your
6    opinions.  So I will not be repetitive and go
7    back and reask things, but I want to identify
8    separately each of your opinions in this case?
9  A.   Okay.
10  Q.   Okay.  And let's start with number one, you
11    know, what are your opinions?  And I'm going to
12    write them down and then we will discuss them.
13  A.   Okay.  Can I refer to my report, please?
14       MR. GIVENS:  Here is one, I believe.
15  A.   Yes, I'm sorry, I did have a copy.
16  Q.   Please let me know which page you're referring
17    to.
18  A.   Okay.  There's no page numbers on here.  Not
19    including the cover page, you know, page two,
20    under "Opinions."
21  Q.   All right.
22  A.   You know, I don't think I've gone into my
23    analysis that went into, you know, coming up

Page 150

1    with the alternative design. But, you know,
2    that's -- you know, my opinion is, in this
3    particular case, a sound engineering analysis
4    of the engineers in the embodiment phase when
5    they were coming up with this design. It
6    appears to me, and I don't want to -- this is
7    kind of difficult because I am criticizing the
8    engineering to this degree, but what they have
9    here is a stand and they've bought accessory
10   devices and attached it to this stand to come
11   up with a product that is different from -- you
12   know, from the everyday uses of those items.
13       The drill, of course, goes on a stand, but
14   they've got a specific proprietary type stand
15   for this. And they've taken components and
16   attached it to this stand without any real
17   thought to incorporating any safety mechanism
18   in the event -- here you have a method of
19   holding this drill down that is dependent on
20   obtaining a proper vacuum in that base area.
21   Otherwise, it is -- to the engineer, it is
22   foreseeable that the failure either by loss of
23   vacuum, gradual loss of vacuum or slightly more

Page 151

1    than gradual loss of vacuum, while the drill
2    was operating would create a hazardous
3    condition. Also, if someone turned the vacuum
4    pump on and was not able to achieve a
5    sufficient vacuum, then it is a hazardous
6    condition. So you have that.
7        You have also the fact that if that drill
8    were to lock up and -- you know, due to a
9    seizing of the concrete core drilling bit, that
10   you would have very violent motion with regard
11   to the entire stand if there was not an
12   adequate force to hold it down.
13       So the engineer should have anticipated
14   that as it was foreseeable and should have
15   given some thought as to eliminating that risk
16   and hazard. And, in my opinion, the most
17   feasible way of doing that is to not allow the
18   machine to operate if there is either
19   insufficient buildup of vacuum in that base or
20   if the vacuum falls below a certain level in
21   that base; that it would shut the machine down
22   and prohibit its use until the problem was
23   corrected.

Page 152

1        Also, as a backup or redundant guard
2    against sudden movement of the mechanism, the
3    deadman/kill switch is one way of incorporating
4    that. And I'm not saying that there are not
5    other ways that could be -- I'm not saying that
6    there are not other ways that could have been
7    developed or designed to have eliminated this
8    hazard, but in my opinion there was no attempt
9    on this particular machine to try to design out
10   a foreseeable and known hazard.
11       You know, they certainly warn in their
12   manuals and they're aware of the dangers of an
13   insufficient vacuum. It's in their literature
14   where they talk about the importance of having
15   enough vacuum, even though in the manual that
16   was available at the time of Mr. Riley's
17   injuries they didn't say what an adequate
18   vacuum was. Subsequent literature does say 20
19   inches of Mercury.
20       So, you know, you either eliminate it, or
21   if you can't eliminate it, you guard against
22   it. And I guess it's sort of debateable
23   whether my design either eliminates it or

Page 153

1    guards against it. It's kind of in that fine
2    line in between. In attempting to use the
3    vacuum, you can't operate the drill unless
4    there is sufficient vacuum to hold it down. So
5    I guess in that aspect it may not completely
6    eliminate the hazard, because there are other
7    things that could occur, such as a stopping up
8    of the vacuum line or a massive malfunction of
9    the drill motor or whatever that could -- there
10   is still enough energy and force there that
11   potentially could create a hazard. So I guess,
12   you know, it would be my opinion these devices
13   are somewhere in between designing it out and
14   -- designing the hazard out and actually
15   creating a guard for it.
16       And if you can't do any of those, you warn
17   for it; you know, you warn, you give adequate
18   warning. It's my opinion they didn't even give
19   adequate warning in this case. In the owners
20   manual there's no indication that the -- what
21   the sufficient vacuum was or where it would be
22   dangerous for it to fall below. So, you know,
23   just saying that you need, and whatever their

Page 154

1   wording was, just kind of a generic ambiguous
2   term for sufficient vacuum to hold it down to
3   avoid injury was not enough.
4        It is my opinion that in this drill that
5   the most likely method of holding down or
6   securing this drill for its use is going to be
7   utilizing the vacuum system. That's not to say
8   there aren't applications where they're more
9   likely to use the ceiling jack, but it would be
10  my opinion that the most likely use would be
11  the vacuum system. The anchoring of the bolts
12  is difficult and labor intensive for each hole,
13  so you've got that. But any of the methods are
14  appropriate for holding it down if they're, you
15  know, properly done. I would point out that
16  the deadman switch would be sufficient to guard
17  against movement of the drill to shut it down
18  in any of these methods.
19       Now, we've already gone over the gasket
20  showed some signs of damage and separation upon
21  inspection; that was the glue in my opinion.
22  We've gone over the potential for injury due to
23  the vacuum loss. It would be reasonably

Page 155

1   foreseeable to a designer, we've gone over
2   that. Identified hazards should be eliminated
3   by design, I went over that, if economically
4   feasible; by guarding if they cannot be
5   identified. I've gone over that the
6   manufacturer did not do either of those. And
7   if identified hazards cannot be eliminated by
8   design or minimized by guarding should warning
9   alone be used to address the hazard. They did
10  not adequately do that.
11 Q.  What page are you on now?
12 A.  The next page, it would be page three, not
13  including the cover page. And in my opinion
14  the hazards could have been eliminated or
15  designed out of the system and/or guarding as
16  I've done here. You know, with the design of
17  this system, this event doesn't occur in my
18  opinion.
19       The vacuum loss hazard could have been
20  economically and technically eliminated. The
21  interlock vacuum, we've talked about that.
22 Q.  Well, let's stop right there, because I think
23  you mentioned -- maybe you're getting to the

Page 156

1   warnings, but I think you mentioned the
2   warnings some on the bottom of page four?
3 A.  Yes.
4 Q.  And you mention this audible warning. Did you
5   incorporate that into your design?
6 A.  Oh, on the vacuum loss? No. That would be
7   where if you didn't have an interlock to shut
8   the motor down, you could just have it where if
9   the vacuum fell below a certain level you would
10  get a loud audible warning. No, I've not
11  discussed that. To me that would be a sign of,
12  you know, an active warning from the machine
13  itself as opposed to a written warning.
14       (Exhibit 19 marked for identification.)
15 Q.  Let me show you what I've marked as Defendant's
16  Exhibit 19, and it's really two pages. And
17  I'll kind of reach over you, excuse me, but
18  this is a core drill and you recognize this as
19  one similar to the one involved in the
20  accident?
21 A.  Yes.
22 Q.  Although it's new, but we did this to show the
23  warnings. But these are warnings on the core

Page 157

1   drill, one is up by the column and one is on
2   the stand, and this is a blown up picture.
3 A.  Okay.
4 Q.  Now, is there anything ambiguous or unclear
5   about this one that says "Failure to secure rig
6   properly may result in serious injury"?
7 A.  Yeah, what's properly? You know, there's no
8   advice on the required vacuum. And even in the
9   owners manual, if they go read, you know, in
10  there, there's nothing in there to properly
11  identify the proper level of vacuum for that
12  machine.
13 Q.  Okay. Have you taken it upon yourself to write
14  any warnings that you think would be
15  appropriate for the drill?
16 A.  I have not done that, no.
17 Q.  Okay. Are you a warning's expert?
18 A.  No.
19 Q.  Okay. Do you know whether or not Mr. Riley in
20  this case ever attempted to read the warnings
21  or to consult the operators manual?
22 A.  I'm not sure. I don't know.
23 Q.  Okay. Do you have an opinion as to whether or

Page 158

1     not warnings would have made any difference in
2     this case?
3 A.   I don't.
4 Q.   Okay. For example, if the testimony is --
5 A.   That's why warnings are kind of a last resort,
6     you know, on hazards.
7 Q.   In this case you can't provide any opinion,
8     within a reasonable degree of engineering
9     certainty, as to whether or not warnings would
10    have made a difference in causing or not
11    causing the accident?
12 A.   In general terms, without a specific instance,
13     I can't think of any.
14 Q.   Well --
15 A.   You know, I'm -- there again, I would have to
16     review back through it. As I'm sitting right
17     here and it's getting kind of late in the day
18     of this deposition and we haven't had lunch,
19     but I can't -- you know what, I take that back.
20     I think that an adequate visible warning on the
21     vacuum gauge itself could have possibly clued
22     them in.
23        Let me go back over to the drill. There

Page 159

1     is one thing that we have not pointed out.
2     There is one additional modification to this
3     drill that I don't believe we've mentioned.
4     There is a modification to the vacuum gauge
5     dial here.
6 Q.   Is that something that was done after this
7     case?
8 A.   Yes.
9 Q.   Okay. Just for the record, we reserve any
10    right to object to any subsequent remedial
11    changes.
12        MR. GIVENS: No, this is something he
13       did.
14 A.   I did.
15 Q.   I'm sorry, this is something you did?
16 A.   Yes.
17        (Off-the-record discussion.)
18 A.   This is a gauge that I have taken to show that,
19     you know, by taking a red marker -- this one
20     can be erased, but you would want something
21     more permanent. This is just for illustrative
22     purposes. I have put green in the glass zone
23     where you have an acceptable vacuum level and

Page 160

1     it is red where it is not. Now, you could get
2     a gauge that actually printed on the gauge to
3     do that, on the gauge dial. There are numerous
4     gauges that show that, similar type warnings,
5     red, green, go, no go type things. And I put
6     the lettering in here, right here it says "base
7     vacuum," and it says "base secure" in the green
8     zone and "base unsecure" in the red zone.
9 Q.   What you're saying is you've relabeled and
10    color coded the vacuum gauge as a warning to
11    the operator?
12 A.   Correct. Let's say you just had that alone in
13     the case of this incident. If, as you were
14     saying before, they had difficulty drilling
15     that first hole with movement and it was
16     because the base was unsecure, if they had a
17     known gauge, he could say "Well, hey, look, our
18     gauge down here is in the red zone, what does
19     that mean?" And they see the writing "base
20     unsecure." If it's moving, they know the base
21     is unsecure. But now they look at that and
22     they know that the base is unsecure because the
23     vacuum is not what it's supposed to be. In

Page 161

1     other words, the base was unsecure, they had
2     the vacuum pump running, it had some vacuum on
3     it, but it would still move. Now if they have
4     that gauge like that, they then know that that
5     needle on that vacuum gauge is not where it's
6     supposed to be.
7 Q.   Okay. But, now, if the gauge shows that you're
8     in the red zone, it still wouldn't make any
9     difference, would it? Would it enable the
10    operator to get off of the base of the drill
11    he's standing on and avoid injury? That goes
12    back to my timing issue. With your marking --
13 A.   And that alone is not sufficient -- that alone
14     is not sufficient, in my opinion, for this
15     problem as a warning. I have it on here
16     because if the person is sitting here and
17     they've got it operating, they've got it on the
18     vacuum only -- it's off now, good -- they've
19     got it on the vacuum setting and it's not
20     operating, they can look there and see the
21     needle is in the red zone and that it will not
22     operate until it gets to the green zone. They
23     know why.

Page 162

1  Q.  Well, go let's back to this question.
2  A.  Okay.
3  Q.  Would the warning on the vacuum gauge, as you
4      have prepared it now, have made a difference in
5      this case? Would that alone have prevented the
6      accident?
7  A.  I can't say for certain, but it may have.
8  Q.  Okay. Well, what I want you to do is to say
9      within a reasonable degree of engineering
10     certainty. Do you have an opinion as to
11     whether or not Mr. Riley could have utilized
12     such a function and it could have prevented the
13     accident?
14 A.  He could have, yes.
15 Q.  All right. Now, any other opinions about
16     warnings in this case? You commented about the
17     operators manual in regard to the vacuum gauge
18     issue?
19 A.  Right.
20 Q.  And you've now testified about the warning that
21     you've formulated for the core drill as a
22     modification --
23 A.  Right.

Page 163

1  Q.  -- as a part of what I will call your Shaver
2      design?
3  A.  Okay. And one other thing, too, the audible
4      thing certainly would be nice to have that
5      incorporated. I haven't incorporated it on
6      this because it's not -- I didn't feel it was
7      necessary. The machine shuts down. I mean,
8      it's irrelevant to me -- or I wouldn't say
9      irrelevant, but it's not as important that the
10     operator get a beep-beep before the machine
11     shuts down necessarily, you know.
12 Q.  Okay. Well, this may be a good time to stop.
13     Now, what I would like to do is after lunch
14     maybe we can turn it on and make this thing
15     rock and roll.
16         MR. SPRAIN: I would like for you to
17         see it.
18         MR. GIVENS: I have seen it.
19         MR. SPRAIN: Oh, you have?
20         MR. GIVENS: Yeah. It works, as far as
21         I can tell. Of course, I'm about
22         as far away from being an engineer
23         as you can get and still be

Page 164

1      breathing.
2         (Lunch recess.)
3  BY MR. SPRAIN:
4  Q.  Before we took a lunch break, we were going
5      through your various opinions and we -- I
6      believe we concluded your opinions in regard to
7      warnings, but you had demonstrated the warning
8      you created with the vacuum gauge --
9  A.  Correct.
10 Q.  -- on your design? Are there any other
11     opinions you have about the warnings in this
12     case?
13 A.  No, not -- no. Not specifically, no.
14 Q.  Okay. Now, what page of your report are you
15     on? It appears to me you're finished with page
16     four, but you tell me, because I want to make
17     sure I understand all of your opinions.
18 A.  Okay. Now, I guess we've got these things in
19     the report. Are you wanting if I have anything
20     in addition to here that we need to go over or
21     do we basically need to list all of these that
22     are in here one by one and go through them?
23 Q.  Well, I mean, let's go through them. I mean,

Page 165

1      just to recap, you've given me what I view to
2      be your big opinion about the design and you
3      said that there is a design problem and you've
4      created this alternative design?
5  A.  Right.
6  Q.  So I put that as number one.
7  A.  Well, I think -- in warnings I think I've
8      covered that. I say "Vacuum gauges clearly
9      define minimum safe operating ranges and
10     dangerous operating ranges," and that's what
11     we've corrected that to do. And I say "If
12     warnings are used, they must provide those who
13     are potentially in danger with a means to
14     prevent or minimize injury." You know, the
15     warnings that are available on that machine,
16     you know, are not standalone warnings. You
17     know, the warning -- I think the one that tells
18     you to, you know, read the operators manual,
19     it's not that conspicuous. It's not -- you
20     know, the things that are clear and immediate
21     dangers should be specifically warned of on the
22     machine and that's not -- that's not really
23     done. And part of that is that, you know,

Page 166

1    you've got the vacuum pump and all of that kind
2    of incorporated into one.  I don't believe
3    there's a warning on there that specifically
4    states anything about the pressure or the
5    adequacy of the pressure of the vacuum pump
6    being required.  I think we've got that.
7        Then on the next page, "The product is
8    defective and unreasonably dangerous as a
9    result of the designer or manufacturer's
10   failure to address the vacuum loss hazard by
11   design or guarding."  I've already said that.
12 Q.  I believe we've discussed that.
13 A.  Yeah.  I mean, I don't really know of any other
14   way of doing this other than just kind of
15   reading through these one by one and checking
16   them off.
17 Q.  Well, it seems like it's repetitive.
18 A.  It does.  It really does.
19 Q.  This third thing, you say "The designer or
20   manufacturer unreasonably failed to address the
21   vacuum loss hazard by design and guarding."
22   Haven't you already told me about your basis
23   for that and your opinion --

Page 167

1  A.  Yeah.
2  Q.  -- as to how the product could be designed
3    differently?
4  A.  Sure.
5  Q.  Okay.
6  A.  The drill core cutting rig offers no built in
7    redundancy or backup in the event of the
8    failure.  You know, we do have redundancy in
9    this one with the deadman switch and the
10   vacuum.
11 Q.  All right.  And the next thing, we've discussed
12   the clutch --
13 A.  Right.
14 Q.  -- on the motor?
15 A.  Right.
16 Q.  Okay.  And you have defined what you call the
17   vacuum loss hazard?
18 A.  Uh-huh.  (Positive response.)
19 Q.  And I'll hopefully summarize it briefly, but if
20   I'm correct, you're saying that the hazard is
21   that the core drill, as designed, can lose
22   vacuum and that can cause the base to become
23   dislodged and to rotate around the axis of the

Page 168

1    drill and could cause injury; is that what
2    you're calling the vacuum loss hazard?
3  A.  I think so, yeah.
4  Q.  Okay.
5  A.  I'm sorry, because I'm kind of reading and
6    listening to you and I apologize.  I was going
7    through my report.  Would you repeat the
8    question, I'm sorry?
9  Q.  Well, no.  I think I understand what you refer
10   to as the vacuum loss hazard.
11 A.  Yeah.
12 Q.  I think you've covered that.
13 A.  Okay.  I've got one here that I haven't
14   discussed previously.  The presence of an
15   available container or pouch on the machine.
16   It is common for machines that I've been
17   familiar with that the owners/operator manual
18   or instructions, if the use of that manual is
19   critical to the safe operation of that device,
20   there is a pouch or a holder on that device, on
21   a lot of the devices, that the manual goes in.
22   And what that does, that let's anybody know
23   that there's supposed to be a manual there if

Page 169

1    there's not one.  So it just kind of says, hey,
2    this thing is not complete and whole, it
3    doesn't have the manual that is intended to be
4    here.
5        There's no indication on that machine
6    obvious, you know, physically that there's a
7    manual there.  And therefore if there's not a
8    place on that machine to put that manual for it
9    to go, in a situation like this where there is
10   rental, it minimizes the likelihood that a
11   manual will go out with it.
12      Okay.  "United Rentals failed to
13   reasonably maintain the core drill and ensure
14   that it and component parts were in proper
15   working order.  Based upon the condition of the
16   core drill on inspection, the product was
17   poorly maintained.  The drill bit in use at the
18   time of the incident showed some signs of
19   damage.  The vacuum pump was non-functioning
20   and found to have foreign material that was
21   resulting from either corrosion of internal
22   parts or pick-up from the vacuum process from
23   previous use."  You know, we've talked about

Page 170

1    the vacuum pump and the pick-up and that.
2        And there is -- you know, I will have to
3    concede, after reading some depositions that I
4    don't think were taken prior to that, it's
5    questionable, we're not sure which drill bit
6    really was in use at the time. So one bit is
7    good, one bit is bad. I think I would have to
8    see concede that.
9        "Actions of Matthew Riley: Mr. Matthew
10    Riley was not negligent in the operation on or
11    about August 29th."
12 Q.    Well, let's stop right there.
13 A.    Okay.
14 Q.    Now, we've discussed briefly about the
15    operation of the drill for the first hole. Do
16    you think there was any negligence there in
17    terms of Mr. Walters, the supervisor, and
18    Mr. Riley in using the drill for the first
19    hole?
20 A.    No.
21 Q.    Okay. Do you think there was any negligence --
22    I don't want to use that word, that's a legal
23    term. But do you think that there was any

Page 171

1    responsibility -- well, strike that. As to
2    Mr. Riley's supervisor, Mr. Walters, do you
3    think he did anything wrong in training or
4    instructing Mr. Riley on how to properly use
5    the drill?
6 A.    I don't have an opinion that he did not do
7    that. I'm not aware of anything he did wrong.
8 Q.    Okay. Do you think he properly instructed
9    Mr. Riley on how to use the core drill?
10 A.    He probably did. I'm not -- I can't really --
11    I think he did, yes.
12 Q.    Okay. Now, do you think that Flavor House, as
13    the employer, has any responsibility in terms
14    of training Mr. Riley on safe use of the core
15    drill?
16 A.    I'm confused. When you're talking about do
17    they have any responsibility --
18 Q.    Okay. Well, that's my first question. In this
19    case does the employer, Flavor House, have any
20    responsibility to ensure that an operator like
21    Mr. Riley can safely use the core drill?
22 A.    Yes, within their ability and knowledge of the
23    equipment, they have a responsibility involved

Page 172

1    in it. But, now, if you're talking about
2    responsibility as far as the accident, I mean,
3    that's a different story.
4 Q.    Okay. Well, you are aware that they have a
5    Maintenance Department, correct?
6 A.    Correct.
7 Q.    And they have a Safety Department?
8 A.    Correct.
9 Q.    And they had a Safety Director; in fact, he was
10    deposed in this case?
11 A.    Right.
12 Q.    And you're aware that they use various types of
13    products, machinery and equipment?
14 A.    Correct.
15 Q.    All right. And there's been some testimony
16    that one worker had used a core drill over ten
17    times, are you aware of that?
18 A.    No, I don't recall.
19 Q.    Okay. Well, assuming that's true, that one of
20    the coworkers of Mr. Riley testified that he
21    had used a core drill in excess of ten times,
22    and that Flavor House uses and has used many
23    types of machinery and equipment, wouldn't you

Page 173

1    therefore assume that they are sophisticated in
2    how to use machinery, equipment and products,
3    including a core drill?
4        MR. GIVENS: Object to the use of the
5            term "sophisticated" just as an
6            objection to form.
7 A.    I was thinking the same thing, the word
8    "sophisticated."
9 Q.    Well, knowledgeable. Let's use the word
10    "knowledgeable." The same question, but
11    substitute "knowledgeable." Wouldn't you view
12    Flavor House as a knowledgeable employer about
13    educating and training its employees on safe
14    use of machinery and equipment?
15 A.    I would think they would be.
16 Q.    Okay. And in that event, they have some
17    responsibility to make sure their employees
18    know how to safely use machinery and equipment?
19 A.    Yes.
20        MR. GIVENS: Object to the form.
21 Q.    And do you think that in this case Mr. Riley
22    was safely trained to operate and use the core
23    drill?

Page 174

1  A.   I think he was with regards to what was
2       available with the core drill and the method
3       and manner in which it was provided.
4  Q.   Okay.  Now, what would be a proper procedure if
5       during the course of using a product it's
6       deemed to be unsafe, and I'm talking about in
7       general, should you cease using the product;
8       should you go back to the employer and attempt
9       to gain more understanding of the product?
10      What would be the procedure of you as an
11      engineer?
12 A.   Me as an engineer, if a device is deemed
13      unsafe, I would look at it to see if I could
14      determine why it was unsafe.  If I could take
15      any corrective action on my own with available
16      resources to me to correct that condition, I
17      would do so.  If not, I would seek information
18      in operators guides, manuals, whatever.  Then
19      after that I would contact the manufacturer to
20      see if they had any suggestions.
21 Q.   Okay.  I'm sorry, I cut you off before you
22      finished.
23 A.   Yeah, I was finished.

Page 175

1  Q.   Okay.  Would it be advisable for an operator to
2       continue to use a product when it was operating
3       unsafely?
4  A.   If they knew it was unsafe to operate it, yes.
5  Q.   Okay.  And would a supervisor who's training
6       the employee on how to properly use a machine
7       or piece of equipment be advised to cease using
8       it if it started to operate unsafely?
9  A.   If it were unsafe to operate it and they knew
10      it, yes.
11 Q.   Okay.  I believe you were down to page seven.
12      And you've written a mighty lengthy report, so
13      we will just keep going here.  Page eight, and
14      I'm not trying to be repetitive, I don't want
15      you just to read from your report, but if there
16      is anything in addition that you have not
17      discussed today, I want to hear your opinions
18      and we'll discuss them if we need to.
19 A.   Are you talking about page eight including the
20      cover sheet?
21 Q.   Well, no, sir.
22 A.   Page nine including the cover sheet, eight not
23      counting it, right?

Page 176

1  Q.   Right.  It starts at the top "Mr. Matthew Riley
2       did not alter or otherwise use," et cetera, et
3       cetera.
4  A.   Right.
5  Q.   Okay.  Go ahead.
6  A.   That's -- yeah.  Okay.
7  Q.   Well, let me stop you there.  On the second
8       paragraph you state that "Mr. Riley did not
9       fail to abide by any warnings that would have
10      averted the serious injury incident."  But if
11      he had made sure that the base was secure to
12      the work surface, this accident would not have
13      happened, correct?
14 A.   If we knew that he knew what the definition of
15      the word "secure" meant with respect to that
16      and we had that defined, then we may have
17      something to go with.  But the warnings on the
18      machine and the description of it is unclear to
19      define that for him.
20 Q.   Okay.
21      MR. GIVENS:  How are y'all temperature
22      wise?
23      MR. SPRAIN:  I think we're fine.

Page 177

1  Q.   But back to my question, isn't it true that if
2       the base of the core drill had been secure to
3       the work area, the accident would not have
4       happened?
5  A.   I believe that to be true, yes.
6  Q.   Okay.  Now, do you know whether Mr. Riley in
7       fact testified that he knew that it was
8       important for the drill to be secure to the
9       work area?
10 A.   What's the question?
11 Q.   Well, did Mr. Riley testify that he knew that
12      the drill base needed to be secure to the work
13      area?
14 A.   I would have to go back and review his
15      deposition.
16 Q.   Okay.
17 A.   But as I sit right here, I don't recall that
18      being said.
19 Q.   Fair enough.  There's been a lot of testimony,
20      I understand that.  But my question is this;
21      assuming that Mr. Riley testified that he knew
22      the core drill needed to be firmly secured to
23      the work area, wouldn't that obviate the need

Page 178

1    for any warning to tell him that point?
2  A.    Without knowing what context he said that in,
3        you know, what was he referring to, the
4        necessity --
5  Q.    In terms of a safety hazard, in terms of safe
6        operation of the drill?  And I will ask it
7        again.  In the context of safe operation of the
8        core drill, assuming that Mr. Riley testified
9        that he knew the core drill needed to be
10       secured to the work area and stable, would that
11       not in fact obviate the need for a warning on
12       that subject?
13 A.    I don't think it negates the necessity of a
14       warning from the manufacturer, if that's what
15       you're asking with that question.
16 Q.    Well, that's not quite what I'm asking.  In
17       other words, you would agree that if an
18       operator of a product already knows about a
19       danger, the warning doesn't need to be there to
20       tell him something he already knows?  That
21       doesn't negate the importance of the warning to
22       be there for some other operator who may not
23       know, but for that operator who already knows,

Page 179

1        it's just redundant, wouldn't you agree with
2        that?
3  A.    No.
4  Q.    You would not?
5  A.    No.
6  Q.    Okay.  So even if someone knows of a danger and
7        understands how to avoid the danger, they still
8        have to read a warning just to be told again?
9  A.    Well, it doesn't negate the necessity for a
10       warning, you know, even for that person to have
11       it there, just because they may already be
12       aware of that hazard.
13 Q.    Okay.  Well, I think we're talking on the same
14       page, but what I'm trying to understand is, do
15       you know in fact whether Mr. Riley already knew
16       about the danger of the drill base not being
17       properly secured to the floor and in fact he
18       needed to make sure and take steps that the
19       drill base was secure to the floor?
20 A.    I think that was two questions in one.
21 Q.    Okay.  I will reask it.  Do you know whether
22       Mr. Riley already knew, irrespective of any
23       warning, that the drill base had to be secured

Page 180

1        to the floor for safe operation?
2  A.    Yes, I believe he did.
3  Q.    He did know that?
4  A.    I believe so, yes.
5  Q.    Okay.  And you're saying that despite that
6        knowledge he still needed to be warned about
7        something he already knew?
8  A.    But what is the definition of it being secured?
9  Q.    Well, I'm not asking you to second guess his
10       testimony, but I'm asking you to assume that he
11       testified under oath that he knew that the
12       drill base had to be secured to the work
13       area --
14 A.    Okay.
15 Q.    -- for safe operation?
16 A.    Okay.
17 Q.    Okay.  And further assume that he knew it
18       couldn't be dislodged, it needed to be firmly
19       secure?
20 A.    Okay.
21 Q.    Then wouldn't you take that as he already knew
22       of the possible danger of the core drill
23       becoming dislodged and not stable and thus

Page 181

1        could lead to serious injury?
2  A.    I don't know that he knew the consequences.  I
3        have no way of knowing that.
4  Q.    All right.  Back to my question before, and I'm
5        trying to figure out this cause and effect of
6        warnings.  But if he already knew about the
7        dangers of securing or not securing the base of
8        the drill to the floor, do you have any opinion
9        as to whether any additional warnings would
10       have made a difference?
11 A.    I don't.
12 Q.    Okay.
13 A.    I mean, with that information, I can't -- I
14       can't draw a conclusion on it.
15 Q.    Okay.  And that's based as an engineer and to a
16       reasonable degree of engineering certainty, you
17       just can't draw a conclusion as to what cause
18       and effect the warnings would have for somebody
19       who already knew about dangers?
20 A.    Correct.  That's -- yeah, I'm not sure I fully
21       a hundred percent understand what that
22       involves.  Is that getting into like a human
23       factors type thing of --

Page 182

1  Q.  Well, it may, but you're the expert.  Is that
2       something that you know about?  I mean, do you
3       view yourself as a warning expert, first of
4       all?
5  A.   In generalized terms with equipment.  But now
6       as far as -- you know, in equipment, you know,
7       I've analyzed and can analyze, you know,
8       warnings and whether it's adequate and that is
9       something that I do.  But --
10 Q.  Well, what training do you have to analyze
11      warnings and --
12 A.   It would be from experience in having dealt in
13      engineering situations and manufacturing and
14      industrial situations for 20 some odd years.
15 Q.  Okay.
16           (Off-the-record discussion.)
17 Q.  Okay.  Let's see.  Warnings, you said that your
18      knowledge about warnings comes through
19      experience?
20 A.  Yes.
21 Q.  Okay.  Have you ever drawn or written any
22      warnings?
23 A.  Yes.

Page 183

1  Q.  Okay.  Have you rendered testimony before in
2       regard to warnings?  And if you know, you would
3       know; if you don't, you don't.
4  A.   I can't think right now of any.
5  Q.  Have you ever --
6  A.   When I read and sign the deposition, if I can
7       think of any, I'll put it down.
8  Q.  Okay.  Have you ever been precluded from giving
9       any opinions about warnings?
10 A.  No.
11 Q.  Okay.  Have you ever been disqualified as an
12      expert witness in any case?
13 A.  No.
14 Q.  Okay.  Now, back to this case.  I'm probably
15      not asking the question in a good way, but I'll
16      try again.  I'm trying to figure out whether or
17      not you have an opinion, as an engineer and an
18      expert in this case, as to whether the warnings
19      could have changed the result if in fact
20      Mr. Riley already knew about the hazards of
21      safe operation of the drill and specifically
22      about adequately securing the drill to the work
23      surface?

Page 184

1  A.  Yes.
2  Q.  Okay.  And what is that opinion?  I think I
3       asked you do you have an opinion?  Do you have
4       an opinion as to whether or not the warnings
5       could have changed the result and prevented the
6       accident if in fact he already knew about safe
7       operation of the drill and the hazards of the
8       drill?
9  A.  Oh, I misunderstood.
10 Q.  Well, I think we're both getting tired.
11 A.  Yeah.
12 Q.  Tell me what I should do.  Should I reask the
13      question or --
14 A.   Well, I mean, as I understand it, are you
15      asking if it was something that he was already
16      aware of would have resulted in the injury or
17      hazard, would a warning that warned against
18      that, for that hazard, would it have made any
19      difference if the warning was there if he
20      already knew that?
21 Q.  Exactly.  That's pretty much the question.
22      Stated differently, but that's pretty much the
23      question.

Page 185

1  A.  Yeah.  No, if he already knew that, it wouldn't
2       make any difference.
3  Q.  Okay.  All right.  Now --
4  A.   And, I'm sorry, I wasn't trying to be
5       difficult, it was just that it was coming
6       across --
7  Q.  You've done great.  I mean, it's been -- we
8       took what, a 20 minute lunch break and we've
9       been going steady.  So, I mean, just let me
10      know if I don't ask a good question and I'll
11      try to rephrase it.
12          In your report you give an overall opinion
13      about Mr. Riley and you seem to state or you do
14      state that you don't see that he did anything
15      that was negligent that caused or contributed
16      to cause the injury, is that a fair assessment?
17 A.  Yes.
18 Q.  Okay.  Is there anything that he did or didn't
19      do that you think might have been against
20      common sense?
21 A.  No.
22 Q.  Okay.  Do you think standing on the drill stand
23      was something that a person ought to know not

Page 186

1    to do out of common sense?
2  A.   No.
3  Q.   Okay. And do you think that continuing to
4        operate the drill when it had already
5        malfunctioned once before was something that
6        was against common sense?
7             MR. GIVENS: Object to the form, as to
8             the characterization of
9             malfunction.
10  A.   Yeah. Yeah. I don't know that -- they were
11        able to get the hole drilled before and to do
12        so safely. And there's no indication that he
13        didn't anticipate to be able to do it, you
14        know, on the second one safely.
15  Q.   Well, I mean, you saw the testimony where they
16        said they had to jump out of the way and turn
17        the drill off, didn't you?
18  A.   Yeah, I believe so.
19  Q.   Okay. And wouldn't you call the situation with
20        the first use of the drill for the first hole a
21        malfunction in that the entire drill stand
22        became dislodged from the work surface and it
23        spun around the axis?

Page 187

1  A.   Yeah, I don't know what caused it to do so, but
2        it certainly wasn't supposed to have done that.
3  Q.   I mean, that's not correct operation of the
4        drill, right?
5  A.   No, it's not.
6  Q.   And you can't drill the hole if it's operating
7        in that manner, right?
8  A.   Correct.
9  Q.   And it's an unsafe situation, is it not?
10  A.   It would be.
11  Q.   Okay. But you don't think continuing to
12        operate a drill that had already done that to
13        be something against common sense?
14  A.   No.
15  Q.   Okay. And you don't see any fault on the part
16        of Walters, as the supervisor, in letting
17        Mr. Riley use the drill after that situation
18        with the first hole to be something that was
19        negligent or improper?
20  A.   No.
21  Q.   Okay. And you don't see any -- strike that.
22        You don't find any fault with Mr. Riley in
23        continuing to use the drill after he had known

Page 188

1        that it had not operated correctly with regard
2        to the first hole?
3  A.   No.
4  Q.   Okay. I think we're about done with your
5        report. Do you want to finish sort of flipping
6        through it, because there can't be much left?
7  A.   Yeah, we've covered all of this.
8  Q.   And, again, I don't want to rush you. If
9        there's something that you've missed, you know,
10        you let me know. It seems like we've covered
11        so much ground that --
12  A.   Okay. No, I've gone to the end, I'm fine.
13  Q.   All right. Now, here's what I want to do with
14        your education real brief. You're a graduate
15        of Georgia Institute of Technology?
16  A.   Correct.
17  Q.   Georgia Tech?
18  A.   Right.
19  Q.   Do you have any Master's degrees?
20  A.   No.
21  Q.   Okay. You said you worked in manufacturing,
22        where did you work in manufacturing?
23  A.   I worked for a company called Georgia Duck and

Page 189

1        Cordage Mill, it's on there, for approximately
2        ten years. Before that I worked for a company
3        -- well, actually immediately before Georgia
4        Duck and Cordage I worked for Georgia Tech as a
5        project research assistant for one of the
6        professors on a NASA project. Is that in my
7        resume?
8  Q.   Well, maybe. I might be able to short-cut
9        this. How long have you worked at Shaver
10        Engineering and Design?
11  A.   Since 1993.
12  Q.   Okay. And then what was your immediately
13        preceding job?
14  A.   Georgia Duck and Cordage Mill.
15  Q.   Okay. And before that you were in school?
16  A.   I was in school, yes. And during school I held
17        a couple of jobs in manufacturing. One was for
18        an injection molding company; the other was in
19        research and design of a space suit for NASA as
20        part of a research project at Georgia Tech.
21        And then prior to attending Georgia Tech, I
22        worked in my father's business.
23  Q.   Which is what?

Page 190

1   A.   Manufacturing farm machinery.
2   Q.   Okay.  So for 13 years you've been at Shaver
3        Engineering?
4   A.   Correct.
5   Q.   And is Shaver Engineering principally involved
6        in consulting with and giving opinions for law
7        firms or is it broader than that?
8   A.   It's a little broader than that.  It's for law
9        firms, engineering -- I'm sorry, insurance
10       companies and manufacturers.  I've done work
11       for manufacturers as well.
12  Q.   Okay.  If you had to allocate a percentage of
13       work between -- you've heard this question
14       before, haven't you, between defendants and
15       plaintiffs, how would you break it down?  You
16       have heard this question before.
17  A.   Oh, yeah.  And the thing is it's different
18       every time it's asked, because it's time.  And
19       as time goes on, it's different, you know, your
20       time period.  You know, that's one of those
21       moving answers because it changes.  And it also
22       has to do with, and I'm giving this as part of
23       the answer, how do you define your work.  Is it

Page 191

1        the amount that creates most of your revenues?
2        Is it the number of cases?  You know, it's just
3        a hard number, you know, without proper --
4   Q.   Well, let's --
5   A.   I'm going to break it down as close as I can
6        with some variation.  I'm getting to the answer
7        and I'm not going to do that.  It's about 60
8        percent plaintiff, I would say, and 40 percent
9        defense.  There are times, such as one time
10       back in 2001 -- 2000 and 2001 when I was
11       working for the Justice Department on defending
12       a couple of tort claims cases that those two
13       defense cases made up 80 percent of my income
14       for one particular -- well, actually about two
15       years.  So, you know, the amount of work that I
16       do on the defense side can skyrocket.
17       Likewise, in a following year it can be the
18       other way.
19  Q.   Okay.
20  A.   So overall, the overall period, I would say,
21       balancing out all of those factors, it's
22       probably about 60/40.  It could be closer to
23       50/50, you know, but it's somewhere in that

Page 192

1        range.
2   Q.   Okay.  Now, what I would like to do is to list
3        some of the various types of products that
4        you've testified about --
5   A.   Okay.
6   Q.   -- over the last 13 years.  And, of course,
7        this is a drill case and specifically it's a
8        stand up core drill.  Just name some of the
9        other products that you've worked with, whether
10       cars or tools or, you know, you name it?
11  A.   Okay.
12  Q.   Let's just sort of go through this and just get
13       an idea of your experience.
14  A.   Okay.  I did not start keeping this list until,
15       I believe it was, 1996.  So for about three
16       years I did some work that's not going to be
17       included on this list.  And the first one is
18       Douglas versus Henri's Bakery.  That involved a
19       defective chair, manufactured chair.  Gregory,
20       et al. versus Surgical Appliance Industries,
21       Incorporated, et al., that involved an elevated
22       toilet seat.
23  Q.   Elevated toilet seat?

Page 193

1   A.   Yeah.
2   Q.   Okay.
3   A.   One of the bolts broke in it that was holding
4        it together due to hydrogen embrittlement.
5   Q.   Which side were you on there, plaintiff or
6        defendant?
7   A.   Plaintiff.
8   Q.   All right.  What about the chair case,
9        plaintiff or defendant?
10  A.   Plaintiff.
11  Q.   All right.  Keep going.
12  A.   Blake versus General Motors, that was a seat
13       belt case.
14  Q.   All right.  And was that plaintiff or
15       defendant?
16  A.   That was plaintiff.
17  Q.   All right.  What about Morris v. Metropolitan
18       Atlanta Rapid Transit, was that --
19  A.   That was a bus case, a car/bus.
20  Q.   Okay.
21  A.   Henley, et al. versus Chrysler Corporation,
22       that was a products case with a -- do you just
23       want it in general or very quickly specifics?

Page 194

1  Q.   I think you're doing it right now just fine.
2       We can always go back and --
3  A.   It was a steering defect case. There was
4       actually two recalls on that vehicle. The
5       steering wheel -- the back of the steering
6       wheel, the air bag module, and the backing of
7       the cowl were situated in such a way that when
8       the wheel was turned, if a set of keys got in
9       from the key chain, it would get in there and
10      wedge and actually bind the steering. It
11      happened in several cases. So that's what that
12      case was about.
13 Q.   Which side were you on there?
14 A.   The plaintiff.
15 Q.   Okay.
16 A.   Estate of Sylvia Towns versus Culpepper, that
17      was an air bag case where there was no air bag
18      in a car that had been repaired. Okay.
19 Q.   Which side were you representing in the air bag
20      case?
21 A.   I don't represent, but I work for.
22 Q.   Which side were you -- who was your client?
23 A.   Okay. It was the plaintiff.

Page 195

1  Q.   Okay.
2  A.   I've got to correct that because you just say
3       represent. I know lawyers use that term.
4  Q.   It's the wrong word for you, I understand.
5  A.   Yeah. Martin Zachary as Executor for Jesse
6       Zachary, et al. versus Bridgestone/Firestone.
7  Q.   Is that a tire case?
8  A.   That was a Firestone -- Bridgestone/Firestone
9       case.
10 Q.   Which side were you?
11 A.   Plaintiff. Zilly Transport, LLP versus
12      Bridgestone Metalpha.
13 Q.   Was that a tire case?
14 A.   No. That was an improper loading case on a
15      tractor-trailer for -- well, alleged improper
16      loading case from Bridgestone Metalpha.
17 Q.   What product was involved in that case, if any?
18 A.   It really wasn't a product case, I guess. It
19      was steel tire cord and how it was loaded on
20      the trucks, it was how it was anchored. I
21      mean, it was a failure of the loading technique
22      that was in question in that case. So, I mean,
23      that's really not a product case per se, so

Page 196

1       skip on that one.
2       Champlin versus General Motors
3       Corporation. That was tied into the -- well,
4       that was going on at the same time as the case
5       with the Justice Department, it had to do with
6       that. And that was a steering case on the CK
7       series vehicle platforms, an electronic
8       variable orifice steering mechanism that
9       malfunctioned. There were several NTS
10      investigations on that. There never was a
11      recall issued on it though -- oh, yes, there
12      was. I take that back. There was no recall
13      issued. There was technical service bulletins
14      and it was kind of almost like one of those
15      silent warranty things, that if people came in
16      and complained about it, they fixed it. There
17      was no recall.
18      Rodgers versus Woodbine Manufacturing,
19      that was where a lift gate on the back of a
20      Coca-Cola truck, the chain broke, failed, so
21      that was a products case.
22 Q.   Who was your client in the Rodgers case?
23 A.   The plaintiff.

Page 197

1  Q.   What about in the Champlin case?
2  A.   Actually neither. In Champlin versus General
3       Motors, that was a three party claim and
4       neither Champlin nor General Motors was my
5       client.
6          MR. GIVENS: You were one of the et
7       als.?
8  A.   This was a case where somebody sued Champlin,
9       Champlin sued -- yeah, it was an et al.,
10      because Champlin sued Champlin. The daughter
11      was injured and the mother was driving the car.
12      And the daughter/child was seriously injured
13      and so Champlin's insurance company paid her
14      and then Champlin and Farm Bureau, who I worked
15      for Farm Bureau, both sued General Motors
16      because of the underlying defect of the
17      vehicle.
18 Q.   Okay.
19 A.   That was too complicated, sorry about that. We
20      already got Woodbine. Okay. Cole versus Ford
21      Motor Company, that's a Ford Explorer roll-over
22      issue.
23 Q.   Who was your client in that case?

Page 198

1  A.  Cole.  Rodgers versus Woodbine, we just -- two
2      depositions.  U.S. Tsubacki was added on to the
3      case and so they came back and took my
4      deposition a second time.
5  Q.  Okay.
6  A.  Briggs versus Genie Scissor Lift and Sunbelt
7      Rentals, that was a scissor lift that the
8      controls malfunctioned and it raised up and
9      killed the operator.
10 Q.  Who was your client?
11 A.  Briggs would have been.
12 Q.  Okay.
13 A.  Okay.  Blanchard versus Ford Motor Company,
14     that's a Ford Explorer case.
15 Q.  What was wrong with the Ford Explorer?
16 A.  That's one where -- it's a crash worthiness,
17     roof crush type thing.  Now, I'm just doing the
18     accident reconstruction in that one, you know,
19     the speeds and things on the vehicle, not
20     getting involved in the product defect.
21     Okay.  Tim Campbell, et al. versus General
22     Motors, that is a seat belt case, and I'm
23     working for the plaintiff in that case.

Page 199

1      And then the trial testimony, I'll just --
2  we probably, especially the product cases, have
3  gone over them in deposition before they got to
4  trial for sure.  There's no new ones.
5  Q.  Okay.  Now, have you ever been involved in a
6      case involving a drill before?
7  A.  No.
8  Q.  Okay.  Have you ever done any design work in
9      regard to a product that had a vacuum system?
10 A.  Have I ever done any design work?
11 Q.  Well, let me reask that question.  Have you
12     ever been involved in a case involving a
13     product with a vacuum system?
14 A.  No.
15 Q.  Okay.  Is this your first case essentially with
16     this type of product, the core drill?
17 A.  Yes.
18 Q.  Okay.  What is the time period for your listing
19     of testimony as reflected on Exhibit 2,
20     starting with the Douglas versus Henri's Bakery
21     case?
22 A.  It's Henri's, it's a French bakery.
23 Q.  Well, I'm just not as complicated as you.  I

Page 200

1      couldn't read that little sign right there.
2      MR. GIVENS:  It's kind of like
3        Beauchamp, isn't it?
4      MR. SPRAIN:  Yeah.
5  A.  '96, June of '96.
6  Q.  Okay.
7  A.  And this was in response to the Rule 26
8      disclosure and I think you had to go back four
9      years.  And so it was probably 2000 when I had
10     to go back four years and I went back that far
11     through my records as far as I had to go.  And
12     since then I've just added to the list and I've
13     not bothered to drop names off as they get four
14     years old to maintain the list of the current
15     four years.
16 Q.  Okay.  So prior to '96 do any product liability
17     cases stand out?
18 A.  I can't recall right now.
19     MR. SPRAIN:  Okay.  I'm going to pass
20       you on to Mr. Sheehan, he's
21       probably got some questions for
22       you.  I will review my notes and
23       hopefully I won't have any

Page 201

1      follow-ups.
2  A.  Okay.
3
4      CROSS-EXAMINATION
5  BY MR. SHEEHAN:
6  Q.  Mr. Shaver, you had mentioned that you had
7      submitted an affidavit.  Let me see if I can
8      show you what I'll mark as Exhibit Number 20 to
9      Shaver.
10     (Exhibit 20 marked for identification.)
11 Q.  Is that the affidavit that you were referring
12     to, sir?
13 A.  I believe so.  It doesn't look -- it's not
14     signed.  Because the affidavit I'm referring
15     to, I signed it.
16 Q.  That was the affidavit that was attached to the
17     response to the Motion for Summary Judgment
18     filed with the Court and I was just curious if
19     that was the affidavit?
20 A.  I know that was the purpose of it, but I know I
21     signed one, but it doesn't look like your copy
22     there is signed.
23 Q.  That's the Court's copy.

Page 202

1  A.    Okay.
2  Q.    The copy that shows that it was filed with the
3        Court.
4  A.    Okay.  That is it.  It was just an affidavit
5        that the report was true and accurate was my
6        understanding.  I mean, I did an affidavit to
7        that effect.
8  Q.    In fairness could it be that your signature
9        appears within the report and you were just
10       confirming that that was your -- that you were
11       certifying that the information contained in
12       the report was correct?
13 A.    Yes, that's exactly right.  That's exactly what
14       it was.  Thanks for clarifying that.
15 Q.    All right.
16 A.    Well, oh, here it is.  No, this is what I was
17       looking for.  See, there's my report, that's
18       where I signed my report, and then that's what
19       I was looking for.  It's at the end of the
20       report, that's what was throwing me.
21 Q.    Let's mark that page, since we've referred to
22       it in the record, let's mark the page where
23       your signature appears as Exhibit Number 21 to

Page 203

1        your deposition.  Just so the record is clear,
2        we have marked as a composite exhibit a
3        document showing it's been filed on September
4        the 26th of 2006 in the Middle District of
5        Alabama as a composite Exhibit 20 to
6        Mr. Shaver's deposition.  And within that
7        composite exhibit, would you mind marking the
8        page where your signature and the notary
9        appears?
10 A.    Okay.  Right there.
11       (Exhibit 21 marked for identification.)
12 Q.    So you actually signed a document again
13       confirming that this report, Exhibit Number 20,
14       was true and correct?
15 A.    Correct.
16 Q.    All right, sir.  Now, that appears to have been
17       notarized by Ms. Tessie Steverson, the
18       paralegal here in the law firm representing
19       Mr. Riley?
20 A.    Yes.
21 Q.    And the date that your signature was notarized,
22       sir?
23 A.    9/22 -- no, 9/25.  September 25, 2006.

Page 204

1  Q.    All right, sir.  And how many times have you
2        been to this law firm concerning this case of
3        Matthew Riley?
4  A.    Oh, three times, I believe.
5  Q.    Okay.  So this would have been -- as I
6        understand it, you and Mr. Frost met here on
7        Friday, October the 20th of 2006?
8  A.    Yes.
9  Q.    And that would have been the third time you've
10       met here at this law firm representing
11       Mr. Riley?
12 A.    Well, no, today would be the third time.
13 Q.    Oh, thank you, sir.  All right.  So today,
14       October the 27th, is the third time you've met
15       at the law firm?
16 A.    Right.
17 Q.    Did you actually meet before this deposition
18       with counsel representing Mr. Riley to prepare
19       for your deposition?
20 A.    Today?  Other than last Friday, no.  Well, this
21       morning I got here about 30 minutes before.
22 Q.    Before your deposition began?
23 A.    Yes.

Page 205

1  Q.    All right, sir.  And the second time you came
2        to this law firm here in Dothan from -- is your
3        office in --
4  A.    Atlanta.
5  Q.    -- would have been on September the 25th of
6        2006?
7  A.    No, I wasn't here on the 25th.
8  Q.    Okay.  I'm sorry, it appears to be notarized by
9        the paralegal here on the 25th of September?
10 A.    Okay.  I wasn't here then.
11 Q.    Well, was Ms. Steverson with you when you
12       notarized that signature or signed that
13       document?
14 A.    No.
15 Q.    How many reports have you prepared, sir?
16 A.    Total?
17 Q.    Please, sir.
18 A.    I don't know, 40, 50.
19 Q.    Okay.
20       MR. GIVENS:  Are you talking about
21       reports in general or reports as
22       to this particular case?
23 Q.    This case that you're here on today in this

Page 206

1  deposition.
2  A.  Oh, on this case?
3  Q.  Please, sir.
4  A.  Oh, just the one report.
5  Q.  And is that the report that's attached to your
6      affidavit?
7  A.  Well, let's see, I believe it is.
8        MR. SPRAIN:  Thank God it's not 40 or
9           50.
10 A.  I misunderstood the question.  Yeah, I think
11     the front here is a little different, that's
12     the only difference.  I think the wording is
13     the same.  Yes, it -- well --
14       MR. SPRAIN:  Right there is a change or
15          is there?
16       MR. GIVENS:  No, it's just in two
17          pages.
18 A.  Yeah.  And the font shows up different the way
19     it's printed from one to the other.  These are
20     bullets and these are -- I think the difference
21     was it was printed out probably on two
22     different printers, one from the other, is why
23     it -- well, there's a page missing on this one

Page 207

1  here.
2  Q.  Which one is that, sir?
3  A.  The one -- the affidavit one.  Well -- okay.
4      All right.  The affidavit was for the report
5      and then --
6  Q.  I'm sorry, so the record is clear, the
7      affidavit that was filed with the Court is
8      missing a page?  Is that what you're testifying
9      to?
10 A.  Just a minute.  Are you counting the last page
11     Continued Trial Testimony?  It appears that the
12     Continued Trial Testimony, the page that --
13     Continued Trial Testimony, the next page,
14     there's not a page following on that one;
15     however, there was supposed to be this page
16     attached to it.
17 Q.  I'm confused, sir.  The affidavit that was
18     filed with the Court, is it missing a page?
19 A.  It appears to be, yes.
20 Q.  And what page is it missing, sir?
21 A.  The last page of the Rule 26 disclosures of the
22     testimony.
23 Q.  All right.  And that well could have been made

Page 208

1      when it was copied and filed with the Court,
2      would that be -- in all fairness?
3  A.  True.  Yes.
4  Q.  Do you mind if we mark your report, the one
5      that you've been referring to during your
6      deposition?
7  A.  That's fine.  I think it's the same as that one
8      that's already been done, but that's fine.
9  Q.  All right, sir.
10       (Exhibit 22 marked for identification.)
11 Q.  In other words, I have now marked as a
12     composite Exhibit 22 what would be a complete
13     report to include the page that may have not
14     been filed with the Court?
15 A.  Right.  If you are -- and I think the -- the
16     affidavit is for the report and the report is
17     complete.  It's the trial testimony which is in
18     compliance with Rule 26 is missing a page,
19     which is actually --
20 Q.  Missing from what?
21 A.  It's missing from the one filed with the
22     report.
23 Q.  Do you mean the one filed with the Court?

Page 209

1  A.  Yes.
2  Q.  Okay.
3  A.  The one filed with the Court is missing not a
4      page of the report itself, but of the last page
5      of the Rule 26 disclosure, one page of the
6      trial testimony is missing, the last page.
7  Q.  All right, sir.  Could you do us a favor, could
8      you take Exhibit Number 22 to your deposition
9      and just write one through whatever it turns
10     out, start with that cover sheet there?
11 A.  One?  Okay.
12       MR. GIVENS:  Number the pages, in other
13          words.
14 A.  Got you.  (Witness complies.)  It's 24 pages.
15 Q.  All right, sir.  So you now have before you
16     your complete report consisting of 24 pages; is
17     that right, sir?
18 A.  Yes.
19 Q.  And that's been marked as Exhibit Number 22 to
20     your deposition?
21 A.  Correct.
22 Q.  All right, sir.  And so that we're clear, this
23     report consisting of 24 pages, when was it

Page 210

1    prepared?
2    A.   You know, the report was prepared August 29th.
3    Q.   Of what year, sir?
4    A.   I'm sorry, not August 29th. I'm looking at
5         the --
6              MR. SPRAIN:  At the date of the
7              accident.
8    A.   Yeah.  Well, I usually include the date on that
9         front page and it's typically down there.  Oh,
10        okay.  I can tell you.  I didn't put it in date
11        form, but I believe it was 6/22 of 2006.  It
12        would have been June 22nd of 2006.
13   Q.   And since June 22nd of 2006 have your opinions
14        changed in this action, --
15   A.   No.
16   Q.   -- this lawsuit?
17   A.   No.
18   Q.   Okay.  You indicated that you had examined the
19        machine on May the 12th, 2005 outside of
20        Atlanta, sir?
21   A.   Yes.
22   Q.   And you again examined the machine on February
23        the 23rd of 2006?

Page 211

1    A.   I was there for an inspection.  I did not do
2         any examination or testing that went beyond
3         what I had done on -- in May of '05.
4    Q.   Fair enough.  And did you make any additional
5         observations or form any different opinions at
6         that second inspection on February 23rd of
7         2006?
8    A.   No.
9    Q.   All right, sir.
10             (Off-the-record discussion.)
11   Q.   How many times have you met with Mr. Frost in
12        reference to this lawsuit involving Mr. Riley,
13        sir?
14   A.   Once.
15   Q.   And that, again, would have been on the 20th of
16        October of 2006?
17   A.   That's correct.  That's correct.
18   Q.   Have you read the report prepared by Mr. Frost?
19   A.   I got a copy of it and I glanced through it.
20        To be quite honest, I guess it was right after
21        I submitted my report and then his report came
22        in and I looked at it and glanced at it.  And
23        to be honest with you, I haven't really had a

Page 212

1    chance to review it that thoroughly since then
2    before this deposition.
3    Q.   All right, sir.  So that I'm clear then,
4         Mr. Frost -- you received Mr. Frost's report at
5         or about the time you submitted your report on
6         June the 22nd of 2006?
7    A.   It was after.  Because I didn't even know
8         Mr. Frost -- I didn't even know him before then
9         or know about him before then.
10   Q.   Had you ever spoken to Mr. Frost before he
11        submitted his report?
12   A.   No.  In fact, I had never spoken with Mr. Frost
13        before October 20th.
14   Q.   And how many conversations have you had with
15        Mr. Frost concerning this lawsuit?
16   A.   Well, that day.  I mean, we spent several hours
17        together.
18   Q.   I'm sorry, help me?
19   A.   Okay.  On October the 20th.
20   Q.   Of?
21   A.   2006.
22   Q.   All right, sir.
23   A.   And then I spoke with him, I believe, on

Page 213

1    Tuesday of this week and then I spoke with him
2    again yesterday twice.
3    Q.   Okay.  And what was the purpose of speaking
4         with him on Tuesday?
5    A.   I called to let him know that we had gotten the
6         vacuum microswitch in.  I'm sorry, it wasn't
7         Tuesday, I talked to him Wednesday.  I let him
8         know that we got the microswitch in, the vacuum
9         activation switch, and I was starting to put it
10        together and that's pretty much it.
11   Q.   That would have been October the 25th of 2006?
12   A.   Okay.
13   Q.   Is that correct, sir?
14             MR. GIVENS:  Yes, that was day before
15             yesterday.
16   A.   Yes.
17   Q.   And when did you next talk to Mr. Frost, sir?
18   A.   Yesterday probably about midday.
19   Q.   Okay.  That would have been October the 26th,
20        2006?
21   A.   Correct.
22   Q.   All right.  And that was on two telephone
23        conversations?

54 (Pages 210 to 213)

Page 214

1  A.   Yes.  Once I had tested the components of the
2       drill to see that it worked, I called him, and
3       then after I got everything put together I
4       called him to let him know it went together and
5       worked okay.
6  Q.   Have you applied for a patent on your design?
7  A.   No.
8            MR. GIVENS:  Not yet.
9  Q.   Have you read the report prepared by Mr. Roger
10      Davis in this lawsuit?
11 A.   No.
12 Q.   I saw you had a copy of it in your file?
13 A.   Yeah, I did, but I haven't read it.
14 Q.   Have you read the report of any other expert
15      witness who has been designated in this
16      lawsuit?
17 A.   No.
18 Q.   Have you discussed with anyone the expert
19      opinions of anyone designated as an expert in
20      this lawsuit?
21 A.   No.
22 Q.   Do you know Mr. Roger Davis?
23 A.   No.

Page 215

1  Q.   Do you --
2  A.   I've heard the name.  I know Mr. -- I think
3       Mr. Lane mentioned his name once before, but I
4       didn't.
5  Q.   Okay.  What is the distinction between your
6       testimony and Mr. Roger Davis?
7  A.   I don't know.  I haven't reviewed his
8       testimony.
9  Q.   I mean, what did Mr. Lane say he was hiring
10      Mr. Roger Davis to do that you couldn't do?
11 A.   I guess it's okay for me to say what Mr. Lane
12      told me.
13 Q.   Absolutely.
14 A.   Specifically he told me it had to do with the
15      licensing issue.  I believe Mr. Davis is
16      licensed in Alabama.  And when there may have
17      been some concern about the licensing is why I
18      believe -- is the reason I was told.
19 Q.   Okay.  So Mr. Davis and you both are experts in
20      the same discipline?
21 A.   I suppose.  As I say, even though I have a copy
22      of his report, I haven't read it, so I can't
23      comment on that.  But I would assume so based

Page 216

1       on what you're saying.
2  Q.   Well, no, I'm not under oath.
3  A.   Okay.  And I would also assume that based on
4       the fact of what Mr. Lane said he hired him for
5       as well.
6  Q.   And that being that he was licensed in Alabama
7       while you were not?
8  A.   That's correct.  At least during the time he
9       hired him to do that.
10 Q.   And what is the difference in you and
11      Mr. Frost?  How will a jury be assisted by
12      having Mr. Frost testify as an expert in this
13      case as opposed to yourself?
14 A.   I don't know.
15 Q.   So it would be fair to say that your testimony
16      would be cumulative?
17           MR. GIVENS:  I would object to the
18           form.  I don't think it's fair to
19           characterize his testimony as --
20           the testimony of he and Frost as
21           being cumulative when he just said
22           he doesn't know what Frost does
23           different from what he does.  So I

Page 217

1            don't see how he can characterize
2            that as cumulative and I would
3            object to the form on that basis.
4  Q.   Well, I thought you had reviewed Mr. Frost's
5       report?
6  A.   I have when it was sent to me.  After I
7       submitted my report, it came to me, I glanced
8       at it and looked at it.  I recall I did not
9       disagree with anything that he had said and
10      nothing jumped out, but I didn't sit there and
11      analyze his report of how it -- you know,
12      whether it overlapped what I had said or
13      whether it complimented what I said.  I have
14      not rendered an opinion as to where his work
15      stacks up versus mine.  I have no idea.
16 Q.   What expertise does Mr. Frost bring to this
17      lawsuit that you don't have?
18 A.   I don't know.
19 Q.   Well, now, you said that you had conferred with
20      him in reference to the Shaver design?
21 A.   He did mention to me that I believe he has
22      either an electrical engineering degree or
23      electrical background.  So he was of some

Page 218

1    assistance in helping with the electrical
2    circuitry on that unit, yes.
3  Q.   Well, are there any electrical issues that he
4    would be needed for in this lawsuit involving
5    Mr. Riley?
6  A.   I don't know.
7  Q.   Well, do you know of any electrical issues?
8  A.   No.
9  Q.   Have you examined any other core drill machines
10    other than the subject core drill machine and
11    then the exemplar that you've brought here to
12    the deposition with you today?
13  A.   No.
14  Q.   Have you ever used a core drill machine?
15  A.   Yes.
16  Q.   And how many times, sir?
17  A.   Once.
18  Q.   And when was that, sir?
19  A.   Oh, probably five -- four or five years ago.
20  Q.   So 2001?
21  A.   That's probably close.  It could be a year
22    either way.
23  Q.   All right.  And where was that?

Page 219

1  A.   It was in my driveway.
2  Q.   And what was the purpose of your use of the
3    core drill machine on that occasion?
4  A.   My brother-in-law had rented one to anchor a
5    building that he had built that some
6    construction workers had and I wanted a hole in
7    my driveway to put a fence gate post.
8  Q.   And how many holes did you drill?
9  A.   Just one.
10  Q.   And how deep was that?
11  A.   Well, I never got it through the concrete.  I
12    drilled down probably about four to six inches
13    and did not reach the concrete and I just -- I
14    finally decided I didn't really want to keep
15    going any deeper.  It was pretty hard work and
16    I was using it on the tail-end of a four hour
17    rental from Home Depot and it was going to run
18    into the time and I just abandoned the hole
19    cutting and took it back.
20  Q.   And did you have an accident while drilling
21    that one hole?
22  A.   No.
23  Q.   Have you ever rented anything from United

Page 220

1    Rentals?
2  A.   No.
3  Q.   Have you ever spoken to anyone at United
4    Rentals?
5  A.   Yes.
6  Q.   And how many times, sir?
7  A.   Once.
8  Q.   And when was that, sir?
9  A.   Probably about five or six years ago.
10  Q.   Again, that would be in the 2000, 2001 area?
11  A.   Yes.  It would have been before this accident
12    occurred.
13  Q.   And what was the gist of that conversation on
14    that one occasion?
15  A.   That involved the Genie Scissor Lift case.  I
16    was doing research into the scissor lift,
17    different scissor lifts, and the scissor lift
18    that had been in question in that Genie Scissor
19    Lift case had been rented from Sunbelt Rentals.
20    And I called someone at United Rentals to ask a
21    question about the Genie Scissor Lift series.
22    And I've forgot -- today I forget what question
23    it was I had about it.  But since Sunbelt was a

Page 221

1    named party in the suit, I avoided calling them
2    to ask the question.  And so my next
3    alternative was to call -- I just happened to
4    remember, you've got Sunbelt and United
5    Rentals, and when you asked me if I had ever
6    spoke, that's what I remembered.  It was
7    probably not the answer you were looking for.
8  Q.   Oh, no.
9  A.   Okay.
10  Q.   The answer I'm looking for is just the truth.
11  A.   Okay.
12  Q.   In that case did they help you?
13  A.   I can't remember.  I just remember calling them
14    and talking to them.  I think I would have
15    remembered it had it been something earth
16    shattering with regard to the case.
17  Q.   Okay.  Did they assist you?
18  A.   Yes.
19  Q.   Have you spoken to any other rental company in
20    reference to the lawsuit filed by Mr. Matthew
21    Riley?
22  A.   I have not.
23  Q.   Have you ever testified against a rental

Page 222

1    company?
2  A.   No.  Because at the time I testified in that --
3      the other case, the Genie Scissor Lift, that
4      was just against Genie.  No, I have not.
5  Q.   All right, sir.  Have you ever testified in
6      favor of any rental company?
7  A.   No.
8  Q.   What is your understanding as to the training
9      that Mr. Riley received prior to operating the
10     subject core drill machine in this lawsuit?
11  A.   Just that he was showed how to -- you know, how
12     to put it there with the water, how to anchor
13     it with the vacuum, and how to make the -- how
14     to drill the holes.  Basically he was watching
15     Mr., I believe it was, Mike Walters.  It's not
16     Waters, Walters, right.
17  Q.   Did he receive any other training?
18  A.   I don't believe so.  Do you know what, I hate
19     to do this, can we take a short break?
20         MR. SHEEHAN:  Sure.
21         (Recess.)
22  BY MR. SHEEHAN:
23  Q.   Sir, we've taken a recess and we're back on the

Page 223

1      record.  And I notice that you were kind enough
2      to provide us with some negatives from one of
3      the notebooks that had previously been
4      identified?
5  A.   Yes.
6  Q.   Which notebook was that, sir, that the
7      negatives came out of?
8  A.   Oh, I'll have to look and see.  Which
9      photographs are those?  The one showing the
10     drill bit.  This notebook.
11  Q.   And that was marked Exhibit Number?
12  A.   17.
13         (Exhibits 23 through 47 marked for
14         identification.)
15  Q.   All right, sir.  Let me show you photographs
16     that have been made from the negatives that
17     came out of the notebook previously identified
18     as Exhibit 17 to your deposition.
19  A.   Okay.
20  Q.   They have been marked on the back Exhibits 23
21     through 47 to your deposition.
22  A.   Okay.
23  Q.   If you would check those and --

Page 224

1  A.   Okay.
2  Q.   Are those photographs you took, sir?
3  A.   Yes, they are.
4  Q.   And when did you take those, sir?
5  A.   In May of 2005.
6  Q.   Did you take any other photographs in May?
7  A.   That's my wife, I'm sorry.
8         (Off-the-record discussion.)
9  Q.   Did you take any other photographs there in May
10     of 2005?
11  A.   I don't believe so, no.
12  Q.   So, again, the purpose of the negatives in that
13     particular notebook, I guess, was so you would
14     have all of your negatives together of your
15     observations at that first inspection on May
16     the 12th, 2005?
17  A.   No.  The negatives were not supposed to be in
18     the notebook.  I don't normally take negatives
19     out of my office.  They just happened to be in
20     the folder in that book.  They had not been
21     removed and put with the other negatives.
22  Q.   Well, are there any other negatives you have
23     not produced here today?

Page 225

1  A.   Yeah, I have negatives of the other three.
2  Q.   The other three what?
3  A.   Of the other three notebooks.  I don't have the
4      negatives here of those.  That's what I had
5      said before, it's just only by -- you know, I
6      don't normally bring negatives of my
7      photographs to depositions, you know.
8  Q.   Did you take any photographs of the second
9      inspection on February the 23rd, 2006?
10  A.   I looked to see if I had and apparently I
11     didn't.  They were not in the file.
12  Q.   But you have removed negatives from your file
13     before coming to the deposition here today?
14  A.   Well, I didn't do it before coming to the
15     deposition.  It's when I go -- when I have
16     pictures made, when I have them developed --
17     which now I use digital, so it's not even an
18     issue.  But what I did back then was -- you
19     know, I either do one of two things.  I either
20     leave the pack, the pack that comes from the
21     developer, with the negatives until I have a
22     chance to go through them and put them in a
23     notebook like this and then file the negatives