Page 226

1  away.  And they are not kept with the case file
2  itself, they're kept separate.  And, you know,
3  only the photographs themselves, only a copy of
4  the photographs are kept with the files.
5      You know, because most of the time laser
6  copies of photographs are made for depositions
7  and it's only upon request do we go back and
8  get the negatives to make photographs from.  I
9  mean, that's how I've been doing it since I've
10  been doing this.
11  Q.  Have you brought here to the deposition
12  photographic prints of all of the photographs
13  that you are aware of involving Mr. Riley's
14  lawsuit?
15  A.  With the exception of about a dozen and a half
16  photographs taken over the last two to three
17  days as I was making the Shaver design, as
18  y'all are calling it, drill.  I took
19  photographs of that in various -- various
20  things with it and they're in digital form and
21  I don't have those printed out yet.  I haven't
22  done it yet.
23  Q.  Could you provide those to Mr. Lane?

Page 227

1  A.  Yes, I will.
2  Q.  Thank you, sir.  So other than the, you say,
3  dozen and a half photographs made within the
4  last week of the exemplar machine described as
5  the Shaver design, you have brought with you
6  all of the photographic prints involving
7  Mr. Riley's lawsuit?
8  A.  Yes.
9  Q.  Do you have any videotapes?
10  A.  Not that I have found.  I went through my
11  videotapes to see.  I think what happened, I
12  took my video camera, and as it turned out, my
13  recollection, Mr. Lane did not have videotape
14  for his camera, brought a camera, but my tape
15  and his tape were identical.  He put a tape in
16  his camera, one of my blank tapes, and used it.
17  Because I was busy involved with the inspection
18  and I don't think I -- I certainly did not
19  videotape the entire thing.
20  Q.  But you turned that over to Mr. Lane?
21  A.  He took it, he kept it, I never had it.
22  Q.  All right, sir.
23  A.  That was his.

Page 228

1  Q.  And that's the only videotape that you're aware
2  of?
3  A.  That I'm aware of, yeah.
4  Q.  So we have all of the photographic evidence
5  here with us today with the exception of those
6  12 and a half of the exemplar machine called
7  the Shaver design?
8  A.  Right.  Right.
9      MR. GIVENS:  Just by way of keeping the
10      record straight, I don't know that
11      we've got -- when you say 12 and a
12      half, are you talking about 12 and
13      a half photographs?  And I'm just
14      curious about the half of
15      photograph.
16  Q.  Your lawyer is correct.  You had said 12 and a
17  half and so I --
18  A.  I said 12 and a half?
19  Q.  Whatever the record -- I heard 12 and a half,
20  but, I mean, that's --
21  A.  Oh, okay.
22  Q.  What would you say?
23  A.  I would say 12 or so.

Page 229

1  Q.  12 or so.  And I probably misunderstood you and
2  I apologize.  Thank you.
3      MR. GIVENS:  Sure.
4  Q.  I had written down 12 and a half and I
5  apologize.  So we can expect to receive about
6  12 photographs digital?
7  A.  Maybe more.
8  Q.  But, again, they're just going to be what was
9  made within the last week?
10  A.  Correct.  It's not going to have anything to do
11  with the subject drill in this case.  It's only
12  this alternate design.
13  Q.  All right, sir.  And I noticed in one of your
14  exhibits you had copies of the photographs made
15  by Mr. Tew the morning after the accident
16  involving Mr. Riley?
17  A.  Correct.
18  Q.  Okay.  Do you have those, sir?
19  A.  I think they're here somewhere.  I think
20  they're going to be over here in this chair,
21  because I think as we were going through that
22  stuff -- it was in the folder, if I'm not
23  mistaken.  No, no, no.

58  (Pages 226 to 229)

## Page 230

1    MR. GIVENS:  Is it in one of the
2        notebooks?
3  A.   No.  Yeah, it's in a bound form.
4        MR. GIVENS:  I think there's one under
5        there.
6  A.   That's it there.  Thank you.  I believe it's in
7     here.  Yeah, right there.
8  Q.   All right, sir.  And that's contained within
9     composite Exhibit Number?
10  A.   18.
11  Q.   And how many photographs do you have of the
12     machine?
13  A.   And they're just xerox copies, they're not --
14     ten.
15  Q.   Okay.  And have you asked to be provided with
16     all of the photographs taken of the machine
17     there at Flavor House?
18  A.   I haven't personally asked for it, no.  I don't
19     know if the attorneys -- I mean, this is what
20     was sent to me.  You know, the material comes
21     in, they compile it and send it to me.  Have I,
22     after getting this, called up and said send me
23     all of the photographs?  No, I haven't done

## Page 231

1     that.  I just review what they send me.
2  Q.   Okay.  Well, have you reviewed the photographs
3     taken at Flavor House after the accident
4     involving Mr. Riley?
5  A.   Other than these right here, these copies, no.
6  Q.   So the only photographs you've seen of the
7     subject machine after the accident are the ten
8     photographs contained within that composite
9     Exhibit Number --
10        MR. GIVENS:  18.
11  Q.   -- 18?
12  A.   That is correct.  Unless in some of these other
13     color photographs those are slipped in there
14     and I've missed them and I'm just looking at
15     the machine.  I think these are the only ones
16     I've seen at the scene.
17  Q.   And so that I'm clear then, you haven't asked
18     to see the photographs taken of the machine
19     there at Flavor House after the accident?
20  A.   Well, I didn't know that there were any other
21     photographs besides these.
22  Q.   Those ten?
23  A.   Yes.

## Page 232

1  Q.   And you haven't been shown any other
2     photographs of the machine there at Flavor
3     House after the accident?
4  A.   No.  I don't believe so, no.
5  Q.   Well, were you satisfied with those
6     photographs, those ten photographs that you
7     have there in that composite Exhibit 18?
8  A.   Yeah.
9  Q.   They showed you what you needed in order to
10     form your opinion in this case?
11  A.   Yes.
12  Q.   Well, do those photographs -- do they
13     accurately depict the condition of the drill
14     when you saw it on May the 12th of 2005?
15  A.   I believe -- I believe it does.  Yes, I would
16     say so.
17  Q.   Have you inspected the facility at Flavor House
18     to see where the accident occurred?
19  A.   No.  I believe they wouldn't -- we were
20     scheduled to do it several weeks ago and then
21     they wouldn't permit any experts at the -- at
22     the plant.
23  Q.   Who wouldn't permit any experts at the plant?

## Page 233

1  A.   I'm not sure.  They just -- I think it wasn't
2     -- they were having some depositions and I was
3     on standby to inspect, then I was told that
4     they had said no experts would be allowed to
5     come to the plant.  I'm assuming it was Flavor
6     House put those conditions on it.
7  Q.   That's what you're talking about when you say
8     they wouldn't allow you?
9  A.   That was my understanding.  That during the
10     depositions of their people, they were going to
11     be -- were the depositions taken out there at
12     Flavor House?
13  Q.   No, sir.
14  A.   Okay.  Well, I don't know.  At the time there
15     were depositions and I was assuming they are at
16     that time.  I wasn't in on the loop of exactly
17     what was going on.  It was just that -- and I
18     was -- I believe that was back in August,
19     because I was going down to Destin on vacation
20     and I was on standby to come through here at
21     the time to go to inspect the facility.  And
22     then for whatever reason it could not take
23     place due to a logistics thing with the Flavor

Page 234

1    House people.
2  Q.    You testified that it's your understanding that
3       the core drill machine, in the instruction
4       given to Mr. Riley, that it was put there with
5       the water, is that what I understood your
6       testimony to be, when he was taught how to use
7       the machine?
8  A.    Yes.
9  Q.    Okay.  What did you mean by that?
10  A.    Well, with the water hose.  It was not run
11       through the nozzle, is my understanding, of the
12       drill bit; that a water hose was laid down
13       there, you know, around the bit.  At least
14       that's what I picked up from the deposition
15       testimony.
16  Q.    And whose deposition was that, sir?
17  A.    I can't recall right now.
18  Q.    What depositions have you read, sir?
19  A.    I would have to go through and get them out.  I
20       know Mike Waters -- Mike Walters.
21  Q.    Well, did you bring them with you, sir?
22  A.    Yes.  I thought we had gone through them here
23       in the exhibits.

Page 235

1  Q.    So you've identified all of the depositions
2       you've read?
3  A.    I believe so.  Except I didn't see Mike -- was
4       Mike Walters' deposition in here?
5         MR. SPRAIN:  I don't remember seeing
6            that one.
7  A.    Okay.  Well, I did read that one.  I've read
8       that one.  Well, you know what, there are some
9       depositions that were emailed to me that are on
10       my computer, too, that I've looked at through
11       there.  They're not going to be in here
12       physically either.
13  Q.    Okay.  Could you provide -- well, is the e-mail
14       contained within the correspondence file
15       showing what depositions were sent to you?
16         MR. SPRAIN:  I don't think I saw that.
17  A.    I don't know.  I'll have to look through it and
18       see.
19  Q.    Okay.  Well, is it there in front of you?
20  A.    This is it.  You know, it's not in here.
21  Q.    Okay.  Could you provide that to Mr. Lane so he
22       could then attach that to this deposition as
23       Exhibit Number 48?

Page 236

1  A.    Yes.
2  Q.    And if there are any other e-mails, do you mind
3       providing those?
4  A.    I don't mind at all.
5  Q.    And we will mark those other e-mails then as a
6       composite Exhibit 49, fair enough?
7  A.    Fair enough.
8         (Exhibits 48 and 49 marked for
9            identification.)
10         MR. GIVENS:  All right.  The 48 is
11            going to be -- you want the -- if
12            a deposition was sent via email,
13            as an attachment to an email, you
14            want that to be 48.  And we think
15            that's, by his testimony, probably
16            going to be Mr. -- is it Walters?
17  A.    Oh, there's going to be three or four or five.
18       There's going to be several of the depositions
19       that I received.
20         MR. GIVENS:  That were e-mailed?
21  A.    Oh, yes.  Yes.
22         MR. GIVENS:  All right.  So 48 is going
23            to be any depositions that he got

Page 237

1       by e-mail, correct?
2         MR. SHEEHAN:  Yes, sir.
3         MR. GIVENS:  And then 49 is going to be
4            what?
5         MR. SHEEHAN:  Will be any other e-mails
6            that were not provided or
7            contained within the
8            correspondence file.
9         MR. GIVENS:  All right.  I'm just
10            trying to make myself notes to
11            make sure we follow-up.
12         MR. SHEEHAN:  Thank you.
13  Q.    So that I'm clear then, you say that the water
14       hose was not connected to the water attachment
15       on the drill assembly?
16  A.    And that was somewhere in some of the
17       depositions of how they were doing it that I
18       picked up and I'm not exactly sure where that
19       came from.
20  Q.    What is the function of the water hose
21       attachment to the drill assembly?
22  A.    It's my understanding that it sprays a blast of
23       water down at the drill bit as it's drilling

Page 238

```
 1       the --
 2   Q.  Well, why is that?
 3   A.  It would be to cool the bit and to lubricate
 4       the cutting surface.
 5   Q.  Well, is that necessary?
 6   A.  I believe so.
 7   Q.  Why?
 8   A.  To keep the bit cool and to keep down dust and
 9       things.  It's just -- I'm not sure I know all
10       of the reasons, but it would provide for a
11       better cutting and, of course, you know, less
12       dust.
13   Q.  What do you mean a better cutting?
14   A.  Well, it will cut better if it's lubricated.
15       Like on any saw, any metal type cutting, you
16       normally use an oil.  On a lot of cutting
17       methods you use oil to lubricate.  In this
18       particular one it would be my understanding
19       this water would be used as a lubricant, you
20       know, to assist in the cutting of the hole.
21   Q.  Would that help prevent a binding in the hole?
22   A.  It could.
23   Q.  Well, do you have an opinion, based upon a
```

Page 239

```
 1       reasonable degree of engineering, whether or
 2       not it would prevent binding in the hole?
 3   A.  I believe that, yeah, water could prevent
 4       binding in the hole.
 5   Q.  And it's your understanding that the water
 6       attachment was not connected?
 7   A.  It's my understanding that water was -- the
 8       hose was placed down next to the bit and was
 9       applying water at the cutting surface via a
10       hose on the floor rather than being sprayed
11       down.
12   Q.  And do you have an opinion as to whether or not
13       that contributed to the binding of the bit in
14       the hole?
15   A.  No.  As long as there was water present, it
16       wouldn't -- I wouldn't have an opinion that
17       that would be anything negative.
18   Q.  Okay.  The water that was present, where was
19       it?  Was it on the outside or the interior of
20       the drill bit?
21   A.  It would have been on the outside of the drill
22       bit.
23   Q.  And if the water hose had been attached to the
```

Page 240

```
 1       drill assembly, where would the water have been
 2       going?
 3   A.  Let me look at the bit.  I believe it's also on
 4       the outside of the bit.  Let me see.
 5   Q.  Just so I'm clear before you look, do you know
 6       one way or another?
 7   A.  No, not right here.
 8   Q.  No, sir.  The question is do you know without
 9       looking?
10   A.  No.  It looks like it could divert it to the
11       inside.  I don't.
12   Q.  Okay.  So before looking at the drill here that
13       you have brought with you as the Shaver
14       exemplar, you don't know whether or not the
15       water hose connection to the drill assembly --
16   A.  Yes.
17   Q.  Yes what?
18           MR. GIVENS:  Well, let him ask the
19               question.
20   Q.  Yes what, sir?  Yes what?
21   A.  Go ahead with the question.
22   Q.  No.  What were you answering yes to and maybe
23       that will satisfy the --
```

Page 241

```
 1   A.  Well, what I was going to say is, out at
 2       Applied Technical Services I do remember
 3       hooking up the -- a water hose to the --
 4       somebody there hooked up the water hose to the
 5       attachment when the drill was operated and --
 6   Q.  Did you have any difficulty hooking it up?
 7   A.  I don't recall so, no.
 8   Q.  All right.  If you had had any difficulty would
 9       you have noted it in your report?
10   A.  I probably would have, yes.
11   Q.  Did you note it in the report that's now been
12       marked as your complete report, Exhibit Number
13       22?
14   A.  No.  No.
15   Q.  So that I'm clear then, before you looked at
16       your Shaver design exemplar machine, did you
17       know whether or not the water hose attachment
18       would direct water inside the drill bit?
19   A.  I guess I did know that at the time we
20       inspected out at Applied Technical Services.
21       That was May of '05, that was a little over a
22       year ago, and I had forgotten that that is how
23       that it operated.  After looking at it and
```

Page 242

1    refreshing my memory on how it operated, I
2    believe it does do that, yes.
3  Q.    Okay.  Does that assist in the drill bit not
4        binding in the hole?
5  A.    I don't -- I don't know.
6  Q.    And you have no opinion?
7  A.    It would be my opinion that water -- if it was
8        diverted and there was water on the outside,
9        that as long as there was water present into
10       the cut, that that would be sufficient.
11 Q.    But, sir, the question is, if there's water
12       going down the drill bit lubricating the
13       interior of the drill bit?  That's the question
14       on the floor, not whether or not there was a
15       hose on the outside and with water on the
16       outside of the bit.
17 A.    Okay.  I see what you're saying.  It would
18       assist in lubricating, yes.
19 Q.    Now, what would assist?
20 A.    Having it on the inside.
21 Q.    Having the water hose connected to the water
22       hose attachment so that water ran down the
23       drill bit would assist in the drill bit not

Page 243

1        binding in the hole; is that correct, sir?
2  A.    It could do that, yes.
3  Q.    "Could do that," what do you mean, sir?
4  A.    Well, I mean, it's not -- I don't know that if
5        every time you were to do it without it that it
6        would create in a binding situation.  When you
7        say the word "would," that means that it would
8        every time you used it.  If you say the word
9        "could," it may or may not depending on the
10       situation, the speed or the pressure that
11       someone was applying.  That's my only
12       difference in those words.
13 Q.    So that I'm clear, it's your opinion in this
14       case that the water hose not being attached to
15       the drill assembly itself did not contribute to
16       the accident?
17 A.    No.  I have no -- I have no evidence that it
18       did.
19 Q.    Well, do you have an opinion as to whether it
20       did or not?
21 A.    No.
22 Q.    You also said that in instructing Mr. Riley he
23       was taught to anchor it by Mr. Walters?

Page 244

1  A.    I believe so, yes.
2  Q.    And how was he taught to anchor the core drill
3        machine?
4  A.    With the vacuum system.
5  Q.    Was he taught any other way to anchor it?
6  A.    Not that I'm aware of.
7  Q.    Was Mr. Riley taught anything else by
8        Mr. Walters, his supervisor?
9            MR. GIVENS:  Object to the form.
10           That's a remarkably broad
11           question.
12 A.    Yeah.  Without going back through the
13       depositions and looking at them, I can't -- you
14       know, other than in just general terms in the
15       operation, I don't know.
16 Q.    All right, sir.  What was the condition of the
17       leveling screws on the subject core drill
18       machine before the accident involving
19       Mr. Riley?
20 A.    I know that there was some -- there was some
21       testimony that the screws were leveled and then
22       there was some testimony that they may not have
23       been leveled.  There was some discrepancy or

Page 245

1        some variation of what one said to the other,
2        and who said it, I don't recall.
3  Q.    Well, would it make any difference, the
4        condition of the leveling screws?
5  A.    The condition of them?  There could be a
6        situation where if the leveling screws were
7        unlevel that it could create a break in the
8        vacuum or -- a break in the vacuum meaning that
9        the vacuum pressure would drop or not be able
10       to build to sufficient pressure, and that, you
11       know, would be the importance of having the
12       interlock system in the thing.  The leveling
13       screws, if that were creating a problem with
14       it, the machine would not operate.
15 Q.    How should the leveling screws be used on a
16       core drill machine?
17 A.    Well, it's my understanding that you back off
18       on the screws.  And I would have to read back
19       through it, but it's my understanding you back
20       off on the screws, apply the vacuum and let it
21       go -- let it suction down and then take the
22       screws and snug them down to the floor, you
23       know, in the four corners.  And then using the

Page 246

1   leveling bubble to --
2   Q.   I'm sorry, what floor?
3   A.   The concrete floor.  You would take the
4   leveling screws, bring them into contact with
5   the floor, and then, you know, look at your
6   sight bubble and use those to level your
7   machine.
8   Q.   Why do you do that?
9   A.   To make it hold to create a vertical hole into
10  the floor.
11  Q.   Well, why is it important to have a vertical
12  hole into the floor?
13  A.   Well, if you're sticking a post in there or you
14  need a vertical hole, you would -- you would
15  want it to be vertical.  You wouldn't want it
16  to go in at an angle.  I mean, there are some
17  situations you may want it to go in at an
18  angle, but, you know, typically you want a hole
19  that is at a right angle or level to --
20  perpendicular to the floor surface.
21  Q.   Well, was this hole being drilled at an angle?
22  A.   Not to my knowledge, no.
23  Q.   Should it have been drilled at an angle?

Page 247

1   A.   I don't know.  I don't know if they -- I don't
2   know if they were intending -- I have no
3   information that indicates they were intending
4   to drill it at an angle.
5   Q.   Would that have any effect on the vacuum
6   system?
7   A.   If it were a -- if it were off enough severely,
8   it may.
9   Q.   Off how much, sir?
10  A.   I don't know.  A slight difference, I would not
11  expect it to be.
12  Q.   Slight being what, sir?
13  A.   A quarter of an inch, quarter to half inch.
14  Q.   And have you conducted any scientific testing
15  or made any calculations to determine that?
16  A.   No.
17  Q.   Do you have any basis to support that opinion?
18  A.   No.  Other than -- no.  No, I don't.
19  Q.   Now, if you would, sir, on page four of your
20  report, and that's the one marked Exhibit 22;
21  is that correct, sir?
22  A.   Yes.
23  Q.   At the top of the page there you say that "some

Page 248

1   damage and separation upon inspections of the
2   separate drill core cutting rig which may have
3   contributed to the failure of the vacuum;" what
4   did you mean by "may have contributed," sir?
5   A.   Let me read here.  "The gasket shows signs of
6   some damage and separation."  That was where
7   the two ends were glued together that we went
8   into earlier.  The little gap in the gasket
9   where the ends were glued.
10  Q.   All right, sir.  My question is, what did you
11  mean by "may have contributed"?
12  A.   If you have a gap where the two ends of the
13  seal come together, if that is torn or the glue
14  has come loose, there would be an opening or a
15  breach in that seal that could create to the
16  loss of the vacuum pressure inside the vacuum
17  base.  When I say vacuum pressure, I'm talking
18  about negative pressure for the record.  And
19  saying the term negative vacuum is actually a
20  double negative term, but I think everybody
21  understands what I mean.
22  Q.   All right, sir.  My question to you though is
23  what did you mean by "may have contributed"?

Page 249

1   A.   It may have contributed.  That may be one of
2   the reasons that not enough vacuum force was
3   available to hold the drill down to the floor.
4   Q.   And did you perform any testing or have any
5   research or analysis to support that opinion?
6   A.   Well, no.  That is the subject gasket and I
7   don't believe that it has been used -- that
8   gasket has been used on a drill to try to hold
9   it down.
10  Q.   Okay.  So that I'm clear, do you have an
11  opinion, based upon a reasonable degree of
12  engineering, whether or not that gasket had any
13  contributing factor to the accident involving
14  Mr. Riley?
15  A.   Oh, I see what you're saying.  I can't say for
16  certain that it did, if that's what you're
17  asking.  I don't have any information.  It was
18  just an observation that it was torn; it's an
19  observation in my report that it may.
20  Obviously before you could say for certain that
21  it did, additional -- I agree, additional
22  testing would need to be performed to determine
23  if that particular gasket, in that condition,

1    would create a leak.
2       I mean, that's -- I think that's what I
3    meant by the -- I understand what you're
4    saying, the word "may have." I was offering it
5    as a possibility in my report and that's the
6    meaning of that language. I was in no way
7    trying to imply that, hey, that's what caused
8    it to leak or caused it not to.
9       I think the main thing here with this --
10    at least my opinion with this, and I'm
11    elaborating a little bit, there could be
12    numerous reasons not to build up a sufficient
13    vacuum under that base. And that just
14    underlines the importance of having a system in
15    there that will prevent the energizing of the
16    drill motor if you do not have sufficient
17    vacuum under the base, which can happen for
18    numerous reasons.
19  Q.   All right, sir. I guess, in all fairness, what
20    I'm trying to ask you is, do you have an
21    opinion as to a reasonable degree of certainty
22    or is that, in fairness, speculation?
23       MR. GIVENS: Object to the form. Go

1       ahead, you can answer.
2  A.   No, I do not have an opinion to within a degree
3    of reasonable engineering certainty that that
4    did cause a breach in the vacuum of the base.
5    It is just a condition that I observed that may
6    have.
7  Q.   Okay. And a condition that you do not know
8    when occurred?
9  A.   That is true.
10  Q.   So, again, in all fairness, would that be
11    speculation as opposed to a reasonable degree
12    of certainty?
13       MR. GIVENS: Object to the form.
14  A.   I'm not going to use the term "speculation." I
15    disagree with the term "speculation." It's a
16    little stronger than speculation. Looking at
17    that -- at that gap and that fault line in the
18    gasket, I think there's a fairly good
19    likelihood that that could create a leak when
20    that was used in a vacuum situation and put
21    under compression, but I don't know that for
22    certain.
23  Q.   Okay. Would it more likely than not?

1  A.   I believe so, yes.
2  Q.   Okay. And what facts or testing or analysis or
3    research have you performed to make that
4    determination?
5  A.   I told you before I had not.
6  Q.   If I could, on page four there of your report,
7    your last bullet point, you state, on the
8    second line to the bottom of the page there,
9    "eliminated or minimized;" what did you mean by
10    "minimized"?
11  A.   That is typically, you know, a generic term.
12  Q.   What did you mean by it, sir?
13  A.   Decreased the likelihood of a hazard occurring.
14    Decreased it to the level that it is a
15    diminumous risk.
16  Q.   So you're talking about loss of vacuum?
17  A.   Yes.
18  Q.   What caused -- what caused the core drill bit
19    to become bound in the hole?
20  A.   I don't know.
21  Q.   Now, I notice there in the next line it says
22    "sensing switch that would immediately cut
23    power;" what did you mean "immediately"?

1  A.   Immediately, you know, virtually instant.
2  Q.   Okay. And what happens when there's a cut in
3    the power?
4  A.   There is no additional torque applied by the
5    electromagnetic force of the armature and
6    windings of the drill motor.
7  Q.   Is there still any movement or motion?
8  A.   There could be some inertia motion of the --
9    involving the mass of the drill motor itself.
10    However, you do have the base there, the weight
11    of the base, plus --
12  Q.   How much does the base weigh?
13  A.   I don't know, but I'm about to get to the next
14    thing. Plus, since this device shuts down at
15    -- you can have it set at 20 or plus inches of
16    Mercury, but since it shuts down at about 18
17    and a half to 19 inches of Mercury the way it's
18    set now, by the time the vacuum level would
19    decrease to a likelihood of where you would
20    overcome the forces, all of the inertia would
21    have been bound down in the motor to where you
22    would get no movement in the drill base were
23    this event to occur.

Page 254

1  Q.   Now, when you say 20 inches, are you talking
2       about the exemplar Shaver designed machine?
3  A.   That is correct.  Correct, yes.
4  Q.   All right.  What was the subject machine, how
5       much Mercury, how many inches?
6  A.   How much did they have out there that day?
7  Q.   Yes, sir.
8  A.   I don't know.
9  Q.   At the time of the accident was there a
10      complete loss of vacuum?
11 A.   I don't know.  Well, let me rephrase that.  At
12      the instant that the base moved, there was an
13      instantaneous loss of vacuum, because once that
14      base lost contact with the floor, yes.  I think
15      you understand -- we're in an understanding of
16      what happened in that.
17 Q.   All right, sir.  So that I'm clear then, before
18      the base lost contact with the concrete slab,
19      what was the gauge reading?
20 A.   I don't know.
21 Q.   In your opinion?
22 A.   I don't know.
23 Q.   Have you performed any tests or analysis or

Page 255

1       research to determine what it would have been?
2  A.   No.
3  Q.   On page five of your report there, sir, you say
4       the -- in the middle of the page you say "The
5       potential for vacuum loss and the resulting
6       loss of control can occur suddenly and without
7       warning"?
8  A.   Yes.
9  Q.   Is that because the vacuum -- well, let me just
10      ask you.  What did you mean by that?
11 A.   Well, there's a saying, I've heard it before,
12      "nature abhors a vacuum."  And that simply
13      means you have a vacuum there and any breach or
14      any hole to the outside environment is going to
15      result in a balance of forces.  So that's what
16      I meant by that.  That you have -- you have a
17      situation of rather than having a bomb waiting
18      to explode, you have one waiting to implode.
19      And the first chance it gets, that's
20      essentially what it's going to do, it's going
21      to suck in air.  Actually the vacuum doesn't
22      escape from that hole, and we've been saying it
23      that way, but what happens is air rushes in

Page 256

1       through any breach in the system.
2  Q.   Okay.  Were there any breaches in the system?
3  A.   I can't say for certain what the -- well, yes.
4       For whatever reason, the vacuum force was not
5       sufficient enough to hole the base down.
6  Q.   And what force would have been required to hold
7       the base down on that subject machine, sir?
8  A.   Well, the literature, the new literature,
9       recommends 20 inches of Mercury, to not operate
10      the machine at less than 20 inches of Mercury
11      vacuum.
12 Q.   We're talking about the subject machine.
13 A.   Okay.  I'm not sure that there is any
14      literature on the subject machine that states.
15 Q.   That's why I'm asking you for your opinion.
16 A.   Oh, for my opinion?
17 Q.   Please, sir.
18 A.   I have not gone through the calculations to
19      determine the torque of what it is there, but I
20      have done a quick numeric calculation of the
21      torque available to the drill motor and what it
22      would produce.  And --
23 Q.   For the subject machine?

Page 257

1  A.   Yes.  And it's my opinion that times -- the
2       approximate one square foot of gasket area
3       times 20 PSI, which is approximately two-thirds
4       of an atmosphere, that that would hold that
5       base down with sufficient force that a 200-plus
6       foot pound torque at the drill motor is not
7       going to overcome that force on that vacuum
8       base.  Now, if you're asking me would ten do
9       it, you know, I don't know.  I haven't done the
10      testing and the determination to determine
11      exactly what that critical cutoff point is.  I
12      haven't gone that far with the design yet.
13 Q.   Well, that was my next question.  What was the
14      operational range?
15 A.   What was the what?
16 Q.   As I understand it, you don't have an opinion
17      as to the range?
18 A.   As far as the very lowest you could get by
19      with, no.  I feel 20 is adequate and I have no
20      argument with 20.
21 Q.   Okay.  But you're unable to give us a range?
22 A.   No, I'm not prepared to do that.
23 Q.   Okay.  And you haven't done any testing or

Page 258

1    analysis or research to make that
2    determination?
3  A.   No.  I just got the actual model built
4    yesterday afternoon.
5  Q.   You're talking about the Shaver design?
6  A.   Correct.
7  Q.   Okay.
8  A.   And you would have to have that design
9    basically to do that.
10  Q.   So that I'm clear, have you told me what leaks
11    there were to the vacuum system?
12        MR. GIVENS:  What leaks there were?
13        MR. SHEEHAN:  Yes.
14  A.   Other than the potential one to the gasket that
15    we talked about, you know, in depth, I don't
16    believe so.
17  Q.   You don't believe what?
18  A.   That I told you.
19  Q.   Okay.  Would you tell me what the leaks are to
20    the vacuum system of the subject machine that
21    injured Mr. Riley?
22  A.   I don't know.
23  Q.   I noticed in your report that you've got 13

Page 259

1    different actions and deficiencies listed on
2    pages six and seven; is that correct, sir --
3    excuse me, six, seven and eight?
4  A.   I haven't counted them, but there are 13.
5  Q.   All right.  And if I'm correct, only the 13th
6    action of deficiency refers to United Rentals;
7    is that correct, or relates to United Rentals?
8    In other words, can I jump to the 13th bullet
9    point or do I need to go over the first 12 with
10    you?
11        MR. GIVENS:  With all due respect, I
12        would suggest that this witness is
13        not in a position to tell you how
14        to --
15        MR. SHEEHAN:  I just need to know
16        whether I need to go over one
17        through 12 or whether I can go to
18        13 and ask him about 13 as opposed
19        to asking him about the first 12.
20        MR. GIVENS:  Okay.  The underlying
21        question then is, does anything
22        above 13 have anything whatsoever
23        to do with United Rentals?  And I

Page 260

1    would ask him to establish that
2    one way or the other.  And then
3    whether or not you want to ask him
4    about the first 12 or the last
5    13th is up to you, not up to him.
6    That's kind of the point I was
7    trying to make.
8        MR. SHEEHAN:  Fair enough.  Thank you.
9  A.   Let me just look over those top 12 without us
10    going through them one by one and I will try to
11    give you an answer.
12  Q.   Please.
13  A.   And I'll try to speed that up.  I want to make
14    sure that I don't --
15  Q.   And I appreciate Larry's comment.
16  A.   Number 12.
17  Q.   All right, sir.
18  A.   Possibly.
19  Q.   Okay.  Please, sir.
20  A.   Where I talk about the container for the
21    owners/operators instructions, it's my opinion
22    that it would be a good business practice for
23    any rental company or anyone else that is

Page 261

1    supplying equipment for others to use to
2    provide -- if the manufacturer did not, to
3    provide an obvious and conspicuous container or
4    holder that it was known contained
5    instructions.  I've seen that on other
6    equipment.  For two reasons, that gives a place
7    that it's readily available; and also if that
8    container or box is there and it's empty,
9    before it goes out to the -- you know, on like
10    your Ready to Rent form that United Rentals
11    has, then it would be an alert or it would be
12    something on their list they could check out,
13    in place, out of place, whatever, it would be
14    an item there.  So potentially number 12 of
15    that list could involve United Rentals.
16  Q.   All right, sir.  Any others before the 13th
17    bullet?
18  A.   I think going through it that was the only one
19    that I saw that could.
20  Q.   Fair enough.  And so where would this container
21    be placed on the subject core drill machine?
22  A.   There --
23  Q.   On the subject core drill machine?  You're

Page 262

1   welcome to refer to the photographs that you
2   took on May the --
3   A.   Well, I will say that the subject core drilling
4        machine in dimensions, shape, size is virtually
5        the same as this one.
6   Q.   Well, if you will, refer to your photographs
7        and, if you will, show me on the photographs
8        that you identified as --
9   A.   Okay.  And I understand, I wasn't trying to be
10       difficult.
11           MR. GIVENS:  23 through 47.
12           MR. SHEEHAN:  Thank you, sir.
13  A.   You know, I believe there could be a little
14       pouch put in beside the vacuum pump, you know.
15  Q.   Okay.  If you will, why don't you take a pen
16       there and circle --
17  A.   Well, I'm going to take that back.  There are
18       vents, fins, there that would preclude that.
19       That's an exhaust.  Can I take this photograph
20       over and look at that machine?
21  Q.   Sure.
22  A.   It helps me to visualize --
23  Q.   Yes, sir.

Page 263

1   A.   -- 3-D and spatial work.
2   Q.   All right.  Now, what photograph number are you
3        taking, sir?
4   A.   Well, I'm taking, it's on the back, 38.
5   Q.   Exhibit Number 38 to your deposition you're
6        using to compare with the Shaver design
7        machine?
8   A.   Correct.  Okay.  Of course, we will have to get
9        another photograph for another place I see.
10       There could be a pouch put right back here
11       between the wheels.
12  Q.   All right.  If you would, if you will circle
13       that with a pen on the photograph that you
14       have?
15  A.   And, you know, a container like that could be a
16       round tube that the instructions -- a copy of
17       the instructions could be rolled up in even.
18       (Witness complies.)
19  Q.   All right.  Is that legible?
20  A.   I think so.  Sure.
21           MR. GIVENS:  Is it going to stay or is
22           it going to wipe off?
23  A.   I've scratched it.  Now, whether it will show

Page 264

1   up on a copy or not, I don't know if it stays.
2           MR. GIVENS:  The thing I would be
3           concerned about is that that ink,
4           in all likelihood, the first time
5           it's touched will rub off.
6   A.   It's staying pretty good.  It's staying pretty
7        good on there.
8           (Off-the-record discussion.)
9   A.   Right here is another place it could be.
10  Q.   All right.  If you will circle that so we can
11       see it?
12  A.   (Witness complies.)  And that is Number 32.  So
13       it's 32 and 38.
14  Q.   Any other locations that the manual could be
15       placed or a container for a manual?
16  A.   Also on Number 32 I'll put another potential
17       place for it.
18  Q.   Where would that be, sir?
19  A.   Between the vacuum pump and the vertical stand.
20  Q.   And is that legible?
21  A.   No.  Larry, let me know if I get one of your
22       expensive favorite pens and try this.
23           (Off-the-record discussion.)

Page 265

1   A.   I'm going to go back and mark this one between
2        the wheels, Number 38, again with this one.
3        That black shows up better.  I've got three
4        potential places marked that could be.  I mean,
5        that's not exclusive.
6   Q.   All right.  And those are contained on what
7        exhibits?
8   A.   32 and 38.
9   Q.   All right, sir.  So now, if we could, sir,
10       let's discuss this 13th bullet point in your
11       report?
12  A.   Okay.
13  Q.   What facts do you have that United Rentals
14       failed to reasonably maintain the core drill?
15  A.   Two mainly.  The condition of the one bit,
16       that's an indication.  Certainly if testimony
17       and other evidence shows that that drill bit
18       was put into that shape by use at Flavor House,
19       and that can be established, then, you know, I
20       think that would tend to remove that one from
21       United Rentals' responsibility as long as that
22       bit was received.  I saw some deposition
23       testimony that the bit was in poor shape when

Page 266

1  they received it at Flavor House in one of the
2  depositions.
3      I will tell you what may be fair to
4  expedite this, since I'm going to read and sign
5  this deposition, when I read and sign it, when
6  I've done that, I will try to insert the place
7  in the deposition when I refer to statements
8  like that.  Is that fair enough?
9  Q.  No, sir.  You're under oath now and it's
10  instantaneous.
11  A.    Okay.
12      MR. GIVENS:  The only thing you can do
13          when you read and sign is if you
14          see a word you've actually said
15          today and you don't agree that you
16          said that word, you can make a
17          change, but you can't add things
18          to the deposition.
19  A.    I have had them have me do it before, but
20      that's fine.
21      MR. SPRAIN:  Yeah, but that's not
22          correct though.
23  A.    Okay.  Then I won't do it.  No, again, with

Page 267

1  response to that, one of the depositions from
2  some of the people there at Flavor House, and I
3  can't recall the name, it could have been -- I
4  just don't remember, but one of them, I
5  believe, stated that the bit was received in
6  poor condition.
7  Q.  So, I mean, should you use a bit that's
8  received in poor condition?
9  A.    If that's what you are sent with and based on
10  your limited knowledge of the understandings of
11  the machine, should you?  Obviously I would say
12  from my personnel experience and what I know, I
13  would not.
14  Q.  Well, why not?
15  A.    Well, can I finish my answer?
16  Q.  No, sir.  I'm just curious, why wouldn't you
17  use a drill bit that had missing teeth?
18  A.    Well, because of my knowledge as an engineer, I
19  would know that that would create abnormal and
20  excessive forces as it was trying to cut
21  through the cement.  I'm not sure that the
22  people that were using this would have that
23  knowledge and experience to know that.

Page 268

1  Q.  Would that have caused the bit to have become
2  bound in the hole?
3  A.    It could have contributed to the binding of the
4  drill, if that were the bit that was even used.
5  You know, we had two bits there; one that was
6  and one that wasn't.
7  Q.  Well, which bit was being used at the time of
8  the accident, sir?
9  A.    I've already answered that.  I don't know which
10  one.
11  Q.  Would it have been reasonable to use a drill
12  bit with missing teeth?
13  A.    If that is what they were provided with by the
14  company that owned and maintained it, it's not
15  unreasonable for them to assume that that bit
16  was still in condition to possibly get the job
17  done.  Otherwise the people in that position
18  and the mechanics could have opined that if the
19  rental company sent that bit out there, that it
20  must still be capable of cutting.
21  Q.  Well, was it capable of cutting?
22  A.    The bit that I saw, I would not expect it to be
23  capable of cutting a hole through, but, you

Page 269

1  know.
2  Q.  When did the teeth on the drill bit that you
3  saw, when did they break?
4  A.    I don't know.
5  Q.  And you only saw one drill bit?
6  A.    No, I saw two.
7  Q.  Did you examine the other drill bit?
8  A.    Yes.
9  Q.  And what, if any, observations did you make
10  based upon your examination?
11  A.    It seemed to be in good condition.
12  Q.  The question is, in comparison of the two,
13  what, if any, observations did you make?
14  A.    It had all of the teeth on it.  It did not have
15  missing teeth and did not seem to be abnormally
16  worn.
17  Q.  Had it been used?
18  A.    Yes.
19  Q.  When had it been used?
20  A.    I don't know.
21  Q.  When had the drill bit with the missing teeth
22  been used?
23  A.    I don't know.

Page 270

1 Q.    Sir, in the box of materials that you went over
2      with Mr. Sprain there was one single photograph
3      that was out and let's mark that as Exhibit
4      Number 50.  Is that right?
5            MR. GIVENS:  I've got that that should
6            be 48 by my count.
7            MR. SHEEHAN:  48 and 49 are the two for
8            the e-mails.
9            MR. GIVENS:  I'm sorry, you are
10           correct.  I've got it right down
11           there written down, if I could
12           only read.
13           MR. SHEEHAN:  Let me mark this as
14           Exhibit Number 50 to the Shaver
15           deposition.
16           (Exhibit 50 marked for identification.)
17 Q.    And this appears to be a photographic print
18      that was not made from negatives.
19 A.    Okay.
20 Q.    Why was that out of the notebooks?
21 A.    I would say it probably fell out of the sleeves
22      of the notebooks.  They're not sealed in.
23 Q.    Was there any significance of you taking that

Page 271

1      photograph, Number 50?
2 A.    No.  I did not specifically take that
3      photograph out individually for any purpose.
4 Q.    Was there any significance of you taking that
5      photograph?
6 A.    It showed the drill bit.  I mean, it -- I
7      typically try to photograph just about every
8      surface that I can find on something and a lot
9      of times multiple times in case, you know, the
10     picture doesn't turn out, out of focus or
11     whatever.
12 Q.    Okay.  Was that the drill bit that was on the
13     subject machine at the time of your examination
14     in May?
15 A.    Yes, it was.
16 Q.    All right, sir.  Now, would a jammed core bit
17     allow the base to separate from the concrete?
18 A.    Not with -- not with the proper vacuum
19     pressure, no.
20 Q.    And the proper vacuum pressure would have been
21     what?
22 A.    At least 20 inches of Mercury.  It's possible
23     that a lower number would also prevent a jammed

Page 272

1      bit or -- yeah, a jammed bit from displacing
2      the base.
3 Q.    And that's the range that you cannot provide us
4      with?
5 A.    That's correct.
6 Q.    All right, sir.
7 A.    That we went over before.
8 Q.    All right, sir.  Now, if the gasket is pushed
9      down on one side and not on the other so
10     there's not an even force pushing down on the
11     base of that drill machine, what effect would
12     there be on the machine?
13 A.    I would anticipate you having difficulty --
14     and, in fact, in the time that I have taken it,
15     you know, with this machine and --
16 Q.    All right.  Let's identify this machine?
17 A.    The alternate design, but before the alternate
18     design was incorporated.  You have to get a
19     fair amount of water around the gasket to
20     create a suction.
21 Q.    All right.  Now, did you hook the water
22     attachment to the -- or hook a hose to the
23     water attachment and turn the water on?

Page 273

1 A.    No.  No.  I just poured water around the base.
2      I've done that.
3 Q.    How long did you operate it on that occasion?
4 A.    Two or three minutes.  And I did not put a bit
5      in and drill a hole with that on there.  That
6      was just to create a suction to the concrete to
7      do that.  And, of course, if you have a lot of
8      weight on one side versus the other, I mean,
9      you don't even start to build up a vacuum.  The
10     vacuum gauge does not move.
11 Q.    And why is that, sir?
12 A.    Because it doesn't have a seal.  You've got to
13     get the -- you've got to get -- on a wet
14     surface or a good smooth surface, you've got to
15     get it over just right and apply even pressure.
16     You have to -- at least with that one, you have
17     to kind of press down on it and move it
18     slightly to get it started to suck down.  And
19     it pretty well compresses that gasket down.
20        And once it gets it compressed down, you
21     know, moving it and rocking it around, even
22     without the leveling bolts, you know, placed
23     down to maintain it, you're not going to break

Page 274

1    that vacuum by hand motion. And I would not
2    expect with a full vacuum force that you're
3    going to with that drill motor either, even
4    with the rocking around due to -- if there were
5    any, due to the leveling bolts that we had
6    talked about before.
7  Q.  I'm confused. I didn't understand a word you
8       said. I'm sorry, can you explain to me what
9       you just said?
10  A.  The base, if you -- to suction it down, you
11      have to kind of move that gasket, because there
12      will be gaps between the gasket and there and
13      openings where it can -- you have to kind of
14      press down on the gasket and get it started to
15      kind of help it suck down.
16  Q.  To a concrete slab?
17  A.  To a concrete slab with water there. And it
18      pulls and compresses down on that rubber. Once
19      it gets sealed, you know, that seal is made.
20      And if it's a full vacuum in there, it's not
21      going to dislocate or you're not able to move
22      it and rock it around and dislocate it. Was
23      that better that time?

Page 275

1  Q.  Well, I think I understand what you're telling
2       me now.
3  A.  Okay.
4  Q.  Did you use the leveling bolts when you tried
5       to operate it without drilling a hole?
6  A.  No.
7  Q.  Did you use the leveling bolts when you used
8       the Home Depot rental six or seven years ago?
9  A.  I don't recall. I really don't.
10  Q.  What model core drill machine was that?
11  A.  I don't remember.
12  Q.  And so I'm clear, you've never examined any
13      other model core drill machine other than a
14      Norton?
15  A.  No.
16  Q.  Never even seen another model?
17  A.  Oh, I've seen them, you know, but -- yes, I've
18      seen them. I've seen numerous drills.
19  Q.  I mean, let's don't play games. In other
20      words, you've never observed or examined other
21      core drill machines; is that fair?
22  A.  Fair. And I wasn't trying to play games. You
23      asked that and then you said you've never even

Page 276

1    seen them, and I didn't think that was, you
2    know, a fair --
3  Q.  I just didn't want us to get back into the 40
4       reports and all of that kind of --
5  A.  Okay.
6  Q.  Okay. Now, we were going over the 13th bullet
7       point there and you were telling me about what
8       it was that we had failed -- we being United
9       Rentals, had failed to maintain. And, I'm
10      sorry, I've lost my list. What did you tell me
11      to begin with?
12  A.  Well, we had that item in Number 12, do you
13      want to go back to that or just in 13?
14  Q.  All right. Just tell me so I can write it
15      down.
16  A.  That was the container for the manuals, the
17      operators manual.
18  Q.  All right. Anything else that United Rentals
19      failed to maintain?
20  A.  The bit.
21  Q.  All right. Now, you're talking about which
22      bit?
23  A.  The one bit. If that bit were involved and it

Page 277

1    is established that United Rentals delivered
2    that bit to Flavor House in that condition,
3    then that -- you know, that would be
4    applicable. And, you know, I think I say that.
5    You know, I say that "based upon the condition
6    of the core drill on inspection, the product
7    was poorly maintained. The drill bit in use at
8    the time of the accident shows some signs of
9    damage."
10  Q.  Right. But as far as -- in all fairness, do
11      you know what drill bit was being used at the
12      time of the accident?
13  A.  No.
14  Q.  Okay. Let's move on then.
15  A.  Okay. Fine. All right. The vacuum pump, when
16      we examined it, was non-functioning and found
17      to have foreign material internally.
18  Q.  Okay. Why was it not working when you examined
19      it? And I assume that's May of 2005?
20  A.  Yes.
21  Q.  Okay. Why was it not working in May of 2005?
22  A.  Because the powder, the aluminum oxide powder,
23      was inside the diaphram of the vacuum pump.

Page 278

1  Q.  Any other reason that the vacuum pump was not
2      working in May of 2005?
3  A.  Well, the electrical wires were -- had been
4      pulled loose from it as a result of the
5      accident. It had to be wired back up by the
6      factory technicians that were there and, you
7      know, all of us together we wired it.
8  Q.  Okay. Any other reason that the vacuum pump
9      was not operating in May of 2005?
10 A.  Not that I'm aware of.
11 Q.  Okay. So we've covered the vacuum pump. And
12     how was United Rentals to maintain the vacuum
13     pump?
14 A.  United Rentals should have kept the water
15     collection cup drained, made sure that it was
16     emptied and not allowed to build up. Upon
17     receipt of the machine, they should have
18     examined it to have, you know, looked in there
19     to see if it looked like the customer had
20     allowed the cup to get too full and to allow
21     water to get up into that area, just an
22     inspection of the device -- of the units when
23     they came back in.

Page 279

1  Q.  Anything else?
2  A.  No.
3  Q.  Okay. Let's talk about the -- is there any
4      evidence to support your contention that the
5      water collection device was not drained?
6  A.  That there was either water or slurry present
7      in the vacuum pump, that it found its way in
8      there.
9  Q.  Well, what facts do you have to support that?
10 A.  It was inside the pump when we opened it up.
11 Q.  I'm sorry, water was inside the pump when you
12     opened it up in May of 2005?
13 A.  No, but the white powder, the aluminum oxide.
14     And the only way it could have gotten inside
15     the pump would have been had a slurry, which is
16     a mixture of concrete and other material, dust,
17     mixed with water, had been sucked into there,
18     or if water had sucked into there and had
19     reacted to form aluminum oxide with the
20     aluminum housing of the vacuum pump.
21 Q.  And when did the slurry get sucked into the
22     machine?
23 A.  It would have had to have been, you know, prior

Page 280

1      -- when the machine was operational.
2  Q.  Was it sucked in post-accident?
3  A.  No.
4  Q.  And what facts do you have to support your
5      contention that it was not post-accident
6      suction of slurry?
7  A.  Well, the -- post-accident the vacuum pump was
8      not operational. The power cord had been
9      disconnected, you know, had been pulled loose.
10     So there could have been no suction without a
11     power cord to have created one.
12 Q.  Okay. What about after the first hole was
13     drilled and they had the machine turned over?
14 A.  I don't believe that there would have been
15     enough water, you know, sucked in to have --
16     had that cup arrived empty, as it should have,
17     there would not have been enough water that
18     would have been sucked into that cup and
19     bypassed to have allowed it to have gotten up
20     into the pump.
21 Q.  And what facts do you have to support that
22     theory?
23 A.  Well, it takes a significant volume of water

Page 281

1      that's pulled in through that vacuum pump to
2      fill that container all the way up. It would
3      have to be from a long-term usage to even --
4  Q.  No. The question is, what facts do you have to
5      support that opinion?
6  A.  Okay. There was only one hole drilled prior to
7      this happening at Flavor House and the amount
8      of water that would have sucked into that
9      vacuum pump, it just would not have had enough
10     time to fill that container up with one hole.
11 Q.  How much water was sucked in, sir?
12 A.  Well, enough water to have filled the cup.
13 Q.  How much water is that, sir?
14 A.  I don't know the exact volume, but I would say
15     a cup to --
16 Q.  Just give us an approximate for the subject
17     machine?
18 A.  Sure. I would say eight ounces, eight to ten
19     ounces.
20 Q.  And what do you base that on?
21 A.  The approximate volume of the water cup.
22 Q.  Did you measure the subject machine water cup?
23 A.  No.

Page 282

1  Q.   Was there any water in the subject machine
2       water cup?
3  A.   No.
4  Q.   Did you perform any testing to determine how
5       much water had been in the water cup
6       post-accident?
7  A.   No.
8           MR. GIVENS:  Real quick, it's about
9               3:45, do we have any reasonable
10              expectation that we're going to be
11              able to get to John Frost today?
12              And, again, you take as long as
13              you want here, but at this point I
14              was just going to see if we were
15              in a position to make a call on
16              that.
17          MR. SHEEHAN:  Sure.  I think what we
18              need to do, in order to save time
19              with his deposition, is to go on
20              and get him on the record to
21              provide us with the information so
22              we can speed through --
23          MR. SPRAIN:  I agree with that.

Page 283

1           MR. SHEEHAN:  -- his deposition at a
2               subsequent time.  But we need to
3               go on and get his stuff so we can
4               go on and have time to review it
5               rather than take the time that we
6               did with this deposition just
7               identifying documents, is that
8               fair enough, since he's already
9               here from Huntsville?
10          MR. GIVENS:  Yeah.
11          MR. SPRAIN:  One thing I can say, when
12              Winston is done, I've got three
13              follow-up questions.  One is to
14              turn this drill on real quick and
15              would that take a minute or so?
16 A.   Yeah.
17          MR. SPRAIN:  Show me how it works.  I
18              want to get photographs of the new
19              components of the drill that
20              comprise the Shaver design.  And I
21              want to ask him just one more
22              follow-up question, so I'm
23              thinking two or three minutes.

Page 284

1           MR. GIVENS:  I mean, you're not done
2               and the only reason I posed that
3               question at this juncture is just
4               to make a note of what the time
5               is, and I don't know how late
6               we're planning on going, but just
7               to broach that subject and us get
8               our heads together and see what we
9               want to do.
10 BY MR. SHEEHAN:
11 Q.   So that I'm clear then, sir, as far as testing
12      or research or analysis, you haven't performed
13      any on that fact to support whether or not the
14      vacuum pump was, how did you put it, not
15      functioning?
16 A.   Not functioning when?
17 Q.   I was just reading from your report on page
18      eight, you say "The vacuum pump was
19      non-functioning."
20 A.   The vacuum pump was non-functioning.  When we
21      plugged it in, it wouldn't operate.
22 Q.   All right.  But you're talking about in May of
23      2005?

Page 285

1  A.   That's right.
2  Q.   Okay.  But you haven't performed any tests to
3       determine -- where you say "pick-up from the
4       vacuum process from previous years," you don't
5       -- you haven't performed any testing, research
6       or analysis to determine what the -- when that
7       pick-up from the vacuum process had occurred,
8       whether it was pre or post-accident?
9  A.   I don't know physically how it could have done
10      it post-accident.  I mean, just physically --
11 Q.   No, sir.  The question is you haven't performed
12      any tests or research or analysis?
13 A.   Well, we had the lab analysis done at Applied
14      Technical Services to find out that that was an
15      aluminum oxide, which could be a by-product of
16      corrosion, which indicates that there was water
17      present in the vacuum pump.
18 Q.   All right, sir.  But my question is, to
19      determine whether it's pre-accident slurry or
20      post-accident slurry -- excuse me, the timing,
21      and I think --
22          MR. GIVENS:  What I'm about to observe
23              is that that's what he said, is

72  (Pages 282 to 285)

Page 286

```
 1              that he did not see any way that
 2              it could have been post-accident.
 3              And while I certainly don't mean
 4              to testify, the logic in that to
 5              me stands out from the fact that
 6              at the time of the accident the
 7              cord was broken on the vacuum pump
 8              and it was still broken when they
 9              went to test it in May of 2005.
10              So what he further testified was
11              that he could not see a way
12              physically that that material
13              could have gotten up in there
14              post-accident, because there's no
15              expectation the vacuum pump could
16              have run.
17  A.   Correct.
18  Q.   Fair enough.  And I appreciate the distinction
19       and I appreciate you bringing that out.
20       Because I guess what I'm trying to figure out
21       is, do you have an opinion, based upon a
22       reasonable degree of certainty from an
23       engineering standpoint, as to the time that the
```

Page 287

```
 1       slurry would have been picked up in the vacuum
 2       process?
 3  A.   Yes.
 4  Q.   All right.  And, now, have you performed any
 5       calculations to make that determination?
 6  A.   No.
 7  Q.   Have you performed any tests to determine --
 8  A.   No.
 9  Q.   -- when it occurred?  Have you performed any
10       analysis to determine when it occurred?
11  A.   Yes.
12  Q.   And what analysis have you performed to
13       determine the timing of when the slurry was
14       picked up by the machine?
15  A.   It would be an analysis that on the subject
16       machine or this machine there's --
17  Q.   Let's talk about the subject machine.
18  A.   Okay.  The subject machine.  There is not a
19       label on that container that says "after every
20       use empty this."
21  Q.   No.  The question is, when -- the timing that
22       the slurry went into the machine?  That's the
23       only question.
```

Page 288

```
 1  A.   Okay.
 2  Q.   Have you performed any analysis to determine
 3       when the slurry went into that machine?
 4  A.   All right.  We may have a difference of
 5       definition of analysis here.  But an analysis
 6       is an analysis analyzing what -- you know, what
 7       situation you have.  Are we on the same
 8       wavelength with analysis?
 9  Q.   No, sir.  Maybe I don't understand what you are
10       interpreting to be analysis.
11  A.   Okay.  I can say with a reasonable degree of
12       certainty that that water, slurry, whatever,
13       was into that pump prior to the time that
14       Flavor House received it.
15  Q.   And what facts do you have to support that?
16  A.   Okay.  They drilled one hole prior to that --
17       to the time of the accident, okay.  With the
18       cup having -- if it had been emptied properly
19       and drained, you know, when they received it,
20       it should have been empty, okay?  Agreed?
21       Unless United Rentals sent it out half full or
22       full, whatever, the cup should have been empty.
23       In one application of a vacuum pump, you know,
```

Page 289

```
 1       sucking down, one application of a vacuum is
 2       not going to suck enough water into that cup to
 3       fill that cup up.
 4          It's just not going to do it for two
 5       reasons.  You're not going to pull in enough
 6       water around that seal once that vacuum is
 7       suctioned down.  And there is not a label or
 8       anything written on the cup or on the machine
 9       that says "empty this cup after every use."
10       Because for it to fill up after one use that
11       way, there would be water basically pouring
12       into that cup.  And it would be unreasonable to
13       expect someone to have to empty that cup after
14       every use, that would just be -- it's just not
15       going to happen.
16  Q.   Well, did anyone empty the cup after the first
17       hole was drilled?
18  A.   I don't know.  I'm just saying one hole is not
19       going to -- drilling one hole and applying the
20       vacuum is not going to suck enough water in
21       that for it to go from empty to all the way
22       full and suck water into the pump in the volume
23       that I would have expected would have gone in
```

Page 290

1    there from the material that we saw.
2  Q.   How much water went into that machine based on
3       the material you saw on the diaphram of that
4       pump?
5  A.   I don't have a measured quantity of that, but
6       based on the -- based on the amount of material
7       and the corrosion that I saw inside the pump, I
8       would several ounces, several fluid ounces
9       of water.
10 Q.   I'm sorry, can you tell me -- I've gone to the
11      Supreme Court on what several means. What does
12      several mean to you?
13 A.   I would say more than three. More than three
14      ounces.
15 Q.   And what do you base that on?
16 A.   Just the volume of the white corrosion.
17 Q.   How much corrosion was there on it? Did you
18      measure it?
19 A.   The photographs show the entire -- the
20      diaphram, the entire cover of it was covered.
21 Q.   All right, sir. But what I'm asking you is how
22      much -- give me a measurement or some unit so
23      we can compare?

Page 291

1  A.   I did not measure the volume or weight of the
2       amount that was in there.
3  Q.   Okay. And why not?
4  A.   Well, we had the number of people that were
5       there. We removed enough of a sample at that
6       time to analyze what it was.
7  Q.   How much did you remove, sir?
8  A.   It was two petri dishes that Applied Technical
9       Services used and, to my knowledge, would have
10      retained those samples, as it would have only
11      required a minimal amount to have analyzed the
12      content.
13 Q.   So how much did y'all remove, sir?
14 A.   I don't know. The volume was two petri dishes.
15 Q.   Were they full?
16 A.   I don't recall how full they were, but they
17      were -- you know, enough to have two samples to
18      do a chemical analysis of what we thought was
19      enough.
20 Q.   Do your photographs depict the condition of the
21      diaphragm as you saw it there that day?
22 A.   I think we can probably find some in here that
23      do.

Page 292

1  Q.   Your photographs there that you've identified?
2  A.   I've got three other books of photographs here.
3       MR. GIVENS: They're also identified.
4  A.   Oh, okay. Well, he keeps pointing to these as
5       I'm reaching for my books, so I don't know.
6       MR. GIVENS: What he's asking is if
7          there's a photograph in this set
8          that would serve the purpose?
9  A.   No, because these are external. We have a
10      whole set in there of the inside.
11      MR. GIVENS: While he looks for that,
12         can I take about four or five
13         minutes?
14      MR. SHEEHAN: Sure.
15      (Recess.)
16 BY MR. SHEEHAN:
17 Q.   Sir, we've taken a recess and you were going to
18      find us a photograph of the --
19 A.   I didn't see any in my photographs. I saw -- I
20      knew I had seen them here earlier showing all
21      of the powder. This is a series of photographs
22      that was in my file of the photocopies that
23      were in here. They had already been labeled in

Page 293

1       the previous thing about the -- by Mr. Sprain.
2       And this is one of the ones that had been
3       marked to be copied.
4          That is the white powder material inside
5       the vacuum pump. And as you can see, the
6       diameter of that vacuum pump is about five to
7       six inches. It is completely -- this is the
8       top half of the Gast vacuum pump that was
9       removed from the bottom half. You know, this
10      is the main body, this is the top half. And as
11      you can see, there is this white powder
12      material all in here that's almost like a
13      crystal -- well, it is, it's like a crystalline
14      material and it's just completely filled in.
15 Q.   How long did it take that crystalline material
16      to set up, sir?
17 A.   I'm not sure.
18 Q.   Just your judgment as an engineer?
19 A.   You know, several -- several weeks would be
20      what I would say.
21 Q.   And you're talking about several, what do you
22      mean several?
23 A.   We got back to that.

Page 294

1  Q.   Please, sir.
2  A.   You know, two to three months of moisture
3       exposure.
4  Q.   Let's go on and mark those, so we'll know what
5       you're talking about, as Exhibit Number 51 to
6       your deposition.
7  A.   Okay.
8           (Exhibit 51 marked for identification.)
9  Q.   Are there any other photographs?
10 A.   52, and we'll include that one, too, 53.
11          (Exhibits 52 and 53 marked for
12           Identification.)
13 A.   All right.  Anyway, that shows that.
14 Q.   All right.  Let's take those so we will know
15      that these have been separated.  And they were
16      taken out of what composite exhibit, sir?
17 A.   The folder over here that I guess had been put
18      together.  Mr. Sprain, you were going to make
19      copies of these for exhibits?
20          MR. GIVENS:  Actually, I don't know if
21          those were necessarily going to be
22          used if they got over there.  I
23          think what was going to be used

Page 295

1           was left on the table and what got
2           over here --
3  A.   Well, you had me put these purple tabs on them
4       for some reason.  I assume that was to do
5       something with them.
6           MR. SPRAIN:  Yeah, we did label them.
7           This is --
8  A.   As a composite exhibit.
9           MR. SPRAIN:  Yes.  What we did was --
10 A.   It doesn't have a sticker on it though.
11          MR. SPRAIN:  No.  It was Exhibit 5 and
12          we were going to make copies.
13          MR. GIVENS:  Yeah, that's right.  He
14          wrote down the list and then we're
15          going to get copies.  That's
16          right.
17          MR. SPRAIN:  So we tabbed that and
18          then -- what we could do is we
19          could have Tessie or one of your
20          staff persons do that now to
21          expedite matters.  So that was the
22          deal.  I actually did -- and, see,
23          Rick can help us do that later.

Page 296

1           Actually I had two or three pages
2           where I simply -- to expedite
3           matters, I made an exhibit to go
4           back later and make copies.
5           MR. GIVENS:  Okay.
6           MR. SPRAIN:  Of course, I didn't think
7           we would be here until 4:00.
8           MR. GIVENS:  The best laid plans --
9           MR. SPRAIN:  That's right.
10          MR. GIVENS:  -- of mice and men.
11 BY MR. SHEEHAN:
12 Q.   Sir, have you now identified the three
13      maintenance deficiencies that you attribute to
14      United Rentals?
15 A.   Yes.
16 Q.   Are there any other maintenance deficiencies
17      that you attribute --
18 A.   Not that I'm aware of, no.
19 Q.   -- to United Rentals?
20 A.   No.  Not that I'm aware of.
21          MR. GIVENS:  Let him finish his
22          questions.
23 A.   Okay.

Page 297

1  Q.   So you've now told me about all of the
2       maintenance deficiencies that you will opine at
3       trial concerning United Rentals?
4           MR. GIVENS:  Object to the form.
5  A.   I don't know if I will opine those at trial or
6       not.  I don't know if I will be asked to or
7       not.
8  Q.   Okay.  Well, if you have any additional
9       opinions with respect to United Rentals, will
10      you let your lawyer, Mr. Joe Lane, know so that
11      he can notify me and we can redepose you prior
12      to your trial testimony?
13 A.   Sure.  Yes.
14 Q.   Thank you, sir.  Sir, on page nine of your
15      report, prior to your topic "Inspections and
16      Analysis," you have a bullet point, "Mr. Riley
17      was not adequately warned of the risk involved
18      in the hidden or non-inherent risks associated
19      with the operation of this equipment."  What
20      did you mean "non-inherent risks"?
21 A.   Okay.  Those would be risks that would not be
22      -- my meaning, that would not be obvious.  One
23      such example of that would be to get loose

Page 298

1    clothing in and around the rotating drill bit,
2    you know, hands, fingers around moving parts.
3    Those would be, you know, inherent risks I
4    should say. You know, for instance, if you
5    lift the hood of your car and the fan blade is
6    whirling there, sticking your finger into that
7    moving blade would be an inherent risk of
8    having your fingers in and around that. It's
9    not something that's hidden or something that
10   someone cannot look at and readily detect an
11   immediate danger to.
12 Q.   Okay. And what were those risks?
13 A.   The fact that the vacuum could suddenly break
14   away or fall below a level that would allow the
15   drill motor to spin around with a violent
16   reaction.
17 Q.   Any other risk?
18 A.   No.
19 Q.   What was the foreseeable misuse of this
20   product?
21      MR. GIVENS: Object to the form.
22 A.   The foreseeable misuse?
23 Q.   Yes, sir.

Page 299

1 A.   Are you saying I -- is that a word that I used
2   that I should be -- oh, that's just from you.
3 Q.   Well, I'm asking you, did you use that word
4   "foreseeable" and "risk"?
5 A.   I don't know without reading through there.
6 Q.   Okay.
7      MR. GIVENS: Are you asking him did he
8      use the phrase "foreseeable
9      misuse?" I understood that to be
10      the question.
11 Q.   Yes. Did you use that in your report?
12 A.   I don't believe so, but without reading through
13   my report this late in the day, I can't, you
14   know -- in other words, I don't want to say no,
15   you know, and it be there.
16 Q.   Sure. All right. Do you know of any
17   foreseeable misuse of the product?
18      MR. GIVENS: Object to the form.
19 A.   I can't think of one right now.
20 Q.   Do you know of any deficiencies of Flavor House
21   that caused the accident?
22 A.   No, I don't.
23 Q.   If I could, at the top of page nine there, that

Page 300

1   bullet point -- the first bullet point?
2 A.   Okay.
3 Q.   That seems to be a double negative, would you
4   agree?
5 A.   I don't agree that that's a double negative, --
6 Q.   Okay.
7 A.   -- but I may be wrong.
8 Q.   Fair enough. What did Mr. Riley do that he
9   should not have done before the accident?
10 A.   Nothing that I'm aware of.
11 Q.   Okay. What did Mr. Riley not do that he should
12   have done before the accident?
13 A.   I'm not aware of anything.
14 Q.   Okay. Did Mr. Riley do anything wrong before
15   the accident?
16 A.   Not that I'm aware of.
17 Q.   Okay. On page ten of your report, sir, the
18   fifth line down, you say "unevenness in the
19   surface or discontinuity between that gasket
20   seal and the cutting surface;" what did you
21   mean by that, sir?
22 A.   It's not that I don't know what I meant by
23   that, I'm trying to figure out what's ambiguous

Page 301

1   about it. Any unevenness in the surface, say a
2   crack in the concrete, you know how concrete
3   sometimes cracks and one moves up from the
4   other. A discontinuity, it could be -- one
5   example would be if that gasket, the glued end,
6   were not -- was not glued or there was a
7   misalignment of it, that would be a
8   discontinuity. Also, let's say a twig or a
9   stick or, you know, a small obstacle got
10   between the floor and the gasket.
11 Q.   In other words, if the floor had not been
12   properly cleared or the work area had not been
13   properly cleared?
14 A.   That's true, yes.
15 Q.   How would that have made a difference?
16 A.   It would reduce the vacuum building potential
17   of the unit to the floor.
18 Q.   Would it still create a vacuum?
19 A.   It could. It may or it may not, depending on
20   how severe it was.
21 Q.   Do you have an opinion as to whether or not
22   that occurred in this case, whether there was
23   any unevenness or discontinuity?

Page 302

1  A.   I'm not aware of any.
2  Q.   If there had been an unevenness or
3      discontinuity, could this accident have
4      occurred as described by either Mr. Walters or
5      by Mr. Riley?
6  A.   It could have.
7  Q.   Did you see the inconsistencies between the
8      testimony of Mr. Walters and Mr. Riley in their
9      deposition testimony?
10          MR. GIVENS:  Object to the form.
11  Q.   That's probably a poor question.  Did you, in
12      reading the deposition of Mr. Riley and reading
13      the deposition testimony of Mr. Walters, note
14      any inconsistent testimony?
15  A.   No.  None jumps out at me right now.
16  Q.   All right, sir.  So that I'm clear then, the
17      testimony of Mr. Walters and Mr. Riley was
18      consistent?
19  A.   As far as I can recall, basically it was.
20  Q.   All right, sir.  Well, that begs the question.
21      Basically, what do you mean?  Did you see any
22      inconsistencies in the testimony of Mr. Riley
23      and his supervisor Mr. Walters?

Page 303

1  A.   No.  No.
2  Q.   So that I'm clear, would a jammed core bit
3      allow the base to separate?
4  A.   With sufficient vacuum?  No.
5  Q.   Now, I notice on page ten of your report, the
6      second from the bottom -- excuse me, the line
7      second from the bottom, I guess that
8      next-to-the-last sentence on that page, you say
9      "The core bit accompanying the unit displayed
10      scarring and scratches consistent with a
11      violent event."  Which core bit were you
12      talking about?
13  A.   That was -- I believe that would have been the
14      one with the broken teeth, because the other
15      one did not -- I didn't note anything on it.
16      So it was the one with the broken teeth.
17  Q.   Okay.  And that was the bit that was on the
18      machine when you saw it in May of 2005?
19  A.   That bit wasn't on the machine, the one that
20      was broken, it was accompanying the machine.
21  Q.   All right.  Which bit was on the machine when
22      you examined it in May of 2005?
23  A.   The one with the good teeth.

Page 304

1  Q.   Now, "the overall condition of the unit
2      supported the occurrence of a harsh violent
3      event associated with the unit;" what did you
4      mean by that, sir?
5  A.   Electrical cords pulled loose.  I'm trying to
6      remember if there were any scarring that I
7      attributed to it.  I don't recall any.  But
8      just for now in expediency I will say the cord
9      -- you know, the cord pulled loose, the cords
10      pulled loose.
11  Q.   Okay.  Any other evidence that this was a
12      violent event, the accident?
13  A.   Mr. Riley's injuries.
14  Q.   All right.  Anything else?
15  A.   Witness testimony that saw it, the people who
16      were there when it happened.  That's all I can
17      think of right now.
18  Q.   Okay.  So we've got the bit, we've got the
19      witnesses, what else?
20  A.   Mr. Riley's injuries.
21  Q.   Oh, and the injury.  Okay.  Now, what about the
22      bit that accompanied the machine indicated that
23      it was the bit involved in the accident, if it

Page 305

1      was?  Or was there anything about the bit with
2      the missing teeth that indicated it was the bit
3      involved in the accident?
4  A.   I'm not aware of anything specifically that it
5      -- I don't know that we know which bit was in
6      use at the time right now.
7  Q.   Well, based upon your observations at either of
8      the inspections of the bits, did you conclude
9      or are you able to opine which bit was in use
10      at the time of the accident involving
11      Mr. Riley?
12  A.   Based on what I know to date, I can't say which
13      one.  The bit with the good teeth was the one
14      -- that bit was on the drill at the time of the
15      inspection.  But as you pointed out, there had
16      been some inspection at Flavor House looking
17      for a -- I don't think you pointed it out,
18      Mr. Sprain may have, looking for a shear pin.
19      So whether they took the bit off, you know, and
20      stuck another one back on, you know, I don't
21      know what the sequencing was.
22  Q.   Why would they do that?
23  A.   What's that?

Page 306

1  Q.   Why would they change the bit on the machine?
2  A.   Well, I don't think they would have done it
3       intentionally.  I mean, I'm not saying they
4       would have done it intentionally.  I'm just
5       saying that if they were looking for the -- you
6       know, if they have an extra bit there, they
7       have one they took off, and if they removed the
8       bit to look for a shear pin and, you know, if
9       somebody stuck one back on so that you don't
10      have two bits rolling around, they could have
11      picked up the bit that was not necessarily on
12      the machine.  I'm just saying that as a
13      possibility.  I was not implying that there was
14      any other motives for them doing so.
15 Q.   Have you spoken to anybody at Flavor House or
16      any representative or attorney for Flavor
17      House?
18 A.   No.  No.
19 Q.   Let me see if I -- I believe you've answered
20      this question, but just so I'm clear, have you
21      done any testing with respect to any of the
22      maintenance issues that you fault United
23      Rentals for, other than, I guess, the lab test

Page 307

1       that you've already testified which was of the
2       white powdery substance?
3  A.   Uh-huh, the lab test.  No.
4  Q.   Performed any research?
5  A.   Outside of previous observations of equipment
6       having holders, you know, for instructions and
7       operators manuals, you know, that being -- it
8       was not specific research, but it is
9       observations of numerous other equipment --
10 Q.   Fair enough.
11 A.   -- that that occurs on.
12 Q.   Anything else, sir?
13 A.   No.
14 Q.   And if you do any further testing, will you
15      please let Mr. Lane know so that I can redepose
16      you before your trial testimony?
17 A.   Yes, I will.  Yes, I will.
18 Q.   What was the mechanism which caused the vacuum
19      to be less than as manufactured?
20           MR. GIVENS:  Object to the form.
21 A.   Vacuum is not --
22 Q.   You know, the vacuum system?
23 A.   What could cause the vacuum, what method?

Page 308

1  Q.   What was the mechanism that caused -- is it
2       your testimony or your opinion that the vacuum
3       system failed prior to the accident involving
4       Mr. Riley?
5  A.   My opinion is that there was insufficient
6       vacuum at the base to hold the drill base down.
7  Q.   Okay.  And what caused that?
8  A.   I'm not certain.  I don't know what caused
9       that.
10 Q.   Do you have an opinion based upon a reasonable
11      degree of engineering certainty?
12 A.   I don't believe I do.
13 Q.   Okay.
14 A.   Other than -- well, wait.  One thing that
15      caused -- and this is where these kind of
16      questions are tricky.  One thing that caused
17      the machine to have an insufficient level of
18      vacuum is the lack of a fail-safe system to
19      ensure that the machine must have that vacuum
20      present for the drill motor to operate, but I
21      think I've already stated that numerous times.
22      If you're talking about the specific discrete
23      mechanism that was the reason for not building

Page 309

1       that vacuum up, which is, I assume, what you
2       were looking for, no, I don't.
3  Q.   Sir, I know that Mr. Sprain has asked for an
4       opportunity to ask you some questions, and as
5       he asks you questions, I'm going to try to go
6       over my notes so that I don't waste your time.
7  A.   Okay.
8
9           REDIRECT EXAMINATION
10 BY MR. SPRAIN:
11 Q.   I will be very brief, because I know we're all
12      tired.  To follow-up on the vacuum pump, and
13      this is going to be one of my questions, we've
14      already established that after the accident the
15      vacuum pump was not functional, correct?
16 A.   Correct.
17 Q.   Okay.  How do we know that the vacuum pump was
18      actually functional at the time of the
19      accident?
20 A.   We don't have any discrete physical evidence
21      that it was not functioning other than the
22      testimony that it was.
23 Q.   Okay.  And that would have been from Riley and

Page 310

1     I assume Walters, but I have not read Walters?
2  A.  Yeah.
3  Q.  I think Riley said he turned it on, but do you
4      question whether Riley knew that he was in fact
5      turning on and putting into operation the
6      vacuum pump?
7  A.  No, I don't.  I don't question that.  You know,
8      I have no reason to believe that he didn't
9      know.
10 Q.  All right.  And I'm asking you only because in
11     other respects you question his knowledge and
12     training and experience to properly use the
13     core drill and --
14          MR. GIVENS:  Object to the form.  Go
15              ahead.
16 Q.  Okay.  And the next logical step is would you
17     therefore, you know, question whether he really
18     knew as to whether he was effectively using the
19     vacuum system?
20          MR. GIVENS:  Object to the form.
21 Q.  Especially in light of the fact that after the
22     accident you didn't see that it was in fact
23     functioning?

Page 311

1  A.  Well, effectively using; you know, I think you
2      corrected it then, you said effectively using
3      it.  Yeah, I would question his ability to know
4      whether it was effectively being used.  I would
5      not question is ability to know whether the
6      vacuum pump motor was on and running and making
7      the noise of a pump operating.
8  Q.  Okay.  Well, do you know at the time of the
9      accident whether he turned it on, but it wasn't
10     making a vacuum at all?
11 A.  I don't.
12 Q.  Okay.
13 A.  I mean, I don't have any independent way of
14     knowing that, no.
15 Q.  But you know for a fact after the accident it
16     was incapable of being operated?
17 A.  Correct.
18 Q.  All right.  It was incapable of producing a
19     vacuum?
20 A.  Correct.
21          MR. GIVENS:  You said after the
22              accident?
23          MR. SPRAIN:  After the accident.

Page 312

1          MR. GIVENS:  Okay.
2  Q.  Now, what would Mr. Riley have done to have
3      turned on the vacuum pump?
4  A.  What would he have done?
5  Q.  Yeah.  What physically would he have done to
6      have started the operation of the vacuum system
7      on the day of the accident?
8  A.  He would have plugged -- plugged the vacuum
9      pump into the outlet on the control box.
10 Q.  Okay.  And that starts the vacuum pump?
11 A.  Yes.
12 Q.  Okay.  And then the switch is for the motor
13     specifically?
14 A.  Yes.
15          MR. GIVENS:  When you say the motor
16              specifically, are you talking
17              about the drill motor as opposed
18              to vacuum motor?
19 A.  Yes.
20 Q.  Excuse me, the drill motor.  I think you knew
21     what I was talking about, but I'm talking about
22     the Milwaukee electric drill motor, but you're
23     right.  Now, is it possible today, I'm not sure

Page 313

1      whether you have a camera, somebody brought a
2      camera, to take photographs of your alternative
3      design?
4  A.  Sure.
5  Q.  And then we can supplement the record.  Which
6      exhibit are we on?
7          MR. GIVENS:  About 54 by my count.
8          MR. SHEEHAN:  The next one would be 54.
9  Q.  All right.  I don't know how many photographs
10     you'll take, but I assume it would have to be
11     at least a few, but I want to have the vacuum
12     gauge, the kill switch --
13 A.  I probably have already taken photos of that,
14     but we will make sure.
15          MR. GIVENS:  Is that camera digital?
16 A.  It is.  You know, for that matter -- well, it's
17     got a compact memory flash with it.
18          MR. GIVENS:  Okay.  Do you want to pick
19              the pictures?
20 Q.  Well, I want an overall picture.  I want a zoom
21     of the kill switch.  I want a zoom of the
22     vacuum gauge.
23 A.  All right.  Let's take them one at a time,

1  okay?
2  Q.  Okay.
3  A.  You know, it's hard with background clutter.
4       (Off-the-record discussion.)
5       MR. GIVENS:  Does the flash need to
6            have gone off?
7  A.  No, it's fine.  The kill switch.  Okay.  That
8       got it.
9  Q.  Now, what's different about the electrical
10      cords?
11  A.  Okay.
12  Q.  Because you may want to take these and just --
13      is there a way to make it stand out?
14  A.  Yeah.  Well, anyway, there is a double outlet
15      box.
16  Q.  That's inside here?
17  A.  No.  There is a double outlet box that you plug
18      them into on the box that comes with the drill.
19      I have pigtails out here to allow more room
20      inside the box to contain my relays and stuff.
21      This is also -- this is convenience.  You could
22      have a bigger box and have the same plug in.
23      The only thing that is good about this is

1  before there was a plug on here that you could
2  have -- an adapter that you could -- if you
3  didn't have different plugs, you could miss --
4  for the drill and all, you could misswitch
5  them.  So the way we've got it wired to ensure
6  that you can't do that, there are different
7  plugs for the vacuum pump versus the adapter.
8  They had a plug and adapter on here before for
9  the drill.  And that's kind of --
10  Q.  What about this box, is it the same or is it --
11  A.  That's a different box.
12  Q.  Well, why don't you get the front?  I'm not
13      sure which angle you photographed the kill
14      switch, but I want to get that.
15  A.  Okay.  We got the kill switch in that one, too.
16      And what we'll do with my lettering that I've
17      got here --
18  Q.  Now, one thing I noticed, there aren't any
19      warning labels on this product, why is that?
20  A.  Just a second.  Any warning labels on what?
21  Q.  On this product, on the core drill?
22  A.  Okay.  Are you saying why didn't I add labels
23      to it?

1  Q.  Right.
2  A.  Oh, well, my purpose was not to make this --
3       you know, are you asking warning labels on --
4       MR. GIVENS:  Are you asking wherever it
5            came from were there warning
6            labels on it when he got it and
7            what happened to them?
8  A.  I haven't removed any warning labels.
9  Q.  Okay.  But it came with the box and they
10      weren't put on the product?
11  A.  I haven't seen the box for it.
12  Q.  Okay.  Well, what I understand, and you tell me
13      if I'm wrong or right, the product is
14      assembled, there is the Diamond Products base,
15      which is this with the column, there is the
16      Milwaukee motor, and there is a Gast pump, and
17      then it's all put together and assembled, is
18      that your understanding?
19  A.  When -- I don't know if Mr. Lane had anybody
20      assemble it.  When I got it, it was assembled
21      and put together fully and in this office when
22      I received it.
23  Q.  Okay.  What I'm going to do is I've marked a

1  document as Exhibit 54 to Mr. Shaver's
2  deposition and it states these are photographs
3  of his alternative design.
4       (Exhibit 54 marked for identification.)
5  Q.  I think you've got sufficient photographs.  Now
6  what I want to do is turn this on.
7  A.  Okay.
8  Q.  And let's figure out the protocol, because I
9  don't want to belabor this, but I want to turn
10  it on.  Is this going to cause any racket or
11  any --
12  A.  A little bit, but not a lot.
13  Q.  Okay.
14  A.  All right.  We're turning this to "use vacuum"
15  and you will hear the vacuum pump come on.
16  There's the vacuum.
17  Q.  Okay.
18  A.  All right.  Now, if we were to --
19  Q.  Now, what's different about the core drill at
20  the time of the accident?  Because I thought
21  there was a switch to turn the motor on and you
22  said before just a minute ago that you would
23  plug the cord into the outlet to activate the

1    vacuum pump?
2  A.   Correct.
3  Q.   So this alternative design is different in that
4      you've got one switch that turns on the vacuum
5      pump?
6  A.   Correct.
7  Q.   And that's because you've changed the linkage,
8      you first get a good vacuum.  Then what turns
9      on the motor?
10  A.   Okay.  Just the kill switch.
11  Q.   Oh, the kill switch?
12  A.   Yes.
13  Q.   And so you depress -- the vacuum is on now.
14      What do you do with your design --
15  A.   Right now the motor will not turn on.
16  Q.   All right.
17  A.   Okay.  The vacuum is running, but you will see
18      where the vacuum gauge is, it's at zero.
19  Q.   All right.  It's in the red, so the --
20  A.   Now, right here is the thing that you would
21      normally --
22  Q.   That's the vacuum slot?
23  A.   That's the vacuum slot where it goes in.  We're

1      not building up any vacuum, you can't get the
2      drill to operate.  If we had this thing in
3      there and out on, you know, concrete or a solid
4      floor and we could get it wet enough to stick
5      down, then we would start building up a vacuum.
6          To replicate a vacuum -- and, see, the
7      vacuum switch is built into here.  It is in
8      here.  And this is a hollow hose that is
9      actually transmitting the vacuum.  The vacuum
10      that's available to this unit is now coming up
11      through this tube into the box to activate our
12      box, our thing.
13          All right.  That's not going to do it.
14      I'm just going to do it with my finger.
15  Q.   So what are you doing now so the record is
16      clear?  You're putting your finger in the
17      vacuum slot?
18  A.   Yeah.  Hold on just a second.  We just did this
19      this morning.
20  Q.   This right here --
21  A.   There is only one place that it could be loose
22      and that's inside that box at the switch.
23  Q.   Okay.

1  A.   And that would be if you were pulling on this,
2      you know, when you were over here doing that,
3      and I may not have the clamps tight in here.
4      You see, this is a prototype that we put
5      together and I don't have everything clamped
6      down as tight inside the box maybe as you
7      normally would.
8  Q.   So you're saying when I lifted it up a little
9      while ago, maybe it could have jarred something
10      loose?
11  A.   You jarred it, yeah.  And it will take me just
12      a minute.  Let me go out and get a screwdriver
13      and I can pull it loose and put it back on.
14  Q.   Okay.  We will cut the switch.
15  A.   And I'm going to unplug it, too, since I'm
16      going to open the box.  Let's take a short
17      break and I'll take care of that.
18          (Recess.)
19  BY MR. SPRAIN:
20  Q.   Mr. Shaver has turned the core drill, and it's
21      his alternative design core drill, back in
22      operation and please resume with your testimony
23      about what you're doing?

1  A.   And I will explain what the problem was before.
2      Mr. Sprain had loosened the water collection
3      cup and it wasn't tight back on and we weren't
4      building a vacuum.
5  Q.   I did it intentionally to sabotage his efforts.
6  A.   Yeah, you thought you were going to throw me
7      there, didn't you?  All right.  Well, here we
8      have the activation switch.  And as you will
9      note, the drill will not operate.
10  Q.   Okay.
11  A.   The drill motor will not come on.  Notice that
12      the needle is in the red zone.
13  Q.   So that's showing the vacuum pressure is
14      inadequate?
15  A.   Right.
16  Q.   Now, you put your finger inside the vacuum slot
17      to sort of stop up the vacuum hose?
18  A.   Right.  I'm still having trouble.  Okay.  Hang
19      on.
20          MR. GIVENS:  Will that do it?
21  A.   No, that's not as good as your hand.  All
22      right.  There we go.  As you'll see in the red
23      zone, now in the green zone it works.  All

Page 322

1    right. I'm going to gradually -- I'm going to
2    gradually reduce the vacuum and you'll see when
3    it gets to the red zone, shortly thereafter, my
4    hand is still pressed down, it shuts off. The
5    pressure goes back up. (Demonstrating.) Okay.
6        All right. Next to show how it's wired
7    and how it functions, the middle, the drill is
8    shut off. So activation of the deadman switch
9    will not --
10        MR. GIVENS: It just won't work?
11  A.   It just doesn't work, everything is off. I'm
12    going to turn it to the next setting, which, as
13    we said before, was brace, otherwise using the
14    ceiling jacks or whatever, and the drill
15    operates.
16        Okay. Now, to, you know, expound upon
17    when you're using this, the method of
18    protection here would be for the operator
19    having his hand on this. If this was spinning
20    around and you do like that and it will shut
21    off. And you can tell it's still moving, but
22    if that were bound down --
23        MR. GIVENS: It wouldn't run that long.

Page 323

1  A.   It's not going to run that long if it has, you
2    know, a bit and tension in there like that.
3    The other thing, if someone is back here, the
4    thing about it is, as far as standing on it, if
5    you're going to lose your balance, I will say
6    this, depressing this and holding it while
7    standing on it, you would have to be an acrobat
8    to ride that thing around and keep your hand
9    pressing that button down for it not to shut it
10    down and to stop. You know, it may move you
11    initially and get you started, but it's not
12    going to keep beating you around.
13  Q.   Okay. Fair enough. That's the end of my
14    questioning.
15  A.   You need to get photographs inside now. This
16    is the microswitch. This is the vacuum
17    microswitch.
18  Q.   Well, what about you, have you photographed it?
19  A.   Yeah.
20  Q.   Take a couple of shots and just add those to my
21    exhibit when you get them developed.
22  A.   (Witness complies.) All right. This is
23    tricky, believe me, but building a prototype is

Page 324

1    never that hard. It's so easy to knock these
2    wires loose here.
3        (Off-the-record discussion.)
4        MR. SPRAIN: Saint Gobain Abrasives
5        does make a request that we be
6        allowed to have our people inspect
7        and examine this drill, because it
8        does have changes to it and
9        modifications. And I'm sure y'all
10        wouldn't object, Larry.
11  A.   Uh-huh.
12        MR. GIVENS: I would leave that up to
13        Joe.
14        MR. SPRAIN: Sure.
15        MR. GIVENS: I wouldn't envision we do,
16        but I'm not going to make
17        decisions like that in his case.
18        MR. SPRAIN: Oh, sure.
19  A.   Keep in mind when I said uh-huh, I wasn't
20    agreeing you can.
21        MR. SPRAIN: But this is a principal
22        part of his opinions and so we'll
23        need to look at it.

Page 325

1        RECROSS-EXAMINATION
2    BY MR. SHEEHAN:
3  Q.   Sir, before you leave, and I won't take Larry's
4    picture, but can I get you to show me how you
5    would use this exemplar when we're taking the
6    picture?
7  A.   Sure. We're plugged in. All right. We would
8    use it -- no, we're not plugged in, sorry. Or
9    do you want me to --
10  Q.   Well, that's fine, you can plug it in.
11  A.   I'm kind of curious if it's still going to work
12    after we -- that part works. Hopefully this
13    still will. And it doesn't and it's supposed
14    to.
15        MR. SPRAIN: I didn't touch it that
16        time.
17        MR. GIVENS: It probably needs
18        tightening in there, doesn't it?
19        It went to the green.
20  A.   Yeah, but it won't activate. We knocked the
21    wire --
22        MR. GIVENS: We knocked something loose
23        inside. I shouldn't have

Page 326

1      tightened it up.
2  A.   Yeah.  All right.  I know what we knocked
3      loose.
4          MR. GIVENS:  By process of elimination,
5              it's got to be something on the
6              inside of that.
7  Q.   That's all right, sir.  If I could get you to
8      stand and show me how an operator should
9      properly operate it with the new configuration?
10 A.   Oh, okay.
11 Q.   Are we calling that the front of the machine?
12 A.   Now, I'm saying if I'm standing on the front of
13     the machine, this is how you would do it.
14         MR. GIVENS:  But you could still do it
15             from either side?
16 A.   That's right.
17 Q.   Now, I'm going to take a photograph of the
18     position.  Now, is this the proper way to use
19     your Shaver design machine?
20 A.   Either way.  I don't recommend one way or the
21     other, either the front or the back of the
22     machine.  This would be standing on the front.
23 Q.   All right, sir.

Page 327

1          MR. GIVENS:  If we get in the frame let
2              us know.
3  A.   This would be from the back side.  Pressing
4      down, you would lift up on the handle like
5      that.  You didn't get it, did you?
6  Q.   All right.  If you would show me, I'm sorry?
7  A.   Okay.  (Indicating)
8  Q.   All right, sir.
9  A.   I tell you what, while y'all are -- if y'all
10     want to ask any other questions, I will try to
11     be taking this out, because I want to leave it
12     in operational condition if I can.
13 Q.   Before you move, sir, I notice that when you
14     stand in the back you put your right foot on
15     the right side of the machine?
16 A.   Okay.
17 Q.   Is that correct, sir?
18 A.   That's what I did, yes.  I'm not saying that
19     that's -- there's an incorrect way of standing
20     on -- you know, to positioning yourself either.
21 Q.   And before standing on the machine, do you
22     adjust the leveling screws?
23 A.   I mean, I would, yes.  I mean, according to the

Page 328

1      instructions of letting the vacuum attach down
2      and then, you know, making sure that they were
3      snug, you know, to keep the machine level.
4  Q.   Now, when do you adjust the leveling screws?
5  A.   I would have to look back through the
6      instructions to be sure, it's been sometime,
7      you know, since I reviewed this.  But I
8      believe, from the best of my recollection as we
9      stand, that you apply the vacuum and allow it
10     to suck down to create that vacuum and then you
11     take the leveling screws and adjust it slightly
12     to that -- to level the base to that.
13 Q.   And the function of the leveling screws being
14     engaged is what?
15 A.   To drill the hole into the concrete
16     perpendicular to the floor surface or
17     perpendicular to -- it's actually horizontal
18     since you're using this bubble level, I would
19     assume, or you could use any reference, any
20     outside reference of what you wanted to do
21     within a certain limitation.
22 Q.   And why is it important for it to be
23     perpendicular to the concrete slab?

Page 329

1  A.   Either perpendicular to the concrete slab, if
2      that's what you were looking to adjust, or
3      plumb.  I mean, normally when people are
4      drilling holes into the concrete floor, they
5      want them to go, you know, perpendicular to the
6      surface.  They want it to go straight down;
7      they don't want it going at an angle.
8  Q.   Would the fact that the drill bit is not going
9      straight down in the concrete and could
10     possibly be misaligned, would that have any
11     effect?
12 A.   I don't believe so.  You asked that question
13     before and I think that, you know, I may have
14     misunderstood, but as we've just gone through
15     it, I don't think that it would.
16 Q.   Okay.
17         MR. GIVENS:  Here's the screwdriver.
18 A.   We're unplugged, the screwdriver.
19         MR. SPRAIN:  Okay.  What's the status?
20             Are we done with Mr. Shaver?
21         MR. SHEEHAN:  I've got a few more
22             questions that don't require his
23             standing next to the machine?

Page 330

1  A.   Can I answer them while standing next to the
2       machine and doing this? I'm just trying to
3       save a little time to get out of here.
4            (Off-the-record discussion.)
5  BY MR. SHEEHAN:
6  Q.   Sir, I noted in composite Exhibit Number 18 to
7       your deposition --
8  A.   This was too easy. Well, I spoke too soon, way
9       too soon.
10           MR. GIVENS: Let's go ahead and get
11               this done and then we can do that
12               later.
13 A.   Okay. I'm sorry.
14 Q.   I noticed in composite Exhibit Number 18 to
15      your deposition, which apparently is marked on
16      the second page, there appears to be a document
17      to Don Shaver prepared by Joseph D. Lane on the
18      front page and then actually the second page,
19      the table of contents, is the one that's been
20      marked with the exhibit label. Within the
21      photographs taken by Mr. Tew, the leveling
22      bolts as reflected in his photographs taken the
23      morning after the accident, how would you

Page 331

1       describe those leveling screws?
2  A.   They are near flush; maybe slightly protruding
3       beyond the plane of the base of the aluminum
4       base.
5  Q.   Were those leveling screws engaged at the time
6       of the accident?
7  A.   They could have been. I mean, there's nothing
8       there that -- you know, these two I see. I
9       don't know what it would have had to have been
10      adjusted to to have gotten it plumb on that
11      particular floor.
12 Q.   All right, sir. Have you ever seen a
13      photograph identified as Mr. Walters' Exhibit
14      Number 5 to his deposition?
15 A.   Yes.
16 Q.   You've seen the deposition exhibits then?
17 A.   Well -- no, I haven't seen this.
18           MR. GIVENS: Isn't that one and the one
19               you're showing him the same?
20           MR. SHEEHAN: Yes, sir.
21 A.   Okay. No, I don't recall having seen these.
22 Q.   All right, sir.
23 A.   I --

Page 332

1  Q.   So that I'm clear then, the photographs that
2       you have contained within Exhibit Number 18 to
3       your deposition, the composite exhibit, are the
4       only photographs you've ever seen other than
5       the ones you took?
6  A.   Yes. Well, no. I mean, I've seen -- there are
7       some other photographs in my folder over there
8       that we went through earlier.
9  Q.   That were taken by you, sir?
10 A.   No.
11 Q.   Who were they taken by?
12 A.   By different people. I mean, I've got -- I've
13      got photographs that are similar to these of
14      the machine. I've got probably four or five
15      sets of photographs of this core drill machine
16      and different core drilling machines.
17 Q.   And who were they taken by, sir?
18 A.   Different people. I mean, they're in the
19      folder over here.
20 Q.   Okay. If you would, identify those people that
21      have taken the photographs to your knowledge?
22 A.   Here we go. These are photographs that were
23      taken at the inspection at Applied Technical

Page 333

1       Services.
2  Q.   In May of 2005?
3  A.   Yes. Those were taken by persons other than
4       myself.
5  Q.   Who would that have been, sir?
6  A.   Some of the people on that list.
7  Q.   The attendees?
8  A.   Yes. Let's see. I've got stacks of color
9       photos over here.
10 Q.   I believe it's been represented in my file that
11      those were photographs taken by Mr. Joe Lane
12      during the deposition of Mr. Myers.
13 A.   Okay. That's these. And then these are of the
14      inspection.
15 Q.   Taken by yourself, sir?
16 A.   No.
17 Q.   Who were those taken by?
18 A.   I am not sure.
19 Q.   But one of the attendees at the inspection in
20      May of 2005?
21 A.   Yes. Yes.
22 Q.   All right, sir. For the record then, let me
23      ask you, the composite Exhibit Number 18

84 (Pages 330 to 333)

Page 334

1    containing the photographs, and I guess, as
2    pointed out by your attorney, is Mr. Riley's --
3        MR. GIVENS:  For the record, he doesn't
4            have an attorney in this case.
5        MR. SHEEHAN:  By the attorney for
6            Mr. Riley, I apologize.
7        MR. GIVENS:  Thank you.
8        MR. SHEEHAN:  Thank you.
9    Q.    The photograph identified in Mr. Walters'
10           deposition, 005, --
11   A.    Okay.
12   Q.    -- is the same photograph as contained within
13           your Exhibit Number 18?
14   A.    Okay.
15   Q.    Is that true, sir?
16   A.    Yes.
17   Q.    All right.  And that was the condition of the
18           leveling screws as you saw them in May of 2005
19           at the inspection in Atlanta?
20   A.    I don't recall without looking back at my
21           photographs.
22   Q.    All right.  If you would, look back at your
23           photographs, sir.

Page 335

1        MR. GIVENS:  Mr. Sheehan, just as a
2            matter so you can hopefully kind
3            of do what you need to do, I'm
4            going to call a halt to these
5            proceedings no later than 5:30.
6            If you are not through with him by
7            that time, in that we've got to
8            reconvene to do Mr. Frost, we will
9            certainly agree to make him
10           available for additional
11           questions, but just as a matter of
12           fair warning, at 5:30 I'm done.
13       MR. SHEEHAN:  Thank you, sir.
14   A.    It appears to be that they are in that
15           approximate same position, yes.
16   Q.    All right.  Do you see any difference in the
17           position of the leveling screws --
18   A.    No.
19   Q.    -- in the photographs taken by Mr. Tew after
20           the accident and the photographs you took after
21           your inspection in May of 2005?
22   A.    No, I don't.
23   Q.    All right.  Sir, if at the time of Mr. Riley's

Page 336

1    accident the leveling bolts are in the position
2    as shown in the photograph taken by Mr. Tew,
3    what is the propensity of the drill bit
4    becoming bound in the hole?
5    A.    I don't believe it would increase it any.
6    Q.    All right, sir.  Does the likelihood of the
7           drill bit becoming bound in the hole increase
8           as weight is applied to the corner of the base
9           or on one of the sides of the base of the core
10          drill machine which is the subject of this
11          lawsuit?
12   A.    It could conceivably do that.
13   Q.    Given --
14   A.    I'm not saying that it did, but it could.
15   Q.    And how is that, sir?
16   A.    If you were on an unlevel surface, a rocky
17          surface, I can envision how it would if you
18          want to --
19   Q.    Please, if you would, tell me those instances
20          where you envision that it would?
21   A.    Or could.  And it would be if it were on a
22          crowned surface to where the unit would rock
23          from side to side.  If you could get it to --

Page 337

1    that surface would have to be crowned enough
2    that it would result in a binding of the drill
3    bit.  You know, it would increase the
4    propensity of it, but it's still not likely
5    that it would.  You would -- you would still
6    get advanced warning of any likelihood of
7    binding from a build up of the amperage, you
8    know, on the amp meter, and you would hear
9    differences in the sound of the drill motor.
10   Q.    Did either Mr. Riley or Mr. Walters hear any
11          difference in the machine during its operation?
12   A.    I don't believe so.
13   Q.    And that's your recollection of their
14          testimony?
15   A.    Yes, it is.
16   Q.    If the pump is operating as manufactured and
17          the gasket was performing with no weakened glue
18          joint and the machine is properly set up, would
19          the binding cause the base to rotate, the
20          binding of the drill bit?
21   A.    It depends on whether there was sufficient
22          vacuum in between the base.  Just because the
23          -- just because the vacuum pump is operating

Page 338

1    and just because the seal doesn't have a tear
2    in it, you've not eliminated all of the
3    possibilities for there not being a vacuum in
4    place.
5  Q.   What are the other possibilities for the vacuum
6    not --
7  A.   Oh, they're too numerous to list.  Well, I
8    guess we could go through them, but you could
9    easily miss some, too.  Like we said, a foreign
10   object, a crack in the concrete, not having the
11   little -- you know, the little valve shut,
12   having the cup not screwed onto the water
13   collection like we experienced before.
14 Q.   Using your Shaver design machine?
15 A.   Correct.
16 Q.   Anything else?
17 A.   No.  Well, oh, yeah, there are other things,
18   too.  I mean, I could go on.  We would go well
19   past, you know, the 5:30 time period if we sat
20   here and thought of every conceivable thing of
21   why you could not build up a vacuum under
22   there.
23 Q.   Let me ask you to assume that the base was

Page 339

1    properly set up and the pump was properly
2    operating and that someone was standing on the
3    machine, would the base have rotated when the
4    bit became bound in the hole?
5  A.   Do we have the vacuum pump operating and a full
6    vacuum underneath the -- under the base?
7  Q.   Yes, sir.
8  A.   No, it would not rotate.
9  Q.   If you eliminated from that hypothetical that
10   the machine was not properly set up, would that
11   have any effect?
12       MR. GIVENS:  As I understood the first
13          hypothetical, the machine was
14          properly set up, and as you've
15          just phrased it, you eliminated
16          not being properly set up?
17       MR. SHEEHAN:  Exactly.
18 A.   It would depend on what specifically was not
19   proper about the setup.
20 Q.   And how would you properly set up the machine?
21 A.   Make sure all of the vacuum lines were
22   attached, have the gasket in place, get water
23   in the area to create a suction, and move the

Page 340

1    base, make any adjustments, moving it to make
2    -- to get good contact to create a seal between
3    the floor and the base.  That would be --
4  Q.   The proper setup?
5  A.   Yes.
6  Q.   Assuming that there was a proper setup and
7    assuming that the vacuum pump were operating as
8    manufactured and as intended, but the leveling
9    bolts were not engaged -- were not in contact
10   with the concrete slab, would the drill bit
11   become bound?
12 A.   It could.  It's a possibility.
13 Q.   And how would it be possible to become bound in
14   the hole?
15 A.   It's possible that with extra movement in the
16   hole, that if you had movement in it, that it
17   could increase the likelihood possibly of the
18   drill binding.
19 Q.   What do you mean extra movement in the hole?
20 A.   Well, if the leveling screws act as a
21   stabilizing -- you know, to stabilize the base
22   once you get it there, you know, we talked
23   about a crown in the floor, if you had that

Page 341

1    situation where it was rocking around, I
2    suppose that, you know, it could increase the
3    binding tendency of the drill.
4  Q.   Any other way?
5  A.   No, not that I can think of right now.
6  Q.   Assuming that the pump was operating properly,
7    that the machine was properly set up and the
8    leveling bolts are not engaged and touching the
9    concrete, and also assume that weight is
10   applied to one side of the base of the core
11   drill machine, would the drill bit become bound
12   in the hole?
13 A.   Not necessarily.
14 Q.   Could it?
15 A.   Sure, it could.
16 Q.   How is that?
17 A.   Well, certainly none of those things that you
18   just mentioned would preclude it from doing so,
19   from being bound.  I mean, we know that drill
20   bits do become bound while drilling in surfaces
21   and through surfaces, and, you know, if that
22   standing on one side created movement, it could
23   -- could assist it in binding.

Page 342

1           MR. SHEEHAN:  Thank you, sir.  I
2               appreciate your time.
3  A.   Thank you.
4           MR. SHEEHAN:  Oh, I'm sorry, one last
5               question.
6  Q.   Do you have any relatives by blood or marriage
7       in Central Alabama?
8  A.   No.
9  Q.   Or in Alabama?
10 A.   No.  The Shaver name came from Montgomery, but
11      we're talking probably at least four
12      generations away, so I don't think.
13          MR. SHEEHAN:  I appreciate your time.
14          MR. GIVENS:  Okay.
15          FURTHER DEPONENT SAITH NOT
16
17      DEPONENT:                    .
18 Subscribed and sworn to before me this
19 day of            , 2006.
20
21
             NOTARY PUBLIC
22
23 My Commission Expires:              .

Page 343

1          REPORTER'S CERTIFICATE
2
3  STATE OF ALABAMA
4  COUNTY OF MONTGOMERY
5          I, Ricky L. Tyler, Certified Court
6  Reporter and Notary Public in and for the State of
7  Alabama at Large, do hereby certify that on Friday,
8  October 27th, 2006, pursuant to notice and
9  stipulation on behalf of the Defendants, I reported
10 the deposition of DONALD R. SHAVER, who was first
11 duly sworn by me to speak the truth, in the matter of
12 MATTHEW RILEY, Plaintiff, vs. UNITED RENTALS (NORTH
13 AMERICA), INC., et al., Defendants, Civil Action
14 Number 1:05 CV-994-T, now pending in the United
15 States District Court for the Middle District of
16 Alabama, Southern Division, that the foregoing 342
17 computer-printed pages contain a true and accurate
18 transcription of the examination of said witness by
19 counsel for the parties set out herein; that the
20 reading and signing of said deposition was not waived
21 by witness and counsel for the parties.
22          I further certify that I am neither of kin
23 nor of counsel to the parties to said cause, nor in

Page 344

1  any manner interested in the results thereof.
2          This 2nd day of November, 2006.
3
4
5
6
7
             Ricky L. Tyler
8            Certified Court Reporter
             and Notary Public
9            State of Alabama at Large
10
11
12
13
14
15
16
17
18
19
20
21
22
23