# EXHIBIT  6

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MATTHEW RILEY,

      Plaintiff,

Vs.                     CIVIL ACTION NO.

                          1:05 CV-994-T

UNITED RENTALS (NORTH AMERICA),

INC., et al.,

      Defendants.


      DEPOSITION OF ROGER E. DAVIS, taken

pursuant to notice and stipulation on behalf of the

Defendants, in the conference room of Cochran,

Cherry, Givens, Smith, Lane & Taylor, 163 West Main

Street, Dothan, Alabama, before Ricky L. Tyler,

Certified Court Reporter and Notary Public in and for

the State of Alabama at Large, on Friday, November

10th, 2006, commencing at 10:00 A.M.

Page 2

1        APPEARANCES
2  FOR THE PLAINTIFF:
3           JOSEPH D. LANE, ESQ.
4           Cochran, Cherry, Givens, Smith,
5            Lane & Taylor
6           P. O. Box 927
7           Dothan, AL 36302
8
9
10  FOR THE DEFENDANT, SAINT GOBAIN ABRASIVES, INC.:
11           KEVIN T. SHIRES, ESQ.
12           Sprain & Shires, PC
13           1707 29th Court South
14           Birmingham, AL 35209
15
16
17  FOR THE DEFENDANT, UNITED RENTALS:
18           C. WINSTON SHEEHAN, JR., ESQ.
19           Ball, Ball, Matthews & Novak
20           2000 Interstate Park Drive, Suite 204
21           Montgomery, AL 36109-5413
22
23

Page 3

1        INDEX
                                    Page
2
3  Direct Examination by  MR. SHEEHAN:        9
   Cross-Examination by MR. SHIRES:        250
4  Cross-Examination by MR. LANE:          273
   Redirect Examination by MR. SHEEHAN:    282
5
        EXHIBITS
6
For Defendant:
7
   1    Deposition Notice
8  For Identification               9
9  2    Volume I of Davis' Binders
   For Identification              10
10
   3    Davis' Report
11  For Identification             11
12  4    Volume II of Davis' Binders
   For Identification             12
13
   5    Copy of Photograph
14  For Identification             18
15  6    Gast Operation & Maintenance
        Manual
16  For Identification             19
17  7    Page 5 of Gast Operation &
        Maintenance Manual
18  For Identification             19
19  8    Copy of Photograph DSC 0209
   For Identification             33
20
   9    Copy of Photograph
21  For Identification             52
22  10   Copy of Photograph
   For Identification             52
23

Page 4

1  11   Copy of Photograph
   For Identification             52
2
3  12   Copy of Photograph
   For Identification             52
4
   13   Copy of Photograph
5  For Identification             52
6  14   Copy of Photograph
   For Identification             64
7
   15   Engineering Calculations
8  For Identification             68
9  16   Copy of Photograph
   For Identification             79
10
   17   Copy of Photograph
11  For Identification             80
12  18   Copy of Photograph
   For Identification             82
13
   19   Copy of Photograph
14  For Identification             82
15  20   Copy of Photograph
   For Identification             83
16
   21   Copy of Photograph
17  For Identification             85
18  22   Diagram (United Rentals 0035)
   For Identification             98
19
   23   Copy of Photograph
20  For Identification            131
21  24   Copy of Photograph
   For Identification            132
22
   25   Copy of Photograph
23  For Identification            133

Page 5

1  26   Copy of Photograph
   For Identification            134
2
3  27   Copy of Photograph
   For Identification            134
4
   28   Volume III of Davis' Binders
5  For Identification            136
6  29   Summary of Matthew Riley
        Deposition
7  For Identification            137
8  30   Summary of Michael Walters
        Deposition
9  For Identification            137
10  31   Summary of George Kennedy
        Deposition
11  For Identification            138
12  32   Volume IV of Mr. Davis' Binders
        For Identification        138
13
   33   Safety Design Analysis Page 11
14  For Identification            144
15  34   Safety Design Analysis Page 12
   For Identification            144
16
   35   Electrical Schematic for
17     Alternate Design
   For Identification            145
18
   36   My Independent Opinions
19  For Identification            147
20  37   List of Depositions Reviewed
        After Report
21  For Identification            150
22  38   Report of Mark Hickok
   For Identification            154
23

Page 6

1  39   Deposition Summary of Frost
      For Identification              168
2
   40   Deposition Summary of Shaver
3  For Identification              169
4  41   Deposition Summary of
         Whitecotton
5  For Identification              170
6  42   Deposition of James Mason
      For Identification              179
7
   43   Chemical Test Report
8  For Identification              182
9  44   Norton Core Drilling Equipment
         And Bits
10 For Identification              185
11 45   Clipper Core Drill Rig
      For Identification              185
12
   46   Record of Telephone Conversation
13       With Gast
   For Identification              192
14
   47   Invoice
15 For Identification              193
16 48   Supporting Documentation for
         Engineering Services by Davis
17 For Identification              194
18 50   Davis Deposition Taken on
         8/27/03
19 For Identification              200
20 51   Time Records
      For Identification              200
21
   52   E-mails
22 For Identification              200
23

Page 7

1  53   Notes concerning Milwaukee Drill
         Manual
2  For Identification              202
3  54   List of Documents Reviewed
      For Identification              203
4
5  55   Notes of Telephone Conversation
      For Identification              203
6
   56   Davis Time Report
7  For Identification              217
8  57   Unbilled Time
      For Identification              219
9
   58   Troubleshooting Chart
10 For Identification              240
11 59   Listing of Davis Depositions
      For Identification              284
12
   60   Davis Deposition - American
13       Rental Centers
   For Identification              290
14
15
16       STIPULATIONS
17

18       It is stipulated and agreed by and between
19  counsel representing the parties that the deposition
20  of ROGER E. DAVIS, may be taken before Ricky L.
21  Tyler, Certified Court Reporter and Notary Public in
22  and for the State of Alabama at Large, without the
23  formality of a commission; and all formality with

Page 8

1   respect to other procedural requirements is waived;
2   that objections to questions, other than objections
3   as to the form of the questions, need not be made at
4   this time, but may be reserved for a ruling at such
5   time as the deposition may be offered in evidence or
6   used for any other purpose by either party as
7   provided by the Federal Rules of Civil Procedure.
8        It is further stipulated and agreed by and
9   between counsel representing the parties in this case
10  that the filing of the deposition of ROGER E. DAVIS,
11  is hereby waived and that said deposition may be
12  introduced at the trial of this case or used in any
13  other manner by either party hereto provided for by
14  the Statute, regardless of the waiving of the filing
15  of same.
16       It is further stipulated and agreed by and
17  between the parties hereto and the witness, that the
18  signature of the witness to this deposition is hereby
19  waived.
20
21           * * * * *
22
23

Page 9

1        P R O C E E D I N G S
2
3        ROGER E. DAVIS, of lawful age, having first
4   been duly sworn, testified as follows:
5
6        DIRECT EXAMINATION
7   BY MR. SHEEHAN:
8   Q.   Mr. Davis, my name is Winston Sheehan.  If I
9        ask you a question you do not understand, will
10       you let me know; otherwise I'll assume that
11       you're answering the question honestly and
12       completely; is that fair?
13  A.   That's fair.
14           (Exhibit 1 marked for identification.)
15  Q.   I'm going to show you Exhibit Number 1 to your
16       deposition and ask if you have seen that, sir?
17  A.   I think I have seen this.  I know that it went
18       to my office.
19  Q.   All right, sir.  And have you complied with
20       that request for production?
21  A.   I have all of my records here with me today.
22       Also, I know that my secretary provided a
23       transcript of a deposition at your request.  So

Page 10

1    I believe it has been complied with.
2  Q.  All right, sir.  Let's go over the various
3      items there if you would, sir.  Item number one
4      is what, sir?
5  A.  "Documents related to all opinions, conclusions
6      or other testimony to be offered by said expert
7      at the trial of this case against all
8      defendants."
9  Q.  All right, sir.  Could you show us those
10     documents, sir?
11 A.  They're all in these binders.
12 Q.  All right.  Let's go on and mark those then.
13 A.  Do you want to bring them up to the table?
14 Q.  Please, sir.
15 A.  Well, this came out of the binders.
16 Q.  All right, sir.  What do you have there first?
17 A.  Well, we will start with Volume I, I suppose.
18 Q.  We will mark Volume I then as Exhibit Number 2
19     to your deposition.
20 A.  On the cover here?
21 Q.  Wherever is good for you, sir.
22     (Exhibit 2 marked for identification.)
23     MR. LANE:  Okay.  We're not going to

Page 11

1      give you his files to keep.  We'll
2      get them copied for you, but we're
3      not --
4  A.  This document came out of this binder; I just
5      took it out for convenience.
6  Q.  All right.  Why don't we go on and mark it
7      separately then?  Is there a reason that that
8      was taken out of the binder?
9  A.  For convenience.
10 Q.  And what is this document you took out for
11     convenience?
12 A.  This is a copy of my report.
13 Q.  Let's mark that as Davis Exhibit Number 3 then.
14     (Exhibit 3 marked for identification.)
15 Q.  And what is contained there in Volume Number I,
16     sir?
17 A.  Volume I contains color photographs; just some
18     administrative type stuff, like my flight
19     arrangements, case opening information; some
20     research that I did, I have copies of some of
21     that material; I have notes from my engineering
22     analysis of this case, and, of course, my
23     report is here.  I have a section for

Page 12

1      correspondence, most of which is administrative
2      type documents; a report of the injury; a copy
3      of the complaint; copies of interrogatories and
4      answers and requests for production.
5  Q.  You say you have another volume?
6  A.  I have three more volumes actually.
7  Q.  All right, sir.
8      (Exhibit 4 marked for identification.)
9  Q.  You've now marked a second binder as Exhibit
10     Number 3, is that --
11 A.  No, this is Number 4.
12 Q.  Number 4.  And what is in that, sir?
13 A.  This is documents I was provided, including
14     photographs, operations manuals, photographs,
15     the chemical analysis of the aluminum oxide
16     found in the vacuum pump, a copy of two reports
17     from experts on the plaintiff's side, Saint
18     Gobain's disclosure, I think you call it a --
19     what is this thing called?  Expert disclosure,
20     which includes a report from Mark Hickok.  And
21     I have a number of photographs that were
22     provided to me, color photographs.
23 Q.  And who were they provided by?

Page 13

1  A.  By Mr. Lane.
2  Q.  And what are they photographs of?
3  A.  Well, there are several sets actually.  This
4      first set was photographs taken during the
5      inspection of May 12, 2005; it was a joint
6      inspection in Atlanta, I believe.  The second
7      set of photographs was actually provided by
8      Heather Robinson with Ralcorp, but I think they
9      came through Mr. Lane's office.  The third set
10     are photos taken at Matthew Riley's deposition.
11     The fourth set of photos is from United Rentals
12     that was attached to their initial disclosures.
13     I believe that's the final set here.
14 Q.  All right, sir.  You said that there were some
15     photographs in this Volume Number I that's
16     Exhibit 2 to your deposition?
17 A.  Yes, sir, there are some photographs there.
18 Q.  Before we move on, have you now identified the
19     documents that are in Volume II?
20 A.  I have.
21 Q.  What are the difference in the photographs in
22     Volume I as compared to Volume II?
23 A.  These may be duplicates, but they were clearer

4  (Pages 10 to 13)

Page 14

1    photos, as I recall, of perhaps some that I
2    already had.
3  Q.   Okay.  Why did you separate those photographs
4    out, sir?
5  A.   Because my binders are full and I just had to
6    find a place it would fit.
7  Q.   And who made those photographs, sir?
8  A.   I don't know.
9  Q.   When were they made?
10  A.   I don't know.  They're not dated.
11  Q.   Are they a continuation then of the photographs
12    from Volume II?
13  A.   Yeah, they should be properly filed in that
14    volume, I suppose, because they're photographs
15    provided to me, not taken by me.
16  Q.   Okay.  Have you taken any photographs?
17  A.   No.
18  Q.   Seen any videos?
19  A.   No.
20  Q.   So what do those photographs match up to in
21    reference to Volume Number I -- I mean, excuse
22    me, Volume Number II?
23  A.   I don't know.  Actually I think I could

Page 15

1    probably fit these in here.
2  Q.   And what section would you fit those in?
3  A.   Under photographs provided.
4  Q.   By whom?
5  A.   I don't know that.  Well, they were provided by
6    Mr. Lane, but I don't know who made the
7    photographs.
8  Q.   Well, as I understand, you got photographs from
9    Mr. Lane, --
10        MR. LANE:  Scan through there if you
11            need to.
12  Q.   -- Ms. Robinson, Mr. Riley's deposition and
13    then United Rentals.  And my question to you
14    is, which grouping would those go to?
15  A.   Okay.  These are photographs that were made at
16    the plant site, Flavor House plant site, where
17    the injury occurred.
18  Q.   And how many photographs are there, sir?
19  A.   11.
20  Q.   And it's your testimony that the only reason
21    those 11 photographs appear in --
22  A.   Now in Volume II.
23  Q.   But they previously appeared in Volume I

Page 16

1    separate from Volume II?
2  A.   Yes, sir.  Yes, sir.
3  Q.   And there was no significance to those?
4  A.   Just I fit them where I had space to fit them.
5  Q.   All right.  So you've now taken 11 photographs
6    that were in Volume I and put them in Volume
7    II?
8  A.   Yes, sir.
9  Q.   And under whose category of photographs have
10    you now placed those, sir?
11  A.   I really have not placed it in a category
12    that's labeled, I just put it in the front of
13    that section to keep it separate from those
14    that are labeled.
15        MR. LANE:  You can scan through there
16            if you want to see if they --
17  A.   Okay.  These are in fact duplicates of the
18    photos that were provided by Heather Robinson
19    and I'll put them under that tab in my binder.
20  Q.   And you say those photographs are clearer than
21    the ones that --
22  A.   Yes, sir.
23  Q.   -- you previously had in Volume Number II?

Page 17

1  A.   I'm sorry, I didn't mean to interrupt you.
2    They are actually a little enlarged over those
3    that I previously had from Ms. Robinson.  So
4    they are clearer, yes.
5  Q.   I see you've tabbed one of the photographs in
6    Volume II, which is Exhibit Number 4 to your
7    deposition?
8  A.   Yes, sir.
9  Q.   Why did you tab that photograph, sir?
10  A.   I tabbed it because it was a photograph of the
11    -- of the aluminum oxide that was deposited in
12    the vacuum pump, also showing at least a
13    portion of the filter of a vacuum pump.  I
14    previously was not -- did not know whether
15    there was a filter in the pump until I found
16    that photograph.
17  Q.   And where is the filter?
18  A.   This is the filter.  This is part of it.
19  Q.   Okay.  Can you circle that for us?
20  A.   (Witness complies.)  I don't believe that shows
21    up, does it?  Does that show up?  Here, I think
22    it is now.
23  Q.   Okay.  And what do you mean you didn't know

1    whether there was a filter or not?
2  A.  Well, the literature for the vacuum pumps
3    indicate that some pumps are equipped with
4    filters and some are not.  I did not know
5    whether this one had such a filter.
6  Q.  Okay.  And what led you to believe that that's
7    a filter that you've now circled on this
8    photograph that you've tabbed?
9  A.  Well, that's the location where the filter
10    would be based on the diagrams from the
11    manufacturer.
12  Q.  Okay.  Can you show me the diagram that you're
13    referring to that led you to believe that what
14    you have circled on that photograph is the
15    filter?
16  A.  Yes, I can.  It may be in Volume I.
17  Q.  Okay.  Let's mark first, if we can, the
18    photograph that you have marked and circled as
19    Exhibit Number 5 to your deposition.
20    (Exhibit 5 marked for identification.)
21  Q.  And you have taken what, sir, a page --
22  A.  A page from -- let's see what the title of it
23    is actually.  It's a product specification

1    sheet essentially from -- actually it's called
2    an Operation and Maintenance Manual from Gast,
3    which is the manufacturer of the vacuum pump on
4    the incident core drill.
5  Q.  All right.  Why don't we mark the -- you say
6    it's what kind of manual?
7  A.  Operation and Maintenance Manual.
8  Q.  Why don't we mark it as Exhibit Number 6 to
9    your deposition as a composite exhibit?
10    (Exhibit 6 marked for identification.)
11  Q.  And then the page that you have extracted from
12    that composite exhibit we'll mark as Exhibit
13    Number 7.
14  A.  All right, sir.
15    (Exhibit 7 marked for identification.)
16  Q.  And that's actually page number five out of the
17    Exhibit --
18  A.  A total of eight pages.  And that is Exhibit 6.
19  Q.  So that I'm clear, when did you discover this
20    filter?
21  A.  I found the photo this morning actually.
22  Q.  You're talking about Exhibit Number 5?
23  A.  Yes.

1  Q.  And when did you discover that there was a
2    filter in the Gast pump?
3    MR. LANE:  I'm going to object to the
4    form.
5  A.  This morning when I --
6    MR. LANE:  Are you talking about when
7    did he review the diagrams or are
8    you talking about when did he
9    review the photograph?
10  Q.  When did you understand that there was a filter
11    that could be identified?
12  A.  Yesterday would be the first indication that I
13    had that there was a filter there.
14  Q.  And that would have been November the 9th of
15    2006?
16  A.  Yes, sir.
17  Q.  Had you reviewed that manual from Gast
18    Manufacturing before yesterday?
19  A.  I had.  Yes, I had.
20  Q.  How does this filter that you've circled here
21    on Exhibit Number 5, how does it operate?
22  A.  The filter is on the intake side of the vacuum
23    pump.  The air that's drawn in through the

1    intake tubing enters the head of the vacuum
2    pump through a port which has a filter in it.
3    There are then internal passageways in the head
4    of the vacuum pump that pull the -- pull the
5    air through the diaphragm and discharge it
6    through the muffler.
7  Q.  Okay.  And what do you do in order to remove
8    that filter?
9  A.  You take the cover off.
10  Q.  Of what?
11  A.  Of the vacuum pump, the top cover.
12  Q.  And then what do you do?
13  A.  You can pull it out by hand, I think.  I
14    haven't actually physically put my hands on it,
15    but I think you can just remove it by hand.
16  Q.  Okay.  Could you take this exemplar machine
17    that's been produced by Mr. Riley's lawyer and
18    show us how to locate that filter?
19  A.  Sure.  The filter would be located under this
20    cover on the top.
21  Q.  Can you show us how to get to it?
22  A.  This one is fitted with Allen screws, so you
23    take four Allen screws out and lift it off.

Page 22

1  Q.   Okay.  Can you do that for us, sir?
2  A.   Well, I've already tried that.  We don't have
3       the right size Allen screw -- Allen wrench for
4       those particular screws.
5  Q.   When did you try this, sir?
6  A.   This morning.
7  Q.   And for what purpose?
8  A.   I was going to look at the filter.
9  Q.   And you say you couldn't get to the filter?
10        MR. LANE:  He said he didn't have an
11             Allen wrench that fit the bolts.
12 A.   I didn't have the tools, yes, sir.  Correct.
13 Q.   So you've never actually even seen the inside
14       of a Gast pump?
15 A.   I have not.
16 Q.   And you say that you are not able to remove the
17       filter to check the Gast pump?
18 A.   I was not able to remove the cover off of the
19       Gast pump to access the filter on that exemplar
20       core drill.
21 Q.   All right.  And I notice that you've made some
22       highlights on the Gast -- what do you call that
23       Gast --

Page 23

1  A.   Operation and Maintenance Manual.
2  Q.   Okay.  And what have you highlighted within
3       that Exhibit Number -- I'm sorry, I can't see,
4       sir.
5  A.   6.
6  Q.   All right, sir.
7  A.   I highlighted the statement that indicates that
8       "Filters and mufflers are supplied with some
9       models.  These should be checked periodically
10       and replaced when necessary."  I also
11       highlighted --
12 Q.   Before we move on, was there a filter on the
13       Gast pump of the subject core drill machine?
14 A.   My understanding is that it was and the
15       photographs would indicate that.
16 Q.   And what model was on the subject core drill
17       machine that injured Mr. Riley?
18 A.   It was a Model DM500.
19 Q.   And when was that model manufactured?
20 A.   I don't have that information.
21 Q.   Was that Gast pump on the subject machine, was
22       it -- what was the age of it?
23        MR. LANE:  I object to the form.  Are

Page 24

1       you referring to the Gast pump or
2       the model of the core drill?
3        MR. SHEEHAN:  Thank you, and I
4       appreciate it, a good question.
5  Q.   What was the age of the Gast pump on the
6       subject machine that injured Mr. Riley?
7  A.   I don't know, but I believe, just from my
8       recollection, that the subject core drill was
9       acquired by United Rentals, I think, in 2000.
10 Q.   And what do you base that on, sir?
11 A.   I based it on my recollection of the document.
12       I think I have the purchase order actually
13       somewhere in this file.
14 Q.   All right, sir.  So it's your testimony that
15       the Gast pump on the subject core drill machine
16       that injured Mr. Riley was manufactured in
17       2000?
18 A.   No, I don't know when it was manufactured.
19       What I stated was I believe that the drill --
20       core drill was acquired in 2000, which would
21       indicate -- if that's correct, it would
22       indicate that the Gast pump would have been
23       manufactured prior to that; probably not too

Page 25

1       long prior to that, but prior to that.
2  Q.   Okay.  And how many times had that Gast pump
3       been used before the accident involving
4       Mr. Riley?
5  A.   I don't know.  I have some of the -- what they
6       call the green tags from the core drill that
7       would indicate at least a minimum number, but I
8       don't know what the total number would have
9       been.  I don't think we were provided that
10       information.
11 Q.   And, I'm sorry, who didn't provide you that
12       information?
13 A.   Nobody.
14 Q.   Did you request it of anyone?
15 A.   No, I did not.
16 Q.   And what was the minimum number of times that
17       that Gast --
18 A.   I think there are probably six to eight
19       references to the green tags which are
20       generated each time the pump is turned around,
21       that is returned and re-rented.
22 Q.   So how many times had that Gast motor been used
23       on the subject core drill machine that injured

Page 26

1    Mr. Riley?
2  A.   I don't know.
3  Q.   Would that make any difference in your
4       opinions?
5  A.   No.
6  Q.   So that I'm clear then, it wouldn't make any
7       difference how many times the Gast motor had
8       actually been used in forming your opinion in
9       this lawsuit?
10  A.   It would not make any difference.
11  Q.   And why is that?
12  A.   Because the rental company has an obligation to
13       inspect and maintain the equipment.  If it were
14       worn out, I would have expected that they would
15       have replaced it already, if they were doing
16       their job properly.
17  Q.   Okay.  Was the Gast motor on the subject core
18       drill machine that injured Mr. Riley worn out?
19  A.   I can't say that, because I didn't inspect it,
20       but certainly there were some problems with the
21       Gast pump in that it had a deposition of
22       aluminum oxide inside the vacuum pump, which is
23       detrimental to its operation.

Page 27

1  Q.   Other than the aluminum oxide, was there
2       anything else wrong with the Gast pump on the
3       subject core drill machine?
4  A.   I don't know, because I didn't inspect it.
5  Q.   And when did this aluminum oxide start to form
6       on the Gast motor that injured Mr. Riley?
7  A.   I have no way of knowing that.
8  Q.   What caused this aluminum oxide on the Gast
9       motor that injured Mr. Riley?
10  A.   Well, initially I thought that it might have
11       been a product of the wear in the pump, but
12       after further study of the photos and seeing
13       how much of it there was, I believe that it
14       most likely came from ingesting that material
15       through the -- through the vacuum tubing.  I
16       believe that had it been because of wear in the
17       pump that that -- there is so much of it that
18       it would have been noticed.  I believe the wear
19       surfaces would have been noticed during the
20       inspection and there was no mention of that in
21       the documents that I had.
22  Q.   Okay.  Where was this wear?
23       MR. LANE:  Object to the form.

Page 28

1  A.   I said there was no mention of any wear.  I
2       said that -- the manual indicates that if you
3       use the pump to pump water vapor, which
4       certainly this pump would do, that it is
5       subject to corrosion of aluminum components
6       which produce aluminum oxide.  That is one
7       possible source, but they are so --
8  Q.   How long does that take, sir?
9  A.   How long does it take?
10  Q.   Yes, sir.  To create this aluminum oxide?
11  A.   Well, it depends on how well the pump is
12       maintained.
13  Q.   Just in your opinion how long would it take for
14       the aluminum oxide to have initially appeared
15       on the -- is it the diaphragm of the Gast
16       motor?
17  A.   It did appear on the diaphragm, yes.
18  Q.   Did it appear anywhere other than on the
19       diaphragm of the Gast motor?
20  A.   Well, it appeared in the passages of the head
21       that I just showed you in the photographs.
22  Q.   All right.  You're referring to Exhibit Number
23       5 to your deposition?

Page 29

1  A.   Yes.
2  Q.   Okay.  Can you show me where it first appeared,
3       this aluminum oxide?
4       MR. LANE:  Object to the form.
5  A.   Well, if my conclusion is correct, that it was
6       ingested into the pump, it would have appeared
7       initially in the tubing of the pump which leads
8       to the intake port.
9  Q.   Do you have any evidence to support that the
10       aluminum oxide first appeared in the tubing?
11  A.   I did not inspect the tubing.  I saw
12       photographs of the head which indicates that
13       the material is present in the area of the
14       filter and the passages in the head of that
15       pump.
16  Q.   Okay.  Do you have any evidence to support your
17       opinion that the aluminum oxide first appeared
18       in the tubing?
19  A.   Just my analysis.  There was no mention of it
20       in the documents that I received and I did not
21       attend the inspection.  But my analysis was,
22       based on the volume of the material, it was
23       more likely than not that it was ingested

Page 30

1    versus being a product of wear inside the pump.
2  Q.    And how much -- what was the volume of this
3       aluminum oxide?
4  A.    I had no way of measuring.  I just had
5       photographic evidence that indicated that the
6       aluminum oxide covered practically the entire
7       surface of the diaphragm and covered -- and it
8       was also present in some of the passages of the
9       head of the pump.
10  Q.    Okay.  And, again, what evidence do you have of
11       the aluminum oxide in the passages?
12  A.    The photographic evidence.
13  Q.    Okay.  Can you show me those photographs that
14       you're relying upon, sir, to support your
15       opinion?
16  A.    Yes, sir.  Photograph Exhibit Number 5, this
17       material -- this white crystalline-looking
18       material is the aluminum oxide.
19  Q.    Okay.  And when you say the passage, what are
20       you talking about, sir?
21  A.    The pathway that the air moves through inside
22       the pump.
23  Q.    Okay.  And so you're referring again to this

Page 31

1       photograph Number 5?
2  A.    Yes, sir.
3  Q.    Other than photograph 5, do you have any
4       evidence to support your opinion?
5  A.    There are some other photographs in there that
6       show similar views of that.
7  Q.    Okay.  Are you relying on any other photograph
8       other than Exhibit Number 5 to support your
9       opinion?
10  A.    I picked Number 5 because it seemed to be the
11       clearest, show it the clearest.
12  Q.    Okay.  And how much aluminum oxide is on that
13       head or in that Gast pump motor?
14  A.    I have no way of knowing, but, you know, it
15       appears to be perhaps a half ounce.  I didn't
16       really say.
17  Q.    And what do you base your opinion that there's
18       a half an ounce of aluminum oxide on the head
19       of that Gast motor?
20  A.    Based on looking at the photograph.
21  Q.    Other than just looking at that photograph, do
22       you have any evidence to support your opinion?
23  A.    No, I did not -- I'm sorry, I didn't mean to

Page 32

1       interrupt.  I did not attend the inspection, so
2       I have not seen the aluminum oxide.  There
3       apparently was no measurement of the quantity,
4       so all I have is the photographic evidence.
5  Q.    Okay.  What part of the head of that Gast motor
6       first experienced aluminum oxide accumulation?
7  A.    If my conclusion is correct, that it was
8       ingested, then it would have been drawn in
9       through the intake port of the head.
10  Q.    Okay.  And so what part of the diaphragm first
11       had an accumulation of aluminum oxide on it?
12  A.    I would have expected it to be in the passages.
13  Q.    What passages?
14  A.    Of the head.
15  Q.    Okay.  Can you show us a photograph identifying
16       where it first appeared?
17  A.    Again, referring to Exhibit Number 5, the
18       passageways shown in this photograph have an
19       accumulation of aluminum oxide.
20  Q.    Can you show us another photograph identifying
21       the passageways where the aluminum oxide first
22       appeared?
23  A.    I don't know where it first appeared.  But here

Page 33

1       are some of the passageways shown in photograph
2       number DSC 0209.
3  Q.    Why don't we go on and mark that then as
4       Exhibit Number 8 to your deposition?
5  A.    Can we do it just like that?
6           (Exhibit 8 marked for identification.)
7  Q.    Are there any other photographs that would show
8       us where the aluminum oxide first appeared?
9  A.    I think those probably show it most clearly.
10  Q.    Okay.  And when did the aluminum oxide first
11       appear on that Gast motor?
12  A.    I have no way of knowing that.
13  Q.    Well, how long does it take for aluminum oxide
14       to appear?
15        MR. LANE:  Again, I object to the form.
16  A.    Well, it can appear upon the first use if, in
17       fact, it's used in an environment where
18       aluminum oxide is present.  It simply has to be
19       there to be drawn through the tubing and it can
20       begin to accumulate on the first use if it's
21       used in that environment.
22  Q.    Okay.  What is that environment, sir?
23  A.    An environment where aluminum oxide is present.

Page 34

```
 1  Q.   Okay.  And, I'm sorry, where is this
 2       environment with aluminum oxide being present?
 3  A.   I have no way of knowing that.  It could be --
 4       it could be present in any of the customers
 5       that rented the core drill.  I have no way of
 6       knowing that.
 7  Q.   Well, I mean, in reference to this lawsuit,
 8       where did this environment first appear?
 9            MR. LANE:  Object to the form.
10  A.   I don't know.
11  Q.   When did this environment first appear with the
12       subject core drill machine that injured
13       Mr. Riley?
14  A.   I don't know.
15  Q.   How long did it take for the aluminum oxide to
16       show a presence in the Gast motor?
17  A.   I don't know.
18  Q.   How long does it take for aluminum oxide to
19       form?
20  A.   Well, aluminum oxide is a corrosion product.
21  Q.   What's the process that creates the aluminum
22       oxide?
23  A.   The combination of oxygen and aluminum.
```

Page 35

```
 1  Q.   Okay.
 2  A.   So it could have -- the corrosion could already
 3       have accumulated before it was ingested into
 4       the pump or it could be that aluminum fines
 5       were ingested into the pump and corroded inside
 6       the pump.  I just have no way of knowing that.
 7  Q.   What aluminum fines are you talking about, sir?
 8  A.   Well, it could have been from a metal
 9       processing plant, a metal finishing plant, that
10       type of industry where metal -- aluminum fines
11       could be produced.
12  Q.   And, I'm sorry, I don't understand what you
13       mean by aluminum fines.  What's an aluminum
14       fine?
15  A.   Well, granules, let's put it that way, like
16       from a grinding process perhaps or a milling
17       process.
18  Q.   And what are they grinding there that would
19       create these aluminum fines?
20  A.   Aluminum.
21  Q.   Okay.  I'm sorry, how did the aluminum get into
22       the Gast pump, these aluminum fines?
23  A.   Well, you know, I don't know, but if you can
```

Page 36

```
 1       assume that my conclusion is correct, the
 2       aluminum fines could have been present on a
 3       surface where the drill was set up and was
 4       drawn in through the pump by the vacuuming
 5       process.
 6  Q.   And how much aluminum fines would there have
 7       had to have been for the aluminum oxide to have
 8       initiated?
 9            MR. LANE:  I object to the form.
10  A.   Just based on the photographic evidence, it's
11       probably a few ounces of aluminum that would
12       have been involved in producing that material.
13  Q.   When you say a few, what are you talking about,
14       sir?
15  A.   Three.
16  Q.   So three ounces of aluminum fines were
17       necessary in order to initiate the aluminum
18       oxide process that you see in these photographs
19       that you have marked now?
20  A.   Well, not to initiate the process, but to have
21       produced the material that we see.  I think
22       three ounces is probably an outside figure.
23  Q.   What do you mean outside, sir?
```

Page 37

```
 1  A.   A high number.  Probably less than three
 2       ounces.
 3  Q.   Okay.  What would be a minimum number?
 4  A.   A half.  One half ounce.
 5  Q.   Okay.  And was this a powdered aluminum fine or
 6       was it aluminum that was being drilled at the
 7       time or what was the substance?
 8  A.   I don't know.
 9  Q.   Do you have any evidence to support that there
10       were any aluminum fines present at any point in
11       time prior to the accident involving Mr. Riley?
12  A.   Well, the evidence as shown by the photographs
13       of the aluminum oxide.
14  Q.   But other than these photographs taken several
15       months after the accident, do you have any
16       evidence?
17  A.   The photographs are all I have to go by.
18  Q.   Okay.  So that I'm clear, you don't have any
19       evidence to support your conclusion that these
20       aluminum fines became deposited in the Gast
21       motor to start the process?
22            MR. LANE:  Object to the form.
23  A.   No, that's not entirely correct.
```

1  Q.   Please help me.

2  A.   I concluded that it was more likely than not

3       that the aluminum was deposited in the pump

4       just based on the sheer quantity of it.  I

5       think that had it been a product of wear inside

6       the pump that the wear surfaces would have been

7       evident.  And I believe that one of those

8       people involved in that May inspection would

9       have made note of that.

10 Q.   And when was this deposited in the pump, these

11      aluminum fines?

12 A.   I don't know.

13 Q.   Were the aluminum fines deposited in the pump

14      at the Flavor House facility prior to the

15      accident involving Mr. Riley?

16 A.   I don't know.

17 Q.   Could they have been deposited in the pump the

18      day before the accident involving Mr. Riley?

19 A.   When you say the day before, are you talking

20      about at Flavor House or at some other

21      location?

22 Q.   At Flavor House, sir?

23 A.   Could have been, although I don't know of any

1       process that a food products or food -- yeah,

2       food products industry would have that would

3       involve generation of aluminum fines.

4  Q.   Okay.  Well, what kind of business would create

5       these aluminum fines that are shown in the

6       photograph marked as Exhibit Number 5 to your

7       deposition?

8  A.   It could be a metal working industry perhaps.

9  Q.   And what kind of metal working industry would

10      that have been, sir?

11 A.   Aluminum.

12 Q.   And what would they have been doing there to

13      create these aluminum fines that initiated this

14      aluminum oxide?

15 A.   Machining aluminum parts.

16 Q.   For what, sir?

17 A.   I don't know.

18 Q.   What kind of aluminum products would have been

19      -- what percentage of aluminum would have been

20      present in these products that initiated this

21      aluminum oxide process that are shown in this

22      photograph Number 5 to your deposition?

23 A.   I don't know.

1  Q.   So that I'm clear, do you have any facts that

2       would support when this aluminum oxide first

3       appeared in the Gast pump which is attached to

4       the core drill machine which injured Mr. Riley?

5  A.   No.

6  Q.   Do you know how long it took for the aluminum

7       oxide to appear?

8  A.   No.

9           MR. LANE:  Object to the form.  Asked

10              and answered.

11 A.   I do not know.

12 Q.   Again, what is the basis for your opinion that

13      this aluminum oxide is a result of maintenance

14      or lack thereof by United Rentals?

15 A.   The pump should have been maintained by United

16      Rentals as a matter of routine, including

17      removal of the cover, changing the filter as

18      necessary.  The presence of this aluminum oxide

19      does not necessarily mean they did not do that,

20      because it could have accumulated, you know,

21      during the incident or just prior to the

22      incident, which might not have been within the

23      frequency of changing the filter.  However,

1       there is evidence in depositions that indicates

2       that they never disassembled the pump.  Now,

3       that's the deposition of Mr. Kennedy supported

4       by that of Mr. Whitecotton.

5  Q.   Okay.  So I am clear then, it's your opinion

6       that the aluminum oxide that appears in the

7       Gast motor that was attached to the core drill

8       machine that injured Mr. Riley could have

9       occurred during the incident involving

10      Mr. Riley?

11          MR. LANE:  Object to the form.

12 A.   It could have.  It could have, although I know

13      of no process at that facility that would

14      involve generation of aluminum fines.

15 Q.   And do you have any facts that would support an

16      opinion that this aluminum oxide occurred other

17      than during the incident involving Mr. Riley?

18 A.   I just don't know.

19 Q.   Can you show us how the aluminum oxide became

20      deposited in the Gast motor that was attached

21      to the subject core drill machine?

22 A.   I thought we had already discussed that, but

23      it's my conclusion, based on the quantity, that

Page 42

1    it was most likely ingested through the tubing,
2    which would then have come through the inlet
3    port of the Gast pump.
4  Q.   And can you show us on a diagram how that
5    occurred?
6  A.   My Exhibit Number 7 is a diagram of the -- an
7    exploded diagram of the Gast pump.
8  Q.   And, again, is that a page --
9  A.   Page five of the Operation and Maintenance
10    Manual produced by Gast.
11  Q.   All right, sir.
12  A.   The intake port is on this side of the head
13    where I'm pointing with my pen.
14  Q.   All right.  Is it identified by a number, sir?
15  A.   No.
16  Q.   Can you draw a line so we know what you're
17    referring to?
18  A.   How about an arrow, will that work?
19  Q.   That will be fine, sir.
20  A.   (Witness drawing.)
21  Q.   Now, you've taken a black pen and drawn an
22    arrow.  And could you label that for us, sir,
23    so we will know what you're referring to?

Page 43

1  A.   I will just write "intake," is that okay?
2  Q.   Whatever would just assist us in understanding
3    the process of this aluminum oxide becoming
4    ingested in the Gast pump.
5  A.   (Witness complies.)
6  Q.   All right.  So where did these aluminum fines
7    first come into the pump?
8  A.   It's my belief that they came in through the
9    pickup tubing, thence into the intake port.
10  Q.   All right.  Can you show us the intake tubing
11    where it first received these aluminum fines?
12  A.   The tubing is not shown on this exploded view
13    of the pump.  The tubing connects to the
14    fitting that screws into the intake port that
15    I've indicated.
16  Q.   All right.  Can you show us a diagram with that
17    tubing, sir?  Why don't we leave that one out,
18    if we can, sir, since it might ease in
19    reference?
20  A.   I don't believe any of these diagrams show that
21    tubing.  I can show you the tubing on the
22    exemplar if you would like.
23  Q.   All right, sir.  But if we can, since we're

Page 44

1    referring now to Exhibit Number 7, can you show
2    us the process in which these aluminum fines
3    went through the -- this diagram, or using this
4    diagram can you show us how the aluminum fines
5    became deposited on the Gast motor?
6      MR. LANE:  I'm objecting to the form as
7        to whether or not that's actually
8        the source of the aluminum, but
9        based on that assumption, feel
10        free.
11  A.   Okay.  As I have stated a couple of times now,
12    it's my belief that because of the quantity
13    that I see in the photographs that the aluminum
14    oxide was most likely ingested through the
15    tubing, into the intake ports, through the
16    passages of the pump and thence on to --
17  Q.   Can you show us the passages of the pump that
18    would have ingested --
19  A.   Well, you can see those little curved lines on
20    this diagram, those are passages that allow the
21    air passage.
22  Q.   Okay.  Can you draw an arrow so we can see
23    those, maybe out to the side?

Page 45

1  A.   How about this one right here?  (Witness
2    drawing.)  And I've labeled it "air passage."
3  Q.   And how many air passages are there on the --
4    is that the head or the diaphragm?
5  A.   That's what I call the head.
6  Q.   All right.  On this head how many air passages
7    are there, sir?
8  A.   Well, there are probably two continuous loops,
9    one for the intake side and the other for the
10    discharge side or the exhaust side.
11  Q.   All right.  And which one is the intake side,
12    sir?
13  A.   This side over here where the intake port is.
14  Q.   All right.  Can you draw an arrow out to the
15    side and show us the passage that would be an
16    intake where these fines would have first come
17    into the pump motor?
18  A.   I'm going to label that "intake air passage."
19  Q.   Okay.  And you say this air passage that you
20    first identified, would that be for --
21  A.   Exhaust.  And I'll label it such.
22  Q.   Thank you, sir.  All right.  So as I
23    understand, these fines first came in the

1    intake port, went through the air --
2  A.   Intake air passage.
3  Q.   And then where?
4  A.   Then they would have been deposited on the
5       diaphragm.
6            MR. LANE:  Again, I'm objecting to the
7            form.  Go ahead.
8  Q.   And what part of the diaphragm did this first
9       appear, this aluminum oxide?
10 A.   Probably the portion nearest the point where
11      the air passages went through the head of the
12      pump.
13 Q.   And where was that, sir?
14 A.   I don't know, it's not shown here.
15 Q.   Well, can you explain to us the process then as
16      this -- was it a buildup, a steady, gradual
17      buildup, or was it an instantaneous buildup --
18 A.   I don't know.
19 Q.   -- of aluminum oxide?
20 A.   I don't know.
21 Q.   Well, do you have an opinion as to whether --
22      or any scientific basis?
23 A.   For?

1            MR. LANE:  Is that the question?
2            Object to the form.
3  Q.   For your conclusion that this photograph Number
4       5 shows the buildup other than at a time during
5       the incident involving Mr. Riley?
6            MR. LANE:  Object to the form.  That is
7            absolutely not what he testified
8            to.  Let's take a break, I'm
9            getting some coffee.
10 A.   Okay.  I'll grab some as well.
11 Q.   Since there is a question on the floor, would
12      you not discuss with --
13 A.   Certainly, I understand that.
14           (Off-the-record discussion.)
15           (Question read by the Reporter.)
16 A.   So you're restating that question?  Yes.  I
17      have no evidence to conclude when the
18      deposition of the aluminum oxide occurred.
19 Q.   Sir, you were reviewing with us the material
20      you've brought with you to your deposition?
21 A.   Yes, sir.
22 Q.   And were there any other photographs that you
23      felt were significant in forming your opinion

1       in reference to any of the matters involving
2       United Rentals?
3  A.   Well, just the photographs of the machine and
4       how it was built, along with the operations
5       manual which described the components of the
6       machine.  Just the general photography was
7       helpful.
8  Q.   Okay.  And, again, if I could in particular ask
9       you photographs that were of significance in
10      forming an opinion with respect to your
11      criticisms of United Rentals?
12           MR. LANE:  Object to the form.
13 A.   Just what I just answered, and that is just the
14      way the machine was built, which are depicted
15      in many of the -- all of the photographs
16      practically.
17 Q.   And how did United Rentals build this machine?
18 A.   They did not build it.
19 Q.   Okay.  And that's what I was trying to find
20      out, if I could, sir.  Are there any other
21      photographs before we move on that are of
22      significance in your opinions concerning any
23      criticism you may have related to United

1       Rentals?
2  A.   Yes, sir.
3  Q.   All right, sir.  And if you could identify
4       those photographs, sir?
5  A.   There are many, but I will identify one for
6       you, is that fair?
7  Q.   Well, if you could, sir, if we could identify
8       the photographs that are of significance and
9       that you rely upon in forming your opinions
10      with respect to any criticisms you have of
11      United Rentals?
12 A.   Besides the ones we've already talked about; is
13      that correct?
14 Q.   Well, as I understand, there was just one
15      photograph and we marked it as Exhibit Number
16      5?
17           MR. LANE:  Object to the form.
18 A.   I believe so.
19           MR. LANE:  I don't believe you marked
20           it, but he did refer to some other
21           photographs, Winston.
22           MR. SHEEHAN:  Okay.  Which ones were
23           those?

1    MR. LANE: I just remember him pointing
2        out something on some other
3        photographs other than that one
4        photograph, but I don't think it
5        was marked separately.
6    MR. SHEEHAN: Well, let's mark it
7        before we move on, sir.
8  Q.  Mr. Lane has said that you identified another
9      photograph, let's mark it so that the record is
10     clear before we move on.
11 A.  I don't know which one that would have been.
12     MR. SHEEHAN: Mr. Lane?
13     MR. LANE: Well, I thought I was
14         looking over -- where were the
15         photographs we were looking at?
16 A.  Well, we looked at a lot of them. For example,
17     we looked at Heather's photographs. I think we
18     looked at some of these that shows the
19     deposition.
20 Q.  All right. Let's mark those, sir, if you
21     would. But before we move on, let's mark the
22     photograph that you identified previously in
23     your deposition.

1  A.  The one that Mr. Lane just referred to?
2  Q.  Please, sir.
3  A.  I don't know which one that was.
4      MR. SHEEHAN: Mr. Lane, can you help us
5          identify the photograph?
6      MR. LANE: Well, there's a whole series
7          of photographs and I don't know
8          which ones you were looking at.
9          But I know there were photographs
10         of this corrosion that's seen in
11         the head of the pump, is what I
12         was talking about, that y'all were
13         going through. So I don't know if
14         you marked any one in particular.
15 A.  For the sake of being complete, let's mark all
16     of these.
17 Q.  All right, sir.
18 A.  Because those show the deposition of the
19     aluminum oxide.
20 Q.  All right. Do you want to mark them as we --
21 A.  How do we --
22 Q.  Let's mark each sheet so we'll know what we're
23     referring to, sir.

1  A.  Okay. If I put it down at the bottom, I guess
2      that will indicate that both of the photographs
3      are part of the exhibit.
4      (Exhibit 9 marked for identification.)
5  Q.  And that was what Exhibit Number, before we
6      move on?
7  A.  9.
8      (Exhibit 10 marked for identification.)
9  Q.  All right, sir. Exhibit Number 10 was what,
10     sir?
11 A.  10.
12 Q.  What is Exhibit Number 10, sir?
13 A.  Two color photographs.
14 Q.  Of what, sir?
15 A.  Showing deposition of aluminum oxide on the
16     diaphragm and the head of the Gast vacuum pump.
17     (Exhibit 11, 12 and 13 marked for
18         identification.)
19 A.  Exhibit 11 shows deposition of aluminum oxide
20     both on the head and the diaphragm of the Gast
21     vacuum pump. I think I have two more here in
22     this series at least. Exhibit 12 again shows
23     deposition of what I would classify a fairly

1      large quantity of aluminum oxide on the head of
2      the Gast pump. Exhibit 13 shows deposition of
3      aluminum oxide both on the head of the pump and
4      in the internal passageways of the -- for the
5      intake and exhaust ports of the pump.
6  Q.  Any other photographs, sir?
7  A.  I think so.
8  Q.  Before we move on, sir, these photographs that
9      are identified as Exhibit 9 through 13, when
10     were these photographs made, sir?
11 A.  Those were made on May the 12th, 2005.
12 Q.  And how long was that after the accident?
13 A.  Well, the accident was August 29, 2003, so
14     however long that is. Would you like for me to
15     count it up?
16 Q.  Please, sir.
17 A.  Oh, okay. It sounds like about 17 months.
18 Q.  Okay. During those 17 months, sir, did any
19     aluminum oxide form on the head of that Gast
20     pump that you've shown in these photographs?
21 A.  There's really no way for me to know that, but
22     the oxide may have already formed at the time
23     of the deposition. It could have been --

Page 54

1    MR. LANE:  Do you mean at the time of
2        the -- when you said at the time
3        of the deposition, I'm just -- if
4        you don't mind, I'm just unclear
5        on what you mean.
6  A.   I'm sorry, repeat your question.
7        MR. LANE:  I'm sorry, I didn't mean to
8        throw you off.
9  Q.   Did any of the aluminum oxide shown in these
10       photographs, Exhibit Number 9 through 13, taken
11       on May the 12th, form after the accident
12       involving Mr. Riley on August the 29th, 2003?
13 A.   There's no way to know that.  The material that
14       resulted in the deposition of the aluminum
15       oxide could have been unoxidized aluminum or it
16       could have been fully oxidized aluminum, I just
17       have no way of knowing that.  Had it been
18       unoxidized aluminum, it could have continued to
19       oxidize during that period of time, but there
20       had to be material -- foreign material present
21       in the pump in either event.
22 Q.   And when did this material get into the pump?
23 A.   I don't know.

Page 55

1  Q.   Did the material get into the pump after the
2        accident involving Mr. Riley on August the
3        29th, 2003?
4  A.   No.
5  Q.   Did the material get into the pump during the
6        incident involving Mr. Riley?
7  A.   I assume you're defining the incident as the
8        use of the drill at that point where he was
9        injured?
10 Q.   Yes, sir.
11 A.   I don't know.
12 Q.   Could the material have come into the machine
13       during the accident involving Mr. Riley?
14 A.   It's possible, but I doubt that that occurred
15       because of the -- for two reasons, the
16       processes that occur at that plant and the
17       continued -- because it's a food processing
18       plant, and the continued cleaning of the plant.
19       I doubt that there would have been a deposition
20       of metal fines at that location.
21 Q.   Now, when you say "fines," I believe I
22       understand what you're talking about, but can
23       you define what you're talking about when you

Page 56

1        say "fines"?
2  A.   Well, we could describe it as dust.
3  Q.   And how do you spell fines?
4  A.   Anything from dust to granular particles, you
5        know, a range of particle sizes.
6  Q.   And how do you spell that fines?
7  A.   F-I-N-E-S.
8  Q.   So that I'm clear then, the aluminum oxide
9        that's shown on these photographs, Exhibits 9
10       through 13, could not have occurred on the head
11       of the Gast pump after August the 29th, 2003?
12 A.   That's my opinion.
13 Q.   Okay.  And what is that based on?
14 A.   It's based on the fact that the pump was not
15       operable immediately after the incident and did
16       not operate for that entire period of time
17       between the time of the incident and the time
18       of the May 12, 2003 inspection.
19 Q.   Can you describe what air passages are
20       obstructed on these photographs that you've
21       identified as Exhibits 9 through 13?
22 A.   I cannot.  I cannot show those.  If they were
23       obstructed they would not show up in the

Page 57

1        photograph.
2  Q.   Are all of the air passages obstructed on the
3        head of that Gast motor?
4  A.   I really can't tell.  I can't see the openings,
5        so they may well be.  I don't know.
6  Q.   Are there any air passages that are open?
7  A.   I do not see any in that photograph.
8  Q.   So that I'm clear, it's your testimony you
9        don't see any air passages that are open on the
10       head of that Gast motor?
11 A.   On the diaphragm side?
12 Q.   Yes, sir.
13 A.   No.
14 Q.   What does that signify to you, sir?
15 A.   Well, it's an indication that perhaps the
16       aluminum oxide in fact plugged some of the
17       passages in the pump.
18 Q.   Okay.  When did it plug the passages in the
19       pump, sir?
20 A.   By that do you mean when did it start?
21 Q.   Timing.  When did it plug the passages?
22 A.   It may have plugged the passages at the time
23       that it was being used during the incident.

Page 58

1  Q.   At what point in time during the incident, sir?
2  A.   It may have been early in the incident, because
3     it's my opinion that the reason that the drill
4     bit bound up in the hole is because of low
5     vacuum, which would be caused by obstruction of
6     the passages in the ports in the Gast pump.
7  Q.   Did it obstruct the passages during the
8     drilling of the first hole, sir?
9  A.   It may have, because they did have an incident
10    where the vacuum base broke loose.
11  Q.   Okay.  So that I'm clear then, what caused this
12    aluminum oxide -- how was it that the vacuum
13    was operational during the second drilling or
14    the drilling of the second hole if it clogged
15    it during the drilling of the first hole?
16  A.   By that I don't necessarily mean that it
17    completely clogged the passage up.  I believe
18    that it obstructed the passage, so there was
19    probably a condition of low vacuum versus an
20    acceptable vacuum.
21  Q.   And what was the volume of vacuum during the
22    first hole drilling?
23  A.   I don't have any way of knowing that.  But I

Page 59

1    believe that the vacuum was low because it did
2    in fact break loose before the clutch
3    disengaged actually.
4  Q.   What do you base that on, sir?
5  A.   The depositions of Mr. Riley and Mr. Walters.
6  Q.   And what part of their depositions do you base
7    that opinion on?
8  A.   They indicated that during the drilling of the
9    first hole the base broke loose.
10  Q.   Okay.  And what caused the drilling -- what
11    caused the base to break loose during the
12    drilling of the first hole?
13  A.   Low vacuum.
14  Q.   And what caused the low vacuum?
15  A.   Most probably the obstruction of the vacuum
16    pump by the aluminum oxide.
17  Q.   Okay.  And what air passage was obstructed
18    during the drilling of the first hole?
19  A.   There was probably aluminum oxide distributed
20    throughout the head of the pump and on the
21    diaphragm.
22  Q.   Okay.  And can you show us on these photographs
23    what air passage was blocked during the

Page 60

1    drilling of the first hole?
2      MR. LANE:  Object to the form.  Again,
3      asked and answered.
4  A.   Some of the other photographs show the head, I
5    don't see those in this stack.  Are they over
6    here?  No.
7  Q.   Can you use those photographs to identify the
8    area that was blocked during the drilling of
9    the first hole?
10  A.   I was looking for the passages in the head,
11    which I don't see depicted.
12      MR. LANE:  Was that Exhibit 5?
13  A.   Oh, here we go.  Here's one.  Okay.  Exhibit
14    13, the photograph on the top of that page
15    shows the air passages in the head of the pump
16    which are partially clogged with aluminum
17    oxide.
18  Q.   Okay.  Can you show me which passage was first
19    blocked during the drilling of the first hole?
20  A.   It's my belief that the passage on this side of
21    the head would have been the first blocked,
22    that is the intake side.
23  Q.   Okay.  Can you draw us an arrow and circle that

Page 61

1    area that was first blocked during the drilling
2    of the first hole?
3  A.   (Witness complies.)  Did you say an arrow?
4  Q.   Maybe out into the margin so we can see what
5    you're referring to, sir?
6  A.   (Witness complies.)
7  Q.   And would you identify that as being the area
8    that was blocked during the drilling of the
9    first hole?
10  A.   Based on my -- based on my analysis, it's my
11    belief that this was the first set of passages
12    blocked.
13  Q.   All right.  Will you identify that then as the
14    first passage blocked?
15  A.   (Witness complies.)  Okay.
16  Q.   All right.  And then what was the next passage
17    that was blocked?
18  A.   Well, the next route would have been to deposit
19    the aluminum oxide on the diaphragm itself.
20  Q.   All right.  If you will show us the next spot
21    where the aluminum oxide was deposited during
22    the drilling of the first hole?
23  A.   This pen does not do very well on this paper.

Page 62

1    Is there another one we can use?
2        MR. LANE:  And I object to the form of
3        the question there, Winston, but
4        let me see if I can find you a
5        pen.
6  Q.   There you go, sir.
7  A.   That one doesn't do much better, but a little
8       bit.
9  Q.   So that I'm clear, on Exhibit Number 13 you've
10      drawn a circle around the entire head of the
11      Gast motor?
12 A.   Yes.
13 Q.   So between the drilling of the first hole and
14      the drilling of the second hole, it's your
15      opinion that the aluminum oxide shown on
16      Exhibit Number 13 in the bottom photograph
17      appeared?
18       MR. LANE:  Object to the form.
19 A.   Well, I don't know that it appeared during the
20      drilling during this incident, but it was
21      present during the incident.  I've testified I
22      don't know when it occurred initially, but it
23      occurred prior to the incident.

Page 63

1  Q.   All right.  How long before the incident did it
2       occur?
3  A.   I don't know.
4  Q.   Have you now identified all of the photographs
5       that --
6  A.   No, I have not.
7  Q.   -- you need in order to support your opinion
8       with respect to this matter?
9  A.   Let's see.  I thought I had a stack here that
10      was not marked.
11       MR. LANE:  Wasn't there an Exhibit 5?
12       Where is Exhibit 5?
13       (Off-the-record discussion.)
14 Q.   Sir, Mr. Lane would like for you to take that
15      photograph out.
16 A.   It is now out and in the stack.
17 Q.   All right, sir.
18 A.   You did say all, right?
19 Q.   Please, sir.
20 A.   Okay.
21 Q.   All right, sir.  So you now have done what,
22      sir?
23 A.   I have removed a number of photographs that I

Page 64

1    used in my analysis for criticizing United
2    Rentals.
3  Q.   All right, sir.  Are there any other
4       photographs that you need in order to support
5       your opinion with respect to any criticism of
6       United Rentals?
7  A.   I think those are sufficient to do that.
8  Q.   Well, I mean, are there any others?
9  A.   No.
10 Q.   Let's mark those then, if you will, sir?  As we
11      go, if you will identify what you're marking,
12      sir?
13       (Exhibit 14 marked for identification.)
14 A.   All right, sir.  Exhibit 14 is just a
15      photograph showing the -- showing the torque
16      readings on the testing of the clutch in the
17      drill motor.
18 Q.   And how does that relate to your criticism of
19      United Rentals?
20 A.   Well, it shows that the clutch operated
21      properly; that the vacuum -- in my analysis I
22      concluded that a properly operating vacuum pump
23      would be sufficient to handle the load imparted

Page 65

1    by such a load.
2  Q.   Okay.  What vacuum would have been required?
3  A.   Well, the manual says 20, but it takes a good
4       deal less than that.
5  Q.   How much?
6  A.   Well, you have to make one assumption to reach
7       that conclusion and I looked at a range for
8       that assumption.
9  Q.   All right.  Tell us what that range is, sir.
10 A.   Four-tenths to six-tenths for the coefficient
11      of friction between the gasket on the base and
12      the concrete floor.
13 Q.   And can you explain that to me?
14 A.   Sure.  The static coefficient of friction is a
15      number with no units that is used to determine
16      the force necessary to cause an object to move
17      relative to another object.
18       MR. SHIRES:  What did you call that
19       again?
20 A.   Coefficient of friction.  Actually static
21      coefficient of friction.
22 Q.   Okay.  And can you explain that to us, sir?
23 A.   Do you mean other than what I just did?

Page 66

1 Q.  Please, sir.
2 A.  If you have two surfaces in contact -- and I'm
3      going to illustrate with my hands, I'm sorry.
4      If you have two surfaces in contact --
5 Q.  If you would, since he's having to write this
6      down, if you can, describe what you're doing
7      with your hands, sir?
8 A.  I'm placing my hands together to illustrate two
9      surfaces in contact, the palms of my hands.
10     The force necessary to move my left hand
11     relative to my right hand is a function of the
12     coefficient of friction between those two
13     surfaces; that is skin to skin contact.  It is
14     also a function of the amount of force normal
15     to that surface, that is straight perpendicular
16     to the palms of my hands.  The force is equal
17     to the coefficient of friction times the normal
18     weight on that surface.
19        So, for example, if you have a coefficient
20     of friction of point five, then the force
21     necessary to move -- and that's a static
22     coefficient of friction, the force necessary to
23     begin my hands moving relative to -- my left

Page 67

1      hand moving relative to my right hand would be
2      half the amount of weight on my right hand.
3      Does that make sense?
4 Q.  All right.  And so --
5 A.  So that's the explanation of coefficient of
6      friction.
7 Q.  Right, sir.  But how does that relate to any
8      criticism you have of United Rentals?
9 A.  Well, it's my opinion that based upon my
10     analysis that the vacuum pump properly
11     operating -- or the vacuum base properly
12     operating would easily hold the drill down
13     during any drilling process that occurred up to
14     the limits of the clutch.
15 Q.  And what was that, sir?
16 A.  The limits of the clutch are about 230 foot
17     pounds.
18 Q.  And what amount of force was necessary to
19     maintain the base to the slab?
20 A.  During drilling?
21 Q.  Please, sir.
22 A.  I need Volume I.
23        MR. LANE:  Was the question how much

Page 68

1         was needed to hold it?
2         MR. SHEEHAN:  I think we understand
3             each other.
4         MR. LANE:  Well, I don't understand it
5             and I want to know what you asked.
6         MR. SHEEHAN:  Well, you will be able to
7             cross-examine him.
8         MR. LANE:  I would like to re-read the
9             question just so I understand what
10            the question is.
11        (Question read by the Reporter.)
12 A.  I'm not sure I calculated that specific number,
13     but let me tell you what I did calculate.
14 Q.  And you're looking at some notes there, sir?
15 A.  Yes, sir.
16 Q.  Why don't we mark those then as Exhibit Number
17     15?  Is that just one sheet, sir?
18 A.  Yes.
19        (Exhibit 15 marked for identification.)
20 Q.  What is Exhibit Number 15, sir?
21 A.  My engineering calculations.
22 Q.  For what?
23 A.  The comparison of the maximum torque that could

Page 69

1      be imparted on the base of the drill machine by
2      the drill motor as limited by the clutch versus
3      the resisting moment of the vacuum base when
4      it's operating properly.
5 Q.  And what was the volume necessary for it to be
6      maintained to the slab?
7 A.  The clutch releases at 230 foot pounds.  The
8      resisting moment available to -- the resisting
9      moment available when the pump is operating
10     properly at 20 inches of Mercury is 864 foot
11     pounds, approximately.
12 Q.  So that I'm clear, it was necessary for there
13     to be 20 inches of Mercury?
14        MR. LANE:  Object to the form.
15 A.  If you have 20 inches of Mercury, you have a
16     safety factor of about four.  That means the
17     vacuum system will hold down -- will keep the
18     base attached to the surface at a force four
19     times that which actually could be imparted by
20     the clutch mechanism.
21 Q.  So what was the range, sir?
22 A.  I'm sorry, the range?
23 Q.  You said that there was a range?

Page 70

1  A.  Oh, I did, yes.  If you assume the higher
2      coefficient of friction, six-tenths, the
3      resisting moment is 864 foot pounds.  If you
4      assume a lower coefficient of friction, about
5      point four, the resisting moment is 576 foot
6      pounds, still well above that which could be
7      imparted by the drill motor.
8  Q.  So that I'm clear, it was necessary for there
9      to have been 20 inches of Mercury shown on the
10     gauge of the vacuum pump?
11 A.  To give you a safety factor of four, yes, it
12     is.
13 Q.  Okay.  What was the lowest reading on the gauge
14     at the time that it disengaged?
15 A.  I don't know.
16 Q.  Can you give us a range?
17 A.  I can't.
18 Q.  Immediately prior to disengaging, what was the
19     gauge reading?
20         MR. LANE:  Go ahead and answer your
21             question, I just need a quick
22             break here.
23 A.  Okay.  I would say the gauge probably

Page 71

1      approached about five inches of Mercury.
2      That's the point at which it will begin to
3      break loose.
4          MR. LANE:  Winston, I hate to
5              interrupt, hold on just a second.
6          (Off-the-record discussion.)
7  BY MR. SHEEHAN:
8  Q.  So that I'm clear, the gauge, immediately
9      before disengaging during the drilling of the
10     second hole, would have shown five inches of
11     Mercury?
12 A.  What I said was it probably approached about
13     that number.  That's the point at which the
14     base will start to break loose.
15 Q.  And what did the gauge show when the drill
16     broke loose during the drilling of the first
17     hole?
18 A.  I don't know.
19 Q.  And why not?
20 A.  I was not there to see it nor did anybody else
21     indicate that they observed the reading on the
22     gauge.
23 Q.  Well, did they observe the reading on the gauge

Page 72

1      during the drilling of the second hole?
2  A.  I believe they indicated that they watched the
3      gauge, but there is no report of what the
4      actual number was.  They had no indication of
5      what was an acceptable number, so it really
6      didn't mean very much to them except to see
7      that the gauge was actually moving.
8  Q.  Well, as I understand it, you're telling me
9      that the gauge read five inches of Mercury
10     before it disengaged drilling the second hole?
11 A.  I said it was probably approaching about that
12     number, yes.
13 Q.  Well, what was it approaching when it
14     disengaged during the drilling of the first
15     hole?
16 A.  Probably about the same number, about five.
17 Q.  Five inches of Mercury?
18 A.  Yes, sir.
19 Q.  And what do you base that on?
20 A.  My calculations.
21 Q.  Which you've identified as Exhibit Number --
22 A.  Exhibit Number 15.
23 Q.  And that's one sheet?

Page 73

1  A.  Yes, it is.
2  Q.  Was this an instantaneous process or was it a
3      gradual process of the vacuum -- of losing
4      vacuum?
5  A.  I don't know.
6  Q.  Why not?
7  A.  Well, I wasn't there.  It could have been -- it
8      could have been that the pump was simply unable
9      to achieve the higher vacuum that you desire,
10     that is 20 inches of Mercury, because of the --
11     because of the problem we've already discussed
12     with the aluminum oxide.  It perhaps, and most
13     likely, never achieved that reading, but it was
14     able to achieve a vacuum sufficient to provide
15     some hold down force.
16 Q.  And what was that, sir?
17 A.  Something above five.
18 Q.  How much above five?
19 A.  I don't know.
20 Q.  And why not?
21 A.  I wasn't there.
22 Q.  Well, what do you base your opinion that it was
23     something above five?

Page 74

1  A.    Because five is the point at which it will
2         begin to break loose under maximum torque
3         produced by the drill.
4  Q.    And you base that on those calculations that
5         you've now identified as Exhibit Number --
6  A.    15.
7  Q.    -- 15?
8  A.    Yes, sir.
9  Q.    And, I'm sorry, I still don't understand.  Was
10        it an instantaneous loss of vacuum power or was
11        it a gradual loss of vacuum power that caused
12        the base to disengage?
13             MR. LANE:  Object to the form.
14  A.   It could have been either with the same end
15        result.
16  Q.    What do you mean it could have been either?
17  A.   It could have been a sudden loss or it could
18        have been a gradual loss.
19  Q.    A sudden loss of what, sir?
20  A.   Of vacuum.
21  Q.    And what do you base that on?
22  A.   I base it on the fact that the vacuum has to
23        reach a certain level for it not to be

Page 75

1         effective.  I don't know whether it approached
2         it quickly or approached it slowly, but I know
3         that it lost vacuum to that level.
4  Q.    Okay.  How long into the process did it --
5         before it lost vacuum?
6  A.    Which hole?
7  Q.    Good question.  How about the first hole?
8  A.    Well, the testimony indicates that they had
9         drilled for several minutes, I think perhaps
10        five to ten minutes, and had drilled to a depth
11        of, I think, three to four inches before it
12        broke loose.
13  Q.    And what happened after that period of time to
14        cause it to disengage?
15  A.    The vacuum dropped to a point that it was not
16        able to handle the torque generated by the
17        drill motor, therefore it broke loose.
18  Q.    And what caused the vacuum to drop during the
19        drilling of the first hole?
20  A.    I don't know.
21  Q.    What caused the vacuum to drop during the
22        drilling of the second hole?
23  A.    I don't know.  But the evidence would indicate

Page 76

1         that there was a malfunction of the pump, as
2         evidenced by the presence of the aluminum oxide
3         in the pump.
4  Q.    Did the aluminum oxide -- was it present during
5         the drilling of the first hole?
6             MR. LANE:  Object to the form.  At the
7                site or in the pump itself?
8                Object to the form.
9  A.    It's my opinion that the aluminum oxide was
10        present during the drilling process.  I don't
11        know how long before the process started that
12        it was deposited, but it's my opinion that it
13        was there at that time.
14  Q.    What caused the difference in the aluminum
15        oxide during the drilling of the first hole and
16        the drilling of the second hole?
17             MR. LANE:  Object to the form.  Object
18                to the form.
19  A.    Well, you have air movement through the pump
20        that perhaps moved it around.
21  Q.    Is that how you explain the difference in the
22        two?
23  A.    I'm not sure what you mean by the difference.

Page 77

1  Q.    Is it your testimony that the vacuum dropped
2         during the drilling of the first hole?
3  A.    Yes.
4  Q.    And what caused the vacuum to drop during the
5         first hole, the drilling of the first hole?
6  A.    It's most probably the deposition of the
7         aluminum oxide in the vacuum pump which limited
8         its ability to draw a vacuum.
9  Q.    And when you say deposition, are you talking
10        about the deposit?
11  A.    Yes.
12  Q.    Well, how was the vacuum able to operate during
13        the drilling of the second hole?
14  A.    Well, it's most probable that the passages were
15        not completely obscured by the aluminum oxide,
16        therefore it was able to draw a partial vacuum,
17        but not what you would expect it to draw.
18  Q.    Well, what caused the passage to become blocked
19        during the drilling of the second hole that was
20        different from the drilling of the first hole?
21             MR. LANE:  Object to the form.
22  A.    Well, we have a dynamic process ongoing, that
23        is you have movement of air through the pump

Page 78

1  which moves this material around.  And it's
2  likely that the aluminum oxide changed
3  positions during that -- during that entire
4  process.
5  Q.  What caused the aluminum oxide to change
6  positions during the -- before the drilling of
7  the second hole?
8       MR. LANE:  Object to the form.  Asked
9         and answered.
10 A.  Well, I guess the best way I can describe that
11    is it's similar to the movement of air carrying
12    dust with it.
13 Q.  So where did this aluminum oxide come from that
14    blocked the passageway during the drilling of
15    the second hole?
16      MR. LANE:  Object to the form.  Asked
17         and answered.
18 A.  I don't know.
19 Q.  Where was this aluminum oxide during the period
20    between the drilling of the first hole and the
21    start of the drilling of the second hole?
22      MR. LANE:  Object to the form.  Asked
23         and answered.

Page 79

1  A.  It's most probable that it was inside the pump
2     during the entire period.
3  Q.  Where inside the pump, sir?
4  A.  In the head and on the diaphragm.
5  Q.  Can you tell us where or show us on any of
6     these photographs where it was present during
7     the period of time from the drilling of the
8     first hole until the drilling began on the
9     second hole?
10      MR. LANE:  Object to the form.  Asked
11         and answered.
12 A.  That would be the same location that I've
13    already pointed out where I showed the presence
14    of the deposits before.
15 Q.  Can you show us those, sir?
16 A.  Sure.
17 A.  Those photographs show that.
18 Q.  If you will, sir, as you mark them would you
19    tell us what you're marking?
20 A.  Yes, sir.
21      (Exhibit 16 marked for identification.)
22 A.  Exhibit 16 shows the -- two photographs; the
23    top photograph showing the bottom side of the

Page 80

1  head which shows deposits of aluminum oxide.
2  Well, actually they both show that surface, the
3  same surface.  Wait a minute.  No, they don't.
4  The bottom photograph shows the bottom surface
5  of the head and the top photograph shows the
6  top part of it.
7  Q.  Okay.  Could you identify that for us?
8  A.  (witness complies.)  I'm going to identify
9     this second one as "pump body," this is the
10    middle part of the pump below the head where
11    the diaphragm is.
12 Q.  And that's on Exhibit Number?
13 A.  16.
14 Q.  All right, sir.
15      (Exhibit 17 marked for identification.)
16 A.  Exhibit 17 shows two color photographs of the
17    aluminum oxide deposit.  The top one is a
18    close-up, I can't really identify the surface
19    that it's on, but it appears to be the
20    diaphragm.  The bottom one shows a view of the
21    deposits on the diaphragm.
22 Q.  Can you identify those, sir?
23 A.  (Witnesss complies.)  All right, sir.

Page 81

1  Q.  I'm sorry, I couldn't read what you wrote
2     there.
3  A.  I wrote "aluminum oxide."  I don't know the
4     surface, so I just wrote "aluminum oxide."  On
5     the bottom one I wrote "aluminum oxide deposits
6     on the diaphragm."
7  Q.  Is that the top or bottom of the diaphragm,
8     sir?
9  A.  I think it's the top, although it's hard to
10    tell.
11 Q.  Do you want to put "top" and a question mark
12    then?
13 A.  (Witness complies.)
14 Q.  And was this aluminum oxide that you've
15    identified on the top, is that on the bottom or
16    the top of the --
17 A.  I don't know.  I don't know what that surface
18    is.  I can't tell because of the fact that it's
19    zoomed in so close, I cannot identify the
20    surface.
21 Q.  Do you want a put a question mark there then?
22 A.  Sure.  I'm going to put "surface, question
23    mark."

Page 82

1  Q.   Okay.  Is there a question mark there?
2  A.   On top I had a question mark.  Yeah, there's a
3       question mark there.  I kind of wrote over it,
4       but I will rewrite it.
5  Q.   Thank you.
6           (Exhibit 18 marked for identification.)
7  A.   Exhibit 18 similarly shows deposits of aluminum
8       oxide on what appears to be the top surface of
9       the diaphragm in both of these photos.
10 Q.   So both of those are the top?
11 A.   I believe so, yes.
12 Q.   Do you want to write "top" on that?
13 A.   (Witness complies.)
14 Q.   Okay.
15          (Exhibit 19 marked for identification.)
16 A.   Exhibit 19 shows a different view of the same
17       thing.
18 Q.   Is that top or bottom, sir?
19 A.   When I say top, I mean top of diaphragm.  This
20       is the bottom of the head up here.
21 Q.   Do you want to put "top of diaphragm"?
22 A.   (Witness complies.)
23 Q.   Okay.

Page 83

1           (Exhibit 20 marked for identification.)
2  A.   Exhibit 20 is really meant for only the bottom
3       photo of the two, which shows "aluminum oxide
4       in passageway of head."
5  Q.   And what's the top photograph of Exhibit Number
6       20, sir?
7  A.   I can't really tell.  It's a close-up of
8       something.  It could be the bottom of the
9       diaphragm, but I'm not certain of that.
10 Q.   Do you want to put a question mark then beside
11       that?
12 A.   (Witness complies.)  This is already marked, do
13       you want to mark it again?
14 Q.   No, sir, if it's already identified.  What is
15       that, sir?
16 A.   Exhibit Number 8 shows the passageways that
17       I've also identified in Exhibit 20, just
18       another shot of that, and another shot of what
19       appears to be the bottom of the diaphragm.
20 Q.   Is the bottom photograph of the diaphragm?
21 A.   I think so.
22 Q.   Well, do you want to identify that for us, sir?
23 A.   (Witness complies.)

Page 84

1  Q.   And what part of the diaphragm is that
2       photograph?
3  A.   It appears to be the bottom.
4  Q.   All right.  And the top photograph, if you
5       could identify that for us?
6  A.   The passageways in the head.
7  Q.   I'm sorry, on Exhibit Number 8 are the
8       passageways -- are they blocked?
9  A.   It appears that there's some partial
10       obstruction in the passageway, yes.
11 Q.   Sir, the question is, are the passageways
12       blocked?
13          MR. LANE:  Object to the form.
14 A.   Obstructed.  Blocked to me means totally
15       blocked off.  I don't think that's the case.
16 Q.   Were they totally blocked off?
17 A.   It doesn't appear to be.  I don't know.  I
18       don't know if they were totally blocked off.
19       They might have been.
20 Q.   Would it have been necessary for the
21       passageways to have been totally blocked off?
22 A.   To have resulted in what happened?
23 Q.   Yes, sir.

Page 85

1  A.   No, it would not be.
2  Q.   What percentage of the passageways would have
3       had to have been blocked partially?
4  A.   That's sufficient to have resulted in a vacuum
5       of about five inches of Mercury.
6  Q.   Yes, sir.  What percentage?
7          MR. LANE:  That's the answer.
8  A.   I don't know.
9          MR. LANE:  Object to the form.
10 A.   I don't know the cross-sectional area of those
11       passageways.
12          (Exhibit 21 marked for identification.)
13 A.   Exhibit 21 shows the -- the bottom photograph
14       is the one I really am marking here.  And that
15       is it shows the head with the passageways and
16       the obstruction of the passageways by the
17       aluminum oxide.
18 Q.   If you will identify that for us, sir?
19 A.   (Witness complies.)  All right.
20 Q.   And what's that top photograph, sir?
21 A.   It's the -- it's the head before the cover was
22       taken off of the passageways.
23 Q.   What does that show you, sir?

Page 86

1  A.  It doesn't show me anything.  I have not marked
2      that one.
3  Q.  Okay.  If you would, sir, if you will identify
4      that for us?
5  A.  (Witness complies.)  All right, sir.
6  Q.  I'm sorry, what's the difference between the
7      top and the bottom photograph on Exhibit Number
8      21?
9  A.  It appears from that photograph that there's a
10     gasket or a cover over some of the passageways
11     that has not yet been removed to show the view
12     in the bottom photo.
13 Q.  Can you identify the cover for us in any of
14     these photographs?
15 A.  Sure.  (Witness complies.)
16 Q.  And you put a question mark there?
17 A.  Yes.
18 Q.  And why is that?
19 A.  Because I said that's what it appeared to be.
20 Q.  Okay.  So you don't know what that is?
21 A.  No, I was not present when it was photographed.
22     That's what it appears to be from the
23     photograph, but I don't know that for certain.

Page 87

1  Q.  Is this what you would see if you took the --
2  A.  The topmost cover.
3  Q.  -- topmost cover off?
4  A.  Yes.
5  Q.  And where is the filter on there?
6  A.  I cannot see it in this view.
7  Q.  Do you see it in any of these other views?
8  A.  Well, let's take a look.  Exhibit 8.
9  Q.  Okay.  If you would, can you circle the cover
10     there, sir?
11         MR. LANE:  Do you mean the filter?
12         MR. SHEEHAN:  I'm sorry, thank you.
13         The filter?
14 A.  I assumed that's what you were asking.
15     (Witness complies.)  I'm not known for my
16     handwriting skills.
17 Q.  And what's that filter made of?
18 A.  I don't know.
19 Q.  Can you describe the size of the filter?
20 A.  The size?
21 Q.  Yes, sir.
22 A.  It appears to be about perhaps three-quarters
23     of an inch in cross-section by maybe a half inch

Page 88

1      vertical height.
2  Q.  And how would United Rentals know to maintain
3      that filter?
4  A.  They could read the manual.
5  Q.  What manual?
6  A.  The Operation and Maintenance Manual.
7  Q.  Of whom?
8  A.  Gast.
9  Q.  Is there any other way they would know to
10     maintain that filter?
11 A.  Any other way?  Just general knowledge of
12     people who do maintenance work.
13 Q.  How often should that filter be cleaned?
14 A.  Well, the manual indicates you should check it
15     after the first 500 hours and set a schedule
16     based on how quickly it blinds off.
17 Q.  And what manual is that, sir?
18 A.  The Operation and Maintenance Manual for -- I'm
19     not sure if it's for the vacuum pump or the
20     total drill press.
21 Q.  Can you find it for me?
22 A.  Sure.  Exhibit 6, page three, would you like me
23     to read that?

Page 89

1  Q.  Of what, sir?
2  A.  Page three, Exhibit 6.
3  Q.  And what is Exhibit 6?
4  A.  It's the spec sheet -- well, actually it's
5      called Operation and Maintenance Manual for the
6      Gast vacuum pumps, actually three different
7      models of Gast vacuum pumps.
8  Q.  And what model does that refer to?
9  A.  The three, the three models?
10 Q.  Please, sir.
11 A.  DOA, MOA, DAA.
12 Q.  And which model was on the subject machine?
13 A.  DOA.
14 Q.  Does it appear anywhere else?
15 A.  That instruction?
16 Q.  The reference to maintaining it after 500
17     hours?
18 A.  Let me check one other place that it could be.
19     The manual provided by United Rentals, I
20     believe, yes, United Rentals, actually starting
21     with Bates Number 0020, is the owners manual
22     for the core drill, the incident core drill.
23     It includes a section on the Gast vacuum pump

Page 90

```
 1        which states "The required maintenance
 2     procedure for the vacuum pump is listed in the
 3     parts list and operating and maintenance
 4     instructions pamphlet." Now, I'm not sure what
 5     pamphlet that is. I don't believe that's
 6     attached here, although it may be. There's
 7     nothing really identified here as a pamphlet,
 8     but it does refer to the fact that there's an
 9     operation and maintenance procedure which I
10     just referred to.
11  Q.   And what is that standard of care?
12           MR. LANE:  Object to the form.
13  A.   To inspect the pump.
14  Q.   When?
15  A.   Well, the filter portion of the pump is to be
16     inspected after the first 500 hours and
17     thereafter on a frequency determined by the
18     performance of the filter. It also indicates
19     that the vacuum pump is to be purged after
20     every use for a period of 20 to 25 minutes.
21  Q.   Where does it say that, sir?
22  A.   In the manual.
23  Q.   In which manual?
```

Page 91

```
 1  A.   The one I just had. Let me see if I can find
 2     it.
 3           MR. SHIRES:  You're talking about the
 4           owners manual, right?
 5           MR. LANE:  He's talking about the
 6           Gast --
 7  A.   I'm talking about the Gast Operation and
 8     Maintenance Manual. The shutdown procedures on
 9     page three indicates that the pump is to be run
10     with the -- with the piping disconnected, that
11     is it just draws in fresh air, for a period of
12     20 to 25 minutes, part of which is under full
13     load, in order to purge the pump to rid it of
14     any corrosive agents, principally water vapor
15     in this case.
16  Q.   How often, sir?
17  A.   After every use.
18  Q.   And what paragraph is that, sir?
19  A.   Shutdown procedures, which starts with the top
20     of the second column on page three. There's no
21     indication that that was done by United
22     Rentals.
23  Q.   And where do you see that, that it wasn't done
```

Page 92

```
 1     by United Rentals?
 2  A.   From the depositions of Mr. Whitecotton and
 3     Mr. -- the head mechanic, his name is escaping
 4     me here. I'll find out.
 5  Q.   And what was their testimony about that?
 6  A.   Well, they described their procedure in detail
 7     and there was nothing in their description that
 8     indicated that they performed this purging
 9     procedure.
10  Q.   Did they say they didn't perform the purging
11     procedure?
12  A.   There was nothing in their description -- their
13     detailed description of their procedure that
14     indicated that they did.
15  Q.   Well, was there any evidence that they didn't?
16  A.   And the evidence would also indicate that they
17     did not because in fact we have corrosion
18     products in the -- inside the pump.
19  Q.   Again, is there any evidence that they did not
20     perform this purging procedure?
21  A.   What I just said, yes, sir.
22  Q.   What would be the proper maintenance for a core
23     drill machine?
```

Page 93

```
 1  A.   Well, you can follow the maintenance protocol
 2     established by the manufacturer of the
 3     component parts.
 4  Q.   All right. If you will, tell us what the
 5     proper maintenance procedure should have been
 6     for United Rentals?
 7  A.   Well, they should have inspected the machine
 8     between every use to determine if there were
 9     any defective parts, including frayed cords,
10     bad gaskets, whether the motors ran properly,
11     whether the vacuum pump ran properly. They
12     should have inspected the filter on some
13     frequency, not necessarily after every use, but
14     on some frequency.
15  Q.   What frequency?
16  A.   The frequency as stated by the manufacturer,
17     which is after the first 500 hours and
18     thereafter based on the operating experience.
19     And that's really a function of the use of the
20     machine, which in this case United Rentals has
21     no real knowledge of because they rent it to
22     different customers who have different
23     operating environments. Therefore in my
```

24  (Pages 90 to 93)

1   opinion it would be prudent for them to check
2   the filter at every use. Additional operating
3   or maintenance is to purge the pump after every
4   use to rid it of any material which might
5   result in corrosion.
6  Q.   Anything else that they should do in the
7   maintenance of a core drill machine?
8  A.   I think that covers it.
9  Q.   Okay. So that I'm clear, the procedure is to
10   inspect the machine and determine if there are
11   any defective parts?
12  A.   Yes, sir.
13  Q.   And what parts should they look for?
14  A.   Every part.
15  Q.   Okay. If you will, tell me -- just give me a
16   step by step so that I will know?
17  A.   You would do a visual inspection of the drill,
18   which includes the base, to see whether there's
19   any fractures in the base, any abuse of the
20   base from prior customers; look at the channel
21   that the gasket fits in to see if it's clean;
22   look at the gasket to see if it's solid, that
23   it's not damaged in any way. I would look at

1   the power cord to make sure that it's not
2   damaged. I would check the drill motor to make
3   sure that it operates.
4  Q.   And how would they do that?
5  A.   Plug it up and turn it on. I would check the
6   vacuum pump to make sure that it operates. And
7   I think it would be prudent to -- during that
8   process to determine what level of vacuum that
9   it will pull, because it's my opinion that this
10   vacuum pump probably began failing prior to
11   this incident because of these deposits in the
12   pump. Had they -- had they checked the
13   performance of the vacuum pump, they could have
14   determined if, in fact, it was unable to
15   achieve the 20 inches of vacuum that the
16   manufacturer recommends. Well, actually the
17   manufacturer did not recommend any particular
18   level in the manual that they had, but it
19   leaves it up to the judgment of the owner, I
20   suppose. But they should know from prior
21   testing what level to expect.
22  Q.   What other procedures, sir?
23  A.   What else?

1  Q.   Please, sir. In inspecting the core drill
2   machine?
3  A.   I would operate the jack screw to make sure
4   that it operated freely. I would operate the
5   lever which moves the drill motor up and down
6   to make sure that it operates.
7  Q.   I'm sorry, the jack screw, what is a jack
8   screw?
9  A.   That's also called the ceiling jack. It's on
10   top of the column that supports the drill
11   motor.
12  Q.   And why would you check the ceiling jack?
13  A.   Well, because you're renting a product, you
14   want to make sure that it functions properly,
15   because the next customer might choose to use
16   the ceiling jack and he would expect it to
17   operate properly.
18  Q.   Well, what do you use the ceiling jack for?
19  A.   You can use it to hold the drill in place
20   during the drilling of vertical surfaces. You
21   can also use it for -- to assist with drilling
22   horizontal surfaces, although I don't believe
23   that's commonly done.

1  Q.   Can you use the ceiling jack and not the vacuum
2   system to hold the base to the slab?
3  A.   The manufacturer recommends that if you're
4   going to use the ceiling jack when you're
5   drilling a floor, that you use it in
6   conjunction with the anchor screw -- anchor
7   bolt, rather.
8  Q.   What's an anchor bolt?
9  A.   The anchor bolt is a bolt that you would
10   install in the concrete floor. It would
11   protrude up through the center of the base of
12   the drill and you would bolt it down.
13  Q.   And where is this anchor bolt?
14  A.   There's not one on this machine. I can show
15   you where it goes.
16  Q.   Okay. If you could, sir?
17  A.   I'm looking for an exploded view. I have a
18   particular view in mind that illustrates it
19   best, so that's why I'm -- what I'm trying to
20   find.
21       MR. LANE: By the way, while you're
22       looking for that, I just wanted to
23       tell you our lunch is here.

Page 98

1      MR. SHEEHAN: Let's finish this series
2        of questions and then we'll take a
3        break.
4      MR. LANE: That's fine, I just wanted
5        to let you know.
6  A.  Here we are.
7  Q.  All right. Let's mark that, sir.
8  A.  This is already marked. Do you want to mark
9      this individual page, is that what you're
10      saying?
11  Q.  If we're going to refer to it, please, sir.
12  A.  Yes, sir, let's do that.
13        (Exhibit 22 marked for identification.)
14  A.  Exhibit 22 is --
15  Q.  Which is contained within Exhibit Number --
16  A.  Contained within Exhibit Number 3. It's also
17      marked with Bates-stamp United Rentals 0035.
18      It's an exploded diagram of the drill base.
19      The Number 38 part is really a collection of
20      parts that is labeled "anchor base." There's a
21      slot in the anchor base that the bolt from the
22      floor protrudes through and then you put a
23      washer and a nut on it to hold it down to the

Page 99

1      floor.
2  Q.  All right. If you can, can you circle that
3      where the anchor bolt is?
4  A.  The anchor bolt would be in this slot.
5      (Witness complies.)
6  Q.  And where does that show up on the parts
7      inventory?
8  A.  It's on page 16 of the Clipper Owners Manual
9      for DM450 and DM500 core drills.
10  Q.  All right. And my question is, where does it
11      show up on the parts inventory?
12  A.  Oh, on the list itself?
13  Q.  Yes, sir.
14  A.  All of these parts that I'm going to circle are
15      included under Number 38, which is an assembly.
16      It includes though specific part Number 12, 19
17      through 26, 39 and 40, which are a part of this
18      overall list.
19  Q.  Okay. And what are items Number 20, 30 and 40?
20  A.  Just those three, 20, 30 and 40?
21  Q.  Well, if you're referring to them, I'm curious
22      as to what you believe those to be.
23  A.  Okay. Item 12 is a half inch hex head cap

Page 100

1      screw. Item 19 is a half inch lock washer.
2      Item 20 -- I'm sorry, 19 is another screw. 20
3      is a washer. 21 is a jam nut. 22 is actually
4      the wheel assembly. 23 is a cotter pin. 24 is
5      a flat washer. 25 is a six inch wheel. 26 is
6      a wheel mount bracket. 39 is the base itself,
7      the anchor base. And 40 is another screw.
8  Q.  All right. So that I'm clear, it's your
9      testimony that there is no anchor bolt on the
10      subject core drill machine that injured
11      Mr. Riley?
12  A.  Well, you can put an anchor bolt on the
13      machine, because you can take the -- you can
14      take the vacuum port out and extend a screw
15      which you installed in the floor -- well, you
16      can do it one of two ways. You can either
17      install an anchor in the floor and put a bolt
18      through the slot where the vacuum port is,
19      which goes through the base, and bolt it down,
20      or you can insert a stud in the floor which
21      comes up through and then you set the base down
22      on top of it and put a washer and a nut on top
23      of that, so either way.

Page 101

1  Q.  And what size bolt would you use?
2  A.  I think they use half inch.
3  Q.  Made out of what?
4  A.  Just a standard cold rolled steel bolt, most
5      likely.
6  Q.  And what length?
7  A.  Well, let's see. Three and a half inches.
8  Q.  You were telling us that this anchor bolt you
9      would check as part of your maintenance
10      procedure?
11  A.  No, I didn't say that. I said I would check
12      the jack screw.
13  Q.  All right, sir.
14  A.  I would also check the leveling screws.
15  Q.  What are leveling screws?
16  A.  They are four screws at each corner of the
17      base. You need to just check those to make
18      sure they operate freely.
19  Q.  And what function do they serve?
20  A.  They serve to level the device, level the base
21      actually, so that you can drill a hole
22      perpendicular to a horizontal surface.
23  Q.  And why is that significant, if any?

Page 102

1  A.    Well, usually when you put a hole in a floor
2        you want it to be perpendicular to that
3        surface, because you're going to insert
4        something in it which generally you want to be
5        plumb and vertical.
6  Q.    Does it make any difference whether or not
7        while drilling the hole that it be a
8        perpendicular hole?
9  A.    No.  Actually you can drill a hole at an angle
10       or you can drill a hole horizontally, so it's
11       not necessary that it has to be a vertical
12       hole.  But if you want a vertical hole, that's
13       the way you get it level.
14 Q.    Is how?
15 A.    Adjust the leveling screws.
16 Q.    Okay.  Is there any importance in maintaining
17       alignment?
18 A.    I don't understand your question.
19 Q.    Alignment as you're drilling a hole into, say,
20       a concrete slab such as at Flavor House?
21 A.    Yes, there is.
22 Q.    Why?
23 A.    Well, if you don't -- if you have any excessive

Page 103

1        movement of the concrete saw relative to the
2        hole that you're drilling --
3  Q.    I'm sorry, you said "saw"?
4  A.    Yes, a circular saw actually.  Some people call
5        it a bit, but it's really a hole saw, if you're
6        familiar with hole saws like you drill your
7        doors with.
8  Q.    So that we're specific to this fact situation,
9        if you could, let's refer to it as a core drill
10       bit, would that be fair?
11 A.    That's fair.  That's a good way to describe it.
12       So you don't want any excess movement of the
13       core drill bit relative to the hole that you're
14       drilling, because it's likely to bind up if
15       that occurs.
16 Q.    Did that happen in this case?
17 A.    Did it happen?  Yes, it did.
18 Q.    And what caused it to bind up?
19 A.    It's my opinion that it was caused by excess
20       movement resulting from insufficient vacuum to
21       hold it still.
22 Q.    And where was the excessive movement?
23 A.    Of the core drill relative to the hole that was

Page 104

1        being placed in the concrete floor.
2  Q.    Were the leveling screws used in this accident
3        based upon your opinion?
4  A.    The testimony was that it was used, yes.
5  Q.    Okay.  And who was that testimony from, sir?
6  A.    Mr. Riley and Mr. Walters.
7  Q.    Okay.  So how do you engage the leveling
8        screws?
9  A.    Well, the manual for the Clipper drill
10       indicates that you -- you set the base up on
11       the concrete floor, you actually wet the floor.
12 Q.    Why do you wet the floor?
13 A.    To get a good seal between the gasket and the
14       floor.
15 Q.    How much water do you use?
16 A.    Just enough to wet the surface.
17 Q.    In this case how much should they have used?
18 A.    A cup would be sufficient for that purpose.
19 Q.    I'm sorry, sir?
20 A.    A cup.
21 Q.    A cup of water?
22 A.    Yes.
23 Q.    Okay.

Page 105

1  A.    Then you engage the vacuum pump, allow it to
2        pull down, seat itself, and then you run the
3        screws down to where they just begin to touch.
4        You don't want to raise them too high because
5        you will break the seal between the gasket and
6        the floor, but you run them down far enough so
7        they touch.  And you can level it with the
8        bubble that's on the drill motor actually --
9        no, I think it's on the pedestal, one of the
10       two.  There's a bubble there that allows you to
11       level the -- that surface, which really
12       translates to a vertical hole.
13 Q.    And were they drilling a vertical hole in this
14       case?
15 A.    Yes, that was their desire.
16 Q.    Okay.  And did they drill a vertical hole?
17 A.    I don't know.
18 Q.    You haven't seen any photographs of the
19       accident scene?
20 A.    Well, yes, I have.  I've seen some photographs
21       of a hole, but the hole was filled with water
22       and there was no -- there was no measuring
23       device indicated in the photograph to show

Page 106

1   whether it's plumb or not. I had no reason to
2   doubt that it was a vertical hole, it most
3   likely was.
4   Q.   How deep was the hole?
5   A.   The first hole was -- I think it exceeded four
6       inches, but I don't recall the total depth.
7   Q.   And how deep was the second hole?
8   A.   I believe they had drilled about four inches
9       when it started to bind.
10  Q.   What would happen if while drilling the hole
11      the leveling screws were not being used?
12  A.   If the vacuum was working properly, it would
13      have no impact unless you -- unless the base
14      was not level. And if your desire was to put a
15      vertical hole in and the base was not level,
16      then you would not have a vertical hole.
17  Q.   And what would happen?
18  A.   Whoever wanted a vertical hole would be
19      unhappy.
20  Q.   Okay. What if you were standing on the base of
21      the machine while drilling this vertical hole
22      without using the leveling screws?
23  A.   I don't believe it would have an impact. It

Page 107

1   would not have an impact if the vacuum system
2   were working as designed to do, that is to pull
3   about 20 inches of Mercury. Because the clamp
4   down force of that is so extreme that standing
5   -- I tried this yesterday, as a matter of fact,
6   standing on the edge of the base without the
7   leveling screws engaged did not cause any
8   movement.
9   Q.   And where did you try that, sir?
10  A.   Right downstairs here.
11  Q.   Using what machine, sir?
12  A.   That exemplar machine right behind you there.
13  Q.   And what model is that, sir?
14  A.   It's a DM520, I believe, or 420. It appears to
15      be an iteration of the incident drill.
16  Q.   And what Gast motor is on it?
17  A.   It's a DOA.
18  Q.   And what will it pull?
19  A.   20 inches.
20  Q.   Is there any difference between this Gast motor
21      and the Gast motor that was on the subject
22      machine?
23  A.   I think there's some cosmetic differences, but

Page 108

1   I don't believe there is any significance
2   difference.
3   Q.   What differences are there in this machine and
4       the subject core drill machine, if any?
5   A.   Well, that one has been modified, so there are
6       some differences.
7   Q.   Okay. Any other differences other than the
8       modifications?
9   A.   Well, I mentioned some cosmetic differences in
10      the Gast pump; the cover on top is a little bit
11      different. The -- well, I'm not sure how it
12      looked before it was modified, so I really
13      can't answer that fully.
14  Q.   Well, I mean, in your opinion, what differences
15      -- if you're going to rely upon the testing you
16      performed yesterday, --
17  A.   Yes.
18  Q.   -- what differences are there in this modified
19      machine and the machine that injured Mr. Riley?
20      MR. LANE: Do you mean the pump or the
21          other modifications that were done
22          to create the exemplar?
23      MR. SHEEHAN: All modifications. Any

Page 109

1       differences that he knows of.
2   A.   There were no differences that would impact the
3       testing that I did relative to the other drill.
4   Q.   All right. But what differences are there in
5       the two machines, the modified machine and the
6       machine that injured Mr. Riley?
7   A.   Well, I can go through the modifications, but
8       those are not really significant for the test
9       that I did.
10  Q.   And that was the modifications performed by
11      Mr. Shaver?
12  A.   Yes.
13  Q.   All right. We understand that Mr. Shaver has
14      modified the machine. But other than the
15      modifications of Mr. Shaver, are there any
16      differences in the Shaver machine and the
17      machine that injured Mr. Riley?
18  A.   Nothing significant.
19  Q.   You know, please, if you will, just tell me the
20      differences?
21  A.   I don't know of any difference other than the
22      modifications.
23  Q.   Okay. The same size?

Page 110

1  A.   Yes.
2  Q.   Okay.
3  A.   Yes. The same drill motor. It appears to be
4       the same from the photographs I looked at.
5  Q.   Did you have any trouble starting the machine
6       yesterday?
7  A.   Starting?
8  Q.   Yes, sir. Or operating the machine?
9  A.   No.
10 Q.   Did you understand that Mr. Shaver had had
11      difficulty starting the machine during his
12      deposition?
13 A.   I read his deposition that indicated he had a
14      little trouble with what he thought was some
15      loose wiring. The only trouble we had
16      initially drawing a vacuum because the petcock
17      was open; it pulled it right down once we
18      closed it.
19 Q.   Okay. And what pressure did you achieve
20      yesterday afternoon?
21 A.   In excess of 20 inches of Mercury.
22 Q.   What pressure did you obtain, sir?
23 A.   Do you mean how much in excess?

Page 111

1  Q.   Yesterday evening when you tested the machine,
2       what pressure did you see on the gauge?
3  A.   A little over 20 inches of Mercury.
4  Q.   And that's what I'm asking you, sir. What a
5       little over 20?
6  A.   Okay. 22.5.
7  Q.   Did you make a note of that, sir?
8  A.   No, sir.
9  Q.   Did you make a photograph of that?
10 A.   No, sir.
11 Q.   A video of it?
12 A.   No.
13       MR. LANE: Do you want us to go down
14       and demonstrate it for you? We
15       will be happy to.
16 Q.   Who was present during this demonstration?
17 A.   Mr. Lane was present.
18 Q.   Anyone else, sir?
19 A.   Some people walked by during the testing, yes.
20 Q.   And who was that, sir?
21 A.   Some other attorneys here, I don't recall their
22      names.
23       MR. LANE: Do you want me to give them

Page 112

1        to you? It was Larry Givens and
2        Farrest Taylor.
3  Q.   Okay. Did they make any comments while they
4       walked by?
5  A.   Well, there certainly were some words spoken.
6       I cannot tell you what they were specifically.
7  Q.   Any relation to this investigation that you're
8       performing?
9  A.   You know, my impression, and I don't recall
10      specific words, but they were very pleased with
11      the way the machine performed as modified.
12 Q.   And what did they say, sir?
13 A.   I don't know.
14 Q.   Okay. And how long did this testing take?
15 A.   We were probably down there, I don't know, 30
16      or 40 minutes, I would guess.
17 Q.   Okay. And what were you drilling into, sir?
18 A.   We did not drill into anything. We were
19      testing the vacuum hold-down function and also
20      demonstrating the interlocks that had been
21      installed on the machine.
22 Q.   What surface was the exemplar machine on that's
23      been modified by Mr. Shaver?

Page 113

1  A.   Concrete floor.
2  Q.   Okay. And did you have a bit on it?
3  A.   No.
4  Q.   Did you apply any water?
5  A.   Yes.
6  Q.   How?
7  A.   Out of a plastic container.
8  Q.   How much water did you use?
9  A.   About a cup, I would guess.
10 Q.   Did you attach the water hose to the water hose
11      attachment?
12 A.   No.
13 Q.   And why not?
14 A.   Weren't planning on drilling anything. All we
15      needed to do was wet the surface to ensure the
16      sealing of the gasket to the floor.
17 Q.   What would you do after inspecting the leveling
18      screws during this maintenance procedure?
19 A.   Would you repeat that?
20 Q.   Yes, sir. You were telling us the steps you
21      would follow if you had been United Rentals and
22      you were inspecting the machine.
23 A.   Oh, yes.

Page 114

1  Q.   What steps would you follow after checking the
2       leveling screws?
3  A.   Well, I think I had gone through a series of
4       things I would look at.
5  Q.   Yes, sir.  You said the leveling screws?
6  A.   Was that the last thing I mentioned in that
7       series?
8  Q.   Yes, sir.
9  A.   I think I covered everything that I would look
10      at during such an inspection.
11 Q.   Okay.  So you would check the performance of
12      the vacuum, that would be the first thing?
13 A.   That would be one of the things.
14 Q.   Well, what's the first thing you would do?
15 A.   Probably a visual inspection.
16 Q.   Okay.  And the second thing you would do?
17 A.   I would probably check the electrical wiring.
18 Q.   The third thing?
19      MR. LANE:  Again, we've been through
20          this once, but go ahead.
21 A.   I would check the base for any imperfections or
22      damage.  I would check then the gasket for any
23      damage.  Then I would start doing my functional

Page 115

1       testing, which I would run the drill motor.  I
2       would run the vacuum motor.  I would check the
3       amount of vacuum that the vacuum pump would
4       pull.  I would ensure that it actually sealed
5       itself to a concrete floor.  And at some point,
6       you could do this anywhere, would be to check
7       the jack screw to see if it operated properly,
8       the leveling screws.
9  Q.   Anything else, sir?
10 A.   I think that covers it.
11      MR. LANE:  Other than what he
12          previously told you?
13 Q.   Well, have you told us anything else?
14      MR. LANE:  Well, I object to the form.
15          He told you a series before, he's
16          doing his best to repeat that,
17          but, you know, you're not going to
18          eliminate his previous rendition
19          of the process he would go through
20          just because he doesn't repeat it
21          verbatim in his current answer.
22 A.   I would check the filter.
23 Q.   And what filter is that, sir?

Page 116

1  A.   The filter in the vacuum pump.  I would purge
2       the vacuum pump.  I think that covers it.
3  Q.   Okay.  So the last thing you would do would be
4       to purge the vacuum pump?
5       MR. LANE:  Object to the form.
6  A.   Well, I don't really think -- the order of
7       those tasks is not significant to me, I think
8       it should be done during that process.
9  Q.   Okay.  Have you now told us the steps that
10      should have been followed by United Rentals in
11      maintaining this machine?
12 A.   Yes.
13      MR. SHEEHAN:  All right.  I understand
14          that we're going to take a recess.
15      MR. LANE:  Sure.
16      (Lunch recess.)
17 BY MR. SHEEHAN:
18 Q.   Mr. Shaver, we've taken a break for lunch and
19      we're back on the record.  What procedure did
20      you follow in setting up the machine yesterday
21      afternoon?
22 A.   I'm Mr. Davis.
23 Q.   I'm sorry, excuse me.

Page 117

1  A.   That's okay.  I understand, I know who
2       Mr. Shaver is.
3  Q.   I should have said what procedure did you
4       follow in setting up the machine yesterday that
5       Mr. Shaver had modified?
6  A.   Wet the floor, started the vacuum pump, allowed
7       it to pull a vacuum.  We then tested the
8       interlock mechanism to see if it would perform
9       as intended, and it did.  Following that is
10      when I checked the -- whether there was any
11      movement of the base when you step on it while
12      the vacuum is operating properly.
13 Q.   Is that all you did?
14 A.   Yes, sir, I think so.
15 Q.   All right.  And did you stand on the machine?
16 A.   I did.
17 Q.   And how much do you weigh, sir?
18 A.   I weigh about 188 pounds.
19 Q.   Okay.  Did you stand on both feet?
20 A.   I think I put all of my weight on one leg, on
21      one foot.
22 Q.   And which foot was that, sir?
23 A.   My right foot, as I recall.

Page 118

1  Q.   And as you face the machine, which side of the
2       machine did you put your weight on?
3  A.   Well, if you're standing on the side opposite
4       where the drill motor is, it would have been
5       the right side. That would be from the back as
6       I would term it.
7  Q.   Okay. Did you apply any other weight to any
8       part of the base of the machine?
9  A.   No.
10 Q.   And how long did you stand on the machine?
11 A.   Just momentarily to see if there was any
12      motion.
13 Q.   When you say momentarily, what do you mean,
14      sir?
15 A.   Three seconds.
16 Q.   Okay. Did anyone else assist you in operating
17      the machine at that time while you were
18      standing on it?
19 A.   Mr. Lane was present.
20 Q.   Did he assist you in operating the machine?
21 A.   Operating? Yes, he plugged it up, I think. He
22      manipulated some of the switches. We did it
23      together essentially.

Page 119

1  Q.   Well, while you were standing on the machine,
2       did he assist in operating the machine?
3  A.   There was no operating of it. There was simply
4       the vacuum motor was running and I stood on it.
5       He was not doing anything to the machine at
6       that time.
7  Q.   Was he touching the machine?
8  A.   I don't believe so.
9  Q.   Okay. And during that three seconds that you
10      stood on the machine, what, if anything, did
11      you do?
12 A.   I looked to see if there was any movement of
13      the base.
14 Q.   And what do you mean movement of the base, sir?
15 A.   I mean did I observe any movement of the base
16      relative to the floor and also looked at the
17      drill support column to see if it moved.
18 Q.   And what did you observe?
19 A.   It appeared to stay very stationary.
20 Q.   Did you check the level?
21 A.   No, I did not look at the level.
22 Q.   Do you know if it remained level?
23 A.   I believe that it did. I believe it remained

Page 120

1       in the same position it was in prior to my
2       standing on it. It appeared to be very solid
3       and stable.
4  Q.   But you didn't check the level?
5  A.   Did not look at the level.
6  Q.   If you would, sir, tell me how the machine that
7       injured Mr. Riley should have been set up there
8       at Flavor House on the evening of July the
9       28th?
10 A.   Do you mean as the machine was constituted at
11      that time or as it should have been designed to
12      be in the first place?
13 Q.   How should it have been set up properly?
14 A.   Set up?
15 Q.   Yes, sir.
16      MR. LANE: In its configuration at the
17      time?
18 Q.   Yes. As it existed on --
19 A.   At that time?
20 Q.   Yes, sir. How should it have been set up?
21 A.   I understand.
22 Q.   Just give me step by step.
23 A.   Step by step?

Page 121

1  Q.   Please, sir.
2  A.   You should sweep the floor. You should wet the
3       floor. You should put the drill in the
4       position where you want the hole to be.
5       MR. LANE: Winston, do you want him to
6       go through the preparation of the
7       machine itself?
8  A.   Yeah, I was about to back up and ask that. If
9       you mean by that check the gasket, clean the
10      gasket, you know, all of those things in
11      preparation for that, you know, certainly you
12      should do those things.
13 Q.   All right. Let's start from the very
14      beginning, what should they have done, please?
15 A.   Okay. When the drill came into the plant, they
16      should have installed the -- assuming that it
17      was not installed, they should have installed
18      the coring bit that they -- was provided for
19      the size hole they wanted to drill.
20 Q.   And, I'm sorry, what size hole did they want to
21      drill?
22 A.   I don't recall. I think it was a four inch
23      hole.

Page 122

1  Q.  Okay. And what bit did they install on the
2      machine?
3  A.  I don't know. There's some -- there seems to
4      be some difference of opinion as to what drill
5      bit was actually used and I don't know the
6      answer to that.
7  Q.  Did it make any difference?
8  A.  No, not to me.
9  Q.  Did it make any difference what drill bit was
10     used?
11 A.  No, it didn't make any difference to my
12     analysis.
13 Q.  Okay.
14 A.  But I think when they received it the gasket
15     had not been inserted into the slot, so they
16     should have inspected the slot to make sure it
17     was clean. They should have inspected the
18     gasket to make sure it was clean. They should
19     have inserted the gasket into the slot and then
20     positioned the drill in place where they wanted
21     it to drill on the swept floor, swept and
22     wetted floor. Then they should have plugged it
23     up and started the vacuum motor which should

Page 123

1      seat the base and seal it to the floor. Then
2      they should have adjusted the leveling screws,
3      assuming they wanted to drill a vertical hole,
4      which I think they did.
5          Oh, I failed to mention, they should have
6      connected the water hose to the machine or in
7      the alternate provided some other means of
8      flushing the cuttings out of the hole. Which
9      there's some difference of opinion about
10     exactly what they did, that is whether they
11     connected the hose to the machine or laid the
12     hose on the floor. It's my opinion that it
13     wouldn't make any difference, each would be
14     effective to do the intended function. And
15     that's the setup.
16 Q.  Should they have stood on the machine?
17 A.  I don't think it makes any difference. I
18     realize the manual says do not stand on the
19     machine as a means of securing the base to the
20     floor. I interpret that to mean don't rely on
21     standing on the machine as a means of securing
22     the base. And I don't believe they did that.
23 Q.  I'm sorry, don't believe they did what?

Page 124

1  A.  Stood on the base to ensure that it was secured
2      to the floor. Mr. Walters stated that he stood
3      on the base, but he did so as a matter of
4      convenience for operating the machine and
5      reading the gauges. The way that machine is
6      set up, it almost invites you to stand on it
7      because of the positioning of the amp gauge.
8      So he stood on the machine. Mr. --
9  Q.  I'm sorry, where is the amperage, is it in the
10     same place on the Shaver modified machine?
11 A.  No. On this machine it's turned 180 degrees
12     around so that it faces the front.
13 Q.  All right. So that's a difference in the
14     Shaver modified machine?
15 A.  Yes.
16 Q.  All right.
17 A.  Mr. Riley indicated that he placed his foot on
18     the -- one of his feet on the machine during
19     drilling. I think he intended to do that, he
20     thought it would help stabilize it. It would
21     not make any difference one way or the other if
22     the machine vacuum pump were operating
23     properly.

Page 125

1  Q.  So you've now described the steps?
2  A.  Yes. The setup steps, yes.
3  Q.  Okay. Are there any other steps?
4  A.  Well, that's when you start drilling the hole.
5  Q.  Okay. Describe how they should have properly
6      drilled the hole?
7  A.  Well, once you get it set up, you advance the
8      coring bit down to the floor surface. You
9      advance it slowly at first until you get some
10     penetration of the coring bit into the -- into
11     the concrete floor. It tends to wander until
12     you do that trying to seek the path of least
13     resistance, but once you get it seated into the
14     concrete floor, then you can apply the normal
15     pressure to the lever to advance the bit into
16     the concrete floor.
17 Q.  Then what?
18 A.  Then drill the hole. We're talking about what
19     should have been done, right?
20 Q.  Yes, sir, what should have been done.
21 A.  Then just drill the hole to the full depth that
22     you needed.
23 Q.  Did Mr. Riley follow these steps that you've

Page 126

1    outlined as being the proper procedure?
2  A.    Mr. Riley did not really set the machine up.
3    Mr. Walters set it up.  He operated it once it
4    was set up for the second hole.
5  Q.    Did Mr. Riley follow the procedures you've
6    outlined?
7  A.    For the operation?
8  Q.    Yes, sir.
9  A.    Yes.
10  Q.    Did Mr. Riley --
11  A.    Well, let me back up.  There's no testimony
12    about whether it was advanced slowly to get
13    your imprint started.  There's really no
14    testimony to that, but I assume that they did
15    because they successfully started two holes.
16  Q.    Should Mr. Riley have stood on the machine?
17  A.    I don't think it made any difference.
18  Q.    Well, so the answer to the question is?
19  A.    It would not matter.
20  Q.    Okay.  Should Mr. Riley have used the water
21    hose and water hose attachment in order to
22    ensure that water was running down the inside
23    of the core drill bit?

Page 127

1  A.    I don't think that's necessary.  As long as you
2    have water flowing around the hole, that should
3    be adequate to perform that function.
4  Q.    Should Mr. Riley have used a drill bit with
5    missing teeth?
6  A.    If he did, it certainly made his job harder.
7    And I wouldn't have done it if I had an
8    alternative, but the record is not conclusive
9    as to whether he did that or not.  There seems
10    to be a lot of difference of opinion about
11    which bit was actually used and I don't know.
12  Q.    Well, did it make any difference -- if you
13    assume that Mr. Riley used a three and a half
14    core drill bit with missing teeth, would it
15    have made any difference in whether or not the
16    accident would have occurred?
17  A.    No.  For a properly designed drill, he would
18    have been protected even if he used the drill
19    bit with missing teeth.
20  Q.    I didn't understand your answer.  What do you
21    mean?
22  A.    By that I mean if the vacuum system were
23    operating properly and the clutch was operating

Page 128

1    properly --
2  Q.    Well, was the clutch operating properly?
3  A.    Based on the inspection that was done on May
4    the 12th, 2003, the clutch was operating
5    properly.
6  Q.    All right.  So we can dispose of that
7    assumption; is that correct?
8  A.    Yes.  Yes, I would dispose of that.
9        MR. LANE:  Object to the form.  It's
10        relevant to his analysis, so to
11        the extent it's relevant to his
12        analysis, we're not dismissing
13        that fact.
14  Q.    All right.  Well, let's do that, tell me what
15    assumptions are necessary for your analysis.
16    Let's go on and deal with those.
17  A.    My analysis of what was wrong with the machine?
18  Q.    As your lawyer has pointed out, there are
19    certain assumptions that you've made, let's
20    establish what those assumptions are.
21        MR. LANE:  Object to the form.  I
22        didn't say anything about
23        assumptions, but to that extent

Page 129

1        your question is fine.
2  A.    I will be glad to, but I want to understand
3    what you're talking about.  An analysis of what
4    the defects on the machine were?
5  Q.    Yes, sir.  As Mr. Lane has pointed out, if
6    we're going to draw the assumption about the
7    clutch, let's go on and see what these
8    assumptions are that you've made in forming
9    your opinions with respect to any criticisms of
10    United Rentals?
11  A.    The only assumption I made was to select a
12    range for the static coefficient of friction.
13  Q.    Okay.  And you assumed no other facts as being
14    true?
15  A.    As being true?
16  Q.    Yes, sir.
17  A.    Well, sure.  I assumed -- I based my opinions
18    on the entire record.
19  Q.    Well, let's go on and I'm going list the
20    assumptions you've made in forming your
21    opinions with respect to the criticisms of
22    United Rentals so we can deal with Mr. Lane's
23    objection.

Page 130

1   A.   Okay.
2        MR. LANE:  I don't believe that was my
3        objection, but feel free to ask
4        about it.
5   A.   Okay.  I assumed that Mr. Whitecotton told the
6        truth when he described the procedure that he
7        goes through in checking out the machine.  I
8        assumed that -- and I still haven't thought of
9        his name, the other employee of United Rentals,
10       and I suppose I just better look for that name.
11  Q.   I think we can deal with that.  Why don't you
12       go on with your assumptions?  We will put other
13       employee.
14  A.   The other employee that was deposed, I'm going
15       to tell you that I assumed that he was also
16       factual in his description of their maintenance
17       and checkout program.  I assumed that the
18       photographs clearly depicted the machine as it
19       was at the time of the incident.  I think that
20       probably covers it.
21  Q.   Okay.  And what photographs are you talking
22       about, sir?
23  A.   The ones we've marked.

Page 131

1   Q.   Okay.  If you will, identify those photographs,
2        sir?
3   A.   All right, sir.  Exhibit 21, 20, 19, 18, 17,
4        16, 14, there's a stack that's not marked, 5,
5        13, 9, 10, 11, 12.
6   Q.   Okay.  And you say there are some photographs
7        we need to mark?
8   A.   If you would like to.  These are some I pulled
9        out.
10  Q.   Well, if you relied upon them, we do need to
11       mark them.
12  A.   Sure.
13  Q.   If you will, and tell us what they are as you
14       go through them?
15       (Exhibit 23 marked for identification.)
16  A.   Exhibit 23, two photographs showing the
17       passageways in the head of the Gast vacuum pump
18       on the incident drill.
19  Q.   At the top or bottom, sir?
20  A.   Both.
21  Q.   All right.  Do you want to put -- identify that
22       for us?
23  A.   Top and bottom photograph is that what you were

Page 132

1        asking?
2   Q.   Yes.  And where are those?
3   A.   That's the top.
4   Q.   All right.  If you will, identify them, please,
5        sir?
6   A.   (Witness complies.)
7        (Exhibit 24 marked for identification.)
8   A.   Exhibit 24 is photographs made of the incident
9        core drill at the joint inspection on May the
10       12th, 2005 -- I was thinking that was in 2003,
11       was it 2005; is that correct?  But anyway, the
12       joint inspection.
13  Q.   Okay.  And what is of significance there, sir?
14  A.   The significance is that just shows a full view
15       of the drill and the lack of any container for
16       the operations manual, the lack of any
17       interlocks, and the -- although it's hard to
18       tell from the photographs, the other
19       descriptions indicate that there was a switch
20       to operate the drill motor that had to be
21       turned on and off, it's not a trigger type
22       switch.  I relied on that in my criticism of
23       the design of the machine.

Page 133

1   Q.   Well, now we're talking about United Rentals,
2        sir, if we could?
3   A.   Well, United Rentals --
4   Q.   In other words, we're getting beyond --
5   A.   United Rentals was responsible for putting this
6        product in the marketplace.
7   Q.   All right.  So you're including that in your
8        opinion?
9   A.   Yes.
10  Q.   Okay.  Fair enough.  All right.  If you will,
11       continue with your analysis and helping us
12       understand the significance of these
13       photographs that you've selected?
14       (Exhibit 25 marked for identification.)
15  A.   Exhibit 25, really two views of the -- two
16       photographs, I selected those because it shows
17       the vacuum gauge on the incident drill that
18       indicates no markings of a safe operating
19       range.
20  Q.   Okay.  And you fault United Rentals for that?
21  A.   It's a design issue, but United Rentals put it
22       in the marketplace.  It's an unsafe product in
23       my opinion without -- without addressing that

Page 134

1    issue.
2        (Exhibit 26 marked for identification.)
3  A.  Exhibit 26 shows two photographs of what's been
4      termed a green tag or Ready to Rent tag with a
5      checklist on it.  I thought the significance of
6      that was there's no mark for filters.  In other
7      words, filters was not part of their
8      maintenance program.  Although I should add
9      that there's one green tag that I found in this
10     entire set that did have filters checked.  I
11     don't know if that meant they were checked on
12     that one occasion or whether it was simply an
13     error on the part of the person filling out the
14     tag.
15 Q.   Okay.  And, I'm sorry, Exhibit Number 26, who
16     has made these or titled these exhibits here?
17 A.   That heading was put on by my office --
18 Q.   Okay.
19 A.   -- to identify where they came from.
20 Q.   Okay.
21       (Exhibit 27 marked for identification.)
22 A.   27 is the same thing as 26.  It just shows tags
23     of a different date, showing the same thing,

Page 135

1      that is that the filters were not checked.
2  Q.   I'm sorry, tags of a different date, what do
3      you mean?
4  A.   Different dates.
5  Q.   What do you mean by that, sir?
6  A.   Well, Exhibit 27, the tags are dated 5/25/03 --
7      oops, I'm sorry, I take that back.  I'm sorry,
8      I thought that was 5/23.  They're both -- this
9      could be the same -- in fact, I think it is the
10     same photographs, so they both show the same
11     thing exactly.
12 Q.   Okay.  So you've now identified all of the
13     photographs you've relied upon in forming your
14     opinions in this case?
15         MR. LANE:  Object to the form.
16 A.   I believe I have.
17 Q.   You were identifying the documents responsive
18     to the request for production contained within
19     your deposition and I believe you had gotten to
20     Volume III; is that correct, sir?
21 A.   I think we're about to start on three, yes.  I
22     don't think we've marked that one yet.
23 Q.   Let's go on and mark that then if we could.  We

Page 136

1      will mark that.
2        (Exhibit 28 marked for identification.)
3  A.  All right, sir.  This is Volume III of my file
4      and it's entitled "Depositions with Exhibits."
5      And depositions are included for Matthew Riley
6      -- it also includes my summary of those
7      depositions, Matthew Riley, Michael Waters, and
8      George Kennedy.  And that's the name I've been
9      having trouble remembering the past little
10     while.  George Kennedy is the United Rentals
11     employee that I referred to that described some
12     of their checkout procedures.
13 Q.   Anything else contained in --
14 A.   That's all of Volume III.
15 Q.   Anything else in there?
16 A.   No.
17 Q.   And you say you summarized each of those
18     depositions?
19 A.   I have.
20 Q.   All right.  Let's mark those summaries, please,
21     sir.  How did you prepare these summaries?
22 A.   As I read the deposition, I made notes of page
23     and line for any significant statements or --

Page 137

1      well, I didn't know at the time I was doing it
2      what would be significant, potentially
3      significant statements.
4  Q.   So what you thought you would need to rely upon
5      in forming an opinion in this case you wrote
6      down?
7  A.   Yes, sir.
8        (Exhibit 29 marked for identification.)
9  Q.   And what is that exhibit number that you have
10     marked there, sir?
11 A.   Exhibit 29 is my deposition summary for Matthew
12     Riley.
13 Q.   In other words, that's what you felt would be
14     important in forming your opinion --
15 A.   That's correct.
16 Q.   -- in this case?
17 A.   That's correct.
18 Q.   All right sir.
19       (Exhibit 30 marked for identification.)
20 A.   The second deposition summary is for Michael
21     Walters, which I've marked Exhibit 30.
22 Q.   And, again, would those be notes of the items
23     you felt would be significant in forming your

Page 138

1    opinion in this case?
2  A.   Yes.
3  Q.   All right, sir.
4         (Exhibit 31 marked for identification.)
5  A.   Exhibit 31 is my deposition summary for George
6         Kennedy.
7  Q.   And, again, that would be the facts that you
8         felt were significant in forming your opinion
9         in this case?
10 A.   Yes, sir.
11 Q.   Does that carry us through Volume III?
12 A.   It does.
13         (Exhibit 32 marked for identification.)
14 A.   Exhibit 32 is my Volume IV of my file.  It
15         contains some additional depositions for John
16         Frost and for Donald Shaver and a couple of
17         others.  Also included in this volume is the
18         deposition of Timothy Whitecotton, Donna Senn,
19         Thomas Nance, James Mason, Aaron Myers;
20         although I have not fully reviewed that
21         deposition, I've gotten through page 41.  I
22         also have a deposition, which I have not
23         reviewed, for Roy Donley in this volume.

Page 139

1  Q.   Have you reviewed any other depositions, sir?
2  A.   I have skimmed at least one other deposition
3         which I just received.  I have begun skimming
4         it for Ricky Smothers.
5  Q.   Any others?
6  A.   I think that's all.  I have a full list of --
7         well, no, I don't have a full list.  I have
8         listed the depositions that I -- and all of the
9         documents really that I used in writing my
10         report as a part of the report, but I have
11         reviewed some materials since that time which
12         are not listed.
13 Q.   Has your opinion changed since preparing your
14         report as required by the Court in this case?
15 A.   I think I could probably expand my opinion and
16         strengthen my opinion based on what --
17         additional material I have reviewed.
18 Q.   Okay.  And how has it expanded?
19 A.   For example, when I wrote the report I did not
20         know the dimensions of the base, so I was not
21         able to do my calculations.
22 Q.   And you do know those now?
23 A.   I do.

Page 140

1  Q.   And what are they, sir?
2  A.   Where is Volume I?  And this is an
3         approximation.  It's an irregular shape, so I
4         approximated -- averaged the base to be ten and
5         a half inches by 14 inches.
6  Q.   Those are the only dimensions you're talking
7         about?
8  A.   Yes.
9  Q.   And why was that significant?
10 A.   No, that's not the only -- I'm sorry, that's
11         not the only dimensions.  I also measured the
12         distance from the center of the vacuum plate to
13         the spindle on the drill motor.
14 Q.   And why was that important?
15 A.   That enables you to calculate the moment around
16         that force.
17 Q.   And what was that, sir?
18 A.   That dimension?
19 Q.   Please, sir.
20 A.   I think a foot, one foot.
21 Q.   One foot?
22 A.   Yes, sir.
23 Q.   Have you noted these dimensions that you're

Page 141

1    talking about anywhere?
2  A.   I have, sir.
3  Q.   Where is that?
4  A.   On Exhibit 15.
5  Q.   Oh, okay.  All right.  Any other information
6         that you've used to expand your opinions since
7         preparing your report?
8  A.   I determined since writing my report, based on
9         a more detailed and further review of the
10         photographs, I have since come to believe that
11         the aluminum oxide was probably ingested as
12         opposed to being a wear product.
13 Q.   And what do you base that on?
14 A.   Just the quantity that I observed in the
15         photographs.
16 Q.   And what quantity was there on the photograph?
17         MR. LANE:  Object to the form.  Asked
18              and answered.
19 A.   I was not able to quantify except to estimate
20         it visually.
21 Q.   Okay.  And what did you estimate it visually?
22 A.   I think I told you before about three ounces or
23         a little less I think I said.

Page 142

1  Q.  How much less?
2  A.  Half ounce.
3  Q.  Okay.  So two and a half to three ounces?
4  A.  Something like that.
5  Q.  Well, I mean, it's your opinion, I just wonder
6      what facts there were?
7  A.  Well, that's why I said something like that.
8      That's my opinion.
9  Q.  So it was at least two and a half ounces?
10      MR. LANE:  Object to the form.
11  A.  It appeared to be about that amount, yes.
12  Q.  And what did you base that on?
13  A.  The visual observation of the photographs.
14  Q.  Okay.  And how thick was the aluminum oxide?
15  A.  I don't know.
16  Q.  I'm sorry, what expertise do you have in
17      aluminum oxide?
18  A.  I know that it's a corrosion product of
19      aluminum.
20  Q.  Okay.  Anything else?  I mean, training,
21      education, experience?
22  A.  I've worked in the metal working industry in
23      the past, I'm familiar with metals.  I've

Page 143

1      worked in -- I've worked in the hazardous waste
2      industry, I'm familiar with certain chemicals
3      and metals.
4  Q.  Done any testing on aluminum oxide in the past?
5  A.  No.  I have no specific expertise in aluminum
6      oxide, just a general knowledge of what it is.
7  Q.  Okay.  And that's based upon?
8  A.  My education and experience.
9  Q.  Okay.  Do you rely on any treatises or
10      research?
11  A.  No.  No, I did not.
12  Q.  Okay.  You were telling me about what you used
13      to expand your opinion?
14  A.  Yes.
15  Q.  Okay.  Now, the dimensions of the base, where
16      did you obtain those dimensions?
17  A.  I measured it on the exemplar.
18  Q.  All right.  You're talking about Mr. Shaver's
19      modified machine?
20  A.  Yes.  Yes.
21  Q.  Okay.  Any other information that you gleaned
22      to expand on your opinion?
23  A.  Well, you know, I developed -- I developed an

Page 144

1      alternate design for the machine which I was
2      able to observe in action and saw that it
3      performed just like I envisioned since I wrote
4      the report.
5  Q.  Okay.  And where is that alternative design?
6  A.  Sitting right behind you.
7  Q.  Okay.  So you designed the Shaver modified
8      machine?
9  A.  No.  He designed his own modifications, but my
10      alternative design was exactly the same as his
11      design.
12  Q.  Okay.  Where is your alternative design?
13  A.  It's in my report.
14  Q.  I'm sorry, is there --
15  A.  Yes.
16  Q.  Let's mark it then.
17  A.  Pages 11 and 12.
18  Q.  If you will mark each one of those pages?
19      (Exhibits 33 and 34 marked for
20      identification.)
21  A.  Page 11 is Exhibit 33; page 12 is Exhibit 34.
22      And I would like to mark one other page.
23  Q.  Please.

Page 145

1      (Exhibit 35 marked for identification.)
2  A.  Exhibit -- I'm sorry, an appendix in my report
3      contains the electrical schematic -- electrical
4      and vacuum schematic.
5  Q.  And that's something you designed?
6  A.  Yes.
7  Q.  Okay.  Do you have any expertise in electrical
8      engineering?
9  A.  No, I'm not an electrical engineer, but it's
10      very simple.  I'm familiar with that kind of
11      circuitry.  I also discussed it with an
12      electrical engineer on our staff.
13  Q.  And who was that, sir?
14  A.  Tom Copeland.
15  Q.  Okay.  And how much time did you spend with
16      him?
17  A.  Probably 15 minutes.
18  Q.  And how much does he charge an hour?
19  A.  I think he charges 175, but I'm not certain on
20      that.
21  Q.  And you charge how much?
22  A.  175.
23  Q.  Okay.

1  A.  Exhibit 35 is -- I've labeled it "Electrical
2      Schematic for Alternate Design of --" well, I
3      see there's a typo in here, it should be
4      Clipper, it's written Chipper.  It should be
5      "Clipper DM500 core drill."  And it's actually
6      an electrical and vacuum schematic.  I have
7      actually written on this copy because I
8      realized last night that I probably should have
9      labeled this as a vacuum line.  It appears to
10     be some sort of electrical line, but it's
11     actually a vacuum line.  So I wrote "vacuum
12     line" on it.
13 Q.  And had you developed this alternative design
14     before seeing anything or talking to
15     Mr. Shaver?
16 A.  I did.  In fact, I received Mr. Shaver's report
17     only this week, I believe, and reviewed it --
18     I'm sorry, his deposition.  I received his
19     report earlier.  However, I anticipated that
20     that would come up and I developed my own
21     independent conclusions prior to reviewing
22     either of those two reports.  And I so made a
23     note of that, which I believe you'll want to

1      mark.  And it's headed "My Independent Position
2      -- Opinions."
3  Q.  All right.  What exhibit number are we on now,
4      sir?  Let me hand you a label that's been
5      marked Exhibit Number 36.
6          (Exhibit 36 marked for identification.)
7  Q.  And what is that attached to, sir?
8  A.  It's attached to my handwritten notes which I
9      have captioned "My Independent Opinions," which
10     I wrote this before reading either of the two
11     other experts' reports.
12 Q.  And what reports were those, sir?
13 A.  The reports from Mr. Shaver and Mr. -- I forgot
14     his name.  It's in Volume I.  Actually I think
15     it's in Volume II.  It's Mr. Frost.
16 Q.  Do you find any concerns with either one of
17     their reports, Mr. Frost and Mr. Shaver?
18         MR. LANE:  Object to the form as vague,
19             but go ahead.
20 A.  I don't recall any concerns I had with their
21     reports.
22 Q.  So you would agree fully with their --
23 A.  In fact, my alternate design is exactly what he

1      designed, but I don't think that should be
2      unexpected.  I think it's a pretty simple
3      straightforward design that most any engineer
4      would have come up with.
5  Q.  Okay.  So that I'm clear then, you find no
6      fault with either Mr. Frost or Mr. Shaver's
7      reports?
8  A.  Not that I recall.
9  Q.  What about their depositions, did you find any
10     fault in either Mr. Frost or Mr. Shaver's
11     depositions?
12 A.  Not that I can recall.
13 Q.  Okay.  Any other information that you've used
14     to expand your opinion in your report that you
15     submitted?
16 A.  The tests that we did.
17 Q.  That's the test yesterday afternoon for 30
18     minutes?
19 A.  Yes.
20 Q.  Anything else, sir?
21 A.  Well, yes.  I reviewed a number of depositions
22     after I wrote my report, which did not change
23     my opinions, but nonetheless I think they

1      were supportive of my opinions.
2  Q.  Okay.  And which depositions were those, sir?
3  A.  I've got it right here.
4  Q.  Are you going through the Volume IV, sir?
5  A.  This is Volume I.
6  Q.  Okay.
7  A.  That would be -- the depositions I reviewed
8      after completing my report would be that of
9      John Frost, Shaver, Whitecotton, Senn, Nance,
10     Mason, a part of Myers and a part of Smothers.
11 Q.  Okay.  And I see you've got a sheet that has
12     writing on the back of it?
13 A.  Yes, I do.
14 Q.  Is that the only sheet in these exhibits that
15     has some writing on the back?
16 A.  I think so.  Well, let's see.
17 Q.  Let's go on and tab that so when copies are
18     made someone knows to pick up that.
19 A.  Tab it that way.
20 Q.  Please, sir.  So somebody sees that there's
21     something on the back of that sheet.
22 A.  This is a duplicate copy of my report which I
23     just made some notes on, because I didn't know

Page 150

1    if I would revise my report or not, but if I
2    did, I wanted to have the listing of additional
3    materials that I reviewed.
4  Q.   So we've now tabbed the additional materials
5    you've reviewed since writing your report?
6  A.   Yes.  Part of it, yes.
7  Q.   Let's go on and mark that then as Exhibit
8    Number 37.
9        (Exhibit 37 marked for identification.)
10  Q.  Is there any additional information that you've
11    reviewed since making your notes on Exhibit
12    Number 37?
13  A.  Well, I did not include a portion of the
14    Smothers deposition, but I just did that this
15    morning and I didn't write that down, but
16    actually I could add that, I suppose.
17  Q.  All right, sir.  And that way we've got a
18    complete list?
19  A.  Yeah.  I will note that as a partial, I have
20    not completed that review.
21  Q.  Did you highlight that?
22  A.  Highlight it?
23  Q.  Yes, sir.

Page 151

1  A.  I don't believe I've highlighted this at all.
2  Q.  You didn't make any notes as you went through
3    it?
4  A.  No.  I don't believe I did, no.
5  Q.  So we now have a complete list of the
6    information that you've reviewed since
7    preparing your report contained on Exhibit
8    Number 37?
9  A.  I believe so.
10  Q.  Okay.  Did you put the test yesterday afternoon
11    on there?
12  A.  No.  That's not really a document, but I could
13    list the test.
14  Q.  Anything that you've done since preparing your
15    report that you've reviewed, please?
16  A.  I'm going to say "test performed."
17  Q.  Let's see, November the 9th, 2006?
18  A.  At "Cochran, et al.," if that's okay, "law
19    firm."
20  Q.  Using Shaver modified machine?
21  A.  "Using Shaver modified machine."  Could I run
22    to the restroom?
23  Q.  Yes, sir.

Page 152

1  A.  Thank you.
2        (Recess.)
3  BY MR. SHEEHAN:
4  Q.  Sir, we've again taken another break.  We're
5    back on the record.  Have you now listed all of
6    the additional items that you've reviewed,
7    tested, analyzed, researched in connection with
8    this lawsuit?
9  A.  I believe that I have, yes.
10  Q.  And that's listed where, sir?
11  A.  On Exhibit 37.
12  Q.  And that's on the back of a sheet in the report
13    contained within the --
14  A.  It's on the back of a copy of my report on the
15    back of sheet number four.
16  Q.  Or page number four?
17  A.  Page number four, correct.
18  Q.  All right, sir.  And you said you came up with
19    some additional opinions that you've listed on
20    Exhibit Number 36?
21  A.  No, sir.  Those are my original opinions.
22  Q.  Oh, okay.  If you would, read those into the
23    record -- oh, let me ask you first; when did

Page 153

1    you prepare these -- this list of opinions?
2  A.  I don't know.  I noticed that I didn't date it,
3    but I could probably go back to my time records
4    and figure that out.  But I can tell you that I
5    did it before I read the expert reports from
6    Shaver and Frost.
7  Q.  All right, sir.  And have you read the expert
8    report from the United Rentals expert?
9  A.  Hickok, is that the name?
10  Q.  I'm just curious who you think the United
11    Rentals expert is.
12  A.  Well, I read a report from Mr. Hickok, but I
13    don't recall who he was affiliated with.
14  Q.  Have you read any other reports from any
15    experts besides --
16  A.  No, those are the only three that I can recall.
17    I think that's it.
18  Q.  Do you have any objections or criticisms of
19    Mr. Hickok's report?
20  A.  I don't remember.  I don't really remember.  If
21    you want an answer to that, I'm going to have
22    to skim through it as soon as I find it.
23  Q.  All right, sir.  And you've found that report,

Page 154

1    sir?
2  A.   I have, yes.
3  Q.   All right.  Let's go on and mark that as
4       Exhibit Number 38 then.
5           (Exhibit 38 marked for identification.)
6  A.   I don't really have any disagreement with the
7       report, but I don't know exactly what he's
8       referring to when he talks about the vents.  I
9       don't know which vents he's talking about.
10 Q.   And what page are you talking about, sir?
11 A.   The pages aren't numbered, but it's the -- page
12      five.
13 Q.   Of Mr. Hickok's report?
14 A.   Of Mr. Hickok's report.
15 Q.   And what paragragh, sir?
16 A.   Let me find it again.  The first paragraph
17      under Visual Examination, the second sentence,
18      "There was some debris found on the pump, but
19      the vents were clear and the pump's outer
20      housing otherwise was unremarkable."  I'm not
21      sure what vents he's talking about there.
22 Q.   All right, sir.  Any other reports that you've
23      reviewed?

Page 155

1  A.   No.
2  Q.   All right.  And, again, if you would, explain
3       to us -- do you want to maybe take that out
4       since it's been referred to and it will just
5       make it easier for referral?
6           MR. LANE:  Well, we're going to want
7               all of these back at the end of
8               the deposition so he can keep his
9               file complete.
10 Q.   Exhibit Number 36 to your deposition, what is
11      that and when was that prepared?
12          MR. LANE:  Asked and answered.
13 A.   This was prepared during my review and analysis
14      of the incident.  I wrote this to document my
15      opinions after I had reviewed most of the
16      material, but before I reviewed the reports of
17      any other experts.  I didn't really want to
18      taint my thought process by what they said, so
19      I wanted to record that and that's what I did.
20 Q.   Okay.  Was this before you prepared your
21      written report that was submitted to the Court?
22 A.   It was, yes.  Yes, before I wrote the report,
23      correct.

Page 156

1  Q.   And when did you write the report?
2  A.   October 13th.
3  Q.   And how many drafts of the report did you
4       prepare, sir?
5  A.   Well, one.  I always draft a report, it goes
6       through an internal administrative and peer
7       review process, and then it's finalized.
8  Q.   Okay.  And who reviewed your report, sir?
9  A.   On the administrative staff I believe that
10      would have been Laura Murphy.  I don't recall
11      who wrote -- who did the peer review, although
12      I think it was Dan Olsen.
13 Q.   And is he a member of your organization?
14 A.   Yes, he is.
15 Q.   And y'all are a sole proprietorship?
16 A.   We're incorporated.
17 Q.   Okay.  And who are the principals of the
18      corporation?
19 A.   Doctor Warren is the principal.
20 Q.   Did he review your report?
21 A.   I don't think that he did.
22 Q.   And how much of your time is spent devoted to
23      testifying on behalf of people who bring

Page 157

1       lawsuits?
2           MR. LANE:  Plaintiffs you're referring
3               to?  Is that what you --
4           MR. SHEEHAN:  I'm curious if --
5  A.   I'm sorry, would you restate that?
6           MR. SHEEHAN:  I think he understood
7               what I was asking.
8  A.   No, I didn't.  I would like for you to restate
9       that.  How much of my time is spent testifying?
10 Q.   On behalf of people who bring the lawsuit as
11      opposed to the person who is defending the
12      lawsuit?
13          MR. LANE:  Object to the form.
14 A.   As a percentage?
15 Q.   Please, sir.
16 A.   I would say the bulk of the depositions and
17      trials I have been involved in have been on the
18      side of the plaintiff.
19 Q.   What do you mean the bulk?
20 A.   I mean 90 percent.
21 Q.   Okay.
22 A.   Although I haven't calculated that, that's just
23      my approximation.

Page 158

1  Q.  Well, you've been asked this question in other
2      depositions I'm sure.
3  A.  Absolutely.  And I have a list of those in my
4      report actually.
5  Q.  So you weren't surprised at the question?
6  A.  No.  No.
7  Q.  Okay.  Fair enough.  If you will, read the
8      opinion that you came up with before you
9      prepared your or reviewed -- wait just a
10     minute.  Tell me again when you prepared this
11     Exhibit Number 36.
12 A.  I wrote this before I read the expert opinions
13     on the defense side.
14 Q.  Okay.  Now, whose --
15 A.  I had those three, Shaver, Frost and Hickok.
16         MR. LANE:  Wait a minute.
17 Q.  Is it your understanding that Shaver is a
18     defense expert?
19 A.  No, I'm sorry, I stated that wrong.  No, he is
20     not.
21 Q.  All right.  What defense expert reports have
22     you reviewed?
23 A.  Hickok.

Page 159

1  Q.  Is that the only report?
2  A.  Yes.
3  Q.  So that I'm clear then, Exhibit Number 36 was
4      prepared before you read the report of
5      Mr. Hickok?
6         MR. LANE:  Object to the form.
7  A.  Of any of the experts, any of the three.
8  Q.  But you already had the reports from Mr. Frost
9      and Mr. Shaver?
10 A.  I did.  That's why I wrote this is because I
11     realized I had the reports, but I did not want
12     to review them until I had documented my own
13     independent observations.
14 Q.  Okay.  But after your report had already been
15     prepared?
16 A.  No, this was done before my report.  After I
17     wrote this, I reviewed the other experts
18     reports and then I wrote my report.
19 Q.  And have you talked to either Mr. Frost or
20     Mr. Shaver?
21 A.  No.
22         MR. LANE:  Object to the form.
23 A.  I have not.

Page 160

1  Q.  If you would, read that into the record there,
2      sir?
3  A.  Okay.  It's captioned "My independent
4      opinions."  And this is my preliminary thoughts
5      based on my review of nearly all of the
6      material.  "The machine contains a hazard.  The
7      operator can be seriously injured if the base
8      begins to rotate."
9         Number two, "No warning of the hazard is
10     affixed to the machine."
11        Number three, "There is no means available
12     to stop a core drill that is out of control.
13     Should have a constant pressure or trigger
14     switch."
15        Number four, "Manual should be provided
16     with the rental of the unit."
17        Number five, "No means is available to
18     determine safe operation of vacuum unit; the
19     gauge should be marked; the manual should
20     address it."
21        Number six, "An interlock should be
22     installed to cut power to the drill unless
23     vacuum is in a safe range."  And I made a

Page 161

1      parenthetical note, "Details need to be worked
2      out."
3         Number seven, "No warning -- no warnings
4      on machine about standing on it."
5         Number eight, "Could use ammeter to
6      monitor torque applied by bit."
7         Now, at that point I did not realize that
8      the subject machine actually had an ammeter.  I
9      was comparing -- I was reviewing the operator
10     manual for the Milwaukee version of this press
11     which discussed that in detail.  At that time I
12     didn't realize that the subject drill had such
13     an ammeter, but I now know that it did.  So
14     that one was really irrelevant, number eight.
15 Q.  All right, sir.  And while we're at that, can
16     you show me your calculations that you've
17     marked there, sir?
18 A.  Well, I think you have them.  Whatever you did
19     with that stack of exhibits, it's in there.
20 Q.  These are all on the table, sir.
21 A.  Right here?
22 Q.  Well, those are the ones you brought and
23     identified this morning, are they not, sir?

Page 162

1  A.  Yeah, but you took them out of my notebook.
2  Q.  No, sir.  You took them out of your notebook, I
3     didn't touch your notebook, did I?
4  A.  Okay.  You're absolutely right.
5        MR. LANE:  You asked for him to take
6           them out of his notebook, if you
7           want to get technical about it.
8        MR. SHEEHAN:  Right.  But they've been
9           in the care and custody of your
10          expert the whole time.
11       MR. LANE:  It's not a problem.  I mean,
12          I just don't want to get into a
13          trivial argument about who took
14          what out of where.
15       MR. SHIRES:  We wouldn't be trivial,
16          Joe.
17 A.  This is not all of the exhibits, is it, or is
18    it?
19 Q.  You brought certain documents and they're all
20    here on the table.
21 A.  Well, there's one right there.  I think it must
22    be in my notebook.  I think you left that one
23    in my notebook.

Page 163

1  Q.  I, again, didn't touch your notebook.
2  A.  I'm kidding you.  I'm kidding you.  Yes, here
3     it is.
4  Q.  Okay.  And that's been marked as Exhibit
5     Number?
6  A.  15.
7  Q.  All right, sir.  If you would, read that into
8     the record?
9  A.  All right, sir.  It's captioned "Calculations.
10    Area of base approximately is equal to 10.5
11    inches by 14 inches, which calculates to be 147
12    square inches."
13 Q.  Those are the measurements you took off of
14    Mr. Shaver's modified machine?
15 A.  Correct.  That's supposed to be an N.  "N
16    subscript --"
17 Q.  Didn't we miss this second line here, sir?
18 A.  Oh, I'm sorry, I missed one.  "Pressure at
19    center of base due to vacuum equals 20 inches
20    of Mercury," which is the recommended vacuum,
21    and multiplied by a conversion factor to
22    convert Mercury -- inches of Mercury into
23    pounds per square inch.

Page 164

1  Q.  Could you read that into the record, sir?
2  A.  Sure.  "20 inches Mercury times 0.4912 PSI
3     divided by one inch Mercury equals 9.8 pounds
4     per square inch.  The normal force at the
5     center of the base due to the vacuum equals the
6     9.8 pounds per square inch" that I've
7     calculated "times 147 square inches" that I
8     measured, "equals 1,440 pounds force applied to
9     the base of the drill press or the base of the
10    drill at the center."  Well, actually it's
11    distributed throughout the base, but for
12    purposes of calculations you can assume that
13    it's equally distributed and is centered at the
14    center of that base.  So that's 1,440 pounds
15    applied at the base by the vacuum at 20 inches
16    of Mercury.
17       "Assume static coefficient of friction
18    between floor and base gasket is 0.6, then --"
19 Q.  Wait just minute.  I'm sorry, you missed a line
20    up here.
21 A.  I marked that line out.
22 Q.  All right.  Can you read that for us?
23 A.  Sure.  "Resisting moment due to vacuum equals

Page 165

1     1,440 pounds times one foot equals 1,440 foot
2     pounds."
3  Q.  Why did you line through that, sir?
4  A.  Because I wanted to move it down here
5     somewhere.  I had it out of order in my
6     calculations.
7  Q.  Did you have a draft of this before you put it
8     on this sheet?
9  A.  No.  This is my -- as you can see, it's my
10    scratch version.
11 Q.  Is this your only calculations in reference to
12    this lawsuit?
13 A.  I believe so.
14 Q.  All right, sir.
15 A.  "Force," that is the force necessary to slide
16    the machine or move the machine horizontally,
17    "equals U," which is the coefficient of
18    friction, "times N, where U equals static
19    coefficient of friction, 0.6; N the normal
20    force due to vacuum," which I've calculated
21    above; "F is the existing force acting at the
22    center of the base due to vacuum."  So that's a
23    calculation which turns out to be point six

Page 166

```
 1        times 1,440.
 2   Q.   Force equals?
 3   A.   Yeah, "force equals point six times 1,440
 4        equals 864 pounds." Now, I later went back and
 5        calculated what it would be if you were to
 6        lower the static coefficient of friction to
 7        point four. And I noted that in brackets here.
 8        And that would be 576 pounds if the coefficient
 9        of friction equaled point four. Okay?
10            "Resisting moment," that's where I
11        scratched out up here, I brought it down here.
12        "Resisting moment due to vacuum equals force
13        times distance, where D is the distance from
14        the center of the base to the spindle," what is
15        that word?
16   Q.   Drill?
17   A.   Drill, yeah. Spindle of drill. "Force times
18        distance is one foot," that is from the spindle
19        center back to the base measured on a
20        horizontal distance. So it's 864 foot pounds.
21        Now --
22   Q.   I think you missed a calculation again?
23   A.   That one?
```

Page 167

```
 1   Q.   Didn't you? I don't believe you stated that in
 2        the record, did you?
 3   A.   I probably didn't. That's "864 pounds times
 4        one foot equals 864 foot pounds." Then I made
 5        the observation that the "clutch releases at
 6        about 230." I think it's 231 as measured, they
 7        had a range anyway, but the maximum was close
 8        to 230 foot pounds, "versus this clamping force
 9        of 864 foot pounds to hold it down," or if you
10        assume a coefficient of friction that was a
11        little bit lower, 576 foot pounds. So you can
12        compare those two numbers to the 230 that could
13        be imparted before the clutch caused it to
14        release. So you've got plenty of safety margin
15        there if the vacuum pump and system works
16        properly.
17   Q.   I'm sorry, you missed a calculation there.
18   A.   That's not really a calculation, that's a note
19        that says "576 foot pounds is synonymous to the
20        864 if you assume that the coefficient of
21        friction is point four as opposed to point
22        six."
23            Then I said, "working backwards, vacuum
```

Page 168

```
 1        fails to protect at maximum torque transmitted
 2        by clutch at about 4.6 inches of Mercury, or
 3        6.9 inches of Mercury if you assume the static
 4        coefficient of friction was lower at point
 5        four. Therefore, the factor of safety is
 6        somewhere between three and four if you have 20
 7        inches of Mercury." Okay?
 8   Q.   So you've now read into the record all of your
 9        calculations involved in this lawsuit?
10   A.   I believe so, yes, sir.
11   Q.   You mentioned that in Volume IV you had some
12        depositions, did you prepare summaries for all
13        of your depositions?
14   A.   No, sir, I did not.
15   Q.   And why not?
16   A.   I ran out of gas.
17            (Exhibit 39 marked for identification.)
18   Q.   Let me show you Exhibit Number 39 and ask you
19        what that is contained within Volume IV?
20   A.   Deposition summary of John Frost.
21   Q.   All right, sir. And, again, you were noting
22        those things that were of significance in
23        forming your opinion in this lawsuit?
```

Page 169

```
 1   A.   Yes, sir. And there's really very little on
 2        this sheet, because the entire deposition was
 3        taken up identifying documents. I don't
 4        believe you have finished with his -- at least
 5        at that time had not finished with his
 6        deposition, so I really noted very little on
 7        that sheet.
 8   Q.   All right, sir. Is there another summary in
 9        that Volume IV?
10   A.   Yes. Deposition summary for Donald Shaver.
11   Q.   We'll go on mark that as Exhibit 40.
12   A.   All right, sir.
13            (Exhibit 40 marked for identification.)
14   Q.   And, again, what was the purpose of making
15        those notes?
16   A.   I just wanted to extract information and be
17        able to refer back to it rather quickly of
18        those points that I thought might have some
19        significance without having to go back and read
20        the entire thing so that I could quickly get to
21        it by referring to my summary. I also put one
22        thing on there that's not really from his
23        deposition. I just made a note up in the
```

Page 170

1    corner about the measurements of the base that
2    I took just because it was a convenient place
3    for me to write it.
4  Q.   When did you make those measurements, sir?
5  A.   Yesterday.
6  Q.   Okay.
7  A.   Okay.
8  Q.   Please, you were identifying various summaries?
9  A.   Some additional deposition summaries?
10 Q.   Please, sir.
11 A.   Timothy Whitecotton, Exhibit 41.
12        (Exhibit 41 marked for identification.)
13 A.   And I believe that's the last one that I did a
14      summary for in this book.
15 Q.   All right, sir.  I see that you've highlighted
16      an exhibit to Mr. Whitecotton's deposition?
17 A.   Yes, sir.
18 Q.   And if you would, read that into the record for
19      me?
20 A.   This is a Ready to Rent tag from United
21      Rentals, also captioned "Ready to Use."  It
22      contains the equipment number, description core
23      drill.  What I highlighted was the

Page 171

1    acknowledgement that is signed by the customer
2    which says, among other things, "acknowledge
3    the safety sheet, to enable myself and/or my
4    crew to use the equipment in a safe and proper
5    manner without risk to injury."
6  Q.   And why did you highlight -- if you would, read
7      the highlighted portion and then tell me why
8      you highlighted that portion?
9  A.   "The safety sheet, to enable myself and/or my
10      crew to use the equipment in a safe and proper
11      manner without risk to injury."
12 Q.   And why did you highlight that portion?
13 A.   I thought the customer could misconstrue that
14      as being all that's necessary to be able to
15      safely operate this equipment.
16 Q.   And what training, if any, had been provided to
17      Mr. Riley for the use of this equipment?
18 A.   The testimony shows that Mr. Riley was provided
19      on-the-job training on one hole prior to being
20      given the responsibility to drill the second
21      hole, and that training was handled by
22      Mr. Walters.
23 Q.   And what training was provided to him?

Page 172

1  A.   He showed him how to do it essentially and I
2      assume described it to him.
3  Q.   And how did he tell him to do it?
4  A.   Well, he went through the setup procedure that
5      we discussed earlier.
6  Q.   Okay.  Tell me what Mr. Walters told Mr. Riley
7      about how to operate that machine safely.
8  A.   I don't know that I really have a complete
9      description of what he told him, but the record
10      indicates that he demonstrated, and I assume
11      part of that demonstration was a discussion of
12      turning the drill on, where the controls are,
13      the leveling screw adjustment, and actually
14      showing him how it performs.
15 Q.   Was the training of Mr. Riley adequate in your
16      opinion?
17 A.   I think so.  I mean, it's kind of a general
18      purpose machine, there's nothing really
19      complicated about it.  I don't know that I
20      would have done anything differently in
21      training him how to operate it.
22 Q.   Okay.  And was Mr. Walters properly trained in
23      the operation and use of the core drill machine

Page 173

1    that injured Mr. Riley?
2  A.   I don't know what training he received.  I just
3      know that he was an experienced operator of
4      core drills.  I think he indicated that he had
5      operated core drills on perhaps 12 occasions.
6      I don't know what sort of initial training he
7      received, but he was certainly familiar with
8      the operation of core drills.
9  Q.   Well, was Mr. Walters properly trained in the
10      operation of the subject core drill machine
11      that injured Mr. Riley?
12 A.   I really couldn't respond to that, because I
13      don't know what training he received.
14 Q.   Well, do you have an opinion as to whether
15      Mr. Walters properly trained Mr. Riley?
16 A.   I think that he instructed him adequately, yes.
17 Q.   Okay.  So you find no fault in the training of
18      Mr. Riley --
19 A.   No.
20 Q.   -- to operate the subject core drill machine?
21 A.   No.
22 Q.   Okay.  Would the operators manual have made any
23      difference if it had been provided or requested

Page 174

1    by Mr. Riley?
2 A.    I looked at the operators manual and as it's
3        written I don't think it would have made a bit
4        of difference.
5 Q.    So the fact that there was no operators manual
6        with the core drill machine that injured
7        Mr. Riley had no effect on whether or not there
8        was going to be an accident involving
9        Mr. Riley?
10 A.    As it turned out, it did not, because it was --
11        in my opinion, it was lacking in its
12        information. I think that it should have
13        described, for example, what a safe operating
14        level for the vacuum would be and it made no
15        mention of that.
16 Q.    Well, did that make any difference in this case
17        involving Mr. Riley's accident?
18 A.    It could have. If Mr. Riley had known what the
19        safe operating level was and observed what the
20        reading on the gauge was, he could have perhaps
21        avoided the injury.
22 Q.    Whose responsibility was it to tell Mr. Riley
23        what the safe operating pressure should have

Page 175

1        been?
2 A.    I think that it was the responsibility of the
3        manufacturer to do that.
4 Q.    And as I understand it, the fact that Mr. Riley
5        did not hook the hose to the water attachment
6        didn't have any effect on the accident or
7        injury that Mr. Riley suffered?
8            MR. LANE: I object to the form, but go
9        ahead.
10 A.    Not in my opinion, but as a caveat I have to
11        state that I don't know what the flow of water
12        was. But the flow of water could have been
13        adequate or inadequate either way he used it,
14        whether it was hooked up to the machine or laid
15        on the floor. Laying it on the floor, I think,
16        is an acceptable way of getting water to the
17        core drill. So I don't really think that it
18        would have had -- the method of water
19        introduction to that area does not make any
20        difference.
21 Q.    Okay. What amount of force of water should
22        have been applied to the interior of that core
23        drill bit?

Page 176

1 A.    Well, that's not -- the manual only -- there's
2        a description in one of the manuals, and I'm
3        thinking it may be the Milwaukee manual, which
4        has more detail in it. And I can tell you what
5        that detail is.
6 Q.    Well, just in your opinion, as you sit here
7        today, what was the amount of force of water
8        necessary to be applied through the water hose
9        attachment on the subject core drill machine
10        that injured Mr. Riley?
11            MR. LANE: Object to the form.
12 A.    I don't think that you had to introduce the
13        water that way. I think it could have been
14        introduced by the way that it was, that is by
15        flooding the area where the hole is. Because
16        the core drill is slotted, enabling water to
17        flow to the inside anyway. The same as the
18        water from the inside would flow to the
19        outside; it could flow from the inside -- I
20        mean, the outside in through those slots in the
21        core drill bit.
22 Q.    Okay. So what amount of water, if any, was
23        necessary to be applied to the interior of the

Page 177

1        core drill bit?
2            MR. LANE: Object to the form.
3 A.    You could introduce it either to the inside or
4        the outside.
5 Q.    So you don't have an opinion as to whether or
6        not you would turn the water faucet on full or
7        whether it was reduced?
8 A.    I do have an opinion about that.
9 Q.    All right. What is that, sir?
10 A.    To get the maximum life and cutting efficiency
11        out of this core drill bit, it's desirable to
12        flush the cuttings out of the hole, but not to
13        -- not to do it so quickly that you cause the
14        drill to be dulled in the process. Because
15        this drill has diamonds impregnated in the
16        steel and it relies on a certain amount of
17        abrasion to wear that steel away to expose new
18        diamond particles. So if you flush it out too
19        quick, you're going to cause the drill bit to
20        be glazed over. If you don't flush it out
21        quick enough, you cause the drill to wear too
22        quickly. So there is a happy medium. And I
23        think that the manual that I reviewed indicates

Page 178

1     a nominal flow of about two gallons per minute.

2 Q. Okay. So would you turn the faucet on full?

3 A. No.

4 Q. Half?

5 A. Well, you know, it depends on how big the hose

6     is and the water source, but probably about

7     half. You can typically get about, at most,

8     five gallons a minute out of a hose bib for a

9     residential setting and I don't have any reason

10    to believe this would be any different.

11 Q. Did the failure of United Rentals to provide

12    the manual contribute in any way to the

13    accident?

14        MR. LANE: Object to the form. Asked

15          and answered, but go ahead.

16 A. You know, as it was written, probably not, but

17    had it been written better, I think it would

18    have allowed the accident -- or would have

19    enabled the operator to avoid the accident.

20 Q. Sir, if you will, there is a deposition of

21    James Mason and I see someone has put

22    "received"?

23 A. Uh-huh. (Positive response.)

Page 179

1 Q. Who put that on there, sir?

2 A. That was probably somebody in my office.

3     10/25, it was probably about the time I got it.

4 Q. All right. Let's mark that then as Exhibit

5    Number 42 to your deposition, being the --

6 A. Wait a minute. No, it's not. This is the one

7    I got, I think, actually yesterday.

8        MR. LANE: I think that's probably our

9          sticker on there, Winston.

10 A. You think that's your stamp? I don't believe

11    it's mine.

12 Q. All right. Let's go on and tab it since we've

13    discussed it in your deposition.

14       (Exhibit 42 marked for identification.)

15 Q. Sir, you were asked to bring with you documents

16    related to any and all information or items

17    reviewed by you in connection with the

18    preparation for testimony in the lawsuit. Have

19    you done that?

20 A. Yes, sir.

21 Q. And have they been identified here today?

22 A. I believe they have.

23 Q. You were asked to bring with you documents

Page 180

1     related to any and all tests or data relied

2     upon or utilized in connection with this case.

3     Have you done that, sir?

4 A. I have.

5 Q. And that would be including, without

6    limitation, engineering tests or studies?

7 A. Yes.

8 Q. And you've produced those?

9 A. Yes.

10 Q. And have they been marked?

11 A. Yes.

12 Q. And what exhibit numbers are those?

13 A. The one we just marked?

14 Q. No, sir. The engineering tests or studies that

15    you've performed?

16 A. Oh, well, the tests -- I have not documented

17    the tests, but I described the test to you that

18    was done yesterday with the modified core

19    drill. The studies, if you call calculations

20    studies, I suppose you could do that, that's

21    been marked.

22 Q. And that's Exhibit Number?

23 A. 15, I think. Yes, Exhibit 15.

Page 181

1 Q. Any other test or studies?

2 A. No.

3 Q. Any test, data or studies performed by any

4    third-parties considered by you in forming your

5    opinions in this lawsuit?

6 A. Yes.

7 Q. And what are those, sir?

8 A. The chemical analysis of the white powdery

9    material.

10 Q. And that's contained within Volume Number I

11    that's been marked for identification?

12 A. Yes, sir.

13 Q. And tabbed by you?

14 A. Yes.

15 Q. Anything else, sir?

16 A. Third-party testing? I don't think there's any

17    others.

18 Q. Okay. So the record is clear, why don't we go

19    on and mark that, sir?

20 A. Which?

21 Q. In Volume Number I, that --

22 A. Volume I I think has been marked.

23       MR. LANE: Are you talking about the

1       chemical test?
2  A.   Oh, the chemical test.
3       MR. LANE: Is that what you're
4       referring to?
5  Q.   If that's the only independent third-party
6       test?
7  A.   Actually I think that's in Volume II or III.
8       There is actually a tab on it, so it should be
9       easy to find. Yes, here it is.
10 Q.   We will mark that as Exhibit Number --
11 A.   43.
12      (Exhibit 43 marked for identification.)
13 Q.   All right, sir. Do you want to take that out
14      so we can have that and be able to identify it?
15      And that's a three page composite exhibit?
16 A.   Yes.
17 Q.   Any other third-party tests that you've relied
18      upon in forming your opinions?
19 A.   No.
20 Q.   You were asked to bring with you documents
21      related to any and all information, things or
22      items received by you or considered by you in
23      connection with the case?

1  A.   Did that.
2  Q.   And those have been marked and identified?
3  A.   Yes, sir.
4  Q.   And that would be the depositions provided to
5       you by Mr. Lane as well as the photographs
6       provided to you by Mr. Lane?
7  A.   Yes, sir.
8       MR. LANE: Objection.
9  Q.   Did anyone provide you photographs other than
10      Mr. Lane?
11 A.   No.
12      MR. LANE: The basis of my objection, I
13      don't know that that's all that
14      fits under your category. You've
15      marked four volumes here, I don't
16      know -- my problem, Winston, is
17      that I'm not sure if you're
18      referring to the things that have
19      been pulled out of the notebooks
20      and marked or whether you're
21      referring to all of the notebooks,
22      and that's where the ambiguity
23      comes in.

1  Q.   Okay. Is there anything that's not contained
2       on the table here that's been marked and
3       identified?
4  A.   Anything that I have used in this case?
5  Q.   Yes, sir.
6  A.   I brought everything that I have.
7  Q.   And that's all of the information that's been
8       provided to you?
9  A.   It's either on the table or has been on the
10      table at some point today.
11 Q.   And that's all information that's been provided
12      by Mr. Riley's lawyer?
13      MR. LANE: Object to the form.
14 A.   No, I did some of my own research.
15 Q.   Okay. And your research is what?
16 A.   Included in Volume I.
17 Q.   All right. Can you identify that for us?
18 A.   Yes, sir, if we haven't already destroyed that
19      tab. Let me look and see what's pulled out of
20      it. I pulled some information out about -- off
21      the website actually for Norton Core Drilling
22      Equipment for the Clipper Core Drill.
23 Q.   All right. Let's mark that then as we go

1       through it.
2  A.   You want to mark those individually, right?
3  Q.   Please, sir.
4       (Exhibit 44 marked for identification.)
5  A.   Exhibit 44 is my research captioned "Norton
6       Core Drilling Equipment and Bits for
7       Professional Contractors.
8       (Exhibit 45 marked for identification.)
9  A.   Exhibit 45 is captioned "Dynatech Diamonds at
10      Work." It's a Clipper Core Drill Rig document
11      that I got off their Internet site.
12 Q.   All right. And that consists of three pages?
13 A.   Yes.
14 Q.   I notice that on the third page here you've
15      underlined "never stand without anchoring"?
16 A.   Uh-huh. (Positive response.)
17 Q.   What did you mean by that, sir? And why did
18      you underline that portion?
19 A.   Well, I think what they mean by that is don't
20      rely on standing on the unit to provide the
21      means of attachment of the unit to the work
22      surface.
23 Q.   And that's why you underlined that sentence?

Page 186

1  A.    Correct.  Yes.  It doesn't say don't stand on
2        the unit, it says don't rely on it to provide
3        the means of attachment.  That's why I
4        underlined it.
5            And the final one is the document that's
6        already been marked Exhibit 6, which is the
7        Operation and Maintenance Manual for Gast
8        vacuum pumps.
9  Q.    And I believe that's already been identified as
10        a composite exhibit from which a page has been
11        removed and identified and marked?
12  A.    I don't recall if we removed a page from that
13        or not.
14  Q.    I believe it was page five, if you recall,
15        showing the exploding diagram?
16  A.    Yeah, I do recall that.
17  Q.    So you've now identified all of the research
18        that you've relied upon in forming your
19        opinions in this lawsuit?
20  A.    Yes.
21  Q.    You were asked to bring with you all e-mails,
22        notes, reports, memoranda, correspondence, or
23        other written materials prepared by, created

Page 187

1        by, or generated by you in connection with this
2        matter?
3  A.    Yes.
4  Q.    And have you done that?
5  A.    Yes.
6  Q.    And have they been identified?
7  A.    Well, let me add one caveat to that.  I thought
8        that I made a record of a telephone
9        conversation with a technical support person
10        with Gast pumps, but I didn't see any evidence
11        that I put that in my binder.  I may not have
12        made such a record, but I thought I did.
13  Q.    Okay.  Have you had any conversations with
14        anyone else other than a representative from
15        Gast Manufacturing concerning this lawsuit?
16  A.    No.
17            MR. LANE:  Other than me, do you mean?
18  A.    Yeah.
19  Q.    Who was that representative from Gast?
20  A.    I don't know.  I ordinarily could produce that
21        with my record of telephone conversation, but
22        since I don't have it, I did not record that
23        name.

Page 188

1  Q.    And when did you have this conversation, sir?
2  A.    Probably shortly before I finalized my report.
3  Q.    And what was the -- what did you learn from
4        this telephone conversation with the
5        representative from Gast?
6  A.    I talked about the filter; I talked about
7        failure modes of the pump.
8  Q.    What did you learn, sir, based on that
9        telephone conversation?
10  A.    I learned that the filter is present and they
11        recommend that it be checked on some frequency.
12        I talked to him -- at that time I didn't know
13        really -- didn't have a grasp for how much of
14        this aluminum oxide was present and he just
15        verified for me that aluminum oxide could be
16        present due to wear products from inside the
17        pump.  I don't now believe that to be the case.
18  Q.    Were there any parts that you found that were
19        worn?
20  A.    I did not look at the pump and I couldn't tell
21        from the photographs.
22  Q.    All right.  Well, did you determine that any of
23        the parts on the core drill machine that

Page 189

1        injured Mr. Riley were excessively worn?
2  A.    Any of the core drill parts?  You're talking
3        about the entire thing or the vacuum pump?
4  Q.    The entire thing, yes, sir.
5  A.    No, I did not.  Other than the fact the pump
6        did not operate properly, I didn't detect any
7        other deficiency, worn parts, with the core
8        drill.
9  Q.    Okay.  So I'm clear then, there weren't any
10        excessively worn parts on the subject core
11        drill machine that injured Mr. Riley?
12            MR. LANE:  Object to the form.
13  A.    I really don't know, because I didn't see it,
14        but there's no notation of that in the reports
15        from those who did examine it.  Nor do I think
16        it's necessary for the machine to be worn out
17        to have produced the result that it did, except
18        for the fact that you had a deficiency in the
19        vacuum pump that was most likely caused by
20        clogging of the pump by the aluminum oxide, by
21        the foreign material.
22  Q.    And so that I'm clear then, can you answer my
23        question?  Did you note any evidence of the

Page 190

1    excessive wear of the subject core drill
2    machine that injured Mr. Riley?
3         MR. LANE:  Object to the form.  Asked
4              and answered.
5  A.   No, I have not made any note of that.
6  Q.   All right, sir.  And who suggested that you
7       call a representative of Gast Manufacturing?
8  A.   I did that on my own.
9  Q.   Okay.  And was this recently or was it several
10      months ago?
11 A.   I think it was in early October.
12 Q.   Okay.  Why did you wait until October of 2006
13      to call a representative from Gast?
14 A.   Because I opened the case on October the 5th,
15      so I didn't really have much time before I
16      wrote my report to do it other than that period
17      of time.
18 Q.   Okay.  And what number did you use to contact
19      this representative and where did you come up
20      with the telephone number?
21 A.   I looked on the website, but I -- and I would
22      have recorded it had I done the record of
23      telephone conversation.  That document could be

Page 191

1    on my desk, but I don't know that.
2  Q.   Okay.  And you can't tell us the name of this
3       individual?
4  A.   No.
5  Q.   All right.  Are you relying on anything this
6       individual told you in forming your opinions in
7       this case?
8  A.   Not really, no.
9  Q.   And did you seek permission from the attorney
10      representing Gast to contact this individual?
11 A.   No, I did not.
12 Q.   But you had the complaint though in this case,
13      did you not?
14 A.   I did have a complaint.
15 Q.   And you saw that Gast was a defendant in the
16      lawsuit?
17 A.   I don't recall that they were.
18 Q.   Okay.
19 A.   I think they were dismissed or -- no, maybe
20      not.  I don't know.  I don't know if they are
21      or not.
22 Q.   Okay.  But you took that upon yourself to
23      contact the representative?

Page 192

1  A.   I did that, yes.
2  Q.   And you can't give us a telephone number or a
3       name of an individual?
4  A.   If I can find my document I can, but I don't
5       know that I can find the document.  I don't
6       know if it exists, but ordinarily I would make
7       such a record.
8  Q.   Okay.  And if it exists can you get that to
9       Mr. Lane?
10 A.   I can do that.
11 Q.   Okay.  We will attach that as Exhibit Number 46
12      to your deposition.
13 A.   Okay.
14      MR. LANE:  To the extent it exists.
15      (Exhibit 46 marked for identification.)
16 Q.   Do you want to write on there what you're going
17      to produce as Exhibit Number 46?
18      MR. LANE:  It could be a blank sheet of
19           yellow paper.
20 A.   (Witness complies.)  All right, sir.
21 Q.   And you have tabbed the e-mails and
22      correspondence and written materials that have
23      been created or generated by you in this

Page 193

1    matter?
2  A.   They're all filed under the correspondence tab
3       in my binder, Volume I.
4  Q.   Can I see that, sir?
5  A.   Yes, sir.
6  Q.   I'm sorry, I don't see your statement for
7       services rendered.
8       MR. LANE:  Billing, do you mean?
9  A.   But I have it.  I forgot to bring that with me,
10      and technically I guess you want to see this
11      e-mail, too, which is about that subject.  I
12      forgot to bring it, so I had it -- I had it
13      sent to me while I was here.
14      (Exhibit 47 marked for identification.)
15 Q.   And what information or supporting information
16      do you have that you performed engineering
17      services of $4,803.75?
18 A.   I have my time records.
19 Q.   And where are they, sir?
20 A.   They're in the computer at my office.
21 Q.   And can you get those printed out and forwarded
22      to us today?
23 A.   Today?

Page 194

1  Q.   Yes.
2  A.   Sure.
3  Q.   Okay.  We will mark that as Exhibit Number 48.
4         (Exhibit 48 marked for identification.)
5  A.   I better make a call now though, it's 4:00.
6  Q.   All right.
7  A.   Can I do that right now?
8  Q.   Please, sir.
9         (Recess.)
10 BY MR. SHEEHAN:
11 Q.   Sir, you were asked to bring with you all
12      standards and literatures which you plan to use
13      at trial or on which you base your opinions?
14 A.   That's all in my files here.
15         MR. LANE:  And I would object to that.
16 Q.   What standards are there that would be
17      applicable in this case?
18 A.   I don't believe I have pulled any standards for
19      this case.
20 Q.   Would any standards --
21 A.   Although, you know, now that you mention it, I
22      might do that.  I probably should look at the
23      standards for general machine safeguarding.  I

Page 195

1      don't think there's any specific standard that
2      is applicable to this machine, but there are
3      some general standards which I will very
4      quickly look at and may supplement my report
5      with, I don't know.
6  Q.   Okay.  If you supplement your report or change
7      your opinion or enlarge your opinion, will you
8      let Mr. Lane know?
9  A.   Sure.
10 Q.   Okay.  And we would like to depose you so that
11      in all fairness we're not surprised by any
12      opinion that changes between now and the time
13      of trial or that is enlarged, would that be
14      fair?
15 A.   Or that is what?
16 Q.   Any opinion that's enlarged?
17 A.   Oh, okay.  That's fair.
18 Q.   Or if you have any additional opinions?
19 A.   That's fair.  I have no problem with that.
20 Q.   In other words, you were prepared to state your
21      opinions when you came to this deposition
22      today, were you not, sir?
23 A.   I was, but I received some additional

Page 196

1      information.  And as my report states, I
2      reserve the right to change my opinions based
3      on receipt of new information.  I have received
4      some new information.  It doesn't necessarily
5      mean my report needs to be changed or enlarged,
6      but it could.
7  Q.   Okay.  And will you let Mr. Lane know so we're
8      not surprised if you have any additional or
9      enlarged opinions?
10 A.   Sure.  Absolutely.
11 Q.   And that's fair, is it not?
12 A.   It is.
13 Q.   Okay.  Are you familiar with OSHA?
14 A.   Yes, sir.
15 Q.   And have you ever reviewed the standards --
16 A.   Yes, sir.
17 Q.   -- of OSHA?  Have you ever testified concerning
18      OSHA standards?
19 A.   Yes, sir.
20 Q.   And what is your understanding of an employer's
21      responsibilities and duties under OSHA as far
22      as training is concerned?
23 A.   As far as training is concerned?

Page 197

1  Q.   Yes, sir.
2  A.   Well, the employer has a duty to train his
3      employees in the use of the equipment that he's
4      expected to operate.
5  Q.   Okay.  And in your opinion, Mr. Riley was
6      properly trained by his employer, Flavor House?
7  A.   Mr. Riley?  I think he was adequately trained
8      by a coworker who was experienced in operating
9      the equipment, yes.
10 Q.   And he was sophisticated and was familiar with
11      the product that he was using?
12         MR. LANE:  Object to the form.
13 A.   No, he was not familiar with that specific
14      product, but it's -- you know, it's not really
15      much different than a drill press or other
16      equipment that mechanics ordinarily deal with.
17 Q.   So Mr. Walters then was knowledgeable of the
18      core drill machine that injured Mr. Riley?
19 A.   Yes.
20 Q.   And Mr. Riley then would have been properly
21      trained?
22 A.   Yes.
23 Q.   Okay.  You were asked to bring with you

Page 198

1    documents relating to your testimony for the
2    last five years in deposition or trial?
3             MR. LANE: Object to the form. Are you
4             talking about the list of cases,
5             Winston?
6    Q.   I tell you what, do you want me to just read
7         the paragraph, would that help you?
8    A.   Sure.
9    Q.   Documents for the last five years relating to
10        all cases in which you've been retained to
11        render opinions; have you done that, sir?
12            MR. LANE: We would object to the form
13            of that as vague, overbroad,
14            ambiguous and unduly burdensome,
15            but to the extent we understood
16            that to be the list of cases, I
17            think he's provided that.
18   Q.   Well, the first sentence of paragraph seven,
19        documents for the last five years relating to
20        all cases in which said expert has been
21        retained to render opinions; have you done
22        that, sir?
23   A.   Well, my understanding was there was some

Page 199

1    discussion of that issue between this office
2    and your office and that resulted in my
3    providing one deposition.
4             MR. LANE: A copy of a deposition.
5    A.   A copy of a deposition.
6             MR. LANE: A transcript that you
7             requested, Winston, at Doctor
8             Owen's deposition the other day.
9    Q.   Okay. Have you brought that one transcript
10        that was highlighted?
11   A.   I think it was sent to you, but I also have a
12        copy of it.
13   Q.   All right. I'm sorry, sent to me?
14   A.   I believe so.
15   Q.   By whom?
16   A.   Laura Murphy.
17   Q.   And when was that, sir?
18   A.   Within the past two or three days.
19   Q.   I mean, I have not received it.
20   A.   Okay. Well, let me show you.
21            MR. LANE: We may have it, Winston, I
22            don't know.
23   A.   Yeah, it could have come here, I just don't

Page 200

1    know. It probably would have come here.
2    Q.   Do you have a copy of the cover letter from
3         Ms. Murphy to me showing that it was sent to
4         me?
5    A.   I may have been mistaken. It probably came
6         through Mr. Lane here.
7             MR. LANE: And I'm sure Tessie has that
8             for you if you want it, winston.
9    A.   But I have it right here. Here you are.
10   Q.   We will mark that as Exhibit Number 50.
11        (Exhibit 50 marked for identification.)
12   Q.   What else do you have there, sir?
13   A.   Newspaper, the deposition of Ricky Smothers,
14        which I have not reviewed in full, time
15        records.
16   Q.   Okay. Let me look at those time records?
17   A.   E-mail related to my hotel reservation.
18   Q.   Let's mark that, too. Let me mark that as
19        Exhibit Number 52. Exhibit Number 51 will be
20        the time records.
21        (Exhibits 51 and 52 marked for
22        identification.)
23   A.   I'm going to get all of this back, right?

Page 201

1    Q.   Yes, sir. We're going to ask Tessie to make a
2         copy of it before we leave here today.
3             MR. LANE: We're not going to be able
4             to copy these four volumes today.
5             MR. SHEEHAN: Well, we're going to mark
6             the ones that he's individually
7             referred to.
8    A.   Do you want to know about this other piece of
9         paper I have?
10   Q.   Yes, sir.
11   A.   This is some notes from a different case. I
12        brought it because I needed to make a phone
13        call to the attorney involved.
14            MR. SHEEHAN: Do you want to go on and
15            give these to Tessie so she can
16            start copying them?
17            MR. LANE: Who does she bill for these
18            copies?
19            MR. SHEEHAN: Me.
20   Q.   Sir, you've got some notes here in your Volume
21        Number I, what are those, sir?
22            MR. LANE: Are there other documents
23            under here that you want me to

Page 202

1          copy, Winston? I assume there
2          are. If y'all will just hold on a
3          second, I will get these to her.
4          (Off-the-record discussion.)
5   A.   Ready?
6   Q.   Yes, sir.
7   A.   This document that you have just asked me about
8        is some notes I made during my review of the
9        Milwaukee drill manual that I thought might be
10       useful in this case.
11  Q.   Let's mark that as Exhibit Number 53 then.
12       (Exhibit 53 marked for identification.)
13  Q.   Are there any other notes that we've not
14       already previously identified specifically?
15       MR. LANE: Do you want him to pull that
16          one out, I mean, for copying I'm
17          talking about?
18       MR. SHEEHAN: Please, yeah. I think
19          he's going to need to refer to it
20          though in answering some
21          questions.
22  A.   Any other notes you say?
23  Q.   Yes, sir.

Page 203

1   A.   Yes.
2   Q.   Okay. And what are those, sir?
3   A.   I made a list of the documents that I reviewed,
4        which I think I incorporate in my report, but
5        you're certainly welcome to have the
6        handwritten version if you would like.
7   Q.   Please, sir. Let's mark that as composite
8        Exhibit Number 54.
9        (Exhibit 54 marked for identification.)
10  Q.   And that's consisting of two pages; is that
11       correct, sir? Is that correct, sir?
12  A.   Two pages? Did you say two pages? Is that
13       what you said?
14  Q.   That's what it appeared to be, I just wanted,
15       since you're under oath --
16  A.   That's correct, two pages. I guess you better
17       mark that one, too.
18       (Exhibit 55 marked for identification.)
19  Q.   And what is Exhibit Number 55 that you've now
20       identified?
21  A.   This was really some intake information; that
22       is Doctor Warren, I think, took the initial
23       call, it looks like his handwriting, from Joe,

Page 204

1        I believe, Mr. Lane here. Took down some
2        information about the case and decided
3        ultimately to assign it to me.
4   Q.   And why was that, sir?
5   A.   Why did he assign it to me?
6   Q.   Please.
7   A.   I think he felt I could handle the case
8        adequately and I was available to do it.
9   Q.   And why were you -- what expertise did you have
10       that would warrant you handling this case?
11  A.   I have done a lot of machine guarding cases in
12       industrial accidents in my tenure there.
13  Q.   And was this a machine guarding case?
14       MR. LANE: Object to the form.
15  A.   It is a safeguarding case, yes.
16  Q.   And in what respect?
17  A.   In that the mechanism to power the drill motor
18       in my opinion should require constant operator
19       engagement. And there should be some interlock
20       mechanism to disable the drill motor in the
21       event of a failure of the vacuum system when
22       that is the means of securing the drill to the
23       work.

Page 205

1   Q.   If you will, read those notes into the record,
2        please, sir?
3   A.   All of them?
4   Q.   Please.
5   A.   These are his notes on the left side, Doctor
6        Warren's notes. "Joe Lane, 334-793-1555.
7        Farrest Taylor's office."
8   Q.   Have y'all done work for Farrest Taylor in the
9        past?
10  A.   Yes, sir.
11  Q.   And who has done work for Mr. Taylor?
12  A.   Well, I know that Mr. Tindal has. I believe
13       Mr. Olsen has. I never have, this is my first
14       experience with this firm.
15  Q.   Have you ever testified in a case involving a
16       rental equipment company?
17  A.   I believe so. I have a list of those cases in
18       my report. I think that I certainly have
19       investigated cases involving rental companies
20       and I think I have been deposed.
21  Q.   In what case were you deposed involving a
22       rental company?
23  A.   Well, let's see. My report is out of the room.

Page 206

```
 1        Wait a minute, I have another copy of it.  The
 2     attachments to the report are not with this
 3     one.
 4   Q.   We will do it whenever we get it back.
 5   A.   All right, sir.
 6   Q.   If you will, continue reading the telephone
 7     communication?
 8   A.   "Core drill Norton/Clipper, like a drill press.
 9     Secure to floor is vacuum system.  Using core
10     drill vacuum comes," I think it says, "loose.
11     Dull --"
12   Q.   Is that maybe drill?
13   A.   Oh, yeah, "drill spins around.  He tries to
14     jump out of the way.  Rental drill, United
15     Rentals."
16   Q.   Have you ever testified in a case involving
17     United Rentals, either for United Rentals or
18     against United Rentals?
19   A.   I don't know.  I can tell you when I get that
20     document back that you just spoke about.
21   Q.   But to your knowledge, as you sit here today,
22     you can't recall?
23   A.   I think I've done some -- I've investigated
```

Page 207

```
 1     some cases involving United Rentals, I just
 2     don't recall whether there was a deposition
 3     involved.
 4   Q.   When was that that you did this investigation
 5     involving United Rentals, just your best
 6     judgment?
 7   A.   I think there was more than one.  Probably
 8     three -- perhaps three years ago.
 9   Q.   Okay.  Have you ever spoken to anyone at United
10     Rentals in reference to this lawsuit or any of
11     the matters concerning this lawsuit?
12   A.   No, I have not.
13   Q.   Have you ever testified in favor of a rental
14     company?
15   A.   I need to refer to the list to see which ones I
16     have testified in.
17   Q.   As you sit here today, have you ever testified
18     in favor of one?
19   A.   I don't know if I've testified in any cases
20     involving rental companies.  I know that I've
21     investigated some incidents involving rental
22     companies, but I don't know if that resulted in
23     testimony.
```

Page 208

```
 1   Q.   Well, have you ever testified in a case in
 2     favor of United Rentals?
 3   A.   I would answer just like I did a minute ago.
 4   Q.   I know, but just as you sit here today without
 5     looking at that, we understand that you've got
 6     a list of cases for the last five years that
 7     you've produced pursuant to the request?
 8   A.   I guess I don't know the answer to that.
 9   Q.   Okay.  So that I'm clear then, as we sit here
10     today, you can't testify whether or not you've
11     ever testified in favor of United Rentals?
12   A.   I cannot.  I cannot.
13   Q.   Or that you've been involved in a matter in
14     which you were investigating on behalf of
15     United Rentals?
16        MR. LANE:  Again, I object to the form,
17          asked and answered.  He said he's
18          certainly willing to review
19          documentation to that effect.
20   Q.   You know, as you sit here today is what I'm
21     asking for?
22   A.   I don't know.  I have been involved in cases
23     that involve several of the major rental
```

Page 209

```
 1     companies and perhaps included in that would be
 2     United.  I know that I've done cases involving
 3     RSC, for example, and I may have done some for
 4     United, for or against United, I don't know.
 5   Q.   Have you ever testified for RSC?
 6   A.   I don't know if I've testified at all in those
 7     rental cases that I've done.
 8   Q.   Have you ever investigated on behalf of RSC?
 9   A.   Yes.
10   Q.   And when was that, sir?
11   A.   Probably three years ago.
12   Q.   And what kind of equipment was that?
13   A.   Well, one that comes to mind is an aerial lift.
14   Q.   Have you ever testified in a case involving a
15     core drill machine --
16   A.   No.
17   Q.   -- for anyone?
18   A.   I have not.
19   Q.   Have you ever investigated a core drill
20     machine?
21   A.   No, I have not.
22   Q.   Okay.  If you will, continue with the reading
23     there?
```

Page 210

1 A.    Okay.  And I don't know what this means,
2    "AEMLD," it looks like, I don't know what that
3    means.  "Negligence Saint Gobain/Norton
4    manufacturer.  Diamond is true manufacturer.
5    Vacuum pump, Milwaukee drill motor/clutch as
6    opposed to shear pin."
7       Here are some more notes from Doctor
8    Warren on the second page.  "Two experts not
9    licensed, John Frost, Don Shaver.  One, no
10    manual provided, dash, warnings.  Two,
11    interlocked between vacuum.  Three, gauge with
12    pump holding secure or not."
13 Q.    What does that mean?
14 A.    Well, these are notes he made during that
15    telephone conversation.
16 Q.    Right, sir.  What does that mean to you?
17 A.    Well, it means to me that I guess the question
18    to be investigated was did the vacuum system
19    secure the drill base to the working surface or
20    not.
21       He wrote a note about a vacuum switch and
22    a 20 amp switch, and I don't really know what
23    he's talking about there.

Page 211

1 Q.    Any further notes there on those?
2 A.    Yes, other notes that I made on this same sheet
3    of paper on the front.  I wrote "October 13
4    deadline on licensing issue."  Then I wrote the
5    name of the law firm, "Cochran, Cherry, Givens
6    and," I guess that's "Smith."
7 Q.    And you recognized them because you had done
8    work for them on numerous occasions in the
9    past?
10 A.    No.  I have never worked for them.
11       MR. LANE:  Object to the form.
12 Q.    You've never worked for this law firm?
13 A.    I have not.
14       MR. LANE:  It's asked and answered and
15       that's exactly what he said.
16 Q.    I'm sorry, I thought you had worked for
17    Mr. Taylor.
18 A.    No, I have not.
19       MR. LANE:  He said --
20 A.    Mr. Tindal has worked for Mr. Taylor.
21 Q.    Okay.  But other members of the Warren Group
22    have worked for this law firm that's
23    representing Mr. Riley?

Page 212

1 A.    Yes.  I believe two members have, yes.
2 Q.    On how many times?
3 A.    Well, I would guess at least two.  There may
4    have been more cases, but I'm aware of what I
5    think to be two cases.
6 Q.    All right.
7 A.    "Defense says he misused product, standing on
8    it.  Two holes drilled.  First hole supervisor
9    at Flavor House; second hole first time he used
10    the core drill.  Delivered by United.  No
11    manual.  Clutch about 20 amp drill motor.
12    Contributory negligence a complete defense in
13    Alabama."
14 Q.    What does that mean?
15 A.    That means that we have to determine whether
16    our -- the operator played any part in this
17    incident.
18 Q.    If he did, what?
19 A.    That's a legal matter that I don't know
20    anything about.
21 Q.    Well, where did you come up with this
22    contributory negligence that you wrote down on
23    that sheet?

Page 213

1 A.    I assume it was a telephone conversation.  I
2    think this entire thing --
3 Q.    Who did you have the conversation with and
4    when?
5 A.    I would say probably shortly after the initial
6    contact, which was October the 5th, 2006.
7 Q.    And who was the conversation with?
8 A.    Probably Mr. Lane, but I don't know that for
9    sure.
10 Q.    Okay.  He was telling you about contributory
11    negligence?
12 A.    I would assume so.  I don't -- you know, it's
13    not something that means that much to me.  I
14    assume that's something we had to investigate.
15       "Corrosion in vacuum pump.  Water in trap.
16    Positive for marijuana.  Model DM500."
17 Q.    Who was positive for marijuana?
18 A.    My understanding is that Mr. Riley tested
19    positive for marijuana in a post-incident test.
20 Q.    And where was the water?
21 A.    In the bottle, in the water trap.
22 Q.    On the subject core drill machine that injured
23    Mr. Riley?

Page 214

1  A.    That's my information.
2  Q.    Okay.  How did the water get from the water
3        trap jar to the vacuum pump motor?
4              MR. LANE:  Object to the form.
5  A.    I don't know that it did.  The water trap jar
6        is there to prevent that from occurring.
7  Q.    Okay.  Is there any way for the water in the
8        water trap jar to get to the vacuum pump?
9  A.    Sure.  If the float ball is missing or if the
10       float ball doesn't seat very well or if it's
11       filled up too much and the drill is tipped over
12       while it's being transported, for example, you
13       could introduce water into it.
14 Q.    And how is that possible?
15 A.    Well, if the drill is laying on its side, the
16       ball doesn't seat.
17 Q.    And what happens then if the ball does not
18       seat?
19 A.    The water could flow into the tubing which
20       leads to the vacuum pump.
21 Q.    And what happens when water gets in the vacuum
22       pump?
23 A.    Well, it could lead to corrosion.

Page 215

1  Q.    Do you mean --
2              THE REPORTER:  I'm sorry, I didn't hear
3              what you said, Winston.
4              MR. SHIRES:  Sorry about that.
5  Q.    I'm sorry, what did you say, sir?
6              MR. LANE:  He didn't hear your
7              question.
8              MR. SHEEHAN:  No, I'm asking the --
9              MR. SHIRES:  Rick didn't hear your
10             question.
11 Q.    How did the water get from the water trap jar
12       to the vacuum pump motor?
13 A.    During the incident?
14 Q.    Yes, sir.
15 A.    I don't know that it did.
16 Q.    Could it?
17 A.    Could it?
18 Q.    Yes, sir.
19 A.    Sure, it could.
20 Q.    Okay.  If you will continue reading those notes
21       there, sir?
22 A.    "Install interlock switch on exemplar."
23 Q.    Wait just a minute.  What does that mean?

Page 216

1  A.    What does that mean?
2  Q.    Yes, sir.
3  A.    That was one of the -- it's a part of the
4        discussion, I'm presuming, with Mr. Lane about
5        what could have been done to prevent this
6        injury.
7  Q.    And he was telling you that there could have
8        been an interlock?
9              MR. LANE:  Object to the form.
10 A.    No, that was my job.
11 Q.    You wrote the note, what did you mean when you
12       wrote the note?
13 A.    That was a part of the discussion, something I
14       would have told him.
15 Q.    You told him what?
16 A.    It's my belief, based on these notes, that I
17       discussed with him the possibility of putting
18       an interlock in there to prevent that
19       occurrence from happening.
20 Q.    All right, sir.  Are there other notes there?
21 A.    That's it.
22 Q.    I believe there is a page two, isn't there?
23 A.    There is, but I've already been through that.

Page 217

1        It's Doctor Warren's notes.
2  Q.    All right, sir.  Are there any other notes in
3        any of these folders?
4  A.    Besides these summaries, I don't believe so.
5        The summaries we've already marked.
6              (Exhibit 56 marked for identification.)
7  Q.    Sir, I understand that we've been provided with
8        two sheets of paper and you've got those in
9        front of you?
10 A.    Oh, I didn't realize that was here.
11 Q.    And is this what's been forwarded by your
12       office?
13 A.    That certainly looks like my -- oh, is that
14       another copy of it?
15 Q.    What is this that's been marked as Exhibit
16       Number 56?
17 A.    56.  It's a printout of the time report from
18       our computer system where I log my time for
19       this case.
20 Q.    All right.  And does this show all of the time
21       that you've devoted to this matter?
22 A.    No, sir.
23 Q.    Where is the other supporting documentation to

Page 218

1   warrant your statement?
2  A.   I haven't entered it yet because I was on this
3       trip. This is through October 13th.
4  Q.   Okay. So there has been time -- today is what,
5       November the 10th, so that's almost what, two
6       weeks or more?
7           MR. LANE: Well, this is November the
8           -- I thought you said October
9           10th.
10 Q.   Mr. Lane is right, there's a month of time that
11      you've not documented?
12 A.   Well, I don't know. I need to go back and look
13      at my records, I guess. Because this -- I
14      don't know if this represents just what's been
15      billed or whether it represents all of my time.
16      I guess I need to make that phone call. Should
17      I do that right now?
18 Q.   If you've got other information that's
19      responsive to this request?
20 A.   I don't know that I do. It seems to me that I
21      may have billed some other time in that month
22      or accrued some other time.
23          (Off-the-record discussion.)

Page 219

1  A.   This is complete, all of this time has been
2       billed, but I think there's some time that I
3       have not yet entered in preparing for this
4       deposition today. Of course, some of that time
5       was outside of the office.
6  Q.   For the time that you've not shown, we'll mark
7       that as Exhibit Number 57, if you will identify
8       that as being something that you will provide
9       to Mr. Lane?
10          MR. LANE: To the extent it exists,
11          yes.
12          (Exhibit 57 marked for identification.)
13 A.   Let's see. The 13th was the last entry there?
14 Q.   Yes, sir.
15 A.   Okay.
16 Q.   Sir, I notice on the second page there there's
17      a reference to -- who is Phillip Darnell?
18 A.   He's a technician in my firm.
19 Q.   And what did he prepare?
20 A.   He prepared the CAD drawing that's included in
21      my report.
22 Q.   Okay. Can you show me that CAD drawing?
23 A.   Yes, sir. Where's the stack?

Page 220

1           MR. LANE: The ones she's copying?
2  A.   Yeah.
3           MR. LANE: Probably still out there.
4  A.   Let me see. I don't know if I have that in
5       here. I think it's outside the room at the
6       moment. It's the drawing of the electrical
7       schematic diagram that we have already
8       discussed and I believe marked.
9  Q.   All right.
10 A.   I can't remember what exhibit number it is.
11 Q.   And what does CAD stand for?
12 A.   Computer Assisted Drawing.
13 Q.   And that was the electrical diagram?
14 A.   Yes, sir, for the alternate design.
15 Q.   In your list of cases are there any cases that
16      are similar in nature to this accident
17      involving Mr. Riley?
18          MR. LANE: Object to the form.
19 A.   Do we have the list back yet?
20          MR. LANE: Is that list out there?
21 A.   I assume you're talking about the list of cases
22      that I've been deposed or testified in, right?
23 Q.   Yes, sir.

Page 221

1  A.   That's outside of the room at the moment.
2  Q.   All right. Just as we sit here now, can you
3       recall any cases that are similar in nature?
4  A.   On that list I'm not sure, but I think I've
5       investigated other cases that have some
6       similarities.
7  Q.   And in what way are they similar?
8  A.   I think I investigated a case involving an
9       injury to an employee operating a milling
10      machine that had a magnetic chuck on it. That
11      is that the part was held to the bed of the
12      machine by electromagnetic force. And
13      obviously if you lose the electromagnetic
14      capability, that the part is subject to being
15      ejected from the machine. All right, sir. I
16      have my list.
17 Q.   All right. Are any of those similar?
18 A.   Similar to this case?
19 Q.   Yes, sir.
20          MR. LANE: Again, object to the form as
21          to what you mean by similar.
22 A.   No.
23 Q.   So this is the first case that you've ever

Page 222

1    investigated of a similar nature?
2         MR. LANE:  Object to the form.
3  A.   No.  The first case that I have testified to of
4    this type.
5  Q.   Okay.  And you have investigated other
6    incidents that are similar in nature to this
7    accident?
8  A.   I've investigated similar kinds of equipment,
9    like drill presses, for example, and milling
10   machines with magnetic chucks like I just
11   talked about.
12 Q.   Any others?
13 A.   I've investigated other machines involving
14   interlocks, but not specifically drill --
15   drilling machines.
16 Q.   Any others, sir?
17 A.   Not that I recall.
18 Q.   And you will provide us with the time that you
19   have spent since October the 13th and we will
20   mark that as Exhibit Number 57?
21 A.   Yes, sir.
22 Q.   All right, sir.  So that I'm clear then, we've
23   now marked the complete file on this case,

Page 223

1    including handwritten and all typed notes and
2    correspondence to you from anyone or from you
3    for anyone?
4  A.   I believe so, yes, sir.
5  Q.   Have you reviewed the equipment history for
6    this particular machine that injured Mr. Riley?
7  A.   The rental history?
8  Q.   Yes, sir.
9  A.   Some of it.  I don't believe we have a complete
10   record of that.
11 Q.   Okay.
12 A.   But I have reviewed some of it, yes.
13 Q.   Okay.  And what have you reviewed, sir?
14 A.   What I think I estimated earlier to be perhaps
15   eight green tags or Ready to Rent tags
16   indicating that this machine had been inspected
17   after return from a customer in preparation for
18   rental to another customer.
19 Q.   Okay.  And who provided you with those?
20 A.   I think those were attached to one of the
21   depositions that I've reviewed.
22 Q.   And where did you get that?
23 A.   The deposition?

Page 224

1  Q.   Please.
2  A.   Mr. Lane provided me the deposition.
3  Q.   Okay.  And so that I'm clear, do you know how
4    many times it's been rented since put in
5    inventory by United Rentals?
6  A.   No, I do not know.
7  Q.   Would that make any difference?
8  A.   No.
9  Q.   And why not?
10 A.   Well, because the machine was, in fact, rented
11   on that occasion and should have been in
12   serviceable condition.  It wouldn't matter if
13   it was brand-new or aged.
14 Q.   Okay.  And why was it not in serviceable
15   condition?
16 A.   Well, what I think was wrong with the machine
17   was that it was unable to produce the vacuum
18   necessary to secure it to the floor because of
19   a problem with the vacuum pump.
20 Q.   And why was that?
21        MR. LANE:  Object to the form.  Asked
22        and answered.
23 A.   Why was it -- I'm not sure I understand what

Page 225

1    you're asking.
2  Q.   Not able to produce the vacuum necessary to
3    secure it to the floor?
4  A.   Oh, okay.  It's my opinion that the pump was
5    unable to produce the vacuum because it was --
6    because of the accumulation of foreign material
7    inside the pump.
8  Q.   And that's the aluminum oxide that you've
9    testified to today?
10 A.   Yes, sir.
11 Q.   Anything else?
12 A.   Anything else about the --
13 Q.   The serviceability?
14 A.   Of the equipment?
15 Q.   Yes, sir.
16 A.   Sure.  I mean, I think there were some other
17   design issues with the pump -- with the drill
18   that I've enumerated in my report already.
19 Q.   Okay.  Any serviceability condition?
20 A.   Serviceability?  Yes.  I think that there were
21   some maintenance issues that I attribute to
22   United Rentals that could have played a role in
23   this incident.

Page 226

```
 1  Q.   And what are those, sir?
 2  A.   Well, the fact that United Rentals did not
 3       purge the pump as recommended by the
 4       manufacturer between each use; the fact that
 5       they did not inspect the filters.
 6  Q.   Anything else, sir?
 7  A.   I believe that's all of the maintenance issues
 8       at least that I can think of at the moment.
 9  Q.   If you recollect any others, will you let
10       Mr. Lane know so that we're not surprised at
11       the time of trial?
12  A.   Yes, sir.
13  Q.   Fair enough.  And you believe that's fair, do
14       you not?
15  A.   Sure.
16  Q.   Was there any evidence that the vacuum pump
17       overheated?
18  A.   I saw no indication of that.
19  Q.   Was there any evidence of excessive wear of the
20       vacuum pump?
21            MR. LANE:  Object to the form.
22  A.   Well, I thought there was a question about that
23       initially when I learned of the deposition of
```

Page 227

```
 1       the aluminum oxide inside the pump, but I now
 2       believe that it's more likely that was an
 3       ingestion rather than a wear issue.
 4  Q.   Well, did you have any facts that supported
 5       your opinion that there was excessive wear at
 6       the time you prepared your report?
 7  A.   Sure.  I had the report that there was aluminum
 8       oxide inside the pump.  We know the pump has
 9       aluminum components, which can produce aluminum
10       oxide when mixed with water, which we know
11       passes through the pump.  So it was natural to
12       believe that the aluminum oxide might have
13       resulted from a wear in the pump.
14  Q.   Okay.  Was there any fact that you had to
15       support your opinion that there was excessive
16       wear of the vacuum pump?
17  A.   Well, just what I've described and the chemical
18       analysis of the material.
19  Q.   I guess I'm puzzled by this opinion on page
20       eight of your report.
21  A.   Opinion eight did you say or page eight?
22  Q.   Page eight, sir.
23  A.   Where are you looking?
```

Page 228

```
 1  Q.   The last paragraph there, sir?
 2  A.   Well, that's really not the opinion, that's the
 3       analysis.
 4  Q.   I'm sorry.
 5  A.   Okay.  The last paragraph you say?
 6  Q.   The paragraph at the bottom of the page?
 7  A.   Okay.
 8  Q.   The third or forth sentence, "The quantity of
 9       aluminum oxide residue found inside the pump
10       indicates excessive wear of aluminum components
11       of the vacuum pump?
12  A.   Right.
13  Q.   And what components indicated that was
14       excessive wear?
15  A.   I did not know what might have been worn,
16       simply I knew that the pump had aluminum
17       components that could wear or could oxidize
18       when exposed to water vapor.
19  Q.   Did any of those parts oxidize?
20  A.   I don't know.  I didn't see the pump.
21  Q.   Well, did you have any -- or do you have any
22       facts that would support that sentence?
23  A.   What I just described.  But as I stated
```

Page 229

```
 1       earlier, after reviewing the quantity of
 2       material with better photographs that I have
 3       and more photographs, after looking at the
 4       quantity, I don't believe that was wear,
 5       because that much material, you would be able
 6       to determine where it was missing from.
 7  Q.   Okay.  What photographs have you obtained since
 8       October the 13th of 2006?
 9  A.   I think we looked at some enlarged photographs
10       from -- I forgot her name, the lady that took
11       photographs.  The photographs made by Heather
12       Robinson.  I received some --
13  Q.   How many photographs did you receive from
14       Heather Robinson after October the 13th of
15       2006?
16  A.   I received nine photographs.  However, in
17       looking at those photos, I don't believe those
18       are the ones that I used to change my
19       conclusion on that.
20  Q.   Okay.  Well, can you identify the photographs
21       that you've used to change your opinion?
22  A.   Sure.  We have marked those.  19, 18, 17, 16,
23       5, 13, 9, 10, 11, 12, those are the ones.
```

Page 230

1  Q.  Okay.  And who took these photographs, sir?
2  A.  I believe Mr. Lane took these photographs at
3      the joint inspection in Atlanta.
4  Q.  Okay.  And it's your testimony you did not have
5      these photographs, 11, 10, 9, 19, 18, 17, 16,
6      5, 13 and 12 at the time you prepared your
7      report?
8  A.  No, that's not my testimony.
9  Q.  Okay.  I'm sorry, I thought you used these
10     photographs after your report was prepared?
11 A.  I have re-evaluated them.  I prepared this
12     report under a pretty tight time frame,
13     deadline.  When I went back and further
14     evaluated these photos, I realized there's more
15     material here than I initially thought, so I
16     have since changed my mind about that.
17 Q.  Okay.  So that I'm clear then, you did have
18     these photographs --
19 A.  I did, yes.
20 Q.  -- at the time you prepared your report?
21 A.  I believe I did.  I think so.
22 Q.  Well, they're listed in your --
23 A.  Well, if they're listed, I did have them.

Page 231

1  Q.  Okay.  In that same paragraph, sir, you say
2      that "As the vacuum pump was neither used nor
3      disassembled since the injury to Mr. Riley, it
4      can be reasonably concluded that the vacuum
5      pump failed at the time of the incident"?
6  A.  Yes, sir.
7  Q.  And what did you mean by that, "at the time of
8      the incident"?
9  A.  What page is that, eight?
10 Q.  Yes, sir.
11 A.  What I mean by that is that the pump was not
12     used because it was not operable after the
13     incident, and it was not disassembled until the
14     time of the joint inspection where the aluminum
15     oxide was discovered.
16 Q.  All right, sir.  And my question to you is,
17     what did you mean when you said "it can be
18     reasonably concluded that the vacuum pump
19     failed at the time of the incident"?
20 A.  Well, because the material couldn't have gotten
21     in there after the incident since it wouldn't
22     operate.
23        MR. LANE:  I'm not sure that's what

Page 232

1      he's asking though.
2        MR. SHEEHAN:  I think we're on the same
3        wavelength.
4  A.  Okay.
5        MR. SHIRES:  I don't think so.
6        MR. LANE:  I don't think so either.
7           Take your time if you need to
8           review it.
9  A.  Sure.  Well, for the material to be ingested
10     into the pump, it has to be introduced through
11     the tubing.  And the vacuum pump is what moves
12     that material into the vacuum pump while it's
13     operating.  If it's not operating, it's not
14     moving material through the tubing.  It's
15     possible that you could introduce some water
16     into the pump if it's tilted over, for example,
17     but that quantity of material, in my opinion,
18     could not have just simply run in there from
19     being tilted over and thereafter have oxidized.
20 Q.  What amount of water could have gotten in there
21     if the machine were turned over?
22 A.  What amount could have gotten in there?
23 Q.  Yes.

Page 233

1  A.  I don't know.
2  Q.  What amount of water would it have taken to
3      form this aluminum oxide on the head of the
4      diaphragm of the pump?
5  A.  Well, I don't know.  It depends on the
6      concentration of the aluminum oxide in the
7      water.  It could have been a dilute mixture or
8      it could have been a soupy mixture.
9  Q.  I'm sorry, what do you mean?
10 A.  I mean by that that if it's a dilute mixture,
11     it would take a lot of water.
12 Q.  Dilute mixture of what, sir?
13 A.  Of water and aluminum oxide.
14 Q.  I don't understand.  Help me understand that.
15     A dilute mixture of --
16 A.  Water and aluminum oxide.
17 Q.  All right.  Well, what percentage of water?
18 A.  I don't know.  That's what I'm saying, if it's
19     a dilute mixture, then it takes more quantity
20     of the mixture to deposit a given amount inside
21     the pump.
22 Q.  Well, based upon your examination of these
23     photographs, what percentage was it or could it

Page 234

1    have been?
2  A.    There's no way to know that.
3  Q.    What percentage of aluminum oxide was ingested
4      by the vacuum pump when the machine -- if the
5      machine were turned over after the accident?
6  A.    I have no way of knowing that.
7  Q.    But it could have happened?
8  A.    It could have -- it could have happened if it
9      were present, yes.
10 Q.    If what were present?
11 A.    Aluminum oxide.
12 Q.    If aluminum oxide were present where?
13 A.    If aluminum oxide were present in the tubing or
14      in the water trap and the drill were turned
15      over, it could have bypassed the float ball and
16      entered into the tubing.  Only if you turned it
17      completely over would it flow completely into
18      the pump, I believe.  But if it entered into
19      the tubing and you operated the pump, it could
20      be ingested.  But we know that it didn't
21      operate, so it was not ingested by operation of
22      the pump.
23 Q.    Did you see any scoring or scarring of parts of

Page 235

1      the vacuum pump?
2  A.    In the photographs?
3  Q.    Did you see any?
4  A.    Well, I didn't see the pump; I saw photographs
5      of the pump.  Scoring or scarring of the
6      component part?  No, I don't recall having seen
7      any of that.
8  Q.    Did you see any excessive wear of the
9      crankshaft?
10 A.    Didn't see the crankshaft.
11 Q.    Piston rod?
12 A.    Didn't see the piston rod.
13 Q.    Piston?
14 A.    Didn't see the piston.
15 Q.    On page nine of your report, sir, the middle
16      paragraph there, the last sentence of the
17      second paragraph there in the middle of the
18      page, you state "The evidence indicates that
19      the gasket may have been damaged at the time of
20      the incident"?
21 A.    Yes.
22 Q.    And what do you mean by that?
23 A.    Well, it was observed after the incident that

Page 236

1      the gasket had some discontinuity in it at the
2      seam where it was joined together, the ends
3      were joined together.
4  Q.    And when did that occur, sir?
5  A.    Well, what I indicated there is that it may
6      have been damaged at the time of the incident
7      as a result of the incident or it could have
8      been preexisting to the incident.
9  Q.    Well, in your opinion, when did it occur?
10 A.    I don't know, but that really was not important
11      to my analysis.
12 Q.    Why not, sir?
13 A.    Because that's an event that could be
14      foreseeable, and had the machine been properly
15      designed, failure of the gasket which had
16      occurred at any time would not result in such a
17      dramatic injury.
18 Q.    I didn't understand what you said, sir.  Can
19      you put it in layman's terms?
20 A.    I thought I did.
21        MR. LANE:  I thought you did, too.  Go
22      ahead.
23 A.    Let me see if I can reword that.  The gasket

Page 237

1      can fail at any time during use, that's a
2      foreseeable event.
3  Q.    Do you mean while Mr. Riley was using it the
4      gasket could fail?
5  A.    While Mr. Riley or anybody was using it, it
6      could fail, right, resulting in loss of vacuum
7      in the base.  That's an event that should have
8      been anticipated and foreseen by the
9      manufacturer.  Then the manufacturer should
10      have provided a safeguard for that event that
11      would not result in a traumatic injury to the
12      operator.
13 Q.    And what safeguard should the manufacturer have
14      provided, sir?
15 A.    Well, I think the one that I included in my
16      report would be sufficient to do that.
17 Q.    Which is the --
18 A.    Which is the vacuum interlock.
19 Q.    In your opinion, was the gasket damaged to the
20      point that it did not function as intended at
21      the time of the accident --
22 A.    I don't know.
23 Q.    -- involving Mr. Riley?

Page 238

1  A.  I don't know.
2  Q.  And why not?
3        MR. LANE:  Object to the form.
4  A.  Because I don't -- I wasn't there and I don't
5        know if the gasket was damaged before the
6        incident or as a result of the incident.
7  Q.  How could the gasket have been damaged as a
8        result of the incident?
9  A.  Well, you had pretty violent movement of the
10       machine and you could have distorted the gasket
11       sufficient to not only impair the seam, but you
12       could have ripped it apart, it was such a
13       violent reaction.
14  Q.  What do you base that on?
15  A.  I base it on the fact that the machine was
16       hurling itself around on a concrete floor.
17  Q.  Based upon the testimony?
18  A.  Correct.  I was not there.
19  Q.  Is it more probable than not that the gasket
20       was intact up until the incident involving
21       Mr. Riley?
22  A.  I think the gasket was functional.  I think
23       that they were able to pull some vacuum on this

Page 239

1        drill at the time of the incident.  So I think
2        the gasket was functional.
3  Q.   So the gasket didn't have anything to do with
4        this accident involving Mr. Riley?
5        MR. LANE:  Object to the form.
6  A.  I don't think so.  I think it's more likely
7        that the vacuum pump problem was the cause of
8        the low vacuum.  Now, that's one of -- there
9        could be any number of issues that caused the
10       low vacuum.  In fact, the manufacturer, I
11       think, lists 12 different scenarios that can
12       cause a low vacuum situation.  But my analysis
13       concluded that most likely that the vacuum pump
14       problem with the foreign material was the cause
15       of the low vacuum.
16  Q.  Okay.  And can you show me those 12 scenarios?
17  A.  I believe I can.
18  Q.  Please, sir.
19  A.  Well, I think it's something we pulled out.
20       MR. LANE:  Are these the only other
21            three we've marked that have not
22            been copied?
23       MR. SHEEHAN:  I don't know.

Page 240

1        (Off-the-record discussion.)
2  A.  All right, sir.
3  Q.  What are you referring to, sir?
4  A.  Please refer to Exhibit 3, and this would be
5        page eight of the Operation and Maintenance
6        Manual from Gast for the Model DOA pump, among
7        others.  Page eight is a Troubleshooting Guide
8        that lists low vacuum with 12 causes listed for
9        that low vacuum.
10  Q.  And are there any other possible causes for the
11       vacuum pump to fail?
12  A.  No.  I think they included everything I could
13       think of other than some of the obvious.  I
14       don't think they said it may not be plugged up,
15       but, you know, I think as far as what could
16       happen to it, I think they listed it all.
17  Q.  Let's mark that then, sir, as Exhibit Number 58
18       to your deposition.
19  A.  All right.
20       (Exhibit 58 marked for identification.)
21  Q.  And I'm going to tab that, sir, so it will be
22       easily referred to as well.
23  A.  Okay.

Page 241

1  Q.  And was this a gradual loss of vacuum or was it
2        an immediate loss of vacuum?
3  A.  I have no way of knowing that.
4  Q.  Well, in your opinion, was it a gradual loss or
5        was it an instantaneous loss of vacuum?
6  A.  If I had to guess, and I have no, you know,
7        technical basis for this, it probably was more
8        of a gradual loss.  I think that probably this
9        pump was not able to generate very much vacuum
10       at the outset and it's likely that the vacuum
11       dropped during usage.  I don't want to
12       anticipate that it would have dropped
13       dramatically, quickly, because that's what
14       occurs when you lose contact of the gasket with
15       the concrete.  This vacuum dropped before that
16       point, enabling the relative movement of the
17       drill bit, the core drill bit in the hole,
18       which caused it to bind up.
19  Q.  Would that gradual loss of vacuum have been
20       noticeable to the operator?
21  A.  If he were watching the gauge closely, it may
22       have been noticeable.  He has actually two
23       gauges that are on the machine that are

Page 242

```
 1        important to the operation.  One is the ammeter
 2        which tells you how much force to put on the
 3        lever to advance the head; the other is the
 4        vacuum gauge.  Of those two, I would expect an
 5        operator operating the drill to pay much more
 6        attention to the ammeter, because once your
 7        vacuum is established, you have no reason to
 8        think it's going to drop unless there's some
 9        malfunction.
10   Q.   Over what period of time did the vacuum pump
11        gradually reduce?
12            MR. LANE:  Object to the form.
13   A.   Well, you know, I have no way of knowing that,
14        but I think that the vacuum was somewhat
15        functional when he started drilling the hole,
16        the first hole.  I think during that drilling
17        procedure the vacuum probably dropped to cause
18        this wobbling to occur and binding of the bit.
19   Q.   And what time period was that, sir?
20   A.   Within five minutes.
21   Q.   And what was the initial gauge reading when he
22        started the drilling of the first hole?
23   A.   I don't know.
```

Page 243

```
 1   Q.   What would you expect it to have been?
 2   A.   Something less than 20, I would anticipate,
 3        based on the condition of the pump as I saw it
 4        in the photographs.
 5   Q.   And what would that be, sir?
 6   A.   I don't know.  Less than 20.
 7   Q.   Well, I mean, but that's from one to 20, sir.
 8        What I'm asking you, in your opinion, what was
 9        the gauge reading when they began drilling the
10        first hole?
11   A.   I have nothing to base such an opinion on.
12   Q.   Okay.  Would it have been less than five?
13   A.   I doubt it, because at five it would not
14        provide the clamping force.  Above five it
15        would provide some clamping force.  So it's
16        likely that it was above five at the outset.
17   Q.   How much above five?
18   A.   I don't know.
19   Q.   Well, if I were an operator and I looked down
20        and I saw the gauge reading, what would have
21        been the gauge reading, say, at the beginning
22        of the second hole?
23            MR. LANE:  Object to the form.
```

Page 244

```
 1   A.   I have no way of knowing that.
 2   Q.   What time period passed from the beginning of
 3        the drilling of the second hole until the
 4        accident occurred?
 5   A.   I think it was in the range of five to ten
 6        minutes.  They had drilled a few inches into
 7        the concrete before it failed.
 8   Q.   Have you performed any test or made any
 9        calculations to determine the time period?
10   A.   No.  That depends on how quickly they were
11        advancing the drill bit in the concrete.
12   Q.   Why would that make any difference?
13            MR. LANE:  Object to the form.
14   A.   Well, I'm not sure how to answer that, frankly.
15   Q.   Did it make any difference that the drill bit
16        was going into the concrete?
17   A.   Yeah.
18   Q.   What difference did that make?
19   A.   If the drill bit were not going into the
20        concrete, it wouldn't have bound up.
21   Q.   If the drill bit were going into the concrete,
22        would it have made any difference?
23   A.   Well, the drill bit had to be in the concrete
```

Page 245

```
 1        for the drill bit to bind up on the concrete.
 2   Q.   Right.
 3   A.   So it was in the concrete.
 4   Q.   Did it make any difference the depth of the
 5        drill bit in the concrete?
 6   A.   It's more likely that binding will occur in a
 7        deep hole versus a shallow hole, but depending
 8        on the relative movement, it could occur in a
 9        shallow hole.
10   Q.   Okay.  What depth would the binding have begun
11        to have occurred?
12   A.   Well, it began at the time of the incident.
13   Q.   And what was the depth?
14   A.   I think it was described as about three inches.
15   Q.   Okay.  And that's your opinion, that that's
16        when it would have started binding, when the
17        drill bit was three inches deep into the slab?
18   A.   No.  That's my recollection of what I've read.
19   Q.   Well, what's your opinion as to the depth of
20        the drill bit at the time he began --
21            MR. LANE:  I have an objection to the
22            form of the previous question and
23            to this question.
```

Page 246

1 A.   Okay.  My opinion is that the drill bit started
2      binding at about the depth that the hole
3      terminated.
4 Q.   Okay.  And what was that, in your opinion?
5           MR. LANE:  Object to the form.
6 A.   I don't -- there's no basis for an opinion of
7      that.  I can only base it on the testimony that
8      I read.  And my recollection of that testimony
9      is it was about three inches.
10 Q.  Okay.  Have you made any calculations, done any
11     research to determine whether or not the depth
12     of the bit would have had any impact on this --
13 A.  On the likelihood of the event?
14 Q.  Yes, sir.
15 A.  Well, just my knowledge of engineering
16     principles tells me that the deeper the hole,
17     the more likely it is that it's going to have a
18     binding effect.
19 Q.  And what happens as that drill bit gets deeper
20     into the concrete?
21 A.  What happens?
22 Q.  Yes, sir.  To the base of the machine?
23 A.  You have more -- you have a larger moment arm

Page 247

1      of the force acting against the concrete.  You
2      have more contact area between the concrete
3      core drill and the bit and the concrete.
4 Q.   Did the base start to come up off of the
5      concrete, the back of the drill, as that hole
6      became deeper?
7           MR. LANE:  Object to the form.
8 A.   I don't believe so.
9 Q.   And why not?
10 A.  Well, had it come up at the back, it would have
11     lost -- it would have lost vacuum immediately.
12     And it's my opinion that it did not lose vacuum
13     until the bit bound up in the hole, which would
14     give you a torsional motion; that is rotation
15     around the spindle in that direction.  So you
16     would lose vacuum as a result of horizontal
17     movement rather than a tilting movement.
18 Q.  Did the -- so that I'm clear then, in your
19     opinion the depth of the drill bit at the time
20     of the accident had no significance to this
21     accident?
22          MR. LANE:  Object to the form.
23 A.  I didn't say that.

Page 248

1 Q.   Well, did it have any significance?
2 A.   What I said was that it's more likely that you
3      will have a binding effect with a deeper hole,
4      just based purely on the geometry.
5 Q.   As I understand it, you haven't made any
6      scientific analysis of that?
7 A.   I thought about it.
8 Q.   Okay.  Have you done any research or testing?
9 A.   No.
10 Q.  Do you intend to?
11 A.  No.
12 Q.  Why not?
13 A.  I don't think it's necessary.
14 Q.  If you do, will you let Mr. Lane know so we can
15     redepose you?
16 A.  Sure.
17 Q.  If the base is misaligned or tilted with the
18     slab, how much vacuum would be needed to
19     maintain the base so it did not rotate?
20 A.  If the base is misaligned or tilted?
21 Q.  Yes, sir.
22 A.  You will not be able to draw a vacuum.
23 Q.  Okay.

Page 249

1 A.   Let me qualify that last answer just a little
2      bit.  You can have -- you can have a small
3      amount of misalignment which can be
4      accommodated by the compression of the gasket,
5      but if your gasket loses contact, you can draw
6      no vacuum.
7 Q.   Okay.  What percentage?
8           MR. LANE:  Object to the form.
9 A.   Percentage of what?
10 Q.  Or degree?
11 A.  Degree?
12 Q.  Yes, sir.
13          MR. LANE:  What degree of what?
14          MR. SHEEHAN:  I think he knows what I'm
15          talking about.
16 A.  I don't know.  I've not done any analysis of
17     that.
18 Q.  And if you do, you're going to let Mr. Lane
19     know so we can examine you and not be surprised
20     at trial?
21 A.  Yes, sir.
22          MR. SHEEHAN:  Thank you, sir.  I
23          appreciate your time.

Page 250

1             CROSS-EXAMINATION
2 BY MR. SHIRES:
3 Q.    Mr. Davis, my name is Kevin Shires; I represent
4      Saint Gobain Abrasives.  I know we've been over
5      a lot, and I'm certainly not going to cover
6      anything again, okay, but there are some things
7      I just want to clarify in a more simple manner
8      for my understanding.
9        You did your report on October 13th of
10      2006, correct?
11 A.    Correct.
12 Q.    Okay.  We've got Exhibit 36, this handwritten
13      stuff?
14 A.    We've got what?
15 Q.    Exhibit 36.
16 A.    Oh, Exhibit 36.  I just didn't understand what
17      you said.
18 Q.    This handwritten stuff?
19 A.    Yes.
20 Q.    Was that done before or after this report?
21 A.    Before.
22 Q.    Okay.  So if I understand correctly then, the
23      report should contain these opinions in a typed

Page 251

1      form, right?
2        MR. LANE:  Object to the form.
3 A.    I think I told you that I did not include the
4      last one, because I subsequently discovered
5      that it was not really applicable.
6 Q.    Okay.  Since October 13th, in a nutshell, what,
7      if any, has -- have your opinions changed from
8      this report at all, in what way, in a nutshell?
9 A.    My basic opinion has not changed.
10 Q.    Okay.  And in this report -- and do you have it
11      in front of you, sir?
12 A.    I've got it.
13 Q.    Turning to page 13, you set out your opinions,
14      and there are six opinions, correct?
15 A.    There are, yes.
16 Q.    Okay.  Are these all of your opinions that you
17      now hold in this case at this present time
18      subject to the caveat, new and discovered
19      information that may change them?
20 A.    Yes.
21 Q.    Okay.  Opinion number one, tell me if I state
22      this -- read with me and tell me if I state it
23      incorrectly.  It says "Saint Gobain Abrasives

Page 252

1      and United Rentals (North America), Inc.
2      placed into the market the incident Clipper
3      DM500 core drill with an uncontrolled hazard.
4      The hazard is the potential for uncontrolled
5      rotation of the equipment that may strike and
6      seriously injure the operator or bystander."
7      Did I read that correctly?
8 A.    You did.
9 Q.    Okay.  And the basis is a "Review of owners
10      manual"?
11 A.    Yes.
12 Q.    Which owners manual is that?
13 A.    The one that was provided by United Rentals.
14 Q.    And is that -- let me look in the appendix.
15      You've attached an appendix to your report,
16      correct?
17 A.    I did.
18 Q.    Is that Appendix I, the Clipper DM500 owners
19      manual?
20 A.    Yes.
21 Q.    Okay.  What exactly is this uncontrolled
22      hazard, in a nutshell, for me in layman's
23      terms?

Page 253

1 A.    The hazard, as I say, is the potential for the
2      base of the machine to rotate and strike a
3      person in the vicinity of that machine while
4      it's operating.
5 Q.    Okay.  And what is your understanding of what
6      Saint Gobain Abrasives, what is your
7      understanding of what role they played in terms
8      of, quote, placing this machine into the
9      market?
10 A.    I believe the incident machine has the Norton
11      name on it, which is a Saint Gobain company or
12      successor or predecessor or something like
13      that.
14 Q.    Okay.  And then with the Norton name, what is
15      your understanding of what role Norton played
16      in placing this into the market?
17 A.    Norton owned the machine at some point in time.
18 Q.    Okay.  You're understanding they owned the
19      machine?
20 A.    Sure.
21 Q.    Okay.  Do you understand whether or not -- do
22      you know whether or not they manufactured the
23      machine?

Page 254

1  A.  My information is -- I don't have any -- I
2      haven't substantiated it, but there was a
3      third-party that was involved in the
4      manufacture, probably manufactured under
5      contract to Diamond something or other.
6  Q.  Okay.  Do you know who manufactured and
7      designed this actual core drill?
8  A.  I do not know who did the initial design or the
9      manufacture for that matter.  Although there
10     was some testimony that would indicate that
11     Diamond played a role in that.
12 Q.  Okay.  Is your opinion in opinion number one
13     that Saint Gobain Abrasives placed it in the
14     stream of -- into the market and into the
15     stream of commerce based upon your belief that
16     they were the manufacturer or designer of this
17     machine?
18       MR. LANE:  Object to the form.
19 A.  Well, yes, because I believe that if you
20     contract with a person to manufacture a machine
21     for you, you are the manufacturer in essence.
22     You caused it to be manufactured.
23 Q.  Okay.  Opinion number two is "Saint Gobain

Page 255

1      Abrasives, Inc. failed to insure that a
2      reasonably foreseeable operator of the incident
3      equipment is adequately warned of the hazard of
4      uncontrolled rotation of the machine."  Did I
5      read that correctly?
6  A.  Yes, you did.
7  Q.  Okay.  And again --
8        MR. SHEEHAN:  Could you read a little
9          slower?
10       MR. SHIRES:  I'm sorry, Winston.  I'm
11         just reading opinion number two.
12       MR. SHEEHAN:  I know, but if you will
13         just read it a little slower it
14         will just help the court reporter.
15       MR. SHIRES:  Sorry, Rick.
16 Q.  I stated that correctly?
17 A.  Yes, you did.
18 Q.  Okay.  And then the basis is three things,
19     "Review of warnings on the machine and in the
20     manual"?
21 A.  Yes.
22 Q.  "Failure to provide a readily accessible
23     storage compartment for the manual on the

Page 256

1      machine"?
2  A.  Yes.
3  Q.  And then comparison of the warnings for the
4      owners manual for this versus the Milwaukee
5      Core Drill Operators Manual in Appendix II,
6      correct?
7  A.  Yes.
8  Q.  So did you design a storage -- in your work did
9      you design a storage place on this exemplar
10     that we have here today?
11 A.  No.  No, I did not.
12 Q.  Do you own any power tools or equipment around
13     your home, sir?
14 A.  Sure I do.
15 Q.  Do you have a lawn mower?
16 A.  Sure I do.  I have two lawn mowers actually.
17 Q.  You do.  Does either of them have a storage
18     compartment for the owners manual for your lawn
19     mower?
20 A.  No, but I, as the consumer, have such a manual.
21     I, as the consumer and user, in the case where
22     you have a piece of rental equipment, the
23     manual, if it's important to the safety of the

Page 257

1      operator, should be provided with the machine
2      so that it's accessible to the user.
3  Q.  Okay.  Do you know whether or not United
4      Rentals had a copy of this manual?
5  A.  The evidence would indicate that they do.
6  Q.  Okay.  Now, opinion three is directed at United
7      Rentals, correct?
8  A.  It is.
9  Q.  Is there anything in that opinion that is
10     directed at Saint Gobain Abrasives?
11 A.  No.
12 Q.  Okay.  Opinion four is that "Saint Gobain
13     Abrasives failed to provide warnings on the
14     machine or in the owners manual that adequately
15     describes the hazard contained in the machine."
16     Again, is this the hazard that you previously
17     discussed, the uncontrolled hazard?
18 A.  It is.  And after I looked over my report last
19     night, I realized that that opinion is really
20     very similar to opinion two and those probably
21     could be combined.
22 Q.  So you would consider -- I mean basically it's
23     redundant, that could be combined?

Page 258

1  A.  I think so, yes.
2  Q.  Okay.  And again that's review of the owners
3       manual?
4  A.  Yes.
5  Q.  Okay.  And then opinion five is directed again
6       to United Rentals; is that correct?
7  A.  Correct.
8  Q.  Is there anything contained within that opinion
9       or the basis of that opinion that is directed
10      to Saint Gobain Abrasives?
11 A.  No.
12 Q.  Okay.  And then opinion six, "The uncontrolled
13      hazard in the incident core drill constitutes a
14      defect in the machine that was a cause of the
15      injury to Mr. Riley."  Did I read that
16      correctly?
17 A.  You did.
18 Q.  Okay.  And then it says, as the basis for this
19      opinion, "Refer to the engineering analysis
20      section of this report."  Did I read that
21      correctly?
22 A.  You did.
23 Q.  Okay.  And what do you mean by that

Page 259

1       specifically?
2  A.  What I mean by that is that there's an
3       uncontrolled hazard in this machine that could
4       have been safeguarded and should have been
5       identified and dealt with in the design process
6       for this drill press.
7  Q.  Okay.
8  A.  That was not done.  Consequently it's a machine
9       with a defect because it's both technologically
10      and economically feasible to provide such a
11      safeguard without impairing the function of the
12      machine.
13 Q.  Okay.  And do you consider this a design defect
14      or a manufacturing defect?
15 A.  Design defect.
16 Q.  Okay.  Do you know who designed the overall
17      makeup of the DM500 core drill?
18 A.  I do not.
19 Q.  Okay.  Do you believe that Saint Gobain
20      designed it?
21 A.  I don't know.
22 Q.  Okay.  But to clarify, that opinion that there
23      is an uncontrolled hazard is based on your

Page 260

1       opinion that that is a design defect with this
2       machine, correct?
3  A.  Correct.
4  Q.  Okay.  I think earlier you testified that the
5       vacuum -- and I think you've used some figures
6       of degrees of Mercury and foot pounds per
7       pressure, correct?
8  A.  Yes, I have.
9  Q.  In terms of the vacuum, correct?
10 A.  Yes.
11 Q.  And then the foot pounds per pressure, am I
12      stating that correctly?
13 A.  Foot pounds is really a moment, not a pressure.
14 Q.  Okay.  And that is, I think, to describe the
15      amount of torque created by the actual motor on
16      the core drill?
17 A.  In part, yes.
18 Q.  Okay.  Now, if I understood you correctly, you
19      stated that if the vacuum had actually been
20      functioning properly, --
21 A.  Yes.
22 Q.  -- that the core drill would not have bound up
23      and spun upon its base, correct?

Page 261

1  A.  Not quite.  It could have bound up, but it
2       would not have spun on its base.
3  Q.  Okay.  Because I think you testified earlier
4       that the clutch in this particular instance on
5       the motor functioned properly?
6  A.  The evidence would indicate that it did,
7       because it was -- it was set to slip at a
8       moment which was less than -- less than the
9       ability of the vacuum base to hold it in place.
10 Q.  Okay.  And I'm going to come over, this helps
11      me understand, I'm not trying to --
12 A.  Sure.
13 Q.  This is the vacuum down here at the base of the
14      machine, correct?  Right here that I'm pointing
15      to?
16 A.  That's the vacuum pump you're pointing to, yes.
17 Q.  The vacuum pump?
18 A.  Yes.
19 Q.  Okay.  And if I understand your testimony, in
20      this particular incident, if the vacuum had
21      functioned properly and had an adequate seal,
22      this incident would never have occurred; it
23      would not have bound up and spun around its

Page 262

1    base, correct?
2 A.   It would have bound up, but it -- it could have
3      bound up.
4 Q.   Okay.
5 A.   But I think it's more likely that it would not
6      have bound up in this case, because I believe
7      that the low vacuum that resulted from this
8      pump problem allowed the wobble to occur which
9      caused the binding.
10 Q.   Okay. And I understand that's your opinion. I
11      think we've gone over, --
12 A.   Right.
13 Q.   -- in considerable detail, that your opinion is
14      that the vacuum failed to hold an adequate
15      vacuum and released off the surface basically
16      spinning around the axis. I understand that.
17 A.   Correct. Yes.
18 Q.   What I want to establish is that we would never
19      have gotten to the point of this core drill
20      spinning around on its axis had the vacuum
21      maintained a sufficient seal of the degrees of
22      Mercury that you have stated?
23 A.   Quite right.

Page 263

1 Q.   Okay. So then -- what do you call this switch?
2      And this is a little red push down switch that
3      I've got my hand on. What do you call that?
4 A.   Well, it's commonly referred to as a palm
5      button, but it's a continuous pressure switch.
6      It requires you to continuously hold it down
7      for the switch to be closed.
8           MR. LANE: For the power to the motor.
9 Q.   And if the operator's hand comes off this
10      button, the machine stops?
11 A.   The drill motor stops.
12 Q.   Well, would it be fair to also say, based upon
13      your testimony, that if the vacuum had held the
14      base down, then this design that, I guess,
15      Mr. Shaver created?
16 A.   Correct.
17 Q.   Okay. It would have never come into play,
18      because the base would have never been spinning
19      around, correct?
20 A.   Correct.
21 Q.   Okay. Then maybe this is a redundant
22      protection, would that be fair to say?
23 A.   Yeah, I think there's some redundancy between

Page 264

1      those two, because I think both are protective
2      for the same hazard.
3 Q.   Okay. And, again, so not to belabor the point,
4      and I think you understand the point I'm trying
5      to at least get in my head, is if the vacuum
6      worked properly, we would never get to this
7      operator button here to turn off the unit,
8      because it would have never bound up and spun
9      on its base, correct?
10 A.   Correct. But I also hold the opinion that that
11      button should be a continuous pressure type
12      button in any event that provides a redundancy
13      which is cheap, easy, simple, does not impair
14      the function, and should have been provided.
15 Q.   Okay. And that's based upon your examination
16      of the documents in this case and then a core
17      drill and what not, correct?
18 A.   Yes.
19 Q.   Okay. I think you were asked earlier whether
20      or not you have ever worked on any similar
21      cases or types of machines. Have you ever
22      actually worked with a core drill machine in
23      any case?

Page 265

1 A.   On a case involving a core drill machine, is
2      that what you're asking me?
3 Q.   Yes.
4 A.   No.
5 Q.   Have you ever even seen a core drill machine
6      prior to your involvement in this case?
7 A.   I believe I have. I'm certainly aware and
8      familiar with them. In fact, I just worked on
9      a case in Louisiana a month or two ago where we
10      had trouble trying to secure a core drill for a
11      job that we were doing there. So certainly I'm
12      aware of the presence of core drills.
13 Q.   Okay. But you've never -- have you ever worked
14      in any capacity in your background,
15      educationally, training, employment or
16      otherwise, where you were responsible for the
17      design of a core drill?
18 A.   No.
19 Q.   Okay. So would it be fair to say that until
20      you were employed by Mr. Lane and his firm,
21      you've never had any involvement with the safe
22      design of a core drill or the safe operation of
23      a core drill?

Page 266

1  A.   A core drill, not specifically, but, you know,
2      it's a basic machine which certainly I have the
3      capability of designing safeguards for.
4  Q.   Okay.  You read Mr. Walters' deposition,
5      correct?
6  A.   I did.
7  Q.   Do you recall Mr. Walters testifying that he
8      forgot to tell Mr. Riley about the leveling
9      bolts on the core drill?
10 A.   I don't -- I don't recall that specifically,
11     although Mr. Walters indicated that he set the
12     machine up for the second hole.
13 Q.   Okay.
14 A.   So that would be irrelevant.
15 Q.   Okay.  Now, also reading Mr. Walters'
16     deposition, do you recall him testifying that
17     while they were drilling the first hole
18     together that the drill swung about its base
19     several times?
20 A.   I don't know that he described it as swung
21     around.  I think that -- I think that they -- I
22     think that it broke loose, but Mr. Riley was
23     able to turn the switch off pretty quickly and

Page 267

1      I don't recall the testimony indicating how
2      many times it -- how far it moved.
3  Q.   Okay.
4  A.   But certainly if he had not been able to turn
5      the switch off quickly, it could have rotated a
6      number of times.
7  Q.   Okay.
8  A.   As it did in the second case.
9  Q.   What does that tell you about the core drill at
10     that time, if anything, in terms of its
11     performance?
12 A.   It probably was not performing the vacuum hold
13     down function very well.
14 Q.   Okay.  I think you've, in your report, used the
15     term "reasonably foreseeable operator,"
16     correct?
17 A.   Yes.
18 Q.   Okay.  Would a reasonably foreseeable operator
19     continue to use a core drill after it had
20     released like that?
21     MR. LANE:  Object to the form.
22 A.   Probably so.  I think he was of the opinion
23     that if you didn't advance the drill bit so

Page 268

1      vigorously that it would not have occurred.
2  Q.   I recall reading in your report on page nine
3      that you talk about something called the
4      "safety hierarchy," correct?
5  A.   Yes.
6  Q.   And if I understand that concept correctly,
7      it's you should design products in a safe
8      manner basically?  It's the design first that
9      should be the consideration of a manufacturer,
10     correct?
11 A.   That's correct.
12 Q.   Okay.  Now, does a manufacturer have any
13     corresponding expectations of what you call the
14     reasonably foreseeable operator in terms of the
15     operation of products that are manufactured?
16 A.   Does he have any expectations of that operator?
17 Q.   Yes.
18 A.   In other words, should he take responsibility
19     for his own protection, is that what you're
20     asking me?
21 Q.   Yes.
22 A.   I think that the manufacturer should make every
23     effort to design the machine so that an

Page 269

1      incompetent operator will not be injured if in
2      fact he were to operate the machine.
3  Q.   Should a manufacturer be able to assume that
4      the operator is not on drugs?
5      MR. LANE:  Object to the form.
6  A.   No.  I think even a person on drugs deserves
7      protection from injury if it's feasible to put
8      a machine in the marketplace that will not
9      cause injury.
10 Q.   Okay.  I guess then does a manufacturer have
11     any expectations of a reasonably foreseeable
12     operator?
13 A.   I think when you do a hazardous analysis for a
14     machine you should assume the worst.  You
15     should assume that the operator is going to
16     make errors and you should design your machine,
17     to the extent possible, so that it would not
18     result in injury even if those errors occurred.
19 Q.   Okay.  So is that a no, you should have no
20     expectations?
21     MR. LANE:  Object to the form.
22 A.   In that kind of analysis, yes, that would be a
23     worst case scenario type analysis.

Page 270

1  Q.  Okay.  I think you testified if the base is
2      misaligned or tilted you will not be able to
3      draw a vacuum, correct?
4          MR. LANE:  Object to the form.
5  Q.  To an extent, I mean it's a degree thing?
6  A.  Within limits, yeah.  You can have some
7      misalignment within the limits of the
8      compression of the gasket.
9  Q.  Okay.  On page ten of your report it says "The
10     manufacturer and the rental company should have
11     reasonably expected that a worker such as
12     Mr. Riley would be a user of the incident core
13     drill."  Did I state that correctly?
14 A.  Yes, you did.
15 Q.  Okay.  I want you to assume for me that Saint
16     Gobain Abrasives was not the manufacturer of
17     the core drill, does that sentence in your mind
18     still apply to Saint Gobain Abrasives?
19         MR. LANE:  I'm going to object to the
20             form.  It calls for legal
21             conclusions about who the
22             manufacturer is under the law of
23             Alabama.

Page 271

1  A.  You know, from my engineering perspective, if a
2      company contracts to have a machine designed
3      and produced for them, they're the owner of
4      that machine.  They have both bought the
5      design.
6  Q.  Okay.  Further down in that paragraph it says
7      "The manufacturer of the core drill did not
8      provide a storage compartment on the machine to
9      insure that the manual could be readily
10     accessible to the operator."  The same question
11     as it applies to Saint Gobain under the
12     assumption that they were not the actual
13     manufacturer or designer of this machine?
14         MR. LANE:  The same objection and it
15             calls for a legal conclusion
16             concerning who the manufacturer
17             is.
18 A.  And I would have the same answer that I just
19     provided for the previous question.
20 Q.  I think you testified that you believe that the
21     training of Mr. Riley was adequate?
22 A.  Yes.
23 Q.  And that was the short on-the-job training --

Page 272

1  A.  Yes.
2  Q.  -- that he received from Mr. Walters?
3  A.  Correct.
4  Q.  Okay.  Did you read Ken Tew's deposition?
5  A.  I'll have to look and see.  I read so many that
6      I can't recall all of these names.  I'm looking
7      for this one that has the marked up list on
8      that side of the page, do you recall where that
9      is?
10         MR. SHEEHAN:  I believe this is it in
11             Volume I.
12 A.  Oh, thank you very much.  Mr. Who?
13 Q.  Ken Tew's deposition.
14 A.  I don't believe I've seen that deposition.
15 Q.  Okay.  Have you read the deposition of
16     Mr. James Mason?
17 A.  I have.
18 Q.  Okay.  Did you read the portion contained in
19     his deposition wherein he stated that he
20     believed that Mr. Riley was not adequately
21     trained to operate the core drill?
22 A.  I did, yes.
23 Q.  Okay.  And I want you to assume for me that

Page 273

1      Mr. Tew testified as to the same.
2  A.  Okay.
3  Q.  Does that affect your opinion at all in terms
4      of the adequacy of the training that Mr. Riley
5      received in this case?
6          MR. LANE:  And I object to the form.
7              Go ahead.
8  A.  Not unless they have some basis for that
9      opinion that would change my opinion, no.
10         MR. SHIRES:  Okay.  Mr. Davis, thank
11             you very much for your time this
12             afternoon.
13 A.  Thank you, sir.
14         MR. LANE:  I have a couple of questions
15             to ask you.
16
17         CROSS-EXAMINATION
18 BY MR. LANE:
19 Q.  Mr. Davis, you were asked about, I believe,
20     page eight of the Gast manual that was made a
21     part of your report which deals with
22     troubleshooting for the vacuum pump itself,
23     correct?

Page 274

1  A.  Correct.
2  Q.  And there were 12 ways in which the vacuum pump
3      itself could fail, correct?
4  A.  Correct.
5  Q.  I want to ask about a couple of other things.
6      First of all, as far as those problems that
7      were listed on page eight of that Gast manual,
8      does the alternative feasible design that you
9      have proposed and that has been incorporated
10     into the exemplar that we've been looking at
11     here today, does it address all of the
12     potential failures that were listed on page
13     eight of that Gast manual?
14 A.  It does.  If you had a failure resulting in a
15     low vacuum pressure, the alternate design would
16     protect the operator from that event.
17 Q.  Okay.  You were also asked about the pressure
18     switch on the unit.  This design that -- the
19     design that you drew up as a part of your
20     opinions and report, did it incorporate the
21     ability to override the vacuum system if some
22     other securing method was available or happens
23     to be utilized?

Page 275

1  A.  Quite right.  Good point.
2  Q.  Okay.  And in the event that another method,
3      such as the ceiling jack, is used as a means of
4      securing it or the anchor bolt is used to
5      secure it, would that pressure switch then
6      serve additional safety in the event -- not
7      just the redundancy for the vacuum system, but
8      additional safety in the event that one of
9      those securing methods failed?
10 A.  That would then be the primary safeguard for
11     the operator.  And I should have thought of
12     that, it's just getting late in the day and I
13     didn't think about it.
14 Q.  Okay.  So that would provide additional safety
15     as well; it's not just redundant, it becomes
16     the primary safety feature, correct?
17 A.  Correct, for another method besides the vacuum
18     system.
19 Q.  Okay.  Now, the vacuum gauge that is on this
20     Gast pump, did you feel that that vacuum gauge
21     should have clearly delineated ranges of safe
22     operation?
23 A.  I sure did, yes.

Page 276

1  Q.  Did the Gast vacuum gauge that was on
2      Mr. Riley's unit have such delineation?
3  A.  It did not.  No, it did not.
4  Q.  Okay.  Now, we talked about the list of
5      potential failures that you might see with
6      regards to the vacuum pump itself on page
7      eight?
8  A.  Yes.
9  Q.  I want to ask you about a couple of other means
10     of potential failure in the event that the
11     vacuum securing method is utilized as
12     recommended in the operators manual, correct?
13 A.  Okay.
14 Q.  Now, what about a porous floor, will that
15     affect the ability of the vacuum to draw a
16     complete vacuum?
17 A.  It sure will, yes.
18 Q.  All right.  And is that something that an
19     operator may or may not be aware of during the
20     operation of the unit?  In other words, as far
21     as whether or not it's pulling a complete
22     vacuum or not?
23 A.  Well, he could observe the pump running and may

Page 277

1      assume that it's vacuumed down, but --
2  Q.  When in fact it may not be?
3  A.  When in fact it may not.
4  Q.  All right.  Especially if there's no
5      delineation on the gauge about what the proper
6      vacuum pressure would be, correct?
7  A.  Quite right.  He has no way of knowing that.
8  Q.  Now, that's not a problem with the machine
9      necessarily, that's a problem with the
10     substance you're working on, correct, the
11     substrate?
12 A.  Correct.
13 Q.  And would the alternative feasible designs that
14     you have designed and that Mr. Shaver has also
15     implemented in the alternative feasible design
16     here, would those address that potential cause
17     of a loss of adequate vacuum pressure?
18 A.  Absolutely.
19 Q.  Okay.  What about cracks in the floor, would
20     that also affect the ability of the machine to
21     draw maximum vacuum pressure?
22 A.  It would.
23 Q.  Would the alternative feasible design that has

Page 278

1    been proposed by you and implemented by
2    Mr. Shaver address that potential cause of a
3    loss of vacuum?
4  A.   It sure would.
5  Q.   Okay.  What about the effect -- we talked about
6    cracks in the floor or any kind of other means
7    that water can get up under this base.  When
8    water gets up under this base, where is that
9    water going to go as it accumulates during the
10    vacuum process?
11  A.   Well, a good bit of it is going to be pulled
12    into the water trap of the vacuum system.
13  Q.   All right.  And if that trap fills up, what
14    happens as the trap fills up?
15  A.   It's going to -- well, if it fills up --
16  Q.   During the operation?
17  A.   -- during the operation and presses the ball
18    against the seat and the ball seats properly,
19    it's going to shut the vacuum off.
20  Q.   And you're going to lose vacuum pressure,
21    correct?
22  A.   You are.
23  Q.   And the operator may not be aware of that

Page 279

1    during the operation, correct?
2  A.   He may not notice it, that's correct.
3  Q.   And does the alternative feasible design that
4    you have proposed, and that has been
5    implemented in our exemplar here by Mr. Shaver,
6    address that potential failure?
7  A.   It does.
8  Q.   It does.  And it would prevent -- in the event
9    that vacuum pressure is lost, it shuts power
10    off to the drill which is actually causing the
11    force that could spin the drill around,
12    correct?
13  A.   Correct.
14  Q.   All right.  Now, you were asked -- since we're
15    talking about the water trap there, you've been
16    asked a lot of questions about the source of
17    the aluminum oxide that was observed in the
18    inspection, correct?
19  A.   Yes.
20  Q.   Did you see anywhere in the inspection notes
21    that there was a substantial amount of aluminum
22    oxide found in that trap that contained water
23    during the inspection?

Page 280

1  A.   Are you talking about the inspection in
2    Atlanta?
3  Q.   Yes.
4  A.   The joint inspection?
5  Q.   Yes.
6  A.   No.  As a matter of fact, I saw no indication
7    that there was any in that trap.
8  Q.   Okay.  Assuming there was no aluminum oxide
9    found in that trap, what would that tell you
10    about most likely when the aluminum oxide that
11    was discovered in the vacuum pump itself found
12    its way into the pump?  Would it have been
13    sometime before this use that occurred at
14    Flavor House?
15  A.   Yes, it would.
16  Q.   Okay.  Because it would have to go through that
17    trap in order to get through there, wouldn't
18    it?
19  A.   Yes.
20  Q.   All right.  And if the trap was emptied out
21    sometime before that, as it should be during
22    the inspection, --
23  A.   Correct.

Page 281

1  Q.   -- you would expect to see aluminum oxide in
2    the trap if it came from the use at Flavor
3    House, correct?
4  A.   Yes.
5  Q.   Okay.  Now, that water trap that we talked
6    about that's got the little ball in there that
7    floats up and down, that only protects from
8    material getting up in the pump during the
9    actual operation of the pump, correct?
10  A.   Yes.
11  Q.   Okay.  Without that pressure sucking that ball
12    up in there, it really won't seal off that
13    potential source of contamination, correct?
14  A.   Yeah, the floating of the ball alone would
15    probably not seat it very well.
16  Q.   Okay.  So in the event there's material in that
17    cup and the unit is turned over sideways
18    shipping it back and forth from the rental
19    company, that could result in some movement of
20    material into the pump itself?
21  A.   Sure, it could.
22  Q.   Okay.  Do you think that's a good reason for
23    there to be a thorough inspection of the

Page 282

1    filters and the inside of the pump after each
2    rental?
3  A.   And a purge, yes.
4  Q.   And a purge?
5  A.   Yes.
6  Q.   Yes, exactly.  Does it make any difference --
7    considering the defect that you've identified
8    in your report, does it make any difference why
9    the vacuum actually failed in this case?  In
10    other words, as far as a fix for this problem,
11    does it make any difference why the vacuum
12    failed?
13  A.   No, it does not.  I think you could -- should
14    have anticipated failure in the design phase
15    and done something to protect the operator from
16    that potential.
17       MR. LANE:  That's all I have.
18
19           REDIRECT EXAMINATION
20  BY MR. SHEEHAN:
21  Q.   And you have now reviewed the cases that you've
22    testified concerning?
23  A.   Yes, I looked at that list.

Page 283

1  Q.   And did any of those cases -- or have you ever
2    testified on behalf of a rental equipment
3    company?
4  A.   I don't believe I looked at it with that in
5    mind when I looked at it.  So let me refer to
6    it again.
7       (Off-the-record discussion.)
8  A.   The answer to your question, Mr. Sheehan, is
9    that, yes, there is one case that I have
10    testified in involving a rental company.
11  Q.   And what was that, sir?
12  A.   Michael T. Mabry versus Bohola Enterprise,
13    Inc., doing business as American Rental
14    Centers.
15  Q.   And where was that, sir?
16  A.   Spartanburg County, South Carolina.
17  Q.   And who was the -- who were you testifying for,
18    sir?
19  A.   The rental center.
20  Q.   Okay.  And who was representing the rental
21    center in that case?
22  A.   I don't recall.  I don't have that information
23    here.

Page 284

1  Q.   Okay.  Now, I believe you provided Mr. Lane
2    with a sheet showing the representatives and
3    contact persons?
4  A.   I don't know that I did.
5       MR. SHEEHAN:  The sheet that I gave to
6         you on --
7       MR. LANE:  The highlighted one?
8       MR. SHEEHAN:  Yes, sir.
9       MR. LANE:  Yeah.  Let me see what
10         Tessie did with it.
11  A.   All right.
12       MR. SHEEHAN:  I believe that came from
13         Mr. Davis' office.
14       (Off-the-record discussion.)
15  BY MR. SHEEHAN:
16  Q.   Sir, let me mark as Exhibit Number 59 a
17    document that's been provided to me by
18    Mr. Lane?
19  A.   Yes.
20       (Exhibit 59 marked for identification.)
21  Q.   And does that case that you're referring to in
22    Spartanburg, South Carolina appear on the
23    document provided to me by Mr. Lane?

Page 285

1  A.   Is this a continuation from here?
2       MR. LANE:  Yes.
3  A.   Okay.  These are the ones that we had
4    depositions for, I suppose.  I don't think that
5    that one is listed here, because -- I don't
6    know why.  I'm not sure why it's not listed,
7    but it's not.
8  Q.   Do you mean you've got cases that you didn't
9    report to the Federal Court?
10       MR. LANE:  I object to the form.  This
11         is a list of cases that he said
12         that he has deposition testimony
13         or some form of testimony
14         available to copy, which is what
15         you asked for.
16       MR. SHEEHAN:  Okay.  Exactly, I asked
17         for it and that's why I'm curious
18         why that --
19       MR. LANE:  It doesn't mean every case
20         he's listed that he's got copies
21         of the depositions.
22  Q.   Well, can you explain the difference in what
23    you presented to the Federal Court and Exhibit

Page 286

1      Number 59?
2  A.  Sure.
3  Q.  Please.
4  A.  This is a list of --
5  Q.  This being?
6  A.  This being Exhibit 59 is a list of cases that
7      we provided for which we can provide you
8      depositions.  This list is a list of all --
9  Q.  Which list are we talking about now so that the
10     record is clear?
11  A.  Sure.  A list of my trials and depositions for
12     the last four years contained in Exhibit 3
13     contains all of the cases during the last four
14     years that I have been either deposed or gone
15     to trial for.  I don't know why we were unable
16     to pull the deposition in this case, but I can
17     investigate that a little further and see if I
18     can determine that.  I just don't know as I
19     speak to you today.
20  Q.  Okay.  You were asked to bring with you
21     reference to depositions and testimony
22     concerning five years in paragraph seven?
23     MR. LANE:  Well, we will give you what

Page 287

1      the Federal law requires.
2  A.  Yes, I realize that.
3  Q.  Have you complied with that request?
4  A.  No.  I brought four years of listing as we
5      ordinarily keep as a matter of record.
6  Q.  Well, can you provide --
7      MR. LANE:  I believe that's what the
8          Federal law requires and that's
9          the extent we're going to go to
10         it.  I don't believe it requires
11         five years.
12     MR. SHEEHAN:  I don't believe there was
13         any objection to producing the
14         documents requested.
15     MR. LANE:  We will object to it right
16         now then, Winston.
17  A.  Well, we made some telephone calls about that
18     and I'm not sure what all the final result was.
19  Q.  You talked to Mr. Lane and he told you not to
20     bring a list?
21  A.  No, no, no.
22     MR. LANE:  I didn't even notice that,
23         but I will object on the record

Page 288

1      right now to anything beyond what
2      the Federal law requires --
3      Federal Rules of Civil Procedure
4      require.
5  Q.  So you are refusing to produce the information
6      that was requested in paragraph seven?
7      MR. LANE:  We are producing -- to the
8          extent that it comports with
9          complies with the Federal Rules of
10         Civil Procedure, we produced that
11         is my understanding; is that not
12         correct?
13  A.  You know, it's feasible to provide five years
14     and I don't really object to that.  It will
15     take some work, but it can be done if that's
16     what you desire.
17  Q.  Well, sir, that was what was requested.
18  A.  If you're willing to pay for it.
19  Q.  Well, sir, you were requested to bring to this
20     deposition the items listed in paragraph seven.
21     Is it my understanding you were told not to do
22     what was requested in your deposition notice?
23     MR. LANE:  He was not instructed not to

Page 289

1      do that.
2  A.  No.
3  Q.  Don't you feel that you have an obligation to
4      produce the documents that were requested?
5  A.  Sure.
6  Q.  Okay.
7  A.  Sure.
8  Q.  And can you provide us with a copy of the
9      deposition taken in this rental case?
10  A.  I can do that if I can lay my hands on it, yes,
11     sir.  And I should be able to.
12  Q.  Okay.  When could you get that to us?
13     MR. LANE:  My objection stands on it.
14         He can do whatever he wants to,
15         but my objection stands and I
16         would probably recommend that he
17         not do that if I was asked, but
18         that's because of my objection.
19  A.  Your question is when could I do that?
20  Q.  When could you provide us with a copy of that
21     deposition transcript involving the other
22     rental company in which you've been involved?
23  A.  Well, I'm not sure when I'm going to get out of

Page 290

```
 1      Alabama.  No, I'm kidding.  Let's see, what's
 2   today?  Friday?
 3   Q.   Yes, sir.
 4   A.   I could probably do that by Tuesday,
 5   electronically at least.
 6   Q.   All right, sir.  Could you provide that to
 7   Mr. Lane?
 8   A.   Yes, sir.  And I probably should make myself a
 9   list.
10   Q.   Why don't we make that as Exhibit Number 60?
11        (Exhibit 60 marked for identification.)
12   Q.   And, I'm sorry, sir, Exhibit Number 60 to your
13   deposition will be the deposition transcript,
14   and if you will, put the style of the case
15   there so we will know --
16   A.   (Witness complies.)
17   Q.   -- what Exhibit Number 60 is going to be to
18   your deposition?
19        MR. LANE:  This is to the extent that
20           such transcript is available, that
21           would be my objection to the place
22           marker for Exhibit Number 60.
23   A.   I'm putting the caveat in here providing we can
```

Page 291

```
 1   find it, we will provide it.  If we can't find
 2   it, we can't provide it.
 3   Q.   Where was the deposition taken, sir?
 4   A.   I don't recall that.
 5   Q.   And when was it taken?
 6   A.   I don't recall that, but it's been probably --
 7   probably four years.  It's been sometime ago.
 8   Q.   And who were the lawyers involved in that
 9   deposition?
10   A.   That's where we started; I don't recall that.
11   Q.   And what was the style of the case, sir?
12   A.   It's captioned Michael T. Mabry, M-A-B-R-Y,
13   versus Bohola, B-O-H-O-L-A, Enterprises, Inc.,
14   d/b/a American Rental Centers.
15   Q.   And the case number?
16   A.   My case file number is 20128.
17   Q.   And the style in the Court there in Spartanburg
18   is what?
19   A.   The what?
20   Q.   The CV number or the case number?
21   A.   Oh, I don't know that.
22        MR. LANE:  He just read off what he's
23           got here.  I'll tell you again,
```

Page 292

```
 1      Michael T. Mabry versus Bohola
 2   Enterprises, Inc., d/b/a American
 3   Rental Centers.  He's already read
 4   that once.
 5   A.   I don't have the CV number.  If such a number
 6   is on it, I don't know what it is.
 7   Q.   Let me ask you this; what do you believe the
 8   purpose of a disclosure in Federal Court to be
 9   other than in order to be able to identify the
10   case if you don't provide a case number?
11        MR. LANE:  Object to the form.  It has
12           absolutely nothing to do with this
13           guy's reason for being here today.
14   Q.   Do you understand the requirements of the
15   Federal Court with respect to cases that you've
16   been involved in?
17        MR. LANE:  Object to the form.
18   A.   I have no legal training, if that's what you
19   mean.
20   Q.   Okay.  Have you ever read the rule to see what
21   is required?
22   A.   I don't know that I have.  I don't think I
23   have.
```

Page 293

```
 1        MR. SHEEHAN:  Joe, are you objecting to
 2           him providing information
 3           sufficient for us to be able to
 4           obtain the deposition transcript
 5           in that particular proceeding?
 6        MR. LANE:  If he wants to provide it, I
 7           am not going to tell him not to.
 8           I'm not objecting to him providing
 9           it.  I'm just saying I don't think
10           he has to go beyond -- this may be
11           within that -- the Federal rules,
12           I don't know, but to the extent
13           it's outside of it, I don't think
14           he's required to produce it.  To
15           the extent he said he would
16           produce it, I have no problem with
17           it, if it's available.
18   A.   Maybe this will clear that up.  This case has
19   not gone to trial, so it may have a CV number,
20   is that what you call it?
21   Q.   It would have a case number where it would be
22   filed in a particular court where it would
23   identify the attorneys involved in the
```

Page 294

1    litigation.
2  A.    Maybe it would.  You know, I'm not real
3        familiar with that process, but it reached the
4        stage of a deposition at least.  If by that
5        stage you have done that, then it probably
6        exists that way.
7  Q.    Okay.  I guess what I'm asking you to do is to
8        identify enough information so we can contact
9        the attorneys in the event you're not able to
10       provide us with the deposition transcript?
11 A.    I see.  Okay.
12 Q.    Would you do that, sir?
13 A.    I will do that to the best of my ability.
14 Q.    When was the deposition taken, sir?
15 A.    Where?
16 Q.    When?
17 A.    I don't know, but I would -- you know, based on
18       my lack of recollection of it, it was probably
19       early on this list.  Probably four years ago,
20       because the oldest on that list is four years
21       old.  So it's probably in that four year range.
22 Q.    Okay.
23            MR. LANE:  And, Winston, let me just be

Page 295

1            clear, if this is within -- if
2            this is within those cases, I have
3            no problem with him producing
4            everything he has got.  I don't
5            have any problem with him
6            producing everything he's got
7            anyway, but my point is I just
8            want --
9  Q.    We just want enough information so we can
10       identify the attorneys in the event you're not
11       going to produce the transcript.
12 A.    Okay.  That's fair.  But I think you indicated
13       maybe a reluctance to pay for the copies --
14 Q.    No, sir.
15 A.    -- because you thought I should bring it today?
16 Q.    No, sir.  I had no reluctance to --
17 A.    Okay.
18 Q.    As a matter of fact, I owe you 50 dollars for
19       the deposition transcript you brought today.
20 A.    No, you don't, because we waived that because
21       it was not very big.
22 Q.    Okay.  But I would be glad to reimburse you a
23       reasonable expense for copying the transcript.

Page 296

1  A.    That was not a big expense on our part.
2            MR. LANE:  Just give it to me though,
3            Winston, and I'll do something
4            with it.
5  A.    We waived that.
6  Q.    I apparently was told by Mr. Lane that I was
7        going to have to pay 50 dollars for the
8        transcript and that's why I -- and I will be
9        glad to pay that.
10 A.    We told him that, but my secretary has told me
11       it wasn't a big deal, so don't worry about it.
12 Q.    Well, again, I would represent to you that I
13       will be glad to reimburse you.
14 A.    That's not necessary.  Now, that's not to say
15       I'm not going to charge you for the other one,
16       because I don't know how much work it's going
17       to take.
18 Q.    All right, sir.  As long as it's reasonable, I
19       have no problem.
20 A.    Sure.
21 Q.    And if you feel it's unreasonable, if you will
22       let Mr. Lane know so that --
23 A.    Okay.

Page 297

1            (Off-the-record discussion.)
2            MR. SHEEHAN:  I appreciate your time.
3            Thank you.
4  A.    Yes, sir.
5            FURTHER DEPONENT SAITH NOT
6
7                  * * * * *
8
9            REPORTER'S CERTIFICATE
10
11 STATE OF ALABAMA
12 COUNTY OF MONTGOMERY
13       I, Ricky L. Tyler, Certified Court
14 Reporter and Notary Public in and for the State of
15 Alabama at Large, do hereby certify that on Friday,
16 November 10th, 2006, pursuant to notice and
17 stipulation on behalf of the Defendants, I reported
18 the deposition of ROGER E. DAVIS, who was first duly
19 sworn by me to speak the truth, in the matter of
20 MATTHEW RILEY, Plaintiff, vs. UNITED RENTALS (NORTH
21 AMERICA), INC., et al., Defendants, Civil Action
22 Number 1:05 CV-994-T, now pending in the United
23 States District Court for the Middle District of

Page 298

1   Alabama, Southern Division, that the foregoing 297
2   computer-printed pages contain a true and accurate
3   transcription of the examination of said witness by
4   counsel for the parties set out herein; that the
5   reading and signing of said deposition was waived by
6   witness and counsel for the parties.
7        I further certify that I am neither of kin
8   nor of counsel to the parties to said cause, nor in
9   any manner interested in the results thereof.
10       This 15th day of November, 2006.
11
12
13
14
15
          Ricky L. Tyler
16        Certified Court Reporter
          and Notary Public
17        State of Alabama at Large
18
19
20
21
22
23